**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SOUTHWESTERN PAYROLL SERVICE, INC.

        *Plaintiff,*

   *v.*

PIONEER BANCORP INC.; PIONEER BANK;
MICHAEL T. MANN; VALUEWISE CORPORATION
d/b/a APOGEE d/b/a OPTIX CONSULTING, and d/b/a
PRIMACY SEARCH GROUP; MYPAYROLLHR.COM,
LLC; CLOUD PAYROLL LLC; ROSS PERSONNEL
CONSULTANTS, INC., ALWAYS LIVE HOLDINGS,
LLC; KANINGO, LLC; HIRE FLUX, LLC; HIRE FLUX
HOLDINGS, LLC; VIVERANT LLC and HEUTMAKER
BUSINESS ADVISORS, LLC,

        *Defendants*

_____

NATIONAL PAYMENT CORPORATION,

        *Intervenor-Plaintiff,*

   *v.*

PIONEER BANCORP INC.; PIONEER BANK;
MICHAEL T. MANN; VALUEWISE CORPORATION;
MYPAYROLLHR.COM, LLC; CLOUD PAYROLL LLC;
ROSS PERSONNEL CONSULTANTS, INC., ALWAYS
LIVE HOLDINGS, LLC; KANINGO, LLC; HIRE FLUX,
LLC; HIRE FLUX HOLDINGS, LLC; VIVERANT LLC;
and HEUTMAKER BUSINESS ADVISORS, LLC,

        *Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Case No. 1:19-cv-1349 (FJS/CFH)

**AMENDED COMPLAINT**

      National Payment Corporation ("NatPay"), by and through its undersigned attorneys, as

and for its Amended Complaint against the Defendants Pioneer Bancorp Inc. and Pioneer Bank

(collectively, "Pioneer"), Michael T. Mann, ValueWise Corporation ("Valuewise"),

MyPayrollHR.com, LLC ("MyPayroll"), Cloud Payroll LLC ("Cloud Payroll"), Ross Personnel Consultants, Inc. ("Ross"), Always Live Holdings, LLC, Kanigo, LLC, Hire Flux, LLC, Hire Flux Holdings, LLC, Viverant LLC, and Heutmaker Business Advisors, LLC, hereby alleges as follows:

## **INTRODUCTION**

1.      By this action, NatPay seeks an order declaring that Pioneer has no right to retain and must disgorge at least sixteen million dollars in tax funds paid by thousands of employers across the United States and owed to the IRS and other taxing authorities, and that Pioneer, not NatPay, is liable to those employers and other third parties for the damages caused by Pioneer's unlawful actions.

2.      Pioneer has outright admitted that it grabbed millions of dollars in third-party tax payments from MyPayroll and Cloud Payroll bank accounts controlled by Michael Mann, a convicted fraudster.  Pioneer's rationale changes to suit its needs, but for purposes of this litigation Pioneer maintains that it helped itself to the third-party tax funds to cover $15,588,000 in overdrafts that occurred in Pioneer bank accounts held by other entities owned or controlled by Mann.  However, Pioneer had no right to set off funds in any MyPayroll and Cloud Payroll accounts because, among other reasons, none of those accounts were overdrawn.

3.      But that is not the extent of Pioneer's wrongful conduct.  Pioneer also intentionally diverted $2.8 million in third-party tax funds from a Cloud Payroll account to a number of other accounts controlled by Mann and ultimately to pay down the balance on a $42 million loan extended to Valuewise, Mann's consulting business.  Notably, Pioneer diverted the funds after it had purportedly "frozen" the bank accounts controlled by Mann and also manipulated its records to make it appear as though the loan payment had been made by Mann several days earlier.

4.    There can be no legitimate dispute that nearly all the money swiped by Pioneer and used to pay down the Valuewise loan are in fact third-party tax funds.  Pioneer insists it is entitled to keep millions of dollars that it knows to belong to thousands of employers across the country because the MyPayroll and Cloud Payroll accounts that were used to house the funds were opened by Pioneer as general depository accounts, not trust accounts, and Pioneer employees were somehow oblivious to the open and unmistakable fact that Mann had been using the accounts to process billions of dollars in third-party payroll and tax payments for years.  This is utter nonsense.

5.    Putting aside that any honest bank would nonetheless release the funds immediately upon learning that they were payroll and tax monies paid by thousands of innocent employers, Pioneer's position is flatly contradicted by its own records.  Pioneer opened the MyPayroll and Cloud Payroll accounts knowing that they would be used to house and process third-party payroll and taxes.  Thereafter, on a near-daily basis Pioneer employees assisted Mann in processing payroll and tax payments from his accounts.

6.    Moreover, Pioneer's ignorance defense is predicated on a flagrant dereliction of Pioneer's obligations under federal and state law.  If Pioneer officers and employees were truly unaware that MyPayroll and Cloud Payroll were processing billions of third-party payroll and tax dollars through their Pioneer bank accounts, then Pioneer should surrender its banking license for its deliberate ignorance and intentional disregard of federal and state regulatory requirements, including but not limited to the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311 *et seq*., and related anti-money laundering laws and regulations.

7.    Mann has admitted that from about 2013 through September 2019, he engaged in a fraudulent scheme to deceive banks and financing companies into loaning his companies millions of dollars.  Because he could not repay the loans with legitimate business revenues, he diverted

millions of dollars in payroll and tax payments that were entrusted to his payroll companies by employers across the country.  Mann also engaged in a kiting scheme, using checks, wire transfers, and the Automated Clearing House ("ACH") system to rapidly transfer millions of dollars among various accounts he controlled at Pioneer and Bank of America in order to give the appearance of business far in excess of reality.

8.      On August 12, 2020, Mann pled guilty to federal charges of bank fraud, wire fraud, identity theft, and filing false tax records.  On August 25, 2020, Mann pled guilty to one count of money laundering under New York State law in Saratoga County Court.  On August 4, 2021, Mann was sentenced to twelve years in federal prison and eight to twenty-eight years in state prison.

9.      By August 2019, Mann was Pioneer's largest loan customer and the thirty-four accounts he controlled at Pioneer represented the highest volume of deposit activity of any customer.  Mann had a dedicated team of executives and customer service representatives at Pioneer that catered to his every whim on a near-daily basis.  When Mann requested additional lending, that new accounts be opened, or myriad other privileges, Pioneer gave him whatever he requested, and the due diligence Pioneer was required to exercise pursuant to applicable law and its own policies was utterly non-existent.  Mann's money laundering and check kiting activities were continuous, obvious, and could not have occurred but for Pioneer's collusion and deliberate ignorance.

10.      Indeed, according to Pioneer's records, the Federal Deposit Insurance Corporation ("FDIC") conducted a Safety and Soundness Exam in December 2019 and concluded that Pioneer's BSA compliance program was "fundamentally and materially" deficient, and required Pioneer to enter into a Memorandum of Understanding to correct the deficiencies.

11.     In November 2013, Pioneer and Mann agreed that Mann would open a MyPayroll "Client Account" at Pioneer for the purpose of housing third-party tax funds.  Mann had discussions with his relationship manager at Pioneer, David Blessing (Vice President, Commercial Services) both before and after the MyPayroll account ending in 0212 ("0212 Client Account") was opened, and Pioneer employees provided Mann with information necessary to set up the account for payroll tax processing.

12.     From December 17, 2013 through the end of the month, there were 190 deposits to the 0212 Client Account totaling over $5 million.  Just one year later, in the month of December 2014, there were over 1,500 transactions in the 0212 Client Account, with over $14 million in third-party funds flowing in and out of the account in that month alone.  In December 2018, there were nearly 15,000 transactions in the 0212 Client Account, with over $216 million in third-party funds flowing through the account.  This volume of activity is consistent with very few businesses other than payroll companies, and would be highly suspicious for a payroll company with annual revenues of less than $10 million.  Indeed, the annual revenues of all the Mann-controlled entities combined in 2018 was only about $175 million.

13.     Ultimately, Mann decided to segregate third-party tax funds in a new account separate from payroll and payroll related funds.  In February 2019, Pioneer and Mann agreed that Mann would open an account for Cloud Payroll ending in 2440 ("2440 Tax Account"), specifically for the purpose of housing third-party employer tax/treasury payments to the IRS and other taxing jurisdictions.  In May 2019, there were 10,000 transactions in the 2440 Tax Account, with over $107 million flowing in and out of the account that month.

14.     From December 2013 through August 30, 2019, billions and billions of dollars consisting of third-party payroll and tax payments flowed through the 0212 Client Account and

the 2440 Tax Account at Pioneer, resulting in significant fees for Pioneer and substantial bonuses paid to Blessing.

15.     It was no secret at Pioneer that the 0212 Client Account and 2440 Tax Account were used to house and process payroll and tax funds.  Almost daily Pioneer employees assisted Mann with the processing of third-party payroll and taxes by, among other things, wiring tax payments to the IRS and other taxing authorities, providing MyPayroll or Cloud Payroll with copies of checks made payable from MyPayroll or Cloud Payroll accounts to the IRS and other taxing authorities or to employees, and originating or confirming ACH payments to the IRS and other taxing authorities, employers, and employees.

16.     In addition, Pioneer's BSA department personnel, including Pioneer's chief BSA compliance officer, routinely reviewed monthly transactions in the 0212 Client Account and the 2440 Tax Account, often after excessive activity triggered suspicious activity alerts.  Without exception, the BSA department sanctioned the activity as consistent with the transactional activity of a payroll company.  The BSA department's conclusions were accepted by Pioneer's SAR Committee, which consisted of several of the bank's senior officers.

17.     While Pioneer's intentional theft and retention of third-party payroll and tax funds is egregious, discovery in this case has revealed that it was the culmination of years of complicity with Mann's money laundering scheme.  Pioneer's own records establish that Pioneer employees were aware of and encouraged Mann's illegal diversion of third-party payroll and tax funds to cover overdrafts and negative balances in other Mann-controlled accounts at Pioneer.

18.     Beginning in 2014, accounts controlled by Mann were routinely overdrawn by substantial amounts.  At times, these overdrafts occurred on a near-daily basis and often reached multi-million-dollar amounts as Mann continually wrote bad checks.  Mann and Pioneer agreed

that Mann would temporarily divert third-party payroll and tax funds to cover these overdrafts. David Blessing instructed Mann to "move the money," while others at Pioneer reviewed the overdrawn account(s) to ensure that Mann had, in fact, moved funds from the 0212 Client Account or the 2440 Tax Account to the overdrawn account(s).   Pioneer usually rewarded Mann for his covering efforts by waiving any overdraft fees that are routinely charged against other bank customers.

19.     Pioneer's records also show that, in addition to Blessing, Pioneer senior officers, including Tom Amell (President, Chief Executive Officer), Frank C. Sarratori (Executive VP, General Counsel, and Chief Administrator), and Joseph Fleming (Senior VP and Chief Lending Officer), were aware of and approved Mann's practice of diverting third-party payroll and tax funds to cover overdrafts in other Mann-controlled accounts.

20.     Pioneer senior officers knew that Mann's diversion of the payroll and tax funds in this manner was unlawful, as they were fully familiar with MyPayroll and Cloud Payroll's operations and obligations to their employer-clients.   These senior officers not only sanctioned Mann's money laundering activities, they also approved year-over-year increases in the Valuewise loan, notwithstanding frequent and suspicious overdrafts in the accounts Mann controlled.

21.     Pioneer also facilitated Mann's kiting activities, which came to a crashing halt when Bank of America froze the accounts Mann controlled there on August 30, 2019.

22.     Mann has admitted, and Pioneer's records clearly show, that beginning no later than January 2019, Mann used checks, wire transfers, and the ACH system to transfer millions of dollars among various accounts held at Pioneer and Bank of America in furtherance of his fraud and money laundering schemes.

23.     By May 2019, at Mann's request and without any questions asked, Pioneer had extended remote deposit capture ("RDC") access to 18 accounts Mann controlled at Pioneer Bank. RDC access is typically granted for the convenience of customers as it allows them to deposit checks remotely and thus avoid a trip to the bank.  Usually a customer would not have access to the deposited funds until the checks cleared.  However, Pioneer gave Mann instant access to the deposited funds and allowed him to deposit (and then instantly withdraw) up to $1.3 million per day in each of 17 accounts.  Mann was thus able to circumvent the usual restrictions on access to funds deposited by check and had immediate access to up to $22.1 million *per day*.

24.     As a result, Mann was able to kite dozens of checks totaling more than $15 million on a near-daily basis between accounts held at Bank of America and Pioneer, which often caused substantial overdrafts in the Pioneer accounts.  Indeed, on June 17, 2019, one Pioneer employee remarked in an email to two of her co-workers that the accounts controlled by Mann "are perpetually over a million dollars negative during the day but seem to always become positive at night."

25.     To the outside world Mann's kiting made his accounts look larger and his businesses appear more active than they really were.  The puffed-up numbers gave the illusion that the Mann's consulting companies were large, successful Pioneer customers.  In July 2019, bolstered by the purported activity of its largest customer, Pioneer reorganized from a mutual savings bank to a mutual holding company and completed its initial public offering of stock to the public.

26.     On August 29, 2019, Mann deposited 36 checks written from accounts he controlled at Bank of America totaling $15,588,000 into twelve accounts he controlled at Pioneer. Rather than waiting until the checks cleared, Pioneer instantly credited the twelve accounts with

100% of the funds.  This enabled Mann to write 39 checks totaling $18,043,000 from those twelve accounts back to the accounts at Bank of America.  Pioneer immediately paid Bank of America $18,043,000, which included most of the $15,588,000 credit extended by Pioneer.

27.     When Bank of America froze accounts controlled by Mann on August 30, 2019, it also refused to pay the 36 Bank of America checks totaling $15,588,000.  This caused twelve Mann-controlled accounts at Pioneer Bank to be overdrawn.  None of the twelve overdrawn accounts were held by MyPayroll or Cloud Payroll.

28.     Significantly, at the time Bank of America returned the checks on August 30, 2019, the outstanding balance on the Valuewise loan had risen to nearly $39 million in the eighteen days following August 12, 2019, when the loan limit was increased by $10 million to $42 million.  Between the overdrafts and its share of risk on the Valuewise loan, Pioneer was facing potential losses of over $31 million.  Thus, Pioneer's executive team was desperate to recover any funds it could from any available source.

29.     At about 4:30 p.m. on August 30, 2019, Joseph Fleming contacted Mann and they agreed that, consistent with past practices, the third-party payroll and tax funds would be used to cover Mann's debts and Pioneer's potential losses.  They further agreed that Mann would no longer have access to any bank accounts at Pioneer, and that Pioneer would not permit any withdrawals from the accounts but would allow deposits, thus ensnaring the third-party tax and payroll funds that would continue to accumulate in the 0212 Client Account and 2440 Tax Account.  They agreed that Mann would not disclose their plan to any third parties.

30.     Pioneer then implemented a "partial" freeze of the Mann-controlled accounts.  Pioneer halted all posting of any transactions in the Mann-controlled accounts on August 30, 2019, and spent the next several days analyzing all credits/deposits to, and debits/withdrawals from,

those accounts.  Among the transactions scheduled for August 30, 2019 were over 700 ACH credits/deposits to the 2440 Tax Account totaling over $6 million in third-party tax funds. Pioneer's records establish that each credit entry was identified as "TAX COL" and included the name of the third-party employer that had paid the tax funds.

31.     On September 3, 2019, Pioneer posted all suspended August 30 and September 3 credits/deposits to the Mann-controlled accounts as of September 3, 2019.  The 2440 Tax Account had a positive balance of $8,883,528.54 by end of day September 3, 2019.

32.     Pioneer waited until the last possible moment to return (reject) any ACH debits/withdrawals to the Mann-controlled accounts, thus ensuring that NatPay and others would not and could not know that Pioneer was blocking withdrawals yet allowing deposits until the morning of September 4, 2019, which was too late to stop any ACH credits/deposits to the accounts previously sent or scheduled that day.

33.     Also on September 3, 2019, Pioneer senior executives received an email from Mann indicating that there was approximately $1.9 million in the "tax account" and more would be coming in the next day.  Mann also indicated in his email that he believed he had diverted about $3 million from the "tax account" to pay down the Valuewise loan on August 30, 2019.

34.     On September 4, 2019, Pioneer senior executives met with Mann and his attorney for the better part of the day.  Mann wanted Pioneer to release the third-party funds in the MyPayroll and Cloud Payroll accounts, otherwise the payroll companies would be destroyed. Mann testified under oath that he and his attorney specifically discussed with Pioneer's outside counsel Mann's payroll businesses, the fact that they processed both payroll and taxes, and the fact that payroll and tax funds were housed at Pioneer Bank.  Mann conveyed to Pioneer's attorney

that it was important to release the funds because otherwise the payroll companies would be worthless.

35.    Nonetheless, Pioneer refused to release any funds unless Bank of America agreed to pay the 36 checks totaling $15,588,000 deposited in the Mann-controlled accounts at Pioneer. Pioneer's executive team cared only about Pioneer's bottom line and covering its losses, and undoubtedly calculated that its victims—mostly small businesses scattered throughout the country—lacked the time and money to recover their payroll and tax funds.

36.    Ultimately, Pioneer and Mann agreed that, notwithstanding the immense harm it would cause thousands of employers and employees, some of whom were Pioneer's own customers, Pioneer would seize the third-party payroll and tax monies in the MyPayroll and Cloud Payroll accounts to offset Pioneer's potential losses.

37.    Pioneer and Mann also agreed that Pioneer would divert at least $2.8 million in third-party tax funds deposited in the 2440 Tax Account to pay down the Valuewise loan, and Pioneer would manipulate the dates on which transactions were posted to make it appear as though Mann had made this payment on August 30, 2019.

38.    By end of the day September 4, 2019, the 2440 Tax Account should have had a positive balance of $10,628,738.17.  However, through a series of highly suspect transactions, Pioneer not only emptied the 2440 Tax Account but intentionally caused the account to have a negative balance.

39.    At 6:30 p.m. on September 4, 2019, Pioneer transferred $6,845,944.84 from the 2440 Tax Account to Pioneer's own general ledger account.  For purposes of this litigation, Pioneer alleges that it set off these funds to cover overdrafts in other accounts controlled by Mann, even though it had no right to do so under any governing account agreements or New York law.

11

40.     Pioneer also posted six transfers totaling $6,845,000 from the 2440 Tax Account to the 0212 Client Account, and used $2.8 million of those funds to pay down the Valuewise loan.

41.     Specifically, Pioneer transferred $2.8 million from the 0212 Client Account to an account held by Defendant Weitz and Associates ("Weitz Account"), then transferred the funds from the Weitz Account to a Valuewise account ending in 3614 ("Valuewise 3614 Account"), and from there used the funds to reduce the balance on the Valuewise loan.

42.     Pioneer manipulated the posting of these transactions by backdating certain of them in an effort to conceal its wrongdoing.  Pioneer posted the debit/withdrawal of tax funds from the 2440 Tax Account as of September 4, 2019, but posted the credits/deposits of those same funds to the 0212 Client Account and the subsequent transfers to the Weitz Account and Valuewise 3614 Account as of September 3, 2019.  And while Pioneer posted the debit/withdrawal of the tax funds from the Valuewise 3614 Account as of September 3, 2019, it posted the payment of those funds to the Valuewise loan account as of August 30, 2019.

43.     Thus, according to Pioneer's records, the $2.8 million in third-party tax funds Pioneer diverted from the 2440 Tax Account on September 4, 2019 moved *backwards in time* to pay down the Valuewise loan on August 30, 2019.

44.     During this time, Pioneer endeavored to keep the other participants in the Valuewise loan, Berkshire Bank ("Berkshire") and Chemung Canal Trust Company ("Chemung"), in the dark concerning any issues with Mann.  On September 3, 2019, Pioneer provided Berkshire and Chemung with remittance advice indicating that Mann had made a $3.2 million payment on the Valuewise loan on August 30, 2019, notwithstanding that the Mann-controlled accounts were "frozen," and all transactions suspended on August 30, 2019.

12

45.     From September 4 until September 9, 2019, Pioneer officers ignored repeated and increasingly anxious inquiries from Berkshire and Chemung representatives regarding the public controversy surrounding Mann.   When Pioneer executives finally met with Berkshire and Chemung representatives, they concealed the fact that Pioneer had diverted more than $15 million from accounts controlled by Mann to Pioneer's general ledger account, and had applied at least $2.8 million in third-party tax funds taken from the 2440 Tax Account to make the August 30, 2019 payment on the Valuewise loan.   To date, it is unclear whether Berkshire and Chemung are aware that they received stolen property from Pioneer.

46.     In furtherance of its money laundering scheme, Pioneer also deceived many third-party employers, including both large and small companies, libraries, and other not-for-profits, that inquired about their payroll or tax funds "frozen" in accounts at Pioneer.   In letters and emails, Pioneer's General Counsel Frank Sarratori misleadingly claimed that Pioneer never provided "payroll services, ACH tax wiring services, tax filing services or other payroll related services" to MyPayroll or Cloud Payroll, when, in fact, Pioneer had routinely provided such services.   Sarratori also failed to disclose that Pioneer had seized the very funds these companies were trying to locate. Instead, he instructed that any inquiries should be directed to MyPayroll and Cloud Payroll, knowing full well that those entities were shuttered as a result of Pioneer's illegal actions.

47.     Pioneer's selective return of debit/withdrawal entries violated the rules governing the ACH system that are enforced by the National Automated Clearing House Association ("NACHA"), the not-for-profit association that oversees the ACH system.   In returning the entries, Pioneer used a return code indicating that the accounts were frozen.   However, NACHA rules prohibit the use of that code when a bank selectively returns entries as Pioneer had done, *i.e.*, accepting credits/deposits but rejecting debits/withdrawals.

48.     In response to a complaint filed with NACHA on behalf of NatPay, Pioneer abandoned its initial defective defense and instead falsely claimed that, at the time it returned the debit entries initiated by NatPay for payment of the tax funds to various taxing authorities, "there were no funds available [to] cover the dollar value of the debit entry" in the 2440 Tax Account. To the contrary, when Pioneer returned the debit entries at the end of the day on September 3, 2019, there was over $8 million in the 2440 Tax Account.  Thus, there was plenty of money in the account to cover all the debit entries initiated by NatPay.  As a result of this and other lies, NACHA concluded that a violation of the rules did "not appear to have occurred."

49.     There is no question that Mann's conduct was egregious, but it was Pioneer that aided and abetted him for years and then knowingly caused the collapse of MyPayroll and Cloud Payroll and the resulting harm to thousands of employers and employees throughout the country. Even today, Pioneer chooses to pay its team of lawyers millions of dollars to pursue frivolous defenses rather than forfeit the third-party funds for return to Mann's true victims.

50.     As a direct result of Pioneer's intentional misconduct, NatPay has incurred at least $3.8 million in damages and was required to bring this action in order to appease MyPayroll and Cloud Payroll clients threatening to bring suit against it.

51.     While federal and state authorities have investigated Mann's misconduct, it is unclear whether these authorities have investigated Pioneer's role in his money laundering scheme or Pioneer's diversion and conversion of third-party payroll and tax funds. Even if such investigations have occurred, on information and belief, Pioneer has misrepresented facts and concealed relevant records, emails, and other information that refute its frivolous defenses to NatPay's claims.

52.     For example, in a letter to the Securities Exchange Commission filed September 29, 2020, Pioneer falsely claimed, among other things, that it had an "express policy" against customers using their accounts to process payroll (it doesn't), that Mann "lied" to Pioneer regarding the nature of use of the funds in the MyPayroll and Cloud Payroll accounts (he didn't), that Pioneer did not know the MyPayroll and Cloud Payroll accounts were used to process third-party payroll and tax payments (Pioneer knew), and that Pioneer had a right to set off the third-party funds under its agreements and New York State law (it didn't).  Conspicuously absent from Pioneer's fictional account of events is the fact that Pioneer knowingly diverted $2.8 million in third-party tax funds to reduce the balance on the Valuewise loan, among other facts noted above.

53.     Pioneer also represented to the SEC that there were no "red flags" in the accounts controlled by Mann before August 30, 2019.  However, by no later than May 2019, there were sufficient "red flags" in the accounts controlled by Mann to set a bank regulator's hair on fire.  In additional to the near-daily six- and seven-figure overdrafts, the transactions in nearly half of the thirty-four Mann-controlled accounts consisted exclusively of six- and seven-figure, round-dollar mobile deposits and same-day withdrawals, usually by check, with tens of millions of dollars moving daily between Mann-controlled accounts.

54.     Pioneer should disgorge the third-party payroll and tax funds it knowingly converted and make whole its many victims, including NatPay.

## PARTIES

55.     NatPay is a Florida corporation with a principal place of business located at 3415 W. Cypress Street, Tampa, Florida 33607-5007.

56.     On information and belief, Defendant Pioneer Bancorp, Inc. is a foreign bank, incorporated in Maryland, with its principal place of business in Albany, New York.

57.     On information and belief, Defendant Pioneer Bank is a stock bank organized and existing under the laws of the State of New York having an address at 652 Albany Shaker Road, Albany, New York 12180-3999.

58.     On information and belief, Defendant Michael T. Mann is a citizen of the State of New York residing in Edinburg, New York.

59.     On information and belief, Defendant Valuewise Corporation d/b/a Apogee d/b/a Optix Consulting d/b/a Primacy Search Group is a Delaware corporation, with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065.

60.     On information and belief, Defendant MyPayroll is a Massachusetts limited liability company, with its principal place of business located at 855 Route 146, Suite 220 and/or 240 in Clifton Park, New York.

61.     On information and belief, Defendant Cloud Payroll is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065.

62.     On information and belief, Defendant Ross Personnel Consultants, Inc ("Ross") is a Connecticut corporation with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065.

63.     On information and belief, Defendant Always Live Holdings, LLC ("ALH") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065.

64.     On information and belief, Defendant Kanigo, LLC ("Kanigo") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065.

65.     On information and belief, Defendant Hire Flux, LLC ("Hire Flux") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065.

66.     On information and belief, Defendant Hire Flux Holdings, LLC ("HFH") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065.

67.     On information and belief, Defendant Viverant LLC ("Viverant") is a New York limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065.

68.     On information and belief, Defendant Heutmaker Business Advisors, LLC ("HBA") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065.

69.     On information and belief, during the relevant period, Mann controlled and/or owned or partially owned Valuewise, MyPayroll, Cloud Payroll, Ross, ALH, Kanigo, Hire Flux, HFH, Viverant, and HBA (collectively, the "Entity Defendants").

70.     On information and belief, during the relevant period, Mann also partially owned ProData Payroll Services, Inc. ("ProData") and Southwestern Payroll Services, Inc. ("SWP"), two legitimate payroll service bureaus that were victimized by Mann and Pioneer.

71.     On information and belief, during the relevant period, Mann also controlled and/or owned or partially owned Create Force LLC, FocalPointe Group LLC, Lincoln Academy LLC, TrueConsulting Corp., TrueHR LLC, and Weitz and Associates (collectively with the Entity Defendants, ProData and SWP, the "Mann Entities").

## JURISDICTION AND VENUE

72.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because this is an action between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

73.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2201 *et seq.* because an actual case or controversy exists between the parties, as is evidenced by the facts and circumstances described herein.

74.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 because NatPay asserts claims pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*.

75.     Venue is proper in the United States District Court, Northern District of New York pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are residents of this Judicial District for such purposes.  Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to NatPay's claims occurred in this Judicial District.

## FACTUAL ALLEGATIONS

**NatPay – Relevant Background**

76.     NatPay has been a third-party ACH service provider since its inception in 1991. NatPay provides ACH transfer services to a nationwide clientele, including companies who calculate and prepare payroll and payroll-related taxes.

77.     The ACH Network is an electronic-funds system run by the NACHA, a not-for-profit association that administers and facilitates operating rules for ACH payments, which define the roles and responsibilities of ACH Network participants ("Operating Rules").

78.     An ACH payment or transfer is the electronic movement of money between banks through the ACH network.  Only depositary financial institutions may transmit entries through the ACH System.

79.     ACH transactions are initiated by the electronic transmission of debit or credit entries through the ACH system.  An ACH debit transaction involves funds being pulled or withdrawn from an account, whereas an ACH credit transaction involves funds being pushed or deposited in an account.

80.     While the movement of money via ACH is often thought of as instantaneous, it usually moves over a period of days, with various rules that determine the settlement process and the circumstances under which a bank can reject an ACH transaction, *i.e.*, to refuse to settle or reject the entry.

81.     In the payroll and payroll tax payment context, ACH debit and credit entries are usually initiated the day before the settlement or effective date.

82.     Under the ACH Operating Rules, banks usually have up to two days to reject an ACH entry for a commercial entity; however, in practice if a bank is going to issue a return it usually does so within one day of receiving a debit, particularly if an account is frozen or there are insufficient funds in the account to cover the debit.

**NatPay's Contractual Relationship with Cloud Payroll**

83.     NatPay provided ACH data processing services for tax collection and tax payment to Cloud Payroll beginning in 2017.

84.     Cloud Payroll contracted with NatPay to provide ACH data processing services for the payment of taxes via ACH to the employer-clients of Cloud Payroll, MyPayroll, ProData, and SWP (collectively, the "Third-Party Employers").  The Third-Party Employers authorized

NatPay to provide these services in their contracts with Cloud Payroll, MyPayroll, ProData, and SWP.

85.     From October 2017 through February 2019, Cloud Payroll's tax settlement account was the 0212 Client Account.  Beginning in March 2019, Cloud Payroll used the 2440 Tax Account for tax settlement purposes.

86.     Based on electronic instructions provided by Cloud Payroll, NatPay managed the electronic data processing necessary to effectuate the transfer of tax monies, through the ACH system in a series of ACH entries, from the Third-Party Employer bank accounts ultimately to the various taxing authorities across the United States, including the IRS, to pay taxes due.

87.     Under the ACH Operating Rules requiring that each step in the ACH process pass through a depositary financial institution, NatPay could not direct the transfer of funds directly from the Third-Party Employers' bank accounts to the various taxing authorities' bank accounts. Rather, each transaction had to involve either a debit or credit of NatPay's settlement account at First Premier Bank ("First Premier"), located in Sioux Falls, South Dakota, which serves as NatPay's depository financial institution for transmitting entries through the ACH system.

88.     In addition, based on the instructions provided by Cloud Payroll, and because employers usually pay taxes before they are due, NatPay was required to effectuate the deposit of any tax funds collected from the Third-Party Employer accounts into the 0212 Client Account or 2440 Tax Account at Pioneer.

89.     NatPay would similarly receive instructions from Cloud Payroll to effectuate the withdrawal of tax funds from the 0212 Client Account or 2440 Tax Account and the payment of such funds to the IRS or other taxing authorities.

90.     Thus, the transfer of tax funds from employers' accounts to the taxing authorities' accounts was accomplished through a series of transactions involving the debiting and crediting of various accounts, and occurred over a series of days, weeks, or even months, depending on when the tax payments were due.

91.     To complete this transfer, the tax funds were first moved from the Third-Party Employers' accounts through NatPay's account at First Premier to the 0212 Client Account or 2440 Tax Account at Pioneer.  When the tax funds were due for payment, they would travel back through NatPay's First Premier account to the accounts of the appropriate taxing authorities.  The timing of outgoing tax payments was determined by Cloud Payroll, based on due dates for taxes to be paid to the appropriate taxing authorities.

92.     NatPay's account at First Premier, the 0212 Client Account, and the 2440 Tax Account were intended as pass through accounts for the tax funds, and thus served as tax settlement accounts.

93.     NatPay provided ACH processing services to Cloud Payroll for nearly two years without any issue, until Pioneer partially froze the 0212 Client Account and the 2440 Tax Account on August 30, 2019.

**Pioneer's Long-Term Relationship with Mann**

94.     In 2009, Mann was introduced to David Blessing, Vice President, Commercial Services at Pioneer Bank, who would serve as Mann's relationship partner at Pioneer Bank for the next ten years.  Over this time, the two men developed a personal relationship as well that included frequent golf outings and shared meals.  Mann frequently discussed his businesses and business opportunities with Blessing and sought his input with respect to business opportunities.

95.     On or about November 2, 2009, Pioneer extended a $2 million revolving line of credit facility to Valuewise and Ross (the "Valuewise Loan").  The Valuewise Loan was secured by a blanket lien on Valuewise's assets.

96.     Over the next decade, Mann established or purchased a number of other companies, many of which would become subsidiaries of Valuewise.  By August 2019, Mann owned or partially owned about fifteen companies and had opened a total of thirty-four bank accounts at Pioneer.  Pioneer's loan documentation referred to Valuewise as a "conglomerate with four operating divisions including human resource consulting, physical therapy, payroll services and finance and accounting consulting."

97.     Pioneer also renewed or increased the Valuewise Loan every year between 2010 and 2019, and certain of the Main Entities, including MyPayroll and Cloud Payroll, were added as co-borrowers.

98.     In June 2017, the Valuewise Loan was increased to $22 million and Pioneer also extended an additional $2.6 million term loan to Valuewise.

99.     In June 2018, the Valuewise Loan jumped up to $32 million, and Pioneer also extended a non-revolving line of credit/term loan to Viverant.

100.    On August 12, 2019, less than a month before Mann's fraudulent schemes collapsed, Pioneer once again increased the Valuewise Loan by $10 million to $42 million.

101.    Mann had frequent if not daily communications with a number of Pioneer officers and employees concerning the accounts he controlled, the Valuewise Loan, and other matters.

**Pioneer's BSA/AML Diligence and Compliance with Respect to Mann Was Nonexistent**

102.    Pioneer is required to abide by federal and state banking laws, regulations, and guidelines, including the USA Patriot Act, the BSA and related anti-money laundering ("AML") regulations.

103.    BSA/AML provisions require financial institutions, among other things, to develop (a) effective compliance programs to detect and prevent money laundering, (b) effective customer due diligence systems and monitoring programs, and (c) an effective suspicious activity monitoring and reporting process.  If suspicious activity that might signal criminal activity is detected, financial institutions are obligated to file suspicious activity reports with the U.S. Treasury's Office of Financial Crimes Enforcement Network ("FinCEN").

104.    One purpose of these requirements is to ensure that banks, which are often in the best position to identify potentially illegal activity, will closely observe the transactions taking place in their clients' accounts.  BSA/AML guidance instructs banks and other financial institutions regarding how best to achieve that goal, and what actions to take once suspicious activity is identified.  Moreover, under federal and state law, Pioneer had a duty to operate in a manner that protects the public interest, maintains public confidence in its business, and maintains the safe and sound conduct of its business.

105.    Beginning in about 2014, Pioneer failed to execute its BSA/AML compliance programs effectively, if at all, when it came to Michael Mann.  Pioneer's BSA/AML programs and systems were compromised because Mann was considered one of the most, if not the most, important Pioneer customer.  Moreover, Pioneer did not want to take any action that might cause a default on the Valuewise Loan and other loans extended to the Mann Entities.

106.    As a result, Pioneer's culture reflected one where Pioneer personnel gave Mann whatever he wanted without performing a proper investigation and due diligence, including but not limited to:  opening numerous accounts without determining the purpose of such accounts; increasing the Valuewise Loan; limiting the scope of audits; granting excessive RDC privileges; and allowing frequent, substantial overdrafts in accounts.  Moreover, Pioneer for years deliberately ignored suspicious activity clearly indicative of money laundering and kiting in the accounts held by the Mann Entities ("Mann Entity Accounts").

107.    For example, financial institutions must fully understand the business in which their customers are engaged.  This duty, referred to as the responsibility to "Know Your Customer" ("KYC"), is critical to determining what activity is suspicious.  Account opening KYC due diligence is vital because the information obtained serves as a baseline against which to distinguish account activity that may be normal for a particular industry from account activity that might suggest criminal activity, and guides the bank in other BSA/AML areas such as alert management, investigation, and suspicious activity reporting.

108.    Consistent with these requirements, Pioneer's own policies required it to "have a clear and concise understanding of all bank customer practices" in order "to ensure the immediate detection and identification of suspicious activity."  Yet, Pioneer personnel routinely flouted their KYC obligations when opening accounts for Mann and the Mann Entities.

109.    Pioneer personnel failed to ask Mann about the purpose and intended use of the accounts he opened, the anticipated activity in the accounts, and the source of funds flowing into the accounts.  Instead, Pioneer personnel relied exclusively on a deficient "Customer Due Diligence" form that Pioneer employees completed for Mann.  The form did not request required

information concerning the new account, including the use and purpose of the account, the expected volume of transactions in the account, and the source of any funds.

110.   In most instances, as discussed more below, Mann sent an email to Pioneer employees indicating that he wanted to open a new account, and Pioneer personnel would complete the paperwork and send it to Mann for his signature.  Other than in connection with the opening of the MyPayroll Client Account, even when Mann disclosed information concerning anticipated activity in the account, Pioneer failed to document this information in the account opening documents.

111.   Financial institutions must also have in place systems that are triggered when there is suspicious activity or "red flags."  Such industry-standard "red flags" include unexplained, repetitive, and unusual transactions in bank accounts; high-volume payments without logical explanation; transfers sent and received by the same person using different accounts; large, round-dollar transactions; and the immediate withdrawal of funds deposited to an account.

112.   When the systems are triggered, the bank must thoroughly investigate the account activity and determine whether the information should be reported to FinCEN.  Reportable activity includes, among other things, transactions where the bank has a substantial basis for believing a criminal violation is occurring, transactions involving potential money laundering, and transactions that have no business or apparent lawful purpose or are not the sort in which the particular customer would normally be engaging.

113.   For years, Pioneer failed to monitor the Mann Entity Accounts and investigate and report suspicious activities.  While the various Mann Entity Accounts were reviewed for suspicious activity more than one-hundred times from 2017 through August 30, 2019, not once did Pioneer perform any serious analysis of the account, nor did it report the suspicious activity to FinCEN.

114.    Rather, as discussed more below, Pioneer BSA/AML compliance employees usually just copied and pasted from prior entries rather than investigating and reporting the money laundering and kiting activities that were evident in the Mann Entity Accounts.

115.    There were innumerable suspicious transactions in the Mann Entity Accounts, all of which should have not only triggered thorough investigations but also reports to regulators.  In 2019, nearly half of the Mann Entity Accounts reflect a pattern of frequent, and at times daily, six- and seven-figure, round-dollar mobile deposits, followed immediately by withdrawals of most if not all of the deposits, usually by check, in large, round-dollar amounts.  These transactions involved no third parties, but rather the movement of money between Mann Entity Accounts and even between accounts held by the same Mann Entity.  The transactions reflect quintessential kiting and money laundering activity, all of which was obvious to Pioneer.

116.    The frequent overdrafts in the Mann Entity Accounts were also "red flags" that required investigation but were ignored by Pioneer.  Senior officers at Pioneer, including Blessing, Fleming, Sarratori, and Amell were well aware that the Mann Entity Accounts routinely experienced six- and seven-figure overdrafts, yet no one at Pioneer ever investigated any underlying issues or reported the overdrafts to Pioneer's BSA department.

117.    Pioneer's failures were particularly egregious and confounding in light of the substantial loans that Pioneer extended to Mann's companies.  Pioneer's policies required additional monitoring of the Mann Entity Accounts, yet such monitoring was superficial at best.

118.    Ultimately, Pioneer also failed to engage in proper due diligence with respect to the Valuewise Loan.  Pioneer allowed Mann to dictate and substantially limit the scope of any  audit or field exam.  Pioneer also accepted at face value Mann's representations concerning the financial health of his companies and the work performed by his outside auditors.

119.    Had Pioneer acted prudently, followed its own policies, and complied with its BSA/AML and related obligations, Mann's bank fraud, money laundering, and kiting schemes would have been detected and reported to FinCEN at least as early as 2017, prior to NatPay's contractual relationship with Cloud Payroll, and well before August 30, 2019, when Bank of America froze certain Mann Entity Accounts.

120.    In December 2019, the FDIC conducted a Safety and Soundness Exam and concluded that Pioneer's BSA/AML compliance programs were, in Pioneer's words, "fundamentally and materially deficient."  Pioneer entered into a Memorandum of Understanding with the FDIC that required it to improve and enhance its programs and hire qualified BSA staff.

121.    In addition, Pioneer disclosed in its financial statements for the year ending June 30, 2020, that it was not in "full compliance" with applicable laws and regulations.  Discovery has revealed that this a colossal understatement.

**Pioneer Knew from the Outset that Mann Would Use the MyPayroll Accounts to Process Payroll and Taxes**

122.    Mann has admitted to federal and state prosecutors that by 2013, his consulting companies were not performing well, and he was having difficulty meeting obligations.

123.    In or about 2013, Mann purchased MyPayroll, which operated as a payroll service bureau.  Payroll service bureaus often calculate, collect and pay employer payroll and related taxes.  On information and belief, Mann purchased MyPayroll for the purpose of taking advantage of the "float," that is, the time between when payroll and taxes are collected and the time they are to be paid.

124.    Mann and Blessing discussed Mann's purchase of MyPayroll and Mann's intention to house third-party payroll tax in an account at Pioneer.

125.    On November 19, 2013, Mann and Blessing had lunch, and Mann requested that Blessing set up two accounts at Pioneer for MyPayroll that would be used to house and process third-party payroll taxes.

126.    On November 21, 2013, Mann submitted an ACH application for Valuewise to Blessing, and informed him that he would need to fill out two more applications for the MyPayroll accounts once they were set up.  He indicated that the dollar value of ACH transactions in the MyPayroll accounts "could be in the millions daily."

127.    Blessing forwarded Mann's email to Sandra Dedrick (Commercial Services Officer).  Ms. Dedrick responded, indicating that she needed a schedule of transactions because "ACH is expected to be consistent in frequency, like payroll," and that if Mann planned on using "ACH to collect payments in the future he will need a debit limit and will have to be consistent when he takes the payments (the 1st and 15th or every month, etc.)."

128.    Pioneer prepared the opening paperwork for the MyPayroll accounts based on information provided by Mann and Blessing, and the paperwork was ready for Mann's signature on November 26, 2013.

129.    In opening the 0212 Client Account, Pioneer personnel indicated by hand on the account opening documents that the 0212 Client Account was a "Client Account."

130.    In describing the service provided by MyPayroll, Pioneer personnel indicated that MyPayroll was a "Payroll Svce [sic] Bureau."

131.    Unlike other Mann Entity Accounts, the MyPayroll accounts were opened as business checking accounts to be used in conjunction with a business checking package that included no monthly service charge and no fees for up to 200 transactions/items per month. However, additional items above 200 would be charged $.25 per transaction.

132.    Pioneer also identified MyPayroll as a "high-risk" customer, which required Pioneer to engage in enhanced due diligence and closely monitor MyPayroll's accounts.

133.    On December 3, 2013, Blessing asked Mann whether things went smoothly with the acquisition of MyPayroll and whether "the funds that were held by the 3rd party transferred over?" Mann replied that he would "push them to move the funds they are holding" and that they could further discuss any options regarding changes to "the holding account."

134.    On December 11, 2013, Mann informed Blessing that MyPayroll would be using a "third party tax processor initially" and that tax processor needed assistance from Pioneer.

**To:** David Blessing ███████████████
**From:** Michael Mann ████████
**Sent:** Wed 12/11/2013 3:57:09 PM Coordinated Universal Time
**Subject:** Question

David...

We will be using a third party tax processor initially. They will need to prenote a file and also to get approval on processing checks from our system (probably me giving them signing authority). Who do I work with to get these done? I will probably be signing today and will want a quick turnaround.

135.    Blessing forwarded Mann's email to Lucas Scarchilli (Commercial Structured Debt Analyst) and ultimately Mann was assisted by Sandra Dedrick.

136.    On December 16, 2013, Mann forwarded communications with MyPayroll's third-party ACH tax processor, Payroll Tax Management ("PTM") to Ms. Dedrick, Blessing and Mr. Scarchilli, including a sample check that would be created using the MyPayroll 0212 Account and requesting information "needed for the ACH files." PTM indicated that it needed the information because it would be "initiating the drafts back to [the] account at Pioneer bank."

137.    Mann asked Blessing, Dedrick and Scarchilli whether the requested information would be easy to get because PTM could "have the money in the account tomorrow if I can get them the answer."

138.    The sample check forwarded by PTM and Mann to Ms. Dedrick was clear evidence that Mann would be processing third-party payroll tax payments from the 0212 Client Account.



139.    Ms. Dedrick provided the requested information the same day.

140.    The next day, December 17, 2013, there were 171 credits/deposits in the 0212 Client Account totaling more than $737,000.  Each of the credits bore the description "PAYROLL TAX MANA/TAXDRAFT."  For each credit, Pioneer also received information identifying the third-party employer that paid the funds.

141.    Between December 17, 2013 and December 31, 2013–a total of only eleven business days–there were 190 credits/deposits totaling over $5 million and 65 debits/withdrawals totaling over $3.2 million in the 0212 Client Account.  The vast majority of transactions were payroll tax deposits from third-party employers and debits for the payment of taxes, as even a cursory review of Pioneer's records would reveal.

142.    There were two checks drawn on the 0212 Client Account in December 2013, both of which identified the payor as "Payroll Tax Management, Inc." and were made payable to the New York State Tax Department.  The memo line of the checks identified the MyPayroll employer-client on whose behalf the tax payments were made.

30

143.   In January 2014, the number of transactions in the 0212 Client Account tripled, with 209 credits/deposits totaling over $7.8 million and 424 debits (withdrawals) totaling over $9 million.  Pioneer's records show that the ACH transactions in the account were clearly labeled as third-party payroll tax debits or credits.  Also, in January 2014, 101 checks were issued from the 0212 Client Account, all of which identified the payor as PTM and were made payable to state and local taxing authorities, including New York, Michigan, Kentucky, and Ohio.

144.   On April 1, 2014, Mann sent Blessing a copy of MyPayroll's contract with PTM, which delineated PTM's role in processing ACH entries for the collection and payment of taxes.

145.   On April 4, 2014, Blessing relayed Mann's plans regarding payroll and taxes to other senior executives at Pioneer, including Joseph Fleming (Senior Vice President & Chief Lending Officer), Alicia Riegert (Senior Vice President and Chief Information Officer), Craig Furlong (Operations Officer), and Carol Beth Chase (Systems and Product Development Officer).

| | |
|---|---|
| **From:** | David Blessing |
| **To:** | Alicia Riegert; Carol Beth Chase; Graig Furlong; Joseph Fleming |
| **Cc:** | Michael Mann |
| **Subject:** | My Payroll on Line/Valuewise |
| **Date:** | Monday, April 21, 2014 1:41:59 PM |

I had lunch with Mike Mann today. Initially, we are only going to be handling the tax portion of the payroll, which is 100% prefunded with no obligation to forward on the taxes to the appropriate entities if it wasn't received. This will create $0 in credit risk. If we handle it well, his ultimate goal is to move over the actual payroll as well which isn't always pre funded. However we will cross that bridge when we come to it.

146.   In the month of May 2014, the checks issuing from the 0212 Client Account identified  "MyPayrollHR" as the payor.  There were 181 credits to the 0212 Client Account for over $10 million and 521 debits for over $9 million, and the account statement was 46 pages long.

147.   Mann, Pioneer, and PTM continued their discussions about processing payroll from the 2012 Client Account.  On May 29, 2014, Mann forwarded various inquiries from PTM to

Blessing and asked for a contact person at Pioneer to provide ACH specifications to PTM. Blessing responded that he would "jump on it and get back" to him.

148.     Part of these discussions concerned whether Pioneer could process ACH payroll transactions for MyPayroll directly.  On May 29, 2014, Sandra Dedrick sent Mann an ACH Origination Application, Terms and Conditions, and Processing Schedule, and explained Pioneer's ACH processing fees.  Blessing was copied on the email.

149.     In September 2014, Mann informed Pioneer he was interested in uploading ACH files directly to Pioneer, thus eliminating the need for PTM.



150.     Blessing forwarded Mann's email to Scarchilli, Dedrick, Furlong, Riegert, Chase, and Tom Amell, indicating that he wanted to "get this ball rolling" because it meant "significant deposits for the bank."

151.     Mann's discussions with Pioneer concerning the tax and payroll deposits continued into October 2014, and included Didi Harkness, the head of tax for MyPayroll.  For example, on October 9, 2014, there was a call among Mann and Harkness from MyPayroll, and Blessing, Riegert, Furlong, and Chase from Pioneer to discuss the possibility of Pioneer taking over ACH payroll processing for MyPayroll.

152.    After the call, Mann followed up with Blessing via email, noting that Pioneer had "visibility" on what MyPayroll was currently processing, which was unquestionably true since the processing occurred in MyPayroll's bank accounts at Pioneer.

153.    Ultimately, PTM continued to serve as MyPayroll's third-party ACH processor, and the 0212 Client Account continued to be used for housing and processing third-party payroll and taxes.  In December 2014, there were 689 credits/deposits in the 0212 Client Account totaling over $14.7 million, and 886 debits/withdrawals for over $14.8 million.  The number of transactions nearly doubled in January 2015, with 1,446 credits and 1,671 debits.

154.    In December 2016, Mann caused Valuewise to purchase ProData, a payroll service bureau.  Mann then formed Cloud Payroll, which became a 51% owner of ProData.

155.    In about March 2017, Mann caused Valuewise to purchase 51% of SWP, a payroll service bureau located in Oklahoma.

156.    ProData, Cloud Payroll, and SWP—like MyPayroll—were legitimate businesses, and their day-to-day operations were directed not by Mann, but by individuals who had no knowledge of Mann's wrongdoing.  Mann did, however, open and control bank accounts at Pioneer in the names of ProData, Cloud Payroll, and SWP.  Mann insisted, and Pioneer agreed, that he be the sole point of contact with respect to all accounts at Pioneer.

157.    As a result of these acquisitions, the number of transactions in, and the amount of funds flowing through, the 0212 Client Account increased substantially, as indicated below.

|  | December 2015 | December 2016 | December 2017 |
|---|---|---|---|
| Debits | 3,168 | 4,638 | 14,156 |
| Credits | 2,690 | 4,098 | 9,193 |
| Total Funds | $19 million | $60.1 million | $180 million |

158.    Pioneer BSA compliance employees routinely reviewed the 0212 Client Account, including when it triggered a suspicious activity alert due to the volume of transactions in the

account.   The reviewing employees unfailingly concluded that the extraordinary number of transactions was not suspicious because MyPayroll had been a long-time customer and the activity in the account was typical for a payroll company.

159.   For example, Ellen Fogarty (VP, BSA and ID Theft Officer) documented her review of the 0212 Client Account on September 14, 2017, March 13, 2018, April 26, 2018, September 21, 2018, October 30, 2018, and November 14, 2018.  Her review was nearly identical each time, indicating that MyPayroll had been a customer since 2013, that the transactional activity in the account was typical for this customer, and there was "no negative information."

160.   On July 24, 2018, Kelli Rappleyea (BSA Analyst) reviewed the 0212 Client Account as the result of a suspicious activity alert, and she reported as follows:  "June review revealed foreign wire activity.  Transactions appear reasonable.  No suspicious activity detected." In June 2018, there were 8,623 credits and 12,233 debits in the account, with over $139 million flowing in and out of the account that month.

161.   On January 17, 2019, Darlene Julian (BSA Risk Specialist) reviewed the December 2018 activity in the 0212 Client Account.  As noted above, in December 2018, there were 9,607 credits and 5,054 debits in the account, with over $216 million flowing in and out of the account that month.  Julian compared this activity to that in December 2017 and concluded that there was a pattern of high activity in the account, but that it was not suspicious.

162.   On February 20, 2019, Fogarty reviewed the January activity in the 0212 Client Account, which consisted of over 18,000 transactions and more than $185 million moving through the account.  She reviewed the April activity in the 0212 Client Account on May 6, 2019, which consisted of over 6,500 transactions and more than $121 million moving through the account.  In both instances, Fogarty concluded this activity was consistent for MyPayroll and not suspicious.

163.    On May 15, 2019, Julian reviewed the April 2019 activity in the 0212 Client Account, which included more than 6,500 transactions and more than $121 million moving through the account.   Julian concluded that this activity was consistent and "reasonable" for MyPayroll.

164.    On August 27, 2019, shortly before Mann's schemes collapsed, Fogarty reviewed the July activity in the 0212 Client Account, which included over 6,000 transactions and more than $158 million moving through the account.   Fogarty found no issue with this volume of activity.

165.    Pioneer's BSA department personnel either knew and understood that the 0212 Client Account was used to process payroll and taxes or, as discussed below, they were deliberately ignorant and utterly reckless in the performance of their duties.

166.    Information gathered by Pioneer's BSA compliance staff was presented monthly to Pioneer's SAR Committee, which was composed of representatives from Pioneer's Executive Management, Legal, Compliance, Retail, Audit, Risk Management, and Security Departments.

167.    From 2014 through at least March 2017, SAR Committee members received a monthly ACH log that listed all debits and credits of at least $5,000 in Pioneer accounts, including the MyPayroll Client Account.   ACH logs circulated in January, February and March 2017 each listed over 2,000 ACH transactions in the MyPayroll Client Account.   In March 2017, the MyPayroll ACH transactions constituted over seventy percent of all the transactions listed in the ACH log.   The description of most of the ACH transactions included a third-party employer name with the term "TAXES," "PAYROLL," "DIR DEP," and "AGENCY," and there were also many transactions described as "IRS/USATAXPYMT."

168.    Like Pioneer's BSA compliance employees, Pioneer's SAR Committee similarly dismissed the alerts and extraordinary volume of transactions in the 0212 Client Account on the grounds it was consistent with the transactional activity of a payroll company.

**The MyPayroll Account Ending in 0428 Was Also Used to Process Payroll Payments**

169.    In September 2014, Mann opened a third MyPayroll account after informing Pioneer that he was "working on other products/offerings for the payroll business." The MyPayroll account ending in 0428 ("0428 Payroll Account") was opened on September 16, 2014, but used infrequently until early 2016.

170.    In March 2016, MyPayroll began to use the 0428 Payroll Account to issue payroll checks on behalf of MyPayroll employer-clients to their employees. The 0428 Payroll Account was funded by transfers from the 0212 Client Account.

171.    Beginning in March 2016, payroll checks that listed the payor as "Sprint Store by Nexgen Wireless" were issued from the 0428 Payroll Account to third-party employees.

172.    From May 2016 through February 2017, payroll checks that listed the payor as "Saratoga City Tavern" were issued from the 0428 Payroll Account to third-party employees.

173.    Beginning in July 2017, payroll checks that listed the payor as "Elevate Staffing" were issued from the 0428 Payroll Account to third-party employees located all over the country.

174.    From January 2018 through August 2019, payroll checks were issued from the 0428 Payroll Account that listed the payor either as "MyPayrollHR.Com LLC" or one of multiple employers, including "Elevate Staffing" of Glendale, California; "Cape Cleaning" located in Newport News, Virginia; "Wallace Enterprises, Inc." located in Fairfax, Virginia; "Bertram Enterprises, Inc." located in Morrisville, North Carolina; "D.B. & K. Enterprise, Inc." located in Virginia Beach, Virginia; and "Angels on Care Homecare LLC" located in Carmel, New York.

175.    Pioneer's BSA compliance employees also reviewed the transactions in the 0428 Payroll Account on multiple occasions, each time determining that the transactional activity was consistent for MyPayroll.  The information available to Pioneer regarding the transactions in the 0428 Payroll Account clearly showed that the account was used to process third-party payroll.

**In 2019, Pioneer Opened Three New Cloud Payroll Bank Accounts For the Purpose of Processing Third-Party Payroll and Tax Payments**

176.    In January 2019, Mann began the process of opening an account at Pioneer for Cloud Payroll that would receive payroll payments via wire from Third-Party Employers.  On January 15, 2019, Mann received an email from Matthew Schilling (Cloud Payroll Manager of Finance) suggesting that Mann open an account to receive prefunded wire payments from Third-Party Employers.



177.    Mann agreed with Schilling's proposed approach and copied Matthew Roberts (Cloud Payroll employee), instructing him to contact Pioneer directly to open the account.  Roberts forwarded the entire email conversation to Trudy Seeber (Branch Manager/Business Development Officer) and Deborah Salsburg (Sales Leader and Assistant Branch Manager) at Pioneer and asked

them to review the discussion "regarding opening a business wire account" and to send him "any forms or information to start the setup."

178.    Seeber responded, asking only for the business name of the account holder and the identity of the signers.

179.    Roberts indicated that Mann would be the only signer and the business name was Cloud Payroll, and Salsburg provided the account opening paperwork completely filled out and marked where Mann needed to sign.

| | |
|---|---|
| From: | Deborah A. Salsburg |
| To: | Matthew Roberts; Michael Mann |
| Cc: | Trudy Seeber |
| Subject: | SECURE MESSAGE |
| Date: | Wednesday, January 16, 2019 10:50:40 AM |

Hello,

Attached is the paperwork you requested for the new Cloud Payroll LLC account. I marked everywhere that Mike needs to sign.
Mike, If you could also shoot me an email about the business not operating in NY as you have done previously.
As soon as you get the paperwork back to me I will get it opened in the system.
Thank you!
Deb

**Deborah Salsburg**
**Sales Leader/Assistant Branch Manager NMLS# 481820**

180.    Pioneer was thus fully aware that the purpose of the new account was to receive, house and process Third-Party Employer payroll payments.

181.    Although Pioneer has claimed in this litigation that Mann checked certain boxes on the paperwork "No" with respect to the questions of whether Cloud Payroll was a "non-bank or third party payment processor" or a "Money Services Business as defined in 31 CFR §1010.100(ff)," it was actually Pioneer personnel who checked these boxes, knowing that Cloud Payroll was a "payroll company."

182.    In any event, though, Cloud Payroll was not a "non-bank or third party payment processor," nor was it a "Money Services Business as defined in 31 CFR §1010.100(ff)."

183.    On January 29, 2019, Mann sent Salsburg and Seeber another email, indicating that he needed to open another account for Cloud Payroll.  Mann asked that they send him "the paperwork to sign" once completed.

184.    Shortly thereafter, Salsburg sent Mann the documents fully prepared and marked where Mann needed to sign.  She indicated in her cover email that she could open the account once the paperwork was received.

185.    Once again, Pioneer personnel—not Mann—checked the "No" boxes on the paperwork with respect to the questions as to whether Cloud was a "non-bank or third party payment processor" or a "Money Services Business as defined in 31 CFR §1010.100(ff)."

186.    On February 25, 2019, Mann again emailed Salsburg and Seeber to request the opening of a third Cloud Payroll account—which ultimately was the 2440 Tax Account—indicating that the payroll company was "collecting money from multiple locations."

187.    That same day, Seeber responded that they would "get [the paperwork] out to you tomorrow morning."  The next morning, Salsburg sent Mann the completed paperwork marked where he needed to sign.

| | |
|---|---|
| From: | Deborah A. Salsburg ▉▉▉▉▉▉▉] |
| Sent: | 2/26/2019 3:20:21 PM |
| To: | 'Michael Mann' ▉▉▉▉▉▉]; Trudy Seeber ▉▉▉▉▉▉] |
| Subject: | SECURE MESSAGE |
| Attachments: | Cloud Payroll LLC.pdf |

Hi Mike,

Here is the paperwork as requested.

You know the drill. Once I get it back, I will get the account opened and shoot you an email.

I hope you enjoy this less windy day today!!!
Talk to you soon,
Deb
**Deborah A. Salsburg**
Sales Leader/Assistant Branch Manager NMLS# 481820
P/F: 518▉▉▉
E: ▉▉▉▉@pioneerbanking.com

188.    Mann signed the prepared paperwork and returned it, and Salsburg told him the account was "all set" and that he should be able to see it online in "a day or two."

189.    The 2440 Tax Account was opened in late February, and there was no activity in the account that month.  However, in March 2019 there were over 1,000 transactions in the 2440 Tax Account, with over $22 million moving in and out of the account.

190.    This spike in activity triggered a suspicious activity alert, and on April 3, 2019, Darlene Julian (BSA Risk Specialist) reviewed March transactions in the 2440 Tax Account.  Her review was inconclusive.

> This is a new business customer as of the end of February.  Any business activity for March would create a spike in activity.  There is wire and ACH activity for March.  A pattern of business activity has not yet been determined.

191.    In April 2019, the number of transactions in the 2440 Tax Account increased to nearly 10,000, over 1,550 checks written from the account were paid, and over $92 million moved through the account.  The account statement for the 2440 Tax Account for April is 300 pages long.

192.    It was eminently clear from even a cursory review of information in Pioneer's possession that the 2440 Tax Account was being used to process tax payments.  Most business days, hundreds of credits were listed, all of which were labeled "CLOUDPAYROLL/TAX COL." For example, following are only some of the credits to the 2440 Tax Account on April 2, 2019.

Account Number    XXXXXX2440
Statement Date    04/30/2019
Statement Thru Date    04/30/2019
Page    6

**TRANSACTION DETAIL (Continued)**

| Date | Description | Deposits | Withdrawals | Balance |
|---|---|---|---|---|
| Apr 02 | CLOUDPAYROLL/TAX COL | 3,869.44 | | 790,603.55 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 3,803.89 | | 794,407.44 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 3,244.73 | | 797,652.17 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 3,165.54 | | 800,817.71 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 3,145.66 | | 803,963.37 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 3,098.55 | | 807,061.92 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 3,021.45 | | 810,083.37 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,996.42 | | 813,079.79 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,930.04 | | 816,009.83 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,883.13 | | 818,892.96 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,723.57 | | 821,616.53 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,682.71 | | 824,299.24 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,610.00 | | 826,909.24 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,546.97 | | 829,456.21 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,428.16 | | 831,884.37 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,398.14 | | 834,282.51 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,327.49 | | 836,610.00 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,288.91 | | 838,898.91 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,246.27 | | 841,145.18 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,135.04 | | 843,280.72 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,095.01 | | 845,375.73 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,983.25 | | 847,358.98 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,941.52 | | 849,300.50 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,907.65 | | 851,208.15 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,561.72 | | 852,769.87 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,552.58 | | 854,322.45 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,511.32 | | 855,833.77 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,504.20 | | 857,337.97 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,503.32 | | 858,841.29 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,467.75 | | 860,309.04 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,462.37 | | 861,771.41 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,456.65 | | 863,228.06 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,410.65 | | 864,638.71 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,395.96 | | 866,034.67 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,365.03 | | 867,399.70 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,246.03 | | 868,645.73 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,225.67 | | 869,871.40 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,183.23 | | 871,054.63 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,150.49 | | 872,205.12 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,057.42 | | 873,262.54 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,054.42 | | 874,316.96 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,054.41 | | 875,371.37 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,040.28 | | 876,411.65 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 998.36 | | 877,410.01 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 991.77 | | 878,401.78 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 969.92 | | 879,371.70 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 900.64 | | 880,272.34 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 821.82 | | 881,094.16 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 716.63 | | 881,810.79 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 683.80 | | 882,494.59 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 665.77 | | 883,160.36 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 639.74 | | 883,800.10 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 616.30 | | 884,416.40 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 615.30 | | 885,031.70 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 585.74 | | 885,617.44 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 584.64 | | 886,202.08 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 582.94 | | 886,785.02 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 582.18 | | 887,367.20 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 579.44 | | 887,946.64 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 568.48 | | 888,515.12 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 548.60 | | 889,063.72 |

193.     The ACH transaction details received by Pioneer and reflected in its internal records clearly identified the thousands of Third-Party Employers that paid the tax funds deposited into the 2440 Tax Account.

194.     Debits/withdrawals to the 2440 Tax Account reflected ACH payments of taxes to taxing authorities, all of which were originated by NatPay.

| Apr 02 | CLOUDPAYROLL/TAX COL | 27.72 | | 896,565.43 |
|---|---|---|---|---|
| Apr 02 | CLOUDPAYROLL/TAX COL | 18.51 | | 896,583.94 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 9.79 | | 896,593.73 |
| Apr 02 | CHECK #306535 | | 246.00 | 896,347.73 |
| Apr 02 | CHECK #306539 | | 42.54 | 896,305.19 |
| Apr 02 | CHECK #306540 | | 90.74 | 896,214.45 |
| Apr 02 | CLOUDPAYROLL/TAX COL | | 14.00 | 896,200.45 |
| Apr 02 | CLOUDPAYROLL/TAX COL | | 19.80 | 896,180.65 |
| Apr 02 | NATPAY-11725374/TAX DEP | | 196.19 | 895,984.46 |
| Apr 02 | NATPAY-11725374/TAX DEP | | 279.84 | 895,704.62 |
| Apr 02 | NATPAY-11725374/TAX DEP | | 2,823.93 | 892,880.69 |
| Apr 02 | NATPAY-11725374/TAX DEP | | 664,444.27 | 228,436.42 |

195.    The more than 1,500 checks written from the 2440 Tax Account in April 2019 were made payable to taxing authorities such as the Arizona Department of Revenue, Missouri Director of Revenue, Montana Department of Revenue, Oklahoma Tax Commission, the Virginia Department of Taxation, and the Pennsylvania Department of Revenue.  The checks identified the Third-Party Employer on whose behalf each payment was made.

196.    Julian reviewed the April 2019 activity in the 2440 Tax Account on May 15, 2019, because it had again been flagged for suspicious activity.  Julian acknowledged that the activity for the "new business customer" had increasing ACH totals, but concluded that the activity was not unusual "[d]ue to the type of business" of the customer, *i.e.*, a payroll company.

197.    The amount of activity in the 2440 Tax Account remained substantial through August, 2019.

|  | May 2019 | June 2019 | July 2019 | August 2019 |
|---|---|---|---|---|
| Debits | 1,104 | 645 | 2,351 | 729 |
| Credits | 8,222 | 7,362 | 8,147 | 7,568 |
| Total Funds | $107 million | $97 million | $102.7 million | $102.5 million |

**Pioneer Earned Substantial Fees and Blessing Received Bonuses Based on the Volume of Activity in the 0212 Account**

198.    Because of the extraordinary number of transactions processed in the 0212 Client Account, including ACH transactions, wires, and the diversion of third-party payroll and tax payments to other accounts via online banking, Pioneer collected significant monthly fees.  Among other things, for every transaction over 200 per month, Pioneer charged the 0212 Client Account $.25 per transaction.  Pioneer referred to these fees as a "Global Item Charge."

|  | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Global Item Charge | $1,831 | $16,739 | $22,604 | $46,421 | $64,412 |

199.    On July 3, 2017, Mann emailed Christine Batchelder Charbonneau (Commercial Services Assistant) about the Global Item Charges to the MyPayroll 0212 Client Account.  He

indicated that he thought the charges were from "[their] ACH processor," but determined that those charges were paid separately.  Mann requested that, in light of the large volume of transactions in the 0212 Client Account, the type of account be changed to avoid the fees.  Mann promised to "keep a high balance" in the 0212 Client Account.

200.    In response, Charbonneau indicated that she was working with Randall Benedict to see what was "best" for Mann, would confirm with Blessing, and would get back to him.

201.    After investigating the issue, Pioneer apparently decided not to change the account and continued to assess Global Item Charges on the 0212 Client Account.

202.    Notably, Pioneer's records establish that Blessing earned about $50,000 as a portion of his annual bonus based in large part on the Global Item Charges to the 0212 Client Account.

203.    In this connection, reports reflecting the Global Item Charges applied to specific accounts at Pioneer were circulated to senior executives of Pioneer, including Fleming, Blessing, and other customer relationship managers.

204.    The Global Item Charges generated from the 0212 Client Account were exponentially higher than those of any other account at Pioneer and resulted in a relatively higher bonus for Blessing.

**Pioneer Routinely Provided Mann with Assistance in Processing Payroll and Tax Payments**

205.    Mann and employees of MyPayroll or Cloud Payroll routinely sought and received assistance from Pioneer personnel with payroll and tax payment processing.

206.    Pioneer employees frequently wired payments from the 0212 Client Account to third-party employees, the IRS and other taxing authorities, and Cachet Financial Services, the company that provided Mann's payroll companies with third-party ACH services for payroll collection and payments.

207.    For example, on August 8, 2014, Mann forwarded eight wire transfer requests to Dedrick and Charbonneau at Pioneer.  The transfers clearly reflected payroll payments from the 0212 Client Account to the accounts held by individuals located in Virginia, Texas, Alabama, Minnesota, Florida, and other states.  Pioneer promptly sent the wires.

208.    For further example, on March 8, 2017, Mann reached out to Charbonneau  to ask whether Pioneer could do same-day wire payments to the IRS.  Charbonneau sent Mann a form to authorize a wire transfer.   Thereafter, Charbonneau, Erica Fredricks (Deposit Operations Specialist), and Kelsie Forte (Deposit Operations Specialist) facilitated ten wire tax payments from the MyPayroll 0212 Client Account to the IRS on behalf of MyPayroll.   Each of the forms completed by Mann indicated that the wire would go to "US Treasury" and specified the type of tax payment for a given tax month/year on behalf of a specific Third-Party Employer.

209.    For further example, on March 28, 2018, Pioneer again facilitated the wire transfer of tax funds from the 0212 Client Account to the IRS.  Mann forwarded to Pioneer an email request and two wire transfer authorization forms sent by Cloud Payroll employee Matthew Schilling.  The forms indicated the names of the taxpayer, the types of tax and tax year.  The amounts transferred on behalf of these Third-Party Employers to the IRS were $243,466.07 and $256,000.85.  The authorization forms were reviewed and approved by Pioneer officers.

210.    As another example, on January 2, 2019, Mann sent an email to Charbonneau and Fredricks at Pioneer requesting assistance with an "Urgent Wire Request."  Mann forwarded an email from Bob Higley of MyPayroll requesting a wire on behalf of a specific Third-Party Employer.  Mann indicated in his email to Charbonneau  and Fredricks as follows:

> The client posted payroll after our 3:00 deadline on Monday.  We decided to do a same day payroll for them because they are a good client.  We do need to get this to Cachet by noon.

211.   Fredricks responded shortly thereafter, indicating that the wire had been sent.  The wire request was signed by Blessing and Jerilee Beaudoin.

212.   Pioneer personnel also routinely confirmed receipt of ACH credits/deposits of payroll or tax funds in the 0212 Client Account or 2440 Tax Account.

213.   For example, in early September 2014, Amy Patentreger (MyPayroll Operations Executive) asked that Dedrick and Charbonneau confirm that certain payroll funds from a Third-Party Employer had been deposited in the 0212 Client Account.

Hello ladies!

I am not sure if you are able to help me with this or not, but I figured it is worth a shot.....

We have a client that bounced their payroll a couple of times last week.  We sent it through for another collection on Tuesday 9/2, which means it should have been deposited into our account on Wednesday 9/3 or today.  (we would have normally required him to Wire, but he was out of town and that wasn't a possibility)

The problem is, we need to process another payroll for them today and I am hesitant to do that without knowing for sure we were able to collect last week's.  Is there any way that you can confirm that the collection was successful?  I know that it is not completely fool-proof since there is still a bit of time to reject the funds.  But I am hoping you would be able to see an NSF on it sooner than we will be notified.

If so, the amount is for $1458.66.  It was coming from account #1340001385 at Woodforest bank.

Thanks for any help or suggestions you may have!
Amy

214.   That day, Charbonneau confirmed receipt of a "credit/deposit to the MYPAYROLLHRCOM LLC account in the amount of $1,458.66 on September 3rd."

215.   On July 14, 2015, Mann emailed Charbonneau asking whether he could obtain information on a debit in the 0212 Client Account and indicated that they needed to show the Texas Workforce Commission that a payment had been made on behalf of an employer client.

From: Michael Mann ████████████████████████
Sent: Tuesday, July 14, 2015 3:08 PM
To: Christine Batchelder
Subject: Question
Can you send me more information on a debit in account ending 212?
The debit happened on 4/30 and was called Mavitax Inc/Agency in the amount of 811.57. Are there more information (like a reference number) that you can send me so we can contact the Texas Workforce Commission to show we made that payment?
Thanks,
Mike

216.    On September 2, 2015, Mann forwarded a request from Peggy Byrnes (MyPayroll Payroll Tax Manager) to Charbonneau requesting detail information for an ACH payment to the "NY SUI (Employment Security)" on behalf of a specific Third-Party Employer.  Charbonneau provided Mann with those details that day.

217.    On October 27, 2015, Mann emailed Charbonneau requesting ACH trace information for payments made to the State of Connecticut on behalf of six clients.



218.    Charbonneau  reviewed the 0212 Client Account and sent Mann an email with the requested trace numbers.

219.    On July 31, 2015, the date Charbonneau  reviewed the 0212 Client Account, there were 1,190 ACH debits to the 0212 Client Account, most of which identified a Third-Party Employer and reflected a third-party tax payment with such terms as "IRS/USATAXPYMT," "TXWORKFORCECOMM/DEBIT," "COMMWLTHOFPA INT/PAEMPLOYTX," "BERK TAX PMT EMP/EMP WEBPAY," "WI DEPT REVENUE/TAXPAYMNT," "FLA DEPT REVENUE/CUT," "VA DEPT TAXATION/TAX PAYMEN," "IL DEPT OF REVEN/EDI PYMNTS," and "CONNECTICUT DOL/CT UI TAX."

220.   On July 9, 2019, Mann sent an email to Randall Benedict at Pioneer, asking whether all ACH transfers to the 0212 Client Account and 2440 Tax Account had been posted.  Mann indicated that he was "expecting a lot" in the accounts, but he was doing reconciliation and did not see the transfers.  He indicated that if everything was posted, he would check with his "ACH transmitter."

221.   Benedict responded, letting Mann know that everything had posted.  On July 9, 2019, there were about 120 distinct ACH credits to the 2440 Tax Account, all of which clearly reflected the deposit of tax funds.  For example, following is an excerpt from Pioneer's records:

| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 33,917.03 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 26,920.31 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 20,400.9 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 19,604.52 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 18,488.93 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 17,785.29 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 16,977.67 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 15,676.13 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 13,969.18 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 13,650.72 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 12,930.35 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 12,594.63 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 11,609.56 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 10,532.64 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 9,493.86 |

222.   Later that day, Mann forwarded to Benedict a series of emails between NatPay and Cloud Payroll representatives regarding an ACH credit/deposit to the 2440 Tax Account "for $435,839.52 for federal withholding."  Mann provided Benedict with the trace number and asked whether he could identify a credit that "should have hit the 2440 account."  After reviewing the 2440 Tax Account, Benedict sent Mann an email stating as follows:

> We do not see that ACH coming into 2440. Other ACH transactions have been processed but they are ***normal tax collection*** ACH's. Perhaps the ACH had an effective date of 7/10/19?  The trace number is not on our list of ACH coming in. Lets watch the account in the morning, I have a feeling it will hit then.  (Emphasis added).

223.   On July 11, 2019, Mann followed up with Benedict, informing him that the items they discussed had settled on July 10, 2019, and that he was working with his "ACH processor" to

determine why they did not settle until that date.  Benedict forwarded the email to Blessing and Fleming.

224.    Pioneer personnel also routinely provided Mann with copies of checks written from the 0212 Client or 2440 Tax Accounts, all of which were made payable to taxing authorities and identified the Third-Party Employer on whose behalf the tax payment was being made.

225.    For example, on November 17, 2014, Mann forwarded a request from Roxanne Cluckey (MyPayroll Senior Tax Payroll Specialist) to Dedrick and Charbonneau seeking a copy of two checks made payable to the South Carolina Department of Revenue.  Dedrick forwarded Mann copies of the checks, both of which clearly indicated that the payments were made payable from the 0212 Client Account on behalf of a specific Third-Party Employer for third quarter taxes.

226.    On dozens of occasions from 2014 through August 2019, Mann requested that Pioneer employees, including Charbonneau, Dedrick, and Marcia Leggett, provide copies of checks made payable from MyPayroll accounts to taxing authorities such as the Kentucky Division of Revenue, the North Carolina Department of Revenue, the South Carolina Department of Revenue, the City of Denver, the "Department of Revenue – Treasury Division," the Colorado Department of Revenue, the "DC Dept. of Employment Security," the "Treasurer of State of Ohio," the "Salem City (Columbiana) % Tax Collector," and the "Regional Income Tax Agency." All such checks clearly indicated that the payment was made from the 0212 Client Account or 2440 Tax Account on behalf of a specific Third-Party Employer for third quarter taxes.

227.    Pioneer's records establish that Pioneer personnel for years routinely provided Mann and his payroll companies substantial assistance in the processing of third-party payroll and taxes from the MyPayroll and Cloud Payroll accounts.  There is simply no plausible basis to

believe that Pioneer's employees were ignorant of the fact that MyPayroll and Cloud Payroll were operating as payroll companies and were using their accounts to process payroll and taxes.

**Mann's Money Laundering Scheme Involving Third-Party Payroll and Tax Funds**

228.   Mann has admitted to federal and state authorities that, by no later than January 2014, he began to experience business financial pressure and as a result started to engage in a scheme involving fictious companies and falsified assets, emails, audits, and bank exams, and to exploit the "float" between the time payroll and tax monies were funded and when such monies had to be disbursed.

229.   Significantly, payroll and payroll-related tax payments are often withdrawn from an employer's account before the funds must be paid to employees or taxing authorities.  Thus, Mann knew that during the time the funds were to be held in the 0212 Client Account or 2440 Tax Account, he could divert the payroll and tax monies to meet his other financial obligations.

230.   Mann conducted millions of dollars in financial transactions between accounts that diverted stolen payroll and tax funds from Third-Party Employers.

231.   From 2014 through August 30, 2019, Mann diverted more than $1.5 billion in round-dollar transactions from the 0212 Client Account to other Mann Entity Accounts.

232.   Mann also routinely diverted third-party tax funds from the 2440 Tax Account to other Mann Entity Accounts and to reduce the balance on the Valuewise Loan.

233.   For example, on August 15, 2019, Mann diverted $5.735 million in third-party tax funds from the 2440 Tax Account to the 0212 Client Account.  From there, Mann dispersed the third-party tax funds to a number of Mann Entity Accounts, including $2.579 million to a Valuewise account to cover overdrafts.  Mann then transferred $730,000 from the Valuewise

account:  first, to the Weitz Account; second, to another Valuewise account; and third, to pay down the Valuewise Loan.

234.    A week later, on August 22, 2019, Mann diverted $2.677 million in third-party tax funds from the 2440 Tax Account to the 0212 Client Account.  From there, Mann disbursed the funds to a number of Mann Entity Accounts, including $601,000 to the Weitz Account.  Mann then transferred those tax funds to a Valuewise account, and then used the funds to pay down the Valuewise Loan.

235.    Just one day later, on August 23, 2019, Mann diverted $3.424 million in third-party tax funds from the 2440 Tax Account to the 0212 Client Account.  From there, Mann disbursed the funds to a number of Mann Entity Accounts.

236.    On August 29, 2019, Mann diverted $5.446 million in third-party tax funds from the 2440 Tax Account to the 0212 Client Account.  From there, Mann disbursed the funds to a number of Mann Entity Accounts, including $2.8 million to the Weitz Account, then to a Valuewise account, and finally to reduce the balance of the Valuewise Loan.

**Pioneer Facilitated and Participated in Mann's Money-Laundering Scheme**

237.    When Mann opened the 0212 Client Account at Pioneer, Pioneer had no policies against a payroll company opening and using payroll and/or tax settlement accounts for the purpose of processing payroll.  Nor did Pioneer have any such policy in 2019, when Mann opened the three Cloud Payroll Accounts.

238.    At least one other Pioneer customer was a payroll company that used its bank accounts at Pioneer to process payroll-related payments from 2011 through late 2019.

239.    Pioneer not only agreed to allow Mann to use the 0212 Client Account to receive and house third-party payroll and tax funds, it also understood and agreed to allow Mann to divert

the third-party payroll and tax funds to other Mann Entity Accounts to cover any shortfalls in such accounts and pay down the Valuewise Loan. Pioneer sanctioned these diversions and even encouraged Mann to move the funds.

240.    Mann began experiencing overdrafts on a regular basis in 2014. When overdrafts occurred, Pioneer would put a hold on the overdrawn account(s). Mann would ask Pioneer to pay the overdraft amounts, indicating that he had the funds in other accounts and would move funds from the other accounts to the overdrawn accounts. Mann routinely referenced the balance in all his accounts, including the 0212 Client Account (the only Mann Entity account that routinely had a substantial positive balance at that time) to justify paying the overdrafts.

241.    Apparently without exception, Pioneer always paid the outstanding items, thus extending Mann credit until he diverted funds from his other accounts to the overdrawn account(s).

242.    Mann's overdrafts were so frequent and substantial that eventually Pioneer insisted that Mann move the funds into the overdrawn account before Pioneer would pay the outstanding items(s), and Pioneer employees would check the account(s) to ensure that he had moved the money before any items were paid.

243.    Throughout this time, Blessing and Fleming gave approval to pay the outstanding items, usually indicated as a direction to "pay and waive," meaning that the items should be paid, and no overdraft fees assessed.

244.    Other Pioneer senior executives were well aware of Mann's use of the payroll and tax funds in the 0212 Client Account and the 2440 Tax Accounts to cover overdrafts.

245.    For example, on Sunday, January 8, 2017, Mann emailed Blessing to request assistance in paying two checks drafted from a Valuewise account, indicating that he had failed to "move the money."

> On Jan 8, 2017, at 1:03 PM, Michael Mann ████████████████████ wrote:
>
> David...
>
> On Friday I made a mistake.  I needed to move about 950K to account ending in 3648 and I did not.  Our balance on all our accounts is over 1M so I had the money.  I just did not move the money.
>
> Can you make sure that checks 5378 and 5379 get paid from account 3648?
>
> Sorry about that and thank you very much for your help.
>
> Mike

246.   Blessing responded that day to Mann's email, indicating that he was "on it" and directing Benedict to "make sure they get paid[.]"  Fleming gave his approval as well.

247.   To cover the overdraft, Mann transferred $400,000 from the 0212 Client Account to the Valuewise 3648 account.

248.   On July 20, 2017, Mann emailed Blessing, Benedict, and Charbonneau, indicating that he needed assistance in paying certain items, and would "have plenty of money when the ach payments hit this morning in the accounts" and would "move the money to the right accounts" later that morning.



249.   Benedict forwarded the email to Blessing and Fleming, indicating that "Valuewise has three items for a total of $2,101,114.00 being presented against a balance of -$100.00" and "Ross Personnel has three items for a total of $2,108,869.00 being presented against a balance of -$99.62."  Fleming received the emails and responded: "Randy please pay and either charge or waive based on what we normally do."

250.   Pioneer's records show that on July 20, 2017, in a series of six-figure, round-dollar transfers, Mann moved funds from the 0212 Client Account to cover the overdrafts in the Ross Personnel account.

| Description | Source Full Description | Sub Source | Effective Date | Credit $ | Debit $ | Running Current Balance |
|---|---|---|---|---|---|---|
| NSF Charge | Internal Trans (Demand Deposit) | DD | 7/19/17 | 0 | 105 | ($99.62) |
| 907-Ross Personn/PAYROLL | Return Item Processing | | 7/19/17 | 0 | 657,824 | ($657,923.62) |
| 907-Ross Personn/PAYROLL | Return Item Processing | | 7/19/17 | 0 | 697,276 | ($1,355,199.62) |
| 907-Ross Personn/PAYROLL | Return Item Processing | | 7/19/17 | 0 | 753,769 | ($2,108,968.62) |
| Rev: NSF Charge | Return Item Processing Fees | FEE | 7/19/17 | 105 | 0 | ($2,108,863.62) |
| Internet Transfer From 0212 | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 643,000 | 0 | ($1,465,863.62) |
| Internet Transfer From 0212 | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 600,000 | 0 | ($865,863.62) |
| Internet Transfer From 0212 | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 498,000 | 0 | ($367,863.62) |
| Internet Transfer From 0212 | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 486,000 | 0 | $118,136.38 |
| Internet Transfer To 0212 | FIDELITY ONLINE BANKING | OLB | 7/21/17 | 0 | 118,135 | $1.38 |

251.   Pioneer's records similarly show that Mann transferred client funds from the 0212 Client Account to the Valuewise 3622 account to cover the overdraft in that account, again in a series of six-figure, round-dollar transfers.

| Description | Source Full Description | Sub Source | Effective Date | Credit $ | Debit $ | Running Current Balance |
|---|---|---|---|---|---|---|
| NSF Charge | Internal Trans (Demand Deposit) | DD | 7/19/17 | 0 | 105 | ($100.00) |
| 904-ValueWise Co/PAYROLL | Return Item Processing | | 7/19/17 | 0 | 653,379 | ($653,479.00) |
| 904-ValueWise Co/PAYROLL | Return Item Processing | | 7/19/17 | 0 | 697,452 | ($1,350,931.00) |
| 904-ValueWise Co/PAYROLL | Return Item Processing | | 7/19/17 | 0 | 750,283 | ($2,101,214.00) |
| Rev: NSF Charge | Return Item Processing Fees | FEE | 7/19/17 | 105 | 0 | ($2,101,109.00) |
| Internet Transfer From 0212 | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 993,000 | 0 | ($1,108,109.00) |
| Internet Transfer From 3614 | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 690,000 | 0 | ($418,109.00) |
| Internet Transfer From 0212 | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 680,000 | 0 | $261,891.00 |
| Internet Transfer From 0212 | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 490,000 | 0 | $751,891.00 |
| Internet Transfer From 0212 | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 472,000 | 0 | $1,223,891.00 |
| Internet Transfer From 0212 | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 465,000 | 0 | $1,688,891.00 |
| Internet Transfer From 0212 | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 200,000 | 0 | $1,888,891.00 |

252.   Similarly, on August 10, 2017, Mann emailed Blessing and Benedict, indicating that he needed help getting items paid in certain accounts.  Mann assured them that "[w]e have over 7M in all of our accounts that is significantly more money than we need for the items to be paid."  At the time of his email, the 0212 Client Account had an account balance of about $7.7 million.

253.    Benedict forwarded the email to Blessing, informing him that Valuewise had four items for over $2.5 million being presented against a balance of $935, and Ross had five items for over $2.79 million being presented against a balance of $254,491.38.

254.    Blessing directed Benedict to "pay and waive" and forwarded the emails to Frank Sarratori, asking that he "concur."   Sarratori approved, based on his understanding that Mann routinely transferred money from other accounts to cover any overdrafts.   Ultimately, Mann moved money from the 0212 Client Account to cover the negative balances.

| From: | Frank Sarratori █████████████████ |
|---|---|
| Sent: | 8/10/2017 12:01:35 PM |
| To: | David Blessing ████████████████; Randall Benedict ████████████████ |
| Subject: | RE: Help paying items |

Based upon my understanding as explained by Dave Blessing, this occurs monthly and money is transferred from the other accounts Mike has with us to cover the extended credit, I concur with Dave to pay and waive.

Frank

255.    For further example, on December 21, 2017, Mann emailed Blessing, Benedict, and Charbonneau indicating that he would "need assistance in paying items" in certain of his accounts. He further indicated that there was over $14 million in the other Pioneer accounts.   At the time, the 0212 Client Account had an account balance of about $14.7 million.

256.    Benedict forwarded the email to Christopher Seftner (Commercial Services Liaison) who informed Blessing, Fleming, and Benedict that Valuewise had three items totaling $1,909,395 being presented against a balance of $198,613, and Ross had four items totaling $2,410,222 begin presented against a balance of -$138.37.

257.    Blessing then forwarded the email chain to Amell, Fleming, and Benedict indicating that the problem is that Mann had the money but "in the wrong accounts" and requesting that Amell "pay and waive."

**From:** David Blessing
**Sent:** Thursday, December 21, 2017 8:27 AM
**To:** Christopher J. Seftner ◄██████████████►; Thomas L. Amell ◄██████████████►
**Cc:** Joseph Fleming ◄██████████████►; Randall Benedict ◄██████████████►
**Subject:** RE: NSF

Tom, As discussed Mike has a total of $14,000,000 in the bank it is just in the wrong accounts.  Please approve to pay and waive.  We have never had a problem with doing this.

258.    With no questions asked, Amell responded a minute later "Approved to pay and waive."  Later that day, Mann transferred $3.360 million from the 0212 Client Account to other Mann Entity Accounts.

259.    On May 9, 2018, Benedict sent an email to Blessing notifying him that a check for $320,930 was being presented against a negative balance of $638,086 in a Valuewise account.

260.    Blessing instructed Benedict to pay the item and forwarded the email to Fleming, asking that he approve, and to Mann, directing him to move the money.

On May 10, 2016, at 8:08 AM, David Blessing ██████████████ wrote:

Pay and Waive, Joe please approve.

Mike, please get the money moved.

261.    Pioneer's records show that Pioneer paid the item and eventually Mann diverted $800,000 in third-party payroll and tax funds from the 0212 Client Account to the Valuewise 3622 account.

262.    On August 13, 2018, Mann emailed Benedict to request assistance in paying items in three accounts, indicating that the money to cover the items was already in those accounts. Benedict reviewed the accounts and confirmed that sufficient funds were there and forwarded Mann's email and the account information to Blessing and Fleming.  Fleming instructed Benedict to "pay and waive."

263.    Pioneer's records show that Mann diverted $4.640 million in third-party payroll and tax funds from the 0212 Client Account on August 13, 2018 to cover the overdrafts.

264.    By August 2019, there were near-daily overdrafts in the Mann Entity Accounts. Pioneer's records establish that Pioneer officers repeatedly endorsed Mann's diversion of the third-party payroll and tax funds from the 0212 Client Account and 2440 Tax Account to cover the overdrafts.

265.    For example, on August 1, 2019, Mann emailed Blessing and Benedict requesting assistance in paying eight items totaling nearly $6 million from the Valuewise 3648 account and indicating that sufficient funds were then in the account.  Benedict reviewed the account and confirmed that funds had been deposited to the account.

266.    Pioneer's records show that on August 1, 2019, Mann diverted $4.57 million in third-party tax funds from the 2440 Tax Account to the 0212 Client Account.

|  |  |  |
|---|---|---|
| Account Number | | XXXXXX2440 |
| Statement Date | | 08/30/2019 |
| Statement Thru Date | | 09/02/2019 |
| Page | | 11 |

**TRANSACTION DETAIL (Continued)**

| Date | Description | Amount | Balance |
|---|---|---|---|
| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 730,000.00 | 5,290,871.18 |
| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 876,000.00 | 4,414,871.18 |
| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 987,000.00 | 3,427,871.18 |
| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 988,000.00 | 2,439,871.18 |
| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 989,000.00 | 1,450,871.18 |

267.    Mann then diverted $5.394 million in third-party payroll and tax funds from the 0212 Client Account to cover the overdrafts in the Valuewise 3648 account.

**BUSINESS CHECKING**                                        **Account Number: XXXXXX3648**

**Account Owner(s):    VALUEWISE CORPORATION**
**                            DBA PRIMACY SEARCH GROUP**

**Balance Summary**

| | |
|---|---|
| **Beginning Balance as of 08/01/2019** | **$501,341.16** |
| + Deposits and Credits  (63) | $44,812,492.45 |
| - Withdrawals and Debits  (86) | $45,313,173.98 |
| **Ending Balance as of 08/31/2019** | **$659.63** |
| Service Charges for Period | $0.00 |
| Average Balance for Period | $1,543.00 |
| Average Collected for Period | $1,543.00 |
| Minimum Balance for Period | $647.00 |

**TRANSACTION DETAIL**

| Date | Description | Amount | Balance |
|---|---|---|---|
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 989,000.00 | -4,379,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 988,000.00 | -3,391,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 987,000.00 | -2,404,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 986,000.00 | -1,418,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 985,000.00 | -433,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 450,000.00 | 16,734.65 |

268.     On August 8, 2019, Mann emailed Benedict requesting assistance in paying items totaling over $12 million in a Valuewise account ending in 3648 and a TrueConsulting account ending in 1251 and stating that the money was in the accounts to cover the items.

269.     Benedict emailed Blessing with the issue after having reviewed the accounts to confirm the transfers, and Blessing approved the payments.

270.     To partially cover the overdrafts, Mann first moved $4,206,000 from the 2440 Tax Account to the 0212 Client Account.

| | | Account Number | XXXXXX2440 |
| | | Statement Date | 08/30/2019 |
| | | Statement Thru Date | 09/02/2019 |
| | | Page | 37 |

**TRANSACTION DETAIL (Continued)**

| | | | |
|---|---|---|---|
| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 256,000.00 | 3,959,365.29 |
| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 986,000.00 | 2,973,365.29 |
| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 987,000.00 | 1,986,365.29 |
| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 988,000.00 | 998,365.29 |
| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 989,000.00 | 9,365.29 |

271.     Mann then diverted $4.946 million in third-party tax and payroll funds from the 0212 Client Account to the Valuewise 3648 account to cover the overdrafts.

| | | Account Number | XXXXXX3648 |
| | | Statement Date | 08/30/2019 |
| | | Statement Thru Date | 09/02/2019 |
| | | Page | 2 |

**TRANSACTION DETAIL (Continued)**

| | | | |
|---|---|---|---|
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 998,000.00 | -3,940,352.77 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 989,000.00 | -2,951,352.77 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 988,000.00 | -1,963,352.77 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 986,000.00 | -977,352.77 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 985,000.00 | 7,647.23 |

272.     Mann also diverted $3.214 million in third-party payroll and tax funds from the 0212 Client Account to the TrueConsulting 1251 account to cover the overdrafts.

| | | Account Number | XXXXXX1251 |
| | | Statement Date | 08/30/2019 |
| | | Statement Thru Date | 09/02/2019 |
| | | Page | 2 |

**TRANSACTION DETAIL (Continued)**

| | | | |
|---|---|---|---|
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 989,000.00 | -2,218,289.22 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 988,000.00 | -1,230,289.22 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 987,000.00 | -243,289.22 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 250,000.00 | 6,710.78 |

273.    On August 12, 2019, Mann emailed Benedict to request assistance in paying fourteen items totaling over $9 million from the Ross 3630 account.   Benedict reviewed the account and forwarded Mann's email to Blessing and Fleming, indicating that sufficient funds were in the account to cover the items.   Blessing and Fleming approved.

274.    Pioneer's records show that on August 12, 2019, Mann diverted $1.232 million in third-party tax funds from the 2440 Tax Account to the 0212 Client Account, and diverted $4.478 million in third-party payroll and tax funds from the 0212 Client Account to the Ross 3630 account to partially cover the overdrafts.

275.    On August 13, 2019, Benedict emailed Mann indicating that two Valuewise accounts were overdrawn and asking whether Mann would be making a deposit to cover the items. Mann responded that the money was in the accounts to cover the items.

276.    Benedict reviewed the accounts and informed Blessing and Fleming that sufficient funds had been transferred to the accounts.

> Hello Dave,
>
> Valuewise 3622, has 6 items for a total of $4,239,069.87 being presented against a balance of $363,666.58. Current balance is $4,243,166.
>
> Valuewise 3648, 7 items for a total of $4,893,426.30 being presented against a balance of $345,166.55. Current balance is $4,896,072.

277.    Blessing approved payment of the items.   Pioneer's records show that Mann moved $1.867 million in third-party tax funds from the 2440 Tax Account to the 0212 Client Account, and then diverted $5,132,500 in third-party tax and payroll funds from the 0212 Client Account to partially cover the overdrafts.

Account Number    XXXXXX0212
Statement Date    08/30/2019
Statement Thru Date    09/02/2019
Page    43

**TRANSACTION DETAIL (Continued)**

| Date | Description | Deposits | Withdrawals | Balance |
|------|-------------|----------|-------------|---------|
| Aug 13 | 9112- HUMAN CAPI/BILL COLL | 15.00 | | 7,829,265.76 |
| Aug 13 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 989,000.00 | | 8,818,265.76 |
| Aug 13 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 878,000.00 | | 9,696,265.76 |
| Aug 13 | INTERNET TRANSFER FROM WEITZ AND AS-3945 | 35,000.00 | | 9,731,265.76 |
| Aug 13 | INTERNET TRANSFER FROM WEITZ AND AS-3945 | 35,000.00 | | 9,766,265.76 |
| Aug 13 | INTERNET TRANSFER FROM CLOUD PAYROL-2366 | 22,000.00 | | 9,788,265.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 22,500.00 | 9,765,765.76 |
| Aug 13 | INTERNET TRANSFER TO 0428 | | 30,000.00 | 9,735,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 279,000.00 | 9,456,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3648 | | 876,000.00 | 8,580,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 986,000.00 | 7,594,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 988,000.00 | 6,606,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3648 | | 989,000.00 | 5,617,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 989,000.00 | 4,828,765.76 |

## Pioneer Enables Mann's Kiting Scheme

278.    Pioneer facilitated Mann's kiting activities as well, which often resulted in overdrafts and the diversion of third-party payroll and tax funds, by granting him RDC privileges in excessive amounts for numerous Mann Entity Accounts.

279.    RDC is a deposit transaction delivery system that allows commercial customers the ability to deposit checks into Pioneer accounts from a remote location. Once a customer is approved for RDC, Pioneer installs a bank-provided scanner and software at the customer's remote location.

280.    During the relevant period, Pioneer's RDC policies and procedures recognized various legal, compliance, reputational, and operational risks associated with RDC operations, including increased risk of money laundering and fraud. Pioneer's RDC policies and procedures required that customer due diligence and assessment be performed at the time of an RDC application, and that certain annual, periodic, and daily reviews be performed to detect any suspicious activities.

281.    Pioneer either failed to follow its own policies and procedures, or it deliberately disregarded Mann's obvious illegal kiting activities.

282.     In June 2018, Mann requested and received RDC privileges with respect to four of his Valuewise accounts, each with a daily maximum of $25,000.  Mann signed an RDC agreement on June 28, 2018.  That same day, Pioneer and Mann amended the RDC agreement to add two additional accounts, one held by Ross and the other by TrueConsulting.  It appears that Pioneer engaged in no due diligence or assessment prior to granting these RDC privileges.

283.     On July 19, 2018, Mann requested an increase in the RDC amounts for all but one of these accounts to a daily maximum of $600,000 per check and $1.2 million in total per account. Blessing approved an increase in the amounts *beyond* what Mann requested, to $650,000 per check and a daily maximum of $1.3 million.

284.     Pioneer continued to grant Mann RDC privileges with more and more of his accounts, always at the same unusually high levels.  Mann merely had to ask and such privileges were granted, no questions asked.

285.     For example, in January 2019, Mann contacted Joshua Engel (Pioneer Cash Management Officer) and Blessing to request that three additional accounts be given RDC privileges and instructed that the same maximum amounts be used as with the other accounts.

**From:** Michael Mann ████████████████████
**Sent:** Wednesday, January 30, 2019 2:27 PM
**To:** Joshua W. Engel ████████████████
**Cc:** David Blessing ████████████████
**Subject:** Adding accounts

**\*\*SENT FROM EXTERNAL SOURCE\*\***

Josh…
I hope you are doing well. We need to add three companies to the remote deposit. If we send money between them electronically our system creates a two day delay in receiving the funds. Therefore, remote deposit will be a better option for us in the near term.
We will use the same limits on these accounts that we use on the others. They would have a per check maximum of $650,000 and a daily maximum of $1,300,000. They account numbers are as follows:

| Account Name | Account Number |
|---|---|
| Pro Data Payroll Services | ████ 1988 |
| SouthWestern Payroll Services | ████ 1996 |
| CloudPayroll | ████ 2382 |

Thanks,
Mike

286.    In granting these additional privileges, Pioneer merely asked that Mann sign the RDC service agreement and application, which Pioneer personnel had completed for him.

287.    Similarly, on April 24, 2019, Mann reached out to Engel and Blessing again to request that RDC privileges be extended to six additional accounts.

288.    On April 24, 2019, as Pioneer was well aware, the outstanding principal on the Valuewise Loan was just $89,000 shy of the $32 million cap.  Thus, Mann had no ability to draw down on his line of credit to cover any obligations.

289.    Mann again instructed Pioneer that the accounts have the same excessive RDC limits as the others.



290.    By this time, Pioneer's records clearly evidenced that Mann was engaged in kiting. Many of the Mann Entity Accounts served no purpose other than to kite.  If Pioneer's officers and employees had performed the customer assessment or monitoring they were required to perform,

Mann's kiting activity would have been exposed. Instead, Pioneer deliberately ignored all the red flags in the Mann Entity Accounts.

291.    By August 2019, 18 accounts controlled by Mann had RDC privileges, and all but one of the accounts had $650,000 per check and $1.3 million per day maximums. As a result, Mann could and often did use his RDC privileges to kite over $20 million per day.

292.    Notwithstanding these high limits, Mann occasionally requested that his daily maximum be increased on a particular day and Pioneer, of course, agreed no questions asked.

293.    For example, on August 1, 2019, Mann sent an email to Blessing and Benedict requesting that the daily limit for a Valuewise account be increased to $1.6 million. Mann indicated in his email that he had spoken to Blessing about such increases, and that Blessing had told him it is "easy to do when we need to bump it for a day." Blessing emailed back saying he would take care of it and forwarded Mann's email to Drieux Miller (Cash Management Specialist), who facilitated this increase.

294.    Similarly, on August 28, 2019, Mann sent an email to Blessing and Miller requesting that a Valuewise account ending in 4018 be increased for the day to $1,975,000, and a Ross account ending in 3630 be increased for the day to $2,360,000. Pioneer approved, no questions asked.

295.    By granting Mann RDC privileges for nearly twenty accounts and granting him instant credit for any RDC deposits, Pioneer facilitated Mann in kiting millions of dollars in non-existent funds daily between accounts at Bank of America and Pioneer.

296.    By October 2018, Mann was using RDC privileges to deposit millions of dollars a month in numerous accounts. By January 2019, Mann was using his RDC privileges to deposit

tens of millions of dollars in numerous accounts.  By June 2019, Mann was depositing hundreds of millions of dollars a month in multiple accounts using his RDC privileges.

297.    For example, in December 2018, Mann used his RDC privileges to deposit about 30 checks for over $13.8 million in a single Valuewise account.  All the checks were in large round numbers, and Mann immediately used the available funds to write checks to accounts at Bank of America.

298.    In June 2019, Mann deposited 59 checks for over $23 million in his Valuewise 3622 account.  Mann immediately used the available funds to write checks to accounts at Bank of America.  Pioneer's records also reflect that Mann was at the same time diverting third-party payroll and tax funds from the 0212 Client Account.

| Date | Description | Deposit | Withdrawal | Balance |
|---|---|---|---|---|
| Jun 21 | MOBILE DEPOSIT | 1,296,000.00 | | 1,325,694.69 |
| Jun 21 | CHECK #5919 | | 392,000.00 | 933,694.69 |
| Jun 21 | CHECK #5920 | | 487,000.00 | 446,694.69 |
| Jun 21 | CHECK #5921 | | 446,000.00 | 694.69 |
| Jun 24 | INTERNET TRANSFER FROM 0212 | 136,000.00 | | 136,694.69 |
| Jun 24 | MOBILE DEPOSIT | 1,286,000.00 | | 1,422,694.69 |
| Jun 24 | CHECK #5922 | | 492,000.00 | 930,694.69 |
| Jun 24 | CHECK #5923 | | 475,000.00 | 455,694.69 |
| Jun 24 | CHECK #5924 | | 455,000.00 | 694.69 |
| Jun 25 | INTERNET TRANSFER FROM 3945 | 104,000.00 | | 104,694.69 |
| Jun 25 | MOBILE DEPOSIT | 1,296,000.00 | | 1,400,694.69 |
| Jun 25 | CHECK #5925 | | 431,000.00 | 969,694.69 |
| Jun 25 | CHECK #5926 | | 480,000.00 | 489,694.69 |
| Jun 25 | CHECK #5927 | | 489,000.00 | 694.69 |
| Jun 26 | OPTUM/DIR DEP | 633,892.81 | | 634,587.50 |
| Jun 26 | INTERNET TRANSFER FROM 3945 | 137,000.00 | | 771,587.50 |
| Jun 26 | MOBILE DEPOSIT | 1,286,000.00 | | 2,057,587.50 |
| Jun 26 | CHECK #5928 | | 496,000.00 | 1,561,587.50 |
| Jun 26 | CHECK #5929 | | 468,000.00 | 1,093,587.50 |
| Jun 26 | CHECK #5930 | | 458,000.00 | 635,587.50 |
| Jun 26 | CHECK #5931 | | 324,283.00 | 311,304.50 |
| Jun 26 | CHECK #5932 | | 310,840.00 | 464.50 |
| Jun 27 | INTERNET TRANSFER FROM 0212 | 139,000.00 | | 139,464.50 |

299.    All the checks written from the Valuewise account were in large, round numbers and made payable to accounts held by Mann Entities at Bank of America.

**CHECKS**                                                    * Indicates a Skip in Check Number(s)

| Date | Check No. | Amount | Date | Check No. | Amount | Date | Check No. | Amount |
|---|---|---|---|---|---|---|---|---|
| Jun 04 | 5880 | 488,000.00 | Jun 12 | 5900 | 496,000.00 | Jun 21 | 5920 | 487,000.00 |
| Jun 04 | 5881 | 462,000.00 | Jun 12 | 5901 | 456,000.00 | Jun 21 | 5921 | 446,000.00 |
| Jun 04 | 5882 | 351,000.00 | Jun 12 | 5902 | 349,000.00 | Jun 24 | 5922 | 492,000.00 |
| Jun 05 | 5883 | 183,000.00 | Jun 13 | 5903 | 424,000.00 | Jun 24 | 5923 | 475,000.00 |
| Jun 05 | 5884 | 492,000.00 | Jun 13 | 5904 | 406,000.00 | Jun 24 | 5924 | 455,000.00 |
| Jun 05 | 5885 | 454,000.00 | Jun 13 | 5905 | 399,000.00 | Jun 25 | 5925 | 431,000.00 |
| Jun 06 | 5886 | 488,000.00 | Jun 13 | 5906 | 493,000.00 | Jun 25 | 5926 | 480,000.00 |
| Jun 06 | 5887 | 473,000.00 | Jun 14 | 5907 | 499,000.00 | Jun 25 | 5927 | 489,000.00 |
| Jun 06 | 5888 | 464,000.00 | Jun 14 | 5908 | 429,000.00 | Jun 26 | 5928 | 496,000.00 |
| Jun 06 | 5889 | 447,000.00 | Jun 14 | 5909 | 372,000.00 | Jun 26 | 5929 | 468,000.00 |
| Jun 07 | 5890 | 493,000.00 | Jun 17 | 5910 | 490,000.00 | Jun 26 | 5930 | 458,000.00 |
| Jun 07 | 5891 | 455,000.00 | Jun 17 | 5911 | 429,000.00 | Jun 26 | 5931 | 324,283.00 |
| Jun 07 | 5892 | 352,000.00 | Jun 17 | 5912 | 382,000.00 | Jun 26 | 5932 | 310,840.00 |
| Jun 07 | 5893 | 486,000.00 | Jun 18 | 5913 | 484,000.00 | Jun 27 | 5933 | 492,000.00 |
| Jun 10 | 5894 | 484,000.00 | Jun 18 | 5914 | 450,000.00 | Jun 27 | 5934 | 484,000.00 |
| Jun 10 | 5895 | 477,000.00 | Jun 18 | 5915 | 419,000.00 | Jun 27 | 5935 | 461,000.00 |
| Jun 10 | 5896 | 453,000.00 | Jun 19 | 5916 | 491,000.00 | Jun 28 | 5936 | 498,000.00 |
| Jun 11 | 5897 | 490,000.00 | Jun 19 | 5917 | 433,000.00 | Jun 28 | 5937 | 447,000.00 |
| Jun 11 | 5898 | 464,000.00 | Jun 19 | 5918 | 379,000.00 | Jun 28 | 5938 | 455,000.00 |
| Jun 11 | 5899 | 344,000.00 | Jun 21 | 5919 | 392,000.00 | | | |

300.   Notably, Pioneer BSA compliance department employee Kelli Rappleyea reviewed the June 2019 activity in this Valuewise account on July 26, 2019. Her analysis defies logic:

> June review revealed increase in ACH totals. ***Transactions appear reasonable. No suspicious activity detected***. (Emphasis added).

301.   The activity described above with respect to the Valuewise 3622 account was consistent with at least 15 other Mann Entity Accounts, many if not all of which Pioneer employees routinely reviewed due to suspicious activity alerts.

302.   Thus, for example, in March 2019, Mann was using at least 11 accounts at Pioneer solely to shuffle funds and kite, and the amount of money moved through these accounts was between $11.3 and $38.1 million, for a total of approximately $283.6 million for the month of March 2019.

303.   In July 2019, Mann was using at least 17 accounts at Pioneer solely to move funds around and kite. The amount of money moved through each of these accounts was between $29 and $45 million, for a total of approximately $568.2 million the month of July 2019.

304.   None of this could have or would have occurred but for Pioneer's deliberate ignorance and facilitation of Mann's kiting scheme.

**The Collapse of the Mann/Pioneer Money Laundering Scheme**

305.    By August 2019, Mann was spending several hours a day orchestrating hundreds of transactions among the Mann Entity Accounts, including diverting third-party payroll and tax funds to other accounts, kiting millions of dollars between Bank of America and Pioneer, and moving money around to cover overdrafts.

306.    Immediately after Pioneer increased the ceiling of the Valuewise Loan from $32 million to $42 million on August 12, 2019, Mann requested and received an additional disbursement of $8.1 million, bringing the total amount of principal outstanding to over $40 million.

307.    On August 15, 2019, Mann made a $3.1 million principal payment on the Valuewise Loan using third-party tax funds diverted from the 2440 Tax Account.

308.    By August 28, 2019, the outstanding principal on the Valuewise Loan had swelled to $41,590,894.90.

309.    On August 29, 2019, Mann made a principal payment of $2.9 million using third-party tax funds diverted from the 2440 Tax Account.

310.    Also on August 29, 2019, just as he had done nearly every day for the previous several months, Mann wrote 36 checks totaling $15.588 million from four accounts he controlled at Bank of America and deposited them via RDC in twelve Mann Entity Accounts at Pioneer. Mann deposited three six-figure, round-dollar checks in each of the twelve Mann Entity Accounts totaling $1.299 million, just below the $1.3 million daily RDC cap.

311.    Just as it had done nearly every day for the past several months, Pioneer immediately credited the Mann Entity Accounts in the amount of the deposits, in effect giving the Mann Entities an interest-free loan totaling $15.588 million.

312.    That same day, Mann wrote 36 checks totaling over $18 million from certain of the Mann Entity Accounts at Pioneer using the proceeds of the Bank of America checks.

313.    According to Pioneer, it learned late in the afternoon on August 30, 2019 that Bank of America would not honor the 36 checks Mann had written the prior day and was freezing all accounts controlled by Mann at Bank of America.

314.    Fleming contacted Mann and the two agreed that Pioneer would block withdrawals from the Mann Entity Accounts but would allow deposits into the accounts.  They further agreed that Mann would inform no one, thus conspiring to ensure that Third-Party Employer tax and payroll monies would continue to accumulate in the 0212 Client Account and 2440 Tax Account.

315.    Mann and Pioneer knew and intended that NatPay would continue to process ACH transactions for Cloud Payroll, including debits to Third-Party Employer accounts and credits to the 2440 Tax Account consisting of third-party tax payments.  Mann and Pioneer further agreed and understood that Pioneer would seize the deposits to offset Mann's obligations and any losses incurred by Pioneer.

316.    Pioneer did not post any transactions in the Mann Entity Accounts for August 30, 2019, and instead spent the next several days analyzing all credits and debits to the accounts.

317.    Even a rudimentary analysis of the 2440 Tax Account would have established that the funds deposited in the account were third-party tax payments to be paid to the IRS and other taxing authorities.

318.    On September 3, 2019, Pioneer employees, including Kim Catello (Deposit Operations Analyst), David Hunn (formerly VP, Deposit Operations, now VP, BSA and Identity Theft Officer), and Sula Landi (VP, Controller), prepared or reviewed spreadsheets that listed all

suspended August 30, 2019 credit/deposits and debits/withdrawals in the Mann Accounts, and indicated which debits/withdrawals would be allowed and which would be returned.

319.   The spreadsheets reflected that millions of dollars in third-party payroll and tax funds were available for deposit to the MyPayroll and Cloud Payroll accounts.   Nonetheless, the spreadsheets further reflect that Pioneer decided to return and refuse to honor all third-party debits/withdrawals from the Mann Entity Accounts, including all legitimate debits/withdrawals from the 0212 Client Account, the 0428 Payroll Account, and the 2440 Tax Account, none of which had overdrafts.   Indeed, none of the MyPayroll or Cloud Payroll accounts had overdrafts or negative balances.

320.   At about 8:57 p.m. on September 3, 2019, Mann sent an email to Tim Burke, who was working with Pioneer, instructing that there were significant funds in the "tax account," and that more money would be coming into the account.   He also indicated that he had probably moved about $3 million from the "tax account" to pay down the "line," *i.e.*, the Valuewise Loan.

**From:** Michael Mann <███████████████████>
**Date:** September 3, 2019 at 20:57:31 EDT
**To:** Timothy Burke <███████████████████>
**Subject:** Cover

Tim....

There was probably close to 1.9M to cover tomorrow morning from the tax account. I did move probably 3M to the line from the tax account on Friday. There is more money coming in tomorrow to cover the 452K that Matt discussed. However, my guess is there was not enough money in their today.

Again, Pioneer should see it on the report tomorrow. Obviously, if I would have known this was going to happen on Friday, I would have left the money in the account.

Also, I do hope you get to BofA soon. My guess is they have the remainder to cover future tax liabilities.

Thanks for helping today. Again, I just wanted to make you aware based on numbers I see in the tax reports. I could be wrong but probably not.

Thanks,

Mike

321.    Burke then forwarded the email to Blessing and Fleming, who in turn forwarded the email to Tom Amell, Frank Sarratori, Patrick Hughes (Chief Financial Officer), and Laura Mazzara (Executive Vice President and Chief Risk Officer).

322.    Thus, as of September 3, 2019, Pioneer's senior officers were unquestionably aware that there were substantial third-party tax funds in the "tax account" at Pioneer.  At the very least, Pioneer had a duty to investigate the source of the funds in the 2440 Tax Account.

**Pioneer Causes Third-Party Tax Funds to Accumulate in the 2440 Tax Account**

323.    Between August 30, 2019 and September 4, 2019, with no knowledge that Pioneer was blocking debits/withdrawals from Cloud Payroll's accounts, NatPay effectuated a series of credits to the 2440 Tax Account, resulting in the deposit of $9,968,692.32 in third-party tax funds withdrawn from the accounts of about 1,340 employers.

324.    Specifically, NatPay effectuated the transfer of $6,152,367.91 in third-party tax funds from the accounts of approximately 740 employers to the 2440 Tax Account, effective August 30, 2019.

325.    NatPay effectuated the transfer of $2,037,583.70 in third-party tax funds from the accounts of approximately 200 employers to the 2440 Tax Account, effective September 3, 2019.

326.    NatPay effectuated the transfer of $1,778,740.71 in third-party tax funds from the accounts of approximately 400 employers to the 2440 Tax Account, effective September 4, 2019.

327.    Once Pioneer posted the August 30 and September 3 credits/deposits on September 3, 2019, the 2440 Tax Account had a positive balance of $8,883,528.54.  The ACH credits/deposits were easily identifiable to Pioneer as third-party tax monies because each was labeled "CLOUDPAYROLL/TAX COL" and included the name of the Third-Party Employer.

328. Pioneer senior officers met with Mann and Mann's attorney on September 4, 2019. Mann wanted Pioneer to release the third-party funds in the MyPayroll and Cloud Payroll accounts so that the payroll companies would not be destroyed. In furtherance of this goal, Mann told Pioneer's outside counsel that third-party payroll and tax funds were housed in Mann Entity Accounts and should be released so that the payroll companies would not be rendered worthless.

329. However, Pioneer refused to release any funds unless Bank of America agreed to release the funds it had frozen in its accounts that were controlled by Mann. Mann eventually left the meeting with the understanding that Pioneer intended to retain the third-party tax and payroll funds to offset Pioneer's potential losses.

330. Had Pioneer not looted the 2440 Tax Account, it would have had a positive balance of $10,662,269.25 on and after September 4, 2019.

331. On September 4, 2019, Pioneer posted a "debit memo" to the 2440 Tax Account reflecting its withdrawal of $6,845,944.84, which it then deposited in its own general ledger account.

332. Pioneer falsely claims that it was entitled to seize the funds to cover the overdrafts in other Mann Entity Accounts. However, Pioneer had no rights of setoff with respect to the 2440 Tax Account because, among other reasons, no Cloud Payroll accounts were overdrawn, and Pioneer knew the funds were third-party tax/treasury payments.

333. Also on September 4, 2019, Pioneer diverted $6,845,000 from the 2440 Tax Account to the 0212 Client Account. Pioneer then transferred $2.8 million of the third-party tax funds from the 0212 Client Account to other Mann Entity Accounts, and ultimately to pay down the Valuewise Loan.

334.    Significantly, however, Pioneer manipulated the dates on which these transactions occurred.  The transfer of $6,845,000 from the 2440 Tax Account was posted as of September 4, 2019, when Pioneer controlled the Mann Entity Accounts.

| Sep 04 | OLB TRANSFER | 2,800,000.00 | -762,416.30 |
|---|---|---|---|
| Sep 04 | OLB TRANSFER | 989,000.00 | -1,751,416.30 |
| Sep 04 | OLB TRANSFER | 988,000.00 | -2,739,416.30 |
| Sep 04 | OLB TRANSFER | 987,000.00 | -3,726,416.30 |
| Sep 04 | OLB TRANSFER | 986,000.00 | -4,712,416.30 |
| Sep 04 | OLB TRANSFER | 95,000.00 | -4,807,416.30 |

335.    Inexplicably, the deposit of the $6,845,000 to the 0212 Client Account was posted one day earlier, as of September 3, 2019.

| Sep 03 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 2,800,000.00 | 5,957,621.76 |
|---|---|---|---|
| Sep 03 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 989,000.00 | 6,946,621.76 |
| Sep 03 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 988,000.00 | 7,934,621.76 |
| Sep 03 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 987,000.00 | 8,921,621.76 |
| Sep 03 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 986,000.00 | 9,907,621.76 |
| Sep 03 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 95,000.00 | 10,002,621.76 |

336.    Similarly, the transfer of $2.8 million from the 0212 Client Account to the Weitz Account, the transfer of $3 million from the Weitz Account and to the Valuewise account ending in 3614, and the withdrawal of $3.2 million from the Valuewise 3614 account were all posted as of September 3, 2019.

337.    However, the deposit of the $3.2 million to the Valuewise Loan account was apparently backdated, as of August 30, 2019.

| 8/30/2019 | 42 | Internet Transfer From 8603614 - VALUEWISE CORPORATION | | | $3,200,000.00 | $35,490,894.90 |
|---|---|---|---|---|---|---|

338.    Significantly, on August 30, 2019, the Valuewise 3614 account had a balance of only $84,807.04, and therefore the payment of $3.2 million from that account to pay down the Valuewise Loan account on August 30, 2019 was impossible.

**BUSINESS CHECKING**                                        Account Number: XXXXXX3614

Account Owner(s):   VALUEWISE CORPORATION

**Balance Summary**

| | |
|---|---|
| Beginning Balance as of 08/01/2019 | $136,326.40 |
| + Deposits and Credits  (35) | $27,290,923.82 |
| - Withdrawals and Debits  (168) | $27,342,443.18 |
| **Ending Balance as of 08/31/2019** | **$84,807.04** |
| Service Charges for Period | $395.43 |
| Average Balance for Period | $99,322.00 |
| Average Collected for Period | $90,893.00 |
| Minimum Balance for Period | $1,340.00 |

339.    Pioneer's manipulation of the dates that these transactions were posted in its records made it appear as though Mann had initiated the payment from the Valuewise 3614 account to the Valuewise Loan account on August 30, 2019, before the Mann Accounts were partially "frozen." However, Pioneer had suspended all August 30, 2019 transactions, and any transfers that occurred were accomplished by Pioneer on September 4, 2019.

340.    Between Pioneer's "debit memo" withdrawal of $6,845,944.84 and the $6,845,000 transfer to the 0212 Client Account, Pioneer intentionally created a negative balance in the 2440 Tax Account, knowing that additional third-party tax funds would be deposited in the account on September 4, 2019.

341.    Thus, while third-party tax funds in the amount of $1,778,740.71 were deposited to the 2440 Tax Account on September 4, 2019, these amounts were applied to the negative balance created by Pioneer, and are not reflected in Pioneer's admitted "setoff" of $6,845,944.84 from the 2440 Tax Account

342.    Moreover, Pioneer has admittedly taken at least $15,975,018.25 from the Mann Entity Accounts in addition to the $1,778,740.71 deposited to the 2440 Tax Account on September 4, 2019, notwithstanding that the amount of the overdrafts was significantly less, only $15,588,000 million.  Pioneer has no legitimate basis for taking more from the accounts than necessary to cover the overdrafts.

343.    The negative balance in the 2440 Tax Account reflected in Pioneer's records is false and misleading because the negative balance was caused by Pioneer's looting of tax funds from the account, not because the account—or any Cloud Payroll account—was overdrawn.  If not for Pioneer's illegal conduct, the balance in the 2440 Tax Account as of September 4, 2019 would have been $10,628,738.17.

344.    The negative balance is also deceiving because it allowed Pioneer to understate the amount of funds it "set off" from the 2440 Tax Account.

345.    The negative balance also allowed Pioneer to record a non-interest expense, *i.e.*, write off, of $2.5 million in the first quarter of 2020.

346.    While it allowed third-party tax funds to be deposited to Cloud Payroll's account, Pioneer prevented the withdrawal of $4,329,563.94 in third-party tax funds from the 2440 Tax Account between August 30, 2019 and September 4, 2019.

347.    Specifically, on August 30, 2019 Pioneer blocked the withdrawal of $814,208.33 in third-party tax funds from the 2440 Tax Account that were to be paid to the IRS and other taxing authorities on behalf of Third-Party Employers.

348.    On September 3, 2019, Pioneer blocked the withdrawal of $3,002,466.62 in third-party tax funds from the 2440 Tax Account that were to be paid to the IRS and other taxing authorities on behalf of Third-Party Employers.

349.    On September 4, 2019, Pioneer blocked the withdrawal of $512,888.99 in third-party tax funds from the 2440 Tax Account that were to be paid to the IRS and other taxing authorities on behalf of Third-Party Employers.

350.    But for Pioneer's wrongful interference with the 2440 Tax Accounts, all tax monies paid by Third-Party Employers and deposited to the 2440 Tax Account would have been paid to the IRS and other taxing authorities.

351.    In addition to the $9,968,692.32 in third-party tax funds deposited to the 2440 Tax Account between August 30 and September 4, 2019 (and converted by Pioneer), at least $6,508,493.50 in third-party tax funds were deposited to the 2440 Tax Account prior to August 30, 2019 and not yet due to be paid to the appropriate taxing jurisdictions.  These funds were similarly converted by Defendants.

**Pioneer Converted $2.7 Million from NatPay**

352.    On or about August 29, 2019, Mann caused Cloud Payroll to send NatPay instructions to effectuate the transfer of $2,721,815.77 from certain Mann Entity Accounts at Pioneer to the 0212 Client Account, effective August 30, 2019.

353.    Specifically, the instructions directed the transfer of $1,306,231.96 from a Mann-controlled account ending in 2382 to the 0212 Client Account.

354.    The instructions further directed the transfer of $1,309,196.51 from a Mann-controlled account ending in 1699 to the 0212 Client Account.

355.    Finally, the instructions directed the transfer of $106,387.30 from a Mann-controlled account ending in 1988 to the 0212 Client Account.

356.    The debits and credits that would have effectuated these transfers were not posted by Pioneer on August 30, 2019, but instead suspended in order for Pioneer to manipulate the transactions.

357.    Pioneer could see that, as of August 30, 2019, the accounts ending in 2382, 1699, and 1988 did not have sufficient funds to cover these transfers to the 0212 Client Account.

358.    Pioneer also knew that if it permitted the credits/deposits to the 0212 Client Account and subsequently returned the debits/withdrawals from the other accounts, NatPay would end up funding the deposits and Pioneer could then convert NatPay's funds for its own use.

359.    Pioneer posted the credits/deposits to the 0212 Client Account effective September 3, 2019.

| Date | Description | Deposits | Withdrawals | Balance |
|------|-------------|----------|-------------|---------|
| Sep 01 | BEGINNING BALANCE | | | $303,392.32 |
| Sep 03 | CLOUDPAYROLL LLC/EPAY0001 | 762,429.09 | | 1,065,821.41 |
| Sep 03 | CLOUDPAYROLL LLC/EPAY0001 | 694,328.67 | | 1,760,150.08 |
| Sep 03 | CLOUDPAYROLL LLC/EPAY0001 | 611,903.29 | | 2,372,053.37 |
| Sep 03 | CLOUDPAYROLL LLC/EPAY0001 | 546,767.42 | | 2,918,820.79 |
| Sep 03 | CLOUDPAYROLL LLC/EPAY0001 | 106,387.30 | | 3,025,208.09 |

360.    It did not return the debits/withdrawals until the last possible moment, so they were not received by NatPay until September 4, 2019.

361.    This resulted in a direct loss to NatPay in the amount of $2,721,815.77, which was paid from NatPay's settlement account to the 0212 Client Account.

362.    NatPay attempted to reject the withdrawal from its account, but Pioneer refused to accept the rejection, contrary to industry practice.

363.    On September 4, 2019, Pioneer posted a "debit memo" to the 0212 Client Account, reflecting its transfer of $7,205,338.10 from the 0212 Client Account to Pioneer's general account. Included in this amount was the $2,721,815.77 converted from NatPay, in addition to third-party payroll and tax funds.

364.    There were no overdrafts in any of the MyPayroll accounts, and therefore Pioneer's purported "setoff" of funds from the 0212 Client Account was unauthorized and illegal.

365.    Further, Pioneer knew that the 0212 Client Account held third-party payroll and tax funds and therefore was not subject to setoff.

**Defendants Work Together to Conceal Their Misconduct**

366.    Although Pioneer knew there were serious issues with the Mann Entities and the Mann Entity Accounts on August 30, 2019, and that Mann had stepped down as CEO of Valuewise and all related entities on the morning of September 3, 2019, Pioneer executives purposefully kept Berkshire and Chemung in the dark and did not respond to their inquiries until Monday, September 9, 2019.

367.    On September 3, 2019, Charbonneau  forwarded a Notification of Paydown on the Valuewise Loan to Berkshire and Chemung, falsely indicating that Mann had made a payment in the amount of $3.2 million on August 30, 2019.

368.    On September 4, 2019, around the time Pioneer executives were conspiring with Mann to convert the third-party tax funds and payroll, Stephen Malinowski from Berkshire emailed Blessing to confirm their meeting the following day with Mann.

369.    Blessing responded curtly, "Steve, unfortunately we have to reschedule.  I will let you know."

370.    Unaware of the situation, Malinowski indicated that it was not a problem and asked whether Blessing had time for lunch the following day, Malinowski's "treat."

371.    Blessing responded the following day, September 5, 2019, "Sorry not today."

372.    Malinowski responded, asking if everything was "OK?"

373.    Blessing responded, "Yes just tied up with something at work."

374.    Wholly unaware of the unfolding situation and intentionally left in the dark by Pioneer, Malinowski asked that Blessing let him know when he and Mann were free so they could reschedule the meeting, and let him know when Blessing was free for lunch or coffee.

375.    Blessing did not respond.

376.     On September 5, 2019, Charbonneau sent Berkshire and Chemung a Participation Remittance and rate change effective September 1, 2019, as if everything were fine with the Valuewise Loan.

377.     On September 6, 2019, the Albany Times Union newspaper published an article regarding the sudden shuttering of MyPayroll.  Laura Mazzara (EVP, Chief Risk Officer) sent a link to the article to Tom Amell, indicating that Pioneer was not mentioned in the article.  Amell responded, "Let's keep it that way."

378.     Also on September 6, 2019, Malinowski sent an email to Fleming, indicating that he had been trying to reach Blessing and that he had learned that MyPayroll was out of business. He asked that Fleming call him.  Fleming did not respond.

379.     Kevin Harrigan of Chemung sent an email to Blessing on September 6, 2019, indicating that he had a client using MyPayroll who had received notification that MyPayroll had gone out of business and asking for information.  Harrington stated "I hope you have news to get me off the ledge."

380.     The email was forwarded to Pioneer senior management, and Blessing did not respond to Harrigan's email.

381.     Harrigan also sent an email to Pioneer's outside counsel on September 6, 2019, asking questions about the situation and indicating that Chemung had not received any update on the situation from Pioneer.

382.     Harrigan then left a voice message for Fleming and followed up with an email seeking information.  Fleming forwarded the email to Sarratori, but did not respond to Harrigan.

383.     On September 6, 2019, Malinowski also sent an email to Blessing indicating that he had just read an article in the Times Union regarding MyPayroll and asking what was "going on."  Blessing did not respond.

384.     Finally, on September 9, 2019, more than a week after Pioneer knew there were substantial issues with the Mann Entities and the Mann Entity Accounts, Pioneer finally responded to the inquires of Berkshire and Chemung.  However, Pioneer failed to disclose that, on September 4 and 5, 2019, Pioneer had transferred to its own general ledger account nearly $16 million from the Mann Entity Accounts purportedly to cover the overdrafts in certain Mann Entity Accounts.

385.     This apparently was not the first time Pioneer disregarded its fiduciary duty and failed to disclose material information to Berkshire and Chemung.

386.     Notwithstanding Pioneer's knowledge of Mann's near-daily overdrafts and his use of third-party tax and payroll funds to cover the overdrafts, Pioneer failed to disclose this material information to Berkshire and Chemung.

387.     Berkshire and Chemung have brought separate suits against Pioneer in New York State Supreme Court, Albany County, based on Pioneer's fraud and other misconduct.

**Pioneer's Scheme to Conceal Its Conversion and Money Laundering Activities**

388.     On September 18, 2019, NatPay's bank, First Premier, filed a complaint with NACHA, alleging that Pioneer's returns had violated NACHA operating rules.

389.     Specifically, First Premier indicated that, under the NACHA rules, a financial institution receiving a debit entry may return it for any reason unless the reason is prohibited.  The NACHA rules prohibit a receiving financial institution from returning a debit entry due to the "type of entry."  There is no question that Pioneer violated this rule when it returned only debit entries—not credit entries—on the grounds the accounts were purportedly "frozen."

390.    In furtherance of Pioneer's scheme to conceal its money laundering and conversion, Pioneer made a number of intentional misrepresentations and deceptive omissions to NACHA in a letter signed by Frank Sarratori (Executive VP, General Counsel, and Chief Administrator).

391.    Sarratori stated that the 2440 Tax Account was pledged as collateral for certain debt obligations owed by the account owner, and that pursuant to UCC Article 9, Pioneer had a perfected security interest in the account and all funds deposited in the 2440 Tax Account.

392.    Sarratori further indicated that Pioneer had a right of set off against the 2440 Tax Account for the account owner's debt obligations, and that as of September 4 and 5, 2019 various debt obligations owed by the account owner were in default and due and payable.

393.    Sarratori falsely stated that at the time of the returns, "there were no funds available cover [sic] the dollar value of the debit entries."  Therefore, while Pioneer used return reason code R16, "it could with equal justification have used return reason code R01 (the available balance is not sufficient to cover the dollar value of the debit entry)[.]"

394.    Notably, while Sarratori repeatedly referred to "defaulted loans" as the basis for the returns, Pioneer has abandoned any reliance on this excuse.  Rather, Pioneer has taken the position that it was entitled to set off the tax funds due to overdrafts occurring in Mann Entity Accounts.

395.    This is likely due to the fact that there are exclusions in Pioneer's insurance policies that would reduce or eliminate coverage to the extent that Pioneer setoff funds in the Mann Entity Accounts because such funds served as collateral for the Valuewise Loan.  Pioneer has brought a declaratory judgment action against Atlantic Specialty Insurance Company in New York Supreme Court, Albany County, seeking to recover what can no doubt be extraordinary defense costs based on Pioneer's belated excuse for seizing the funds in the Mann Entity Accounts.

396.    Sarratori's assertions to NACHA were materially false, since he failed to disclose that the 2440 Tax Account was held by Cloud Payroll, and that Cloud Payroll had no "debt obligations" to Pioneer.  None of the accounts held by Cloud Payroll had overdrafts.

397.    Sarratori's assertion to NACHA that there were no funds available at the time it returned the debits was also materially false.  To the contrary, Pioneer setoff funds from the Mann Entity Accounts at 6:30 p.m. on September 4, 2019.  At that time, the 2440 Tax Account had a balance of over $10 million.

398.    Moreover, Sarratori failed to disclose that the only reason there ultimately were no funds in the 2440 Tax Account was because Pioneer converted more than $6.845 million to its own account and caused the transfer of another $6.845 million in funds to other Mann Accounts that were also ultimately either converted by Pioneer or used to pay down the Valuewise Loan.

399.    NACHA was not the only third party Pioneer intentionally sought to deceive.

400.    In the aftermath of the closure of MyPayroll and Cloud Payroll, numerous individuals on behalf of small businesses, not-for-profits, and other employers throughout the country sent communications to Pioneer asking about their tax and/or payroll monies.

401.    Those employers were distraught that the payroll and tax payments that had been withdrawn from their accounts were "frozen" at Pioneer Bank.

402.    Pioneer curtly responded to these inquiries, if at all, with false information.

| From: | Frank C. Sarratori |
| To: | "James: ▉▉▉▉ |
| Subject: | FW: ▉▉▉▉ /MyPayrollHR issue |
| Date: | Monday, October 07, 2019 4:25:38 PM |
| Attachments: | pioneer_signature.png |
|  | pioneer_signature.png |
|  | pioneer_signature.png |

This acknowledges receipt of your recent inquiry.  Pioneer Bank is not providing (nor has it ever provided) payroll services, ACH tax wiring services, tax filing services or other payroll related services for Cloud Payroll.

All inquiries or concerns regarding missing payroll or missing tax/treasury payments connected to Cloud Payroll  should be directed to Cloud Payroll.

Sincerely,

Frank C. Sarratori

403.    These communications were false because, as demonstrated above, Pioneer authorized Mann use the 0212 Client Account and 2440 Tax Account to house and process third-party payroll and tax funds, and routinely assisted MyPayroll and Cloud Payroll in processing payroll and tax payments.  Moreover, by this date, Pioneer was well aware that the funds it had seized were third-party payroll and tax funds to which Pioneer had no right.  Pioneer also directed that any inquiries be directed to MyPayroll and Cloud Payroll, even though Pioneer knew full well that those entities were shuttered as a result of Pioneer's illegal actions.

**Additional Harm Caused by Defendants' Misconduct**

404.    As a result of Pioneer's acceptance of ACH credit/deposit entries and delayed rejection of ACH debit/withdrawal entries, NatPay incurred losses of about $3,884,115 when funds were transferred from NatPay's settlement account and deposited to the accounts of various taxing authorities or to certain Mann Entity Accounts and ultimately seized by Pioneer.

405.    In addition, due to Defendants' conduct, NatPay has received multiple demand letters sent by or on behalf of certain Third-Party Employers, demanding "return" of their tax funds, notwithstanding that Pioneer—not NatPay—has possession of their tax funds.

406.    NatPay was also named as a defendant in a related class action entitled *Simmons et al. v. Cachet Financial Services*, Case No. 2:19-cv-01624 (KJD/VCF), currently pending in the United States District Court for the District of Nevada.

407.    In order to protect and defend itself from these and additional threats, NatPay was required to bring this action and seek Pioneer's disgorgement of the Third-Party Employer tax funds.

408.    Defendants' misconduct has not only harmed NatPay.  Pioneer's illegal seizing of tax funds has unquestionably harmed thousands of employers throughout the country.  Many

employers have been required to pay the taxes owed to the appropriate taxing authorities and thus have in effect paid such taxes twice.  Other Third-Party Employers have not or cannot pay the taxes owed a second time, have received notices of deficiencies, are incurring penalties, and are subject to collection activities by the various taxing authorities.

409.     Pioneer and Mann's conspiracy to use the third-party tax and payroll funds to offset overdrafts and pay down the Valuewise Loan resulted in the conversion of at least $16 million in third-party tax funds to the detriment of thousands of additional employers and employees throughout the country.

## FIRST CAUSE OF ACTION
## (DECLARATORY JUDGMENT – AGAINST PIONEER)

410.     NatPay incorporates the allegations contained in paragraphs 1 through 409 above as if fully recited herein.

411.     NatPay effectuated the deposit of at least $16 million in third-party tax funds withdrawn from the accounts of the Third-Party Employers into the 2440 Tax Account at Pioneer.

412.     Pioneer has seized most of these tax funds, claiming that it was entitled to "setoff" overdrafts in other Mann Entity Accounts, even though there were no overdrafts in the 2440 Tax Account or any other Cloud Payroll or MyPayroll accounts.

413.     Pioneer knew that the funds in the 2440 Tax Account were third-party funds paid by employers for deposit to the IRS and other taxing authorities.

414.     Pioneer was obligated to investigate the source of the funds in the 2440 Tax Account prior to setting off any funds in the account, and Pioneer's own records clearly reveal that the funds in the account were third-party tax payments, not the funds of Cloud Payroll, Mann, or any of the Mann Entities.

415.    Mann and the Entity Defendants have not challenged Pioneer's ability to seize Third-Party Employer payroll and tax funds, and worked in concert with Pioneer in order that the payroll and tax funds be used to reduce Mann's debt to Pioneer and Pioneer's purported losses.

416.    Third-Party Employers have alleged that NatPay is liable to them with respect to any tax funds withdrawn from their accounts but not paid to the appropriate taxing authorities, and have brought suit or threatened to bring suit against NatPay as a result of Pioneer's conduct.

417.    This case involves an actual, substantial controversy between the parties.

418.    NatPay seeks a declaration with respect to the rights of the parties vis-à-vis the tax funds deposited to the 2440 Tax Account, and specifically a declaration that Pioneer wrongfully seized the Third-Party Employer tax funds, that Pioneer must release such funds to NatPay or a receiver for payment to the appropriate taxing jurisdictions, that Pioneer must disgorge any interest or profits it has earned by way of its wrongful retention of the third-party tax funds, and that Pioneer is liable, not NatPay, to any Third-Party Employers with respect to the tax funds and any damages they have incurred due to Pioneer's unlawful actions.

## SECOND CAUSE OF ACTION
### (CONVERSION)

419.    NatPay incorporates the allegations contained in paragraphs 1 through 418 above as if fully recited herein.

420.    Pioneer, through its improper partial "freezing" of the 2440 Tax Account and its seizure and diversion of all third-party funds in the account, has knowingly and wrongfully converted at least $16 million in Third-Party Employer tax funds to which it has no right of possession.

421.    Pioneer continues to exercise unauthorized and wrongful possession and control over the Third-Party Employer tax funds to the exclusion of NatPay who, by virtue of its

contractual relationship with Cloud Payroll, and Cloud Payroll's relationship with the Third-Party Employers, has the right to possess the tax funds and to ensure their remittance to the appropriate taxing authorities.

422. Pioneer knew that the Third-Party Employer tax funds in the 2440 Tax Account were not the property of Mann, the Mann Entities, or Pioneer, and the funds could not be pledged as collateral for the $42 million loan or used to setoff overdrafts in other Mann Entity Accounts.

423. In addition, Pioneer and Mann knew that Mann had caused ACH instructions to be sent to NatPay on or about August 29, 2019 to effectuate the transfer of $2,721,815.77 from certain Mann-controlled accounts at Pioneer to the 0212 Client Account, effective August 30, 2019.

424. Pioneer and Mann knew and agreed that Pioneer would accept the credit/deposit entry side of the transfers, and would delay return of the debit/withdrawal entry side of the transfers, which would necessarily result in NatPay funding any credit/deposit entries to any Mann Entity Accounts.

425. On August 29, 2019, based on the instructions received from Cloud Payroll, NatPay initiated debit/withdrawal entries to three Mann-controlled accounts and credit/deposit entries to the 0212 Client Account for the purposes of transferring $2,721,815.77 from the former accounts to the latter account.

426. As a result of Pioneer's selective rejection of ACH entries, the debit/withdrawal entries initiated by NatPay to the three Mann-controlled accounts were blocked, and Pioneer purposefully delayed rejection of the debit entries for several days so that they were not received by NatPay until September 4, 2019. However, the credit/deposit entries initiated by NatPay were accepted by Pioneer. As a result, $2,721,815.77 from NatPay's settlement account at First Premier was deposited to the 0212 Client Account.

427.    Mann and the Entity Defendants failed to challenge Pioneer's ability to seize the Third-Party Employer tax funds and NatPay's funds and have worked in concert with Pioneer in order that the third-party funds be used to reduce Mann's debt and Pioneer's losses.

428.    By letter dated September 9, 2019, NatPay demanded that Pioneer correct its improper returns and thereby release all funds wrongfully in its possession

429.    Pioneer ignored NatPay's demand.

430.    Defendants' wrongful conversion of the third-party tax funds and NatPay's funds has caused NatPay to suffer damages, including the loss of over $3.8 million and other damages that will continue to accrue until the Third-Party Employer tax funds are paid to the appropriate taxing authorities.

431.    NatPay seeks all damages allowable by law against Defendants, including compensatory and punitive damages, interest, costs, and attorneys' fees.

432.    NatPay is entitled to an order requiring that Pioneer disgorge any interest or profits it has earned by way of its wrongful retention of the tax funds.

## THIRD CAUSE OF ACTION
### (FRAUD)

433.    NatPay incorporates the allegations contained in paragraphs 1 through 432 above as if fully recited herein.

434.    Beginning on or about August 30, 2019, Pioneer and Mann agreed and implemented a plan to allow all credits/deposits to the Mann-controlled accounts, including the 2440 Tax Account, and ultimately to reject all legitimate debits/withdrawals from the accounts.

435.    Pioneer purposefully delayed returning ACH debit/withdrawal entries so that they would not be received by NatPay until September 4, 2019, knowing that tax funds would amass in the 2440 Tax Account and Pioneer could seize any deposits.

436.   Pioneer knew that by delaying returns, third-party ACH processors, including NatPay, would rely on Pioneer's acceptance of credit entries and silence as to debit entries as indication that the Mann Entity Accounts were not frozen and continue to make deposits to the accounts.

437.   Pioneer's conduct in this manner violated NACHA Operating Rules, was unprecedented, and was not foreseeable by NatPay.

438.   Mann and the Entity Defendants enabled and ratified Pioneer's conduct for their own selfish purposes.

439.   Defendants' fraud has caused NatPay to suffer damages, including the loss of over $3.8 million, that will continue to accrue until the Third-Party Employer tax funds are paid to the appropriate taxing authorities.

440.   NatPay seeks all damages allowable by law against Defendants, including compensatory and punitive damages, interest, costs, and attorneys' fees.

441.   NatPay is entitled to an order requiring that Pioneer disgorge any interest or profits it has earned by way of its wrongful retention of the tax funds.

## FOURTH CAUSE OF ACTION
### (NEGLIGENCE/GROSS NEGLIGENCE)

442.   NatPay incorporates the allegations contained in paragraphs 1 through 441 above as if fully recited herein.

443.   All Defendants owed a duty to NatPay to keep and maintain the Third-Party Employer tax funds in trust for payment to the taxing authorities.

444.   All Defendants knew that NatPay served as Cloud Payroll's ACH service provider, and that NatPay would be harmed if ACH credits/deposits were allowed but ACH

debits/withdrawals were returned, or if the Third-Party Employer tax funds were converted by Mann or Pioneer.

445.    Defendants intentionally diverted Third-Party Employer tax funds in the 2440 Tax Account to other accounts to cover overdrafts, to pay down the Valuewise loan, or other improper purposes.

446.    Defendants failed to adequately monitor and supervise the tax funds.

447.    Defendants agreed that Mann and the Entity Defendants could pledge the MyPayroll and Cloud Payroll accounts as collateral for the Valuewise Loan, even though all Defendants knew that the MyPayroll and Cloud Payroll accounts were used to process third-party payroll and tax payments, and could not be pledged as collateral for the Valuewise Loan.

448.    In issuing the Valuewise Loan, Pioneer had a duty to engage in credit underwriting and due diligence, and to ensure that the Mann and the Entity Defendants had sufficient liquidity and assets with respect to the Valuewise Loan, and to ensure that any accounts that were pledged as collateral for the Valuewise Loan did not include third-party payroll or tax funds.

449.    Pioneer's due diligence with respect to the Valuewise Loan was grossly deficient.

450.    Pioneer had a duty upon opening any of the Mann Entity Accounts to gain an understanding, independent of any forms completed for Mann, of the purpose and anticipated use of the account, the expected volume of activity in the account, and source of funds in the account. Pioneer also had a duty to monitor the Mann Entity Accounts for suspicious activities and report suspicious activity to FinCEN.

451.    Moreover, under federal and state law, Pioneer had a duty to operate in a manner that protects the public interest, including that it insure the safe and sound conduct of its business,

maintain public confidence in its business, and protect the interests of the public, depositors, creditors, shareholders and stockholders.

452.    Pioneer deliberately ignored its obligations and any suspicious activities in the Mann Entity Accounts. Pioneer failed to use the ordinary care of a reasonably prudent bank under the same or similar circumstances, and failed to exercise adequate banking standards of care specifically in relation to the 0212 Client Account, the 2440 Tax Account, and the other Mann Entity Accounts. Had Pioneer fulfilled these obligations, Mann's schemes would have ended, and no harm would have come to the Third-Party Employers and NatPay.

453.    Mann and the Entity Defendants had a duty to challenge Pioneer's conversion of the tax funds, but instead have colluded with Pioneer and acquiesced in Pioneer's misconduct.

454.    Pioneer has converted Third-Party Employer tax funds purportedly to setoff overdrafts in accounts held by entities other than Cloud Payroll and MyPayroll, and has refused to release the third-party tax funds knowing that such funds were not the property of Mann, Cloud Payroll or any other Mann Entity, or Pioneer.

455.    Defendants have breached their duties to NatPay.

456.    Defendants' negligence, willful misconduct, gross negligence, and reckless actions have caused damages to NatPay. Defendants' conduct is so careless and reckless as to show a complete disregard for the rights and safety of others and the consequences of Defendants' actions or inactions.

457.    Defendants' negligence, gross negligence, willful misconduct and reckless actions have caused NatPay to suffer damages, including the loss of over $3.8 million and other damages that will continue to accrue until the Third-Party Employer tax funds are paid to the appropriate taxing authorities.

458.    NatPay seeks all damages allowable by law against Defendants, including compensatory and punitive damages, interest, costs, and attorneys' fees.

459.    NatPay is entitled to an order requiring that Pioneer disgorge any interest or profits Pioneer has earned by way of its wrongful retention of the tax funds.

## FIFTH CAUSE OF ACTION
### (UNJUST ENRICHMENT/MONEY HAD AND RECEIVED – PIONEER)

460.    NatPay incorporates the allegations contained in paragraphs 1 through 459 above as if fully recited herein.

461.    Prior to September 5, 2019, NatPay effectuated the transferred more than $16 million in Third-Party Employer tax funds to the 2440 Tax Account at Pioneer, none of which has been paid to the appropriate taxing authorities.

462.    On August 29, 2019, based on the instructions received from Cloud Payroll, NatPay initiated debit/withdrawal entries to three Mann-controlled accounts and credit/deposit entries to the 0212 Client Account for the purposes of transferring $2,721,815.77 from the former accounts to the latter account.

463.    As a result of Pioneer's selective rejection of ACH transactions, the debit/withdrawal entries initiated by NatPay to the three Mann-controlled accounts were blocked, and Pioneer purposefully delayed rejection of the debit entries for several days so that they were not received by NatPay until September 4, 2019.  However, the credit/deposit entries initiated by NatPay were accepted by Pioneer.  As a result, $2,721,815.77 from NatPay's settlement account at First Premier was deposited to the 0212 Client Account.

464.    Pioneer has been unjustly enriched by its conversion and retention of Third-Party Employer tax funds and NatPay's funds.  By allowing Pioneer to retain the Third-Party Employer

tax funds and NatPay's funds to offset their obligations to Pioneer, Mann and the Entity Defendants have been unjustly enriched.

465.    Pioneer's conversion and retention of funds was at the expense of the Third-Party Employers and NatPay.

466.    Pioneer's losses with respect to its dealings with Mann were the result of Pioneer's own misconduct and willful disregard of Mann's illegal activities.

467.    It is against equity and good conscience to permit Pioneer to retain the Third-Party Employer tax funds and NatPay's funds.

468.    Pioneer should be ordered to release the Third-Party Employer tax funds to NatPay or to a receiver for payment to the appropriate taxing jurisdictions, to release $2,721,815.77 to NatPay, and to disgorge any interest or profits it has earned by way of its wrongful retention of the third-party funds.

### SIXTH CAUSE OF ACTION
### (VIOLATION OF RICO, 18 U.S.C. § 1962(c))

469.    NatPay incorporates the allegations contained in paragraphs 1 through 468 above as if fully recited herein.

470.    Each Defendant is a "person" capable of holding legal or beneficiary interest in property  within the meaning of 18 U.S.C. § 1961(3).

471.    Each Defendant violated 18 U.S.C. § 1962(c) by the acts described above, and as further described below.

472.    From at least 2014 through September 4, 2019, Mann, the Mann Entities, and Pioneer were associated with and comprised an "enterprise" within the meaning of 18 U.S.C. § 1961(4) that engaged in acts and activities that affected interstate commerce, including money

laundering (the "RICO Enterprise").  At all relevant times, the RICO Enterprise constituted an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

473.    The purpose of the RICO Enterprise was to obtain Third-Party Employer tax and payroll payments from employers throughout the country and to use those third-party tax and payroll funds to cover any overdrafts in other Mann Entity Accounts, pay down the Valuewise Loan, and otherwise to benefit Mann, Pioneer, and the RICO Enterprise.  Defendants intended to and did in fact hide, launder, and otherwise wrongfully retain the Third-Party Employer tax and payroll funds.

474.    Defendants knew that their use of the third-party funds was not authorized by the Third-Party Employers or NatPay.  Defendants diverted the third-party funds to other Mann Entity accounts in order to conceal the nature, source, ownership and control of the third-party funds.  Defendants stole third-party tax funds in the amount $2.8 million from the 2440 Account and caused about 66% of those funds to be wired to Berkshire and Chemung as payment on the Valuewise Loan.

475.    The RICO Enterprise had a discernable structure.  Mann had the most significant degree of control over the affairs of the RICO Enterprise, and controlled the flow of the third-party payroll and tax funds.  Pioneer, primarily through Blessing, Fleming, and Benedict, provided Mann with substantial assistance and necessary approvals, and encouraged Mann to divert third-party funds from the 0212 Client Account and the 2440 Tax Account to other Mann Entity Accounts and to reduce the balance of the Valuewise Loan.  Pioneer also assisted Mann by concealing his money laundering activities from Valuewise Loan participants, including Berkshire and Chemung, and from federal regulators including FinCEN.  At all relevant times, Pioneer knew that Mann was engaged in fraudulent activity and that the Third-Party Employer payroll and tax funds were

obtained through wrongful criminal conduct.  Pioneer knew that by assisting and encouraging Mann to divert third-party payroll and tax funds from the MyPayroll and Cloud Payroll accounts, and concealing his money laundering from third parties, it was participating in and facilitating that unlawful conduct.

476.    Certain of the Mann Entities that comprised the RICO Enterprise, including MyPayroll, Cloud Payroll, SWP, and ProData, were engaged in legitimate payroll businesses, and were used by Mann to recruit and contract with Third-Party Employers.  The Mann Entities were acquired or formed by Mann and were used by him to engage in money laundering.

477.    On and after August 30, 2019, Pioneer took control of the RICO Enterprise, and diverted third-party payroll and tax funds from the MyPayroll and Cloud Payroll accounts to its own accounts and to pay down the Valuewise Loan.  Pioneer also wired, with the intent to defraud, stolen Third-Party Employer tax funds in an amount exceeding $10,000 to Berkshire and Chemung.

478.    The RICO Enterprise was distinct from the predicate acts of money laundering. Mann and the Mann Entities engaged in various lawful activities, including consulting work and payroll processing services, and Pioneer executed certain lawful commercial banking transactions on behalf of Mann and the Mann Entities.

479.    Each of the Defendants agreed to and did conduct, participate in the conduct of, operate, and manage the affairs of the RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and in violation of 18 U.S.C. § 1962(c).

480.    The racketeering activities committed by the Defendants all had the same or similar purposes, results, participants, victims, and methods of commission, and they were not isolated events.  As described above, the Defendants engaged in numerous predicate acts of money

laundering in violation of 18 U.S.C. §§ 1956 and 1957, which occurred on a regular basis from 2014 at least through September 4, 2019, and would have continued but for Bank of America's freezing of the Mann Entities' bank accounts held at Bank of America, and thus constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

481.    Defendants knew that the transfer of third-party payroll and tax funds from the MyPayroll and Cloud Payroll accounts to other Mann-controlled accounts or to third parties were designed to conceal or disguise the nature, location, source, ownership, or control of the stolen funds.

482.    Defendants' transactions affected interstate and foreign commerce because (a) proceeds of specified unlawful activity were deposited in financial institutions in the United States, (b) stolen funds were moved by ACH, wire, and other means that affected interstate commerce, and (c) financial institutions that are engaged in, or the activities of which affect, interstate or foreign commerce were used to facilitate the illegal transactions.

483.    From 2017 through at least September 5, 2019, NatPay was a reasonably foreseeable and/or anticipated victim of Defendants' racketeering activity.

484.    As a direct and proximate result of, and by reason of, the activities of Defendants, and their conduct in violation of 18 U.S.C. § 1962(c), NatPay has been injured in its business and its property, within the meaning of 18 U.S.C. § 1964(c).

485.    As described above, as a result of Defendants' misconduct, NatPay has been damaged in the amount of at least $3.8 million, and NatPay has incurred and will continue to incur substantial costs in seeking to obtain disgorgement of its funds as well as the Third-Party Employer tax funds.

486.     NatPay is entitled to recover and seeks threefold the damages it has sustained together with the cost of the suit including costs and expenses, reasonable attorney's fees, and reasonable experts' fees.

### SEVENTH CAUSE OF ACTION
### (VIOLATION OF RICO, 18 U.S.C. § 1962(d))

487.     NatPay incorporates the allegations contained in paragraphs 1 through 486 above as if fully recited herein.

488.     Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate RICO, 18 U.S.C. § 1962(c).

489.     In connection with the RICO Enterprise, Pioneer and Mann agreed to accomplish an unlawful plan to engage in a pattern of racketeering activity.

490.     Pioneer and Mann agreed to the overall objective of the conspiracy, and agreed to commit at least two acts of racketeering, including but not limited to money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

491.     As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, NatPay has been injured in its business or property.

492.     The unlawful actions of Defendants, and each of them, have directly, legally, and proximately caused injuries to NatPay in its business.

493.     As described above, as a result of Defendants' misconduct, NatPay has been damaged in the amount of at least $3.8 million, and NatPay has incurred and will continue to incur substantial costs in seeking to obtain disgorgement of its funds as well as the Third-Party Employer tax funds.

494.    NatPay is entitled to recover and seeks threefold the damages it has sustained together with the cost of the suit including costs and expenses, reasonable attorney's fees, and reasonable experts' fees.

## EIGHTH CAUSE OF ACTION
### (AIDING AND ABETTING CONVERSION – PIONEER)

495.    NatPay incorporates the allegations contained in paragraphs 1 through 494 above as if fully recited herein.

496.    On and after August 30, 2019, Pioneer and Mann knew that, if the 2440 Tax Account was partially "frozen," *e.g.*, that Pioneer would allow ACH credit/deposit entries but would hold and later return debit/withdrawal entries, that NatPay would fund any credits with respect to transfers between accounts directed by Cloud Payroll.

497.    Pioneer and Mann knew that Mann had caused ACH instructions to be sent to NatPay on or about August 29, 2019 to effectuate the transfer of $2,721,815.77 from certain Mann-controlled accounts at Pioneer to the 0212 Client Account, effective August 30, 2019.

498.    Pioneer and Mann knew and agreed that Pioneer would accept the credit/withdrawal entry side of the transfers, and would delay return of the debit/withdrawal entry side of the transfers, which would necessarily result in NatPay funding any credit/deposit entries to any Mann Entity Accounts.

499.    On August 29, 2019, based on the instructions received from Cloud Payroll, NatPay initiated debit/withdrawal entries to three Mann-controlled accounts and credit/deposit entries to the 0212 Client Account for the purposes of transferring $2,721,815.77 from the former accounts to the latter account.

500.    As a result of Pioneer's selective rejection of ACH transactions, the debit/withdrawal entries initiated by NatPay to the three Mann-controlled accounts were blocked,

and Pioneer purposefully delayed rejection of the debit entries for several days so that they were not received by NatPay until September 4, 2019.  However, the credit/deposit entries initiated by NatPay were accepted by Pioneer.  As a result, $2,721,815.77 from NatPay's settlement account at First Premier was deposited to the 0212 Client Account.

501.    Defendants agreed that Pioneer would convert NatPay's money to reduce Mann's debts to Pioneer and Pioneer's losses.

502.    NatPay has demanded return of its funds, but Pioneer has refused to disgorge its ill-gotten gains.

503.    NatPay seeks all damages allowable by law against Defendants, including compensatory and punitive damages, interest, costs, and attorneys' fees.

504.    NatPay is entitled to an order requiring that Pioneer disgorge any interest or profits Pioneer has earned by way of its wrongful retention of the tax funds.

## NINTH CAUSE OF ACTION
### (AIDING AND ABETTING FRAUD – PIONEER)

505.    NatPay incorporates the allegations contained in paragraphs 1 through 504 above as if fully recited herein

506.    Beginning in about 2014 through September 2019, Mann engaged in a fraudulent scheme whereby he induced Third-Party Employers to enter into agreements pursuant to which Mann's payroll companies would, among other things, process payroll and tax payments.

507.    From 2017 through September 2019, Mann engaged in a fraudulent scheme whereby he, through Cloud Payroll, induced NatPay to act as Cloud Payroll's ACH Third-Party processor.

508.    Mann failed to disclose to the Third-Party Employers and NatPay that Mann would engage in money laundering by diverting and using the third-party tax funds deposited to the 0212

Client Account and the 2440 Tax Account, and that Pioneer sanctioned, facilitated, and encouraged these actions.

509.    NatPay would never have contracted with Cloud Payroll had it known that Mann would engage in money laundering by diverting and using the third-party tax funds deposited to the 0212 Client Account and the 2440 Tax Account, and that Pioneer would sanction, facilitate, and encourage these actions.

510.    Mann and Pioneer knew that the third-party tax funds deposited in the 0212 Client Account and the 2440 Tax Account were entrusted to MyPayroll and Cloud Payroll, and should not be used for any purposes other than paying the tax/treasury funds to the appropriate taxing authorities.

511.    Pioneer knew that Mann engaged third-party ACH processors, including NatPay, to effectuate the transfer of payroll and tax funds from Third-Party Employers to the 0212 Client Account and the 2440 Tax Account, and from those accounts to the IRS or other taxing authorities.

512.    Pioneer knew that NatPay was acting as Cloud Payroll's third party ACH processor and was operating under the belief that Mann had not pledged the MyPayroll and Cloud Payroll accounts as collateral and was not diverting tax funds deposited to the Mann Entity Accounts for purposes other than paying third-party taxes.

513.    Nonetheless, Pioneer enabled, facilitated, and provided substantial assistance to Mann in committing fraud by, among other things,

a.    allowing and at times requiring Mann to move the third-party funds from the 0212 Client Account and the 2440 Tax Account to other Mann Accounts to cover overdrafts;

b.    allowing and at times requiring Mann to use the third-party funds in the 0212 Client Account and the 2440 Tax Account to pay down the Valuewise Loan;

c.    failing to report suspicious activities in Mann's Accounts to regulatory authorities;

d.    allowing Mann to use the MyPayroll and Cloud Payroll accounts as collateral for the Valuewise Loan and other loans extended to the Entity Defendants;

e.    conspiring with Mann to ensure that NatPay continued to facilitate the transfer of third-party tax funds to the 2440 Tax Account knowing that Pioneer would use the tax funds to reduce any debts of Mann or the Mann Entities to Pioneer and Pioneer's losses;

f.    converting the third-party funds in the 0212 Client Account and the 2440 Tax Account on and after August 30, 2019; and

g.    transferring third-party tax funds from the 2440 Tax Account to pay down the Valuewise Loan on or about September 4, 2019.

514.    As a result of Mann's fraud and Pioneer's substantial assistance, NatPay has been injured in an amount no less than $3.8 million.

## JURY TRIAL DEMANDED

515.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, NatPay hereby requests a jury trial on all issues so triable.

## PRAYER FOR RELIEF

For the foregoing reasons, NatPay respectfully seeks a judgment in its favor and against the Defendants as follows:

1.    For a declaration with respect to the rights of the parties vis-à-vis the tax funds deposited to the Cloud Payroll account by First Premier, and specifically:

A.    a declaration that Pioneer wrongfully seized the Third-Party Employer tax funds and that it must release such funds to NatPay for payment to the appropriate taxing jurisdictions, and disgorge any interest or profits it has earned by way of its wrongful retention of the tax funds;

    B.     a declaration that Pioneer and not NatPay is liable to any taxing authorities or any Third-Party Employers with respect to the tax funds and any damages due to Pioneer's unlawful action.

2.     For compensatory damages in an amount of no less than $3.8 million;

3.     For an award of three times the damages sustained by NatPay;

4.     For an award of punitive damages, pre-judgment and post-judgment interest at the highest rates allowable by law, attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by law; and

5.     Such other and further relief as the Court deems just and equitable.

Dated:  April 13, 2023          Respectfully submitted,

GREENBERG TRAURIG, LLP

By: _____

Cynthia E. Neidl (513737)
Katie L. Birchenough (700106)
54 State Street, 6th Floor
Albany, New York  12207
Tel:  (518) 689-1400
Email:   neidlc@gtlaw.com
            birchenoughk@gtlaw.com

Roland Garcia (*admitted pro hac vice*)
Jennifer Tomsen (*admitted pro hac vice*)
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Tel:  (713) 374-3510
Email:   garciar@gtlaw.com
            tomsenj@gtlaw.com

*Attorneys for Intervenor Plaintiff*
*National Payment Corporation*