## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SOUTHWESTERN PAYROLL SERVICE, INC. and
GRANITE SOLUTIONS GROUPE, INC.,

         *Plaintiffs*,

   v.

PIONEER BANCORP INC.; PIONEER BANK;
MICHAEL T. MANN; VALUEWISE
CORPORATION d/b/a APOGEE d/b/a OPTIX
CONSULTING, and d/b/a PRIMACY SEARCH
GROUP; MYPAYROLLHR.COM, LLC; CLOUD
PAYROLL LLC; ROSS PERSONNEL
CONSULTANTS, INC., ALWAYS LIVE
HOLDINGS, LLC; KANINGO, LLC; HIRE FLUX,
LLC; HIRE FLUX HOLDINGS, LLC; VIVERANT
LLC and HEUTMAKER BUSINESS ADVISORS,
LLC,

         *Defendants.*

Case No. 1:19-cv-1349 (FJS/CFH)

**THIRD AMENDED COMPLAINT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

NATIONAL PAYMENT CORPORATION,

         *Intervenor-Plaintiff,*

   v.

PIONEER BANCORP INC.; PIONEER BANK;
MICHAEL T. MANN; VALUEWISE
CORPORATION; MYPAYROLLHR.COM, LLC;
CLOUD PAYROLL LLC; ROSS PERSONNEL
CONSULTANTS, INC., ALWAYS LIVE
HOLDINGS, LLC; KANINGO, LLC; HIRE FLUX,
LLC; HIRE FLUX HOLDINGS, LLC; VIVERANT
LLC; and HEUTMAKER BUSINESS ADVISORS,
LLC,

         *Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**COME NOW** the Plaintiffs, Southwestern Payroll Service, Inc. and Granite Solutions Groupe, Inc., through their undersigned counsel of record, and pursuant to Fed. R. Civ. P. 15(a)(1)(B), for their Third Amended Complaint against the Defendants hereby submit the following:

<u>**PARTIES, JURISDICTION AND VENUE**</u>

1.     Plaintiff Southwestern Payroll Service, Inc. ("Southwestern Payroll") is an Oklahoma Corporation with its principal place of business in Tulsa, Oklahoma.  Southwestern Payroll is subject to Court supervision in Tulsa County, Oklahoma, and is controlled by C. David Rhoades, as Receiver.

2.     Plaintiff Granite Solutions Groupe, Inc. ("Granite Solutions") is a California Corporation with its principal place of business in San Francisco, California.

3.     Defendant Pioneer Bancorp, Inc. is a foreign bank, incorporated in Maryland, with its principal place of business in Albany, New York. Pioneer Bancorp, Inc. is the holding company for Defendant Pioneer Bank.

4.     Defendant Pioneer Bank (collectively with Pioneer Bancorp, Inc., "Pioneer") is a stock bank organized and existing under the laws of the State of New York having an address at 652 Albany Shaker Road, Albany, NY 12180.

5.     Defendant Michael Mann ("Mann") is a citizen of the State of New York.

6.     Defendant Valuewise Corporation d/b/a Apogee d/b/a Optix Consulting d/b/a Primacy Search Group ("Valuewise") is a Delaware corporation, with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065.

7.     Defendant MyPayrollHR, LLC ("MyPayrollHR") is a Massachusetts limited liability company with its principal place of business located in Clifton Park, New York. Upon

Plaintiff's information, and belief, none of its manager/members are citizens of the State of Oklahoma or of the State of California.

8.      Defendant Cloud Payroll, LLC ("Cloud Payroll") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065. Upon information and belief, none of its manager/members are citizens of the State of Oklahoma or of the State of California.

9.      Defendant Ross Personnel Consultants, Inc. ("Ross") is a Connecticut corporation with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065.

10.     Defendant Always Live Holdings, LLC ("Always Live") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065. Upon Plaintiff's information and belief, none of its manager/members are citizens of the State of Oklahoma or of the State of California

11.     Defendant Kanigo, LLC ("Kanigo") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065. Upon Plaintiff's information and belief, none of its manager/members are citizens of the State of Oklahoma or of the State of California

12.     Defendant Hire Flux, LLC ("Hire Flux") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065. Upon Plaintiff's information and belief, none of its manager/members are citizens of the State of Oklahoma or of the State of California.

13.     Defendant Hire Flux Holdings, LLC ("Hire Flux Holdings") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or

240, Clifton Park, New York 12065. Upon Plaintiff's information and belief, none of its manager/members are citizens of the State of Oklahoma or of the State of California.

14.     Defendant Viverant LLC ("Viverant") is a New York limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065. Upon Plaintiff's information, and belief, none of its manager/members are citizens of the State of Oklahoma or of the State of California.

15.     Defendant Heutmaker Business Advisors, LLC ("Heutmaker") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065. Upon Plaintiff's information, and belief, none of its manager/members are citizens of the State of Oklahoma or of the State of California.

16.     Upon information and belief, Mann, at all times pertinent hereto, controlled and/or owned/partially owned Valuewise, MyPayrollHR, Cloud Payroll, Ross, Always Live, Kanigo, Hire Flux, Hire Flux Holdings, Viverant, and Heutmaker (collectively, the "Entity Defendants").

17.     Upon information and belief, at all times pertinent hereto, Mann also partially owned ProData Payroll Services, Inc. ("ProData"), another payroll service bureau like SWP that was likewise victimized by Mann and Pioneer, as further set forth below.

18.     Upon information and belief, at all times pertinent hereto, Mann also controlled and/or owned or partially owned Create Force LLC, FocalPointe Group, LLC, Lincoln Academy, LLC, TrueConsulting Corp., TrueHR, LLC, and Weitz and Associates (collectively with the Entity Defendants, and with ProData and SWP, the "Mann Entities").

19.     This Court has jurisdiction of this action pursuant to 28 USC § 1332(a)(1) in that this is an action between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

20.     This Court additionally has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2201 *et seq*. because an actual case or controversy exists between the parties, as set forth at greater length herein.

21.     This Court additionally has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 because SWP and Granite Solutions assert claims pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*. A Civil RICO Statement shall be timely submitted subsequent to the filing of this Third Amended Complaint pursuant to Civil L.R. 9.2.

22.     Venue is proper in the Northern District of New York pursuant to 28 USC § 1391(b)(1&2).

## INTRODUCTORY ALLEGATIONS & BACKGROUND

23.     By way of this action, Southwestern Payroll and Granite Solutions seek an order declaring that Pioneer has no right to retain, and must disgorge, millions of dollars in tax funds paid by employers (who are clients of Southwestern Payroll or who, in Granite Solutions' case, is an employer itself) and owed to the IRS and other taxing authorities across the country, that Pioneer, not SWP, is liable to its employer-clients and other third-parties for any and all damages caused by Pioneer's unlawful actions as further set forth herein, and that Pioneer is liable to Granite Solutions for taking tax monies that were to be paid to taxing authorities.

24.     Pioneer admits that it seized (converted) millions of dollars in third-party tax payments from MyPayroll and Cloud Payroll bank accounts at Pioneer. Pioneer's excuse for converting these third-party tax funds changes to suit its needs, but for purposes of this litigation Pioneer maintains that it helped itself to the third-party tax funds to cover $15,588,000 in

overdrafts in Pioneer bank accounts held by other entities owned or controlled by Michael T. Mann.

25.     But that is not the extent of Pioneer's wrongful conduct. Pioneer also intentionally diverted $2.8 million in third-party tax funds from a Cloud Payroll account to a number of other accounts controlled by Mann and ultimately to pay down the balance on a $42 million loan extended to Valuewise, Mann's consulting business. Notably, Pioneer diverted the funds after it had purportedly "frozen" the bank accounts controlled by Mann, and also manipulated its records to make it appear as though the loan payment had been made by Mann several days earlier.

26.     There can be no legitimate dispute that nearly all the money converted by Pioneer and used to pay down the Valuewise loan are in fact third-party tax funds. Pioneer insists it is entitled to keep millions of dollars it knows to belong to thousands of employers (and ultimately various taxing authorities) across the country because the MyPayrollHR and Cloud Payroll accounts that were used to house the funds were opened by Pioneer as general depository accounts, not trust accounts, and Pioneer employees were somehow oblivious to the open and unmistakable fact that Mann had been using the accounts to process billions of dollars in third-party payroll and tax payments for years. Pioneer's defense is utter nonsense.

27.     Putting aside that any bank would nonetheless release the funds immediately upon learning they were payroll and tax monies (as outlined by Receiver Rhoades to Frank Sarratori shortly after the discovery of the "freeze") paid by thousands of innocent employers, Pioneer's ignorance defense is flatly contradicted by its own records. Pioneer opened the MyPayrollHR and Cloud Payroll accounts knowing that they would be used to house and process third-party payroll and taxes. Thereafter, on a near-daily basis, Pioneer employees assisted Mann in processing payroll and tax payments from his accounts.

28.     Moreover, Pioneer's ignorance defense is predicated on a flagrant dereliction of Pioneer's obligations under federal and state law. If Pioneer's officers and employees were truly unaware that MyPayrollHR and Cloud Payroll were processing billions of third-party payroll and tax dollars through Pioneer bank accounts, then Pioneer should surrender its license for its deliberate ignorance and intentional disregard of federal and state regulatory requirements, including but not limited to the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311 *et seq.* and related anti-money laundering laws and regulations.

29.     Mann has admitted that from 2013 through September 2019, he engaged in a fraudulent scheme to deceive banks and financing companies into loaning his companies millions, and later tens of millions, of dollars.  Because he could not repay the loans with legitimate business revenues, he diverted millions of dollars in payroll and payroll tax funds housed in accounts at Pioneer (what will be referred to as the 0212 Tax Account and the 2440 Tax Account).  Mann also engaged in a kiting scheme, using checks, wire transfers, and the Automated Clearing House ("ACH") system to rapidly transfer millions of dollars, including third-party payroll tax dollars, among various accounts he controlled at Pioneer and Bank of America, in order to give the appearance of business assets far in excess of reality.

30.     On August 12, 2020, Mann pled guilty to federal charges of bank fraud, wire fraud, identity theft, and filing false tax records.  On August 25, 2020, Mann pled guilty to one count of money laundering under New York State law in Saratoga County Court. On August 4, 2021, Mann was sentenced to serve twelve years in federal prison and eight to twenty-eight years in state prison.

31.     By August 2019, Mann was Pioneer's largest loan customer by far, with a $42 million line of credit extended to Valuewise (the "Valuewise Loan"). The thirty-four accounts he controlled at Pioneer represented the highest volume of deposit activity of any customer of Pioneer.

Mann had a dedicated team of Pioneer executives and customer service representatives that catered to his every whim on a near-daily basis. When Mann requested additional lending, that new accounts be opened, or myriad other privileges, Pioneer gave him whatever he requested and the due diligence Pioneer was required to exercise pursuant to applicable law and its own policies was utterly non-existent. Mann's money laundering and check kiting activities, their volume and magnitude included, were continuous, obvious, and could not have occurred but for Pioneer's collusion.

32.     Indeed, the FDIC conducted a Safety and Soundness Exam in December 2019 and concluded that Pioneer's BSA/AML compliance program was fundamentally and materially deficient, and required Pioneer to enter into a Memorandum of Understanding to correct the deficiencies.

33.     Pioneer and Mann agreed in November, 2013 that Mann would open a MyPayrollHR "Client Account" (the "0212 Tax Account") at Pioneer for the purpose of housing third-party tax funds. Mann had discussions with his relationship manager at Pioneer, David Blessing (Vice President, Commercial Services) both before and after the 0212 Tax Account was opened, and Pioneer employees provided Mann with information necessary to set up the account for payroll tax processing.

34.     Between December 17, 2013 and December 31, 2013 – a total of only eleven business days – there were 190 credits/deposits totaling over $5 million, and 65 debits/withdrawals totaling over $3.2 million, in the 0212 Tax Account. The vast majority of transactions were payroll tax deposits from third-party employers, and debits for the payment of taxes, as even a cursory review of Pioneer's records reveals.

35.     Ultimately, Mann decided to segregate third-party tax funds in a new account separate from payroll and payroll related funds. In February 2019, Pioneer and Mann agreed that Mann would open an account for Cloud Payroll ending in 2440 (the "2440 Tax Account"), specifically for the purpose of housing third-party employer tax/treasury payments to the IRS and other taxing jurisdictions. In May 2019, there were 10,000 transactions in the 2440 Tax Account, with over $107 million flowing in and out of the account that month.

36.     From December 2013 through August 30, 2019, billions and billions of third-party payroll and tax funds flowed through the 0212 Tax Account and 2440 Tax Account, resulting in significant fees payable to Pioneer and substantial bonuses to David Blessing.

37.     It was no secret at Pioneer that the 0212 Tax Account and 2440 Tax Account were used to house and process payroll and tax funds.  Pioneer employees provided frequent and often daily assistance to Mann with the processing of third-party payroll and taxes.  Among other things, Pioneer personnel wired tax payments to the IRS and other taxing authorities, providing MyPayrollHR or Cloud Payroll with copies of checks made payable from MyPayrollHR or Cloud Payroll accounts to the IRS and other taxing authorities or to employees, and originating or confirming ACH payments to the IRS and other taxing authorities, employers, and employees.

38.     In addition, Pioneer's BSA department personnel, including Pioneer's chief BSA compliance officer, Ellen Fogarty, routinely reviewed monthly transactions in the 0212 Tax Account and the 2440 Tax Account after excessive activity triggered suspicious activity alerts. Without exception, the BSA department sanctioned the activity as consistent with the transactional activity of a payroll company. The BSA department's conclusions were accepted by Pioneer's SAR Committee, which consisted of several of the bank's senior officers.

39.     While Pioneer's intentional conversion and retention of third-party payroll and tax funds is egregious, discovery in this case has revealed that it was the culmination of years of complicity with Mann's money laundering scheme.  Pioneer's own records establish that Pioneer employees were aware of and encouraged Mann's illegal diversion of third-party payroll and tax funds to cover overdrafts and negative balances in other Mann-controlled accounts at Pioneer.

40.     Beginning in 2014, certain accounts controlled by Mann were routinely overdrawn by substantial amounts.  At times, these overdrafts occurred on a near-daily basis and often reached multi-million-dollar amounts as Mann continually wrote bad checks.  Mann and Pioneer agreed that Mann would temporarily divert third-party payroll and tax funds to cover these overdrafts.  David Blessing instructed Mann to "move the money," while others at Pioneer reviewed the overdrawn account(s) to ensure that Mann had, in fact, moved funds from the 0212 Tax Account or the 2440 Tax Account to the overdrawn account(s).  Pioneer usually rewarded Mann for his efforts by waiving any overdraft fees that were routinely charged against the accounts of other bank customers.

41.     Pioneer's records also show that, in addition to Blessing, Pioneer senior officers including Tom Amell (President, Chief Executive Officer), Frank C. Sarratori (Executive VP, General Counsel, and Chief Administrator), and Joseph Fleming (Senior VP and Chief Lending Officer) were aware of and approved Mann's practice of diverting third-party payroll and tax funds to cover overdrafts in other Mann-controlled accounts.

42.     Pioneer senior officers knew that Mann's diversion of the payroll and tax funds in this manner was unlawful, because they were fully familiar with MyPayrollHR and Cloud Payroll's operations and obligations to their employer-clients.  These senior officers not only sanctioned Mann's money laundering activities, they also approved year-over-year increases in

the Valuewise loan, notwithstanding frequent and suspicious overdrafts in the accounts Mann controlled.

43.     Pioneer also facilitated Mann's kiting activities, which came to a crashing halt when Bank of America froze the accounts Mann controlled there on August 30, 2019.

44.     Mann has admitted that beginning no later than January 2019, he used checks, wire transfers, and the ACH system to transfer millions of dollars among various accounts held at Pioneer and Bank of America in furtherance of his fraud and money laundering schemes.

45.     By May 2019, at Mann's request and without any questions asked, Pioneer had extended remote deposit capture ("RDC") access to 18 accounts Mann controlled at Pioneer Bank. RDC access is typically granted for the convenience of customers as it allows them to deposit checks remotely and thus avoid a trip to the bank.  Usually, a customer would not have access to the deposited funds until the checks cleared.  However, Pioneer gave Mann instant access to the deposited funds and allowed him to deposit (and then instantly withdraw) up to $1.3 million per day in each of 17 accounts.  Mann was thus able to circumvent the usual restrictions on access to funds deposited by check and had immediate access to up to $22.1 million *per day*.

46.     As a result, Mann was able to kite dozens of checks totaling more than $15 million on a near-daily basis between accounts held at Bank of America and Pioneer, which often caused substantial overdrafts in the Pioneer accounts.  Indeed, on June 17, 2019, one Pioneer employee remarked in an email to two of her co-workers that the accounts controlled by Mann "are perpetually over a million dollars negative during the day but seem to always become positive at night."

47.     To the outside world, however, Mann's kiting made his accounts look larger and his businesses appear more active than they really were. The inflated numbers gave the illusion

that the Mann consulting companies were large, successful Pioneer customers. In July 2019, bolstered by this false image, Pioneer completed its reorganization from a mutual savings bank to a mutual holding company and held its initial public offering.

48.     On August 29, 2019, Mann deposited 36 checks written from accounts he controlled at Bank of America totaling $15,588,000 into twelve accounts he controlled at Pioneer. Rather than waiting until the checks cleared, Pioneer instantly credited the twelve accounts with 100% of the funds. This enabled Mann to write 39 checks totaling $18,043,000 from those twelve accounts back to the accounts at Bank of America. Pioneer immediately paid Bank of America $18,043,000, which included most of the $15,588,000 credit extended by Pioneer.

49.     When Bank of America froze accounts controlled by Mann on August 30, 2019, it also refused to pay the 36 Bank of America checks totaling $15,588,000.  This caused twelve Mann-controlled accounts at Pioneer Bank to be overdrawn.   None of the twelve overdrawn accounts were held by MyPayrollHR or Cloud Payroll.

50.     Significantly, at the time Bank of America returned the checks on August 30, 2019, the outstanding balance on the Valuewise Loan had risen to nearly $39 million in the eighteen days since August 12, 2019, when the loan was increased by $10 million to $42 million. Between the overdrafts and its share of risk on the Valuewise loan, Pioneer was facing potential losses of over $31,000,000.00. Thus, Pioneer's executive team was desperate to recover any funds it could from any available source.

51.     At approximately 4:30 p.m. on August 30, 2019, Joseph Fleming contacted Mann and they agreed that, consistent with past practices, the third-party payroll and tax funds would be used to cover Mann's debts and Pioneer's potential losses.  They further agreed that Mann would no longer have access to any bank accounts at Pioneer, and that Pioneer would not permit any

withdrawals from the accounts but would allow deposits, thus ensnaring the third-party tax and payroll funds that would continue to accumulate in the 0212 Tax Account and 2440 Tax Account. They agreed that Mann would not disclose their plan to any third parties.

52.     Pioneer then implemented a "partial" freeze of the Mann-controlled accounts. Pioneer halted all posting of any transactions in the Mann-controlled accounts on August 30, 2019, and spent the next several days analyzing all credits/deposits to, and debits/withdrawals from, those accounts. Among the transactions scheduled for August 30, 2019 were over 700 ACH credits/deposits to the 2440 Tax Account totaling over $6 million in third-party tax funds. Pioneer's records establish that each credit entry was identified as "TAX COL" and included the name of the third-party employer that had paid the tax funds.

53.     On September 3, 2019, Pioneer posted all suspended August 30, 2019 and September 3, 2019 credits/deposits to the Mann-controlled accounts as of September 3, 2019. The 2440 Tax Account had a positive balance of $8,883,528.54 by end of day September 3, 2019.

54.     Pioneer waited until the last possible moment to return (reject) any ACH debits/withdrawals to the Mann-controlled accounts, thus ensuring that Mann's payroll service bureaus, including Southwestern Payroll and MyPayrollHR as Granite Solution's payroll service provider, would not and could not know that Pioneer was blocking withdrawals yet allowing deposits until the morning of September 4, 2019, which was too late to stop any ACH credits/deposits to the accounts previously sent or scheduled that day.

55.     Also on September 3, 2019, Pioneer senior executives received an email from Mann indicating that there was approximately $1.9 million in the "tax account" and more would be coming in the next day.  Mann also indicated in his email that he believed he had diverted about $3 million from the "tax account" to pay down the Valuewise loan on August 30, 2019.

56.     On September 4, 2019, Pioneer senior executives met with Mann and his attorney for the better part of the day. Mann wanted Pioneer to release the third-party funds in the MyPayrollHR and Cloud Payroll accounts, otherwise the payroll companies would be destroyed. Mann testified under oath that he and his attorney specifically discussed with Pioneer's outside counsel that Mann's payroll businesses processed both payroll and taxes, and the fact that payroll and tax funds were housed at Pioneer Bank. Mann conveyed to Pioneer's attorney that it was important to release the funds because otherwise the payroll companies would be worthless.

57.     Nonetheless, Pioneer refused to releasee any funds unless Bank of America agreed to pay the 36 checks totaling $15,588,000 deposited in the Mann-controlled accounts at Pioneer. Pioneer's executive team cared only about Pioneer's bottom line and covering its losses, and undoubtedly calculated that its victims—mostly small businesses scattered throughout the country—lacked the time and money to recover their payroll and tax funds.

58.     Ultimately, Pioneer and Mann agreed that, notwithstanding the immense harm it would cause thousands of employers and employees, some of whom were Pioneer's own customers, Pioneer would inappropriately seize the third-party payroll and tax monies in the MyPayrollHR and Cloud Payroll accounts to offset Pioneer's potential losses.

59.     Pioneer and Mann also conspired and agreed that Pioneer would divert at least $2.8 million in third-party tax funds deposited in the 2440 Tax Account to pay down the Valuewise loan, and Pioneer would manipulate the dates on which transactions were posted to make it appear as though Mann had made this payment on August 30, 2019.

60.     By the end of the day on September 4, 2019, the 2440 Tax Account should have had a positive balance of $10,628,738.17. However, through a series of highly suspect transactions,

Pioneer not only emptied the 2440 Tax Account, but intentionally caused the account to have a negative balance.

61.   At 6:30 p.m. on September 4, 2019, Pioneer transferred $6,845,944.84 from the 2440 Tax Account to Pioneer's general ledger account. For purposes of this litigation, Pioneer alleges that it setoff these funds to cover overdrafts in other accounts controlled by Mann, even though it had no right to do so under any governing account agreements or New York law.

62.   Pioneer also posted six transfers totaling $6,845,000 from the 2440 Tax Account to the 0212 Tax Account, and used 2.8 million of those funds to pay down the Valuewise loan even though none of those monies belonged to Valuewise.

63.   Specifically, Pioneer transferred $2.8 million from the 0212 Tax Account to an account held by Defendant Weitz and Associates (the "Weitz Account"), then transferred the funds from the Weitz Account to a Valuewise account ending in 3614 (the "Valuewise 3614 Account"), and from there used the funds to reduce the balance on the Valuewise loan.

64.   Pioneer manipulated the posting of these transactions by backdating certain of them in an effort to conceal its wrongdoing.  Pioneer posted the debit/withdrawal of tax funds from the 2440 Tax Account as of September 4, 2019, but posted the credits/deposits of those same funds to the 0212 Tax Account and the subsequent transfers to the Weitz Account and Valuewise 3614 Account as of September 3, 2019.  And while Pioneer posted the debit/withdrawal of the tax funds from the Valuewise 3614 Account as of September 3, 2019, it posted the payment of those funds to the Valuewise loan account as of August 30, 2019.

65.   Thus, according to Pioneer's records, the $2.8 million in third-party tax funds Pioneer diverted from the 2440 Tax Account on September 4, 2019 moved *backwards in time* to pay down the Valuewise loan on August 30, 2019.

66.     During this time, Pioneer endeavored to keep the other banking participants in the Valuewise loan, Berkshire Bank ("Berkshire") and Chemung Canal Trust Company ("Chemung"), in the dark concerning any issues with Mann.  On September 3, 2019, Pioneer provided Berkshire and Chemung with remittance advice indicating that Mann had made a $3.2 million payment on the Valuewise loan on August 30, 2019, notwithstanding that the Mann-controlled accounts were "frozen" and all transactions suspended on August 30, 2019.

67.     From September 4 until September 9, 2019, Pioneer officers ignored repeated and increasingly anxious inquiries from Berkshire and Chemung representatives regarding the public controversy surrounding Mann.  When Pioneer executives finally met with Berkshire and Chemung representatives, they concealed the fact that Pioneer had diverted more than $15 million from accounts controlled by Mann to Pioneer's general ledger account, and had applied at least $2.8 million in third-party tax funds taken from the 2440 Tax Account to make the August 30, 2019 payment on the Valuewise loan. To date, it is unclear whether Berkshire and Chemung are aware that they received stolen property (money) from Pioneer.

68.     In furtherance of its money laundering scheme, Pioneer also deceived many third-party employers, including both large and small companies, libraries, and other not-for-profits, that inquired about their payroll or tax funds "frozen" in accounts at Pioneer.  In letters and emails, Pioneer's General Counsel, Frank Sarratori, misleadingly claimed that Pioneer never provided "payroll services, ACH tax wiring services, tax filing services or other payroll related services" to MyPayrollHR or Cloud Payroll, when, in fact, Pioneer had routinely provided such services. Sarratori also failed to disclose that Pioneer had seized the very funds these companies were trying to locate.  Instead, he instructed that any inquiries should be directed to MyPayrollHR and Cloud Payroll, knowing that those entities were shuttered as a result of Pioneer's illegal actions.

69.     Pioneer's selective return of debit/withdrawal entries violated the rules governing the ACH system that are enforced by the National Automated Clearing House Association ("NACHA"), the not-for-profit association that oversees the ACH system.  In returning the entries, Pioneer used a return code indicating that the accounts were frozen. However, NACHA rules prohibit the use of that code when a bank selectively returns entries as Pioneer had done, *i.e.* accepting credits/deposits but rejecting debits/withdrawals.

70.     In response to a complaint filed with NACHA on behalf of NatPay, Pioneer abandoned its initial defective defense and instead falsely claimed that, at the time it returned the debit entries initiated by NatPay for payment of the tax funds to various taxing authorities, "there were no funds available [to] cover the dollar value of the debit entry" in the 2440 Tax Account. To the contrary, when Pioneer returned the debit entries at the end of the day on September 3, 2019, there was over $8 million in the 2440 Tax Account. Thus, there was plenty of money in the account to cover all the debit entries initiated by NatPay. As a result of this and other lies, NACHA concluded that a violation of the rules did "not appear to have occurred."

71.     There is no question that Mann's conduct was egregious, but it was Pioneer that aided and abetted him for years, and then knowingly caused the collapse of MyPayrollHR and Cloud Payroll and the resulting harm to Plaintiffs and to thousands of other employers and employees throughout the country. Even today Pioneer chooses to pay its team of lawyers millions of dollars to pursue frivolous defenses rather than forfeit the third-party tax funds for return to Pioneer's and Mann's true victims.

72.     As a direct result of Pioneer's intentional misconduct, SWP and Granite Solutions have incurred millions in damages and, in the case of SWP, was required to bring this action to

address the concerns of the many employer-customers threatening to bring suit against it (many of whom have filed such suits regardless).

73.     While federal and state authorities have investigated Mann's misconduct, it is unclear whether these authorities have investigated Pioneer's role in his money laundering scheme or Pioneer's diversion and conversion of third-party payroll and tax funds or Pioneer's conspiracy with Mann. Even if such investigations have occurred, on information and belief, Pioneer has misrepresented facts and fraudulently concealed relevant records, emails, and other information that refute its frivolous defenses to Plaintiffs' claims.

74.     For example, in a letter to the Securities Exchange Commission filed September 29, 2020, Pioneer falsely claimed, among other things, that it had an "express policy" against customers using their accounts to process payroll (it does not), that Mann "lied" to Pioneer regarding the nature of use of the funds in the MyPayrollHR and Cloud Payroll accounts (he did not), that Pioneer did not know the MyPayrollHR and Cloud Payroll accounts were used to process third-party payroll and tax payments (Pioneer knew), and that Pioneer had a right to set off the third-party funds under its agreements and New York State law (it did not).  Conspicuously absent from Pioneer's fictional account of events is the fact that Pioneer knowingly diverted $2.8 million in third-party tax funds to reduce the balance on the Valuewise loan, among other facts noted above.

75.     Pioneer also represented to the SEC that there were no "red flags" in the accounts controlled by Mann before August 30, 2019.  However, by no later than May 2019, there were sufficient "red flags" in the accounts controlled by Mann to set a bank regulator's hair on fire.  In addition to the near-daily six and seven-figure overdrafts, the transactions in nearly half of the thirty-four Mann-controlled accounts consisted exclusively of six and seven-figure, round-dollar

mobile deposits and same-day withdrawals, usually by check, with tens of millions of dollars moving daily between the Mann-controlled accounts.

76.     Pioneer should disgorge the third-party payroll and tax funds it knowingly converted and make whole its many victims, including Plaintiffs.

***Background: SWP and its Payroll Operations***

77.     Southwestern Payroll is a payroll compliance and support company which contracts with employer-clients to provide payroll processing services, including providing payroll checks to the employer-client's employees, and collecting, processing, and remitting an employer-client's withheld payroll taxes to the appropriate taxing authorities in an accurate and timely fashion.

78.     Payroll tax processing involves the automated clearing house ("ACH") transfer of a payroll company's clients' federal, state, and local taxes associated with a particular payroll into a dedicated account at a bank.  After the payroll clients' tax trust funds are withdrawn from the clients' bank account on a particular payroll date, the funds are held in escrow in a bank account until they are due to be paid to various taxing authorities.  At that point, another ACH transaction occurs in order to transfer the money from the holding bank account to the appropriate taxing authority.

79.     While the movement of money in the ACH process is often thought of as instantaneous, it usually moves over a period of days, with various rules that determine the settlement process and the circumstances under which a bank can reject an ACH transaction, *i.e.*, refuse to settle the transfer.

80.     Intervenor National Payment Corporation ("NatPay") provided ACH data processing services for tax collection and tax payment to Cloud Payroll, and thus by extension to

the SWP Employer-Clients, beginning in 2017, and is likewise another innocent victim of Mann and Pioneer.

81.     Failure to timely transfer payroll taxes to their appropriate taxing authorities results in penalties and interest assessments.  Federal withholding taxes and most state payroll taxes are due within three (3) days of the payroll being run, and federal and state unemployment taxes are due quarterly.

82.     Prior to 2017, non-party Jeffery Darin Alred ("Alred") was the sole owner of Southwestern Payroll.

83.     On or about April 21, 2017, Mann, through Cloud Payroll, which is wholly owned by Valuewise, purchased 51% of the outstanding stock of Southwestern Payroll from Alred. Mann was and/or is the sole owner of Valuewise Corporation. However, Mann/Cloud Payroll was never involved in the day-to-day operations of Southwestern Payroll.  Even after the sale, all day-to-day operations of Southwestern Payroll were controlled by Alred and his staff of around thirty-five to forty employees in Tulsa, Oklahoma, many of whom have been with the company for more than a decade.

84.     Upon information and belief, Pioneer provided some of the financing for Cloud Payroll's purchase of the majority interest in Southwestern Payroll.

85.     Pioneer was at all times aware of the fact that Southwestern Payroll's client's tax trust funds were housed in Pioneer accounts after Mann purchased a majority interest in Southwestern Payroll.

86.     From October 2017 through February 2019, Cloud Payroll's tax settlement account for Southwestern Payroll's employer-clients' payroll tax funds was the 0212 Tax Account.  Beginning in March 2019, the 2440 Tax Account was opened as the tax settlement

account to collect and hold the third-party payroll taxes.  The 0212 Account continued to hold the payroll monies which were due to employees of payroll employer-clients across the country, including Granite Solutions' tax trust funds.

87.     Because Pioneer and/or Mann insisted that the tax trust funds be held in a Pioneer bank account, the procedure employed was as follows: upon processing a payroll at Southwestern Payroll, the tax trust funds were withdrawn from the clients' bank accounts and were initially placed in an account under the control of Southwestern Payroll at Prosperity Bank in Tulsa, Oklahoma.  This initial step was generated by an ACH transfer initiated by Prosperity Bank.  Thereafter, NatPaywould transfer the tax trust funds to an account at First Premier Bank in Sioux Falls, South Dakota.  NatPay would then transfer the tax trust funds to the 0212 Tax Account, and later the 2440 Tax Account, where the funds would remain until they were due to a particular taxing authority and ultimately paid.

88.     The ACH transactions sent to Pioneer by NatPay from the First Premier Bank account carried a batch description identifying the type of tax payment they represented, either as "TAX PAY" or "TAX COL", and were thus known to Pioneer as tax trust funds. When the funds were due to a particular taxing authority, NatPay, based on instructions from Cloud Payroll, would transfer the funds from the Pioneer account back to First Premier Bank, and then to the appropriate taxing authority(ies).

89.     Southwestern Payroll's account at Prosperity Bank, NatPay's account at First Premier, the 0212 Tax Account, and later the 2440 Tax Account, were intended at all relevant times as pass-through accounts for tax funds due to be paid to the IRS and other state and local taxing authorities across the country, and thus served as tax settlement accounts.

### *Background: Granite Solutions and its Payroll Relationship with MyPayrollHR*

90.     Granite Solutions is a financial services consulting firm based in San Francisco, California.

91.     At all pertinent times hereto, and beginning in 2014, Granite Solutions contracted with MyPayrollHR as its third-party payroll provider.

92.     Consistent with its years of past practice, on August 28, 2019, Granite Solutions allowed MyPayrollHR to initiate an ACH withdrawal from its operating account for its August 30, 2019 pay cycle to cover both employee wages and associated federal employment taxes. These payments were ultimately deposited in the 2440 Tax Account.

93.     On September 2, 2019, MyPayrollHR, consistent with its past practices and its contractual relationship with Granite Solutions, initiated an Electronic Federal Tax Payment System ("EFTPS") payment from the 2440 Tax Account to the United States Internal Revenue Service in the amount of $328,553.33 in connection with its August 30, 2019 payroll.

94.     On or about September 5, 2019, Granite Solution's employees began notifying Granite Solutions that their bank accounts were incurring one or more debits from Cachet Financial Services, another ACH data processing service similar to NatPay, oftentimes in amounts similar to their most recent direct deposited payroll.

95.     On or about September 6, 2019, and unbeknownst to Granite Solutions at the time, its $328,553.33 EFTPS payment was reversed as a result of Pioneer's freeze of the 2440 Tax Account and later denial of debit entries/withdrawals from the 2440 Tax Account.

**Pioneer's Long-Term Relationship with Mann**

96.     In 2009, Mann was introduced to David Blessing, Vice President, Commercial Services at Pioneer Bank, who would serve as Mann's relationship partner at Pioneer Bank for the next ten years.  Over this time, the two men developed a personal relationship as well that included

frequent golf outings and shared meals.  Mann frequently discussed his businesses and business opportunities with Blessing and sought his input with respect to business opportunities.

97.     On or about November 2, 2009, Pioneer extended a $2 million revolving line of credit facility to Valuewise and Ross (the "Valuewise Loan").  The Valuewise Loan was secured by a blanket lien on Valuewise's assets.

98.     Over the next decade, Mann established or purchased a number of other companies, many of which would become subsidiaries of Valuewise.  By August 2019, Mann owned or partially owned approximately fifteen companies and had opened a total of thirty-four bank accounts at Pioneer. Pioneer's loan documentation referred to Valuewise as a "conglomerate with four operating divisions, including human resource consulting, physical therapy, payroll services, and finance and accounting consulting."

99.     Pioneer also renewed or increased the Valuewise Loan every year between 2010 and 2019, and certain of the Main Entities, including MyPayrollHR and Cloud Payroll, were added as co-borrowers.

100.    In June 2017, the Valuewise Loan was increased to $22 million and Pioneer also extended an additional $2.6 million term loan to Valuewise.

101.    In June 2018, the Valuewise Loan jumped up to $32 million, and Pioneer also extended a non-revolving line of credit/term loan to Viverant.

102.    On August 12, 2019, less than a month before Mann's fraudulent schemes collapsed, Pioneer once again increased the Valuewise Loan by $10 million, to $42 million.

103.    Mann had frequent if not daily communications with a number of Pioneer officers and employees concerning the accounts he controlled, the Valuewise Loan, and other matters.

**Pioneer's BSA/AML Diligence and Compliance with Respect to Mann Was Nonexistent**

104.     Pioneer is required to abide by federal and state banking laws, regulations, and guidelines, including the USA Patriot Act, the BSA and related anti-money laundering ("AML") regulations.

105.     BSA/AML provisions require financial institutions, among other things, to develop (a) effective compliance programs to detect and prevent money laundering, (b) effective customer due diligence systems and monitoring programs, and (c) an effective suspicious activity monitoring and reporting process.  If suspicious activity that might signal criminal activity is detected, financial institutions are obligated to file suspicious activity reports ("SARs") with the U.S. Treasury's Office of Financial Crimes Enforcement Network ("FinCEN").

106.     One purpose of these requirements is to ensure that banks, which are often in the best position to identify potentially illegal activity, will closely observe the transactions taking place in their clients' accounts. BSA/AML guidance instructs banks and other financial institutions regarding how best to achieve that goal, and what actions to take once suspicious activity is identified. Moreover, under federal and state law, Pioneer had a duty to operate in a manner that protects the public interest, maintains public confidence in its business, and maintains the safe and sound conduct of its business.

107.     Beginning in approximately 2014, Pioneer failed to execute its BSA/AML compliance programs effectively, if at all, when it came to Michael Mann.  Pioneer's BSA/AML programs and systems were compromised because Mann was considered one of the most, if not the most, important customers of Pioneer.  Moreover, Pioneer did not want to take any action that might cause a default on the Valuewise Loan and other loans extended to the Mann Entities.

108.     As a result, Pioneer's culture reflected one where the Pioneer personnel gave Mann whatever he wanted without performing the proper investigation and due diligence, including but

not limited to: opening numerous accounts without determining the purpose of such accounts, increasing the Valuewise Loan, limiting the scope of audits, granting excessive RDC privileges, and allowing frequent, substantial overdrafts in accounts as well as moving money from the trust tax accounts to cover the overdrafts in Mann Accounts. Moreover, Pioneer for years deliberately ignored suspicious activity clearly indicative of money laundering and kiting in the accounts held by the Mann Entities ("Mann Entity Accounts").

109.   For example, financial institutions must fully understand the business in which their customers are engaged. This duty, referred to as the responsibility to "Know Your Customer" ("KYC"), is critical to determining what activity is suspicious. Account opening KYC due diligence is vital because the information obtained serves as a baseline against which to distinguish account activity that may be normal for a particular industry from account activity that might suggest criminal activity, and guides the bank in other BSA/AML areas such as alert management, investigation, and suspicious activity reporting.

110.   Consistent with these requirements, Pioneer's own policies required it to "have a clear and concise understanding of all bank customer practices" in order "to ensure the immediate detection and identification of suspicious activity." Yet Pioneer personnel routinely flouted their KYC obligations when opening accounts for Mann and the Mann Entities.

111.   Pioneer personnel failed to ask Mann about the purpose and intended use of the accounts he opened, the anticipated activity in the accounts, and the source of funds flowing into the accounts. Instead, Pioneer personnel relied exclusively on a deficient "Customer Due Diligence" form that Pioneer employees completed for Mann. The form did not request required information concerning each new account, including the use and purpose of the account, the

expected volume of transactions in the account, and the source of any funds to be deposited to the account.

112.    In most instances, as discussed more below, Mann sent an email to Pioneer employees indicating that he wanted to open a new account, and Pioneer personnel would complete the paperwork and send it to Mann for his signature.  Other than in connection with the opening of the MyPayroll Client Account, even when Mann disclosed information concerning anticipated activity in the account, Pioneer failed to document this information in the account opening documents.

113.    Financial institutions must also have in place systems that are triggered when there is suspicious activity or "red flags."  Such industry-standard "red flags" include unexplained, repetitive, and unusual transactions in bank accounts, high-volume payments without logical explanation, transfers sent and received by the same person using different accounts, large, round dollar transactions, and the immediate withdrawal of funds deposited to an account.

114.    When such systems are triggered, the bank must thoroughly investigate the account activity and determine whether the information should be reported to the FinCEN.  Reportable activity includes, among other things, transactions where the bank has a substantial basis for believing a criminal violation is occurring, transactions involving potential money laundering, and transactions that have no business or apparent lawful purpose or are not the sort in which the particular customer would normally be engaging.

115.    Pioneer failed for years to monitor the Mann Entity Accounts and investigate and report suspicious activities.  While the various Mann Entity Accounts were reviewed for suspicious activity more than one hundred sixty times from 2017 through August 30, 2019, not once did

Pioneer perform any serious analysis of the account, nor did it report the suspicious activity to FinCEN.

116.    Rather, as discussed more below, Pioneer BSA/AML compliance employees usually just copied and pasted from prior entries on their internal spreadsheets, rather than investigate and report the money laundering and kiting activities that were evident in the Mann Entity Accounts.

117.    There were innumerable suspicious transactions in the Mann Entity Accounts, all of which should have not only triggered thorough investigations but also reports to regulators.  In 2019, nearly half of the Mann Entity Accounts reflect a pattern of frequent, and at times daily, six- and seven-figure, round-dollar mobile deposits, followed immediately by withdrawals of most if not all of the deposits, usually by check, in large, round-dollar amounts.  These transactions involved no third parties, but rather the movement of money between Mann Entity Accounts and even between accounts held by the same Mann Entity.  The transactions reflect quintessential kiting and money laundering activity, all of which was or should have been obvious to Pioneer.

118.    The frequent overdrafts in the Mann Entity Accounts were also "red flags" that required investigation but were ignored by Pioneer.  Senior officers at Pioneer, including Blessing, Fleming, Sarratori, and Amell were well aware that the Mann Entity Accounts routinely experienced six- and seven-figure overdrafts, yet no one at Pioneer ever investigated any underlying issues or reported the overdrafts to Pioneer's BSA department.

119.    Pioneer's failures were particularly egregious and confounding in light of the substantial loans that Pioneer extended to Mann's companies.  Pioneer's policies required additional monitoring of the Mann Entity Accounts, yet such monitoring was superficial at best.

120.    Ultimately, Pioneer also failed to engage in proper due diligence with respect to the Valuewise Loan. Pioneer allowed Mann himself to dictate and substantially limit the scope of any audit or field exam. Pioneer also accepted at face value Mann's representations concerning the financial health of his companies and the work performed by his outside auditors.

121.    Had Pioneer acted prudently, followed its own policies, and complied with its BSA/AML and related obligations, Mann's bank fraud, money laundering, and kiting schemes would have been detected and reported to FinCEN at least as early as 2017, likely prior to Cloud Payroll's purchase of a majority interest in Southwestern Payroll, and well before the August 30, 2019 to September 4, 2019 timeline, when both Southwestern Payroll and Granite Solutions had and were continuing to ultimately authorize Pioneer to receive tax trust funds.

122.    In December, 2019, the FDIC conducted a Safety and Soundness Exam, and concluded that Pioneer's BSA/AML compliance programs were, in Pioneer's words, "fundamentally and materially deficient." Pioneer entered into a Memorandum of Understanding with the FDIC that required it to improve and enhance its programs and hire qualified BSA staff.

123.    In addition, Pioneer disclosed in its financial statements for the year ending June 30, 2020, that it was not in "full compliance" with applicable laws and regulations.  Discovery has revealed that this a colossal understatement.

**Pioneer Knew from the Outset that Mann Would Use the MyPayroll Accounts to Process Payroll and Taxes**

124.    Mann has admitted to federal and state prosecutors that by 2013, his consulting companies were not performing well, and he was having difficulty meeting obligations.

125.    In or about 2013, Mann purchased MyPayrollHR, which operated as a payroll service bureau. Payroll service bureaus often calculate, collect and pay employer payroll and related taxes. On information and belief, Mann purchased MyPayrollHR for the purpose of taking

advantage of the "float," that is, the time between when payroll and taxes are collected and the time they are to be paid.

126.    Mann and Blessing discussed Mann's purchase of MyPayrollHR and Mann's intention to house third-party payroll tax in an account at Pioneer.

127.    On November 19, 2013, Mann and Blessing had lunch, and Mann requested that Blessing set up two accounts at Pioneer for MyPayrollHR that would be used to house and process payroll taxes.

128.    On November 21, 2013, Mann submitted an ACH application for Valuewise to Blessing, and informed him that he would need to fill out two more applications for the MyPayrollHR accounts once they were set up. He indicated that the dollar value of ACH transactions in the MyPayrollHR accounts "could be in the millions daily."

129.    Blessing forwarded Mann's email to Sandra Dedrick (Commercial Services Officer). Ms. Dedrick responded, indicating that she needed a schedule of transactions because "ACH is expected to be consistent in frequency, like payroll," and that if Mann planned on using "ACH to collect payments in the future he will need a debit limit and will have to be consistent when he takes the payments (the 1st and 15th or every month, etc.)."

130.    Pioneer prepared the opening paperwork for the MyPayrollHR accounts based on information provided by Mann and Blessing, and the paperwork was ready for Mann's signature on November 26, 2013.

131.    In opening the 0212 Tax Account, Pioneer personnel indicated by hand on the account opening documents that the 0212 Tax Account was a "Client Account."

132.    In describing the service provided by MyPayrollHR, Pioneer personnel indicated that MyPayrollHR was a "Payroll Svce [sic] Bureau."

133.    Unlike other Mann Entity Accounts, the MyPayrollHR accounts were opened as business checking accounts to be used in conjunction with a business checking package that included no monthly service charge and no fees for up to 200 transactions/items per month. However, additional items above 200 would be charged $.25 per transaction.

134.    Pioneer also identified MyPayrollHR as a "high-risk" customer, which required Pioneer to engage in enhanced due diligence and closely monitor MyPayrollHR's accounts.

135.    On December 3, 2013, Blessing asked Mann whether things went smoothly with the acquisition of MyPayrollHR and whether "the funds that were held by the 3rd party transferred over?" Mann replied that he would "push them to move the funds they are holding" and that they could further discuss any options regarding changes to "the holding account."

136.    On December 11, 2013, Mann informed Blessing that MyPayrollHR would be using a "third party tax processor initially" and that tax processor needed assistance from Pioneer.

---

**To:** David Blessing
**From:** Michael Mann
**Sent:** Wed 12/11/2013 3:57:09 PM Coordinated Universal Time
**Subject:** Question

---

David...

We will be using a third party tax processor initially. They will need to prenote a file and also to get approval on processing checks from our system (probably me giving them signing authority). Who do I work with to get these done? I will probably be signing today and will want a quick turnaround.

---

137.    Blessing forwarded Mann's email to Lucas Scarchilli (Commercial Structured Debt Analyst) and ultimately Mann was assisted by Sandra Dedrick.

138.    On December 16, 2013, Mann forwarded communications with MyPayroll's third-party ACH tax processor, Payroll Tax Management ("PTM") to Ms. Dedrick, Blessing and Mr. Scarchilli, including a sample check that would be created using the MyPayrollHR 0212 Tax Account and requesting information "needed for the ACH files." PTM indicated that it needed the information because it would be "initiating the drafts back to [the] account at Pioneer bank."

139.     Mann asked Blessing, Dedrick, and Scarchilli whether the requested information would be easy to get because PTM could "have the money in the account tomorrow if I can get them the answer."

140.     The sample check forwarded by PTM and Mann to Ms. Dedrick was clear evidence that Mann would be processing third-party payroll tax payments from the 0212 Tax Account.



141.     Ms. Dedrick provided the requested information the same day.

142.     The next day, December 17, 2013, there were 171 credits/deposits in the 0212 Tax Account totaling more than $737,000.  Each of the credits bore the description "PAYROLL TAX MANA/TAXDRAFT." For each credit, Pioneer also received information identifying the third-party employer that paid the funds.

143.     Between December 17, 2013 and December 31, 2013 – a total of only eleven business days – there were 190 credits/deposits totaling over $5 million, and 65 debits/withdrawals totaling over $3.2 million in the 0212 Tax Account. The vast majority of transactions were payroll tax deposits from third-party employers and debits for the payment of taxes, as even a cursory review of Pioneer's records would reveal.

144.    There were two checks drawn on the 0212 Tax Account in December 2013, both of which identified the payor as "Payroll Tax Management, Inc." and were made payable to the New York State Tax Department.  The memo line of the checks identified the MyPayrollHR employer-client on whose behalf the tax payments were made.

145.    In January 2014, the number of transactions in the 0212 Tax Account tripled, with 209 credits/deposits totaling over $7.8 million and 424 debits (withdrawals) totaling over $9 million.  Pioneer's records show that the ACH transactions in the account were clearly labeled as third-party payroll tax debits or credits.  Also, in January 2014, 101 checks were issued from the 0212 Tax Account, all of which identified the payor as PTM and were made payable to state and local taxing authorities, including New York, Michigan, Kentucky, and Ohio.

146.    On April 1, 2014, Mann sent Blessing a copy of MyPayrollHR's contract with PTM, which delineated PTM's role in processing ACH entries for the collection and payment of taxes.

147.    On April 4, 2014, Blessing relayed Mann's plans regarding payroll and taxes to other senior executives at Pioneer, including Joseph Fleming (Senior Vice President & Chief Lending Officer), Alicia Riegert (Senior Vice President and Chief Information Officer), Craig Furlong (Operations Officer), and Carol Beth Chase (Systems and Product Development Officer).

| From: | David Blessing |
|---|---|
| To: | Alicia Riegert; Carol Beth Chase; Craig Furlong; Joseph Fleming |
| Cc: | Michael Mann |
| Subject: | My Payroll on Line/Valuewise |
| Date: | Monday, April 21, 2014 1:41:59 PM |

I had lunch with Mike Mann today. Initially, we are only going to be handling the tax portion of the payroll, which is 100% prefunded with no obligation to forward on the taxes to the appropriate entities if it wasn't received. This will create $0 in credit risk. If we handle it well, his ultimate goal is to move over the actual payroll as well which isn't always pre funded. However we will cross that bridge when we come to it.

148.    In the month of May 2014, the checks issuing from the 0212 Tax Account identified "MyPayrollHR" as the payor.   There were 181 credits to the 0212 Tax Account for over $10 million, and 521 debits for over $9 million, and the account statement was 46 pages long.

149.    Mann, Pioneer, and PTM continued their discussions about processing payroll from the 0212 Tax Account.   On May 29, 2014, Mann forwarded various inquiries from PTM to Blessing and asked for a contact person at Pioneer to provide ACH specifications to PTM. Blessing responded that he would "jump on it and get back" to him.

150.    Part of these discussions concerned whether Pioneer could process ACH payroll transactions for MyPayrollHR directly.   On May 29, 2014, Sandra Dedrick sent Mann an ACH Origination Application, Terms and Conditions, and Processing Schedule, and explained Pioneer's ACH processing fees.   Blessing was copied on the email.

151.    In September 2014, Mann informed Pioneer he was interested in uploading ACH files directly to Pioneer, thus eliminating the need for PTM.

| From: | Michael Mann |
|---|---|
| To: | David Blessing (blessingd@pioneersb.com); Lucas Scarchilli (scarchilli@pioneersb.com) |
| Cc: | Didi Harkness (dharkness@mypayrollhr.com); Frank Grant |
| Subject: | Request for ACH meeting |
| Date: | Tuesday, September 16, 2014 9:09:34 AM |

David...
We are looking to bring both payroll tax and payroll deposit processing in house. I am aware that we have the ability to upload ACH NACHA files and want to start those discussions. Our system does create the files.... However, I want to make sure we start talking so we create our processes that map to your processes to start moving forward on this.
Please forward to anyone that should be in the meeting and I am happy to set up some time for a conference call. Didi is in NC.... so we can start with a conference call.
Mike

152.    Blessing forwarded Mann's email to Scarchilli, Dedrick, Furlong, Riegert, Chase, and Tom Amell, indicating that he wanted to "get this ball rolling" because it meant "significant deposits for the bank."

153.    Mann's discussions with Pioneer concerning the tax and payroll deposits continued into October 2014, and included Didi Harkness, the head of tax for MyPayrollHR.  For example, on October 9, 2014, there was a call between Mann and Harkness from MyPayrollHR, and Blessing, Riegert, Furlong, and Chase from Pioneer to discuss the possibility of Pioneer taking over ACH payroll processing for MyPayrollHR.

154.    After the call, Mann followed up with Blessing via email, noting that Pioneer had "visibility" on what MyPayrollHR was currently processing, which was unquestionably true since the processing occurred in MyPayrollHR's bank accounts at Pioneer.

155.    Ultimately, PTM continued to serve as MyPayrollHR's third-party ACH processor, and the 0212 Tax Account continued to be used for housing and processing third-party payroll and taxes.  In December 2014, there were 689 credits/deposits in the 0212 Tax Account totaling over $14.7 million, and 886 debits/withdrawals for over $14.8 million.  The number of transactions nearly doubled in January 2015, with 1,446 credits and 1,671 debits.

156.    In December 2016, Mann caused Valuewise to purchase ProData, a payroll service bureau.  Mann then formed Cloud Payroll, which became a 51% owner of ProData.

157.    In approximately March 2017, Mann caused Valuewise to purchase 51% of Plaintiff Southwestern Payroll.

158.    ProData, Cloud Payroll, and Southwestern Payroll—like MyPayrollHR—were legitimate businesses, and their day-to-day operations were directed not by Mann, but by individuals who had no knowledge of Mann's wrongdoing.  Mann did, however, open and control bank accounts at Pioneer in the names of ProData, Cloud Payroll, and Southwestern Payroll.  Mann insisted, and Pioneer agreed, that he be the sole point of contact with respect to all accounts at Pioneer.

159.    As a result of these acquisitions, the number of transactions in, and the amount of funds flowing through, the 0212 Tax Account increased substantially, as indicated below.

|  | December 2015 | December 2016 | December 2017 |
|---|---|---|---|
| Debits | 3,168 | 4,638 | 14,156 |
| Credits | 2,690 | 4,098 | 9,193 |
| Total Funds | $19 million | $60.1 million | $180 million |

160.    Pioneer BSA compliance employees routinely reviewed the 0212 Tax Account, including when it triggered a suspicious activity alert due to the volume of transactions in the account. The reviewing employees would conclude that the extraordinary number of transactions was not suspicious because MyPayrollHR had been a long-time customer and the activity in the account was typical for a payroll company.

161.    For example, Ellen Fogarty (VP, BSA and ID Theft Officer) documented her review of the 0212 Tax Account on September 14, 2017, March 13, 2018, April 26, 2018, September 21, 2018, October 30, 2018, and November 14, 2018.  Her review was nearly identical each time, indicating that MyPayrollHR had been a customer since 2013, that the transactional activity in the account was typical for this customer, and there was "no negative information."

162.    On July 24, 2018, Kelli Rappleyea (BSA Analyst) reviewed the 0212 Tax Account as the result of a suspicious activity alert, and she reported as follows: "June review revealed foreign wire activity. Transactions appear reasonable. No suspicious activity detected."  In June 2018, there were 8,623 credits and 12,233 debits in the account, with over $139 million flowing in and out of the account that month.

163.    On January 17, 2019, Darlene Julian (BSA Risk Specialist) reviewed the December 2018 activity in the 0212 Tax Account.  As noted above, in December 2018, there were 9,607 credits and 5,054 debits in the account, with over $216 million flowing in and out of the account

that month. Julian compared this activity to that in December 2017 and concluded that there was a pattern of high activity in the account, but that it was not suspicious.

164.    On February 20, 2019, Fogarty reviewed the January activity in the 0212 Tax Account, which consisted of over 18,000 transactions and more than $185 million moving through the account.  She reviewed the April activity in the 0212 Tax Account on May 6, 2019, which consisted of over 6,500 transactions and more than $121 million moving through the account.  In both instances, Fogarty concluded this activity was consistent for MyPayrollHR and was not suspicious.

165.    On May 15, 2019, Julian reviewed the April 2019 activity in the 0212 Tax Account, which included more than 6,500 transactions and more than $121 million moving through the account. Julian concluded that this activity was consistent and "reasonable" for MyPayrollHR.

166.    On August 27, 2019, shortly before Mann's schemes collapsed, Fogarty reviewed the July activity in the 0212 Tax Account, which included over 6,000 transactions and more than $158 million moving through the account.  Fogarty found no issue with this volume of activity.

167.    Pioneer's BSA department personnel either knew and understood that the 0212 Tax Account was used to process payroll and taxes or, as discussed below, they were deliberately ignorant and utterly reckless in the performance of their duties in order to claim ignorance of the nature of the account and the source of its funds.

168.    Information gathered by Pioneer's BSA compliance staff was presented monthly to Pioneer's SAR Committee, which was composed of representatives from Pioneer Executive Management, Legal, Compliance, Retail, Audit, Risk Management and Security Departments.

169.    From 2014 through at least March 2017, SAR Committee members received a monthly ACH log that listed all debits and credits of at least $5,000 in Pioneer accounts, including

the MyPayrollHR Client Account.  ACH logs circulated in January, February and March 2017 each listed over 2,000 ACH transactions in the MyPayrollHR Client Account.  In March 2017, the MyPayrollHR ACH transactions constituted over seventy percent of all the transactions listed in the ACH log.  The description of most of the ACH transactions included a third-party employer name with the term "TAXES," "PAYROLL," "DIR DEP," and "AGENCY," and there were also many transactions described as "IRS/USATAXPYMT."

170.    Like Pioneer's BSA compliance employees, Pioneer's SAR Committee similarly dismissed the alerts and extraordinary volume of transactions in the 0212 Tax Account on the grounds it was consistent with the transactional activity of a payroll company.

**The MyPayrollHR Account Ending in 0428 Was Used to Process Payroll Payments**

171.    In September 2014, Mann opened a third MyPayrollHR account after informing Pioneer he was "working on other products/offerings for the payroll business."  The MyPayrollHR account ending in 0428 ("0428 Payroll Account") was opened on September 16, 2014, but used infrequently until early 2016.

172.    In March 2016, MyPayrollHR began to use the 0428 Payroll Account to issue payroll checks on behalf of MyPayrollHR employer-clients to their employees.  The 0428 Payroll Account was funded by transfers from the 0212 Tax Account.

173.    Beginning in March 2016, payroll checks that listed the payor as "Sprint Store by Nexgen Wireless" were issued from the 0428 Payroll Account to third-party employees.

174.    From May 2016 through February 2017, payroll checks that listed the payor as "Saratoga City Tavern" were issued from the 0428 Payroll Account to third-party employees.

175.    Beginning in July 2017, payroll checks that listed the payor as "Elevate Staffing" were issued from the 0428 Payroll Account to third-party employees located all over the country.

176.     From January 2018 through August 2019, payroll checks were issued from the 0428 Payroll Account that listed the payor either as "MyPayrollHR.Com LLC" or one of multiple employers, including "Elevate Staffing" of Glendale, California; "Cape Cleaning" located in Newport News, Virginia; "Wallace Enterprises, Inc." located in Fairfax, Virginia; "Bertram Enterprises, Inc." located in Morrisville, North Carolina; "D.B.& K. Enterprise, Inc." located in Virginia Beach, Virginia; and "Angels on Care Homecare LLC" located in Carmel, New York.

177.     Pioneer's BSA compliance employees also reviewed the transactions in the 0428 Payroll Account on multiple occasions, each time determining that the transactional activity was consistent for MyPayrollHR.  The information available to Pioneer regarding the transactions in the 0428 Payroll Account clearly showed that the account was used to process third-party payroll.

**In 2019, Pioneer Opened Three New Cloud Payroll Bank Accounts For the Purpose of Processing Third-Party Payroll and Tax Payments**

178.     In January 2019, Mann began the process of opening an account at Pioneer for Cloud Payroll that would receive payroll payments via wire from third-party employers.  On January 15, 2019, Mann received an email from Matthew Schilling (Cloud Payroll Manager of Finance) suggesting that Mann open an account to receive prefunded wire payments from third-party employers.



**From:** Matthew Schilling <span style="background:black">████████████</span>
**Sent:** Tuesday, January 15, 2019 1:46 PM
**To:** Michael Mann <span style="background:black">████████████████</span> ; Michael Mann
<span style="background:black">████████████</span>
**Subject:** Wire-in account
Hi Mike,
I was wondering if you ever had a chance to setup a wire account.
We have one small client that constantly NSFs and right now they owe us $8k. We have W2's held
over their head as collateral, as in we won't send them until we have payment. I wanted to explore
the possibility of having them prefund payrolls by wiring us and then having the ACH draw off of our
account. This is one client that makes me nervous but there are a few violators that could stand to
have a prefund option.
Let me know if you have a chance to set up the account.
Thanks,

**Matthew Schilling**
*Manager of Finance*
Office: 518.348█████
Cell: 518.723████
@cloudpayroll

179.    Mann agreed with Schilling's proposed approach and copied Matthew Roberts
(Cloud Payroll employee), instructing him to contact Pioneer directly to open the account.  Roberts
forwarded the entire email conversation to Trudy Seeber (Branch Manager/Business Development
Officer) and Deborah Salsburg (Sales Leader and Assistant Branch Manager) at Pioneer and asked
them to review the discussion "regarding opening a business wire account" and to send him "any
forms or information to start the setup."

180.    Seeber responded, asking only for the business name of the account holder and the
identity of the signers.

181.    Roberts indicated that Mann would be the only signer and the business name was
Cloud Payroll, and Salsburg provided the account opening paperwork completely filled out and
marked where Mann needed to sign.

| | |
|---|---|
| From: | Deborah A. Salsburg |
| To: | Matthew Roberts; Michael Mann |
| Cc: | Trudy Seeber |
| Subject: | SECURE MESSAGE |
| Date: | Wednesday, January 16, 2019 10:50:40 AM |

Hello,

Attached is the paperwork you requested for the new Cloud Payroll LLC account. I marked everywhere that Mike needs to sign.

Mike, If you could also shoot me an email about the business not operating in NY as you have done previously.

As soon as you get the paperwork back to me I will get it opened in the system.

Thank you!

Deb

**Deborah Salsburg**
**Sales Leader/Assistant Branch Manager NMLS# 481820**

182.   Pioneer was thus fully aware that the purpose of the new account was to receive, house, and process third-party employer payroll payments.

183.   Although Pioneer has claimed in this litigation that Mann checked certain boxes on the paperwork "No" with respect to the questions of whether Cloud Payroll was a "non-bank or third-party payment processor" or a "Money Services Business as defined in 31 CFR §1010.100(ff)," it was actually Pioneer personnel who checked these boxes, knowing that Cloud Payroll was a "payroll company."

184.   In any event, though, Cloud Payroll was not a "non-bank or third-party payment processor," nor was it a "Money Services Business as defined in 31 CFR §1010.100(ff)."

185.   On January 29, 2019, Mann sent Salsburg and Seeber another email, indicating that he needed to open another account for Cloud Payroll.  Mann asked that they send him "the paperwork to sign" once completed.

186.   Shortly thereafter, Salsburg sent Mann the documents fully prepared and marked where Mann needed to sign.  She indicated in her cover email that she could open the account once the signature was received.

187.    Once again, Pioneer personnel--not Mann--checked the "No" boxes on the paperwork with respect to the questions as to whether Cloud was a "non-bank or third-party payment processor" or a "Money Services Business as defined in 31 CFR §1010.100(ff)."

188.    On February 25, 2019, Mann again emailed Salsburg and Seeber to request the opening of a third Cloud Payroll account—which ultimately was the 2440 Tax Account—indicating that the payroll company was "collecting money from multiple locations."

**From:** Michael Mann ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, February 25, 2019 2:02 PM
**To:** Deborah A. Salsburg ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** Trudy Seeber ▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Cloudpayoll

Hi Deb and Trudy. I hope both of you are still doing well.

Actually, I need to set up another Cloudpayroll, LLC bank account. We are collecting money from multiple locations and want to make sure we keep them separate.

Can you send me the paperwork to sign when you get it done?

Thanks,
Mike

189.    That same day, Seeber responded that they would "get [the paperwork] out to you tomorrow morning."  The next morning, Salsburg sent Mann the completed paperwork marked where he needed to sign.

**From:**            Deborah A. Salsburg ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:**            2/26/2019 3:20:21 PM
**To:**              'Michael Mann' ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Trudy Seeber ▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:**         SECURE MESSAGE
**Attachments:**     Cloud Payroll LLC.pdf

Hi Mike,

Here is the paperwork as requested.

You know the drill. Once I get it back, I will get the account opened and shoot you an email.

I hope you enjoy this less windy day today!!!
Talk to you soon,
Deb
Deborah A. Salsburg
Sales Leader/Assistant Branch Manager NMLS# 481820
P/F: 518▮▮▮▮▮▮▮▮
E: ▮▮▮▮▮▮▮@pioneerbanking.com

190.    Mann signed the prepared paperwork and returned it, and Salsburg told him the account was "all set" and that he should be able to see it online in "a day or two."

191.    The 2440 Tax Account was opened in late February, and there was no activity in the account that month.  However, in March 2019 there were over 1,000 transactions in the 2440 Tax Account, with over $22 million moving in and out of the account.

192.    This spike in activity triggered a suspicious activity alert, and on April 3, 2019, Darlene Julian (BSA Risk Specialist) reviewed March transactions in the 2440 Tax Account.  Her review was inconclusive:

> This is a new business customer as of the end of February. Any business activity for March would create a spike in activity. There is wire and ACH activity for March.  A pattern of business activity has not yet been determined.

193.    In April 2019, the number of transactions in the 2440 Tax Account increased to nearly 10,000. 1,551 checks written from the account were paid, and over $92 million moved through the account.  The account statement for the 2440 Tax Account for April is 300 pages long.

194.    It was vividly clear from even a cursory review of information in Pioneer's possession that the 2440 Tax Account was being used to process tax payments.  On most business days, hundreds of credits were listed, all of which were labeled "CLOUDPAYROLL/TAX COL."  For example, the following are only some of the credits to the 2440 Tax Account on April 2, 2019.

Account Number XXXXXX2440
Statement Date 04/30/2019
Statement Thru Date 04/30/2019
Page 6

**TRANSACTION DETAIL (Continued)**

| Date | Description | Deposits | Withdrawals | Balance |
|------|-------------|---------:|------------:|--------:|
| Apr 02 | CLOUDPAYROLL/TAX COL | 3,869.44 | | 790,603.55 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 3,803.89 | | 794,407.44 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 3,244.73 | | 797,652.17 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 3,165.54 | | 800,817.71 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 3,145.66 | | 803,963.37 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 3,098.55 | | 807,061.92 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 3,021.45 | | 810,083.37 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,996.42 | | 813,079.79 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,930.04 | | 816,009.83 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,883.13 | | 818,892.96 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,723.57 | | 821,616.53 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,682.71 | | 824,299.24 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,610.00 | | 826,909.24 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,546.97 | | 829,456.21 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,428.16 | | 831,884.37 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,398.14 | | 834,282.51 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,327.49 | | 836,610.00 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,288.91 | | 838,898.91 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,246.27 | | 841,145.18 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,135.54 | | 843,280.72 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 2,095.01 | | 845,375.73 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,983.25 | | 847,358.98 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,941.52 | | 849,300.50 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,907.65 | | 851,208.15 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,561.72 | | 852,769.87 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,552.58 | | 854,322.45 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,511.32 | | 855,833.77 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,504.20 | | 857,337.97 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,503.32 | | 858,841.29 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,467.75 | | 860,309.04 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,462.37 | | 861,771.41 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,456.65 | | 863,228.06 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,410.65 | | 864,638.71 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,395.96 | | 866,034.67 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,365.03 | | 867,399.70 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,246.03 | | 868,645.73 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,225.67 | | 869,871.40 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,183.23 | | 871,054.63 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,150.49 | | 872,205.12 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,057.42 | | 873,262.54 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,054.42 | | 874,316.96 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,054.41 | | 875,371.37 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 1,040.28 | | 876,411.65 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 998.36 | | 877,410.01 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 991.77 | | 878,401.78 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 969.92 | | 879,371.70 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 900.64 | | 880,272.34 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 821.82 | | 881,094.16 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 716.63 | | 881,810.79 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 683.80 | | 882,494.59 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 665.77 | | 883,160.36 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 639.74 | | 883,800.10 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 616.30 | | 884,416.40 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 615.30 | | 885,031.70 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 585.74 | | 885,617.44 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 584.64 | | 886,202.08 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 582.94 | | 886,785.02 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 582.18 | | 887,367.20 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 579.44 | | 887,946.64 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 568.48 | | 888,515.12 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 548.60 | | 889,063.72 |

195.  The ACH transaction details received by Pioneer and reflected in its internal records clearly identified the thousands of third-party employers that paid the tax funds deposited into the 2440 Tax Account.

196.  Debits/withdrawals to the 2440 Tax Account reflected ACH payments of taxes to taxing authorities, all of which were originated by NatPay.

43

| Apr 02 | CLOUDPAYROLL/TAX COL | | 27.72 | 896,565.43 |
|---|---|---|---|---|
| Apr 02 | CLOUDPAYROLL/TAX COL | | 18.51 | 896,583.94 |
| Apr 02 | CLOUDPAYROLL/TAX COL | | 9.79 | 896,593.73 |
| Apr 02 | CHECK #306535 | 246.00 | | 896,347.73 |
| Apr 02 | CHECK #306539 | 42.54 | | 896,305.19 |
| Apr 02 | CHECK #306540 | 90.74 | | 896,214.45 |
| Apr 02 | CLOUDPAYROLL/TAX COL | 14.00 | | 896,200.45 |
| Apr 02 | CLOUDPAYROLL/TAX COL | | 19.80 | 896,180.65 |
| Apr 02 | NATPAY-11725374/TAX DEP | 196.19 | | 895,984.46 |
| Apr 02 | NATPAY-11725374/TAX DEP | 279.84 | | 895,704.62 |
| Apr 02 | NATPAY-11725374/TAX DEP | 2,823.93 | | 892,880.69 |
| Apr 02 | NATPAY-11725374/TAX DEP | 664,444.27 | | 228,436.42 |

197.     The more than 1,500 checks written from the 2440 Tax Account in April 2019 were made payable to taxing authorities such as the Arizona Department of Revenue, Missouri Director of Revenue, Montana Department of Revenue, Oklahoma Tax Commission, the Virginia Department of Taxation, and the Pennsylvania Department of Revenue.  The checks identified the third-party employer on whose behalf each payment was made.

198.     Julian reviewed the April 2019 activity in the 2440 Tax Account on May 15, 2019, because it had again been flagged for suspicious activity.  Julian acknowledged that the activity for the "new business customer" had increasing ACH totals, but concluded that the activity was not unusual "[d]ue to the type of business" of the customer, *i.e.*, a payroll company.

199.     The amount of activity in the 2440 Tax Account remained substantial through August, 2019.

| | May 2019 | June 2019 | July 2019 | August 2019 |
|---|---|---|---|---|
| Debits | 1,104 | 645 | 2,351 | 729 |
| Credits | 8,222 | 7,362 | 8,147 | 7,568 |
| Total Funds | $107 million | $97 million | $102.7 million | $102.5 million |

**Pioneer Earned Substantial Fees and Blessing Received Bonuses Based on the
Volume <u>of Activity in the 0212 Account</u>**

200.     Because of the extraordinary number of transactions processed in the 0212 Tax Account, including ACH transactions, wires, and the diversion of third-party payroll and tax payments to other accounts via online banking, Pioneer collected significant monthly fees.  Among

other things, for every transaction over 200 per month, Pioneer charged the 0212 Tax Account $.25 per transaction.  Pioneer referred to these fees as a "Global Item Charge."

| | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Global Item Charge | $1,831 | $16,739 | $22,604 | $46,421 | $64,412 |

201.    On July 3, 2017, Mann emailed Christine Batchelder Charbonneau  (Commercial Services Assistant) about the Global Item Charges to the MyPayrollHR 0212 Tax Account.  He indicated that he thought the charges were from "[their] ACH processor," but determined that those charges were paid separately.  Mann requested that, in light of the large volume of transactions in the 0212 Tax Account, the type of account be changed to avoid the fees. Mann promised to "keep a high balance" in the 0212 Tax Account.

202.    In response, Charbonneau indicated that she was working with Randall Benedict to see what was "best" for Mann, would confirm with Blessing, and would get back to him.

203.    After investigating the issue, Pioneer apparently decided not to change the account and continued to assess Global Item Charges on the 0212 Tax Account.

204.    Notably, Pioneer's records establish that Blessing earned about $50,000 as a portion of his annual bonus based in large part on the Global Item Charges to the 0212 Tax Account.

205.    In this connection, reports reflecting the Global Item Charges applied to specific accounts at Pioneer were circulated to senior executives of Pioneer, including Fleming, Blessing, and other customer relationship managers.

206.    The Global Item Charges generated from the 0212 Tax Account were exponentially higher than those of any other account at Pioneer and resulted in a relatively higher bonus for Blessing.

**Pioneer Routinely Provided Mann with Assistance in Processing Payroll and Tax Payments**

207.   Mann and employees of MyPayrollHR or Cloud Payroll routinely sought and received assistance from Pioneer personnel with payroll and tax payment processing.

208.   Pioneer employees frequently wired payments from the 0212 Tax Account to third-party employees, the IRS and other taxing authorities, and Cachet Financial Services, the company that provided Mann's payroll companies with third-party ACH services for payroll collection and payments.

209.   For example, on August 8, 2014, Mann forwarded eight wire transfer requests to Dedrick and Charbonneau (Commercial Services Assistant) at Pioneer.   The transfers clearly reflected payroll payments from the 0212 Tax Account to the accounts held by individuals located in Virginia, Texas, Alabama, Minnesota, Florida, and other states. Pioneer promptly sent the wires.

210.   For further example, on March 8, 2017, Mann reached out to Charbonneau to ask whether Pioneer could do same-day wire payments to the IRS. Charbonneau sent Mann a form to authorize a wire transfer. Thereafter, Charbonneau, Erica Fredricks (Deposit Operations Specialist), and Kelsie Forte (Deposit Operations Specialist) facilitated ten wire tax payments from the MyPayrollHR 0212 Tax Account to the IRS on behalf of MyPayrollHR.   Each of the forms completed by Mann indicated that the wire would go to "US Treasury" and specified the type of tax payment for a given tax month/year on behalf of a specific MyPayrollHR third-party employer.

211.   For further example, on March 28, 2018, Pioneer again facilitated the wire transfer of tax funds from the 0212 Tax Account to the IRS.   Mann forwarded to Pioneer an email request and two wire transfer authorization forms sent by Cloud Payroll employee Matthew Schilling.   The forms indicated the names of the taxpayer, the types of tax, and tax year.   The amounts transferred on behalf of these third-party employers to the IRS were $243,466.07 and $256,000.85.   The authorization forms were reviewed and approved by Pioneer officers.

212.     As another example, on January 2, 2019, Mann sent an email to Charbonneau and Fredricks at Pioneer requesting assistance with an "Urgent Wire Request." Mann forwarded an email from Bob Higley of MyPayrollHR requesting a wire on behalf of a specific third-party employer. Mann indicated in his email to Charbonneau and Fredricks as follows:

> The client posted payroll after our 3:00 deadline on Monday.  We decided to do a same day payroll for them because they are a good client.  We do need to get this to Cachet by noon.

213.     Fredricks responded shortly thereafter, indicating that the wire had been sent.  The wire request was signed by Blessing and Jerilee Beaudoin.

214.     Pioneer personnel also routinely confirmed receipt of ACH credits/deposits of payroll or tax funds in the 0212 Tax Account or 2440 Tax Account.

215.     For example, in early September 2014, Amy Patentreger (MyPayrollHR Operations Executive) asked that Dedrick and Charbonneau confirm that certain payroll funds from a third-party employer had been deposited in the 0212 Tax Account.

| | |
|---|---|
| **From:** | Amy Patentreger [apatentreger@mypayrollhr.com] |
| **Sent:** | 9/4/2014 6:22:21 PM |
| **To:** | Sandy Dedrick (DedrickS@pioneersb.com) [DedrickS@pioneersb.com]; Christine Batchelder [BatchelderC@pioneerbanking.com] |
| **Subject:** | Confirm deposit? |

Hello ladies!

I am not sure if you are able to help me with this or not, but I figured it is worth a shot......

We have a client that bounced their payroll a couple of times last week.  We sent it through for another collection on Tuesday 9/2, which means it should have been deposited into our account on Wednesday 9/3 or today.  (we would have normally required him to Wire, but he was out of town and that wasn't a possibility)

The problem is, we need to process another payroll for them today and I am hesitant to do that without knowing for sure we were able to collect last week's.  Is there any way that you can confirm that the collection was successful?  I know that it is not completely fool-proof since there is still a bit of time to reject the funds.  But I am hoping you would be able to see an NSF on it sooner than we will be notified.

If so, the amount is for $1458.66.  It was coming from account #████1385 at ████████bank.

Thanks for any help or suggestions you may have!
Amy

--------------------------------------------------------------------

Amy Patentreger
Operations Executive
Mypayrollhr.com

216.    That day, Charbonneau confirmed receipt of a "credit/deposit to the MYPAYROLLHRCOM LLC account in the amount of $1,458.66 on September 3rd."

217.    On July 14, 2015, Mann emailed Charbonneau asking whether she could obtain information on a debit in the 0212 Tax Account and indicated that they needed to show the Texas Workforce Commission that a payment had been made on behalf of an employer-client.

**From:** Michael Mann ██████████████████
**Sent:** Tuesday, July 14, 2015 3:08 PM
**To:** Christine Batchelder
**Subject:** Question

Can you send me more information on a debit in account ending 212?
The debit happened on 4/30 and was called Mavitax Inc/Agency in the amount of 811.57. Are there more information (like a reference number) that you can send me so we can contact the Texas Workforce Commission to show we made that payment?
Thanks,
Mike

218.    On September 2, 2015, Mann forwarded a request from Peggy Byrnes (MyPayrollHR Payroll Tax Manager) to Charbonneau requesting detail information for an ACH payment to the "NY SUI (Employment Security)" on behalf of a specific third-party employer. Charbonneau provided Mann with those details that day.

219.    On October 27, 2015, Mann emailed Charbonneau requesting ACH trace information for payments made to the State of Connecticut on behalf of six clients.

**From:** Michael Mann ██████████████████
**Sent:** Tuesday, October 27, 2015 9:16 AM
**To:** Christine Batchelder ██████████████
**Subject:** ACH Trace Information

Christine....

I hope you are doing well.  Can you send me the ACH trace information on the following transactions.  The state of CT can't find them.  I did verify all of them did go out or our account.

| Settle Date | Client Name | Amount |
|---|---|---|
| 07/31/2015 | COMFORT MAINTENANCE CORP | 146.61 |
| 07/31/2015 | MY THREE GRAPES, LLC | 611.28 |
| 07/31/2015 | R&G Strategic Enterprises | 3,584.91 |
| 07/31/2015 | Accounting System Integrators, LLC | 116.58 |
| 07/31/2015 | Work At Home Vintage Employees LLC | 166.92 |
| 07/31/2015 | Advanced Spine and Sports Medicine LLC | 21.34 |

Thanks,

Mike

220.    Charbonneau reviewed the 0212 Tax Account and sent Mann an email with the requested trace numbers.

221.    On July 31, 2015, the date Charbonneau reviewed the 0212 Tax Account, there were 1,190 ACH debits to the 0212 Tax Account, most of which identified a third-party employer and reflected a third-party tax payment with such terms as "IRS/USATAXPYMT," "TXWORKFORCECOMM/DEBIT," "COMMWLTHOFPA INT/PAEMPLOYTX," "BERK TAX PMT EMP/EMP WEBPAY," "WI DEPT REVENUE/TAXPAYMNT," "FLA DEPT REVENUE/CUT," "VA DEPT TAXATION/TAX PAYMEN," "IL DEPT OF REVEN/EDI PYMNTS," and "CONNECTICUT DOL/CT UI TAX."

222.    On July 9, 2019, Mann sent an email to Randall Benedict at Pioneer, asking whether all ACH transfers to the 0212 Tax Account and 2440 Tax Account had been posted. Mann indicated that he was "expecting a lot" in the accounts, but he was doing reconciliation and did not see the transfers. He indicated that if everything was posted, he would check with his "ACH transmitter."

223.    Benedict responded, letting Mann know that everything had posted. On July 9, 2019, there were about 120 distinct ACH credits to the 2440 Tax Account, all of which clearly reflected the deposit of tax funds.  For example, the following is an excerpt from Pioneer's records:

| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 33,917.03 |
|---|---|---|---|---|---|---|
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 26,920.31 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 20,400.9 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 19,604.52 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 18,488.93 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 17,785.29 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 16,977.67 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 15,676.13 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 13,969.18 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 13,650.72 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 12,930.35 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 12,594.63 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 11,609.56 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 10,532.64 |
| 178002440 | ACH CREDIT | CLOUDPAYROLL/TAX COL | Fed Trans | ACH Federal Reserve Transactions | 7/9/19 | 9,493.86 |

224.    Later that day, Mann forwarded to Benedict a series of emails between NatPay and Cloud Payroll representatives regarding an ACH credit/deposit to the 2440 Tax Account "for $435,839.52 for federal withholding."  Mann provided Benedict with the trace number and asked whether he could identify a credit that "should have hit the 2440 account." After reviewing the 2440 Tax Account, Benedict sent Mann an email stating as follows:

> We do not see that ACH coming into 2440. Other ACH transactions have been processed but they are ***normal tax collection*** ACH's. Perhaps the ACH had an effective date of 7/10/19?  The trace number is not on our list of ACH coming in. Lets watch the account in the morning, I have a feeling it will hit then.  (Emphasis added).

225.    On July 11, 2019, Mann followed up with Benedict, informing him that the items they discussed had settled on July 10, 2019, and that he was working with his "ACH processor" to determine why they did not settle until that date. Benedict forwarded the email to Blessing and Fleming.

226.    Pioneer personnel also routinely provided Mann with copies of checks written from the 0212 Tax or 2440 Tax Accounts, all of which were made payable to taxing authorities and identified the third-party employer on whose behalf the tax payment was being made.

227.    For example, on November 17, 2014, Mann forwarded a request from Roxanne Cluckey (MyPayrollHR Senior Tax Payroll Specialist) to Charbonneau and Dedrick seeking a copy of two checks made payable to the South Carolina Department of Revenue. Dedrick forwarded Mann copies of the checks, both of which clearly indicated that the payments were made payable from the 0212 Tax Account on behalf of a specific third-party employer for third quarter taxes.

228.    On dozens of occasions from 2014 through August 2019, Mann requested that Pioneer employees, including Charbonneau, Dedrick, and Marcia Leggett, provide copies of checks made payable from MyPayrollHR accounts to taxing authorities such as the Kentucky

Division of Revenue, the North Carolina Department of Revenue, the South Carolina Department of Revenue, the City of Denver, the "Department of Revenue – Treasury Division," the Colorado Department of Revenue, the "DC Dept. of Employment Security," the "Treasurer of State of Ohio," the "Salem City (Columbiana) % Tax Collector," and the "Regional Income Tax Agency." All such checks clearly indicated that the payment was made from the 0212 Tax Account or 2440 Tax Account on behalf of a specific third-party employer for third quarter taxes.

229.    Pioneer's records establish that Pioneer personnel for years routinely provided Mann and his payroll companies substantial assistance in the processing of third-party payroll and taxes from the MyPayrollHR and Cloud Payroll accounts. There is simply no plausible basis to believe that Pioneer's employees were ignorant of the fact that MyPayrollHR and Cloud Payroll were operating as payroll companies and were using their accounts to process payroll and taxes.

**Mann's Money Laundering Scheme Involving Third-Party Payroll and Tax Funds**

230.    Mann has admitted to federal and state authorities that, by no later than January 2014, he began to experience business financial pressure and as a result started to engage in a scheme involving fictious companies and falsified assets, emails, audits, and bank exams and to exploit the "float" between the time payroll and tax monies were funded and when such monies had to be disbursed.

231.    Significantly, payroll and payroll-related tax payments are often withdrawn from an employer's account before the funds must be paid to employees or taxing authorities. Thus, Mann knew that during the time the funds were to be held in the 0212 Tax Account or 2440 Tax Account, he could divert the payroll and tax monies to meet his other financial obligations.

232.    Mann conducted millions of dollars in financial transactions between accounts that diverted stolen payroll and tax funds from third-party employers.

233.    From 2014 through August 30, 2019, Mann diverted more than $1.5 billion in round-dollar transactions from the 0212 Tax Account to other Mann Entity Accounts.

234.    Mann also routinely diverted third-party tax funds from the 2440 Tax Account to other Mann Entity Accounts to reduce the balance on the Valuewise Loan.

235.    For example, on August 15, 2019, Mann diverted $5.735 million in third-party tax funds from the 2440 Tax Account to the 0212 Tax Account.  From there, Mann dispersed the third-party tax funds to a number of Mann Entity Accounts, including $2.579 million to a Valuewise account to cover overdrafts. Mann then transferred $730,000 from the Valuewise account:  first, to the Weitz Account; second, to another Valuewise account; and third, to pay down the Valuewise Loan.

236.    A week later, on August 22, 2019, Mann diverted $2.677 million in third-party tax funds from the 2440 Tax Account to the 0212 Tax Account. From there, Mann disbursed the funds to a number of Mann Entity Accounts, including $601,000 to the Weitz Account. Mann then transferred those tax funds to a Valuewise account, and then used the funds to pay down the Valuewise Loan.

237.    Just one day later, on August 23, 2019, Mann diverted $3.424 million in third-party tax funds from the 2440 Tax Account to the 0212 Tax Account. From there, Mann disbursed the funds to a number of Mann Entity Accounts.

238.    On August 29, 2019, Mann diverted $5.446 million in third-party tax funds from the 2440 Tax Account to the 0212 Tax Account. From there, Mann disbursed the funds to a number of Mann Entity Accounts, including $2.8 million to the Weitz Account, then to a Valuewise account, and finally to reduce the balance of the Valuewise Loan.

### Pioneer Facilitated and Participated in Mann's Money-Laundering Scheme

239.   When Mann opened the 0212 Tax Account at Pioneer, Pioneer had no written policies against a payroll company opening and using payroll and/or tax settlement accounts for the purpose of processing payroll. Nor did Pioneer have any such policy in 2019, when Mann opened the three Cloud Payroll Accounts.

240.   At least one other Pioneer customer was a payroll company that used its bank accounts at Pioneer to process payroll-related payments from 2011 through late 2019.

241.   Pioneer not only agreed to allow Mann to use the 0212 Tax Account to receive and house third-party payroll and tax funds, it also understood and agreed to allow Mann to divert the third-party payroll and tax funds to other Mann Entity Accounts to cover any shortfalls in such accounts and pay down the Valuewise Loan. Pioneer sanctioned these diversions and even encouraged Mann to move the funds.

242.   Mann began experiencing overdrafts on a regular basis in 2014. When overdrafts occurred, Pioneer would put a hold on the overdrawn account(s). Mann would ask Pioneer to pay the overdraft amounts, indicating that he had the funds in other accounts and would move funds from the other accounts to the overdrawn accounts. Mann routinely referenced the balance in all his accounts, including the 0212 Tax Account (the only Mann Entity account that routinely had a substantial positive balance at that time) to justify paying the overdrafts.

243.   Apparently without exception, Pioneer always paid the outstanding items, thus extending Mann credit until he diverted the tax trust funds from his other accounts to the overdrawn account(s).

244.   Mann's overdrafts were so frequent and substantial that eventually Pioneer insisted that Mann move the funds into the overdrawn account before Pioneer would pay the outstanding

items(s), and Pioneer employees would check the account(s) to ensure that he had moved the money before any items were paid.

245.     Throughout this time, Blessing and Fleming gave approval to pay the outstanding items, usually indicated as a direction to "pay and waive," meaning that the items should be paid, and no overdraft fees assessed.

246.     Pioneer's senior executives were well aware of Mann's use of the payroll and tax funds in the 0212 Tax Account and the 2440 Tax Accounts to cover overdrafts.

247.     For example, on Sunday, January 8, 2017, Mann emailed Blessing to request assistance in paying two checks drafted from a Valuewise account, indicating that he had failed to "move the money."

> On Jan 8, 2017, at 1:03 PM, Michael Mann ███████████████████ wrote:
>
> David…
>
> On Friday I made a mistake.  I needed to move about 950K to account ending in 3648 and I did not.  Our balance on all our accounts is over 1M so I had the money.  I just did not move the money.
>
> Can you make sure that checks 5378 and 5379 get paid from account 3648?
>
> Sorry about that and thank you very much for your help.
>
> Mike

248.     Blessing responded that day to Mann's email, indicating that he was "on it" and directing Benedict to "make sure they get paid[.]" Fleming gave his approval as well.

249.     To cover the overdraft, Mann transferred $400,000 from the 0212 Tax Account to the Valuewise 3648 account.

250.     On July 20, 2017, Mann emailed Blessing, Benedict, and Charbonneau, indicating that he needed assistance in paying certain items, and would "have plenty of money when the ach payments hit this morning in the accounts" and would "move the money to the right accounts" later that morning.

**From:** Michael Mann ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
**Sent:** Thursday, July 20, 2017 5:19 AM
**To:** David Blessing ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛; Randall Benedict ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛; Christine Batchelder ⬛⬛⬛⬛⬛⬛⬛⬛⬛
**Subject:** Assistance

I have a few items in both account ending in 3622 and 3630 that I need assistance paying. I apologize for not being on top of this. I will have plenty of money when the ach payments hit this morning in the accounts. I will move the money to the right accounts when I land around 8:45 am.

I appreciate the assistance.

Thanks,

Mike

251.     Benedict forwarded the email to Blessing and Fleming, indicating that "Valuewise has three items for a total of $2,101,114.00 being presented against a balance of -$100.00" and "Ross Personnel has three items for a total of $2,108,869.00 being presented against a balance of -$99.62." Fleming received the emails and responded: "Randy please pay and either charge or waive based on what we normally do."

252.     Pioneer's records show that on July 20, 2017, in a series of six-figure, round-dollar transfers, Mann moved funds from the 0212 Tax Account to cover the overdrafts in the Ross Personnel account.

| Description | Source Short Description | Source Full Description | Sub Source | Effective Date | Credit $ | Debit $ |
|---|---|---|---|---|---|---|
| NSF Charge | Internal Trn | Internal Trans (Demand Deposit) | DD | 7/19/17 | 0 | 105 |
| 907-Ross Person/PAYROLL | Return Itm | Return Item Processing | | 7/19/17 | 0 | 657,824 |
| 907-Ross Person/PAYROLL | Return Itm | Return Item Processing | | 7/19/17 | 0 | 697,276 |
| 907-Ross Person/PAYROLL | Return Itm | Return Item Processing | | 7/19/17 | 0 | 753,769 |
| Rev: NSF Charge | Rtn Itm Fees | Return Item Processing Fees | FEE | 7/19/17 | 105 | 0 |
| Internet Transfer From 0212 | Online Bnk | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 643,000 | 0 |
| Internet Transfer From 0212 | Online Bnk | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 600,000 | 0 |
| Internet Transfer From 0212 | Online Bnk | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 498,000 | 0 |
| Internet Transfer From 0212 | Online Bnk | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 486,000 | 0 |

253.     Pioneer's records similarly show that Mann transferred client funds from the 0212 Tax Account to the Valuewise 3622 account to cover the overdraft in that account, again in a series of six-figure, round-dollar transfers.

| Description | Source Short Description | Source Full Description | Sub Source | Effective Date | Credit $ | Debit $ |
|---|---|---|---|---|---|---|

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| NSF Charge | Internal Trn | Internal Trans (Demand Deposit) | DD | | 7/19/17 | 0 | 105 |
| 904-ValueWise Co/PAYROLL | Return Itm | Return Item Processing | | | 7/19/17 | 0 | 653,379 |
| 904-ValueWise Co/PAYROLL | Return Itm | Return Item Processing | | | 7/19/17 | 0 | 697,452 |
| 904-ValueWise Co/PAYROLL | Return Itm | Return Item Processing | | | 7/19/17 | 0 | 750,283 |
| Rev: NSF Charge | Rtn Itm Fees | Return Item Processing Fees | FEE | | 7/19/17 | 105 | 0 |
| Internet Transfer From 0212 | Online Bnk | FIDELITY ONLINE BANKING | OLB | | 7/20/17 | 993,000 | 0 |
| Internet Transfer From 3614 | Online Bnk | FIDELITY ONLINE BANKING | OLB | | 7/20/17 | 690,000 | 0 |
| Internet Transfer From 0212 | Online Bnk | FIDELITY ONLINE BANKING | OLB | | 7/20/17 | 680,000 | 0 |
| Internet Transfer From 0212 | Online Bnk | FIDELITY ONLINE BANKING | OLB | | 7/20/17 | 490,000 | 0 |
| Internet Transfer From 0212 | Online Bnk | FIDELITY ONLINE BANKING | OLB | | 7/20/17 | 472,000 | 0 |
| Internet Transfer From 0212 | Online Bnk | FIDELITY ONLINE BANKING | OLB | | 7/20/17 | 465,000 | 0 |
| Internet Transfer From 0212 | Online Bnk | FIDELITY ONLINE BANKING | OLB | | 7/20/17 | 200,000 | 0 |

254.     Similarly, on August 10, 2017, Mann emailed Blessing and Benedict, indicating that he needed help getting items paid in certain accounts.  Mann assured them that "[w]e have over 7M in all of our accounts that is significantly more money than we need for the items to be paid." At the time of his email, the 0212 Tax Account had an account balance of approximately $7.7 million.

255.     Benedict forwarded the email to Blessing, informing him that Valuewise had four items for over $2.5 million being presented against a balance of $935, and Ross had five items for over $2.79 million being presented against a balance of $254,491.38.

256.     Blessing directed Benedict to "pay and waive" and forwarded the emails to Frank Sarratori, asking that he "concur." Sarratori approved, based on his understanding that Mann routinely transferred money from other accounts to cover any overdrafts. Ultimately, Mann oved money from the 0212 Tax Account to cover the negative balances.

| | |
|---|---|
| **From:** | Frank Sarratori ▮▮▮▮▮▮▮▮ |
| **Sent:** | 8/10/2017 12:01:35 PM |
| **To:** | David Blessing ▮▮▮▮▮▮▮▮▮▮; Randall Benedict ▮▮▮▮▮▮▮▮▮ |
| **Subject:** | RE: Help paying items |

Based upon my understanding as explained by Dave Blessing,  this occurs monthly and money is transferred from the other accounts Mike has with us to cover the extended credit, I concur with Dave to pay and waive.

Frank

257.     For further example, on December 21, 2017, Mann emailed Blessing, Benedict, and Charbonneau indicating that he would "need assistance in paying items" in certain of his accounts.

He further indicated that there was over $14 million in the other Pioneer accounts. At the time, the 0212 Tax Account had an account balance of approximately $14.7 million.

258.    Benedict forwarded the email to Christopher Seftner (Commercial Services Liaison) who informed Blessing, Fleming, and Benedict that Valuewise had three items totaling $1,909,395 being presented against a balance of $198,613, and Ross had four items totaling $2,410,222 begin presented against a balance of -$138.37.

259.    Blessing then forwarded the email chain to Amell, Fleming, and Benedict indicating that the problem is that Mann had the money but "in the wrong accounts" and requesting that Amell "pay and waive."

**From:** David Blessing
**Sent:** Thursday, December 21, 2017 8:27 AM
**To:** Christopher J. Seftner <▮▮▮▮▮▮▮▮▮▮▮>; Thomas L. Amell <▮▮▮▮▮▮▮▮▮▮▮>
**Cc:** Joseph Fleming <▮▮▮▮▮▮▮▮▮▮▮>; Randall Benedict <▮▮▮▮▮▮▮▮▮▮▮>
**Subject:** RE: NSF

Tom, As discussed Mike has a total of $14,000,000 in the bank it is just in the wrong accounts.  Please approve to pay and waive.  We have never had a problem with doing this.

260.    With no questions asked, Amell responded a minute later "Approved to pay and waive." Later that day, Mann transferred $3.36 million from the 0212 Tax Account to other Mann Entity Accounts.

261.    On May 9, 2018, Benedict sent an email to Blessing notifying him that a check for $320,930 was being presented against a negative balance of $638,086 in a Valuewise account.

262.    Blessing instructed Benedict to pay the item and forwarded the email to Fleming, asking that he approve, and to Mann, directing him to move the money.

On May 10, 2016, at 8:08 AM, David Blessing ▮▮▮▮▮▮▮▮▮▮▮ wrote:

Pay and Waive, Joe please approve.

Mike, please get the money moved.

263.    Pioneer's records show that Pioneer paid the item and eventually Mann diverted $800,000 in third-party payroll and tax funds from the 0212 Tax Account to the Valuewise 3622 account.

264.    On August 13, 2018, Mann emailed Benedict to request assistance in paying items in three accounts, indicating that the money to cover the items was already in those accounts. Benedict reviewed the accounts and confirmed that sufficient funds were there and forwarded Mann's email and the account information to Blessing and Fleming. Fleming instructed Benedict to "pay and waive." Pioneer's records show that Mann diverted $4.640 million in third-party payroll and tax funds from the 0212 Tax Account on August 13, 2018 to cover the overdrafts.

265.    By August 2019, there were near-daily overdrafts in the Mann Entity Accounts. Pioneer's records establish that Pioneer officers repeatedly endorsed Mann's diversion of the third-party payroll and tax funds from the 0212 Tax Account and 2440 Tax Account to cover the overdrafts.

266.    For example, on August 1, 2019, Mann emailed Blessing and Benedict requesting assistance in paying eight items totaling nearly $6 million from the Valuewise 3648 account and indicating that sufficient funds were then in the account. Benedict reviewed the account and confirmed that funds had been deposited to the account.

267.    Pioneer's records show that on August 1, 2019, Mann diverted $4.57 million in third-party tax funds from the 2440 Tax Account to the 0212 Tax Account.

| | | | |
|---|---|---|---|
| | Account Number | XXXXXX2440 | |
| | Statement Date | 08/30/2019 | |
| | Statement Thru Date | 09/02/2019 | |
| | Page | 11 | |

**TRANSACTION DETAIL (Continued)**

| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 730,000.00 | 5,290,871.18 |
|---|---|---|---|
| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 876,000.00 | 4,414,871.18 |
| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 987,000.00 | 3,427,871.18 |
| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 988,000.00 | 2,439,871.18 |
| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 989,000.00 | 1,450,871.18 |

268.    Mann then diverted $5.394 million in third-party payroll and tax funds from the 0212 Tax Account to cover the overdrafts in the Valuewise 3648 account.

| BUSINESS CHECKING | | Account Number: XXXXXX3648 |
| --- | --- | --- |
| Account Owner(s): VALUEWISE CORPORATION DBA PRIMACY SEARCH GROUP | | |

**Balance Summary**

| | |
| --- | --- |
| Beginning Balance as of 08/01/2019 | $501,341.16 |
| + Deposits and Credits (63) | $44,812,492.45 |
| - Withdrawals and Debits (86) | $45,313,173.98 |
| Ending Balance as of 08/31/2019 | $659.63 |
| Service Charges for Period | $0.00 |
| Average Balance for Period | $1,543.00 |
| Average Collected for Period | $1,543.00 |
| Minimum Balance for Period | $647.00 |

**TRANSACTION DETAIL**

| | | | |
| --- | --- | --- | --- |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 989,000.00 | -4,379,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 988,000.00 | -3,391,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 987,000.00 | -2,404,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 986,000.00 | -1,418,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 985,000.00 | -433,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 450,000.00 | 16,734.65 |

269.    On August 8, 2019, Mann emailed Benedict requesting assistance in paying items totaling over $12 million in a Valuewise account ending in 3648 and a TrueConsulting account ending in 1251 and stating that the money was in the accounts to cover the items.

270.    Benedict emailed Blessing with the issue after having reviewed the accounts to confirm the transfers, and Blessing approved the payments.

271.    To partially cover the overdrafts, Mann first moved $4,206,000 from the 2440 Tax Account to the 0212 Tax Account.

| | | Account Number | XXXXXX2440 |
| --- | --- | --- | --- |
| | | Statement Date | 08/30/2019 |
| | | Statement Thru Date | 09/02/2019 |
| | | Page | 37 |

**TRANSACTION DETAIL (Continued)**

| | | | |
| --- | --- | --- | --- |
| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 256,000.00 | 3,959,365.29 |
| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 986,000.00 | 2,973,365.29 |
| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 987,000.00 | 1,986,365.29 |
| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 988,000.00 | 998,365.29 |
| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 989,000.00 | 9,365.29 |

272.    Mann then diverted $4.946 million in third-party tax and payroll funds from the 0212 Tax Account to the Valuewise 3648 account to cover the overdrafts.

| | Account Number | XXXXXX3648 |
|---|---|---|
| | Statement Date | 08/30/2019 |
| | Statement Thru Date | 09/02/2019 |
| | Page | 2 |

**TRANSACTION DETAIL (Continued)**

| | | | |
|---|---|---|---|
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 998,000.00 | -3,940,352.77 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 989,000.00 | -2,951,352.77 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 988,000.00 | -1,963,352.77 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 986,000.00 | -977,352.77 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 985,000.00 | 7,647.23 |

273.    Mann also diverted $3.214 million in third-party payroll and tax funds from the 0212 Tax Account to the TrueConsulting 1251 account to cover the overdrafts.

| | Account Number | XXXXXX1251 |
|---|---|---|
| | Statement Date | 08/30/2019 |
| | Statement Thru Date | 09/02/2019 |
| | Page | 2 |

**TRANSACTION DETAIL (Continued)**

| | | | |
|---|---|---|---|
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 989,000.00 | -2,218,289.22 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 988,000.00 | -1,230,289.22 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 987,000.00 | -243,289.22 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 250,000.00 | 6,710.78 |

274.    On August 12, 2019, Mann emailed Benedict to request assistance in paying fourteen items totaling over $9 million from the Ross 3630 account.  Benedict reviewed the account and forwarded Mann's email to Blessing and Fleming, indicating that sufficient funds were in the account to cover the items.  Blessing and Fleming approved.

275.    Pioneer's records show that on August 12, 2019, Mann diverted $1.232 million in third-party tax funds from the 2440 Tax Account to the 0212 Tax Account, and diverted $4.478 million in third-party payroll and tax funds from the 0212 Tax Account to the Ross 3630 account to partially cover the overdrafts.

276.    On August 13, 2019, Benedict emailed Mann indicating that two Valuewise accounts were overdrawn and asking whether Mann would be making a deposit to cover the items. Mann responded that the money was in the accounts to cover the items.

277. Benedict reviewed the accounts and informed Blessing and Fleming that sufficient funds had been transferred to the accounts.

> Hello Dave,
>
> Valuewise 3622, has 6 items for a total of $4,239,069.87 being presented against a balance of $363,666.58. Current balance is $4,243,166.
>
> Valuewise 3648, 7 items for a total of $4,893,426.30 being presented against a balance of $345,166.55. Current balance is $4,896,072.

278. Blessing approved payment of the items. Pioneer's records show that Mann moved $1.867 million in third-party tax funds from the 2440 Tax Account to the 0212 Tax Account, and then diverted $5,132,500 in third-party tax and payroll funds from the 0212 Tax Account to partially cover the overdrafts.

| | Account Number | XXXXXX0212 |
| --- | --- | --- |
| | Statement Date | 08/30/2019 |
| | Statement Thru Date | 09/02/2019 |
| | Page | 43 |

**TRANSACTION DETAIL (Continued)**

| Date | Description | Deposits | Withdrawals | Balance |
| --- | --- | --- | --- | --- |
| Aug 13 | 9112- HUMAN CAPI/BILL COLL | 15.00 | | 7,829,265.76 |
| Aug 13 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 989,000.00 | | 8,818,265.76 |
| Aug 13 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 878,000.00 | | 9,696,265.76 |
| Aug 13 | INTERNET TRANSFER FROM WEITZ AND AS-3945 | 35,000.00 | | 9,731,265.76 |
| Aug 13 | INTERNET TRANSFER FROM WEITZ AND AS-3945 | 35,000.00 | | 9,766,265.76 |
| Aug 13 | INTERNET TRANSFER FROM CLOUD PAYROL-2366 | 22,000.00 | | 9,788,265.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 22,500.00 | 9,765,765.76 |
| Aug 13 | INTERNET TRANSFER TO 0428 | | 30,000.00 | 9,735,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 279,000.00 | 9,456,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3648 | | 876,000.00 | 8,580,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 986,000.00 | 7,594,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 988,000.00 | 6,606,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3648 | | 989,000.00 | 5,617,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 989,000.00 | 4,628,765.76 |

## Pioneer Enables Mann's Kiting Scheme

279. Pioneer facilitated Mann's kiting activities as well, which often resulted in overdrafts and the diversion of third-party payroll and tax funds, by granting him RDC privileges in excessive amounts for numerous Mann Entity Accounts.

280.    RDC is a deposit transaction delivery system that allows commercial customers the ability to deposit checks into Pioneer accounts from a remote location. Once a customer is approved for RDC, Pioneer installs a bank-provided scanner and software at the customer's remote location.

281.    During the relevant period, Pioneer's RDC policies and procedures recognized various legal, compliance, reputational, and operational risks associated with RDC operations, including increased risk of money laundering and fraud. Pioneer's RDC policies and procedures required that customer due diligence and assessment be performed at the time of an RDC application, and that certain annual, periodic, and daily reviews be performed to detect any suspicious activities.

282.    Pioneer either failed to follow its own policies and procedures, or it deliberately disregarded Mann's obvious illegal kiting activities.

283.    In June 2018, Mann requested and received RDC privileges with respect to four of his Valuewise accounts, each with a daily maximum of $25,000. Mann signed an RDC agreement on June 28, 2018. That same day, Pioneer and Mann amended the RDC agreement to add two additional accounts, one held by Ross and the other by TrueConsulting. It appears that Pioneer engaged in no due diligence or assessment prior to granting these RDC privileges.

284.    On July 19, 2018, Mann requested an increase in the RDC amounts for all but one of these accounts to a daily maximum of $600,000 per check and $1.2 million in total per account. Blessing approved an increase in the amounts *beyond* what Mann requested, to $650,000 per check and a daily maximum of $1.3 million.

285.    Pioneer continued to grant Mann RDC privileges with more and more of his accounts, always at the same unusually high levels. Mann merely had to ask, and such privileges were granted, no questions asked.

286.    For example, in January 2019, Mann contacted Joshua Engel (Pioneer Cash Management Officer) and Blessing to request that three additional accounts be given RDC privileges and instructed that the same maximum amounts be used consistent with the other accounts.



287.    In granting these additional privileges, Pioneer merely asked that Mann sign the RDC service agreement and application, which Pioneer personnel had completed for him.

288.    Similarly, on April 24, 2019, Mann reached out to Engel and Blessing again to request that RDC privileges be extended to six additional accounts.

289.    On April 24, 2019, as Pioneer was well aware, the outstanding principal on the Valuewise Loan was just $89,000 shy of the $32 million cap. Thus, Mann had no ability to draw down on his line of credit to cover any obligations.

290.   Mann again instructed Pioneer that the accounts have the same excessive RDC limits as the others.



291.   By this time, Pioneer's records clearly evidenced that Mann was engaged in kiting. Many of the Mann Entity Accounts served no purpose other than to kite. If Pioneer's officers and employees had performed the customer assessment or monitoring they were required to perform, Mann's kiting activity would have been exposed. Instead, Pioneer deliberately ignored all the red flags in the Mann Entity Accounts.

292.   By August 2019, 18 accounts controlled by Mann had RDC privileges, and all but one of the accounts had $650,000 per check and $1.3 million per day maximums. As a result, Mann could and often did use his RDC privileges to kite over $20 million per day.

293.   Notwithstanding these high limits, Mann occasionally requested that his daily maximum be increased on a particular day, and Pioneer, of course, agreed. No questions asked.

294.    For example, on August 1, 2019, Mann sent an email to Blessing and Benedict requesting that the daily limit for a Valuewise account be increased to $1.6 million. Mann indicated in his email that he had spoken to Blessing about such increases, and that Blessing had told him it is "easy to do when we need to bump it for a day." Blessing emailed back saying he would take care of it and forwarded Mann's email to Drieux Miller (Cash Management Specialist), who facilitated this increase.

295.    Similarly, on August 28, 2019, Mann sent an email to Blessing and Miller requesting that a Valuewise account ending in 4018 be increased for the day to $1,975,000, and a Ross account ending in 3630 be increased for the day to $2,360,000. Pioneer approved, no questions asked.

296.    By granting Mann RDC privileges for nearly twenty accounts and grating him instant credit for any RDC deposits, Pioneer facilitated Mann in kiting millions of dollars in non-existent funds daily between accounts at Bank of America and Pioneer.

297.    By October 2018, Mann was using RDC privileges to deposit millions of dollars a month in numerous accounts. By January 2019, Mann was using his RDC privileges to deposit tens of millions of dollars in numerous accounts. By June 2019, Mann was depositing hundreds of millions of dollars a month in multiple accounts using his RDC privileges.

298.    For example, in December 2018, Mann used his RDC privileges to deposit approximately 30 checks for over $13.8 million in a single Valuewise account. All the checks were in large round numbers, and Mann immediately used the available funds to write checks to accounts at Bank of America.

299.    In June 2019, Mann deposited 59 checks for over $23 million in his Valuewise 3622 account. Mann immediately used the available funds to write checks to accounts at Bank of

America. Pioneer's records also reflect that Mann was at the same time diverting third-party payroll and tax funds from the 0212 Tax Account.

| Jun 21 | MOBILE DEPOSIT | 1,296,000.00 | | 1,325,694.69 |
|---|---|---|---|---|
| Jun 21 | CHECK #5919 | | 392,000.00 | 933,694.69 |
| Jun 21 | CHECK #5920 | | 487,000.00 | 446,694.69 |
| Jun 21 | CHECK #5921 | | 446,000.00 | 694.69 |
| Jun 24 | INTERNET TRANSFER FROM 0212 | 136,000.00 | | 136,694.69 |
| Jun 24 | MOBILE DEPOSIT | 1,286,000.00 | | 1,422,694.69 |
| Jun 24 | CHECK #5922 | | 492,000.00 | 930,694.69 |
| Jun 24 | CHECK #5923 | | 475,000.00 | 455,694.69 |
| Jun 24 | CHECK #5924 | | 455,000.00 | 694.69 |
| Jun 25 | INTERNET TRANSFER FROM 3945 | 104,000.00 | | 104,694.69 |
| Jun 25 | MOBILE DEPOSIT | 1,296,000.00 | | 1,400,694.69 |
| Jun 25 | CHECK #5925 | | 431,000.00 | 969,694.69 |
| Jun 25 | CHECK #5926 | | 480,000.00 | 489,694.69 |
| Jun 25 | CHECK #5927 | | 489,000.00 | 694.69 |
| Jun 26 | OPTUM/DIR DEP | 633,892.81 | | 634,587.50 |
| Jun 26 | INTERNET TRANSFER FROM 3945 | 137,000.00 | | 771,587.50 |
| Jun 26 | MOBILE DEPOSIT | 1,286,000.00 | | 2,057,587.50 |
| Jun 26 | CHECK #5928 | | 496,000.00 | 1,561,587.50 |
| Jun 26 | CHECK #5929 | | 468,000.00 | 1,093,587.50 |
| Jun 26 | CHECK #5930 | | 458,000.00 | 635,587.50 |
| Jun 26 | CHECK #5931 | | 324,283.00 | 311,304.50 |
| Jun 26 | CHECK #5932 | | 310,840.00 | 464.50 |
| Jun 27 | INTERNET TRANSFER FROM 0212 | 139,000.00 | | 139,464.50 |

300. All the checks written from the Valuewise account were in large, round numbers and made payable to accounts held by Mann Entities at Bank of America.

## CHECKS

\* Indicates a Skip in Check Number(s)

| Date | Check No. | Amount | Date | Check No. | Amount | Date | Check No. | Amount |
|---|---|---|---|---|---|---|---|---|
| Jun 04 | 5880 | 488,000.00 | Jun 12 | 5900 | 496,000.00 | Jun 21 | 5920 | 487,000.00 |
| Jun 04 | 5881 | 462,000.00 | Jun 12 | 5901 | 456,000.00 | Jun 21 | 5921 | 446,000.00 |
| Jun 04 | 5882 | 351,000.00 | Jun 12 | 5902 | 349,000.00 | Jun 24 | 5922 | 492,000.00 |
| Jun 05 | 5883 | 183,000.00 | Jun 13 | 5903 | 424,000.00 | Jun 24 | 5923 | 475,000.00 |
| Jun 05 | 5884 | 492,000.00 | Jun 13 | 5904 | 406,000.00 | Jun 24 | 5924 | 455,000.00 |
| Jun 05 | 5885 | 454,000.00 | Jun 13 | 5905 | 399,000.00 | Jun 25 | 5925 | 431,000.00 |
| Jun 06 | 5886 | 488,000.00 | Jun 13 | 5906 | 493,000.00 | Jun 25 | 5926 | 480,000.00 |
| Jun 06 | 5887 | 473,000.00 | Jun 14 | 5907 | 499,000.00 | Jun 25 | 5927 | 489,000.00 |
| Jun 06 | 5888 | 464,000.00 | Jun 14 | 5908 | 429,000.00 | Jun 26 | 5928 | 496,000.00 |
| Jun 06 | 5889 | 447,000.00 | Jun 14 | 5909 | 372,000.00 | Jun 26 | 5929 | 468,000.00 |
| Jun 07 | 5890 | 493,000.00 | Jun 17 | 5910 | 490,000.00 | Jun 26 | 5930 | 458,000.00 |
| Jun 07 | 5891 | 455,000.00 | Jun 17 | 5911 | 429,000.00 | Jun 26 | 5931 | 324,283.00 |
| Jun 07 | 5892 | 352,000.00 | Jun 17 | 5912 | 382,000.00 | Jun 26 | 5932 | 310,840.00 |
| Jun 07 | 5893 | 486,000.00 | Jun 18 | 5913 | 484,000.00 | Jun 27 | 5933 | 492,000.00 |
| Jun 10 | 5894 | 484,000.00 | Jun 18 | 5914 | 450,000.00 | Jun 27 | 5934 | 484,000.00 |
| Jun 10 | 5895 | 477,000.00 | Jun 18 | 5915 | 419,000.00 | Jun 27 | 5935 | 461,000.00 |
| Jun 10 | 5896 | 453,000.00 | Jun 19 | 5916 | 491,000.00 | Jun 28 | 5936 | 498,000.00 |
| Jun 11 | 5897 | 490,000.00 | Jun 19 | 5917 | 433,000.00 | Jun 28 | 5937 | 447,000.00 |
| Jun 11 | 5898 | 464,000.00 | Jun 19 | 5918 | 379,000.00 | Jun 28 | 5938 | 455,000.00 |
| Jun 11 | 5899 | 344,000.00 | Jun 21 | 5919 | 392,000.00 | | | |

301. Notably, Pioneer BSA compliance department employee Kelli Rappleyea reviewed the June 2019 activity in this Valuewise account on July 26, 2019. Her analysis defies logic:

June review revealed increase in ACH totals. ***Transactions appear reasonable. No suspicious activity detected***. (Emphasis added).

302.    The activity described above with respect to the Valuewise 3622 account was consistent with at least 15 other Mann Entity Accounts, many if not all of which Pioneer employees routinely reviewed due to suspicious activity alerts.

303.    Thus, for example, in March 2019, Mann was using at least 11 accounts at Pioneer solely to shuffle funds and kite, and the amount of money moved through these accounts was between $11.3 and $38.1 million, for a total of approximately $283.6 million for the month of March 2019.

304.    In July 2019, Mann was using at least 17 accounts at Pioneer solely to move funds around and kite checks. The amount of money moved through each of these accounts was between $29 and $45 million, for a total of approximately $568.2 million for the month of July 2019.

305.    None of this could have or would have occurred but for Pioneer's deliberate ignorance and facilitation of Mann's check kiting scheme.

## The Collapse of the Mann/Pioneer Money Laundering Scheme

306.    By August 2019, Mann was spending several hours a day orchestrating hundreds of transactions among the Mann Entity Accounts, including diverting third-party payroll and tax funds to other accounts, kiting millions of dollars between Bank of America and Pioneer, and moving money around in his Pioneer accounts to cover overdrafts.

307.    Immediately after Pioneer increased the ceiling of the Valuewise Loan from $32 million to $42 million on August 12, 2019, Mann requested and received an additional disbursement of $8.1 million, bringing the total amount of principal outstanding to over $40 million.

308.    On August 15, 2019, Mann made a $3.1 million principal payment on the Valuewise Loan using third-party tax funds diverted from the 2440 Tax Account.

309.    By August 28, 2019, the outstanding principal on the Valuewise Loan had swelled to $41,590,894.90.

310.    On August 29, 2019, Mann made a principal payment toward the Valuewise Loan of $2.9 million using third-party tax funds diverted from the 2440 Tax Account.

311.    Also on August 29, 2019, just as he had done nearly every day for the previous several months, Mann wrote 36 checks totaling $15.588 million from four accounts he controlled at Bank of America and deposited them via RDC in twelve Mann Entity Accounts at Pioneer. Mann deposited three six-figure, round-dollar checks in each of the twelve Mann Entity Accounts totaling $1.299 million, just below the $1.3 million daily RDC cap.

312.    Just as it had done nearly every day for the past several months, Pioneer immediately credited the checks to the Mann Entity Accounts in the amount of the deposits, in effect giving the Mann Entities an interest-free loan totaling $15.588 million.

313.    That same day, Mann wrote 36 checks totaling over $18 million from certain of the Mann Entity Accounts at Pioneer using the same-day credited proceeds of the Bank of America checks.

314.    According to Pioneer, it learned late in the afternoon on August 30, 2019 that Bank of America would not honor the 36 checks Mann had written the previous day and was freezing all accounts controlled by Mann at Bank of America.

315.    Fleming contacted Mann and the two agreed that Pioneer would block withdrawals from the Mann Entity Accounts but would allow deposits into the accounts.  They further agreed

that Mann would inform no one, thus conspiring to ensure that third-party employer tax and payroll monies would continue to accumulate in the 0212 Tax Account and 2440 Tax Account.

316.    Mann and Pioneer knew and intended that Southwestern Payroll would continue to deposit incoming tax trust funds.  From August 30, 2019 through September 4, 2019, Pioneer received ACH transactions of Southwestern Payroll's tax trust funds totaling $6,740,339.63. Mann and Pioneer further knew that employers like Granite Solutions would continue to authorize their payroll service providers (in Granite Solutions' case – MyPayrollHR) to withdraw payroll and payroll taxes from their bank accounts, which would ultimately be deposited in the 0212 Tax Account and 2440 Tax Account at Pioneer.Mann and Pioneer further agreed and understood that Pioneer would seize the deposits to offset Mann's obligations and any losses incurred by Pioneer.

317.    Pioneer did not post any transactions in the Mann Entity Accounts for August 30, 2019, and instead spent the next several days analyzing all credits and debits to the accounts.

318.    Even a rudimentary analysis of the 2440 Tax Account would have established that the funds deposited in the account were third-party tax payments to be paid to the IRS and other taxing authorities.

319.    On September 3, 2019, Pioneer employees, including Kim Catello (Deposit Operations Analyst), David Hunn (formerly VP, Deposit Operations, now VP, BSA and Identity Theft Officer), and Sula Landi (VP, Controller), prepared or reviewed spreadsheets that listed all suspended August 30, 2019 credit/deposits and debits/withdrawals in the Mann Accounts, and indicated which debits/withdrawals would be allowed and which would be returned.

320.    The spreadsheets reflected that millions of dollars in third-party payroll and tax funds were available for deposit to the MyPayrollHR and Cloud Payroll accounts.  Nonetheless, the spreadsheets further reflect that Pioneer decided to return and refuse to honor all third-party

debits/withdrawals from the Mann Entity Accounts, including all legitimate debits/withdrawals from the 0212 Tax Account, the 0428 Payroll Account, and the 2440 Tax Account, none of which had overdrafts.  Indeed, none of the MyPayrollHR or Cloud Payroll accounts had overdrafts or negative balances.

321.    At approximately 8:57 p.m. on September 3, 2019, Mann sent an email to Tim Burke, who was working with Pioneer, instructing that there were significant funds in the "tax account," and that more money would be coming into the account. He also indicated that he had probably moved about $3 million from the "tax account" to pay down the "line," *i.e.*, the Valuewise Loan.

**From:** Michael Mann <████████████████████>
**Date:** September 3, 2019 at 20:57:31 EDT
**To:** Timothy Burke <████████████████████>
**Subject: Cover**

Tim….

There was probably close to 1.9M to cover tomorrow morning from the tax account. I did move probably 3M to the line from the tax account on Friday.  There is more money coming in tomorrow to cover the 452K that Matt discussed.  However, my guess is there was not enough money in their today.

Again, Pioneer should see it on the report tomorrow. Obviously, if I would have known this was going to happen on Friday, I would have left the money in the account.

Also, I do hope you get to BofA soon.  My guess is they have the remainder to cover future tax liabilities.

Thanks for helping today.  Again, I just wanted to make you aware based on numbers I see in the tax reports.  I could be wrong but probably not.

Thanks,

Mike

322.    Burke then forwarded the email to Blessing and Fleming, who in turn forwarded the email to Tom Amell, Frank Sarratori, Patrick Hughes (Chief Financial Officer), and Laura Mazzara (Executive Vice President and Chief Risk Officer).

323.     Thus, as of September 3, 2019, Pioneer's senior officers were unquestionably aware that there were substantial third-party tax funds in the "tax account" at Pioneer. At the very least, Pioneer had a duty to investigate the source of the funds in the 2440 Tax Account.

**Pioneer Causes Third-Party Tax Funds to Accumulate in the 2440 Tax Account**

324.     Between August 30, 2019 and September 3, 2019, with no knowledge that Pioneer was blocking debits/withdrawals from Cloud Payroll's accounts, Southwestern Payroll authorized ACH transactions of its employer-customers tax trust funds totaling $6,740,339.63. Similarly, Granite Solutions' account was debited $328,553.33 as any for taxes due to the IRS in connection with its August 30, 2019 payroll.

325.     Once Pioneer posted these August 30 - September 3 credits/deposits on September 3, 2019, the 2440 Tax Account had a positive balance of $8,883,528.54, reflecting the aforementioned monies debited from Southwestern Payroll, Granite Solutions, and other third-parties across the United States. The ACH credits/deposits were easily identifiable to Pioneer as third-party tax monies because each was labeled "CLOUDPAYROLL/TAX COL" and included the name of the third-party employer to which each payment was associated.

326.     Pioneer senior officers met with Mann and Mann's attorney on September 4, 2019. Mann wanted Pioneer to release the third-party funds in the MyPayrollHR and Cloud Payroll accounts so that the payroll companies would not be destroyed. In furtherance of this goal, Mann told Pioneer's outside counsel that third-party payroll and tax funds were housed in Mann Entity Accounts and should be released so that the payroll companies would not be rendered worthless.

327.     However, Pioneer refused to release any funds unless Bank of America agreed to release the funds it had frozen in its accounts that were controlled by Mann. Mann eventually left

the meeting with the understanding that Pioneer intended to claim the third-party tax and payroll funds for itself to offset Pioneer's potential losses.

328.    Had Pioneer not looted the 2440 Tax Account, it would have had a positive balance of $10,662,269.25 on and after September 4, 2019.

329.    However, on September 4, 2019, Pioneer posted a "debit memo" to the 2440 Tax Account reflecting its withdrawal of $6,845,944.84, which it then deposited in its own general ledger account.

330.    Pioneer falsely claims that it was entitled to seize the funds to cover the overdrafts in other Mann Entity Accounts.  However, Pioneer had no set off rights with respect to the 2440 Tax Account because, among other reasons, no Cloud Payroll accounts had overdrafts and Pioneer knew the funds were third-party tax/treasury payments.

331.    Also on September 4, 2019, Pioneer diverted $6,845,000 from the 2440 Tax Account to the 0212 Tax Account. Pioneer then transferred $2.8 million of the third-party tax funds from the 0212 Tax Account to other Mann Entity Accounts, and ultimately to pay down the Valuewise Loan.

332.    Significantly, however, Pioneer manipulated the dates on which these transactions occurred.  The transfer of $6,845,000 from the 2440 Tax Account was posted as of September 4, 2019, when Pioneer controlled the Mann Entity Accounts.

| Sep 04 | OLB TRANSFER | 2,800,000.00 | -762,416.30 |
|--------|--------------|--------------|-------------|
| Sep 04 | OLB TRANSFER | 989,000.00 | -1,751,416.30 |
| Sep 04 | OLB TRANSFER | 988,000.00 | -2,739,416.30 |
| Sep 04 | OLB TRANSFER | 987,000.00 | -3,726,416.30 |
| Sep 04 | OLB TRANSFER | 986,000.00 | -4,712,416.30 |
| Sep 04 | OLB TRANSFER | 95,000.00 | -4,807,416.30 |

333.    Inexplicably, the deposit of the $6,845,000 to the 0212 Tax Account was posted one day earlier, on September 3, 2019.

| | | | |
|---|---|---|---|
| Sep 03 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 2,800,000.00 | 5,957,621.76 |
| Sep 03 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 989,000.00 | 6,946,621.76 |
| Sep 03 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 988,000.00 | 7,934,621.76 |
| Sep 03 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 987,000.00 | 8,921,621.76 |
| Sep 03 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 986,000.00 | 9,907,621.76 |
| Sep 03 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 95,000.00 | 10,002,621.76 |

334.     Similarly, the transfer of $2.8 million from the 0212 Tax Account to the Weitz Account, the transfer of $3 million from the Weitz Account and deposit to the Valuewise account ending in 3614, and the withdrawal of $3.2 million from the Valuewise 3614 account were all posted as of September 3, 2019.

335.     However, the deposit of the $3.2 million to the Valuewise Loan account was apparently backdated, as of August 30, 2019.

| | | | | | |
|---|---|---|---|---|---|
| 8/30/2019 | 42 | Internet Transfer From 8603614 - VALUEWISE CORPORATION | | $3,200,000.00 | $35,490,894.90 |

336.     Significantly, on August 30, 2019, the Valuewise 3614 account had a balance of only $84,807.04, and therefore the payment of $3.2 million from that account to pay down the Valuewise Loan account on August 30, 2019 was impossible.

**BUSINESS CHECKING**                                        Account Number: XXXXXX3614

**Account Owner(s):   VALUEWISE CORPORATION**

**Balance Summary**

| | |
|---|---|
| Beginning Balance as of 08/01/2019 | **$136,326.40** |
| + Deposits and Credits  (35) | $27,290,923.82 |
| - Withdrawals and Debits  (166) | $27,342,443.18 |
| **Ending Balance as of 08/31/2019** | **$84,807.04** |
| Service Charges for Period | $395.43 |
| Average Balance for Period | $99,322.00 |
| Average Collected for Period | $90,893.00 |
| Minimum Balance for Period | $1,340.00 |

337.     Pioneer's manipulation of the dates that these transactions were posted in its records made it appear as though Mann had initiated the payment from the Valuewise 3614 account to the Valuewise Loan account on August 30, 2019, before the Mann Accounts were partially "frozen." However, Pioneer had suspended all August 30, 2019 transaction, and any transfers that occurred were accomplished by Pioneer on September 4, 2019.

338.     Between Pioneer's "debit memo" withdrawal of $6,845,944.84 and the $6,845,000 transfer to the 0212 Tax Account, Pioneer intentionally created a negative balance in the 2440 Tax Account, knowing that additional third-party tax funds would be deposited in the account on September 4, 2019.

339.     Thus, while third-party tax funds in the amount of $1,778,740.71 were deposited to the 2440 Tax Account on September 4, 2019, these amounts were applied to the negative balance created by Pioneer, and are not reflected in Pioneer's admitted "setoff" of $6,845,944.84 from the 2440 Tax Account.

340.     Moreover, Pioneer has admittedly taken at least $15,975,018.25 from the Mann Entity Accounts in addition to the $1,778,740.71 deposited to the 2440 Tax Account on September 4, 2019, notwithstanding that the amount of the overdrafts was significantly less, only $15,588,000 million. Pioneer has no legitimate basis for taking more from the accounts than necessary to cover the overdrafts.

341.     The negative balance in the 2440 Tax Account reflected in Pioneer's records is false and misleading because the negative balance was caused by Pioneer's looting of tax funds from the account, not because the account—or any Cloud Payroll account—was overdrawn. If not for Pioneer's illegal conduct, the balance in the 2440 Tax Account as of September 4, 2019 would have been $10,628,738.17.

342.     The negative balance is also deceiving because it allowed Pioneer to understate the amount of funds it "set off" from the 2440 Tax Account.

343.     The negative balance also allowed Pioneer to record a non-interest expense, *i.e.*, write off, of $2.5 million in the first quarter of 2020.

344.   While it allowed third-party tax funds to be deposited to Cloud Payroll's account, Pioneer prevented the withdrawal of $4,329,563.94 in third-party tax funds from the 2440 Tax Account between August 30, 2019 and September 4, 2019.

345.   Specifically, on August 30, 2019 Pioneer blocked the withdrawal of $814,208.33 in third-party tax funds from the 2440 Tax Account that were to be paid to the IRS and other taxing authorities on behalf of third-party employers such as Granite Solutions and the employer-clients of Southwestern Payroll.

346.   On September 3, 2019, Pioneer blocked the withdrawal of $3,002,466.62 in third-party tax funds from the 2440 Tax Account that were to be paid to the IRS and other taxing authorities on behalf of third-party employers such as Granite Solutions and the employer-clients of Southwestern Payroll.

347.   On September 4, 2019, Pioneer blocked the withdrawal of $512,888.99 in third-party tax funds from the 2440 Tax Account that were to be paid to the IRS and other taxing authorities on behalf of third-party employers such as Granite Solutions and the employer-clients of Southwestern Payroll.

348.   But for Pioneer's wrongful interference with the 2440 Tax Account, all tax monies paid by third-party employers and deposited to the 2440 Tax Account would have been paid to the IRS and other taxing authorities.

349.   In addition to the $9,968,692.32 in third-party tax funds deposited to the 2440 Tax Account between August 30 and September 4, 2019 (and converted by Pioneer), at least $6,508,493.50 in third-party tax funds were deposited to the 2440 Tax Account prior to August 30, 2019 and not yet due to be paid to the appropriate taxing jurisdictions, including $3,069,627.45

which had been collected by Southwestern Payroll on behalf of its employer-clients.  These funds were similarly converted by Defendants.

**<u>Defendants Work Together to Conceal Their Misconduct</u>**

350.    Although Pioneer knew there were serious issues with the Mann Entities and the Mann Entity Accounts on August 30, 2019, and that Mann had stepped down as CEO of Valuewise and all related entities on the morning of September 3, 2019, Pioneer executives purposefully kept Berkshire and Chemung in the dark and did not respond to their inquiries until Monday, September 9, 2019.

351.    On September 3, 2019, Charbonneau forwarded a Notification of Paydown on the Valuewise Loan to Berkshire and Chemung, falsely indicating that Mann had made a payment in the amount of $3.2 million on August 30, 2019.

352.    On September 4, 2019, around the time Pioneer executives were conspiring with Mann to convert the third-party tax funds and payroll, Stephen Malinowski from Berkshire emailed Blessing to confirm their meeting the following day with Mann.

353.    Blessing responded curtly, "Steve, unfortunately we have to reschedule.  I will let you know."

354.    Unaware of the situation, Malinowski indicated that it was not a problem and asked whether Blessing had time for lunch the following day, Malinowski's "treat."

355.    Blessing responded the following day, September 5, 2019, "Sorry not today."

356.    Malinowski responded, asking if everything was "OK?"

357.    Blessing responded, "Yes just tied up with something at work."

358.    Wholly unaware of the unfolding situation and intentionally left in the dark by Pioneer, Malinowski asked that Blessing let him know when he and Mann were free so they could reschedule the meeting, and let him know when Blessing was free for lunch or coffee.

359.    Blessing did not respond.

360.    On September 5, 2019, Charbonneau sent Berkshire and Chemung a Participation Remittance and rate change effective September 1, 2019, as if everything were fine with the Valuewise Loan.

361.    On September 6, 2019, the Albany Times Union newspaper published an article regarding the sudden shuttering of MyPayrollHR. Laura Mazzara (EVP, Chief Risk Officer) sent a link to the article to Tom Amell, indicating that Pioneer was not mentioned in the article. Amell responded, "Let's keep it that way."

362.    Also on September 6, 2019, Malinowski sent an email to Fleming, indicating that he had been trying to reach Blessing and that he had learned that MyPayrollHR was out of business. He asked that Fleming call him. Fleming did not respond.

363.    Kevin Harrigan of Chemung sent an email to Blessing and Matthew Guidarelli (Commercial Portfolio Manager) on September 6, 2019, indicating that he had a client using MyPayrollHR who had received notification that MyPayrollHR had gone out of business and was asking for information. Harrington stated "I hope you have news to get me off the ledge."

364.    The email was forwarded to Pioneer senior management, and Blessing did not respond to Harrigan's email.

365.    Harrigan also sent an email to Pioneer's outside counsel on September 6, 2019, asking questions about the situation and indicating that Chemung had not received any update on the situation from Pioneer.

366.     Harrigan then left a voice message for Fleming and followed up with an email seeking information.  Fleming forwarded the email to Sarratori, but did not respond to Harrigan.

367.     On September 6, 2019, Malinowski also sent an email to Blessing indicating that he had just read an article in the Times Union regarding MyPayrollHR and asking what was "going on."  Blessing did not respond.

368.     Finally, on September 9, 2019, more than a week after Pioneer knew there were substantial issues with the Mann Entities and the Mann Entity Accounts, Pioneer finally responded to the inquires of Berkshire and Chemung. However, Pioneer failed to disclose that, on September 4 and 5, 2019, Pioneer had transferred to its own general ledger account nearly $16 million from the Mann Entity Accounts, purportedly to cover overdrafts in certain Mann Entity Accounts.

369.     This apparently was not the first time Pioneer disregarded its fiduciary duty and failed to disclose material information to Berkshire and Chemung.

370.     Notwithstanding Pioneer's knowledge of Mann's near-daily overdrafts and his use of third-party tax and payroll funds to cover the overdrafts, Pioneer failed to disclose this material information to Berkshire and Chemung.

371.     Berkshire and Chemung have brought separate suits against Pioneer in New York State Supreme Court, Albany County, based on Pioneer's fraud and other misconduct.

**Pioneer's Scheme to Conceal Its Conversion and Money Laundering Activities**

372.     On September 18, 2019, Intervenor Plaintiff NatPay's bank, First Premier, filed a complaint with NACHA, alleging that Pioneer's returns had violated NACHA operating rules.

373.     Specifically, First Premier indicated that, under the NACHA rules, a financial institution receiving a debit entry may return it for any reason unless the reason is prohibited. The NACHA rules prohibit a receiving financial institution from returning a debit entry due to the

"type of entry." There is no question that Pioneer violated this rule when it returned only debit entries—not credit entries—on the grounds the accounts were purportedly "frozen."

374.    In furtherance of Pioneer's scheme to conceal its money laundering and conversion, Pioneer made a number of intentional misrepresentations and deceptive omissions to NACHA in a letter signed by Sarratori (Executive VP, General Counsel, and Chief Administrator).

375.    Sarratori stated that the 2440 Tax Account was pledged as collateral for certain debt obligations owed by the account owner, and that pursuant to the UCC Article 9, Pioneer had a perfected security interest in the account and all funds deposited in the 2440 Tax Account.

376.    Sarratori further indicated that Pioneer had a right of set off against the 2440 Tax Account for the account owner's debt obligations, and that as of September 4 and 5, 2019 various debt obligations owed by the account owner were in default and due and payable.

377.    Sarratori falsely stated that at the time of the returns, "there were no funds available cover [sic] the dollar value of the debit entries."  Therefore, while Pioneer used return reason code R16, "it could with equal justification have used return reason code R01 (the available balance is not sufficient to cover the dollar value of the debit entry)[.]"

378.    Notably, while Sarratori repeatedly referred to "defaulted loans" as the basis for the returns, Pioneer has abandoned any reliance on this excuse.  Rather, Pioneer now has taken the position that it was entitled to set off the tax funds due to overdrafts occurring in Mann Entity Accounts.

379.    This is likely due to the fact that there are exclusions in Pioneer's insurance policies that would reduce or eliminate coverage to the extent that Pioneer set off funds in the Mann Entity Accounts because such funds served as collateral for the Valuewise Loan. Pioneer has brought a declaratory judgment action against Atlantic Specialty Insurance Company in New York Supreme

Court, Albany County, seeking to recover what can no doubt be extraordinary defense costs based on Pioneer's belated excuse for seizing the funds in the Mann Entity Accounts.

380.    Sarratori's assertions to NACHA were materially false, since he failed to disclose that the 2440 Tax Account was held by Cloud Payroll, and that Cloud Payroll had no "debt obligations" to Pioneer.  None of the accounts held by Cloud Payroll had overdrafts.

381.    Sarratori's assertion to NACHA that there were no funds available at the time it returned the debits was also materially false.  To the contrary, Pioneer set off funds from the Mann Entity Accounts at 6:30 p.m. on September 4, 2019.  At that time the 2440 Tax Account had a balance of over $10 million.

382.    Moreover, Sarratori failed to disclose that the only reason there ultimately were no funds in the 2440 Tax Account was because Pioneer converted more than $6.845 million to its own account and caused the transfer of another $6.845 million in funds to other Mann Accounts that were also ultimately either converted by Pioneer or used to pay down the Valuewise Loan.

383.    NACHA was not the only third-party Pioneer intentionally sought to deceive.

384.    In the aftermath of the closure of MyPayrollHR and Cloud Payroll, numerous individuals on behalf of small businesses, not-for-profits, and other employers throughout the country sent communications to Pioneer asking about their tax and/or payroll monies.

385.    Those employers were distraught that the payroll and tax payments that had been withdrawn from their accounts were "frozen" at Pioneer Bank.

386.    Pioneer curtly responded to these inquiries, if at all, with false information.

| | |
|---|---|
| **From:** | Frank C. Sarratori |
| **To:** | "james~~███████████~~ |
| **Subject:** | FW: ~~███████████~~ /MyPayrollHR issue |
| **Date:** | Monday, October 07, 2019 4:25:38 PM |
| **Attachments:** | pioneer_signature.png |
| | pioneer_signature.png |
| | pioneer_signature.png |

This acknowledges receipt of your recent inquiry. Pioneer Bank is not providing (nor has it ever provided) payroll services, ACH tax wiring services, tax filing services or other payroll related services for Cloud Payroll.

All inquiries or concerns regarding missing payroll or missing tax/treasury payments connected to Cloud Payroll should be directed to Cloud Payroll.

Sincerely,

Frank C. Sarratori

387.    These communications were false because, as demonstrated above, Pioneer authorized Mann to use the 0212 Tax Account and 2440 Tax Account to house and process third-party payroll and tax funds, and routinely assisted MyPayrollHR and Cloud Payroll in processing payroll and tax payments. Moreover, by this date, Pioneer was well aware that the funds it had seized were third-party payroll and tax funds to which Pioneer had no right. Pioneer also directed that any inquiries be directed to MyPayrollHR and Cloud Payroll even though Pioneer knew full well that those entities were shuttered as a result of Pioneer's illegal actions.

### **Additional Harm Caused by Defendants' Misconduct**

388.    As a result of Pioneer's acceptance of ACH credit/deposit entries and delayed rejection of ACH debit/withdrawal entries, Southwestern Payroll incurred losses of approximately $6,740,339.63 from on or about August 30, 2019 to September 4, 2019, when funds were transferred from Southwestern Payroll's account at Prosperity Bank and ultimately deposited to the 2440 Tax Account. This amount is in addition to the $3,069,627.45 that represented Southwestern Payroll's employer-clients' tax payments which had been collected prior to August 30, 2019, but were being housed in the 2440 Tax Account prior to their payment due date, for a sum total *in wrongfully seized tax funds* only in the amount of $9,809,967.08.

389.    Additionally, Southwestern Payroll's employer-clients have incurred penalties and interest as a result of untimely and/or non-remittance of their payroll tax obligations. In order to abate penalties and interest, many of Southwestern Payroll's employer-clients have been required to pay the taxes owed to the appropriate taxing authorities a second time. Others have not or cannot afford to pay the taxes owed for a second time, have received notices of deficiencies, are incurring penalties, and are subject to collection and enforcement activities of the various taxing authorities.

390.    As a result of Pioneer's acceptance of ACH credit/deposit entries and delayed rejection of ACH debit/withdrawal entries, Granite Solutions incurred losses of payroll tax payments of approximately $416,866.62, and was also assessed penalties and interest fees, in an amount to be determined at trial, prior to its notification of the delinquency and ultimate ability to pay said taxes for a second time. Granite Solutions has also incurred losses in the form of costs and attorney fees to pursue this action, accounting fees as a result of its efforts to employ third-parties to assist with the various IRS notices and investigate and calculate its losses, and loss billing and client expenses after dedicating countless man hours to recuperate the funds wrongfully seized from its various employees' bank accounts.

391.    In addition, due to Defendants' conduct, Southwestern Payroll has received multiple demand letters sent by or on behalf of certain employer-clients, demanding "return" of their tax funds, notwithstanding that Pioneer—not Southwestern Payroll—has possession of their tax funds. In order to protect and defend itself from these and additional threats, Southwestern Payroll was required to bring this action and seek Pioneer's disgorgement of the third-party employer tax funds.

392.    Pioneer and Mann's conspiracy to use the third-party tax and payroll funds to offset overdrafts and pay down the Valuewise Loan resulted in the conversion of at least $16 million in

third party tax funds to the detriment of thousands of additional employers and employees throughout the country.

## FIRST CAUSE OF ACTION
### (DECLARATORY JUDGMENT – AGAINST PIONEER)

393.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 392 above as if fully recited herein.

394.    Southwestern Payroll transferred at least $9,809,967.08 and Granite Solutions transferred approximately $416,866.62 into the 2440 Tax Account at Pioneer that were never withdrawn for payment of taxes.

395.    Pioneer has seized these funds, claiming that the funds were pledged as collateral for the Valuewise Loan, or alternatively, were set off against overdrafts in other Mann Entity accounts. This is Pioneer's contention despite its knowledge that the funds in the 2440 Tax Account were third-party funds paid by employers for deposit to the IRS and other taxing authorities, and despite the fact that there were no overdrafts in the 2440 Tax Account or any other Cloud Payroll or MyPayrollHR accounts.

396.    Pioneer was obligated to investigate the source of the funds in the 2440 Tax Account prior to setting off any funds in the account, and Pioneer's own records clearly reveal that the funds in the account were third-party tax payments, not the funds of Cloud Payroll, Mann or any of the Mann Entities.

397.    Mann and the Entity Defendants have not challenged Pioneer's ability to seize these payroll and tax funds, and worked in concert with Pioneer in order that the payroll and tax funds be used to reduce his/its/their debt(s) to Pioneer and to reduce Pioneer's purported losses.

398.    Southwestern Payroll has demanded that Pioneer return the funds to Southwestern Payroll, or otherwise remit the funds to the appropriate taxing authorities as directed by

Southwestern Payroll. Additionally, Granite Solutions has demanded that Pioneer return its tax trust funds to it, with penalties and interest, which demand Pioneer has refused.

399.    This case involves an actual, substantial controversy between the parties.

400.    Southwestern Payroll and Granite Solutions seek a declaration with respect to the rights of the parties vis-à-vis the tax trust funds, and specifically a declaration that Pioneer wrongfully seized the funds and that it must release such funds to Southwestern Payroll, or a receiver, for payment to the appropriate taxing jurisdictions, return Granite Solutions twice-paid tax trust funds to it,  disgorge any interest or profits it has earned by way of its wrongful retention of the tax funds, and that Pioneer be found liable, not Southwestern Payroll, to any of its employer-clients with respect to the tax funds and any damages they have incurred due to Pioneer's unlawful actions.

## SECOND CAUSE OF ACTION
### (CONVERSION)

401.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 400 above as if fully recited herein.

402.    Pioneer, through its improper partial "freezing" of the 2440 Tax Account and its seizure and diversion of all third-party funds in the account, has knowingly and wrongfully converted in excess of $9 million in tax funds belonging to Plaintiffs and/or Plaintiffs' customers, to which it has no right of possession.

403.    Pioneer continues to exercise unauthorized and wrongful possession and control over the tax funds to the exclusion of Southwestern Payroll who, by virtue of its contractual relationship with its employer-clients, has the right to possess the tax funds and to ensure their remittance to the appropriate taxing authorities, and to the exclusion of Granite Solutions who has now double paid its tax obligations.

404.    Pioneer knew that the tax funds in the 2440 Tax Account were not the property of Mann, the Mann Entities, or Pioneer, and the funds could not be pledged as collateral for the $42 million loan or used to set off any Mann Entity overdrafts.

405.    Pioneer and Mann knew and agreed that Pioneer would accept the credit/deposit entry side of the transfers, and would delay return of the debit/withdrawal entry side of the transfers, which would necessarily result in Southwestern Payroll continuing to fund any credit/deposit entries to any Mann Entity Accounts.

406.    As a result of Pioneer's selective rejection of ACH entries, the debit/withdrawal entries which would have remitted the tax funds to the proper taxing authorities were blocked, and Pioneer purposefully delayed rejection of the debit entries for several days so that parties such as the Plaintiffs would remain unaware of Pioneer's true intentions.

407.    Mann and the Entity Defendants failed to challenge Pioneer's ability to seize the tax funds and are working in concert with Pioneer in order that the tax funds be used to reduce Mann's debt and Pioneer's losses.

408.    Southwestern Payroll, by and through C. David Rhoades as its court-appointed receiver, demanded that Pioneer release all funds wrongfully in its possession, and Pioneer ignored that demand. Similarly, Granite Solutions made demand upon Pioneer to release all funds wrongfully in its possession, and Pioneer has likewise ignored that demand.

409.    Defendants' wrongful conversion of the tax funds has caused Plaintiffs to suffer damages, including collective tax fund related losses in excess of $10,000,000, and other damages that will continue to accrue, at least on Southwestern Payroll's part, until the tax funds are paid to the appropriate taxing authorities.

410.    Plaintiffs seek all damages allowable by law against Defendants, including compensatory and punitive damages, interest, costs, attorneys' fees, accounting fees, loss of billing and client expenses, and reputational harm and lost profits arising out of loss of Southwestern Payroll customers. Plaintiffs seek all damages allowable by law against Pioneer for its wrongful and unauthorized possession and control over the tax trust funds.

411.    Plaintiffs are entitled to an order requiring that Pioneer disgorge any interest or profits it has earned by way of its wrongful retention of the tax funds.

## THIRD CAUSE OF ACTION
### (FRAUD: SOUTHWESTERN PAYROLL V. DEFENDANTS)

412.    Southwestern Payroll incorporates the allegations contained in paragraphs 1 through 411 above as if fully recited herein.

413.    Southwestern Payroll's fraud claim involves tax trust funds which were deposited with Pioneer between August 30, 2019 and September 4, 2019.  Beginning on or about August 30, 2019, Pioneer allowed all credits/deposits to the Mann-controlled accounts, including the 2440 Tax Account, but ultimately rejected all legitimate debits/withdrawals from the accounts. Pioneer purposefully delayed returning ACH debit/withdrawal entries so that they would not be received until September 4, 2019, knowing that tax funds would amass in the 2440 Tax Account and Pioneer could seize any deposits. Moreover, instead of telling Southwestern Payroll or anyone else that there was an issue with Mann, Pioneer purposefully continued to accept tax trust funds into the 2440 Tax Account, but froze outgoing transactions to prevent the funds from being paid to the appropriate taxing authorities.

414.    This case is not simply a dispute about whether the tax trust funds belong to Pioneer or the taxing authorities. Southwestern Payroll alleges that Pioneer purposefully stopped all outgoing ACH transactions from the 2440 Tax Account, but allowed money to keep flowing into

the account beginning August 30, 2019 and continuing until Southwestern Payroll discovered the partial freeze on September 4, 2019, in a purposeful and fraudulent attempt to obtain as much money as possible to satisfy the Valuewise Loan and/or offset overdrafts in other Mann accounts, even though Pioneer knew the money in the 2440 Tax Account was not Mann's money, but instead was money to be held in trust and remitted to the proper taxing authorities to which the funds were due.

415.    Pioneer knew that by delaying returns, Southwestern Payroll and the other payroll service bureaus owned by Mann, including MyPayrollHR (which was in possession of Granite Solutions' tax funds) would rely on Pioneer's acceptance of credit entries and silence as to debit entries as indication that the Mann Entity Accounts were not frozen, and would continue to make deposits to the accounts.

416.    Pioneer's conduct in this manner violated NACHA Operating Rules, was unprecedented, and was not foreseeable to anyone other than Pioneer. Mann and the Entity Defendants enabled and ratified Pioneer's conduct for their own selfish purposes.

417.    Pioneer had a duty to disclose to Southwestern Payroll its intention to freeze outgoing ACH transactions from the 2440 Tax Account based on Pioneer's superior knowledge of Mann's activities and its fiduciary duty to allow Southwestern Payroll's client tax trust funds to be paid directly to taxing authorities.

418.    The confidential and fiduciary relationship is established by statute, case law, and special circumstances.

419.    26 U.S.C. § 7501 provides:  "Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United

States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States ....”

420.    The United States Supreme Court has also found that payroll taxes, once collected, are to be held in trust.  In *Begier v. I.R.S*, 496 U.S. 53 (1990), the Court reviewed at what point a trust is created with respect to 26 U.S.C. § 7501. *Id.* The United States Supreme Court held that a trust for tax collections is created at the time wages are paid by an employer because it is at that point the tax withholding occurs. *Id.* at 61-62.

421.    Further, there are special facts which create a fiduciary and/or confidential relationship between Pioneer and Southwestern Payroll by virtue of Pioneer's receipt and holding of Southwestern Payroll's tax trust funds.

422.    Pioneer had superior knowledge which was not readily available to Southwestern Payroll, namely that it had frozen only outgoing transactions from the 2440 Tax Account but was continuing to allow credits to the account, with the intent to use the accumulation of these funds to offset the Valuewise Loan and/or overdrafts in other Mann-controlled accounts. Pioneer's success in accumulating as much money into the 2440 Account as it possibly could, to offset the defaulted Valuewise Loan and other account overdrafts and recover its losses, hinged on its ability to act in a clandestine manner. Pioneer knew that by accepting credit entries but denying and delaying debit entries, Southwestern Payroll would continue to act on its mistaken belief that the 2440 Tax Account was operating as it always had – payroll taxes into the holding account for a time, and payroll taxes permitted to be paid out when due.

423.    There were literally thousands of tax transactions that went in and out of the 2440 Tax Account each day, and there is no feasible way to monitor whether Pioneer would be honoring the ACH transactions in real time.  It takes weeks, months, or in certain circumstances, quarters

(90 days) before a payroll company receives notice from taxing authorities that tax payments have not been made.  Southwestern Payroll could not have learned of what Pioneer did any sooner through the exercise of ordinary intelligence.  Southwestern Payroll only discovered the denial and delay of debit entries through Alred's investigation on **September 4, 2019**, prompted by notice of Mann's resignation, and which was received only *after* Pioneer had already accepted the additional funds into the 2440 Tax Account.

424.    Southwestern Payroll was reasonably operating under a mistaken belief of a material fact. Namely, Southwestern Payroll reasonably believed that if Pioneer accepted the credit entries for the tax trust funds, it would also allow and accept the debit entries which were to initiate payment from the 2440 Tax Account to the appropriate taxing authorities, as it had done for years.

425.    Pioneer knew the funds in the 2440 Tax Account were tax funds, and this situation is exactly the type of special circumstance which creates a fiduciary relationship sufficient for Southwestern Payroll to maintain a fraud claim.

426.    Southwestern Payroll seeks all damages allowable by law against Pioneer for its fraudulent and wrongful collection and retention of the tax trust funds, including $9,809,967.08, penalties and interest assessed and to be assessed from the taxing authorities, loss of profits, damages for reputational harm, interest, costs, attorneys' fees, and that Pioneer be required to disgorge any interest it has earned by way of its fraudulent acquisition and retention of the tax trust funds.

### FOURTH CAUSE OF ACTION
### (FRAUD)

427.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 426 above as if fully recited herein.

428.    Beginning on or about August 30, 2019, Pioneer and Mann agreed to and implemented a plan to allow all credits/deposits to the Mann-controlled accounts, including the 2440 Tax Account, and ultimately to reject all legitimate debits/withdrawals from the accounts.

429.    Pioneer purposefully delayed returning ACH debit/withdrawal entries so that employers such as Granite Solutions would not be aware of their return until September 4, 2019 or later, knowing that Granite Solutions' tax funds would amass in the 2440 Tax Account and that Pioneer could seize its deposits.

430.    Pioneer knew that by delaying returns, payroll providers such as Southwestern Payroll, and third-party employers such as Granite Solutions, would rely on Pioneer's acceptance of credit entries and silence as to debit entries as indication that the Mann Entity Accounts were not frozen, and would continue to authorize deposits to the accounts.

431.    Pioneer's conduct in this manner violated NACHA Operating Rules, was unprecedented, and was not foreseeable by Plaintiffs.

432.    Mann and the Entity Defendants enabled and ratified Pioneer's conduct for their own selfish purposes.

433.    Southwestern Payroll seeks all damages allowable by law against Pioneer for its fraudulent and wrongful collection and retention of the tax trust funds, including $9,809,967.08, penalties and interest assessed and to be assessed from the taxing authorities, loss of profits, damages for reputational harm, interest, costs, attorneys' fees, and that Pioneer be required to disgorge any interest it has earned by way of its fraudulent acquisition and retention of the tax trust funds.

434.    Defendants' fraud has caused Granite Solutions to suffer damages, including the loss of approximately $416,866.62 in payroll tax liabilities, and has incurred penalties and interest as a result.

435.    Plaintiffs seek all damages allowable by law against Defendants, including compensatory and punitive damages, interest, loss of profits, accounting fees, loss of billing and client expenses, costs, and attorney fees.

436.    Plaintiffs are entitled to an order requiring that Pioneer disgorge any interest or profits it has earned by way of its wrongful retention of the tax trust funds.

## FIFTH CAUSE OF ACTION
## (NEGLIGENCE/GROSS NEGLIGENCE)

437.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 436 above as if fully recited herein.

438.    All Defendants owed a duty to Plaintiffs to keep and maintain the third-party employer tax funds in trust for payment to the taxing authorities.

439.    All Defendants knew that the tax trust funds paid into the 2440 Tax Account were collected by Mann's payroll service bureaus, such as Plaintiff Southwestern Payroll, after being collected from their third-party employer customers, such as Granite Solutions, and that these businesses would collectively be harmed if ACH credits/deposits were allowed but ACH debits/withdrawals were returned, or if the third-party employer tax funds were converted by Mann or Pioneer.

440.    Defendants intentionally diverted the tax funds in the 2440 Tax Account to other accounts to cover overdrafts, to pay down the Valuewise loan, or otherwise used the funds for improper purposes.

441.    Defendants failed to adequately monitor and supervise the tax funds.

442.   Defendants agreed that Mann and the Entity Defendants could pledge the MyPayrollHR and Cloud Payroll accounts as collateral for the Valuewise Loan, even though all Defendants knew that the MyPayrollHR and Cloud Payroll accounts were used to process third-party payroll and tax payments, and could not be pledged as collateral for the Valuewise Loan.

443.   In issuing the Valuewise Loan, Pioneer had a duty to engage in credit underwriting and due diligence, and to ensure that the Mann and the Entity Defendants had sufficient liquidity and assets with respect to the Valuewise Loan, and to ensure that any accounts that were pledged as collateral for the Valuewise Loan did not include third-party payroll or tax funds.

444.   Pioneer's due diligence with respect to the Valuewise Loan was grossly deficient.

445.   Pioneer had a duty upon opening any of the Mann Entity Accounts to gain an understanding, independent of any forms completed for or by Mann, of the purpose and anticipated use of the account, the expected volume of activity in the account, and source of funds in the account.  Pioneer also had a duty to monitor the Mann Entity Accounts for suspicious activities and report suspicious activity to FinCEN.

446.   Moreover, under federal and state law, Pioneer had a duty to operate in a manner that protects the public interest, including that it insure the safe and sound conduct of its business, maintain public confidence in its business, and protect the interests of the public, depositors, creditors, shareholders and stockholders.

447.   Pioneer deliberately ignored its obligations and any suspicious activities in the Mann Entity Accounts.  Pioneer failed to use the ordinary care of a reasonably prudent bank under the same or similar circumstances, and failed to exercise adequate banking standards of care specifically in relation to the 0212 Tax Account, the 2440 Tax Account, and the other Mann Entity Accounts.  Had Pioneer fulfilled these obligations, Mann's schemes would have ended, and no

harm would have come to the third-party employers such as Plaintiff Granite Solutions, and to the payroll service bureaus contractually obligated to collect said funds, such as Plaintiff Southwestern Payroll.

448.    Mann and the Entity Defendants had a duty to challenge Pioneer's conversion of the tax funds, but instead have colluded with Pioneer and acquiesced in Pioneer's misconduct.

449.    Pioneer has converted third-party employer tax funds purportedly to set off overdrafts in accounts held by entities other than Cloud Payroll and MyPayrollHR, and has refused to release the third-party tax funds knowing that such funds were not the property of Mann, Cloud Payroll or any other Mann Entity, or Pioneer.

450.    Defendants have breached their duties to Plaintiffs.

451.    Defendants' negligence, willful misconduct, gross negligence, and reckless actions have caused damages to Plaintiffs.  Defendants' conduct is so careless and reckless as to show a complete disregard for the rights and safety of others and the consequences of Defendants' actions or inactions.

452.    Defendants' negligence, gross negligence, willful misconduct and reckless actions have caused Plaintiffs to suffer damages, including the collective loss of over $2 million in tax funds due to various taxing authorities, and other damages that will continue to accrue until the third-party tax funds are paid to the appropriate taxing authorities.

453.    Plaintiffs seek all damages allowable by law against Pioneer for its fraudulent and wrongful collection and retention of the tax trust funds, including compensatory and punitive damages, interest, costs, attorneys' fees, accounting fees, loss of billing and client expenses, and reputational harm and lost profits arising out of loss of Southwestern Payroll customers. Plaintiffs

seek all damages allowable by law against Pioneer for its wrongful and unauthorized possession and control over the tax trust funds.

## SIXTH CAUSE OF ACTION
### (UNJUST ENRICHMENT/MONEY HAD AND RECEIVED– PIONEER)

454.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 453 above as if fully recited herein.

455.    Prior to September 5, 2019, Plaintiffs collectively authorized and/or effectuated the transfer of more than $10 million in tax trust funds to the 2440 Tax Account at Pioneer, none of which has been paid to the appropriate taxing authorities.

456.    Pioneer has been unjustly enriched by its conversion and retention of the tax trust funds. By allowing Pioneer to retain the tax trust funds to offset their obligations to Pioneer, Mann and the Entity Defendants have been unjustly enriched.

457.    Pioneer's conversion and retention of funds was at the expense of Plaintiffs.

458.    Pioneer's losses with respect to its dealings with Mann were the result of Pioneer's own misconduct and willful disregard of Mann's illegal activities.

459.    It is against equity and good conscience to permit Pioneer to retain the tax trust funds and any interest it has earned from same.

460.    Pioneer should be ordered to release the tax trust funds of Southwestern Payroll's employer-clients to Southwestern Payroll, or to a receiver for payment to the appropriate taxing jurisdictions, to release approximately $416,866.62 in tax trust funds to Granite Solutions, and to disgorge any interest or profits it has earned by way of its wrongful retention of the third-party funds.

## SEVENTH CAUSE OF ACTION
### (VIOLATION OF RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c))

94

461.     Plaintiffs incorporate the allegations contained in paragraphs 1 through 460 above as if fully recited herein.

462.     Each Defendant is a "person" capable of holding legal or beneficiary interest in property within the meaning of 18 U.S.C. § 1961(3).

463.     Each Defendant violated 18 U.S.C. § 1962(c) by the acts described above, and as further described below.

464.     From at least 2014 through September 4, 2019, Mann, the Mann Entities, and Pioneer were associated with and comprised an "enterprise" within the meaning of 18 U.S.C. § 1961(4) that engaged in acts and activities that affected interstate commerce, including money laundering (the "RICO Enterprise").  At all relevant times, the RICO Enterprise constituted an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

465.     The purpose of the RICO Enterprise was to obtain third-party employer tax and payroll payments from employers and their payroll service providers throughout the country and to use those third-party tax and payroll funds to cover any overdrafts in other Mann Entity Accounts, pay down the Valuewise Loan, and otherwise to benefit Mann, Pioneer, and the RICO Enterprise.  Defendants intended to and did in fact hide, launder, and otherwise wrongfully retain the third-party employer tax and payroll funds.

466.     Defendants knew that their use of the third-party funds was not authorized by the third-party employers and/or their payroll service providers bound to collect said funds. Defendants diverted the third-party funds to other Mann Entity accounts in order to conceal the nature, source, ownership and control of the third-party funds.  Defendants converted third-party tax funds in the amount of $2.8 million from the 2440 Tax Account and caused approximately 2/3 of those funds to be wired to Berkshire and Chemung as payment on the Valuewise Loan.

467.    The RICO Enterprise had a discernable structure. Mann had the most significant degree of control over the affairs of the RICO Enterprise, and controlled the flow of the third-party payroll and tax funds.  Pioneer, primarily through Blessing, Fleming, and Benedict, provided Mann with substantial assistance and the necessary approvals and encouraged Mann to divert third-party funds from the 0212 Tax Account and the 2440 Tax Account to other Mann Entity Accounts and to reduce the balance of the Valuewise Loan. Pioneer also assisted Mann by concealing his money laundering activities from Valuewise Loan participants, including Berkshire and Chemung, and from federal regulators including FinCEN. At all relevant times, Pioneer knew that Mann was engaged in fraudulent activity and that the third-party employer payroll and tax funds were transferred to other accounts owned and controlled by Mann at Pioneer bank through wrongful criminal conduct. Pioneer knew that by assisting and encouraging Mann to divert third-party payroll and tax funds from the MyPayrollHR and Cloud Payroll accounts, and concealing his money laundering from third parties, it was participating in and facilitating that unlawful conduct.

468.    On and after August 30, 2019, Pioneer took control of the RICO Enterprise, and diverted third-party payroll and tax funds from the MyPayrollHR and Cloud Payroll accounts to its own accounts and to pay down the Valuewise Loan.  Pioneer also wired, with the intent to defraud, stolen third-party employer tax funds in an amount exceeding $10,000 to Berkshire and Chemung.

469.    The RICO Enterprise was distinct from the predicate acts of money laundering. Mann and the Mann Entities engaged in various lawful activities, including consulting work and payroll processing services, and Pioneer executed certain lawful commercial banking transactions on behalf of Mann and the Mann Entities.

470.    Each of the Defendants agreed to and did conduct, participate in the conduct of, operate, and manage the affairs of the RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and in violation of 18 U.S.C. § 1962(c).

471.    The racketeering activities committed by the Defendants all had the same or similar purposes, results, participants, victims, and methods of commission, and they were not isolated events. As described above, the Defendants engaged in numerous predicate acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957, which occurred on a regular basis from 2014 at least through September 4, 2019, and would have continued but for Bank of America's freezing of the Mann Entities' bank accounts held at Bank of America, and thus constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

472.    Defendants knew that the transfer of third-party payroll and tax funds from the MyPayrollHR and Cloud Payroll accounts to other Mann-controlled accounts or to third parties were designed to conceal or disguise the nature, location, source, ownership, or control of the converted funds.

473.    Defendants' transactions affected interstate and foreign commerce because (a) proceeds of specified unlawful activity were deposited in financial institutions in the United States, (b) converted funds were moved by ACH, wire, and other means that affected interstate commerce, and (c) financial institutions that are engaged in, or the activities of which affect, interstate or foreign commerce were used to facilitate the illegal transactions.

474.    From 2014 through September 5, 2019, and from April, 2017 through September 5, 2019, Granite Solutions and Southwestern Payroll, respectively, were reasonably foreseeable and/or anticipated victims of Defendants' racketeering activity.

475.     As a direct and proximate result of, and by reason of, the activities of Defendants, and their conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property, within the meaning of 18 U.S.C. § 1964(c).

476.     As described above, as a result of Defendants' misconduct, Plaintiffs have been collectively damaged in the amount of at least $13 million, and have incurred and will continue to incur substantial costs in seeking to obtain disgorgement of the third-party tax funds.

477.     Plaintiffs are entitled to recover and seeks threefold the damages they have sustained together with the cost of the suit including costs, reasonable attorney's fees and reasonable experts' fees.

## EIGTH CAUSE OF ACTION
### (VIOLATION OF RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS ACT,  18 U.S.C. § 1962(d))

478.     Plaintiffs incorporate the allegations contained in paragraphs 1 through 477 above as if fully recited herein.

479.     Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate RICO, 18 U.S.C. § 1962(c).

480.     In connection with the RICO Enterprise, Pioneer and Mann agreed to accomplish an unlawful plan to engage in a pattern of racketeering activity.

481.     Pioneer and Mann agreed to the overall objective of the conspiracy, and agreed to commit at least two acts of racketeering, including but not limited to money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

482.     As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Plaintiffs have been injured in their business or property.

483.     The unlawful actions of Defendants, and each of them, have directly, legally, and proximately caused injuries to Plaintiffs in their businesses.

484.     As described above, as a result of Defendants' misconduct, Plaintiffs have collectively been damaged in the amount of at least $13 million, and have incurred and will continue to incur substantial costs in seeking to obtain disgorgement of the third-party tax funds.

485.     Plaintiffs are entitled to recover and seek threefold the damages they have sustained together with the cost of the suit including costs, expenses reasonable attorney's fees and reasonable experts' fees.

## <u>NINTH CAUSE OF ACTION</u>
### (AIDING AND ABETTING CONVERSION – PIONEER)

486.     Plaintiffs incorporate the allegations contained in paragraphs 1 through 485 above as if fully recited herein.

487.     On and after August 30, 2019, Pioneer and Mann knew that, if the 2440 Tax Account was partially "frozen," *e.g.*, that Pioneer would allow ACH credit/deposit entries but would hold and later return debit/withdrawal entries, that employers such as Granite Solutions, and their payroll service providers such as Southwestern Payroll, would continue to fund the 2440 Tax Account in anticipation of their future remittance to the appropriate taxing authorities.

488.     Pioneer and Mann knew and agreed that Pioneer would continue to accept the credit/withdrawal entry side of the transfers of tax trust funds to the 2440 Tax Account, and would delay return of the debit/withdrawal entry side of the transfers, so that neither Granite Solutions nor Southwestern Payroll would learn of the tax trust funds non-remittance to the appropriate taxing authorities until it was too late to reclaim the tax trust funds.

489.     Defendants agreed that Pioneer would convert the tax trust funds to reduce Mann's debts to Pioneer.

490.     Plaintiffs have demanded return of the tax trust funds, but Pioneer has refused to disgorge its ill-gotten gains.

## TENTH CAUSE OF ACTION
## (AIDING AND ABETTING FRAUD – PIONEER)

491.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 490 above as if fully recited herein

492.    Beginning in about 2014 through September 2019, Mann engaged in a fraudulent scheme whereby he induced third-party employers to enter into agreements pursuant to which Mann's payroll companies would, among other things, process payroll and tax payments.

493.    From 2017 through September 2019, Mann engaged in a fraudulent scheme whereby he, through Cloud Payroll, induced Southwestern Payroll to collect third-party tax funds of its employer-clients, knowing his intent to money launder and check kite with those funds. Further, Mann, through MyPayrollHR, induced Granite Solutions to enter into an agreement with MyPayrollHR whereby Granite would authorize MyPayrollHR, and trusted MyPayrollHR, to be a steward of its tax trust funds and ensure their timely remittance to various taxing authorities.

494.    Mann failed to disclose to Plaintiffs that Mann would engage in money laundering by diverting and using the third-party tax funds deposited to the 0212 Tax Account and the 2440 Tax Account, and that Pioneer sanctioned, facilitated, and encouraged these actions.

495.    Southwestern Payroll would never have contracted with Cloud Payroll, and Granite Solutions would never have contracted with MyPayrollHR, had they known that Mann would engage in money laundering by diverting and using the third-party tax funds deposited to the 0212 Tax Account and the 2440 Tax Account, and that Pioneer would sanction, facilitate, and encourage these actions.

496.    Mann and Pioneer knew that the third-party tax funds deposited in the 0212 Tax Account and the 2440 Tax Account were entrusted to MyPayrollHR/Cloud Payroll, and should

not be used for any purposes other than paying the tax/treasury funds to the appropriate taxing authorities.

497.    Pioneer knew that Southwestern Payroll was collecting tax funds for its employer-clients, and that Granite Solutions had authorized MyPayrollHR to process and house its tax trust funds for timely remittance to various taxing authorities, and that both were operating under the belief that Mann was not diverting tax funds deposited to the Mann Entity Accounts for purposes other than paying third-party taxes.

498.    Nonetheless, Pioneer enabled, facilitated, and provided substantial assistance to Mann in committing fraud by, among other things,

      a.    allowing and at times requiring Mann to move the third-party funds from the 0212 Tax Account and the 2440 Tax Account to other Mann Accounts to cover overdrafts;

      b.    allowing and at times requiring Mann to use the third-party funds in the 0212 Tax Account and the 2440 Tax Account to pay down the Valuewise Loan;

      c.    failing to report suspicious activities in Mann's Accounts to regulatory authorities;

      d.    allowing Mann to use the MyPayrollHR and Cloud Payroll accounts as collateral for the Valuewise Loan and other loans extended to the Entity Defendants;

      e.    conspiring with Mann to ensure that Southwestern Payroll continued to transfer its employer-clients' tax funds to the 2440 Tax Account, knowing that Pioneer would use the tax funds to offset any debts of Mann or the Mann Entities to Pioneer;

      f.    conspiring with Mann to ensure that third-party employers such as Granite Solutions continued to authorize its payroll service companies to collect, house, and timely remit

its tax funds in the 2440 Tax Account, knowing that Pioneer would use the tax funds to reduce any debts of Mann or the Mann Entities to Pioneer, and to reduce Pioneer's losses;

   g. converting the third-party funds in the 0212 Tax Account and the 2440 Tax Account on and after August 30, 2019; and

   h. transferring third-party tax funds from the 2440 Tax Account to pay down the Valuewise Loan on or about September 4, 2019.

  499. As a result of Mann's fraud and Pioneer's substantial assistance, Plaintiffs have been injured in an amount no less than $497 million.

<h2 style="text-align:center"><u>JURY TRIAL DEMANDED</u></h2>

  500. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby request a jury trial on all issues so triable.

<h2 style="text-align:center"><u>PRAYER FOR RELIEF</u></h2>

  **For the foregoing reasons,** Plaintiffs respectfully seek a judgment in their favor and against the Defendants as follows:

  1. For a declaration with respect to the rights of the parties vis-à-vis the tax funds, specifically:

   A. a declaration that Pioneer wrongfully seized the third-party employer tax funds and that it must release such funds to Southwestern Payroll, or a receiver, for payment to the appropriate taxing jurisdictions, return Granite Solutions' twice-paid tax funds to it, and disgorge any interest or profits it has earned by way of its wrongful retention of the tax funds;

B.      a declaration that Pioneer, and not Southwestern Payroll, is liable to any taxing authorities or any of its employer-clients, with respect to the tax funds and any damages due to Pioneer's unlawful action.

2.      For compensatory damages in an amount in excess of $13 million, including the wrongfully seized tax trust funds, penalties and interest charged, accounting fees, loss of billing and client expense, loss of business profits, and reputational harm.

3.      For an award of three times the damages sustained by Plaintiffs;

4.      For an award of punitive damages, pre-judgment and post-judgment interest at the highest rates allowable by law, attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by law; and

5.      Such other and further relief as the Court deems just and equitable.

Respectfully submitted,

By:      _s/Andrew C. Jayne_
          Andrew C. Jayne, OBA #19493
          Tara D. Zickefoose, OBA #31757
          BAUM GLASS JAYNE CARWILE & PETERS
          401 S. Boston Ave., Suite 2000
          Tulsa, Oklahoma 74103
          Telephone:  918/938.7944
          Facsimile:  918/938.7966
          Email:  ajayne@bgjclaw.com
                    tzickefoose@bgjclaw.com

          -and-

Michael A. Kornstein, Esq.
Bar Roll No. 103178
COOPER ERVING & SAVAGE LLP
LOCAL COUNSEL FOR PLAINTIFF
39 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone: (518) 449-3900
mkornstein@coopererving.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of April, 2023, I electronically transmitted the previous document to the Clerk of the Court using the ECF System for filing and transmittal of Notice of Electronic Filing was then made to the following ECF registrants:

Michael A. Kornstein – mkornstein@coopererving.com
*Local Counsel for Defendant Southwestern Payroll Service, Inc.*

Robert J. Alessi – Robert.alessi@us.dlapiper.com
Jeffrey D. Kuhn – Jeffrey.kuhn@us.dlapiper.com
*Counsel for Defendant Pioneer Bancorp, Inc., Pioneer Bank*

Cynthia E. Neidl – neidlc@gtlaw.com
*Counsel for non-party National Payment Corporation*

*s/ Andrew C. Jayne*