**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

SOUTHWESTERN PAYROLL SERVICE, INC.,
and GRANITE SOLUTIONS GROUPE, INC.,

        *Plaintiffs,*

    *v.*

PIONEER BANCORP INC., et al.,

        *Defendants.*

---

NATIONAL PAYMENT CORPORATION,

        *Intervenor-Plaintiff,*

    v.

PIONEER BANCORP INC., et al.,

        Defendants.

Case No.  1:19-cv-1349 (FJS/CFH)

**PIONEER BANK AND PIONEER BANCORP INC.'S ANSWER AND DEFENSES TO PLAINTIFFS' THIRD AMENDED COMPLAINT, AND COUNTERCLAIMS/CROSSCLAIMS**

Defendants Pioneer Bank and Pioneer Bancorp Inc. (collectively, the "Answering Defendants"), through their attorneys, DLA Piper LLP (US), hereby answer and interpose their defenses to the third amended complaint filed by plaintiffs Southwestern Payroll Service, Inc. ("SWP") and Granite Solutions Groupe, Inc. ("Granite Solutions") (collectively, "Plaintiffs") on April 26, 2023,] (Dkt. No. 245, "Third Amended Complaint").  Except as otherwise expressly admitted herein, Answering Defendants deny each and every allegation in the Third Amended Complaint, including, without limitation, any allegations contained in Plaintiffs' prayer for relief, headings, and subheadings.  This answer is based on Answering Defendants' investigation and understanding to date, and Answering Defendants expressly reserve the right to amend this answer to the fullest extent provided under applicable law.  Moreover, Answering Defendants object to the entirety of the Third Amended Complaint as grossly inconsistent with the requirement that a

complaint set forth "a short and plain statement of the claim showing the pleader is entitled to relief."  Fed. R. Civ. P. 8(a); *see, e.g.*, *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ("Unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." (cleaned up)).  Without waiver of any rights or defenses, Answering Defendants answer the allegations in the complaint as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Third Amended Complaint; accordingly, such allegations are denied.

2.      Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 of the Third Amended Complaint; accordingly, such allegations are denied.

3.      Answering Defendants admit the allegations in paragraph 3 of the Third Amended Complaint, except that Answering Defendants deny that Pioneer Bancorp Inc. is a "foreign bank" under the N.Y. Banking Law.

4.      Answering Defendants admit the allegations in paragraph 4 of the Third Amended Complaint, except that Answering Defendants deny that the zip code of Pioneer Bank's headquarters is 12180.

5.      Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5 of the Third Amended Complaint; accordingly, such allegations are denied.

6.      Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 of the Third Amended Complaint; accordingly, such allegations are denied.

7.      Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 of the Third Amended Complaint; accordingly, such allegations are denied.

8.      Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 of the Third Amended Complaint; accordingly, such allegations are denied.

9.      Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Third Amended Complaint; accordingly, such allegations are denied.

10.      Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 of the Third Amended Complaint; accordingly, such allegations are denied.

11.      Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 of the Third Amended Complaint; accordingly, such allegations are denied.

12.      Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Third Amended Complaint; accordingly, such allegations are denied.

13.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Third Amended Complaint; accordingly, such allegations are denied.

14.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Third Amended Complaint; accordingly, such allegations are denied.

15.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Third Amended Complaint; accordingly, such allegations are denied.

16.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Third Amended Complaint; accordingly, such allegations are denied.

17.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Third Amended Complaint; accordingly, such allegations are denied.

18.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the Third Amended Complaint; accordingly, such allegations are denied.

19.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Third Amended Complaint; accordingly, such allegations are denied.

20. Paragraph 20 of the Third Amended Complaint asserts conclusions of law, to which no response is required. To the extent a response is require, Answering Defendants deny the allegations in paragraph 20 of the Third Amended Complaint.

21. Paragraph 21 of the Third Amended Complaint asserts conclusions of law, to which no response is required. To the extent a response is require, Answering Defendants deny the allegations in paragraph 21 of the Third Amended Complaint.

22. Paragraph 22 of the Third Amended Complaint asserts conclusions of law, to which no response is required.

23. Answering Defendants deny the allegations in paragraph 23 of the Third Amended Complaint.

24. Answering Defendants deny the allegations in paragraph 24 of the Third Amended Complaint.

25. Answering Defendants deny the allegations in paragraph 25 of the Third Amended Complaint.

26. Answering Defendants deny the allegations in paragraph 26 of the Third Amended Complaint.

27. Answering Defendants deny the allegations in paragraph 27 of the Third Amended Complaint.

28. Answering Defendants deny the allegations in paragraph 28 of the Third Amended Complaint.

29. Answering Defendants admit the allegations in paragraph 29 of the Third Amended Complaint that in August 2020 Mann admitted that from about 2013 through September 2019, he engaged in a fraudulent scheme to deceive banks and financing companies into loaning his

companies millions of dollars.  Answering Defendants further admit that Mann also engaged in a kiting scheme, using checks, wire transfers, and the Automated Clearing House ("ACH") system to rapidly transfer millions of dollars among various accounts he controlled at Pioneer and Bank of America.  Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 29 of the Third Amended Complaint; accordingly, such allegations are denied.

30.   Answering Defendants admit the allegations in paragraph 30 of the Third Amended Complaint.

31.   Answering Defendants deny the allegations in paragraph 31 of the Third Amended Complaint.

32.   The allegations in paragraph 32 of the Third Amended complaint are improper and must be stricken because they refer to privileged and confidential supervisory information of the Federal Deposit Insurance Corporation ("FDIC") that is prohibited from disclosure by law, absent FDIC authorization.   To the extent they are not stricken, Answering Defendants deny the allegations in paragraph 32 of the Third Amended Complaint.

33.   Answering Defendants deny the allegations in paragraph 33 of the Third Amended Complaint.

34.   Answering Defendants deny the allegations in paragraph 34 of the Third Amended Complaint and note that paragraph 34 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

35.   Answering Defendants deny the allegations in paragraph 35 of the Third Amended Complaint.

36.   Answering Defendants deny the allegations in paragraph 36 of the Third Amended Complaint.

37.   Answering Defendants deny the allegations in paragraph 37 of the Third Amended Complaint.

38.   Answering Defendants deny the allegations in paragraph 38 of the Third Amended Complaint.

39.   Answering Defendants deny the allegations in paragraph 39 of the Third Amended Complaint.

40.   Answering Defendants deny the allegations in paragraph 40 of the Third Amended Complaint.

41.   Answering Defendants deny the allegations in paragraph 41 of the Third Amended Complaint.

42.   Answering Defendants deny the allegations in paragraph 42 of the Third Amended Complaint.

43.   Answering Defendants deny the allegations in paragraph 43 of the Third Amended Complaint.

44.   Answering Defendants deny the allegations in paragraph 44 of the Third Amended Complaint.

45.   Answering Defendants deny the allegations in paragraph 45 of the Third Amended Complaint, except admit that Pioneer extended remote deposit capture ("RDC") access to accounts that Mann controlled at Pioneer Bank in reliance on numerous materially false representations by Mann.

46.     Answering Defendants deny the allegations in paragraph 46 of the Third Amended Complaint.

47.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentence of paragraph 47 of the Third Amended Complaint; accordingly, such allegations are denied.  Answering Defendants deny the allegations in the third sentence of paragraph 47 of the Third Amended Complaint.

48.     Answering Defendants deny the allegations in paragraph 48 of the Third Amended Complaint, except admit that on August 29, 2019, Mann deposited 36 checks written from accounts controlled by Mann at Bank of America totaling $15,588,000 into accounts at Pioneer Bank.

49.     Answering Defendants admit the allegation in paragraph 49 of the Third Amended Complaint that Bank of America returned and called back the 36 Bank of America checks totaling $15,588,000.  Answering Defendants deny the remaining allegations in paragraph 49 of the Third Amended Complaint.

50.     Answering Defendants deny the allegations in paragraph 50 of the Third Amended Complaint.

51.     Answering Defendants deny the allegations in paragraph 51 of the Third Amended Complaint.

52.     Answering Defendants deny the allegations in paragraph 52 of the Third Amended Complaint.

53.     Answering Defendants deny the allegations in paragraph 53 of the Third Amended Complaint.

54.     Answering Defendants deny the allegations in paragraph 54 of the Third Amended Complaint.

55.     Answering Defendants deny the allegations in paragraph 55 of the Third Amended Complaint and note that paragraph 55 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

56.     Answering Defendants deny the allegations in paragraph 56 of the Third Amended Complaint.

57.     Answering Defendants deny the allegations in paragraph 57 of the Third Amended Complaint.

58.     Answering Defendants deny the allegations in paragraph 58 of the Third Amended Complaint.

59.     Answering Defendants deny the allegations in paragraph 59 of the Third Amended Complaint.

60.     Answering Defendants deny the allegations in paragraph 60 of the Third Amended Complaint.

61.     Answering Defendants deny the allegations in paragraph 61 of the Third Amended Complaint.

62.     Answering Defendants deny the allegations in paragraph 62 of the Third Amended Complaint.

63.     Answering Defendants deny the allegations in paragraph 63 of the Third Amended Complaint.

64.     Answering Defendants deny the allegations in paragraph 64 of the Third Amended Complaint.

65.     Answering Defendants deny the allegations in paragraph 65 of the Third Amended Complaint.

66.     Answering Defendants deny the allegations in paragraph 66 of the Third Amended Complaint.

67.     Answering Defendants deny the allegations in paragraph 67 of the Third Amended Complaint.

68.     Answering Defendants deny the allegations in paragraph 68 of the Third Amended Complaint.

69.     Answering Defendants deny the allegations in paragraph 69 of the Third Amended Complaint.

70.     Answering Defendants deny the allegations in paragraph 70 of the Third Amended Complaint.

71.     Answering Defendants deny the allegations in paragraph 71 of the Third Amended Complaint.

72.     Answering Defendants deny the allegations in paragraph 72 of the Third Amended Complaint.

73.     Answering Defendants deny that they had any "role" in Mann's money laundering scheme or that they diverted or converted any funds.  Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of paragraph 73 of the Third Amended Complaint; accordingly, such allegations are

denied. Answering Defendants deny the remaining allegations in paragraph 73 of the Third Amended Complaint.

74.    Answering Defendants deny the allegations in paragraph 74 of the Third Amended Complaint.

75.    Answering Defendants deny the allegations in paragraph 75 of the Third Amended Complaint.

76.    Answering Defendants deny the allegations in paragraph 76 of the Third Amended Complaint.

77.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 77 of the Third Amended Complaint; accordingly, such allegations are denied.

78.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78 of the Third Amended Complaint; accordingly, such allegations are denied.

79.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 79 of the Third Amended Complaint; accordingly, such allegations are denied.

80.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80 of the Third Amended Complaint; accordingly, such allegations are denied.

81.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 81 of the Third Amended Complaint; accordingly, such allegations are denied.

82.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 82 of the Third Amended Complaint; accordingly, such allegations are denied.

83.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 83 of the Third Amended Complaint; accordingly, such allegations are denied.

84.     Answering Defendants deny the allegations in paragraph 84 of the Third Amended Complaint.

85.     Answering Defendants deny the allegations in paragraph 85 of the Third Amended Complaint.

86.     Answering Defendants deny the allegations in paragraph 86 of the Third Amended Complaint.

87.     Answering Defendants deny that Pioneer insisted that tax trust funds be held in a Pioneer bank account.  Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 87 of the Third Amended Complaint; accordingly, such allegations are denied.

88.     Answering Defendants deny the allegations in paragraph 88 of the Third Amended Complaint.

89.     Answering Defendants deny the allegations in paragraph 89 of the Third Amended Complaint.

90.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 90 of the Third Amended Complaint; accordingly, such allegations are denied.

91.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 91 of the Third Amended Complaint; accordingly, such allegations are denied.

92.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 92 of the Third Amended Complaint; accordingly, such allegations are denied.

93.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 93 of the Third Amended Complaint; accordingly, such allegations are denied.

94.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 94 of the Third Amended Complaint; accordingly, such allegations are denied.

95.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 95 of the Third Amended Complaint; accordingly, such allegations are denied.

96.     Answering Defendants deny the allegations in paragraph 96 of the Third Amended Complaint.

97.     Answering Defendants admit the allegations in paragraph 97 of the Third Amended Complaint.

98.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 98 of the Third Amended Complaint; accordingly, such allegations are denied.

99.     Answering Defendants deny the allegations in paragraph 99 of the Third Amended Complaint.

100.    Answering Defendants deny the allegations in paragraph 100 of the Third Amended Complaint, except admit that, in June 2017, a line of credit with a maximum principal amount of $22 million was extended to ValueWise and certain of its affiliates, based in substantial part on unqualified, audited consolidated financial statements that purported to verify, among other things, ValueWise's reported revenues and accounts receivable.

101.    Answering Defendants deny the allegations in paragraph 101 of the Third Amended Complaint, except admit that, in June 2018, a line of credit with a maximum principal amount of $32 million was extended to ValueWise and certain of its affiliates, and Pioneer Bank extended a non-revolving line of credit to Viverant, based in substantial part on unqualified, audited consolidated financial statements that purported to verify, among other things, ValueWise's reported revenues and accounts receivable.

102.    Answering Defendants deny the allegations in paragraph 102 of the Third Amended Complaint, except admit that, on August 12, 2019, a line of credit with a maximum principal amount of $42 million was extended to ValueWise and certain of its affiliates, based in substantial part on unqualified, audited consolidated financial statements that purported to verify, among other things, ValueWise's reported revenues and accounts receivable.

103.    Answering Defendants deny the allegations in paragraph 103 of the Third Amended Complaint.

104.    Paragraph 104 of the Third Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 104 of the Third Amended Complaint.

105.    Paragraph 105 of the Third Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 105 of the Third Amended Complaint.

106.    Paragraph 106 of the Third Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 106 of the Third Amended Complaint.

107.    Answering Defendants deny the allegations in paragraph 107 of the Third Amended Complaint.

108.    Answering Defendants deny the allegations in paragraph 108 of the Third Amended Complaint.

109.    Paragraph 109 of the Third Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 109 of the Third Amended Complaint.

110.    Answering Defendants deny the allegations in paragraph 110 of the Third Amended Complaint.

111.    Answering Defendants deny the allegations in paragraph 111 of the Third Amended Complaint.

112.    Answering Defendants deny the allegations in paragraph 112 of the Third Amended Complaint.

113.    Paragraph 113 of the Third Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 113 of the Third Amended Complaint.

114.     Paragraph 114 of the Third Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 114 of the Third Amended Complaint.

115.     Answering Defendants deny the allegations in paragraph 115 of the Third Amended Complaint.

116.     Answering Defendants deny the allegations in paragraph 116 of the Third Amended Complaint.

117.     Answering Defendants deny the allegations in paragraph 117 of the Third Amended Complaint.

118.     Answering Defendants deny the allegations in paragraph 118 of the Third Amended Complaint.

119.     Answering Defendants deny the allegations in paragraph 119 of the Third Amended Complaint.

120.     Answering Defendants deny the allegations in paragraph 120 of the Third Amended Complaint.

121.     Answering Defendants deny the allegations in paragraph 121 of the Third Amended Complaint.

122.     The allegations in paragraph 122 of the Third Amended Complaint are improper and must be stricken because they refer to privileged and confidential supervisory information of the FDIC that is prohibited from disclosure by law, absent FDIC authorization.  To the extent they are not stricken, Answering Defendants deny the allegations in paragraph 122 of the Third Amended Complaint, and note that paragraph 122 of the Third Amended Complaint references a

document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

123.    Answering Defendants deny the allegations in paragraph 123 of the Third Amended Complaint.

124.    Answering Defendants deny the allegations in paragraph 124 of the Third Amended Complaint.

125.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 125 of the Third Amended Complaint; accordingly, such allegations are denied.

126.    Answering Defendants deny the allegations in paragraph 126 of the Third Amended Complaint.

127.    Answering Defendants deny the allegations in paragraph 127 of the Third Amended Complaint.

128.    Answering Defendants deny the allegations in paragraph 128 of the Third Amended Complaint.

129.    Answering Defendants deny the allegations in paragraph 129 of the Third Amended Complaint and note that paragraph 129 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

130.    Answering Defendants deny the allegations in paragraph 130 of the Third Amended Complaint.

131.    Answering Defendants deny the allegations in paragraph 131 of the Third Amended Complaint.

132.     Answering Defendants deny the allegations in paragraph 132 of the Third Amended Complaint.

133.     Answering Defendants deny the allegations in paragraph 133 of the Third Amended Complaint, except admit that the MyPayrollHR account was a general demand deposit business checking account at Pioneer Bank.

134.     Answering Defendants deny the allegations in paragraph 134 of the Third Amended Complaint.

135.     Answering Defendants deny the allegations in paragraph 135 of the Third Amended Complaint and note that paragraph 135 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

136.     Answering Defendants deny the allegations in paragraph 136 of the Third Amended Complaint and note that paragraph 136 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

137.     Answering Defendants deny the allegations in paragraph 137 of the Third Amended Complaint and note that paragraph 137 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

138.     Answering Defendants deny the allegations in paragraph 138 of the Third Amended Complaint and note that paragraph 138 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

139.     Answering Defendants deny the allegations in paragraph 139 of the Third Amended Complaint and note that paragraph 139 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

140.     Answering Defendants deny the allegations in paragraph 140 of the Third Amended Complaint.

141.     Answering Defendants deny the allegations in paragraph 141 of the Third Amended Complaint.

142.     Answering Defendants deny the allegations in paragraph 142 of the Third Amended Complaint and note that paragraph 142 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

143.     Answering Defendants deny the allegations in paragraph 143 of the Third Amended Complaint and note that paragraph 143 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

144.     Answering Defendants deny the allegations in paragraph 144 of the Third Amended Complaint and note that paragraph 144 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

145.     Answering Defendants deny the allegations in paragraph 145 of the Third Amended Complaint and note that paragraph 145 of the Third Amended Complaint references a document

that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

146.     Answering Defendants deny the allegations in paragraph 146 of the Third Amended Complaint and note that paragraph 146 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

147.     Answering Defendants deny the allegations in paragraph 147 of the Third Amended Complaint and note that paragraph 147 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

148.     Answering Defendants deny the allegations in paragraph 148 of the Third Amended Complaint and note that paragraph 148 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

149.     Answering Defendants deny the allegations in paragraph 149 of the Third Amended Complaint.

150.     Answering Defendants deny the allegations in paragraph 150 of the Third Amended Complaint.

151.     Answering Defendants deny the allegations in paragraph 151 of the Third Amended Complaint and note that paragraph 151 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

152.     Answering Defendants deny the allegations in paragraph 152 of the Third Amended Complaint and note that paragraph 152 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

153.     Answering Defendants deny the allegations in paragraph 153 of the Third Amended Complaint.

154.     Answering Defendants deny the allegations in paragraph 154 of the Third Amended Complaint.

155.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 155 of the Third Amended Complaint that PTM continued to serve as MyPayroll's third-party ACH processor.  Answering Defendants deny the remaining allegations in the first sentence of paragraph 155 of the Third Amended Complaint.  Answering Defendants deny the allegations in the second and third sentences of paragraph 155 of the Third Amended Complaint and note that the allegations in the second and third sentences of paragraph 155 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

156.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 156 of the Third Amended Complaint; accordingly, such allegations are denied.

157.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 157 of the Third Amended Complaint; accordingly, such allegations are denied.

158.     Answering Defendants deny the allegations in paragraph 158 of the Third Amended Complaint.

159.     Answering Defendants deny the allegations in paragraph 159 of the Third Amended Complaint.

160.     Answering Defendants deny the allegations in paragraph 160 of the Third Amended Complaint.

161.     Answering Defendants deny the allegations in paragraph 161 of the Third Amended Complaint and note that paragraph 161 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

162.     Answering Defendants deny the allegations in paragraph 162 of the Third Amended Complaint and note that paragraph 162 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

163.     Answering Defendants deny the allegations in paragraph 163 of the Third Amended Complaint.

164.     Answering Defendants deny the allegations in paragraph 164 of the Third Amended Complaint.

165.     Answering Defendants deny the allegations in paragraph 165 of the Third Amended Complaint.

166.     Answering Defendants deny the allegations in paragraph 166 of the Third Amended Complaint.

167.     Answering Defendants deny the allegations in paragraph 167 of the Third Amended Complaint.

168.     Answering Defendants deny the allegations in paragraph 168 of the Third Amended Complaint.

169.     Answering Defendants deny the allegations in paragraph 169 of the Third Amended Complaint and note that paragraph 169 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

170.     Answering Defendants deny the allegations in paragraph 170 of the Third Amended Complaint.

171.     Answering Defendants deny the allegations in paragraph 171 of the Third Amended Complaint, except admit that MyPayrollHR opened the general demand deposit checking account ending in 0428 at Pioneer Bank on September 16, 2014.

172.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 172 of the Third Amended Complaint; accordingly, such allegations are denied.

173.     Answering Defendants deny the allegations in paragraph 173 of the Third Amended Complaint and note that paragraph 173 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

174.     Answering Defendants deny the allegations in paragraph 174 of the Third Amended Complaint and note that paragraph 174 of the Third Amended Complaint references a document

that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

175.     Answering Defendants deny the allegations in paragraph 175 of the Third Amended Complaint and note that paragraph 175 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

176.     Answering Defendants deny the allegations in paragraph 176 of the Third Amended Complaint and note that paragraph 176 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

177.     Answering Defendants deny the allegations in paragraph 177 of the Third Amended Complaint.

178.     Answering Defendants deny the allegations in the first sentence of paragraph 178 of the Third Amended Complaint.  Answering Defendants deny the allegations in the second sentence of paragraph 178 of the Third Amended Complaint and note that the allegations in the second sentence of paragraph 178 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

179.     Answering Defendants deny the allegations in paragraph 179 of the Third Amended Complaint and note that paragraph 179 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

180.     Answering Defendants deny the allegations in paragraph 180 of the Third Amended Complaint and note that paragraph 180 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

181.     Answering Defendants deny the allegations in paragraph 181 of the Third Amended Complaint and note that paragraph 181 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

182.     Answering Defendants deny the allegations in paragraph 182 of the Third Amended Complaint.

183.     Answering Defendants deny the allegations in paragraph 183 of the Third Amended Complaint.

184.     Answering Defendants deny the allegations in paragraph 184 of the Third Amended Complaint.

185.     Answering Defendants deny the allegations in paragraph 185 of the Third Amended Complaint and note that paragraph 185 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

186.     Answering Defendants deny the allegations in paragraph 186 of the Third Amended Complaint.

187.     Answering Defendants deny the allegations in paragraph 187 of the Third Amended Complaint.

188.     Answering Defendants deny the allegations in paragraph 188 of the Third Amended Complaint and note that paragraph 188 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

189.     Answering Defendants deny the allegations in paragraph 189 of the Third Amended Complaint and note that paragraph 189 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

190.     Answering Defendants deny the allegations in paragraph 190 of the Third Amended Complaint and note that paragraph 190 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

191.     Answering Defendants deny the allegations in paragraph 191 of the Third Amended Complaint and note that paragraph 191 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

192.     Answering Defendants deny the allegations in paragraph 192 of the Third Amended Complaint and note that paragraph 192 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

193.     Answering Defendants deny the allegations in paragraph 193 of the Third Amended Complaint and note that paragraph 193 of the Third Amended Complaint references a document

that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

194.   Answering Defendants deny the allegations in paragraph 194 of the Third Amended Complaint.

195.   Answering Defendants deny the allegations in paragraph 195 of the Third Amended Complaint.

196.   Answering Defendants deny the allegations in paragraph 196 of the Third Amended Complaint.

197.   Answering Defendants deny the allegations in paragraph 197 of the Third Amended Complaint and note that paragraph 197 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

198.   Answering Defendants deny the allegations in the first sentence of paragraph 198 of the Third Amended Complaint, except admit that, on May 15, 2019, Ms. Julian reviewed the April 2019 activity in the 2440 Account following an automated alert from the BAM system. Answering Defendants deny the allegations in the second sentence of paragraph 198 of the Third Amended Complaint and note that the allegations in the second sentence of paragraph 198 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

199.   Answering Defendants deny the allegations in paragraph 199 of the Third Amended Complaint.

200.   Answering Defendants deny the allegations in paragraph 200 of the Third Amended Complaint.

201.     Answering Defendants deny the allegations in paragraph 201 of the Third Amended Complaint.

202.     Answering Defendants deny the allegations in paragraph 202 of the Third Amended Complaint.

203.     Answering Defendants deny the allegations in paragraph 203 of the Third Amended Complaint.

204.     Answering Defendants deny the allegations in paragraph 204 of the Third Amended Complaint.

205.     Answering Defendants deny the allegations in paragraph 205 of the Third Amended Complaint and note that paragraph 205 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

206.     Answering Defendants deny the allegations in paragraph 206 of the Third Amended Complaint.

207.     Answering Defendants deny the allegations in paragraph 207 of the Third Amended Complaint.

208.     Answering Defendants deny the allegations in paragraph 208 of the Third Amended Complaint.

209.     Answering Defendants deny the allegations in the first sentence of paragraph 209 of the Third Amended Complaint and note that the allegations in the first sentence of paragraph of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

Answering Defendants deny the remaining allegations in paragraph 209 of the Third Amended Complaint.

210.    Answering Defendants deny the allegations in paragraph 210 of the Third Amended Complaint and note that paragraph 210 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

211.    Answering Defendants deny the allegations in paragraph 211 of the Third Amended Complaint and note that paragraph 211 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

212.    Answering Defendants deny the allegations in paragraph 212 of the Third Amended Complaint and note that paragraph 212 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

213.    Answering Defendants deny the allegations in paragraph 213 of the Third Amended Complaint and note that paragraph 213 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

214.    Answering Defendants deny the allegations in paragraph 214 of the Third Amended Complaint.

215.    Answering Defendants deny the allegations in paragraph 215 of the Third Amended Complaint and note that paragraph of the Third Amended Complaint references a document that

speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

216.    Answering Defendants deny the allegations in paragraph 216 of the Third Amended Complaint and note that paragraph 216 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

217.    Answering Defendants deny the allegations in paragraph 217 of the Third Amended Complaint and note that paragraph 217 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

218.    Answering Defendants deny the allegations in paragraph 218 of the Third Amended Complaint and note that paragraph 218 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

219.    Answering Defendants deny the allegations in paragraph 219 of the Third Amended Complaint and note that paragraph 219 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

220.    Answering Defendants deny the allegations in paragraph 220 of the Third Amended Complaint.

221.    Answering Defendants deny the allegations in paragraph 221 of the Third Amended Complaint and note that paragraph 221 of the Third Amended Complaint references a document

that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

222.    Answering Defendants deny the allegations in paragraph 222 of the Third Amended Complaint and note that paragraph 222 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

223.    Answering Defendants deny the allegations in paragraph 223 of the Third Amended Complaint and note that paragraph 223 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

224.    Answering Defendants deny the allegations in paragraph 224 of the Third Amended Complaint and note that paragraph 224 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

225.    Answering Defendants deny the allegations in paragraph 225 of the Third Amended Complaint and note that paragraph 225 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

226.    Answering Defendants deny the allegations in paragraph 226 of the Third Amended Complaint.

227.    Answering Defendants deny the allegations in paragraph 227 of the Third Amended Complaint and note that paragraph 227 of the Third Amended Complaint references a document

that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

228.    Answering Defendants deny the allegations in paragraph 228 of the Third Amended Complaint and note that paragraph 228 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

229.    Answering Defendants deny the allegations in paragraph 229 of the Third Amended Complaint.

230.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 230 of the Third Amended Complaint, except admit that Mann made various statements to federal and state prosecutors and refer to those statements for all of their content.

231.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 231 of the Third Amended Complaint; accordingly, such allegations are denied.

232.    Answering Defendants deny the allegations in paragraph 232 of the Third Amended Complaint.

233.    Answering Defendants deny the allegations in paragraph 233 of the Third Amended Complaint.

234.    Answering Defendants deny the allegations in paragraph 234 of the Third Amended Complaint.

235.    Answering Defendants deny the allegations in paragraph 235 of the Third Amended Complaint.

236.    Answering Defendants deny the allegations in paragraph 236 of the Third Amended Complaint.

237.    Answering Defendants deny the allegations in paragraph 237 of the Third Amended Complaint.

238.    Answering Defendants deny the allegations in paragraph 238 of the Third Amended Complaint.

239.    Answering Defendants deny the allegations in paragraph 239 of the Third Amended Complaint.

240.    Answering Defendants deny the allegations in paragraph 240 of the Third Amended Complaint.

241.    Answering Defendants deny the allegations in paragraph 241 of the Third Amended Complaint.

242.    Answering Defendants deny the allegations in paragraph 242 of the Third Amended Complaint.

243.    Answering Defendants deny the allegations in paragraph 243 of the Third Amended Complaint.

244.    Answering Defendants deny the allegations in paragraph 244 of the Third Amended Complaint.

245.    Answering Defendants deny the allegations in paragraph 245 of the Third Amended Complaint.

246.    Answering Defendants deny the allegations in paragraph 246 of the Third Amended Complaint.

247.     Answering Defendants deny the allegations in paragraph 247 of the Third Amended Complaint and note that paragraph 247 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

248.     Answering Defendants deny the allegations in paragraph 248 of the Third Amended Complaint and note that paragraph 248 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

249.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 249 of the Third Amended Complaint; accordingly, such allegations are denied.

250.     Answering Defendants deny the allegations in paragraph 250 of the Third Amended Complaint and note that paragraph 250 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

251.     Answering Defendants deny the allegations in paragraph 251 of the Third Amended Complaint and note that paragraph 251 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

252.     Answering Defendants deny the allegations in paragraph 252 of the Third Amended Complaint and note that paragraph 252 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

253.     Answering Defendants deny the allegations in paragraph 253 of the Third Amended Complaint and note that paragraph 253 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

254.     Answering Defendants deny the allegations in paragraph 254 of the Third Amended Complaint and note that paragraph 254 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

255.     Answering Defendants deny the allegations in paragraph 255 of the Third Amended Complaint and note that paragraph 255 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

256.     Answering Defendants deny the allegations in paragraph 256 of the Third Amended Complaint and note that paragraph 256 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

257.     Answering Defendants deny the allegations in paragraph 257 of the Third Amended Complaint and note that paragraph 257 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

258.     Answering Defendants deny the allegations in paragraph 258 of the Third Amended Complaint and note that paragraph 258 of the Third Amended Complaint references a document

that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

259.    Answering Defendants deny the allegations in paragraph 259 of the Third Amended Complaint and note that paragraph 259 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

260.    Answering Defendants deny the allegations in paragraph 260 of the Third Amended Complaint and note that paragraph 260 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

261.    Answering Defendants deny the allegations in paragraph 261 of the Third Amended Complaint.

262.    Answering Defendants deny the allegations in paragraph 262 of the Third Amended Complaint.

263.    Answering Defendants deny the allegations in paragraph 263 of the Third Amended Complaint.

264.    Answering Defendants deny the allegations in paragraph 264 of the Third Amended Complaint and note that paragraph 264 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

265.    Answering Defendants deny the allegations in paragraph 265 of the Third Amended Complaint.

266.     Answering Defendants deny the allegations in paragraph 266 of the Third Amended Complaint and note that paragraph 266 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

267.     Answering Defendants deny the allegations in paragraph 267 of the Third Amended Complaint.

268.     Answering Defendants deny the allegations in paragraph 268 of the Third Amended Complaint.

269.     Answering Defendants deny the allegations in paragraph 269 of the Third Amended Complaint and note that paragraph 269 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

270.     Answering Defendants deny the allegations in paragraph 270 of the Third Amended Complaint and note that paragraph 270 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

271.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 271 of the Third Amended Complaint; accordingly, such allegations are denied.

272.     Answering Defendants deny the allegations in paragraph 272 of the Third Amended Complaint.

273.     Answering Defendants deny the allegations in paragraph 273 of the Third Amended Complaint.

274.     Answering Defendants deny the allegations in paragraph 274 of the Third Amended Complaint and note that paragraph 274 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

275.     Answering Defendants deny the allegations in paragraph 275 of the Third Amended Complaint.

276.     Answering Defendants deny the allegations in paragraph 276 of the Third Amended Complaint and note that paragraph 276 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

277.     Answering Defendants deny the allegations in paragraph 277 of the Third Amended Complaint and note that paragraph 277 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

278.     Answering Defendants deny the allegations in paragraph 278 of the Third Amended Complaint.

279.     Answering Defendants deny the allegations in paragraph 279 of the Third Amended Complaint.

280.     Answering Defendants deny the allegations in paragraph 280 of the Third Amended Complaint.

281.     Answering Defendants deny the allegations in paragraph 281 of the Third Amended Complaint.

282.     Answering Defendants deny the allegations in paragraph 282 of the Third Amended Complaint.

283.     Answering Defendants deny the allegations in paragraph 283 of the Third Amended Complaint and note that paragraph 283 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

284.     Answering Defendants deny the allegations in paragraph 284 of the Third Amended Complaint and note that paragraph 284 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

285.     Answering Defendants deny the allegations in paragraph 285 of the Third Amended Complaint.

286.     Answering Defendants deny the allegations in paragraph 286 of the Third Amended Complaint and note that paragraph 286 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

287.     Answering Defendants deny the allegations in paragraph 287 of the Third Amended Complaint.

288.     Answering Defendants deny the allegations in paragraph 288 of the Third Amended Complaint.

289.     Answering Defendants deny the allegations in paragraph 289 of the Third Amended Complaint.

290.    Answering Defendants deny the allegations in paragraph 290 of the Third Amended Complaint and note that paragraph 290 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

291.    Answering Defendants deny the allegations in paragraph 291 of the Third Amended Complaint.

292.    Answering Defendants deny the allegations in paragraph 292 of the Third Amended Complaint.

293.    Answering Defendants deny the allegations in paragraph 293 of the Third Amended Complaint.

294.    Answering Defendants deny the allegations in paragraph 294 of the Third Amended Complaint and note that paragraph 294 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

295.    Answering Defendants deny the allegations in paragraph 295 of the Third Amended Complaint and note that paragraph 295 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

296.    Answering Defendants deny the allegations in paragraph 296 of the Third Amended Complaint.

297.    Answering Defendants deny the allegations in paragraph 297 of the Third Amended Complaint.

298.     Answering Defendants deny the allegations in paragraph 298 of the Third Amended Complaint and note that paragraph 298 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

299.     Answering Defendants deny the allegations in paragraph 299 of the Third Amended Complaint and note that paragraph 299 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

300.     Answering Defendants deny the allegations in paragraph 300 of the Third Amended Complaint and note that paragraph 300 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

301.     Answering Defendants deny the allegations in paragraph 301 of the Third Amended Complaint.

302.     Answering Defendants deny the allegations in paragraph 302 of the Third Amended Complaint.

303.     Answering Defendants deny the allegations in paragraph 303 of the Third Amended Complaint.

304.     Answering Defendants deny the allegations in paragraph 304 of the Third Amended Complaint.

305.     Answering Defendants deny the allegations in paragraph 305 of the Third Amended Complaint.

306.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 306 of the Third Amended Complaint; accordingly, such allegations are denied.

307.    Answering Defendants deny the allegations in paragraph 307 of the Third Amended Complaint.

308.    Answering Defendants deny the allegations in paragraph 308 of the Third Amended Complaint.

309.    Answering Defendants deny the allegations in paragraph 309 of the Third Amended Complaint.

310.    Answering Defendants deny the allegations in paragraph 310 of the Third Amended Complaint.

311.    Answering Defendants deny the allegations in paragraph 311 of the Third Amended Complaint, except admit that Answering Defendants admit that Mann wrote 36 checks totaling $15.588 million from three accounts at Bank of America and deposited them via RDC in accounts at Pioneer Bank.

312.    Answering Defendants deny the allegations in paragraph 312 of the Third Amended Complaint.

313.    Answering Defendants deny the allegations in paragraph 313 of the Third Amended Complaint.

314.    Answering Defendants deny the allegations in paragraph 314 of the Third Amended Complaint.

315.    Answering Defendants deny the allegations in paragraph 315 of the Third Amended Complaint.

316.     Answering Defendants deny the allegations in paragraph 316 of the Third Amended Complaint.

317.     Answering Defendants deny the allegations in paragraph 317 of the Third Amended Complaint.

318.     Answering Defendants deny the allegations in paragraph 318 of the Third Amended Complaint.

319.     Answering Defendants deny the allegations in paragraph 319 of the Third Amended Complaint.

320.     Answering Defendants deny the allegations in paragraph 320 of the Third Amended Complaint.

321.     Answering Defendants deny the allegations in paragraph 321 of the Third Amended Complaint and note that paragraph 321 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

322.     Answering Defendants deny the allegations in paragraph 322 of the Third Amended Complaint and note that paragraph 322 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

323.     Answering Defendants deny the allegations in paragraph 323 of the Third Amended Complaint.

324.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 324 of the Third Amended Complaint; accordingly, such allegations are denied.

325.     Answering Defendants deny the allegations in paragraph 325 of the Third Amended Complaint.

326.     Answering Defendants deny the allegations in paragraph 326 of the Third Amended Complaint.

327.     Answering Defendants deny the allegations in paragraph 327 of the Third Amended Complaint.

328.     Answering Defendants deny the allegations in paragraph 328 of the Third Amended Complaint.

329.     Answering Defendants deny the allegations in paragraph 329 of the Third Amended Complaint.

330.     Answering Defendants deny the allegations in paragraph 330 of the Third Amended Complaint.

331.     Answering Defendants deny the allegations in paragraph 331 of the Third Amended Complaint.

332.     Answering Defendants deny the allegations in paragraph 332 of the Third Amended Complaint.

333.     Answering Defendants deny the allegations in paragraph 333 of the Third Amended Complaint.

334.     Answering Defendants deny the allegations in paragraph 334 of the Third Amended Complaint and note that paragraph 334 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

335.   Answering Defendants deny the allegations in paragraph 335 of the Third Amended Complaint.

336.   Answering Defendants deny the allegations in paragraph 336 of the Third Amended Complaint.

337.   Answering Defendants deny the allegations in paragraph 337 of the Third Amended Complaint.

338.   Answering Defendants deny the allegations in paragraph 338 of the Third Amended Complaint.

339.   Answering Defendants deny the allegations in paragraph 339 of the Third Amended Complaint.

340.   Answering Defendants deny the allegations in paragraph 340 of the Third Amended Complaint.

341.   Answering Defendants deny the allegations in paragraph 341 of the Third Amended Complaint.

342.   Answering Defendants deny the allegations in paragraph 342 of the Third Amended Complaint.

343.   Answering Defendants deny the allegations in paragraph 343 of the Third Amended Complaint.

344.   Answering Defendants deny the allegations in paragraph 344 of the Third Amended Complaint.

345.   Answering Defendants deny the allegations in paragraph 345 of the Third Amended Complaint.

346.     Answering Defendants deny the allegations in paragraph 346 of the Third Amended Complaint.

347.     Answering Defendants deny the allegations in paragraph 347 of the Third Amended Complaint.

348.     Answering Defendants deny the allegations in paragraph 348 of the Third Amended Complaint.

349.     Answering Defendants deny the allegations in paragraph 349 of the Third Amended Complaint.

350.     Answering Defendants deny the allegations in paragraph 350 of the Third Amended Complaint.

351.     Answering Defendants deny the allegations in paragraph 351 of the Third Amended Complaint.

352.     Answering Defendants deny the allegations in paragraph 352 of the Third Amended Complaint.

353.     Answering Defendants deny the allegations in paragraph 353 of the Third Amended Complaint and note that paragraph 353 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

354.     Answering Defendants deny the allegations in paragraph 354 of the Third Amended Complaint and note that paragraph 354 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

355.     Answering Defendants deny the allegations in paragraph 355 of the Third Amended Complaint and note that paragraph 355 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

356.     Answering Defendants deny the allegations in paragraph 356 of the Third Amended Complaint and note that paragraph 356 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

357.     Answering Defendants deny the allegations in paragraph 357 of the Third Amended Complaint and note that paragraph 357 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

358.     Answering Defendants deny the allegations in paragraph 358 of the Third Amended Complaint.

359.     Answering Defendants deny the allegations in paragraph 359 of the Third Amended Complaint and note that paragraph 359 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

360.     Answering Defendants deny the allegations in paragraph 360 of the Third Amended Complaint.

361.     Answering Defendants deny the allegations in paragraph 361 of the Third Amended Complaint and note that paragraph 361 of the Third Amended Complaint references a document

that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

362.     Answering Defendants deny the allegations in paragraph 362 of the Third Amended Complaint and note that paragraph 362 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

363.     Answering Defendants deny the allegations in paragraph 363 of the Third Amended Complaint and note that paragraph 363 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

364.     Answering Defendants deny the allegations in paragraph 364 of the Third Amended Complaint and note that paragraph 364 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

365.     Answering Defendants deny the allegations in paragraph 365 of the Third Amended Complaint and note that paragraph 365 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

366.     Answering Defendants deny the allegations in paragraph 366 of the Third Amended Complaint and note that paragraph 366 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

367.    Answering Defendants deny the allegations in paragraph 367 of the Third Amended Complaint and note that paragraph 367 of the Third Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

368.    Answering Defendants deny the allegations in paragraph 368 of the Third Amended Complaint.

369.    Answering Defendants deny the allegations in paragraph 369 of the Third Amended Complaint.

370.    Answering Defendants deny the allegations in paragraph 370 of the Third Amended Complaint.

371.    Answering Defendants deny the allegations in paragraph 371 of the Third Amended Complaint, except admit that Berkshire and Chemung have brought suits against Pioneer in New State Supreme Court, Albany County.

372.    Answering Defendants deny the allegations in paragraph 372 of the Third Amended Complaint, except admit that First Premier submitted a complaint to NACHA on or about September 18, 2019, alleging that Pioneer violated NACHA operating rules, but NACHA ultimately rejected the complaint and determined that no violation occurred.

373.    Answering Defendants deny the allegations in paragraph 373 of the Third Amended Complaint.

374.    Answering Defendants deny the allegations in paragraph 374 of the Third Amended Complaint.

375.    Answering Defendants deny the allegations in paragraph 375 of the Third Amended Complaint.

376.     Answering Defendants deny the allegations in paragraph 376 of the Third Amended Complaint.

377.     Answering Defendants deny the allegations in paragraph 377 of the Third Amended Complaint.

378.     Answering Defendants deny the allegations in paragraph 378 of the Third Amended Complaint.

379.     Answering Defendants deny the allegations in paragraph 379 of the Third Amended Complaint.

380.     Answering Defendants deny the allegations in paragraph 380 of the Third Amended Complaint.

381.     Answering Defendants deny the allegations in paragraph 381 of the Third Amended Complaint.

382.     Answering Defendants deny the allegations in paragraph 382 of the Third Amended Complaint.

383.     Answering Defendants deny the allegations in paragraph 383 of the Third Amended Complaint.

384.     Answering Defendants deny the allegations in paragraph 384 of the Third Amended Complaint.

385.     Answering Defendants deny the allegations in paragraph 385 of the Third Amended Complaint.

386.     Answering Defendants deny the allegations in paragraph 386 of the Third Amended Complaint.

387.    Answering Defendants deny the allegations in paragraph 387 of the Third Amended Complaint.

388.    Answering Defendants deny the allegations in paragraph 388 of the Third Amended Complaint.

389.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 389 of the Third Amended Complaint; accordingly, such allegations are denied.

390.    Answering Defendants deny the allegations in paragraph 390 of the Third Amended Complaint.

391.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 391 of the Third Amended Complaint; accordingly, such allegations are denied.

392.    Answering Defendants deny the allegations in paragraph 392 of the Third Amended Complaint.

## FIRST CAUSE OF ACTION
### (DECLARATORY JUDGMENT – AGAINST PIONEER)

393.    The statement in paragraph 393 of the Third Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-392 of the Third Amended Complaint.

394.    Answering Defendants deny the allegations in paragraph 394 of the Third Amended Complaint.

395.    Answering Defendants deny the allegations in paragraph 395 of the Third Amended Complaint.

396.    Answering Defendants deny the allegations in paragraph 396 of the Third Amended Complaint.

397.    Answering Defendants deny the allegations in paragraph 397 of the Third Amended Complaint.

398.    Answering Defendants deny the allegations in paragraph 398 of the Third Amended Complaint.

399.    Paragraph 399 of the Third Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 399 of the Third Amended Complaint.

400.    Answering Defendants deny the allegations in paragraph 400 of the Third Amended Complaint.

## SECOND CAUSE OF ACTION
### (CONVERSION)

401.    The statement in paragraph 401 of the Third Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-400 of the Third Amended Complaint.

402.    Answering Defendants deny the allegations in paragraph 402 of the Third Amended Complaint.

403.    Answering Defendants deny the allegations in paragraph 403 of the Third Amended Complaint.

404.    Answering Defendants deny the allegations in paragraph 404 of the Third Amended Complaint.

405.    Answering Defendants deny the allegations in paragraph 405 of the Third Amended Complaint.

406.    Answering Defendants deny the allegations in paragraph 406 of the Third Amended Complaint.

407.    Answering Defendants deny the allegations in paragraph 407 of the Third Amended Complaint.

408.    Answering Defendants deny the allegations in paragraph 408 of the Third Amended Complaint.

409.    Answering Defendants deny the allegations in paragraph 409 of the Third Amended Complaint.

410.    Answering Defendants deny the allegations in paragraph 410 of the Third Amended Complaint.

411.    Answering Defendants deny the allegations in paragraph 411 of the Third Amended Complaint.

## THIRD CAUSE OF ACTION
### (FRAUD: SOUTHWESTERN PAYROLL V. DEFENDANTS)

412.    The statement in paragraph 412 of the Third Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-411 of the Third Amended Complaint.

413.    Answering Defendants deny the allegations in paragraph 413 of the Third Amended Complaint.

414.    Answering Defendants deny the allegations in paragraph 414 of the Third Amended Complaint.

415.    Answering Defendants deny the allegations in paragraph 415 of the Third Amended Complaint.

416.     Answering Defendants deny the allegations in paragraph 416 of the Third Amended Complaint.

417.     Answering Defendants deny the allegations in paragraph 417 of the Third Amended Complaint.

418.     Answering Defendants deny the allegations in paragraph 418 of the Third Amended Complaint.

419.     Answering Defendants deny the allegations in paragraph 419 of the Third Amended Complaint.

420.     Paragraph 420 contains conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 420 of the Third Amended Complaint.

421.     Answering Defendants deny the allegations in paragraph 421 of the Third Amended Complaint.

422.     Answering Defendants deny the allegations in paragraph 422 of the Third Amended Complaint.

423.     Answering Defendants deny the allegations in paragraph 423 of the Third Amended Complaint.

424.     Answering Defendants deny the allegations in paragraph 424 of the Third Amended Complaint.

425.     Answering Defendants deny the allegations in paragraph 425 of the Third Amended Complaint.

426.     Answering Defendants deny the allegations in paragraph 426 of the Third Amended Complaint.

## FOURTH CAUSE OF ACTION
### (FRAUD)

427.    The statement in paragraph 427 of the Third Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-426 of the Third Amended Complaint.

428.    Answering Defendants deny the allegations in paragraph 428 of the Third Amended Complaint.

429.    Answering Defendants deny the allegations in paragraph 429 of the Third Amended Complaint.

430.    Answering Defendants deny the allegations in paragraph 430 of the Third Amended Complaint.

431.    Answering Defendants deny the allegations in paragraph 431 of the Third Amended Complaint.

432.    Answering Defendants deny the allegations in paragraph 432 of the Third Amended Complaint.

433.    Answering Defendants deny the allegations in paragraph 433 of the Third Amended Complaint.

434.    Answering Defendants deny the allegations in paragraph 434 of the Third Amended Complaint.

435.    Answering Defendants deny the allegations in paragraph 435 of the Third Amended Complaint.

436.    Answering Defendants deny the allegations in paragraph 436 of the Third Amended Complaint.

## FIFTH CAUSE OF ACTION
### (NEGLIGENCE/GROSS NEGLIGENCE)

437.    The statement in paragraph 437 of the Third Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-436 of the Third Amended Complaint.

438.    Answering Defendants deny the allegations in paragraph 438 of the Third Amended Complaint.

439.    Answering Defendants deny the allegations in paragraph 439 of the Third Amended Complaint.

440.    Answering Defendants deny the allegations in paragraph 440 of the Third Amended Complaint.

441.    Answering Defendants deny the allegations in paragraph 441 of the Third Amended Complaint.

442.    Answering Defendants deny the allegations in paragraph 442 of the Third Amended Complaint.

443.    Answering Defendants deny the allegations in paragraph 443 of the Third Amended Complaint.

444.    Answering Defendants deny the allegations in paragraph 444 of the Third Amended Complaint.

445.    Answering Defendants deny the allegations in paragraph 445 of the Third Amended Complaint.

446.    Paragraph 446 of the Third Amended Complaint contains conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 446 of the Third Amended Complaint.

447.     Answering Defendants deny the allegations in paragraph 447 of the Third Amended Complaint.

448.     Answering Defendants deny the allegations in paragraph 448 of the Third Amended Complaint.

449.     Answering Defendants deny the allegations in paragraph 449 of the Third Amended Complaint.

450.     Answering Defendants deny the allegations in paragraph 450 of the Third Amended Complaint.

451.     Answering Defendants deny the allegations in paragraph 451 of the Third Amended Complaint.

452.     Answering Defendants deny the allegations in paragraph 452 of the Third Amended Complaint.

453.     Answering Defendants deny the allegations in paragraph 453 of the Third Amended Complaint.

## SIXTH CAUSE OF ACTION
### (UNJUST ENRICHMENT/MONEY HAD AND RECEIVED – PIONEER)

454.     The statement in paragraph 454 of the Third Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-453 of the Third Amended Complaint.

455.     Answering Defendants deny the allegations in paragraph 455 of the Third Amended Complaint.

456.     Answering Defendants deny the allegations in paragraph 456 of the Third Amended Complaint.

457.    Answering Defendants deny the allegations in paragraph 457 of the Third Amended Complaint.

458.    Answering Defendants deny the allegations in paragraph 458 of the Third Amended Complaint.

459.    Answering Defendants deny the allegations in paragraph 459 of the Third Amended Complaint.

460.    Answering Defendants deny the allegations in paragraph 460 of the Third Amended Complaint.

## SEVENTH CAUSE OF ACTION
### (RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(C))

461.    The statement in paragraph 461 of the Third Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-460 of the Third Amended Complaint.

462.    Paragraph 462 asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 462 of the Third Amended Complaint.

463.    Answering Defendants deny the allegations in paragraph 463 of the Third Amended Complaint.

464.    Answering Defendants deny the allegations in paragraph 464 of the Third Amended Complaint.

465.    Answering Defendants deny the allegations in paragraph 465 of the Third Amended Complaint.

466.    Answering Defendants deny the allegations in paragraph 466 of the Third Amended Complaint.

467.     Answering Defendants deny the allegations in paragraph 467 of the Third Amended Complaint.

468.     Answering Defendants deny the allegations in paragraph 468 of the Third Amended Complaint.

469.     Answering Defendants deny the allegations in paragraph 469 of the Third Amended Complaint.

470.     Answering Defendants deny the allegations in paragraph 470 of the Third Amended Complaint.

471.     Answering Defendants deny the allegations in paragraph 471 of the Third Amended Complaint.

472.     Answering Defendants deny the allegations in paragraph 472 of the Third Amended Complaint.

473.     Answering Defendants deny the allegations in paragraph 473 of the Third Amended Complaint.

474.     Answering Defendants deny the allegations in paragraph 474 of the Third Amended Complaint.

475.     Answering Defendants deny the allegations in paragraph 475 of the Third Amended Complaint.

476.     Answering Defendants deny the allegations in paragraph 476 of the Third Amended Complaint.

477.     Answering Defendants deny the allegations in paragraph 477 of the Third Amended Complaint.

**EIGHTH CAUSE OF ACTION**
**(RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS ACT,**
**18 U.S.C. § 1962(D))**

478.    The statement in paragraph 478 of the Third Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-477 of the Third Amended Complaint.

479.    Answering Defendants deny the allegations in paragraph 479 of the Third Amended Complaint.

480.    Answering Defendants deny the allegations in paragraph 480 of the Third Amended Complaint.

481.    Answering Defendants deny the allegations in paragraph 481 of the Third Amended Complaint.

482.    Answering Defendants deny the allegations in paragraph 482 of the Third Amended Complaint.

483.    Answering Defendants deny the allegations in paragraph 483 of the Third Amended Complaint.

484.    Answering Defendants deny the allegations in paragraph 484 of the Third Amended Complaint.

485.    Answering Defendants deny the allegations in paragraph 485 of the Third Amended Complaint.

**NINTH CAUSE OF ACTION**
**(AIDING AND ABETTING CONVERSION – PIONEER)**

486.    The statement in paragraph 486 of the Third Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-485 of the Third Amended Complaint.

487.     Answering Defendants deny the allegations in paragraph 487 of the Third Amended Complaint.

488.     Answering Defendants deny the allegations in paragraph 488 of the Third Amended Complaint.

489.     Answering Defendants deny the allegations in paragraph 489 of the Third Amended Complaint.

490.     Answering Defendants deny the allegations in paragraph 490 of the Third Amended Complaint.

## TENTH CAUSE OF ACTION
### (AIDING AND ABETTING FRAUD – PIONEER)

491.     The statement in paragraph 491 of the Third Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-490 of the Third Amended Complaint.

492.     Answering Defendants deny the allegations in paragraph 492 of the Third Amended Complaint.

493.     Answering Defendants deny the allegations in paragraph 493 of the Third Amended Complaint.

494.     Answering Defendants deny the allegations in paragraph 494 of the Third Amended Complaint.

495.     Answering Defendants deny the allegations in paragraph 495 of the Third Amended Complaint.

496.     Answering Defendants deny the allegations in paragraph 496 of the Third Amended Complaint.

497.     Answering Defendants deny the allegations in paragraph 497 of the Third Amended Complaint.

498.     Answering Defendants deny the allegations in paragraph 498 of the Third Amended Complaint.

499.     Answering Defendants deny the allegations in paragraph 499 of the Third Amended Complaint.

## JURY TRIAL DEMANDED

500.     Paragraph 500 of the Third Amended Complaint requests a jury trial, to which no response is required.

501.     To the extent not expressly admitted herein, Answering Defendants deny each and every other allegation, express or implied, contained in the Third Amended Complaint, including but not limited to any allegation contained in headings to Plaintiffs' Third Amended Complaint.

## ANSWERING DEFENDANTS' AFFIRMATIVE DEFENSES

502.     Answering Defendants set forth below their affirmative defenses.  Each defense is asserted as to all claims against Answering Defendants.  By setting forth these affirmative defenses, Answering Defendants do not assume the burden of proving any fact, issue, or element of claims where such burden properly belongs to the Plaintiffs.

503.     Answering Defendants have not knowingly or intentionally waived any applicable defenses, and Answering Defendants reserve the right to elaborate on or amend the affirmative defenses set forth below, or assert and rely upon other applicable affirmative defenses, based on discovery in this matter, in accordance with applicable law, including recent Second Circuit precedent.

## FIRST AFFIRMATIVE DEFENSE

504.     Plaintiffs fail to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

505.    SWP has unclean hands.

506.    As set forth in Pioneer Bank's below counterclaims (paragraphs 541 to 761 below, and incorporated into all of Answering Defendants' affirmative defenses by reference), SWP was an active participant in a pervasive and orchestrated scheme of fraudulent and criminal conduct undertaken by Michael Mann, SWP itself, and other companies Mann owned and/or controlled, and which caused millions of dollars of damages to Pioneer Bank.

507.    As set forth in paragraphs 594-761, SWP engaged in the unlicensed transmission of money, money laundering, and multiple unlawful acts in furtherance of a RICO enterprise. Further, SWP conspired with Mann and Mann-controlled entities to violate RICO, 18 U.S.C. § 1962(d).

508.    SWP is liable to Pioneer Bank for damages incurred by Pioneer Bank as a result of the criminal and fraudulent acts of Mann and Plaintiff.

### THIRD AFFIRMATIVE DEFENSE

509.    Plaintiffs' claims are barred by documentary evidence.

510.    Mann and the Mann Entities repeatedly agreed and represented in writing that the accounts described in the Amended Complaint were general corporate accounts, were not trust accounts, and were not being used to process third-party payroll or taxes.  Documentary evidence also establishes that no contractual, confidential, fiduciary, or other relationship existed between Plaintiffs and the Answering Defendants.

### FOURTH AFFIRMATIVE DEFENSE

511.    Answering Defendants have at all times acted reasonably, in good faith, and have discharged all of their responsibilities and duties in accordance with applicable law.

512.     Answering Defendants further state that Pioneer Bank's September 4, 2019 actions to partially recover overdrafts from the accounts of entities owned or controlled by Michael Mann that resulted from Bank of America's return/call back of 36 checks totaling $15,588,000 that had been deposited into those accounts was completely within Pioneer Bank's rights.  Furthermore, Pioneer Bank's overdraft recovery was also completely within Pioneer Bank's rights under well-established setoff law.  The accounts in question were general accounts and not special purpose accounts; and even if, as Plaintiffs allege, those accounts were being used to process third-party payroll or taxes (in direct violation of Pioneer Bank policy), Pioneer Bank personnel had no knowledge of that fact at the time of the setoff to cover the overdrafts resulting from Bank of America's return/call back of the $15,588,000 in checks.

## FIFTH AFFIRMATIVE DEFENSE

513.     SWP's claims are barred by SWP's contributory negligence.

514.     Answering Defendants repeat and re-allege their prior allegations/assertions in support of their affirmative defenses contained in paragraphs 505 through 512 above, as though more fully set forth in this paragraph.

515.     Any alleged damages incurred by SWP were caused entirely by the negligence and other tortious, criminal, or illegal conduct by SWP, Mann, or the Mann Entities.

516.     Mann and the Mann Entities repeatedly agreed and represented in writing that the accounts described in the Complaint were general corporate accounts, were not trust accounts, and were not being used to process third-party payroll or taxes.

517.     The accounts described in the Complaint that SWP alleges were being used to process third-party payroll or taxes were thus general corporate accounts and were not special purpose or trust accounts.

518.    Pioneer Bank policy prohibits accounts at Pioneer Bank from being used to process third-party payroll or taxes.

519.    If, as SWP alleges, Mann and/or the Mann Entities were, unbeknownst to Answering Defendants and in violation of Pioneer Bank policy, using SWP to transmit third-party payroll or tax funds into general corporate accounts at Pioneer Bank, SWP had a duty to inform Answering Defendants of that fact but did not do so.

520.    SWP's own negligence thus contributed to its alleged damages.

## SIXTH AFFIRMATIVE DEFENSE

521.    Plaintiffs' claims are barred by the doctrines of consent, estoppel, and/or waiver.

522.    Answering Defendants repeat and re-allege their prior allegations/assertions in support of their affirmative defenses contained in paragraphs 505 through 520 above, as though more fully set forth in this paragraph.

## SEVENTH AFFIRMATIVE DEFENSE

523.    Plaintiffs have failed to mitigate their damages, if any.

524.    Answering Defendants repeat and re-allege their prior allegations/assertions in support of their affirmative defenses contained in paragraphs 505 through 522 above, as though more fully set forth in this paragraph.

## EIGHTH AFFIRMATIVE DEFENSE

525.    Plaintiffs' claims fail to join necessary parties.

526.    Answering Defendants repeat and re-allege their prior allegations/assertions in support of their affirmative defenses contained in paragraphs 505 through 524 above, as though more fully set forth in this paragraph.

## NINTH AFFIRMATIVE DEFENSE

527.   SWP's claims are barred or limited for lack of standing.

528.   Answering Defendants repeat and re-allege their prior allegations/assertions in support of their affirmative defenses contained in paragraphs 523 through 526 above as though more fully set forth in this paragraph.

529.   Among other deficiencies, SWP's alleged damages are improperly based on purported harms to third parties – viz., Cloud Payroll's employer-clients.

## TENTH AFFIRMATIVE DEFENSE

530.   In the event that Plaintiffs obtain any recovery from Answering Defendants (which Answering Defendants reject), Answering Defendants are entitled to a set-off in the amount that Plaintiff (or the third parties Plaintiff is acting on behalf of) actually receives, or in the exercise of reasonable diligence could receive, from other or collateral sources of recovery – including, but not limited to, recovery under any civil, judicial, or administrative forfeiture process.

## ELEVENTH AFFIRMATIVE DEFENSE

531.   Certain of Plaintiffs' claims are barred because there was no confidential or fiduciary relationship between Plaintiff and the Answering Defendants.

## TWELFTH AFFIRMATIVE DEFENSE

532.   The funds described in Plaintiffs' Third Amended Complaint as being on deposit in an account or accounts at Pioneer Bank were not subject to or impressed with a trust under any provision of law, and Pioneer Bank did not hold those funds in trust.

## THIRTEENTH AFFIRMATIVE DEFENSE

533.    Plaintiffs' declaratory judgment claim is impermissibly duplicative because it parallels Plaintiffs' other claims and seeks a declaration of the same legal issues, rights, and/or obligations at issue in Plaintiffs' other claims.

## FOURTEENTH AFFIRMATIVE DEFENSE

534.    Plaintiffs' claims are barred because valid and enforceable contracts govern the subject matters of those claims, or Plaintiffs' claims are inconsistent with or contradicted by the terms of those contracts.

## FIFTEENTH AFFIRMATIVE DEFENSE

535.    Plaintiffs' claims are barred by the ACH Network operating rules, which Answering Defendants were at all times compliant with.

## SIXTEENTH AFFIRMATIVE DEFENSE

536.    SWP's claims are barred by the *in pari delicto* doctrine.

537.    As set forth in Pioneer Bank's below counterclaims (paragraphs 541 to 761 below, and incorporated into all of Answering Defendants' affirmative defenses by reference), SWP was an active participant in a pervasive and orchestrated scheme of fraudulent and criminal conduct undertaken by Michael Mann, SWP itself, and other companies Mann owned and/or controlled, and which caused millions of dollars of damages to Pioneer Bank.

538.    As set forth in paragraphs 594-761, SWP engaged in the unlicensed transmission of money, money laundering, and multiple unlawful acts in furtherance of a RICO enterprise. Further, Plaintiff conspired with Mann and Mann-controlled entities to violate RICO, 18 U.S.C. § 1962(d).

## SEVENTEENTH AFFIRMATIVE DEFENSE

539.    Granite Solutions' claims are barred because Granite Solution's alleged damages were not proximately cause by any act or omission of Pioneer, but rather were proximately caused by the fraudulent conduct of Mann; SWP and other companies Mann owned and/or controlled by Mann, including without limitation MyPayrollHR.com LLC and Cloud Payroll LLC; and Granite Solution's own actions or failures to act.

540.    The Third Amended Complaint acknowledges that Mann' "fraudulent schemes" ultimately led to Pioneer Bank's September 4, 2019 actions to partially recover overdrafts from the accounts of entities owned or controlled by Mann.  At all relevant times, Pioneer had no knowledge of, or involvement in, Mann's wrongdoings and acted in good faith and in accordance with law.

**WHEREFORE**, Defendants Pioneer Bank and Pioneer Bancorp Inc. ("Answering Defendants") respectfully request that this Court enter judgment in favor of Answering Defendants:

(a) dismissing the Third Amended Complaint against Answering Defendants in its entirety;

(b) denying each and every demand and prayer for relief in the Third Amended Complaint against Answering Defendants;

(c) awarding Answering Defendants their costs, disbursements, and attorneys' fees; and

(d) granting such other relief as this Court deems just and proper.

## PIONEER BANK'S COUNTERCLAIMS/CROSSCLAIMS

541.   Counterclaim/crossclaim-plaintiff Pioneer Bank, by its undersigned counsel, as and for its counterclaims and crossclaims against counterclaim-defendant Southwestern Payroll Service, Inc. ("Southwestern Payroll" or "SWP") and crossclaim-defendants Michael T. Mann ("Mann"), MyPayrollHR.com, LLC, n/k/a "CloudPayroll LLC" ("MyPayrollHR"), and Cloud Payroll, LLC ("Cloud Payroll"), alleges as follows:

542.   Pioneer Bank's counterclaims/crossclaims arise out of the fraudulent, deceptive, and criminal schemes orchestrated by Mann and carried out by and through his companies, including, among others, Southwestern Payroll, MyPayrollHR, and Cloud Payroll, whereby the counterclaim/crossclaim-defendants defrauded Pioneer Bank (and others), as a direct result of which Pioneer Bank suffered damages in excess of $96 million.

543.   When Mann opened accounts at Pioneer Bank in his official business capacity on behalf of Southwestern Payroll, MyPayrollHR, and Cloud Payroll, he falsely represented in writing to Pioneer Bank that none of those companies were third-party payment processors or money transmitters in the money services business.   That was false, as Southwestern Payroll, MyPayrollHR, and Cloud Payroll were each payroll companies that, among other services, collected, processed, remitted, transferred, and transmitted funds from their third-party employer-clients to third-party employees or third-party taxing authorities.

544.   Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll made these false misrepresentations to Pioneer Bank as part of an orchestrated fraudulent scheme to move funds collected from Southwestern Payroll's, MyPayrollHR's, and Cloud Payroll's employer-clients into accounts at Pioneer Bank held by numerous companies owned and controlled by Mann, including parent company ValueWise Corporation ("ValueWise"), in order to deceive Pioneer Bank into

believing that ValueWise and its subsidiaries and affiliates (the "Mann Entities," which included SWP, MyPayrollHR, and Cloud Payroll) had significantly greater revenues and receivables than they actually did.

545.    The Mann Entities then used the perceived financial strength resulting from those illusory revenues and receivables to procure certain check deposit rights at Pioneer Bank that Pioneer Bank only grants to its most financially secure customers, and to obtain a $42 million line of credit for ValueWise and certain of its subsidiaries and affiliates that Pioneer Bank never would have extended if it had known the truth.

546.    The misrepresentations by Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll that were relied upon by Pioneer Bank allowed the Mann Entities to abuse Pioneer Bank's check deposit system, which ultimately resulted in accounts at Pioneer Bank held by those companies being overdrawn by more than $18 million.  Those misrepresentations also directly and proximately caused Pioneer Bank's losses of upwards of $65 million as a result of Pioneer Bank's line of credit, as well as an additional $12.4 million in damages in the form of unnecessary professional fees and yearly compounding losses of return on equity.  In total, therefore, Pioneer Bank has suffered nearly $100 million damages as a result of the criminal scheme orchestrated and conducted by Mann, Southwestern Payroll, MyPayrollHR, Cloud Payroll, and various other individuals and entities that participated in and formed an integral part of the criminal enterprise.

547.    To recover the substantial losses that it has suffered as a direct result of this criminal scheme, Pioneer Bank asserts counterclaims/crossclaims against Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll for fraud and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*

## The Parties

548.    Counterclaim/crossclaim-plaintiff Pioneer Bank is a federally-insured stock bank organized and existing under the laws of the State of New York.  Pioneer Bank's headquarters is located at 652 Albany Shaker Road, Albany, New York 12211.

549.    Counterclaim-defendant Southwestern Payroll is a corporation organized under the laws of the State of Oklahoma.  Southwestern Payroll's headquarters is located at 11008 East 51st Street, Tulsa, Oklahoma 74146.

550.    Crossclaim-defendant Michael Mann was, at all relevant times, a citizen of the State of New York, residing in Edinburgh, New York.  Upon information and belief, Mann is currently incarcerated at FCI Fort Dix, 5756 Hartford & Pointville Road, Joint Base MDL, New Jersey 08640.

551.    Crossclaim-defendant MyPayrollHR was, at all relevant times, a limited liability company existing under the laws of the Commonwealth of Massachusetts, with its principal place of business located at 855 Route 146, Suite 220/240, Clifton Park, New York 12065.

552.    Crossclaim-defendant Cloud Payroll was, at all relevant times, a limited liability company existing under the laws of the State of Delaware, with its principal place of business located at 855 Route 146, Suite 220/240, Clifton Park, New York 12065.

553.    At all times relevant to Pioneer Bank's counterclaims/crossclaims, MyPayrollHR and Cloud Payroll were wholly owned subsidiaries of ValueWise (also d/b/a "Apogee," "Optix Consulting," and "Primacy Search Group"), of which Mann was the 100% owner.  Mann also held, through Cloud Payroll, 51% interests in payroll service companies Southwestern Payroll and Pro/Data Payroll Services Inc. ("Pro/Data").  Cloud Payroll, MyPayrollHR, SWP, and Pro/Data collectively are referred to as the "Mann Payroll Companies."

554.    Mann held himself out as the president of SWP, Cloud Payroll, MyPayrollHR, and Pro/Data at all times relevant to Pioneer Bank's counterclaims/crossclaims.  Mann also controlled bank accounts that he opened at Pioneer Bank in the name of SWP, Cloud Payroll, and MyPayrollHR.

555.    Through ValueWise, Mann also controlled (directly or indirectly) at least a majority interest in several other companies purportedly engaged in a variety of businesses, including consulting and human resources, executive search and recruiting, sports marketing, information technology, physical therapy, and accounting and business advice (collectively, the "Other Mann Entities").  The Other Mann Entities include, but are not limited to, Ross Personnel Consultants, Inc.; Always Live Holdings, LLC; Kaningo, LLC; Hire Flux, LLC; Hire Flux Holdings, LLC; Viverant LLC; and Heutmaker Business Advisors, LLC.  The primary business and purported source of revenue of ValueWise and the Other Mann Entities was consulting and human resources.

### Jurisdiction and Venue

556.    This Court has jurisdiction over Pioneer Bank's counterclaims/crossclaims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 because the RICO counterclaim/crossclaim arises under the laws of the United States, and the Court has jurisdiction over Pioneer Bank's fraud counterclaim/crossclaim pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

557.    Southwestern Payroll has consented to this Court's personal jurisdiction over Southwestern Payroll by bringing the instant action in this Court.

558.    Venue is proper in this district under and pursuant to 28 U.S.C. § 1391(a) and 18 U.S.C. § 1965 in that numerous acts, practices, and events giving rise to Pioneer Bank's counterclaims/crossclaims occurred in this district, and Mann, MyPayrollHR, and Cloud Payroll

either reside in and/or maintain their principal places of business in this district, and Southwestern Payroll has consented to venue in this district by filing its Third Amended Complaint.

**Statement of Facts**

A.   **Background on ValueWise Corporation, Michael T. Mann, and the Banking Relationship with Pioneer Bank**

1.   **ValueWise's Founding and the Origins of Its Loan and Deposit Relationships with Pioneer Bank**

559.   ValueWise was established in 2005 by Mann, its founder and sole owner. ValueWise's principal place of business was in Clifton Park, New York.  Initially, ValueWise and its subsidiaries were primarily engaged in the consulting and human resource businesses.

560.   In 2009, ValueWise's then-attorney, Vincent Valenza of the law firm McNamee, Lochner, Titus & Williams PC, referred ValueWise to David Blessing, a commercial loan officer at Pioneer Bank.  At the time, ValueWise was seeking a working capital line of credit in order to reduce the financing fees it had been incurring through its existing receivables-factoring financing arrangement and approached Pioneer Bank for that purpose.

561.   On or about November 2, 2009, Mann opened two demand deposit general business checking accounts in the names of ValueWise and an affiliate owned and controlled by Mann, Ross Personnel Consultants Inc. ("RPC"), which operated as a division of ValueWise.  At the time, ValueWise already had an existing banking relationship with Bank of America, N.A., among others.

562.   On the same date, Pioneer Bank extended a $2 million working capital line of credit facility to ValueWise and RPC.  The line of credit was secured by a blanket lien on ValueWise's assets, the vast majority of which were purported accounts receivable.  Pioneer Bank identified the "repayment source" for the line of credit as conversion of ValueWise's receivables into cash.

563.    Because the line of credit primarily was secured by ValueWise's receivables, the continued availability of the line was conditioned on Pioneer Bank's annual receipt of "review quality financial statements" for ValueWise and its subsidiaries and affiliates within 120 days of calendar year-end.

## 2.    ValueWise's Purported Significant Growth Leads to Expansion of the Banking Relationship with Pioneer Bank

564.    In 2010, Mann represented to Pioneer Bank that ValueWise had further diversified its corporate holdings to include a physical therapy division under the name Viverant, LLC.

565.    In July 2010, Pioneer Bank approved replacing ValueWise and RPC's prior line of credit with a new working capital line of credit with a maximum principal amount of $3 million. The increased line of credit was once again secured by a blanket lien on ValueWise's assets, which again were primarily comprised of purported accounts receivable.

566.    Because Pioneer Bank policy required receipt of financial statements audited by independent certified public accountants for any loans greater than $2.5 million, this new line of credit was conditioned on Pioneer Bank's receipt of audited annual financial statements for ValueWise within 120 days of calendar year end.  The requirement for audited financial statements represented an upgrade from the review quality financial statements required for the $2 million line.

567.    Pioneer Bank required ValueWise to have an independent certified public accountant audit their annual financial statements to, among other things, verify the revenue and accounts receivable that ValueWise reported.  ValueWise engaged Teal, Becker & Chiaramonte, CPAs, P.C. ("TBC"), a then-prominent accounting firm, for that purpose.  In verifying ValueWise's reported revenue and accounts receivable, TBC was required to, among other things, independently obtain confirmation that the reported figures were true and accurate, including

through third-party confirmation, the use of a specialist, analytical procedures, examination of documents from independent sources, or inquiries of others within or outside the entity.

568.    In accordance with Pioneer Bank's requirement to receive audited financial statements for ValueWise as a condition to Pioneer Bank's extension of the line of credit, on March 15, 2011, TBC issued unqualified audited consolidated financial statements for ValueWise and its affiliates showing $11.39 million in revenue.  In May 2011, in reliance on these unqualified audited financial statements – in particular TBC's confirmation of ValueWise's reported revenue and accounts receivable – Pioneer Bank approved renewal of the $3 Million line of credit in May 2011.

569.    On April 2, 2012, TBC issued unqualified, audited consolidated financial statements for ValueWise and its affiliates for calendar year 2011 showing $22.2 million in revenue — an increase of 95% year-over-year.  On April 17, 2012, in reliance on these unqualified audited financial statements Pioneer Bank approved replacement of the $3 Million line of credit with a new $5 million working capital line of credit.

570.    On May 15, 2013, TBC issued unqualified, audited financial statements for ValueWise and its affiliates for calendar years 2011 and 2012 showing $26.4 million in revenue in 2012, or a 19% year-over-year increase.  On September 6, 2013, in reliance on these unqualified audited financial statements Pioneer Bank approved replacement of the prior line of credit with a new working capital line of credit with a maximum principal amount of $6 million on or about September 6, 2013.

**3.    Mann Acquires Payroll Service Companies and Various Other Businesses, and Uses the Purported Growth of ValueWise's Revenue to Obtain Further Extensions of Credit and Expand His Deposit Relationship with Pioneer Bank**

571.    In or about November 2013, ValueWise acquired MyPayrollHR, the first of several payroll companies in which ValueWise would obtain a controlling stake.  On November 26, 2013, Mann opened two general demand deposit business checking accounts at Pioneer Bank on

MyPayrollHR's behalf with account numbers ending in 0204 ("Account 0204") and 0212 ("Account 0212").

572.    On neither of the account agreements signed by Mann did Mann disclose that he would be processing third-party payroll or payroll taxes through the accounts. Specifically, Mann expressly represented, among other things, that MyPayrollHR was not a third-party payment processor. Had Mann informed Pioneer Bank that his business was a third-party payment processor, as stated on the account opening documents, Pioneer Bank would not have opened these accounts. In or about December 2013, Mann represented to Pioneer Bank that ValueWise had acquired MyPayrollHR.

573.    In or about January 2014, Mann represented to Pioneer Bank personnel that ValueWise had acquired a 75% ownership interest in Heutmaker Business Advisors, LLC, which purportedly served as the finance/accounting consulting arm of ValueWise.

574.    On May 9, 2014, TBC issued unqualified, audited consolidated financial statements for ValueWise and its affiliates for calendar years 2012 and 2013 showing $31.1 million in revenue in 2013 (a 17.9% year-over-year increase). On June 6, 2014, in reliance on these unqualified audited financial statements Pioneer Bank approved the renewal of the $6 million working capital line of credit. Several ValueWise subsidiaries, including MyPayrollHR, were added as borrowers on the line of credit.

575.    On April 29, 2015, TBC issued unqualified, audited consolidated financial statements for ValueWise and its affiliates for calendar years 2013 and 2014 showing $39.1 million in revenue in 2014 (a 25.6% year-over-year increase). On May 19, 2015, in reliance on these unqualified audited financial statements Pioneer Bank approved the replacement of the prior line

of credit with a new working capital line of credit with a maximum principal amount of $15 million.

576.    On April 28, 2016, TBC issued unqualified, audited consolidated financial statements for ValueWise and its affiliates for calendar years 2014 and 2015 showing $58.2 million in revenue in 2015 (a 48.9% year-over-year increase).  On June 10, 2016, in reliance on these unqualified audited financial statements Pioneer Bank approved the replacement of the prior line of credit with a new working capital line of credit with a maximum principal amount of $15 million.

577.    Upon information and belief, on or about December 1, 2016, Mann formed Cloud Payroll as a limited liability company organized under the laws of Delaware.  Cloud Payroll was 100%-owned by ValueWise.  At or around the time of its formation, Cloud Payroll acquired a 51% interest in Pro/Data.

578.    On April 4, 2017, Mann opened a demand deposit general business checking account at Pioneer Bank on behalf of Cloud Payroll, with an account number ending in 1640 ("Account 1640").  On the account agreement that he signed, Mann did not disclose that he would be processing third-party payroll or payroll taxes through the accounts.  To the contrary, Mann expressly represented, among other things, that Cloud Payroll was not a third-party payment processor.  Had Mann informed Pioneer Bank that his business was a third-party payment processor, as stated on the account opening documents, Pioneer Bank would not have opened these accounts.

579.    Shortly thereafter, on April 17, 2017, Cloud Payroll entered into a Stock Purchase Agreement with Southwestern Payroll under which Cloud Payroll acquired 51% of the outstanding shares of the capital stock of Southwestern Payroll.  Cloud Payroll agreed to pay more than $4.3

million in consideration for the shares, broken down as follows: (a) repayment of more than $1.3 million in debt then owed by Southwestern Payroll to SPS Holdings, LLC; (b) payment of $90,000 cash to Southwestern Payroll's former owner, Ray Fowler, and delivery of a promissory note from Cloud Payroll of $1 million to Fowler; and (c) payment of approximately $30,000 in cash to Southwestern Payroll president and then sole owner Darin Alred, as well as a delivery of a promissory note from Cloud Payroll to Alred in the face amount of nearly $1.9 million.

580.    Then, on April 28, 2017, TBC issued unqualified, audited consolidated financial statements for ValueWise and its affiliates for calendar years 2015 and 2016 showing $81.1 million in revenue in 2016 (a 31.8% year-over-year increase).  On June 20, 2017, in reliance on these unqualified audited financial statements Pioneer Bank approved the replacement of the prior line of credit with a new working capital line of credit with a maximum principal amount of $22 million.

581.    Following the replacement of the line of credit, Mann formally changed the name of MyPayrollHR to "CloudPayroll LLC" on July 11, 2017.  Mann did not immediately disclose this name change to Pioneer Bank and continued to use Account 0204 and Account 0212 in the name of MyPayrollHR.

582.    On October 23, 2017, Mann opened three new demand deposit general business checking accounts at Pioneer Bank on behalf of Southwestern Payroll, Pro/Data, and MyPayrollHR, respectively.

583.    On May 4, 2018, TBC issued unqualified, audited consolidated financial statements for ValueWise and its affiliates for calendar years 2016 and 2017 showing $106.9 million in revenue in 2017 (a 31.8% year-over-year increase).  On June 1, 2018, in reliance on these unqualified audited financial statements Pioneer Bank approved the replacement of the prior line

of credit with a new working capital line of credit with a maximum principal amount of $32 million.  Cloud Payroll was included as a borrower on the line of credit for the first time.

584.    Mann thereafter opened four new demand deposit general business checking accounts in the name of Cloud Payroll at Pioneer Bank in early 2019.  Most relevant here for the reasons detailed below, Mann opened an account with the account number ending 2440 ("Account 2440") on February 26, 2019.  On none of the account agreements signed by Mann did Mann disclose that he would be processing through any of the accounts third-party payroll or payroll taxes on behalf of the employer-clients of the Mann Payroll Companies.  To the contrary, Mann expressly represented that Cloud Payroll was not a third-party payment processor.  Had Mann informed Pioneer Bank that his business was a third-party payment processor, as stated on the account opening documents, Pioneer Bank would not have opened these accounts.

585.    Finally, on May 6, 2019, TBC issued unqualified, audited consolidated financial statements for ValueWise and its affiliates for calendar years 2017 and 2018 showing $168.9 million in revenue in 2018 (a 58% year-over-year increase).  The audited financial statements showed that ValueWise and its affiliates had $52.2 million in receivables at the time.  On August 12, 2019, in reliance on these unqualified audited financial statements Pioneer Bank approved the replacement of the prior line of credit with a new working capital line of credit with a maximum principal amount of $42 million.

586.    On the deposit side of the relationship, the perceived financial strength of ValueWise and its affiliates – affirmed by years of unqualified audited financial statements – led Pioneer Bank to conclude that it could grant remote deposit capture ("RDC") privileges to the Mann Entities.

587.    At all relevant times, RDC was a deposit transaction delivery system that allows a small number of commercial customers the ability to deposit checks into Pioneer Bank accounts from a remote location (such as an office) without having to physically deliver the checks to Pioneer Bank.  If a customer is approved for RDC, Pioneer Bank installs a bank-provided scanner and software at the customer's remote location.  Pioneer Bank's written RDC Policy required that all potential RDC customers be assessed for eligibility, including a review of the customer's deposit history and overall relationship with Pioneer Bank.

588.    As of August and September 2019, customers approved and utilizing RDC at Pioneer Bank received same day availability of deposited funds – as opposed to the ordinary one-day hold/next day availability of the deposited funds.

589.    Pioneer Bank eventually granted RDC privileges to Southwestern Payroll, Cloud Payroll, and other Mann Entities based in significant part on the perceived financial strength of the Mann Entities.  That perceived financial strength was later shown to be illusory, however.  In reality, as Pioneer Bank learned in approximately late September 2019, the Mann Entities had artificially inflated accounts that resulted from Mann's scheme to use funds collected from Southwestern Payroll's, MyPayrollHR's, and Cloud Payroll's third-party employer-customers to make it appear that the Mann Entities had far greater revenues and receivables than they actually had.

590.    In short, between 2010 and 2018, ValueWise and its affiliates reported significant growth in its revenue and receivables, which TBC purported to confirm in the unqualified audited financial statements that it issued.  That perceived growth, in turn, enabled ValueWise expand its loan relationship with Pioneer Bank from an initial $2 million line of credit in November 2009 to a $42 million line of credit by August 2019.  The Mann Entities also expanded their deposit

relationship with Pioneer Bank considerably, opening more than 30 demand deposit general business checking accounts in the names of over a dozen different entities, and ultimately obtaining RDC privileges.

591.   The charts below show the substantial increases in reported revenue and accounts receivable for ValueWise between 2010 and 2018:

| Year | Revenue | Percentage Increase Over Prior Year |
|------|---------|-------------------------------------|
| 2010 | $   11,387,299 | - |
| 2011 | $   22,191,160 | 95% |
| 2012 | $   26,409,650 | 19% |
| 2013 | $   31,128,077 | 18% |
| 2014 | $   39,101,212 | 26% |
| 2015 | $   58,226,989 | 49% |
| 2016 | $   81,063,858 | 39% |
| 2017 | $ 106,902,131 | 32% |
| 2018 | $ 168,949,153 | 58% |

| Year | Accounts Receivable | Percentage Increase Over Prior Year |
|------|---------------------|-------------------------------------|
| 2010 | $   4,082,195 | - |
| 2011 | $   7,919,828 | 94% |
| 2012 | $   9,887,406 | 25% |
| 2013 | $ 12,631,855 | 28% |
| 2014 | $ 17,038,959 | 35% |
| 2015 | $ 26,837,108 | 58% |
| 2016 | $ 29,004,287 | 8% |
| 2017 | $ 38,555,368 | 33% |
| 2018 | $ 52,214,814 | 35% |

**B.    Unbeknownst to Pioneer Bank, the Mann Entities Use Their Expanding Loan and Deposit Relationships with Pioneer Bank as a Tool in the Development of a Sprawling Criminal Enterprise Involving the Mann Payroll Companies**

592.   ValueWise's acquisition of MyPayrollHR in November 2013, and the opening of Account 0212 on behalf of MyPayrollHR the same month, coincided with the growth and perpetuation of a sprawling criminal enterprise engaged in, among other things, wire fraud, bank

fraud, money laundering, and illegal unlicensed money transmission that would operate undetected – by Pioneer Bank, Bank of America, and others – for nearly six years.

593.    The growth of the enterprise would accelerate in late 2016 and early 2017, with the formation of Cloud Payroll and Cloud Payroll's acquisition of majority interests in Pro/Data and Southwestern Payroll.  These acquisitions provided access to hundreds of millions of dollars in funds obtained by the Mann Payroll Companies from their employer-clients, which were then used by the criminal enterprise both for legitimate business purposes and to further the enterprise's illicit aims.

### 1.    The Mann Payroll Companies' Misrepresentations to Pioneer Bank Concerning the Nature of Their Businesses

594.    At all relevant times, Cloud Payroll, Southwestern Payroll, MyPayrollHR, and Pro/Data accepted funds earmarked for the payment of payroll and payroll taxes from their third-party employer-clients and transmitted those funds through financial institutions to third-party employees or third-party taxing authorities.  Consequently, MyPayrollHR, Cloud Payroll, and Southwestern Payroll acted as "money transmitter[s]" in the "money services businesses" as those terms are defined in the controlling statutes and regulations in the states in which they operate.

### a.    Mann and MyPayrollHR's False Representations to Pioneer Bank

595.    In the process of opening Account 0212 on behalf of MyPayrollHR on November 26, 2013, Mann completed and signed an "Account Agreement" form provided by Pioneer Bank, purportedly as president of MyPayrollHR.  In signing the Account Agreement, Mann certified the accuracy of the information he provided to Pioneer Bank concerning MyPayrollHR.

596.     In the "Ownership of Account – Business Purpose" section of the Account Agreement, Mann did not check the boxes indicating that the MyPayrollHR account at Pioneer Bank would be used as any type of trust account.

597.     Also on November 26, 2013, in the process of opening the MyPayrollHR account, Mann completed and signed a form provided by Pioneer Bank titled "'For Profit' Commercial Due Diligence (CDD) Information Sheet" ("CDD Form").  Mann completed and signed the CDD Form on November 26, 2013, in his capacity as "President" of MyPayrollHR.

598.     Section 5 of the CDD Form asked: "Is your business a non-bank or third party payment processor?"  Below that question, the CDD Form explained, among other things, that a non-bank or third-party payment processor "is a business that provides payment processing services to merchants and other business entities" (the CDD Form also provided settling of debit and credit card transactions as an example of third-party payment processing services).  Pioneer Bank has a strict policy against allowing its accounts to be used for processing payroll or other third-party payment processing, and Section 5 thus explained that "Pioneer Bank is not equipped at this time to maintain accounts for non-bank or third-party payment processors."

599.     Mann answered "No" to the question in Section 5 of the CDD Form, thereby representing to Pioneer Bank that MyPayrollHR was not a third-party payment processor.  This statement was knowingly false by Mann and MyPayrollHR.

600.     In fact, on November 26, 2013, and unbeknownst to Pioneer Bank at the time, MyPayrollHR was a third-party payment processor because it was collecting, processing, remitting, transferring, and transmitting payroll and tax payments on behalf of third-party employer-customers.

601.    Section 9 of the CDD Form asked: "Is this business [*i.e.*, MyPayrollHR] a 'Money Services Business' as defined in 31 CFR § 103.11(uu)?"   (Subsequently re-codified at 31 CFR § 1010.100(ff).)  Immediately under that question, the CDD Form stated that a "Money Services Business" is defined to include, among other things, "a money transmitter, which engages as a business in accepting currency or funds and transmits such currency or funds by any means through a financial agency or institution."  In addition, the referenced federal regulation defines a "Money Services Business" to include, among other things, a "money transmitter," which is in turn defined as:

> (A)    A person that provides money transmission services.  The term "money transmission services" means the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means.  "Any means" includes, but is not limited to, through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or an informal value transfer system; or

> (B)    Any other person engaged in the transfer of funds.

602.    Mann answered "No" to the question in Section 9 of the CDD Form, thereby representing to Pioneer Bank that MyPayrollHR was neither in the "money services business" nor a "money transmitter" as those terms are defined under 31 CFR § 1010.100(ff).  This statement was also knowingly false by Mann and MyPayrollHR.

603.    In fact, on November 26, 2013, MyPayrollHR was a payroll processing company that collected, processed, remitted, transferred, and transmitted employee payroll and withheld tax funds on behalf of its employer-customers.  MyPayrollHR was thus accepting funds from persons (its employer-customers) and transmitting it to other persons (employees or taxing authorities).

Accordingly, on November 26, 2013, MyPayrollHR was a "money transmitter" in the "money services business" as those terms are defined under 31 CFR § 1010.100(ff).

604.    In the process of opening additional accounts for MyPayrollHR, Mann signed and completed additional Account Agreements and CDD Forms on September 16, 2014, and October 23, 2017.   On both of those occasions, Mann, still in his capacity as president of MyPayrollHR, made identical representations to Pioneer Bank that MyPayrollHR was neither a third-party payment processor, in the "money transmitter business," nor a "money transmitter." Those statements were knowingly false by Mann and MyPayrollHR.

605.    In fact, on both September 16, 2014, and October 23, 2017, MyPayrollHR continued to operate as a third-party payment processor and a "money transmitter" in the "money services business" by, among other things, collecting funds from its third-party employer-customers and transmitting those funds to third-party employees and/or third-party taxing authorities.    MyPayrollHR also failed to disclose that it had changed its name to "CloudPayroll LLC" – confusingly similar to Cloud Payroll's name, which had opened an account in April 2017 – over three months prior.

606.    At 4:33 p.m. on October 23, 2017, Mann sent the Account Agreement and CDD Form containing the false representation that MyPayrollHR was neither a third-party payment processor nor a money transmitter in the money services business to Pioneer Bank via email.  Mann used the email account michael_mann@valuewisecorp.com to send the Account Agreement and CDD Form to Trudy Seeber, Pioneer Bank's business development officer, at seebert@pioneerbanking.com, and Deborah Salsburg, Pioneer Bank's sales leader and assistant branch manager, at salsburgd@pioneerbanking.com, which are Ms. Seeber's and Ms. Salsburg's business email accounts at Pioneer Bank.

b.      **Mann and Cloud Payroll's Misrepresentations to Pioneer Bank**

607.     In the process of opening Account 1640 on behalf of Cloud Payroll on April 4, 2017, Mann completed and signed an "Account Agreement" just as he had previously done for MyPayrollHR (as described above in paragraphs 595 to 600).  Mann purported to do so in his capacity as "President" of Cloud Payroll.

608.     In signing the Account Agreement, Mann certified the accuracy of the information he provided to Pioneer Bank concerning Cloud Payroll in the process of opening the account.

609.     In the "Ownership of Account – Business Purpose" section of the Account Agreement, Mann did not check the boxes indicating that the Cloud Payroll account at Pioneer Bank would be used as any type of trust account.

610.     Also on April 4, 2017, in the process of opening Account 1640, Mann completed and signed the CDD Form just as he had previously done for MyPayrollHR (as described above in paragraphs 601 to 606).

611.     Mann completed and signed the CDD Form on April 4, 2017, in his capacity as "Member" of Cloud Payroll.

612.     In completing Section 5 of the CDD Form, Mann answered "No" to the question "Is your business a non-bank or third party payment processor?" – thereby representing to Pioneer Bank that Cloud Payroll was not a third-party payment processor.  This statement was knowingly false by Mann and Cloud Payroll.

613.     In fact, on April 4, 2017, Cloud Payroll was a third-party payment processor because it was collecting, processing, remitting, transferring, and transmitting payroll and tax payments on behalf of third-party employer-customers.

614.     In completing Section 9 of the CDD Form, Mann answered "No" to the question "Is this business [*i.e.*, Cloud Payroll] a 'Money Services Business' as defined in 31 CFR

§ 103.11(ff)?" – thereby representing to Pioneer Bank that Cloud Payroll was neither in the "money services business" nor a "money transmitter" as those terms are defined under 31 CFR § 1010.100(ff).  This statement was knowingly false by Mann and Cloud Payroll.

615.    In fact, on April 4, 2017, Cloud Payroll was a payroll processing company that collected, processed, remitted, transferred, and transmitted employee payroll and withheld tax funds on behalf of its employer-customers.  Thus, on April 4, 2017, Cloud Payroll was a "money transmitter" in the "money services business" as those terms are defined under 31 CFR § 1010.100(ff).

616.    At 4:33 p.m. on April 4, 2017, Mann sent the Account Agreement and CDD Form containing the false representation that Cloud Payroll was neither a third-party payment processor nor a money transmitter in the money services business to Pioneer Bank via email.  Mann used the email account michael_mann@valuewisecorp.com to send the Account Agreement and CDD Form to Trudy Seeber, Pioneer Bank's business development officer, at seebert@pioneerbanking.com, which is Ms. Seeber's business email account at Pioneer Bank.

617.    In the process of opening Account 2440 for Cloud Payroll, Mann signed and completed an Account Agreement and CDD Form on February 26, 2019.  On that occasion, Mann, still in his capacity as a member of Cloud Payroll, made identical representations to Pioneer Bank that Cloud Payroll was neither a third-party payment processor, in the "money transmitter business," nor a "money transmitter."  Those statements were knowingly false by Mann and Cloud Payroll.

618.    In fact, on February 26, 2019, Cloud Payroll continued to operate as a third-party payment processor and a "money transmitter" in the "money services business" by, among other

things, collecting funds from its third-party employer-customers and transmitting those funds to third-party employees and/or third-party taxing authorities.

619.    At 10:36 a.m. on February 26, 2019, Mann sent the Account Agreement and CDD Form containing the false representation that Cloud Payroll was neither a third-party payment processor nor a money transmitter in the money services business to Pioneer Bank via email.  Mann used the email account michael_mann@valuewisecorp.com to send the Account Agreement and CDD Form to Trudy Seeber, Pioneer Bank's business development officer, at seebert@pioneerbanking.com, and Deborah Salsburg, Pioneer Bank's sales leader and assistant branch manager, at salsburgd@pioneerbanking.com, which are Ms. Seeber's and Ms. Salsburg's business email accounts at Pioneer Bank.

### c.    Mann and SWP's Misrepresentations to Pioneer Bank

620.    In the process of opening an account at Pioneer Bank on behalf of SWP with an account number ending in 1996 on October 23, 2017 ("Account 1996"), Mann completed and signed an "Account Agreement" just as he had previously done for MyPayrollHR and Cloud Payroll.  Mann purported to do so in his capacity as "President" of SWP.

621.    In signing the Account Agreement, Mann certified the accuracy of the information he provided to Pioneer Bank concerning Southwestern Payroll in the process of opening the account.

622.    In the "Ownership of Account – Business Purpose" section of the Account Agreement, Mann did not check the boxes indicating that the Southwestern Payroll account at Pioneer Bank would be used as any type of trust account.

623.    Also on October 23, 2017, in the process of opening the Southwestern Payroll account, Mann completed and signed the CDD Form just as he had previously done for MyPayrollHR and Cloud Payroll (as described above in paragraphs 595 to 606, and 607 to 619).

624. Mann completed and signed the CDD Form on October 23, 2017, in his capacity as "President" of Southwestern Payroll.

625. In completing Section 5 of the CDD Form, Mann answered "No" to the question "Is your business a non-bank or third party payment processor?" – thereby representing to Pioneer Bank that Southwestern Payroll was not a third-party payment processor. This statement was knowingly false by Mann and Southwestern Payroll.

626. In fact, on October 23, 2017, Southwestern Payroll was a third-party payment processor because it was collecting, processing, remitting, transferring, and transmitting payroll and tax payments on behalf of third-party employer-customers.

627. In completing Section 9 of the CDD Form, Mann answered "No" to the question "Is this business [*i.e.*, Southwestern Payroll] a 'Money Services Business' as defined in 31 CFR § 103.11(ff)?" – thereby representing to Pioneer Bank that Southwestern Payroll was neither in the "money services business" nor a "money transmitter" as those terms are defined under 31 CFR § 1010.100(ff). This statement was knowingly false by Mann and Southwestern Payroll.

628. In fact, on October 23, 2017, Southwestern Payroll was a payroll processing company that collected, processed, remitted, transferred, and transmitted employee payroll and withheld tax funds on behalf of its employer-customers. Thus, on October 23, 2017, Southwestern Payroll was a third-party payment processor and a "money transmitter" in the "money services business."

629. At 11:49 a.m. on October 23, 2017, Mann sent the Account Agreement and CDD Form containing the false representation that Southwestern Payroll was neither a third-party payment processor nor a money transmitter in the money services business to Pioneer Bank via email. Mann used the email account michael_mann@valuewisecorp.com to send the Account

Agreement and CDD Form to Trudy Seeber, Pioneer Bank's business development officer, at seebert@pioneerbanking.com, and Deborah Salsburg, Pioneer Bank's sales leader and assistant branch manager, at salsburgd@pioneerbanking.com, which are Ms. Seeber's and Ms. Salsburg's business email accounts at Pioneer Bank.

### 2. The Orchestrated Scheme to Defraud Pioneer Bank

630.    Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll each lied to Pioneer Bank about the fact that Southwestern Payroll, MyPayrollHR, and Cloud Payroll were third-party payment processors and "money transmitters" in the "money services business" as part of an orchestrated criminal scheme to defraud Pioneer Bank by artificially inflating the account balances of Southwestern Payroll, MyPayrollHR, Cloud Payroll, and the Other Mann Entities.

631.    Contrary to their express representations to Pioneer Bank, unbeknownst to Pioneer Bank personnel, and in violation of Pioneer Bank policy, the Mann Payroll Companies used their accounts at Pioneer Bank to gather, process, and transmit large amounts of money collected from their third-party employer-clients (all of which was unbeknownst to Pioneer Bank personnel at the time and before Pioneer Bank set off funds from the accounts of Cloud Payroll, MyPayrollHR, and certain other Mann Entities on September 4, 2019).

632.    As a result, a significant portion of the funds in the Other Mann Entities' accounts at Pioneer Bank were not revenues or receivables of those companies but were instead funds collected from those companies' third-party employer-clients to be transmitted to third-party employees or third-party taxing authorities.  The represented value and quality of the receivables of ValueWise and its subsidiaries was central to Pioneer Bank's decision whether to continue to extend credit to them.

633.    When the MyPayrollHR, Cloud Payroll, SWP, and the Other Mann Entities accounts were opened at Pioneer Bank, Mann made arrangements to link those accounts with the

accounts of the Other Mann Entities at Pioneer Bank so that he could freely and easily transfer funds between all of those accounts.  Mann did not take any steps to designate any of the accounts at Pioneer Bank as dedicated payroll accounts, special purpose accounts, or restricted accounts that would have either prohibited those accounts from being opened at Pioneer Bank or limited the ability to withdraw or use funds from those accounts or transfer funds from those accounts to other accounts at Pioneer Bank held by Other Mann Entities or otherwise controlled by Mann.

634.   Mann continually transferred funds from the MyPayrollHR and Cloud Payroll accounts – i.e., funds largely collected from third-party employer-clients of the Mann Payroll Companies – to the accounts of the Other Mann Entities, including ValueWise, at Pioneer Bank (or back through the accounts of MyPayrollHR and Cloud Payroll at Pioneer Bank) in order to artificially inflate the accounts of all of those entities so as to create the appearance that ValueWise and its affiliates had significantly greater revenues and receivables than they actually had.

635.   Southwestern Payroll, MyPayrollHR, and Cloud Payroll each was engaged in the business of accepting funds from third-party employer-clients and transmitting those funds through financial institutions to third-party employees or third-party taxing authorities.  Consequently, Southwestern Payroll, MyPayrollHR, and Cloud Payroll each satisfied the definitions of "money services businesses" and "money transmitters" under state and federal law.  However, upon information and belief, neither Southwestern Payroll, MyPayrollHR, nor Cloud Payroll were licensed at any time from 2013 to 2019 as money services businesses or money transmitters with any state financial regulators or registered as such with the U.S. Department of the Treasury.

### a.   Cloud Payroll Obtains a Controlling Interest in SWP

636.   As noted above, Cloud Payroll, a wholly owned subsidiary of ValueWise, obtained a 51% interest in SWP by way of a Stock Purchase Agreement dated as of April 17, 2017 (the "Southwestern/Cloud SPA").  R. Darin Alred, SWP's president and then-sole owner, executed the

Southwestern/Cloud SPA on behalf of himself and SWP.  Mann executed the agreement on behalf of Cloud Payroll as its president.

637.    Under the Southwestern/Cloud SPA, Cloud Payroll agreed to pay over $4.3 million in consideration for a 51% stake in SWP.  That consideration consisted of the following:

(a)    immediate repayment of $1,329,777.87 owed by SWP to SPS Holdings, LLC;

(b)    an immediate cash payment of $90,335.70 to Ray Fowler, SWP's former owner;

(c)    delivery of a promissory note to Fowler, in the principal amount of $1 million and bearing an annual interest rate of 6%, to be repaid as follows: (i) 18 equal monthly installments of principal and interest of $23,293 beginning on June 1, 2017 and ending on November 18, 2018; and (ii) 18 monthly interest-only payments of $3,000 beginning on June 1, 2017 and ending on November 1, 2018, with a final payment of $600,000 to be made on November 1, 2018;

(d)    an immediate cash payment of $30,503.23 to Alred; and

(e)    delivery of a promissory note to Alred, in the principal amount of $1,882,464.20 and bearing an annual interest rate of 6%, to be repaid in 18 equal monthly installments of principal and interest of $109,619.14 beginning on June 1, 2017 and ending on November 1, 2018.

638.    Concurrent with the execution of the Southwestern/Cloud SPA, Alred executed an employment agreement with SWP under which he agreed to serve as SWP's president for an initial five-year term for a starting base annual salary of $300,000.

     **b.**     **SWP Facilitates the Transfer of Funds of Its Employer-Clients to Bank Accounts Controlled by MyPayrollHR and Cloud Payroll, in Breach of SWP's Service Agreements with Its Employer-Clients**

639.    From at least 2012 through April 2017 (prior to the closing of the transactions contemplated by the Southwestern/Cloud SPA), SWP's relationship with each of its 1,200 employer-client was governed by a form "Service Agreement" prepared by SWP. Under the Service Agreement, SWP agreed, among other things, to collect funds from the employer-clients for the purpose of payment of payroll taxes and hold those funds in an account established and controlled by SWP.

640.    Specifically, under section 3.2 of the Service Agreement, each employer-client authorized SWP to collect "such amounts as are necessary to pay proper taxing authorities the payroll taxes which are specifically identified on Payroll Reports. Such amounts are to be held *in an account established by [SWP] until such time as these amounts are due to the appropriate taxing authorities[.]*" SWP similarly agreed, in section 3.3 of the Service Agreement, to collect from its employer-clients earmarked for the payment of employee payroll and hold those funds "in an account established by [SWP] until Client's check date, when funds shall be deposited into employee accounts."

641.    From at least 2012 and at least through the closing of the Southwestern/Cloud SPA, and consistent with the terms of the Service Agreement, SWP collected funds from its employer-clients for payment of employee payroll or payroll taxes and held those funds in accounts that SWP had opened for those purposes at Prosperity Bank in Tulsa, Oklahoma. The funds that SWP collected from employer-clients did not move to any other bank account before payment of payroll to employees of the employer-clients or payroll taxes to the relevant taxing authorities.

642.    Before the closing of the Southwestern/Cloud SPA, Mann made clear to Alred and SWP, on more than one occasion, that the above-described process would have to be altered such

that funds collected from SWP's employer-clients would be transferred and deposited into an account outside of SWP's control at Pioneer Bank. Alred had no objection to that request, despite the fact that it violated the plain terms of SWP's Service Agreements with its employer-clients. And following the closing of the Southwestern/Cloud SPA in April 2017, SWP maintained in effect the same Service Agreements with its employer-clients.

643.    Yet just months after the closing, SWP authorized Mann to drastically alter the manner in which funds were collected from employer-clients for the purpose of the payment of payroll taxes and ultimately paid to the taxing authorities. According to Alred, the alterations to that process were part of an effort to "centralize" the processing of payroll taxes by the Mann Payroll Companies through Cloud Payroll. SWP never sought or obtained authorization from any of its employer-clients to make these radical changes to its longstanding policy, recognized in the Service Agreements, of holding funds collected from employer-clients in a bank account established and maintained by SWP until payment to the taxing authorities.

644.    Shortly after the Southwestern/Cloud SPA closed, Alred began discussing with (among others) Mann and Cloud Payroll CEO John Reinke how this "centralization" could be accomplished. From the beginning, Alred knew that the lack of any formal arrangement between Cloud Payroll and SWP in that regard, and the lack of authorization from SWP's clients, would be a problem.

645.    For example, on May 9, 2017 – not even a month after the Southwestern/Cloud SPA closed – Alred suggested to Mann and Cloud Payroll CEO John Reinke that SWP and Cloud Payroll enter into a shared services agreement setting forth the services that Cloud Payroll was to perform. Alred also specifically stated that SWP should "look at our service agreement with our clients to be sure it does not need any updates for 'outsourcing' tax and ACH."

646.     SWP and Cloud Payroll engaged in minimal follow up on these issues, but ultimately they were never addressed.  For example, Alred followed up with Reinke on the shared services agreement issue three weeks later, expressing concerns and reservations about the lack of shared services agreement with Cloud Payroll, particularly given the "proprietary information" that SWP was being asked to share with Cloud Payroll.  Reinke encouraged Alred to prepare a draft shared services agreement, but Alred never did, and SWP and Cloud Payroll did not pursue the issue further.

647.     Around the same time, on May 30, 2017, Alred raised concerns with Cloud Payroll employees about the proposed flow of funds collected from SWP's employer-clients through bank accounts not under SWP's control and suggested that an account be opened in SWP's name instead, so that funds could be deposited in that account such that SWP could "still know what the float is on our funds[.]"  Ultimately, an account would be opened in SWP's name at Pioneer Bank in October 2017, but, as described below, that account was not used for the purpose of collecting funds from SWP's employer-clients – it was used solely as an instrument for money laundering and check kiting in furtherance of the criminal enterprise.

648.     Then, on July 3, 2017, Alred circulated to various Cloud Payroll and SWP personnel, including Reinke, a draft email to be sent to SWP's employer-clients notifying the employer-clients that "Southwestern Payroll has partnered with Cloud Payroll to enhance the services we provide to our customers."  Alred touted the "significant resources for our tax filing team" and "the expert support" that this "partnership" would bring.

649.     Alred further proposed in the draft email to advise employer-clients of a "minor change[]" to the way in which SWP collected "funds from your bank account for your payroll taxes," representing that "these transactions will now be initiated by Cloud Payroll. . . .  *Your tax*

*funds will be under the same protective stewardship you have always trusted, but the transactions are simply being processed by our tax partner*."

650.    These statements were false and misleading, as Alred well knew – the funds collected from employer-clients for the payment of payroll taxes would ***not*** be "under the same protective stewardship" that the employer-clients "have always trusted," nor were the transactions "simply being processed by our tax partner."  Instead, as Alred was fully aware, transactions would be processed through a bank account that was completely outside of SWP's control or visibility. And as Alred and SWP would later learn, but fail to disclose to SWP's employer-clients, that bank account was not even controlled by SWP's purported "partner," Cloud Payroll – it was controlled by MyPayrollHR.

651.    Notwithstanding the false representations in the draft email, employer-clients at least would have had an opportunity to raise questions about these changes if the email had ever been sent to them.  But upon information and belief, neither SWP nor Cloud Payroll ever sent the email.

652.    At all relevant times, therefore, SWP operated without a shared services agreement with Cloud Payroll and did not even notify its employer-clients of its plan to "outsource" payroll tax processing to Cloud Payroll, much less update its Service Agreements with its employer-clients to reflect this "outsourcing."

653.    Nevertheless, in or about October 2017, Alred, as SWP's president, authorized Mann to cause funds collected from SWP's employer-clients and deposited into SWP's accounts at Prosperity Bank to be withdrawn from those accounts and transferred to Account 0212 before payment to the relevant taxing authorities.

654.     As noted above, Account 0212 was opened at Pioneer Bank in the name of MyPayrollHR in 2013 and was not an account established by SWP.  Thus, by permitting the transfer of funds that it collected from its employer-clients to Account 0212 without the employer-clients' knowledge or authorization, SWP breached its Service Agreements with its employer-clients.

655.     SWP accomplished this surreptitious and unprecedented change to its process for collecting funds from its employer-clients through a business arrangement with National Payment Corporation ("NatPay"), an ACH service provider based on in Tampa, Florida.  NatPay provides ACH transfer services to clients, including companies which calculate and prepare payrolls and payroll-related taxes.  NatPay is by far the largest ACH processor in the United States, and over 95% of its clientele are payroll service companies.

656.     In or about October 2017, and in furtherance of their criminal enterprise, SWP and the other Mann Payroll Companies partnered with NatPay to facilitate transfers of funds from their employer-clients.  It is common for a payroll services company to partner with an ACH services provider that can electronically transfer funds directly from the bank accounts of the payroll company's employer-clients to the accounts of employees and taxing authorities.

657.     Specifically, the four Mann Payroll Companies sought to funnel all of the funds withheld by their employer-clients for the payment of payroll taxes through a single account at Pioneer Bank – Account 0212 held by MyPayrollHR.  The Mann Payroll Companies also sought to separate funds withheld by employer-clients for the payment of payroll taxes from funds withheld by employer-clients for the payment of employee payroll.  As NatPay has admitted, both proposed structural features were highly unorthodox and virtually unprecedented in the payroll industry.  And these structural features served no legitimate business purpose – their only purpose

was to ensure that the Other Mann Entities could obtain access to funds to falsely inflate the reported revenues and receivables of ValueWise and its affiliates.

658.    In or about September 2017, NatPay and the Mann Payroll Companies began exploring a business relationship whereby NatPay would facilitate the criminal enterprise by way of the ACH services that it provided.  Those discussions progressed in late October 2017, when the Mann Payroll Companies proposed a structure under which Cloud Payroll would set up a single customer account at NatPay through which all of the Mann Payroll Companies could process ACH transactions on behalf of the employer-clients.  All of the funds collected from employer-clients, in turn, would be funneled through Account 0212.

659.    NatPay informed the Mann Payroll Companies that, for compliance reasons, it could not open an account for Cloud Payroll that would process ACH payroll tax transactions for Cloud Payroll, Pro/Data, and Southwestern Payroll combined.  NatPay informed them that a separate account instead would have to be set up for each company.

660.    But the Mann Payroll Companies found a workaround that enabled them to funnel all funds through Account 0212, and NatPay did not hesitate to begin processing ACH transactions for them.

661.    On October 31, 2017, Cloud Payroll, Pro/Data, and Southwestern Payroll, each submitted "Starter Kits" to NatPay.  A "Starter Kit" is a standard set of documents and form contracts that NatPay provides to each prospective client and requires them to fill out and execute before NatPay will begin processing ACH transactions for the client.  Among the documents contained in the Starter Kits were Processor Service Agreements which authorized NatPay to, among other things, execute transfers of funds through the ACH system in order to make tax payments on behalf of Cloud Payroll, Pro/Data, and Southwestern Payroll.

662.    Mann signed the Starter Kit documents on behalf of each payroll company purportedly as their "President," even though he never formally held that title at any of the three companies.  In fact, Alred held himself out to others as SWP's President and had stated to Cloud Payroll personnel that Mann was SWP's "Secretary Treasurer."

663.    SWP, Cloud Payroll, and Pro/Data also each falsely represented that Mann was its 100% direct owner, even though Mann held only a 51% stake in Pro/Data and Southwestern Payroll indirectly through Cloud Payroll, which was a wholly owned subsidiary of Valuewise and not 100%-owned by Mann himself.  SWP also falsely represented that its trade name was "CloudPayroll" – SWP never operated under that trade name – and that Alred was SWP's "Managing Partner."

664.    NatPay accepted all of these representations without conducting proper meaningful due diligence, apart from performing a credit check.  NatPay did nothing to independently verify the statements in the Starter Kits concerning Mann's title or ownership of Cloud Payroll, Pro/Data, SWP, or MyPayrollHR.

665.    In the Processor Service Agreements that they signed, SWP, Cloud Payroll, and Pro/Data each instructed NatPay to execute ACH transactions (debits and credits) on behalf of Cloud Payroll, Pro/Data and Southwestern Payroll using the same "checking" account at Pioneer Bank for each company (*i.e.*, Account 0212).  In other words, the Mann Payroll Companies intended to commingle the funds collected from their respective employer-clients in a single "checking" account.  Notably, approximately a week prior to execution of the Processor Service Agreements, Mann had opened a demand deposit general business checking account in SWP's name at Pioneer Bank on October 23, 2017, with an account number ending in 1996 ("Account

1996"), but that account was not designated as the account to which funds of SWP's employer-clients were to be transferred.

666.    As SWP, the other Mann Payroll Companies, and NatPay well knew, this commingling arrangement was directly contrary to longstanding business practices and recognized standards in the payroll service industry of ensuring that funds collected from employer-clients for the purpose of payment of payroll taxes remained in a bank account established and controlled by payroll service company at all times until payment to the relevant taxing authorities.   This arrangement instead allowed employer-client funds to be commingled with each other and with general corporate operating funds in a general demand deposit (checking) account that was not set up as a custodial or trust account.

667.    NatPay has admitted that this was "strange arrangement" for NatPay and that NatPay had never seen this kind of flow of funds.   Indeed, there is no legitimate business reason to funnel funds collected from the employer-clients of multiple payroll companies into a single bank account held in the name of one payroll company – let alone a demand deposit checking account that was not set up as a custodial or trust account.

668.    As described above, Mann opened each of the Mann Payroll Companies' accounts at Pioneer Bank as unrestricted demand deposit (general business checking) accounts that were not designated as tax settlement accounts, fiduciary accounts, trust accounts, or the like – much like NatPay's operating account at Regions Bank and in stark contrast to NatPay's custodial account at First Premier.

669.    Mann completed the requisite paperwork to combine these accounts with the operating accounts of Other Mann Entities at Pioneer Bank so that funds could be freely and easily

transferred between the accounts for purposes of "cash management."  He also arranged for the accounts to serve as collateral for his line of credit with Pioneer Bank.

670.   Mann testified in this action that there was never any agreement between Cloud Payroll and Pioneer Bank that the funds in any of the accounts that he controlled were to be kept separate and isolated from other accounts at Pioneer Bank or to restrict or limit in any way Cloud Payroll's use of the funds in the Cloud Payroll accounts.  Had Mann attempted to set up the appropriate type of account for a payroll services company to impound client tax payments, Pioneer Bank would have rejected his account application or, at a minimum, would not have treated the account as another one of the Other Mann Entities' many general corporate operating accounts.

671.   As a result, when the Mann Payroll Companies instructed NatPay to transfer funds collected from their employer-clients to Account 0212, they knew that the funds would be maintained in a general, unrestricted checking account, and thus that any funds in the account could be use or transferred for any purpose.

672.   But the Mann Payroll Companies' commingling of funds collected from their respective employer-clients in Account 0212 as not the only unusual feature of the arrangement with NatPay.

673.   In the case of Cloud Payroll and MyPayrollHR, they proposed (and NatPay agreed) to process payroll tax payments in the following manner:  First, NatPay electronically debited third-party employers' bank accounts and transferred funds from the third-party employers' bank accounts to its account at First Premier Bank ("First Premier").  NatPay then transferred the funds to Account 0212 and, beginning in or about March 2019, Account 2440, at Pioneer Bank.  When payments to taxing authorities were requested or scheduled, funds would complete a roundtrip

from Account 0212/Account 2440 back to NatPay's First Premier account.  NatPay simultaneously would initiate the transfer of funds from its account to the accounts of the appropriate taxing authorities.  The below chart depicts this flow of funds:



674.   The flow of payments for Southwestern Payroll was even more circuitous.  Payment flowed from Southwestern Payroll's employer-clients' accounts to a Southwestern Payroll bank account at Prosperity Bank in Tulsa Oklahoma.  The funds then flowed to NatPay's depository institution, First Premier, to Account 0212/Account 2440.  When payments to taxing authorities were requested or scheduled, funds would travel back from Account 0212/Account 2440 through NatPay's First Premier bank account.  NatPay simultaneously would initiate the transfer of funds from its account to the accounts of the appropriate taxing authorities.



675.   There was no legitimate business reason for NatPay to "roundtrip" funds through Account 0212/Account 2440 before forwarding them to tax authorities—illicit activity of which Pioneer Bank was completely unaware.  This additional step in the flow of the funds was highly unusual and served multiple illegitimate purposes for both the Mann Payroll Companies and NatPay that could not have been achieved without each company's active involvement.

102

676.    Shortly after execution of the NatPay Starter Kits, NatPay began processing ACH transactions for the Mann Payroll Companies using this unorthodox structure in or about November 2017.  And as noted, SWP never obtained permission from its employer-clients to handle funds collected from them in this manner.

### c.    SWP Processes Employer-Client Funds Through Accounts 0212 and 2440, Where They Are Commingled and Used for Purposes Other Than Payment of Payroll Taxes

677.    SWP has admitted that it was aware that, beginning in late 2017, the funds that SWP collected from its employer-clients for the payment of payroll taxes were commingled with the funds of the employer-clients of the other Mann Payroll Companies in Account 0212, in direct violation of SWP's Service Agreements with its employer-clients—a fact that SWP intentionally concealed from its employer-clients.  SWP facilitated transactions into Account 0212, through the circuitous flow of funds described above, on virtually a daily basis through at least February 2019.

678.    Not long after funds collected from its employer-clients began to be transferred through NatPay and to Account 0212, SWP was notified of significant problems in the process that resulted in numerous failures to timely pay taxes on behalf of SWP's employer-clients.  Alred raised these issues directly with Cloud Payroll, including Reinke and Mann, in a January 9, 2018, email, decrying the "tsunami of notices we have been receiving . . . on some of our largest clients for non-filing of returns, non-payment of taxes etc.  Plus the responses are sporadic and provide little or no explanation of why the tax was not filed or paid."

679.    In short, just months after SWP agreed to institute an unprecedented and unlawful process for collection of funds from its employer-clients, the situation already was teetering on the brink of disaster.  Yet neither Alred nor anyone else at SWP did anything to stop it, and the problems persisted.

680.   In fact, not even two months later, on March 7, 2018, Alred sent a frantic message to Mann, Reinke, and others at Cloud Payroll stating: "This situation is a disaster!"  Alred warned that the large number of missed tax payments was "threatening many client relationships!"  And he further demanded that the issue "better be the most important thing on someone's desk until ALL missing payments are resolved."  Most critically, Alred expressed deep concern that he had been told that the missing payments been "taken care of," when in fact they were not.

681.   Alred raised the same deep concerns less than three weeks later in a March 27, 2018 email, where he stated that SWP was "growing increasingly frustrated and angry with the process working with Cloud on dealing with tax notices. . . .  My staff has completely lost faith that anything we send to Cloud gets dealt with timely and that there is any documentation or organized communication."  After noting that SWP was "LOSING clients" because of this problem, Alred stated:

> As a business owner, I am extremely nervous because I have no way of knowing what has been done with Client funds, what has been paid and what has not, and I am going to have to take some measures to regain control of our tax processing some way or another.  We have zero visibility into your processes and this is contributing to the feeling of unease.

682.   Following that email, and despite his representations, Alred did not further investigate ways to gain additional visibility into Cloud Payroll's processes and procedures for handling funds collected from Southwestern Payroll's employer-clients.

683.   SWP has further admitted that it was aware that Account 0212 was used for purposes other than the payment of payroll taxes, including for use by the Other Mann Entities in their operations.  In fact, that was common knowledge among top executives at the Mann Payroll Companies.  As Cloud Payroll CEO Reinke admitted, Account 0212 was "an everything account" that "had all kinds" of funds flowing through in and out of it.  Funds collected from employer-clients were transferred into the account, and even invoice payments from other clients of the

various Mann Entities were transferred into the account.  The Mann Entities even paid their "various expenses" out of Account 0212.  Account 0212 thus was a "catchall account" that the Mann Entities used as a slush fund.

684.    Eventually, Mann would open Account 2440 on February 26, 2019, and SWP, Cloud Payroll, and Pro/Data thereafter instructed NatPay to route funds collected from their employer-clients through that account rather than Account 0212.

685.    Once again, however, Account 2440 was not an account established or controlled by SWP.  And SWP and the other Mann Payroll Companies all were well aware that their employer-clients' funds would be commingled in that single account, as they were in Account 0212.  The Mann Payroll Entities continued to collect funds from their employer-clients and route them through Account 2440 through September 2019, when the criminal enterprise collapsed.

686.    At no point between April 2017 and September 2019 did SWP ever disclose to its employer-clients that funds withdrawn from their back accounts were being transferred to bank accounts outside of SWP's control.

### d.    SWP Knowingly Permits the Misuse of Funds Withheld from Its Employer-Clients in Order to Promote and Conceal the Criminal Enterprise

687.    Once Mann, through ValueWise and Cloud Payroll, became the majority owner of Southwestern Payroll in April 2017, each of Mann's subsequent actions taken on behalf of or in connection with Southwestern Payroll were imputed to Southwestern Payroll, including Mann's admissions to bank fraud, wire fraud, and money laundering in defrauding Pioneer Bank, as described in greater detail below.

688.    Additionally, as described in greater detail above, in April 2017, Southwestern Payroll and its founders, including Darin Alred, agreed to sell 51 percent of the company in exchange for millions of dollars in future payments by Cloud Payroll.  Despite its longstanding

history in the payroll services industry, Southwestern Payroll and Alred agreed to the highly unusual structure and flow-of-funds proposed by Cloud Payroll in exchange for millions of dollars in future payments.  As Southwestern Payroll and Alred well knew, the structure and flow of funds meant that SWP's employer-clients' payroll and payroll tax dollars would be routed circuitously through three different banks and the funds would necessarily be commingled in accounts controlled by Mann at Pioneer.

689.    Moreover, even within the unusual structure that Southwestern Payroll, Alred, and Mann conducted at least twelve suspicious transactions totaling more than $122,000 between September 2018 and March 2019 were debited from Account 0212 and "reverse" routed, through NatPay, *back* to SWP's account at Prosperity Bank (x9333), not to the tax authorities.

690.    In other instances throughout 2018, Mann undertook at least five additional suspicious transactions totaling more than $756,000 where funds from Account 0212 were *wired* directly to SWP's account at Prosperity (x9333) and not to the tax authorities as set forth in the table below.  Yet there is no evidence that SWP remitted any of the transferred funds to the tax authorities or back to the employer-clients.

| Date | Amount of Wire | Account From (Pioneer) | Account To (Prosperity) |
|------|----------------|------------------------|-------------------------|
| January 19, 2018 | $276,019.52 | Account 0212 | Account 9333 |
| January 25, 2018 | $328,641.10 | Account 0212 | Account 9333 |
| June 6, 2018 | $120,705.55 | Account 0212 | Account 9333 |
| July 3, 2018 | $15,519.74 | Account 0212 | Account 9333 |
| July 5, 2018 | $15,904.97 | Account 0212 | Account 9333 |

691.    On information and belief, the defendants and other scheme participants undertook to conduct these suspicious ACH and wire activities to facilitate the fraud against Pioneer Bank by falsely inflating the flow of funds through Account 0212 and Southwestern Payroll's account

Prosperity.  Moreover, the "reverse" routed ACH transactions and wire activity also served to conceal the source of the proceeds of the Enterprise's illegal activity.

692.    Southwestern Payroll knew that the funds it directed to the other Mann Payroll Companies were the proceeds of a fraudulent scheme to misuse funds apparently intended by employer-clients to be used for the discharge of payroll tax obligations and to defraud Pioneer Bank in the process, and Southwestern Payroll intended to assist Mann in laundering those funds, including through establishing a circuitous flow of funds the purpose of which was to conceal the nature of the funds from Pioneer and relevant state and federal authorities.

693.    With the assistance of the Mann Payroll Companies, ValueWise and the Other Mann Entities were able to misappropriate millions of dollars of funds collected from the employer-clients of the Mann Payroll Companies and diverted into Account 0212 and Account 2440, where funds were then diverted into other Mann Entity bank accounts.  With the Mann Payroll Companies' knowledge and participation, a substantial volume of the misappropriated funds from their employer-clients were transmitted through NatPay and through Mann's accounts at Pioneer bank, including Account 1996, set up in SWP's name.  As a result of this scheme, SWP and its owners/founders each earned in excess of $1 million, including directly from the proceeds of the illegal scheme as described in greater detail below.

694.    As described in greater detail below, Mann has pled guilty to various federal and state crimes, including bank fraud where he admitted drawing down on the ValueWise revolving line of credit ("Account 3614") using false borrowing base certificates on seven occasions, including in late 2017 and throughout 2018 and 2019 in violation of 18 U.S.C. § 1344.  Alred benefited directly from this fraud.

695.    For example, on July 13, 2018, $450,000 was drawn down from the ValueWise revolving line of credit based on ValueWise's presentation of a false and fabricated borrowing base certificate in December 2017.  On the same day, ValueWise apparently routed the $450,000 from Pioneer account x3614 to various other accounts, including $109,233 to Account 0212 where, as Alred well knew, Mann was commingling third-party payroll tax and other funds.  From there, the $109,233 was routed to Cloud Payroll Account 1640.  Mann then wrote a check from Account 1640 for $109,619.14 (the vast majority of which was covered by the same-day transfer of $109,233 from Account 0212) to Darin Alred at 5520 E 104th Street in Tulsa, Oklahoma.

696.    This identical process was repeated on virtually all of the other 17 occasions on which Alred was compensated for Southwestern Payroll's role in the scheme to defraud Pioneer, monthly from June 2017 through June 2018 and August 2018 through November 2018.  That is, at the same time Alred received his monthly payment of $109,619.14, ValueWise drew down from its revolving line of credit at Pioneer Bank.

697.    In total, on 18 occasions from Account 1640, Mann sent Alred $109,619.14, totaling $1,973,144.52, to compensate Alred ostensibly in connection with the promissory note issued to Alred at the closing of the Southwestern/Cloud SPA.  But in reality, those payments were compensation for the use of funds collected from Southwestern Payroll's employer-clients' to feed the criminal scheme.  Because the payments were drawn from the ValueWise revolving line of credit – obtained by Mann using false borrowing base certificates – the payments to Alred represented proceeds of Southwestern Payroll and Mann's unlawful scheme to defraud Pioneer Bank.

698.    Additionally, routing the payments through Account 1640 served to conceal the source of the proceeds (from the ValueWise revolving line of credit).  The use of proceeds of this

unlawful scheme to pay for the purchase of Southwestern Payroll also promoted and facilitated the scheme, as Southwestern Payroll provided a source of funds (collected from its employer-clients) to perpetuate the scheme.  Finally, because each of the payments to Alred exceed $10,000 in criminal proceeds, each violated 18 U.S.C. § 1957.

699.    In addition, Southwestern Payroll Account 1996 at Pioneer Bank was itself used to launder funds, i.e., it served as a temporary staging account through which the Mann Entities would kite checks and route purported direct deposit payments through other Mann Entity accounts to create the illusion of significant receivables and revenues flowing through those accounts. Specifically, even though Account 1996 was not designated as an account through which funds collected from SWP's employer-clients would be transferred, a significant volume of apparent direct deposit ACH transactions were regularly credited to Account 1996.

700.    For example, on November 9, 2018, purported ACH direct payroll deposits of $652,867 and $454,010 were credited to Account 1996 with the description "912-TrueConsulti/DIR DEP" and "904-ValueWiseCo/DIR DEP," respectively.  Once in Southwestern Payroll Account 1996, those funds were further concealed and used to facilitate the criminal scheme because, unlike funds collected from the Mann Payroll Companies' employer-clients, these funds were *not* transferred to a non-Pioneer account (such as NatPay's account at First Premier), but instead were transferred to another account at Pioneer controlled by Mann and nominally for ValueWise under its alias Primacy Search (Account 3648).  From there, ValueWise concealed these criminal proceeds and further facilitated the scheme by writing same-day checks to other Mann entities involved in the scheme, including $465,000 and $364,000 *back* to ValueWise and $479,000 to another Mann Entity, Optix Corporation.

701.    This highly suspicious pattern of using ACH direct deposited funds from Account 1996 — designed to both promote and conceal the fraudulent scheme — occurred multiple times, including (at a minimum) on December 21, 2018, February 11, 2019, and March 8, 2019.  There is no plausible explanation for this activity other than Southwestern Payroll helping Mann to engage in check-kiting and to create the illusion of inflated revenues (and receivables) to defraud Pioneer Bank.  And Mann himself also acknowledged that Account 1996 and Account 3648 were not used for legitimate purposes in and around the time the above conduct occurred.  Indeed, Mann admitted that, "throughout 2019," he used Account 1996 exclusively for kiting to defraud Pioneer Bank and Bank of America, which unquestionably "is illegal activity."

702.    In February 2019, when Mann and Alred opened Account 2440, SWP knew that, beginning in March 2019, funds collected from employer-clients of multiple payroll companies were being transferred into Account 2440.  Like Account 0212, Account 2440 was used to further the criminal enterprise.  As Mann has admitted:

> a.  From the time Account 2440 was opened through September 2019, Cloud Payroll was able to move "funds between account 2440 and 23 other accounts" at Pioneer Bank.
>
> b.  From the time Account 2440 was opened through September 2019, Cloud Payroll could withdraw or transfer funds from Account 2440 "for any reason," regularly transferred funds from Account 2440 to entities that were not taxing authorities, and did not use the funds in Account 2440 exclusively for the payment of taxes.
>
> c.  Throughout 2019, funds were repeatedly transferred between Account 2440 and Account 0212, "and then to other checking accounts held by ValueWise affiliates at Pioneer Bank as part of the" criminal scheme.  Mann also "moved money out of 2440 into another account that did feed some of these accounts that were kiting checks back and forth between Bank of America and Pioneer."

703.    And, on or about August 30, 2019, right before Bank of America recalled checks that Mann had written of out his accounts there, Mann moved millions of dollars from Account

0212 into Account 1996 and Account 3648. Mann admitted that this "was probably covering money I owed to put into those accounts," i.e., to conceal the funds misappropriated from the employer-clients of the Mann Payroll Companies.

704.    Although Alred himself knew about or deliberately ignored red flags for more than two years, by no later than September 4, 2019, Alred became aware that Mann had resigned and understood that "Mike Mann had been committing some kind of fraud, loan fraud, or some kind of fraud against the bank and that [Pioneer was] going to freeze the tax accounts." And Alred had "definitely used the word 'fraud' . . . Mann had committed some kind of fraud against . . . Pioneer Bank". Yet, despite this clear acknowledgement of SWP's involvement in a "fraud" scheme, at no point did Alred or Southwestern Payroll file a suspicious activity report (SAR) with or otherwise alert the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of Treasury.

705.    On information and belief, Southwestern Payroll failed to file a SAR *because* it also knew that it was operating – and continues to operate – as an unlicensed money transmitter in violation of Treasury/FinCEN regulations and the Bank Secrecy Act. Filing a SAR would have revealed this as well as Southwestern Payroll's own role in the fraudulent scheme.

## C.    The Criminal Enterprise Collapses, Causing Pioneer Bank Nearly $100 Million in Damages

706.    On August 29, 2019, Mann used the RDC privileges of the Mann Entities at Pioneer Bank to deposit 36 checks totaling $15,588,000 written from Mann Entity accounts at Bank of America accounts into various Mann Entity accounts at Pioneer Bank (including three checks totaling approximately $1.3 million into a Southwestern Payroll account).

707.    Because the $15.6 million in checks were deposited by Mann utilizing RDC, the deposited funds were made available for withdrawal that same day. Checks were then written out

of various Mann Entity accounts at Pioneer Bank on August 29, 2019, using proceeds from the $15,588,000 in Bank of America checks deposited earlier that day.

708.   On August 30, 2019, Bank of America returned and called back the 36 checks totaling $15,588,000 deposited by Mann into the Mann Entity accounts the day before – which resulted in the Mann Entity accounts being overdrawn.

709.   On September 23, 2019, Mann was arrested and charged with bank fraud in violation of 18 U.S.C. § 1344.

710.   According to the affidavit of FBI Special Agent Matthew J. Wabby ("Wabby Affidavit") in support of the Criminal Complaint (dated September 20, 2019) filed in *U.S. v. Michael T. Mann* (N.D.N.Y. Case No. 1:19-MJ-602 (DJS)), Mann gave an interview to the FBI on September 10, 2019, in which Mann admitted his crimes.  Among other things, Mann admitted that many of the Mann Entities "had no purpose other than to be used in [Mann's] fraud," and that Mann fraudulently represented "to banks and financing companies that his fake businesses had certain receivables that they did not have."

711.   Pioneer Bank was unaware of the fraudulent and criminal scheme orchestrated by Mann and carried out through Southwestern Payroll, MyPayrollHR, and Cloud Payroll.  Pioneer Bank relied upon the written false representations made by Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll when opening accounts at Pioneer Bank that Southwestern Payroll, MyPayrollHR, and Cloud Payroll were not third-party payment processors or "money transmitters" in the "money services business."  These representations were false.

712.   Pioneer Bank was also unaware of the fraudulent and criminal scheme orchestrated by Mann and carried out through Southwestern Payroll, MyPayrollHR, and Cloud Payroll.  Each

of those companies were knowingly operating as unlicensed money transmitting businesses in violation 18 U.S.C. § 1960.

713.     On August 12, 2020, Mann pleaded guilty to 12 different federal crimes, including nine counts of bank fraud, one count of conspiracy to commit wire fraud, one count of aggravated identify theft, and one count of filing a false tax return.  As part of his guilty plea, Mann admitted that he repeatedly lied to Pioneer Bank over many years and took active measures to conceal his fraudulent activity from Pioneer, and further admitted that Pioneer Bank was the largest victim (among many) of the criminal enterprise that he led.  Specifically, Mann admitted to committing bank fraud under 18 U.S.C. § 1344 by drawing down on the Valuewise revolving line of credit using false borrowing base certificates, including seven specific instances of bank fraud between December 2017 and August 2019.  Mann also admitted that MyPayrollHR and Southwestern Payroll "each contracted with … NatPay…to process the ACH files that transferred tax payments from employers to the IRS and other taxing authorities.   As part of [MyPayroll HR and Southwestern Payroll's] respective agreements with NatPay, tax payments were routed from the employers' accounts to accounts controlled by [Mann] at Pioneer prior to disbursement of the tax authorities."  Further, "[a]s with the payroll funds, [Mann] used the tax funds for his own purposes, including to pay down the [line of credit]."  Mann ultimately was sentenced to 12 years in prison.

714.     And Pioneer Bank was in fact the largest victim of the criminal enterprise.  In addition to the more than $18 million in damages that Pioneer Bank suffered as a result of the overdrafts in the bank accounts controlled by Mann, Pioneer Bank also lost upwards of $30 million, just in principal outstanding, on the $42 million line of credit that had been approved just weeks prior to the collapse of the criminal enterprise.

715. On September 11, 2019, Pioneer Bank declared multiple events of default under the $42 million line of credit.  At the time, the principal balance outstanding under the line of credit was more than $35 million.

716. Pioneer Bank thereafter took actions to try to recover the outstanding principal balance, but ultimately was unsuccessful.  Though Pioneer Bank obtained a consent judgement against Mann and the other borrowers (including Cloud Payroll and MyPayrollHR) in the amount of $35,839,912.81 (plus interest) in late 2019, that judgment has gone unsatisfied, and Pioneer Bank has been able to collect a small portion of that amount – all while incurring substantial fees and expenses in connection with its collection efforts.  At present, approximately $31.5 million in principal remains outstanding on the line of credit.  Accounting for lost interest, default interest, default fees, professional fees, and yearly compounding losses of return on equity, Pioneer Bank's damages on the line of credit amount to approximately $65.5 million at present and continue to grow.

717. Pioneer Bank's losses due to the overdrafts also far exceed the negative balance of more than $18 million in the accounts controlled by Mann.  Pioneer Bank also has suffered roughly an additional $12.4 million in damages as a direct and proximate result of the criminal enterprise that victimized it in the form of unnecessary professional fees and yearly compounding losses of return on equity.

718. In total, therefore, Pioneer Bank has suffered no less than $96,352,548 as a result of the criminal activity of those who participated in the enterprise headed by Mann, of which SWP formed a crucial and indispensable part.

## FIRST COUNTERCLAIM AGAINST SOUTHWESTERN PAYROLL/
## CROSSCLAIM AGAINST MANN, MYPAYROLLHR, AND CLOUD PAYROLL

### Fraud

719.     Counterclaim/crossclaim-plaintiff Pioneer Bank repeats and re-alleges each and every allegation and statement contained in paragraphs 541 through 718 above as though fully set forth in this paragraph.

720.     Mann, on behalf of himself and on behalf of Southwestern Payroll, MyPayrollHR, and Cloud Payroll, made repeated and knowingly false representations of material fact to Pioneer Bank.

721.     Specifically (and as detailed above), Mann, on behalf of himself and MyPayrollHR, Cloud Payroll, or Southwestern Payroll, made knowingly false written representations of material fact to Pioneer Bank on November 26, 2013; September 16, 2014; April 4, 2017; October 23, 2017; and February 26, 2019.  On each of those dates, when completing the Account Agreements and CDD Forms necessary to open new accounts at Pioneer Bank, Mann, on behalf of himself and MyPayrollHR, Cloud Payroll, or Southwestern Payroll, falsely represented that MyPayrollHR, Cloud Payroll, or Southwestern Payroll were neither third-party payment processors nor money transmitters in the money services business.

722.     Mann, MyPayrollHR, Cloud Payroll, and Southwestern Payroll knew that these representations were false at the time they were made.

723.     Mann, on behalf of himself and MyPayrollHR, Cloud Payroll, and Southwestern Payroll, made those knowingly false written representations of material fact to Pioneer Bank on November 26, 2013, September 16, 2014, April 4, 2017, October 23, 2017, and February 26, 2019, for the purpose of inducing Pioneer Bank to rely on those representations when Pioneer Bank made

decisions regarding Pioneer Bank's deposit and other banking relationships with MyPayrollHR, Cloud Payroll, Southwestern Payroll, and the Other Mann Entities.

724.    Pioneer Bank justifiably relied on the knowingly false written representations of material fact made by Mann and MyPayrollHR, Cloud Payroll, and Southwestern Payroll to Pioneer Bank on November 26, 2013, September 16, 2014, April 4, 2017, October 23, 2017, and February 26, 2019, when, among other things, Pioneer Bank granted RDC privileges to Cloud Payroll, Southwestern Payroll, and other Mann Entities in 2018 and 2019.  Because Pioneer Bank relied on the false representations that MyPayrollHR, Cloud Payroll, and Southwestern Payroll were neither third-party payment processors nor money transmitters in the money services business, Pioneer Bank was unaware that Mann, MyPayrollHR, Cloud Payroll, and Southwestern Payroll were moving funds collected from third-party employer customers into the accounts of the Mann Entities to deceive Pioneer Bank into concluding that the Mann Entities had significantly greater revenues and receivables than they actually did.

725.    Pioneer Bank was damaged and injured by its justifiable reliance on the false representations by Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll because Mann, Southwestern Payroll, Cloud Payroll, and other Mann Entities abused Pioneer Bank's RDC system by, among other things, withdrawing approximately $15.6 million on August 29, 2019, that had ostensibly been deposited in their accounts earlier that day via 36 checks from Bank of America, and then failing to repay Pioneer Bank when Bank of America returned and called back those checks, which resulted in the Mann Entity accounts at Pioneer Bank being overdrawn by more than $18 million – none of which has been repaid by the Mann Entities.  (On November 20, 2019, Albany County Supreme Court (Hon. Richard Platkin, A.J.S.C.) entered a consent judgment in favor of Pioneer Bank against Mann and several Mann Entities based on their default under a credit

facility/loan from Pioneer Bank.  That consent judgment did not compensate Pioneer Bank for the Mann Entities' overdrawn accounts, and Southwestern Payroll was not a party to that action or consent judgment.)

726.    The repeated and knowingly false representations of material fact made by Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll were part of an intentional course of conduct designed by Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll to deceive Pioneer Bank into releasing money to the Mann Entities.

727.    In making these repeated and knowingly false representations of material fact, Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll possessed an intent to victimize Pioneer Bank by exposing Pioneer Bank to actual and potential loss.

728.    Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll all acted in concert and conspired to defraud Pioneer Bank – and each are jointly and severally liable to Pioneer Bank for the damages caused by their conspiracy to defraud Pioneer Bank.

729.    Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll all agreed with each other and worked cooperatively with each other in furtherance of their orchestrated scheme to defraud Pioneer Bank – including by making repeated identical written false representations of fact to Pioneer Bank on November 26, 2013, September 16, 2014, April 4, 2017, October 23, 2017, and February 26, 2019, and by transferring money between their accounts and those of the Other Mann Entities at Pioneer Bank in order to deceive Pioneer Bank into concluding that the Mann Entities had significantly greater revenues and receivables than they actually did.

730.    Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll each took overt acts in furtherance of their agreement to defraud Pioneer Bank.

731.    Specifically, Mann made false representations to Pioneer Bank on November 26, 2013, September 16, 2014, April 4, 2017, October 23, 2017, and February 26, 2019, and also executed hundreds of monetary transactions through the Mann Entity accounts between 2014 and 2019 intended to deceive Pioneer Bank into concluding that the Mann Entities had significantly greater revenues and receivables than they actually did.

732.    MyPayrollHR, through Mann as its president, made false representations to Pioneer Bank on November 26, 2013, September 16, 2014, and October 23, 2017, and also executed hundreds of monetary transactions through the Mann Entity accounts between 2014 and 2019 intended to deceive Pioneer Bank into concluding that the Mann Entities had significantly greater revenues and receivables than they actually did.

733.    Cloud Payroll, through Mann as its indirect owner and controlling member, made false representations to Pioneer Bank on April 4, 2017, and February 26, 2019, and also executed hundreds of monetary transactions through the Mann Entity accounts between 2014 and 2019 intended to deceive Pioneer Bank into concluding that the Mann Entities had significantly greater revenues and receivables than they actually did.

734.    Southwestern Payroll, through Mann as its president and indirect majority owner, made false representations to Pioneer Bank on October 23, 2017, and also executed at least dozens of monetary transactions through the Mann Entity accounts between 2017 and 2019 intended to deceive Pioneer Bank into concluding that the Mann Entities had significantly greater revenues and receivables than they actually did.

735.    Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll all intentionally participated in the furtherance of the scheme to defraud Pioneer Bank by making repeated and

identical knowingly false written representations to Pioneer Bank (as set forth above), which resulted in damages to Pioneer Bank of at least $96,352,548.

736.    Based on the foregoing, Pioneer Bank has been damaged, and is entitled to judgment in its favor against Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll, in an amount to be determined at trial, but in no event less than $96,352,548.

## SECOND COUNTERCLAIM AGAINST SOUTHWESTERN PAYROLL / CROSSCLAIM AGAINST MANN, MYPAYROLLHR, AND CLOUD PAYROLL

### RICO Violations – 18 U.S.C. § 1962(c)

737.    Counterclaim/crossclaim-plaintiff Pioneer Bank repeats and re-alleges each and every allegation and statement contained in paragraphs 541 through 736 above as though fully set forth in this paragraph.

738.    At all times relevant to Pioneer Bank's counterclaims and crossclaims, Mann, Southwestern Payroll, MyPayrollHR, Cloud Payroll, and the Other Mann Entities were associated with and comprised an enterprise (as "enterprise" is defined in 18 U.S.C. § 1961(4)) that engaged in acts and activities that affect interstate commerce (including financial institution/bank fraud that adversely affected Pioneer Bank's banking activities, which are an instrumentality of interstate commerce).

739.    The primary purpose and function of this enterprise (hereinafter, the "Enterprise") was to enable Mann and the Mann Entities to obtain large extensions of credit from Pioneer Bank and other banks and financing companies, and other banking privileges, through various orchestrated fraudulent and criminal activities whereby Mann and the Mann Entities fraudulently inflated the revenues and receivables of ValueWise and its affiliates.  This purpose was accomplished in substantial part by the unlawful diversion of funds collected from the employer-clients of the Mann Payroll Companies for defendants' own unlawful purposes.

740.   The Enterprise also functioned as an operationally and economically interconnected association of companies owned (directly or indirectly) and controlled by Mann – some of which were at least partially engaged in legitimate businesses.  MyPayrollHR, Cloud Payroll, Southwestern Payroll, and the Other Mann Entities were each controlled by Mann as their majority or sole shareholder, and their activities in furtherance of the Enterprise were directed by Mann, and other individuals acting at Mann's direction, beginning in 2013

741.   Each defendant was essential to and participated in the operation and management of the Enterprise.

> a.   Mann had the most significant degree of control over the affairs of the Enterprise and controlled the flow of funds collected from the Mann Payroll Companies' employer-clients through the Enterprise.

> b.   The Other Mann Entities, including Southwestern Payroll, MyPayrollHR and Cloud Payroll, directed the flow of funds collected from Mann Payroll Companies' employer-clients through the Enterprise.

> c.   Specifically, Southwestern Payroll, primarily through its executives, Michael Mann and Darin Alred, directed the flow of funds collected from SWP's employer-clients through the Enterprise, including routing and diverting funds throughout the Enterprise, concealed the Enterprise's money laundering activities from Pioneer, and from federal regulators, including FinCEN, and from state regulators, and fraudulently inflated the Mann Entities' revenues and receivables by concealing the source of the funds in the Enterprise.

742.   Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll each agreed to and did conduct, participate in the conduct of, operate, and manage the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), by engaging in acts indictable under 18 U.S.C. § 1343 (wire fraud); 1344 (bank fraud); § 1960 (unlicensed money transmitting); § 1956 (money laundering and money laundering conspiracy); and § 1957 (money laundering spending statute), for the unlawful purpose of intentionally defrauding Pioneer Bank.  Specifically:

a.  On November 26, 2013, September 16, 2014, and October 23, 2017, MyPayrollHR and Mann, in his capacity as president of MyPayrollHR, made multiple knowingly false representations to Pioneer Bank that MyPayrollHR was neither a third-party payment processor, in the "money transmitter business," nor a "money transmitter."  Mann and MyPayrollHR made those misrepresentations to Pioneer Bank as part of a scheme and/or artifice to obtain money under the custody or control of Pioneer Bank by means of false and fraudulent pretenses intended to deceive Pioneer Bank into concluding that the Mann Entities had significantly greater revenues and receivables than they actually did so that the Mann Entities could procure and abuse RDC privileges at Pioneer Bank to obtain money from Pioneer Bank by, among other things, withdrawing approximately $15.6 million on August 29, 2019, that had ostensibly been deposited into their accounts earlier that day via 36 checks from Bank of America, and then failing to repay Pioneer Bank when Bank of America returned and called back those checks, which resulted in the Mann Entity accounts at Pioneer Bank being overdrawn by more than $18 million.  In making those repeated and knowingly false representations of material fact, Mann and MyPayrollHR possessed an intent to victimize Pioneer Bank by exposing Pioneer Bank to actual and potential loss.  MyPayrollHR and Mann thus did conduct and participate in the conduct of the affairs of the Enterprise through a pattern of financial institution/bank fraud in violation of 18 U.S.C. § 1344.

b.  On April 4, 2017, and February 26, 2019, Cloud Payroll and Mann, in his capacity as member and indirect owner of Cloud Payroll, made multiple knowingly false representations to Pioneer Bank that Cloud Payroll was neither a third-party payment processor, in the "money transmitter business," nor a "money transmitter."  Mann and Cloud Payroll made those misrepresentations to Pioneer Bank as part of a scheme and/or artifice to obtain money under the custody or control of Pioneer Bank by means of false and fraudulent pretenses intended to deceive Pioneer Bank into concluding that the Mann Entities had significantly greater revenues and receivables than they actually did so that the Mann Entities could procure and abuse RDC privileges at Pioneer Bank to obtain money from Pioneer Bank by, among other things, withdrawing approximately $15.6 million on August 29, 2019, that had ostensibly been deposited into their accounts earlier that day via 36 checks from Bank of America, and then failing to repay Pioneer Bank when Bank of America returned and called back those checks, which resulted in the Mann Entity accounts at Pioneer Bank being overdrawn by more than $18 million.  In making those repeated and knowingly false representations of material fact, Mann and Cloud Payroll possessed an intent to victimize Pioneer Bank by exposing Pioneer Bank to actual and potential loss.  Cloud Payroll and Mann thus did conduct and participate in the conduct of the affairs of the Enterprise through a pattern of financial institution/bank fraud in violation of 18 U.S.C. § 1344.

c.   On October 23, 2017, Southwestern Payroll and Mann, in his capacity as president and indirect majority owner of Southwestern Payroll, made multiple knowingly false representations to Pioneer Bank that Southwestern Payroll was neither a third-party payment processor, in the "money transmitter business," nor a "money transmitter."  Mann and Southwestern Payroll made those misrepresentations to Pioneer Bank as part of a scheme and/or artifice to obtain money under the custody or control of Pioneer Bank by means of false and fraudulent pretenses intended to deceive Pioneer Bank into concluding that the Mann Entities had significantly greater revenues and receivables than they actually did so that the Mann Entities could procure and abuse RDC privileges at Pioneer Bank to obtain money from Pioneer Bank by, among other things, withdrawing approximately $15.6 million on August 29, 2019, that had ostensibly been deposited into their accounts earlier that day via 36 checks from Bank of America, and then failing to repay Pioneer Bank when Bank of America returned and called back those checks, which resulted in the Mann Entity accounts at Pioneer Bank being overdrawn by more than $18 million.  In making those knowingly false representations of material fact, Mann and Southwestern Payroll possessed an intent to victimize Pioneer Bank by exposing Pioneer Bank to actual and potential loss.  Southwestern Payroll and Mann thus did conduct and participate in the conduct of the affairs of the Enterprise through a pattern of financial institution/bank fraud in violation of 18 U.S.C. § 1344.

d.   On October 23, 2017, MyPayrollHR and Mann, in his capacity as president of MyPayrollHR, committed financial institution/bank fraud against Pioneer Bank in violation of 18 U.S.C. § 1344 by, among other things, making multiple knowingly false representations to Pioneer Bank that MyPayrollHR was neither a third-party payment processor, in the "money transmitter business," nor a "money transmitter."  MyPayrollHR and Mann used wire communications in furtherance of their intentional scheme to defraud and deceive Pioneer Bank.  Specifically, at 4:33 p.m. on October 23, 2017, Mann and MyPayrollHR, furthered their fraudulent scheme against Pioneer Bank by sending the Account Agreement and CDD Form containing the false representation that MyPayrollHR was neither a third-party payment processor nor a money transmitter in the money services business to Pioneer Bank via email.  Mann used the email account michael_mann@valuewisecorp.com to send the Account Agreement and CDD Form to Trudy Seeber, Pioneer Bank's business development officer, at seebert@pioneerbanking.com, and Deborah Salsburg, Pioneer Bank's sales leader and assistant branch manager, at salsburgd@pioneerbanking.com, which are Ms. Seeber's and Ms. Salsburg's business email accounts at Pioneer Bank.  MyPayrollHR and Mann thus did conduct and participate in the conduct of the affairs of the Enterprise through wire fraud in violation of 18 U.S.C. § 1343.

e. On April 4, 2017, Cloud Payroll and Mann, in his capacity as member of Cloud Payroll, committed financial institution/bank fraud against Pioneer Bank in violation of 18 U.S.C. § 1344 by, among other things, making multiple knowingly false representations to Pioneer Bank that Cloud Payroll was neither a third-party payment processor, in the "money transmitter business," nor a "money transmitter." Cloud Payroll and Mann used wire communications in furtherance of their intentional scheme to defraud and deceive Pioneer Bank. Specifically, at 4:33 p.m. on April 4, 2017, Mann and Cloud Payroll, furthered their fraudulent scheme against Pioneer Bank by sending the Account Agreement and CDD Form containing the false representation that Cloud Payroll was neither a third-party payment processor nor a money transmitter in the money services business to Pioneer Bank via email. Mann used the email account michael_mann@valuewisecorp.com to send the Account Agreement and CDD Form to Trudy Seeber, Pioneer Bank's business development officer, at seebert@pioneerbanking.com, which is Ms. Seeber's business email account at Pioneer Bank. Cloud Payroll and Mann thus did conduct and participate in the conduct of the affairs of the Enterprise through wire fraud in violation of 18 U.S.C. § 1343.

f. On February 26, 2019, Cloud Payroll and Mann, in his capacity as member of Cloud Payroll, committed financial institution/bank fraud against Pioneer Bank in violation of 18 U.S.C. § 1344 by, among other things, making multiple knowingly false representations to Pioneer Bank that Cloud Payroll was neither a third-party payment processor, in the "money transmitter business," nor a "money transmitter." Cloud Payroll and Mann used wire communications in furtherance of their intentional scheme to defraud and deceive Pioneer Bank. Specifically, at 10:36 a.m. on February 26, 2019, Mann and Cloud Payroll, furthered their fraudulent scheme against Pioneer Bank by sending the Account Agreement and CDD Form containing the false representation that Cloud Payroll was neither a third-party payment processor nor a money transmitter in the money services business to Pioneer Bank via email. Mann used the email account michael_mann@valuewisecorp.com to send the Account Agreement and CDD Form to Trudy Seeber, Pioneer Bank's business development officer, at seebert@pioneerbanking.com, and Deborah Salsburg, Pioneer Bank's sales leader and assistant branch manager, at salsburgd@pioneerbanking.com, which are Ms. Seeber's and Ms. Salsburg's business email accounts at Pioneer Bank. Cloud Payroll and Mann thus did conduct and participate in the conduct of the affairs of the Enterprise through wire fraud in violation of 18 U.S.C. § 1343.

g. On October 23, 2017, Southwestern Payroll and Mann, in his capacity as president and indirect majority owner of Southwestern Payroll, committed financial institution/bank fraud against Pioneer Bank in violation of 18 U.S.C. § 1344 by, among other things, making multiple knowingly false representations to Pioneer Bank that Southwestern Payroll was neither a

third-party payment processor, in the "money transmitter business," nor a "money transmitter."   Southwestern Payroll and Mann used wire communications in furtherance of their intentional scheme to defraud and deceive Pioneer Bank.   Specifically, on October 23, 2017, Mann and Southwestern Payroll, furthered their fraudulent scheme against Pioneer Bank by sending the Account Agreement and CDD Form containing the false representation that Southwestern Payroll was neither a third-party payment processor nor a money transmitter in the money services business to Pioneer Bank via email.   Mann used the email account michael_mann@valuewisecorp.com to send the Account Agreement and CDD Form to Trudy Seeber, Pioneer Bank's business development officer, at seebert@pioneerbanking.com, which is Ms. Seeber's business email account at Pioneer Bank.  Southwestern Payroll and Mann thus did conduct and participate in the conduct of the affairs of the Enterprise through wire fraud in violation of 18 U.S.C. § 1343.

h.  From at least 2013 to 2019, MyPayrollHR accepted funds from third-party employer-clients and transmitted those funds through financial institutions to third-party employees or third-party taxing authorities.  Consequently, MyPayrollHR acted as a "money transmitter" in the "money services businesses" as those terms are defined in the controlling statutes and regulations in the states where MyPayrollHR operates.  However, in order to perpetuate MyPayrollHR's fraud on Pioneer Bank by preventing Pioneer Bank from learning that MyPayrollHR was a third-party payment processor and a money transmitter in the money services business, and to prevent Pioneer Bank from learning the source of the funds in MyPayrollHR's account at Pioneer Bank, MyPayrollHR was not licensed at any time from 2013 to 2019 as a money services business or a money transmitter with any state financial regulators or registered as such with the U.S. Department of the Treasury.  From at least 2013 to 2019, MyPayrollHR conducted and participated in the conduct of the affairs of the Enterprise by intentionally operating as an unlicensed and otherwise illegal money transmitting businesses in violation of 18 U.S.C. § 1960.

i.  From at least 2014 to 2019, Cloud Payroll accepted funds from third-party employer-clients and transmitted those funds through financial institutions to third-party employees or third-party taxing authorities.  Consequently, Cloud Payroll acted as a "money transmitter" in the "money services businesses" as those terms are defined in the controlling statutes and regulations in the states where Cloud Payroll operates.  However, in order to perpetuate Cloud Payroll's fraud on Pioneer Bank by preventing Pioneer Bank from learning that Cloud Payroll was a third-party payment processor and a money transmitter in the money services business, and to prevent Pioneer Bank from learning the source of the funds in Cloud Payroll's account at Pioneer Bank, Cloud Payroll was not licensed at any time from 2014 to 2019 as a money services business or a money transmitter with any state financial regulators or registered as such with the U.S. Department of

the Treasury.  From at least 2014 to 2019, Cloud Payroll conducted and participated in the conduct of the affairs of the Enterprise by intentionally operating as an unlicensed and otherwise illegal money transmitting businesses in violation of 18 U.S.C. § 1960.

j.     From at least 2017 to 2019, Southwestern Payroll accepted funds from third-party employer-clients and transmitted those funds through financial institutions to third-party employees or third-party taxing authorities. Consequently, Southwestern Payroll acted as a "money transmitter" in the "money services businesses" as those terms are defined in the controlling statutes and regulations in the states where Southwestern Payroll operates. However, in order to perpetuate Southwestern Payroll's fraud on Pioneer Bank by preventing Pioneer Bank from learning that Southwestern Payroll was a third-party payment processor and a money transmitter in the money services business, and to prevent Pioneer Bank from learning the source of the funds in Southwestern Payroll's account at Pioneer Bank, Southwestern Payroll was not licensed at any time from 2017 to 2019 as a money services business or a money transmitter with any state financial regulators or registered as such with the U.S. Department of the Treasury.  From at least 2017 to 2019, Southwestern Payroll conducted and participated in the conduct of the affairs of the Enterprise by intentionally operating as an unlicensed and otherwise illegal money transmitting businesses in violation of 18 U.S.C. § 1960.  Similarly, despite operating as a money transmitter, Southwestern Payroll *continues to violate* 18 U.S.C. § 1960 because it still has not registered with FinCEN.  Accordingly, on information and belief, Southwestern Payroll does not have an appropriate or effective Anti-Money Laundering program as required by the BSA.

k.     Mann has admitted that, from 2013 through 2019, he caused the fraudulent diversion of funds collected from employer-clients of the Mann Payroll Companies and then laundered the proceeds of the fraud through the Enterprise.  Specifically, MyPayrollHR and Southwestern Payroll each contracted with NatPay ostensibly to process ACH files that transferred funds collected from their employer-clients to the IRS and other taxing authorities.  As part of that arrangement, funds collected from employer-clients were to be routed through NatPay's account at First Premier, to Account 0212 (and, later, Account 2440).  Funds then would be withdrawn from Account 0212/Account 2440 and transferred to NatPay, which simultaneously would schedule payments from its account to various taxing authorities.  The funds collected from employer-clients, however, admittedly were used for numerous other improper purposes, "including to pay down the [Valuewise revolving line of credit]."  Mann further admitted to committing bank fraud under 18 U.S.C. § 1344 by drawing down on the Valuewise revolving line of credit using false borrowing base certificates, including six specific instances of bank fraud in violation of 18 U.S.C. § 1344 between December 2017 and August 2019.  Mann also pled guilty under New York State Law to Money Laundering the First Degree in

violation of Section 470.20(1)(b)(i)(A)(iii).    The criminal complaint associated with that guilty plea contained an "Analysis of Financial Transactions Evidencing Money Laundering" and stated that "from at least January 2016 through the collapse of MANN's entities on or about September 2019, his modus operandi was the same — MANN conducted millions of dollars in financial transactions on a near-daily basis between his accounts that diverted stolen money from employers, employees, financial institutions and financing companies. … MANN misappropriated these funds by taking them from … Account x0212 and using them for purposes other than employee payroll."  A review of the financial records, and Mann's admissions, show that the purpose of these transactions was to artificially inflate assets and accounts receivable in order to fraudulently obtain additional financing, pay down loans and lines of credit, and pay back wrongfully obtained employee payroll and taxes.

l.      As described above, in or around April 2017, Southwestern Payroll agreed to join the Enterprise and thereafter facilitated transactions on behalf of the Enterprise knowing the funds in those transactions would be funds misappropriated from its employer-clients, as well as funds unlawfully obtained through the ValueWise revolving credit.  Southwestern Payroll joined that agreement knowing that the purpose of these transactions would be to both facilitate the Enterprise's continuing wire and bank fraud schemes and to conceal the source of the unlawful proceeds.  For example, Southwestern Payroll and Mann agreed to create and did create a convoluted structure whose sole purpose was to circuitously route the funds throughout the Enterprise to conceal or disguise the nature, location, source, ownership, or control of the misappropriated employer-client funds.  Moreover, from 2017 until 2019, Southwestern Payroll's employer-clients provided an abundant source of funds, and Southwestern Payroll also engaged in transactions on behalf of the Enterprise knowing the funds in those transactions were the proceeds of misappropriated employer-client funds, as well as unlawful proceeds of funds obtained through the ValueWise revolving line of credit with false borrowing base certificates. Southwestern Payroll further knew that its founder, Darin Alred, was paid nearly $2 million in illicit proceeds which promoted and facilitated the Enterprise's criminal activities and continued access to funds collected from SWP's employer-clients.    Southwestern Payroll engaged in these transactions with the intent to facilitate Mann's wire fraud scheme and conceal the source of the unlawful proceeds, and Southwestern Payroll did in fact hide, launder, and otherwise wrongfully retain the misappropriated employer-client funds, as well as the unlawful proceeds of the funds obtained from the ValueWise revolving line of credit with false borrowing base certificates.  For example, from 2017 until 2019, Southwestern Payroll used the convoluted structure to move money throughout the Enterprise to conceal or disguise the source of the Enterprise's proceeds from its unlawful activities, including bank and wire fraud, i.e., the funds misappropriated from employer-clients of SWP, as well as from the unlawful funds obtained

from the ValueWise revolving line of credit with false borrowing base certificates.  Additionally, Alred received 18 monthly payments, each of nearly $110,000 and circuitously routed from the ValueWise revolving line of credit through a Cloud Payroll account to facilitate the scheme, conceal the source of the unlawful proceeds.  Southwestern Payroll also did not register as a money service business with FinCEN or obtain a money transmission license in any state in which it operated for the purpose of protecting the Enterprise from any regulation-required audits or reports, including reports of suspicious activity to FinCEN.  Southwestern Payroll thus did conduct and participate in the conduct of the affairs of the Enterprise by engaging in both money laundering and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a) and 1956(h), and money laundering in violation of 18 U.S.C. § 1957.

743.   These predicate acts were essential to and furthered defendants' racketeering scheme of misusing funds collected from the employer-clients of the Mann Payroll Companies.

744.   The racketeering activities committed by Southwestern Payroll, Mann, MyPayrollHR, Cloud Payroll all had the same or similar purposes, results, participants, victims, and methods of commission, and they were not isolated events.  Through these predicate acts, which occurred on a regular basis from 2013 at least through September 5, 2019, and would have continued but for the freezing of the Mann Entities' bank accounts, defendants devised and intended to devise a scheme to misuse funds collected from the employer-clients of the Mann Payroll Companies and defraud Pioneer Bank.  Thus, the numerous acts of financial institution/bank fraud, wire fraud, operating as illegal money transmitting businesses, and money laundering set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

745.   The racketeering activities affected interstate and foreign commerce because (a) proceeds of specified unlawful activity were deposited in financial institutions in the United States, (b) stolen funds were moved by ACH, wire, and other means that affected interstate commerce, and (c) financial institutions that are engaged in, or the activities of which affect, interstate or foreign commerce were used to facilitate the illegal transactions.

746.    As set forth above, pursuant to and in furtherance of the Enterprise and their fraudulent schemes, Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll committed multiple related acts of financial institution/bank fraud, wire fraud and operating as illegal money transmitting businesses intentionally, willfully, and with actual knowledge of those activities over several years and at least from 2013 to 2019.

747.    Southwestern Payroll, Mann, MyPayrollHR, and Cloud Payroll also engaged in money laundering and conspiracy to commit money laundering set forth above intentionally, willfully, and with actual knowledge of those activities.  Southwestern Payroll knew that Mann was engaged in fraudulent activity, that the funds collected from its employer-clients were being misused through commingling and diversion, and that they were being obtained through wrongful criminal conduct.  Southwestern Payroll also knew that, by its actions in circuitously routing the funds, concealing its status as a money transmitter, and assisting the Enterprise in diverting funds collected from its employer-clients, it was participating and facilitating the unlawful conduct, and concealing and disguising the source, nature, location, and ownership of the illicit proceeds.

748.    The Enterprise was distinct from the predicate acts of wire fraud, financial institution/bank fraud, unlicensed money transmitting, and money laundering.  Southwestern Payroll, Mann and the Other Mann Entities engaged in various lawful activities, including consulting work and payroll processing services, and executing certain lawful ACH transactions on behalf of Mann and the Mann Entities.

749.    In addition to the predicate racketeering acts by Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll set forth above, the Enterprise also engaged in separate and distinct courses of fraudulent and illegal conduct.  For example, as set forth in the Wabby Affidavit,

Mann also admitted to using the Mann Entities to kite checks between Pioneer Bank and Bank of America.

750.   The racketeering activities committed by Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll all had the same or similar purposes, results, participants, victims, and methods of commission, and they were not isolated events.  The numerous acts of financial institution/bank fraud, wire fraud, and operating as illegal money transmitting businesses set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

751.   Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll committed the acts of financial institution/bank fraud, wire fraud, money laundering, money laundering conspiracy, and operating as illegal money transmitting businesses set forth above intentionally, willfully, and with actual knowledge of those activities.

752.   Mann, Southwestern Payroll, MyPayrollHR, and Cloud Payroll have directly and indirectly conducted and participated in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

753.   Pioneer Bank justifiably relied on the false misrepresentations directed at it as part of Mann's, Southwestern Payroll's, MyPayrollHR's, and Cloud Payroll's racketeering activities – including financial institution/bank fraud and wire fraud – by, among other things, granting RDC privileges to Cloud Payroll, Southwestern Payroll, and other Mann Entities in 2018 and 2019. Mann, Southwestern Payroll, Cloud Payroll, and other Mann Entities abused those RDC privileges to obtain money from Pioneer Bank by, among other things, withdrawing approximately $15.6 million on August 29, 2019, that had ostensibly been deposited into their accounts earlier that day via 36 checks from Bank of America, and then failing to repay Pioneer Bank when Bank of

America returned and called back those checks, which resulted in the Mann Entity accounts at Pioneer Bank being overdrawn by more than $18 million.

754.    As a direct and proximate result of Mann's, Southwestern Payroll's, MyPayrollHR's, and Cloud Payroll's racketeering activities and violations of 18 U.S.C. § 1962(c), Pioneer Bank has been injured in its business and property, in the amount of not less than $96,352,548.  The racketeering activities of Mann, SWP, MyPayrollHR, and Cloud Payroll were the direct and proximate cause of Pioneer Bank's damages because but for their efforts to facilitate and conceal the conduct of the criminal enterprise, Pioneer Bank never would have continued to extend credit to ValueWise and its affiliates, never would have granted the Mann Entities RDC privileges, and never would have been victimized by nearly $20 million in overdrafts in the bank accounts that Mann controlled.

755.    Pursuant to 18 U.S.C. § 1964(c), Pioneer Bank is entitled to treble damages, plus its attorneys' fees.  At a minimum, therefore, Pioneer Bank is entitled to an award of $289,057,644.

### THIRD COUNTERCLAIM AGAINST SWP / CROSSCLAIM AGAINST MANN, MYPAYROLLHR, AND CLOUD PAYROLL
#### Conspiracy to Violate RICO – 18 U.S.C. § 1962(d)

756.    Counterclaim/crossclaim-plaintiff Pioneer Bank repeats and re-alleges each and every allegation and statement contained in paragraphs 541 through 755 above as though fully set forth in this paragraph.

757.    In violation of 18 U.S.C. § 1962(d), Mann, SWP, MyPayrollHR, and Cloud Payroll conspired with each other to commit a violation of 18 U.S.C. § 1962(c), by knowingly agreeing and conspiring to directly or indirectly conduct or participate in the affairs of an enterprise through the pattern of racketeering activity described above.

758.    The conspiracy commenced among Mann, SWP, MyPayrollHR, and Cloud Payroll by no later than 2017, and each counterclaim/crossclaim defendant committed essential and overt

acts in furtherance of the agreement to commit two or more fraudulent and illegal racketeering acts.

759.    Each counterclaim/crossclaim defendant was aware of the nature of the conspiracy and that the conspiracy extended beyond each defendant and involved the other defendants.

760.    As a direct and proximate result of Mann's, SWP's, MyPayrollHR's, and Cloud Payroll's racketeering activities and violations of 18 U.S.C. § 1962(c), Pioneer Bank has been injured in its business and property, in the amount of not less than $96,352,548.

761.    Pursuant to 18 U.S.C. § 1964(d), Pioneer Bank is entitled to treble damages, plus its attorneys' fees.  At a minimum, therefore, Pioneer Bank is entitled to an award of $289,057,644.

### PRAYER FOR RELIEF

**WHEREFORE**, counterclaim/crossclaim-plaintiff Pioneer Bank respectfully requests that this Court enter judgment against counterclaim-defendant Southwestern Payroll, and crossclaim-defendants Mann, MyPayrollHR, and Cloud Payroll, as follows:

A.    On the first counterclaim/crossclaim for fraud, a judgment in favor of Pioneer Bank, and against Southwestern Payroll, Mann, MyPayrollHR, and Cloud Payroll, jointly and severally, in an amount to be determined at trial but in no event less than $96,352,548, plus pre-judgment interest;

B.    On the second counterclaim/crossclaim for violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962(c), a judgment in favor of Pioneer Bank, and against Southwestern Payroll, Mann, MyPayrollHR, and Cloud Payroll, jointly and severally, for threefold Pioneer Bank's damages, including pre-judgment interest, in an exact amount to be determined at trial but in no event less than $289,057,644, and the cost of the suit, including reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c);

C.      On the third counterclaim/crossclaim for conspiracy to violate the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962(d), a judgment in favor of Pioneer Bank, and against Southwestern Payroll, Mann, MyPayrollHR, and Cloud Payroll, jointly and severally, for threefold Pioneer Bank's damages, including pre-judgment interest, in an exact amount to be determined at trial but in no event less than $289,057,644, and the cost of the suit, including reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c); and

D.      Such other and further relief as this Court deems just, proper, and equitable.

Dated: May 12, 2023                    DLA PIPER LLP (US)
      New York, New York



By:_____
     Robert J. Alessi (NDNY Bar Roll No. 101019)
     Steven M.  Rosato (NDNY Bar Roll No.  703375)
     1251 Avenue of the Americas
     New York, New York 10020
     Tel.: (212) 335-4500
     robert.alessi@us.dlapiper.com
     steven.rosato@us.dlapiper.com

     Courtney G.  Saleski (NDNY Bar Roll No.  703877)
     1650 Market Street
     Suite 5000
     Philadelphia, Pennsylvania 19103
     Tel.: (215) 656-3300
     Fax: (215) 656-3301
     courtney.saleski@us.dlapiper.com

     *Attorneys for Defendants*
      *Pioneer Bancorp Inc.  and Pioneer Bank*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on all parties appearing in this action/known counsel of record via the CM/ECF system on this 12th day of May 2023.



_____

Robert J. Alessi (NDNY Bar Roll No. 101019)