**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

---

SOUTHWESTERN PAYROLL SERVICE, INC., and GRANITE SOLUTIONS GROUPE, INC.

*Plaintiff,*

*v.*

PIONEER BANCORP, INC., et al.,

*Defendants.*

Case No.  1:19-cv-1349 (FJS/CFH)

---

NATIONAL PAYMENT CORPORATION,

*Intervenor-Plaintiff,*

v.

PIONEER BANCORP, INC., et al.,

*Defendants.*

**PIONEER BANK AND PIONEER BANCORP, INC.'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO NATIONAL PAYMENT CORPORATION'S AMENDED COMPLAINT, AND AMENDED <u>COUNTERCLAIMS/CROSSCLAIMS</u>**

---

Defendants Pioneer Bank and Pioneer Bancorp, Inc. (collectively, the "Answering Defendants"), through their attorneys, DLA Piper LLP (US), hereby file their Amended Answer and Affirmative Defenses to the Amended Complaint in Intervention ("Amended Complaint") filed by Intervenor-Plaintiff National Payment Corporation ("Plaintiff" or "NatPay") on April 13, 2023, (Dkt. No. 232).  Except as otherwise expressly admitted herein, Answering Defendants deny each and every allegation in the amended complaint, including, without limitation, any allegations contained in Plaintiff's prayer for relief, headings, and subheadings.  This answer is based on Answering Defendants' investigation and understanding to date, and Answering Defendants expressly reserve the right to amend this answer to the fullest extent provided under applicable law.  Moreover, Answering Defendants object to the entirety of the Amended Complaint as grossly inconsistent with the requirement that a complaint set forth "a short and plain statement of the

claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *see, e.g.*, *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ("Unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." (cleaned up)). Without waiver of any rights or defenses, Answering Defendants answer the allegations in the Amended Complaint as follows:

1.      Answering Defendants deny the allegations in paragraph 1 of the Amended Complaint.

2.      Answering Defendants deny the allegations in paragraph 2 of the Amended Complaint.

3.      Answering Defendants deny the allegations in paragraph 3 of the Amended Complaint.

4.      Answering Defendants deny the allegations in paragraph 4 of the Amended Complaint.

5.      Answering Defendants deny the allegations in paragraph 5 of the Amended Complaint.

6.      Answering Defendants deny the allegations in paragraph 6 of the Amended Complaint.

7.      Answering Defendants admit the allegations in paragraph 7 of the Amended Complaint that Pioneer learned in mid-September 2019 that Mann has admitted that from about 2013 through September 2019, he engaged in a fraudulent scheme to deceive banks and financing companies into loaning his companies millions of dollars. Answering Defendants further admit that Mann also engaged in a kiting scheme, using checks, wire transfers, and the Automated Clearing House ("ACH") system to rapidly transfer millions of dollars among various accounts he

controlled at Pioneer and Bank of America. Answering Defendants lack knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 7 of the Amended Complaint, accordingly, such allegations are denied.

8. Answering Defendants admit the allegations in paragraph 8 of the Amended Complaint.

9. Answering Defendants deny the allegations in paragraph 9 of the Amended Complaint.

10. The allegations in paragraph 10 of the Amended complaint are improper and must be stricken because they refer to privileged and confidential supervisory information of the Federal Deposit Insurance Corporation ("FDIC") that is prohibited from disclosure by law, absent FDIC authorization. To the extent they are not stricken, Answering Defendants deny the allegations in paragraph 10 of the Amended Complaint, and note that paragraph 10 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

11. Answering Defendants deny the allegations in paragraph 11 of the Amended Complaint.

12. Answering Defendants deny the allegations in paragraph 12 of the Amended Complaint.

13. Answering Defendants deny the allegations in paragraph 13 of the Amended Complaint.

14. Answering Defendants deny the allegations in paragraph 14 of the Amended Complaint.

15.     Answering Defendants deny the allegations in paragraph 15 of the Amended Complaint.

16.     Answering Defendants deny the allegations in paragraph 16 of the Amended Complaint.

17.     Answering Defendants deny the allegations in paragraph 17 of the Amended Complaint.

18.     Answering Defendants deny the allegations in paragraph 18 of the Amended Complaint.

19.     Answering Defendants deny the allegations in paragraph 19 of the Amended Complaint.

20.     Answering Defendants deny the allegations in paragraph 20 of the Amended Complaint.

21.     Answering Defendants deny the allegations in paragraph 21 of the Amended Complaint.

22.     Answering Defendants deny the allegations in paragraph 22 of the Amended Complaint.

23.     Answering Defendants deny the allegations in paragraph 23 of the Amended Complaint, except admit that Pioneer Bank extended remote deposit capture ("RDC") access to accounts that Mann controlled in reliance on numerous materially false representations by Mann.

24.     Answering Defendants deny the allegations in paragraph 24 of the Amended Complaint.

25.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentence of paragraph 25 of the Amended

Complaint; accordingly, such allegations are denied.  Answering Defendants deny the allegations in the third sentence of paragraph 25 of the Amended Complaint.

26.    Answering Defendants deny the allegations in paragraph 26 of the Amended Complaint, except admit that on August 29, 2019, Mann deposited 36 checks written from accounts controlled by Mann at Bank of America totaling $15,588,000 into accounts at Pioneer Bank.

27.    Answering Defendants admit the allegations in paragraph 27 of the Amended Complaint that Bank of America returned and called back the 36 Bank of America checks totaling $15,588,000.  Answering Defendants deny the remaining allegations in paragraph 27 of the Amended Complaint.

28.    Answering Defendants deny the allegations in paragraph 28 of the Amended Complaint.

29.    Answering Defendants deny the allegations in paragraph 29 of the Amended Complaint.

30.    Answering Defendants deny the allegations in paragraph 30 of the Amended Complaint.

31.    Answering Defendants deny the allegations in paragraph 31 of the Amended Complaint.

32.    Answering Defendants deny the allegations in paragraph 32 of the Amended Complaint.

33.    Answering Defendants deny the allegations in paragraph 33 of the Amended Complaint and note that paragraph 33 of the Amended Complaint references a document that

speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

34.     Answering Defendants deny the allegations in paragraph 34 of the Amended Complaint.

35.     Answering Defendants deny the allegations in paragraph 35 of the Amended Complaint.

36.     Answering Defendants deny the allegations in paragraph 36 of the Amended Complaint.

37.     Answering Defendants deny the allegations in paragraph 37 of the Amended Complaint.

38.     Answering Defendants deny the allegations in paragraph 38 of the Amended Complaint.

39.     Answering Defendants deny the allegations in paragraph 39 of the Amended Complaint.

40.     Answering Defendants deny the allegations in paragraph 40 of the Amended Complaint.

41.     Answering Defendants deny the allegations in paragraph 41 of the Amended Complaint.

42.     Answering Defendants deny the allegations in paragraph 42 of the Amended Complaint.

43.     Answering Defendants deny the allegations in paragraph 43 of the Amended Complaint.

44.    Answering Defendants deny the allegations in paragraph 44 of the Amended Complaint.

45.    Answering Defendants deny the allegations in paragraph 45 of the Amended Complaint.

46.    Answering Defendants deny the allegations in paragraph 46 of the Amended Complaint.

47.    Answering Defendants deny the allegations in paragraph 47 of the Amended Complaint.

48.    Answering Defendants deny the allegations in paragraph 48 of the Amended Complaint.

49.    Answering Defendants deny the allegations in paragraph 49 of the Amended Complaint.

50.    Answering Defendants deny the allegations in paragraph 50 of the Amended Complaint.

51.    Answering Defendants deny that they had any "role" in Mann's money laundering scheme or that they diverted or converted any funds.  Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of paragraph 51 of the Amended Complaint; accordingly, such allegations are denied. Answering Defendants deny the allegations in the second sentence of paragraph 51 of the Amended Complaint.

52.    Answering Defendants deny the allegations in paragraph 52 of the Amended Complaint.

53.     Answering Defendants deny the allegations in paragraph 53 of the Amended Complaint.

54.     Answering Defendants deny the allegations in paragraph 54 of the Amended Complaint.

55.     Upon information and belief, Answering Defendants admit the allegations in paragraph 55 of the Amended Complaint.

56.     Answering Defendants admit the allegations in paragraph 56 of the Amended Complaint, except that Answering Defendants deny that Pioneer Bancorp, Inc. is a "foreign bank" under the N.Y. Banking Law.

57.     Answering Defendants admit the allegations in paragraph 57 of the Complaint, except that the zip code of Pioneer Bank's headquarters is 12211, not 12180.

58.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 58 of the Amended Complaint; accordingly, such allegations are denied.

59.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 59 of the Amended Complaint; accordingly, such allegations are denied.

60.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 60 of the Amended Complaint; accordingly, such allegations are denied.

61.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 61 of the Amended Complaint; accordingly, such allegations are denied.

62.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 62 of the Amended Complaint; accordingly, such allegations are denied.

63.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 63 of the Amended Complaint; accordingly, such allegations are denied.

64.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 64 of the Amended Complaint; accordingly, such allegations are denied.

65.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 65 of the Amended Complaint; accordingly, such allegations are denied.

66.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 66 of the Amended Complaint; accordingly, such allegations are denied.

67.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 67 of the Amended Complaint; accordingly, such allegations are denied.

68.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 68 of the Amended Complaint; accordingly, such allegations are denied.

69.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 69 of the Amended Complaint; accordingly, such allegations are denied.

70.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70 of the Amended Complaint; accordingly, such allegations are denied.

71.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71 of the Amended Complaint; accordingly, such allegations are denied.

72.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72 of the Amended Complaint; accordingly, such allegations are denied.

73.     Paragraph 73 of the Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 73 of the Amended Complaint.

74.     Paragraph 74 of the Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 74 of the Amended Complaint.

75.     Paragraph 75 of the Amended Complaint asserts conclusions of law, to which no response is required.

76.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 76 of the Amended Complaint; accordingly, such allegations are denied.

77.     Answering Defendants admit the allegations in paragraph 77 of the Amended Complaint.

78.     Answering Defendants admit the allegations in the first sentence of paragraph 78 of the Amended Complaint.  Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 78 of the Amended Complaint; accordingly, such allegations are denied.

79.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 79 of the Amended Complaint; accordingly, such allegations are denied.

80.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80 of the Amended Complaint; accordingly, such allegations are denied.

81.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 81 of the Amended Complaint; accordingly, such allegations are denied.

82.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 82 of the Amended Complaint; accordingly, such allegations are denied.

83.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 83 of the Amended Complaint; accordingly, such allegations are denied.

84. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84 of the Amended Complaint; accordingly, such allegations are denied.

85. Answering Defendants deny the allegations in paragraph 85 of the Amended Complaint.

86. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86 of the Amended Complaint; accordingly, such allegations are denied.

87. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87 of the Amended Complaint; accordingly, such allegations are denied.

88. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88 of the Amended Complaint; accordingly, such allegations are denied.

89. Answering Defendants deny the allegations in paragraph 89 of the Amended Complaint.

90. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 90 of the Amended Complaint; accordingly, such allegations are denied.

91. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 91 of the Amended Complaint; accordingly, such allegations are denied.

92.    Answering Defendants deny the allegations in paragraph 92 of the Amended Complaint.

93.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 93 of the Amended Complaint; accordingly, such allegations are denied.

94.    Answering Defendants deny the allegations in paragraph 94 of the Amended Complaint.

95.    Answering Defendants admit the allegations in paragraph 95 of the Amended Complaint.

96.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96 of the Amended Complaint; accordingly, such allegations are denied.

97.    Answering Defendants deny the allegations in paragraph 97 of the Amended Complaint.

98.    Answering Defendants deny the allegations in paragraph 98 of the Amended Complaint, except admit that, in June 2017, a line of credit with a maximum principal amount of $22 million was extended to ValueWise and certain of its affiliates, based in substantial part on unqualified, audited consolidated financial statements that purported to verify, among other things, ValueWise's reported revenues and accounts receivable.

99.    Answering Defendants deny the allegations in paragraph 99 of the Amended Complaint, except admit that, in June 2018, a line of credit with a maximum principal amount of $32 million was extended to ValueWise and certain of its affiliates, and Pioneer extended a non-revolving line of credit to Viverant, based in substantial part on unqualified, audited consolidated

financial statements that purported to verify, among other things, ValueWise's reported revenues and accounts receivable.

100.    Answering Defendants deny the allegations in paragraph 100 of the Amended Complaint, except admit that, on August 12, 2019, a line of credit with a maximum principal amount of $42 million was extended to ValueWise and certain of its affiliates, based in substantial part on unqualified, audited consolidated financial statements that purported to verify, among other things, ValueWise's reported revenues and accounts receivable.

101.    Answering Defendants deny the allegations in paragraph 101 of the Amended Complaint.

102.    Paragraph 102 of the Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 102 of the Amended Complaint.

103.    Paragraph 103 of the Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 103 of the Amended Complaint.

104.    Paragraph 104 of the Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 104 of the Amended Complaint.

105.    Answering Defendants deny the allegations in paragraph 105 of the Amended Complaint.

106.    Answering Defendants deny the allegations in paragraph 106 of the Amended Complaint.

107.     Paragraph 107 of the Amended Complaint asserts conclusions of law, to which no response is required.   To the extent a response is required, Answering Defendants deny the allegations in paragraph 107 of the Amended Complaint.

108.     Answering Defendants deny the allegations in paragraph 108 of the Amended Complaint.

109.     Answering Defendants deny the allegations in paragraph 109 of the Amended Complaint.

110.     Answering Defendants deny the allegations in paragraph 110 of the Amended Complaint.

111.     Paragraph 111 of the Amended Complaint asserts conclusions of law, to which no response is required.   To the extent a response is required, Answering Defendants deny the allegations in paragraph 111 of the Amended Complaint.

112.     Paragraph 112 of the Amended Complaint asserts conclusions of law, to which no response is required.   To the extent a response is required, Answering Defendants deny the allegations in paragraph 112 of the Amended Complaint.

113.     Answering Defendants deny the allegations in paragraph 113 of the Amended Complaint.

114.     Answering Defendants deny the allegations in paragraph 114 of the Amended Complaint.

115.     Answering Defendants deny the allegations in paragraph 115 of the Amended Complaint.

116.     Answering Defendants deny the allegations in paragraph 116 of the Amended Complaint.

117.    Answering Defendants deny the allegations in paragraph 117 of the Amended Complaint.

118.    Answering Defendants deny the allegations in paragraph 118 of the Amended Complaint.

119.    Answering Defendants deny the allegations in paragraph 119 of the Amended Complaint.

120.    The allegations in paragraph 120 of the Amended Complaint are improper and must be stricken because they refer to privileged and confidential supervisory information of the FDIC that is prohibited from disclosure by law, absent FDIC authorization.  To the extent they are not stricken, Answering Defendants deny the allegations in paragraph 120 of the Amended Complaint, and note that paragraph 120 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

121.    Answering Defendants deny the allegations in paragraph 121 of the Amended Complaint.

122.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 122 of the Amended Complaint, except admit that Mann made various statements to federal and state prosecutors and refer to those statements for all of their content.

123.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 123 of the Amended Complaint; accordingly, such allegations are denied.

124.    Answering Defendants deny the allegations in paragraph 124 of the Amended Complaint.

125.    Answering Defendants deny the allegations in paragraph 125 of the Amended Complaint.

126.    Answering Defendants deny the allegations in paragraph 126 of the Amended Complaint.

127.    Answering Defendants deny the allegations in paragraph 127 of the Amended Complaint and note that paragraph 127 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

128.    Answering Defendants deny the allegations in paragraph 128 of the Amended Complaint.

129.    Answering Defendants deny the allegations in paragraph 129 of the Amended Complaint.

130.    Answering Defendants deny the allegations in paragraph 130 of the Amended Complaint.

131.    Answering Defendants deny the allegations in paragraph 131 of the Amended Complaint, except admit that the MyPayroll account was a general demand deposit business checking account at Pioneer Bank.

132.    Answering Defendants deny the allegations in paragraph 132 of the Amended Complaint.

133.    Answering Defendants deny the allegations in paragraph 133 of the Amended Complaint and note that paragraph 133 of the Amended Complaint references a document that

speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

134.     Answering Defendants deny the allegations in paragraph 134 of the Amended Complaint and note that paragraph 134 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

135.     Answering Defendants deny the allegations in paragraph 135 of the Amended Complaint and note that paragraph 135 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

136.     Answering Defendants deny the allegations in paragraph 136 of the Amended Complaint and note that paragraph 136 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

137.     Answering Defendants deny the allegations in paragraph 137 of the Amended Complaint and note that paragraph 137 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

138.     Answering Defendants deny the allegations in paragraph 138 of the Amended Complaint.

139.     Answering Defendants deny the allegations in paragraph 139 of the Amended Complaint.

140.    Answering Defendants deny the allegations in paragraph 140 of the Amended Complaint and note that paragraph 140 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

141.    Answering Defendants deny the allegations in paragraph 141 of the Amended Complaint and note that paragraph 141 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

142.    Answering Defendants deny the allegations in paragraph 142 of the Amended Complaint and note that paragraph 142 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

143.    Answering Defendants deny the allegations in paragraph 143 of the Amended Complaint and note that paragraph 143 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

144.    Answering Defendants deny the allegations in paragraph 144 of the Amended Complaint and note that paragraph 144 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

145.    Answering Defendants deny the allegations in paragraph 145 of the Amended Complaint and note that paragraph 145 of the Amended Complaint references a document that

speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

146.    Answering Defendants deny the allegations in paragraph 146 of the Amended Complaint and note that paragraph 146 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

147.    Answering Defendants deny the allegations in paragraph 147 of the Amended Complaint.

148.    Answering Defendants deny the allegations in paragraph 148 of the Amended Complaint.

149.    Answering Defendants deny the allegations in paragraph 149 of the Amended Complaint and note that paragraph 149 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

150.    Answering Defendants deny the allegations in paragraph 150 of the Amended Complaint and note that paragraph 150 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

151.    Answering Defendants deny the allegations in paragraph 151 of the Amended Complaint.

152.    Answering Defendants deny the allegations in paragraph 152 of the Amended Complaint.

153.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 153 of the Amended Complaint that PTM continued to serve as MyPayroll's third-party ACH processor.  Answering Defendants deny the remaining allegations in the first sentence of paragraph 153 of the Amended Complaint. Answering Defendants deny the allegations in the second and third sentences of paragraph 153 of the Amended Complaint and note that the second and third sentences of paragraph 153 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

154.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 154 of the Amended Complaint; accordingly, such allegations are denied.

155.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 155 of the Amended Complaint; accordingly, such allegations are denied.

156.    Answering Defendants deny the allegations in paragraph 156 of the Amended Complaint.

157.    Answering Defendants deny the allegations in paragraph 157 of the Amended Complaint.

158.    Answering Defendants deny the allegations in paragraph 158 of the Amended Complaint.

159.    Answering Defendants deny the allegations in paragraph 159 of the Amended Complaint and note that paragraph 159 of the Amended Complaint references a document that

speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

160.    Answering Defendants deny the allegations in paragraph 160 of the Amended Complaint and note that paragraph 160 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

161.    Answering Defendants deny the allegations in paragraph 161 of the Amended Complaint.

162.    Answering Defendants deny the allegations in paragraph 162 of the Amended Complaint.

163.    Answering Defendants deny the allegations in paragraph 163 of the Amended Complaint.

164.    Answering Defendants deny the allegations in paragraph 164 of the Amended Complaint.

165.    Answering Defendants deny the allegations in paragraph 165 of the Amended Complaint.

166.    Answering Defendants deny the allegations in paragraph 166 of the Amended Complaint.

167.    Answering Defendants deny the allegations in paragraph 167 of the Amended Complaint and note that paragraph 167 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

168.    Answering Defendants deny the allegations in paragraph 168 of the Amended Complaint.

169.    Answering Defendants deny the allegations in paragraph 169 of the Amended Complaint, except admit that MyPayrollHR opened the general demand deposit checking account ending in 0428 at Pioneer Bank on September 16, 2014.

170.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 170 of the Amended Complaint; accordingly, such allegations are denied.

171.    Answering Defendants deny the allegations in paragraph 171 of the Amended Complaint and note that paragraph 171 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

172.    Answering Defendants deny the allegations in paragraph 172 of the Amended Complaint and note that paragraph 172 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

173.    Answering Defendants deny the allegations in paragraph 173 of the Amended Complaint and note that paragraph 173 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

174.    Answering Defendants deny the allegations in paragraph 174 of the Amended Complaint and note that paragraph 174 of the Amended Complaint references a document that

speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

175.    Answering Defendants deny the allegations in paragraph 175 of the Amended Complaint.

176.    Answering Defendants deny the allegations in the first sentence of paragraph 176 of the Amended Complaint.  Answering Defendants deny the allegations in the second sentence of paragraph 176 of the Amended Complaint and note that the allegations in the second sentence of paragraph 176 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

177.    Answering Defendants deny the allegations in paragraph 177 of the Amended Complaint and note that paragraph 177 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

178.    Answering Defendants deny the allegations in paragraph 178 of the Amended Complaint and note that paragraph 178 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

179.    Answering Defendants deny the allegations in paragraph 179 of the Amended Complaint and note that paragraph 179 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

180.     Answering Defendants deny the allegations in paragraph 180 of the Amended Complaint.

181.     Answering Defendants deny the allegations in paragraph 181 of the Amended Complaint.

182.     Answering Defendants deny the allegations in paragraph 182 of the Amended Complaint.

183.     Answering Defendants deny the allegations in paragraph 183 of the Amended Complaint and note that paragraph 183 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

184.     Answering Defendants deny the allegations in paragraph 184 of the Amended Complaint.

185.     Answering Defendants deny the allegations in paragraph 185 of the Amended Complaint.

186.     Answering Defendants deny the allegations in paragraph 186 of the Amended Complaint and note that paragraph 186 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

187.     Answering Defendants deny the allegations in paragraph 187 of the Amended Complaint and note that paragraph 187 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

188.    Answering Defendants deny the allegations in paragraph 188 of the Amended Complaint and note that paragraph 188 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

189.    Answering Defendants deny the allegations in paragraph 189 of the Amended Complaint, except that Answering Defendants admit that Mann opened a demand deposit general business checking account, with an account number ending in 2440, in February 2019.

190.    Answering Defendants deny the allegations in paragraph 190 of the Amended Complaint and note that paragraph 190 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

191.    Answering Defendants deny the allegations in paragraph 191 of the Amended Complaint and note that paragraph 191 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

192.    Answering Defendants deny the allegations in paragraph 192 of the Amended Complaint.

193.    Answering Defendants deny the allegations in paragraph 193 of the Amended Complaint.

194.    Answering Defendants deny the allegations in paragraph 194 of the Amended Complaint.

195.    Answering Defendants deny the allegations in paragraph 195 of the Amended Complaint and note that paragraph 195 of the Amended Complaint references a document that

speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

196.    Answering Defendants deny the allegations in the first sentence of paragraph 196 of the Amended Complaint, except admit that, on May 15, 2019, Ms. Julian reviewed the April 2019 activity in the 2440 Account following an automated alert from the BAM system.  Answering Defendants deny the allegations in the second sentence of paragraph 196 of the Amended Complaint and note that the allegations in the second sentence of paragraph 196 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

197.    Answering Defendants deny the allegations in paragraph 197 of the Amended Complaint.

198.    Answering Defendants deny the allegations in paragraph 198 of the Amended Complaint.

199.    Answering Defendants deny the allegations in paragraph 199 of the Amended Complaint.

200.    Answering Defendants deny the allegations in paragraph 200 of the Amended Complaint.

201.    Answering Defendants deny the allegations in paragraph 201 of the Amended Complaint.

202.    Answering Defendants deny the allegations in paragraph 202 of the Amended Complaint.

203.    Answering Defendants deny the allegations in paragraph 203 of the Amended Complaint and note that paragraph 203 of the Amended Complaint references a document that

speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

204. Answering Defendants deny the allegations in paragraph 204 of the Amended Complaint.

205. Answering Defendants deny the allegations in paragraph 205 of the Amended Complaint.

206. Answering Defendants deny the allegations in paragraph 206 of the Amended Complaint.

207. Answering Defendants deny the allegations in the first sentence of paragraph 207 of the Amended Complaint and note that the allegations in first sentence of paragraph 207 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content. Answering Defendants deny the remaining allegations in paragraph 207 of the Amended Complaint.

208. Answering Defendants deny the allegations in paragraph 208 of the Amended Complaint and note that paragraph 208 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

209. Answering Defendants deny the allegations in paragraph 209 of the Amended Complaint and note that paragraph 209 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

210. Answering Defendants deny the allegations in paragraph 210 of the Amended Complaint and note that paragraph 210 of the Amended Complaint references a document that

speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

211.    Answering Defendants deny the allegations in paragraph 211 of the Amended Complaint and note that paragraph 211 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

212.    Answering Defendants deny the allegations in paragraph 212 of the Amended Complaint.

213.    Answering Defendants deny the allegations in paragraph 213 of the Amended Complaint and note that paragraph 213 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

214.    Answering Defendants deny the allegations in paragraph 214 of the Amended Complaint and note that paragraph 214 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

215.    Answering Defendants deny the allegations in paragraph 215 of the Amended Complaint and note that paragraph 215 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

216.    Answering Defendants deny the allegations in paragraph 216 of the Amended Complaint and note that paragraph 216 of the Amended Complaint references a document that

speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

217.    Answering Defendants deny the allegations in paragraph 217 of the Amended Complaint and note that paragraph 217 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

218.    Answering Defendants deny the allegations in paragraph 218 of the Amended Complaint.

219.    Answering Defendants deny the allegations in paragraph 219 of the Amended Complaint and note that paragraph 219 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

220.    Answering Defendants deny the allegations in paragraph 220 of the Amended Complaint and note that paragraph 220 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

221.    Answering Defendants deny the allegations in paragraph 221 of the Amended Complaint and note that paragraph 221 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

222.    Answering Defendants deny the allegations in paragraph 222 of the Amended Complaint and note that paragraph 222 of the Amended Complaint references a document that

speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

223.    Answering Defendants deny the allegations in paragraph 223 of the Amended Complaint and note that paragraph 223 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

224.    Answering Defendants deny the allegations in paragraph 224 of the Amended Complaint.

225.    Answering Defendants deny the allegations in paragraph 225 of the Amended Complaint and note that paragraph 225 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

226.    Answering Defendants deny the allegations in paragraph 226 of the Amended Complaint and note that paragraph 226 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

227.    Answering Defendants deny the allegations in paragraph 227 of the Amended Complaint.

228.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 228 of the Amended Complaint, except admit that Mann made various statements to federal and state prosecutors and refer to those statements for all of their content.

229.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 229 of the Amended Complaint; accordingly, such allegations are denied.

230.    Answering Defendants deny the allegations in paragraph 230 of the Amended Complaint.

231.    Answering Defendants deny the allegations in paragraph 231 of the Amended Complaint.

232.    Answering Defendants deny the allegations in paragraph 232 of the Amended Complaint.

233.    Answering Defendants deny the allegations in paragraph 233 of the Amended Complaint.

234.    Answering Defendants deny the allegations in paragraph 234 of the Amended Complaint.

235.    Answering Defendants deny the allegations in paragraph 235 of the Amended Complaint.

236.    Answering Defendants deny the allegations in paragraph 236 of the Amended Complaint.

237.    Answering Defendants deny the allegations in paragraph 237 of the Amended Complaint.

238.    Answering Defendants deny the allegations in paragraph 238 of the Amended Complaint.

239.    Answering Defendants deny the allegations in paragraph 239 of the Amended Complaint.

240.    Answering Defendants deny the allegations in paragraph 240 of the Amended Complaint.

241.    Answering Defendants deny the allegations in paragraph 241 of the Amended Complaint.

242.    Answering Defendants deny the allegations in paragraph 242 of the Amended Complaint.

243.    Answering Defendants deny the allegations in paragraph 243 of the Amended Complaint.

244.    Answering Defendants deny the allegations in paragraph 244 of the Amended Complaint.

245.    Answering Defendants deny the allegations in paragraph 245 of the Amended Complaint and note that paragraph 245 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

246.    Answering Defendants deny the allegations in paragraph 246 of the Amended Complaint and note that paragraph 246 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

247.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 247 of the Amended Complaint; accordingly, such allegations are denied.

248.    Answering Defendants deny the allegations in paragraph 248 of the Amended Complaint and note that paragraph 248 of the Amended Complaint references a document that

speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

249.    Answering Defendants deny the allegations in paragraph 249 of the Amended Complaint and note that paragraph 249 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

250.    Answering Defendants deny the allegations in paragraph 250 of the Amended Complaint and note that paragraph 250 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

251.    Answering Defendants deny the allegations in paragraph 251 of the Amended Complaint and note that paragraph 251 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

252.    Answering Defendants deny the allegations in paragraph 252 of the Amended Complaint and note that paragraph 252 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

253.    Answering Defendants deny the allegations in paragraph 253 of the Amended Complaint and note that paragraph 253 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

254.    Answering Defendants deny the allegations in paragraph 254 of the Amended Complaint and note that paragraph 254 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

255.    Answering Defendants deny the allegations in paragraph 255 of the Amended Complaint and note that paragraph 255 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

256.    Answering Defendants deny the allegations in paragraph 256 of the Amended Complaint and note that paragraph 256 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

257.    Answering Defendants deny the allegations in paragraph 257 of the Amended Complaint and note that paragraph 257 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

258.    Answering Defendants deny the allegations in paragraph 258 of the Amended Complaint and note that paragraph 258 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

259.    Answering Defendants deny the allegations in paragraph 259 of the Amended Complaint and note that paragraph 259 of the Amended Complaint references a document that

speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

260.    Answering Defendants deny the allegations in paragraph 260 of the Amended Complaint and note that paragraph 260 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

261.    Answering Defendants deny the allegations in paragraph 261 of the Amended Complaint.

262.    Answering Defendants deny the allegations in paragraph 262 of the Amended Complaint and note that paragraph 262 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

263.    Answering Defendants deny the allegations in paragraph 263 of the Amended Complaint.

264.    Answering Defendants deny the allegations in paragraph 264 of the Amended Complaint.

265.    Answering Defendants deny the allegations in paragraph 265 of the Amended Complaint and note that paragraph 265 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

266.    Answering Defendants deny the allegations in paragraph 266 of the Amended Complaint.

267.    Answering Defendants deny the allegations in paragraph 267 of the Amended Complaint.

268.    Answering Defendants deny the allegations in paragraph 268 of the Amended Complaint and note that paragraph 268 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

269.    Answering Defendants deny the allegations in paragraph 269 of the Amended Complaint and note that paragraph 269 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

270.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 270 of the Amended Complaint; accordingly, such allegations are denied.

271.    Answering Defendants deny the allegations in paragraph 271 of the Amended Complaint.

272.    Answering Defendants deny the allegations in paragraph 272 of the Amended Complaint.

273.    Answering Defendants deny the allegations in paragraph 273 of the Amended Complaint and note that paragraph 273 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

274.    Answering Defendants deny the allegations in paragraph 274 of the Amended Complaint.

275.    Answering Defendants deny the allegations in paragraph 275 of the Amended Complaint and note that paragraph 275 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

276.    Answering Defendants deny the allegations in paragraph 276 of the Amended Complaint and note that paragraph 276 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

277.    Answering Defendants deny the allegations in paragraph 277 of the Amended Complaint.

278.    Answering Defendants deny the allegations in paragraph 278 of the Amended Complaint.

279.    Answering Defendants admit the allegations in paragraph 279 of the Amended Complaint.

280.    Answering Defendants deny the allegations in paragraph 280 of the Amended Complaint.

281.    Answering Defendants deny the allegations in paragraph 281 of the Amended Complaint.

282.    Answering Defendants deny the allegations in the first and second sentences of paragraph 282 of the Amended Complaint and note that the allegations in the first and second sentences of paragraph 282 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the

document's content.  Answering Defendants deny the allegations in the third sentence of paragraph 282 of the Amended Complaint.

283.    Answering Defendants deny the allegations in paragraph 283 of the Amended Complaint and note that paragraph 283 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

284.    Answering Defendants deny the allegations in paragraph 284 of the Amended Complaint.

285.    Answering Defendants deny the allegations in paragraph 285 of the Amended Complaint and note that paragraph 285 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

286.    Answering Defendants deny the allegations in paragraph 286 of the Amended Complaint.

287.    Answering Defendants deny the allegations in paragraph 287 of the Amended Complaint.

288.    Answering Defendants deny the allegations in paragraph 288 of the Amended Complaint.

289.    Answering Defendants deny the allegations in paragraph 289 of the Amended Complaint and note that paragraph 289 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

290.    Answering Defendants deny the allegations in paragraph 290 of the Amended Complaint.

291.    Answering Defendants deny the allegations in paragraph 291 of the Amended Complaint.

292.    Answering Defendants deny the allegations in paragraph 292 of the Amended Complaint.

293.    Answering Defendants deny the allegations in paragraph 293 of the Amended Complaint and note that paragraph 293 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

294.    Answering Defendants deny the allegations in paragraph 294 of the Amended Complaint and note that paragraph 294 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

295.    Answering Defendants deny the allegations in paragraph 295 of the Amended Complaint.

296.    Answering Defendants deny the allegations in paragraph 296 of the Amended Complaint.

297.    Answering Defendants deny the allegations in the first sentence of paragraph 297 of the Amended Complaint, except admit that the allegations in the first sentence of paragraph 297 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.  Answering

Defendants deny the allegations in the second sentence of paragraph 297 of the Amended Complaint.

298.    Answering Defendants deny the allegations in paragraph 298 of the Amended Complaint and note that paragraph 298 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

299.    Answering Defendants deny the allegations in paragraph 299 of the Amended Complaint and note that paragraph 299 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

300.    Answering Defendants deny the allegations in paragraph 300 of the Amended Complaint.

301.    Answering Defendants deny the allegations in paragraph 301 of the Amended Complaint.

302.    Answering Defendants deny the allegations in paragraph 302 of the Amended Complaint.

303.    Answering Defendants deny the allegations in paragraph 303 of the Amended Complaint.

304.    Answering Defendants deny the allegations in paragraph 304 of the Amended Complaint.

305.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 305 of the Amended Complaint; accordingly, such allegations are denied.

306.    Answering Defendants deny the allegations in paragraph 306 of the Amended Complaint.

307.    Answering Defendants deny the allegations in paragraph 307 of the Amended Complaint.

308.    Answering Defendants deny the allegations in paragraph 308 of the Amended Complaint.

309.    Answering Defendants deny the allegations in paragraph 309 of the Amended Complaint.

310.    Answering Defendants deny the allegations in paragraph 310 of the Amended Complaint, except that Answering Defendants admit that on August 29, 2019, Mann wrote 36 checks totaling $15.588 million from three accounts at Bank of America and deposited them via RDC in accounts at Pioneer.

311.    Answering Defendants deny the allegations in paragraph 311 of the Amended Complaint.

312.    Answering Defendants deny the allegations in paragraph 312 of the Amended Complaint.

313.    Answering Defendants deny the allegations in paragraph 313 of the Amended Complaint.

314.    Answering Defendants deny the allegations in paragraph 314 of the Amended Complaint.

315.    Answering Defendants deny the allegations in paragraph 315 of the Amended Complaint.

316.    Answering Defendants deny the allegations in paragraph 316 of the Amended Complaint.

317.    Answering Defendants deny the allegations in paragraph 317 of the Amended Complaint.

318.    Answering Defendants deny the allegations in paragraph 318 of the Amended Complaint.

319.    Answering Defendants deny the allegations in paragraph 319 of the Amended Complaint.

320.    Answering Defendants deny the allegations in paragraph 320 of the Amended Complaint and note that paragraph 320 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

321.    Answering Defendants deny the allegations in paragraph 321 of the Amended Complaint and note that paragraph 321 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

322.    Answering Defendants deny the allegations in paragraph 322 of the Amended Complaint.

323.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 323 of the Amended Complaint; accordingly, such allegations are denied.

324.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 324 of the Amended Complaint; accordingly, such allegations are denied.

325.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 325 of the Amended Complaint; accordingly, such allegations are denied.

326.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 326 of the Amended Complaint; accordingly, such allegations are denied.

327.    Answering Defendants deny the allegations in paragraph 327 of the Amended Complaint.

328.    Answering Defendants deny the allegations in paragraph 328 of the Amended Complaint.

329.    Answering Defendants deny the allegations in paragraph 329 of the Amended Complaint.

330.    Answering Defendants deny the allegations in paragraph 330 of the Amended Complaint.

331.    Answering Defendants deny the allegations in paragraph 331 of the Amended Complaint.

332.    Answering Defendants deny the allegations in paragraph 332 of the Amended Complaint.

333.    Answering Defendants deny the allegations in paragraph 333 of the Amended Complaint.

334.    Answering Defendants deny the allegations in paragraph 334 of the Amended Complaint.

335.    Answering Defendants deny the allegations in paragraph 335 of the Amended Complaint.

336.    Answering Defendants deny the allegations in paragraph 336 of the Amended Complaint and note that paragraph 336 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document.

337.    Answering Defendants deny the allegations in paragraph 337 of the Amended Complaint.

338.    Answering Defendants deny the allegations in paragraph 338 of the Amended Complaint.

339.    Answering Defendants deny the allegations in paragraph 339 of the Amended Complaint.

340.    Answering Defendants deny the allegations in paragraph 340 of the Amended Complaint.

341.    Answering Defendants deny the allegations in paragraph 341 of the Amended Complaint.

342.    Answering Defendants deny the allegations in paragraph 342 of the Amended Complaint.

343.    Answering Defendants deny the allegations in paragraph 343 of the Amended Complaint.

344.    Answering Defendants deny the allegations in paragraph 344 of the Amended Complaint.

345.    Answering Defendants deny the allegations in paragraph 345 of the Amended Complaint.

346.    Answering Defendants deny the allegations in paragraph 346 of the Amended Complaint.

347.    Answering Defendants deny the allegations in paragraph 347 of the Amended Complaint.

348.    Answering Defendants deny the allegations in paragraph 348 of the Amended Complaint.

349.    Answering Defendants deny the allegations in paragraph 349 of the Amended Complaint.

350.    Answering Defendants deny the allegations in paragraph 350 of the Amended Complaint.

351.    Answering Defendants deny the allegations in paragraph 351 of the Amended Complaint.

352.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 352 of the Amended Complaint; accordingly, such allegations are denied.

353.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 353 of the Amended Complaint; accordingly, such allegations are denied.

354.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 354 of the Amended Complaint; accordingly, such allegations are denied.

355.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 355 of the Amended Complaint; accordingly, such allegations are denied.

356.    Answering Defendants deny the allegations in paragraph 356 of the Amended Complaint.

357.    Answering Defendants deny the allegations in paragraph 357 of the Amended Complaint.

358.    Answering Defendants deny the allegations in paragraph 358 of the Amended Complaint.

359.    Answering Defendants deny the allegations in paragraph 359 of the Amended Complaint.

360.    Answering Defendants deny the allegations in paragraph 360 of the Amended Complaint.

361.    Answering Defendants deny the allegations in paragraph 361 of the Amended Complaint.

362.    Answering Defendants deny the allegations in paragraph 362 of the Amended Complaint.

363.    Answering Defendants deny the allegations in paragraph 363 of the Amended Complaint.

364.    Answering Defendants deny the allegations in paragraph 364 of the Amended Complaint.

365.    Answering Defendants deny the allegations in paragraph 365 of the Amended Complaint.

366.    Answering Defendants deny the allegations in paragraph 366 of the Amended Complaint.

367.    Answering Defendants deny the allegations in paragraph 367 of the Amended Complaint.

368.    Answering Defendants deny the allegations in paragraph 368 of the Amended Complaint.

369.    Answering Defendants deny the allegations in paragraph 369 of the Amended Complaint and note that paragraph 369 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

370.    Answering Defendants deny the allegations in paragraph 370 of the Amended Complaint and note that paragraph 370 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

371.    Answering Defendants deny the allegations in paragraph 371 of the Amended Complaint and note that paragraph 371 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

372.     Answering Defendants deny the allegations in paragraph 372 of the Amended Complaint and note that paragraph 372 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

373.     Answering Defendants deny the allegations in paragraph 373 of the Amended Complaint and note that paragraph 373 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

374.     Answering Defendants deny the allegations in paragraph 374 of the Amended Complaint.

375.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 375 of the Amended Complaint; accordingly, such allegations are denied.

376.     Answering Defendants deny the allegations in paragraph 376 of the Amended Complaint.

377.     Answering Defendants deny the allegations in paragraph 377 of the Amended Complaint and note that paragraph 377 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

378.     Answering Defendants deny the allegations in paragraph 378 of the Amended Complaint and note that paragraph 378 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

379.    Answering Defendants deny the allegations in paragraph 379 of the Amended Complaint and note that paragraph 379 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

380.    Answering Defendants deny the allegations in paragraph 380 of the Amended Complaint and note that paragraph 380 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

381.    Answering Defendants deny the allegations in paragraph 381 of the Amended Complaint and note that paragraph 381 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

382.    Answering Defendants deny the allegations in paragraph 382 of the Amended Complaint and note that paragraph 382 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

383.    Answering Defendants deny the allegations in paragraph 383 of the Amended Complaint and note that paragraph 383 of the Amended Complaint references a document that speaks for itself, refer to the document for all of its content, and deny any and all characterizations of the document's content.

384.    Answering Defendants deny the allegations in paragraph 384 of the Amended Complaint.

385.    Answering Defendants deny the allegations in paragraph 385 of the Amended Complaint.

386.    Answering Defendants deny the allegations in paragraph 386 of the Amended Complaint.

387.    Answering Defendants deny the allegations in paragraph 387 of the Amended Complaint, except admit that Berkshire and Chemung have brought suits against Pioneer in New York State Supreme Court, Albany County.

388.    Answering Defendants deny the allegations in paragraph 388 of the Amended Complaint, except admit that First Premier submitted a complaint to NACHA on or about September 18, 2019, alleging that Pioneer violated NACHA operating rules, but NACHA ultimately rejected the complaint and determined that no violation occurred.

389.    Answering Defendants deny the allegations in paragraph 389 of the Amended Complaint.

390.    Answering Defendants deny the allegations in paragraph 390 of the Amended Complaint.

391.    Answering Defendants deny the allegations in paragraph 391 of the Amended Complaint.

392.    Answering Defendants deny the allegations in paragraph 392 of the Amended Complaint.

393.    Answering Defendants deny the allegations in paragraph 393 of the Amended Complaint.

394.    Answering Defendants deny the allegations in paragraph 394 of the Amended Complaint.

395.    Answering Defendants deny the allegations in paragraph 395 of the Amended Complaint.

396.    Answering Defendants deny the allegations in paragraph 396 of the Amended Complaint.

397.    Answering Defendants deny the allegations in paragraph 397 of the Amended Complaint.

398.    Answering Defendants deny the allegations in paragraph 398 of the Amended Complaint.

399.    Answering Defendants deny the allegations in paragraph 399 of the Amended Complaint.

400.    Answering Defendants deny the allegations in paragraph 400 of the Amended Complaint.

401.    Answering Defendants deny the allegations in paragraph 401 of the Amended Complaint.

402.    Answering Defendants deny the allegations in paragraph 402 of the Amended Complaint.

403.    Answering Defendants deny the allegations in paragraph 403 of the Amended Complaint.

404.    Answering Defendants deny the allegations in paragraph 404 of the Amended Complaint.

405.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 405 of the Amended Complaint; accordingly, such allegations are denied.

406.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 406 of the Amended Complaint; accordingly, such allegations are denied.

407.    Answering Defendants deny the allegations in paragraph 407 of the Amended Complaint.

408.    Answering Defendants deny the allegations in paragraph 408 of the Amended Complaint.

409.    Answering Defendants deny the allegations in paragraph 409 of the Amended Complaint.

**FIRST CAUSE OF ACTION**
**(DECLARATORY JUDGMENT – AGAINST PIONEER)**

410.    The statement in paragraph 410 of the Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-409 of the Amended Complaint.

411.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 411 of the Amended Complaint; accordingly, such allegations are denied.

412.    Answering Defendants deny the allegations in paragraph 412 of the Amended Complaint.

413.    Answering Defendants deny the allegations in paragraph 413 of the Amended Complaint.

414.    Answering Defendants deny the allegations in paragraph 414 of the Amended Complaint.

415.    Answering Defendants deny the allegations in paragraph 415 of the Amended Complaint.

416.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 416 of the Amended Complaint; accordingly, such allegations are denied.

417.    Paragraph 417 of the Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 417 of the Amended Complaint.

418.    Answering Defendants deny the allegations in paragraph 418 of the Amended Complaint.

**SECOND CAUSE OF ACTION**
**(CONVERSION)**

419.    The statement in paragraph 419 of the Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-418 of the Amended Complaint.

420.    Answering Defendants deny the allegations in paragraph 420 of the Amended Complaint.

421.    Answering Defendants deny the allegations in paragraph 421 of the Amended Complaint.

422.    Answering Defendants deny the allegations in paragraph 422 of the Amended Complaint.

423.    Answering Defendants deny the allegations in paragraph 423 of the Amended Complaint.

424.    Answering Defendants deny the allegations in paragraph 424 of the Amended Complaint.

425.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 425 of the Amended Complaint; accordingly, such allegations are denied.

426.    Answering Defendants deny the allegations in paragraph 426 of the Amended Complaint.

427.    Answering Defendants deny the allegations in paragraph 427 of the Amended Complaint.

428.    Answering Defendants deny the allegations in paragraph 428 of the Amended Complaint.

429.    Answering Defendants deny the allegations in paragraph 429 of the Amended Complaint.

430.    Answering Defendants deny the allegations in paragraph 430 of the Amended Complaint.

431.    Answering Defendants deny the allegations in paragraph 431 of the Amended Complaint.

432.    Answering Defendants deny the allegations in paragraph 432 of the Amended Complaint.

## THIRD CAUSE OF ACTION
### (FRAUD)

433.    The statement in paragraph 433 of the Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-432 of the Amended Complaint.

434.    Answering Defendants deny the allegations in paragraph 434 of the Amended Complaint.

435.    Answering Defendants deny the allegations in paragraph 435 of the Amended Complaint.

436.    Answering Defendants deny the allegations in paragraph 436 of the Amended Complaint.

437.    Answering Defendants deny the allegations in paragraph 437 of the Amended Complaint.

438.    Answering Defendants deny the allegations in paragraph 438 of the Amended Complaint.

439.    Answering Defendants deny the allegations in paragraph 439 of the Amended Complaint.

440.    Answering Defendants deny the allegations in paragraph 440 of the Amended Complaint.

441.    Answering Defendants deny the allegations in paragraph 441 of the Amended Complaint.

**FOURTH CAUSE OF ACTION**
**(NEGLIGENCE/GROSS NEGLIGENCE)**

442.    The statement in paragraph 442 of the Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-441 of the Amended Complaint.

443.    Answering Defendants deny the allegations in paragraph 443 of the Amended Complaint.

444.   Answering Defendants deny the allegations in paragraph 444 of the Amended Complaint.

445.   Answering Defendants deny the allegations in paragraph 445 of the Amended Complaint.

446.   Answering Defendants deny the allegations in paragraph 446 of the Amended Complaint.

447.   Answering Defendants deny the allegations in paragraph 447 of the Amended Complaint.

448.   Answering Defendants deny the allegations in paragraph 448 of the Amended Complaint.

449.   Answering Defendants deny the allegations in paragraph 449 of the Amended Complaint.

450.   Answering Defendants deny the allegations in paragraph 450 of the Amended Complaint.

451.   Paragraph 451 of the Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 451 of the Amended Complaint.

452.   Answering Defendants deny the allegations in paragraph 452 of the Amended Complaint.

453.   Answering Defendants deny the allegations in paragraph 453 of the Amended Complaint.

454.   Answering Defendants deny the allegations in paragraph 454 of the Amended Complaint.

455.    Answering Defendants deny the allegations in paragraph 455 of the Amended Complaint.

456.    Answering Defendants deny the allegations in paragraph 456 of the Amended Complaint.

457.    Answering Defendants deny the allegations in paragraph 457 of the Amended Complaint.

458.    Answering Defendants deny the allegations in paragraph 458 of the Amended Complaint.

459.    Answering Defendants deny the allegations in paragraph 459 of the Amended Complaint.

**FIFTH CAUSE OF ACTION**
**(UNJUST ENRICHMENT/MONEY HAD AND RECEIVED – PIONEER)**

460.    The statement in paragraph 460 of the Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-459 of the Amended Complaint.

461.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 461 of the Amended Complaint; accordingly, such allegations are denied.

462.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 462 of the Amended Complaint; accordingly, such allegations are denied.

463.    Answering Defendants deny the allegations in paragraph 463 of the Amended Complaint.

464.    Answering Defendants deny the allegations in paragraph 464 of the Amended Complaint.

465.    Answering Defendants deny the allegations in paragraph 465 of the Amended Complaint.

466.    Answering Defendants deny the allegations in paragraph 466 of the Amended Complaint.

467.    Answering Defendants deny the allegations in paragraph 467 of the Amended Complaint.

468.    Answering Defendants deny the allegations in paragraph 468 of the Amended Complaint.

## <u>SIXTH CAUSE OF ACTION</u>
### (VIOLATION OF RICO, 18 U.S.C. § 1962(c)

469.    The statement in paragraph 469 of the Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-468 of the Amended Complaint.

470.    Paragraph 470 of the Amended Complaint asserts conclusions of law, to which no response is required.  To the extent a response is required, Answering Defendants deny the allegations in paragraph 470 of the Amended Complaint.

471.    Answering Defendants deny the allegations in paragraph 471 of the Amended Complaint.

472.    Answering Defendants deny the allegations in paragraph 472 of the Amended Complaint.

473.    Answering Defendants deny the allegations in paragraph 473 of the Amended Complaint.

474.     Answering Defendants deny the allegations in paragraph 474 of the Amended Complaint.

475.     Answering Defendants deny the allegations in paragraph 475 of the Amended Complaint.

476.     Answering Defendants deny the allegations in paragraph 476 of the Amended Complaint.

477.     Answering Defendants deny the allegations in paragraph 477 of the Amended Complaint.

478.     Answering Defendants deny the allegations in paragraph 478 of the Amended Complaint.

479.     Answering Defendants deny the allegations in paragraph 479 of the Amended Complaint.

480.     Answering Defendants deny the allegations in paragraph 480 of the Amended Complaint.

481.     Answering Defendants deny the allegations in paragraph 481 of the Amended Complaint.

482.     Answering Defendants deny the allegations in paragraph 482 of the Amended Complaint.

483.     Answering Defendants deny the allegations in paragraph 483 of the Amended Complaint.

484.     Answering Defendants deny the allegations in paragraph 484 of the Amended Complaint.

485.    Answering Defendants deny the allegations in paragraph 485 of the Amended Complaint.

486.    Answering Defendants deny the allegations in paragraph 486 of the Amended Complaint.

## SEVENTH CAUSE OF ACTION
### (VIOLATION OF RICO, 18 U.S.C. § 1962(d))

487.    The statement in paragraph 487 of the Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-486 of the Amended Complaint.

488.    Answering Defendants deny the allegations in paragraph 488 of the Amended Complaint.

489.    Answering Defendants deny the allegations in paragraph 489 of the Amended Complaint.

490.    Answering Defendants deny the allegations in paragraph 490 of the Amended Complaint.

491.    Answering Defendants deny the allegations in paragraph 491 of the Amended Complaint.

492.    Answering Defendants deny the allegations in paragraph 492 of the Amended Complaint.

493.    Answering Defendants deny the allegations in paragraph 493 of the Amended Complaint.

494.    Answering Defendants deny the allegations in paragraph 494 of the Amended Complaint.

## EIGHTH CAUSE OF ACTION
## (AIDING AND ABETTING CONVERSION – PIONEER)

495.    The statement in paragraph 495 of the Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-494 of the Amended Complaint.

496.    Answering Defendants deny the allegations in paragraph 496 of the Amended Complaint.

497.    Answering Defendants deny the allegations in paragraph 497 of the Amended Complaint.

498.    Answering Defendants deny the allegations in paragraph 498 of the Amended Complaint.

499.    Answering Defendants deny the allegations in paragraph 499 of the Amended Complaint.

500.    Answering Defendants deny the allegations in paragraph 500 of the Amended Complaint.

501.    Answering Defendants deny the allegations in paragraph 501 of the Amended Complaint.

502.    Answering Defendants deny the allegations in paragraph 502 of the Amended Complaint.

503.    Answering Defendants deny the allegations in paragraph 503 of the Amended Complaint.

504.    Answering Defendants deny the allegations in paragraph 504 of the Amended Complaint.

## NINTH CAUSE OF ACTION
## (AIDING AND ABETTING FRAUD – PIONEER)

505.    The statement in paragraph 505 of the Amended Complaint requires no responsive pleading.  To the extent a responsive pleading is required, Answering Defendants incorporate by reference their responses to paragraphs 1-504 of the Amended Complaint.

506.    Answering Defendants deny the allegations in paragraph 506 of the Amended Complaint.

507.    Answering Defendants deny the allegations in paragraph 507 of the Amended Complaint.

508.    Answering Defendants deny the allegations in paragraph 508 of the Amended Complaint.

509.    Answering Defendants deny the allegations in paragraph 509 of the Amended Complaint.

510.    Answering Defendants deny the allegations in paragraph 510 of the Amended Complaint.

511.    Answering Defendants deny the allegations in paragraph 511 of the Amended Complaint.

512.    Answering Defendants deny the allegations in paragraph 512 of the Amended Complaint.

513.    Answering Defendants deny the allegations in paragraph 513 of the Amended Complaint.

514.    Answering Defendants deny the allegations in paragraph 514 of the Amended Complaint.

515.    Paragraph 515 of the Amended Complaint requests a jury trial, to which no response is required.

516.    To the extent not expressly admitted herein, Answering Defendants deny each and every other allegation, express or implied, contained in the Amended Complaint, including but not limited to any allegation contained in headings to Plaintiff's Amended Complaint.

## ANSWERING DEFENDANTS' AFFIRMATIVE DEFENSES

517.    Answering Defendants set forth below their affirmative defenses.  Each defense is asserted as to all claims against Answering Defendants.  By setting forth these affirmative defenses, Answering Defendants do not assume the burden of proving any fact, issue, or element of claims where such burden properly belongs to the Plaintiff.

518.    Answering Defendants have not knowingly or intentionally waived any applicable defenses, and Answering Defendants reserve the right to elaborate on or amend the affirmative defenses set forth below, or assert and rely upon other applicable affirmative defenses, based on discovery in this matter, in accordance with applicable law, including recent Second Circuit precedent.

## FIRST AFFIRMATIVE DEFENSE

519.    The Amended Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

520.    Plaintiff has unclean hands.

521.    Plaintiff was an active participant in a pervasive and orchestrated scheme of fraudulent and criminal conduct undertaken by Michael Mann, Plaintiff itself, payroll companies owned by Mann and acting at Mann's direction (including Southwestern Payroll Service, Inc., MyPayrollHR.com LLC, Cloud Payroll LLC, and Pro/Data Payroll Services Inc. which are collectively referred to as the "Mann Payroll Companies"), and other companies Mann owned

and/or controlled (together with the Mann Payroll Companies, the "Mann Entities"). The Mann Entities maintained numerous bank accounts at Pioneer Bank, and Plaintiff was aware of this banking relationship through its processing of transactions through those accounts in furtherance of the fraudulent scheme.

522.    In furtherance of the scheme, Plaintiff engaged in illegal money laundering and unlicensed money transmission in violation of federal and state law. Plaintiff also disregarded its own business practices, ignored multiple red flags indicating that Mann and the Mann Entities were engaged in unlawful conduct, and willingly permitted its services as a processor of transactions through the Automated Clearing House ("ACH") to be used for unlawful purposes.

523.    Plaintiff joined the criminal scheme in the fall of 2017, when it agreed to provide ACH processing services to the Mann Payroll Companies. Plaintiff agreed with Mann to facilitate transactions on behalf of the criminal enterprise knowing the funds in those transactions would be the proceeds of funds misappropriated from employer-clients of the Mann Payroll Companies. Plaintiff also engaged in transactions on behalf of the Mann Payroll Companies knowing the funds in those transactions were the proceeds of funds misappropriated from the employer-clients, as well the proceeds of unlawful activity, namely, funds obtained through a revolving line of credit that ValueWise and certain of its subsidiaries and affiliates obtained through Pioneer Bank based on intentionally false borrowing base certificates.

524.    Before agreeing to process ACH transactions for the Mann Payroll Companies, Plaintiff performed virtually no due diligence on the Mann Payroll Companies whatsoever, in violation of industry standards and its own business practices. Plaintiff understood it was required to verify Mann and his companies were not engaged in fraudulent activity. But rather than attempt to do so, Plaintiff simply performed a credit check and did nothing else. Plaintiff also did nothing

to independently verify the representations made to it by Mann about his title or ownership of the Mann Payroll Companies, which were set forth in the contracts that Plaintiff signed along with Mann.

525.    Plaintiff also performed no due diligence whatsoever concerning how the Mann Payroll Companies handled employer-client funds or the nature of any accounts of the Mann Payroll Companies at Pioneer Bank.  Specifically, Plaintiff did nothing to ensure that funds it transferred to or from the accounts of the Mann Payroll Companies were held for the exclusive benefit of the payroll companies' customers or held separate from other accounts Mann controlled at Pioneer Bank.  At no time did Plaintiff ever attempt to contact any Pioneer Bank representative – despite being provided with contact information by Mann – much less inform Pioneer Bank that funds collected from the employer-clients of the Mann Payroll Companies were to be transferred by Plaintiff to accounts at Pioneer Bank.

526.    Plaintiff also voluntarily agreed to a convoluted payment flow structure, entirely at odds with Plaintiff's historical business practices, whose sole purpose to conceal or disguise the true nature of the funds misappropriated from the employer-clients.

527.    When Plaintiff and the Mann Payroll Companies were discussing a potential business relationship, Mann made some unusual demands of Plaintiff.  As explained below, these demands were contrary to well-established industry standards for payroll companies and ACH service providers and had all the hallmarks of fraud.  Plaintiff – despite knowing better based on its long track record in the business – was willing to satisfy these demands.

528.    Specifically, the Mann Payroll Companies sought to funnel all of the funds withheld by their employer-clients for the payment of payroll taxes through a single account at Pioneer Bank held in the name of MyPayrollHR ("Account 0212").  The Mann Payroll Companies also sought

to separate funds withheld by employer-clients for the payment of payroll taxes from funds withheld by employer-clients for the payment of employee payroll. Both proposed structural features, by Plaintiff's own admission, were highly unorthodox and virtually unprecedented in the payroll industry. And these structural features served no legitimate business purpose – their only purpose was to ensure that various Mann Entities could obtain access to funds to falsely inflate the reported revenues and receivables of ValueWise and its affiliates.

529.    The Mann Payroll Companies ultimately proposed a structure under which Cloud Payroll would set up a single customer account with Plaintiff through which all of the Mann Payroll Companies could process ACH transactions on behalf of the employer-clients. All of the funds collected from employer-clients, in turn, would be funneled through Account 0212.

530.    Plaintiff informed the Mann Payroll Companies that, for compliance reasons, it could not open an account for Cloud Payroll that would process ACH payroll tax transactions for Cloud Payroll, Pro/Data, and Southwestern Payroll combined. Plaintiff informed them that a separate account instead would have to be set up for each company.

531.    But in substance, Plaintiff granted the Mann Payroll Companies their wish. While Plaintiff required each to sign a separate agreement, each of the agreements identified Account 0212 as the bank account through which transactions were to be processed.

532.    Plaintiff therefore understood that Mann intended to commingle funds collected by each of the three payroll processors in a single "checking" account. Plaintiff further understood and knew that the Mann Payroll Companies maintained a banking relationship with Pioneer Bank.

533.    Plaintiff also agreed to the Mann Payroll Companies' unusual request that funds withheld by employer-clients for the payment of employee payroll and the associated payroll taxes be split up, with each going through a separate ACH service provider and into separate bank

accounts at different banking institutions.  And as noted, Plaintiff permitted the Mann Payroll Companies to funnel all funds collected from their employer-clients through Account 0212.

534.    Plaintiff recognized that this unprecedented approach was inconsistent with its past practices.  As Plaintiff well knew, separating payroll from tax payment processing reduces its ability to monitor risk, including the risk of fraud and misappropriation.  Plaintiff's Vice President and General Manager Steven Pereira admitted that this was the first instance in the nearly 30-year history of the company in which Plaintiff agreed to "only [handle] payroll tax funds, funds earmarked for the payment of payroll taxes and not payroll," *i.e.*, "only do taxes instead of payroll and taxes."  He acknowledged that this created risks because payroll processors are less likely to divert payroll funds from employees because the consequences of that conduct are "instant," whereas the IRS might take six months to bring a late tax payment to its attention.

535.    Similarly, James Hagen, Plaintiff's Vice President of Sales and an employee of more than 15 years, admitted that Plaintiff made an exception to its "hard and fast rule" that Plaintiff would not permit "decoupling of tax payments from the payroll payments."  Instead, Plaintiff's general approach to working with payroll companies is to process both payroll and payroll taxes "through [Plaintiff's] accounts directly" rather than split them up or route the funds through an account that Plaintiff does not control.  According to Hagen, this approach helps guard against fraud.

536.    Despite recognizing the risks and the clear departure from past practices and industry standards, Plaintiff moved forward with Mann because, in Pereira's words, Plaintiff is "an aggressive company" and took the position "if you want us to do that, we're going to do [it]."

537.    Plaintiff's agreement to funnel payroll taxes for all of the Mann Payroll Companies into a single, unrestricted demand deposit checking account at Pioneer Bank, rather than

maintaining the funds in separate *accounts of Plaintiff* before they were paid to tax authorities, also was an extreme departure from standard practices.

538.    The transfer of funds collected from third-party employer-client accounts to taxing authorities is normally accomplished by way of a transfer from the employer-client's bank account directly to the ACH processor's settlement account, from which the funds are then sent directly on to the taxing authorities.  This is both standard industry practice and standard practice for Plaintiff.  Rather than follow this established procedure, Plaintiff agreed to (and did) transfer all funds collected from the Mann Payroll Companies funds to a single account outside of Plaintiff's control, where they became commingled with each other and with general corporate operating funds in a general demand deposit (checking) account that was not set up as a custodial or trust account.

539.    Plaintiff also recognized but deliberately and willfully ignored the inherent risks of this approach.  James Hagen admitted that this was the first time this approach had ever been proposed to Plaintiff.  Hagen stated that Plaintiff normally did not "allow a payroll processor to process" its employer-clients' funds through the payroll company's own account.  Rather, Plaintiff would "pull the money directly from the client's account," transfer it "directly to [Plaintiff's] account and then directly to the employee," such that "the client payroll processor never holds payroll, never touches it."

540.    Plaintiff has admitted that this was a "strange arrangement" for Plaintiff and that Plaintiff had never seen this kind of flow of funds.  Indeed, there is no legitimate business reason to funnel funds collected from the employer-clients of multiple payroll companies into a single bank account held in the name of one payroll company – let alone a demand deposit checking account that was not set up as a custodial or trust account.  Plaintiff also required payroll companies to set up designated tax impound accounts, but it did not do so with the Mann Payroll Companies.

541.    As an established ACH services provider that almost exclusively serves payroll companies, Plaintiff understood the importance of safeguarding and segregating funds collected from the payroll companies' employer-clients for the purpose of paying payroll and payroll taxes on behalf of the employer-clients.

542.    Despite being aware of multiple and obvious risks and red flags, Plaintiff onboarded the Mann Payroll Companies and began processing ACH transactions almost immediately.  And for a period of nearly two years, Plaintiff allowed the the Mann Payroll Companies to use its ACH services throughout the two-year period of its involvement to misappropriate funds from the Mann Payroll Companies' employer-clients, using an unorthodox transaction structure that Plaintiff never had permitted in its over 30 years in business.

543.    Most prominently, however, Plaintiff engaged in a series of transactions that were specifically designed and structured to defeat detection of the fraudulent misappropriation scheme. These transactions spanned more than a year and totaled hundreds of millions of dollars, ceasing only when the scheme collapsed in August 2019.

544.    These transactions, which Mann labeled as "ePay" transactions, totaled nearly $700 million, occurred on an almost daily basis, and involved the accounts of at least the following Mann Entities: Valuewise, Southwestern Payroll, Cloud Payroll, Create Force LLC, Focalpointe Group LLC, Hire Flux LLC, Ross Personnel Consultants Inc., Trueconsulting Corp., and Truehr LLC.  In essence, the ePay transactions were intrabank transfers of funds between accounts of various Mann Entities at Pioneer Bank and Account 0212 that were unrelated to the processing of payroll and payroll taxes for the Mann Payroll Companies' employer-clients.

545.    The following chart sets forth a breakdown, by Mann Entity, of the volume and amount of the ePay ACH transactions conducted by Plaintiff on behalf of the Mann Entities over the period between June 2018 and August 2019:

| Mann Entity (Pioneer Bank Acct. No.) | Total ePay Amount | No. of ePay Transactions |
|---|---|---|
| Cloud Payroll LLC (x2382) | $141,685,618 | 214 |
| Create Force LLC (x1699) | $8,087,394 | 13 |
| Create Force d/b/a Always Live (x4820) | $1,308,581 | 2 |
| Focalpointe Group LLC (x2192) | $30,813,914 | 51 |
| Hire Flux LLC (x1632) | $3,260 | 1 |
| Pro/Data Payroll Services Inc. (x1988) | $63,160,374 | 98 |
| Ross Personnel Consultants Inc. (x4838, x3630) | $46,358,847 | 74 |
| Southwestern Payroll Service, Inc. (x1996) | $48,029,161 | 74 |
| Trueconsulting Corp. (x1236, x1251) | $107,618,905 | 171 |
| Truehr LLC (x1244) | $49,164,116 | 76 |
| Valuewise Corp. d/b/a Apogee (x4018) | $55,386,373 | 90 |
| Valuewise Corp. d/b/a Optix Consulting (x3622, x2473) | $55,172,057 | 93 |
| Valuewise Corp. d/b/a Primacy Search Group (x3648, x 2481) | $62,948,928 | 101 |
| Valuewise Corp. d/b/a Viverant (x2499) | $1,441,724 | 3 |

546.    The highly unusual characteristics of these ePay transactions relative to the typical payroll tax-related transactions that Plaintiff processed, and the circumstances under which the transactions occurred, make their illegitimate and unlawful nature clear on their face.  And Plaintiff knew or willfully blinded itself to that fact.

547.    Most obviously, there was no legitimate business reason to conduct transactions between bank accounts of different Mann Entities at the same bank through the ACH system; instead, the transactions simply could have been conducted through intrabank transfers that would not have required the Mann Entities to incur ACH transaction processing fees.

548.    The volume and average amount of the ePay transactions relative to NatPay's payroll tax payment processing activity also provides strong evidence of unlawful and illegitimate conduct.  As set forth in the table above, Plaintiff conducted slightly more than 1,000 ePay transactions totaling approximately $670 million, for a per-transaction average of ***more than $600,000***.  By contrast, Plaintiff conducted approximately ***44,000*** transactions over that same period, ostensibly for the collection of funds from employer-clients for the payment of payroll taxes, totaling approximately $360 million, for a per-transaction average of just ***$8,000***.  And while the vast majority of ePay transactions ranged between $500,000 and $700,000 each, nearly 100% of the payroll tax-related transactions were under $100,000.

549.    The stark differences between the volume and amounts of these transactions are another clear indication that the ePay transactions were not legitimate and should raised significant suspicion for Plaintiff that they were not legitimate, ordinary-course payroll tax processing transactions.  And Plaintiff admittedly did nothing whatsoever to investigate these transactions.  These glaring differences in the ePay transactions and tax processing transactions should have been considered by Plaintiff as a significant risk of potentially illegal activity.

550.    The timing of the ePay transactions also suggests that they were part of a deliberate and illegal scheme.  Between November 2017 (when Plaintiff began processing transactions for the Mann Payroll Companies) and the end of June 2018, there were no ePay transactions conducted.  Yet beginning in late June 2018, ePay transaction activity began and immediately

ramped up to an alarming degree, totaling more than $100 million over a six-week period in July and August 2018.  The ePay transactions were a radical departure from the payroll tax-related transactions: they were not identified in the ACH instructions to Plaintiff as tax collections or tax deposits (as such transactions typically would be), and the individual amounts of the ePay transactions greatly exceeded typical payroll tax transactions.  And perhaps most alarmingly, these ePay transactions could not be tied to any later payments to taxing authorities, a fact that Plaintiff unquestionably should have noticed.

551.    Moreover, while Plaintiff specifically was instructed by the Mann Payroll Companies in February 2019 to cease processing any payroll tax-related transactions through Account 0212 and to instead process them through a Cloud Payroll account at Pioneer Bank ending in 2440, Plaintiff continued thereafter to accept and execute ACH instructions for hundreds of millions of dollars in ePay transactions through Account 0212.  In fact, after Account 2440 was opened and Plaintiff began processing payroll tax-related transactions through it, Plaintiff *exclusively processed ePay transactions through Account 0212*.

552.    This ePay transaction activity obviously was improper and indicative of unlawful activity.  In fact, Plaintiff's own employees have admitted that these transactions were not legitimate.  For example, Plaintiff's Operations Manager Dawn Cafaro described the transactions as "bogus" in a September 5, 2019 email exchange with Hagen and Pereira.  And at his deposition, Pereira admitted that the transactions were suspicious and claimed that Plaintiff has since implemented procedures to detect similar transaction activity.

553.    The ePay transactions also were intentionally structured to evade Plaintiff's general rule prohibiting single, same-day transactions of over $1 million.  On an almost daily basis, Plaintiff was carrying out instructions to process transactions through the same Mann Entity bank

account that exceeded $1 million in the aggregate, but that were divided into smaller amounts to circumvent Plaintiff's general rule against transactions in excess of $1 million. There is no business reason that would explain the consistent daily pattern of transactions in similar amounts primarily involving various Mann Entities. This transaction pattern was indicative of potential money laundering and should have been flagged by Plaintiff.

554.    Plaintiff continued to carry out these facially illegitimate ePay transactions until the scheme collapsed in August 2019.

555.    In addition to its involvement in money laundering and other illegal activity relating to the transactions it processed for the Mann Payroll Companies, Plaintiff engaged in illegal unlicensed money transmission throughout the period.

556.    Plaintiff is an ACH service provider that handles, among other things, third-party processing of employee payroll via direct deposit, processing and payment of payroll taxes, and related services on behalf of payroll service companies.

557.    Plaintiff advertises that it provides "all payment types," including ACH processing for large payrolls and same-day ACH credits that may be "wire funded" by prior deposit to Plaintiff by the customer.

558.    Money transmission is regulated by both federal and state authorities. At the federal level, money transmission activity is mainly regulated under the Bank Secrecy Act ("BSA") Financial Crimes Enforcement Network ("FinCEN").

559.    Money transmission services are defined as "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means."

560.    The BSA regulations require money transmitters to register with FinCEN, implement an anti-money-laundering program, and comply with certain recordkeeping and reporting requirements.

561.    State money transmission regulators directly supervise licensed money transmitters, including by administering periodic examinations to: (i) protect the interests of individual and commercial customers of money transmission businesses, (ii) provide for the safe and sound conduct of money transmission businesses, and (iii) maintain public confidence in financial institutions doing business in such states.

562.    From at least 2017 to 2019, Plaintiff accepted payroll and payroll tax funds from Mann Payroll Companies that were obtained from those entities' third-party employer-clients. Plaintiff transmitted these funds through financial institutions to Pioneer Bank before then transmitting those funds to third-party employees or third-party taxing authorities through financial institutions other than Pioneer Bank.  Consequently, Plaintiff acted as a "money transmitter" in the "money services businesses" as those terms are defined under U.S. Treasury Department regulation 31 CFR § 1010.100(ff) and under the controlling statutes and regulations in the states where Plaintiff operates, such as Texas.

563.    Despite operating as a money transmitter, Plaintiff failed to become licensed with any state in which it operated until June 2021, when the Texas Department of Banking found that "NatPay receives customer funds into NatPay's settlement account in exchange for NatPay's promise to transmit those funds to employees and other payees.  NatPay controls the monetary value received into the settlement account it owns."

564.    The Texas Department of Banking also found that Plaintiff had conducted unlicensed money transmission in Texas since 1991.

565.    By failing to obtain a state license, Plaintiff knowingly avoided any and all state-level regulatory oversight, including but not limited to periodic audits of its business by regulators and "permissible investments" requirements.

566.    By failing to register and obtain required licenses to conduct money transmission, Plaintiff could engage in unusual and high-risk business practices involving third-party payroll tax funds, as it did with the Mann Payroll Companies, without any oversight.

567.    Despite operating as a money transmitter since at least 1991, Plaintiff also failed to register – and to present day has not registered – with FinCEN.  Had it registered with FinCEN as required, Plaintiff would have needed to establish a BSA program, including transaction monitoring, Suspicious Activity Report (SAR) filings, independent testing of the BSA controls, and other regulatory requirements.

568.    On information and belief, Plaintiff failed to register with FinCEN and/or obtain a state license because it knew that doing so would hinder its ability to engage in unusual and high-risk business practices involving third-party payroll funds (as alleged in detail below) and therefore significantly reduce its revenue associated with such conduct.

569.    Plaintiff's continued failure to register with FinCEN reflects an ongoing threat that it will continue to facilitate money laundering and other types of illicit activity without any requirement to report such activity, nor a program, policies, and procedures to identify such activity in the first place.

570.    In light of the foregoing, Plaintiff's claims are barred in their entirety under the doctrine of unclean hands.

## <u>THIRD AFFIRMATIVE DEFENSE</u>

571.    Plaintiff's claims are barred by documentary evidence.

572.    Mann and the Mann Entities repeatedly agreed and represented in writing that the accounts described in the Amended Complaint were general corporate accounts, were not trust accounts, and were not being used to process third-party payroll or taxes.  Documentary evidence also establishes that no contractual, confidential, fiduciary, or other relationship existed between Plaintiff and the Answering Defendants.

### FOURTH AFFIRMATIVE DEFENSE

573.    Answering Defendants have at all times acted reasonably, in good faith, and have discharged all of their responsibilities and duties in accordance with applicable law.

574.    Answering Defendants further state that Pioneer Bank's September 4, 2019 actions to partially recover overdrafts from the accounts of entities owned or controlled by Michael Mann that resulted from Bank of America's return/call back of 36 checks totaling $15,588,000 that had been deposited into those accounts was completely within Pioneer Bank's rights.  Furthermore, Pioneer Bank's overdraft recovery was also completely within Pioneer Bank's rights under well-established setoff law.  The accounts in question were general accounts and not special purpose accounts; and even if, as Plaintiff alleges, those accounts were being used to process third-party payroll or taxes (in direct violation of Pioneer Bank policy), Pioneer Bank personnel had no knowledge of that fact at the time of the setoff to cover the overdrafts resulting from Bank of America's return/call back of the $15,588,000 in checks.

### FIFTH AFFIRMATIVE DEFENSE

575.    Plaintiff's claims are barred by Plaintiff's contributory negligence.

576.    Answering Defendants repeat and re-allege their prior allegations/assertions in support of their affirmative defenses contained in paragraphs 517 through 574 above, as though more fully set forth in this paragraph.

577.    Any alleged damages incurred by Plaintiff were caused entirely by the negligence and other tortious, criminal, or illegal conduct by Plaintiff, Mann, or the Mann Entities.

578.    Mann and the Mann Entities repeatedly agreed and represented in writing that the accounts described in the Complaint were general corporate accounts, were not trust accounts, and were not being used to process third-party payroll or taxes.

579.    The accounts described in the Complaint that Plaintiff alleges were being used to process third-party payroll or taxes were thus general corporate accounts and were not special purpose or trust accounts.

580.    Pioneer Bank policy prohibits accounts at Pioneer Bank from being used to process third-party payroll or taxes.

581.    If, as Plaintiff alleges, Mann and/or the Mann Entities were, unbeknownst to Answering Defendants and in violation of Pioneer Bank policy, using Plaintiff to transmit third-party payroll or tax funds into general corporate accounts at Pioneer Bank, Plaintiff had a duty to inform Answering Defendants of that fact but did not do so.

582.    Plaintiff's own negligence thus contributed to its alleged damages.

**SIXTH AFFIRMATIVE DEFENSE**

583.    Plaintiff's claims are barred by the doctrines of consent, estoppel, and/or waiver.

584.    Answering Defendants repeat and re-allege their prior allegations/assertions in support of their affirmative defenses contained in paragraphs 517 through 582 above, as though more fully set forth in this paragraph.

**SEVENTH AFFIRMATIVE DEFENSE**

585.    Plaintiff has failed to mitigate its damages, if any.

586.    Answering Defendants repeat and re-allege their prior allegations/assertions in support of their affirmative defenses contained in paragraphs 517 through 584 above, as though more fully set forth in this paragraph.

### EIGHTH AFFIRMATIVE DEFENSE

587.    Plaintiff's claims fail to join necessary parties.

588.    Answering Defendants repeat and re-allege their prior allegations/assertions in support of their affirmative defenses contained in paragraphs 517 through 586 above, as though more fully set forth in this paragraph.

### NINTH AFFIRMATIVE DEFENSE

589.    Plaintiff's claims are barred or limited for lack of standing.

590.    Answering Defendants repeat and re-allege their prior allegations/assertions in support of their affirmative defenses contained in paragraphs 517 through 588 above as though more fully set forth in this paragraph.

591.    Among other deficiencies, Plaintiff's alleged damages are improperly based on purported harms to third parties – viz., Cloud Payroll's employer-clients.

### TENTH AFFIRMATIVE DEFENSE

592.    In the event that Plaintiff obtains any recovery from Answering Defendants (which Answering Defendants reject), Answering Defendants are entitled to a set-off in the amount that Plaintiff (or the third parties Plaintiff is acting on behalf of) actually receives, or in the exercise of reasonable diligence could receive, from other or collateral sources of recovery – including, but not limited to, recovery under any civil, judicial, or administrative forfeiture process.

## ELEVENTH AFFIRMATIVE DEFENSE

593.    Certain of Plaintiff's claims are barred because there was no confidential or fiduciary relationship between Plaintiff and the Answering Defendants.

## TWELFTH AFFIRMATIVE DEFENSE

594.    The funds described in Plaintiff's Amended Complaint as being on deposit in an account or accounts at Pioneer Bank were not subject to or impressed with a trust under any provision of law, and Pioneer Bank did not hold those funds in trust.

## THIRTEENTH AFFIRMATIVE DEFENSE

595.    Plaintiff's declaratory judgment claim is impermissibly duplicative because it parallels Plaintiff's other claims and seeks a declaration of the same legal issues, rights, and/or obligations at issue in Plaintiff's other claims.

## FOURTEENTH AFFIRMATIVE DEFENSE

596.    Plaintiff's claims are barred because valid and enforceable contracts govern the subject matters of those claims, or Plaintiff's claims are inconsistent with or contradicted by the terms of those contracts.

## FIFTEENTH AFFIRMATIVE DEFENSE

597.    Plaintiff's claims are barred by the ACH Network operating rules, which Answering Defendants were at all times compliant with.

## SIXTEENTH AFFIRMATIVE DEFENSE

598.    Plaintiff's claims are barred by the *in pari delicto* doctrine.

599.    As set forth in paragraphs 520 to 570 above, which are incorporated herein by reference, Plaintiff was an active participant in a pervasive and orchestrated scheme of fraudulent

and criminal conduct undertaken by Michael Mann, Plaintiff itself, and other companies Mann owned and/or controlled, and which caused millions of dollars of damages to Pioneer Bank.

600.    Plaintiff's wrongdoing therefore bars it from recovering in any way from Answering Defendants under the doctrine of *in pari delicto*.

**WHEREFORE**, Answering Defendants respectfully request that this Court enter judgment in their favor as follows:

(a) dismissing the Amended Complaint against Answering Defendants in its entirety;

(b) denying each and every demand and prayer for relief in the Amended Complaint against Answering Defendants;

(c) awarding Answering Defendants their costs, disbursements, and attorneys' fees; and

(d) granting such other relief as this Court deems just and proper.

## PIONEER BANK'S COUNTERCLAIMS/CROSSCLAIMS

601.    Counterclaim/crossclaim-plaintiff Pioneer Bank, by its undersigned counsel, as and for its counterclaims and crossclaims against counterclaim-defendant National Payment Corporation ("NatPay") and crossclaim-defendants Michael T. Mann ("Mann"), MyPayrollHR.com, LLC, n/k/a "CloudPayroll LLC" ("MyPayrollHR"), and Cloud Payroll, LLC ("Cloud Payroll"), alleges as follows:

602.    Pioneer Bank's counterclaims/crossclaims arise out of the fraudulent, deceptive, and criminal schemes orchestrated by Mann and carried out by and through companies under his control including, among others, Southwestern Payroll, MyPayrollHR, and Cloud Payroll (collectively, the "Mann Entities"), and others acting at his direction, including NatPay.  Through this criminal scheme, the counterclaim/crossclaim-defendants defrauded Pioneer Bank (and others), as a direct result of which Pioneer Bank suffered damages in excess of $96 million. NatPay – the nation's largest processor of transactions through the Automated Clearing House ("ACH") system – was a critical and knowing participant in the criminal scheme.

603.    A central purpose and function of this criminal enterprise was to misappropriate funds collected from the employer-clients of payroll service companies Southwestern Payroll, MyPayrollHR and Cloud Payroll to benefit defendants, including by allowing defendants to unlawfully generate inappropriate and unlawful fees; by fraudulently inflating the revenues and receivables flowing through bank accounts at Pioneer Bank controlled by Southwestern Payroll, MyPayrollHR, Cloud Payroll, and their affiliates; and by diverting the funds for defendants' own unlawful purposes.  The misappropriation of employer-client funds was perpetuated and furthered by pervasive money-laundering activity, using bank accounts of the Mann Entities at Pioneer Bank, that was deliberately designed to prevent Pioneer Bank from detecting the unlawful activity.

NatPay knew at all times that Pioneer Bank was being used as an unwitting conduit for the unlawful money laundering activity in which NatPay was directly involved.

604.     Another primary purpose of the enterprise, which was mutually dependent upon the scheme to misappropriate employer-client funds, was to misappropriate and misuse funds obtained by the Mann Entities from other sources, including from Pioneer Bank.  As described herein, the Mann Entities obtained financing from Pioneer Bank and other sources by falsely inflating their revenues and accounts receivable, based in substantial part on the misappropriation of funds from employer-clients of the payroll companies acting at Mann's direction.  But to cover up and prevent detection of the scheme to misappropriate employer-client funds, the Mann Entities would use other funding sources to ensure that the Mann Payroll Companies continued to make payroll and payroll tax payments on behalf of the employer-clients.  The Mann Entities achieved this deception through money laundering transactions in their accounts at Pioneer Bank that were deliberately routed through NatPay to prevent Pioneer Bank from detecting their unlawful activity.  Given the highly unusual characteristics of these transactions, which NatPay acknowledges were not legitimate, NatPay knew these transactions involved funds from sources other than the employer-clients of Mann's payroll companies and, further, that the transactions were intended to deceive and injure Pioneer Bank.

605.     The seeds of the scheme were planted in late 2013, when Valuewise Corporation ("Valuewise"), an entity owned and controlled by Mann, acquired MyPayrollHR.  Valuewise sat at the top of the organizational structure of the Mann Entities.

606.     MyPayrollHR then opened a demand deposit general business checking account at Pioneer Bank, falsely representing to Pioneer that MyPayrollHR was not a third-party payment processor or a money transmitter in the money services business.  In truth and in fact,

MyPayrollHR was a payroll company that, among other services, collected, processed, remitted, transferred, and transmitted funds from their third-party employer-clients to third-party employees or third-party taxing authorities. Mann thereafter would form Cloud Payroll in 2016, which in turn would acquire controlling interests in other payroll companies, including Southwestern Payroll in April 2017. Like MyPayrollHR, Cloud Payroll and Southwestern Payroll each opened demand deposit general business checking accounts at Pioneer Bank and falsely represented to Pioneer Bank that they were not third-party payment processors or money transmitters in the money services business.

607.    Throughout this period, Mann used an account opened by MyPayrollHR at Pioneer Bank ending in 0212 ("Account 0212") as an "everything account," through which he would move funds collected from employer-clients of MyPayrollHR to accounts at Pioneer Bank held by Valuewise and other entities under Mann's ownership and control to inflate the balances in those accounts. Using the funds collected from employer-clients, Mann presented a false picture of Valuewise's financial health, primarily through fraudulently inflated accounts receivable figures, to Pioneer Bank and others. Valuewise used these fraudulently inflated accounts receivable to obtain financing from various sources, including Pioneer Bank. As of June 2017, Valuewise had a $22 million line of credit with Pioneer Bank.

608.    NatPay's agreement to join the criminal enterprise in the fall of 2017 served as rocket fuel for the fraudulent scheme. In or around September 2017, NatPay agreed with Mann to facilitate transactions on behalf of the criminal enterprise knowing the funds in those transactions would be the proceeds of funds misappropriated from employer-clients of SWP, MyPayrollHR, and Cloud Payroll, among others. NatPay conspired with defendants to create, and did create, a convoluted payment flow structure the sole purpose of which was to conceal or disguise the true

nature of the funds misappropriated from the employer-clients. NatPay also engaged in transactions on behalf of the Mann Entities knowing the funds in those transactions were the proceeds of funds misappropriated from the employer-clients, as well as the proceeds of unlawful activity, namely, funds obtained through a revolving line of credit that ValueWise and certain of its subsidiaries and affiliates obtained through Pioneer Bank based on intentionally false borrowing base certificates.

609.    In the two years of NatPay's participation in the criminal scheme, Valuewise's line of credit with Pioneer Bank nearly doubled, standing at $42 million as of August 2019. In agreeing to join the criminal scheme, NatPay signed contracts with Michael Mann under which it agreed to process ACH transactions on behalf of (among others) MyPayrollHR, Cloud Payroll, and Southwestern Payroll – *all through Account 0212*. At the time that NatPay signed those contracts, NatPay knew that these payroll companies all had a banking relationship with Pioneer Bank.

610.    Valuewise's banking relationship with Pioneer Bank, including the existence of several different accounts that Valuewise held at Pioneer Bank, also was disclosed to NatPay at the time that NatPay agreed to join the criminal scheme. Among the bank accounts specifically disclosed to NatPay was the account through which Valuewise's draws on its line of credit with Pioneer Bank were funded.

611.    As detailed below, NatPay knew at all relevant times that Pioneer Bank was a target and unwitting tool of this criminal scheme. Using its expertise as the nation's largest processor of ACH transactions, NatPay facilitated thousands of facially illegitimate transactions, totaling hundreds of millions of dollars, through bank accounts at Pioneer Bank that were controlled by various entities (including, among others, Southwestern Payroll, MyPayrollHR, and Cloud Payroll) operating at Mann's direction. NatPay knew that these transactions served no legitimate

business purpose, and the transactions were deliberately structured by NatPay and its co-conspirators to conceal, and prevent Pioneer Bank from detecting, the criminal enterprise's unlawful conduct.

612.    Specifically, these illegitimate transactions were structured as follows:  (i) Mann would instruct NatPay to debit funds from the accounts of various Mann Entities at Pioneer Bank in dollar amounts in the high six figures, typically totaling millions of dollars on a given day; (ii) NatPay would route the funds to its custodial account at First Premier Bank; and (iii) based on instructions from Mann, NatPay would credit Account 0212 in amounts matching the debits from the Mann Entities' accounts.  In other words, NatPay was simply "roundtripping" millions of dollars of funds, on almost a daily basis, between different accounts at Pioneer Bank held by the Mann Entities.

613.    NatPay since has ***admitted*** that these transactions were entirely "bogus" and illegitimate.  These transactions were part and parcel of the criminal scheme, as they enabled the Mann Payroll Companies to continue misappropriation of their employer-clients' funds by providing funding for legitimate payroll and payroll tax transaction activity.  These transactions also helped to conceal the criminal enterprises' fraudulent activity from Pioneer Bank because, to Pioneer Bank, they would appear as part of the normal ACH activity involving NatPay's custodial account at First Premier Bank.

614.    With NatPay's substantial assistance and participation, Pioneer Bank was both prevented from uncovering this criminal conduct and deceived into believing that the Mann Entities had significantly greater revenues and receivables than they did.  The Mann Entities then used the perceived financial strength resulting from those illusory revenues and receivables to procure certain check deposit rights at Pioneer Bank that Pioneer Bank only grants to its most

financially secure customers, and to obtain financing to which the Mann Entities otherwise would not have been entitled.

615.    NatPay engaged in these transactions to facilitate Mann's wire fraud scheme and conceal the source of the unlawful proceeds, and NatPay did in fact hide, launder, and otherwise wrongfully retain funds misappropriated from the employer-clients of SWP, MyPayrollHR, and Cloud Payroll.  NatPay also did not register as a money service business or obtain a money transmission license in any state in which it operated to protect Mann and his companies from any regulation-required audits or reports.  NatPay knew that Pioneer Bank was an intended target of this criminal scheme and knew that the scheme would cause, and did cause, severe harm to Pioneer Bank.

616.    Due in substantial part to NatPay's involvement, the Mann Entities were able to abuse Pioneer Bank's check deposit system, which ultimately resulted in accounts at Pioneer Bank held by those companies being overdrawn by more than $18 million.  Those misrepresentations also directly and proximately caused Pioneer Bank's losses of upwards of $65 million as a result of Pioneer Bank's line of credit, as well as an additional $12.4 million in damages in the form of unnecessary professional fees and yearly compounding losses of return on equity.  In total, therefore, Pioneer Bank has suffered nearly $100 million in damages as a result of the criminal scheme orchestrated and conducted by Mann, Southwestern Payroll, MyPayrollHR, Cloud Payroll, NatPay, and various other individuals and entities that participated in and formed an integral part of the criminal enterprise.

617.    To recover the substantial losses that it has suffered as a direct result of this criminal scheme, Pioneer Bank asserts counterclaims/crossclaims against NatPay, Mann, MyPayrollHR,

and Cloud Payroll for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

## The Parties

618.    Counterclaim/crossclaim-plaintiff Pioneer Bank is a federally insured stock bank organized and existing under the laws of the State of New York.  Pioneer Bank's headquarters is located at 652 Albany Shaker Road, Albany, New York 12211.

619.    Counterclaim-defendant NatPay is a Florida corporation with a principal place of business located at 3415 W. Cypress Street, Tampa, Florida 33607-5007.  NatPay is a third-party ACH service provider and provides ACH transfer services to clients, including companies which calculate and prepare payrolls and payroll-related taxes.  NatPay is by far the largest ACH processor in the United States, and over 95% of its clientele are payroll service companies.

620.    Crossclaim-defendant Michael Mann was, at all relevant times, a citizen of the State of New York residing in Edinburgh, New York.  Upon information and belief, Mann is currently incarcerated at FCI Fort Dix, 5756 Hartford & Pointville Road, Joint Base MDL, New Jersey 08640.

621.    Crossclaim-defendant MyPayrollHR was, at all relevant times, a limited liability company existing under the laws of the Commonwealth of Massachusetts, with its principal place of business located at 855 Route 146, Suite 220/240, Clifton Park, New York 12065.

622.    Crossclaim-defendant Cloud Payroll was, at all relevant times, a limited liability company existing under the laws of the State of Delaware, with its principal place of business located at 855 Route 146, Suite 220/240, Clifton Park, New York 12065.

623.    At all times relevant to Pioneer Bank's counterclaims/crossclaims, MyPayrollHR and Cloud Payroll were wholly owned subsidiaries of ValueWise (also d/b/a "Apogee," "Optix Consulting," and "Primacy Search Group"), of which Mann was the 100% owner.  Mann also held,

through Cloud Payroll, 51% interests in payroll service companies Southwestern Payroll Service, Inc. ("Southwestern Payroll" or "SWP") and Pro/Data Payroll Services Inc. ("Pro/Data"). Cloud Payroll, MyPayrollHR, SWP, and Pro/Data collectively are referred to as the "Mann Payroll Companies."

624.    Mann held himself out as the president of SWP, Cloud Payroll, MyPayrollHR, and Pro/Data at all times relevant to Pioneer Bank's counterclaims/crossclaims. Mann also controlled bank accounts that he opened at Pioneer Bank in the name of SWP, Cloud Payroll, and MyPayrollHR.

625.    Through ValueWise, Mann also controlled (directly or indirectly) at least a majority interest in several other companies purportedly engaged in a variety of businesses, including consulting and human resources, executive search and recruiting, sports marketing, information technology, physical therapy, and accounting and business advice (collectively, the "Other Mann Entities"). The primary business and purported source of revenue of ValueWise and the Other Mann Entities, however, was consulting and human resources.

## Jurisdiction and Venue

626.    This Court has jurisdiction over Pioneer Bank's counterclaims/crossclaims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 because the RICO counterclaim/crossclaim arises under the laws of the United States, and the Court has jurisdiction over Pioneer Bank's fraud counterclaim/crossclaim pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

627.    NatPay has consented to this Court's personal jurisdiction over NatPay by bringing the instant action in this Court.

628.    Venue is proper in this district under and pursuant to 28 U.S.C. § 1391(a) and 18 U.S.C. § 1965 in that numerous acts, practices, and events giving rise to Pioneer Bank's counterclaims/crossclaims occurred in this district, and Mann, MyPayrollHR, and Cloud Payroll

either reside in and/or maintain their principal places of business in this district, and NatPay has consented to venue in this district by filing its Amended Complaint.

## Statement of Facts

**A.    Background on ValueWise Corporation, Michael T. Mann, and the Banking Relationship with Pioneer Bank**

> **1.    ValueWise's Founding and the Origins of Its Loan and Deposit Relationships with Pioneer Bank**

629.    ValueWise was established in 2005 by Mann, its founder and sole owner. ValueWise's principal place of business was in Clifton Park, New York. Initially, ValueWise and its subsidiaries were primarily engaged in the consulting and human resource businesses.

630.    In 2009, ValueWise's then-attorney, Vincent Valenza of the law firm McNamee, Lochner, Titus & Williams PC, referred ValueWise to David Blessing, a commercial loan officer at Pioneer Bank. At the time, ValueWise was seeking a working capital line of credit in order to reduce the financing fees it had been incurring through its existing receivables-factoring financing arrangement and approached Pioneer Bank for that purpose.

631.    On or about November 2, 2009, Mann opened two demand deposit general business checking accounts in the names of ValueWise and an affiliate owned and controlled by Mann, Ross Personnel Consultants Inc. ("RPC"), which operated as a division of ValueWise. At the time, ValueWise already had an existing banking relationship with Bank of America, N.A., among others.

632.    On the same date, Pioneer Bank extended a $2 million working capital line of credit facility to ValueWise and RPC. The line of credit was secured by a blanket lien on ValueWise's assets, the vast majority of which were purported accounts receivable. Pioneer Bank identified the "repayment source" for the line of credit as conversion of ValueWise's receivables into cash.

633.    Because the line of credit primarily was secured by ValueWise's receivables, the continued availability of the line was conditioned on Pioneer Bank's annual receipt of "review quality financial statements" for ValueWise and its subsidiaries and affiliates within 120 days of calendar year-end.

## 2.    ValueWise's Purported Significant Growth Leads to Expansion of the Banking Relationship with Pioneer Bank

634.    In 2010, Mann represented to Pioneer Bank that ValueWise had further diversified its corporate holdings to include a physical therapy division under the name Viverant, LLC.

635.    In July 2010, Pioneer Bank approved replacing ValueWise and RPC's prior line of credit with a new working capital line of credit with a maximum principal amount of $3 million. The increased line of credit was once again secured by a blanket lien on ValueWise's assets, which again were primarily comprised of purported accounts receivable.

636.    Because Pioneer Bank policy required receipt of financial statements audited by independent certified public accountants for any loans greater than $2.5 million, this new line of credit was conditioned on Pioneer Bank's receipt of audited annual financial statements for ValueWise within 120 days of calendar year end.  The requirement for audited financial statements represented an upgrade from the review quality financial statements required for the $2 million line.

637.    Pioneer Bank required ValueWise to have an independent certified public accountant audit their annual financial statements to, among other things, verify the revenue and accounts receivable that ValueWise reported.  ValueWise engaged Teal, Becker & Chiaramonte, CPAs, P.C. ("TBC"), a then-prominent accounting firm, for that purpose.  In verifying ValueWise's reported revenue and accounts receivable, TBC was required to, among other things, independently obtain confirmation that the reported figures were true and accurate, including

through third-party confirmation, the use of a specialist, analytical procedures, examination of documents from independent sources, or inquiries of others within or outside the entity.

638.    In accordance with Pioneer Bank's requirement to receive audited financial statements for ValueWise as a condition to Pioneer Bank's extension of the line of credit, on March 15, 2011, TBC issued unqualified audited consolidated financial statements for ValueWise and its affiliates showing $11.39 million in revenue.  In May 2011, in reliance on these unqualified audited financial statements – in particular TBC's confirmation of ValueWise's reported revenue and accounts receivable – Pioneer Bank approved renewal of the $3 Million line of credit in May 2011.

639.    On April 2, 2012, TBC issued unqualified, audited consolidated financial statements for ValueWise and its affiliates for calendar year 2011 showing $22.2 million in revenue – an increase of 95% year-over-year.  On April 17, 2012, in reliance on these unqualified audited financial statements – in particular TBC's confirmation of the reported revenue and accounts receivable of ValueWise and its affiliates – Pioneer Bank approved replacement of the $3 Million LOC with a new $5 million working capital line of credit.

640.    On May 15, 2013, TBC issued unqualified, audited financial statements for ValueWise and its affiliates for calendar years 2011 and 2012 showing $26.4 million in revenue in 2012, or a 19% year-over-year increase.  On September 6, 2013, in reliance on these unqualified audited financial statements – in particular TBC's confirmation of the reported revenue and accounts receivable of ValueWise and its affiliates – Pioneer Bank approved replacement of the prior line of credit with a new working capital line of credit with a maximum principal amount of $6 million on or about September 6, 2013.

3.     **Mann Acquires Payroll Service Companies and Various Other Businesses, and Uses the Purported Growth of ValueWise's Revenue to Obtain Further Extensions of Credit and Expand His Deposit Relationship with Pioneer Bank**

641.     In or about November 2013, ValueWise acquired MyPayrollHR, the first of several payroll companies in which ValueWise would obtain a controlling stake.  On November 26, 2013, Mann opened two demand deposit general business checking accounts at Pioneer Bank on MyPayrollHR's behalf with account numbers ending in 0204 ("Account 0204") and 0212 (the "Account 0212").  On neither of the account agreements signed by Mann did Mann disclose that he would be processing third-party payroll or payroll taxes through the accounts.  In fact, in the account opening documents, Mann represented, among other things, that MyPayrollHR was not a third-party payment processor.  In or about December 2013, Mann represented to Pioneer Bank that ValueWise had acquired MyPayrollHR.

642.     In or about January 2014, Mann represented to Pioneer Bank personnel that ValueWise had acquired a 75% ownership interest in Heutmaker Business Advisors, LLC, which purportedly served as the finance/accounting consulting arm of ValueWise.

643.     On May 9, 2014, TBC issued unqualified, audited consolidated financial statements for ValueWise and its affiliates for calendar years 2012 and 2013 showing $31.1 million in revenue in 2013 (a 17.9% year-over-year increase).  On June 6, 2014, in reliance on these unqualified audited financial statements, Pioneer Bank approved the renewal of the $6 million working capital line of credit.  Several ValueWise subsidiaries, including MyPayrollHR, were added as borrowers on the line of credit.

644.     On April 29, 2015, TBC issued unqualified, audited consolidated financial statements for ValueWise and its affiliates for calendar years 2013 and 2014 showing $39.1 million in revenue in 2014 (a 25.6% year-over-year increase).  On May 19, 2015, in reliance on these unqualified audited financial statements, Pioneer Bank approved the replacement of the prior line

of credit with a new working capital line of credit with a maximum principal amount of $15 million.

645.    On April 28, 2016, TBC issued unqualified, audited consolidated financial statements for ValueWise and its affiliates for calendar years 2014 and 2015 showing $58.2 million in revenue in 2015 (a 48.9% year-over-year increase).  On June 10, 2016, in reliance on these unqualified audited financial statements, Pioneer Bank approved the replacement of the prior line of credit with a new working capital line of credit with a maximum principal amount of $15 million.

646.    Upon information and belief, on or about December 1, 2016, Mann formed Cloud Payroll as a limited liability company organized under the laws of Delaware.  Cloud Payroll was 100%-owned by ValueWise.  At or around the time of its formation, Cloud Payroll acquired a 51% interest in Pro/Data.

647.    On April 4, 2017, Mann opened a demand deposit general business checking account at Pioneer Bank on behalf of Cloud Payroll, with an account number ending in 1640 ("Account 1640").  On the account agreement that he signed, Mann did not disclose that he would be processing third-party payroll or payroll taxes through the accounts.  To the contrary, Mann expressly represented, among other things, that Cloud Payroll was not a third-party payment processor.  Had Mann informed Pioneer Bank that his business was a third-party payment processor, as stated on the account opening documents, Pioneer Bank would not have opened these accounts.

648.    Shortly thereafter, on April 17, 2017, Cloud Payroll entered into a Stock Purchase Agreement with Southwestern Payroll under which Cloud Payroll acquired 51% of the outstanding shares of the capital stock of Southwestern Payroll.  Cloud Payroll agreed to pay more than $4.3

million in consideration for the shares, broken down as follows: (a) repayment of more than $1.3 million in debt then owed by Southwestern Payroll to SPS Holdings, LLC; (b) payment of $90,000 cash to Southwestern Payroll's former owner, Ray Fowler, and delivery of a promissory note from Cloud Payroll of $1 million to Fowler; and (c) payment of approximately $30,000 in cash to Southwestern Payroll president and then sole owner Darin Alred, as well as a delivery of a promissory note from Cloud Payroll to Alred in the face amount of nearly $1.9 million.

649.    Then, on April 28, 2017, TBC issued unqualified, audited consolidated financial statements for ValueWise and its affiliates for calendar years 2015 and 2016 showing $81.1 million in revenue in 2016 (a 31.8% year-over-year increase).  On June 20, 2017, in reliance on these unqualified audited financial statements, Pioneer Bank approved the replacement of the prior line of credit with a new working capital line of credit with a maximum principal amount of $22 million.

650.    Following the replacement of the line of credit, Mann formally changed the name of MyPayrollHR to "CloudPayroll LLC" on July 11, 2017.  Mann did not immediately disclose this name change to Pioneer Bank and continued to use Account 0204 and Account 0212 in the name of MyPayrollHR.

651.    On October 23, 2017, Mann opened three new demand deposit general business checking accounts at Pioneer Bank on behalf of Southwestern Payroll, Pro/Data, and MyPayrollHR, respectively.

652.    On May 4, 2018, TBC issued unqualified, audited consolidated financial statements for ValueWise and its affiliates for calendar years 2016 and 2017 showing $106.9 million in revenue in 2017 (a 31.8% year-over-year increase).  On June 1, 2018, in reliance on these unqualified audited financial statements, Pioneer Bank approved the replacement of the prior line

of credit with a new working capital line of credit with a maximum principal amount of $32 million.  Cloud Payroll was included as a borrower on the line of credit for the first time.

653.    Mann thereafter opened four new demand deposit general business checking accounts in the name of Cloud Payroll at Pioneer Bank in early 2019.  Most relevant here for the reasons detailed below, Mann opened an account with the account number ending 2440 ("Account 2440") on February 26, 2019.  On none of the account agreements signed by Mann did Mann disclose that he would be processing through any of the accounts third-party payroll or payroll taxes on behalf of the employer-clients of the Mann Payroll Companies.  To the contrary, Mann expressly represented that Cloud Payroll was not a third-party payment processor.  Had Mann informed Pioneer Bank that his business was a third-party payment processor, as stated on the account opening documents, Pioneer Bank would not have opened these accounts.

654.    Finally, on May 6, 2019, TBC issued unqualified, audited consolidated financial statements for ValueWise and its affiliates for calendar years 2017 and 2018 showing $168.9 million in revenue in 2018 (a 58% year-over-year increase).  The audited financial statements showed that ValueWise and its affiliates had $52.2 million in receivables at the time.  On August 12, 2019, in reliance on these unqualified audited financial statements, Pioneer Bank approved the replacement of the prior line of credit with a new working capital line of credit with a maximum principal amount of $42 million.

655.    On the deposit side of the relationship, the perceived financial strength of ValueWise and its affiliates – affirmed by years of unqualified audited financial statements – gave Pioneer Bank to conclude that it could grant remote deposit capture ("RDC") privileges to the Mann Entities.

656.    At all relevant times, RDC was a deposit transaction delivery system that allows a small number of commercial customers the ability to deposit checks into Pioneer Bank accounts from a remote location (such as an office) without having to physically deliver the checks to Pioneer Bank. If a customer is approved for RDC, Pioneer Bank installs a bank-provided scanner and software at the customer's remote location. Pioneer Bank's written RDC Policy required that all potential RDC customers be assessed for eligibility, including a review of the customer's deposit history and overall relationship with Pioneer Bank.

657.    As of August and September 2019, customers approved and utilizing RDC at Pioneer Bank received same day availability of deposited funds – as opposed to the ordinary one-day hold/next day availability of the deposited funds.

658.    Pioneer Bank eventually granted RDC privileges to Southwestern Payroll, Cloud Payroll, and other Mann Entities based in significant part on the perceived financial strength of the Mann Entities. That perceived financial strength was later shown to be illusory, however. In reality, as Pioneer Bank later learned in approximately late September 2019, the Mann Entities had artificially inflated accounts that resulted from Mann's scheme to use funds collected from Southwestern Payroll's, MyPayrollHR's, and Cloud Payroll's third-party employer-customers to make it appear that the Mann Entities had far greater revenues and receivables than they actually had.

659.    In short, between 2010 and 2018, ValueWise and its affiliates reported significant growth in its revenue and receivables, which TBC purported to confirm in the unqualified audited financial statements that it issued. That perceived growth, in turn, enabled ValueWise to expand its loan relationship with Pioneer Bank from an initial $2 million line of credit in November 2009 to a $42 million line of credit by August 2019. The Mann Entities also expanded their deposit

relationship with Pioneer Bank considerably, opening more than 30 demand deposit general business checking accounts in the names of over a dozen different entities, and ultimately obtaining RDC privileges.

660.    The charts below show the substantial increases in reported revenue and accounts receivable for ValueWise between 2010 and 2018:

| Year | Revenue | Percentage Increase Over Prior Year |
|------|---------|-------------------------------------|
| 2010 | $   11,387,299 | - |
| 2011 | $   22,191,160 | 95% |
| 2012 | $   26,409,650 | 19% |
| 2013 | $   31,128,077 | 18% |
| 2014 | $   39,101,212 | 26% |
| 2015 | $   58,226,989 | 49% |
| 2016 | $   81,063,858 | 39% |
| 2017 | $ 106,902,131 | 32% |
| 2018 | $ 168,949,153 | 58% |

| Year | Accounts Receivable | Percentage Increase Over Prior Year |
|------|---------------------|-------------------------------------|
| 2010 | $   4,082,195 | - |
| 2011 | $   7,919,828 | 94% |
| 2012 | $   9,887,406 | 25% |
| 2013 | $ 12,631,855 | 28% |
| 2014 | $ 17,038,959 | 35% |
| 2015 | $ 26,837,108 | 58% |
| 2016 | $ 29,004,287 | 8% |
| 2017 | $ 38,555,368 | 33% |
| 2018 | $ 52,214,814 | 35% |

**B.    Unbeknownst to Pioneer Bank, the Mann Entities Use Their Expanding Loan and Deposit Relationships with Pioneer Bank as a Tool in the Development of a Sprawling Criminal Enterprise Involving the Mann Payroll Companies and NatPay**

661.    ValueWise's acquisition of MyPayrollHR in November 2013, and the opening of Account 0212 on behalf of MyPayrollHR the same month, coincided with the growth and perpetuation of a sprawling criminal enterprise engaged in, among other things, wire fraud, bank

fraud, money laundering, and illegal unlicensed money transmission that would operate undetected – by Pioneer Bank, Bank of America, and others – for nearly six years.

662.    The growth of the enterprise continued in late 2016 and early 2017, with the formation of Cloud Payroll and Cloud Payroll's acquisition of majority interests in Pro/Data and Southwestern Payroll.  These acquisitions provided access to hundreds of millions of dollars in funds obtained by the Mann Payroll Companies from their employer-clients, which were then used by the criminal enterprise both for legitimate business purposes and to further the enterprise's illicit aims.

663.    NatPay would join the criminal enterprise and exponentially accelerate its growth beginning in the fall of 2017 until its collapse two years later.

### 1.    The Mann Payroll Companies' Misrepresentations to Pioneer Bank Concerning the Nature of Their Businesses

664.    At all relevant times, Cloud Payroll, Southwestern Payroll, MyPayrollHR, and Pro/Data accepted funds earmarked for the payment of payroll and payroll taxes from their third-party employer-clients and transmitted those funds through financial institutions to third-party employees or third-party taxing authorities.  Consequently, MyPayrollHR, Cloud Payroll, and Southwestern Payroll acted as "money transmitter[s]" in the "money services businesses" as those terms are defined in the controlling statutes and regulations in the states in which they operate.

### a.    Mann and MyPayrollHR's False Representations to Pioneer Bank

665.    In the process of opening Account 0212 on behalf of MyPayrollHR on November 26, 2013, Mann completed and signed an "Account Agreement" form provided by Pioneer Bank, purportedly as president of MyPayrollHR.  In signing the Account Agreement, Mann certified the accuracy of the information he provided to Pioneer Bank concerning MyPayrollHR.

666.    In the "Ownership of Account – Business Purpose" section of the Account Agreement, Mann did not check the boxes indicating that the MyPayrollHR account at Pioneer Bank would be used as any type of trust account.

667.    Also on November 26, 2013, in the process of opening the MyPayrollHR account, Mann completed and signed a form provided by Pioneer Bank titled "'For Profit' Commercial Due Diligence (CDD) Information Sheet" ("CDD Form").  Mann completed and signed the CDD Form on November 26, 2013, in his capacity as "President" of MyPayrollHR.

668.    Section 5 of the CDD Form asked: "Is your business a non-bank or third-party payment processor?"  Below that question, the CDD Form explained, among other things, that a non-bank or third-party payment processor "is a business that provides payment processing services to merchants and other business entities" (the CDD Form also provided settling of debit and credit card transactions as an example of third-party payment processing services).  Pioneer Bank has a strict policy against allowing its accounts to be used for processing payroll or other third-party payment processing, and Section 5 thus explained that "Pioneer Bank is not equipped at this time to maintain accounts for non-bank or third-party payment processors."

669.    Mann answered "No" to the question in Section 5 of the CDD Form, thereby representing to Pioneer Bank that MyPayrollHR was not a third-party payment processor.  This statement was knowingly false by Mann and MyPayrollHR.

670.    In fact, on November 26, 2013, and unbeknownst to Pioneer Bank at the time, MyPayrollHR was a third-party payment processor because it was collecting, processing, remitting, transferring, and transmitting payroll and tax payments on behalf of third-party employer-customers.

671.    Section 9 of the CDD Form asked: "Is this business [*i.e.*, MyPayrollHR] a 'Money Services Business' as defined in 31 CFR § 103.11(uu)?"    (Subsequently re-codified at 31 CFR § 1010.100(ff).)  Immediately under that question, the CDD Form stated that a "Money Services Business" is defined to include, among other things, "a money transmitter, which engages as a business in accepting currency or funds and transmits such currency or funds by any means through a financial agency or institution."  In addition, the referenced federal regulation defines a "Money Services Business" to include, among other things, a "money transmitter," which is in turn defined as:

> (A)    A person that provides money transmission services.  The term "money transmission services" means the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means.  "Any means" includes, but is not limited to, through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or an informal value transfer system; or

> (B)    Any other person engaged in the transfer of funds.

672.    Mann answered "No" to the question in Section 9 of the CDD Form, thereby representing to Pioneer Bank that MyPayrollHR was neither in the "money services business" nor a "money transmitter" as those terms are defined under 31 CFR § 1010.100(ff).  This statement was also knowingly false by Mann and MyPayrollHR.

673.    In fact, on November 26, 2013, MyPayrollHR was a payroll processing company that collected, processed, remitted, transferred, and transmitted employee payroll and withheld tax funds on behalf of its employer-customers.  MyPayrollHR was thus accepting funds from persons (its employer-customers) and transmitting it to other persons (employees or taxing authorities).

Accordingly, on November 26, 2013, MyPayrollHR was a "money transmitter" in the "money services business" as those terms are defined under 31 CFR § 1010.100(ff).

674.    In the process of opening additional accounts for MyPayrollHR, Mann signed and completed additional Account Agreements and CDD Forms on September 16, 2014, and October 23, 2017.  On both of those occasions, Mann, still in his capacity as president of MyPayrollHR, made identical representations to Pioneer Bank that MyPayrollHR was neither a third-party payment processor, in the "money transmitter business," nor a "money transmitter." Those statements were knowingly false by Mann and MyPayrollHR.

675.    In fact, on both September 16, 2014, and October 23, 2017, MyPayrollHR continued to operate as a third-party payment processor and a "money transmitter" in the "money services business" by, among other things, collecting funds from its third-party employer-customers and transmitting those funds to third-party employees and/or third-party taxing authorities.    MyPayrollHR also failed to disclose that it had changed its name to "CloudPayroll LLC" – confusingly similar to Cloud Payroll's name, which had opened an account in April 2017 – over three months prior.

676.    At 4:33 p.m. on October 23, 2017, Mann sent the Account Agreement and CDD Form containing the false representation that MyPayrollHR was neither a third-party payment processor nor a money transmitter in the money services business to Pioneer Bank via email.  Mann used the email account michael_mann@valuewisecorp.com to send the Account Agreement and CDD Form to Trudy Seeber, Pioneer Bank's business development officer, at seebert@pioneerbanking.com, and Deborah Salsburg, Pioneer Bank's sales leader and assistant branch manager, at salsburgd@pioneerbanking.com, which are Ms. Seeber's and Ms. Salsburg's business email accounts at Pioneer Bank.

### b.    Mann and Cloud Payroll's Misrepresentations to Pioneer Bank

677.    In the process of opening Account 1640 on behalf of Cloud Payroll on April 4, 2017, Mann completed and signed an "Account Agreement" just as he had previously done for MyPayrollHR (as described above in paragraphs 610 to 615). Mann purported to do so in his capacity as "President" of Cloud Payroll.

678.    In signing the Account Agreement, Mann certified the accuracy of the information he provided to Pioneer Bank concerning Cloud Payroll in the process of opening the account.

679.    In the "Ownership of Account – Business Purpose" section of the Account Agreement, Mann did not check the boxes indicating that the Cloud Payroll account at Pioneer Bank would be used as any type of trust account.

680.    Also on April 4, 2017, in the process of opening the Cloud Payroll account, Mann completed and signed the CDD Form just as he had previously done for MyPayrollHR (as described above in paragraphs 616 to 621).

681.    Mann completed and signed the CDD Form on April 4, 2017, in his capacity as "Member" of Cloud Payroll.

682.    In completing Section 5 of the CDD Form, Mann answered "No" to the question "Is your business a non-bank or third-party payment processor?" – thereby representing to Pioneer Bank that Cloud Payroll was not a third-party payment processor. This statement was knowingly false by Mann and Cloud Payroll.

683.    In fact, on April 4, 2017, Cloud Payroll was a third-party payment processor because it was collecting, processing, remitting, transferring, and transmitting payroll and tax payments on behalf of third-party employer-customers.

684.    In completing Section 9 of the CDD Form, Mann answered "No" to the question "Is this business [*i.e.*, Cloud Payroll] a 'Money Services Business' as defined in 31 CFR

§ 103.11(ff)?" – thereby representing to Pioneer Bank that Cloud Payroll was neither in the "money services business" nor a "money transmitter" as those terms are defined under 31 CFR § 1010.100(ff).  This statement was knowingly false by Mann and Cloud Payroll.

685.    In fact, on April 4, 2017, Cloud Payroll was a payroll processing company that collected, processed, remitted, transferred, and transmitted employee payroll and withheld tax funds on behalf of its employer-customers.  Thus, on April 4, 2017, Cloud Payroll was a "money transmitter" in the "money services business" as those terms are defined under 31 CFR § 1010.100(ff).

686.    At 4:33 p.m. on April 4, 2017, Mann sent the Account Agreement and CDD Form containing the false representation that Cloud Payroll was neither a third-party payment processor nor a money transmitter in the money services business to Pioneer Bank via email.  Mann used the email account michael_mann@valuewisecorp.com to send the Account Agreement and CDD Form to Trudy Seeber, Pioneer Bank's business development officer, at seebert@pioneerbanking.com, which is Ms. Seeber's business email account at Pioneer Bank.

687.    In the process of opening Account 2440 for Cloud Payroll, Mann signed and completed an Account Agreement and CDD Form on February 26, 2019.  On that occasion, Mann, still in his capacity as a member of Cloud Payroll, made identical representations to Pioneer Bank that Cloud Payroll was neither a third-party payment processor, in the "money transmitter business," nor a "money transmitter."  Those statements were knowingly false by Mann and Cloud Payroll.

688.    In fact, on February 26, 2019, Cloud Payroll continued to operate as a third-party payment processor and a "money transmitter" in the "money services business" by, among other

things, collecting funds from its third-party employer-customers and transmitting those funds to third-party employees and/or third-party taxing authorities.

689.    At 10:36 a.m. on February 26, 2019, Mann sent the Account Agreement and CDD Form containing the false representation that Cloud Payroll was neither a third-party payment processor nor a money transmitter in the money services business to Pioneer Bank via email.  Mann used the email account michael_mann@valuewisecorp.com to send the Account Agreement and CDD Form to Trudy Seeber, Pioneer Bank's business development officer, at seebert@pioneerbanking.com, and Deborah Salsburg, Pioneer Bank's sales leader and assistant branch manager, at salsburgd@pioneerbanking.com, which are Ms. Seeber's and Ms. Salsburg's business email accounts at Pioneer Bank.

c.    **Mann and SWP's Misrepresentations to Pioneer Bank**

690.    In the process of opening an account at Pioneer Bank on behalf of SWP with an account number ending in 1996 on October 23, 2017 ("Account 1996"), Mann completed and signed an "Account Agreement" just as he had previously done for MyPayrollHR and Cloud Payroll.  Mann purported to do so in his capacity as "President" of SWP.

691.    In signing the Account Agreement, Mann certified the accuracy of the information he provided to Pioneer Bank concerning Southwestern Payroll in the process of opening the account.

692.    In the "Ownership of Account – Business Purpose" section of the Account Agreement, Mann did not check the boxes indicating that the Southwestern Payroll account at Pioneer Bank would be used as any type of trust account.

693.    Also on October 23, 2017, in the process of opening the Southwestern Payroll account, Mann completed and signed the CDD Form just as he had previously done for MyPayrollHR and Cloud Payroll (as described above in paragraphs 610 to 621 and 622 to 634).

694.    Mann completed and signed the CDD Form on October 23, 2017, in his capacity as "President" of Southwestern Payroll.

695.    In completing Section 5 of the CDD Form, Mann answered "No" to the question "Is your business a non-bank or third-party payment processor?" – thereby representing to Pioneer Bank that Southwestern Payroll was not a third-party payment processor. This statement was knowingly false by Mann and Southwestern Payroll.

696.    In fact, on October 23, 2017, Southwestern Payroll was a third-party payment processor because it was collecting, processing, remitting, transferring, and transmitting payroll and tax payments on behalf of third-party employer-customers.

697.    In completing Section 9 of the CDD Form, Mann answered "No" to the question "Is this business [*i.e.*, Southwestern Payroll] a 'Money Services Business' as defined in 31 CFR § 103.11(ff)?" – thereby representing to Pioneer Bank that Southwestern Payroll was neither in the "money services business" nor a "money transmitter" as those terms are defined under 31 CFR § 1010.100(ff). This statement was knowingly false by Mann and Southwestern Payroll.

698.    In fact, on October 23, 2017, Southwestern Payroll was a payroll processing company that collected, processed, remitted, transferred, and transmitted employee payroll and withheld tax funds on behalf of its employer-customers. Thus, on October 23, 2017, Southwestern Payroll was a third-party payment processor and a "money transmitter" in the "money services business."

699.    At 11:49 a.m. on October 23, 2017, Mann sent the Account Agreement and CDD Form containing the false representation that Southwestern Payroll was neither a third-party payment processor nor a money transmitter in the money services business to Pioneer Bank via email. Mann used the email account michael_mann@valuewisecorp.com to send the Account

Agreement and CDD Form to Trudy Seeber, Pioneer Bank's business development officer, at seebert@pioneerbanking.com, and Deborah Salsburg, Pioneer Bank's sales leader and assistant branch manager, at salsburgd@pioneerbanking.com, which are Ms. Seeber's and Ms. Salsburg's business email accounts at Pioneer Bank.

### 2. The Orchestrated Scheme to Defraud Pioneer Bank

700.    As established above, the Mann Payroll Companies lied to Pioneer Bank about the fact that they were third-party payment processors and "money transmitters" in the "money services business."  These lies were part and parcel of an orchestrated criminal scheme to defraud Pioneer Bank by artificially inflating the account balances of the Other Mann Entities, of which NatPay became a knowing and indispensable part.

701.    Contrary to their express representations to Pioneer Bank, unbeknownst to Pioneer Bank personnel, and in violation of Pioneer Bank policy, the Mann Payroll Companies, in concert with NatPay, used their accounts at Pioneer Bank to gather, process, and transmit large amounts of money collected from their third-party employer customers (all of which was unbeknownst to Pioneer Bank personnel at the time and before Pioneer Bank set off funds from the accounts of Cloud Payroll, MyPayrollHR, and certain other Mann Entities on September 4, 2019).

702.    As a result, a significant portion of the funds in the Other Mann Entities' accounts at Pioneer Bank were not revenues or receivables of those companies but were instead funds collected from those companies' third-party employer-customers to be transmitted to third-party employees or third-party taxing authorities.  The represented value and quality of the receivables of ValueWise and its subsidiaries was central to Pioneer Bank's decision whether to continue to extend credit to them.

703.    When the MyPayrollHR, Cloud Payroll, SWP, and the Other Mann Entities accounts were opened at Pioneer Bank, Mann made arrangements to link those accounts with the

accounts of the Other Mann Entities at Pioneer Bank so that he could freely and easily transfer funds between all of those accounts.  Mann did not take any steps to designate any of the accounts at Pioneer Bank as dedicated payroll accounts, special purpose accounts, or restricted accounts that would have either prohibited those accounts from being opened at Pioneer Bank or limited the ability to withdraw or use funds from those accounts or transfer funds from those accounts to other accounts at Pioneer Bank held by Other Mann Entities or otherwise controlled by Mann.

704.    Mann continually transferred funds from the MyPayrollHR and Cloud Payroll accounts – i.e., funds largely collected from third-party employer-clients of the Mann Payroll Companies  – to the accounts of the Other Mann Entities, including ValueWise, at Pioneer Bank (or back through the accounts of MyPayrollHR and Cloud Payroll at Pioneer Bank) in order to artificially inflate the accounts of all of those entities so as to create the appearance that ValueWise and its affiliates had significantly greater revenues and receivables than they actually had.

### a. NatPay Agrees to Process Payroll Tax Payments for Unlicensed Money Transmitters Controlled by Mann

705.    To further the criminal enterprise, the Mann Payroll Companies sought to partner with an ACH services provider to facilitate transfers from their employer-clients.  It is common for a payroll services company to partner with an ACH services provider that can electronically transfer funds directly from the bank accounts of the payroll company's employer-clients to the accounts of employees and taxing authorities.

706.    But the Mann Payroll Companies determined to make some unusual demands of any ACH service provider interested in capturing the tremendous volume of business generated by the Mann Payroll Companies.  As explained below, these demands were contrary to well-established industry standards for payroll companies and ACH service providers and had all

the hallmarks of fraud. NatPay – despite knowing better based on its long track record in the business – was willing to satisfy these demands.

707.    Specifically, the four Mann Payroll Companies sought to funnel all of the funds withheld by their employer-clients for the payment of payroll taxes through a single account at Pioneer Bank – Account 0212 held by MyPayrollHR. The Mann Payroll Companies also sought to separate funds withheld by employer-clients for the payment of payroll taxes from funds withheld by employer-clients for the payment of employee payroll. Both proposed structural features, by NatPay's own admission, were highly unorthodox and virtually unprecedented in the payroll industry. And these structural features served no legitimate business purpose – their only purpose was to ensure that the Other Mann Entities could obtain access to funds to falsely inflate the reported revenues and receivables of ValueWise and its affiliates.

708.    In or about September 2017, NatPay and the Mann Payroll Companies began exploring a business relationship whereby NatPay would facilitate the criminal enterprise by way of the ACH services that it provided. Those discussions progressed in late October 2017, when the Mann Payroll Companies proposed a structure under which Cloud Payroll would set up a single customer account at NatPay through which all of the Mann Payroll Companies could process ACH transactions on behalf of the employer-clients. All of the funds collected from employer-clients, in turn, would be funneled through Account 0212.

709.    NatPay informed the Mann Payroll Companies that, for compliance reasons, it could not open an account for Cloud Payroll that would process ACH payroll tax transactions for Cloud Payroll, Pro/Data, and Southwestern Payroll combined. NatPay informed them that a separate account instead would have to be set up for each company.

710.    But the Mann Payroll Companies found a workaround that enabled them to funnel all funds through Account 0212, and NatPay did not hesitate to begin processing ACH transactions for them.

711.    On October 31, 2017, Cloud Payroll, Pro/Data, and Southwestern Payroll each submitted "Starter Kits" to NatPay. A "Starter Kit" is a standard set of documents and form contracts that NatPay provides to each prospective client and requires them to fill out and execute before NatPay will begin processing ACH transactions for the client. Among the documents contained in the Starter Kits were Processor Service Agreements which authorized NatPay to, among other things, execute transfers of funds through the ACH system in order to make tax payments on behalf of Cloud Payroll, Pro/Data, and Southwestern Payroll.

712.    Mann signed the Starter Kit documents on behalf of each payroll company purportedly as their "President," even though he never formally held that title at any of the three companies. Mann also falsely represented that he was the 100% direct owner of each company, even though he held only a 51% stake in Pro/Data and Southwestern Payroll indirectly through Cloud Payroll, which was a wholly owned subsidiary of Valuewise and not 100%-owned by Mann himself.

713.    In the Processor Service Agreements for Cloud Payroll, Pro/Data, and Southwestern Payroll, Mann instructed NatPay to execute ACH transactions (debits and credits) on behalf of Cloud Payroll, Pro/Data and Southwestern Payroll using the same "checking" account at Pioneer Bank for each company (*i.e.*, Account 0212).

714.    NatPay therefore understood that Mann intended to commingle funds collected by each of the three payroll processors in a single "checking" account. NatPay further understood and knew that the Mann Payroll Companies maintained a banking relationship with Pioneer Bank.

715.    NatPay understood it was required to verify Mann and his companies were not engaged in fraudulent activity.  NatPay performed little to no due diligence on Mann or the Mann Payroll Companies, apart from performing a credit check.  Further, NatPay did nothing to independently verify Mann's statements in the Starter Kits about his title or ownership of Cloud Payroll, Pro/Data, Southwestern Payroll, or MyPayrollHR.

716.    NatPay also performed no due diligence whatsoever concerning how the Mann Payroll Companies handled such funds or the nature of any accounts of the Mann Payroll Companies at Pioneer Bank.  Specifically, NatPay did nothing to ensure that funds it transferred to or from the accounts of the Mann Payroll Companies were held for the exclusive benefit of the payroll companies' customers or held separate from other accounts Mann controlled at Pioneer Bank.  At no time did NatPay ever attempt to contact any Pioneer Bank representative – despite being provided with contact information in the Starter Kits – much less inform Pioneer Bank that funds collected from the employer-clients of the Mann Payroll Companies were to be transferred by NatPay to accounts at Pioneer Bank.

717.    On November 1, 2017, the day after the Starter Kits were signed by Mann, Cloud Payroll and MyPayrollHR provided to NatPay a list of their employer-clients that included names, addresses, and bank account numbers.  Included on that list was Valuewise, along with the account and routing numbers for three separate bank accounts at Pioneer Bank maintained by Valuewise.  One of the disclosed accounts was an account through which Valuewise funded draws on the line of credit that it had with Pioneer Bank.

718.    NatPay further agreed to the Mann Payroll Companies' unusual request that funds withheld by employer-clients for the payment of employee payroll and the associated payroll taxes be split up, with each going through a separate ACH service provider and into separate bank

accounts at different banking institutions.  NatPay also permitted the Mann Payroll Companies to funnel all funds collected from their employer-clients through Account 0212.

719.    NatPay recognized that this unprecedented approach was inconsistent with its past practices.  As NatPay well knew, separating payroll from tax payment processing reduces its ability to monitor risk, including the risk of fraud and misappropriation.  NatPay's Vice President and General Manager Steven Pereira admitted that this was the first instance in the nearly 30-year history of the company in which NatPay agreed to "only [handle] payroll tax funds, funds earmarked for the payment of payroll taxes and not payroll," *i.e.*, "only do taxes instead of payroll and taxes."  He acknowledged that this created risks because payroll processors are less likely to divert payroll funds from employees because the consequences of that conduct are "instant," whereas the IRS might take six months to bring a late tax payment to its attention.

720.    Similarly, James Hagen, NatPay's Vice President of Sales and a NatPay employee of more than 15 years, admitted that NatPay made an exception to its "hard and fast rule" that NatPay would not permit "decoupling of tax payments from the payroll payments."  Instead, NatPay's general approach to working with payroll companies is to process both payroll and payroll taxes "through [NatPay's] accounts directly" rather than split them up or route the funds through an account that NatPay does not control.  According to Hagen, this approach helps guard against fraud.

721.    Despite recognizing the risks and the clear departure from past practices and industry standards, NatPay moved forward with Mann because, in Pereira's words, NatPay is "an aggressive company" and took the position "if you want us to do that, we're going to do [it]."

722.    NatPay's agreement to funnel payroll taxes for all of the Mann Payroll Companies into a single, unrestricted demand deposit checking account at Pioneer Bank, rather than

maintaining the funds in separate *NatPay accounts* before they were paid to tax authorities, also was an extreme departure from standard practices.

723.    The transfer of funds collected from third-party employer-client accounts to taxing authorities is normally accomplished by way of a transfer from the employer-client's bank account directly to the ACH processor's settlement account, from which the funds are then sent directly on to the taxing authorities.  This is both standard industry practice and standard practice for NatPay. Rather than follow this established procedure, NatPay agreed to (and did) transfer all funds collected from the Mann Payroll Companies funds to a single account outside of NatPay's control – Account 0212 and, beginning in or about March 2019, Account 2440 – where they became commingled with each other and with general corporate operating funds in a general demand deposit (checking) account that was not set up as a custodial or trust account.

724.    NatPay also recognized but deliberately and willfully ignored the inherent risks of this approach.  James Hagen admitted that this was the first time this approach had ever been proposed to NatPay.  Hagen stated that NatPay normally did not "allow a payroll processor to process" its employer-clients' funds through the payroll company's own account.  Rather, NatPay would "pull the money directly from the client's account," transfer it "directly to [NatPay's] account and then directly to the employee," such that "the client payroll processor never holds payroll, never touches it."

725.    NatPay has admitted that this was a "strange arrangement" for NatPay and that NatPay had never seen this kind of flow of funds.  Indeed, there is no legitimate business reason to funnel funds collected from the employer-clients of multiple payroll companies into a single bank account held in the name of one payroll company – let alone a demand deposit checking

account that was not set up as a custodial or trust account.  NatPay also required payroll companies to set up designated tax impound accounts, but it did not do so with the Mann Payroll Companies.

726.    As an established ACH services provider that almost exclusively serves payroll companies, NatPay understood the importance of safeguarding and segregating funds collected from the payroll companies' employer-clients for the purpose of paying payroll and payroll taxes on behalf of the employer-clients.

727.    In 1998, the FDIC authorized $100,000 in insurance for each employer-client's funds when on deposit with NatPay.  In doing so, the FDIC informed NatPay of its "understanding that [NatPay] has an agreement with the bank that the funds in the account are not to be used or otherwise pledged by [NatPay] except for the express purpose of settling payroll transactions after transmission of [the] ACH file."

728.    Accordingly, NatPay opened an account at First Premier entitled "NPC Custodial ACH Settlement Account."  NatPay arranged for its bank, First Premier, to provide a side letter documenting their mutual understanding regarding the special nature of the account.  The letter states:

> So that National Payment Corporation's account number _1701275690___ complies with your desire to maintain this account for the exclusive use of customers of National Payment Corporation, we wish to confirm the following special instructions regarding this account.
>
> First PREMIER Bank ("the Bank") has been informed that all funds deposited therein is being held by the Bank for the exclusive benefit of customers of National Payment Corporation and is being kept separate from other accounts maintained by National Payment Corporation with the Bank.  The funds shall at no time be used directly or indirectly as security for a loan to National Payment Corporation by the Bank and shall be subject to no writ, charge, security interest, lien or claim of any kind in favor of the Bank.

729.    Separately, NatPay maintained an account at a different bank for corporate operating expenses.

730.    Even though NatPay recognized the importance of safeguarding and segregating funds collected from employer-clients when setting up its own account at First Premier, NatPay

agreed to participate in the Mann Payroll Companies' illegitimate scheme to route payroll tax funds through a general corporate operating account at Pioneer Bank that bore none of the same protections.

731.    Mann opened each of the Mann Payroll Companies' accounts at Pioneer Bank as unrestricted demand deposit general business checking accounts that were not designated as tax settlement accounts, fiduciary accounts, trust accounts, or the like – much like NatPay's operating account and in stark contrast to NatPay's custodial account at First Premier.

732.    Mann completed the requisite paperwork to combine these accounts with the operating accounts of Other Mann Entities at Pioneer Bank so that funds could be freely and easily transferred between the accounts for purposes of "cash management."  He also arranged for the accounts to serve as collateral for his line of credit with Pioneer.  And, unlike NatPay's account at First Premier, the Mann Payroll Companies' accounts did not have a title indicating that Cloud Payroll served as a trustee, custodian, or fiduciary for the account.

733.    Mann testified in this action that there was never any agreement between Cloud Payroll or MyPayrollHR and Pioneer Bank that the funds in any of the accounts that he controlled were to be kept separate and isolated from other accounts at Pioneer Bank or to restrict or limit in any way Cloud Payroll or MyPayrollHR's use of the funds in the accounts.  Had Mann attempted to set up the appropriate type of account for a payroll services company to impound client tax payments, Pioneer Bank would have rejected his account application or, at a minimum, would not have treated the account as another one of the Other Mann Entities' many general corporate operating accounts.

734.    In the case of Cloud Payroll and MyPayrollHR, they proposed (and NatPay agreed) to process payroll tax payments in the following manner: First, NatPay electronically debited third-party employers' bank accounts and transferred funds from the third-party employers' bank accounts to its account at First Premier Bank ("First Premier").  NatPay then transferred the funds to Account 0212, and beginning in or about March 2019, Account 2440, at Pioneer Bank.  When payments to taxing authorities were requested or scheduled, funds would complete a roundtrip from Account 0212/Account 2440 back to NatPay's First Premier account to the account.  NatPay simultaneously would initiate the transfer of funds from its account to the accounts of the appropriate taxing authorities. The below chart depicts this flow of funds:



735.    The flow of payments for Southwestern Payroll was even more circuitous.  Payment flowed from Southwestern Payroll's employer-clients' accounts to a Southwestern Payroll bank account at Prosperity Bank in Tulsa, Oklahoma.  The funds then flowed to NatPay's depository institution, First Premier, to Account 0212/Account 2440.  When payments to taxing authorities were requested or scheduled, funds would travel back from Account 0212/Account 2440 through NatPay's First Premier bank account.  NatPay simultaneously would initiate the transfer of funds from its account to the accounts of the appropriate taxing authorities.  The below chart depicts this flow of funds.



736.    There was no legitimate business reason for NatPay to "roundtrip" funds through Account 0212/Account 2440 before forwarding them to tax authorities – illicit activity of which Pioneer Bank was completely unaware.  This additional step in the flow of funds was highly unusual and served multiple illegitimate purposes for both the Mann Payroll Companies and NatPay that could not have been achieved without each company's active involvement.

737.    Notwithstanding the obvious risks – including the highly unusual nature of the payment flow Mann's companies used, separating payroll and payroll tax processing, and the obvious commingling of funds collected from the employer-clients of all of the Mann Payroll Companies – NatPay also offered to process transactions for the Mann Payroll Companies with "No Credit Limits."  This too was unusual given the substantial credit risk to NatPay if an ACH debit were rejected by a financial institution.  NatPay's competitors, including Mann's ACH processor at the time, imposed credit limits on ACH processing for payroll companies.

738.    Moreover, another ACH processor used by MyPayrollHR, Cachet Financial Services ("Cachet"), repeatedly told MyPayrollHR that payroll funds were required to be settled into Cachet's account and that MyPayrollHR could not settle payroll funds into its own accounts at Pioneer Bank.  NatPay did not require the same of the Mann Payroll Companies.

739.    And notably, the Mann Payroll Companies had approached Cachet with the same proposal they made to NatPay – just hours before the NatPay Starter Kits were signed on October 31, 2017 – and Cachet immediately expressed considerable skepticism about it.  Cachet founder Aberash Asfaw wrote to Mann and Cloud Payroll CEO John Reinke regarding "risk management issues regarding your new company structure," noting that it was "very new … not only to [Cachet] but the market place" and created "significant risk/issues."  Asfaw offered that

the "new processing/structural method" would require "further research and review" as part of a "Due Diligence" process, noting that "[t]he regulations are very formidable."

740. Mann reacted with hostility to this proposal. After receiving Asfaw's email, Mann wrote the following email to Reinke on October 31, 2017 at 12:51 p.m.:

> As soon as I saw this email, I asked McAuliffe how long it will take to get ProData up on Natpay. He said one day after we sign the kit. I said, "Get me the fucking kit, I want to process ProData with Natpay tomorrow." I will then enjoy telling her to fuck off. Just making sure we have an option first **

741. Mann moved immediately to engage Cachet's competitor, NatPay, which, as noted above, was willing to disregard universally accepted industry practices, and ignore its own risk management rules designed to prevent fraud and misappropriation in partnering with the Mann Payroll Companies.

742. The highly unusual flow of funds was designed to obscure the source of funds and – unbeknownst to Pioneer Bank – artificially inflate the balances and purportedly legitimate business revenues flowing through Mann's accounts. The consolidation of funds collected from employer-clients of the Mann Payroll Companies in a single demand deposit general business checking account artificially inflated the balances in accounts that served as collateral for the ValueWise line of credit and made it appear to Pioneer Bank that the Mann Entities had far greater assets and revenues than they really did. This enabled the Mann Entities to convince Pioneer Bank to extend tens of millions of dollars in credit under false pretenses and gave false comfort to Pioneer Bank that the Mann Entities' assets qualified them for RDC privileges.

743. In addition, the flow of funds allowed Mann to divert employer-client funds collected by the Mann Payroll Companies for other corporate and personal purposes. Mann freely transferred funds into and out of Account 0212 and, beginning in 2019, Account 2440, for any reason. He has testified that he "regularly transferred funds from account 2440 to entities that

[were] not taxing authorities … and did not use the funds in account 2440 exclusively for the payment of" taxes.  Throughout 2019, Mann "repeatedly transferred funds from account 2440 to account 0212, and then to other checking accounts held by ValueWise affiliates at Pioneer Bank as part of [his] kiting scheme."  Mann also "moved money out of 2440 into another account that did feed some of these account that were kiting checks back and forth between Bank of America and Pioneer."

744.    Despite being aware of multiple and obvious risks and red flags, NatPay onboarded the Mann Payroll Companies and began processing ACH transactions almost immediately.

<blockquote>

**b.    NatPay Processes ACH Transactions Through Numerous Accounts of the Mann Entities at Pioneer to Participate in and Help Conceal the Criminal Enterprise, from Which NatPay Benefits**

**i.    NatPay Assists in Misappropriating Funds from the Mann Payroll Companies' Employer-Clients and Earns Outsized Fees For Its Work**

</blockquote>

745.    In early November 2017, NatPay began processing ACH transactions for the Mann Payroll Companies using the unorthodox structure described above, which included the routing of funds through Account 0212.  By engaging in this course of conduct, NatPay played a vital role in the scheme to defraud Pioneer, and the success of the scheme depended upon NatPay's involvement.

746.    NatPay was responsible for initiating ACH transfers of funds collected from the Mann Payroll Companies' employer-clients from its special "Custodial ACH Settlement Account" to Mann-controlled accounts at Pioneer Bank and then back again.  NatPay charged the Mann Payroll Companies a fee for each ACH transaction it processed, among other fees.

747.    NatPay's agreement to a highly unorthodox, multi-step flow of payments through multiple financial institutions enabled NatPay to generate substantially greater fees than it otherwise would have if NatPay had followed standard industry practice by transferring funds from

the employers' bank accounts directly to NatPay's First Premier settlement account and then directly on to the taxing authorities.  Rather than generating fees for a single ACH debit item and a single ACH credit item, as would have been customary under the standard approach in the payroll service industry, NatPay was able to generate fees for **double** the number of ACH credit and ACH debit items.

748.    NatPay continually sought to generate more revenue from its relationship with the Mann Payroll Companies and was eager to grow its relationship with them.  From 2017 through 2019, NatPay sought to gain accounts from Mann's other ACH processor, Cachet.

749.    In June 2019, for example, Jim Hagen wrote to Cloud Payroll to "thank" it for all of the business and asked if there was "anything . . . on our side to draw some of those [payroll] transactions to Nat Pay."

750.    Using the unusually risky structure and flow of funds, NatPay artificially increased the number of ACH transactions generated from the Mann Payroll Companies.  And NatPay earned more with every transaction.

751.    NatPay knew that the funds it processed for the Mann Payroll Companies were the proceeds of a fraudulent scheme of misappropriating funds from employer-clients and to defraud Pioneer in the process, and NatPay intended to launder those funds, including through establishing a circuitous flow of funds the purpose of which was to conceal the nature of the funds from Pioneer Bank and relevant state and federal authorities.

752.    NatPay knew that Pioneer Bank was an unwitting instrument of this fraudulent scheme.  As described further below, the significant volume of highly suspicious and facially illegitimate transactions that NatPay conducted on behalf of Valuewise, the Mann Payroll Companies, and the Other Mann Entities make clear that NatPay was aware of the banking

relationship between Pioneer Bank and the Mann Entities and that the Mann Entities were using Pioneer Bank as a conduit to launder the proceeds of their unlawful activities.

753.    With NatPay's assistance, the Mann Payroll Companies enabled ValueWise and the Other Mann Entities to misappropriate millions of dollars of funds collected from the employer-clients of the Mann Payroll Companies and diverted into Account 0212 and Account 2440, where funds were then diverted into other Mann Entity bank accounts. With NatPay's knowledge and participation, the Mann Payroll Companies routed a substantial volume of the misappropriated funds directly through NatPay. As a result of this scheme, NatPay earned fees totaling more than $100,000.

754.    NatPay and Mann agreed that NatPay's fees would be paid from Account 1640, which was opened by Mann in Cloud Payroll's name in April 2017. NatPay knowingly accepted funds collected from the employer-clients of the Mann Payroll Companies that Mann directed from Account 1640. NatPay also knew that Account 1640 was not limited to employer-client funds because, in the Starter Kits, the Mann Payroll Companies designated that account as the one from which NatPay could debit its fees.

755.    For example, on September 20, 2018, a Cloud Payroll employee "flagg[ed] that the tax payment went through [account] 1640…[w]hich was not designated on any of the Processor Service Agreements as an account through which tax payments would go." Knowing that this flow of funds may make it more likely for Pioneer Bank or regulators to identify the money laundering scheme, to continue concealing the scheme from September 21, 2018 forward, NatPay stopped accepting funds collected from the employer-clients of the Mann Payroll Companies through Account 1640.

756.    NatPay instead routed funds through Account 0212 and, beginning in March 2019, through Account 2440.  In late February 2019, the Mann Payroll Companies contacted NatPay to request that the account for processing funds withheld from their employer-clients be changed from Account 0212 to Account 2440.  NatPay made no inquiries about the nature of Account 2440 at the time and instead simply followed the Mann Payroll Companies' instruction.  Yet as discussed below, NatPay still processed transactions involving Account 0212 – including highly unusual round-trip ACH transactions between Account 0212 and other accounts at Pioneer Bank.

757.    Although NatPay ceased accepting funds collected from the employer-clients of the Mann Payroll Companies from Account 1640, NatPay knowingly continued to process transactions involving commingled funds of the employer-clients of the Mann Payroll Companies through Account 1640 on 42 occasions between October 2018 and August 2019 totaling more than $239,000, and contrary to the direction given in the Starter Kits for the Mann Payroll Companies.

758.    Additionally, on several occasions between 2017 and August 2019 Mann directly diverted funds collected from the Mann Payroll Companies employer-clients – the proceeds of Mann's unlawful activity – in order to compensate NatPay for its role in the scheme.  On one such occasion on or about July 12, 2019, Mann diverted employer-client funds to pay NatPay that Mann had placed into an account at Pioneer solely to avoid non-sufficient fund issues.

759.    Moreover, the strange manner in which NatPay invoiced and received fees from the Mann Payroll Companies further facilitated the money laundering scheme and served to conceal or disguise the source, nature, location, control, or ownership of the proceeds.  This included in separate, same-day transactions in amounts just under the $10,000 threshold that would have subjected Defendants to liability under 18 U.S.C. § 1957, which prohibits any person who

knowingly engages in a monetary transaction involving more than $10,000 in proceeds of criminal activity.

760.    For example, on or about July 19, 2018, Mann apparently diverted funds collected from employer-clients of the Mann Payroll Companies in order to pay outstanding fees owed to NatPay totaling $13,452.06; however, this amount was broken into two, same-day transactions of $9,822.99 and $3,629.07.  Moreover, NatPay engaged in further unusual conduct with respect to the $9,822.99 invoice by waiving previously agreed-upon expedited processing charges that – if charged – would have caused that invoice to exceed $10,000.  On information and belief, NatPay did this both to curry favor with the Mann Payroll Companies and to ensure that it could avoid violating 18 USC § 1957.

> ii.    **NatPay Knowingly Facilitates Hundreds of Millions of Dollars in Money-Laundering Transactions Involving the Accounts of Numerous Mann Entities at Pioneer Bank**

761.    NatPay not only facilitated the misappropriation of funds from employer-clients of the Mann Payroll Companies but, between June 2018 and August 2019, facilitated a systematic, highly structured series of money-laundering ACH transactions between Account 0212 and the bank accounts of numerous Mann Entities at Pioneer Bank that were specifically designed to further the criminal scheme, to conceal the criminal activity from Pioneer Bank, and to deceive Pioneer Bank into continuing its banking relationship with the Mann Entities under false pretenses.

762.    These transactions, which Mann labeled as "ePay" transactions, totaled nearly $700 million, occurred on an almost daily basis, and involved the accounts of at least the following Mann Entities: Valuewise, Southwestern Payroll, Cloud Payroll, Create Force LLC, Focalpointe Group LLC, Hire Flux LLC, Ross Personnel Consultants Inc., Trueconsulting Corp., and Truehr LLC.  In essence, the ePay transactions were intrabank transfers of funds between accounts of

various Mann Entities at Pioneer Bank and Account 0212 that were unrelated to the processing of payroll and payroll taxes for the Mann Payroll Companies' employer-clients.

763.    The following chart sets forth a breakdown, by Mann Entity, of the volume and amount of the ePay ACH transactions conducted by NatPay on behalf of the Mann Entities over the period between June 2018 and August 2019:

| Mann Entity (Pioneer Bank Acct. No.) | Total ePay Amount | No. of ePay Transactions |
|---|---|---|
| Cloud Payroll LLC (x2382) | $141,685,618 | 214 |
| Create Force LLC (x1699) | $8,087,394 | 13 |
| Create Force d/b/a Always Live (x4820) | $1,308,581 | 2 |
| Focalpointe Group LLC (x2192) | $30,813,914 | 51 |
| Hire Flux LLC (x1632) | $3,260 | 1 |
| Pro/Data Payroll Services Inc. (x1988) | $63,160,374 | 98 |
| Ross Personnel Consultants Inc. (x4838, x3630) | $46,358,847 | 74 |
| Southwestern Payroll Service, Inc. (x1996) | $48,029,161 | 74 |
| Trueconsulting Corp. (x1236, x1251) | $107,618,905 | 171 |
| Truehr LLC (x1244) | $49,164,116 | 76 |
| Valuewise Corp. d/b/a Apogee (x4018) | $55,386,373 | 90 |
| Valuewise Corp. d/b/a Optix Consulting (x3622, x2473) | $55,172,057 | 93 |
| Valuewise Corp. d/b/a Primacy Search Group (x3648, x 2481) | $62,948,928 | 101 |
| Valuewise Corp. d/b/a Viverant (x2499) | $1,441,724 | 3 |

764.    NatPay processed these transactions based on instructions that came directly from the Mann Payroll Companies.  These instructions included the name of the Mann Entity and the

account number and routing number from which the funds would be debited. Notably, none of the Mann Entities listed above ever was identified by the Mann Payroll Companies to NatPay as an employer-client – with the exception of Valuewise, for which NatPay apparently did conduct legitimate payroll and payroll tax processing transactions separate and apart from the fraudulent ePay transactions.

765. The highly unusual characteristics of these ePay transactions relative to the typical payroll tax-related transactions that NatPay processed, and the circumstances under which the transactions occurred, make their illegitimate and unlawful nature clear on their face. And NatPay knew or willfully blinded itself to that fact.

766. Most obviously, there was no legitimate business reason to conduct transactions between bank accounts of different Mann Entities at the same bank through the ACH system; instead, the transactions simply could have been conducted through intrabank transfers that would not have required the Mann Entities to incur ACH transaction processing fees.

767. The volume and average amounts of the transactions relative to the payroll tax payment processing activity in which NatPay was engaged at the same time, also provides strong evidence of unlawful and illegitimate conduct. As set forth in the table above, NatPay conducted slightly more than 1,000 ePay transactions totaling approximately $670 million, for a per-transaction average of *more than $600,000*. By contrast, NatPay conducted approximately *44,000* transactions over that same period, ostensibly for the collection of funds from employer-clients, totaling approximately $360 million, for a per-transaction average of just *$8,000*. And while the vast majority of ePay transactions ranged between $500,000 and $700,000 each, nearly 100% of the payroll tax-related transactions were under $100,000.

768.    The stark differences between the volume and amounts of these transactions are another clear indication that the ePay transactions were not legitimate.  To the contrary, the illicit purpose that these transactions served is clear: to make it appear to Pioneer that they were simply part of the normal transaction activity between Account 0212 and NatPay's account at First Premier.  NatPay has admitted that the transaction activity would have appeared precisely that way to Pioneer Bank.  By burying the ePay transactions among thousands of other transactions, the Mann Payroll Companies and NatPay intended to and did conceal their unlawful activity from Pioneer Bank.

769.    Further establishing that the ePay transactions were part of a deliberate scheme is their timing.  Between November 2017 (when NatPay began processing transactions for the Mann Payroll Companies) and the end of June 2018, there were no ePay transactions conducted.  Yet beginning in late June 2018, ePay transaction activity began and immediately ramped up to an alarming degree, totaling more than $100 million over a six-week period in July and August 2018.  The ePay transactions were a radical departure from the payroll tax-related transactions: they were not identified in the ACH instructions to NatPay as tax collections or tax deposits (as such transactions typically would be), and the individual amounts of the ePay transactions exceeded typical transactions by orders of magnitude.  And perhaps most alarmingly, these ePay transactions could not be tied to any later payments to taxing authorities.

770.    Moreover, while NatPay specifically was instructed by the Mann Payroll Companies in February 2019 to cease processing any payroll tax-related transactions through Account 0212 and to instead process them through Account 2440, NatPay continued thereafter to accept and execute ACH instructions for hundreds of millions of dollars in ePay transactions through Account 0212.  In fact, after Account 2440 was opened and NatPay began processing

payroll tax-related transactions through it, NatPay *exclusively processed ePay transactions through Account 0212*.

771.    This ePay transaction activity obviously was improper and indicative of unlawful activity.   In fact, NatPay's own employees have admitted that these transactions were not legitimate.  For example, NatPay Operations Manager Dawn Cafaro described the transactions as "bogus" in a September 5, 2019 email exchange with Hagen and Pereira.  And at his deposition, Pereira admitted that the transactions were suspicious and claimed that NatPay has since implemented procedures to detect similar transaction activity.

772.    The ePay transactions, and the concealment of their true nature from Pioneer Bank, were indispensable to the scheme to misappropriate funds from the employer-clients of the Mann Payroll Companies.   After the Mann Payroll Companies (with NatPay's assistance) misappropriated funds from the employer-clients and diverted them to the Other Mann Entities to falsely inflate their revenue and accounts receivable, the Mann Payroll Companies had to find a way to continue to fund payroll and payroll tax payments on behalf of their employer-clients.  The ePay transactions provided the Mann Payroll Companies with a mechanism to do so, as they provided funds that the Other Mann Entities had obtained from sources other than the Mann Payroll Companies' employer-clients to make payroll and payroll tax payments.   One of these other sources (of which NatPay became aware, as described below) was the line of credit issued by Pioneer Bank to Valuewise.

773.    As a result, the criminal enterprise was directly propped up by, and could not have continued to operate without, the ePay transaction activity that NatPay directed, oversaw, and knowingly permitted to occur.   NatPay knew that these transactions all involved accounts maintained by the Mann Entities at Pioneer Bank, knew that Pioneer Bank was being used as an

unwitting instrument to further the criminal enterprise, and intended to conceal the enterprise's unlawful conduct from Pioneer Bank through the deliberately deceptive structuring of these transactions. The ePay transactions, in turn, enabled the enterprise to perpetuate its scheme to misappropriate and misuse funds from numerous sources, including Pioneer Bank and the employer-clients of the Mann Payroll Companies.

        iii.       **NatPay Facilitates Millions of Dollars in Fraudulent Drawdowns on the Valuewise Line of Credit**

774.    As described in greater detail below, Mann has pled guilty to various federal and state crimes, including bank fraud where he admitted drawing down on the ValueWise revolving line of credit ("Account 3614") using false borrowing base certificates on seven occasions, including in late 2017 and throughout 2018 and 2019 in violation of 18 U.S.C. § 1344. NatPay participated in moving these fraudulent funds as well.

775.    The existence of Account 3614 was disclosed to NatPay on November 1, 2017, simultaneous with Mann's signing of the Starter Kits on behalf of the Mann Payroll Companies. Between November 2017 and September 2019, Mann initiated 30 drawdowns on the Mann Entities' line of credit with Pioneer Bank representing a total of approximately $36 million. These fraudulent drawdowns on the line of credit were in turn used to fund other operations – including the payment of payroll taxes on behalf of the employer-clients of the Mann Payroll Companies.

776.    For example, on August 3, 2018, an $800,000 draw on the line of credit was transferred to Account 3614 and, through a series of transactions involving accounts of other Mann Entities at Pioneer Bank, ultimately was aggregated with other funds the same day in a Trueconsulting account at Pioneer Bank ending in 1251. NatPay thereafter conducted four ePay transactions from that account to Account 0212. This establishes a direct path from the initial draw on the line of credit to ePay transactions conducted by NatPay.

777.    Similarly, on October 1, 2018, a $750,000 draw on the line of credit was transferred to Account 3614 and thereafter to several Mann Entities before being transferred to Account 0212 by NatPay via an ePay transaction from a Valuewise account at Pioneer Bank ending in 3648.  On that same day, NatPay processed ePay transactions from another Valuewise account and a Ross Personnel account (both at Pioneer Bank) totaling approximately $1.7 million.  Ultimately, NatPay used the funds from the drawdown on the line of credit to fund, in part, payments from Account 0212 to various taxing jurisdictions totaling approximately $4.3 million.

778.    NatPay therefore directly facilitated the misappropriation and misuse of funds drawn down on the line of credit that Pioneer Bank extended to Valuewise, which was intended to fund business operations and not to fund payroll tax payments for the Mann Payroll Companies' employer-clients – those payments should have been made using funds collected from the employer-clients.  By facilitating these fraudulent drawdowns from the Valuewise line of credit through the same money-laundering transactions designed to conceal the enterprise's unlawful conduct from Pioneer Bank, NatPay directly supported and facilitated the criminal enterprise's bank fraud against Pioneer Bank.

779.    Although NatPay knew about and intentionally ignored red flags for nearly two years, by no later than September 5, 2019, NatPay could no longer deny that its complicity in the above-described money laundering scheme, admitting that the entirety of it was "fraudulent…which caused all of Mann's accounts" at Pioneer Bank and Bank of America "to be frozen."

780.    No later than the morning of September 5, 2019, NatPay also acknowledged, based on a review of its own records from August 29, 2019, that there appeared to be five same-day,

round-trip "bogus [ACH] transfers from one account to another cloud payroll account" totaling more than $2 million.  These ACH transfers were **themselves** ePay transactions.

781.    Yet, despite this clear acknowledgement of its involvement in a "fraudulent" scheme, including involving "bogus" ACH transfers, on information and belief, at no point did NatPay file a suspicious activity report ("SAR") with or otherwise alert the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of Treasury.  Instead, James Hagen of NatPay made the intent clear: "We have to do whatever it takes to make sure we are whole…No question."  On information and belief, NatPay failed to file a SAR *because* it also knew that it was operating – and continues to operate – as an unlicensed money transmitter in violation of Treasury / FinCEN regulations and the Bank Secrecy Act.  Filing a SAR would have revealed this as well as NatPay's own role in the fraudulent scheme.

782.    NatPay also *benefitted directly* from its role in the criminal enterprise by soliciting and capturing a significant volume of another ACH processor's clients when that processor went into bankruptcy as a result of NatPay and Mann's scheme.

      **c.**     **NatPay Was Operating at All Relevant Times as an Unlicensed Money Transmission Business**

783.    NatPay is an ACH service provider that handles, among other things, third-party processing of employee payroll via direct deposit, processing and payment of payroll taxes, and related services on behalf of payroll service companies.

784.    NatPay advertises that it provides "all payment types," including ACH processing for large payrolls and same-day ACH credits that may be "wire funded" by prior deposit to NatPay by the customer.

785.    Money transmission is regulated by both federal and state authorities.  At the federal level, money transmission activity is mainly regulated under the Bank Secrecy Act ("BSA") by FinCEN.

786.    Money transmission services are defined as "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means."

787.    The BSA regulations require money transmitters to register with FinCEN, implement an anti-money-laundering program, and comply with certain recordkeeping and reporting requirements.

788.    State money transmission regulators directly supervise licensed money transmitters, including by administering periodic examinations to: (i) protect the interests of individual and commercial customers of money transmission businesses, (ii) provide for the safe and sound conduct of money transmission businesses, and (iii) maintain public confidence in financial institutions doing business in such states.

789.    From at least 2017 to 2019, NatPay accepted payroll and payroll tax funds from Mann Payroll Companies that were obtained from those entities' third-party employer-clients. NatPay transmitted these funds through financial institutions to Pioneer Bank before then transmitting those funds to third-party employees or third-party taxing authorities through financial institutions other than Pioneer Bank.  Consequently, NatPay acted as a "money transmitter" in the "money services businesses" as those terms are defined under U.S. Treasury Department regulation 31 CFR § 1010.100(ff) and under the controlling statutes and regulations in the states where NatPay operates, such as Texas.

790.    Despite operating as a money transmitter, NatPay failed to become licensed with any state in which it operated until June 2021, when the Texas Department of Banking found that "NatPay receives customer funds into NatPay's settlement account in exchange for NatPay's promise to transmit those funds to employees and other payees.  NatPay controls the monetary value received into the settlement account it owns."

791.    The Texas Department of Banking also found that NatPay had conducted unlicensed money transmission in Texas since 1991.

792.    By failing to obtain a state license, NatPay knowingly avoided any and all state-level regulatory oversight, including but not limited to periodic audits of its business by regulators and "permissible investments" requirements.

793.    By failing to register and obtain required licenses to conduct money transmission, NatPay could engage in unusual and high-risk business practices involving third-party payroll tax funds, as it did with the Mann Payroll Companies, without any oversight.

794.    Despite operating as a money transmitter since at least 1991, NatPay also failed to register – and to present day has not registered – with FinCEN.  Had it registered with FinCEN as required, NatPay would have needed to establish a BSA program, including transaction monitoring, Suspicious Activity Report (SAR) filings, independent testing of the BSA controls, and other regulatory requirements.

795.    On information and belief, NatPay failed to register with FinCEN and/or obtain a state license because it knew that doing so would hinder its ability to engage in unusual and high-risk business practices involving third-party payroll funds (as alleged in detail below) and therefore significantly reduce its revenue associated with such conduct.

796. NatPay's continued failure to register with FinCEN reflects an ongoing threat that it will continue to facilitate money laundering and other types of illicit activity without any requirement to report such activity, nor a program, policies, and procedures to identify such activity in the first place.

## C.     The Criminal Enterprise Collapses, Causing Pioneer Bank Nearly $100 Million in Damages

797. On August 29, 2019, Mann used the RDC privileges of the Mann Entities at Pioneer Bank to deposit 36 checks totaling $15,588,000 written from Mann Entity accounts at Bank of America accounts into various Mann Entity accounts at Pioneer Bank (including three checks totaling approximately $1.3 million into Southwestern Payroll's Account 1996).

798. Because the $15.6 million in checks were deposited by Mann utilizing RDC, the deposited funds were made available for withdrawal that same day.  Thirty-nine checks totaling $18,043,000 were then written by Mann out of various Mann Entity accounts at Pioneer Bank on August 29, 2019, using proceeds from the $15,588,000 in Bank of America checks deposited earlier that day, as well as the proceeds of illegitimate ePay transactions conducted by NatPay at or around the same time.

799. On August 30, 2019, Bank of America returned and called back the 36 checks totaling $15,588,000 deposited by Mann into the Mann Entity accounts the day before – which resulted in the Mann Entity accounts being overdrawn by more than $18 million.  Because NatPay's money laundering and money transmission activities provided the Mann Entities with access to the funds necessary to write the 39 checks to the Bank of America accounts, NatPay's unlawful conduct was a direct and proximate cause of Pioneer Bank's losses due to the overdrafts.

800. On September 23, 2019, Mann was arrested and charged with bank fraud in violation of 18 U.S.C. § 1344.

801.    According to the affidavit of FBI Special Agent Matthew J. Wabby ("Wabby Affidavit") in support of the Criminal Complaint (dated September 20, 2019) filed in *United States v. Michael T. Mann* (N.D.N.Y. Case No. 1:19-MJ-602 (DJS)), Mann gave an interview to the FBI on September 10, 2019, in which Mann admitted his crimes.  Among other things, Mann admitted that many of the Mann Entities "had no purpose other than to be used in [Mann's] fraud," and that Mann fraudulently represented "to banks and financing companies that his fake businesses had certain receivables that they did not have."

802.    Pioneer Bank was unaware of the fraudulent and criminal scheme orchestrated by Mann and carried out through the Mann Payroll Companies and NatPay.  Among other things, Pioneer Bank relied upon the written representations made by Mann, and entities he controlled, including MyPayrollHR, SWP, and Cloud Payroll when opening accounts at Pioneer Bank that these entities were not third-party payment processors or "money transmitters" in the "money services business."  These representations were false.

803.    On August 12, 2020, Mann pleaded guilty to 12 different federal crimes, including nine counts of bank fraud, one count of conspiracy to commit wire fraud, one count of aggravated identify theft, and one count of filing a false tax return.  As part of his guilty plea, Mann admitted that he repeatedly lied to Pioneer Bank over many years and took active measures to conceal his fraudulent activity from Pioneer, and further admitted that Pioneer Bank was the largest victim (among many) of the criminal enterprise that he led.  Specifically, Mann admitted to committing bank fraud under 18 U.S.C. § 1344 by drawing down the ValueWise revolving line of credit using false borrowing base certificates, including six specific instances of bank fraud between December 2017 and August 2019.

804.    Mann also admitted that MyPayrollHR and Southwestern Payroll "each contracted with … NatPay … to process the ACH files that transferred tax payments from employers to the IRS and other taxing authorities.  As part of [MyPayroll HR and Southwestern Payroll's] respective agreements with NatPay, tax payments were routed from the employers' accounts to accounts controlled by [Mann] at Pioneer prior to disbursement of the tax authorities."  Further, "[a]s with the payroll funds, [Mann] used the tax funds for his own purposes, including to pay down the [line of credit]."  Mann ultimately was sentenced to 12 years in prison.

805.    And Pioneer Bank was in fact the largest victim of the criminal enterprise of which NatPay formed an integral part.  In addition to the more than $18 million in damages that Pioneer Bank suffered as a result of the overdrafts in the bank accounts controlled by Mann, Pioneer Bank also lost upwards of $30 million, just in principal outstanding, on the $42 million line of credit that had been approved just weeks prior to the collapse of the criminal enterprise.

806.    On September 11, 2019, Pioneer Bank declared multiple events of default under the $42 million line of credit.  At the time, the principal balance outstanding under the line of credit was more than $35 million.

807.    Pioneer Bank thereafter took actions to try to recover the outstanding principal balance, but ultimately was unsuccessful.  Though Pioneer Bank obtained a consent judgement against Mann and the other borrowers (including Cloud Payroll and MyPayrollHR) in the amount of $35,839,912.81 (plus interest) in late 2019, that judgment has gone unsatisfied, and Pioneer Bank has been able to collect a small portion of that amount – all while incurring substantial fees and expenses in connection with its collection efforts.  At present, approximately $31.5 million in principal remains outstanding on the line of credit.  Accounting for lost interest, default interest, default fees, professional fees, and yearly compounding losses of return on equity, Pioneer Bank's

damages on the line of credit amount to approximately $65.5 million at present and continue to grow.

808.    Pioneer Bank's losses due to the overdrafts also far exceed the negative balance of more than $18 million in the accounts controlled by Mann.  Pioneer Bank also has suffered roughly an additional $12.4 million in damages as a direct and proximate result of the criminal enterprise that victimized it in the form of unnecessary professional fees and yearly compounding losses of return on equity.

809.    In total, therefore, Pioneer Bank has suffered no less than $96,352,548 as a result of the criminal activity of those who participated in the enterprise headed by Mann, of which NatPay and the Mann Payroll Companies formed a crucial and indispensable part.

### FIRST COUNTERCLAIM AGAINST NATPAY / CROSSCLAIM AGAINST MANN, MYPAYROLLHR, AND CLOUD PAYROLL
#### RICO Violations – 18 U.S.C. § 1962(c)

810.    Counterclaim/crossclaim-plaintiff Pioneer Bank repeats and re-alleges each and every allegation and statement contained in paragraphs 601 through 809 above as though fully set forth in this paragraph.

811.    Each defendant, including NatPay, Mann, MyPayrollHR, and Cloud Payroll is a "person" as that term is defined by 18 U.S.C. § 1961(3).

812.    Each defendant violated 18 U.S.C. § 1962(c) by the acts described above, and as further described below.

813.    At all times relevant to Pioneer Bank's counterclaims and crossclaims, NatPay, Mann, MyPayrollHR, Cloud Payroll, and Southwestern Payroll were associated with and comprised an enterprise, as that term is defined in 18 U.S.C. § 1961(4), that engaged in acts and activities that affect interstate commerce, including unlicensed money transmission that adversely

affected Pioneer Bank's banking activities, which are an instrumentality of interstate commerce, and money laundering.

814.    The primary purpose and function of this enterprise (hereinafter, the "Enterprise") was to enable Mann and the Mann Entities to obtain large extensions of credit from Pioneer Bank and other banks and financing companies, and other banking privileges, through various orchestrated fraudulent and criminal activities whereby Mann and the Mann Entities fraudulently inflated the revenues and receivables of ValueWise and its affiliates.  This purpose was accomplished in substantial part by the unlawful diversion of funds collected from the employer-clients of the Mann Payroll Companies for defendants' own unlawful purposes, as well as unlawful money laundering and unlicensed money transmission that was used to conceal the Enterprise's fraudulent conduct from Pioneer Bank and prevent the Enterprise's criminal conduct from coming to light.

815.    The Enterprise also functioned as an operationally and economically interconnected association of NatPay and companies owned (directly or indirectly) and controlled by Mann – some of which were at least partially engaged in legitimate businesses.  MyPayrollHR, Cloud Payroll, Southwestern Payroll, and the Other Mann Entities were each controlled by Mann as their majority or sole shareholder, and their activities in furtherance of the Enterprise were directed by Mann, and other individuals acting at Mann's direction, beginning in 2013.  NatPay likewise received and acted upon the instructions given to it by Mann, MyPayrollHR, Cloud Payroll, and Southwestern Payroll in furtherance of the Enterprise.

816.    Each defendant was essential to and participated in the operation and management of the Enterprise.

a.    Mann had the most significant degree of control over the affairs of the Enterprise and controlled the flow of funds collected from the Mann Payroll Companies' employer-clients through the Enterprise.

b.    The Other Mann Entities, including Southwestern Payroll, MyPayrollHR, and Cloud Payroll, directed the flow of funds collected from Mann Payroll Companies' employer-clients through the Enterprise.

c.    NatPay, primarily through its executives, Steven Pereira, James Hagen and Dawn Cafaro, provided the Enterprise with the necessary approvals, routed and diverted the funds throughout the Enterprise, concealed the Enterprise's money laundering activities from Pioneer, and from federal regulators, including FinCEN, and from state regulators, including the Texas Department of Banking, and fraudulently inflated the Other Mann Entities' revenues and receivable by concealing the source of the funds in the Enterprise.

817.    NatPay, Mann, MyPayrollHR, and Cloud Payroll each agreed to and did conduct, participate in the conduct of, operate, and manage the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), by engaging in acts indictable under 18 U.S.C. § 1343 (wire fraud); 1344 (bank fraud); § 1960 (unlicensed money transmitting); and § 1956 (money laundering and money laundering conspiracy).  Specifically:

a.    Mann, MyPayrollHR (through Mann as its President), and Cloud Payroll (through Mann as its indirect owner and controlling member) made knowingly false written representations of material fact to Pioneer Bank on November 26, 2013; September 16, 2014; April 4, 2017; October 23, 2017; and February 26, 2019.  On each of those dates, when completing the Account Agreements and CDD Forms necessary to open new accounts at Pioneer Bank, Mann, on behalf of himself and MyPayrollHR, Cloud Payroll, or Southwestern Payroll, falsely represented that MyPayrollHR, Cloud Payroll, or Southwestern Payroll were neither third-party payment processors nor money transmitters in the money services business.  These misrepresentations were part of the Enterprise's scheme to deceive Pioneer Bank into concluding that the Mann Entities had significantly greater revenues and receivables than they actually did.  In making those repeated and knowingly false representations of material fact, Mann, MyPayrollHR, and Cloud Payroll possessed an intent to victimize Pioneer Bank by exposing Pioneer Bank to actual and potential loss.  MyPayrollHR and Mann thus did conduct and participate in the conduct of the affairs of the

Enterprise through a pattern of financial institution/bank fraud in violation of 18 U.S.C. § 1344.

b.      Mann, MyPayrollHR, and Cloud Payroll used wire communications in furtherance of their intentional scheme to defraud and deceive Pioneer Bank. Specifically, on October 23, 2017; April 4, 2017; February 26, 2019; Mann, MyPayrollHR, and Cloud Payroll furthered the Enterprise's fraudulent scheme by sending the Account Agreement and CDD Form containing the false representation that the MyPayrollHR, Cloud Payroll, and Other Mann Entities were neither a third-party payment processor nor a money transmitter in the money services business to Pioneer Bank via email. On each of those dates, Mann, on behalf of himself and the Other Mann Entities, including MyPayrollHR and Cloud Payroll used the email account michael_mann@valuewisecorp.com to send the Account Agreement and CDD Form to Trudy Seeber, Pioneer Bank's business development officer, at seebert@pioneerbanking.com, which is Ms. Seeber's business email account at Pioneer Bank. In addition, on February 26, 2019, Mann also sent the fraudulent Account Agreement and CDD Form to Deborah Salsburg, Pioneer Bank's sales leader and assistant branch manager, at salsburgd@pioneerbanking.com, which is Ms. Salsburg's business email accounts at Pioneer Bank. Mann, MyPayrollHR, and Cloud Payroll thus did conduct and participate in the conduct of the affairs of the Enterprise through wire fraud in violation of 18 U.S.C. § 1343.

c.      Mann admitted that from 2013 through 2019 he fraudulently diverted payroll and payroll tax funds for his purposes and then laundered the proceeds of his fraud through the Enterprise. Specifically, MyPayrollHR and Southwestern Payroll each contracted with NatPay to process ACH files that transferred tax payments from employers to the IRS and other taxing authorities. As part of the arrangement with NatPay, tax payments were routed from the employers' accounts to Mann-controlled accounts at Pioneer prior to disbursement to the relevant taxing authorities. As with payroll funds, Mann "used the tax funds for his own purposes, including to pay down the [Valuewise revolving line of credit]." Mann further admitted to committing bank fraud under 18 U.S.C. § 1344 by drawing down on the Valuewise revolving line of credit using false borrowing base certificates, including six specific instances of bank fraud in violation of 18 U.S.C. § 1344 between December 2017 and August 2019. Mann also pled guilty under New York State Law to Money Laundering the First Degree in violation of Section 470.20(1)(b)(i)(A)(iii). The criminal complaint associated with that guilty plea contained an "Analysis of Financial Transactions Evidencing Money Laundering" and stated that "from at least January 2016 through the collapse of MANN's entities on or about September 2019, his modus operandi was the same – MANN conducted millions of dollars in financial transactions on a near-daily basis between his accounts that diverted stolen money from employers, employees, financial intuitions and financing companies. … MANN misappropriated

these funds by taking them from … Account x0212 and using them for purposes other than employee payroll. A review of the financial records, and Mann's admissions, show that the purpose of these transactions was to artificially inflate assets and accounts receivable in order to fraudulently obtain additional financing, pay down loans and lines of credit, and pay back wrongfully obtained employee payroll and taxes.

d.  From at least 2013 to 2019, MyPayrollHR accepted funds from third-party employer-clients and transmitted those funds through financial institutions to third-party employees or third-party taxing authorities. Consequently, MyPayrollHR acted as a "money transmitter" in the "money services businesses" as those terms are defined in the controlling statutes and regulations in the states where MyPayrollHR operates. However, MyPayrollHR was not licensed at any time from 2013 to 2019 as a money services business or a money transmitter with any state financial regulators or registered as such with the U.S. Department of the Treasury. MyPayrollHR operated without a license to prevent Pioneer Bank from learning that MyPayrollHR was a third-party payment processor and a money transmitter in the money services business, and to prevent Pioneer Bank from learning the source of the funds in MyPayrollHR's account at Pioneer Bank, thus serving to perpetuate the Enterprise's scheme of defrauding Pioneer through the use of misappropriated employer-client funds. MyPayrollHR thus did conduct and participate in the conduct of the affairs of the Enterprise by intentionally operating as an unlicensed and otherwise illegal money transmitting businesses in violation of 18 U.S.C. § 1960.

e.  From at least 2014 to 2019, Cloud Payroll accepted funds from third-party employer-clients and transmitted those funds through financial institutions to third-party employees or third-party taxing authorities. Consequently, Cloud Payroll acted as a "money transmitter" in the "money services businesses" as those terms are defined in the controlling statutes and regulations in the states where Cloud Payroll operates. However, CloudPayroll was not licensed at any time from 2013 to 2019 as a money services business or a money transmitter with any state financial regulators or registered as such with the U.S. Department of the Treasury. Cloud Payroll operated without a license to prevent Pioneer Bank from learning that Cloud Payroll was a third-party payment processor and a money transmitter in the money services business, and to prevent Pioneer Bank from learning the source of the funds in Cloud Payroll's account at Pioneer Bank, thus serving to perpetuate the Enterprise's scheme of defrauding Pioneer through the use of misappropriated employer-client funds. Cloud Payroll thus did conduct and participate in the conduct of the affairs of the Enterprise by intentionally operating as an unlicensed and otherwise illegal money transmitting businesses in violation of 18 U.S.C. § 1960.

f.    From at least 2017 to 2019, NatPay accepted funds from MyPayrollHR, Cloud Payroll, Southwestern Payroll, and the Other Mann Entities that were obtained from their third-party employer-clients. NatPay transmitted these funds through financial institutions to Pioneer before then transmitting those funds to third-party employees or third-party taxing authorities through financial institutions other than Pioneer. Consequently, NatPay acted as a "money transmitter" in the "money services businesses" as those terms are defined in the controlling statutes and regulations in the states where NatPay operates. However, NatPay was not licensed at any time from 2013 to 2019 as a money services business or a money transmitter with any state financial regulators or registered as such with the U.S. Department of the Treasury. NatPay operated without a license to prevent Pioneer Bank from learning that NatPay was a third-party payment processor and a money transmitter in the money services business, and to prevent Pioneer Bank from learning the source of the funds in 0212 checking account at Pioneer Bank, thus serving the Enterprises scheme to defraud Pioneer through the misuse of employer-client funds. NatPay thus did conduct and participate in the conduct of the affairs of the Enterprise by intentionally operating as an unlicensed and otherwise illegal money transmitting businesses in violation of 18 U.S.C. § 1960. Furthermore, NatPay did not obtain a license from any state in which it operated until January 2022 when the Texas Department of Banking fined NatPay for operating as an unlicensed money transmitter since 1991. Similarly, despite operating as a money transmitter, NatPay *continues to violate* 18 U.S.C. § 1960 because it still has not registered with FinCEN. Accordingly, on information and belief, NatPay does not have an appropriate or effective Anti-Money Laundering program as required by the BSA.

g.    As described above, in or around September 2017, NatPay agreed with Mann and the Enterprise to facilitate transactions on behalf of the Enterprise knowing the funds in those transactions would be misappropriated from the Mann Payroll Companies' employer-clients, as well as funds unlawfully obtained through the ValueWise line of credit extended by Pioneer Bank. NatPay joined that agreement knowing that the purpose of these transactions would be to both facilitate Mann and the Enterprise's continuing wire and bank fraud schemes and to conceal the source of the unlawful proceeds. In summary:

1.    NatPay and Mann agreed to create and NatPay did create a convoluted payment flow structure whose sole purpose was to circuitously route the funds throughout the Enterprise to conceal or disguise the nature, location, source, ownership, or control of the misappropriated employer-client funds. Moreover, from 2017 until 2019, NatPay engaged in transactions on behalf of the Enterprise knowing the funds in those transactions were the proceeds of misappropriated employer-client funds, as well as unlawful proceeds of funds

obtained through the ValueWise revolving line of credit with false borrowing base certificates. NatPay engaged in these transactions with the intent to facilitate Mann's wire fraud scheme and conceal the source of the unlawful proceeds, and NatPay did in fact hide, launder, and otherwise wrongfully retain the misappropriated employer-client funds.

2. At Mann's direction, NatPay carried out, through its ACH services, hundreds of millions of dollars in sham ePay transactions through its ACH services involving bank accounts at Pioneer Bank maintained by numerous Mann Entities and Account 0212. These transactions were specifically designed to conceal from Pioneer the Mann Entities' misappropriation and misuse of proceeds obtained from various financing sources, including funds obtained from the Valuewise revolving line of credit with false borrowing base certificates. From 2017 until 2019, NatPay used the convoluted structure to move funds throughout the Enterprise to conceal or disguise the source of the Enterprise's proceeds from its unlawful activities, including bank and wire fraud.

3. NatPay also engaged in separate, same day transactions in amounts just under the $10,000 threshold that would have subjected Defendants to liability under 18 U.S.C. § 1957. NatPay also did not register as a money service business with FinCEN or obtain a money transmission license in any state in which it operated for the purpose of protecting the Enterprise from any regulation-required audits or reports, including reports of suspicious activity to FinCEN.

4. NatPay thus did conduct and participate in the conduct of the affairs of the Enterprise by engaging in both money laundering and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a) and 1956(h).

818. These predicate acts were essential to and furthered defendants' racketeering scheme of misusing funds collected from the employer-clients of the Mann Payroll Companies, obtaining financing from Pioneer Bank and others through fraudulent means, and unlawfully generating fees.

819. The racketeering activities committed by NatPay, Mann, MyPayrollHR, Cloud Payroll all had the same or similar purposes, results, participants, victims, and methods of

commission, and they were not isolated events. Through these predicate acts, which occurred on a regular basis from 2013 at least through September 5, 2019, and would have continued but for the freezing of the Mann Entities' bank accounts, defendants devised and intended to devise a scheme to misuse funds collected from the employer-clients of the Mann Payroll Companies and defraud Pioneer Bank. Thus, the numerous acts of financial institution/bank fraud, wire fraud, operating as illegal money transmitting businesses, and money laundering set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

820.    The racketeering activities affected interstate and foreign commerce because (a) proceeds of specified unlawful activity were deposited in financial institutions in the United States, (b) stolen funds were moved by ACH, wire, and other means that affected interstate commerce, and (c) financial institutions that are engaged in, or the activities of which affect, interstate or foreign commerce were used to facilitate the illegal transactions.

821.    Defendants engaged in financial institution/bank fraud and wire fraud set forth above intentionally, willfully, and with actual knowledge of those activities.

822.    NatPay, Mann, MyPayrollHR, and Cloud Payroll engaged in illegal money transmitting businesses set forth above intentionally, willfully, and with actual knowledge of those activities.

823.    NatPay, Mann, MyPayrollHR, and Cloud Payroll engaged in money laundering and conspiracy to commit money laundering set forth above intentionally, willfully, and with actual knowledge of those activities.

824.    NatPay knew that Mann was engaged in fraudulent activity, that the payroll and payroll taxes were being misused through commingling and diversion, and that they were being obtained through wrongful criminal conduct. NatPay also knew that by its actions in circuitously

routing the funds, concealing its status as a money transmitter, and assisting the Enterprise in diverting payroll and payroll tax funds it was participating and facilitating the unlawful conduct, and concealing and disguising the source, nature, location, and ownership of the illicit proceeds.

825.   Further, NatPay knew that the Mann Payroll Companies and the Other Mann Entities maintained banking relationships with Pioneer Bank, and NatPay knew that the Enterprise was using Pioneer Bank as an unwitting conduit for its unlawful purposes, including money laundering, bank fraud, and wire fraud.  NatPay used bank accounts at Pioneer Bank to process transactions on behalf of the Enterprise that were deliberately designed to prevent Pioneer Bank from discovering the criminal scheme.  In furtherance of the scheme to conceal the Enterprise's criminal conduct, NatPay evaded regulatory requirements by avoiding federal and state licensing requirements for entities engaged in money transmission.

826.   The Enterprise was distinct from the predicate acts of wire fraud, financial institution/bank fraud, unlicensed money transmitting, and money laundering.  NatPay, Mann and the Other Mann Entities engaged in various lawful activities, including consulting work and payroll processing services, and executing certain lawful ACH transactions on behalf of Mann and the Mann Entities.

827.   Pioneer Bank justifiably relied on the false representations directed at it as part of Mann's, Southwestern Payroll's, MyPayrollHR's, and Cloud Payroll's racketeering activities – including financial institution/bank fraud and wire fraud, and on NatPay, Southwestern Payroll, Mann, MyPayrollHR, and Cloud Payroll to be appropriately licensed and to disclose that they were operating as "money transmitter[s]" in the "money services businesses" as those terms are defined in the controlling statutes and regulations – by, among other things:  (a) increasing the revolving line of credit facility which Mann increased based on false and fraudulent documentation

pertaining to his fraudulently inflated receivables; and (b) eventually granting RDC privileges to MyPayrollHR, Cloud Payroll, and the Other Mann Entities based in significant part on the illusion of the Mann Entities' robust revenue that resulted from the scheme to misappropriate funds collected from the employer-clients of the Mann Payroll Companies, as facilitated by NatPay.

828.    As a direct and proximate result of NatPay's, Mann's, MyPayrollHR's, and Cloud Payroll's racketeering activities and violations of 18 U.S.C. § 1962(c), Pioneer Bank has been injured in its business and property, in the amount of not less than $96,352,548.  The racketeering activities of NatPay, Mann, MyPayrollHR, and Cloud Payroll were the direct and proximate cause of Pioneer Bank's damages because, but for their efforts to facilitate and conceal the conduct of the criminal enterprise, Pioneer Bank would have discovered the illicit scheme and never would have continued to extend credit to ValueWise and its affiliates, never would have granted the Mann Entities RDC privileges, and never would have been victimized by nearly $20 million in overdrafts in the bank accounts that Mann controlled.

829.    Pursuant to 18 U.S.C. § 1964(c), Pioneer Bank is entitled to treble damages, plus its attorneys' fees.  At a minimum, therefore, Pioneer Bank is entitled to an award of $289,057,644.

### SECOND COUNTERCLAIM AGAINST NATPAY/CROSSCLAIM AGAINST MANN, MYPAYROLLHR, AND CLOUD PAYROLL
#### Conspiracy to Violate RICO – 18 U.S.C. § 1962(d)

830.    Counterclaim/crossclaim-plaintiff Pioneer Bank repeats and re-alleges each and every allegation and statement contained in paragraphs 601 through 829 above as though fully set forth in this paragraph.

831.    In violation of 18 U.S.C. § 1962(d), NatPay, Mann, MyPayrollHR, and Cloud Payroll conspired with each other to commit a violation of 18 U.S.C. § 1962(c), by knowingly agreeing and conspiring to directly or indirectly conduct or participate in the affairs of an enterprise through the pattern of racketeering activity described above.

832.    The conspiracy commenced among NatPay, Mann, MyPayrollHR, and Cloud Payroll by no later than 2017, and each counterclaim/crossclaim defendant committed essential and overt acts in furtherance of the agreement to commit two or more fraudulent and illegal racketeering acts.

833.    Each counterclaim/crossclaim defendant was aware of the nature of the conspiracy and that the conspiracy extended beyond each defendant and involved the other defendants.

834.    As a direct and proximate result of NatPay's, Mann's, MyPayrollHR's, and Cloud Payroll's racketeering activities and violations of 18 U.S.C. § 1962(c), Pioneer Bank has been injured in its business and property.

835.    Pursuant to 18 U.S.C. § 1964(d), Pioneer Bank is entitled to treble damages, plus its attorneys' fees.  At a minimum, therefore, Pioneer Bank is entitled to an award of $289,057,644.

## PRAYER FOR RELIEF

**WHEREFORE**, counterclaim/crossclaim-plaintiff Pioneer Bank respectfully requests that this Court enter judgment against counterclaim-defendant NatPay, and crossclaim-defendants Mann, MyPayrollHR, and Cloud Payroll, as follows:

A.    On the first counterclaim/crossclaim for violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962(c), a judgment in favor of Pioneer Bank, and against NatPay, Mann, MyPayrollHR, and Cloud Payroll, jointly and severally, for threefold Pioneer Bank's damages, including pre-judgment interest, in an exact amount to be determined at trial but in no event less than $289,057,644, and the cost of the suit, including reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c); and

B.    On the second counterclaim/crossclaim for conspiracy to violate the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962(d), a judgment in favor of Pioneer Bank, and against NatPay, Mann, MyPayrollHR, and Cloud Payroll, jointly and severally, for

threefold Pioneer Bank's damages, including pre-judgment interest, in an exact amount to be determined at trial but in no event less than $289,057,644, and the cost of the suit, including reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c); and

C.    Such other and further relief as this Court deems just, proper, and equitable.

Dated: April 15, 2024                       DLA PIPER LLP (US)
       New York, New York

                              By: */s/ Robert J. Alessi*
                                  Robert J.  Alessi (NDNY Bar Roll No. 101019)
                                  Steven M.  Rosato (NDNY Bar Roll No. 703375)
                                  1251 Avenue of the Americas
                                  New York, New York 10020
                                  Tel.: (212) 335-4500
                                  robert.alessi@us.dlapiper.com
                                  steven.rosato@us.dlapiper.com

                                  Courtney G.  Saleski (NDNY Bar Roll No. 703877)
                                  Evan E. North (NDNY Bar Roll NO. 704414)
                                  1650 Market Street, Suite 5000
                                  Philadelphia, Pennsylvania 19103
                                  Tel.: (215) 656-3300
                                  Fax: (215) 656-3301
                                  courtney.saleski@us.dlapiper.com

                                  *Attorneys for Defendants*
                                    *Pioneer Bancorp, Inc. and Pioneer Bank*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on all parties appearing in this action/known counsel of record via the CM/ECF system on this 15th day of April 2024.

*/s/ Robert J. Alessi*
Robert J. Alessi (NDNY Bar Roll No.101019)