**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

---

SOUTHWESTERN PAYROLL SERVICE, INC. and
GRANITE SOLUTIONS GROUPE, INC.,

       *Plaintiffs*,

   *v.*

PIONEER BANCORP, INC., et al.,

       *Defendants.*

---

NATIONAL PAYMENT CORPORATION,

       *Intervenor-Plaintiff*,

   *v.*

PIONEER BANCORP, INC., et al.,

       *Defendants.*

Case No. 1:19-cv-1349 (FJS/CFH)

---

**MEMORANDUM OF LAW IN SUPPORT OF PIONEER'S MOTION FOR**
**SUMMARY JUDGMENT ON CLAIMS OF SOUTHWESTERN PAYROLL**
**SERVICE, INC. AND GRANITE SOLUTIONS GROUPE, INC.**

Robert J. Alessi (NDNY Bar Roll No. 101019)    Courtney G. Saleski (NDNY Bar Roll No. 703877)
Steven M. Rosato (NDNY Bar Roll No. 703375)   Evan E. North (NDNY Bar Roll No. 704414)
1251 Avenue of the Americas              1650 Market Street, Suite 5000
New York, New York 10020               Philadelphia, Pennsylvania 19103
Tel.: (212) 335-4500                     Tel.: (215) 656-3300
robert.alessi@us.dlapiper.com           courtney.saleski@us.dlapiper.com
steven.rosato@us.dlapiper.com           evan.north@us.dlapiper.com

*Counsel for Defendants Pioneer Bancorp, Inc. and Pioneer Bank*

Dated:  June 3, 2024

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

LEGAL STANDARD .................................................................................................... 3

ARGUMENT ............................................................................................................... 3

I.  SWP'S CLAIMS ARE BARRED BY ITS OWN WRONGDOING. ............................... 3

    A.  The Doctrine of *in Pari Delicto* Bars SWP's Claims. ............................. 3

        1.  The Conduct and Knowledge of Michael Mann and Darin Alred, SWP's Officers, Are Imputed to SWP. ......................................... 4

        2.  SWP's Unlawful and Unethical Conduct Bars Its Claims. ......................... 4

        3.  SWP Cannot Show That the Adverse Interest Exception Applies. ............ 7

    B.  The Doctrine of Unclean Hands Bars SWP's Unjust Enrichment Claim. .............. 9

II. THE COURT SHOULD ENTER SUMMARY JUDGMENT IN PIONEER'S FAVOR ON PLAINTIFFS' COMMON LAW CLAIMS. ............................................ 9

    A.  Plaintiffs' Claims Rest on the False Premise That They Have an Interest in Funds in Standard Pioneer Checking Accounts Not Held by Either of Them. ..................................................... 9

        1.  Plaintiffs Cannot Overcome the Strong Presumption That the MPHR and Cloud Accounts Were General Accounts. ...................... 10

        2.  The Accounts Were Not Trust or Fiduciary Accounts. ........................... 12

        3.  Funds in the Accounts Were Not Subject to a Statutory Trust Under Section 7501 of the Internal Revenue Code. ................................ 14

    B.  Pioneer Is Entitled to Judgment on Plaintiffs' Common Law Claims. ................ 16

        1.  Plaintiffs Do Not Have Any Legal Interest in Any Funds Deposited in the Cloud Account That Would Support Their Conversion Claims. ........ 16

        2.  Plaintiffs' Unjust Enrichment Claim Duplicates the Conversion Claims and Otherwise Lacks Any Legal Basis. ......................................... 17

        3.  Pioneer Owed No Duty to Plaintiffs and Thus Cannot Be Liable to Them for Any Alleged Negligence. .......................................... 18

4.      Plaintiffs' Fraud Claims Are Based on a Fatally Flawed
        Application of the "Special Facts" Doctrine................................................ 19

5.      The Court Should Enter Judgment in Pioneer's Favor
        on the Declaratory Judgment Claim. ........................................................ 22

III.    PIONEER IS ENTITLED TO JUDGMENT ON PLAINTIFFS' RICO CLAIMS.......... 22

        A.      Pioneer Did Not Knowingly Participate in Predicate Acts of Money
                Laundering or Agree to Facilitate a Pattern of Racketeering. ............................ 22

        B.      Pioneer Did Not Conduct the Affairs of, or Share a Common Purpose with,
                the Alleged Enterprise.......................................................................... 26

        C.      Plaintiffs Cannot Establish Proximate Causation Under RICO........................... 27

IV.     THE COURT SHOULD ENTER SUMMARY JUDGMENT IN PIONEER'S
        FAVOR ON THE AIDING AND ABETTING FRAUD CLAIM. ................................. 29

V.      PLAINTIFFS HAVE NOT SUFFERED ANY COGNIZABLE DAMAGES. ................ 30

CONCLUSION.................................................................................................... 31

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*In re Aapex Sys.*,
   2000 WL 34326278 (W.D.N.Y. Nov. 21, 2000) ..................................................15

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*,
   731 F.2d 112 (2d Cir. 1984) ................................................................................20

*Abbott Labs. v. Adelphia Supply USA*,
   2017 WL 57802 (E.D.N.Y. Jan. 4, 2017) ............................................................22

*Abraham v. Leigh*,
   471 F. Supp. 3d 540 (S.D.N.Y. 2020) .................................................................30

*In re Agape Litig.*,
   681 F. Supp. 2d 352 (E.D.N.Y. 2010) ...........................................................19, 29

*Ahles v. Aztec Enters., Inc.*,
   120 A.D.2d 903 (3d Dep't 1986) .........................................................................16

*American E Grp. LLC v. Livewire Ergogenics Inc.*,
   2020 WL 469312 (S.D.N.Y. Jan. 28, 2020) ..........................................................9

*In re Applied Logic Corp.*,
   576 F.2d 952 (2d Cir. 1978) ................................................................................18

*Aquino by Convergent Distribs. of Tex., LLC v. Alexander Capital, LP*,
   642 B.R. 106 (S.D.N.Y. 2022) ..............................................................................7

*AXH Air-Coolers, LLC v. Pioneer Bancorp, Inc.*,
   2021 WL 5446947 (N.D.N.Y. Nov. 22, 2021) .....................................................16

*AXH Air-Coolers, LLC v. Pioneer Bancorp, Inc.*,
   2022 WL 16790328 (N.D.N.Y. Aug. 2, 2022) ..............................12, 16, 17, 19

*Baker v. Latham Sparrowbush Assocs.*,
   72 F.3d 246 (2d Cir. 1995) ....................................................................................4

*Beck v. Prupis*,
   529 U.S. 494 (2000) ..............................................................................................27

*Begier v. IRS*,
   496 U.S. 53 (1990) ................................................................................................14

iii

*In re Bennett Funding Grp., Inc.*,
   146 F.3d 136 (2d Cir. 1998)...........................................................................................18

*In re Bennett Funding Grp., Inc.*,
   212 B.R. 206 (B.A.P. 2d Cir. 1997), *aff'd*,
   146 F.3d 136 (2d Cir. 1998)....................................................................................10, 11

*In re Black & Geddes, Inc.*,
   35 B.R. 830 (Bankr. S.D.N.Y. 1984) ...........................................................................12

*Century Bus. Credit Corp. v. N. Fork Bank*,
   246 A.D.2d 395 (1st Dep't 1998) .................................................................................18

*Chamilia, LLC v. Pandora Jewelry, LLC*,
   2007 WL 2781246 (S.D.N.Y. Sept. 24, 2007)..............................................................30

*Chaney v. Dreyfus Serv. Corp.*,
   595 F.3d 219 (5th Cir. 2010) ..................................................................................18, 19

*CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*,
   735 F.3d 114 (2d Cir. 2013)............................................................................................3

*Cobalt Multifamily Inv'rs I, LLC v. Shapiro*,
   857 F. Supp. 2d 419 (S.D.N.Y. 2012)............................................................................8

*Corsello v. Verizon N.Y., Inc.*,
   18 N.Y.3d 777 (2012) ...................................................................................................17

*Crestview SPV, LLC v. Crestview Fin., LLC*,
   217 A.D.3d 473 (1st Dep't 2023) ...........................................................................17, 18

*CRT Invs., Ltd. v BDO Seidman, LLP*,
   85 A.D.3d 470 (1st Dep't 2011) ...................................................................................29

*Dahlgren v. First Nat'l Bank of Holdrege*,
   533 F.3d 681 (8th Cir. 2008) ..................................................................................25, 27

*Dem. Nat'l Cmte. v. Russian Fed'n*,
   392 F. Supp. 3d 410 (S.D.N.Y. 2019)..........................................................................26

*Demirovic v. Ortega*,
   2016 WL 11472745 (E.D.N.Y. Sept. 15, 2016) ..........................................................17

*Empire Merchants, LLC v. Reliable Churchill LLLP*,
   902 F.3d 132 (2d Cir. 2018)..........................................................................................27

*Entretelas Americanas S.A. v. Soler*,
   2020 WL 9815186 (S.D.N.Y. Feb. 3, 2020)................................................................23

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004).................................................................27

*Frost Nat'l Bank v. Midwest Autohaus, Inc.*,
    241 F.3d 862 (7th Cir. 2001) .........................................................25, 26

*Georgia Malone & Co. v. Rieder*,
    19 N.Y.3d 511 (2012) ........................................................................17

*Glen Flora Dental Ctr., Ltd. v. First Eagle Bank*,
    2024 WL 621601 (N.D. Ill. Feb. 14, 2024) ......................................25

*Glen Flora Dental Ctr., Ltd. v. First Eagle Bank*,
    487 F. Supp. 3d 722 (N.D. Ill. 2020) ...............................................5, 6

*Goel v. Ramachandran*,
    111 A.D.3d 783 (2d Dep't 2013) .......................................................29

*Grain Traders, Inc. v. Citibank, N.A.*,
    960 F. Supp. 784 (S.D.N.Y. 1997)...........................................2, 10, 17

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
    17 F. Supp. 2d 275 (S.D.N.Y. 1998).....................................................9

*Guest v. First Republic Corp. of Am.*,
    618 F. Supp. 3d 86 (N.D.N.Y. 2022) .................................................19

*In re Hamilton Taft & Co.*,
    53 F.3d 285 (9th Cir. 1995), *vacated on other grounds*,
    68 F.3d 337 (9th Cir. 1995) ...............................................................15

*Hamilton v. Beretta U.S.A. Corp.*,
    96 N.Y.2d 222 (2001) ........................................................................18

*HBL Indus. v. Chase Manhattan Bank*,
    45 B.R. 865 (S.D.N.Y. 1985)..............................................................16

*Hemi Grp., LLC v. City of N.Y., N.Y.*,
    559 U.S. 1 (2010)................................................................................27

*In re ICP Strategic Credit Income Fund Ltd.*,
    568 B.R. 596 (S.D.N.Y. 2017)..............................................................8

*Ironforge.com v. Paychex, Inc.*,
    747 F. Supp. 2d 384 (W.D.N.Y. 2010) ...............................................13

*JMM Props., LLC v. Erie Ins. Co.*,
    2013 WL 149457 (N.D.N.Y. Jan. 14, 2013).........................................4

*Katzman v. Victoria's Secret Catalogue,*
   167 F.R.D. 649 (S.D.N.Y. 1996) ........................................................................26

*Kirschner v. KPMG LLP,*
   15 N.Y.3d 446 (2010) ...........................................................................3, 4, 7, 8

*Kleeberg v. Eber,*
   2020 WL 4586904 (S.D.N.Y. Aug. 10, 2020)......................................................22

*In re Knox,*
   64 N.Y.2d 434 (1985) ........................................................................................18

*In re Lehman Bros. Holdings, Inc.,*
   439 B.R. 811 (Bankr. S.D.N.Y. 2010) ................................................................10

*Lerner v. Fleet Bank, N.A.,*
   459 F.3d 273 (2d Cir. 2006)...........................................................18, 19, 22, 29

*In re LIBOR-Based Fin. Instrs. Antitrust Litig.,*
   27 F. Supp. 3d 447 (S.D.N.Y. 2014)..................................................................17

*Lumen at White Plains, LLC v. Stern,*
   135 A.D.3d 600 (1st Dep't 2016) ......................................................................29

*Maier-Schule GMC, Inc. v. Gen. Motors Corp.,*
   154 F.R.D. 47 (W.D.N.Y. 1994)........................................................................30

*Mandarin Trading Ltd. v. Wildenstein,*
   16 N.Y.3d 173 (2011) ........................................................................................20

*Marchak v. JPMorgan Chase & Co.,*
   2016 WL 3911926 (E.D.N.Y. July 15, 2016) ....................................................19

*Marlin v. Moody Nat. Bank, N.A.,*
   248 F. App'x 534 (5th Cir. 2007) ......................................................................25

*Mazo v. United States,*
   1977 WL 1114 (S.D. Ga. Mar. 22, 1977) ..........................................................15

*Merkin v. Berman,*
   123 A.D.3d 523 (1st Dep't 2014) ......................................................................21

*MH Pillars Ltd. v. Realini,*
   2018 WL 1184847 (N.D. Cal. Mar. 7, 2018).......................................................7

*In re Morales Travel Agency,*
   667 F.2d 1069 (1st Cir. 1981)............................................................................13

*Morin v. Frontier Bus. Tech.*,
    288 B.R. 663 (W.D.N.Y. 2003) ................................................................15

*Moss v. BMO Harris Bank, N.A.*,
    258 F. Supp. 3d 289 (E.D.N.Y. 2017) ..............................................26, 27

*Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A.*,
    261 F.R.D. 13 (S.D.N.Y. 2009) ...............................................................29

*Ne. Gen. Corp. v. Wellington Advert., Inc.*,
    82 N.Y.2d 158 (1993) ...............................................................................13

*New Greenwich Litig. Trustee, LLC v. Citco Fund Servs. (Europe) B.V.*,
    145 A.D.3d 16 (1st Dep't 2016) .......................................................3, 6, 8

*New Paradigm Software Corp. v. New Era of Networks, Inc.*,
    2002 WL 31749396 (S.D.N.Y. Dec. 9, 2002) ..........................................30

*Palatkevich v. Choupak*,
    2014 WL 1509236 (S.D.N.Y. Jan. 24, 2014) ...........................................23

*Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*,
    412 F. App'x 325 (2d Cir. 2011) ................................................................3

*Pasternack v. Lab. Corp. of Am. Holdings*,
    27 N.Y.3d 817 (2016) ...............................................................................20

*Peoples Westchester Sav. Bank v. F.D.I.C.*,
    961 F.2d 327 (2d Cir. 1992) ........................................................10, 11, 12

*Pincover v. J.P. Morgan Chase Bank, N.A.*,
    592 F. Supp. 3d 212 (S.D.N.Y. 2022) ......................................................18

*Q3 Inv. Recovery Vehicle, LLC v. McEvoy*,
    2023 N.Y. Slip Op. 30184(U), (Sup. Ct., N.Y. Cnty. 2023) .....................12

*In re Refco Sec. Litig.*,
    759 F. Supp. 2d 301 (S.D.N.Y. 2010) ......................................................10

*Republic of Iraq v. ABB AG*,
    768 F.3d 145 (2d Cir. 2014), *cert. denied*, 576 U.S. 1028 (2015) .............3

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ..................................................................................26

*In re Ridgemour Meyer Props., LLC*,
    791 F. App'x 279 (2d Cir. 2020) ................................................................3

*Rogers v. McDorman*,
    521 F.3d 381 (5th Cir. 2008) ...........................................................................7

*Rosemann v. St. Louis Bank*,
    858 F.3d 488 (8th Cir. 2017) .........................................................................25

*Rosner v. Bank of China*,
    528 F. Supp. 2d 419 (S.D.N.Y. 2007).......................................................2, 27

*In re Sakowitz, Inc.*,
    949 F.2d 178 (5th Cir. 1991) .........................................................................13

*Schmidt v. Fleet Bank*,
    16 F. Supp. 2d 340 (S.D.N.Y. 1998).............................................................25

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
    473 U.S. 479 (1985).......................................................................................22

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018)...........................................................................29

*Sunbelt Beverage Corp. v. United States*,
    1996 WL 556939 (N.D. Cal. July 23, 1996)..................................................15

*Sw. Payroll Serv., Inc. v. Pioneer Bancorp, Inc.*,
    2020 WL 1889013 (N.D.N.Y. Apr. 16, 2020)................................................20

*Sw. Payroll Serv., Inc. v. Pioneer Bancorp, Inc.*,
    2020 WL 4353219 (N.D.N.Y. July 7, 2020) .................................................21

*Swan Brewery Co. v. U.S. Tr. Co. of N.Y.*,
    832 F. Supp. 714 (S.D.N.Y. 1993).............................................................9, 10

*In re Teckenbrock*,
    2012 WL 3818220 (Bankr. S.D.N.Y. Sept. 4, 2012).....................................13

*In re Thompson*,
    37 B.R. 211 (Bankr. M.D. Fla. 1983) ............................................................15

*Thyroff v. Nationwide Mut. Ins. Co.*,
    460 F.3d 400 (2d Cir. 2006)...........................................................................16

*In re Tucker*,
    346 B.R. 844 (Bankr. E.D. Okla. 2006).........................................................13

*United States v. $1,399,313.74 in U.S. Currency*,
    591 F. Supp. 2d 365 (S.D.N.Y. 2008)............................................................24

*United States v. Viola,*
  35 F.3d 37 (2d Cir. 1994) ......................................................................26

*United States v. Zemlyansky,*
  908 F.3d 1 (2d Cir. 2018) .......................................................................22

*Univ. of Md. at Baltimore v. Peat, Marwick, Main & Co.,*
  996 F.2d 1534 (3d Cir. 1993) .................................................................26

*Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.,*
  2019 WL 3503109 (N.D. Cal. Aug. 1, 2019) ........................................19

*Votsis v. ADP, LLC,*
  2019 N.Y. Slip Op. 34093(U), (Sup. Ct., Monroe Cnty. 2019), *aff'd,*
  187 A.D.3d 1490 (4th Dep't 2019) ........................................................12

*Walker v. City of N.Y.,*
  621 F. App'x 74 (2d Cir. 2015) ................................................................3

*Zamora v. FIT Int'l Grp. Corp.,*
  834 F. App'x 622 (2d Cir. 2020) ...........................................................27

*Zamora v. JPMorgan Chase Bank,*
  2015 WL 4653234 (S.D.N.Y. July 31, 2015) ........................................17

*Zaz-Huff, Inc. v. Chase Manhattan Bank, N.A.,*
  277 A.D.2d 59 (1st Dep't 2000) .......................................................12, 14

## Statutes and Rules

12 U.S.C. § 3403(a) ...............................................................................20

18 U.S.C. § 1343 ....................................................................................22

18 U.S.C. § 1956 ....................................................................................22

18 U.S.C. § 1956(c)(7) ...........................................................................23

18 U.S.C. § 1957 ....................................................................................22

18 U.S.C. § 1957(a) ..........................................................................23, 24

18 U.S.C. § 1960 ......................................................................................7

Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"),
  18 U.S.C. §§ 1961-1968 .............................................................. *passim*

26 U.S.C. § 6672 ....................................................................................15

26 U.S.C. § 6672(a) ..................................................................................................................15

26 U.S.C. § 7501 .................................................................................................................14, 15

Bank Secrecy Act of 1970, 31 U.S.C. §§ 5311 *et seq.* .............................................................19

Fed. R. Civ. P. 56(a) ...................................................................................................................3

Pioneer Bancorp, Inc. and Pioneer Bank (collectively, "Pioneer") respectfully submit this memorandum of law in support of their motion for summary judgment on all claims asserted by Southwestern Payroll Service, Inc. ("SWP") and Granite Solutions Groupe, Inc. ("GSG," and collectively, "plaintiffs") in the third amended complaint ("TAC," Dkt. No. 245).[1]

## PRELIMINARY STATEMENT

Plaintiffs have changed their legal theories numerous times in this litigation. They have done so to try to avoid the conclusion that they are not proper parties for the claims and relief they seek, nor is Pioneer, a victim and lawful actor, a proper defendant. After a massive fraudulent scheme spearheaded by Michael Mann, SWP's controlling shareholder and Treasurer, came to light in September 2019, SWP quickly filed this lawsuit in an effort to save itself and shift the blame to Pioneer—by far, and indisputably, the largest victim of the fraud. Beyond advancing ever-shifting legal theories, plaintiffs have gone to great lengths to obscure core, unchanging facts that preclude any recovery against Pioneer. But plaintiffs now must face the evidentiary reality of summary judgment: The undisputed evidence shows that their claims have no basis, regardless of the legal theory they might espouse at any given moment. For three fundamental reasons, Pioneer respectfully requests summary judgment in its favor on all of plaintiffs' claims.

*First*, the doctrine of *in pari delicto* categorically bars SWP from recovering anything from Pioneer, given the extensive and irrefutable evidence of SWP's own misconduct. As noted, SWP was owned and controlled by Mann at all relevant times, and SWP formed an integral part of the fraudulent scheme that Mann directed. SWP benefitted handsomely from that scheme. Among other things, SWP received $1.3 million in debt relief ***paid directly out of proceeds of the scheme***,

---

[1] Capitalized terms not otherwise defined have the meaning in Pioneer's statement of material facts pursuant to Local Rule 56.1 ("SMF"). Pioneer respectfully refers the Court to the SMF for a complete recitation of the relevant facts, which are discussed herein.

and SWP saw its business grow considerably. Further, SWP breached its contracts with its employer-clients in funneling their funds to the MPHR and Cloud Accounts, and SWP defrauded its customers by intentionally failing to tell them it was doing so. SWP has been sued by many of its employer-clients for its misconduct. This threat of liability explains SWP's improper effort to point the finger at Pioneer. The Court should not permit SWP to carry on this misdirection any longer. SWP must be held to account for its misconduct, which is plentiful.

*Second*, plaintiffs' common law claims for conversion, fraud, negligence, and unjust enrichment all suffer from the same fatal defect: they all depend on a finding that the MPHR Account and the Cloud Account were special, trust, or fiduciary accounts because, without such a finding, plaintiffs lack any cognizable interest in those accounts. But the undisputed evidence shows that the accounts were none of those things: they were general accounts, from start to finish, as even one of plaintiffs' experts admitted. Under settled New York law, "a depositor loses title to money deposited in a general account at the moment those funds are deposited," and banks owe no duty to non-customers absent a fiduciary relationship between the depositor and the non-customer. *E.g.*, *Grain Traders, Inc. v. Citibank, N.A.*, 960 F. Supp. 784, 793 (S.D.N.Y. 1997). On this fundamental basis, plaintiffs' claims cannot survive summary judgment.

*Third*, plaintiffs' RICO claims rest on the absurd proposition that Pioneer joined the same fraudulent scheme that grievously harmed it. There is no evidence to support that fictional premise. The evidence shows only that Pioneer provided "banking services," which courts repeatedly have rejected as insufficient to establish a bank's participation in the fraudster's crimes. *E.g.*, *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 431 (S.D.N.Y. 2007). This principle also dooms plaintiffs' aiding and abetting fraud claim, which rests on the same meritless theory.

For these reasons and others detailed below, the Court should enter summary judgment in Pioneer's favor on all of plaintiffs' claims.

## LEGAL STANDARD

"Summary judgment should be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Walker v. City of N.Y.*, 621 F. App'x 74, 75 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)).  Where the non-moving party bears the burden of proof, "it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013).  The non-moving party then must "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.*

## ARGUMENT

## I.   SWP'S CLAIMS ARE BARRED BY ITS OWN WRONGDOING.

### A.   The Doctrine of *in Pari Delicto* Bars SWP's Claims.

"The doctrine of *in pari delicto* mandates that the courts will not intercede to resolve a dispute between two wrongdoers." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010).  The defense applies whenever the wrongdoing of the party against whom it is asserted is "at least equal to that of the party asserting it." *New Greenwich Litig. Trustee, LLC v. Citco Fund Servs. (Europe) B.V.*, 145 A.D.3d 16, 25 (1st Dep't 2016); *Republic of Iraq v. ABB AG*, 768 F.3d 145, 162, 163 (2d Cir. 2014), *cert. denied*, 576 U.S. 1028 (2015).  This principle "is so strong in New York that . . . the defense applies even in difficult cases and should not be weakened by exceptions." *In re Ridgemour Meyer Props., LLC*, 791 F. App'x 279, 280 (2d Cir. 2020) (cleaned up).  In proper cases, like this one, courts can determine at summary judgment that the defense applies. *See, e.g.*, *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 412 F. App'x 325, 327 (2d Cir. 2011).

1.   **The Conduct and Knowledge of Michael Mann and Darin Alred, SWP's Officers, Are Imputed to SWP.**

"The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation." *E.g.*, *Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995). An entity is "responsible for the acts of its authorized agents even if particular acts were unauthorized," and "even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud." *Kirschner*, 15 N.Y.3d at 465; *see JMM Props., LLC v. Erie Ins. Co.*, 2013 WL 149457, at *6-7 (N.D.N.Y. Jan. 14, 2013) (imputing criminal conduct).

At all relevant times, Michael Mann and Darin Alred were officers and agents of SWP; their conduct and knowledge thus are imputed to SWP. Mann, through Cloud Payroll, gained a controlling 51% interest in SWP in April 2017. SMF ¶¶ 128-29. Alred, who was theretofore the 100% owner and president of SWP, retained a 49% equity interest in the company following the transaction, and received payments totaling nearly $2 million under the terms of the transaction. SMF ¶¶ 12, 129. Mann and Alred were the "only two officers of Southwestern Payroll," with Mann serving as Secretary/Treasurer and Alred serving as President. SMF ¶¶ 133-35.

SWP has admitted that Mann was authorized to, and did, execute contracts on behalf of SWP. *See* SMF ¶¶ 164-65. Mann opened Account 1996 on behalf of SWP in October 2017 "in his capacity as the representative of Southwestern Payroll." SMF ¶ 164. According to Alred, "Michael Mann . . . had the right to represent the interest of Southwestern Payroll at Pioneer Bank." SMF ¶ 166. Mann also contracted on behalf of SWP in October 2017 to have NatPay provide ACH transaction processing services through August 2019. SMF ¶ 136. Alred, for his part, "ran the company" after the transaction, just as he had before. SMF ¶ 137.

2.   **SWP's Unlawful and Unethical Conduct Bars Its Claims.**

*First*, SWP knowingly authorized the diversion of funds collected from its employer-

clients out of its accounts at Prosperity Bank to accounts at Pioneer Bank that were not under the control of SWP, or even in its name—in direct violation of SWP's contracts with its employer-clients. SMF ¶¶ 104, 141-142, 146-47, 160, 224, 230. SWP also knew that the MPHR and Cloud Accounts contained funds from other sources, and that funds deposited in those accounts were being used for purposes other than the payment of payroll taxes. *See, e.g.*, SMF ¶¶ 100-03. These practices both violated payroll processing industry standards and were completely at odds with the way that SWP had done business in the past. SMF ¶ 150. SWP knew these changes to its operations were wrong, as evidenced by the fact that SWP considered asking employer-clients to sign documents to authorize the setup of a new account, but ultimately decided against it. SMF ¶¶ 155-56. SWP never disclosed to its employer-clients that their funds would be routed into the MPHR Account or, later, the Cloud Account, and thereafter commingled with funds collected from employer-clients of other payroll service companies. SMF ¶¶ 153-57. Numerous employer-clients have sued SWP alleging that SWP defrauded them and breached its service contracts. SMF ¶ 163.

*Second*, SWP intentionally failed to implement appropriate safeguards to protect its employer-clients' funds. Critically, SWP relinquished to Cloud Payroll its responsibility to ensure that the funds collected from SWP would be paid to taxing authorities—Alred *admitted* that SWP no longer considered itself responsible for ensuring timely payment. SMF ¶¶ 148-49. SWP failed even to set up a shared services agreement with Cloud Payroll to delineate the services that Cloud Payroll would perform on SWP's behalf and address any potential liability to SWP that might arise if those services were not performed properly. SMF ¶¶ 144-45. Nor did SWP set up a formal board of directors to oversee its operations, as governing documents required and as SWP's receiver admitted was irregular. SMF ¶¶ 138-39. SWP's failure "to implement any supervisory measures" to safeguard against fraud, and its "ignoring of various events" that would have alerted it "to any wrongdoing[,]" preclude it from shifting responsibility to Pioneer. *Glen Flora Dental*

*Ctr., Ltd. v. First Eagle Bank*, 487 F. Supp. 3d 722, 738 (N.D. Ill. 2020); *see also New Greenwich*, 145 A.D.3d at 25 (negligent, reckless conduct sufficient to invoke defense).

SWP's wrongdoing and reckless mismanagement of its own business engendered substantial harm.  On repeated occasions following the acquisition and the concomitant radical change in the way SWP processed funds intended for payroll obligations, SWP's customers lodged complaints that their taxes were not being timely paid.  *See* SMF ¶¶ 157-61.  In January 2018, for example, Alred emailed Mann about a "tsunami of notices we have been receiving . . . on some of our largest clients for non-filing of returns, non-payment of taxes etc.  Plus the responses are sporadic and provide little or no explanation of why the tax was not filed or paid."  SMF ¶ 158.  After nothing was done to address these problems, Alred sent another email two months later, stating that "the situation is a disaster!"  SMF ¶ 159.  Customers were demanding "to know where their money is," and Alred was demanding a solution.  *Id.*  Three weeks later, Alred threatened to "tak[e] back tax processing in-house" given these ongoing problems, but SWP never did.  SMF ¶¶ 160-62.  In fact, SWP did nothing to increase oversight of its employer-clients' funds, nor did it disclose to them the details concerning the mishandling of their funds.  *See supra* at 5.

*Third*, SWP used Account 1996 almost exclusively for money laundering and check and ACH kiting transactions for purposes of defrauding Pioneer Bank.  SMF ¶ 172.  For instance, on November 9, 2018, ACH deposits totaling over $1.1 million were credited to Account 1996 from accounts held by TrueConsulting and ValueWise, which were then transferred to another ValueWise account.  SMF ¶¶ 173-75.  These transactions were fraudulent; SWP has no record of ever invoicing TrueConsulting for the amount deposited in Account 1996, nor does SWP have any record of owing any debt corresponding to the amounts withdrawn from the account.  SMF ¶ 176.  In August 2019, there were 107 transactions in the account—not one was legitimate.  SMF ¶ 177.

*Fourth*, SWP defrauded Pioneer Bank when, in opening Account 1996, it falsely

represented to Pioneer Bank on the CDD Form that SWP was *not* a "Money Services Business" and *not* a "non-bank third party payment processor." SMF ¶¶ 167-68. In truth, SWP was both. A Money Services Business was specifically defined in the CDD Form as "a money transmitter[.]" SMF ¶ 167. A third-party payroll processing company is a third-party payment processor. SMF ¶ 168. Pioneer relied on the truth of SWP's representations on the CDD Form, which makes clear that Pioneer will not open accounts for entities engaged in such business. SMF ¶¶ 170-71.

*Finally*, SWP operated as an unlicensed money transmitter in providing its payroll services in violation of federal and state criminal law. SMF ¶¶ 11, 14-16; *see* 18 U.S.C. § 1960; *MH Pillars Ltd. v. Realini*, 2018 WL 1184847, at *6 (N.D. Cal. Mar. 7, 2018). By its own admission, SWP received funds from its employer-clients and transmitted them to third parties. SMF ¶ 11. Such activity constitutes money transmission under federal and state law, and numerous jurisdictions have recognized that payroll companies, like SWP, are money transmitters. SMF ¶ 16.

In short, SWP was a direct and "active participant[]" in the very fraudulent scheme that it claims caused it harm. *Rogers v. McDorman*, 521 F.3d 381, 391 (5th Cir. 2008). Because, at a minimum, SWP's wrongful conduct was "at least equal" to what SWP asserts against Pioneer, the *in pari delicto* doctrine bars any recovery by SWP. *Kirschner*, 15 N.Y.3d at 464.

### 3.    SWP Cannot Show That the Adverse Interest Exception Applies.

SWP cannot satisfy the "adverse interest" exception to the above-described imputation rule to distance itself from Mann's criminal conduct. *Aquino by Convergent Distribs. of Tex., LLC v. Alexander Capital, LP*, 642 B.R. 106, 126 (S.D.N.Y. 2022). That "most narrow of exceptions" prevents imputation where the agent is shown to "have *totally abandoned* his principal's interests and [been] acting *entirely* for his own or another's purposes." *Kirschner*, 15 N.Y.3d at 466. It applies only to "those cases—outright theft or looting or embezzlement—where the insider's misconduct benefits only himself or a third party," *id.* at 466-67, and is inapplicable where "a

corporation receives *any* benefit from the fraud." *Cobalt Multifamily Inv'rs I, LLC v. Shapiro*, 857 F. Supp. 2d 419, 428 (S.D.N.Y. 2012). Even short-term benefits suffice, and any harm from the discovery of the fraud—rather than from the fraud itself—does not bear on whether the adverse interest exception applies." *Kirschner*, 15 N.Y.3d at 469.

SWP cannot show that Mann's conduct falls within this exception. SWP benefitted from that conduct in myriad ways—any one of which precludes application of the exception. To begin, SWP benefitted from Mann paying off more than $1.3 million in debt following Cloud Payroll's acquisition of its 51% interest in SWP—after the scheme was well underway. SMF ¶ 129. That debt was paid off ***using ill-gotten gains from the scheme***. SMF ¶ 130. SWP benefitted from Mann controlling the company: Between April 2017 and September 2019, SWP's revenues and profits *grew* annually, and SWP experienced a net gain of more than 100 employer-clients. SMF ¶ 140. SWP further benefitted from the scheme insofar as it provided access to funds in Mann's accounts at Pioneer that were combined for cash purposes, ensuring that payments would continue to be made on behalf of SWP's employer-clients. SMF ¶¶ 91, 213, 230. SWP also benefitted from Mann's centralization of tax payment processing, as it allowed SWP to reduce its expenses. SMF ¶¶ 148-49, 226. When issues arose with regard to tax processing for SWP's employer-clients, it was Mann who resolved them. SMF ¶¶ 228-29. At a minimum, Mann kept SWP's "business alive," which is "enough of a benefit to defeat the adverse interest exception." *In re ICP Strategic Credit Income Fund Ltd.*, 568 B.R. 596, 611-12 (S.D.N.Y. 2017).[2]

---

[2] Even were the Court to find a factual dispute as to whether the exception applies to Mann's conduct, SWP's felonious operation as an unlicensed money transmitter and Alred's intentional concealment of information about its handling of employer-client funds alone warrant application of the *in pari delicto* doctrine here. *See, e.g.*, *New Greenwich*, 145 A.D.3d at 25-27.

### B.      The Doctrine of Unclean Hands Bars SWP's Unjust Enrichment Claim.

SWP's equitable claim for unjust enrichment (TAC ¶¶ 454-60) is also barred by the defense of unclean hands (Pioneer Ans. ¶¶ 505-08), which is "[a]nalogous to the defense of *in pari delicto*," but bars only equitable relief. *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 310 (S.D.N.Y. 1998). Given SWP's misconduct, *see supra* at 5-7, the doctrine of unclean hands bars SWP from recovering from Pioneer for unjust enrichment. *See, e.g.*, *American E Grp. LLC v. Livewire Ergogenics Inc.*, 2020 WL 469312, at *12 (S.D.N.Y. Jan. 28, 2020).

## II.    THE COURT SHOULD ENTER SUMMARY JUDGMENT IN PIONEER'S FAVOR ON PLAINTIFFS' COMMON LAW CLAIMS.

### A.     Plaintiffs' Claims Rest on the False Premise That They Have an Interest in Funds in Standard Pioneer Checking Accounts Not Held by Either of Them.

Each of plaintiffs' eight common law claims (TAC ¶¶ 393-460, 486-98) relies on a false legal and factual premise: that plaintiffs have some legally cognizable interest in funds (for which plaintiffs have invented the phrase "tax trust funds") that were deposited into the MPHR or Cloud Account (for which plaintiffs have invented the phrase "tax accounts"). *E.g.*, TAC ¶¶ 398, 400, 410, 426, 433, 453, 460, 490, 497. But plaintiffs' fictionalized description of the accounts and the funds deposited in them cannot change reality: (i) the MPHR and Cloud Accounts were opened as general accounts, and there was no restriction on their use; and (ii) MyPayrollHR and Cloud Payroll in fact used the accounts for purposes beyond processing payroll tax payments for third parties. SMF ¶¶ 80-104, 209-22. Those fundamental, undisputed facts compel the conclusion that plaintiffs lack any legally cognizable interest in any funds allegedly deposited in those accounts, because those funds ***became the property of Pioneer Bank the moment they were deposited***. *See, e.g.*, *Swan Brewery Co. v. U.S. Tr. Co. of N.Y.*, 832 F. Supp. 714, 718 (S.D.N.Y. 1993).

1.      **Plaintiffs Cannot Overcome the Strong Presumption That the MPHR and Cloud Accounts Were General Accounts.**

"Bank deposits can be classified as either general or special." *Peoples Westchester Sav. Bank v. F.D.I.C.*, 961 F.2d 327, 330 (2d Cir. 1992).  Upon deposit of funds to a general account, "title passes from the depositor to the bank, and the bank may use those funds in conducting its business," creating a debtor-creditor relationship between bank and depositor.  *In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 328 (S.D.N.Y. 2010); *Grain Traders*, 960 F. Supp. at 793.  A special account, in contrast, creates "a bailor-bailee relationship between the depositor and the bank," *Refco*, 759 F. Supp. 2d at 328-29, such that title to the funds remains with the accountholder. *Peoples Westchester*, 961 F.2d at 330.  Funds deposited in a special account thus are segregated from other funds.  *Swan Brewery*, 832 F. Supp. at 717-18.

"As a general matter, a strong presumption exists under New York law that a deposit account is a general account and not a special purpose account."  *In re Lehman Bros. Holdings, Inc.*, 439 B.R. 811, 824 (Bankr. S.D.N.Y. 2010).  "To override this presumption, evidence must demonstrate that the parties *mutually intended to set aside the funds* for a specific purpose."  *Id.* (emphasis added).  "[T]he existence or absence of an agreement that the funds on deposit in the account were to be kept *separate and isolated* from other accounts in the bank or the bank's general funds is a critical factor."  *In re Bennett Funding Grp., Inc.*, 212 B.R. 206, 214 (B.A.P. 2d Cir. 1997), *aff'd*, 146 F.3d 136 (2d Cir. 1998) (emphasis added).  The absence of such an agreement is "a profound demonstration of the presumption" that an account is general.  *Id.* at 215.

A custodian's (such as MPHR or Cloud Payroll) deposit of third-party client funds for the purpose of temporarily holding those funds does not transform a general account into a special account.  For example, in *Peoples Westchester*, the Second Circuit held that an attorney's titling of an Interest on Lawyer Account (or IOLA)—the sole purpose of which is to hold client funds—

10

as a "Trust Account" was insufficient to establish a special account.  961 F.2d at 329.  The Court emphasized that the account agreement made "no mention of a duty to segregate funds[,]" which "the parties must [have] explicitly provide[d]" if they intended a special account.  *Id.* at 331.  The Court also disagreed with the district court that the bank's mere opening of the account meant that it "accepted the funds on a basis that they were to be held for a specific purpose, thereby giving rise to a special deposit."  *Id.*  The Court explained that this "misperceives the meaning of 'specific purpose,'" which "connotes that, in holding the funds, the bank itself acts as an agent directly on behalf of the beneficial owner—a service for which the bank is separately compensated."  *Id.*

The same conclusion is required here.  As to the "critical factor" in the analysis, there is no evidence from which a jury could infer that Pioneer and Mann agreed to keep funds deposited in either of the accounts "separate and isolated from other accounts in the bank or the bank's general funds."  *Bennett*, 212 B.R. at 214.  To the contrary, the documentary evidence shows that the accounts were general checking accounts.  SMF ¶¶ 83-86; 210-11.  The account agreements did not require Pioneer to segregate funds, nor did they contain language designating Pioneer as "an agent directly on behalf of the beneficial owner[s]" of deposited funds.  *Peoples Westchester*, 961 F.2d at 331; SMF ¶ 85.  Rather, Mann had total control over the accounts and ensured that he could freely transfer funds by combining them for "cash management purposes."  SMF ¶¶ 91, 211.[3]

Consistent with this documentary evidence, Mann testified that there was "never any agreement" that Pioneer would isolate the funds in those accounts from the bank's other accounts.  SMF ¶¶ 88-89, 92, 217-21.  Nor did Mann specially compensate Pioneer for maintaining the accounts, paying only a per-transaction fee, as would be expected from a general account.  SMF ¶

---

[3] The account agreement for the MPHR Account contains a handwritten "Client Account" notation, but as Mann testified, that notation was never intended to restrict the use of funds in those accounts.  SMF ¶ 90.  In any case, such an ambiguous notation is not sufficient to create a special account.  *Peoples Westchester*, 961 F.2d at 329.

86; *see Peoples Westchester*, 961 F.2d at 331.  He also testified that, in practice, he "repeatedly transferred funds from [the Cloud Account] to [the MPHR Account], and then to other checking accounts held by ValueWise affiliates at Pioneer Bank."  SMF ¶¶ 100-03, 212-14.  Mann could withdraw or transfer funds from the accounts "for any reason," often transferred funds to entities other than taxing authorities, and did not use the funds exclusively for tax payments.  SMF ¶ 213. John Reinke, CEO of Cloud Payroll, corroborated that testimony, admitting that the MPHR Account "started out as an everything account," with funds "going in and going out for payment of various expenses and everything."  SMF ¶ 101.  This evidence also comports with the widely understood fact that community banks, like Pioneer, generally do not open special deposit accounts and, when they do, they require unique agreements.  SMF ¶¶ 87, 93.

While the Court may have had to accept plaintiffs' allegations about the parties' mutual intent at the pleading stage, *AXH Air-Coolers, LLC v. Pioneer Bancorp, Inc.*, 2022 WL 16790328, at *4 (N.D.N.Y. Aug. 2, 2022), it cannot do so on summary judgment.  There never was any mutual intent to treat the MPHR and Cloud Accounts as special accounts; they were general accounts.

## 2.   The Accounts Were Not Trust or Fiduciary Accounts.

There also is no genuine dispute that the accounts were not trust or fiduciary accounts. New York courts look to the status of the ***depositor*** as a trustee or fiduciary to determine whether an account is "fiduciary in nature."  *Zaz-Huff, Inc. v. Chase Manhattan Bank, N.A.*, 277 A.D.2d 59, 61 (1st Dep't 2000); *see also Q3 Inv. Recovery Vehicle, LLC v. McEvoy*, 2023 N.Y. Slip Op. 30184(U), at *4 (Sup. Ct., N.Y. Cnty. 2023) (same).  Where "a recipient of funds is not prohibited from using them as his own and commingling them with his own monies, a debtor-creditor, not a trust, relationship exists."  *In re Black & Geddes, Inc.*, 35 B.R. 830, 836 (Bankr. S.D.N.Y. 1984).

"Courts have rejected claims that companies providing payroll services are fiduciaries to their clients."  *Votsis v. ADP, LLC*, 2019 N.Y. Slip Op. 34093(U), at *5 (Sup. Ct., Monroe Cnty.

2019), *aff'd*, 187 A.D.3d 1490 (4th Dep't 2019); *see also, e.g.*, *Ironforge.com v. Paychex, Inc.*, 747 F. Supp. 2d 384, 394-95 (W.D.N.Y. 2010) (relationship between payroll company and employer-client is strictly contractual).[4]  Consistent with that understanding, SWP, Cloud Payroll, and MyPayrollHR were not trustees or fiduciaries to their clients.

      SWP has denied that it owed any fiduciary duty to its clients.  *See, e.g.*, SMF ¶ 17.  SWP admits only that it had a "contractual obligation" to remit payments to taxing authorities on behalf of its employer-clients.  SMF ¶ 18.  Those obligations were defined in payroll services agreements that did not impose fiduciary duties or require funds collected from employer-clients to be held in trust.  SMF ¶ 19.  SWP was only required to collect funds from its clients and make payroll tax payments as they became due, and it used the funds as if they were its own, earning interest that it used to reduce fees owed to its bank.  SMF ¶¶ 19-21.  Under Oklahoma law, which governs the SWP service agreements, a fiduciary relationship cannot be read into a contract containing "no terms [] to create a trust . . . ."  *In re Tucker*, 346 B.R. 844, 850 (Bankr. E.D. Okla. 2006); *accord Ne. Gen. Corp. v. Wellington Advert., Inc.*, 82 N.Y.2d 158, 164 (1993) (if defendant "wanted fiduciary-like relationships or responsibilities, it could have bargained for and specified for them").

      There is similarly no evidence that MyPayrollHR or Cloud Payroll held employer-client payroll funds in trust or otherwise acted as fiduciaries.  MyPayrollHR's standard contract (including its contract with GSG) contained no words to that effect, requiring MyPayrollHR only to "process Payments to taxing authorities," stressing that the employer-client would be "solely

---

[4] Courts have reached the same conclusion in a variety of other commercial contexts.  *See, e.g.*, *In re Morales Travel Agency*, 667 F.2d 1069, 1072 (1st Cir. 1981) (travel agency did not hold airline ticket sale receipts in trust for airline); *In re Sakowitz, Inc.*, 949 F.2d 178, 182 (5th Cir. 1991) (department store was not a fiduciary for subleasing retail merchants); *In re Teckenbrock*, 2012 WL 3818220, at *3 (Bankr. S.D.N.Y. Sept. 4, 2012) (talent manager acting as intermediary for client payments was not a trustee or fiduciary).

responsible to pay all taxes," and authorizing MyPayrollHR to earn and keep interest on funds collection from its employer-clients.  SMF ¶¶ 51-54.  There likewise is no evidence that Cloud Payroll agreed to act as a fiduciary or trustee.  At best, therefore, both MyPayrollHR and Cloud Payroll assumed a simple contractual obligation with respect to any funds they collected and were not prohibited from commingling or using those funds in whatever way they saw fit.

Analysis of the MPHR and Cloud Accounts themselves leaves no dispute that they were opened and maintained as ordinary business checking accounts, not fiduciary or trust accounts. "Banks rely on their depositors to self-identify accounts held as a fiduciary or in trust for the benefit of a third party."  SMF ¶ 96.  In opening the accounts, Mann did not indicate the purpose of the account was to hold funds in trust, and there is no evidence that Pioneer was told that the accounts would contain such funds.  SMF ¶¶ 92, 95, 215-18.  While account labeling is not dispositive, *Zaz-Huff*, 277 A.D.2d at 61, the accounts were not even labeled as trust or fiduciary accounts, and there was never any agreement between SWP and Cloud Payroll requiring funds collected from SWP's employer-clients to be deposited in trust accounts.  SMF ¶¶ 99, 144, 147, 215.  Plaintiffs' expert even admitted that payroll service bureaus do not place client funds in trust accounts.  SMF ¶ 94.

### 3.  Funds in the Accounts Were Not Subject to a Statutory Trust Under Section 7501 of the Internal Revenue Code.

Nor can plaintiffs establish that any portion of the funds in the MPHR Account or the Cloud Account constituted what they term "tax trust funds."  TAC ¶ 421.  That contention is based on a mistaken interpretation of 26 U.S.C. § 7501, which does not imbue specific funds with a trust character as they travel through multiple intermediaries—it simply imposes an obligation on the person "required to collect or withhold" the funds to ensure that they are paid over to the IRS.

The "special fund in trust" created under § 7501 is a "trust in an abstract 'amount'—a dollar figure not tied to any particular assets—rather than in the actual dollars withheld."  *Begier*

14

*v. IRS*, 496 U.S. 53, 62 (1990).  That is, the trust "is not really a trust over particular funds as much as it is a trust over a particular amount" that remains with the employer.  *Morin v. Frontier Bus. Tech.*, 288 B.R. 663, 673 (W.D.N.Y. 2003).  Congress defined the enforcement reach of the § 7501 trust through a companion statute authorizing the IRS to collect taxes either from the company that has failed to pay taxes or from a defined class of responsible individuals, such as corporate officers. 26 U.S.C. § 6672(a).  "If the withholding taxes are not collected by the United States from the employer or personally from its officers or persons found liable under Section 6672, such tax is lost."  *Mazo v. United States*, 1977 WL 1114, at *2 (S.D. Ga. Mar. 22, 1977).

Plaintiffs' contention that there were "tax trust funds" in the MPHR and Cloud Accounts has neither factual nor legal merit.  To the contrary, numerous courts have recognized that the § 7501 trust does not follow specific funds from one place to another but remains with the statutorily responsible entities and individuals.  *See, e.g.*, *In re Hamilton Taft & Co.*, 53 F.3d 285, 288 (9th Cir. 1995) (funds transferred to payroll company were not subject to § 7501), *vacated on other grounds*, 68 F.3d 337 (9th Cir. 1995); *Morin*, 288 B.R. at 673 (§ 7501 trust at all times "remained with" the employer); *In re Aapex Sys.*, 2000 WL 34326278, at *4 (W.D.N.Y. Nov. 21, 2000) (IRS has "no direct right of action" against payroll company under § 7501); *Sunbelt Beverage Corp. v. United States*, 1996 WL 556939, at *4 (N.D. Cal. July 23, 1996) (withheld taxes transferred to payroll processor "were not subject to § 7501's statutory trust").

Aside from the employer, there is a limited class of individuals who can be held responsible for an employer's nonpayment of taxes because they must "collect, truthfully account for, and pay over" taxes subject to § 7501.  26 U.S.C. § 6672.  Congress's decision to limit potential liability to certain individuals under § 6672 means it did not contemplate liability of other, unnamed third parties like Pioneer.  *In re Thompson*, 37 B.R. 211, 215 (Bankr. M.D. Fla. 1983) (the "Government has recourse only against the employer or the corporate officer" responsible under § 6672).

**B.      Pioneer Is Entitled to Judgment on Plaintiffs' Common Law Claims.**[5]

     **1.      Plaintiffs Do Not Have Any Legal Interest in Any Funds Deposited in the Cloud Account That Would Support Their Conversion Claims.**

Pioneer is entitled to judgment on plaintiffs' claims for conversion and aiding and abetting conversion (TAC ¶¶ 401-26, 486-90) because plaintiffs cannot "establish legal ownership of a specific identifiable piece of property." *Ahles v. Aztec Enters., Inc.*, 120 A.D.2d 903, 903 (3d Dep't 1986); *see also Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006). Plaintiffs assert a possessory or proprietary interest in funds deposited in the Cloud Account. But there is no material dispute that (1) the Cloud Account was a general account, barring any claim of conversion against Pioneer; and (2) neither SWP nor Granite was the accountholder, and thus neither has any legally cognizable interest in funds deposited in the account.

The evidence establishes that the Cloud Account was a general account. *See supra* at 9-12. That is dispositive "because deposits in a general account cannot be converted as a matter of law[.]" *AXH Air-Coolers*, 2022 WL 16790328, at *4; *see AXH Air-Coolers, LLC v. Pioneer Bancorp, Inc.*, 2021 WL 5446947, at *3 (N.D.N.Y. Nov. 22, 2021) (dismissing conversion claim). Even if plaintiffs could somehow overcome the presumption that the Cloud Account was general, their conversion claims still fail because they cannot show that they had a possessory interest in any funds deposited into the account. *See AXH Air-Coolers*, 2022 WL 16790328, at *4-5. As Cloud Payroll was the accountholder, plaintiffs are, at most, "creditors of [a] special account depositor[]," which is insufficient to establish a "possessory interest in the converted property." *Id.* at *5 (quoting *HBL Indus. v. Chase Manhattan Bank*, 45 B.R. 865, 868 (S.D.N.Y. 1985)).

GSG is in an even worse position: It cannot even show that it is a creditor of Cloud Payroll, as it never had any contract with Cloud Payroll.  SMF ¶¶ 46-49.  GSG thus is in the same position

---

[5] Plaintiffs' aiding and abetting fraud claim is addressed separately at section IV below.

as the plaintiff in *AXH Air-Coolers*.  2022 WL 16790328, at \*5.  This "attenuated link between [GSG] and the funds in" the Cloud Account necessarily defeats GSG's conversion claims.  *Id.*

### 2. Plaintiffs' Unjust Enrichment Claim Duplicates the Conversion Claims and Otherwise Lacks Any Legal Basis.

Plaintiffs' claim that "Pioneer has been unjustly enriched by its *conversion* and *retention* of" funds allegedly deposited into the Cloud Account (TAC ¶ 456 (emphasis added)) is an improper attempt to recast plaintiffs' defective conversion claim.  Unjust enrichment "is not available" where, as here, it "simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) (collecting cases); *see, e.g.*, *Demirovic v. Ortega*, 2016 WL 11472745, at \*5 (E.D.N.Y. Sept. 15, 2016).  Because the funds in the Cloud Account became Pioneer's property when deposited, *Grain Traders*, 960 F. Supp. at 793, "there was nothing wrongful about [Pioneer's] exercise of dominion and control over" funds in the account.  *Crestview SPV, LLC v. Crestview Fin., LLC*, 217 A.D.3d 473, 474 (1st Dep't 2023).

Even if the claim were not duplicative of plaintiffs' conversion claim (and it is), neither plaintiff can establish a "sufficient connection" to the Cloud Account, a threshold requirement for any unjust enrichment claim.  *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 519 (2012).  SWP was not the accountholder, and SWP had neither any dealings with Pioneer regarding the account nor any access to it.  SMF ¶¶ 80, 104, 146, 149, 225-29.  As for GSG, it had never heard of Pioneer before the events giving rise to this dispute.  SMF ¶ 46-49.  As plaintiffs and Pioneer "'simply had no dealings with each other'" vis-à-vis the account, "their relationship is 'too attenuated' to support an unjust enrichment claim."  *In re LIBOR-Based Fin. Instrs. Antitrust Litig.*, 27 F. Supp. 3d 447, 479 (S.D.N.Y. 2014) (quoting *Georgia Malone*, 19 N.Y.3d at 517-18).  Courts routinely dismiss unjust enrichment claims asserted against banks by non-customers on this ground.  *See, e.g.*, *id.*; *Zamora v. JPMorgan Chase Bank*, 2015 WL 4653234, at \*4 (S.D.N.Y. July 31, 2015).

Finally, courts are not "free to ignore" a bank's legal right of setoff simply because "they think application would be 'unjust[.]'" *In re Applied Logic Corp.*, 576 F.2d 952, 957-58 (2d Cir. 1978).  Pioneer's lawful exercise of its rights with respect to its own property was not unjust, *Crestview*, 217 A.D.3d at 474, and no "compelling circumstances" exist to justify overriding those rights, *e.g.*, *In re Bennett Funding Grp., Inc.,* 146 F.3d 136, 139 (2d Cir. 1998).

### 3.    Pioneer Owed No Duty to Plaintiffs and Thus Cannot Be Liable to Them for Any Alleged Negligence.

An element of any negligence claim is the existence of "a duty owed by the defendant to the plaintiff." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006).  Thus, "a threshold question" on any such claim "is whether the alleged tortfeasor owed a duty of care to the injured party." *Pincover v. J.P. Morgan Chase Bank, N.A.*, 592 F. Supp. 3d 212, 228 (S.D.N.Y. 2022). "The injured party must show that a defendant owed not merely a general duty to society but a specific duty to him or her[.]" *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (2001).

Banks ordinarily "do not owe non-customers a duty to protect them from the intentional torts of their customers." *Lerner*, 459 F.3d at 286.  Nor must banks "monitor the depositors' financial activities so as to assure the creditors' collection of the depositors' debts." *Century Bus. Credit Corp. v. N. Fork Bank*, 246 A.D.2d 395, 396 (1st Dep't 1998).  "[T]he fear of imposing on banks endless, unpredictable liability [] drives New York's distinction between a bank's customers and non-customers." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 231 (5th Cir. 2010).

This rule is so strong that banks are not even "required to conduct an investigation to protect funds from possible misappropriation *by a fiduciary*."  *In re Knox*, 64 N.Y.2d 434, 438 (1985) (emphasis added).  There is only one limited circumstance in which a bank *might* owe a duty to non-customers: where the bank participates in the "diversion" of funds from a ***fiduciary*** account, "either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being

18

executed" by the fiduciary.  *AXH Air-Coolers*, 2022 WL 16790328, at *6 (quoting *Lerner*, 459 F.3d at 287).  While plaintiffs ignored evidence at the pleading stage to feign the narrow exception, they now must face the evidence that such exception cannot apply.  The Mann Payroll Companies were not fiduciaries, and thus neither the MPHR Account nor the Cloud Account was a fiduciary account.  *See supra* at 12-14.  That alone is dispositive of plaintiffs' negligence claim.

There is likewise no merit to plaintiffs' attempt to impose on Pioneer a duty to the general public based on the Bank Secrecy Act of 1970 and related statutes (commonly referred to as BSA/AML and Know-Your-Customer ("KYC") regulations).  *See* TAC ¶¶ 445-46.  It is well settled that BSA/AML and KYC regulations do not create a "duty of care" owed to the general public.  *In re Agape Litig.*, 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010); *see, e.g.*, *Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*, 2019 WL 3503109, at *7 (N.D. Cal. Aug. 1, 2019) (same; collecting cases); *Marchak v. JPMorgan Chase & Co.*, 2016 WL 3911926, at *3 (E.D.N.Y. July 15, 2016) ("[C]ourts have repeatedly held that a bank's duty under the BSA is owed *only* to the government and not to private parties.") (cleaned up).

As a matter of law, therefore, Pioneer owed no duty to plaintiffs under any negligence theory (e.g., ordinary negligence, gross negligence, or negligence *per se*).  *See Venture Gen. Agency*, 2019 WL 3503109, at *7; *see, e.g.*, *Guest v. First Republic Corp. of Am.*, 618 F. Supp. 3d 86, 90 (N.D.N.Y. 2022) (whether a duty exists "is a question of law" for the court).  Were it otherwise, banks would owe "endless, unpredictable" duties to unforeseeable third parties.  *Chaney*, 595 F.3d at 231.  While Pioneer complied with BSA/AML regulations at all relevant times, *see* SMF ¶¶ 64-72, the Court need not address that issue to resolve this motion.

### 4.    Plaintiffs' Fraud Claims Are Based on a Fatally Flawed Application of the "Special Facts" Doctrine.

Plaintiffs assert two fraud claims that largely duplicate each other.  TAC ¶¶ 412-36.  Both

claims relate to the six-day period over Labor Day weekend in 2019 during which Pioneer prevented debits from the Cloud Account and the other Mann Entity Accounts—*after* Pioneer had learned that Bank of America returned and called back nearly $16 million in checks written to various Mann Entity Accounts.  TAC ¶¶ 413, 428-29; *see* SMF ¶¶ 230-36.  According to plaintiffs, Pioneer had a duty to disclose to them the status of transaction activity in the Cloud Account during this period and that the failure to do so amounted to fraud.  TAC ¶¶ 417, 430.  Plaintiffs are wrong.

Plaintiffs must show "a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."  *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 827 (2016).  A "fraudulent omission" requires a showing that "the defendant had a duty to disclose material information and that it failed to do so."  *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 179 (2011).  Plaintiffs failed to adduce any evidence to support the existence of any such duty or justifiable reliance.

*First*, neither SWP nor GSG was the designated accountholder for the Cloud Account.  SMF ¶¶ 80, 209.  As a result, Pioneer not only had no duty to disclose information about the account to plaintiffs—it was ***prohibited*** from doing so under federal law.  12 U.S.C. § 3403(a) (prohibiting banks from disclosing "the financial records of any customer," subject to limited exceptions inapplicable here); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 123 (2d Cir. 1984) ("[A] bank should keep its own customers' affairs confidential.").

*Second*, this Court held at the outset of this case that there was no confidential or fiduciary relationship between Pioneer and SWP giving rise to any duty to disclose information about the Cloud Account.  *Sw. Payroll Serv., Inc. v. Pioneer Bancorp, Inc.*, 2020 WL 1889013, at *4 (N.D.N.Y. Apr. 16, 2020).  Discovery did nothing to change that conclusion—especially as to GSG, which admittedly had no relationship with Pioneer.

*Third*, plaintiffs also cannot establish a duty to disclose based on the "special facts" doctrine, which applies when "one party has superior knowledge that is not readily available/accessible to the other party and that party knows the other party is acting on the basis of mistaken knowledge." *Sw. Payroll Serv., Inc. v. Pioneer Bancorp, Inc.*, 2020 WL 4353219, at *4 (N.D.N.Y. July 7, 2020). As a threshold matter, a duty to disclose on this basis arises "only in business dealings between parties to a prospective transaction," *Merkin v. Berman*, 123 A.D.3d 523, 524 (1st Dep't 2014), and plaintiffs indisputably were not parties to any relevant transaction with Pioneer—Cloud Payroll was. SMF ¶¶ 104, 241-45. In addition, there is no evidence that Pioneer withheld any information ***knowing*** that ***any*** person, much less plaintiffs, was acting based on mistaken knowledge. Mann and Cloud Payroll, through NatPay, initiated the ACH transactions underlying plaintiffs' claims. SMF ¶ 319. Pioneer returned ACH debits associated with those transactions within the two-day period required under the NACHA Operating Rules, as NatPay admitted. SMF ¶ 320. Plaintiffs contend that this two-day delay was an intentional omission to cause plaintiffs to continue to "authorize deposits" into the accounts. TAC ¶ 429. Not so. Banks do not—and are not expected or required to—provide notice before returning debits within the two-day window. SMF ¶ 320-22. Plaintiffs' assertion that Pioneer violated the NACHA Operating Rules also is belied by NACHA's rejection of that identical claim. SMF ¶ 326.

*Fourth*, SWP's claim that it was operating at some kind of informational deficit between August 30 and September 4 is further flawed: there is no dispute that Michael Mann—SWP's controlling shareholder, principal, and authorized signatory on Account 1996 opened in its name— was made aware of the account freeze on August 30, 2019. SMF ¶¶ 241-45. As Mann's knowledge is imputed to SWP, *see supra* at 4, SWP had knowledge in real time about the status of its own account at Pioneer, as well as all of the other accounts affected by the freeze.

*Finally*, plaintiffs also cannot show that they justifiably relied on any purported omission

by Pioneer.  GSG cannot claim *any* reliance because it admits it was not even aware of Pioneer's existence at the time.  SWP similarly cannot claim any reliance.  SWP knowingly permitted Cloud Payroll to withdraw funds SWP collected from its employer-clients and deposit them in the Cloud Account, to which SWP knew it had no right of access.  SMF ¶¶ 142-53.

**5.    The Court Should Enter Judgment in Pioneer's Favor on the Declaratory Judgment Claim.**

Since plaintiffs' declaratory judgment claim (TAC ¶¶ 393-400) "parallels the other claims and merely seeks a declaration of the same rights and obligations[,]" Pioneer is entitled to judgment on that claim as well.  *E.g.*, *Kleeberg v. Eber*, 2020 WL 4586904, at *16 (S.D.N.Y. Aug. 10, 2020).

**III.    PIONEER IS ENTITLED TO JUDGMENT ON PLAINTIFFS' RICO CLAIMS.**

To establish a civil RICO claim under Section 1962(c), a plaintiff must show "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).  To establish RICO conspiracy, the plaintiff must show the defendant both "knew about and agreed to facilitate a racketeering scheme."  *United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018) (internal quotations omitted).  "[M]ere knowledge of the scheme, even coupled with personal benefit, is not enough to impose liability for a RICO conspiracy."  *Abbott Labs. v. Adelphia Supply USA*, 2017 WL 57802, at *9 (E.D.N.Y. Jan. 4, 2017).  The plaintiff also must establish "an injury to [its] business or property" and "causation of the injury by the defendant's violation."  *Lerner*, 459 F.3d at 283.

**A.    Pioneer Did Not Knowingly Participate in Predicate Acts of Money Laundering or Agree to Facilitate a Pattern of Racketeering.**

Plaintiffs' theory is that the alleged enterprise engaged in a pattern of "money laundering in violation of 18 U.S.C. §1956 and 1957, which involved third-party payroll and payroll tax funds that were obtained by wire fraud, in violation of 18 U.S.C. § 1343."  Dkt. No. 264, RICO Stmt. ¶ 5.a.  Money laundering under § 1956 requires a showing that, among other things, the defendant

22

knowingly engaged in a financial transaction that "involved the proceeds of specified unlawful activity [("SUA")] as defined in 18 U.S.C. § 1956(c)(7)" and, further, that the defendant knew "that the financial transaction was designed in whole or in part to conceal or disguise the source, ownership, control, etc., of those proceeds." *Entretelas Americanas S.A. v. Soler*, 2020 WL 9815186, at *9 (S.D.N.Y. Feb. 3, 2020). Money laundering under § 1957 similarly requires evidence that the defendant "knowingly engaged . . . in a monetary transaction involving criminally derived property." *Palatkevich v. Choupak*, 2014 WL 1509236, at *18 (S.D.N.Y. Jan. 24, 2014); *see* 18 U.S.C. § 1957(a). Plaintiffs cannot show that Pioneer knowingly conducted or agreed to facilitate financial transactions with money derived from the alleged SUA of wire fraud.

There is certainly evidence that Mann was a crook who misused funds obtained from third parties (including Pioneer). But even if plaintiffs could establish wire fraud by Mann resulting in criminally derived proceeds in accounts at Pioneer, there is zero evidence from which a jury could infer Pioneer *knew* the funds deposited in those accounts were derived from wire fraud. Pioneer had no visibility into Mann's communications, contractual relationships, or purported assurances to employer-clients—nor did Pioneer have access to any information about the way in which Mann obtained funds from third parties. Pioneer did not originate ACH collections for Mann—Cloud Payroll and NatPay did. SMF ¶¶ 142, 224-29. There is zero evidence that Pioneer had any communication or contract with the payroll companies' employer-clients. All the funds were deposited into Pioneer accounts based on instructions from Cloud Payroll through NatPay, which has admitted that it never communicated with anyone at Pioneer. SMF ¶ 40-42.

This evidence is consistent with Mann's testimony as well. SMF ¶¶ 73-76. He testified that he was not aware that anybody at Pioneer knew that he was engaged in check kiting and ACH kiting. SMF ¶ 74. Nor did anyone at Pioneer say anything to him that would lead him to believe that Pioneer was so aware. SMF ¶ 75. And while Pioneer knew about non-sufficient funds

("NSF") transactions, Mann never told anyone that the reason for these transactions was that he was operating a check-kiting scheme, SMF ¶ 76, and Pioneer believed the reason for these transactions was Mann's business's needs outstripping his line of credit, SMF ¶¶ 77-78.  Mann further admitted, in his August 2020 guilty plea, that he was able to increase the ValueWise line of credit only *by defrauding Pioneer (his victim)*—a fraud that involved generating fake invoices, mischaracterizing business relationships, and artificially inflating assets.  *See* SMF ¶¶ 61-63.  In fact, state and federal law enforcement thoroughly investigated and determined that Pioneer was a victim of Mann's crimes, not a participant in them.  *Id.*  Mann spent years propping up and concealing his scheme by telling thousands of lies.  SMF ¶ 79.

Plaintiffs' theory of knowledge is that "Pioneer knew the [supposed] third-party payroll and payroll tax funds were to be held in trust by the Payroll Companies and were not to be used for any other purpose."  RICO Stmt. ¶ 5.b.  That theory is not supported by the evidence (*see supra* at 9-15), but even if it were, it does not show that Pioneer knowingly participated in laundering money derived from SUA.  Establishing that Pioneer knew there were alleged "third party funds" in Mann's accounts does not equate to knowledge that those funds were obtained by any SUA.  *See United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, 373 (S.D.N.Y. 2008).

Plaintiffs also point to alleged events occurring *after* the collapse of Mann's fraud scheme as evidence of Pioneer's involvement.  TAC ¶¶ 324-49.  Those later events do not show that Pioneer knew any funds deposited at Pioneer were the product of Mann's fraud scheme (and it did not).  Pioneer nevertheless responds to and refutes these false allegations.  *See* SMF ¶¶ 246-318.

Moreover, even a bank's purported awareness of a customer's wrongdoing (and there is no evidence to infer that here) does not mean that the bank agreed to participate in and facilitate that wrongdoing—much less to participate in a criminal enterprise.  Numerous "[c]ourts have rejected the idea that knowledge of bad banking practices—like check kiting or uncollected balances—is

enough to show an agreement to facilitate a RICO enterprise." *Glen Flora Dental Ctr., Ltd. v. First Eagle Bank*, 2024 WL 621601, at *13 (N.D. Ill. Feb. 14, 2024) (collecting cases).

The recent summary judgment decision in *Glen Flora* is on point.  There, the plaintiff asked the court to infer an agreement between the bank and the fraudsters to participate in an embezzlement scheme based on purported evidence that (i) the fraudsters had "diverted company funds" from the bank "for their own personal use" (much like Mann did); (ii) the company "started racking up significant fees with [the bank] for insufficient funds" under the fraudsters' financial management; (iii) bank "executives received daily reports about overdraft fees on Plaintiffs' accounts"; (iv) there were "a dozen 'red flags,'" including high overdraft fees and failing to check for fraudulent signatures; and (v) the bank knew of the fraudster's "questionable conduct," such as "overstating the amount of deposits." *Id.* at *4-5, *11.  The court rejected the argument and granted summary judgment for the bank, relying on numerous circuit court cases consistently holding that knowledge of bad banking practices—even criminal practices like "check kiting"— cannot establish a racketeering agreement.  *Id.* at *13-14.[6]

Given this unbroken line of cases rejecting RICO claims based on the same evidence-free theory, plaintiffs cannot show that Pioneer agreed to participate in a money laundering scheme.

---

[6] *See, e.g.*, *Rosemann v. St. Louis Bank*, 858 F.3d 488, 500-01 (8th Cir. 2017) (allegations that "handling of the overdrafts" and acceptance of "millions in fiduciary funds" to pay down line of credit insufficient to prove RICO conspiracy); *Dahlgren v. First Nat'l Bank of Holdrege*, 533 F.3d 681, 690 (8th Cir. 2008) (rejecting RICO claims where bank extended customer lines of credit, allowed customer to commingle funds, "honored substantial overdrafts," approved "n.s.f. checks to investors," and encouraged other banks "to participate in the lines of credit"); *Marlin v. Moody Nat. Bank, N.A.*, 248 F. App'x 534, 539 (5th Cir. 2007) (similar); *Frost Nat'l Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 870-71 (7th Cir. 2001) (similar); *see also Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 344, 354 (S.D.N.Y. 1998) (similar).

### B.    Pioneer Did Not Conduct the Affairs of, or Share a Common Purpose with, the Alleged Enterprise.

"Bankers do not become racketeers by acting like bankers." *Moss v. BMO Harris Bank, N.A.,* 258 F. Supp. 3d 289, 307-308 (E.D.N.Y. 2017).  And the supposed "evidence" of Pioneer conducting the enterprise's affairs is simply evidence of Pioneer conducting its own affairs—the affairs of a bank.  But Pioneer cannot be liable under RICO absent evidence that it took "*some* part in directing [that enterprise's] affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  This "'operation and management requirement,'" "is an extremely rigorous test" in "this Circuit." *E.g., Dem. Nat'l Cmte. v. Russian Fed'n*, 392 F. Supp. 3d 410, 440-41 (S.D.N.Y. 2019).

Plaintiffs fail this exacting standard.  They contend that Pioneer directed the enterprise by providing Mann and his entities with banking services: access to bank accounts, a line of credit, remote deposit checking privileges, and approvals of NSF transactions when Mann overdrew his accounts.  They claim that, by providing these services, Pioneer "facilitated and condoned Mann's" diversion of employer funds "to cover overdrafts and pay down the Valuewise line of credit." RICO Stmt. ¶ 5.b.  Those assertions are wrong, but it does not matter because, even if correct, such conduct does not constitute "directing" or "conducting" the affairs of Mann's RICO enterprise.

No matter how one looks at it, all plaintiffs have is evidence of Pioneer acting as a bank. *Frost Nat'l Bank*, 241 F.3d at 870-71.  That Mann used Pioneer's services unlawfully does not suggest otherwise.  "Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result." *Univ. of Md. at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993); *United States v. Viola*, 35 F.3d 37, 41 (2d Cir. 1994) (similar).  If that were enough, every bank would be liable under RICO—the "litigation equivalent of a thermonuclear device," *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996)—whenever a customer fraudulently uses the

26

bank's services for a sufficient period.

For precisely that reason, courts routinely hold that merely providing "banking services," "regardless of how indispensable or essential such services may have been," does not qualify as "operation or management" of a RICO enterprise.  *Rosner v. Bank of China,* 528 F. Supp. 2d 419, 431 (S.D.N.Y. 2007).  Courts have reached that conclusion even when the bank provided services "with knowledge of the fraud"—a factual predicate not present here.  *Id.*; *see, e.g.*, *Dahlgren*, 533 F.3d at 690; *Moss*, 258 F. Supp. 3d at 307-308.  The same conclusion is required here.

For substantially the same reason, Pioneer did not "share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes."  *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 174 (2d Cir. 2004).  A bank's generation of "fees and profits" from a customer's fraud does not suffice because it is "only a benefit incidental to the ordinary and lawful banking relationship."  *Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x 622, 625-26 (2d Cir. 2020).  Pioneer's actions to ensure that Mann was covering his overdrafts and paying down his line of credit are entirely consistent with a bank acting to further its own interests—not the interests of any criminal enterprise.

## C.     Plaintiffs Cannot Establish Proximate Causation Under RICO.

To recover on a RICO claim, the plaintiff must show "that a RICO predicate offense not only was a but for cause of his injury, but was the proximate cause as well."  *Hemi Grp., LLC v. City of N.Y., N.Y.*, 559 U.S. 1, 9 (2010) (cleaned up).  A plaintiff must show that it was injured by "an act . . . that is independently wrongful under RICO."  *Beck v. Prupis*, 529 U.S. 494 (2000).  "The requirements of RICO causation are stricter than those for common-law torts."  *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 145 (2d Cir. 2018).  There must be some "direct relation between the injury asserted and the injurious conduct alleged.  A link that is too remote, purely contingent, or indirect is insufficient."  *Hemi Grp.*, 559 U.S. at 9 (cleaned up).

Here, plaintiffs' alleged injuries indisputably were not caused by Mann's money laundering scheme. At best, their claimed losses were caused by protective measures taken when the scheme collapsed—*i.e.*, the freeze of Mann's accounts at Bank of America and Pioneer. As the "enterprise" necessarily ended upon initiation of those protective measures, plaintiffs cannot tie their alleged harm to any purported money laundering predicates.

Here are the probative facts. On August 29, 2019, Mann deposited 36 checks written from accounts he controlled at Bank of America totaling $15,588,000 ("36 BOA Checks") into twelve accounts he controlled at Pioneer, including into SWP's Account 1996. SMF ¶ 232. By virtue of his remote deposit capture privileges, Mann had immediate access to those funds, which Mann used on the same day by writing 39 checks totaling $18,043,000 from his accounts at Pioneer back to the accounts at Bank of America. SMF ¶ 233-34. But the next day, Bank of America returned and called back the 36 BOA Checks, which resulted in Mann's accounts at Pioneer being overdrawn by over $18 million. SMF ¶ 237. That same day, Pioneer and Bank of America froze all the accounts Mann controlled at the respective banks and disabled his access to them. SMF ¶¶ 236-38. The day of the freeze, Pioneer informed Mann—the authorized person on the accounts— that the accounts had been frozen and that access to them had been disabled. SMF ¶¶ 239-45.

The only reasonable conclusion a fact finder could reach is that any purported "enterprise" ended around the time the accounts were frozen. The government reached that conclusion when Mann was sentenced. SMF ¶ 231. And plaintiffs admit that Mann's money-laundering schemes "collapsed" and "came crashing down" at this time. TAC ¶¶ 102, 166, 306-07; *see also* RICO Stmt. ¶ 9. Plaintiffs were not harmed by Mann's diversion or misuse of employer funds—the harm they allege occurred after the scheme collapsed and accounts were frozen. SMF ¶ 230. Plaintiffs' RICO claims are thus foreclosed for lack of causation because the freeze happened at a time when no jury could find the existence of a functioning RICO enterprise.

IV.   **THE COURT SHOULD ENTER SUMMARY JUDGMENT IN PIONEER'S FAVOR ON THE AIDING AND ABETTING FRAUD CLAIM.**

Plaintiffs' claim for aiding and abetting fraud is based on substantially the same defective theory supporting their RICO claims and fails for substantially the same reasons.  TAC ¶¶ 491-98.

First, as with plaintiffs' other common law claims, this claim also depends upon the assertion that "Mann and Pioneer knew that the third-party tax funds deposited in the [MPHR Account] and the [Cloud Account] were entrusted to MyPayrollHR/Cloud Payroll, and should not be used for any purposes other than paying the tax/treasury funds to the appropriate taxing authorities."  TAC ¶ 496 (emphasis added).  That assertion is baseless.  *See supra* at 9-15.

Second, plaintiffs cannot show that Pioneer had "actual knowledge" of, or substantially assisted, any alleged fraud.  *Goel v. Ramachandran*, 111 A.D.3d 783, 792 (2d Dep't 2013).  Constructive knowledge cannot substitute for actual knowledge.  *E.g.*, *Lumen at White Plains, LLC v. Stern*, 135 A.D.3d 600, 600 (1st Dep't 2016).  There is no evidence to support plaintiffs' wild theory that Pioneer had actual knowledge of any aspect of Mann's fraudulent scheme.  *See supra* 22-27; *see, e.g.*, *Lerner*, 459 F.3d at 294 ("red flags," including "overdrawn" accounts and "dishonored" checks, do not show actual knowledge).  Substantial assistance requires "more than just performing routine business services for the alleged fraudster."  *CRT Invs., Ltd. v BDO Seidman, LLP*, 85 A.D.3d 470, 472 (1st Dep't 2011).  Pioneer provided banking services to Mann—nothing more.  Doing so, "*even where there is a suspicion of fraudulent activity,* does not amount to substantial assistance."  *Agape,* 681 F. Supp. 2d at 365 (emphasis added); *see, e.g.*, *Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 25 (S.D.N.Y. 2009) (similar).  And to the extent that the claim is based on alleged inaction by Pioneer, it fails for lack of any fiduciary relationship between Pioneer and plaintiffs.  *See, e.g.*, *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 346 (2d Cir. 2018).

## V.      PLAINTIFFS HAVE NOT SUFFERED ANY COGNIZABLE DAMAGES.

Even if plaintiffs could overcome the above-described legal defects, they cannot show that they suffered any damages.  "[A] defendant may prevail on a motion for summary judgment where the plaintiff fails to provide evidence of damages[.]"  *Maier-Schule GMC, Inc. v. Gen. Motors Corp.*, 154 F.R.D. 47, 56 (W.D.N.Y. 1994).  A plaintiff must offer more than "unsubstantiated and conclusory assertions" to show a genuine issue of fact as to damages.  *New Paradigm Software Corp. v. New Era of Networks, Inc.*, 2002 WL 31749396, at *16-17 (S.D.N.Y. Dec. 9, 2002).  Rather, a plaintiff must "establish the existence of damages with reasonable certainty" as to each claim.  *Abraham v. Leigh*, 471 F. Supp. 3d 540, 563 (S.D.N.Y. 2020).

SWP apparently seeks as its principal form of "damages" funds that were deposited into the Cloud Account that employer-clients intended would be used for the payment of payroll taxes.  TAC ¶¶ 394, 433.  But SWP was not damaged by the non-payment of its employer-clients' payroll taxes—its employer-clients were.  SMF ¶¶ 336-38.  As a fallback, SWP tries to put forth a "lost profits" damages theory based on its purported loss of employer-clients following the events of Labor Day weekend 2019.  But its "evidence" of the purported reasons certain employer-clients left SWP comprises inadmissible hearsay assertions by SWP, not the employer-clients.  SMF ¶¶ 339-40.  That requires summary judgment in Pioneer's favor on this category of alleged damages.  *See, e.g.*, *Chamilia, LLC v. Pandora Jewelry, LLC*, 2007 WL 2781246, at *16-17 (S.D.N.Y. Sept. 24, 2007) (rejecting hearsay evidence on reasons for lost business).

As for GSG, while it claimed that it owed taxes and penalties to the IRS, TAC ¶ 434, GSG has not substantiated that claim, and Pioneer understands it and like claims of SWP on behalf of others are false.  SMF ¶ 343.  GSG also alleges other losses, TAC ¶ 390, but virtually all of them are based on a rudimentary calculation of alleged lost client billings with no factual support.  SMF ¶ 344.  Such unsubstantiated speculation is insufficient to survive summary judgment.

## **CONCLUSION**

In light of the foregoing, Pioneer is entitled to judgment as a matter of law on all of plaintiffs' claims under Fed. R. Civ. P. 56(a).  At the threshold, SWP's claims are barred in their entirety by SWP's own wrongdoing under the doctrines of *in pari delicto* and unclean hands. Pioneer also is entitled to summary judgment on each of the claims asserted in the TAC because the undisputed material facts show as a matter of law that plaintiffs cannot prove the fundamental elements of those claims.

Dated: June 3, 2024          DLA PIPER LLP (US)
          New York, New York

          By: */s/ Robert J. Alessi*          
          Robert J. Alessi (NDNY Bar Roll No. 101019)
          Steven M. Rosato (NDNY Bar Roll No. 703375)
          1251 Avenue of the Americas
          New York, New York 10020
          Tel.: (212) 335-4500
          Fax: (212) 335-4501
          robert.alessi@us.dlapiper.com
          steven.rosato@us.dlapiper.com

          Courtney G. Saleski (NDNY Bar Roll No. 703877)
          Evan E. North (NDNY Bar Roll No. 704414)
          1650 Market Street, Suite 5000
          Philadelphia, Pennsylvania 19103
          Tel.: (215) 656-3300
          Fax: (215) 656-3301
          courtney.saleski@us.dlapiper.com
          evan.north@us.dlapiper.com

          *Attorneys for Defendants*
          *Pioneer Bancorp, Inc. and Pioneer Bank*