# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOUTHWESTERN PAYROLL SERVICE, INC. and GRANITE SOLUTIONS GROUPE, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> PIONEER BANCORP, INC., et al., <br><br> *Defendants.* <br><br> ───────────────────────── <br> NATIONAL PAYMENT CORPORATION, <br><br> *Intervenor-Plaintiff,* <br><br> v. <br><br> PIONEER BANCORP, INC., et al., <br><br> *Defendants.* | Case No. 1:19-cv-1349 (FJS/CFH) |

## LOCAL RULE 56.1 STATEMENT OF UNDISPUTED
## AND MATERIAL FACTS IN SUPPORT OF
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Robert J. Alessi (NDNY Bar Roll No. 101019)
Steven M. Rosato (NDNY Bar Roll No. 703375)
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 335-4500
robert.alessi@us.dlapiper.com
steven.rosato@us.dlapiper.com

Courtney G. Saleski (NDNY Bar Roll No. 703877)
Evan E. North (NDNY Bar Roll No. 704414)
1630 Market Street, Suite 5000
Philadelphia, Pennsylvania 19103
Tel.: (215) 656-3300
courtney.saleski@us.dlapiper.com
evan.north@us.dlapiper.com

*Counsel for Defendants Pioneer Bancorp, Inc. and Pioneer Bank*

Dated: June 3, 2024

Under Local Civil Rule 56.1, and in support of its motions for summary judgment on the claims of plaintiffs Southwestern Payroll Service, Inc. ("SWP"), Granite Solutions Groupe, Inc. ("GSG"), and intervenor National Payment Corporation ("NatPay") (collectively, "plaintiffs"), defendants and counterclaim plaintiffs Pioneer Bancorp, Inc. and Pioneer Bank (collectively, "Pioneer") respectfully submit the following Statement of Undisputed Material Facts setting forth, in numbered paragraphs, all undisputed material facts with record references.

## I.    The Parties

### A.    Pioneer Bancorp, Inc. & Pioneer Bank

1.    Pioneer Bancorp, Inc. is a corporation organized under the laws of Maryland with its principal place of business in Albany, New York.  Pioneer Bancorp, Inc. is the holding company for Pioneer Bank.  Dkt. No. 245, SWP & GSG's Third Am. Compl. ("TAC") ¶ 3; Dkt. No. 259, Pioneer. Ans. to TAC & Countercl. ¶ 3.[1]

2.    Pioneer Bank is a federally insured stock bank organized and existing under the laws of the State of New York having an address at 652 Albany Shaker Road, Albany, NY 12211. Dkt. No. 245, TAC ¶ 4; Dkt. No. 259, Pioneer. Ans. to TAC & Countercl. ¶ 4.

### B.    Michael T.  Mann, ValueWise Corporation, and the "Other Mann Entities"

3.    Michael Mann was, at all relevant times, a citizen of the State of New York, residing in Edinburgh, New York, who is currently incarcerated at FCI Fort Dix, 5756 Hartford & Pointville Road, Joint Base MDL, New Jersey 08640.  Dkt. No. 259, Pioneer Ans. To TAC & Countercl. ¶ 550; Dkt. No. 267, SWP & GSG's Ans. to Pioneer Countercl. ¶ 4.

---

[1] "Exh." refers to exhibits attached to the Declaration of Robert J. Alessi dated June 3, 2024.  Exhibits are numbered according to the order in which they appear in this Statement of Undisputed Material Facts.

4.      Mann owned 100% of ValueWise Corporation ("ValueWise"), a Delaware corporation.  Exh. 1, Deposition Transcript of Michael T. Mann, August 3, 2021, ("Mann Depo. vol. I,") 19:10-11.

5.      Through ValueWise, Mann also controlled at least a majority interest in several other companies purportedly engaged in a variety of businesses, including consulting, accounting, and physical therapy.  Exh. 2, PB-SWP-00334220 at 229; Exh. 1, Mann Depo. vol. I, 18:9-12, 19:19-24, 97:12-23.

6.      The companies owned by ValueWise included Defendant Ross Personnel Consultants, Inc.; Defendant Always Live Holdings, LLC; Defendant Kaningo, LLC; Defendant Hire Flux Holdings, LLC; Defendant Heutmaker Business Advisors LLC ("Heutmaker"); Defendant Viverant LLC ("Viverant"); Weitz & Associates; FocalPointe Group LLC ("FocalPointe"); Create Force LLC ("Create Force"); Lincoln Academy, LLC; HireFlux, LLC ("HireFlux"); TrueConsulting Corp. ("TrueConsulting"); and True HR LLC (collectively "Other Mann Entities").  Exh. 3, Deposition Transcript of Michael T. Mann, September 14, 2021, ("Mann Depo. vol. II,") 276:20-277:13.

7.      In 2017, Michael Mann formed Cloud Payroll as a holding company for the purpose of acquiring a payroll company called Pro Data Payroll Services, which helped employers with the processing of payroll and payroll tax.  Exh. 3, Mann Depo. vol. II, 330:7-12, 345:25-346:3, 336:22-337:5, 607:9-608:2.

8.      By August 2017, Mann and ValueWise, also had at least the majority interest in three separate payroll companies: MyPayrollHR, Southwestern Payroll, and Pro Data (collectively, the "Mann Payroll Companies," and collectively with the Other Mann Entities, the "Mann Entities.").  Exh. 1, Mann Depo. vol. I, 90:17-91:10.

9.    From 2009 until 2019, Mann opened and used 34 accounts at Pioneer on behalf of the Other Mann Entities and the Mann Payroll Companies.  Exh. 4, PB-SWP-00146814.

**C.    Southwestern Payroll Service, Inc.**

10.    SWP is a corporation organized under the laws of the State of Oklahoma, and its headquarters are located at 11008 East 51st Street, Tulsa, Oklahoma 74146.  Dkt. No. 259, Pioneer. Ans. to TAC & Countercl. ¶ 549; Dkt. No. 267, SWP & GSG's Ans. to Pioneer Countercl. ¶ 4; Exh. 5, Deposition Transcript of Darin Alred, April 18, 2022 ("Alred Depo. vol. I") 93:25-94:4.

11.    SWP is a payroll company, whose services primarily consist of payroll and payroll tax processing, which entails receiving funds from clients and transmitting them to third parties. Exh. 5, Alred Depo. vol. I, 21:19-22:25; Exh. 6, SWP's Answers to Pioneer's First Set of Interrogatories No. 3; Exh. 7, SWP's Responses to Pioneer's First Requests for Admission No. 1.

12.    From 2012 until April 2017, Darin Alred was the sole owner of SWP.  Exh. 5, Alred Depo. vol. I, 97:17-21.

13.    Since at least 2012, Darin Alred has been the president of SWP.  Exh. 5, Alred Depo. vol. I, 94:14-95:8.

14.    SWP conducts payment activity involving at least the following states: Alaska, Alabama, Arizona, Arkansas, California, Georgia, Illinois, Kansas, Michigan, Missouri, Oklahoma, Pennsylvania, Texas, and Washington.  Exh. 8, SWP-039494_0001.

15.    SWP admits that it does not maintain, and has never maintained, a money transmitter license in any jurisdiction.  Exh. 9, SWP's Responses to Pioneer's Second Requests for Admissions No. 17.

16.    SWP was required to obtain at least one state money transmission license.  Exh. 10, Report of Dan Wood ("Wood Rpt.") ¶¶ 84-86.

17. SWP has denied that it "possessed the status of a fiduciary" with respect to some of its employer-clients. Exh. 11, *Alred v. Sw. Payroll Svc., Inc.*, No. CJ-2019-3516 (D. Ct., Tulsa Cnty., Okla. Aug. 16, 2023), Southwestern Payroll Service, Inc.'s Answer to Third-Party Petition of Transition Health Services Group LLC at 4 (¶¶ 15-18); Exh. 12, *Alred v. Southwestern Payroll Svc., Inc.*, No. CJ-2019-3516 (D. Ct., Tulsa Cnty., Okla. Jul. 27, 2023) Third Party Petition of Transition Health Svc. Grp., LLC at 4 (¶¶ 15-18).

18. SWP admitted that it only had a "contractual" obligation and responsibility, not a fiduciary one, to safeguard funds collected from employer-clients to remit payments to taxing authorities on behalf of its employer-clients. Exh. 9, SWP's Responses to Pioneer's Second Requests for Admissions Nos. 11, 16.

19. SWP's relationship with its employer-clients was governed by a form "Service Agreement" prepared by SWP, which states that "Client hereby contracts and authorizes [SWP] to collect on Client's check date EFT transactions for such amounts as are necessary to pay proper taxing authorities the payroll taxes which are specifically identified on Payroll Reports. Such amounts are to be held in an account established by [SWP] until such time as these amounts are due to the appropriate taxing authorities." Dkt. No. 259, Pioneer. Ans. to TAC & Countercl. ¶ 639-40; Dkt. No. 267, SWP & GSG's Ans. to Pioneer Countercl. ¶¶ 32, 34; Exh. 13, SWP-040584; Exh. 14, Deposition Transcript of Daren Alred, April 19, 2022 ("Alred Depo. vol. II,") 410:21-411:4, 417:13-2.

20. Reflecting the absence of a fiduciary relationship, SWP has had the benefit of the use of funds collected from its employer-clients, earning interest on these funds throughout the interval between collection and payment to tax authorities, which interest SWP used to reduce its

fees and expenses charged by its banking provider.  Exh. 5, Alred Depo. vol. I, 75:23-76:4, 81:21-82:17, 85:16-86:6.

21.     SWP stated that employer-clients of SWP did not care what SWP did with the funds collected "as long as at the end of the day the taxing authorities get their money and the employee got their money."  Exh. 15, Deposition 30(b)(6) Transcript of SWP via David Rhoades, October 26, 2023 ("SWP Depo. via Rhoades vol. II"), 61:6-62:10.

22.     This practice is standard in the payroll industry, where a significant source of profits are derived from funds invested during the interval of collection and payment-i.e., the "float" period.  Exh. 16, Report of Nicholas Pirrung ("Pirrung Rpt.") ¶¶ 32-33.

23.     This is consistent with the general acceptance in the payroll industry that a payroll service company does not act in a fiduciary capacity for its clients or the employees of its clients. Exh. 16, Pirrung Rpt. ¶ 33.

### D.     National Payment Corporation

24.     National Payment Corporation ("NatPay") (collectively with SWP and Granite Solutions, "Plaintiffs") is a Florida corporation with a principal place of business located at 3415 W. Cypress Street, Tampa, Florida 33607-5007.  Dkt. No. 232, NatPay Am. Compl. ¶ 55, Dkt. No. 332, Pioneer's Am. Ans. To NatPay's Am. Compl. ¶ 55.

25.     NatPay's income is transactionally based, meaning it earns a fee for each ACH transaction that it processes.  Exh. 17, Deposition Transcript of Steven Pereira, October 19, 2022, ("Pereira Depo.") 95:23-96:4.

26.     From the end of 2012 through at least 2022, Steven Pereira was the operational general manager of NatPay, reporting directly to NatPay's two majority owners, and owning an equity interest in NatPay.  Exh. 17, Pereira Depo. 36:14-16, 37:21-24, 38:24-25, 41:15-42:2, 46:24-47:15.

5

27.    Dawn Cafaro, NatPay's operation manager, and Jim Hagen, NatPay's vice president of sales, report directly to Steven Pereira, with the latter interacting with Pereira on almost a daily basis.  Exh. 17, Pereira Depo. 42:5-19; Exh. 18, Deposition Transcript of Jim Hagen, April 11, 2022, ("Hagen Depo.") 75:9-76:2, 77:3-25.

28.    Virtually all other NatPay employees report either directly or indirectly to Steven Pereira.  Exh. 17, Pereira Depo. 46:3-17.

29.    Dawn Cafaro is NatPay's operations manager and "handles all the work for direct deposit and customer service on-boarding, everything that is basically in the core ACH system." Exh. 17, Pereira Depo. at 42:13-19; Exh. 19, Deposition Transcript of Dawn Cafaro, April 13, 2022, ("Cafaro Depo.") at 35:11 37:16.

30.    In her role, Dawn Cafaro is responsible for ensuring "that [NatPay's] processes are working the way that they are supposed to" and "that our processes stay in place . . ."  Exh. 19, Cafaro Depo. at 37:17-38:12.

31.    NatPay maintained the same ACH settlement account at First Premier Bank from 1983 to at least 2022, through which NatPay processed ACH transactions for its customers.  Exh. 17, Pereira Depo. 115:4-9; Exh. 20, NatPay Responses to Pioneer's First Revised Set of Interrogatories No. 6.c.

32.    First Premier Bank and NatPay documented their agreement regarding the special nature of the ACH Settlement account in a side letter that provided that First Premier would "maintain this account for the exclusive use of customers of National Payment Corporation" and that "all funds on deposit in this account are owned by the customers of National Payment Corporation."  Exh. 21, NP0013585, at 594-595.

33.    The funds in NatPay's ACH Settlement account at First Premier Bank are not included as an asset on NatPay's balance sheet.  Exh. 22, Deposition 30(b)(6) Transcript of NatPay via Steven Pereira, October 20, 2022 ("NatPay Depo. via Pereira") 205:12-25.

34.    When funds go into NatPay's ACH settlement account at First Premier Bank, NatPay does not own that money.  Exh. 22, NatPay Depo. via Pereira 202:20-25.

35.    NatPay does not hold a permit, license, certificate, registration, or other authority by a governmental agency to operate a money transmitter business, except with respect to the State of Texas, which license it was forced to obtain through a consent order after the events at issue in this case.  Exh. 23, NatPay Responses to Pioneer's Second Set of Interrogatories No. 22; Exh. 24, NatPay Responses to Pioneer's Second Set of Requests for Admissions No. 14.

36.    NatPay was required to obtain and maintain at least one state money transmission license during the period at issue in this case based on its payroll activities for the Mann Payroll Companies.  Exh. 10, Wood Rpt. ¶ 95-102.

37.    NatPay also was investigated by the Illinois Department of Financial and Professional Regulation and entered into a Consent Order with that regulator that, while not requiring NatPay to obtain a money transmitter license, found that NatPay operated unlawfully without a license, required NatPay to change its business model in Illinois, and fined NatPay over $82,000.  Exh. 25, NP0151518.

38.    NatPay has one-to-one contractual agreements with the payroll service companies for which it processes payroll.  Exh. 17, Pereira Depo. 90:22-91:5 66:5-9, 67:2-8, 68:2-7.

39.    NatPay "just takes a set of payment instructions and carries those out."  Exh. 19, Cafaro Depo. 102-11-12.

40.     NatPay is not, and has never been, a party to any contract with Pioneer.  Exh. 24, NatPay's Responses to Pioneer's Second Set of Requests for Admission Nos. 5, 7.

41.     NatPay has never maintained a bank account at Pioneer.  Exh. 24, NatPay's Responses to Pioneer's Second Set of Requests for Admission No. 6; Exh. 17, Pereira Depo. 82:13-15.

42.     NatPay had no contractual or banking relationship with Pioneer, had no communication with Pioneer about transactions into Pioneer accounts, and had no idea who Pioneer even was until the events in September 2019.  Exh. 17, Pereira Depo. 82:8-12, 155:15-25, 199:3-6.

**E.      Granite Solutions Groupe, Inc.**

43.     Granite Solutions Groupe Inc. ("Granite Solutions") is a consulting firm that focuses mainly in financial services consulting.  Exh. 26, Deposition 30(b)(6) Transcript of Granite Solutions via Daniel L'Abbe, October 24, 2023, ("GSG Depo. I") 17:17-19.

44.     Granite Solutions has subsidiary companies in the United States, Canada, the U.K., India, and South Africa.  Exh. 26, GSG Depo. I 24:16-24.

45.     Granite Solutions' only physical office in the United States is in San Francisco, California.  Exh. 26, GSG Depo. I 25:11-17.

46.     Granite Solutions never opened or maintained a bank account at Pioneer.  Exh. 27, Granite Solutions' Responses to Pioneer's First Requests for Admissions No. 2.

47.     Granite Solutions never entered into a written contract with Pioneer.  Exh. 27, Granite Solutions' Responses to Pioneer's First Requests for Admissions No. 3.

48.     Granite Solutions never had any direct communications with Pioneer at any time prior to September 5, 2019.  Exh. 27, Granite Solutions' Responses to Pioneer's First Requests for Admissions No. 4.

49.     Granite Solutions was not aware of Pioneer Bank before August 30, 2019.  Exh. 26, GSG Depo. I 29:21-23.

50.     Granite Solutions admits it never had any contract with Cloud Payroll.  Exh. 26, GSG Depo. I 103:2-4; Exh. 28, Deposition 30(b)(6) Transcript of Granite Solutions via Daniel L'Abbe, October 25, 2023, ("GSG Depo. II") 42:10-46:13.

51.     From May 2014 until the events at issue in this case, Granite Solutions entered into an "Online Service Agreement" with MyPayrollHR to process its payroll and payroll tax payments.  Exh. 29, Granite Solutions' Responses to Pioneer's First Set of Interrogatories Nos. 4, 11.

52.     Section 6 of Granite Solutions' Online Service Agreement with MyPayrollHR provided that "[n]o interest or earnings will accrue to [Granite Solutions] on account of any Transaction or otherwise under this Agreement."  Exh. 26, GSG Depo. I 71:4-10; Exh. 30, GSG000304, at 305.

53.     The words "trust," "escrow," or "fiduciary" is not used in Granite Solutions' Online Service Agreement with MyPayrollHR.  Exh. 30, GSG000304.

54.     Section 8 of Granite Solutions' Online Service Agreement with MyPayrollHR provided that Granite Solutions would "at all times be solely responsible to pay all taxes."  Exh. 30, GSG000304, at 305.

## II.     2009: Michael Mann Initiates a Loan and Deposit Relationship with Pioneer, During Which He Perpetrates a Fraudulent Scheme Against Pioneer.

### A.     Michael Mann and ValueWise Fraudulently Obtain a Line of Credit from Pioneer.

55.     In 2009, Michael Mann was primarily engaged in management consulting through ValueWise Corporation.  Exh. 1, Mann Depo. vol. I, 15:5-21.

9

56.     On or about November 2, 2009, Pioneer extended a $2 million working capital line of credit to ValueWise, which was secured by a blanket lien on ValueWise's assets, the vast majority of which were purported accounts receivables.  Dkt. No. 259, Pioneer. Ans. To TAC & Countercl. ¶ 3; Dkt. No. 267, SWP & GSG's Ans. To Pioneer Countercl. ¶ 12; Exh. 1, Mann Depo. vol. I, 17:9-15; Exh. 3, Mann Depo. vol. II, 460:19-21, 426:17-20.

57.     The accounts receivables that secured the line of credit were set forth in audited financial statements and were the primary borrowing base and collateral for the line of credit issued by Pioneer.  Exh. 3, Mann Depo. vol. II, 462:21-463:4.

58.     From 2009 to 2019, ValueWise's outside auditor was Teal Becker & Chiaramonte, CPAs, P.C. ("TBC").  Exh. 3, Mann Depo. vol. II, 461:17-19.

59.     TBC was required to verify 100 percent of ValueWise entities' invoices as part of TBC's annual audit of the ValueWise entities.  Exh. 3, Mann Depo. vol. II, 497:8-17.

60.     On August 12, 2019, the ValueWise line of credit with a maximum principal amount of $42 million was extended to ValueWise and certain of its affiliates.  Dkt. No. 245, TAC ¶ 102; Dkt. No. 259, Pioneer. Ans. To TAC & Countercl. ¶ 102; Exh. 3, Mann Depo. vol. II, 503:3-6.

61.     Michael Mann admitted to fraudulently obtaining these loans from Pioneer by overstating the Mann Entity revenues and receivables, mischaracterizing their business relationships and prospects, and created companies whose sole purpose was to further the fraud by generating fake invoices and disguising sources of funds.  Exh. 31, Michael T. Mann Plea Agreement at 5(b), 5(n)-5(u).

62.     Michael Mann admitted that from about 2013 through September 2019, he fraudulently deceived banks and financing companies, including Pioneer, into loaning ValueWise

10

and the Mann Entities millions of dollars, and he engaged in a kiting scheme, using checks, wire transfers, and the Automated Clearing House ("ACH") system to rapidly transfer millions of dollars among various accounts he controlled at Pioneer and at Bank of America. Dkt. No. 245, TAC ¶ 29; Dkt. No. 259, Pioneer. Ans. To TAC & Countercl. ¶ 29.

63.    Mann pleaded guilty to federal charges of bank fraud, wire fraud, identity theft, and filing false tax records, and on August 4, 2021, Mann was sentenced to serve twelve years in federal prison. Dkt. No. 245, TAC ¶ 30; Dkt. No. 259, Pioneer. Ans. To TAC & Countercl. ¶ 30

64.    In 2015, the Federal Deposit Insurance Corporation ("FDIC") assessed Pioneer's compliance with Bank Secrecy Act ("BSA")/Anti-Money Laundering ("AML") regulations and guidance, and, in its Report of Examination, assigned Pioneer a risk management composite rating of 1 (the highest rating), stating:



Exh. 32, PB-SWP-00402169, at 173-74.

65.    The 2015 Report of Examination from FDIC also noted that Pioneer received the highest composite and management rating in 2012 and 2014. Exh. 32, PB-SWP-00402169, at 173.

66.    In 2016, the New York Department of Financial Services ("NYDFS") assessed Pioneer's compliance with BSA/AML regulations and guidance, and, in its Report of Examination, assigned Pioneer a composite risk and management rating of 1 (the highest rating), stating:

11



Exh. 33, PB-SWP-00428485, at 489, 491.

67.    In 2017, the FDIC once again assessed Pioneer's compliance with BSA/AML and issued a report, which assigned a composite rate of 2 ("fundamentally sound"), and it concluded that the condition of Pioneer was satisfactory:



Exh. 34, PB-SWP-00402185, at 191-92.

68.    In 2018, NYDFS once again assessed Pioneer's compliance with BSA/AML regulations and guidance, and, in its Report of Examination, assigned Pioneer a composite rating of 2, stating:



12

Exh. 35, PB-SWP-00428499, at 503-05.

69.     Pioneer also engaged Wolf & Company, P.C. ("Wolf & Co."), a 110-year old public accounting firm with a dedicated bank advisory board serving nearly 400 banks across America, to conduct annual BSA/AML/Office of Foreign Assets Control ("OFAC") independent audits of Pioneer, including Pioneer's BSA policies, procedures, suspicious activity monitoring and reporting, customer due diligence, and remote deposit capture (RDC) practices, among other areas. Exhs. 36-38, PB-SWP-00411912; PB-SWP-00411931; PB-SWP-00411948.

70.     The Wolf & Co. 2017 BSA audit covered the period from 7/1/2016 to 12/31/2016, with Pioneer bank receiving a "Satisfactory," rating from Wolf & Co., who reported 15 findings— 4 moderate-risk and 11 low-risk—with no high-risk issues identified.    Exh. 36, PB-SWP-00411912, at 915.

71.     The Wolf & Co. 2018 BSA and OFAC audit covered the period from 6/1/2017 to 12/31/2017, with Pioneer receiving a "Satisfactory," rating from Wolf & Co., who reported 3 findings—1 moderate-risk and 2 low-risk—with no high-risk issues identified. Exh. 37, PB-SWP-00411931, at 932-33.

72.     The Wolf & Co. 2019 independent BSA/AML/OFAC audit covered the period from 1/1/2018 to 12/31/2018, with Pioneer receiving a "Strong" rating by Wolf & Co., who reported only 2 low-risk findings, no high-risk issues identified. Exh. 38, PB-SWP-00411948, at 949-950.

13

**B.      Michael Mann Admits That Pioneer Was a Victim of His Fraud and Had No Knowledge of His Fraudulent Kiting Scheme.**

73.      Mann admitted that Pioneer was a victim of his fraudulent scheme, and that "no one at Pioneer Bank knew anything about the fraud scheme," which is described in Mann's Plea Agreement, including a scheme to obtain fraudulent financing, as well as the misappropriation of funds from employer-clients.  Exh. 3, Mann Depo. vol. II, 538:4-23.

74.      Mann was not aware that anybody at Pioneer knew that he was engaged in check kiting and ACH kiting.  Exh. 3, Mann Depo. vol. II, 455:4-25.

75.      Nobody at Pioneer ever said anything to Mann that would lead him to believe that Pioneer was aware that Mann was engaged in check kiting.  Exh. 3, Mann Depo. vol. II, 456:14-20.

76.      Michael Mann testified that he never told anyone that the reason he had insufficient funds in his accounts was because he was operating a kiting scheme.  Exh. 3, Mann Depo. vol. II, 543:18-25.

77.      Joe Fleming, Chief Credit Officer at Pioneer, testified that he believed that overdrafts in Michael Mann's accounts were due to insufficient lines of credit, which kept Mann from operating his companies efficiently, not due to kiting or other fraudulent activity.  Exh. 39, Deposition Transcript of Joseph Fleming, July 15, 2021 ("Fleming Depo.") 131:7-16.

78.      When Patrick Hughes, Chief Financial Officer and vice president at Pioneer, inquired into the why there were negative balances in ValueWise's accounts, he understood that it was due to Valuewise's growth, cashflows, and timing of cash flows.  Exh. 40, Deposition of Patrick Hughes, April 25, 2023, ("Hughes Depo.") 80:10-18.

79.      Michael Mann admitted that he propped up and concealed his fraud by telling thousands of lies, including to Pioneer.  Exh. 3, Mann Depo. vol. II, 558:20-563:6.

**III.    2013: Michael Mann Opens a General Deposit Checking Account for MyPayrollHR at Pioneer, Misrepresents His Use of That Account, and Deceives Pioneer Employees, All of Whom Were Unaware That Mann Was Using the Account to Process Third Party Payroll.**

**A.    The Inception of the MyPayrollHR General Deposit Checking Account.**

80.    In November 2013, Michael Mann opened a general demand deposit business checking account at Pioneer Bank on MyPayrollHR's behalf, with account number ending in 0212 (the "MPHR Account"). Exh. 41, PB SWP-00000372; Exh. 42, Report of James J. Kreig ("Kreig Rpt.") ¶ 77.

81.    There were no other authorized signatories to the MPHR Account beside Mann. Exh. 3, Mann Depo. vol. II, 295:18-21.

82.    When Michael Mann opened the MPHR Account, he intended it to be a "checking account." Exh. 1, Mann Depo. vol. I, 34:23-35:9; Exh. 3, Mann Depo. vol. II, 290:17-21, 310:5-8.

83.    The only agreement between Michael Mann and Pioneer concerning the MPHR Account is the "Account Agreement" form signed by Michael Mann when opening the MPHR Account. Exh. 41, PB-SWP-00000372, at 373; Exh. 3, Mann Depo. vol. II, 292:6-294:20, 309:19-311:4.

84.    The Account Agreement states that the MPHR Account will be "permanently designated as a checking account." Exh. 41, PB-SWP-00000372, at 373; Exh. 3, Mann Depo. vol. II, 296:22-297:4.

85.    The Account Agreement for the MPHR Account also incorporated Terms and Conditions, which language was consistent with those used to open standard general deposit checking accounts across regional and community banks. Exh. 41, PB-SWP-00000372, at 373; Exh. 43, PB-SWP-00394156 at 00394161; Exh. 42, Kreig Rpt. ¶¶ 16, 37, 37 n.37.

86.     Michael Mann did not specially compensate Pioneer for maintaining the MPHR Account, paying only a service fee per transaction.  Exh. 41, PB-SWP-00000372, at 37.

87.     To open a special deposit account, community banks like Pioneer require a unique agreement.  Exh. 42, Kreig Rpt. ¶ 22-23.

88.     Michael Mann testified that he did not ask Pioneer "to restrict [the MPHR] Account 0212 so that the funds could not be transferred out of the [MPHR] Account to other accounts at Pioneer Bank."  Exh. 3, Mann Depo. vol. II, 324:10-16

89.     Michael Mann testified that when the MPHR Account was opened "there was no agreement between MyPayroll and Pioneer Bank that the funds in [the MPHR] Account 0212 were to be kept separate and isolated from other accounts at Pioneer Bank."  Exh. 3, Mann Depo. vol. II, 308:7-16.

90.     The words "client account" on the Account Agreement was never intended to restrict Michael Mann from transferring funds from the MPHR Account to other accounts held by Other Mann Entities.  Exh. 3, Mann Depo. vol. II, 309:11-18.

91.     To the contrary, when opening the MPHR Account, Michael Mann completed a "Pioneer Link Application Form," which linked the MPHR Account with the other bank accounts of the Mann Entities at Pioneer, allowing Mann to transfer funds between these accounts for cash management purposes.  Exh. 41, PB-SWP-00000372, at 375; Exh. 3, Mann Depo. vol. II, 295:22-296:3, 298:5-14.

92.     Michael Mann also never told anyone at Pioneer that he wanted the MPHR Account to be a "special purpose or trust account," Exh. 3, Mann Depo. vol. II, 311:25-312:7, nor did he ask to open a "trust account for taxes," Exh. 1, Mann Depo. vol. I, 235:7-12, and no one at Pioneer

ever told Mann that the MPHR Account was a "special purpose or trust account," Exh. 3, Mann Depo. vol. II, 312:8-15.

93.     In practice, community banks like Pioneer do not open special deposit accounts, Exh. 42, Kreig Rpt. ¶ 22-23, and no expert has testified that the MPHR Account (or account ending in 2440 (the "Cloud Account")) was a special deposit account, with one of plaintiffs' experts even testifying that it was not a special deposit account, Exh. 44, Deposition Transcript of Bryant Moravek, March 19, 2024 ("Moravek Depo.") 194:11-24.

94.     Payroll service bureaus do not place client funds in trust accounts, Exh. 45, Deposition Transcript of Plaintiffs' Expert Joseph Sova ("Sova Depo.") 154:9-23, with one of Plaintiffs' experts even testifying that the MPHR Account (and the Cloud Account) were "not a trust account," Exh. 44, Moravek Depo. 224:2-3.

95.     Consistent with Michael Mann's lack of intent to establish a trust account, on the Account Agreement for the MPHR Account, the box indicating, "Trust – Separate Agreement" was not checked.  Exh. 41, PB-SWP-00000372, at 373.

96.     Banks rely on their depositors to self-identify accounts held as a fiduciary or in trust for the benefit of a third party.  Exh. 42, Kreig Rpt. ¶ 37.

97.     If an account at Pioneer is opened as an escrow or trust account, there are separate forms that must be filled out, and the name "escrow" would be included in the name of the account. Exh. 46, Deposition Transcript of Trudy Seeber, July 15, 2022 ("Seeber Depo.") 43:16-44:10.

98.     Likewise, if an account other than a business checking account is opened at Pioneer, then that information would be listed under "additional information" on the Account Agreement. Exh. 47, Deposition 30(b)(6) Transcript of Pioneer via Frank Sarratori, December 13, 2021 ("Pioneer Depo. via Sarratori") 76:7-14.

17

99.   The Account Agreement for the MPHR Account does not title the account as an "escrow" account, nor is there any information under "additional information." Exh. 41, PB-SWP-00000372, at 372-73.

100.   The MPHR Account was collateral for the ValueWise LOC, Exh. 48, PB-SWP-00331964, 966-67, for which with Pioneer prepared credit memos documenting the current and average account balances in the MPHR Account, Exh. 49, PB-SWP-00334483, at 486.

101.   The MPHR Account "started out as an everything account and had all kinds of – so everything was going in and out of [MPHR Account] 0212." Exh. 50, Deposition Transcript of John Reinke, July 27, 2022 ("Reinke Depo.") 82:18-83:3.

102.   "[T]hroughout the history of [MPHR] Account 0212" Mann would transfer the account "to cover business expenses of other ValueWise entities." Exh. 3, Mann Depo. vol. II, 323:18-25.

103.   "From the time that [MPHR] account 0212 was opened in November 2013 through September 2019, MyPayroll regularly transferred funds from [MPHR] Account 0212 to entities that were not taxing authorities." Exh. 3, Mann Depo. vol. II, 325:7-11.

104.   Mann was the one who was responsible for and who controlled the MPHR Account. Exh. 51, PB-SWP-00038123, at ¶ 4.

   **B.   Every Pioneer Employee Testified That They Were Unaware That Mann Was Inflating His Receivables Through Processing Third Party Payroll.**

105.   Michael Mann did not talk to anyone at Pioneer about what kinds of money he was going to put into the MPHR Account. Exh. 47, Pioneer Depo. via Sarratori 52:10-14.

106.   When Michael Mann opened the MPHR Account, he also completed and signed a Commercial Due Diligence ("CDD") form, which was marked "NO" in response to the question asking if MyPayrollHR acted as a "third party payment processor, which was defined on the CDD

18

form as "a business entity that offers payment processing services to merchants and other commercial entities." Exh. 41, PB-SWP-00000372, at 379.

107. Additionally, the same CDD form was also marked "NO" in response to the question asking if MyPayrollHR was a "money service business," which was defined as "a money transmitter, which engages as a business in accepting currency or funds and transmits such currency or funds by any means through a financial agency or institution." Exh. 41, PB-SWP-00000372, at 378.

108. Trudy Seeber, development officer at Pioneer who opened the MPHR Account for Michael Mann, testified that she was unaware that MyPayrollHR processed third-party payroll or was anything other than a software consulting company. Exh. 46, Seeber Depo. 53:23-54:5, 94:4-13, 151:2-7.

109. Trudy Seeber testified that Mann lied to her about his use of his accounts at Pioneer to process third party payroll. Exh. 46, Seeber Depo. 187:21-188:10.

110. Christine Batchelder Charbonneau, commercial services assistant at Pioneer who assisted Michael Mann with his loan and deposit transactions, testified that she did not even know what types of businesses were owned by Michael Mann, let alone that any of them processed third-party payroll. Exh. 52, Deposition Transcript of Christine Batchelder Charbonneau, July 13, 2021 ("Charbonneau Depo.") 51:7-52-17.

111. Randall Benedict, senior portfolio manager at Pioneer who assisted Michael Mann with his loan and deposits, testified that he did not even know what types of businesses were owned by Michael Mann, let alone that any of them processed third-party payroll. Exh. 53, Deposition Transcript of Randall Benedict, July 20, 2021 ("Benedict Depo.") 46:21-23, 48:13-20.

112.    All other Pioneer employees also testified that they were unaware that Michael Mann was using his accounts at Pioneer to process third party payroll. *See*, *infra*, ¶¶ 113-127.

113.    Thomas Amell, Chief Executive Officer at Pioneer, testified that he was unaware of the nature or source of the funds in the Cloud Account or the MPHR Account before, during, and through August and September 2019. Exh. 54, Deposition Transcript of Thomas Amell, April 27, 2023 ("Amell Depo.") 149:13-22, 151:14-24.

114.    Frank Sarratori, Chief Administrative Officer of Pioneer, testified that he was unaware of the nature or source of the funds in the Cloud Account or the MPHR Account before, during, and through August and September 2019. Exh. 55, Deposition Transcript of Frank Sarratori, December 15, 2021 ("Sarratori Depo.") 37:11-22.

115.    Patrick Hughes, CFO of Pioneer, testified that he was unaware of the nature or source of the funds in the Cloud Account and the MPHR Account before, during, and through August and September 2019. Exh. 40, Hughes Depo. 51:6-19.

116.    Joseph Fleming, then-Chief Credit Officer, testified that he was unaware of the nature or source of the funds in the Cloud Account and the MPHR Account before, during, and through August and September 2019. Exh. 39, Fleming Depo. 81:8-24.

117.    David Hunn, then-Vice President of Deposit Operations at Pioneer, testified that he was unaware of the nature or source of the funds in the Cloud Account and the MPHR Account before, during, and through August and September 2019. Exh. 56, Deposition Transcript of David Hunn, December 17, 2021 ("Hunn Depo.") 32:15-33:7.

118.    Ellen Fogarty, Bank Secrecy Act Officer at Pioneer, testified that she was unaware of the nature or source of the funds in the Cloud Account and the MPHR Account before, during,

and through August and September 2019.  Exh. 57, Deposition Transcript of Ellen Fogarty, July 14, 2021 ("Fogarty Depo.") 31:10-32:3.

119.    Kimberly Catello, deposit operations manager at Pioneer, testified that she was unaware of the nature or source of the funds in the Cloud Account and the MPHR Account before, during, and through August and September 2019.  Exh. 58, Deposition Transcript of Kimberly Catello, April 14, 2023, ("Catello Depo.") 90:21-91:11, 94:12-95:18.

120.    Trudy Seeber testified that she was unaware of the nature or source of the funds in the Cloud Account and the MPHR Account before, during, and through August and September 2019.  Exh. 46, Seeber Depo. 67:6-21, 332:8-23.

121.    Sandra Dedrick, commercial services officer at Pioneer, testified that she was unaware of the nature or source of the funds in the Cloud Account and The MPHR Account before, during, and through August and September 2019.  Exh. 59, Deposition Transcript of Sandra Dedrick, December 10, 2021 ("Dedrick Depo.") 71:2-11, 102:9-20, 186:12-18, 210:22-211:3.

122.    Christine Batchelder Charbonneau testified that she was unaware of the nature or source of the funds in the Cloud Account and the MPHR Account before, during, and through August and September 2019, testifying that she did not even know what a payroll company is or does, or even whether a payroll service bureau would process third-party payroll.  Exh. 52, Charbonneau Depo. 74:25-75:7, 77:9-12, 107:4-6, 131:2-9, 138:11-15.

123.    Christine Batchelder Charbonneau testified that she was unaware that the checks she processed for Michael Mann had anything to do with payroll.  Exh. 52, Charbonneau Depo. 109:14-16, 188:4-17.

124.    Randall Benedict, senior portfolio manager at Pioneer who assisted Michael Mann with his loan and deposits, testified that he was unaware of the source of the funds in the Cloud

Account and the MPHR Account before, during, and through August and September 2019, testifying that he did not even know what a payroll company is or does, or even whether a payroll service bureau would process third-party payroll. Exh. 53, Benedict Depo. 38:3-15, 52:6-18.

125. Deborah Salsburg, assistant branch manager at Pioneer who assisted Mann with his loan and deposits, testified that she was unaware of the source of the funds in the Cloud Account and the MPHR Account before, during, and through August and September 2019, testifying that she did not even know what a payroll company is or does, or even whether a payroll service bureau would process third-party payroll. Exh. 60, Deposition Transcript of Deborah Salsburg, July 12, 2021, ("Salsburg Depo.") 29:3-21, 174:17-19.

126. Matthew Guidarelli, commercial portfolio manager at Pioneer who assisted Mann with his loans and deposits, testified that he was unaware of the nature or source of the funds in the Cloud Account and the MPHR Account before, during, and through August and September 2019. Exh. 61, Deposition Transcript of Matthew Guidarelli, July 21, 2021 ("Guidarelli Depo.") 228:9-25.

127. Marcia Leggett, commercial services employee at Pioneer who assisted Mann with his loan and deposits, testified that she was unaware of the nature or source of the funds in the Cloud Account and the MPHR Account before, during, and through August and September 2019. Exh. 62, Deposition Transcript of Marcia Leggett, July 9, 2021 ("Leggett Depo.") 217:7-24, 220:17-221:13.

IV.    **2017: SWP Agrees with Mann to Facilitate the Fraudulent Scheme.**

A.    **Mann Acquires a Controlling Interest in SWP and Becomes and Officer of the Company.**

128. In April 2017, Michael Mann, through Cloud Payroll, purchased 51% of the stock in SWP from Darin Alred by way of a Stock Purchase Agreement ("SPA"). Dkt. No. 259, Pioneer.

22

Ans. To TAC & Countercl. ¶ 636-37; Dkt. No. 267, SWP & GSG's Ans. To Pioneer Countercl. ¶ 32; Exh. 5, Alred Depo. vol. I, 97:22-98:9; Exh. 1, Mann Depo. vol. I, 10:22-24, 110:15-111:2; Exh. 3, Mann Depo. vol. II, 285:5-9, 346:11-14; Exh. 6, SWP's Answers to Pioneer's First Set of Interrogatories No. 1a.

129.    Under the SPA between Southwestern and Cloud Payroll, Cloud Payroll agreed to pay over $4.3 million in consideration for a 51% stake in SWP, which consisted of the following:

i.      immediate repayment of $1,329,777.87 owed by SWP to SPS Holdings, LLC;

ii.     an immediate cash payment of $90,335.70 to Ray Fowler, SWP's former owner;

iii.    delivery of a promissory note to Fowler, in the principal amount of $1 million and bearing an annual interest rate of 6%, to be repaid as follows: (i) 18 equal monthly installments of principal and interest of $23,293 beginning on June 1, 2017 and ending on November 18, 2018; and (ii) 18 monthly interest-only payments of $3,000 beginning on June 1, 2017 and ending on November 1, 2018, with a final payment of $600,000 to be made on November 1, 2018;

iv.     an immediate cash payment of $30,503.23 to Alred; and

v.      delivery of a promissory note to Alred, in the principal amount of $1,882,464.20 and bearing an annual interest rate of 6%, to be repaid in 18 equal monthly installments of principal and interest of $109,619.14 beginning on June 1, 2017, and ending on November 1, 2018.

Dkt. No. 259, Pioneer Ans. To TAC & Countercl. ¶ 636-37; Dkt. No. 267, SWP & GSG's Ans. To Pioneer Countercl. ¶ 32.

23

130.    Michael Mann paid off SWP's $1.329 million debt through funds taken from the MPHR Account:

    i.    On April 20, 2017, Mann transferred $2,534,789 from the MPHR Account to account x3622 at Pioneer, which brought the balance in x3622 to $2,534,793.  Exh. 63, PB-SWP-00017240, at 241.

    ii.    On April 20, 2017, Mann transferred $1,450,998 from account x3622 to account x1640 at Pioneer, which brought the balance in account x1640 to $1,451,048.  Exh. 63, PB-SWP-00017240, at 241; Exh. 64, PB-SWP-00016962, at 962.

    iii.    On April 20, 2017, Mann sent two wires to Prosperity Bank on April 20, 2017, from account x1640 at Pioneer, in the amounts of $639,777.87 and $690,000.00, which was for payment of SWP's $1.3 million in debt.  Exh. 65, c-mann-0000255229; Exh. 66, PB-SWP-00106233, at 233, 235; Exh. 67, PB-SWP-00106225, at 225, 227.

131.    SWP admits that after Mann became a 51% owner in SWP in 2017, Mann was entitled to execute contracts on behalf of SWP.  Exh. 9, SWP's Responses to Pioneer's Second Requests for Admissions No. 12.

132.    Daren Alred testified that Michael Mann, as a majority owner of SWP, was a representative of SWP and had the right to represent the interests of SWP.  Exh. 5, Alred Depo. vol. I, 224:23-25; Exh. 14, Alred Depo. vol. II, 401:12-17, 405:2-5.

133.    On June 21, 2017, in response to Michael McAuliffe asking for a "list of Southwestern Payroll's corporate officers," for purposes of representing to third parties, Darin Alred, stated that there was "only me and Mike Mann at the moment.  I am President.  He is Secretary Treasurer."  Exh. 5, Alred Depo. vol. I, 247:4-25; Exh. 68, SWP-018206.

24

134.    Michael Mann testified that "as of June 2017," he was "one of only two officers of Southwestern Payroll . . . the secretary treasurer of Southwestern Payroll." Exh. 3, Mann Depo. vol. II, 350:12-19.

135.    Michael Mann was the Secretary/Treasurer of SWP for the period of time that included from before August 28, 2019, to (and including) September 3, 2019. Exh. 51, PB-SWP-00038123 at ¶ 1; Exh. 3, Mann Depo. vol. II, 351:3-6.

136.    Michael Mann also contracted on behalf of SWP in October 2017 to have NatPay provide ACH transaction processing services through August 2019. Exh. 69, NP0002504, at 513, 522.

137.    Following the sale of SWP to Cloud Payroll, Alred "ran the company" as he did prior to the transaction. Exh. 5, Alred Depo. vol. I, 253:7.

138.    SWP did not set up a formal board of directors to oversee its operations, as the agreement memorializing the Cloud Payroll acquisition of a majority interest in SWP required. Exh. 5, Alred Depo. vol. I, 94:5-22; Exh. 14, Alred Depo. vol. II, 684:23-685:1; Exh. 70, SWP-015292_0002, at § 11.

139.    David Rhoades, SWP's receiver, acknowledged that the lack of a formal board of directors was irregular. Exh. 71, Deposition Transcript of C. David Rhoades, July 14, 2022 ("Rhoades Depo.") 92:7-94:22.

140.    Between April 2017 and September 2019, SWP's revenues and profits grew on an annualized basis. Exh. 72, Deposition 30(b)(6) Transcript of SWP via David Rhoades, July 14, 2022 ("SWP Depo. via Rhoades I") 48:15-25.

**B.    Following its Acquisition by Mann, SWP Relinquishes Control of Over the Funds It Collected from Its Employer-Clients to Cloud Payroll, Without Any Safeguards to Ensure Their Proper Handling.**

141.    SWP admits that after the sale of a majority stake in SWP to Cloud Payroll in April 2017, Cloud Payroll's centralized tax department began processing payroll tax for SWP's employer-clients through accounts at Pioneer that were controlled by Mann and Cloud Payroll. Exh. 6, SWP's Answers to Pioneer's First Set of Interrogatories No. 1b.

142.    Beginning in November 2017, once the funds collected from employer-clients of SWP were deposited in SWP's account at Prosperity Bank, Cloud Payroll, using NatPay as their ACH processor, would then initiate an ACH transfer of funds from SWP's account to NatPay's account at First Premier Bank in Sioux Falls, South Dakota; NatPay would then transfer the funds to the MPHR Account (and later the Cloud Account) at Pioneer; and when payment to taxing authorities were requested or scheduled, NatPay would, based on instructions from Cloud Payroll, transfer to the funds from Pioneer back to First Premier and then to the taxing authorities.  Exh. 5, Alred Depo. vol. I, 216:2-4, 263:3-7, 264:11-14; Exh. 14, Alred Depo. vol. II, 518:12-519:4.

143.    Daren Alred testified that he authorized the procedure for processing payroll taxes for SWP's employer clients using Cloud Payroll.  Exh. 14, Alred Depo. vol. II, 470:7-473:3.

144.    Despite Daren Alred recognizing the need for a service agreement between SWP and Cloud Payroll, Exh. 5, Alred Depo. vol. I, 184:5-6; Exh. 73, SWP-018265, SWP and Cloud Payroll never finalized an executed a service agreement, Exh. 5, Alred Depo. vol. I, 164:9-17; Exh. 50, Reinke Depo. 257:5-7.

145.    SWP also never communicated any policies, written or otherwise, to Cloud Payroll that funds withdrawn from its employer-clients' bank accounts and deposited into the Cloud Account were not to be used for any other purpose other than payment of taxes.  Exh. 14, Alred Depo. vol. II, 535:19-536:5.

146.    SWP had no access to the MPHR Account, nor was it an account under SWP's control.  Exh. 15, SWP Depo. via Rhoades II, 71:9-14.

147.    SWP did not have an agreement with MyPayrollHR concerning the use of the MPHR Account to process funds from SWP's employer-clients that were collected for the payment of taxes.  Exh. 5, Alred Depo. vol. I, 275:9-15; Exh. 14, Alred Depo. vol. II, 422:6-14.

148.    SWP no longer considered itself responsible for ensuring that funds collected from their employer-clients were paid to the taxing jurisdictions, with Daren Alred testifying that this was the responsibility of Cloud Payroll.  Exh. 5, Alred Depo. vol. I, 271:17-272:13.

149.    Indeed, NatPay viewed Cloud Payroll as "doing the taxes" on behalf of the Mann Payroll Companies, and it recognized Cloud Payroll, not SWP, as its customer, as Cloud Payroll was the sole entity issuing instructions to NatPay for the processing of tax payments through the MPHR and Cloud Accounts at Pioneer.  Exh. 19, Cafaro Depo. 121:14-15; Exh. 17, Pereira Depo. 181:22-25; Exh. 74, Deposition 30(b)(6) Transcript of NatPay via Dawn Cafaro, October 18, 2023, ("NatPay Depo. via Cafaro") 30:20-31:10.

150.    SWP and Daren Alred were aware that relinquishing control of funds collected for the payment of taxes to another entity was completely at odds with the way that SWP had done business in the past.  Exh. 5, Alred Depo. vol. I, at 262:20-264:20.

151.    SWP practices where it knowingly permitted funds collected from its employer-clients to be deposited into accounts that were not under its control and where it relinquished any responsibility to ensure payments were timely made to taxing jurisdictions violate clear standards and norms in the payroll processing industry.  Exh. 16, Pirrung Rpt. ¶¶ 50-54.

**C.      SWP Violates Its Service Agreement With Its Employer-Clients by Allowing Cloud Payroll to Deposit Funds Collected From the Employer-Clients Into the MPHR Account at Pioneer.**

152.    SWP admits that once the funds it collected from its employer-clients were transferred to the MPHR Account (and later the Cloud Account), then it was no longer in compliance with its Service Agreement with its employer-clients, which required SWP to deposit withheld funds in an account under SWP's control.  Exh. 15, SWP Depo. via Rhoades II 70:4-16.

153.    SWP and Cloud Payroll never updated SWP's service agreement with its clients to allow the outsourcing of tax processing to Cloud Payroll.  Exh. 5, Alred Depo. vol. I, 169:22-170:2.

154.    SWP never informed its clients of the existence of MyPayrollHR or that the funds collected from them were deposited into the MPHR Account at Pioneer.  Exh. 15, SWP Depo. via Rhoades II 93:5-17; Exh. 14, Alred Depo. vol. II, 448:16-449:10, 514:7-518:11.

155.    On October 25, 2017, Alred sent Cloud Payroll a draft letter, proposing to advise employer-clients of a "minor change[]" to the way that SWP collected funds for payroll tax and to explain to employer-clients that Cloud Payroll will process tax withholding and payment but that "Your tax funds will be under the same protective stewardship that you have always trusted . . ." Exh. 75, SWP-017679, at p. 2.

156.    That draft letter was never sent, Exh. 15, SWP Depo. via Rhoades II 92:11-93:17,] and SWP admits that it never told its clients that the funds collected from them would be deposited by into accounts at Pioneer that were not held by SWP but by MyPayrollHR, and later Cloud Payroll, Exh. 76, SWP's Supplemental Answers to Pioneer's First Set of Interrogatories No. 13; Exh. 5, Alred Depo. vol. I, 274:7-14.

157.    At that time, in late 2017, Alred already knew that funds collected from the employer-clients of the Mann Payroll Companies, including SWP, were all being comingled and

28

deposited into the MPHR Account and used by Mann during the float period.  Exh. 5, Alred Depo. vol. I, 202:16-203:13, 282:18-22, 288:4-11; Exh. 14, Alred Depo. vol. II, 383:5-24; Exh. 3, Mann Depo. vol. II, 358:9-15; Exh. 50, Reinke Depo. 82:14-83:4.

158.    In fact, on January 9, 2018, Alred emailed Mann, decrying the "tsunami of notices we have been receiving . . .on some of our largest clients for non-filing of returns, non-payment of taxes etc.  Plus the responses are sporadic and provide little or no explanation of why the tax was not filed or paid." Exh. 5, Alred Depo. vol. I, 309:6-21; Exh. 77, SWP-017140.

159.    On March 7, Alred again raised concerns about tax processing, stating that "the situation is a disaster!" and warning that clients "want to know where their money is if we have not paid it in" and demanding that this "better be the most important thing on someone's desk." Exh. 5, Alred Depo. vol. I, 317:22-24, 318:9-319:3; Exh. 78, c-mann-0000277972.

160.    On March 27, 2018, Alred raised the same concern, stating: "As a business owner, I am extremely nervous because I have no way of knowing what has been done with Client funds, what has been paid and what has not, and I am going to have to take some measures to regain control of our tax processing some way or another.  We have zero visibility into your processes and this is contributing to the feeling of unease." Exh. 79, c-mann-0000278765.

161.    On the same day, Alred wrote that "I am very close to taking back tax processing in-house." Exh. 5, Alred Depo. vol. I, 347:18-23; Exh. 79, c-mann-0000278765.

162.    SWP never took back tax processing in house until after September 4, 2019.  Exh. 5, Alred Depo. vol. I, 349:3-11.

163.    SWP has been sued by numerous employer-clients alleging, among other things, that SWP defrauded them and that SWP breached its service contracts with them.  Exh. 71, Rhoades Depo. 140:2-7; Exh. 80, *Baptist Village Retirement vs. Southwestern Payroll Service,*

29

*Inc.*, CJ-2020-896 (D. Ct., Tulsa Cnty., Okla. Feb. 14, 2020), Petition of Baptist Village Retirement; Exh. 12, *Alred v. Southwestern Payroll Svc., Inc.*, No. CJ-2019-3516 (D. Ct., Tulsa Cnty., Okla. Jul. 27, 2023) Third Party Petition of Transition Health Svc. Grp., LLC.

    **D.**    **SWP and Michael Mann Open Account 1996 At Pioneer, Misrepresent The Nature of SWP's Business to Pioneer, and Use the Account for ACH and Check Kiting.**

164. In October of 2017, Mann, on behalf of SWP, opened up a general deposit checking account ending in 1996 ("Account 1996") at Pioneer "in his capacity as the representative of Southwestern Payroll" Exh. 14, Alred Depo. vol. II, 418:11-19; Exh. 81, PB-SWP-00000505, at 508.

165. SWP admits that Mann was entitled to open, and did open, Account 1996 at Pioneer on behalf of SWP, and that he was also entitled to execute contracts on behalf of SWP. Exh. 9, SWP's Responses to Pioneer's Second Requests for Admissions Nos. 12, 13.

166. According to Alred, "I knew that Michael Mann, as the majority shareholder [of SWP], had the right to represent the interest of Southwestern Payroll at Pioneer Bank." Exh. 14, Alred Depo. vol. II, 405:2-5.

167. When opening Account 1996, Michael Mann signed the CDD form, which had the box checked "no" to question in Section 9, which asked, "Is this business a 'Money Services Business' as defined in CFR § 1010.100(ff)," and which was defined in the CDD form as "a money transmitter, which engages as a business in accepting currency or funds and transmits such currency or funds by any means through a financial agency or institution." Exh. 81, PB-SWP-00000505, at 511-12.

168. Likewise, on the same CDD form, Michael Mann signed that SWP was not a "third party payment processor," which was defined on the form as a "business that provides payment

30

processing services to merchants and other business entities." Exh. 81, PB-SWP-00000505, at 510.

169.    Pioneer has a policy that payroll companies cannot have third party payment processing accounts in the bank for their third party payroll. Exh. 47, Deposition 30(b)(6) Transcript of Pioneer via Frank Sarratori December 13, 2021 ("Pioneer Depo. via Sarratori") 117:4-118:7, 322:14-323:19; Exh. 54, Amell Depo. 181:19-24; Exh. 46, Seeber Depo. 72:18-73:23.

170.    Pioneer's BSA Department reviews every CDD Form prior to account opening. Exh. 57, Fogarty Depo. 14-16.

171.    Pioneer relies on the truth of the representations in the CDD Form that a customer is not utilizing the account for the prohibited purposes of third party payment processing or money transmitting. Exh. 47, Pioneer Depo. via Sarratori 325:2-17.

172.    Throughout 2019, Mann and SWP used Account 1996 almost exclusively for kiting checks and ACH's to defraud Pioneer and Bank of America. Exh. 3, Mann Depo. vol. II, 454:11-455:3.

173.    An example of ACH kiting is on November 9, 2018, where $1,106,887 in four ACH deposits were credited to Account 1996 with the description "912- TrueConsulti/DIR DEP" on two of those transactions, which totaled $652,867, and the description "904-ValueWiseCo/DIR DEP" on the remaining two transactions, which totaled $454,010. Exh. 82, PB-SWP-00028159, at 168.

174.    That $1,106,887 was then transferred from account 1996 to another Mann Entity account ending in 3648. Exh. 82, PB-SWP-00028159, at 168; Exh. 83, PB-SWP-0028530, at 531-532.]

175.    From there, checks were written out to two other Mann Entities—ValueWise ($465,000 and $364,000) and to Optix Consulting ($479,000).  Exh. 83, PB-SWP-0028530, at 532, 538, 541.

176.    SWP has no record of any invoice it billed to True Consulting for such amounts, Exh. 15, SWP Depo. via Rhoades II 120:2-19, nor did SWP owe any debt that would correspond to the amounts withdrawn from SWP's account on November 19, 2018, Exh. 15, SWP Depo. via Rhoades II 122:3-8.

177.    In August 2019 there 107 transactions in Account 1996, and Michael Mann admitted that not one served any legitimate purpose and were instead part of Mann's check-kiting scheme.  Exh. 3, Mann Depo. vol. II, 453:16-455:3.

**V.    2017: NatPay Agrees with Mann to Facilitate the Fraudulent Scheme.**

**A.    NatPay and Cloud Payroll Decouples the Processing of Payroll Tax From Payroll, and, Through a Circuitous Route, Transfer and Deposit All Funds Collected From the Mann Payroll Companies' Employer-Clients Into the MPHR Account.**

178.    NatPay admits that from November 2017 through September 2019, Cloud Payroll directed NatPay, through the use of electronic files reflecting specific ACH debits and credits, to collect funds that were deposited in SWP's account, deposit those funds into accounts held by Mann at Pioneer, and then transfer funds from those accounts to appropriate taxing jurisdictions. Exh. 24, NatPay's Responses to Pioneer's Second Set of Requests for Admission No. 13.

179.    Steven Pereira testified that NatPay had never before transferred funds between the accounts of different payroll companies at separate banks prior to remitting payments to tax authorities, describing this arrangement as "a little strange," "new," and "unique."  Exh. 17, Pereira Depo. 168:10-170:24.

180.    This arrangement served no legitimate business purpose.  Exh. 16, Pirrung Rpt. ¶¶ 20, 60; Exh. 84, Expert Supplemental Report of David Williams ("Williams Rpt.") ¶ 35.

181.    NatPay's arrangement with Cloud Payroll was the first time that NatPay served as an ACH transmitter for only a company's payroll tax payments when that company also made payroll payments through the ACH system.  Exh. 17, Pereira Depo. 78:17-79:3.

182.    And since NatPay's arrangement with Cloud Payroll, it has never again agreed to serve as an ACH transmitter solely for payroll tax payments but not for the payroll.  Exh. 22, NatPay Depo. via Pereira 79:4-6; Exh. 18, Hagen Depo. 245:3-257:15.

183.    NatPay had an "hard and fast rule" against decoupling processing of payroll and payroll tax because it knew that doing so reduced NatPay's ability to monitor fraud and risk, including the risk that the payroll company misappropriates funds for the duration the funds withheld for tax payments is deposited in the payroll company's account.  Exh. 18, Hagen Depo., 254:7-255:6, 257:10-21, 298:20-25; Exh. 22, NatPay Depo. via Pereira 80:3-81:2.

184.    NatPay also permitted all of the Mann Payroll Companies to process transactions through a single bank account at Pioneer—something NatPay never allowed before and has not allowed since.  Exh. 18, Hagen Depo. 140:12-147:22.

185.    The comingling of funds collected from distinct payroll processors in a single account were atypical and provided the opportunity for Michael Mann to engage in fraudulent activity with the funds.  Exh. 10, Wood Rpt. ¶ 34.

**B.      NatPay Does Little to No Due Diligence Before Agreeing to Process Payroll Tax For Michael Mann in a Highly Suspicious and Fraudulent Manner.**

186.    Other than minimal verification to ensure that the Mann's Payroll Companies were functioning entities, NatPay did not implement any analytics to prevent Michael Mann from money laundering through NatPay's ACH services.  Exh. 74, NatPay Depo. via Cafaro 36:19:37:6.

33

187.    When NatPay agreed to process payroll taxes for the Mann Payroll Companies, the only information it inquired was if the Mann Entity accounts at Pioneer listed in the onboarding documents (through which NatPay would process tax payments) were checking or savings accounts.  Exh. 22, NatPay Depo. via Pereira 13:22-14:16.

188.    NatPay also did not take any steps to determine if the funds it collected at the direction of Michael Mann and transferred to Mann's accounts at Pioneer would be treated any different than normal operating funds of the Mann Payroll Companies.  Exh. 23, NatPay's Responses to Pioneer's Second Set of Interrogatories No. 19.

189.    Despite agreeing to (and then actually) transferring millions of dollars in funds collected for the purpose of payroll tax to the MPHR Account and the Cloud Account at Pioneer, NatPay never investigated who opened those accounts, or if those accounts had any special protections for deposited funds, or if deposited funds in those accounts were used for purposes beyond just paying taxes.  Exh. 22, NatPay Depo. via Pereira 172:18-174:3; Exh. 17, Pereira Depo. 244:7-24, 248:11-17.

190.    At no time did NatPay ever attempt to contact Pioneer representatives or inform them that funds collected from employer-clients of SWP, Pro Data, and MyPayrollHR/Cloud Payroll were to be transferred by NatPay to accounts at Pioneer.  Exh. 22, NatPay Depo. via Pereira 13:10-11.

**C.    NatPay "Roundtrips" Hundreds of Millions in Fraudulent ACH Kiting Transactions for Mann.**

191.    In July 2018, NatPay began facilitating individual ACH transactions identified as "ePay0001" or "ePay" (collectively "ePay transactions"), which involve the intrabank transfer of funds between accounts held by the Mann Payroll Companies and Other Mann Entities at Pioneer. Exh. 84, Williams Rpt. ¶ 63.

192.    NatPay conducted more than 1,000 ePay transactions totaling approximately $670 million, for a per-transaction average of *more than $600,000* between the MPHR Account and Other Mann Entities' accounts at Pioneer.  Exh. 84, Williams Rpt. ¶ 63.

193.    For example, between July 2018 and September 2019, there were over 600 transactions totaling $378,341,321 million of next day ePay transactions that were deposited into the MPHR Account with each transaction averaging between $582,711 and $682,412, depending on the month.  Exh. 84, Williams Rpt. ¶¶ 40, 42.

194.    The fraudulent nature of these transactions were evidenced by their contrast with legitimate tax processing transactions, which amount to approximately 44,000 transactions over that same period, totaling approximately $360 million, for a per-transaction average of just *$8,000*.  Exh. 84, Williams Rpt. ¶ 65.

195.    Indeed, while the vast majority of ePay transactions ranged between $500,000 and $700,000 each, nearly 100% of the payroll tax-related transactions were under $100,000.  Exh. 84, Williams Rpt. ¶ 65.

196.    Another indicator that these transactions were fraudulent is that they began suddenly—from November 11, 2017, until July 2018, NatPay did not facilitate any ePay transactions into, or out of, the MPHR Account.  Exh. 84, Williams Rpt. ¶¶ 28, 63.

197.    Mann testified that these ePay transactions were a form of kiting and had nothing to do with payment of taxes.  Exh. 3, Mann Depo. vol. II, 319:3-6.

198.    Likewise, NatPay employees admitted that these kinds of ePay transactions were not legitimate tax payments, with Dawn Cafaro calling them "bogus transfers from one account to another." Exh. 85, NP0097967.

199.    Critically, when NatPay gets a file in which there is one ACH transaction that is over $100,000 and is not being directed towards a taxing jurisdiction, NatPay's system will halt and NatPay will need to determine how to proceed because of the potential risk of fraud involved in processing such large transactions.  Exh. 22, NatPay Depo. via Pereira 96:17-20, 97:10-22, 98:6-99:5.

200.    Yet, NatPay did nothing to investigate this transaction to determine what its purpose was.  Exh. 74, NatPay Depo. via Cafaro 164:21-165:3.

**D.      NatPay Ignores Other Indicia of Fraud and Processes Transactions For Michael Mann Through Undesignated Mann Entity Accounts at Pioneer.**

201.    On September 6, 2018, Dawn Cafaro, Operations Manager at NatPay raised the issue of decoupled next day ACH tax payments for Cloud Payroll in excess of $1 million, because NatPay does not allow transactions over a million dollars for next day processing.  Exh. 19, Cafaro Depo. 134:5-71-81:17-182:25; Exh. 86, NP0003032.

202.    Despite Cafaro flagging this issue, NatPay continued to engage in decoupled next day processing of large tax payments for Cloud Payroll and between July 2018 and September 2019, there were 342 instances of next day transactions in excess of $1 million dollars.  Exh. 84, Williams Rpt. ¶ 39.

203.    These immediate back-and-forth transfer of funds between accounts were inconsistent with tax processing and were an indication of classic money laundering.  Exh. 84, Williams Rpt. ¶ 92.

204.    Moreover, in March 2019, NatPay was explicitly instructed to stop using the MPHR Account for all purposes.  Exh. 87, NP0000358.

205. Yet, from March 25, 2019, through August 2019, NatPay continued to roundtrip $272,964,217 in fraudulent ePay transactions on behalf of the Mann Entities through the MPHR Account. Exh. 3, Mann Depo. vol. II, 314:6-20; Exh. 84, Williams Rpt. ¶ 93-94.

206. Critically, five of the transactions for which NatPay seeks to recover $2.7 million were fraudulent ePay transactions that NatPay routed through the MPHR Account after failing to investigate the suspicious nature of these transactions. Exh. 74, NatPay Depo. via Cafaro 168:21-169:2; Exh. 85, NP0097967; Exh. 88, NP0071707, at 707, 756-60.

207. Moreover, these five ePay transactions involved bank accounts at Pioneer Bank of numerous Mann Entities for whom NatPay never even received debit authorization, as none of these accounts are listed on the onboarding agreements signed by the Mann Payroll Companies. Exh. 88, NP0071707, at 707, 756-60; Exh. 89, NP0002917; Exh. 69, NP0002504.

208. And NatPay's failure to obtain appropriate money transmitter licensing enabled it to evade the strictures of federal and state regulators and relax its own standards and practices, and it was in service of its financial goals. Exh. 22, NatPay Depo. via Pereira 136:24-139:4.]

## VI.    2019: Michael Mann and Cloud Payroll Open a General Deposit Checking Account at Pioneer, Which They Use to Process Funds Collected from the Mann Payroll Companies.

209. In February of 2019, Mann, on behalf of Cloud Payroll, opened the Cloud Account at Pioneer. Exh. 3, Mann Depo. vol. II, 407:19-21.

210. The Account Agreement for the Cloud Account states that the account was a Business Premier Checking Account, and it incorporated Terms and Conditions, which language was consistent with those used to open standard general deposit checking accounts across regional and community banks. Exh. 90, PB-SWP-00000072, at 073; Exh. 43, PB-SWP-00394156, at 161; Exh. 42, Report of James J. Kreig ("Kreig Rpt.") ¶¶ 16, 37, 37 n.37.

211.    When Mann opened the Cloud Account, he submitted a Pioneer Link Application Form, requesting to combine the Cloud Account with 23 other accounts held by 12 Other Mann Entities for cash management purposes.  Exh. 90, PB-SWP-00000072, at 081-083; Exh. 3, Mann Depo. vol. II, 415:5-16.

212.    From the time the Cloud Account was opened in February of 2019 through September of 2019, Cloud Payroll and Mann were able to move funds between the Cloud Account and the other 23 accounts listed on the Pioneer Link Application Form for the Cloud Account. Exh. 3, Mann Depo. vol. II, 422:3-10.

213.    From the time the Cloud Account was opened through September 2019, Cloud Payroll could withdraw or transfer funds from the Cloud Account "for any reason," "regularly transfer[] funds from [Cloud] account 2440 to entities that [were] not taxing authorities … and did not use the funds in [Cloud] account 2440 exclusively for the payment of taxing [sic]."  Exh. 3, Mann Depo. vol. II, 435:22-436:16.

214.    Throughout 2019, Mann "repeatedly transferred funds from [Cloud ] account 2440 to [the MPHR Account], and then to other checking accounts held by ValueWise affiliates at Pioneer Bank as part of [his] check kiting scheme."  Exh. 3, Mann Depo. vol. II, 431:14-21.

215.    On the Account Agreement for the Cloud Account, the box indicating, "Trust – Separate Agreement" was not checked.  Exh. 90, PB-SWP-00000072, at 073.

216.    Nowhere in the Account Agreement for the Cloud Account does it state that the Cloud Account will be a trust account.  Exh. 90, PB-SWP-00000072, at 073; Exh. 3, Mann Depo. vol. II, 422:20-23.

217.    Mann never told anyone at Pioneer that he wanted to open the Cloud Account as a trust account, special account, or escrow account.  Exh. 3, Mann Depo. vol. II, 423:2-24.

218.    Nobody at Pioneer ever told Mann that the Cloud Account would be treated as a trust account, or a special account, or an escrow account.  Exh. 3, Mann Depo. vol. II, 424:2-7.

219.    "There was never any agreement between Cloud Payroll and Pioneer Bank that the funds in [the Cloud Account] were to be kept separate and isolated from other accounts at Pioneer Bank" or to "restrict or limit in any way, Cloud Payroll's used of the funds in [the Cloud Account]."  Exh. 3, Mann Depo. vol. II, 434:12-435:10.

220.    Neither Mann nor anyone else representing Cloud Payroll ever asked Pioneer to restrict the Cloud Account so that funds could not be transferred between the Cloud Account and other Accounts at Pioneer held by Cloud Payroll or other ValueWise affiliates.  Exh. 3, Mann Depo. vol. II, 434:20-435:4.

221.    Mann did not talk to anyone at Pioneer about what kinds of money he was going to put into the Cloud Account.  Exh. 47, Pioneer Depo. via Sarratori 52:14-22.

222.    The Cloud Account was collateral for the ValueWise line of credit, Exh. 48, PB-SWP-00331964, at 966-67, for which Pioneer prepared credit memos documenting the current and average account balances in the Cloud Account, Exh. 49, PB-SWP-00334483, at 486.

223.    In March 2019, NatPay and Cloud Payroll began processing the funds collected from SWP's employer-clients bank accounts for the payment of taxes through the Cloud Account that was held by Cloud Payroll and controlled by Mann.  Exh. 14, Alred Depo. vol. II, 383:5-24, 467:4-15.

224.    Cloud Payroll deposited funds collected from the employer-clients of multiple Mann Payroll Companies, including MyPayrollHR (like Granite Solutions), SWP, and Pro Data into the Cloud Account.  Exh. 3, Mann Depo. vol. II, 409:21-410:8.

39

225.    During the relevant events, payroll tax processing for SWP was outsourced to Cloud Payroll and Cloud Payroll handled all tax processing for SWP.  Exh. 76, SWP's Supplemental Answers to Pioneer's First Set of Interrogatories Nos. 13d, 13e.

226.    NatPay testified that throughout 2019 and the relevant events it processed all the transactions for Cloud Payroll through the Cloud Account, and that the tax process for all the Mann Payroll Companies "ran under Cloud Payroll."  Exh. 74, NatPay Depo. via Cafaro 77:3-4.

227.    In processing transactions for the Mann Payroll Companies through the Cloud Account, individuals at Cloud Payroll dealt with Michael Mann, who "was the only one . . . that would actually do the transactions."  Exh. 50, Reinke Depo. 101:16-24.

228.    And when there were issues with Cloud Payroll's processing of payroll and payroll tax through the Accounts at Pioneer, Mann was "really the only one who actually dealt – who actually dealt with the bank to actually resolve with [sic] the issue."  Exh. 50, Reinke Depo. 102:9-25.

229.    Mann was the one who was responsible for and who controlled the Cloud Account. Exh. 51, PB-SWP-00038123, at ¶ 4.

**VII.    August 30, 2019: Mann's Fraudulent Kiting Scheme Collapses.**

230.    From 2017 until August 30, 2019, Mann would always make sure that there was enough money in the MPHR Account and then the Cloud Account to cover all payments to taxing authorities such that all payments were timely paid.  Exh. 3, Mann Depo. vol. II, 614:5-615-14.

231.    "Mann's scheme collapsed in late August and early September 2019, when one of his banks froze his accounts, setting off a chain of events that left his payroll companies unable to process payroll and tax payments."  Exh. 91, Department of Justice Press Release, NDNY, August 4, 2021.

232.    On August 29, 2019, Mann deposited thirty-six checks written from accounts he controlled at Bank of America totaling $15,588,000 ("36 BOA Checks") into twelve accounts he controlled at Pioneer, including into Account 1996 of SWP.  Exh. 92, Declaration of Frank Sarratori, Oct. 15, 2021 ("Sarratori Decl.") ¶ 6; Exh. 93, SWP's Answers to Pioneer's Second Set of Interrogatories No. 19, at p. 10.

233.    Because Mann had remote deposit capture privileges, Pioneer credited those twelve accounts with 100% of the 36 BOA Checks, which Mann withdrew on the same day by writing thirty-nine checks totaling $18,043,000 from his accounts at Pioneer back to the accounts at Bank of America.  Exh. 92, Sarratori Decl. ¶ 6; Exh. 93, SWP's Answers to Pioneer's Second Set of Interrogatories No. 19, at p. 10.

234.    Pioneer immediately paid Bank of America $18,043,000, which funds included the $15,588,000 credit extended by Pioneer for the 36 BOA Checks.  Exh. 94, Pioneer's Answers to SWP's First and Second Set of Interrogatories No. 14; Exh. 93, SWP's Answers to Pioneer's Second Set of Interrogatories No. 19, at p. 10.

235.    At approximately 4:30 p.m., on Friday, August 30, 2019, Bank of America returned and called back the 36 BOA Checks totaling $15,588,000.  Exh. 92, Sarratori Decl. ¶ 6; Exh. 94, Pioneer's Answers to SWP's First and Second Set of Interrogatories No. 14; Exh. 93, SWP's Answers to Pioneer's Second Set of Interrogatories No. 19, at p. 10.

236.    On August 30, 2019, Bank of America froze all the accounts Mann controlled at the respective banks.  Exh. 92, Sarratori Decl. ¶ 6; Exh. 94, Pioneer's Answers to SWP's First and Second Set of Interrogatories No. 14.

237.    The return and callback of the 36 BOA Checks resulted in Mann's accounts at Pioneer being severely overdrawn, with an aggregate negative net account balance of over $18

41

million.  Exh. 92, Sarratori Decl. ¶ 6; Exh. 94, Pioneer's Answers to SWP's First and Second Set of Interrogatories No. 14.

238.    On August 30, 2019, Pioneer received notice of Bank of America returning the 36 BOA Check.  Exh. 58, Catello Depo. 102:17-19; Exh. 56, Hunn Depo. 78:21-79:4, 82:19-22.

239.    On August 30, 2019, Frank Sarratori, in consultation with David Hunn, directed deposit operations at Pioneer Bank to freeze all the Mann Payroll Companies' and Other Mann Entities' accounts at Pioneer.  Exh. 92, Sarratori Decl. ¶ 6; Exh. 56, Hunn Depo. 84:19-22; Exh. 58, Catello Depo. 104:6-11.

240.    At Pioneer, the terms "restricted" and "frozen" are used interchangeably.  Exh. 58, Catello Depo. 38:19-24.

241.    On August 30, 2019, at approximately 5:15p p.m., Joe Fleming at Pioneer called Mann and told him that Bank of America had retuned and called back the 36 BOA Checks that were deposited the day before at Pioneer.  Exh. 51, PB-SWP-00038123 ¶ 5.

242.    During the same call, Joe Fleming told Michael Mann that Pioneer had frozen all the Mann Payroll Company's and the Other Mann Entities' accounts at Pioneer and disabled Mann's access to those accounts.  Exh. 51, PB-SWP-00038123 ¶ 5.

243.    When Michael Mann was informed that his accounts were frozen, he understood that the effect of the freezes was to prevent the Mann Payroll Companies and the Other Mann Entities from withdrawing funds from the Mann Entity accounts at Pioneer and from making any payments out of his accounts at Pioneer.  Exh. 51, PB-SWP-00038123 ¶ 5.

244.    At that time, Michael Mann understood that the freeze would not have any effect on continuing incoming deposits into any of the Mann Payroll Companies' or Other Mann Entities' accounts at Pioneer.  Exh. 51, PB-SWP-00038123 ¶ 5.

245.    When Joe Fleming informed Michael Mann of the freeze of the Mann Entity accounts at Pioneer, Mann was responsible for and controlled all of the Mann Payroll Companies' and Other Mann Entities' accounts at Pioneer.  Exh. 51, PB-SWP-00038123 ¶ 6.

**VIII. Labor Day Weekend 2019: Pioneer Freezes Mann's Accounts and Initiates an Account Overdraft Recovery on the Severe Negative Balances in the Mann Entity Accounts.**

    **A.    Consistent With Its Historic Practice, Pioneer Processes the Transactions in the Mann Entity Accounts.**

        **1.    Pioneer's Standard Procedure For Manually Processing Unposted Transactions.**

246.    At Pioneer Bank, restricting an account causes all incoming and outgoing transactions to be automatically rejected during overnight processing, effectively "unposting" them from the account.  Exh. 95, Declaration of David Hunn, May 23, 2024 ("Hunn Decl.") ¶ 5; Exh. 58, Catello Depo. 41:2-11; Exh. 56, Hunn Depo. 85:18-21, 131:22-132:9.

247.    When a transaction is unposted, it remains queued within Pioneer's Horizon processing platform, awaiting manual processing, and is reflected in Pioneer Bank's Unposted Item Reports and Unposted Item Repair Positional Reports.  Exh. 95, Hunn Decl. ¶ 5; Exh. 56, Hunn Depo. 89:20-24, 90:4-5.

248.    Manual processing of unposted items begins the next business day, when Deposit Operations employees at Pioneer Bank follow a procedure for "decisioning" items on the Unposted Item Report—i.e., determining whether an item should be "returned" (i.e., declined) or "posted" to the account.  Exh. 95, Hunn Decl. ¶ 6; Exh. 56, Hunn Depo. 91:9-21, 126:19-22 131:19-25; Exh. 58, Catello Depo. 44:6-10.

249.    This process has a daily deadline of 1 p.m. ET, which is set by FIS Global, Pioneer's core processor.  Exh. 95, Hunn Decl. ¶ 6; Exh. 96, PB-SWP-00407645.

43

250.    Pioneer Bank's system organizes unposted transaction items by account number in ascending order.  Within each account, ACH transactions are listed in descending order by amount, followed by OLB transfers, which are also listed in descending order by amount.  Exh. 95, Hunn Decl. ¶ 7; Exh. 58, Catello Depo. 81:3-7.

251.    The results of this decisioning process are reflected in Pioneer Bank's Unposted Item Repair Decision Reports, Exh. 95, Hunn Decl. ¶ 7; Exh. 97, PB-SWP-00403089, at 089.

252.    Transactions items that are not processed before the day's cutoff are reflected in Pioneer Bank's Unposted Items Aging Report.  Exh. 95, Hunn Decl. ¶ 7; Exh. 98, PB-SWP-00403057, at 057.

253.    An online banking ("OLB") transfer is a transfer of money between deposit accounts at Pioneer Bank, with two sides to each OLB transfer: a debit and a credit.  Exh. 95, Hunn Decl. ¶ 8; Exh. 56, Hunn Depo. 217:9-11.

254.    When a customer initiates an OLB transfer from one deposit account to another and both accounts are restricted, both the debit and the credit will become unposted during overnight processing, and both the debit and credit from OLB transfers are processed individually and separately.  Exh. 95, Hunn Decl. ¶ 8; Exh. 56, Hunn Depo. 217:6-11.

**2.    On August 30, 2019, Before Pioneer Restricted Michael Mann's Accounts, He Initiates 25 Online Banking Transactions Between the Mann Entity Accounts.**

255.    Pioneer's transaction records establish that, on August 30, 2019, Michael Mann initiated twenty-five OLB transfers between his accounts at Pioneer.  Exh. 95, Hunn Decl. ¶ 9; Exh. 99, PB-SWP-00408492; Exh. 100, PB-SWP-00408493, at 567-68, 665-66.

256.    Six of these OLB transfers were debits initiated from the Cloud Account and credits to the MPHR Account (the "Six OLB Transfers");

44

i.   at 8:02:44 a.m., Mann initiated a $989,000 debit from the Cloud Account and a credit of the same amount to the MPHR Account;

ii.   at 8:03:32 a.m., Mann initiated a $988,000 debit from the Cloud Account and a credit of the same amount to the MPHR Account;

iii.   at 8:04:11 a.m., Mann initiated a $987,000 debit from the Cloud Account and a credit of the same amount to the MPHR Account;

iv.   at 8:04:46 a.m., Mann initiated a $986,000 debit from the Cloud Account and a credit of the same amount to the MPHR Account;

v.   at 8:06:16 a.m., Mann initiated a $95,000 debit from the Cloud Account and a credit of the same amount to the MPHR Account;

vi.   at 3:50:26 p.m., Mann initiated a $2,800,000 debit from the Cloud Account and a credit of the same amount to the MPHR Account;

Exh. 95, Hunn Decl. ¶ 9; Exh. 100, PB-SWP-00408493, at 567-68, 665-66; Exh. 99, PB-SWP-00408492.

257.   Another one of these twenty-five OLB transfers was a payment of $3,200,000 to the ValueWise line of credit, which was effectuated by initiating a debit from Account ending in 3614 and a credit to Loan Account ending in 2340 (the "Loan OLB Transfer"), which Mann initiated at 3:55:13 p.m.  Exh. 95, Hunn Decl. ¶ 9; Exh. 100, PB-SWP-00408493, at 666; Exh. 99, PB-SWP-00408492.

258.   Because of the severe negative balance across the Mann Entity accounts at Pioneer due to Bank of America return of the 36 BOA Checks, Pioneer Bank restricted, or "froze," the Mann Entity accounts, which process began at 4:38:36 p.m.  and concluded at 4:45:26 p.m.  Exh. 95, Hunn Decl. ¶ 9; Exh. 101, PB-SWP-00333705.

### 3.   Consistent With Its Standard Practice, Deposit Operations at Pioneer Decisions the Online Banking Transactions That Unposted From the Mann Entity Accounts.

259.   On August 30, 2019, the Six OLB Transfers, the Loan OLB Transfer, and other ACH transactions across the Mann Entity accounts were automatically unposted during overnight processing because these accounts were restricted by Pioneer Bank.  Exh. 95, Hunn Decl. ¶ 11;

45

Exh. 56, Hunn Depo. 114:12-21, 216:21-217:2, 217:18-22; Exh. 102, PB-SWP-00403611, at 633-34, 733-34; Exh. 103, PB-SWP-00402737, at 764, 872-873.

260. On the morning of September 3, 2019, Pioneer Bank faced a backlog of unposted transactions from August 30, which required manual processing. Exh. 95, Hunn Decl. ¶ 12; Exh. 56, Hunn Depo. 88:10-15.

261. Pioneer Bank's standard practice for "decisioning" unposted ACH transactions in restricted accounts was to post any credits and return any debits. Exh. 95, Hunn Decl. ¶ 12; Exh. 58, Catello Depo. 60:7-14; Exh. 39, Fleming Depo. 318:6-18.

262. It is general practice for a bank to block or prevent the withdrawal of funds from a check kiter's account after a check kiting scheme is detected to prevent a further loss to the bank. Exh. 42, Kreig Rpt. ¶ 120.

263. It is also general practice for a bank to continue to accept deposits to the account of the criminal to reduce any existing loss. Exh. 42, Kreig Rpt. ¶ 120.

264. In all cases, the deposits made to the account after the fraud is discovered by the bank serve to reduce the bank's losses. Exh. 42, Kreig Rpt. ¶ 120.

265. Pioneer Bank's standard approach to unposted OLB transfers in restricted accounts was to post both credits and debits, as OLB transfers merely involve multiple accounts at Pioneer Bank moving money from one account to another, never leaving Pioneer Bank. Exh. 95, Hunn Decl. ¶ 12; Exh. 56, Hunn Depo. 217:6-11, 218:7-14; Exh. 58, Catello Depo. 58:3-7.

266. On September 3, 2019, in accordance with Pioneer Bank's standard practice and established procedures, Kim Catello, working with others in Deposit Operations at Pioneer Bank, began decisioning the items that unposted from the Mann Entity accounts on August 30. Exh. 95,

46

Hunn Decl. ¶ 13; Exh. 56, Hunn Depo. 95:6-9, 97:10-13, 96:25-97:6, 102:25-103:5; Exh. 58, Catello Depo. 112:12-16, 113:11-13.

267.    Kim Catello also testified that she posted ACH credits to the Mann Entity Accounts because "we always post credits against frozen accounts," and "we've never had an occasion where we returned or have to return a credit . . .and we allow those to post to the accounts," and "there's never been a time when Pioneer Bank returned both credits and debits on a frozen account."  Exh. 58, Catello Depo. 59:22-25, 60:16-20, 113:20-23.

268.    Each of the more than 1,000 unposted transactions required individual attention, with several manual interventions or "clicks" needed for processing.  Exh. 95, Hunn Decl. ¶ 13; Catello Depo. 52:20-25.

269.    Because of how unposted transactions are organized within Pioneer's processing system, Kim Catello and others in Deposit Operations began decisioning unposted transactions from lower-numbered accounts, handling ACH transactions before OLB transfers within those accounts.  Exh. 95, Hunn Decl. ¶ 13; Exh. 97, PB-SWP-00403089, at 287; Exh. 58, Catello Depo. 81:3-7.

270.    The result of this process was that the final transaction processed on September 3 before the daily cutoff time was an ACH credit of $5,139.71 to the Cloud Account, with other ACH transactions of lesser amounts not processed in time to the Cloud Account.  Exh. 95, Hunn Decl. ¶ 13; Exh. 97, PB-SWP-00403089, at 224.

271.    Because Deposit Operations began decisioning the unposted items in the Cloud Account after those in the MPHR Account, the Six OLB Transfer credits to the MPHR Account were posted, but the Six OLB Transfer debits to the Cloud Account had not yet been decisioned

by the cutoff time.  Exh. 95, Hunn Decl. ¶ 13; Exh. 97, PB-SWP-00403089, at 125, 287-88, Exh. 98, PB-SWP-00403057 at 057, 086-87.

272.    When OLB debits remain unposted for an entire day, Pioneer Bank's standard procedure is to move them overnight to the Unposted Item Repair General Ledger account within the bank, where they stay until they can be decisioned by Deposit Operations the next day.  Exh. 95, Hunn Decl. ¶ 14; Exh. 104, PB-SWP-00408925, at 950; Exh. 56, Hunn Depo. 223:23-25.

273.    Consistent with this procedure, the Six OLB Transfer debits to the Cloud Account were moved to the Unposted Item Repair General Ledger account, and on September 4, 2019, between 12:27:19 a.m.  and 12:27:57 p.m., Kim Catello decisioned the Six OLB Transactions, posting them back to the Cloud Account.  Exh. 95, Hunn Decl. ¶ 14; Exh. 105, PB-SWP-00403390, at 509-10; Exh. 104, PB-SWP-00408925, at 950.

274.    On September 4, 2019, Kim Catello also continued processing the remaining unposted items to the Mann Entity accounts.  Exh. 56, Hunn Depo. 209:6-25; Exh. 105, PB-SWP-00403390, at 446, 509.

275.    When Kim Catello was decisioning the unposted items from the Mann Entity Accounts, she had no knowledge of Michael Mann's business other than that he was a customer of Pioneer, and had no knowledge whether Michael Mann was using accounts at Pioneer to deposit funds collected from third-party employer-clients of the Mann Payroll Companies.  Exh. 58, Catello Depo. 90:21-91:11, 94:12-95:3.

276.    David Hunn did not himself review the descriptions on the unposted transactions in the Mann Entity accounts.  Exh. 56, Hunn Depo. 154:4-155:3.

**4.    Pioneer Account Statements Reflect the Different Dates the Online Banking Transactions Were Processed.**

277.    Because the Six OLB Transfer debits to the Cloud Account and the Six OLB Transfer credits to the MPHR Account were decisioned on different days, they have different dates on Pioneer Bank's account statements. Exh. 95, Hunn Decl. ¶ 15; Exh. 56, Hunn Depo. 146:13-18, 219:4-10.

278.    Typically, transactions on Pioneer Bank's account statements reflect the effective date as the day the transaction was initiated; however, if a transaction does not post by the last day of a statement cycle and is then decisioned in the subsequent cycle, the effective date on the account statement will reflect a date in the new statement cycle, depending on the type of transaction. Exh. 95, Hunn Decl. ¶ 15; Exh. 56, Hunn Depo. 120:25-121:6.

279.    For ACH transactions, the effective date will be the first business day of the new statement cycle. Exh. 95, Hunn Decl. ¶ 15; Exh. 56, Hunn Depo. 121:3-6.

280.    For OLB transfers, the effective date will also be the first business day of the new cycle unless an OLB transfer debit was moved to the Unposted Item Repair General Ledger account, in which case the effective date will be the day the OLB transfer debit was decisioned from that account. Exh. 95, Hunn Decl. ¶ 15; Exh. 56, Hunn Depo. 146:13-18, 219:4-10.

281.    Pioneer does not set the effective date on an account statement for an ACH deposit or credit that was manually posted to a restricted/frozen account. Exh. 58, Catello Depo. 56:9-15.

282.    Pioneer does not set the effective date on an account statement for an ACH return that was manually posted to a restricted/frozen account. Exh. 58, Catello Depo. 56:18-20.

283.    Pioneer does not set the effective date on an account statement for an OLB transfer between general deposit checking accounts that was manually posted to a restricted/frozen account. Exh. 58, Catello Depo. 56:21-24.

49

284.    In this case, August 30, 2019, was the last date in the August statement cycle, and September 3, 2019, was the first date in the next statement cycle, as August 31 through September 2 was Labor Day weekend.  Exh. 95, Hunn Decl. ¶ 16; Exh. 56, Hunn Depo. 86:25-87:4, 120:21-121:5.

285.    For this reason, the Six OLB Transfer credits to the MPHR Account have an effective date of September 3, 2019, because these credits were decisioned on that date before the cutoff time.  Exh. 95, Hunn Decl. ¶ 16; Exh. 56, Hunn.  Depo. 146:13-18, 219:4-10; Exh. 97, PB-SWP-00403089, at 125; Exh. 105, PB-SWP-00403390, at 509-10; Exh. 106, PB-SWP-00240714, at 716.

286.    In contrast, the Six OLB Transfer debits to the Cloud Account have an effective date of September 4, 2019, because these debits were moved to the Unposted Item General Ledger account and were decisioned out of that account back to the Cloud Account on September 4, 2019.  Exh. 95, Hunn Decl. ¶ 16; Exh. 56, Hunn Depo. 219:4-10; Exh. 97, PB-SWP-00403089, at 287-88; Exh. 107, PB-SWP-00036104, at 121.

287.    Although the OLB Loan Transfer was decisioned on September 3, 2019, it has an effective date of August 30, 2019, because Regulation Z of the federal Truth in Lending Act provides that "a creditor shall credit a payment to the consumer's account as of the date of receipt," and, in accordance with Consumer Financial Protection Bureau guidelines, Pioneer Bank interprets Regulation Z to require crediting of payments to loan accounts on the date they were initiated in Pioneer Bank's online banking system.  Exh. 95, Hunn Decl. ¶ 17; Exh. 108, PB-SWP-00045054, at 054; 12 CFR § 1026.10(a).

288.    Thus, despite its usual practice for dating other transactions involving deposit accounts, the loan payment is dated effective August 30, 2019—the date the payment was initiated

50

by Mann—even though that date falls within the previous statement cycle.  Exh. 95, Hunn Decl. ¶ 17.

        **B.**        **Pioneer Exercises Its Right to Account Overdraft Recovery.**

        **1.**        **Pioneer Debits the Mann Entity Accounts With Positive Balances to Recover Overdrafts in the Mann Entity Accounts With Negative Balances.**

289.      On September 4, 2019, there was a negative balance across the Mann Payroll Companies' and Other Mann Entities' accounts.  Exh. 40, Hughes Depo. 159:22-24.

290.      On September 4, 2019, Patrick Hughes, then-CFO of Pioneer, Frank Sarratori, and Tom Amell reached a collective decision to initiate an account overdraft recovery to partially recover the overdrafts/negative net balances in the Mann Entity accounts.  Exh. 109, Declaration of Patrick Hughes, Mar. 22, 2022, ¶ 5; Exh. 40, Hughes Depo. 163:14-25; Exh. 92, Sarratori Decl. ¶ 7, Exh. 54, Amell Depo. 162:20-25.

291.      Pioneer's decision to initiate an account overdraft recovery for the funds in the Mann Entity accounts was based entirely on the aggregate negative overdraft, not on any default of the line of credit.  Exh. 55, Sarratori Depo. 146:18-25.

292.      On September 4, 2019, there was a meeting at Pioneer between Patrick Hughes, Frank Sarratori, and Tom Amell, where they made a decision to initiate account overdraft recovery measures.  Exh. 40, Hughes Depo. 156:2-11, 157:16-20.

293.      On September 4, 2019, there was a meeting at Pioneer between Patrick Hughes, Bob Alessi, Michael Mann and his attorney, and Tim Burke and his attorney.  Exh. 40, Hughes Depo. 157:5-13, Exh. 54, Amell Depo. 164:22-165:25.

294.      Mann was not asked what the source of the funds in the Cloud Account and the MPHR Account was.  Exh. 40, Hughes Depo. 169:24-170:3.

295.    Mann refused to answer any of Pioneer's questions other than those related to transferring control of the various Mann Entities to Mr. Burke. Exh. 110, Pioneer's Responses to NatPay's First Set of Interrogatories No. 2.

296.    Tim Burke did not inform Pioneer as to the source of the funds that Mann deposited into the Cloud Account and the MPHR Account. Exh. 55, Sarratori Depo. 162:15-21.

297.    Frank Sarratori was not told by Matt Schilling that there were funds collected from employer-clients of the Mann Payroll Companies in the Cloud Account or the MPHR Account. Exh. 47, Pioneer Depo. via Sarratori 181:3-7.

298.    Frank Sarratori was not told by John Reinke that there were funds collected from employer-clients of the Mann Payroll Companies in the Cloud Account or the MPHR Account. Exh. 47, Pioneer Depo. via Sarratori 185:8-13; Exh. 55, Sarratori Depo. 29:2-6.

299.    Neither Frank Sarratori nor Tom Amell asked Reinke the source of the funds in the Cloud Account and MPHR Account. Exh. 50, Reinke Depo. 17-21.

300.    In the afternoon of September 4, 2019, Pioneer Bank initiated an account overdraft recovery of $15,076,168.67 from Mann Entity general deposit accounts to partially cover the overdrafts/negative net account balances in the Mann Entity general deposit accounts that resulted from Bank of America returning/calling back the 36 BOA Checks on August 30, 2019. Exh. 110, Pioneer's Responses to NatPay's First Set of Interrogatories No. 5; Exh. 94, Pioneer's Supplemental Responses to SWP's First and Second Set of Interrogatories No. 14.

301.    Pioneer had designated a deposit clearance general ledger account ending in 6000 ("GL Account 6000") for the account overdraft recovery, but GL Account 6000 was not active on September 4, 2019. Exh. 40, Hughes Depo. 162:2-8, 188:3-7.

302.    Because GL Account 6000 was not active on September 4, 2019, Pioneer effectuated the account overdraft recovery by debiting the Mann Entity general deposit corporate operating accounts and crediting the positive and negative balances to Pioneer Bank's general ledger account ending in 2000 ("GL Account 2000").  Exh. 40, Hughes Depo. 160:19-161:4.

303.    On the morning of September 5, 2019, Pioneer entered a correcting entry to effectuate the movement of funds from GL Account 2000 to GL Account 6000.  Exh. 40, Hughes Depo. 162:11-14.

304.    Because there was a negative balance across the Mann Entity accounts on an aggregate basis, the deposits to the GL Account 6000 merely brought the aggregate negative balance to approximately $2.5 million, which Pioneer recorded as a loss.  Exh. 40, Hughes Depo. 190:6-11; Exh. 55, Sarratori Depo. 180:16-20.

**2.    The Six OLB Transfer Debits to the Cloud Account Were Not Reflected in the Cloud Account Balance on September 4, 2019, When Pioneer Recovered $6,845,944.84 to Cover an Aggregate Negative Net Balance Across the Mann Entity Accounts.**

305.    The real-time running balance of an account is only available on Pioneer's Horizon processing system.  Exh. 95, Hunn Decl. ¶ 18; Exh. 56, Hunn Depo. 124:6-13.

306.    Transactions that are decisioned in a restricted account will not be reflected in the real-time running account balance until the next business day—for example, ACH credit transactions that were unposted from the Cloud Account on September 3, 2019, and were decisioned on September 4, 2019, were not reflected in the real-time balance until September 5, 2019.  Exh. 95, Hunn Decl. ¶ 18; Exh. 56, Hunn Depo. 121:13-19, 126:15-127:8.

307.    Similarly, transactions that unposted from the Cloud Account on September 4, 2019, and were decisioned on September 5, 2019, were not reflected in the real-time balance until September 6, 2019.  Exh. 95, Hunn Decl. ¶ 18; Exh. 56, Hunn Depo. 122:22-123:3.

308.    The balances in Pioneer Bank's account statements do not represent the real-time running balance that is reflected in the Horizon system. Exh. 95, Hunn Decl. ¶ 19; Exh. 56, Hunn Depo. 124:6-13.

309.    The account statements are generated at the end of each month and show balances that include transactions that may not have been posted or visible in the system on that date—for example, an account statement balance for September 3, 2019, would include all transactions initiated on that date. Exh. 95, Hunn Decl. ¶ 19; Exh. 56, Hunn Depo. 125:17-126:18.

310.    However, if the account was restricted, then some of these transactions may have been decisioned on September 4 and only appeared in the real-time running balance in Horizon system on September 5. Exh. 95, Hunn Decl. ¶ 19; Exh. 56, Hunn Depo. 126:19-127:8.

311.    Therefore, the balance for a specific transaction on the account statement may differ from what is visible on the real-time running balance in the Horizon system. Exh. 95, Hunn Decl. ¶ 19; Exh. 56, Hunn Depo. 124:6-13.

312.    On September 4, 2019, the real-time running balance of the Cloud Account was $6,845,944.84, which only included the transactions that unposted on August 30 and were then decisioned on September 3, and thus visible on September 4, 2019. Exh. 95, Hunn Decl. ¶ 20; Exh. 56, Hunn Depo. 134:16-17.

313.    The real-time running balance could not include the Six OLB Transfer debits, because those debits were only decisioned on September 4, and therefore would only become visible the next day, on September 5, 2019. Exh. 95, Hunn Decl. ¶ 20; Exh. 56, Hunn Depo. 121:13-19, 122:15-19, 126:15-127:8.

314.    Also not included in the real-time running balance were any of the ACH credits that unposted on September 3 and were then decisioned on September 4, 2019.  Exh. 95, Hunn Decl. ¶ 20; Exh. 56, Hunn Depo. 121:13-19, 122:15-19, 126:15-127:8.

315.    On September 4, 2019, Kim Catello, based on a directive from David Hunn, debited the full real-time running balance in the Cloud Account, which was $6,845,944.84, which brought real-time running balance in the Cloud Account to zero.  It did not put the Cloud Account into negative status.  Exh. 95, Hunn Decl. ¶ 21; Exh. 56, Hunn Depo. 134:13-17; Exh. 58, Catello Depo. 119:5-8.

316.    The account overdraft recovery of the Cloud Account did not put the account into negative status.  Exh. 95, Hunn Decl. ¶ 21; Exh. 56, Hunn Depo. 134:21-135:2, 237:8-10.

317.    Although Pioneer Bank's account statements show a September 4, 2019, opening balance of $8,883,528.54, these statements are generated at the end of each month and do not represent the real-time running balance.  Exh. 95, Hunn Decl. ¶ 22; Exh. 56, Hunn Depo. 121:17-21.

318.    In real-time, the September 4, 2019, balance could not have been $8,883,528.54 because that amount includes transactions that—despite having an effective date of September 3—were only processed on September 4, and thus, would only be reflected in the real-time balance on September 5, 2019.  Exh. 95, Hunn Decl. ¶ 22; Exh. 56, Hunn Depo. 122:15-19, 125:17-19, 126:15-127:8.

C.    **The National Automated Clearing House Association Determines that Pioneer Complied with the Requirements for Promptly Returning ACH Transactions to NatPay and SWP.**

319.    The ACH transactions into the Cloud Account and the MPHR Account, which serve as the foundation for Plaintiffs' claims, were initiated by Cloud Payroll, using NatPay as the ACH

transmitter.  Exh. 88, NP0071707.  Exh. 76, SWP's Supplemental Answers to Pioneer's First Set of Interrogatories Nos. 13d, 13e; Exh. 74, NatPay Depo. via Cafaro, 77:3-4.

320.    Banks have "up to two days to reject an ACH entry," and NatPay admits that Pioneer returned ACH debits within the permitted two-day window.  Exh. 17, Pereira Depo. 88:1-6, 258:12-17; Exh. 22, NatPay Depo. via Pereira 233:18-23.

321.    NatPay does not expect banks to provide it with notice before they reject a debit.  Exh. 19, Cafaro Depo. 150:23-151:3.

322.    NatPay admits that there is no requirement that Pioneer to reach out and let NatPay know that it was rejecting debits to accounts at Pioneer.  Exh. 22, NatPay Depo. via Pereira 234:5-8.

323.    On September 24, 2019, NatPay filed a National Automated Clearing House Association ("NACHA") complaint against Pioneer, accusing Pioneer of violating Subsection 3.8.1.1 by using the return reason code R16 to reject debits but accept credits to the Pioneer accounts.  Exh. 111, PB-SWP-00397920, at 23.

324.    Pioneer responded to NatPay's NACHA complaint and stated that its justification to reject debits was under R01 return reason code of insufficient funds, which only applies to debits, not credits.  Exh. 112, PB-SWP-00385498.

325.    When Kim Catello had decisioned the unposted items from the Mann Entity accounts, she simply decided to use NACHA Return Code R16 based on the account saying it was restricted, not based on a directive from upper management.  Exh. 58, Catello Depo. 177:7-9.

326.    On October 2, 2019, NACHA informed Pioneer that "[u]pon careful review of the responses received . . .it has been determined that a violation of the NACHA Operating Rules does not appear to have occurred."  Exh. 113, PB-SWP-00385510.

IX.    **Plaintiffs' Lack of Damages**

A.    **NatPay's Lack of Damages**

327.    NatPay has not admitted any liability or made any payments in response to any of the demand letters sent by or on behalf of certain third-party employers in connection with the events at issue in this action.  Exh. 24, NatPay's Responses to Pioneer's Second Set of Requests for Admission No. 8.

328.    NatPay has not been subjected to, nor admitted to, any liability in connection with the class action entitled *Simmons et al.  v.  Cachet Financial Services et al.*, currently pending in the United States District Court for the District of Nevada.  Exh. 24, NatPay's Responses to Pioneer's Second Set of Requests for Admission Nos. 8, 10.

329.    The Mann Payroll Companies agreed to indemnify *NatPay* in connection with any failure of their employer-clients' taxes to be paid, and NatPay expressly disclaimed any liability arising out of any such failure.  Exh. 89, NP0002917, at 939; Exh. 69, NP0002504, at 520, 539.

330.    The funds that were transferred out of NatPay's ACH Settlement account to fund the five fraudulent ePay transactions and NatPay's August 29 tax payments were not the property of NatPay.  Exh. 17, Pereira Depo. 280:17-25, 312:16-20.

331.    To fund the five fraudulent ePay transactions and NatPay's August 29 tax payments, $3.8 million was debited from NatPay's settlement account, which included $2.7 million for the five fraudulent ePay intrabank ACH transactions.  Exh. 17, Pereira Depo. 311:9-16.

332.    NatPay could not say that it ever paid $3.8 million of its own money and deposited it into its ACH Settlement Account.  Exh. 17, Pereira Depo. 207:9-19.

333.    NatPay's financial statements do not recognize any contingent liability or loss in connection with the transactions involving the Cloud Account at issue in this case.  Exh. 24,

NatPay's Responses to Pioneer's Second Set of Requests for Admission No. 11; Exh. 114, NP0094174, at 178-81.

334. NatPay's financial statements do not recognize any contingent liability or loss in connection with the transactions involving the MPHR Account at issue in this case. Exh. 24, NatPay's Responses to Pioneer's Second Set of Requests for Admission No. 12; Exh. 114, NP0094174, at 178-81.

335. No taxing jurisdiction has reached out to NatPay and demanded payment of an employer's tax obligations. Exh. 22, NatPay Depo. via Pereira 45:10-23; 52:3-11.

### B. SWP's Lack of Damages

336. SWP never made any payments to taxing authorities for tax obligations still outstanding for its employer-clients in connection with the August 30, 2019, payroll. Exh. 14, Alred Depo. vol. II, 665:10-14.

337. SWP itself did not have any outstanding tax obligations to the taxing authorities in connection with the August 30, 2019, payroll. Exh. 14, Alred Depo. vol. II, 669:3-5.

338. SWP has not admitted any liability to any of its employer-clients in connection with the funds that SWP allowed Mann, MyPayrollHR, and Cloud Payroll to process through the Pioneer accounts. Exh. 9, SWP's Responses to Pioneer's Second Requests for Admissions No. 11.

339. There is no written documentation as to whether, or how many, clients left SWP because of the events that occurred in Aug.-Sep. of 2019. Exh. 14, Alred Depo. vol. II, 677:17-23.

340. There is no written documentation as to the amount lost in annual revenues because of the events that occurred in Aug.-Sep. of 2019. Exh. 14, Alred Depo. vol. II, 687:7-15.

341.    David Payne, the expert who calculated SWP's lost profits damages, testified that he did not communicate with any former client of SWP to determine the reason why the decided to leave SWP.  Exh. 115, Deposition Transcript of David Payne, March 27, 2024, ("Payne Depo.") 55:16-19, 64:9-12.

### C.    Granite Solutions' Lack of Damages

342.    Granite Solutions admitted that it never made any payment to IRS for its August 30, 2019, payroll tax obligations.  Exh. 29, Granite Solutions' Responses to Pioneer's First Set of Interrogatories No. 8

343.    Granite Solutions claimed that it owes the IRS $432,039.33 in unpaid taxes but did not provide any supporting documentation that showed they currently owe that amount to the IRS and other taxing authorities.  Exh. 116, GSG031529.

344.    In response to an interrogatory by Pioneer requesting a computation of Granite Solutions' damages, Granite Solutions produced a spreadsheet that claimed $1,815,872 in "Loss Consultant Billings and Client Expense," which it calculated as "Revenue $47,212,673 divied [sic] by 2080 hours in a year multiple [sic] by 80 lost hours,"— presumably based on the assertion that the company lost two out of fifty-two, forty-hour workweeks—yet it could not provide any documentation showing that its company stopped all work for two weeks due to the reversal of its tax payments.  Exh. 29, Granite Solutions' Responses to Pioneer's First Set of Interrogatories No. No. 12; Exh. 116, GSG031529, comment to cell B7.

Dated:  June 3, 2024                              DLA PIPER LLP (US)
       New York, New York


By: */s/*   Robert J. Alessi
     Robert J.  Alessi (NDNY Bar Roll No. 101019)
     Steven M.  Rosato (NDNY Bar Roll No. 703375)
     1251 Avenue of the Americas
     New York, New York 10020
     Tel.: (212) 335-4500
     Fax: (212) 335-4501
     robert.alessi@us.dlapiper.com
     steven.rosato@us.dlapiper.com

     Courtney G.  Saleski (NDNY Bar Roll No. 703877)
     Evan E.  North (NDNY Bar Roll No. 704414)
     1650 Market Street, Suite 5000
     Philadelphia, Pennsylvania 19103
     Tel.: (215) 656-3300
     Fax: (215) 656-3301
     courtney.saleski@us.dlapiper.com
     evan.north@us.dlapiper.com
     *Attorneys for Defendants*
     *Pioneer Bancorp, Inc. and Pioneer Bank*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on all parties

in this action/known counsel of record via the CM/ECF system on this 3rd day of June, 2024.


<u>/s/  Robert J. Alessi               </u>
Robert J.  Alessi (NDNY Bar Roll No. 101019)