EXHIBIT 54

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

---------------------------------
                                )
SOUTHWESTERN PAYROLL             )
SERVICES, INC,                   )
                                )
          PLAINTIFF,             )     CASE NO:
                                )     1:19-CV-1349 (FJS/CFH)
     vs                          )
                                )
PIONEER BANCORP, et al,          )
                                )
          DEFENDANTS.            )
---------------------------------)


Remote Videotaped Deposition

of

THOMAS AMELL

Albany, New York

Thursday, April 27, 2023


Reported by:

Mary Agnes Drury, RPR, NYACR, CLR

Thomas Amell - April 27, 2023

38 (Pages 146 to 149)

### Page 146

THOMAS AMELL

    MR. ALESSI: Object to the form of the question.

    THE WITNESS: No. You are twisting what I'm saying.

    Due diligence occurred from the time the overdraft occurred and continued to occur, and you can define due diligence, whatever, investigation, due diligence, learning, learning occurred continuously all that period of time.

    You asked me if I personally looked for the source of the funds. No, I didn't look for the source of the funds, I think that would be academic. I don't know.

BY MR. JAYNE:

    Q. Did you instruct others to look at the source of the funds upon which Pioneer was implementing overdraft recoveries?

    A. I'm not following you. I'm sorry. Why would I care where the money came from?

    Q. Sir, this will be easier if you'll just listen to my question.

    A. I'm sorry. Go ahead.

### Page 147

THOMAS AMELL

    Q. My question is very simple: Did you instruct anyone to look at the source of the funds upon which Pioneer Bank was exercising overdraft recoveries on the morning of September 4th, 2019?

    A. I'm sorry. No, not to my knowledge, I didn't specifically instruct that.

    Q. Do you know if anyone else did?

    MR. ALESSI: Object to the form of the question.

    THE WITNESS: Not to my knowledge.

    MR. ALESSI: Mr. Amell.

    THE WITNESS: Sorry.

    MR. ALESSI: Object to the form of the question.

    THE WITNESS: Not to my knowledge.

BY MR. JAYNE:

    Q. And I think you've told us that you think the source of the funds over which Pioneer was exercising overdraft recoveries was frankly irrelevant to you?

    MR. ALESSI: Object to the form of the question.

    THE WITNESS: Yeah, I'm sorry, can

### Page 148

THOMAS AMELL

you say it again, because I want to be --

    Q. I think you told us that you did not care or that the source of the -- strike that.

    I think you told us that it doesn't matter where the funds came from over -- well, strike that. Let's see if I can do better.

    Do you care where the funds came from that you implemented the overdraft recovery upon?

    MR. ALESSI: Object to the form of the question.

    THE WITNESS: I don't know how it's relevant. Do I care? No, I don't -- sure. If I had the information that's great, but it's not relevant to the decision I need to make.

    So the decision I need to make at that point in time is we can't get a hold of Bank of America, we're short some $15 million. And my decision point after getting all of my information is we need to act on our overdraft recovery.

    So where this money come in from to solve our problem, I'm not sure how it's

### Page 149

THOMAS AMELL

relevant to the decision that I needed to make.

    So I'm not saying I don't care, I mean --

BY MR. JAYNE:

    Q. You're saying it's irrelevant?

    A. I'm not saying it's irrelevant. I'm not saying that.

    I'm just saying it's not part of my factor in making my decision.

    Q. If you would have known on September -- well, first let me ask: Did you know on September 4th, 2019, when you made the decision to implement overdraft recoveries over moneys in Michael Mann's accounts, that some of that money was third-party payroll tax money?

    MR. ALESSI: Object to the form of the question.

    THE WITNESS: Yeah, I've answered that as well. No, I didn't know. I didn't know why this money was coming from.

    Q. If you did know on September 4th, of 2019 that some of this money in Michael Mann's accounts was payroll tax dollars, would you

Page 150

1              THOMAS AMELL
2  still have implemented the overdraft
3  recoveries?
4          MR. ALESSI:  Object to the form of
5      the question.
6          THE WITNESS:  It's a hypothetical,
7      because we don't have -- we don't have
8      those accounts, so there is no possible way
9      we would have an account that we would
10     classify as a tax account; we just don't do
11     that business, so --
12  Q.    Well, you know as you sit here
13  today --
14         MR. ALESSI:  He needs to finish his
15     answer, please.
16         THE WITNESS:  Yeah.  So you're
17     hypothetically asking me if I knew that.
18         We don't have that type of account.
19         And in addition to that, look, a
20     part of our due diligence was, you know, is
21     the account restricted in any way, right?
22         Because there are accounts that can
23     restrict the proceeds of money or direct
24     the proceeds or money or -- there is a
25     whole host of things that could happen on

Page 151

1              THOMAS AMELL
2      an account that would provide the bank with
3      direction as to what we can and can't do.
4          It wasn't the case in these
5      accounts.  All of these accounts were just
6      general deposit DDA demand accounts that
7      don't have any restrictions.
8          So that's why the source of the
9      funds to me is, you know, an academic
10     hypothetical question, right?
11         It's a general deposit account; it's
12     money to me.
13  BY MR. JAYNE:
14  Q.    Do you -- as you sit here today, do
15  you know that some of the money or actually, a
16  majority of the money over which Pioneer
17  exercised overdraft recoveries on
18  September 4th, 2019 was payroll tax dollars?
19  As you sit here today, do you know that?
20         MR. ALESSI:  Object to the form of
21     the question.
22         THE WITNESS:  Well, I don't know
23     that; you're the one suing me thinking
24     that.
25  Q.    But if that's correct, if I'm

Page 152

1              THOMAS AMELL
2  correct and it turns out that the majority of
3  the money that was taken or that was recovered
4  as part of the overdraft recovery was payroll
5  tax dollars, does that matter to you?
6          MR. ALESSI:  Object to the form of
7      the question.
8          THE WITNESS:  Does it matter?  Look,
9      at the end of day somebody is going to
10     determine who owns these funds.  My
11     position is very clear.  It's a general
12     deposit demand account with money in it.
13         And I've been doing this for
14     30 years:  When you deposit your money in a
15     general deposit demand account, it's the
16     bank's money.
17         So if you put it in some special
18     account, and the payroll industry is a good
19     example of where you need special, you know
20     it, right, you own the business, right, so
21     I'm hoping all of your accounts are
22     properly established, so that you can
23     protect your funds.
24  BY MR. JAYNE:
25  Q.    Before you implemented overdraft

Page 153

1              THOMAS AMELL
2  recoveries in Michael Mann's accounts on the
3  morning of September 4th, 2019, did you suspect
4  that Michael Mann had been check kiting or
5  committing fraud on Pioneer Bank?
6          MR. ALESSI:  Object to the form of
7      the question.
8          THE WITNESS:  As I mentioned, I had
9      a whole host of emotions.  I had no
10     information.  I'm sitting there with a
11     $15 million hole, and I made the decision
12     to collect our money into a general ledger
13     account.
14         I had no idea what was going on.  We
15     couldn't get information; we couldn't talk
16     to the Bank of America.  We made several
17     attempts to talk to Michael Mann over the
18     weekend.  In fact, I think later that day
19     there was a meeting with Mann.
20         We couldn't get any information,
21     right?  So I had no idea what was going on,
22     I just wanted to possess our money.
23  BY MR. JAYNE:
24  Q.    You had a meeting with Michael Mann
25  on that afternoon of September 4th, 2019,

Page 162

THOMAS AMELL

retain -- the name escapes me Greisler, Lemery Greisler. We attempted to obtain a lawyer that we know, because we knew we were going to need some legal representation, and we reached out to that firm, but I'm not sure exactly what time -- I'm not sure exactly when we did that.

Q.   So is the answer to the question you don't know?

A.   Okay. I don't know.

Q.   I don't want to put words in your mouth. Let me see if I can do it this way:

Is it fair to say you do not know whether you, Mr. Sarratori, or Mr. Hughes reached out to any outside banking lawyer before implementing the overdraft recoveries in Mann's accounts on September 4th, 2019?

MR. ALESSI:  I'm going to object to the form of the question.

THE WITNESS:  My recollection is that we -- Pat, Frank as an attorney, and I and others made a collective decision to act on the overdrafts; and that was not for the purpose of our engaging of outside counsel.

Page 163

THOMAS AMELL

I believe at that time we were engaging Lemery Greisler to help us with --

MR. ALESSI:  I'm sorry, Mr. Amell, I've got to stop you to assert the privilege.

You cannot speak about any purpose for engaging any counsel for any topic; this or any other.

THE WITNESS:  You see, you lawyers have got a lot of rules.

BY MR. JAYNE:

Q.   So I think the answer is -- and you correct me if I'm wrong, is you don't know whether you reached out to any outside banking lawyer, outside counsel before you implemented the overdraft recoveries in Mann's accounts the morning of September 4, 2019, correct?

MR. ALESSI:  Object to the form of the question.

THE WITNESS:  Again, I don't recall reaching out to outside counsel to assist us.

MR. ALESSI:  No. Mr. Amell, do not talk, please, about -- your answer about

Page 164

THOMAS AMELL

the purpose.

You can answer the question as it was stated. If you need it read back -- please do not answer with regard to any counsel with respect to any reason why you would have reached out for this Mann matter or any other reason you would have reached out any other topic.

THE WITNESS:  Understood.

BY MR. JAYNE:

Q.   Can you answer the question, sir?

A.   Can you ask it again?

Q.   Do you recall whether you, Mr. Hughes, or Mr. Sarratori reached out to any outside banking counsel before you implemented the overdraft recoveries in Michael Mann's accounts on the morning of September 4th, 2019?

MR. ALESSI:  And I'll object to the form of that question.

THE WITNESS:  I don't recall.

Q.   Okay. Let's talk about the meeting with Mr. Mann on the afternoon of September 4th, 2019. Okay?

A.   Okay.

Page 165

THOMAS AMELL

Q.   Where did it occur?

A.   Right here at headquarters.

Q.   Fourth floor?

A.   Yep. Fourth floor conference room, yep.

Q.   Who was there?

A.   I remember Frank Sarratori was there, Michael Mann, myself, Mr. Alessi, and Michael had his attorney, I can't remember his attorney's name. I think it was -- I think that was it.

Q.   What was said during the meeting?

A.   It really turned into just a discussion between the two attorneys.

Q.   Do you remember what either of the two attorneys said in front of you when the whole group was together?

A.   I remember Mr. Alessi initiating the conversation by asking Michael Mann a -- what I thought was a benign question, and that prompted Michael's attorney to kind of stop the discussion and then Mr. Alessi and Michael Mann's attorney left the room, and I don't know what that discussion was about.

Page 178

1  THOMAS AMELL
2  Q. And Joe Fleming was Dave Blessing's
3  supervisor when the events of August 30th,
4  2019, occurred, correct?
5  A. Correct.
6  Q. And what did you say his title was?
7  A. Joe was the chief credit officer.
8  Q. And Joe was demoted at some point
9  after August 30, 2019, correct?
10 A. Well, let me clarify. In title,
11 yes, he was demoted. Because in order to sit
12 on the executive team, you're an executive vice
13 president if you are a direct report of mine,
14 so the only way you can be an executive vice
15 president is a direct report of mine.
16         So the position we asked him to take
17 was a not a direct report of mine, so it comes
18 with an SVP title. So, technically, yes, he
19 was demoted, but not in a negative sense.
20 Q. Do you have any criticisms of Dave
21 Blessing or Joe Fleming with respect to how
22 they handled Michael Mann's accounts at Pioneer
23 Bank?
24     MR. ALESSI: Object to the form of
25   the question.

Page 179

1  THOMAS AMELL
2     THE WITNESS: Yeah, I don't, I
3   really don't.
4  Q. What was Joe Fleming's title change
5  after he was chief credit officer?
6  A. So it's functional. So he went from
7  executive vice president chief credit officer
8  to senior vice president -- I'm going to say
9  special assets; I'm not sure exactly what the
10 title is, but it's a senior vice president
11 level, so reports to an executive vice
12 president.
13 Q. And does his change of job title
14 have anything to do with the events with
15 Michael Mann's accounts?
16 A. Yeah, no.
17 Q. Did Joe Fleming leave the bank
18 voluntarily or was he terminated?
19 A. Joe was terminated.
20 Q. Why was Joe terminated?
21 A. Yeah, so the -- so what I told Joe,
22 when we moved him from the executive vice
23 president's role, because I brought in Rob
24 Nichols, that I would give Joe the opportunity
25 to be in the -- to stay with the bank, because

Page 180

1  THOMAS AMELL
2  he was valuable in the bank.
3         But it came with the understanding
4  that I wouldn't move his salary. So he was
5  making significantly more than the position
6  warranted, so I gave him a period of time to
7  either accept that or if he wanted to move on,
8  he could move on. And we got to the point
9  where I just couldn't afford to pay an
10 executive vice president's salary for a special
11 assets group that was really very, very small.
12 Q. Where did Joe move to,
13 professionally?
14 A. He stayed in banking; one of the
15 banks down south, I can't remember exactly.
16 Q. Prior to August 30, 2019, did
17 Pioneer have a policy of not letting payroll
18 companies have accounts at Pioneer Bank?
19 A. I'm sorry, can you repeat that?
20 Q. Prior to August 30, 2019, was there
21 a policy at Pioneer Bank of not letting payroll
22 companies have accounts?
23     MR. ALESSI: Object to the form of
24   the question.
25     THE WITNESS: Yeah. And we're back

Page 181

1  THOMAS AMELL
2  to defining a payroll company.
3         We prohibit in our policy is you
4  can't transact third-party payroll
5  activities at the bank. But you can be a
6  payroll company; I'll give you that.
7         I'll give a perfect example. We
8  talked earlier about GTM Payroll and Guy
9  Maddalone.
10        So GTM Payroll has accounts with
11 Pioneer Bank right now. And if I could
12 take on his payroll type business,
13 obviously I don't have it, he's close to
14 me.
15        So there's a good example; I can't
16 do that business. So I have some of his
17 business, but not that piece.
18 BY MR. JAYNE:
19 Q. So you are saying that there was a
20 policy at Pioneer Bank prior to August 30,
21 2019, that didn't allow payroll companies to
22 house third-party payroll taxes; is that what
23 you're saying?
24 A. That's what I'm saying.
25 Q. And you know what third-party

Page 274

1  THOMAS AMELL
2  documentation all cleaned up in that meeting
3  and, you know, that never came to fruition.
4      Q.    Are you aware that Tim Burke went to
5  dinner with David Blessing on September 3rd,
6  2019?
7      A.    I am.  I believe he picked him up at
8  the airport and brought him here in the
9  morning.
10     Q.    Did David Blessing discuss with you
11 anything that he and Tim Burke discussed over
12 dinner?
13     A.    No.  No.
14     MS. NEIDL:  Okay.  No further
15 questions for the witness.
16     MR. JAYNE:  Southwestern Payroll
17 reserves any further questions until the
18 time of trial.
19     VIDEOGRAPHER:  This concludes
20 today's testimony for the remote video
21 deposition of Mr. Thomas Amell.
22     The time is 4:25 p.m., and we're
23 going off the record.
24     - oOo -
25

Page 275

3  (Time Noted: 4:25 p.m.)
6  _____
7  THOMAS AMELL
9  Subscribed and sworn to before me
10 this_____day of _____2023.
12 _____

Page 276

1  C E R T I F I C A T E
4  STATE OF NEW YORK )
5                    ) ss.:
6  COUNTY OF ONONDAGA )
7      I, Mary Agnes Drury, a Notary Public
8  within and for the State of New York, do
9  hereby certify:
10     That THOMAS AMELL, the witness whose
11 deposition is hereinbefore set forth, was
12 duly sworn by me and that such deposition
13 is a true record of the testimony given by
14 such witness.
15     I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage; and that I am
18 in no way interested in the outcome of this
19 matter.
20     IN WITNESS WHEREOF, I have hereunto
21 set my hand this 16th day of May, 2023.

24     Mary Agnes Drury

Page 277

1  I N D E X
3  WITNESS/EXAMINATIONS                        PAGE
4  THOMAS AMELL
5  EXAMINATION BY MR. JAYNE                       7
6  EXAMINATION BY MS. NEIDL                     223
7      - oOo -
8  PLAINTIFF EXHIBITS
9  NUMBER      DESCRIPTION                     PAGE
10 Exhibit 538 Set-Off Funds Held In Table,      33
11             Bates Stamped PB-SWP-00241113
12             1-Page
13 Exhibit 539 Amell E-mail Dated 9/19/17,       54
14             Bates Stamped
15             PB-SWP-00069412, 1-Page
16 Exhibit 541 Mazzara E-mail Dated 9/4/19,     127
17             Bates Stamped PB-SWP-00369284
18             to '285, 2-Pages
19 Exhibit 540 Amell E-mail Dated 10/16/19,     207
20             Bates Stamped PB-SWP-00356088
21             to '089, 2-Pages
22     - oOo -

# ACKNOWLEDGEMENT OF DEPONENT

## THOMAS AMELL

I, Thomas Amell, do hereby certify that I have read or concluded that no changes are necessary to the foregoing pages 1 through 279 herein propounded, except for the corrections, changes in form or substance, if any, noted in the attached Errata Sheet.

_____
THOMAS AMELL

SUBSCRIBED AND SWORN TO BEFORE ME THIS

___8___ DAY OF ___June___, 2023.

MY COMMISSION EXPIRES:

February 24, 2024

_____
NOTARY PUBLIC

*[Notary seal: MELISSA L LOMAESTRO, STATE OF NEW YORK, NOTARY PUBLIC, Qualified in Albany County, 01LO6404533, MY COMMISSION EXPIRES 02/24/2024]*

Washington, DC | Hyattsville | Richmond | New York | San Francisco | Palo Alto | Houston | Los Angeles | Hong Kong | London

FOR INTERNAL USE ONLY:
Job # 042723-Z-MDJ

# ERRATA SHEET
## Thomas Amell
## April 27, 2023

| PAGE / LINE | CORRECTION | REASON FOR CHANGE |
|---|---|---|
| 10 / 19 | Change "Sienna" to "Siena" | Correct spelling |
| 11 / 16 | Change "Sienna" to "Siena" | Correct spelling |
| 12 / 3 | Change "Sienna" to "Siena" | Correct spelling |
| 13 / 21 | Change "I have -- no" to "I have" | Correct statement |
| 19 / 4 | Insert "it was" before "overdrawn" | Clarify the sentence |
| 51 / 2-3 | Change "CASH T" to "Cachet" | Incorrect words |
| 56 / 24 | Change "under" to "understand" | Incorrect word |
| 63 / 25 | Change "the" to "of" | Incorrect word |
| 68 / 21 | Change "come" to "comes" | Incorrect word |
| 88 / 6 | Change "time" to "times" | Correct tense of word to plural |
| 101 / 4 | Insert "formal" between "two forums" | Correct the sentence |
| 101 / 19 | Delete "in the form of" and replace with "before the formal staff loan committee and the formal" | Correct the sentence |
| 104 / 22 | Change "our" to "the" | Incorrect word |
| 104 / 25 | Delete the first "his" | Incorrect word |
| 105 / 20-21 | Insert "have" between "I come" and delete "that" between "find" and "out" | Clarify the sentence |
| 109 / 11 | Insert "been" between "already" and "talking" | Clarify the sentence |

Washington, DC | Hyattsville | Richmond | New York | San Francisco | Palo Alto | Houston | Los Angeles | Hong Kong | London

FOR INTERNAL USE ONLY:
Job # 042723-Z-MDJ

# ERRATA SHEET
## THOMAS AMELL
## APRIL 27, 2023

| PAGE / LINE | CORRECTION | REASON FOR CHANGE |
|---|---|---|
| 124 / 6 | Change "September 19th" to "September 3rd" | Incorrect date |
| 125 / 15 | Change "saver" to "savior" | Incorrect word |
| 133 / 22 | Change "2018" to "2019" | Incorrect year |
| 135 / 13 | Insert "that" after "receivables" | Clarify the sentence |
| 136 / 17 | Change "account" to "accounts" | Incorrect word |
| 144 / 17 | Change "suspension" to "suspense" | Incorrect word |
| 148 / 24 | Change "come" to "came" | Correct tense of word |
| 149 / 22 | Change "why" to "where" | Incorrect word |
| 150 / 24 | Change first "or" to "of" | Incorrect word |
| 152 / 19 | Insert "a" before "special" and insert "account" after "special" | Clarify the sentence |
| 158 / 22 | Change "possess" to "process" | Incorrect word |
| 170 / 14 | Change "CASH T" to "Cachet" | Incorrect word |
| 179 / 16 | Should read: "No" | To clarify that the deponent intended to state no which is in line with his previous answer that Joe Fleming was not demoted "in a negative sense" |
| 187 / 13 | Change "he" to "we" | Incorrect word |
| 188 / 17 | Change "processing" to "processor" | Incorrect word |
| 190 / 4 | Delete "No" and replace with "I am now familiar with the name of Matt Schilling but had not heard of him prior to the Mann-related events" | To clarify that the deponent had not heard of Mr. Schilling prior to the events in September 2019 |

Washington, DC | Hyattsville | Richmond | New York | San Francisco | Palo Alto | Houston | Los Angeles | Hong Kong | London

FOR INTERNAL USE ONLY:
Job # 042723-Z-MDJ

# ERRATA SHEET
## Thomas Amell
## April 27, 2023

| PAGE / LINE | CORRECTION | REASON FOR CHANGE |
|---|---|---|
| 192 / 16 | Insert "is" after "money" | Clarify the sentence |
| 208 / 10 | Change "CASH e t" to "Cachet" | Incorrect word |
| 214 / 3 | Change "CASH e t" to "Cachet" | Incorrect word |
| 218 / 4 | Change "is" to "are" | Correct tense of word to plural |
| 233 / 8 | Change "we" to "me" | Incorrect word |
| 250 / 11 | Change "leftover" to "left those" | Incorrect word |
| 252 / 7 | Change "just had" to "have" | Incorrect words |
| 258 / 11 | Delete "exactly" | Incorrect, not what deponent stated |
| 264 / 21 | Change "mechanic" to "mechanism" | Incorrect word |
| 267 / 8 | Change "bun" to "bunch" | Incorrect word |
| 267 / 17 | Change "Michal" to "Michael" | Incorrect word |
| 267 / 21 | Change "CASH e t" to "Cachet" | Incorrect word |
| 269 / 3 | Change "CASH e t" to "Cachet" | Incorrect word |
| 273 / 10 | Change "have" to "having" | Incorrect word |

Washington, DC | Hyattsville | Richmond | New York | San Francisco | Palo Alto | Houston | Los Angeles | Hong Kong | London

FOR INTERNAL USE ONLY:
Job # 042723-Z-MDJ