# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

SOUTHWESTERN PAYROLL SERVICE, INC. and
GRANITE SOLUTIONS GROUPE, INC.,

       *Plaintiffs,*

    *v.*

PIONEER BANCORP, INC., et al.,

       *Defendants.*

NATIONAL PAYMENT CORPORATION,

       *Intervenor-Plaintiff,*

    *v.*

PIONEER BANCORP, INC., et al.,

       *Defendants.*

Case No. 1:19-cv-1349 (FJS/CFH)

## MEMORANDUM OF LAW IN SUPPORT OF PIONEER'S MOTION FOR
## SUMMARY JUDGMENT ON CLAIMS OF NATIONAL PAYMENT CORPORATION

Robert J. Alessi (NDNY Bar Roll No. 101019)
Steven M. Rosato (NDNY Bar Roll No. 703375)
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 335-4500
robert.alessi@us.dlapiper.com
steven.rosato@us.dlapiper.com

Courtney G. Saleski (NDNY Bar Roll No. 703877)
Evan E. North (NDNY Bar Roll No. 704414)
1650 Market Street, Suite 5000
Philadelphia, Pennsylvania 19103
Tel.: (215) 656-3300
courtney.saleski@us.dlapiper.com
evan.north@us.dlapiper.com

*Counsel for Defendants Pioneer Bancorp, Inc. and Pioneer Bank*

Dated: June 3, 2024

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL STANDARD............................................................................................................... 3

ARGUMENT ........................................................................................................................... 4

I.   NATPAY'S CLAIMS ARE BARRED BY ITS OWN WRONGDOING. ........................ 4

    A.   The Doctrine of *in Pari Delicto* Bars NatPay's Claims.......................................... 4

        1.   The Conduct and Knowledge of NatPay's Employees
            Are Imputed to NatPay. ................................................................................ 4

        2.   NatPay's Unlawful and Unethical Conduct Bars Its Claims. ...................... 5

    B.   The Doctrine of Unclean Hands Bars NatPay's Unjust Enrichment Claim. .......... 8

II.  THE COURT SHOULD ENTER SUMMARY JUDGMENT ON
    NATPAY'S COMMON LAW CLAIMS. ........................................................................ 8

    A.   NatPay's Claims Rest on the False Premise That They Have an Interest
        in Funds in Standard Pioneer Checking Accounts Not Held by NatPay. ............... 8

        1.   NatPay Cannot Overcome the Strong Presumption That
            the MPHR and Cloud Accounts Were General Accounts. ......................... 9

        2.   The Accounts Were Not Trust or Fiduciary Accounts. ............................ 11

        3.   Funds in the Accounts Were Not Subject to a Statutory Trust
            Under Section 7501 of the Internal Revenue Code. ................................. 13

    B.   Pioneer Is Entitled to Judgment on NatPay's Common Law Claims. .................. 15

        1.   NatPay Has No Legal Interest in Any Funds Deposited
            in the MPHR and Cloud Accounts That Would Support
            Its Conversion Claims................................................................................ 15

        2.   NatPay's Unjust Enrichment Claim Duplicates the Conversion
            Claims and Otherwise Lacks Any Legal Basis........................................ 16

        3.   Pioneer Owed No Duty to NatPay and Thus Cannot Be
            Liable to NatPay for Any Alleged Negligence. ...................................... 17

4.      NatPay's Fraud Claim Is Based on a Fatally Flawed Application of the "Special Facts" Doctrine.............................................. 18

5.      The Court Should Enter Judgment in Pioneer's Favor on the Declaratory Judgment Claim. ........................................................ 21

III.      PIONEER IS ENTITLED TO JUDGMENT ON NATPAY'S RICO CLAIMS.............. 21

     A.      Pioneer Did Not Knowingly Participate in Predicate Acts of Money Laundering or Agree to Facilitate a Pattern of Racketeering. .............................. 21

     B.      Pioneer Did Not Conduct the Affairs of, or Share a Common Purpose with, the Alleged Enterprise.......................................................................... 25

     C.      NatPay Cannot Establish Proximate Causation Under RICO.............................. 26

IV.      THE COURT SHOULD ENTER SUMMARY JUDGMENT IN PIONEER'S FAVOR ON THE AIDING AND ABETTING FRAUD CLAIM. .................................. 28

V.      NATPAY HAS NOT SUFFERED ANY COGNIZABLE DAMAGES. ......................... 29

CONCLUSION...................................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*In re Aapex Sys.*,
2000 WL 34326278 (W.D.N.Y. Nov. 21, 2000) ........................................................15

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*,
731 F.2d 112 (2d Cir. 1984)...................................................................................20

*Abbott Labs. v. Adelphia Supply USA*,
2017 WL 57802 (E.D.N.Y. Jan. 4, 2017) ...............................................................21

*Abraham v. Leigh*,
471 F. Supp. 3d 540 (S.D.N.Y. 2020)......................................................................29

*In re Agape Litig.*,
681 F. Supp. 2d 352 (E.D.N.Y. 2010) .........................................................17, 18, 28

*Ahles v. Aztec Enters., Inc.*,
120 A.D.2d 903 (3d Dep't 1986) .............................................................................15

*Am. E Grp. LLC v. Livewire Ergogenics Inc.*,
2020 WL 469312 (S.D.N.Y. Jan. 28, 2020) ..............................................................8

*In re Applied Logic Corp.*,
576 F.2d 952 (2d Cir. 1978).....................................................................................17

*AXH Air-Coolers, LLC v. Pioneer Bancorp, Inc.*,
2021 WL 5446947 (N.D.N.Y. Nov. 22, 2021) .........................................................16

*AXH Air-Coolers, LLC v. Pioneer Bancorp, Inc.*,
2022 WL 16790328 (N.D.N.Y. Aug. 2, 2022) ............................................11, 16, 18

*Beck v. Prupis*,
529 U.S. 494 (2000).................................................................................................26

*Begier v. IRS*,
496 U.S. 53 (1990)...................................................................................................14

*In re Bennett Funding Grp., Inc.*,
146 F.3d 136 (2d Cir. 1998).....................................................................................17

*In re Bennett Funding Grp., Inc.*,
212 B.R. 206 (B.A.P. 2d Cir. 1997), *aff'd*,
146 F.3d 136 (2d Cir. 1998)................................................................................9, 10

iii

*In re Black & Geddes, Inc.*,
  35 B.R. 830 (Bankr. S.D.N.Y. 1984) ...................................................................................11

*Century Bus. Credit Corp. v. N. Fork Bank*,
  246 A.D.2d 395 (1st Dep't 1998) .......................................................................................17

*Chaney v. Dreyfus Serv. Corp.*,
  595 F.3d 219 (5th Cir. 2010) .........................................................................................18, 19

*CILP Assocs., L.P. v. Pricewaterhouse Coopers, LLP*,
  735 F.3d 114 (2d Cir. 2013) ................................................................................................3

*Corsello v. Verizon N.Y., Inc.*,
  18 N.Y.3d 777 (2012) ........................................................................................................16

*Crestview SPV, LLC v. Crestview Fin., LLC*,
  217 A.D.3d 473 (1st Dep't 2023) ..................................................................................16, 17

*CRT Invs., Ltd. v BDO Seidman, LLP*,
  85 A.D.3d 470 (1st Dep't 2011) .........................................................................................28

*Dahlgren v. First Nat'l Bank of Holdrege*,
  533 F.3d 681 (8th Cir. 2008) .........................................................................................24, 26

*Dem. Nat'l Cmte. v. Russian Fed'n*,
  392 F. Supp. 3d 410 (S.D.N.Y. 2019) ................................................................................25

*Demirovic v. Ortega*,
  2016 WL 11472745 (E.D.N.Y. Sept. 15, 2016) .................................................................16

*DT Floormasters, Inc. v. United States*,
  2008 WL 2705554 (S.D. Ind. July 10, 2008) .....................................................................12

*Empire Merchants, LLC v. Reliable Churchill LLLP*,
  902 F.3d 132 (2d Cir. 2018) ...............................................................................................26

*Entretelas Americanas S.A. v. Soler*,
  2020 WL 9815186 (S.D.N.Y. Feb. 3, 2020) ......................................................................22

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
  385 F.3d 159 (2d Cir. 2004) ...............................................................................................26

*Frost Nat'l Bank v. Midwest Autohaus, Inc.*,
  241 F.3d 862 (7th Cir. 2001) .........................................................................................24, 25

*Georgia Malone & Co. v. Rieder*,
  19 N.Y.3d 511 (2012) .....................................................................................................16, 17

*Glen Flora Dental Ctr., Ltd. v. First Eagle Bank*,
2024 WL 621601 (N.D. Ill. Feb. 14, 2024) ...............................................................24

*Glen Flora Dental Ctr., Ltd. v. First Eagle Bank*,
487 F. Supp. 3d 722 (N.D. Ill. 2020) ............................................................... *passim*

*Goel v. Ramachandran*,
111 A.D.3d 783 (2d Dep't 2013) ............................................................................28

*Grain Traders, Inc. v. Citibank, N.A.*,
960 F. Supp. 784 (S.D.N.Y. 1997) ...................................................................2, 9, 16

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
17 F. Supp. 2d 275 (S.D.N.Y. 1998) ........................................................................8

*Guest v. First Republic Corp. of Am.*,
618 F. Supp. 3d 86 (N.D.N.Y. 2022) ......................................................................18

*In re Hamilton Taft & Co.*,
53 F.3d 285 (9th Cir. 1995), *vacated on other grounds*,
68 F.3d 337 (9th Cir. 1995) ...................................................................................14

*Hamilton v. Beretta U.S.A. Corp.*,
96 N.Y.2d 222 (2001) ............................................................................................17

*HBL Indus. v. Chase Manhattan Bank*,
45 B.R. 865 (S.D.N.Y. 1985) .................................................................................16

*Hemi Grp., LLC v. City of N.Y., N.Y.*,
559 U.S. 1 (2010) ...................................................................................................26

*Ironforge.com v. Paychex, Inc.*,
747 F. Supp. 2d 384 (W.D.N.Y. 2010) ...................................................................12

*JMM Props., LLC v. Erie Ins. Co.*,
2013 WL 149457 (N.D.N.Y. Jan. 14, 2013) .............................................................4

*Katzman v. Victoria's Secret Catalogue*,
167 F.R.D. 649 (S.D.N.Y. 1996) ............................................................................25

*Kirschner v. KPMG LLP*,
15 N.Y.3d 446 (2010) ...........................................................................................4, 8

*Kleeberg v. Eber*,
2020 WL 4586904 (S.D.N.Y. Aug. 10, 2020) ........................................................21

*In re Knox*,
64 N.Y.2d 434 (1985) ............................................................................................18

*In re Lehman Bros. Holdings, Inc.*,
    439 B.R. 811 (Bankr. S.D.N.Y. 2010) ..................................................................................9

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) .............................................................................17, 18, 21, 28

*In re LIBOR Based Fin. Instrs. Antitrust Litig.*,
    27 F. Supp. 3d 447 (S.D.N.Y. 2014) ..................................................................................17

*Lumen at White Plains, LLC v. Stern*,
    135 A.D.3d 600 (1st Dep't 2016) .......................................................................................28

*Maier-Schule GMC, Inc. v. Gen. Motors Corp.*,
    154 F.R.D. 47 (W.D.N.Y. 1994) ........................................................................................29

*Mandarin Trading Ltd. v. Wildenstein*,
    16 N.Y.3d 173 (2011) ........................................................................................................19

*Marchak v. JPMorgan Chase & Co.*,
    2016 WL 3911926 (E.D.N.Y. July 15, 2016) ....................................................................18

*Marlin v. Moody Nat. Bank, N.A.*,
    248 F. App'x 534 (5th Cir. 2007) ......................................................................................24

*Mazo v. United States*,
    1977 WL 1114 (S.D. Ga. Mar. 22, 1977) .........................................................................14

*Merkin v. Berman*,
    123 A.D.3d 523 (1st Dep't 2014) ......................................................................................20

*MH Pillars Ltd. v. Realini*,
    2018 WL 1184847 (N.D. Cal. Mar. 7, 2018) ......................................................................7

*In re Morales Travel Agency*,
    667 F.2d 1069 (1st Cir. 1981) ...........................................................................................12

*Morin v. Frontier Bus. Tech.*,
    288 B.R. 663 (W.D.N.Y. 2003) .........................................................................................14

*Moss v. BMO Harris Bank, N.A.*,
    258 F. Supp. 3d 289 (E.D.N.Y. 2017) ..........................................................................25, 26

*Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A.*,
    261 F.R.D. 13 (S.D.N.Y. 2009) .........................................................................................28

*Ne. Gen. Corp. v. Wellington Advert., Inc.*,
    82 N.Y.2d 158 (1993) ........................................................................................................12

vi

*New Greenwich Litig. Trustee, LLC v. Citco Fund Servs. (Europe) B.V.*,
　145 A.D.3d 16 (1st Dep't 2016) ..................................................................................4, 6

*New Paradigm Software Corp. v. New Era of Networks, Inc.*,
　2002 WL 31749396 (S.D.N.Y. Dec. 9, 2002) ...............................................................29

*Palatkevich v. Choupak*,
　2014 WL 1509236 (S.D.N.Y. Jan. 24, 2014) ...............................................................22

*Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*,
　412 F. App'x 325 (2d Cir. 2011) ....................................................................................4

*Pasternack v. Lab. Corp. of Am. Holdings*,
　27 N.Y.3d 817 (2016) ...................................................................................................19

*Peoples Westchester Sav. Bank v. FDIC*,
　961 F.2d 327 (2d Cir. 1992)..................................................................................9, 10, 11

*Pincover v. J.P. Morgan Chase Bank, N.A.*,
　592 F. Supp. 3d 212 (S.D.N.Y. 2022)...........................................................................17

*Prudential-Bache Sec., Inc. v. Citibank, N.A.*,
　73 N.Y.2d 263 (1989) .....................................................................................................4

*Q3 Inv. Recovery Vehicle, LLC v. McEvoy*,
　2023 N.Y. Slip Op. 30184(U), (Sup. Ct., N.Y. Cnty. 2023).......................................11

*In re Refco Sec. Litig.*,
　759 F. Supp. 2d 301 (S.D.N.Y. 2010)............................................................................9

*Republic of Iraq v. ABB AG*,
　768 F.3d 145 (2d Cir. 2014), *cert. denied*, 576 U.S. 1028 (2015)...............................4

*Reves v. Ernst & Young*,
　507 U.S. 170 (1993)......................................................................................................25

*In re Ridgemour Meyer Props., LLC*,
　791 F. App'x 279 (2d Cir. 2020) .....................................................................................4

*Rosemann v. St. Louis Bank*,
　858 F.3d 488 (8th Cir. 2017) ........................................................................................24

*Rosner v. Bank of China*,
　528 F. Supp. 2d 419 (S.D.N.Y. 2007)......................................................................3, 26

*In re Sakowitz, Inc.*,
　949 F.2d 178 (5th Cir. 1991) ........................................................................................12

*Schmidt v. Fleet Bank,*
    16 F. Supp. 2d 340 (S.D.N.Y. 1998) .................................................................................24

*Sedima, S.P.R.L. v. Imrex Co., Inc.,*
    473 U.S. 479 (1985) .........................................................................................................21

*SPV Osus Ltd. v. UBS AG,*
    882 F.3d 333 (2d Cir. 2018) .............................................................................................28

*Sunbelt Beverage Corp. v. United States,*
    1996 WL 556939 (N.D. Cal. July 23, 1996) ....................................................................15

*Sw. Payroll Serv., Inc. v. Pioneer Bancorp, Inc.,*
    2020 WL 1889013 (N.D.N.Y. Apr. 16, 2020) .................................................................20

*Sw. Payroll Serv., Inc. v. Pioneer Bancorp, Inc.,*
    2020 WL 4353219 (N.D.N.Y. July 7, 2020) ....................................................................20

*Swan Brewery Co. v. U.S. Tr. Co. of N.Y.,*
    832 F. Supp. 714 (S.D.N.Y. 1993) .................................................................................8, 9

*In re Teckenbrock,*
    2012 WL 3818220 (Bankr. S.D.N.Y. Sept. 4, 2012) .......................................................12

*In re Thompson,*
    37 B.R. 211 (Bankr. M.D. Fla. 1983) ..............................................................................15

*Thyroff v. Nationwide Mut. Ins. Co.,*
    460 F.3d 400 (2d Cir. 2006) .............................................................................................15

*In re Tucker,*
    346 B.R. 844 (Bankr. E.D. Okla. 2006) ...........................................................................12

*United States v. $1,399,313.74 in U.S. Currency,*
    591 F. Supp. 2d 365 (S.D.N.Y. 2008) ..............................................................................23

*United States v. Viola,*
    35 F.3d 37 (2d Cir. 1994) .................................................................................................25

*United States v. Zemlyansky,*
    908 F.3d 1 (2d Cir. 2018) .................................................................................................21

*Univ. of Md. at Baltimore v. Peat, Marwick, Main & Co.,*
    996 F.2d 1534 (3d Cir. 1993) ...........................................................................................25

*Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.,*
    2019 WL 3503109 (N.D. Cal. Aug. 1, 2019) ...................................................................18

*Votsis v. ADP, LLC*,
  2019 N.Y. Slip Op. 34093(U), (Sup. Ct., Monroe Cnty. 2019), *aff'd*,
  187 A.D.3d 1490 (4th Dep't 2019) .....................................................................12

*Walker v. City of New York*,
  621 F. App'x 74 (2d Cir. 2015) .............................................................................3

*Zamora v. FIT Int'l Grp. Corp.*,
  834 F. App'x 622 (2d Cir. 2020) .........................................................................26

*Zamora v. JPMorgan Chase Bank*,
  2015 WL 4653234 (S.D.N.Y. July 31, 2015) ......................................................17

*Zaz-Huff Inc. v. Chase Manhattan Bank, N.A.*,
  277 A.D.2d 59 (1st Dep't 2000) .....................................................................11, 13

## Statutes and Rules

12 U.S.C. § 3403(a) ..................................................................................................19

18 U.S.C. § 1343 ......................................................................................................21

18 U.S.C. § 1956 ......................................................................................................21

18 U.S.C. § 1956(c)(7) .............................................................................................22

18 U.S.C. § 1957 ......................................................................................................21

18 U.S.C. § 1957(a) .............................................................................................22, 23

18 U.S.C. § 1960 ........................................................................................................7

Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"),
  18 U.S.C. §§ 1961-1968 ............................................................................... *passim*

26 U.S.C. § 6672 ..................................................................................................14, 15

26 U.S.C. § 6672(a) ..................................................................................................14

26 U.S.C. § 7501 .............................................................................................13, 14, 15

Bank Secrecy Act of 1970, 31 U.S.C. §§ 5311 *et seq.* ..........................................18

Fed. R. Civ. P. 56(a) ..................................................................................................3

Pioneer Bancorp, Inc. and Pioneer Bank (collectively, "Pioneer") respectfully submit this memorandum of law in support of their motion for summary judgment on all claims asserted by National Payment Corporation ("NatPay") in its amended complaint ("AC," Dkt. No. 232).[1]

## PRELIMINARY STATEMENT

Plaintiffs have changed their legal theories numerous times in this litigation. They have done so to try to avoid the conclusion that they are not proper parties for the claims and relief they seek, nor is Pioneer, a victim and lawful actor, a proper defendant. After a massive fraudulent scheme spearheaded by Michael Mann, SWP's controlling shareholder and Treasurer, came to light in September 2019, SWP quickly filed this lawsuit in an effort to save itself and shift the blame to Pioneer—by far, and indisputably, the largest victim of the fraud. NatPay, the nation's largest processor of ACH transactions, then intervened in this suit in 2020, claiming victim status for itself and accusing Pioneer of wrongdoing, even though it facilitated Mann's scheme in working with SWP and other payroll companies under Mann's control. Pioneer was dubious of NatPay's claimed need to intervene in the case at the time, and discovery has confirmed Pioneer's doubts: NatPay not only has no cognizable interest in this case—it is a wrongdoer that deserves punishment, not a reward.

Since NatPay joined this case, it has worked hand-in-hand with SWP to attempt to devise some legal theory that might justify its involvement. NatPay now must face evidence for the first time, and it cannot succeed. The core and indisputable facts—which NatPay went to great lengths to obscure in its pleadings—preclude NatPay recovering against Pioneer, regardless of the legal theory that NatPay and its collaborators might espouse at any given moment. For four fundamental

---

[1] Capitalized terms not otherwise defined have the meaning in Pioneer's statement of material facts pursuant to Local Rule 56.1 ("SMF"). Pioneer respectfully refers the Court to the SMF for a complete recitation of the relevant facts, which are discussed herein.

reasons, there is no basis for any part of this case to proceed to trial, and the Court should enter judgment in Pioneer's favor on all claims.

*First*, the doctrine of *in pari delicto* categorically bars NatPay from recovering anything from Pioneer, given the extensive and irrefutable evidence of NatPay's own misconduct. Discovery has revealed that NatPay willfully disregarded its own established standards and practices in allowing the Mann Payroll Companies to use NatPay as a conduit for their misappropriation and money laundering operation. At countless points over the two years that NatPay processed ACH transactions for the Mann Payroll Companies, NatPay had the opportunity to put a stop to the operation. It never did, and the reason was simple—it was too interested in making more money and processing more transactions for the Mann Payroll Companies. Beyond that, NatPay operated as an unlicensed money transmitter, in violation of federal and state criminal laws that exist to facilitate the detection of precisely the kind of conduct that NatPay allowed to occur here. The Court should not countenance NatPay's wrongful conduct. The *in pari delicto* doctrine applies to bar all of NatPay's claims.

*Second*, NatPay's law claims for conversion, fraud, negligence, and unjust enrichment all suffer from the same fatal defect: they all depend on a finding that the MPHR Account and the Cloud Accounts were special, trust, or fiduciary accounts because, without such a finding, NatPay lacks any cognizable interest in those accounts. But the undisputed evidence shows that the accounts were none of those things: they were general accounts, from start to finish, as even one of plaintiffs' experts admitted. Under settled New York law, "a depositor loses title to money deposited in a general account at the moment those funds are deposited," and banks owe no duty to non-customers absent a fiduciary relationship between the depositor and the non-customer. *E.g.*, *Grain Traders, Inc. v. Citibank, N.A.*, 960 F. Supp. 784, 793 (S.D.N.Y. 1997). On this fundamental basis, NatPay's claims cannot survive summary judgment.

*Third*, NatPay's RICO claims rest on the absurd proposition that Pioneer joined the same fraudulent scheme that grievously harmed it.  There is no evidence to support that fictional premise.  The evidence shows only that Pioneer provided "banking services," which courts repeatedly have rejected as insufficient to establish a bank's participation in the fraudster's crimes. *E.g.*, *Rosner v. Bank of China,* 528 F. Supp. 2d 419, 431 (S.D.N.Y. 2007).  This principle also dooms NatPay's aiding and abetting fraud claim, which is based on the same theory.

*Finally*, Pioneer is entitled to summary judgment on all of NatPay's claims because, by NatPay's own admission, NatPay has suffered no damage whatsoever.  NatPay admitted in discovery that the funds it seeks to recover in this case were never NatPay's to begin with.  Further, NatPay has admitted that it has recognized no loss on its own books and faces no liability from any third party.  NatPay simply has not suffered any cognizable harm.

For these reasons and others detailed below, the Court should enter summary judgment in Pioneer's favor on all of NatPay's claims.

## LEGAL STANDARD

"Summary judgment should be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Walker v. City of New York*, 621 F. App'x 74, 75 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)).  Where the non-moving party bears the burden of proof, "it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *CILP Assocs., L.P. v. Pricewaterhouse Coopers, LLP*, 735 F.3d 114, 123 (2d Cir. 2013).  The non-moving party must then "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.*

**ARGUMENT**

**I.    NATPAY'S CLAIMS ARE BARRED BY ITS OWN WRONGDOING.**

**A.    The Doctrine of *in Pari Delicto* Bars NatPay's Claims.**

"The doctrine of *in pari delicto* mandates that the courts will not intercede to resolve a dispute between two wrongdoers." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010). The defense applies whenever the wrongdoing of the party against whom it is asserted is "at least equal to that of the party asserting it." *New Greenwich Litig. Trustee, LLC v. Citco Fund Servs. (Europe) B.V.*, 145 A.D.3d 16, 25 (1st Dep't 2016); *Republic of Iraq v. ABB AG*, 768 F.3d 145, 162, 163 (2d Cir. 2014), *cert. denied*, 576 U.S. 1028 (2015). "This principle "is so strong in New York that . . . the defense applies even in difficult cases and should not be weakened by exceptions." *In re Ridgemour Meyer Props., LLC*, 791 F. App'x 279, 280 (2d Cir. 2020) (cleaned up). In proper cases, like this one, courts can determine at summary judgment that the defense applies. *See, e.g.*, *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 412 F. App'x 325, 327 (2d Cir. 2011).

**1.    The Conduct and Knowledge of NatPay's Employees Are Imputed to NatPay.**

"[T]he acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals." *Kirschner*, 15 N.Y.3d at 465. An entity is "responsible for the acts of its authorized agents even if particular acts were unauthorized," and "even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud." *Id.*; *see also JMM Props., LLC v. Erie Ins. Co.*, 2013 WL 149457, at *6-7 (N.D.N.Y. Jan. 14, 2013) (granting summary judgment on LLC's claims based on managing member's criminal conduct). The "knowledge and conduct" of NatPay's "officers, agents and employees" "may be imputed to" NatPay. *Prudential-Bache Sec., Inc. v. Citibank, N.A.*, 73 N.Y.2d 263, 276 (1989).

NatPay employees Steve Pereira, Dawn Cafaro, and James Hagen all were directly

involved in the business relationship between NatPay and the Mann Payroll Companies and were responsible for various aspects of NatPay's day-to-day operations. As NatPay's general manager for more than ten years, Steve Pereira is broadly responsible for the operation of the company, reporting only to its two majority owners. SMF ¶ 26. All other NatPay employees, either directly or indirectly, report to Mr. Pereira. SMF ¶¶ 27-28. Mr. Pereira also holds an equity interest in NatPay. SMF ¶ 26. Dawn Cafaro "is NatPay's operations manager" and "handles all the work for direct deposit and customer service on-boarding, everything that is basically in the core ACH system." SMF ¶ 29. In that role, Ms. Cafaro is responsible for ensuring "that [NatPay's] processes are working the way that they are supposed to" and "that our processes stay in place . . . ." SMF ¶ 30. Mr. Hagen is NatPay's vice president of sales and reports directly to Mr. Pereira, interacting with him daily. SMF ¶ 27. Based on these undisputed facts, the knowledge and conduct of Pereira, Cafaro, and Hagen are imputable to NatPay as a matter of law.

### 2.        NatPay's Unlawful and Unethical Conduct Bars Its Claims.

NatPay's multifaceted wrongdoing—which directly targeted Pioneer—precludes NatPay from recovering from Pioneer on any of its claims under the doctrine of *in pari delicto*.

*First*, NatPay willfully disregarded its own practices and procedures in allowing the Mann Payroll Companies to structure and process ACH transactions using NatPay's services in a way that was unprecedented in NatPay's 30-year history of operation. NatPay permitted all of the Mann Payroll Companies to process transactions through a single bank account—something NatPay never allowed before and has not allowed since. SMF ¶ 184. This bizarre flow of funds— in which funds flowed from a payroll processor's employer-client, then to the payroll processor's account, and then on to another payroll processor's account, before remittance to the taxing authorities—was without precedent and served no legitimate business purpose. SMF ¶¶ 179-80. NatPay also permitted the Mann Payroll Companies to process transactions related *only* to the

payment of payroll taxes, and not any payroll transactions—again, something that NatPay never allowed before and has not allowed since.  SMF ¶¶ 181-83.

NatPay also looked the other way in conducting due diligence on the Mann Payroll Companies prior to on-boarding them, doing little beyond verifying the corporate entities' existence—despite NatPay's purported interest in conducting such diligence "to help prevent money laundering."  SMF ¶¶ 186-90.  NatPay's departure from its longstanding practices created a fertile environment for fraud and misappropriation by the Mann Payroll Companies.  Under the doctrine of *in pari delicto*, NatPay's abject failure "to implement any supervisory measures" to safeguard against fraud, and its "ignoring of various events" that would have alerted it "to any wrongdoing[,]" preclude it from trying to shift responsibility for its alleged losses to Pioneer.  *Glen Flora Dental Ctr., Ltd. v. First Eagle Bank*, 487 F. Supp. 3d 722, 738 (N.D. Ill. 2020); *see also New Greenwich*, 145 A.D.3d at 25 (negligent, reckless conduct sufficient to invoke defense).

*Second*, NatPay willfully and deliberately ignored multiple indicia of fraud and illegal conduct in processing transactions for the Mann Payroll Companies.  NatPay permitted the Mann Payroll Companies to repeatedly engage in next-day processing of ACH transactions totaling more than $1 million, in direct violation of NatPay's express policy prohibiting next-day processing above that amount, despite being made aware of the violations.  SMF ¶¶ 201-02.  And most egregiously, beginning in the summer of 2018 through August 2019, NatPay processed hundreds of millions of dollars in fraudulent "ePay" transactions on behalf of numerous Mann Entities.  *See* SMF ¶¶ 191-200.  Mann admitted that these ePay transactions were an entirely illegitimate form of kiting and had nothing to do with the payment of payroll taxes.  SMF ¶ 197.  Even NatPay has admitted that these transactions were completely "bogus."  SMF ¶ 198.  Yet incredibly, the substantial majority of NatPay's claimed damages in this case ***relate to five ePay transactions that NatPay allowed to be processed.***  SMF ¶ 206; *see* AC ¶¶ 352-65.

The fact that these ePay transactions had no legitimate connection to payroll tax processing should have been apparent to NatPay, given the glaring inconsistencies between the characteristics of those transactions and the typical payroll tax-related transactions that NatPay processed for the Mann Payroll Companies. SMF ¶¶ 192-95, 202. The ePay transactions were for abnormally high dollar amounts in the six-figures, occurred on a cadence not typical of payroll tax-related transactions, and involved bank accounts at Pioneer Bank of numerous Mann Entities for whom NatPay never received debit authorization. SMF ¶¶ 196, 202, 208. And perhaps most egregiously, hundreds of millions of dollars in ePay transactions—including the five on which NatPay now seeks to recover—were processed through the MPHR Account *after NatPay was explicitly instructed to stop using that account for all purposes* in March 2019. SMF ¶¶ 204-05. NatPay's willful failure to put a stop to these illegitimate transactions, and its acquiescence in them, led directly to NatPay's alleged harm.

*Third*, NatPay was operating at all relevant times as a money transmitter without proper licensing, in violation of federal and state law. SMF ¶¶ 35-37; *see* 18 U.S.C. § 1960; *MH Pillars Ltd. v. Realini*, 2018 WL 1184847, at *6 (N.D. Cal. Mar. 7, 2018). NatPay has admitted as much, entering into a Consent Order with the Texas Department of Banking that requires NatPay to be licensed as a money transmitter in that state. SMF ¶ 35. NatPay also was investigated by the Illinois Department of Financial and Professional Regulation and entered into a Consent Order with that regulator that, while not requiring NatPay to obtain a money transmitter license, found that NatPay operated unlawfully without a license, required NatPay to change its business model in Illinois, and fined NatPay over $82,000. SMF ¶ 37. NatPay's failure to obtain appropriate money transmitter licensing enabled it to evade the strictures of federal and state regulators and relax its own standards and practices in service of its financial goals. SMF ¶ 208.

In short, NatPay's own misconduct directly caused its alleged harm. Because, at a

minimum, NatPay's wrongful conduct was "at least equal" to what NatPay asserts against Pioneer, the *in pari delicto* doctrine bars recovery.  *Kirschner*, 15 N.Y.3d at 464.

**B.    The Doctrine of Unclean Hands Bars NatPay's Unjust Enrichment Claim.**

NatPay's equitable claim for unjust enrichment (AC ¶¶ 460-68) is similarly barred by the doctrine of unclean hands (Pioneer Am. Ans. ¶¶ 520-70), which is "[a]nalogous to the defense of *in pari delicto*," but bars only equitable relief.  *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 310 (S.D.N.Y. 1998).  Given NatPay's misconduct detailed above, the doctrine of unclean hands bars NatPay from recovering from Pioneer for unjust enrichment.  *See, e.g.*, *Am. E Grp. LLC v. Livewire Ergogenics Inc.*, 2020 WL 469312, at \*12 (S.D.N.Y. Jan. 28, 2020).

**II.    THE COURT SHOULD ENTER SUMMARY JUDGMENT ON NATPAY'S COMMON LAW CLAIMS.**

**A.    NatPay's Claims Rest on the False Premise That They Have an Interest in Funds in Standard Pioneer Checking Accounts Not Held by NatPay.**

Each of NatPay's seven different common law claims (AC ¶¶ 410-68, 495-514) relies on a false legal and factual premise:  that NatPay has some legally cognizable interest in funds that allegedly were deposited into the MPHR Account or the Cloud Account, for which NatPay has invented the phrase "Third-Party Employer tax funds" that allegedly were held "in trust."  AC ¶¶ 418, 420-22, 439, 443, 454, 464, 468, 504, 510.  But NatPay's fictionalized description of the funds in the accounts cannot change reality: (i) the MPHR and Cloud Accounts were opened as general checking accounts, and there was no restriction on their use; and (ii) MyPayrollHR and Cloud Payroll in fact used the accounts for purposes other than processing payroll tax payments for third parties.  SMF ¶¶ 80-104, 209-22.  Those fundamental, indisputable facts compel the conclusion that NatPay lacks any legally cognizable interest in any funds allegedly deposited in those accounts, because those funds ***became the property of Pioneer Bank the moment they were deposited into the account***.  *See, e.g.*, *Swan Brewery Co. v. U.S. Tr. Co. of N.Y.*, 832 F. Supp. 714,

8

718 (S.D.N.Y. 1993).

### 1.    NatPay Cannot Overcome the Strong Presumption That the MPHR and Cloud Accounts Were General Accounts.

"Bank deposits can be classified as either general or special." *Peoples Westchester Sav. Bank v. FDIC*, 961 F.2d 327, 330 (2d Cir. 1992). Upon deposit of funds to a general account, "title passes from the depositor to the bank, and the bank may use those funds in conducting its business," creating a debtor-creditor relationship between bank and depositor. *In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 328 (S.D.N.Y. 2010); *Grain Traders*, 960 F. Supp. at 793. A special account, in contrast, creates "a bailor-bailee relationship between the depositor and the bank," *Refco*, 759 F. Supp. 2d at 328-29, such that title to the funds remains with the accountholder. *Peoples Westchester*, 961 F.2d at 330. Funds deposited in a special account thus are segregated from other funds. *Refco*, 759 F. Supp. 2d at 329 n.25; *Swan Brewery*, 832 F. Supp. at 717-18.

"As a general matter, a strong presumption exists under New York law that a deposit account is a general account and not a special purpose account." *In re Lehman Bros. Holdings, Inc.*, 439 B.R. 811, 824 (Bankr. S.D.N.Y. 2010). "To override this presumption, evidence must demonstrate that the parties *mutually intended to set aside the funds* for a specific purpose." *Id.* (emphasis added). "[T]he existence or absence of an agreement that the funds on deposit in the account were to be kept *separate and isolated* from other accounts in the bank or the bank's general funds is a critical factor." *In re Bennett Funding Grp., Inc.*, 212 B.R. 206, 214 (B.A.P. 2d Cir. 1997), *aff'd*, 146 F.3d 136 (2d Cir. 1998) (emphasis added). Absence of such an agreement is "a profound demonstration of the presumption" that an account is general. *Id.* at 215.

A custodian's (such as MPHR or Cloud Payroll) deposit of third-party client funds for the purpose of temporarily holding those funds does not transform a general account into a special account. For example, in *Peoples Westchester*, the Second Circuit held that an attorney's titling

9

of an Interest on Lawyer Account (or IOLA)—the sole purpose of which is to hold client funds—as a "Trust Account" was insufficient to establish a special account.  961 F.2d at 329.  The Court emphasized that the account agreement made "no mention of a duty to segregate funds[,]" which "the parties must [have] explicitly provide[d]" if they intended a special account.  *Id.* at 331.  The Court also disagreed with the district court that the bank's mere opening of the account meant that it "accepted the funds on a basis that they were to be held for a specific purpose, thereby giving rise to a special deposit."  *Id.*  The Court explained that this "misperceives the meaning of 'specific purpose,'" which "connotes that, in holding the funds, the bank itself acts as an agent directly on behalf of the beneficial owner—a service for which the bank is separately compensated."  *Id.*

The same conclusion is required here.  As to the "critical factor" in the analysis, there is no evidence from which a jury could infer that Pioneer and Mann agreed to keep funds deposited in either of the accounts "separate and isolated from other accounts in the bank or the bank's general funds."  *Bennett I*, 212 B.R. at 214.  To the contrary, the documentary evidence shows that the accounts were general checking accounts.  SMF ¶¶ 83-86; 210-11.  The account agreements did not require Pioneer to segregate funds, nor did they contain language designating Pioneer as "an agent directly on behalf of the beneficial owner[s]" of deposited funds.  *Peoples Westchester*, 961 F.2d at 331; SMF ¶ 85.  Rather, Mann had total control over the accounts and ensured that he could freely transfer funds by combining them for "cash management purposes."  SMF ¶¶ 91, 211.[2]

Consistent with this documentary evidence, Mann testified that there was "never any agreement" that Pioneer would isolate the funds in those accounts from the bank's other accounts.  SMF ¶¶ 88-89, 92, 217-22.  Nor did Mann specially compensate Pioneer for maintaining the

---

[2] The account agreement for the MPHR Account contains a handwritten "Client Account" notation, but as Mann testified, that notation was never intended to restrict the use of funds in those accounts.  SMF ¶ 90.  In any case, such an ambiguous notation is not sufficient to create a special account.  *Peoples Westchester*, 961 F.2d at 329.

accounts, paying only a per-transaction fee, as would be expected from a general account. SMF ¶ 86; *Peoples Westchester*, 961 F.2d at 331. He also testified that, in practice, he "repeatedly transferred funds from [the Cloud Account] to [the MPHR Account], and then to other checking accounts held by ValueWise affiliates at Pioneer Bank." SMF ¶¶ 100-03, 212-14. Mann could withdraw or transfer funds from the accounts "for any reason," often transferred funds to entities other than taxing authorities, and did not use the funds exclusively for tax payments. SMF ¶ 213. John Reinke, CEO of Cloud Payroll, corroborated that testimony, admitting that the MPHR Account "started out as an everything account," with funds "going in and going out for payment of various expenses and everything." SMF ¶ 101. This evidence also comports with the widely understood fact that community banks, like Pioneer, generally do not open special deposit accounts and, when they do, they require unique agreements. SMF ¶¶ 87, 93.

While the Court may have had to accept NatPay's allegations about the parties' mutual intent at the pleading stage, *AXH Air-Coolers, LLC v. Pioneer Bancorp, Inc.*, 2022 WL 16790328, at \*4 (N.D.N.Y. Aug. 2, 2022), it cannot do so on summary judgment. There never was any mutual intent to treat the MPHR and Cloud Accounts as special accounts; they were general accounts.

### 2.    The Accounts Were Not Trust or Fiduciary Accounts.

There also is no genuine dispute that the accounts were not trust or fiduciary accounts. New York courts look to the status of the ***depositor*** as a trustee or fiduciary to determine whether an account is "fiduciary in nature." *Zaz-Huff Inc. v. Chase Manhattan Bank, N.A.*, 277 A.D.2d 59, 61 (1st Dep't 2000); *see also Q3 Inv. Recovery Vehicle, LLC v. McEvoy*, 2023 N.Y. Slip Op. 30184(U), at \*4 (Sup. Ct., N.Y. Cnty. 2023) (same). Where "a recipient of funds is not prohibited from using them as his own and commingling them with his own monies, a debtor-creditor, not a trust, relationship exists." *In re Black & Geddes, Inc.*, 35 B.R. 830, 836 (Bankr. S.D.N.Y. 1984).

"Courts have rejected claims that companies providing payroll services are fiduciaries to

11

their clients." *Votsis v. ADP, LLC*, 2019 N.Y. Slip Op. 34093(U), at \*5 (Sup. Ct., Monroe Cnty. 2019), *aff'd*, 187 A.D.3d 1490 (4th Dep't 2019); *see also, e.g.*, *Ironforge.com v. Paychex, Inc.*, 747 F. Supp. 2d 384, 394-95 (W.D.N.Y. 2010) (relationship between payroll company and employer-client is contractual, not special or fiduciary); *DT Floormasters, Inc. v. United States*, 2008 WL 2705554, at \*4 (S.D. Ind. July 10, 2008) (similar).[3] Consistent with that understanding, SWP, Cloud Payroll, and MyPayrollHR were not trustees or fiduciaries to their clients.

NatPay cannot show that any relevant party acted as a trustee or fiduciary for employer-client funds. SWP, for instance, has denied that it owed any fiduciary duty to its clients, admitting only that it had a "contractual obligation" to remit payments to taxing authorities on behalf of its employer-clients. SMF ¶¶ 17-18. Those obligations were defined in payroll services agreements that did not impose fiduciary duties or require funds collected from employer-clients to be held in trust. SMF ¶ 19. SWP was only required to collect funds from its clients and make payroll tax payments as they became due, and it used the funds as if they were its own, earning interest that it used to reduce fees owed to its bank. SMF ¶¶ 19-21. Under Oklahoma law, which governs the SWP service agreements, a fiduciary relationship cannot be read into a contract where it uses "no terms [] to create a trust . . . ." *In re Tucker*, 346 B.R. 844, 850 (Bankr. E.D. Okla. 2006); *accord Ne. Gen. Corp. v. Wellington Advert., Inc.*, 82 N.Y.2d 158, 164 (1993) (if defendant "wanted fiduciary-like relationships or responsibilities, it could have bargained for and specified for them").

There is similarly no evidence that MyPayrollHR or Cloud Payroll held employer-client

---

[3] Courts have reached the same conclusion in a variety of other commercial contexts. *See, e.g.*, *In re Morales Travel Agency*, 667 F.2d 1069, 1072 (1st Cir. 1981) (travel agency did not hold airline ticket sale receipts in trust for airline); *In re Sakowitz, Inc.*, 949 F.2d 178, 182 (5th Cir. 1991) (department store was not a fiduciary for subleasing retail merchants); *In re Teckenbrock*, 2012 WL 3818220, at \*3 (Bankr. S.D.N.Y. Sept. 4, 2012) (talent manager acting as intermediary for client payments was not a trustee or fiduciary).

payroll funds in trust or otherwise acted as fiduciaries.  MyPayrollHR's standard contract (including its contract with GSG) contained no words to that effect, requiring MyPayrollHR only to "process Payments to taxing authorities," stressing that the employer-client would be "solely responsible to pay all taxes," and authorizing MyPayrollHR to earn and keep interest on funds collection from its employer-clients.  SMF ¶¶ 51-54.  There likewise is no evidence that Cloud Payroll agreed to act as a fiduciary or trustee.  At best, therefore, both MyPayrollHR and Cloud Payroll assumed a simple contractual obligation with respect to any funds they collected and were not prohibited from commingling or using those funds in whatever way they saw fit.[4]

Analysis of the MPHR and Cloud Accounts themselves leaves no dispute that they were opened and maintained as ordinary business checking accounts, not fiduciary or trust accounts. "Banks rely on their depositors to self-identify accounts held as a fiduciary or in trust for the benefit of a third party."  SMF ¶ 96.  In opening the accounts, Mann did not indicate the purpose of the account was to hold funds in trust, and there is no evidence that Pioneer was told that the accounts would contain such funds.  SMF ¶¶ 92, 95, 215-18.  While account labeling is not dispositive, *Zaz-Huff*, 277 A.D.2d at 61, the accounts were not even labeled as trust or fiduciary accounts, and there was never any agreement between SWP and Cloud Payroll requiring funds collected from SWP's employer-clients to be deposited in trust accounts.  SMF ¶¶ 99, 144, 147, 215.  Plaintiffs' expert even admitted that payroll service bureaus do not place client funds in trust accounts.  SMF ¶ 94.

### 3. Funds in the Accounts Were Not Subject to a Statutory Trust Under Section 7501 of the Internal Revenue Code.

Nor can NatPay establish that any portion of the funds in the MPHR Account or the Cloud

---

[4] Because New York courts look to the status of the accountholder determine whether an account is "fiduciary in nature," *Zaz-Huff*, 277 A.D.2d at 61, NatPay's status is irrelevant, as it was not the accountholder on the MPHR or Cloud Accounts.  SMF ¶¶ 80, 209.

Account were subject a "trust" under 26 U.S.C. § 7501.  AC ¶ 443.  That contention is based on a mistaken interpretation of 26 U.S.C. § 7501, which does not imbue specific funds with a trust character as they travel through multiple intermediaries—it simply imposes an obligation on the person "required to collect or withhold" the funds to ensure that they are paid over to the IRS.

The "special fund in trust" created under § 7501 is a "trust in an abstract 'amount'—a dollar figure not tied to any particular assets—rather than in the actual dollars withheld." *Begier v. IRS*, 496 U.S. 53, 62 (1990).  That is, the trust "is not really a trust over particular funds as much as it is a trust over a particular amount" that remains with the employer. *Morin v. Frontier Bus. Tech.*, 288 B.R. 663, 673 (W.D.N.Y. 2003).  Congress defined the enforcement reach of the § 7501 trust through a companion statute authorizing the IRS to collect taxes either from the company that has failed to pay taxes or from a defined class of responsible individuals, such as corporate officers.  26 U.S.C. § 6672(a).  "If the withholding taxes are not collected by the United States from the employer or personally from its officers or persons found liable under Section 6672, such tax is lost." *Mazo v. United States*, 1977 WL 1114, at *2 (S.D. Ga. Mar. 22, 1977).

NatPay alleges that funds deposited into the MPHR and Cloud Accounts were required to be maintained "in trust for payment to the taxing authorities."  AC ¶ 443.  NatPay has failed to develop evidence to support this alleged "trust" and it is not clearly articulated in the complaint, but it appears to be predicated, at least in part, on the baseless notion that § 7501 imbues payroll tax funds with a halo of protection wherever they may be found.

That contention has neither factual nor legal merit.  To the contrary, numerous courts have recognized that the § 7501 trust does not follow specific funds from one place to another but remains with the statutorily responsible entities and individuals. *See, e.g.*, *In re Hamilton Taft & Co.*, 53 F.3d 285, 288 (9th Cir. 1995) (funds transferred to payroll company were not subject to § 7501), *vacated on other grounds*, 68 F.3d 337 (9th Cir. 1995); *Morin*, 288 B.R. at 673 (§ 7501

14

trust at all times "remained with" the employer); *In re Aapex Sys.*, 2000 WL 34326278, at *4 (W.D.N.Y. Nov. 21, 2000) (IRS has "no direct right of action" against payroll company under § 7501); *Sunbelt Beverage Corp. v. United States*, 1996 WL 556939, at *4 (N.D. Cal. July 23, 1996) (withheld taxes transferred to payroll processor "were not subject to § 7501's statutory trust").

Aside from the employer, there is a limited class of individuals who can be held responsible for an employer's nonpayment of taxes because they must "collect, truthfully account for, and pay over" taxes subject to § 7501.  26 U.S.C. § 6672.  Congress's decision to limit potential liability to certain individuals under § 6672 means it did not contemplate liability of other, unnamed third parties like Pioneer.  *In re Thompson*, 37 B.R. 211, 215 (Bankr. M.D. Fla. 1983) (the "Government has recourse only against the employer or the corporate officer" responsible under § 6672).

**B.      Pioneer Is Entitled to Judgment on NatPay's Common Law Claims.**[5]

**1.      NatPay Has No Legal Interest in Any Funds Deposited in the MPHR and Cloud Accounts That Would Support Its Conversion Claims.**

Pioneer is entitled to judgment on NatPay's claims for conversion and aiding and abetting conversion (AC ¶¶ 419-32, 495-504) because NatPay cannot "establish legal ownership of a specific identifiable piece of property."  *Ahles v. Aztec Enters., Inc.*, 120 A.D.2d 903, 903 (3d Dep't 1986); *see also Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006). NatPay claims a possessory or proprietary interest in funds deposited in the MPHR and Cloud Accounts.  But there is no material dispute that (1) both accounts were general accounts, barring any claim of conversion against Pioneer; and (2) NatPay was not the accountholder, and thus has no legally cognizable interest in funds deposited in the accounts.

The evidence shows that the MPHR and Cloud Accounts were general accounts, as discussed above.  *See supra* at 8-11.  That fact alone is dispositive "because deposits in a general

---

[5] NatPay's aiding and abetting fraud claim is discussed separately at section IV below.

account cannot be converted as a matter of law[.]" *AXH Air-Coolers*, 2022 WL 16790328, at *4; *see AXH Air-Coolers, LLC v. Pioneer Bancorp, Inc.*, 2021 WL 5446947, at *3 (N.D.N.Y. Nov. 22, 2021) (dismissing conversion claim). Even if NatPay could somehow overcome the presumption that the MPHR and Cloud Accounts were general, its conversion claims still fail because NatPay cannot show that it had a possessory interest in any funds deposited into the accounts. *See AXH Air-Coolers*, 2022 WL 16790328, at *4-5. As MyPayrollHR and Cloud Payroll were the accountholders, NatPay is, at most, a "creditor[] of [a] special account depositor[]," which is insufficient to establish a "possessory interest in the converted property." *Id.* at *5 (quoting *HBL Indus. v. Chase Manhattan Bank*, 45 B.R. 865, 868 (S.D.N.Y. 1985)).

### 2.    NatPay's Unjust Enrichment Claim Duplicates the Conversion Claims and Otherwise Lacks Any Legal Basis.

NatPay's claim that "Pioneer has been unjustly enriched by its *conversion* and *retention* of" funds allegedly deposited into the MPHR and Cloud Accounts (AC ¶ 464 (emphasis added)) is an improper attempt to recast NatPay's defective conversion claim. Unjust enrichment "is not available" where, as here, it "simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) (collecting cases); *see, e.g.*, *Demirovic v. Ortega*, 2016 WL 11472745, at *5 (E.D.N.Y. Sept. 15, 2016). Because the funds in those accounts became Pioneer's property when deposited, *Grain Traders*, 960 F. Supp. at 793, "there was nothing wrongful about [Pioneer's] exercise of dominion and control over" funds in them. *Crestview SPV, LLC v. Crestview Fin., LLC*, 217 A.D.3d 473, 474 (1st Dep't 2023).

Even if the claim were not duplicative of NatPay's conversion claim (and it is), Pioneer is entitled to judgment because NatPay cannot establish the requisite "sufficient connection" to Pioneer to maintain an unjust enrichment claim. *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 519 (2012). NatPay's own witnesses admitted that no one at NatPay has ever spoken with anyone

16

at Pioneer, much less had any business dealings with Pioneer.  SMF ¶ 39-42.  As Pioneer and NatPay "'simply had no dealings with each other,' their relationship is 'too attenuated' to support an unjust enrichment claim."  *In re LIBOR Based Fin. Instrs. Antitrust Litig.*, 27 F. Supp. 3d 447, 479 (S.D.N.Y. 2014) (quoting *Georgia Malone*, 19 N.Y.3d at 517-18).  Courts routinely dismiss unjust enrichment claims asserted against banks by non-customers on this ground.  *See, e.g.*, *id.*; *Zamora v. JPMorgan Chase Bank*, 2015 WL 4653234, at *4 (S.D.N.Y. July 31, 2015).

Finally, courts are not "free to ignore" a bank's legal right of setoff simply because "they think application would be 'unjust[.]'"  *In re Applied Logic Corp.*, 576 F.2d 952, 957-58 (2d Cir. 1978).  Pioneer's lawful exercise of its rights with respect to its own property was not unjust, *Crestview*, 217 A.D.3d at 474, and no "compelling circumstances" exist to justify overriding those rights, *e.g.*, *In re Bennett Funding Grp., Inc.,* 146 F.3d 136, 139 (2d Cir. 1998).

### 3. Pioneer Owed No Duty to NatPay and Thus Cannot Be Liable to NatPay for Any Alleged Negligence.

An element of any negligence claim is the existence of "a duty owed by the defendant to the plaintiff."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006).  Thus, "a threshold question" on any such claim "is whether the alleged tortfeasor owed a duty of care to the injured party."  *Pincover v. J.P. Morgan Chase Bank, N.A.*, 592 F. Supp. 3d 212, 228 (S.D.N.Y. 2022).  "The injured party must show that a defendant owed not merely a general duty to society but a specific duty to him or her[.]"  *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (2001).

Banks generally "do not owe non-customers a duty to protect them from the intentional torts of their customers."  *Lerner*, 459 F.3d at 286; *see In re Agape Litig.*, 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010) (same).  Nor do banks owe a duty "to monitor the depositors' financial activities so as to assure the creditors' collection of the depositors' debts."  *Century Bus. Credit Corp. v. N. Fork Bank*, 246 A.D.2d 395 (1st Dep't 1998).  "[T]he fear of imposing on banks

17

endless, unpredictable liability [] drives New York's distinction between a bank's customers and non-customers." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 231 (5th Cir. 2010).

This rule is so strong that banks are not even "required to conduct an investigation to protect funds from possible misappropriation *by a fiduciary*." *In re Knox*, 64 N.Y.2d 434, 438 (1985) (emphasis added). There is only one limited circumstance in which a bank *might* owe a duty to non-customers: where the bank participates in the "diversion" of funds from a ***fiduciary*** account, "either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being executed" by the fiduciary. *AXH Air-Coolers*, 2022 WL 16790328, at *6 (quoting *Lerner*, 459 F.3d at 287). While NatPay ignored evidence at the pleading stage to feign the narrow exception, it now must face the evidence that such exception cannot apply. The Mann Payroll Companies were not fiduciaries, and thus neither the MPHR Account nor the Cloud Account was a fiduciary account. *See supra* at 11-13. That alone is dispositive of NatPay's negligence claim.

There is likewise no merit to NatPay's attempt to impose on Pioneer a duty to the general public based on the Bank Secrecy Act of 1970 and related statutes (commonly referred to as BSA/AML and Know-Your-Customer ("KYC") regulations). *See* TAC ¶¶ 445-46. It is well settled that BSA/AML and KYC regulations do not create a "duty of care" owed to the general public. *In re Agape Litig.*, 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010); *see, e.g.*, *Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*, 2019 WL 3503109, at *7 (N.D. Cal. Aug. 1, 2019) (same; collecting cases); *Marchak v. JPMorgan Chase & Co.*, 2016 WL 3911926, at *3 (E.D.N.Y. July 15, 2016) ("[C]ourts have repeatedly held that a bank's duty under the BSA is owed *only* to the government and not to private parties.") (cleaned up).

As a matter of law, therefore, Pioneer owed no duty to NatPay under any negligence theory (e.g., ordinary negligence, gross negligence, or negligence *per se*). *See Venture Gen. Agency*, 2019 WL 3503109, at *7; *see, e.g.*, *Guest v. First Republic Corp. of Am.*, 618 F. Supp. 3d 86, 90

18

(N.D.N.Y. 2022) (whether a duty exists "is a question of law" for the court). Were it otherwise, banks would owe "endless, unpredictable" duties to unforeseeable third parties. *Chaney*, 595 F.3d at 231. While Pioneer complied with BSA/AML regulations at all relevant times, *see* SMF ¶¶ 64-72, the Court need not address that issue to resolve this motion.

### 4.    NatPay's Fraud Claim Is Based on a Fatally Flawed Application of the "Special Facts" Doctrine.

NatPay asserts a claim for fraud relating to the six-day period over Labor Day weekend in 2019 during which Pioneer prevented debits from the MPHR and Cloud Accounts (and all other Mann Entity Accounts)—*after* Pioneer had learned that Bank of America returned and called back nearly $16 million in checks written to various Mann Entity Accounts, resulting in millions of dollars in overdrafts in those accounts. AC ¶¶ 433-41; *see* SMF ¶¶ 230-36. According to NatPay, Pioneer had a duty to disclose to it the status of transaction activity in the Mann Entity Accounts during this period and that the failure to do so amounted to fraud. AC ¶¶ 434-36. The facts show that Pioneer had no such duty and did nothing wrong.

NatPay must show "a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 827 (2016). A "fraudulent omission" requires a showing that "the defendant had a duty to disclose material information and that it failed to do so." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 179 (2011). NatPay failed to adduce any evidence to support the existence of any such duty.

*First*, NatPay was not the designated accountholder for either the MPHR Account or the Cloud Account. SMF ¶¶ 80, 209. Pioneer thus not only had no duty to disclose information about the account to NatPay—it was ***prohibited*** from doing so under federal law. 12 U.S.C. § 3403(a)

(prohibiting banks from disclosing "the financial records of any customer," subject to limited exceptions inapplicable here); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 123 (2d Cir. 1984) ("[A] bank should keep its own customers' affairs confidential.").

*Second*, this Court held at the outset of this case that there was no confidential or fiduciary relationship between Pioneer and SWP giving rise to any duty to disclose information about the Cloud Account. *Sw. Payroll Serv., Inc. v. Pioneer Bancorp, Inc.*, 2020 WL 1889013, at *4 (N.D.N.Y. Apr. 16, 2020). Discovery did nothing to warrant a different conclusion as to NatPay, which admittedly had no relationship with Pioneer.

*Third*, NatPay also cannot establish a duty to disclose based on the "special facts" doctrine, which applies when "one party has superior knowledge that is not readily available/accessible to the other party and that party knows the other party is acting on the basis of mistaken knowledge." *Sw. Payroll Serv., Inc. v. Pioneer Bancorp, Inc.*, 2020 WL 4353219, at *4 (N.D.N.Y. July 7, 2020). As a threshold matter, a duty to disclose on this basis arises "only in business dealings between parties to a prospective transaction," *Merkin v. Berman*, 123 A.D.3d 523, 524 (1st Dep't 2014), and NatPay was not a party to any relevant transaction with Pioneer—Cloud Payroll was. SMF ¶¶ 104, 241-45. NatPay admits that it had no business dealings with Pioneer. SMF ¶ 42. In addition, there is no evidence that Pioneer withheld any information **knowing** that **any** person, much less NatPay, was acting on the basis of mistaken knowledge. Mann and Cloud Payroll, through NatPay, initiated the ACH transactions underlying NatPay's claims. SMF ¶ 319. Pioneer returned ACH debits associated with those transactions within the two-day period required under the NACHA Operating Rules, as NatPay admitted. SMF ¶ 320. NatPay contends that this two-day delay was an omission to cause NatPay to continue "to make deposits to the accounts." AC ¶ 436. Not so. Banks do not—and are not expected or required to—provide notice before returning debits within the two-day window. SMF ¶¶ 320-22. NatPay's assertion that Pioneer violated the

NACHA Operating Rules also is belied by NACHA's rejection of that identical claim.  SMF ¶ 326.

Pioneer had no duty to disclose to NatPay information about the status of the Mann Entities' accounts.  Pioneer returned debits from those accounts, and provided notice of the reasons for the returns, in accordance with applicable NACHA rules.  The law imposed no further duty on Pioneer, and the lack of such a duty is fatal to NatPay's fraud claim.

### 5.    The Court Should Enter Judgment in Pioneer's Favor on the Declaratory Judgment Claim.

Since NatPay's declaratory judgment claim (AC ¶¶ 410-18) "parallels the other claims and merely seeks a declaration of the same rights and obligations[,]" Pioneer is entitled to judgment on that claim as well.  *E.g.*, *Kleeberg v. Eber*, 2020 WL 4586904, at *16 (S.D.N.Y. Aug. 10, 2020).

## III.    PIONEER IS ENTITLED TO JUDGMENT ON NATPAY'S RICO CLAIMS.

To establish a civil RICO claim under Section 1962(c), a plaintiff must show "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).  To establish RICO conspiracy, the plaintiff must show the defendant both "knew about and agreed to facilitate a racketeering scheme."  *United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018) (internal quotations omitted).  "[M]ere knowledge of the scheme, even coupled with personal benefit, is not enough to impose liability for a RICO conspiracy."  *Abbott Labs. v. Adelphia Supply USA*, 2017 WL 57802, at *9 (E.D.N.Y. Jan. 4, 2017).  The plaintiff also must establish "an injury to [its] business or property" and "causation of the injury by the defendant's violation."  *Lerner*, 459 F.3d at 283.

### A.    Pioneer Did Not Knowingly Participate in Predicate Acts of Money Laundering or Agree to Facilitate a Pattern of Racketeering.

NatPay's theory is that the alleged enterprise engaged in a pattern of "money laundering in violation of 18 U.S.C. §§ 1956 and 1957, which involved third-party payroll and payroll tax funds that were obtained by wire fraud, in violation of 18 U.S.C. § 1343."  Dkt. No. 260, RICO

Stmt. ¶ 5.a.  Money laundering under § 1956 requires a showing that, among other things, the defendant knowingly engaged in a financial transaction that "involved the proceeds of specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7) ["SUA")]" and, further, that the defendant knew "that the financial transaction was designed in whole or in part to conceal or disguise the source, ownership, control, etc., of those proceeds." *Entretelas Americanas S.A. v. Soler*, 2020 WL 9815186, at *9 (S.D.N.Y. Feb. 3, 2020).  Money laundering under § 1957 similarly requires evidence that the defendant "knowingly engaged . . . in a monetary transaction involving criminally derived property." *Palatkevich v. Choupak*, 2014 WL 1509236, at *18 (S.D.N.Y. Jan. 24, 2014); *see* 18 U.S.C. § 1957(a).  NatPay cannot show that Pioneer knowingly conducted or agreed to facilitate financial transactions with money derived from the alleged SUA of wire fraud.

There is certainly evidence that Mann was a crook who misused funds allegedly belonging to third parties.  But even if NatPay can establish wire fraud by Mann resulting in criminally derived proceeds in accounts at Pioneer, there is zero evidence from which a jury could infer Pioneer *knew* the funds deposited in those accounts were derived from wire fraud.  Pioneer had no visibility into Mann's communications, contractual relationships, or purported assurances to employer-clients—nor did Pioneer have access to any information about the way in which Mann obtained funds from third parties.  Pioneer did not originate ACH collections for Mann—Cloud Payroll and NatPay did.  SMF ¶¶ 142, 224-29.  There is zero evidence that Pioneer had any communication or contract with the payroll companies' employer-clients.  All the funds were deposited into Pioneer accounts based on instructions from Cloud Payroll through NatPay, which has admitted that it never communicated with anyone at Pioneer.  SMF ¶¶ 40-42.

This evidence is consistent with Mann's sworn testimony as well.  SMF ¶¶ 73-76.  He testified that he was not aware that anybody at Pioneer knew that he was engaged in check kiting and ACH kiting.  SMF ¶ 74.  Nor did anyone at Pioneer say anything to him that would lead him

22

to believe that Pioneer was so aware. SMF ¶ 75. And while Pioneer knew about non-sufficient funds ("NSF") transactions, Mann never told anyone that the reason for these transactions was that he was operating a check-kiting scheme, SMF ¶ 76, and Pioneer believed the reason for these transactions was Mann's business's needs outstripping his line of credit, SMF ¶¶ 77-78. Mann further admitted, in his August 2020 guilty plea, that he was able to increase the ValueWise line of credit only *by defrauding Pioneer (his victim)*—a fraud that involved generating fake invoices, mischaracterizing business relationships, and artificially inflating assets. *See* SMF ¶¶ 61-63. In fact, state and federal law enforcement thoroughly investigated and determined that Pioneer was a victim of Mann's crimes, not a participant in them. *Id.* Mann spent years propping up and concealing his scheme by telling thousands of lies. SMF ¶ 79.

NatPay's theory of knowledge is that "Pioneer knew the third-party payroll and payroll tax funds were to be held in trust by the Payroll Companies and were not to be used for any other purpose." RICO Stmt. ¶ 5.b. That theory is not supported by the evidence (*see supra* at 8-15), but even if it were, it does not show that Pioneer knowingly participated in laundering money derived from SUA. Establishing that Pioneer knew there were "third party funds" in Mann's accounts does not equate to knowledge that those funds were obtained by any SUA. *See United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, 373 (S.D.N.Y. 2008).

NatPay also points to alleged events occurring *after* the collapse of Mann's fraud scheme as evidence of Pioneer's involvement. AC ¶¶ 323-65. Those later events do not show that Pioneer knew any funds deposited at Pioneer were the product of Mann's fraud scheme (and it did not). Pioneer nevertheless responds to and refutes NatPay's false allegations. *See* SMF ¶¶ 246-318.

Moreover, even a bank's purported awareness of a customer's wrongdoing (and there is no evidence to infer that here) does not mean that the bank agreed to participate in and facilitate that wrongdoing—much less to participate in a criminal enterprise. Numerous "[c]ourts have rejected

23

the idea that knowledge of bad banking practices—like check kiting or uncollected balances—is enough to show an agreement to facilitate a RICO enterprise." *Glen Flora Dental Ctr., Ltd. v. First Eagle Bank*, 2024 WL 621601, at *8 (N.D. Ill. Feb. 14, 2024) (collecting cases).

The recent summary judgment decision in *Glen Flora* is on point. There, the plaintiff asked the court to infer an agreement between the bank and the fraudsters to participate in an embezzlement scheme based on purported evidence that (i) the fraudsters had "diverted company funds" from the bank "for their own personal use" (much like Mann did); (ii) the company "started racking up significant fees with [the bank] for insufficient funds" under the fraudsters' financial management; (iii) bank "executives received daily reports about overdraft fees on Plaintiffs' accounts"; (iv) there were "a dozen 'red flags,'" including high overdraft fees and failing to check for fraudulent signatures; and (v) the bank knew of the fraudster's "questionable conduct," such as "overstating the amount of deposits." *Id.* at *4-5, *11. The court rejected the argument and granted summary judgment for the bank, relying on numerous circuit court cases consistently holding that knowledge of bad banking practices—even criminal practices like "check kiting"—cannot establish a racketeering agreement. *Id.* at *13-14.[6]

Given this unbroken line of cases rejecting RICO claims based on the same evidence-free theory, NatPay cannot show that Pioneer agreed to participate in a money laundering scheme.

---

[6] *See, e.g.*, *Rosemann v. St. Louis Bank*, 858 F.3d 488, 500-01 (8th Cir. 2017) (allegations that "handling of the overdrafts" and acceptance of "millions in fiduciary funds" to pay down line of credit insufficient to prove RICO conspiracy); *Dahlgren v. First Nat'l Bank of Holdrege*, 533 F.3d 681, 690 (8th Cir. 2008) (rejecting RICO claims where bank extended customer lines of credit, allowed customer to commingle funds, "honored substantial overdrafts," approved "n.s.f. checks to investors," and encouraged other banks "to participate in the lines of credit"); *Marlin v. Moody Nat. Bank, N.A.*, 248 F. App'x 534, 539 (5th Cir. 2007) (similar); *Frost Nat'l Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 870-71 (7th Cir. 2001) (similar); *see also Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 344, 354 (S.D.N.Y. 1998) (similar).

24

**B.    Pioneer Did Not Conduct the Affairs of, or Share a Common Purpose with, the Alleged Enterprise.**

"Bankers do not become racketeers by acting like bankers." *Moss v. BMO Harris Bank, N.A.,* 258 F. Supp. 3d 289, 307-308 (E.D.N.Y. 2017).  And the supposed "evidence" of Pioneer conducting the enterprise's affairs is simply evidence of Pioneer conducting its own affairs—the affairs of a bank.  But Pioneer cannot be liable under RICO absent evidence that it took "*some* part in directing [that enterprise's] affairs."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  This "'operation and management requirement,'" "is an extremely rigorous test" in "this Circuit."  *E.g.*, *Dem. Nat'l Cmte. v. Russian Fed'n*, 392 F. Supp. 3d 410, 440-41 (S.D.N.Y. 2019).

NatPay fails this exacting standard.  It contends that Pioneer directed the enterprise by providing Mann and his entities with banking services: access to bank accounts, a line of credit, remote deposit checking privileges, and approvals of NSF transactions when Mann overdrew his accounts.  It claims that, by providing these services, Pioneer "facilitated and condoned Mann's" diversion of employer funds "to cover overdrafts and pay down the ValueWise line of credit."  RICO Stmt. ¶ 5.b.  Those assertions are baseless, but it does not matter because, even if true, none of it constitutes "directing" or "conducting" the affairs of Mann's RICO enterprise.

No matter how one looks at it, all NatPay has is evidence of Pioneer acting as a bank.  *Frost Nat'l Bank*, 241 F.3d at 870-71.  That Mann used Pioneer's services unlawfully does not suggest otherwise.  "[S]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result."  *Univ. of Md. at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993); *United States v. Viola*, 35 F.3d 37, 41 (2d Cir. 1994) (similar).  If that were enough, every bank would be liable under RICO—the "litigation equivalent of a thermonuclear device," *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996)—whenever a customer fraudulently uses the bank's services for

25

a sufficient period.

For precisely that reason, courts routinely hold that merely providing "banking services," "regardless of how indispensable or essential such services may have been," does not qualify as "operation or management" of a RICO enterprise. *Rosner v. Bank of China,* 528 F. Supp. 2d 419, 431 (S.D.N.Y. 2007). Courts have reached that conclusion even when the bank provided services "with knowledge of the fraud"—a factual predicate not present here. *Id.*; *see, e.g.*, *Dahlgren*, 533 F.3d at 690; *Moss*, 258 F. Supp. 3d at 307-308. The same conclusion is required here.

For substantially the same reason, Pioneer did not "share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 174 (2d Cir. 2004). A bank's generation of "fees and profits" from a customer's fraud does not suffice because it is "only a benefit incidental to the ordinary and lawful banking relationship." *Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x 622, 625-26 (2d Cir. 2020). Pioneer's actions to ensure that Mann was covering his overdrafts and paying down his line of credit are entirely consistent with a bank acting to further its own interests—not the interests of any criminal enterprise.

### C.    NatPay Cannot Establish Proximate Causation Under RICO.

To recover on a RICO claim, the plaintiff must show "that a RICO predicate offense not only was a but for cause of his injury, but was the proximate cause as well." *Hemi Grp., LLC v. City of N.Y., N.Y.*, 559 U.S. 1, 9 (2010) (cleaned up). A plaintiff must show that it was injured by "an act . . . that is independently wrongful under RICO." *Beck v. Prupis*, 529 U.S. 494 (2000). "The requirements of RICO causation are stricter than those for common-law torts." *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 145 (2d Cir. 2018). There must be some "direct relation between the injury asserted and the injurious conduct alleged. A link that is too remote, purely contingent, or indirect is insufficient." *Hemi Grp.*, 559 U.S. at 9 (cleaned up).

Here, NatPay's alleged injuries indisputably were not caused by Mann's money laundering scheme.  At best, NatPay's claimed losses were caused by protective measures taken when the scheme collapsed—*i.e.*, the freeze of Mann's accounts at Bank of America and Pioneer.  As the "enterprise" necessarily ended upon initiation of those protective measures, NatPay cannot tie its alleged harm to any purported money laundering predicates.

Here are the probative facts.  On August 29, 2019, Mann deposited 36 checks written from accounts he controlled at Bank of America totaling $15,588,000 ("36 BOA Checks") into twelve accounts he controlled at Pioneer, including into SWP's Account 1996.  SMF ¶ 232.  By virtue of his remote deposit capture privileges, Mann had immediate access to those funds, which Mann used on the same day by writing 39 checks totaling $18,043,000 from his accounts at Pioneer back to the accounts at Bank of America.  SMF ¶ 233-34.  But the next day, Bank of America returned and called back the 36 BOA Checks, which resulted in Mann's accounts at Pioneer being overdrawn by over $18 million.  SMF ¶ 237.  That same day, Pioneer and Bank of America froze all the accounts Mann controlled at the respective banks and disabled his access to them.  SMF ¶¶ 236-38.  The day of the freeze, Pioneer informed Mann—the authorized person on the accounts—that the accounts had been frozen and that access to them had been disabled.  SMF ¶¶ 239-45.

The only reasonable conclusion a fact finder could reach is that any purported "enterprise" ended on or near the date the accounts were frozen—August 30, 2019.  The government reached that conclusion when Mann was sentenced.  SMF ¶ 231.  And NatPay itself admits that Mann's money-laundering schemes "collapsed" at this time.  AC ¶¶ 49, 164, 305-06.  NatPay was not harmed by Mann's diversion or misuse of employer funds—the harm it alleges occurred after the scheme collapsed and accounts were frozen.  SMF ¶ 230.  NatPay's RICO claims are thus foreclosed for lack of causation because the freeze happened at a time when no jury could find the

existence of a functioning RICO enterprise.

## IV. THE COURT SHOULD ENTER SUMMARY JUDGMENT IN PIONEER'S FAVOR ON THE AIDING AND ABETTING FRAUD CLAIM.

NatPay's claim for aiding and abetting fraud is based on substantially the same defective theory supporting its RICO claims and fails for substantially the same reasons. AC ¶¶ 505-14.

First, as with the other common law claims, this claim also depends upon the assertion that "Mann and Pioneer knew that the third-party tax funds deposited in the [MPHR Account] and the [Cloud Account] were entrusted to MyPayrollHR/Cloud Payroll, and should not be used for any purposes other than paying the tax/treasury funds to the appropriate taxing authorities." AC ¶ 510 (emphasis added). That assertion has no factual or legal basis. *See supra* at 8-15.

Second, NatPay cannot show that Pioneer had "actual knowledge" of, or substantially assisted, any alleged fraud. *Goel v. Ramachandran*, 111 A.D.3d 783, 792 (2d Dep't 2013). With respect to actual knowledge, constructive knowledge will not suffice. *E.g.*, *Lumen at White Plains, LLC v. Stern*, 135 A.D.3d 600, 600 (1st Dep't 2016). There is no evidence to support NatPay's wild theory that Pioneer had actual knowledge of any aspect of Mann's fraudulent scheme. *See supra* 21-26; *see, e.g.*, *Lerner*, 459 F.3d at 294 ("red flags," including "overdrawn" accounts and "dishonored" checks, do not show actual knowledge). Substantial assistance requires "more than just performing routine business services for the alleged fraudster." *CRT Invs., Ltd. v BDO Seidman, LLP*, 85 A.D.3d 470, 472 (1st Dep't 2011). Pioneer provided banking services to Mann—nothing more. Doing so, "*even where there is a suspicion of fraudulent activity,* does not amount to substantial assistance." *Agape,* 681 F. Supp. 2d at 365 (emphasis added); *see, e.g.*, *Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 25 (S.D.N.Y. 2009) (similar). To the extent that the claim is based on alleged inaction by Pioneer, it fails for lack of any fiduciary relationship between Pioneer and NatPay. *See, e.g.*, *SPV Osus Ltd.*

28

*v. UBS AG*, 882 F.3d 333, 346 (2d Cir. 2018).

## V.    NATPAY HAS NOT SUFFERED ANY COGNIZABLE DAMAGES.

Even if NatPay could overcome the above-described legal defects, it cannot show that it suffered any recoverable damages. "[A] defendant may prevail on a motion for summary judgment where the plaintiff fails to provide evidence of damages[.]" *Maier-Schule GMC, Inc. v. Gen. Motors Corp.*, 154 F.R.D. 47, 56 (W.D.N.Y. 1994). A plaintiff must offer more than "unsubstantiated and conclusory assertions" to show a genuine issue of fact as to damages. *New Paradigm Software Corp. v. New Era of Networks, Inc.*, 2002 WL 31749396, at *16-17 (S.D.N.Y. Dec. 9, 2002). Rather, a plaintiff must "establish the existence of damages with reasonable certainty" as to each claim. *Abraham v. Leigh*, 471 F. Supp. 3d 540, 563 (S.D.N.Y. 2020).

NatPay claims that it incurred "at least $3.8 million in damages," comprised of approximately $1.1 million paid to taxing authorities and approximately $2.7 million that NatPay was unable to debit from three Mann Entity Accounts corresponding to credits made to the MPHR Account in connection with admittedly "bogus" ePay transactions. AC ¶¶ 50, 352-65, 404; SMF ¶¶ 198, 205-06, 330-31. But NatPay admits that all of these transactions were conducted through its "settlement account at First Premier Bank," AC ¶¶ 87, 404, 426, and discovery has established that funds contained in that account do not belong to NatPay. SMF ¶¶ 31-34, 330. Consistent with that revelation, NatPay has admitted that it has not recognized any loss on its financial statements corresponding to the losses it claims here. SMF ¶ 333. NatPay has further admitted that it faces no threat of liability from any third party, including from employer-clients of the Mann Payroll Companies or any taxing authorities. SMF ¶¶ 327, 335. Put simply, NatPay has not suffered any cognizable loss in connection with this matter. Pioneer is entitled to summary judgment on all of NatPay's claims on this basis as well.

29

## **CONCLUSION**

In light of the foregoing, Pioneer is entitled to judgment as a matter of law on all of NatPay's claims under Fed. R. Civ. P. 56(a). At the threshold, NatPay's are barred in their entirety by NatPay's own wrongdoing under the doctrines of *in pari delicto* and unclean hands. Pioneer also is entitled to summary judgment on each of the claims asserted in the AC because the undisputed material facts show as a matter of law that NatPay cannot prove fundamental elements of those claims, and even if NatPay could, it cannot show that is suffered any cognizable harm.

Dated: June 3, 2024                              DLA PIPER LLP (US)
       New York, New York

                                        By: */s/ Robert J. Alessi*
                                            Robert J. Alessi (NDNY Bar Roll No. 101019)
                                            Steven M. Rosato (NDNY Bar Roll No. 703375)
                                            1251 Avenue of the Americas
                                            New York, New York 10020
                                            Tel.: (212) 335-4500
                                            Fax: (212) 335-4501
                                            robert.alessi@us.dlapiper.com
                                            steven.rosato@us.dlapiper.com

                                            Courtney G. Saleski (NDNY Bar Roll No. 703877)
                                            Evan E. North (NDNY Bar Roll No. 704414)
                                            1650 Market Street, Suite 5000
                                            Philadelphia, Pennsylvania 19103
                                            Tel.: (215) 656-3300
                                            Fax: (215) 656-3301
                                            courtney.saleski@us.dlapiper.com
                                            evan.north@us.dlapiper.com

                                            *Attorneys for Defendants*
                                            *Pioneer Bancorp, Inc. and Pioneer Bank*