**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOUTHWESTERN PAYROLL SERVICE, INC. and GRANITE SOLUTIONS GROUPE, INC., <br> *Plaintiffs,* <br>      *v.* <br><br> PIONEER BANCORP INC., et. al., <br>         *Defendants.* | Case No. 1:19-cv-1349 (FJS/CFH) |

NATIONAL PAYMENT CORPORATION,
        *Intervenor-Plaintiff,*
     *v.*

PIONEER BANCORP INC., et al.
        *Defendants.*

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON BEHALF OF SOUTHWESTERN PAYROLL SERVICE, INC. AND GRANITE SOLUTIONS GROUPE, INC.**

Andrew C. Jayne, OBA #19493
Tara D. Zickefoose, OBA #31757
BAUM GLASS JAYNE CARWILE & PETERS
401 S. Boston Ave., Suite 200
Tulsa, Oklahoma 74103
Telephone:  918/938.7944
Facsimile:  918/938.7966
Email: ajayne@bgjclaw.com
     tzickefoose@bgjclaw.com
     -and-
Walter D. Haskins, OBA #3964
Walter D. Haskins, P.C.
1611 S. Utica Ave.
Tulsa, OK 74104
Telephone: 918/231.6602
Email: wdhaskins@protonmail.com
     -and-
Michael A. Kornstein, Esq.
Bar Roll No. 103178
COOPER ERVING & SAVAGE LLP
LOCAL COUNSEL FOR PLAINTIFF
39 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone: (518) 449-3900
mkornstein@coopererving.com

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 2

ARGUMENT & AUTHORITIES ..................................................................................... 4

I.    STANDARD OF REVIEW ................................................................................. 4

II.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON PIONEER'S FOURTH   5
      AFFIRMATIVE DEFENSE OF SETOFF BECAUSE THERE WAS NO MUTUALITY

III.  PIONEER BANK, AS A MATTER OF LAW, HAD A DUTY TO INVESTIGATE THE SOURCE OF   8
      THE FUNDS PRIOR TO ITS SETOFF

IV.   SOUTHWESTERN PAYROLL IS ENTITLED TO SUMMARY JUDGMENT ON PIONEER'S   13
      SUBSTANTIVE RICO CLAIM

      A.    PIONEER CANNOT SHOW A PATTERN OF RACKETEERING ACTIVITY   13

            i.    The predicate acts of bank and wire fraud are unsatisfied because   14
                  Pioneer cannot establish that there was a knowing misrepresentation on
                  the Account Opening documents for Account 1996

            ii.   Southwestern Payroll did not knowingly control, manage, supervise, or   19
                  operate an illegal money transmitting business

            iii.  Southwestern Payroll did not knowingly engage in a transaction   21
                  involving criminally derived property sufficient to sustain the predicate
                  act of money laundering against it

            iv.   The only "pattern" of activity involved in any of the underlying   23
                  transactions is Southwestern Payroll's repeated and lawful collection
                  and remittance of payroll and payroll tax dollars

      B.    PIONEER SUFFERED NO INJURY ATTRIBUTABLE TO ANY RICO VIOLATIONS, BUT   24
            EVEN IF IT HAD, ITS INJURY IS TOO ATTENUATED BY SUBSTANTIAL
            INTERVENING FACTORS RELATED TO THE ACTS AND INACTIONS OF PIONEER
            AND OTHER THIRD PARTIES

V.    SOUTHWESTERN PAYROLL IS ENTITLED TO SUMMARY JUDGMENT ON PIONEER'S RICO   26
      CONSPIRACY CLAIM BECAUSE SOUTHWESTERN PAYROLL MANIFESTED NO CONSCIOUS
      AGREEMENT TO JOIN A RACKETEERING SCHEME

VI.   THE LACK OF A MISREPRESENTATION OR MATERIAL OMISSION OF ANY FALSE MATERIAL   27
      FACT, AND THE LACK OF ANY JUSTIFIABLE RELIANCE, ENTITLES SOUTHWESTERN
      PAYROLL TO SUMMARY JUDGMENT ON PIONEER'S FRAUD CLAIM

CONCLUSION ............................................................................................................ 29

i

## **TABLE OF AUTHORITIES**

**CASES**                                                                                                      **PAGE(S)**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .. 4, 5

*Bamberger Polymers Intern. Corp. v. Citibank, N.A.*, 124 Misc. 2d 653 (Sup. Ct. N.Y. Cnty. 1983) .. 8

*Beecher v. Vogt Manu. Co.*, 227 N.Y. 468 (1920) .. 6

*Bernstein v. Misk*, 948 F. Supp. 228 (E.D.N.Y. 1997) .. 21

*Bryant v. Maffucci*, 923 F.2d 979 (2d Cir. 1991) .. 5

*Burns v. Lopez*, 256 N.Y. 123, 128-129 (1931) .. 6

*Caldarola v. Calabrese*, 298 F.3d 156 (2d Cir. 2002) .. 5

*Casio Computer Co., Ltd. v. Sayo*, 2000 WL 1877516 (S.D.N.Y. Oct. 13, 2000). .. 21

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229 (2d Cir. 1999) .. 13

*Daly v. Atlantic Bank of New York*, 201 A.D.2d 128 (1st Dep't 1994) .. 8, 9, 10

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001). .. 13, 14

*Delco Elec. Corp. v. Wells Fargo Capital Fin., Inc.*, 265 F. Supp. 3d 213 (E.D.N.Y. 2017) .. 9

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) .. 23, 27

*Gerrity Co. v. Bonacquisti Constr. Corp.*, 136 A.D.2d 59, 525 N.Y.S.2d 926 (1988) .. 8

*Grace v. Corn Exch. Bank Trust Co.*, 287 N.Y. 94 (1941) .. 9

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989) .. 14

*In re Lehman Bros.*, 458 B.R. 134 (Bankr. S.D.N.Y. 2011) .. 6, 7

*Kelly v. United States*, 590 U.S. 391 (2020) .. 14

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229 (2d Cir. 1999) .. 24

*Marine Midland Bank-New York v. Graybar Elec. Co.*, 41 N.Y.2d 703 (1977) .. 5

*Matter of Sanger*, 46 Misc. 3d 830 (Surr. Ct. Nassau Cnty. Sep. 30, 2014) .. 6

*Meda AB v. 3M Co.*, 969 F. Supp. 2d 360 (S.D.N.Y. Sept. 3, 2013) .. 28

*MNC Com. Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615 (2d Cir. 1989) .. 6

*Modern Settings, Inc. v. Prudential-Bache Secs, Inc.*, 936 F.2d 640 (2d Cir. 1991) .. 5, 7

*Morris v. Windsor Trust Co.*, 213 N.Y. 27 (1914) .. 8

*Murphy v. Onondaga Cnty.*, No. 5:18-cv-1218 (GLS/CFH), 2022 U.S. Dist. LEXIS 48996 (N.D.N.Y. Mar. 18, 2022) .. 26

*Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192 (2d Cir. 2013) .. 14

*Packaging Indus. Group v. Dennison Mfg. Co.,* 192 B.R. 41 (N.D.N.Y. 1996) .. 6

*Palatkevich v. Choupak*, 2014 WL 1509236 (S.D.N.Y. Jan. 24, 2014) .. 21

*People v. City Bank of Rochester*, 96 N.Y. 32 (1884) .. 8

*Reich v. Lopez*, 858 F.3d 55 (2d Cir. 2017) .. 23

*Samsor v. Meisels*, 708 F. App'x 728 (2d Cir. 2017) .. 24

*Schreibman v. Chase Manhattan Bank*, 15 A.D.2d 769 (1st Dep't 1962) .. 9

*Straus v. Tradesmen's Nat'l Bank* 122 N.Y. 379 (1890) .. 5, 8

*UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010) .. 24

*United Nat'l Ins. Co. v. The Tunnel, Inc.*, 988 F.2d 351 (2d Cir. 1993) .. 4

*U.S. v. Bank of America*, 2009 WL 2009022 (W.D.N.Y. Feb. 20, 2009) .. 8

*U.S. v. Pierce*, 224 F.3d 158 (2d Cir. 2000) .. 14

*Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138 (2002) .. 6

**STATUTES**
18 U.S.C. § 1343        14
18 U.S.C. § 1343        14
18 U.S.C. § 1962        13
N.Y. U.C.C. § 4-212        7
31 U.S.C. § 5330        19
N.Y. U.C.C. § 4-401        8

**RULES**

FED. R. CIV. P. 56        4

Southwestern Payroll Service, Inc. ("Southwestern Payroll") and Granite Solutions Groupe, Inc. ("Granite"), through its undersigned counsel, respectfully submit this memorandum of law pursuant to Fed. R. Civ. P. 56.

## PRELIMINARY STATEMENT

Pioneer Bank and Pioneer Bancorp, Inc. (collectively "Pioneer") trumpets in the press and in legal filings that it is Mann's biggest victim. However, Pioneer lost its right to claim victim status when it decided to knowingly take third-party tax funds to reduce its losses from years of bad decision making, ineptitude, and collaboration with Mann to conduct illegal activity in his accounts at Pioneer.

Contemporaneously herewith, Plaintiffs have filed a Statement of Undisputed Material Facts ("SUMF") which set out the staggering documentary evidence establishing that Pioneer knew, from 2013 on, that Mann owned payroll companies that were depositing third-party payroll tax funds in accounts at Pioneer, and Pioneer was specifically told, before it exercised its setoff, that the precise funds at issue in this case were third-party payroll tax funds. From the fact the accounts at issue were opened in the names of companies with "payroll" in the title, to the account opening documents and bank statements which identify the account where the funds were initially held as a "Client Account," to the overwhelming number of emails discussing the payroll tax funds, to the numerous occasions when Pioneer actually wired same day payroll and payroll taxes at Mann's request, to the bank statements where tens of thousands of transactions reference "payroll" and "tax," to the testimony of Mann and others where they specifically told Pioneer officers and employees there were payroll tax funds in the accounts at Pioneer, to the fact there were emails and meetings at Pioneer where Pioneer officers discussed the payroll tax funds and the possibility of Mann partnering with Pioneer to create "Pioneer Payroll," to the fact an officer at Pioneer went to

MyPayrollHR to observe the payroll company and discussed the benefits to Pioneer of Mann housing payroll tax dollars at the Bank, the sheer volume of evidence that Pioneer obviously knew the funds it claims to have setoff on September 4, 2019, were payroll tax funds is overwhelming.

However, Plaintiffs are not asking for summary judgment on whether Pioneer knew the funds it took were payroll tax funds. Plaintiffs are simply asking for summary judgment on Pioneer's Affirmative Defense of Setoff, and a finding that as a matter of law Pioneer had sufficient information concerning the fact the funds at issue might not belong to Mann that it had a duty to investigate the source of the funds prior to the setoff. Under New York law and Plaintiffs' Statement of Undisputed Material Facts, Plaintiffs are entitled to summary adjudication on these issues.

Further, as set forth below, Plaintiff Southwestern Payroll is entitled to summary adjudication on Pioneer's RICO and fraud claims.

## BACKGROUND

Pioneer began its banking relationship with Michael Mann in 2009, when Mann, on behalf of Defendant Valuewise Corporation ("Valuewise"), opened demand deposit accounts at Pioneer, and Pioneer likewise extended a two million dollar working capital line of credit secured by Valuewise's receivables. Over the next four years alone, Valuewise opened additional accounts at Pioneer, and Pioneer increased Mann's line of credit to six million dollars.

By November of 2013, Valuewise acquired its first payroll service bureau, MyPayrollHR, LLC ("MyPayrollHR"), and opened two new accounts at Pioneer in its name, including an account ending in 0212 ("Account 0212"). The account opening documents clearly described the business as a payroll service bureau, and documents and testimony cited in Plaintiffs' SUMF show Pioneer was well aware that MyPayrollHR was processing payroll and payroll taxes for its employer clients, and that the funds deposited in Account 0212 were collected for that purpose.

2

In 2016, Mann formed Cloud Payroll, LLC ("Cloud Payroll"), which was 100% wholly owned by Valuewise. Contemporaneously therewith, Cloud Payroll acquired a 51% interest in ProData Payroll Services, Inc. ("ProData"), another payroll service bureau that processed payroll and payroll taxes for its employer-clients. By this time, Valuewise's line of credit with Pioneer was up to fifteen million dollars.

In April of 2017, Cloud Payroll purchased a 51% interest in Southwestern Payroll, a payroll service bureau formed in Tulsa, Oklahoma, in 1986. Shortly thereafter, Southwestern Payroll's employer-client payroll tax dollars were deposited to Account 0212, where they were intended to be held until they were due to the relevant taxing authorities. By February of 2019, Cloud Payroll opened an account at Pioneer ending in 2440 ("Account 2440") for the purpose of segregating payroll and payroll tax funds of the three payroll companies.  From then on, Southwestern Payroll's employer-clients' payroll tax funds were deposited to this account, rather than Account 0212.

By August of 2019, Pioneer had extended Valuewise's working line of credit to $42 million, and Mann was one of, if not Pioneer's largest, loan customer.  Mann had thirty-four accounts at Pioneer, through his various entities, representing the highest volume of deposit activity of any Pioneer customer, and Pioneer executives and customer service representatives catered to Mann's whims on a near-daily basis, including extending him Remote Deposit Capture privileges, linking his accounts held in various entity names for easy intra-bank transfers, and frequently paying and waiving fees for overdrafts in the non-payroll related accounts. Because the payroll tax funds would sit in the account at Pioneer for a period of time before they were due to the taxing authorities, Mann would use the payroll tax funds to cover overdrafts in other accounts and then move the money back into the payroll tax accounts so the payroll taxes could be timely paid to the taxing authorities. This went on for years, in accounts over which Pioneer had full visibility and access. Mann was kiting,

3

faking accounts receivable in non-payroll companies, and using the payroll tax funds to cover massive overdrafts in his other accounts. While Mann kept this hidden from the officers and personnel that worked at the legitimate payroll companies, it was in plain view in his accounts at Pioneer and Pioneer knew and facilitated Mann's use of the payroll tax funds to cover overdrafts in other accounts.

However, the illegal scheme came crashing down in late August and early September of 2019, when Pioneer decided to seize nearly $10M of Southwestern Payroll's employer-client payroll tax funds, and nearly $500,000 of Plaintiff Granite's[1] payroll tax funds, and then refused to release the funds or otherwise assure their proper remittance to the taxing authorities to which they were destined, maliciously claiming a right to setoff the funds.

## ARGUMENT AND AUTHORITIES

### I.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). It is a "tool to winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict."  *United Nat'l Ins. Co. v. The Tunnel, Inc*., 988 F.2d 351, 355 (2d Cir. 1993). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphasis in original).

---

[1] MyPayrollHR was Granite's payroll company at the time of these events.  Because MyPayrollHR went out of business within a week of Pioneer seizing both payroll and payroll tax funds of its employer clients, Granite does not have a payroll company to bring this case on its behalf and instead has had to bring this action itself.

The party who opposes summary judgment "must do more than simply show that there is some metaphysical doubt to the material facts." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002). Defeating summary judgment does not occur on the "basis of conjecture or surmise," through conclusory assertions, nor where there is merely a "scintilla of evidence" to support the non-moving party's claim. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *Anderson*, 477 U.S. at 241.

II.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON PIONEER'S FOURTH AFFIRMATIVE DEFENSE OF SETOFF BECAUSE THERE WAS NO MUTUALITY

Pioneer's Fourth Affirmative Defense is based on allegations that Pioneer's seizure of funds from Accounts 0212 and 2440 in the name of MyPayrollHR and Cloud Payroll was within its rights under 'well-established setoff law.'"[2] Pioneer has insisted, both in this proceeding and in other contexts, that it was entitled to setoff the funds in any of Mann's accounts.  However, Pioneer had no such right, under "well-established setoff law" or otherwise.  Accordingly, Pioneer's Fourth Affirmative Defense should be dismissed.

As a general rule, a deposit made in a bank by a person in a general account becomes the funds of the bank, and the relation between the depositor and the bank is that of debtor and creditor. *Straus v. Tradesmen's Nat'l Bank* 122 N.Y. 379,382 (1890); 9 N.Y. Jur. 2d Banks § 299.  A bank generally has a right to set off the accounts of a borrower against the matured indebtedness of that borrower.  *Marine Midland Bank-New York v. Graybar Elec. Co*., 41 N.Y.2d 703, 708 (1977).  Thus, for example, if a depositor defaults on a loan made by the bank, the bank may apply an amount from the depositor's general account sufficient to satisfy the loan.

However, a bank's right to set off against a debtor's account is permissible only where, among other things, the debts sought to be setoff are mutual. *See Modern Settings, Inc. v. Prudential-*

---

[2] While New York has codified the right of set off in New York Debtor and Creditor Law ("DCL") § 151,

5

*Bache Secs, Inc.*, 936 F.2d 640, 648 (2d Cir. 1991) (observing that "[t]he equitable remedy of set-off is unavailable where the claims do not involve mutual debts and credit"). Mutuality means that the debts are "due to and from the same persons in the same capacity." *Id.* (quoting *Beecher v. Vogt Manu. Co.*, 227 N.Y. 468, 473 (1920); *see also Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138 (2002); *Burns v. Lopez*, 256 N.Y. 123, 128-129 (1931) (holding "the debts which are to be set off against each other shall be due from and to the parties in the same right"). Mutuality is an essential, definitional element of the right to setoff that must be strictly observed. *In re Lehman Bros.*, 458 B.R. 134, 144 (Bankr. S.D.N.Y. 2011); *Packaging Indus. Group v. Dennison Mfg. Co. (In re Sentinel Prods. Corp.)*, 192 B.R. 41, 46 (N.D.N.Y. 1996).

Here, none of the checks that Mann deposited into Bank of America ("BOA") on August 28, 2019, were written on Account 0212 or Account 2440. (SUMF 138). Further, when BOA called back the checks Mann wrote on accounts at BOA on August 30, 2019, that action did not result in a negative balance in either Account 0212 nor Account 2440. (SUMF 140-151). It is undisputed that at the time Pioneer started its setoff, Account 0212 and Account 2440 did not have a negative balance. (SUMF 140-151). The fact that the MyPayrollHR (Account 0212) and Cloud Payroll (Account 2440) were affiliated with Mann or with his other entities does not give Pioneer the right to setoff those funds because of a negative balance in other accounts in the name of different entities or people. *See, e.g., MNC Com. Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 618 (2d Cir. 1989) (holding that where mutuality is required, "a subsidiary's debt may not be set off against the credit"); *In re Sentinel Prod. Corp.*, 192 B.R. 41, 47 (N.D.N.Y. 1996) (holding that it was "a matter of well settled law" in New York "that debts involving parent and subsidiary business entities are not mutual for Section 553 setoff purposes"); *Matter of Sanger*, 46 Misc. 3d 830, (Surr. Ct. Nassau Cnty.

---

Pioneer does not allege and cannot show the applicability of this provision here.

Sep. 30, 2014) (holding bank had no right to setoff funds in the account of a customer that was not a debtor to the bank); *see also Modern Settings, Inc.*, 936 F.2d at 648 (disallowing setoff where there was a lack of mutuality between debts and credits). *In re Lehman Bros.*, 458 B.R. 134, 144 (Bankr. S.D.N.Y. 2011) ("[T]o disregard this most basic of corporate formalities and treat subsidiaries as if they have the same standing as their parent for purposes of setoff rights is to ignore the separate nature of these entities to the obvious detriment of other creditors. For that reason, mutuality is an essential, definitional element of the right to setoff that must be strictly observed.").

Pioneer's "Terms and Conditions" applicable to its accounts, assuming they were provided to Mann,[3] provide Pioneer with no greater rights than under New York law.  Specifically, Pioneer's Terms and Conditions give Pioneer the right to setoff only "when permitted by law" and any "right of setoff does not apply to this account if prohibited by law."  (Jayne Decl. Ex. TTTTTT at § 15). Pioneer's contractual setoff is also applicable only where there is "due any payable debt" that is owed by the account holder.  *Id.*  Thus, Pioneer's Terms and Conditions fail to provide it with a setoff right against either MyPayrollHR or Cloud Payroll, as neither of those entities owed Pioneer any debt as a result of the overdrafts.

Further, while the Terms and Conditions make the account holder liable "for any account shortage resulting from charges or overdrafts," *id.* § 3, there is nothing in the Terms and Conditions makes an account holder liable for shortages in other accounts or permits Pioneer to deduct funds from an account to cover overdrafts in other accounts.  The New York Uniform Commercial Code limits a bank's right of charge-back or refund to the overdrawn customer.  *See* N.Y. U.C.C. § 4-212

---

[3]  The evidence shows that Pioneer opened Mann's accounts via email, and there is no evidence in Pioneer's records suggesting that Pioneer actually sent to Mann any "Terms and Conditions" that governed the any accounts that he opened.  For purposes of this motion, Movants assume the Terms and Conditions identified by Pioneer govern the accounts.

("If a collecting bank has made provisional settlement with its customer for an item and itself fails by reason of dishonor . . . the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account or obtain refund from its customer); N.Y. U.C.C. § 4-401 (permitting a bank to charge against its customer's account "any item that is otherwise properly payable from that account").

Pioneer setoff funds held by entities that owed no debt. Because mutuality was lacking, Pioneer had no right to engage in setoff or overdraft recovery with respect to the funds in any accounts held by MyPayrollHR and Cloud Payroll. Pioneer's setoff defense fails as a matter of law and should be dismissed.

III.    PIONEER BANK, AS A MATTER OF LAW, HAD A DUTY TO INVESTIGATE THE SOURCE OF THE
FUNDS PRIOR TO ITS SETOFF

When a bank "is on notice that funds in a depositor's account are owned by a third party, the bank cannot appropriate those funds in order to set them off against a debt of the depositor." *Daly v. Atlantic Bank of New York*, 201 A.D.2d 128, 129 (1st Dep't 1994); *accord U.S. v. Bank of America*, 2009 WL 2009022, at *6 (W.D.N.Y. Feb. 20, 2009); *Bamberger Polymers Intern. Corp. v. Citibank, N.A.*, 124 Misc. 2d 653, 657 (Sup. Ct. N.Y. Cnty. 1983); *Straus v. Tradesmen's Nat'l Bank* 122 N.Y. 379, 382 (1890) (bank had no right to set off funds of depositor where bank was on notice that the funds were third-party funds deposited for a special purpose); *Morris v. Windsor Trust Co.*, 213 N.Y. 27, 31-32 (1914) (bank could not set off funds forwarded to it for a special purpose); *People v. City Bank of Rochester*, 96 N.Y. 32, 37 (1884) (bank had no right to set off against funds where funds were delivered to it for a special purpose); *Gerrity Co. v. Bonacquisti Constr. Corp.*, 136 A.D.2d 59 at 65 ("If a bank knows that the account was substantially composed of trust funds and the setoff would substantially deplete the account, the bank can no longer disavow bad faith due

8

to a lack of knowledge of outstanding trust claims of statutory beneficiaries at the time of the setoff.")

"A bank will be considered to have such notice when it is aware of facts which would fairly provoke it to inquire as to the true ownership of the funds and such inquiry, if made with ordinary diligence, would reveal the true ownership."  *Daly,* 201 A.D.2d at 129*; see also Schreibman v. Chase Manhattan Bank*, 15 A.D.2d 769, 770 (1st Dep't 1962) ("knowledge upon the part of a bank that deposits made by a debtor of the bank in his own name belonging to a third person absolutely precludes the bank from applying such funds to the individual indebtedness of the depositor to it.") (internal quotation marks and citations omitted.); *c.f. Grace v. Corn Exch. Bank Trust Co*., 287 N.Y. 94, 106 (1941) ("If the bank chooses to ignore completely the facts which indicate that the debtor is using moneys which may not belong to him, and accepts payment careless whether or not the moneys paid belong to him, it becomes morally and legally a participant in the debtor's wrong."); *Delco Elec. Corp. v. Wells Fargo Capital Fin., Inc.*, 265 F. Supp. 3d 213, 221-222 (E.D.N.Y. 2017) (bank may be liable for diversion if "it knew or should have known of the trust nature of the funds it received—that is, if the circumstances are such that it should have inquired into the origin of the funds and thereby discovered the trust nature of those funds").  "Neither a large bank nor a small bank may urge that it is ignorant of facts clearly disclosed in the transactions of its customers, . . . nor may a bank close its eyes to the clear implications of such facts."  *Grace*, 287 N.Y. at 107.

In *Daly v. Atlantic Bank of New York*, several accounts were opened at a bank by Queensboro Management, Inc. ("QMI"), a real estate cooperative corporation management company, including an account labeled "Realty Two."  201 A.D.2d at 130.  QMI and the bank also entered into a $250,000 loan agreement.  *Id.*  Subsequently, two of QMI's accounts were overdrawn at a time when media reports were circulating that QMI was being criminally investigated for misappropriation of

funds from the cooperative boards in which it managed.  *Id.*  The bank also learned that QMI ceased

doing business and was receiving calls from QMI's clients notifying the bank that the funds held in

the accounts belonged to the clients and requesting that the bank freeze QMI's accounts.  *Id.*  Despite

this information, the bank declared QMI in default of the $250,000 loan and set off the default using

among other things, the funds deposited in the "Realty Two" account. *Id.*

      The Court found the bank was aware that QMI: (1) was in the business of managing a

number of cooperative apartment buildings; (2) was constantly in possession of large sums of money

which it held as agent; (3) was being investigated on charges of mismanagement and criminal

wrongdoing and; (4) had failed to make tax payments on behalf of its clients and was approaching

insolvency. *Id.* at 131.  In addition, the bank had "received information from QMI's employees that

the Realty Two account was a fiduciary account and was on notice that checks deposited to the

account bore the notation that they represented "maintenance" or "rent." *Id.*  Finally, the bank knew

QMI had refused to transfer funds from the Realty Two account to cover overdrafts in other

accounts.  *Id.*

      The Court concluded the bank had more than sufficient knowledge obligating it to inquire as

to the true ownership of the funds in the Realty Two account, and it "was not entitled to simply

appropriate the funds and turn a blind eye to the numerous indicators that the funds in the account

were being held by QMI for the corporations it represented." *Id.*  The Court rejected as specious the

bank's argument that it had to act swiftly without inquiry as to the source of the funds because "it

could simply have frozen the account so that it could make the necessary inquiry at its leisure." *Id.*

      Here, the facts establish that Pioneer had, if not actual knowledge of the source of the funds

in Accounts 0212 and 2440, more than sufficient knowledge obligating it to inquire as to the true

ownership of the funds in those accounts.[4] Well before the events that occurred at Pioneer between

August 30, 2019 and September 5, 2019, the evidence set forth in Plaintiffs' SUMF Nos. 20 through

114 established the following: (1) Pioneer knew Mann owned multiple payroll businesses that

engaged in "payroll processing, time and labor management, payroll tax processing, comprehensive

resource information system and 'pay as you go' workers compensation"; (2) Account 0212 and

Account 2440 were opened by companies with payroll in the name; (3) Mann disclosed on the

account opening documents that both MyPayrollHR and Cloud Payroll were payroll service bureaus;

(4) The account opening documents for Account 0212 and the bank statements indicate it is a "Client

Account"; (5) over a course of years there were tens of thousands of transactions that are described

as "payroll" or "tax"; (6) by 2017 and 2018 more than a billion dollars a year was flowing through

Account 0212[5]; (7) Mann routinely emailed Pioneer officers and staff needing help with payroll and

payroll tax issues and Pioneer staff responded and even referenced the payroll tax funds; (8) Mann

routinely asked Pioneer to wire same day payroll and payroll tax to taxing authorities, and Pioneer

complied; (9) Pioneer actively assisted Mann in moving the payroll tax funds from another company

into Account 0212 when he opened the account; (10) Mann had a meeting with the CEO of Pioneer

to talk about starting Pioneer Payroll; (11) Pioneer executives had a meeting with Mann and others

where the payroll tax held at Pioneer was discussed; (12) David Blessing, a VP at Pioneer, visited

---

[4] Pioneer's witnesses testified that they made the decision to perform a "setoff" on September 4, 2019.  There
is no documentary evidence corroborating this testimony, and pertinent documents show that Pioneer did not
make its "setoff" decision until many weeks later.  Solely for purposes of this motion, Southwestern Payroll
assumes the setoff occurred when funds were moved to Pioneer's GL account at about 6:30 pm on September
4, 2019.

[5] With respect to the volume of activity in Accounts 0212 and 2440 and the fact that nearly all of the
transactions in those accounts reference "payroll" and/or "tax", Plaintiffs have only attached some examples
of the account statements in their Statement of Materials Undisputed Facts because of their size.  By 2017, the
statements for Account 0212 are hundreds of pages long per month.  If Pioneer contests the volume of funds
going through the accounts or the fact that "payroll" and "tax" are all over those account statements each
month, Plaintiffs would be happy to provide the Court with the incredibly voluminous account statements.

MyPayrollHR, toured its operations, and discussed the benefits to Pioneer in housing large deposits of payroll tax; (13) Pioneer's BSA/AML Department was charged with looking into Account 0212 and Account 2440 for suspicious activity in response to BAM alerts and had to see what was going on the accounts if they were doing their job; (14) The entire time Mann was housing payroll and payroll tax funds at Pioneer and using those accounts to pay taxing authorities, another local payroll company unrelated to Mann, Optimal Payroll Solutions, was housing its employer-clients' payroll and payroll taxes in accounts at Pioneer, and (15) Mann has testified he told Pioneer the funds were payroll and payroll tax funds.

Pioneer claims it began its setoff at 6:30 p.m. on September 4, 2019. (SUMF 256-271). Between August 30, 2019 and when Pioneer claims it initiated the setoff, Plaintiffs' SUMF Nos. 137 to 151 and 175-290, establish the following: (1) in just two days, Accounts 0212 and 2440 received hundreds of ACH credits totaling more than $10 million with "payroll" and "tax" in the description of the credit; (2) Pioneer received an email from Mann referencing millions of dollars in a "tax account"; (3) Matt Schilling of Cloud Payroll informed Frank Sarratori and another Pioneer officer there were payroll funds in the frozen accounts that needed to be released; (4) John Reinke, CEO of Cloud Payroll, informed Sarratori and Tom Amell, CEO of Pioneer, there were payroll and payroll tax funds in the frozen accounts that needed to be released; (5) Aberash Asfaw, CEO of Cachet, informed Sarratori and Amell there were payroll and payroll tax funds in the frozen accounts that needed to be released; and (6) Mann informed Robert Alessi, Pioneer's counsel, that the payroll companies engaged in payroll processing and client payroll tax funds were frozen in the accounts and should be released in order to maintain the value of the payroll companies.

Clearly, Pioneer was on notice that the millions of funds deposited in Accounts 0212 and 2440 were being held for the benefit of their clients for the purpose of making payroll and payroll

tax payments. The facts of this case are even stronger in favor of Pioneer having a duty to investigate the source of the funds prior to setoff than in the *Daly* case, addressed above. With a modicum of inquiry, Pioneer would have quickly understood that the funds deposited to Accounts 0212 and 2440 on and after August 30, 2019 did not belong to Mann, Cloud Payroll or MyPayrollHR, but to third parties that had entrusted the funds to the payroll companies for payment to taxing authorities. Because the evidence is so overwhelming, Plaintiffs are entitled to a finding as a matter of law that Pioneer had a duty to investigate the source of the funds in Accounts 0212 and 2440 before conducting its setoff.

IV.    SOUTHWESTERN PAYROLL IS ENTITLED TO SUMMARY JUDGMENT ON PIONEER'S SUBSTANTIVE RICO CLAIM

To sustain its civil RICO claim, Pioneer must show "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to [Pioneer's] business or property; and (3) that the injury was caused by the violation of Section 1962." *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001). "To establish a violation of [section 1962(c)] then, [Pioneer] must show '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity,'" *Id.* at 306. These requirements must be established with respect to each defendant, as the "focus" of § 1962(c) liability must be on the "individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise...." *Id.* (citations omitted).

A.    PIONEER CANNOT SHOW A PATTERN OF RACKETING ACTIVITY

Section 1962(c)'s third prong – demonstration of a pattern of racketeering activity – requires that there be at least two predicate acts of racketeering occurring within a ten-year period of time, that the predicate acts be related to each other (the "relatedness requirement"), and they must either amount to, or pose, a threat of continued criminal activity (the "continuity requirement"). *Cofacredit,*

*S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). The pattern must be adequately established with respect to each defendant. *DeFalco*, 244 F.3d at 306.

> i.    *The Predicate Acts of Bank and Wire Fraud are Unsatisfied Because Pioneer Cannot Establish that There was a Knowing Misrepresentation on the Account Opening Documents for Account 1996*

18 U.S.C. § 1344 (Bank Fraud) provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice--
> **(1)** to defraud a financial institution; or
> **(2)** to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

*Id.* Further, 18 U.S.C. § 1343 (Wire Fraud) provides, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

*Id.* A "scheme to defraud" is "acts of artifice or deceit which are intended to deprive an owner of his property or money." *U.S. v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000). In the absence of a property right for the scheme to interfere with, there is no scheme to defraud. *Id.* Put another way, the object of the fraud must be property in the victim's hands. *Kelly v. United States*, 590 U.S. 391, 398 (2020). With respect to wire fraud, communications will not support a RICO claim if they reveal sufficient facts to allow the scheme to be detected. *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 204-05 (2d Cir. 2013).

To support its accusation that Southwestern Payroll committed the predicate act of bank fraud, Pioneer alleges the occurrence of one solitary event: that on October 23, 2017, Michael Mann, acting on behalf of Southwestern Payroll, opened Pioneer Bank Account No. 178001996 ("Account 1996") in the name of Southwestern Payroll Services, Inc., and when he did so, he checked "No" to the questions in Section 5 (inquiring if Southwestern Payroll was a TPPP under its defined language therein) and Section 9 (inquiring if Southwestern Payroll was a MT) of Pioneer's Customer Due Diligence ("CDD") Information Sheet.

To support the wire fraud count, Pioneer alleges that Michael Mann then, through the e-mail address "michael_mann@Valuewisecorp.com" emailed the account documents to Trudy Seeber, Pioneer's business development officer, at "seebert@pioneerbanking.com" and to Deborah Salsburg, Pioneer's sales leader and assistant branch manager, at "salsburgd@pioneerbanking.com". Pioneer alleges that, because Southwestern Payroll was a TPPP and a MT, these statements sent through wire communications to a financial institution were "knowingly false," and were made in order to have accounts where Southwestern Payroll could "transmit large amounts of money collected from their third-party employer-clients..."

There are four problems with Pioneer's assertions: (1) Mann did not complete the CDD Information Sheet – Pioneer Bank employee Deborah Salsburg did – and therefore no party purportedly acting on behalf of Southwestern Payroll made any representation at all (SUMF 115-119); (2) Southwestern Payroll is not a TPPP, nor is it a MT, and therefore the representations were not misrepresentations (SUMF 120-125); (3) even if Southwestern Payroll was a TPPP or MT, Pioneer has no evidence that when the representations were made, they were done so by Southwestern Payroll knowingly with an intent to deceive (SUMF 120-135); and (4) even if the

requisite intent could be demonstrated, the alleged "victim" of the fraud – Pioneer Bank – was not defrauded of any property in its hands.

The undisputed evidence is that, time and time again, when Michael Mann would open a new account at Pioneer Bank, his branch contacts would fill out the account opening documents for him with these boxes already checked "No." In the case of account opening forms for Cloud Payroll and/or the other payroll companies, Pioneer Bank representatives would describe the business as a "payroll services bureau" or other similar description, would place a star where they were instructing Mann to sign (e.g. "I marked everywhere that Mike needs to sign"), and would tell Mann "You know the drill," i.e. please sign the forms and return them back via e-mail. (SUMF 20-24, 49-50, 115-119). The undisputed evidence in this respect is that Pioneer representatives checked "No" on these boxes, not Mann. Consequently, there is no "act or artifice of deceit" committed by Southwestern Payroll. (SUMF 115-119).

There is no misrepresentation in checking these boxes "No" because Southwestern Payroll is not a TPPP nor a MT, as those terms are defined in the CDD form. (SUMF 120-135). With respect to the TPPP inquiry, a multi-jurisdictional search of the term "third party payment processor" reveals little about what that term means. The FDIC, in many of its supervisory insight bulletins, describes a TPPP as a deposit customer's use of its deposit account to process payments for its **merchant clients** (e.g. "payment aggregators" or credit card processing companies such as PayPal, Square, etc.). The payment processor receives lists of payments generated by the **merchant clients** for the payment of **goods or services** and initiates the payments by creating and depositing them into a transaction account at the bank.[6] A TPPP is thus a merchant services provider that facilitates the merchant

---

[6] *See*, e.g., *Supervisory* Insights, FED. DEPOSIT INS. CORP.,
http://www.fdic.gov/regulations/examinations/supervisory/insights/sisum11/si_sum11.pdf (last visited

client's receipt of payment for its own goods and services without the merchant client having to establish its own merchant account with a bank.[7]  Pioneer's CDD form sets forth merely that TPPPs are businesses that provide "payment processing services to **merchants** and other business entities. Third party payment processors typically settle debit and credit card transactions on behalf of their **merchant clients**." Southwestern Payroll's employer-clients are not merchants; Southwestern Payroll was not processing payments that **customers** of the employer-clients were making to the employer-clients for their businesses' goods or services (Alred Decl. ¶¶ 4-8). Further, Michael Mann did not believe that Southwestern Payroll was a TPPP, as that term is defined on Pioneer Bank's CDD form, because at all times it used a third-party ACH processor, including NatPay, as the vendor that would initiate the instructions to move the money. (SUMF 120).

With respect to the MT inquiry, Pioneer Bank's own expert testified, consistent with Mann, that it was NatPay, rather than Southwestern Payroll, that was actually processing and transmitting the third-party employer funds. (SUMF 126). This same Pioneer expert, Daniel Wood, testified that although FinCEN requires that money transmitters register with them, he had no information that FinCEN has ever advised Southwestern Payroll it was required to register as a MT or that FinCen had ever conducted any investigation of Southwestern Payroll for failure to register as a MT. (SUMF 127). Mr. Wood further testified he was aware of no information that any state regulatory agency had required Southwestern Payroll to obtain a license to operate as a MT. (SUMF 129). Mr. Wood found no opinions or orders from the state agency in Oklahoma, where Southwestern Payroll is domesticated, indicating that payroll companies are MTs. (SUMF 129).

---

May 24, 2024.

[7] *Payment Processing: What Is a Third-Party Payment Processor?* STAX.COM, https://staxpayments.com/blog/what-is-a-third-party-payment-processor/#Definition_of_Third-Party_Payment_Processing (last visited May 24, 2024).

In fact, Mr. Wood positively testified that, in at least four states, there exist exemptions to MT licensure requirements which explicitly state and affirm that payroll companies are not required to obtain MT licenses in order to conduct their business. (SUMF 130). Mr. Wood testified that he was aware of only three states -- New Hampshire, Connecticut, and Texas -- that, as of September, 2019, had regulatory guidance as to whether or not payroll companies are MTs, and he had no information or evidence that any of the regulators in these states had ever communicated with Mann or Southwestern Payroll. (SUMF 129). More broadly, Mr. Wood had no knowledge or information that anyone at Southwestern Payroll or Cloud Payroll knew that any state might consider them MTs. (SUMF 131). In fact, Southwestern Payroll's own auditing "specifically states that [Southwestern Payroll is] a third-party sender in [its] role in the process, not a money transmitter." (SUMF 123).

By the time he was deposed in April, 2024, Mr. Wood confirmed that it was not until years after the events giving rise to this suit that "up to 14 or 15 states so far" have now begun to adopt the Money Transmission Modernization Act" which categorizes payroll processors as MTs. (SUMF 132). Finally, and critically, Mr. Wood testified that NYDFS, the department that regulates MTs for the state of New York, does not require payroll companies to be licensed as MTs. (SUMF 128).

Thus, the undisputed facts, including the testimony of Pioneer's own expert, establish that Southwestern Payroll did not falsely disclose that it was not a TPPP or MT.  In similar vein, because Mr. Wood testified that he, as the expert on the TPPP/MT topic for Pioneer Bank, had no information that anyone at Cloud Payroll or Southwestern Payroll knew that regulators might consider them MTs, Pioneer cannot satisfy its evidentiary burden to prove that Southwestern Payroll "knowingly" made any misstatements of material fact on the CDD form. The undisputed evidence obtained from Michael Mann himself is that he did not believe the payroll companies were TPPPs or MTs. (SUMF 120-121). Darin Alred, the President of Southwestern Payroll, likewise has stated

18

under oath that he does not believe Southwestern Payroll is a TPPP or MT, as it is defined on Pioneer's CDD form. (SUMF 122-125).

Even if Pioneer Bank had sufficient evidence to prove that Southwestern Payroll was a TPPP or MT, and that it knowingly disclosed otherwise, Pioneer Bank cannot show that such a false disclosure constituted a "scheme to defraud," because the scheme must involve acts of deceit which are intended to deprive the alleged victim thereof of a property interest. The object of any alleged fraud here was the creation of a bank account, where the property of **other third parties** would be deposited. Because there was no property right for the alleged fraud scheme to interfere with, and no deprivation of a property right owned by Pioneer as the claimed victim, there was no commission of any bank or wire fraud through the creation or opening of Account No. 1996.

ii.   SOUTHWESTERN PAYROLL DID NOT KNOWINGLY CONTROL, MANAGE, SUPERVISE, OR OPERATE AN ILLEGAL MONEY TRANSMITTING BUSINESS

Pioneer alleges that Southwestern Payroll knowingly operated as an illegal money transmitting business from 2017 to 2019 by conducting its payroll processing services, and that it operated illegally in doing so to prevent Pioneer from learning the source of the deposited funds. To have committed the predicate act of operating an illegal money transmitting business in violation of 18 U.S.C. § 1960, one must have (1) knowingly (2) conducted, controlled, managed, supervised, directed, or owned (3) all or part of an unlicensed money transmitting business. *Id.*

31 U.S.C. § 5330 defines a "money transmitting business" as a business that

(A) provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system; (B) is

19

required to file reports under section 5313; and (C) is not a depository institution (as defined in section 5313(g)).

*Id.*

As set forth in the previous section, Southwestern Payroll was not a MT, and therefore was not operating an illegal MT business. It provided no check cashing, currency exchange, or money transmitting or remittance services to its employer-clients. It redeemed no money orders, travelers' checks, or other similar instruments. (Alred Decl. at ¶ 8). Further, even **if** it were to be determined that Southwestern Payroll was required, from 2017 to 2019, to have registered as a MT, Pioneer has absolutely no evidence that would support that it **knowingly** operated its affairs in an illegal manner. To the contrary, Southwestern Payroll has been an established payroll processing company since its inception decades before Mann opened an account in its name at Pioneer in 2017, (Alred Decl. at ¶ 4), and has never believed or held an understanding that it was a "money transmitting business." (Alred Decl. at ¶¶ 5-8). Finally, even if Pioneer could establish that Southwestern Payroll was operating an illegal money transmitting business and did so knowingly, there is no dispute that it did not achieve the alleged illicit purpose of preventing Pioneer from learning the source of the funds in the payroll company accounts. As set forth at SUMF 20-114, Mann was not at all discrete about the fact he was housing payroll tax funds in accounts at Pioneer. The evidence is clear that Pioneer knew or should have known that Southwestern Payroll was a payroll company dealing in the collection and remittance of payroll and payroll taxes. Without any evidence that Southwestern Payroll intended to engage in the conduct prohibited by this predicate act, with actual knowledge of the conduct's illegality, Pioneer's RICO claim must fail.

iii.   SOUTHWESTERN PAYROLL DID NOT KNOWINGLY ENGAGE IN A TRANSACTION INVOLVING CRIMINALLY DERIVED PROPERTY SUFFICIENT TO SUSTAIN THE PREDICATE ACT OF MONEY LAUNDERING

Pioneer alleges that Southwestern Payroll facilitated transactions knowing the funds involved would later become misappropriated, or that Valuewise loan funds would be used to cover deficient tax trust funds. (Dkt. No. 270 at p. 32-33). Pioneer further alleges that Southwestern Payroll (i.e. Mann) knew that Darin Alred, its then minority-owner, was paid for Cloud Payroll's purchase of its majority interest in Southwestern Payroll with funds that were "illicit proceeds" derived from Pioneer Bank and Mann/Valuewise's own lending relationship. (*Id.* at p. 33-34).

In order to establish a money laundering claim **against Southwestern Payroll** pursuant to 18 U.S.C. § 1956, Pioneer Bank must prove that: (1) Southwestern Payroll conducted a financial transaction in interstate commerce; (2) Southwestern Payroll knew that the property involved in the transaction represented some form of specific unlawful conduct; (3) the transaction involved the proceeds of unlawful activity; and (4) the transaction was conducted with the purpose of concealing the nature, location, source, ownership, or the control of the illegally acquired proceeds." *Casio Computer Co., Ltd. v. Sayo*, 2000 WL 1877516, at *16 (S.D.N.Y. Oct. 13, 2000). To violate § 1957, Southwestern Payroll must have "(1) knowingly engaged or attempted to engage in a monetary transaction involving *criminally derived property*, (2) with such property being valued at more than $10,000, and (3) with such money actually being derived from specific criminal activity." *Palatkevich v. Choupak*, 2014 WL 1509236 at *18 (S.D.N.Y. Jan. 24, 2014) (citing *Bernstein v. Misk*, 948 F. Supp. 228, 236 n. 2 (E.D.N.Y. 1997)) (emphasis in original).

A fundamental problem with Pioneer Bank's money laundering claim is that when Southwestern Payroll conducted a financial transaction (when it authorized the transferring of its employer-client tax funds out of the employer-clients' bank accounts, and ultimately deposited same

into Account No. 0212 and/or 2440 at Pioneer), the "property involved" in that transaction **was not** "represent[ative of] some form of specific unlawful conduct," nor did this legal process of operating as a typical payroll service bureau involve "proceeds of unlawful activity." What Mann did with those proceeds, in moving them out of Account No. 0212 or Account No. 2440, after they were deposited there, was not an act of Southwestern Payroll. (SUMF 134). Further, Pioneer Bank, through its 30(b)(6) representative, has testified that it does not know of any evidence that there was any employee or officer at Southwestern Payroll that had any knowledge of what Mann was doing at Pioneer with respect to any bank fraud, money laundering, or check kiting. (SUMF 135).

Pioneer's alleges that Southwestern Payroll knew that its minority owner, Darin Alred, and previous owner, Ray Fowler, were being paid for Cloud Payroll's purchase of a majority interest in Southwestern Payroll with "illicit proceeds," those supposedly "illicit proceeds" were monies Pioneer Bank extended to Valuewise under its own revolving line of credit -- a line of credit which had been established years and years in advance of Cloud Payroll's partial acquisition of Southwestern Payroll in April of 2017. [*See, e.g.*, Dkt. No. 259 at ¶¶ 562, 565, 568-570, 574-576]. However, it defies logic to suggest that when Mann, on behalf of Cloud Payroll, paid a debt owed to individuals Darin Alred and/or Ray Fowler for Cloud Payroll's 51% acquisition in Southwestern Payroll, vis-à-vis payments garnered from Pioneer's issued revolving line of credit, that **Southwestern Payroll** conducted these transactions or otherwise engaged in money laundering. Rather, payments from Cloud Payroll to individuals Darin Alred and/or Ray Fowler were clearly conducted by Cloud Payroll and involved persons not even alleged to be a part of the supposed RICO enterprise. Alred is not alleged to be part of the RICO scheme and Ray Fowler passed away in 2019. Alred has stated under oath that Cloud Payroll paid him for 51% of Southwestern Payroll via ACH, he did not pay attention to which account the funds came from, and even if he did, it would

not have mattered because he had no idea what Mann was doing in his accounts at Pioneer. (Alred Decl. ¶¶ 9-12). Without any proof or evidence that Southwestern Payroll intended to engage in the conduct prohibited by this predicate act, with actual knowledge of the conduct's illegality, Pioneer's RICO claim in this respect must fail.

    iv.    THE ONLY "PATTERN" OF ACTIVITY INVOLVED IN ANY OF THE UNDERLYING TRANSACTIONS IS SOUTHWESTERN PAYROLL'S REPEATED AND LAWFUL COLLECTION AND REMITTANCE OF PAYROLL AND PAYROLL TAX DOLLARS

      Even if the Court finds there are material facts in dispute as to whether Southwestern Payroll committed any of the requisite predicate acts, Pioneer must still show that such acts were related and continuous, in order to constitute a "pattern" of racketeering activity. This, Pioneer, cannot do. First, the alleged predicate acts of bank and wire fraud (a one-time, allegedly false disclosure on the CDD form) are not "patterns" of activity, but rather one single isolated event in time. This does not satisfy the horizontal relatedness requirement. *Reich v. Lopez*, 858 F.3d 55, 61 (2d Cir. 2017). Although the alleged predicate acts of operating an illegal money transmitting business and engaging in money laundering occurred just over a two-year period of time, this is the "*minimum*" duration necessary to satisfy closed-ended continuity, but is insufficient, without more, to support it. *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004). Where the activities alleged involve only a handful of participants and do not involve a complex, multi-faceted conspiracy, the continuity requirement is lacking. Pioneer Bank has alleged only a single "scheme" (Dkt. No. 270 at p. 4) and a single victim, itself (Dkt. No. 270 at p. 21-24). The only pattern established by the undisputed evidence is that Southwestern Payroll engaged in the lawful business of providing its employer-clients with payroll and payroll tax services. What Mann and Pioneer did with those funds after they were lawfully deposited with Pioneer is not an act of Southwestern Payroll.

B.   PIONEER SUFFERED NO INJURY ATTRIBUTABLE TO ANY RICO VIOLATIONS, BUT EVEN IF IT
     HAD, ITS INJURY IS TOO ATTENUATED BY SUBSTANTIAL INTERVENING FACTORS RELATED TO
     THE ACTS AND INACTIONS OF PIONEER AND OTHER THIRD PARTIES

"In order to recover damages under RICO," Pioneer Bank must show an injury to its business

or property that was sustained "**by reason of the substantive RICO violation**." *UFCW Local 1776

v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010) (emphasis added). This requires a showing that

the violation was not only the "but for" cause, but also the proximate cause of the victim's injury.

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 234 (2d Cir. 1999)

(citation omitted). The former inquiry is fairly straightforward: was Southwestern Payroll's conduct

a cause-in-fact of Pioneer Bank's harm(s)? *Samsor v. Meisels*, 708 F. App'x 728, 730 (2d Cir. 2017).

However, proximate cause "requires a careful consideration of the 'relation between the injury

asserted and the injurious conduct alleged.'" *Id.* (citation omitted).

Pioneer claims injury in the amount of "not less than $96,352,548" as a result of

Southwestern Payroll's alleged racketeering activities. (Dkt. No. 259 at ¶ 754). Pioneer maintains

that it required Valuewise's annual financial statements to be independently audited by a third-party

accounting firm. (*Id.* at ¶¶ 566-567). Pioneer claims that, in reliance on these audited statements, it

continued year after year to renew Valuewise's revolving line of credit. (*Id.* at ¶¶ 568-570, 574-576,

580, 583, 585). With respect to Southwestern Payroll, Pioneer Bank claims that the depositing of the

payroll tax dollars into accounts at Pioneer Bank, and Mann's "misappropriation" of those funds

after their deposit, tended to support Valuewise's perceived financial strength, which Pioneer

describes as "illusory." (*Id.* at ¶ 604). Pioneer alleges that but for these deposit activities and their

subsequent misappropriation, it would have never continued to extend credit to Valuewise and

would have never granted Mann and his related entities RDC privileges.

As this Court has previously determined, these damages all pertain to Valuewise's perceived growth, and Pioneer's response thereto. (Dkt. No. 318 at p. 34). These damages are not RICO injuries; rather they are damages related to non-predicate acts of check kiting and Pioneer Bank's "own imprudent extension of credit and RDC privileges" to Mann. Further, any misappropriation of the employer-client tax funds "injures the third-party employer-clients – *not* Defendant Pioneer." (Dkt. No. 318 at p. 37). Pioneer has never amended any of its pleadings with respect to Southwestern Payroll since the Court pointed out the problems with Pioneer's claimed RICO damages.

Additionally, Pioneer cannot claim that it relied on the deposits in Accounts 0212 or Account 2440 to extend the line of credit to Mann because the chief lending officer of Pioneer has sworn under oath to the contrary. ***Pioneer executive Joseph Fleming has sworn under oath that Pioneer did not consider the payroll companies when making the decision to extend and increase Valuewise's line of credit.*** If Pioneer did not consider the payroll companies when making its lending decisions, how can it claim that it was damaged by anything the payroll companies were alleged to have been doing?

Fleming has stated under oath that his focus in reviewing credit applications for the borrower, "Valuewise Corporation and Subsidiaries," was "primarily limited to Valuewise." (SUMF 99). Fleming stated under oath he did not consider the less profitable Valuewise subsidiaries/affiliates, including Southwestern Payroll, to be part of the lending base. (SUMF 100-101).

Fleming of course made this Declaration because he is trying to disclaim knowledge of the fact Mann's payroll companies were obviously housing payroll tax at Pioneer. The fact that Mann's payroll companies process payroll and payroll tax is all over the loan documents. Because Pioneer is taking the preposterous position it had no idea Mann was processing payroll and payroll tax in

25

Accounts 0212 and 2440 to try to avoid the *Daly* case cited above, it was important for Fleming to have a reason why he did not pay attention to the loan documents referencing the fact that Mann had payroll companies that processed payroll and payroll tax. However, in making his Declaration, Fleming committed to the fact that Pioneer cannot have any RICO damages.  If Pioneer did not consider the payroll companies or pay attention to them in the decision to extend the $42 million line of credit, the account activity in the payroll accounts and the opening of an account in the name at Southwestern Payroll (Account 1996) certainly cannot have caused Pioneer RICO damages.

Further, it is important to note that Mann was money laundering and kiting for years before Mann opened Account 1996.  Mann's scheme could have gone on just as easily without the opening of Account 1996.  It is frankly absurd for Pioneer to claim that it has damage because Mann (in reality Pioneer) did not check certain "No" boxes when opening Account 1996, when Mann had been kiting and money laundering in other accounts at Pioneer for years.

Simply put, there is no injury sustained by Pioneer Bank proximately caused by any alleged pattern of racketeering allegedly committed by Southwestern Payroll. Pioneer Bank cannot now, in contravention of its own then Chief Lending Officer's sworn testimony, maintain otherwise.

V.    SOUTHWESTERN PAYROLL IS ENTITLED TO SUMMARY JUDGMENT ON PIONEER'S RICO CONSPIRACY CLAIM AGAINST SOUTHWESTERN PAYROLL BECAUSE SOUTHWESTERN PAYROLL MANIFESTED NO CONSCIOUS AGREEMENT TO JOIN A RACKETEERING SCHEME

To allege a RICO conspiracy under 18 U.S.C. § 1962(d), a plaintiff must allege 'a conspiracy to commit a substantive RICO violation.'" *Murphy v. Onodaga Cnty.*, No. 5:18-cv-1218 (GLS/CFH), 2022 U.S. Dist. LEXIS 48996, * 16 (N.D.N.Y. Mar. 18, 2022 (Sharpe, S.J.) (citation omitted). Accordingly, to properly sustain a civil RICO conspiracy claim against Southwestern Payroll pursuant to § 1962(d), Pioneer must show proof that Southwestern Payroll "knew about and agreed to facilitate the [RICO] scheme." Additionally, Pioneer must show proof that "at least one

26

Section 1961 predicate act taken in furtherance of the RICO conspiracy proximately caused injury to [Pioneer Bank's] business or property. *First Capital Asset Mgmt.*, 218 F. Supp. 2d at 384 (citations omitted). Pioneer, through its corporate representative, testified that Pioneer has no evidence that any employee or officer at Southwestern Payroll knew of what Mann was doing at Pioneer with respect to bank fraud, money laundering, and check kiting. (SUMF 135). Mann testified that no employee or officer of Southwestern Payroll had anything to do with any of his crimes. (SUMF 134). These admissions, coupled with the lack of the existence of any enterprise, predicate acts, and proximate cause, as previously identified herein, entitles Southwestern Payroll to summary judgment on Pioneer Bank's RICO conspiracy counterclaim.

VI.  THE LACK OF A MISREPRESENTATION OR MATERIAL OMISSION OF ANY FALSE MATERIAL FACT, AND THE LACK OF ANY JUSTIFIABLE RELIANCE, ENTITLE SOUTHWESTERN PAYROLL TO SUMMARY JUDGMENT ON PIONEER'S FRAUD CLAIM

Pioneer has separately pursued a fraud claim against Southwestern Payroll. The essence of its fraud claim is the same in many respects as its substantive RICO claim: that Mann falsely represented that Southwestern Payroll was not a TPPP or MT, that he did so for the purpose of inducing Pioneer Bank to rely on these representations when making decisions regarding its deposit and other banking relationships, and that Pioneer justifiably relied on them when it granted RDC privileges to Southwestern Payroll.  Pioneer posits that because it was unaware that Southwestern Payroll was depositing third-party employer-client tax funds into Account 0212 and Account 2440, it was "deceived" into concluding that the Mann Entities had significantly greater revenues and receivables than they actually did. Pioneer asserts that this deception caused it injury, when Southwestern Payroll's "abuse" of the RDC system through check kiting led Pioneer to sustain losses after Bank of America failed to honor thirty-six checks for which Pioneer had granted Mann same-day access to such funds.

27

Under New York law, fraud must be proven ***by clear and convincing evidence***, where there is "(1) a material misrepresentation or omission of fact; (2) made by defendant with knowledge of its falsity; (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Meda AB v. 3M Co.*, 969 F. Supp. 2d 360, 385 (S.D.N.Y. Sept. 3, 2013 (citing *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). Pioneer's fraud claim fails on all prongs for virtually the same reasons the RICO claims fail.  First, there is simply no false or material misrepresentation of fact involved because Southwestern Payroll was not a TPPP or MT. Pioneer cannot show, as a matter of law, that Southwestern Payroll was or is a TPP or MT, ***as they are defined on Pioneer's CDD documents***.  Pioneer's own expert, discussed extensively above, admits that as of September of 2019 only three states had addressed whether a payroll company must obtain a MT license and the vast majority of states still have not addressed the issue. (SUMF 129, 132). Critically, Pioneer's expert admits that the state of New York does not require a payroll company to obtain a MT license. (SUMF 128).

Further, under prongs two and three, Pioneer cannot show that there was a knowing misrepresentation with an intent to deceive. It is undisputed that Mann did not fill out the CDD documents at issue, Pioneer filled out the documents. (SUMF 115-119). Further, Mann and Alred have sworn under oath they do not believe a payroll company meets the definition of a TPP or MT, as defined on Pioneer's CDD documents, and Pioneer's own expert has admitted he has no evidence a regulatory authority has told them differently. (SUMF 120-123, 125-135). Pioneer, as a matter of law, cannot meet its burden of clear and convincing evidence that the CDD forms were "knowingly" filled out incorrectly.  The mere fact that there is a strong dispute whether the forms are filled out correctly means that Pioneer cannot show, by clear and convincing evidence, they were "knowingly"

filled out incorrectly when Mann and Alred have testified they do not believe a payroll company is a TPP or MT, as they are defined on the Pioneer CDD documents.

Finally, as set forth above, Pioneer did not justifiably rely on any alleged material misrepresentation, and it cannot show damages. Fleming has stated under oath in a Declaration submitted to this Court that he did not rely on the payroll companies when extending the line of credit to Mann. (SUMF 99-103). Based on this sworn testimony, even if there was a question of fact as to the first three prongs, which there is not, Pioneer cannot show that reliance or damages from anything relating to how the CDD documents were completed in this matter.

## **CONCLUSION**

For the foregoing reasons, Southwestern Payroll and Granite respectfully request the Court grant its motion for partial summary judgment on the issues of Pioneer's affirmative defense of setoff and Pioneer's duty to investigate and know the nature and source of funds being deposited into Account Nos. 0212 and 2440 prior to any setoff.  Further, Southwestern Payroll requests summary judgment on Pioneer's affirmative RICO, RICO conspiracy, and fraud claims, along with any other or further relief the Court deems just and equitable.

Respectfully submitted,


s/ Andrew C. Jayne
Andrew C. Jayne, OBA #19493
Tara D. Zickefoose, OBA #31757
BAUM GLASS JAYNE CARWILE & PETERS
401 S. Boston Ave., Suite 200
Tulsa, Oklahoma 74103
Telephone:  918/938.7944
Facsimile:  918/938.7966
Email: ajayne@bgjclaw.com
        tzickefoose@bgjclaw.com

        -and-

Walter D. Haskins, OBA #3964
Walter D. Haskins, P.C.
1611 S. Utica Ave.
Tulsa, OK 74104
Telephone: 918/231.6602
Email: wdhaskins@protonmail.com

        -and-

Michael A. Kornstein, Esq.
Bar Roll No. 103178
COOPER ERVING & SAVAGE LLP
LOCAL COUNSEL FOR PLAINTIFF
39 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone: (518) 449-3900
mkornstein@coopererving.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 3rd day of June, 2024, I electronically transmitted the previous document to the Clerk of the Court using the ECF System for filing and transmittal of Notice of Electronic Filing was then made to the following ECF registrants:

Michael A. Kornstein – mkornstein@coopererving.com
*Local Counsel for Southwestern Payroll Service, Inc.*

Robert J. Alessi – Robert.alessi@us.dlapiper.com
Steven Rosato – steven.rosato@us.dlapiper.com
Evan E. North – evan.north@us.dlapiper.com
Michael Zahler – mzahler@hodgsonruss.com
*Counsel for Defendant Pioneer Bancorp, Inc., Pioneer Bank*

Cynthia E. Neidl – neidlc@gtlaw.com
Julie A. Yedowitz – Julie.yedowitz@gtlaw.com
Roland Garcia – garciar@gtlaw.com
Jennifer Tomsen – tomsenj@gtlaw.com
 *Counsel for Intervenor-Plaintiff National Payment Corporation*

*s/ Andrew C. Jayne*