**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

SOUTHWESTERN PAYROLL SERVICE, INC. and
GRANITE SOLUTIONS GROUPE, INC.,
     *Plaintiffs,*
  *v.*

PIONEER BANCORP INC., et. al.,
     *Defendants.*

—————————————————————

NATIONAL PAYMENT CORPORATION,
     *Intervenor-Plaintiff*,
  *v.*

PIONEER BANCORP INC., et al.
     *Defendants.*

Case No. 1:19-cv-1349 (FJS/CFH)

**STATEMENT OF UNDISPUTED MATERIAL FACTS OF SOUTHWESTERN
PAYROLL SERVICE, INC. AND GRANITE SOLUTIONS GROUPE, INC.
PURSUANT TO LOCAL RULE 7.1(A)(3)**

Pursuant to Rule 7.1(A)(3) of the Local Rules of this Court, Plaintiff Southwestern Payroll Service, Inc. ("Southwestern Payroll") and Granite Solutions Groupe, Inc. ("Granite") contend that as to the following material facts, no genuine issue exists:

**BACKGROUND**

1. Southwestern Payroll is an Oklahoma Corporation with its principal place of business in Tulsa, Oklahoma. Southwestern Payroll is subject to Court supervision in Tulsa County, Oklahoma, and is controlled by C. David Rhoades as Receiver. (Third Amended Complaint, Dkt. No. 245, ¶ 1; Declaration of J. Darin Alred, ¶ 2 (hereinafter "Alred Decl.")).

2. Southwestern Payroll is a payroll service bureau incorporated under the laws of the State of Oklahoma since1986 under the name "Southwestern Computing Service, Inc." (Alred Decl. at ¶ 4). At all times of its operation, it has processed payroll and serviced its employer clients out of its offices in Tulsa, Oklahoma. (Alred Decl. at ¶ 4).

3. Granite is a California Corporation with its principal place of business in San

Francisco, California. It is a financial services consulting firm which contracted with MyPayrollHR as its third-party payroll provider. (Dkt. No. 245, ¶¶ 2, 90-91).

4.      Defendant Pioneer Bank ("Pioneer") is a stock bank organized and existing under the laws of the State of New York. (Dkt. No. 245, ¶ 4; Pioneer Bank and Pioneer Bancorp, Inc.'s Answer and Defenses to Plaintiffs' Third Amended Complaint, and Counterclaims/Crossclaims, Dkt. No. 259, ¶ 4). It is a publicly traded company. (Jayne Decl. Ex. A at 9:19-22).

5.      Defendant Pioneer Bancorp, Inc. is a bank, incorporated in Maryland, with its principal place of business in Albany, New York. Pioneer Bancorp, Inc. is the holding company for Defendant Pioneer Bank. (Dkt. No. 245, ¶ 3; Dkt. No. 259, ¶ 3).

6.      Michael Mann ("Mann") is a citizen of the State of New York, who during the relevant period was residing in Edinburgh, New York.  (Dkt. No. 245 ¶ 5).

7.      Defendant Valuewise Corporation ("Valuewise") was established in 2005 by Defendant Michael Mann ("Mann"), its sole owner. (Dkt. No. 259, ¶ 559).

8.      Mann owned or partially owned several other entities, including Ross Personnel Consultants, Inc., Always Live Holdings, LLC, Kanigo, LLC, Hire Flux, LLC, Viverant LLC, Heutmaker Business Advisors, LLC, and Weitz and Associates Inc.  (collectively with Valuewise, the "Mann Entities").

9.      MyPayrollHR.com, LLC ("MyPayrollHR") is a Massachusetts limited liability company wholly owned by Valuewise that, until 2019, operated as a payroll service company processing payroll and payroll tax for its employer clients. (Jayne Decl. Ex. N at 18:14-21:16; Ex. W).

10.      A commercial banking relationship existed between Mann, Valuewise, and Pioneer

2

dating as far back as November 2, 2009, when Mann, on behalf of Valuewise and Defendant Ross Personnel Consultants, Inc. opened two demand deposit accounts at Pioneer, and was likewise extended a two million dollar working capital line of credit that same day. (Dkt. No. 259, ¶¶ 561-563; Jayne Decl. Ex. EE at Response 3).

11.    David Blessing, who served as Vice President of Commercial Structured Debt and promoted in about June 2018 to Senior Vice President of Capital Markets, served as Mann's Account Relationship Manager at Pioneer. (Dkt. No. 259, ¶ 560; Jayne Decl. Ex. A at 52:8-15; 80:24-81:3).

12.    Thomas Amell is the Chief Executive Officer and President of Pioneer, at times pertinent hereto Joseph Fleming was Chief Lending Officer and David Blessing's direct supervisor, Frank Sarratori was Pioneer's General Counsel, and Randall Benedict was Senior Portfolio Manager. (Jayne Decl. Ex. A at 9:2-7; Ex. C at 16:14-22; Ex. J at 15:10-16:3; Ex. NNNNNN at 23:16-24:4).

13.    Pioneer's loan relationship with Valuewise grew, and soon Pioneer began requiring that Valuewise have an independent certified public accountant audit its annual financial statements to, among other things, verify the revenue and accounts receivable that Valuewise reported. (Dkt. No. 259, ¶ 567).

14.    Valuewise engaged Teal, Becker & Chiaramonte, CPAs, P.C. ("TBC") for this purpose. (Dkt. No. 259, ¶ 567).

15.    Valuewise purchased MyPayrollHR in November, 2013. (Dkt. No. 259, ¶ 571; Jayne Decl. Ex. Q at 28:3-6).

16.    MyPayrollHR went out of business shortly after the events at Pioneer during the first week of September 2019.  (Jayne Decl. Ex. N at 153:24-156:11).

3

17.     In December, 2016, Mann formed Cloud Payroll, LLC ("Cloud Payroll"), which was 100% owned by Valuewise. (Dkt. No. 259, ¶ 577; Jayne Decl. Ex. Z).

18.     At or near the same time as Cloud Payroll's formation, Cloud Payroll acquired a 51% interest in ProData Payroll Service, Inc. ("ProData"). (Dkt. No. 259, ¶ 577; Jayne Decl. Ex. AA at PB-SWP-00050390). ProData was a payroll service bureau located near Chicago, Illinois, that, until approximately November 2019, processed payroll and payroll tax for its employer clients. (Jayne Decl. Ex. N at 43:7-20). ProData went out of business shortly after the events at Pioneer during the first week of September 2019.  (Jayne Decl. Ex. N at 153:24-157:5).

19.     On April 17, 2017, Cloud Payroll purchased a majority interest in the outstanding shares of stock of Southwestern Payroll. (Dkt. No. 259, ¶ 579; Alred Decl. at ¶ 3).

### MYPAYROLLHR ACCOUNTS, INCLUDING 0212

20.     On November 26, 2013, Mann opened two accounts at Pioneer for MyPayrollHR, one ending in 0204 and the other ending in 0212 ("Account 0212"). Account 0212 was labeled "Client Account" on the account opening documents and that designation carried through to Pioneer's records, including account statements. (Jayne Decl. Ex. LLL; Ex. OO).

21.     Account 0212's opening documents further described the business of MyPayrollHR as "Payroll Svce Bureau". (Jayne Decl. Ex. LLL).

22.     The Pioneer bank statements for Account 0212 provide the following description of the account:

MYPAYROLLHRCOM
CLIENT ACCOUNT
662 PLANK RD
CLIFTON PARK NY 12065-2019

(Jayne Decl. Ex. OO).

4

23.     Mann did not check the "No" box in Section 5 of the Customer Due Diligence Information Sheet for Account 0212, which asks whether the customer is a third-party payment processor; rather, someone at Pioneer checked that "No" box. (Jayne Decl. Ex. Q at 38:11-14).

24.     Likewise, Mann did not check the "No" box in Section 9 of the Customer Due Diligence Information Sheet for Account 0212, which asks whether the customer is a money transmitter; rather, someone at Pioneer checked that "No" box. (Jayne Decl. Ex. Q at 43:14-22).

25.     Regardless, Mann does not believe that a payroll company is a third-party payment processor or a money transmitter as they are defined on Pioneer's Customer Due Diligence Information Sheet.  (Jayne Decl. Ex. Q at 179:18-25, 41:16-42:15).

26.     Darin Alred, the President of Southwestern Payroll, likewise does not believe that a payroll company is a third-party payment processor or a money transmitter as it is defined on Pioneer's Customer Due Diligence Information Sheet.  (Alred Decl. at ¶¶ 5-6).

27.     Nobody at Pioneer ever told Mann that Pioneer had a policy of prohibiting payroll companies from housing payroll or payroll tax dollars at the bank.  (Jayne Decl. Ex. Q at 40:10-17).

28.     Pioneer has no written policy or procedure, outside of what is found on the Customer Due Diligence Information Sheet, prohibiting payroll companies from housing third-party payroll or payroll tax dollars at Pioneer. (Jayne Decl. Ex. OOOOOO).

29.     Mann initially intended on using Account 0212 to house only payroll tax dollars. (Jayne Decl. Ex. Q at 36:25-37:15). All of the initial deposits into Account 0212 on December 17, 2013 are described as "PAYROLL TAX MANA/TAXDRAFT" on the Pioneer statement. (Jayne Decl. Ex. QQ).

30.     Before and after he opened Account 0212, Mann told Blessing he was going to house

5

payroll tax dollars at Pioneer and make payments to the taxing authorities from that account. (Jayne Decl. Ex. Q at 32:6-33:13; 45:14-19; 63:18-64:3, 74:25-75:6).

31.     On December 3, 2013, Mann emailed Trudy Seeber, Business Development Officer for Pioneer, asking about the full account number for Account 0212, stating that he "need[s] to know this so [he] can properly move funds in the account from our clients and don't want to screw it up." (Jayne Decl. Ex. OOO).

32.     On December 11, 2013, Mann emailed Blessing stating:

> We will be using a third party tax processor initially.  They will need to prenote a file and also to get approval on processing checks from our system (probably me giving them signing authority).  Who do I work with to get these done?  I will probably be signing today and will want a quick turnaround.

Mann then forwarded the email to Lucas Scarchilli, who at the time was a Commercial Structured Debt Analyst, who forwarded the email to Dedrick, who at the time served as Pioneer's Commercial Services Officer. Scarchilli then informed Mann that Dedrick would call him shortly.  Later that day, Dedrick emailed Blessing, letting him know that Mann was "all set."  (Jayne Decl. Ex. PPP).

33.     On December 16, 2013, Blessing asked Mann if he was available for lunch with Frank Grant, who had worked for GTM Payroll for several years and was a friend of Blessing. Mann eventually hired Grant as a salesman for MyPayrollHR. (Jayne Decl. Ex. QQQ).

34.     When Mann initially opened Account 0212 in December of 2013, he had to coordinate with Pioneer personnel to transfer the payroll tax funds from a company called Payroll Tax Management ("PTM"), into Account 0212 at Pioneer. (Jayne Decl. Ex. Q at 45:14-47:25; 48:2-22; Ex. RRR).

35.     On December 11, 2013, Mann emailed Blessing the following:

David…

We will be using a third party tax processor initially. They will need to prenote a file and also to get approval on processing checks from our system (probably me giving them signing authority). Who do I work with to get these done? I will probably be signing today and will want a quick turnaround.

(Jayne Decl. Ex. PPP).

36.    On December 20, 2013, Mann emailed Dedrick the following:

Sandra…

We have a few clients that need to wire us money for our payroll company because their tax liabilities is (sic) over 100K.  Is the routing number the same for wires (compared to ACH)?

Thanks,
Mike

(Jayne Decl. Ex. SSS).

37.    On December 20, 2013, Mann forwarded an email with a subject of "Tax Wire" from a MyPayrollHR employee asking Mann to let her know when they received "the tax wire from JMB so we can let PTM know to process payment" to Scarchilli, who asked whether the wire was received in Account 0212, and Scarchilli provided Mann with the amount of the received wire. (Jayne Decl. Ex. TTT).

38.    On December 27, 2013, Mann forwarded an email to Dedrick, indicating that a MyPayrollHR customer would be "wiring tax money in the amount of $424,757.19," and asking her to "keep you[r] eye open on account 212," which Dedrick agreed to do and ultimately informed Mann when the wire arrived.  (Jayne Decl. Ex. UUU).

39.    The ending balance in Account 0212 on December 31, 2013 was $1,825,240.45, and during the month more than $5 million had been deposited in the account. The two checks written from the account identified the payor as "Payroll Tax Management, Inc." and were made payable to "NYS Income Tax."  (Jayne Decl. Ex. QQ).

40. In December of 2014, $14,751,382.32 was deposited to Account 0212, there were over 1,500 transactions in the account, and 199 checks had been written from the account. Transaction descriptions include the term "PAYROLL TAX MANA/TAXDRAFT." (Jayne Decl. Ex. OO).

41. In December of 2015, $18,964,759.07 was deposited to Account 0212, there were over 5,800 transactions in the account, and 183 checks had been written from the account. Transaction descriptions include the terms "[Entity Name]/PAYROLL" and "[ENTITY NAME]/TAXES." (Jayne Decl. Ex. OO).

42. In December of 2016, $60,198,426.60 was deposited to Account 0212, there were over 8,700 transactions in the account, and 66 checks had been written from the account. Transaction descriptions include the terms "[Entity Name]/PAYROLL" and "[ENTITY NAME]/TAXES." (Jayne Decl. Ex. OO).

43. In December of 2017, $187,365,306.66 was deposited to Account 0212, there were over 23,000 transactions in the account, and 192 checks had been written from the account. Transaction descriptions include the terms "[Entity Name]/PAYROLL" and "[ENTITY NAME]/TAXES." (Jayne Decl. Ex. OO).

44. In December of 2018, $216,463,751.35 was deposited to Account 0212, there were over 14,600 transactions in the account, and 419 checks had been written from the account. Transaction descriptions include the terms "[Entity Name]/IMPOUND" and "CLOUDPAYROLL/TAX COL." (Jayne Decl. Ex. OO).

45. In August of 2019, $169,857,909.40 was deposited to Account 0212 and there were over 5,400 transactions in the account. Transaction descriptions include the term "[Entity Name]/PAYROLL." (Jayne Decl. Ex. OO).

## OPENING OF CLOUD PAYROLL ACCOUNT 2440

46.     As time went on, Mann began also housing third party payroll funds in addition to payroll tax funds in Account 0212. (Jayne Decl. Ex. N at 82:10-84:2).

47.     However, in February of 2019, Mann opened an account ending in 2440 ("Account 2440") in the name of Cloud Payroll, LLC.  Mann opened this account to again segregate third party payroll funds from third party payroll tax funds.  (Jayne Decl. Ex. Q at 106:22-107:20). Account 2440 was to house third party payroll tax funds for all of the employer clients of all of the payroll companies. (Jayne Decl. Ex. N at 84:8-17 and Ex. Q at 116:13-117:7).

48.     On February 26, 2019, Deborah Salsburg, Sales Lender/Assistant Branch Manager of Pioneer, sent Mann the account opening documents for Account 2440. At the time she sent the account opening documents, Salsburg had typed the information found on the forms, and pre-marked with a star in all the places where Mann needed to sign the forms. (Jayne Decl. Ex. PPPP).

49.     Mann did not check the "No" box in Section 3 of the Customer Due Diligence Information Sheet, which asks whether the customer, Cloud Payroll, is a third-party payment processer; rather, someone at Pioneer had already pre-checked this box. (Jayne Decl. Ex. PPPP).

50.     Likewise, Mann did not check the "No" box in Section 8 of the Customer Due Diligence Information Sheet, which asks whether the customer, Cloud Payroll, is a money transmitter; rather, someone at Pioneer had already pre-checked this box. (Jayne Decl. Ex. PPPP).

51.     In July of 2019, $102,765,717.30 was deposited to Account 2440, there were over 10,400 transactions in the account, and there were 1,842 checks written from the account.  The majority of transactions bore the description "CLOUDPAYROLL/TAX COL." (Jayne Decl. Ex. PP).

52.    In August of 2019, $102,557,784.81 was deposited to Account 2440, there were over 8,200 transactions in the account, and there were 453 checks written from the account. The majority of transaction bore the description "CLOUDPAYROLL/TAX COL." (Jayne Decl. Ex. PP).

## MANN AND PIONEER MEET TO DISCUSS PIONEER HANDLING THE ACH PROCESSING OF PAYROLL AND PAYROLL TAX TRANSACTIONS

53.    When Mann opened Account 0212 on behalf of MyPayrollHR, he was using PTM to process ACH transactions to move payroll tax money in and out of Account 0212. (Jayne Decl. Ex. Q at 51:13-52:25 and Ex. PPP).

54.    After opening Account 0212, Mann had discussions with Blessing and others at Pioneer about having Pioneer actually process the ACH transactions of payroll tax in and out of Account 0212, rather than continuing to use PTM. (Jayne Decl. Ex. Q at 65:12-66:9).

55.    On March 26, 2014, Mann forwarded emails from representatives of PTM to Blessing, and stated "[w]e are ultimately taking over more and more control of processing for the payroll company. Please read down the email and let me know who from Pioner that should be part of this meeting to go through the questions below."  (Jayne Decl. Ex. VVV).

56.    Blessing forwarded Mann's email to Alicia Riegert, who then served as Sr. Vice President – Chief Information Officer of Pioneer, and Graig Furlong, asking for times to speak with PTM.  (Jayne Decl. Ex. VVV).

57.    Fleming also forwarded Blessing's email to Riegert, stating that he would "really appreciate you help [sic] with this.  It's an opportunity to generate some good deposits." (Jayne Decl. Ex. VVV).

58.    On April 1, 2014, Mann forwarded Blessing a copy of MyPayrollHR's contract with PTM.  Blessing forwarded the document to Riegert. (Jayne Decl. Ex. Q at 84:3-85:2; Ex. WWW).

10

59.     On April 21, 2014, Blessing wrote the following in an email to Riegert, Fleming, and other Pioneer employees:

I had lunch with Mike Mann today. Initially, we are only going to be handling the tax portion of the payroll, which is 100% prefunded with no obligation to forward on the taxes to the appropriate entities if it wasn't received. This will create $0 in credit risk. If we handle it well, his ultimate goal is to move over the actual payroll as well which isn't always pre funded. However we will cross that bridge when we come to it.

(Jayne Decl. Ex. XXX).

60.     On September 18, 2014, Riegert at Pioneer sent a meeting invite titled "Meeting to discuss the Michael Mann ACH Processing" to Amell, Blessing, Fleming, Dedrick, Sarratori, and others at Pioneer.  (Jayne Decl. Ex. BBBB).

61.     Mann ultimately had a meeting with Blessing about Pioneer handling the ACH processing of payroll tax funds.  During the meeting, the fact that Pioneer was already housing the payroll tax funds was discussed. After discussions with Pioneer, Mann concluded that it was not a viable option because Pioneer's cut-off time for submissions was too early, there would not be significant savings, and there would have been a lot of work needed for the transition.  (Jayne Decl. Ex. Q at 70:2-72:22).

### MANN'S EMAIL COMMUNICATIONS WITH PIONEER EMPLOYEES REGARDING PAYROLL TAXES

62.     In an email from Mann to Blessing and Scarchilli on September 16, 2014, with the subject "Request for ACH meeting," Mann stated as follows:

David…

We are looking to bring both payroll tax and payroll deposit processing in house. I am aware that we have the ability to upload ACH NACHA files and want to start those discussions. Our system does create the files….However, I want to make sure

11

we start talking so we create our processes that map to your processes to start moving forward on this.

(Jayne Decl. Ex. YYY).

63.     The September 16, 2014, email was forwarded to the following executives at Pioneer: Amell, Flemming, Sarratori, as well as other Pioneer employees. (Jayne Decl. Ex. ZZZ).

64.     Christine Charbonneau (previously Batchelder) was a Customer Service Assistant at Pioneer.  (Jayne Decl. Ex. QQQQ at 18:23-19:24).  Mann would routinely email Charbonneau requesting copies of cancelled checks that were payable to payroll taxing authorities from Account 0212, and Charbonneau would provide Mann with the cancelled checks.  (Jayne Decl. at Ex. RRRR).

65.     Between 2014 and 2019, Charbonneau and others at Pioneer routinely wired same day payroll and payroll taxes for Mann's payroll companies after receiving an email from Mann or his staff asking for assistance. Plaintiffs are attaching fifteen (15) instances of this occurring to support the use of the word "routinely." (Jayne Decl. Ex. SSSS).

66.     On September 4, 2014, Amy Patentreger at MyPayrollHR emailed Dedrick and Charbonneau because one of MyPayrollHR's clients had bounced their payroll a couple of times the week before.  Ms. Patentreger needed to confirm that the client's funds for payroll had actually been deposited to Account 0212. A few hours later, Charbonneau confirmed the payroll client funds were in Account 0212. (Jayne Decl. Ex. TTTT).

67.     On January 27, 2015, Mann sent Charbonneau an email, copying Dedrick, asking if a wire had come in for a client that owed "us payroll taxes for 2 pay periods." (Jayne Decl. Ex. UUUU).

68.     Mann emailed Blessing on March 26, 2017, and stated, in part:

In our last conversation, I told you that I will probably try to move all the service bureaus that we have purchased and would like to buy a separate company that is

separate from our relationship with Pioneer. Obviously, we would need to raise the money to pay back the 2M note and then have this other entity with their investors responsible for the service bureaus. I would keep the technology company and tax/treasury company within the Valuewise umbrella and Pioneer would be able to take advantage of the deposits and have claim to these companies.

(Jayne Decl. Ex. GGGG).

69. On March 8, 2017, Mann emailed Charbonneau and stated, in part, "[o]ur tax person for our payroll company had to go into the hospital yesterday. We have been told that we need to make an IRS tax payment for National Business Equipment. The money will come out of account ending in 0212." (Jayne Decl. Ex. VVVV).

70. On October 26, 2018, Mann emailed Charbonneau a West Viginia State Tax Department Electronic Funds Transfer Application for Payroll Service Companies and asked her to sign the document.  (Jayne Decl. Ex. WWWW).

71. On May 13, 2019, Mann emailed commercialservicesdept@pioneerbanking.com. The subject line of the email is "Urgent Wire." The text of the email states "I need to process this quickly because it is for same day payroll. I can verify at 518-312-6191." Attached to the email is a completed Pioneer's Wire Transfer Authorization for money to be wired out of Account 0212. (Jayne Decl. Ex. XXXX).

72. On July 9, 2019, Mann emailed Benedict, inquiring whether certain funds had been credited to Account 0212. Benedict replied:

We do not see that ACH coming into 2440. Other ACH transactions have been processed but they are normal tax collection ACH's. Perhaps the ACH had an effective date of 7/10/19? The trace number is not on our list of ACH coming in. Lets watch the account in the morning, I have a feeling it will hit then.

(Jayne Decl. Ex. YYYY).

73. Charbonneau helped Mann create a BAF report so that individuals at Mann's payroll

13

companies could reconcile the payroll tax account with the Pioneer bank statements without seeing the illegal activity Mann was doing in his accounts at Pioneer.  (Jayne Decl. Ex. R at 442:23-443:24; 616:23-618:19]).

## BLESSING VISITS MYPAYROLLHR

74.    On February 22, 2017, Mann emailed Blessing, Reinke -- CEO of the payroll operations for Valuewise -- and others stating, "We will start our meeting next Friday and (sic) 9:00am at our office. I will reserve a conference room and will go over our plans for payroll." (Jayne Decl. Ex. QQQQQQ).

75.    The meeting referenced in this email took place on March 2, 2017. At the meeting, Reinke actually gave Blessing a tour of MyPayrollHR, showing him the payroll and payroll tax operations.  (Jayne Decl. Ex. N at 53:16 - 56:6).

76.    During this meeting, Blessing told Reinke that Pioneer appreciated the payroll business because the large deposits allowed Pioneer to lend more money. (Jayne Decl. Ex. N at 53:16-58:19; 61:6-64:12).

77.    Reinke testified that during this meeting, there were extensive discussions about the fact that Pioneer was housing payroll and payroll tax funds, and Blessing never expressed any confusion about the fact Pioneer was housing payroll and payroll tax funds at Pioneer. (Jayne Decl. Ex. N at 60:13-61:5).

## BLESSING SETS UP A MEETING WITH POTENTIAL INVESTORS IN MANN'S PAYROLL BUSINESS AT PIONEER

78.    Matthew Schilling was the Manager of Finance at Cloud Payroll. (Jayne Decl. Ex. U, ¶ 1). On April 18, 2017, Schilling, Reinke, Mann, Blessing, Fleming and two potential investors, the Agrawal brothers, attended a meeting at Pioneer.  The meeting was the result of Blessing putting the

Agrawal brothers in contact with Mann to see if the Agrawal Brothers would be interested in investing in Mann's payroll companies. (Jayne Decl. Ex. N at 65:3-76:18; Ex. HHHH).

79.    On April 14, 2017, in advance of the meeting, Mann sent Blessing the PowerPoint Presentation that would be given at the meeting.  The PowerPoint Presentation explained the nature of his payroll business, including the fact that it processed payroll and payroll tax.  (Jayne Decl. Ex. IIII).

80.    During this meeting, Blessing explained to the two potential investors the fact that Mann was housing payroll tax funds at Pioneer and the benefits of having large deposits at a bank. (Jayne Decl. Ex. N at 66:19-76:18; Ex. O at 91; 273:7-274:3).

## MANN HAS A MEETING WITH TOM AMELL ABOUT PIONEER PAYROLL

81.    On August 10, 2017, Blessing forwarded Amell an email of August 8, 2017 from Mann which in part states as follows:

> I know you are working on next steps from our meeting.  However, I do want to mention the opportunity we have regarding payroll.  Mypayrollhr (MPHR) is operating like the other bureaus (Southwestern and ProData) as just a service bureau. The technology and tax portions of the company can be a separate company.  As a bureau, it is operating profitably and is experiencing tremendous growth. We could discuss having Pioneer invest in MPHR and create Pioneer Payroll as part of the MPHR bureau.

(Jayne Decl. Ex. QQQQQQ).

82.    On August 21, 2017, Mann sent Blessing a Pioneer Payroll Model. Blessing forwarded Amell the Pioneer Payroll Model on August 24, 2017. (Jayne Decl. Ex. RRRRRR).

83.    On October 4, 2017, Mann had the meeting with Blessing and Amell at Pioneer to discuss financials for a Pioneer Payroll product. (Jayne Decl. Ex. A at 55:2-18; Ex. RRRRRR at p. 7).

15

## THE BSA DEPARTMENT AT PIONEER

84.     Ellen Fogarty was a Vice President and head of the BSA/AML Department of Pioneer from 1994 to her retirement in 2021.  Darlene Julian and Kelli Rappleyea worked for Fogarty in Pioneer's BSA/AML Department.  (Jayne Decl. Ex. D at 18:6-22; 56:22-57:3; Ex. G at 48:2-51:17).

85.     It was the responsibility of the BSA/AML Department at Pioneer to detect suspicious activity in an account and decide whether to file a Suspicious Activity Report ("SAR" with FinCen. (Jayne Decl. Ex. D at 141:9-142:2).

86.     The BSA/AML policy at Pioneer references the concept of "know your customer". (Jayne Decl. Ex. D at 14:17-24). Fogarty admitted that "know your customer" is a very important part of the BSA Department at Pioneer. (Jayne Decl. Ex. D at 145:17-24).

87.     Pioneer used a software called BAM to generate monthly suspicious activity alerts in particular accounts.  BAM was the first level of investigation into potential bank fraud.  (Jayne Decl. Ex. D at 148:18-20; 153:3-13).

88.     Mann's accounts at Pioneer were designated as high-risk accounts by the BAM system.  (Jayne Decl. Ex. D at 337:3-338:15).

89.     The BAM software would generate a report of potentially suspicious activity in an account, and then members of the BSA/AML Department at Pioneer would review the BAM reports and either (a) clear the alert or (b) complete a referral sheet to Pioneer's SAR Committee, who would determine whether to file a SAR with FinCen.  (Jayne Decl. Ex. D at 53:20- 157:18).

90.     Additionally, Fogarty performed a quarterly review of accounts that were designated high risk by Pioneer, including Account 0212.  (Jayne Decl. Ex. D at 174:3-175:6; 191:2-194:19).

91.     To perform a review of a BAM alert, a member of the BSA/AML Department would

16

have to review the activity in the bank account at Pioneer. (Jayne Decl. Ex. G at 87:17-25).

92.     Julian admitted that in order for her to determine whether account activity in a business account was suspicious, she had to know and understand the business of the customer. (Jayne Decl. Ex. G at 90:19-91:10).

93.     Prior to August 30, 2019, the BAM software at Pioneer generated at least 162 alerts or quarterly reviews relating to Mann's accounts at Pioneer. (Jayne Decl. Ex. II).

94.     Between September of 2017 and August 30, 2019, the BAM software at Pioneer generated fourteen alerts or quarterly reviews relating to Account 0212. (Jayne Decl. Ex. JJ).

95.     Between the opening of Account 2440 in February of 2019 and August 30, 2019, the BAM software at Pioneer generated two alerts or quarterly reviews relating to Account 2440.  (Jayne Decl. Ex. KK).

96.     On January 17, 2019, Julian made the following comment in response to a BAM hit or alert in Mann's bank account ending in 1236:

> December revealed an increase in ACH totals for December. The ACH debits are payroll debits and it is not necessarily suspicious to go higher at year end.

(Jayne Decl. Ex. II at PB-SWP-00145581).

97.     Pioneer never filed a SAR report with FinCen relating to any of Mann's accounts until September 30, 2019, nearly a month after Pioneer claims it first learned of Mann's fraudulent activity in his accounts. (Jayne Decl. Ex. II).

## LOAN DOCUMENTS

98.     Pioneer's lending relationship with Mann and Valuewise began in 2009. (Jayne Decl. Ex. AAAAA at ¶ 7).

99.     Pioneer Bank's then Chief Lending Officer, Joseph Fleming, has testified under oath

that his focus in reviewing credit applications for "Valuewise Corporation and Subsidiaries," was "primarily limited to Valuewise." (Jayne Decl. Ex. AAAAA at ¶ 8).

100.    This was the case, Fleming has sworn, because "Valuewise was the largest and by far the most profitable of the co-borrowers, and unlike, for example, the Mann Entity payroll service companies, Valuewise had receivables, which constituted the lending base." (Jayne Decl. Ex. AAAAA at ¶ 8).

101.    Fleming has testified that the focus of his "evaluation of the credit-worthiness of Valuewise was primarily limited to the account receivables for Valuewise itself." (Jayne Decl. Ex. AAAAA at ¶ 8).

102.    At the time of Pioneer Bank's latest increase to the line of credit on August 12, 2019, just days before the collapse, it relied on an independent field exam performed by Harvazinski & Montanye ("H&M"), specifically concentrating "on the text relating to Valuewise's processing of receivables, which was the most relevant information to Pioneer Bank's evaluation of the credit-worthiness of Valuewise." (Jayne Decl. Ex. AAAAA at ¶ 11).

103.    The parts of the H&M field exam having to do with Cloud Payroll (51% owner of Southwestern Payroll) and MyPayrollHR were not a focus of the loan's upward limit change. (Jayne Decl. Ex. AAAAA at ¶ 8).

104.    In Pioneer's Commercial Loan Executive Summary dated June 1, 2018, which raised Mann's line of credit from $22 million to $32 million, the following is included in the History from Prior Credit Requests:

*Payroll Services*

In December 2013, Valuewise Corporation acquired a payroll services company called MyPayrollHR.com, LLC financed by a non-interest bearing seller's note

18

which was paid in full and closed as of FYE '15. MyPayrollHR.com, LLC is wholly owned by Valuewise Corporation and the payroll service company does not generate accounts receivable as cash is received when payroll services are provided.

Payroll services include payroll processing, time and labor management, payroll tax processing, comprehensive resource information system and "pay as you go" workers compensation.

In December 2016, management purchased ProData . . . . Since ProData is an S-Corp., CloudPayroll LLC was formed and is 100% owned by Michael Mann. CloudPayroll LLC is 51% owner of ProData and will be added as a guarantor to the proposed loans. A CreditSafe Report dated 6/5/17 for ProData Payroll Service Inc., did not list derogatory accounts, liens or judgments.

In addition, in the 1st quarter of 2017 SouthWestern Payroll Service Inc., in Tulsa Oklahoma was also acquired. SouthWestern Payroll is a C-Corp and Valuewise Corp. was able to purchase 51% of SouthWestern. A CreditSafe Report dated 6/5/17 for SouthWestern Payroll Service, Inc., did not list derogatory accounts, liens or judgments.

(Jayne Decl. Ex. AA at PB-SWP-00050401-402).

<u>**MANN'S PAYROLL SERVICE BUREAUS WERE NOT THE ONLY PAYROLL COMPANIES HOUSING PAYROLL TAX FUNDS AT PIONEER**</u>

105.    Jim Pfieffer is the President and Owner of Pfieffer and Associates, LLC d/b/a Optimal Payroll Solutions, which is a payroll processing service bureau. (Jayne Decl. Ex. V at ¶¶ 1-2; Ex. T at 81:7-15).

106.    On July 10, 2010, Pfieffer opened four accounts in the name of Pfieffer and Associates, LLC d/b/a Optimal Payroll Solutions. (Jayne Decl. Ex. V at ¶ 4; Ex. T at 82:19-83:4).

107.    Of the four accounts Pfeiffer opened at Pioneer bank on July 10, 2010, one of the accounts was used to process payroll for his clients and two of the accounts were used to process payroll tax.  (Jayne Decl. Ex. V at ¶ 5; Ex. T at 90:6-93:23).

108.    All of the transactions in Pfieffer's payroll account at Pioneer are identified in the statements as payroll and the transactions in the payroll tax account reflect they are for receipt and

19

payment of payroll taxes. (Jayne Decl. Ex. T at 90:6-93:23).

109. When Pfieffer opened these accounts at Pioneer, he made it clear to David Farstead and Lori Carleson, both Pioneer employees, that he was using these accounts to house and transmit payroll and payroll tax for his clients. (Jayne Decl. Ex. V at ¶ 6 and Ex. T at 93:24-94:10).

110. Pfeiffer also testified that he had conversations with Seeber about the fact he was housing payroll and payroll tax at Pioneer for his clients. (Jayne Decl. Ex. V at ¶¶ 7, 9, 10; Ex. T at 100:3-103:21).

111. Seeber would on occasion wire payroll tax funds to taxing authorities out of Pfeiffer's payroll tax account at the Pfieffer's request and direction. (Jayne Decl. Ex. V at ¶¶ 7, 9, 10; Ex. T at 100:3-103:21).

112. Pfieffer provided Seeber with an instruction manual on how to make IRS tax payments so she could wire funds out of Pfeiffer's payroll tax account to the IRS. (Jayne Decl. Ex. V at ¶ 11; Ex. T at 118:24-120:2).

113. Pfeiffer testified he made it clear to Seeber why he was asking her to wire payroll taxes to taxing authorities. (Jayne Decl. Ex. T at 101:18-102:6).

114. In the nine and one-half years that Pfeiffer and Associates, LLC d/b/a Optimal Payroll Solutions was banking at Pioneer, nobody at Pioneer ever told Pfeiffer that there was a policy prohibiting payroll companies from housing and processing payroll tax through accounts at Pioneer until December 2019, after Southwestern Payroll's filing of the instant lawsuit. (Jayne Decl. Ex. V at ¶ 8; Ex. T at 101:18-102:6).

### SOUTHWESTERN PAYROLL IS NOT A TPPP OR MONEY TRANSMITTER

115. On Friday, October 20, 2017 at 4:26 P.M. Mann wrote an email to Salsburg

informing her:

> We purchased majority ownership for two payroll companies a while back and we may want to open accounts for each. If we get you what you need and I sign the documents immediately .... Could we have them open on Monday? If I need to come in, I can stop by the branch. I have some minority owners as well (they will not need access).... But I can get their signatures as well. Just curious. Mike

(Jayne Decl. Ex. SSSSSS).

116.    On Monday, October 23, 2017, Salsburg responds to Mann's email as follows:

> Good morning Mike, Here is the paperwork you need for the 2 new accounts. I marked each spot I need completed. Let me know if you have any questions. Thank you! Deb

Attached to Salsburg's email were three attachments titled: "request to combine accounts.pdf"; "SOUTHWESTERN PAYROLL SERVICES INC.pdf"; and "PRO DATA PAYROLL SERVICES INC.pdf". (Jayne Decl. Ex. SSSSSS).

117.    The "SOUTHWESTERN PAYROLL SERVICES INC.pdf" attachment included an Account Agreement for Account No. 178001996 ("Account 1996") in the name of Southwestern Payroll Services Inc. and a Customer Due Diligence Information Sheet ("CDD form"). (Jayne Decl. Ex. SSSSSS).

118.    On the "SOUTHWESTERN PAYROLL SERVICES INC.pdf" attachment, Salsburg checked the box in Section 5 of the CDD form, which asks whether the customer is a third-party payment processor. (Jayne Decl. Ex. SSSSSS) Mann did not check this box. (Jayne Decl. Ex. Q at 178:5-179:17).

119.    On the "SOUTHWESTERN PAYROLL SERVICES INC.pdf" attachment, Salsburg checked the "No" box in Section 9 of the CDD form, which asks whether the customer is a money transmitter. (Jayne Decl. Ex. SSSSSS). Mann did not check this box. (Jayne Decl. Ex. Q at 178:5-

21

179:17).

120.    Mann did not believe that Southwestern Payroll was a third-party payment processor based on the definition provided on Account 1996's CDD form. (Jayne Decl. Ex. Q at 41:16-42:15, 125:9-25, 179:18-25).

121.    Mann did not believe that Southwestern Payroll was a money transmitter when he signed the account opening documents for Account 1996. (Jayne Decl. Ex. Q at 180:2-10).

122.    Alred, the President of Southwestern Payroll, does not believe that a payroll company is a third-party payment processor based on Pioneer's definition on the account opening documents. (Alred Decl. at ¶ 5.)

123.    Alred does not believe a payroll company is a money transmitter because its own auditing "specifically states that [Southwestern Payroll is] a third-party sender in [its] role in the process, not a money transmitter." (Jayne Decl. Ex. L at 177:15-23).

124.    Southwestern Payroll has been an established payroll processing company since its inception in 1986, decades before Mann opened an account in its name at Pioneer Bank in 2017. (Alred Decl. at ¶ 4).

125.    Southwestern Payroll does not provide check cashing, currency exchange, or money transmitting or remittance services to its employer-clients. (Alred Decl. at ¶ 7). It does not redeem money orders, travelers' checks, or other similar instruments for customers. (Alred Decl. at ¶ 8).

126.    Pioneer Bank's retained expert, Daniel Wood, acknowledged that it was NatPay, rather than Southwestern Payroll, that was actually processing and transmitting the third-party employer funds. (Jayne Decl. Ex. PPPPPP at 47:5- 48:4).

127.    Mr. Wood testified that he had no information that FinCEN has ever advised

22

Southwestern Payroll it was required to register as a MT, that it had ever conducted any investigation of Southwestern Payroll for failure to register as a MT, or that it had ever taken the position that payroll companies are MTs. (Jayne Decl. Ex. PPPPPP at 48:6-49:3; 49:22-50:5; 55:2-9).

128.    The New York Department of Financial Services does not require payroll companies to get money transmitter licenses.  (Jayne Decl. Ex. PPPPPP at 74:2-6).

129.    Pioneer's expert has testified he is aware of no information that any state regulatory agency had required Southwestern Payroll to obtain a license to operate as a MT. (Jayne Decl. Ex. PPPPPP 50:6-25). He found no opinions or orders from the state agency in Oklahoma, where Southwestern Payroll is domesticated, indicating that payroll companies are MTs. (Jayne Decl. Ex. PPPPPP at 50:6-25). He was aware of only three states -- New Hampshire, Connecticut, and Texas -- that, as of September, 2019, had regulatory guidance as to whether or not payroll companies are MTs, and he had no information or evidence that any of the regulators in these states had ever communicated with Mann or Southwestern Payroll. (Jayne Decl. Ex. PPPPPP at 84:23 – 85:16; 86:16 – 87:2).

130.    In at least four states, there exist exemptions to MT licensure requirements which explicitly state and affirm that payroll companies are not required to obtain MT licenses in order to conduct their business. (Jayne Decl. Ex. PPPPPP at 57:9-19).

131.    Mr. Wood had no knowledge or information that anyone at Southwestern Payroll or Cloud Payroll knew that any state might consider them MTs. (Jayne Decl. Ex. PPPPPP at 86:16 – 87:2).

132.    By the time he was deposed in April, 2024, Mr. Wood confirmed that it was not until

years after the events giving rise to this suit that "up to 14 or 15 states so far" have now begun to adopt the Money Transmission Modernization Act" which categorizes payroll processors as MTs. (Jayne Decl. Ex. PPPPPP at 113:18 – 114:10).

133.    Mann testified that the subject of having payroll and payroll tax funds in account 0212 and account 2440 came up on numerous occasions with numerous people at Pioneer bank prior to August 30, 2019. (Jayne Decl. Ex. R at 611:18-612:3).

134.    Mann testified that when he was money laundering, check kiting, and committing fraud at Pioneer, he was not doing it as an officer of Southwestern Payroll and that Southwestern Payroll had nothing to do with this activity. (Jayne Decl. Ex. Q at 11:15-18; Alred Decl. at ¶ 12).

135.    Pioneer does not know of any evidence that there was any employee or officer at Southwestern Payroll that had any knowledge of what Michael Mann was doing at Pioneer Bank with respect to any bank fraud, money laundering, or check kiting. (Jayne Decl. Ex. H at 31:25 – 32:7).

## COLLAPSE OF THE CHECK KITING SCHEME

136.    Beginning on or around 2013, Mann engaged in a check kiting scheme between Pioneer and Bank of America ("BOA"). (Jayne Decl. Ex. FF at 15; Ex. R at 434:6-11; Ex. EE at 7-11).

137.    The kiting scheme collapsed on or about August 30, 2019, when BOA froze the accounts controlled by Mann at BOA. (Dkt. No. 157-2, at ¶ 6; Jayne Decl. Ex. EE at 7-11).

138.    On August 28, 2019, Mann deposited 39 checks totaling $18,043,000 into a BOA account held by Valuewise (x4559). The checks were written from accounts at Pioneer held in the name of the following twelve entities: Valuewise dba Apogee (x4018), Ross Personnel (x3690), Valuewise dba Primacy Search Group (x3648), Trueconsulting Corp. (x1236), TrueHR LLC

(x1244), Create Force LLC (x1699), Pro Data Payroll Services Inc. (x1988), SWP (x1996), Focalpointe Group LLC (x2192), Valuewise dba Optix Consulting (x2473), Valuewise dba Viverant (x2499), Create Force LLC dba Alwayslive (x4820). (Jayne Decl. Ex. CCC).

139.    The amount of each check was in the six figures and in round dollar amounts, such as $491,000, and $443,000, and $483,000, and every check was made payable to "Valuewise Corporation." (Jayne Decl. Ex. CCC).

140.    On August 29, 2019, Mann deposited 36 checks totaling $15,588,000 written from BOA accounts into Pioneer accounts held by the following twelve entities: Valuewise dba Apogee (x4018), Ross Personnel (x3690), Valuewise dba Primacy Search Group (x3648), Trueconsulting Corp. (x1236), TrueHR LLC (x1244), Create Force LLC (x1699), Pro Data Payroll Services Inc. (x1988), SWP (x1996), Focalpointe Group LLC (x2192), Valuewise dba Optix Consulting (x2473), Valuewise dba Viverant (x2499), Create Force LLC dba Alwayslive (x4820). (Jayne Decl. Ex. DDD).

141.    The amount of each check was in the six figures and in round dollar amounts, such as $492,000, and $430,000, and $377,000. The 36 checks were drawn on BOA accounts in the name of Heutmaker Business Advisors, LLC, Primacy Search Group, and Optix Consulting, each a subsidiary or affiliate of Valuewise.  (Jayne Decl. Ex. DDD).

142.    At about 4:30 pm on August 30, 2019, Pioneer received notification that BOA was calling back the 36 BOA checks totaling $15.588 million deposited by Mann on August 29, 2019 in various accounts at Pioneer. (Jayne Decl. Ex. F at 78:21-80:17; Ex. B at 102:8-23; Ex. DD at Response No. 14)

143.    Although Mann "wrote out of Pioneer an equivalent amount" in checks back to [BOA]," Pioneer was able to call those back. (Jayne Decl. Ex. H at 136:15-19; Ex. EEE).

25

144.    None of the accounts held in the name of MyPayrollHR were used by Mann to issue checks to or receive checks from the accounts he controlled at BOA on August 28, 2019.  (Jayne Decl. Ex. CCC; Ex. DDD).

145.    None of the accounts held in the name of MyPayrollHR had a negative balance as of September 3, 2019 as a result of the collapse of the kiting scheme.  (Jayne Decl. Ex. RR, WW, XX, YY).

146.    Account 0212 had a positive balance of $303,392.32 as of August 29, 2019.  (Jayne Decl. Ex. OO at 6.).

147.    Between August 29, 2019 and September 30, 2019, a total of $9,713,736.83 was deposited in Account 0212.  (Jayne Decl. Ex. RR).

148.    None of the accounts held in the name of Cloud Payroll were used by Mann to issue checks to or receive checks from the accounts he controlled at BOA on August 28, 2019.  (Jayne Decl. Ex. CCC; Ex. DDD).

149.    None of the accounts held in the name of Cloud Payroll had a negative balance as of September 3, 2019 as a result of the collapse of the kiting scheme.  (Jayne Decl. Ex. TT; Ex. ZZ; Ex. AAA; Ex. BBB).

150.    Account 2440 had a positive balance of $33,531.08 as of August 29, 2019.  (Jayne Decl. Ex. TT).

151.    Between August 29, 2019 and September 2, 2019, a total of $10,628,738.17 was deposited in Account 2440.  (Jayne Decl. Ex. TT).

## THE VALUEWISE LINE OF CREDIT

152.    Pioneer has two forums in which a commercial loan is approved, a staff loan committee and a board loan committee. (Jayne Decl. Ex. A at 101:3-8; Ex. C at 57:14-21). In 2019,

26

Amell was a member of both committees. (Jayne Decl. Ex. A at 101:3-8). Hughes was also a member of both committees in 2019. (Jayne Decl. Ex. E at 26:24-27:14). Fleming was on the staff loan committee in and prior to 2019. (Jayne Decl. Ex. C at 59:5-14).

153.    In 2014, Pioneer approved a renewal of a $6 million line of credit and a term loan of $3 million to be used, in part, to pay down the line of credit. The Commercial Loan Executive Summary provides that: "In December 2013, Valuewise Corporation acquired a payroll services company called MyPayrollHR.com, LLC which is expected to generate $600M in revenue in 2014 and breakeven. However, Mr. Mann noted that the business will grow dramatically after 2014 as he is investing in a sales force." (Jayne Decl. Ex. W).

154.    The 2014 Credit Request & Approval provides that MyPayrollHR.com is a "payroll services company" that provides "payroll services." It further provided that the 2013 revenue attributable to "Payroll Services" was $77,000, with net losses of $48,000. It also identified two accounts held by MyPayroll and indicated that the average balance in the MyPayroll 0212 account was $462,528. (Jayne Decl. Ex. W).

155.    In 2015, Pioneer approved an increase in the line of credit to $15 million. The 2015 Credit Request & Approval provides that MyPayrollHR.com is a "payroll services company" that provides "payroll services." (Jayne Decl. Ex. X).

156.    The 2015 Credit Request & Approval identified three different accounts held by MyPayroll and indicated that the current balance in the MyPayroll 0212 account was $613,978, which constituted about 87% of the combined current balances of all 10 accounts listed, and an average balance of $341,278, which far exceeded the combined average balances of the other nine accounts listed. (Jayne Decl. Ex. X).

27

157.    The 2015 Credit Request & Approval provided that the revenue for payroll services in 2014 was $671,000, just slightly more than the current balance in the MyPayroll 0212 account.  It further provided that payroll services lost nearly $1.7 million in 2014. (Jayne Decl. Ex. X).

158.    The 2015 Credit Request & Approval provided as follows: "Michael Mann really likes this division has invested heavily in it to get it to grow more quickly. He invested in a sales manager at approximately $250M per year and hired four back office people and over 10 sales people. The loss in 2014 is attributed to salaries and benefits as he is looking to rapidly grow the business." (Jayne Decl. Ex. X).

159.    In 2016, Pioneer approved the renewal of $15 million line of credit, a term loan of $5 million for the purpose of paying down the line of credit, and another term loan of up to $2 million to fund the acquisition of a payroll services company. (Jayne Decl. Ex. Y).

160.    The 2016 Credit Request & Approval provided that MyPayrollHR.com is a "payroll services company" that provides "payroll services." It indicated that the payroll division had revenue of $3.283 million, and net losses of $2.813 million.  It stated that Mann began cutting sales resources midway through 2015, and would cut several sales and operational jobs in June 2016.  It further stated that "the payroll service company holds a value of approximately $6.6 million based on ADP Valuations" and that Mann was "seeking an acquisition target to get the company to breakeven by FYE '16."  (Jayne Decl. Ex. Y).

161.    In 2017, Pioneer approved an increase in the line of credit to $22 million. The 2017 Commercial Loan Executive Summary provides that "Valuewise has evolved into a conglomerate with four operating divisions including consulting, physical therapy, payroll services and finance and accounting consulting."  (Jayne Decl. Ex. Z).

28

162.    The 2017 Credit Request & Approval identified three different accounts held by MyPayrollHR and indicated that the average balance in Account 0212 was $935,324, which was more than double the average daily balance of the 18 other accounts combined. It also reflected that the payroll division's 2016 revenue was about $3.2 million, and had negative 2016 net income of about $1.3 million.  (Jayne Decl. Ex. Z).

163.    The 2017 Credit Request & Approval described the payroll services provided by MyPayrollHR as follows: "payroll processing, time and labor management, payroll tax processing, comprehensive resource information system and "pay as you go" workers compensation."  It further stated that, in December 2016 "management purchased ProData in Gurnee, Illinois which double [sic] the size of their service" and that "CloudPayroll, LLC was formed and [was] 100% owned by Michael Mann," was "51% owner of Prodata and [would] be added as a guarantor of the proposed loans." It further stated that Valuewise purchased 51% of "Southwestern Payroll Service Inc., in Tulsa Oklahoma" in the first quarter of 2017. (Jayne Decl. Ex. Z).

164.    The 2017 Credit Request & Approval stated that Mann had invested approximately $4.5MM in the payroll services division in 2016. The payroll division reported a net of ($1,258M) in FY2016 mainly due to the expense of having a proprietary payroll technology platform.  With the 51% acquisition of Pro/Data in Gurnee, Illinois this doubled the size of their service and upcoming purchase of Southwestern Payroll in Tulsa, Oklahoma, growth is anticipated." (Jayne Decl. Ex. Z).

165.    The 2017 Credit Request & Approval further stated that the "current revenue run rate of the payroll division was "between $8 million and $9 million and expected to continue to grow throughout the year. The EBITDA loss was higher than expected because of the work management is doing to migrate the business from Pro Data and SouthWestern payroll. Payroll division expects the development to be completed by late summer and plans on moving their business to the

29

company's platform in the fourth quarter. Once this migration is completed, they can eliminate most of the costs to the other technology providers of Pro Data and SouthWestern Payroll. They expect to have another loss in the second quarter as we [sic] continue to develop the system to be able to take on the Pro Data and SouthWestern clients. This development work will enable the division to migrate other companies onto the system a lot faster in the future and management can start to sell the technology to other service bureaus (not owned by Valuewise)." (Jayne Decl. Ex. Z).

166.    In 2018, Pioneer increased the line of credit from $22 million to $32 million. The 2018 Commercial Loan Executive Summary provided the payroll division of Valuewise included three "payroll bureaus," and noted that the division "sold a nation-wide contract to Gallagher Insurance for payroll in 2018."   (Jayne Decl. Ex. AA).

167.    The 2018 Credit Request & Approval identified Cloud Payroll and MyPayrollHR as co-borrows on the line of credit.  It also described the payroll services provided by MyPayrollHR as follows:  "payroll processing, time and labor management, payroll tax processing, comprehensive resource information system and "pay as you go" workers compensation." (Jayne Decl. Ex. AA).

168.    The 2018 Summary identified four different accounts held by MyPayrollHR and indicated that the average balance in Account 0212 was $1,848,764, which was more than double the average daily balance of the 19 other accounts listed combined.  (Jayne Decl. Ex. AA).

169.    In 2019, Pioneer increased the line of credit from $32 million to $42 million.  Co-borrows included Cloud Payroll and MyPayrollHR. The 2019 Credit Request & Approval reflected that Cloud Payroll had three Pioneer deposit accounts and MyPayrollHR had four, and Account 0212 had an average balance of $661,439. (Jayne Decl. Ex. BB).

170.    The 2019 Credit Request & Approval described MyPayrollHR as "Cloud-based payroll and a HR software sold to clients throughout the US. The company does not generate

accounts receivable as cash is received when payroll services are provided. The company has been developing payroll software over the past several years and is expected to roll out the software to 3rd parties in 2019." The 2019 Credit Request & Approval described Cloud Payroll as "100% owned by Michael Mann and represents his 51% ownership share of ProData, a payroll service company located in Gurnee, Illinois." (Jayne Decl. Ex. BB).

171.    The 2019 Credit Request & Approval reflected total revenues of $175,389,000, payroll division revenues of $10,240 million, and payroll division net income of negative $5.887 million. It indicated that "[t]he 23% increase in revenue in the payroll division was primarily due to organic growth of the company's three existing payroll service bureau, which are all profitable according to Mr. Mann. In 2018, MyPayrollHR.com sold their first technology license to a payroll service bureau in Oregon and feedback from the customer has been positive. Per Mr. Mann, MypayrollHR expects that technology licenses will provide a significant opportunity for revenue growth by the 2nd half of 2019." (Jayne Decl. Ex. BB).

172.    The 2019 Credit Request & Approval further provided that "[t]he payroll segment losses deepened in FY'18, declining to ($5,887M) due primarily to R&D and IT costs relating to the development of the company's new payroll technology. According to Mr. Mann, the payroll segment will begin seeing profitability from the investment by second half of 2019, when all the existing payroll service bureaus are migrated to the new technology and licenses to third parties are sold." (Jayne Decl. Ex. BB).

173.    The 2019 Credit Request & Approval also stated that "[a] notable change in assets between the last two periods was the addition of $414M in investment in subsidiaries, which included Cloud Payroll, LLC's 10% equity investment in HRNext, LLC (a payroll software

31

company).” It also reflected subordinated debt of Cloud Payroll as of December 31, 2018 totaling $1,257,000. (Jayne Decl. Ex. BB).

174. The Independent Accountants’ Report, dated July 3, 2019, the receipt of which was a condition of approval of the 2019 $42 million line of credit, stated as follows with respect to Valuewise federal and state withheld taxes:  Payroll taxes are electronically paid to Cloud Payroll, which in turn remits them to the various government agencies.”  (Jayne Decl. Ex. CC).

**AUGUST 30, 2019**

175. At about 4:30 pm on August 30, 2019, Pioneer received notification that BOA was calling back the 36 checks totaling $15.8 million deposited by Mann on August 29, 2019 in various accounts at Pioneer. David Hunn, then Pioneer’s Vice President, Deposit Operations, discussed the matter with Patrick Hughes and Joseph Fleming. (Jayne Decl. Ex. H at 121:2-5; Ex. E at 88:6-12).

176. Kim Catello, Pioneer Deposit Operations Analyst, received the directive to “freeze” or “restrict” all 32 of the Mann Entity accounts as well as Mann’s personal bank account, which she accomplished on August 30, 2019. (Jayne Decl. Ex. F at 84:16-86:18; Ex. B at 103:13-104:24; 126:5-127:10; Ex. ZZZZ).

177. As a result, Mann lost any ability to access any accounts at Pioneer.  (Jayne Decl. Ex. Q at 194:5-22).

178. When Pioneer freezes an account, all debit and credit transactions to the account are frozen and will unpost.  (Jayne Decl. Ex. F at 18-25; 231:4-14; Ex. B at 39:21-40:03).

179. Pioneer can freeze an account so that all debit and credit transactions are automatically rejected during posting overnight. (Jayne Decl. Ex. B at 40:25-41:12). Alternatively, when the account is frozen, all debit and credit transactions are unposted and must be manually processed. (Jayne Decl. Ex. F at 232:5-25).

180.    An alternative procedure to freezing an account is to restrict it to "Credits Only." In that scenario, credits will automatically post to the account, and debits will unpost and have to be manually processed. (Jayne Decl. Ex. F at 232:5-16; Ex. B at 129:8-130:4).

181.    With respect to the Mann Entity accounts, Pioneer froze or restricted the accounts as to all transactions, whereby all debit and credit transactions "d[id] not post to the account, or they unpost[ed], and those transactions then need[ed] to be manually processed individually." (Jayne Decl. Ex. F at 88:18-24; 231:2-18; 232:5-25; Ex. B at 38:9-24).

182.    When both the credit and debit of an online banking transaction are unposted, Pioneer can either post both transactions or reject both transactions. (Jayne Decl. Ex. B at 58:8-22).

183.    Fleming was asked to contact Mann and let him know that BOA was calling back the checks and Pioneer would be "freezing his accounts." (Jayne Decl. Ex. H at 124:2-6; Ex. E at 91:20-92:10; Ex. Q at 180:19-11).

184.    Fleming had a telephone conversation with Mann on August 30, 2019, and told him that BOA "had frozen his accounts and [Pioneer was] freezing his accounts." (Jayne Decl. Ex. C at 300:4-301:12; Ex. AAAAA.

185.    At 5:26 pm, Mann sent Fleming a text stating "I have left a message.  As soon as I hear back, I will let you know." Fleming responded, "Okay.  Thanks." (Jayne Decl. Ex. BBBBB).

186.    At about 6:00 pm on August 30, 2019, Fleming sent a copy of the Valuewise "note, loan and security agreement, and credit write-up" to Amell, indicating that the "right of setoff language in the note addresses taking money from the deposit accounts to make payments on the loan" but that "[d]rawing down on the line to offset overdrafts is not addressed." (Jayne Decl. Ex. CCCCC).

33

187.    At 6:08 pm on August 30, 2019, Amell sent an email to Fleming, asking what Fleming's "gut" told him after speaking to Mann, and whether Mann responded "like he was caught or shocked that it happened."  (Jayne Decl. Ex. CCCCC).

188.    At about 6:24 pm on August 30, 2019, Fleming responded to Amell's question, indicating that Mann "was very short [and] he simply said that he was aware of it and would call them and call [Fleming] back." Fleming stated that he was "concerned" because he "would have expected questions and more conversation."  (Jayne Decl. Ex. CCCCC).

189.    At about 6:24 pm on August 30, 2019, Amell responded to Fleming's email, stating that he agreed that Mann "would have needed details." (Jayne Decl. Ex. CCCCC).

190.    At 7:37 pm, Fleming sent a text to Mann, asking "Have you heard anything?" (Jayne Decl. Ex. BBBBB).

191.    Mann responded to Fleming, stating that he had left several messages with BOA but had not heard back. Mann further stated that he "could not access the accounts" that morning and BOA "said they were working on restoring the access" but said "[n]othing about freezing accounts or returning checks." (Jayne Decl. Ex. BBBBB).

192.    Fleming forwarded Mann's text to Amell, Hughes, Sarratori, and Mazzara.  (Jayne Decl. Ex. DDDDD).

**AUGUST 31, 2019**

193.    At about 8:13 am on August 31, 2019, Fleming sent Mann a text asking that Mann call him because Fleming had a conference call scheduled and wanted to touch base. (Jayne Decl. Ex. C at 291:2-292:9; Ex. EEEEE). Fleming also called Mann, but Mann did not pick up.  PB-SWP-00058133.

194.    Mann responded to Fleming's text at 9:40 am, stating "Joe . . . do what's best for you (Pioneer). I am going to jump on this first thing Tuesday to get this fixed. My BofA contact did not call back." Fleming forwarded the text to Amell, Sarratori, Hughes, and Mazzara. (Jayne Decl. Ex. EEEEE).

195.    Amell responded to Fleming, "Not good[.]" (Jayne Decl. Ex. EEEEE).

196.    Fleming and others on the executive team participated in a conference call on the morning of August 31, 2019.  (Jayne Decl. Ex. C at 294:13-296:19).

197.    At about 11:00 am on August 31, 2019, a representative from COOL Insuring Agency, Inc., sent an email to Mazzara with a subject line "FW: Check Kiting Fraud / Forgery or Alteration." The email referenced Pioneer lines of insurance coverage relating to "Forgery" and "Kiting." Mazzara forwarded the email to Amell, Sarratori, Fleming, and Hughes.  (Jayne Decl. Ex. FFFFF).

198.    By this time, Pioneer executives were "doing their homework" regarding how Pioneer would recover if Mann was engaged in check kiting, forgery, or fraud. (Jayne Decl. Ex. C at 305:11-19).

199.    At about 11:02 am on August 31, 2019, Fogarty sent an email to "mitigation .support.hhl@bankofamerica.com" inquiring about the status of three BOA accounts that had "items returned marked Frozen/Blocked account that exceed[ed] $15 million." (Jayne Decl. Ex. GGGGG).

200.    While she was in the office on August 31, 2019, Fogarty made "copies of the checks that were bouncing" so that Pioneer executives would be aware of "the accounts that were going to have the negative balances." She made no other copies of anything after that.  (Jayne Decl. Ex. D at 382:24-383:18).

201.    On August 31, 2019, at Amell's request, Fleming spoke with Mann's accountant, Patrick Scisci.  After the call, Fleming sent Amell an email stating that Mann's accountants were aware that Mann was "understaffed in the financial area," and indicating that he had told Mann that. Amell responded, stating that he was "concerned it might not be him but his CFO." Fleming responded "He is the CFO. That's part of the problem." Amell responded, "That is a big problem." Fleming responded, "We have had multiple conversations about it." (Jayne Decl. Ex. HHHHH; Ex. C at 306:2-311.25).

## SEPTEMBER 3, 2019

202.    At about 7:45 am on Tuesday, September 3, 2019, Mann sent an email to Fleming and Blessing indicating that he was "stepping down as CEO of Valuewise (and all its affiliates) immediately."  He further stated that "Tim [Burke] will be taking over running all entities." (Jayne Decl. Ex. IIIII). Fleming forwarded the email from Mann to Amell, Mazzara, Sarratori, and Hughes. (Jayne Decl. Ex. IIIII).

203.    Tim Burke is an investment banker who began working for Valuewise in 2017. Burke was introduced to Mann by Blessing in about April 2016.  To explain Mann's businesses to Burke, Blessing sent a link to Mann's "payroll website" which, at the time was www.mypayrollhr.com."  (Jayne Decl. Ex. JJJJJ; Ex. Q at 186:2-14).  Fleming also knew Mr. Burke before he began working for Valuewise. (Jayne Decl. Ex. C at 311:4-312:6).

204.    At about 8:00 am on September 3, 2019, Mann sent an email to Burke with an attached document labeled "Instructions."  The Instructions stated that the "[g]oal is to maximize asset value of current assets."  As to the "Payroll Companies," the instructions stated as follows:

> There should be money in the line of credit as well as in Bank of America to cover all the tax dollars for the payroll companies. The Bank of America accounts are frozen (as well as Pioneer) currently. I highly recommend that they continue to make

36

payments for our clients. This will keep the asset value of the payroll companies up and allow Pioneer to get a lot of their money back from this asset. If they don't allow Tim to put it back into the 2440 account, the asset value will go way down. The asset value will probably drop a lot more than the money they must keep the payroll tax payments going. Again, they should work with Tim. They will have a few days to figure this out with Tim if they keep it going. Tim/Pioneer should work with Bank of America to get these funds back. I don't have access to either bank so I am not sure where the money ended up with both banks freezing accounts.

(Jayne Decl. Ex. KKKKK).

205.    Mann was concerned about the payroll companies and tax payments because he believed if taxes were not paid, the value of the payroll companies would collapse. (Jayne Decl. Ex. Q at 192:7-193:23).

206.    On Tuesday, September 3, 2019, Pioneer executives, including Amell, Sarratori, Fleming, and Fogarty, participated in discussions in Sarratori's office. (Jayne Decl. Ex. D at 301:10-306:8; 382:24-383:18; Ex. H at 134:3-136:7). Sarratori had copies of the checks that BOA had returned. (Jayne Decl. Ex. H at 134:3-136:7; 137:22-138:15).

207.    At about 8:10 am, Fleming and Sarratori spoke to Burke by telephone.  Burke offered to fly to Albany and to help in any way that he could. (Jayne Decl. Ex. LLLLL)

208.    When Hunn arrived at Pioneer on the morning of September 3, 2019, there was a "very large volume of unposted items that had to be processed." (Jayne Decl. Ex. F at  88:10-94:7). Hunn went to Frank Sarratori, who was in his office with Amell, Hughes, and possibly others to inform him of the unposted items that needed to be processed. (Jayne Decl. Ex. F at 97:14-98:23; Ex. E at 121:7-22).

209.    Pioneer executives were aware that the bulk of the credits, totaling millions of dollars, were going to accounts held by companies with "payroll" in their names. (Jayne Decl. Ex. E at 127:4-129:19; H at 345:3-18).

210.    Thereafter, Catello began the manual process of reviewing each transaction in each of the frozen accounts, and either posting or rejecting the transaction. (Jayne Decl. Ex. H at 151:20-152:10; Ex. F at 94:8-15; 99:3-11; Ex. B at 110:22-112:8). The information available as to each transaction included at least the account number, dollar amount, type of transaction, and transaction description. (Jayne Decl. Ex. F at 212:2-8).

211.    Catello accepted all credits to the accounts and rejected all debits except certain on-line banking transactions initiated by Mann on August 30, 2019, chargebacks representing the checks called back by BOA, and chargeback and other fees. (Jayne Decl. Ex. F at 102:8-104:12; Ex. MMMMM; Ex. ZZZZ).

212.    Catello completed processing all unposted August 30, 2019 items during the day on September 3, 2019. (Jayne Decl. Ex. B at 112:12-19).

213.    At about 9:20 am, Burke participated in a call with David Blessing and shared with him "what new information" he had after communications with Mann and others since 7:00 am that morning. (Jayne Decl. Ex. LLLLL).

214.    At about 12:30 pm, Mann forwards an email from Schilling to Burke.  Schilling requested access to Pioneer account and noted that they have $451,220.73 to be paid in taxes tomorrow out of the 2440."  Burke stated that he wanted to "ensure funds are getting moved back from the interest account to cover it."  Mann asked Burke to "see what you can do when you talk to Pioneer."  (Jayne Decl. Ex. OOOOO).

215.    At about 12:55 pm on September 3, 2019, Mann sent an email to Sarratori and Burke, indicating that he had received Sarratori's message and that BOA was "not returning [his] calls (or text messages)," that Mann had sent "an email to authorize [Burke] to talk on [his] behalf," and that

38

Burke was "in route to Albany and w[ould] work with [Fleming]." (Jayne Decl. Ex. NNNNN; Ex. Q at 186:27-188:10).

216.    At about 12:57 pm, Fleming forwarded Mann's email to Amell, Mazzara, Hughes, Fleming, and Fogarty. (Jayne Decl. Ex. NNNNN).

217.    At 2:00 pm, Catello sent Hunn and Benedict a spreadsheet reflecting all debits and credits to the Mann Entity accounts, as well as the transactions to be allowed and the transactions to be returned.  The total number of debits and credits to the Mann Entity accounts was over 1,500, including about 737 separate deposits to the Cloud Payroll 2440 account totaling over $8 million. (Jayne Decl. Ex. MMMMM; Ex. UU).

218.    The spreadsheet reflected that Pioneer would allow $46,493,823.98 credits (deposits) to the accounts and $32,288,462.61 debits (withdrawals), for a net positive gain of $13,605,361.37. (Jayne Decl. Ex. MMMMM).

219.    At about 2:25 pm, Blessing picked up Burke from Albany International Airport and brought him to Pioneer, where he met with Amell, Fleming, Sarratori, and Mazzara for about two and a half hours. During the meeting, Burke called Mann to ask that he come to Pioneer the following day, with his attorney, for a meeting with Burke and Pioneer executives. Mann agreed. (Jayne Decl. Ex. LLLLL; Ex. E at 117:3-17; Ex. A at 273:13-274:3).

220.    At about 5:00 pm, Mann sent an email to Burke regarding the meeting at Pioneer the following day and the execution of a corporate resolution. Burke responds that his attorney could be at Pioneer at 11:30 am on September 4, 2019. (Jayne Decl. Ex. PPPPP).

221.    Burke and Blessing had dinner together on September 3, 2019. (Jayne Decl. Ex. LLLLL; Ex. A at 274:4-13).

222.   At about 8:40 pm on September 3, 2019, Burke and Reinke spoke on the telephone. Reinke stated, among other things that he was "very concerned about making tax payments and ability to manage transactions" because Pioneer had frozen the payroll company accounts. (Jayne Decl. Ex. LLLLL; Ex. N at 109:12-111:16; 112:19-113:23).

223.   At about 8:57 pm on September 3, 2019, Mann sent an email to Burke indicating, among other things, that "[t]here was probably close to 1.9M to cover tomorrow morning from the tax account," that Mann had moved "probably 3M to the line from the tax account on Friday [August 30, 2019]", and that there was "more money coming in tomorrow." (Jayne Decl. Ex. QQQQQ; Ex. Q at 190:21-192:6).

224.   Burke responded to Mann's email, indicating that they could "talk about it at 11:30 with the bank." Mann responded, indicating that 11:30 am might be "too late" because "they normally have to pay them before 11:30. Again, I only say this because I don't want to hurt the payroll asset value.  If they look to sell without a blemish, the multiple will be a lot higher." (Jayne Decl. Ex. RRRRR).

225.   At about 9:17 pm on September 3, 2019, Burke forwarded Mann's 8:57 pm email to Blessing and Fleming. (Jayne Decl. Ex. QQQQQ).

226.   At about 9:30 pm, Burke called Fleming to discuss what he had learned from Reinke. (Jayne Decl. Ex. LLLLL; Ex. C at 335:23-336:13).

227.   At about 9:38 pm on September 3, 2019, Fleming forwarded the emails from Burke and Mann to Amell, Sarratori, Hughes, and Mazzara. Fleming stated that he "received the email from Tim" and that he was "not completely sure what [it] was about." He further stated that he had "just hung up with Tim [Burke]," who had spoken "to the head of the payroll company" and was

informed that Mann had gotten "kicked out of United Health four years ago" after getting "caught forging a signature on a United contract."(Jayne Decl. Ex. C at 319:12-326:7; Ex. QQQQQ).

228.    At about 10:08 pm on September 3, 2019, Amell responded to Fleming's email, copying Sarratori, Hughes, and Mazzara, and stating, among other things, that Mann was "a criminal" who had "completely fabricated millions in A/R's." (Jayne Decl. Ex. QQQQQ).

## SEPTEMBER 4, 2019

229.    At 7:43 am on September 4, 2019, Mann sent an email to Burke indicating that Michael Koenig would be representing him and requesting that all documents be emailed to him prior to the meeting. Burke forwarded the email to Fleming and Blessing and proposed that he inform Mann that the documents would not be provided in advance. Fleming forwarded the emails to Sarratori, Amell, Hughes, and Mazzara. (Jayne Decl. Ex. SSSSS).

230.    At 8:33 am, Mazzara responded to Amell's email sent the prior evening in which he called Mann a "criminal" who had "completely fabricated millions in A/R's," asking whether they had "talked to the attorney's [sic] about law enforcement?" (Jayne Decl. Ex. QQQQQ). There were further emails among Pioneer's executives, between 8:34 am and 8:43 am, all of which started with the September 3, 2019 email from Mann to Burke that referenced the "tax account" and indicating that more money would be deposited the next day. *Id.*

231.    When Hunn arrived at Pioneer on the morning of September 4, 2019, there was again "a high volume of unposted items that needed to be addressed." (Jayne Decl. Ex. F at 207:19-23).

232.    Catello was again tasked with manually processing the large number of unposted items. (Jayne Decl. Ex. F at 209:6-25).

233.    At 8:55 am, Catello sent Hunn a spreadsheet reflecting "Items to be Returned" and "Items to be Paid," including $3,346,734.7 in credits, most primarily to the Cloud 2440 account.

Hunn forwarded the spreadsheet to Sula Landi, then serving as Vice President and Comptroller. (Jayne Decl. Ex. TTTTT).

234.    Reinke, the CEO of the payroll companies, directed Schilling, who served as Finance Manager for Cloud Payroll, to go to Pioneer's headquarters on Wolf Road in Albany, New York, to attempt to get the payroll funds unfrozen and keep the value in the payroll business. Schilling arrived at Pioneer's headquarters at about 9:47 am on September 4, 2019. (Jayne Decl. Ex. N at 125:13-133:18; Ex. O at 194:23-196:23; 199:19-202:8; Ex. U at ¶ 4).

235.    Schilling met with Burke in a coffee shop on the first floor and told Burke that payroll funds were frozen in the Pioneer accounts, and there was a concern that client payroll was going to bounce. (Jayne Decl. Ex. U at ¶ 5; Ex. O at 230:3-231:2; 231:25-232:14; Ex. LLLLL).

236.    Schilling also saw Blessing in the coffee shop, who appeared to be distraught and was crying or had been crying. (Jayne Decl. Ex. U at ¶ 5; Ex. O at 201:10-203:17; 231:3-14).

237.    Shortly after Schilling arrived, Sarratori and a female Pioneer employee came to the coffee shop and escorted Schilling to a conference room in the building. Schilling explained that he worked for Cloud Payroll and that there were payroll funds frozen in the payroll company account. Sarratori and the female employee told Schilling that since he was not the account holder, they could not speak to him about it. (Jayne Decl. Ex. U at ¶¶ 6-7; Ex. O at 233:15-237:7).

238.    Sarratori did not ask any questions about the payroll funds that Schilling referenced. (Jayne Decl. Ex. O at 251:15-253:4). Schilling would have provided any information that he had and could have identified the payroll company accounts that held the frozen funds. (Jayne Decl. Ex. O at 253:5-254-13).

239.    Schilling left Pioneer headquarters at about 10:34 am on September 4, 2019. (Jayne Decl. Ex. U at ¶ 9).

240. At about 11:00 am, Mann and Koenig met with Amell, Sarratori, Hughes, Robert Alessi from DLA Piper, and Jeff Cardone from Luse Gorman, in a Pioneer conference room. (Jayne Decl. Ex. S at 20:12-21:24; Ex. H at 360:6-361:4).

241. One goal of the meeting was for Mann to make contact with BOA, and Pioneer had four questions prepared for Mann to ask once he got through to someone. (Jayne Decl. Ex. S at 41:12-42:13; 43:22-44:2; Ex. Q at 198:13-199:3).

242. Another goal of the meeting was for Mann to transfer authority over the various Mann Entities, including the payroll companies, to Burke. (Jayne Decl. Ex. H at 361:5-10; Ex. Q at 197:9-23).

243. Mann's primary concern was the tax funds that were frozen in the accounts at Pioneer. (Jayne Decl. Ex. S at 69:14-23; 72:21-73:15). Mann wanted to get answers from BOA so that Pioneer "could release the freeze on the payroll accounts." (Jayne Decl. Ex. Q at 229:8-21).

244. Mr. Alessi opened the meeting by asking Mann why BOA was so unhappy. (Jayne Decl. Ex. S at 22:13-24). Koenig did not allow Mann to answer questions or make any statements to the larger group. (Jayne Decl. Ex. S at 26:11-16). The larger group asked neither Mann nor Koenig any substantive questions. (Jayne Decl. Ex. S at 50:23-51:8).

245. Late in the morning, Koenig and Mann left the larger conference room and went to a smaller conference room where they were alone for between thirty minutes to an hour. (Jayne Decl. Ex. S at 28:3-10). While in the smaller conference room, Mr. Alessi joined them from time-to-time, for a total of about 15 to 20 minutes. (Jayne Decl. Ex. S at 28:3-22; Ex. Q at 200:3-17).

246. Mr. Alessi and Mann spoke to one another on substantive matters. (Jayne Decl. Ex. S at 29:20-30:2; 76:13-25). Mann wanted to help Pioneer, and therefore Koenig allowed Mann to share whatever information Mann thought might help. (Jayne Decl. Ex. S at 75:3-17).

247.    Mr. Alessi asked Mann whether the payroll business "did taxes or payroll or both" and they engaged in some discussion about the payroll business. Mann informed Mr. Alessi that payroll tax funds were housed at Pioneer and that it was in everyone's interest to let the funds move forward because "not letting the tax funds go through would ruin those companies" and there was "a lot of value in the payroll companies if [they could] keep them going." (Jayne Decl. Ex. Q at 200:3-204:4; Ex. H at 188:7-17).

248.    At about 4:00 pm, Mann and Koenig left Pioneer when it became clear that BOA was not going to get back to Mann. (Jayne Decl. Ex. S at 27:4-8; 42:14-21).

249.    At about 4:16 pm, Reinke called Pioneer to schedule a call with someone, and was told that Sarratori would speak to him. Shortly after that call, Reinke received a call back from someone who told him the specific time that he could call Sarratori. (Jayne Decl. Ex. N at 133:19-135:3).

250.    Reinke initiated a call with Sarratori at about 4:42 pm. Sarratori was on the phone with Amell and a female employee of Pioneer for about seven minutes, during which he told them that the payroll company was in danger of shutting down because payroll and payroll taxes had been frozen by Pioneer, and if the payroll company could not move the money out, then "it was going to wreak a lot of havoc[.]" (Jayne Decl. Ex. N at 135:4-137:16).

251.    Reinke conferenced into the call Aberash Asfaw and Al Blowers from Cachet Bank, who were distraught because payroll funds were frozen in the Pioneer accounts. Asfaw explained that at least $16 million of Cachet's funds had been lost as a result of the Pioneer accounts being frozen. (Jayne Decl. Ex. N at 135:4-139:14; Ex. P at 25:25-27:6).

252.    Sarratori, Amell, and the woman from Pioneer listened patiently to everything said by Reinke and Asfaw, and said that, because they were not the account holders, they could not discuss the accounts with them. (Jayne Decl. Ex. N at 139:15-140:2).

253.    Had Pioneer asked any questions of Reinke, he would have provided any information they requested.  He was desperate to provide information to Pioneer, but Pioneer did not provide him with that opportunity. (Jayne Decl. Ex. N at 143:3-16).

254.    On September 4, 2019, Sarratori received a call from a loan company stating that Mann owed $10 million and that the company had a security interest in account deposits at Pioneer. (Jayne Decl. Ex. H at 342:13-343:6).

255.    At about 7:20 pm on September 4, 2019, Burke sent Blessing a summary of his observations and a timeline of events beginning September 2, 2019 and ending the morning of September 4, 2019.  (Jayne Decl. Ex. LLLLL).

**THE MOVEMENT OF FUNDS FROM THE
MANN ENTITY ACCOUNTS TO A GL ACCOUNT**

256.    Late in the afternoon on September 4, 2019, Hunn was instructed by Hughes to move any funds in the Mann entity accounts to a Pioneer general ledger ("GL") account. (Jayne Decl. Ex. F at 133:8-134:12; 148:22-150:12; 208:2-209:5; 236:6-237:3; Ex. H at 148:25-149:8).

257.    Hunn then directed Catello to move funds from the Mann Entity accounts to a GL account. (Jayne Decl. Ex. B at 118:22-122:24; Ex. F at 237:4-10).

258.    Pioneer could have reversed the decision to move the funds at any time before the transfers were complete. (Jayne Decl. Ex. UUUUU at 212:18-213:2; Ex. J at 149:9-12).

259.    Between about 6:19 pm and 6:31 pm on September 4, 2019, Catello effectuated transfers of funds in Mann Entity accounts to GL account ending in 2000, which was a Pioneer

suspense account, i.e., an account where activity goes that awaits ultimate decision on posting. (Jayne Decl. Ex. B at 118:22-120:19; 154:4-155:22; Ex. E at 160:19-161:10; Ex. VVVVV; Ex. WWWWW.

260.    The total amount withdrawn from the Mann Entity accounts and deposited to the GL 2000 account was $15,076,168.67, including $7,205,338.10 withdrawn from the MyPayroll 0212 account, and $6,845,944.84 withdrawn from the Cloud Payroll 2440 account. (Jayne Decl. Ex. VVVVV; Ex. EE at 14-15).

261.    The withdrawal of funds from the Mann Entity accounts is reflected as a "Debit Memo" in Pioneer's records. (Jayne Decl. Ex. B at 122:5-24; Ex. F at 133:8-25; Ex. RR; Ex. UU).

262.    At about 6:45 pm on September 4, 2019, Catello sent an email to Mazzara with screenshots taken of the Pioneer's Horizon core banking system reflecting (1) the debit memos performed on that date to the Pioneer GL 2000 account; and (2) from each of the Mann Entity accounts, pending or posted transactions and current balances, including for the Cloud Payroll 2440 account transactions described as "CLOUDPAYROLL/TAX" and a balance of $6,845,944.84. (Jayne Decl. Ex. VVVVV; Ex. B at 160:17-162:24).

263.    On September 4, 2019, Amell "had no idea what was going on, [and he] just wanted to possess our money." Accordingly, he "made the decision to collect our money into a general ledger account." (Jayne Decl. Ex. A at 153:8-22).

264.    Pioneer "acted swiftly" to move the funds from the accounts controlled by Mann to a Pioneer GL account because Pioneer executives "were concerned . . . because the bank was out $15.8 million and [they] weren't sure what other creditors were out there." Pioneer wanted to prevent other creditors from attaching the accounts. (Jayne Decl. Ex. H at 343:2-344:8; Ex. A at 142:14-143:11).

265.    The source of the funds, and the fact that the funds could belong to innocent third-parties, was not relevant to Pioneer's decision to move the funds to a GL account. (Jayne Decl. Ex. A at 144:22-149:11).

266.    Pioneer made no contemporaneous writings concerning its decision to move funds from the accounts held by Mann Entities to Pioneer's GL account on September 4, 2019. (Jayne Decl. Ex. H at 158:23-159:4; Ex. A at 200:12-22; Ex. E 179:2-182:3. Pioneer did not mail notice of any set off to Cloud Payroll or MyPayrollHR in accordance with New York Banking Law § 9-g(2). *Id.*

267.    Before the debit memos were effectuated on September 4, 2019, Sarratori, Fleming, and Hughes reviewed the account opening documentation for each of the Mann Entity accounts, account balances, and the loan documents. (Jayne Decl. Ex. H at 194:20-197:5; Ex. E at 164:9-165:20).

268.    Before the debit memos were effectuated on September 4, 2019, Pioneer executives knew that there was about $15 million in the accounts, all of which had been deposited on August 30 and September 3, 2019, into Accounts 0212 and 2440. (Jayne Decl. Ex. H at 344:4-345:189).

269.    Before the debit memos were effectuated on September 4, 2019, Pioneer executives did no investigation concerning the source of the funds in Accounts 0212 and 2440. (Jayne Decl. Ex. H at 206:14-20; Ex. E at 167:4-171:20).

270.    Before the debit memos were effectuated on September 4, 2019, none of Sarratori, Amell, nor Hughes had a direct discussion with Blessing concerning the payroll companies or their accounts. (Jayne Decl. Ex. H at 355:11-17).

271.    Before the debit memos were effectuated on September 4, 2019, Pioneer had available to it information concerning the source of the funds in Accounts 0212 and 2440 and each

47

ACH credit and debit, including the description, and "ACH Individual ID Name." (Jayne Decl. Ex. H at 346:24-350:17; 358:17-359:2; Ex. SS; Ex. VV).

### MATERIAL EVENTS ON AND AFTER SEPTEMBER 5, 2019

272.    At about 6:35 am on September 5, 2019, Catello sent Hunn a spreadsheet identifying "Items to be Returned" and "Items to be Allowed," which included credits totaling $1,778,740.71 to be deposited in the Cloud 2440 account. (Jayne Decl. Ex. XXXXX; Ex. YYYYY; Ex. UU).

273.    Catello manually processed the unposted items in the Mann Entity accounts that morning. (Jayne Decl. Ex. F at 123:17-124:3; 127:9-130:21; Ex. B at 177:13-20).

274.    At about 11:00 am on September 5, 2019, the funds that had been deposited to the GL 2000 account were transferred to a Pioneer GL "Deposit Clearance" account ending in 6000. (Jayne Decl. Ex. E at 162:7-14; Ex. ZZZZZ).

275.    On September 5, 2019, Pioneer customer sent an email to Benedict, requesting that Pioneer "immediately suspend any activity that is requested from MyPayrollHR.com" and noting that on the bank statements the activity is reflected as follows:  "CLOUDPAYROLL/TAX COL" and "2115-National Bu/Payroll."  The customer further stated that it did "not want them to be to take any money out of our account until further notice" because "[t]hey are having issues with their bank accounts[.]" Mr. Benedict prepared and provided the customer with two "ACH Debit Stop-Payment Request" forms. (Jayne Decl. Ex. AAAAAA).

276.    On September 6, 2019, the *Albany Times Union* published an article entitled "Shuttering of Clifton Park payroll company sends businesses scrambling." The article described in detail how the "abrupt closure' of MyPayroll HR left employers outraged and scrambling to pay their employees. (Jayne Decl. Ex. BBBBBB).

48

277.    Mazzara circulated the article to Pioneer Executive Management, stating "FYI... Our name NOT mentioned." Amell responded, "Let's keep it that way." (Jayne Decl. Ex. BBBBBB).

278.    On September 6, 2019, NEWS10 (ABC, Albany) published an article on its website entitled "Local payroll company suddenly closes its doors." The article indicated that a local business owner had reported that he had "no way of paying his employees," and that MyPayroll HR was "used by businesses across the country." On September 6, 2019, Mazzara sent the article to Amell and Sarratori, indicating "Still no mention of any banks, but a matter of time." (Jayne Decl. Ex. CCCCCC).

279.    On September 6, 2019, Sarratori, Hunn, and others at Pioneer received an email that had been sent by MyPayrollHR on September 5, 2019, indicating that it was "no longer able to process any further payroll transactions" and advising that clients should find "an alternative method to pay employees," together with an email from a local accounting firm providing a "Payroll Processing update" and explaining that MyPayrollHR had over 200 employees and 4,000 clients nationwide, and that "all funds held in Trust by mypayrollhr are currently frozen at Pioneer Bank." (Jayne Decl. Ex. DDDDDD).

280.    On September 6, 2019, Mr. Alessi received a letter from a law firm representing a human resources firm that contracted with MyPayrollHR "to provide payroll and direct deposit services" and suggesting that Pioneer "appears to have custody of Goodkind's funds that were wrongfully transferred to Pioneer." (Jayne Decl. Ex. EEEEEE).

281.    On September 9, 2019, Bonnie Pinzel, counsel to NatPay, emailed a letter addressed to Frank Sarratori demanding that Pioneer correct its erroneous return of ACH transactions submitted by NatPay. Pioneer did not respond to Ms. Pinzel's letter. (Jayne Decl. Ex. FFFFFF).

282.    On September 9, 2019, Pioneer Customer "A", which had been referred to MyPayrollHR by Blessing, reached out to Blessing to request that its payroll account be closed because it had "been impacted by the closing of MyPayrollHR[.]" Blessing put the customer in touch with someone in the branch of the bank located at Pioneer headquarters.   (Jayne Decl. Ex. GGGGGG).

283.    On September 9, 2019, Pioneer representatives met with representatives of Berkshire Bank and Chemung Capital Bank.  Pioneer representatives explained that Pioneer was holding about $16 million in credits, and the funds "can be used to reduce the overdraft," but Berkshire and Capital felt the funds should be used to reduce line indebtedness. (Jayne Decl. Ex. HHHHHH).

284.    On September 12, 2019, Hunn received a listing of all Pioneer Bank customers who had transferred or paid money to Cloud Payroll in August 2019, including Customer A, Customer B, Customer C, Customer D, and Customer E. The detailed spreadsheet listed all transactions with the Cloud Payroll account. (Jayne Decl. Ex. IIIIII).

285.    Pioneer's Board of Directors met on September 17, 2019, and neither Pioneer's Board of Directors Meeting minutes nor Pioneer's Executive Session minutes state that Pioneer had exercised its right of "setoff" from the Mann Entity accounts. (Jayne Decl. Ex. JJJJJJ).

286.    The CFO's Report to the Board of Trustees prepared on September 17, 2019 states that Pioneer had "segregated $15 million of deposit related credits into a separate general ledger account." (Jayne Decl. Ex. KKKKKK).

287.    Pioneer's balance sheet as of September 30, 2019 reflects that the funds transferred from the Mann Entity accounts remained in Pioneer's general ledger account ending in 6000.  (Jayne Decl. Ex. E at 187:15-189:21).

288.    On October 1, 2019, Pioneer filed a "Notification of Late Filing," indicating that it "recently became aware of potentially fraudulent activity" and was continuing to review the matter, which "caused a delay in filing the Form 10-K in a timely manner and without unreasonable effort or expense." (Jayne Decl. Ex. KKKKKK).

289.    Slides prepared for presentation to the Board of Directors in October 2019 indicated that Pioneer had "segregated $16 million of deposit related credits into a separate general ledger account." (Jayne Decl. Ex. MMMMMM).

290.    Pioneer's balance sheet as of October 31, 2019 reflects that the funds transferred from the Mann Entity accounts remained in Pioneer's general ledger account ending in 6000. (Jayne Decl. Ex. E at 189:22-191:6).

Dated:    June 3, 2024
          Albany, New York

                              **BAUM GLASS JAYNE CARWILE & PETERS**

                              *s/ Andrew C. Jayne*
                              Andrew C. Jayne, OBA #19493
                              Tara D. Zickefoose, OBA #31757
                              BAUM GLASS JAYNE CARWILE & PETERS
                              401 S. Boston Ave., Suite 200
                              Tulsa, Oklahoma 74103
                              Telephone:  918/938.7944
                              Facsimile:  918/938.7966
                              Email:  ajayne@bgjclaw.com
                                      tzickefoose@bgjclaw.com

                                      -and-

                              Walter D. Haskins, OBA #3964
                              Walter D. Haskins, P.C.
                              1611 S. Utica Ave.
                              Tulsa, OK 74104
                              Telephone: 918/231.6602
                              Email: wdhaskins@protonmail.com

                                      -and-

                              Michael A. Kornstein, Esq.
                              Bar Roll No. 103178
                              COOPER ERVING & SAVAGE LLP
                              LOCAL COUNSEL FOR PLAINTIFF
                              39 North Pearl Street, 4th Floor
                              Albany, NY 12207
                              Telephone: (518) 449-3900
                              mkornstein@coopererving.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of June, 2024, I electronically transmitted the previous document to the Clerk of the Court using the ECF System for filing and transmittal of Notice of Electronic Filing was then made to the following ECF registrants:

Michael A. Kornstein – mkornstein@coopererving.com
*Local Counsel for Southwestern Payroll Service, Inc.*

Robert J. Alessi – Robert.alessi@us.dlapiper.com
Steven Rosato – steven.rosato@us.dlapiper.com
Evan E. North – evan.north@us.dlapiper.com
Michael Zahler – mzahler@hodgsonruss.com
*Counsel for Defendant Pioneer Bancorp, Inc., Pioneer Bank*

Cynthia E. Neidl – neidlc@gtlaw.com
Julie A. Yedowitz – Julie.yedowitz@gtlaw.com
Roland Garcia – garciar@gtlaw.com
Jennifer Tomsen – tomsenj@gtlaw.com
 *Counsel for Intervenor-Plaintiff National Payment Corporation*


*s/ Andrew C. Jayne*

53