**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

SOUTHWESTERN PAYROLL SERVICE, INC. and
GRANITE SOLUTIONS GROUPE, INC.,

               *Plaintiffs,*

   *v.*

PIONEER BANCORP INC., et al.,

               *Defendants.*

Case No. 1:19-cv-1349 (FJS/CFH)

NATIONAL PAYMENT CORPORATION,

               *Intervenor-Plaintiff,*

   *v.*

PIONEER BANCORP INC., et al.,

               *Defendants.*

**INTERVENOR-PLAINTIFF NATIONAL PAYMENT**
**CORPORATION'S MEMORANDUM OF LAW IN SUPPORT**
**<u>OF MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

GREENBERG TRAURIG, LLP
54 State Street, Sixth Floor
Albany, New York 12207
Tel: (518) 689-1400
Fax: (518) 689-1499

*Attorneys for Intervenor National*
*Payment Corporation*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

SUMMARY OF RELEVANT FACTS ..................................................................... 3

STANDARD OF REVIEW ...................................................................................... 9

ARGUMENT ............................................................................................................ 9

    I.     NATPAY IS ENTITLED TO SUMMARY JUDGMENT ON PIONEER'S
          SETOFF AND RELATED DEFENSES ................................................. 9

          A.    Pioneer's Setoff Defense Fails for Lack of Mutuality. ............................. 10

          B.    Pioneer Had Reason to Investigate the Source of the Funds in
               Mann's Accounts Yet Admittedly Failed to Do So. ................................. 13

    II.    NATPAY IS ENTITLED TO SUMMARY JUDGMENT ON PIONEER'S
          RICO CLAIMS ...................................................................................... 17

          A.    The Undisputed Evidence Establishes that NatPay Did Not Share a
               Common Purpose to Engage in Misappropriation, Money
               Laundering or Bank Fraud ....................................................................... 17

          B.    There is No Evidence that NatPay Conspired with Mann or the
               Other Counterclaim Defendants. ............................................................. 25

CONCLUSION ...................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*236 Cannon Realty, LLC v. Ziss*,
  2005 WL 289752 (S.D.N.Y. Feb. 8, 2005)...........................................................................24

*AVA Realty Ithaca, LLC v. Griffin*,
  652 F. Supp. 3d 255 (N.D.N.Y. 2023)....................................................................................8

*Bamberger Polymers International Corp. v. Citibank, N.A.*,
  124 Misc. 2d 653 (N.Y. Cnty. Sup. Ct. 1983) ...............................................................10, 12

*Beecher v. Vogt Manufacturing Co.*,
  227 N.Y. 468 (1920) ............................................................................................................10

*Burns v. Lopez*,
  256 N.Y. 123 (1931) ............................................................................................................10

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................................................8

*City of New York v. Chavez*,
  944 F. Supp. 2d 260 (S.D.N.Y. 2013)...................................................................................25

*Crawford vs. Franklin Credit Management Corp.*,
  758 F.3d 473 (2d Cir. 2014)...................................................................................................25

*Daly v. Atlantic Bank of New York*,
  201 A.D.2d 128 (1st Dep't 1994) ....................................................................12, 13, 14, 15

*Delco Electric Corp. v. Wells Fargo Capital Finance, Inc.*,
  265 F. Supp. 3d 213 (E.D.N.Y. 2017) ..................................................................................13

*Gerrity Co. v. Bonacquisti Construction Corp.*,
  136 A.D.2d 59 (N.Y. App. Div. 1988) .................................................................................12

*Grace v. Corn Exchange Bank Trust Co.*,
  287 N.Y. 94 (1941) ..............................................................................................................13

*Greenidge v. Allstate Insurance Co.*,
  446 F.3d 356 (2d Cir. 2006)....................................................................................................8

*In re Lehman Bros.*,
  458 B.R. 134 (Bankr. S.D.N.Y. 2011)..............................................................................10, 11

*Marine Midland Bank v. Graybar Electric Co.*,
  51 A.D.2d 903 (1st Dep't 1976) ...........................................................................................10

*Marine Midland Bank-New York v. Graybar Electric Co.*,
  41 N.Y.2d 703 (1977)..............................................................................................................9

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)..................................................................................................................9

*McCarthy v. American International Group, Inc.*,
  283 F.3d 121 (2d Cir. 2002)......................................................................9

*MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*,
  882 F.2d 615 (2d Cir. 1989)....................................................................10

*Modern Settings, Inc. v. Prudential-Bache Securities, Inc.*,
  936 F.2d 640 (2d Cir. 1991)................................................................9, 10

*Morris v. Windsor Trust Co.*,
  213 N.Y. 27 (1914)..................................................................................12

*Moss v. BMO Harris Bank*,
  258 F. Supp. 3d 289 (E.D.N.Y. 2017) ....................................................17

*In re Sentinel Products Corp.*,
  192 B.R. 41 (N.D.N.Y. 1996)..................................................................10

*People v. City Bank of Rochester*,
  96 N.Y. 32 (1884) ...................................................................................12

*Reed Construction Data Inc. v. McGraw-Hill Cos., Inc.*,
  745 F. Supp. 2d 343 (S.D.N.Y. 2010).....................................................17

*Matter of Sanger*,
  46 Misc. 3d 830 (Surr. Ct. Nassau Cnty. Sep. 30, 2014).......................10

*Schreibman v. Chase Manhattan Bank*,
  15 A.D.2d 769 (1st Dep't 1962) .............................................................13

*Straus v. Tradesmen's National Bank*
  122 N.Y. 379 (1890) ...........................................................................9, 12

*United States v. Bank of America*,
  2009 WL 2009022 (W.D.N.Y. Feb. 20, 2009) .......................................12

*United National Insurance Co. v. The Tunnel, Inc.*,
  988 F.2d 351 (2d Cir. 1993).....................................................................8

*USA Certified Merchants v. Koebel*,
  262 F. Supp. 2d 319 (S.D.N.Y. 2003).....................................................25

*Westinghouse Credit Corp. v. D'Urso*,
  278 F.3d 138 (2d Cir. 2002)....................................................................10

**Statutes and Other Authorities**

18 U.S.C. § 1962(c) ..............................................................................4, 17

18 U.S.C. § 1962(d) ..................................................................................24

18 U.S.C. § 1964........................................................................................1

Federal Rules of Civil Procedure § 56 ...................................................1, 8

Federal Rules of Civil Procedure § 56(c) ..................................................8

New York Debtor & Creditor Law § 151 ..........................................................................9

New York Uniform Commercial Law § 4-212 ...............................................................11

New York Uniform Commercial Law § 4-401 ...............................................................12

9 N.Y. Jur. 2d Banks § 299 ..............................................................................................9

Northern District New York Local Rules, Rule 56.1 .......................................................3

Intervenor-Plaintiff National Payment Corporation, through its undersigned counsel, respectfully submits this memorandum of law in support of its motion made pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on Pioneer Bancorp Inc. and Pioneer Bank's ("Pioneer") affirmative defense of setoff and Counterclaims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964.

## PRELIMINARY STATEMENT

Plaintiffs brought this case to recover more than $10 million in employer tax funds seized by Pioneer from an account held by Cloud Payroll to cover its losses stemming from Michael Mann's bank fraud and kiting schemes. Since the outset, Pioneer has indignantly maintained that it had the right to help itself to the tax funds paid by hundreds of innocent employers throughout the country. Specifically, Pioneer has claimed the right to setoff, either under common law or under its contracts, the tax funds in the Cloud Payroll account. According to Thomas Amell, the CEO of Pioneer, once a customer deposits money in demand deposit account, the funds belong to the bank. When Michael Mann's check kiting scheme collapsed, Amell "had a $15 million hole that somebody's got to fill." The obvious source of the $10 million deposited in the Cloud Payroll account made no difference to Amell or anyone else at Pioneer contrary to law. According to Amell, it was his money, and he was taking it before any other creditors could claim it.

To narrow the issues at trial, NatPay brings this motion to obtain dismissal of Pioneer's setoff defense, which is not viable for at least two reasons. First, a bank's right of setoff against a depositor's account is permissible only where the depositor owes a debt to the bank. Mann was not kiting checks from the Cloud Payroll account, and Cloud Payroll owed no debt to Pioneer. The fact that Cloud Payroll was affiliated with entities that were overdrawn and thus owed a debt to Pioneer was not a legitimate basis for setoff against the tax funds in the Cloud Payroll account. Pioneer's terms and conditions give it no greater right of setoff than under common law. While

1

Pioneer's terms and conditions permit overdraft recovery when an account is overdrawn, they do not authorize Pioneer to recover funds from the accounts belonging to an overdrawn customer's affiliates.  Because Cloud Payroll owed no debt to Pioneer, Pioneer had no right to set off the funds in Cloud Payroll's accounts.

Pioneer's setoff defense also fails because the undisputed facts show that Pioneer was on notice that the funds in Cloud Payroll's account were owned by third parties.  Pioneer officers knew that Mann owned three payroll service bureaus engaged in payroll and payroll tax processing.  Pioneer officers also knew that millions of dollars had been deposited in the Cloud Payroll account via hundreds of ACH credits over the span of only a day.  Pioneer officers were also told by at least three individuals that payroll and tax funds were frozen by Pioneer in the payroll accounts, and Mann told Pioneer's outside counsel the same thing.  Under the circumstances, Pioneer had a duty to investigate the source of the funds.  Had it done so, it would have taken a nanosecond to understand that the $10 million deposited to the Cloud Payroll account consisted of IRS and other tax payments made by hundreds of employers, including a few that were customers of Pioneer.  Pioneer's setoff defense fails as a matter of law and fact and should be dismissed from the case.

NatPay also seeks to narrow the issues at trial by obtaining summary judgment on Pioneer's RICO claims.  In concluding that Pioneer plausibly stated RICO claims against NatPay, the Court, as it was required to do, assumed the truth of many of Pioneer's factual allegations.  However, at this juncture the Court no longer assumes the truth of Pioneer's allegations and instead may consider the evidence that establishes that Pioneer's RICO allegations are demonstrably false.  For example, Pioneer falsely asserts that NatPay's normal practice is to impound its customers' tax payments in its own account, and that by allowing Cloud Payroll to impound taxes at Pioneer,

NatPay was able to double its fees.  To the contrary, the evidence establishes without contradiction that NatPay does not impound its customers' taxes.  Pioneer's allegations are further refuted by the fact that NatPay does not charge for debits and credits to NatPay's account.

Pioneer's other allegations in support of its RICO claims are equally specious.  The evidence establishes that no one at NatPay spoke to Michael Mann or had any inkling that he was diverting funds from Cloud Payroll's tax settlement account.  The evidence further establishes that Cloud Payroll was a legitimate company and there was nothing about its structure, operations, or transactions that would have alerted NatPay or anyone else that Mann was diverting tax funds, engaged in money laundering, and committing bank fraud.  Pioneer's suggestion that NatPay was obligated to ensure that Cloud Payroll's bank account was appropriate, to monitor Cloud Payroll's account activity, and to ferret out fraud occurring under Pioneer's roof has it backwards.  All of that was Pioneer's responsibility, and its attempt to shift blame to Plaintiffs for its failings should be rejected.  Pioneer's RICO allegations are belied by the evidence, and the Court should grant NatPay judgment in its favor on Pioneer's RICO claims.

## SUMMARY OF RELEVANT FACTS[1]

### Michael Mann's Payroll Companies

Michael Mann began his banking relationship with Pioneer in about 2009, when he opened two accounts and obtained a $2 million line of credit that was extended to Valuewise Corporation ("Valuewise") and Ross Personnel Consultant Inc. ("Ross").  (SOMF ¶ 13.)  David Blessing, who served as Vice President of Commercial Structured Debt and promoted in about June 2018 to Senior Vice President of Capital Markets, served as Mann's Account Relationship Manager at

---

[1] In addition to the brief factual summary provided herein, NatPay respectfully refers to its statement of material facts ("SOMF") submitted herewith as required by Local Rule 56.1.

Pioneer.  (*Id.* ¶ 14).  In 2013, Mann purchased MyPayrollHR.com, LLC ("MyPayroll"), a payroll services bureau.  (*Id.* ¶ 15.)

Mann discussed the purchase of MyPayroll with David Blessing and told him that he would need to open two accounts at Pioneer, one of which would house customers' payroll tax dollars. (*Id.* ¶¶ 17-18).  When Pioneer opened the MyPayroll 0212 Account, the account was designated a "Client Account," which was indicated in the account opening paperwork, the account statements, and Pioneer's records.  (*Id.* ¶ 23.)  The communications between Mann and Blessing and other Pioneer officers and employees demonstrate Pioneer's knowledge that the Client Account would be used to house and process MyPayroll's customer's tax funds. (*Id.* ¶¶ 26-35.)  First millions and then hundreds of millions of dollars flowed through the MyPayroll 0212 Account on a monthly basis (*id.* ¶¶ 36-52), and Mann frequently required Pioneer's assistance with the payroll tax processing (*id.* ¶¶ 124-131).

In 2014, Mann had various communications with Blessing and others at Pioneer concerning whether Pioneer could handle MyPayroll's ACH processing.  (SOMF ¶¶ 56-75.)  Blessing was onboard and pushed others at Pioneer to make it happen.  (*Id.*)   The most senior officers of Pioneer had multiple discussions about it, analyzed and prepared pricing, and uploaded test ACH files for MyPayroll.  (*Id.*)  While ultimately Mann decided that switching MyPayroll from its current ACH providers to Pioneer was not a viable option (*id.* ¶ 74), the parties' communications leave no room for Pioneer to argue it did not understand that MyPayroll was in fact a payroll company.

Ultimately, Mann created Cloud Payroll and purchased two more payroll service bureaus, financed in part from Pioneer loans.  (*Id.* ¶¶ 10-11.)  On at least two occasions in 2017, Blessing expressed his appreciation of the payroll companies and their huge deposits at Pioneer to Mann and others.  (*Id.* ¶¶ 76-84.)  Blessing also referred Mann to a friend with experience in payroll who

4

ultimately became the CEO of MyPayroll (*id.* ¶ 30), and then referred Pioneer customers to MyPayroll for their payroll service needs. (*Id.* ¶¶ 85-88.)

In February 2019, Mann decided to open a new account, in Cloud Payroll's name, for the sole purpose of housing payroll taxes. (*Id*. ¶¶ 91-92.) Consistent with that purpose, the Cloud Payroll 2440 Account was used solely to house payroll taxes. (Declaration of Cynthia Neidl ("Neidl Decl.") Exs. PP, TT, VV.) In March 2019, more than $22 million dollars flowed through the account. (SOMF ¶ 95.) Pioneer's BSA department reviewed the transactions in the account in April and May, 2019, and determined that the transactions were not unusual "[d]ue to the type of business." (*Id.* ¶ 118.)

**The Collapse of Mann's Kiting Scheme**

Beginning no later than January 2019, Mann engaged in a check kiting scheme between Pioneer and Bank of America ("BOA"). (SOMF ¶ 155.) The kiting scheme collapsed on or about August 30, 2019, when BOA froze the accounts controlled by Mann at BOA. (*Id.* ¶ 156.) BOA called back 36 checks totaling $15,588,000 written from BOA accounts into 12 Pioneer accounts that were held by other entities owned by Mann ("Overdrawn Entities"). (*Id.* ¶¶ 159-161.) None of the checks called back had been deposited into an account held by Cloud Payroll or MyPayroll, and none of the accounts held in the name of Cloud Payroll or MyPayroll had a negative balance as a result of the collapse of the kiting scheme. (*Id.* ¶¶ 163-169.)

When Pioneer learned that the BOA accounts were frozen and that BOA was calling back the checks, Pioneer froze all of the more than 30 accounts Mann had opened at Pioneer, including the Cloud Payroll and the MyPayroll accounts. (*Id.* ¶ 172.) When it froze the accounts, all debits and credits unposted, and all transactions had to be manually reviewed and processed. (*Id.* ¶¶ 172-178.) Joseph Fleming, Pioneer's Chief Credit Officer, reached out to Mann, who had little to say.

(*Id.* ¶¶ 180-181, 186-187, 189-190.)  Pioneer executives had various discussions over the Labor Day weekend and obtained coverage information from Pioneer's insurance broker.  (*Id.* ¶¶ 182-185, 188, 190-193, 197.)

At about 7:45 am on Tuesday, September 3, 2019, Mann sent an email to Pioneer indicating that he was stepping down as CEO of Valuewise and its affiliates immediately and that Tim Burke would take over.  (*Id.* ¶ 198.)  Over the course of the day, Mann sent Burke several communications emphasizing that Pioneer "must keep the payroll tax payments going" so that the payroll bureaus did not lose their asset values.  (*Id.* ¶ 200.)  Pioneer also had several communications with Burke and encouraged him to fly to Albany to meet with Pioneer representatives.  (*Id.* ¶ 199, 203.)

Because Pioneer had frozen any accounts Mann had opened, all transactions effective August 30, 2019 unposted and had to be manually processed.  (SOMF ¶¶ 177, 204.)  The head of Deposit Operations informed Pioneer's management that there was a very large volume of unposted items that had to be processed.  (*Id.* ¶ 204.)  They were also informed that the vast majority of credits/deposits, totaling millions of dollars, were going to accounts held by the payroll companies.  (*Id.* ¶ 205.)  In manually processing the transactions, Pioneer accepted all credits to the accounts and rejected all debits/withdrawals except certain on-line banking transactions initiated by Mann on August 30, 2019, chargebacks representing the checks called back by BOA, and chargeback and other fees.  (*Id.* ¶ 207.)  A spreadsheet prepared that day shows the total debits and credits to the accounts were over 1,500, including more than 700 separate credits to the Cloud Payroll 2440 Account, totaling more than $8 million dollars.  (*Id.* ¶ 213.)

Tim Burke arrived in Albany at about 2:30 pm on September 3, 2019, and was brought to Pioneer by Blessing to meet with Pioneer's executive team for a couple of hours before going to dinner with Blessing.  (*Id.* ¶¶ 215, 217.)  Later that evening, Burke received a call from Cloud

Payroll's CEO John Reinke, who said he was "very concerned about making tax payments and ability to manage transactions" because Pioneer had frozen the payroll company accounts. (*Id.* ¶ 218.) Shortly after that, Burke received an email from Mann indicating that "[t]here was probably close to 1.9M to cover tomorrow morning from the tax account," that Mann had moved "probably 3M to the line from the tax account on Friday [August 30, 2019]", and that there was "more money coming in tomorrow." (*Id.* ¶ 219.) Burke forwarded the email to Joseph Fleming and spoke to Fleming about what Burke had learned from John Reinke. (*Id.* ¶¶ 221-222.)

Fleming forwarded Mann's email to Pioneer's management team, and reiterated what he had learned from John Reinke, including that Valuewise's largest client had kicked Mann out years ago for "forging a signature" on a contract. (*Id.* ¶ 223.) Responding to Fleming's email, Amell called Mann "a criminal" and accused Mann (correctly) of "completely fabricating millions in A/R's." (*Id.* ¶ 224.)

The following day, Matthew Schilling, a Cloud Payroll employee went to Pioneer to attempt to get the payroll companies' accounts unfrozen. (SOMF ¶¶ 230-232.) Mr. Saratori and a female executive met with Schilling, who explained who he worked for and that payroll funds were frozen in the payroll company account. (*Id.* ¶¶ 233-235.) Mr. Sarratori told Mr. Schilling that because he was not the account holder they could not speak to him about it, and Mr. Schilling left the bank. (*Id.*) Then Mann and his counsel met with Pioneer management from about 11:00 am until 4:00 pm. (*Id.* ¶¶ 236-244.) During that time, Mann and his attorney met separately with Robert Alessi, Pioneer's outside counsel, and Mann explained that to preserve the value of the payroll companies, Pioneer had to unfreeze the payroll company accounts so they could continue making payments. (*Id.* ¶ 241-243.)

At about 4:45 pm, John Reinke spoke by telephone with Frank Sarratori and Tom Amell, and explained that the payroll company was in danger of shutting down because payroll and payroll taxes had been frozen by Pioneer.  (*Id.* ¶ 246.)  Mr. Reinke conferenced into the call representatives of Cachet Financial Services ("Cachet"), Cloud Payroll's payroll ACH service provider, who explained that at least $16 million of Cachet's funds had been lost as a result of the Pioneer accounts being frozen.  (*Id.* ¶ 247.)

**Pioneer's Decision to Move the Funds from Mann's Accounts**

Late in the afternoon on September 4, 2019, the head of Deposit Operations at Pioneer was instructed to move any funds in any of the frozen accounts to a Pioneer general ledger ("GL") account.  (SOMF ¶ 252.)  Between about 6:19 pm and 6:31 pm on September 4, 2019, a Pioneer employee transferred funds from the frozen accounts to GL account ending in 2000, which was a Pioneer suspense account, *i.e.*, an account where funds are moved prior to decision on their disposition.  (*Id.* ¶ 255.)  The total amount withdrawn from the accounts and deposited to the GL 2000 account was $15,076,168.67, including $7,205,338.10 withdrawn from the MyPayroll 0212 Account, and $6,845,944.84 withdrawn from the Cloud Payroll 2440 Account.  (*Id.* ¶ 256.)

Pioneer management "acted swiftly" to move the funds from the accounts controlled by Mann to a Pioneer GL account because they "were concerned . . . because the bank was out $15.8 million and [they] weren't sure what other creditors were out there."  (SOMF ¶ 260.)  Pioneer wanted to prevent other creditors from attaching the accounts.  (*Id*.)  Contrary to law, the source of the funds, and the fact that the funds could belong to innocent third parties, were not relevant to Pioneer's decision to move the funds to a GL account and ultimately use the funds to offset Pioneer's losses.  (*Id.* ¶ 261.)

## STANDARD OF REVIEW

"Summary judgment is a tool to winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict." *United Nat'l Ins. Co. v. The Tunnel, Inc*., 988 F.2d 351, 355 (2d Cir. 1993). Summary judgment should be granted where the movant establishes that "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Greenidge v. Allstate Ins. Co*., 446 F.3d 356, 361 (2d Cir. 2006). Where a plaintiff uses a summary judgment motion to challenge the legal sufficiency of an affirmative defense, a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case. *AVA Realty Ithaca, LLC v. Griffin*, 652 F. Supp. 3d 255, 267 (N.D.N.Y. 2023). Once the movant meets its burden, it then shifts to the non-movant to establish the existence of elements essential to its case, which it would have to prove at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). "The party against whom summary judgment is sought, however, 'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" *McCarthy v. Am. Int'l Grp., Inc*., 283 F.3d 121, 124 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986)).

## ARGUMENT

### I.   NATPAY IS ENTITLED TO SUMMARY JUDGMENT ON PIONEER'S SETOFF AND RELATED DEFENSES

Pioneer's Fourth Affirmative Defense is based on allegations that Pioneer's seizure of funds from the Cloud Payroll 2440 and MyPayroll 0212 accounts was "completely within Pioneer

9

Bank's rights under well-established setoff law."[2]  (Dkt. No. 332, Pioneer's Amended Answer, Affirmative Defenses, and Counterclaim ("Am. CCs") ¶ 574.)  Pioneer has insisted, both in this proceeding and in other contexts, that it was entitled to exercise its right of setoff or overdraft recovery with respect to the funds in any of accounts at Pioneer controlled by Mann.  However, Pioneer had no such right under "well-established setoff law" or otherwise.  Accordingly, Pioneer's Fourth Affirmative Defense should be dismissed.

### A.    Pioneer's Setoff Defense Fails for Lack of Mutuality.

As a general rule, a deposit made in a bank by a person on general account becomes the funds of the bank, and the relation between the depositor and the bank is that of debtor and creditor. *Straus v. Tradesmen's Nat'l Bank* 122 N.Y. 379, 382 (1890); 9 N.Y. Jur. 2d Banks § 299.  A bank generally has a right to set off the accounts of a borrower against the matured indebtedness of that borrower.  *Marine Midland Bank-New York v. Graybar Elec. Co*., 41 N.Y.2d 703, 708 (1977).  Thus, for example, if a depositor defaults on a loan made by the bank, the bank may apply an amount from the depositor's general account sufficient to satisfy the loan.

A bank's right of setoff against a debtor's account is permissible only where, among other things, the debts sought to be setoff are mutual.  *See Modern Settings, Inc. v. Prudential-Bache Secs, Inc.*, 936 F.2d 640, 648 (2d Cir. 1991) (applying New York law and observing that "[t]he equitable remedy of set-off is unavailable where the claims do not involve mutual debts and credit"); *Bamberger Polymers Int'l Corp. v. Citibank, N.A*., 124 Misc. 2d 653, 655 (N.Y. Cnty. Sup. Ct. 1983) ("The right of setoff may be asserted only when the debtor-creditor relationship is shown to exist between the bank and customer.") (citing *Marine Midland Bank v. Graybar Elec. Co*., 51 A.D.2d 903 (1st Dep't 1976)).  Mutuality means that the debts are "due to and from the

---

[2] While New York has codified the right of setoff in New York Debtor and Creditor Law ("DCL") § 151, Pioneer does not allege and cannot show the applicability of that provision here.

same persons in the same capacity." *Id.* (quoting *Beecher v. Vogt Manu. Co*., 227 N.Y. 468, 473 (1920)); *see also Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138 (2d Cir. 2002); *Burns v. Lopez*, 256 N.Y. 123, 128-129 (1931) (holding "the debts which are to be set off against each other shall be due from and to the parties in the same right").  Mutuality is an essential, definitional element of the right to setoff that must be strictly observed.  *In re Lehman Bros*., 458 B.R. 134, 144 (Bankr. S.D.N.Y. 2011); *In re Sentinel Prods. Corp.*, 192 B.R. 41, 46 (N.D.N.Y. 1996).

Here the "debts" to Pioneer were owed by the Overdrawn Entities, not Cloud Payroll or MyPayroll, which were separate entities with accounts held in their own names.  That Cloud Payroll and MyPayroll were affiliated with Mann or with the Overdrawn Entities is of no moment. *See, e.g.,  MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc*., 882 F.2d 615, 618 n.2 (2d Cir. 1989) (holding that where mutuality is required, "a subsidiary's debt may not be set off against the credit of a parent"); *In re Sentinel Prod. Corp.*, 192 B.R. 41, 47 (N.D.N.Y. 1996) (holding that it was " a matter of well settled law" in New York "that debts involving parent and subsidiary business entities are not mutual for Section 553 setoff purposes"); *Matter of Sanger*, 46 Misc. 3d 830, (Surr. Ct. Nassau Cnty. Sep. 30, 2014) (holding bank had no right to setoff funds in the account of a customer that was not a debtor to the bank); *see also Modern Settings, Inc.*, 936 F.2d at 648 (disallowing setoff where there was a lack of mutuality between debts and credits); *In re Lehman Bros*., 458 B.R. 134, 144 (Bankr. S.D.N.Y. 2011) ("[T]o disregard this most basic of corporate formalities and treat subsidiaries as if they have the same standing as their parent for purposes of setoff rights is to ignore the separate nature of these entities to the obvious detriment of other creditors. For that reason, mutuality is an essential, definitional element of the right to setoff that must be strictly observed.").

11

Pioneer's "Terms and Conditions" applicable to its accounts, assuming they were provided to Mann,[3] provide Pioneer with no greater rights than under New York law.  Specifically, Pioneer's Terms and Conditions give Pioneer the right to setoff only "when permitted by law" and provide that any "right of setoff does not apply to this account if prohibited by law."  (Neidl Decl. Ex. SSSSSS at § 15.)  Pioneer's contractual setoff is also applicable only where there is "due and payable debt" that is owed by the account holder.  (*Id.*)  Thus, Pioneer's Terms and Conditions fail to provide it with a setoff right against either MyPayroll or Cloud Payroll, as neither of those entities owed Pioneer any debt as a result of the overdrafts.

While the Terms and Conditions make the account holder liable "for any account shortage resulting from charges or overdrafts," (*id.* § 3), there is nothing in the Terms and Conditions that makes an account holder liable for shortages in other accounts or permits Pioneer to deduct funds from an account to cover overdrafts in other accounts.  The New York Uniform Commercial Code limits a bank's right of charge-back or refund to the overdrawn customer.  *See* N.Y. U.C.C. § 4-212 ("If a collecting bank has made provisional settlement with its customer for an item and itself fails by reason of dishonor . . . the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account or obtain refund from its customer); N.Y. U.C.C. § 4-401 (permitting a bank to charge against its customer's account "any item that is otherwise properly payable from that account").

Pioneer wrongfully setoff funds held by entities that owed it no debt.  Because mutuality was lacking, Pioneer had no right to engage in setoff or overdraft recovery with respect to the

---

[3] The evidence shows that Pioneer opened accounts for Mann via email, and there is no evidence in Pioneer's records suggesting that Pioneer actually sent to Mann any "Terms and Conditions" that governed any accounts that he opened.  For purposes of this motion, NatPay assumes the Terms and Conditions identified by Pioneer govern the accounts.

funds in any accounts held by MyPayroll and Cloud Payroll.  Pioneer's setoff defense fails as a matter of law and should be dismissed.

B.     **Pioneer Had Reason to Investigate the Source of the Funds in Mann's Accounts Yet Admittedly Failed to Do So.**

Pioneer's setoff defense fails as a matter of law for a second reason.  While a bank is generally entitled to apply a deposit to the payment of a debt due it by the depositor, when "the bank is on notice that funds in a depositor's account are owned by a third party, the bank cannot appropriate those funds in order to set them off against a debt of the depositor."  *Daly v. Atlantic Bank of New York*, 201 A.D.2d 128, 129 (1st Dep't 1994); *accord U.S. v. Bank of America*, 2009 WL 2009022, at *6 (W.D.N.Y. Feb. 20, 2009); *Bamberger Polymers Intern. Corp. v. Citibank, N.A.*, 124 Misc. 2d 653, 657 (Sup. Ct. N.Y. Cnty. 1983); *Straus v. Tradesmen's Nat'l Bank* 122 N.Y. 379, 382 (1890) (holding that bank had no right to set off funds of depositor where bank was on notice that the funds were third-party funds deposited for a special purpose); *Morris v. Windsor Trust Co.*, 213 N.Y. 27, 31-32 (1914) (holding bank could not set off funds forwarded to it for a special purpose); *People v. City Bank of Rochester*, 96 N.Y. 32, 37 (1884) (holding bank had no right to set off against funds where funds were delivered to it for a special purpose); *Gerrity Co. v. Bonacquisti Constr. Corp.*, 136 A.D.2d at 65 ("If a bank knows that the account was substantially composed of trust funds and the setoff would substantially deplete the account, the bank can no longer disavow bad faith due to a lack of knowledge of outstanding trust claims of statutory beneficiaries at the time of the setoff.").

"A bank will be considered to have such notice when it is aware of facts which would fairly provoke it to inquire as to the true ownership of the funds and such inquiry, if made with ordinary diligence, would reveal the true ownership."  *Daly*, 201 A.D.2d at 129; *see also Schreibman v. Chase Manhattan Bank*, 15 A.D.2d 769, 770 (1st Dep't 1962) ("It is universally conceded that

knowledge upon the part of a bank that deposits made by a debtor of the bank in his own name belonging to a third person absolutely precludes the bank from applying such funds to the individual indebtedness of the depositor to it.") (internal quotation marks and citations omitted); *c.f. Grace v. Corn Exch. Bank Trust Co*., 287 N.Y. 94, 106 (1941) ("If the bank chooses to ignore completely the facts which indicate that the debtor is using moneys which may not belong to him, and accepts payment careless whether or not the moneys paid belong to him, it becomes morally and legally a participant in the debtor's wrong."); *Delco Elec. Corp. v. Wells Fargo Capital Fin., Inc.*, 265 F. Supp. 3d 213, 221-222 (E.D.N.Y. 2017) (holding that a bank may be liable for diversion if "it knew or should have known of the trust nature of the funds it received—that is, if the circumstances are such that it should have inquired into the origin of the funds and thereby discovered the trust nature of those funds").  "Neither a large bank nor a small bank may urge that it is ignorant of facts clearly disclosed in the transactions of its customers, . . . nor may a bank close its eyes to the clear implications of such facts."  *Grace*, 287 N.Y. at 107.

In *Daly v. Atlantic Bank of New York*, several accounts were opened at a bank by a Queensboro Management, Inc. ("QMI"), a real estate cooperative corporation management company, including an account labeled "Realty Two." 201 A.D.2d at 130.  QMI and the bank also entered into a $250,000 loan agreement.  *Id.*  Subsequently, two of QMI's accounts were overdrawn at a time when media reports were circulating that QMI was being investigated for misappropriation of funds from the cooperative boards it managed.  *Id.*  The bank also learned that QMI ceased doing business, and it received calls from QMI's clients notifying the bank that the funds held in the accounts belonged to the clients and requesting that the bank freeze QMI's accounts.  *Id.*  Despite this information, the bank declared QMI in default of the $250,000 loan and set off the default using among other things, the funds deposited in the "Realty Two" account.  *Id.*

14

In determining whether the bank had sufficient knowledge requiring it to make inquiry as to the true ownership of the funds, the Court found the bank was aware that QMI (1) was in the business of managing a number of cooperative apartment buildings; (2) was constantly in possession of large sums of money which it held as agent; (3) was being investigated on charges of mismanagement and criminal wrongdoing; (4) had failed to make tax payments on behalf of its clients and was approaching insolvency. *Id*. at 131. In addition, the bank had "received information from QMI's employees that the Realty Two account was a fiduciary account and was on notice that checks deposited to the account bore the notation that they represented "maintenance" or "rent." *Id.* Finally, the bank knew that QMI had refused to transfer funds from the Realty Two account to cover overdrafts in other accounts. *Id.*

The Court concluded that the bank had more than sufficient knowledge obligating it to make inquiry as to the true ownership of the funds in the Realty Two account, and it "was not entitled to simply appropriate the[] funds and turn a blind eye to the numerous indicators that the funds in the account were being held by QMI for the corporations it represented." *Id.* The Court rejected as specious the bank's argument that it had to act swiftly and did not have time to inquire as to the source of the funds because "it could simply have frozen the account so that it could make the necessary inquiry at its leisure." *Id.*

Here, the facts establish that Pioneer had, if not actual knowledge of the source of the funds in the in the Cloud Payroll 2440 and MyPayroll 0212 accounts, more than sufficient knowledge obligating it to inquire as to the true ownership of the funds in those accounts.[4]

---

[4] Pioneer's witnesses testified that they made the decision to perform a "setoff" on September 4, 2019. There is no documentary evidence corroborating this testimony, and pertinent documents show that Pioneer did not make its "setoff" decision until many weeks later. Solely for purposes of this motion, NatPay assumes the setoff occurred when funds were moved from the Mann Entity accounts to a GL suspense account at about 6:30 pm on September 4, 2019.

1. From the outset, David Blessing knew that Mann's payroll companies were engaged in payroll processing and used accounts at Pioneer to house payroll tax funds. (SOMF ¶¶ 17-31, 38, 46-47, 57-88, 133-154.)

2. Other Pioneer officers knew that Mann owned or partially owned four payroll service bureaus that engaged in "payroll processing, time and labor management, payroll tax processing, comprehensive resource information system and 'pay as you go' workers compensation." (*Id.* ¶¶ 132-154.)

3. Multiple Pioneer officers and employees routinely assisted Mann in the processing of payroll by, among other things, wiring funds to the IRS and providing Mann with copies of checks made payable to taxing authorities. (*Id.* ¶¶ 29, 31, 33-35, 124-131.)

4. By no later than September 3, 2019, it was clear that Mann was likely engaged in kiting, had fabricated receivables, and engaged in other acts of fraud involving tens of millions of dollars. (*Id.* ¶P 171, 183-224.)

5. On August 30, 2019, the MyPayroll 0212 Account and Cloud Payroll 2440 Account received thousands of ACH credits totaling more than $15 million. (*Id.* ¶¶ 213, 256.)

6. The ACH credits were clearly described as reflecting third-party payroll and payroll taxes. (Neidl Decl. Exs. RR, UU, VVVV.)

7. The MyPayroll 0212 Account was established as a "Client Account" as evidenced by the account opening documentation and Pioneer's internal systems. (SOMF ¶ 23.)

8. Pioneer management received an email from Mann referencing millions of dollars in a "tax account" at Pioneer. (*Id.* ¶¶ 219, 223-224.)

9. On the morning of September 4, 2019, Matt Schilling, an employee of Cloud Payroll, informed Sarratori and another Pioneer officer that there were payroll funds in the frozen payroll company accounts that needed to be released. (SOMF ¶¶ 230-235.)

10. In the early afternoon of September 4, 2019, John Reinke, the CEO of Cloud Payroll, informed Sarratori and Amell that there were payroll and payroll tax funds in the frozen payroll company accounts that needed to be released.

11. In the early afternoon of September 4, 2019, Aberash Asfaw, CEO of Cachet, informed Sarratori and Amell that there were payroll and payroll tax funds in the frozen accounts that needed to be released. (*Id.* ¶¶ 246-249.)

12. Mann informed Robert Alessi, Pioneer's counsel, that the payroll companies engaged in payroll processing and that client payroll taxes were frozen in the accounts and should be released in order to maintain the value of the payroll companies. (*Id.* ¶¶ 241-243.)

Clearly, Pioneer was on notice that the millions of funds that had been deposited in the Cloud Payroll and MyPayroll accounts were being held by those entities for the benefit of their clients and for the purpose of making payroll and payroll tax payments. Moreover, the facts similarly establish that, with a modicum of inquiry, Pioneer would have quickly understood that the funds deposited into the MyPayroll and Cloud Payroll accounts on and after August 30, 2019 did not belong to Mann, MyPayroll, or Cloud Payroll, but rather to innocent third parties that had entrusted the funds to NatPay and the payroll service bureaus for payment to taxing authorities.

Pioneer maintains that, because the MyPayroll 0212 and Cloud Payroll 2440 accounts were general demand deposit accounts, it had no duty to investigate the source of the funds in the accounts. However, under well settled law, the circumstances gave rise to a duty to investigate the ownership of the funds. Pioneer's setoff defense should be dismissed for this additional reason.

## II.   NATPAY IS ENTITLED TO SUMMARY JUDGMENT ON PIONEER'S RICO CLAIMS

No evidence supports Pioneer's allegations that unspecified persons at NatPay "knew" and "conspired" with Michael Mann to misappropriate tax funds and engage in money laundering and bank fraud. In order to avoid summary judgment, a RICO plaintiff must come forward with evidence that the defendants shared the alleged RICO enterprise's common purpose. Here, Pioneer's allegations of an "unusually risky structure and flow of funds" are not predicated on facts but rather are a work of fiction, buttressed only by the distortion of witness testimony.

### A.   The Undisputed Evidence Establishes that NatPay Did Not Share a Common Purpose to Engage in Misappropriation, Money Laundering or Bank Fraud.

To establish an association-in-fact enterprise, a RICO claimant must allege that the members "share a common purpose to engage in a particular *fraudulent* course of conduct and work together to achieve such purposes." *Moss v. BMO Harris Bank,* 258 F. Supp. 3d at 299 (emphasis in original, quotation marks and citations omitted). "[F]ailing to allege that members

of an association-in-fact enterprise shared a wrongful intent to violate RICO is fatal to an 18 U.S.C. § 1962(c) claim." *Id.* "Individuals or entities that do not share such a common purpose cannot be considered part of a RICO enterprise as a matter of law." *Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 745 F. Supp. 2d 343, 351 (S.D.N.Y. 2010).

The undisputed evidence establishes that NatPay had no knowledge of the alleged enterprise's goals of "misappropriating" third-party employer funds, money laundering, or bank fraud. No one at NatPay ever spoke to Michael Mann. (SOMF ¶¶ 313-319.) The documents and testimony demonstrate that the individuals at NatPay responsible for onboarding customers dealt only with Cloud Payroll employees who had no knowledge of or involvement in Mann's wrongdoing. (*Id.* ¶ 313.) NatPay had no knowledge of and played no part in the diversion of tax funds from Cloud Payroll's tax settlement account. Notably, Mann accomplished the diversion from the MyPayroll 0212 Account and the Cloud Payroll 2440 Account via online banking, not by ACH. (*Id.* ¶ 340.)

When this Court found that Pioneer had sufficiently alleged a common purpose (Dkt. No. 318), the Court identified allegations in Pioneer's Counterclaims that are not only unsupported but have been proved false. Those false allegations persist unadorned in Pioneer's Amended Counterclaims.

In finding that Pioneer plausibly alleged that NatPay shared a common purpose to misappropriate tax funds, the Court relied in part on Pioneer's allegation that NatPay was able "to generate double the ACH fees under the scheme." (Dkt. No. 318 at 18). However, this allegation is premised on the specious theory that NatPay's movement of Cloud Payroll's tax funds involved a "highly unorthodox, multi-step flow of payments." (Am. CC ¶ 747.) Specifically, Pioneer falsely claims that NatPay's normal practice, and standard industry practice, requires NatPay to

house the tax funds of its customers' employer-clients in its account at First Premier.  (Am. CC ¶¶ 723, 734-747).  To support this fictional narrative, Pioneer uses selective quotation to make it appear as though NatPay's witnesses testified that NatPay houses both its customers' payroll and payroll tax funds in NatPay's custodial account, when in fact the witnesses unambiguously referred only to payroll in their testimony.  (*See* Declaration of Steven F. Pereira ("Pereira Decl.") ¶ 59; *compare* Am. CC ¶ 724 *with* Pereira Decl. Ex. O).

The evidence establishes that NatPay requires its customers to house tax funds in their own accounts until the funds are due to be paid.  (SOMF ¶¶ 59-60.)  All of NatPay's witnesses testified that NatPay's customers house tax funds in their own accounts.  (*Id.*)  Moreover, NatPay's practice is evidenced by its Processor Service Agreement, which requires its customers to designate a "Authorized Account for Tax Payment Transactions."  (Pereira Decl. ¶ 59, Ex. N).  This practice is also standard industry practice, as evidenced by the fact that MyPayroll housed its tax funds at Pioneer for four years prior to the switch to NatPay (SOMF ¶¶ 23-25; Neidl Decl. Exs. OO, QQ), and Pioneer had another payroll processor customer that housed tax funds in its tax impound account at Pioneer for ten years.  (SOMF ¶ 31; Neidl Decl. Ex. T.)

Pioneer's theory that NatPay doubled its fees by "roundtripping" tax funds through Cloud Payroll's account (Am. CC ¶¶ 612, 736, 746-747) is equally specious.  NatPay did not charge Cloud Payroll—and does not charge any of its clients—for ACH debits and credits to NatPay's First Premier account.  (Pereira Decl. ¶ 62.)  Thus, for example, if Cloud Payroll initiated a debit from its tax settlement account and a credit to a taxing authority, that equaled two transactions for fee purposes, not four.  (*Id.*)  Similarly, if Cloud Payroll initiated a debit from one Pioneer account and a corresponding credit to different Pioneer account, that equaled two transactions, not four.

(*Id.*)  That pricing is the same for all of NatPay's customers, and therefore the fees NatPay earned from Cloud Payroll were no greater than the fees charged any other customer.  (*Id.*)

The Court also relied on Pioneer's allegations claiming that NatPay departed from its standard practices "in agreeing to Defendant Mann's and the Payroll Companies' arrangement." (Dkt. No. 318.)   Pioneer's allegations regarding NatPay's "standard practices" are similarly without merit.  As noted above, Pioneer's allegations concerning an unusual "flow of funds" is contrary to the evidence.  Also without basis is any notion that there is anything illegal, inappropriate, or suspicious about three payroll service bureaus under common ownership concentrating tax funds in a single account.  (Pereira Decl. ¶¶ 49-53; Neidl Decl. Ex. UUUUUU ("Cafaro Decl.") 121:4-123:12.)  While the Cloud Payroll model was not commonplace, it made sense and raised no red flags.  (*Id.*)

Pioneer's overblown allegations concerning NatPay's decision to contract with Cloud Payroll only for ACH tax processing (Am. CCs ¶¶ 718-721) fails to tell half the story.  Before switching to NatPay, Cloud Payroll contracted with Payroll Tax Management ("PTM") for ACH tax services, and Cachet for ACH payroll services.  (Pereira Decl. ¶ 56.)  The CEO of Cloud Payroll, John Reinke, stated that Cloud Payroll wanted to stop using PTM due to performance issues and that ultimately the payroll side of the business would be transferred to NatPay as well. (SOMF ¶ 324.)  The parties' communications at the time show that NatPay was setting up the accounts to process both payroll and taxes, and that NatPay believed that "[b]y December the full conversion from Cachet w[ould] be completed." (Pereira Decl. ¶ 56, Ex. L.)  Ultimately, ProData was switched over to NatPay for direct deposit services in about November 2018, and Cloud Payroll was working on moving more work to NatPay in the summer of 2019.  (Pereira Decl. ¶

57.)  NatPay's contemporaneous emails with Cloud Payroll demonstrate that the issue was discussed over the course of the parties' relationship.  (*Id*. ¶ 57, Ex. M.)

Finally, the Court relied on "NatPay's alleged failure to communicate with Defendant Pioneer about the transactions."  (Dkt. No. 318.)  The evidence established that there is no requirement that an ACH service provider contact its customers' banks and attempt to get information about its customers' accounts.  (Pereira Decl. ¶ 78.)  Indeed, that would be a fool's errand since banks are prohibited from discussing their customers' accounts with third parties.  (*Id.*)  NatPay performed all the due diligence that First Premier required it to perform at the time, which involved a determination that the payroll service bureaus were legitimate businesses and that they provided the correct TIN, customer name, and address.  (Pereira Decl. ¶ 54, Ex. K.)

Pioneer's new allegations addressed to "e-Pay" transactions (Am. CC ¶¶ 762-773) are also insufficient to establish knowledge by NatPay that Mann was misappropriating tax funds or engaged in money laundering and bank fraud.  Significantly, none of the transactions involved the movement of funds **out** of the Cloud Payroll's designated tax settlement account.  Rather, these transactions moved funds **into** the MyPayroll 0212 Account, an account that Cloud Payroll had designated on its forms as its tax settlement account.  (Pereira Decl. ¶ 71.)  While in hindsight, the transactions "appear to be bogus" as Ms. Cafaro stated in her email on September 5, 2019 (*see* Pereira Decl. Ex. I), NatPay had no reason to analyze any of the Cloud Payroll's transactions until NatPay received returns from Pioneer beginning on September 4, 2019.  (Pereira Decl. ¶ 71.)

Pioneer's allegations that NatPay knew or should have known about these transactions appear to be premised on the clearly erroneous theory that someone at NatPay manually reviewed ACH instructions from Cloud Payroll or Cloud Payroll transaction details.  During the 2017 through 2019 timeframe, NatPay contracted with more than 1,100 processors and had more than

200,000 employer customers.  It processed more than 5,000,000 transactions a month.  (Pereira Decl. ¶ 72.)  Clearly, no one at NatPay was manually reviewing ACH transaction details as it would be impossible to perform such a review.  (*Id.*)

ACH instructions are uploaded by NatPay's customers into its systems, which create NACHA files for transmission to First Premier without manual intervention.  Transactions are reviewed under the following limited circumstances:  (1) if the transaction failed for some reason (e.g., wrong bank account number); (2) an item is returned; (3) the transaction involves a payroll credit of more than $100,000 to a single individual; (4) a batch contains too many items paid to a debit card; and (5) the customer requests information about a transaction.  (Pereira Decl. ¶ 73.)  None of the ePay transactions failed, and Pioneer never returned any of the transactions until September 4, 2019.  (*Id.*)

Even if someone at NatPay had occasion to review Cloud Payroll's transactions in real time and in context, the ePay transactions would not have seemed unusual or suspicious.  (Pereira ¶ 74.)  Again, these transactions were credits to Cloud Payroll's account, not to a third-party account, and therefore they appeared to be tax deposits.  While the transactions often involved high six-figure amounts, they were not round-dollar amounts.  (*Id.*)  Moreover, Cloud Payroll had thousands of employer-clients and was moving billions of tax dollars a year.  (*Id.*)  Cloud Payroll's tax impound transactions ranged from under a dollar to six-figure dollar amounts, so the size of any particular transaction was immaterial.  (*Id.*)  The description "ePay," while different from "TAX COL" and "TAX DEP," suggests a payment and is not on its face suspicious.  (*Id.*)  In fact, Cloud Payroll also used the term "EPAY" in connection with the ACH payment of NatPay's fees. (*Id.*; *id.,* Ex. Q.)

Again, even assuming that someone at NatPay reviewed the ePay transactions, there are many reasons that a payroll processor might move funds from one account to another and could use ACH to do so for record-keeping purposes. (Pereira Decl. ¶ 75.) Some payroll processors move tax funds from an impound account to an interest-bearing account or to a checking account for the purpose of remitting taxes by check. (*Id.*; Neidl Decl. Ex. V ¶ 5.) Wires, returns, and other deposits often need to be moved to the right account. (Pereira Decl. ¶ 75.) Processors may impound fees in one account and need to move them to another account. (*Id.*) NatPay has no ability or reason to monitor such movement, which as everyone knows is the responsibility of the bank where the payroll processor has its accounts. (*Id.*)

In addition, as Pioneer concedes, the ePay transactions were "bur[ied] among thousands of other transactions." (Am. CCs ¶ 768.) From June 2018 through August 2019, there were "slightly more than 1,000 ePay transactions" and more than 44,000 other transactions. (*Id.* ¶ 767.) Pioneer fails to explain why NatPay should have been alerted to this small number of transactions that never failed to process nor were returned by Pioneer. (Pereira Decl. ¶ 76.)

Pioneer's discussion of the "volume and average amounts" of the transactions (Am. CCs ¶ 767) is entirely irrelevant due to NatPay's business model. (Pereira Decl. ¶ 77.) NatPay charges the same fee whether a debit or credit item is one dollar or a million dollars. (*Id.*) Accordingly, NatPay does not run any analytics concerning the dollar amounts of its customers' transactions, and certainly does not average the amounts of different types of transactions for any of its more than 1,000 payroll processors. (*Id.*) While NatPay's systems flag payroll payments of more than $100,000 to a single individual to protect its customers from fraud, debits and credits involving payroll taxes routinely involve amounts in the hundreds of thousands to millions of dollars. (*Id.*)

Pioneer's allegation that it should have been "alarming[]" that the ePay transaction could not be tied to any later payments to taxing authorities" is also based on a faulty premise. (Am. CCs ¶ 769.) NatPay has no ability and does not attempt "to tie" the tax funds that are deposited in its customers' accounts to the funds paid to taxing authorities. (Pereira Decl. ¶ 78.) NatPay's customers may use ACH to pay taxes, but they also use checks, wires, direct transfers, and the Electronic Federal Tax Payment System. (*Id*.) NatPay's customers also often use a second ACH service provider or their bank to process a portion of their tax payments. (*Id.*) In addition, some tax payments are held for weeks or months before payment is due. (*Id.*) Accordingly, any attempt to reconcile a customer's tax debits and credits would be a fool's errand, and NatPay did not have any reason to attempt to do so. (*Id.*)

Finally, while Cloud Payroll changed its tax settlement account in about March 2019 to the Cloud Payroll 2440 Account (Am. CCs ¶ 770), the fact that the ePay transactions involved deposits to the MyPayroll 0212 Account would not have caused those transactions to fail or otherwise trigger any sort of review. (Pereira Decl. ¶ 79.) Similarly, the fact that some of the ePay transactions involved debits to accounts that were not identified by Cloud Payroll as an employer client (Am. CCs ¶ 764), would not have caused those transactions to fail or otherwise trigger a review. (Pereira Decl. ¶ 79.)

There is no factual basis for Pioneer's allegations that someone at NatPay "knew" about the ePay transactions, that the transactions involved accounts maintained by other Mann controlled entities, or that Pioneer had extended Mann's businesses a loan. (Am. CCs ¶¶ 773-782.) In a futile attempt to show NatPay's knowledge of the line of credit, Pioneer alleges that "Account 3614 was disclosed to NatPay on November 1, 2017." (Am. CCs ¶ 775.) Apparently, Pioneer is referencing a spreadsheet provided by Mr. McAuliffe to Ms. Cafaro on November 1, 2017, which listed its

925 customers, including Valuewise.  (Pereira Decl. ¶ 80, Ex. T.)  However, there is nothing in the spreadsheet or the cover email that indicates that Mann owned Valuewise, that Valuewise had a loan from Pioneer, or that Account 3614 was used to draw down on the line of credit.  (Pereira Decl. ¶ 80, Ex. T.)  Moreover, the spreadsheet identifies eighteen other entities with payroll accounts at Pioneer, none of which were affiliated with Mann.  (*See id.*)

Notably, none of the ePay transactions involved Account 3614.  (Am. CCs ¶ 763).  Pioneer alleges that Mann used Account 3614 to drawdown on the line of credit, and then "through a series of transactions" moved funds from that account to other accounts, and ultimately moved the funds to yet another account, and then transferred the funds to the MyPayroll 0212 Account.  (Am. CCs ¶¶ 776-777.)  Even assuming NatPay knew that Mann had a line of credit, NatPay would have no knowledge of any drawdowns on the line of credit or the internal on-line banking transfers accomplished by Mann at Pioneer.  (Pereira Decl. ¶ 81.)  Pioneer's entire theory of NatPay's knowledge of Mann's activities is predicated on pure speculation.

Because there is no evidence that anyone at NatPay knew about Mann's activities nor any evidence of conscious wrongdoing on the part of NatPay, this Court should grant NatPay summary judgment on Pioneer's RICO claims.  *See 236 Cannon Realty, LLC v. Ziss*, 2005 WL 289752, at *8-9 (S.D.N.Y. Feb. 8, 2005) (granting defendant summary judgment on RICO claim where plaintiff failed to prove intent).

### B.    There is No Evidence that NatPay Conspired with Mann or the Other Counterclaim Defendants.

To establish a conspiracy to violate the civil RICO statute pursuant to 18 U.S.C. § 1962(d), the plaintiff must prove "(1) that there existed a conspiracy to commit acts that, if successful, would constitute a substantive civil RICO violation; (2) that defendant agreed to join in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of the

conspiracy in some manner (although not necessarily by the commission of any RICO predicate acts himself)."  *City of New York v. Chavez*, 944 F. Supp. 2d 260, 268-69 (S.D.N.Y. 2013); *see also Crawford*, 758 F.3d at 487 ("To establish a violation of § 1962(d), a plaintiff must show that the defendant agreed with at least one other entity to commit a substantive RICO offense.").

Because Pioneer's substantive RICO claim fails to establish an issue of material fact, the RICO conspiracy claim against NatPay fails as well.  *See USA Certified Merchants*, 262 F. Supp. 2d at 338.  The evidence establishes that NatPay did not conspire with Michael Mann or anyone else to engage in bank fraud or money laundering.  Accordingly, NatPay should be granted summary judgment on Pioneer's RICO claims.

## <u>CONCLUSION</u>

For the foregoing reasons, National Payment Corporation respectfully requests that the Court grant its motion for partial summary judgment in its entirety, dismiss Pioneer's setoff defense and its RICO claims, and grant Plaintiffs such other and further relief as the Court deems appropriate.

Dated: June 3, 2024                                    Respectfully submitted,

GREENBERG TRAURIG, LLP

By: _/s/ Cynthia E. Neidl_____
     Cynthia E. Neidl (513737)
     Julie A. Yedowitz (702823)
     54 State Street, 6th Floor
     Albany, New York  12207
     Tel:  (518) 689-1400
     Fax:  (518) 689-1499
     Email:  neidlc@gtlaw.com
          julie.yedowitz@gtlaw.com

     Roland Garcia (*admitted pro hac vice*)
     Jennifer Tomsen (*admitted pro hac vice*)
     1000 Louisiana Street, Suite 1700
     Houston, Texas 77002
     Tel:  (713) 374-3510
     Email:  garciar@gtlaw.com
          tomsenj@gtlaw.com

     *Attorneys for Intervenor-Plaintiff National Payment Corporation*

697606317v2