**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

SOUTHWESTERN PAYROLL SERVICE, INC. and
GRANITE SOLUTIONS GROUPE, INC.,

*Plaintiffs,*

v.

PIONEER BANCORP INC., et al.,

*Defendants.*

Case No. 1:19-cv-1349 (FJS/CFH)

NATIONAL PAYMENT CORPORATION,

*Intervenor-Plaintiff,*

v.

PIONEER BANCORP INC., et al.,

*Defendants.*

**INTERVENOR-PLAINTIFF NATIONAL PAYMENT CORPORATION'S
L.R. 7.1(A)(3) STATEMENT OF UNDISPUTED MATERIAL FACTS**

Intervenor-Plaintiff National Payment Corporation ("NatPay"), by and through its undersigned counsel and pursuant to Northern District of New York Local Rule 7.1(A)(3), hereby sets forth the following Statement of Undisputed Material Facts in support of NatPay's motion for partial summary judgment.

**Relevant Parties**

1.     NatPay is a Florida corporation with a principal place of business located at 3415 W. Cypress Street, Tampa, Florida 33607-5007.  Dkt. No. 232, NatPay Amended Complaint, ¶ 55.

2.     NatPay operates as a third-party Automated Clearing House ("ACH") service provider, and has since its inception in 1991.  Declaration of Steven Pereira ("Pereira Decl.") ¶ 2.

1

3.     NatPay provides ACH transfer services to a nationwide clientele, including companies who calculate and prepare payroll and payroll-related taxes.  Pereira Decl. ¶ 3.

4.     Defendant Pioneer Bank is a federally insured stock bank organized and existing under the laws of the State of New York, with its headquarters located at 652 Albany Shaker Road, Albany, New York 12211.  Dkt. No. 332, Pioneer Bank and Pioneer Bancorp, Inc.'s Answer and Defenses to National Payment Corporation's Amended Complaint, and Amended Counterclaims/Crossclaims, ¶ 618.

5.     Pioneer Bancorp, Inc. is a Maryland corporation, with its principal place of business in Albany, New York.  Dkt. No. 232 ¶ 56; Dkt. No. 332 ¶ 56.

6.     Michael Mann is a citizen of the State of New York, who during the relevant period was residing in Edinburgh, New York.  Dkt. No. 232 ¶ 58; Dkt. No. 332 ¶ 620.

7.     Valuewise Corporation (also d/b/a Apogee d/b/a Optix Consulting d/b/a Primacy Search Group) ("Valuewise") is a Delaware corporation wholly owned by Michael Mann.  Dkt. No. 232 ¶ 59.

8.     MyPayrollHR.com, LLC, d/b/a MyPayroll and n/k/a Cloud Payroll LLC ("MyPayroll") is a Massachusetts limited liability company wholly owned by Valuewise that, until about 2019, operated as a payroll service company.  Dkt. No. 332 ¶ 621; Declaration of Cynthia Neidl ("Neidl Decl.") Ex. W.

9.     Cloud Payroll LLC ("Cloud Payroll") is a Delaware limited liability company wholly owned by Mann that, until about September 2019, operated as a payroll service bureau.  Dkt. No. 323 ¶ 61; Dkt. No. 332 ¶ 623; Neidl Decl. Ex. Z.

10.     Southwestern Payroll Service, Inc. ("SWP") is an Oklahoma Corporation with its principal place of business in Tulsa, Oklahoma, that at all relevant times herein has operated as a

2

payroll service company.  Mann, through Cloud Payroll, owned a 51% interest in SWP.  Dkt. No. 332 ¶ 623.

11.     ProData Payroll Service, Inc. ("ProData") is an Illinois Corporation that, until about November 2019, operated as a payroll service company.  Mann, through Cloud Payroll, owned a 51% interest in ProData.  Dkt. No. 332 ¶ 623; Neidl Decl. Ex. Z.

12.     Mann owned or partially owned several other entities, including Ross Personnel Consultants, Inc., Always Live Holdings, LLC, Kanigo, LLC, Hire Flux, LLC, Viverant LLC, Heutmaker Business Advisors, LLC, and Weitz and Associates Inc.  (collectively with Valuewise, the "Mann Entities").  Dkt. No. 232 ¶ 69; Neidl Decl. Ex. GG.

**MyPayroll and Client Account 0212**

13.     Michael Mann began his banking relationship with Pioneer in about 2009, when he opened two accounts and obtained a $2 million line of credit extended to Valuewise Corporation ("Valuewise") and Ross Personnel Consultant Inc. ("Ross").  Neidl Decl. Ex. EE at 7.

14.     David Blessing, who served as Vice President of Commercial Structured Debt and promoted in about June 2018 to Senior Vice President of Capital Markets, served as Mann's Account Relationship Manager at Pioneer. Doc. No. 232, ¶ 11.

15.     On or about December 2, 2013, Valuewise entered into a Unit Purchase Agreement with F.W. Davison & Company, Inc., for the purchase of MyPayrollHR.com, LLC ("MyPayroll"), a Massachusetts limited liability company operating as a payroll service bureau.  Neidl Decl. Ex. FFF; Neidl Decl. Ex. Q, Deposition of Michael Mann vol. 1 ("Mann vol. 1 Tr.") 23:9-25:13.

16.     Valuewise did not purchase any technology from the seller at the time, but obtained the right to purchase the technology in the future.  Mann vol. 1 Tr. 24:6-18.  Mann did not purchase the technology for several years.  Mann vol. 1 Tr. 88:10-24.

17.     Mann discussed the purchase of MyPayroll with David Blessing and was informed by Mann that Mann intended to house payroll tax dollars at Pioneer.  Mann vol. 1 Tr. 32:6-33:13; 45:14-19; 63:18-64:3, 74:25-75:6.

18.     On November 20, 2013, Mann informed Blessing via email that the closing on MyPayroll would be on November 29, 2013, and asking him to "set up two accounts as placeholders per our conversation yesterday" and noting that he could "put a little money in each if needed."  Neidl Decl. Ex. GGG.

19.     The following day, Trudy Seeber (née Hudson), who served as Branch Manager of the Clifton Park East branch, sent an email to David Blessing indicating that she had set aside accounts ending in 0212 and 0204 for MyPayroll.   Neidl Decl. Ex. HHH.

20.     On November 21, 2013, Mann sent Blessing an ACH application for Valuewise, and indicated that he "would need to fill out two more applications for the new accounts once set up."  Mann further stated that, he had "mentioned a top amount of 500K for ValueWise . . . however, depending on how we address the ACH files for the new company . . . it could be in the millions daily."  Neidl Decl. Ex. III.

21.     On November 26, 2013, Blessing requested that Trudy Seeber go to Mann's offices so that the paperwork for the new accounts could be completed.  Ms. Seeber indicated that the "[d]ocs [were] all ready for signature."  Neidl Decl. Ex. JJJ.

22.     On November 27, 2013, Ms. Seeber reported to Blessing that Mann was "all set up with both accounts" and that with respect to the account ending in 0212, that Mann "wasn't sure what to anticipate for transactions (more or less than 200) so [they] decided to see how December look[ed] and evaluate the account when [Mann] has a full month on the books."  Neidl Decl. Ex. KKK.

23.     Mann opened two accounts for MyPayroll, one ending in 0204 and the other 0212. The 0212 account ("MyPayroll 0212 Account") was labeled "Client Account" on the account opening documents and that designation carried through to Pioneer's records, including account statements.  Neidl Decl. Ex LLL; Neidl Decl. Ex. OO.

24.     MyPayroll was described in Pioneer's account opening documents as a "Payroll Svce Bureau."  Neidl Decl. Ex. LLL.

25.     When Mann opened the MyPayroll 0212 Account, his intention was to use that account only to house MyPayroll's customers' payroll tax dollars.  Mann vol. 1 Tr. 36:25-37:15.

26.     On November 29, 2013, Pioneer employee Lyn Wiltsie forwarded to James Whalen, who then served as Pioneer's Associate Counsel and Compliance Officer, the MyPayroll 0212 Account paperwork, including the account opening documents that identified MyPayroll as a "Payroll Svce Bureau" and the MyPayroll 0212 Account as a "Client Account," as well as MyPayroll's Certificate of Incorporation, which indicated that the business of MyPayroll was "providing small business payroll services[.]"  Neidl Decl. Ex. MMM; Neidl Decl. Ex. LL.

27.     On December 3, 2013, Mann emailed Blessing to inform him that the closing had occurred and that they "could have some money coming in tomorrow and Thursday[.]"  Blessing asked whether everything went smoothly and whether "the funds that were held by the 3rd party transferred over[.]"  Mann indicated that he had "not yet pushed the 3rd party to transfer the funds until [he] make[s] sure the account is fine" and that he would "push them . . . to move the funds they are holding."  Blessing offered "to get involved" if needed.  Neidl Decl. Ex. NNN (PB-SWP-0033592)

28.    On December 3, 2013, Mann emailed Ms. Seeber, asking about the full account number for the 0212 Account, stating that he "need[s] to know this so [he] can properly move funds in the account from our clients and don't want to screw it up."  Neidl Decl. Ex. OOO.

29.    On December 11, 2013, Mann emailed David Blessing stating:

> We will be using a third party tax processor initially.  They will need to prenote a file and also to get approval on processing checks from our system (probably me giving them signing authority).  Who do I work with to get these done?  I will probably be signing today and will want a quick turnaround.

Mann then forwarded the email to Lucas Scarchilli, who at the time was Pioneer's Commercial Structured Debt Analyst, who forwarded the email to Sandra Dedrick, who at the time served as Pioneer's Commercial Services Officer.  Mr. Scarchilli then informed Mann that Ms. Dedrick would call him shortly.  Later that day, Ms. Dedrick emailed Blessing, letting him know that Mann was "all set."  Neidl Decl. Ex. PPP.

30.    On December 16, 2013, Blessing asked Mann if he was available for lunch with Frank Grant, who had worked for GTM Payroll for several years and was a friend of Blessing. Mann eventually hired Grant as a salesman for MyPayroll.  Neidl Decl. Ex. QQQ.

31.    On December 16, 2013, Mann forwarded to Blessing, Ms. Dedrick, and Mr. Scarchilli a series of emails from representatives of Payroll Tax Management, Inc. ("PTM"), in which PTM was seeking the ODFI number for the ACH files because PTM would be "initiating the drafts back to [MyPayroll's] account at Pioneer Bank."  Attached to an email was a check from the MyPayroll 0212 Account with a payor of MyPayrollHR.COM LLC, made payable to NYS Income Tax.  Neidl Decl. Ex. RRR.

32.    On December 17, 2013, there were about 172 separate ACH credits (deposits) to the MyPayroll 0212 Account, each labeled "PAYROLL TAX MANA/TAXDRAFT" in amounts varying from $4.75 to $98,797.12, and totaling $737,105.09.  Neidl Decl. Ex. QQ.

6

33.     On December 20, 2019, Mann sent an email to Ms. Dedrick stating "[w]e have a few clients that need to wire us money for our payroll company because their tax liabilities is over 100K," and asking whether the routing number was the same for wires as for ACH.  Neidl Decl. Ex. SSS.

34.     On December 20, 2019, Mann forwarded an email Mr. Scarchilli with a subject of "Tax Wire" from a MyPayroll employee asking Mann to let her know when they received "the tax wire from JMB so we can let PTM know to process payment."   Mann asked whether the wire was received in the MyPayroll 0212 account, and Mr. Scarchilli provided Mann with the amount of the received wire.  Neidl Decl. Ex. TTT.

35.     On December 27, 2013, Mann forwarded an email to Sandra Dedrick, indicating that a MyPayroll customer would be "wiring tax money in the amount of $424,757.19," and asking her to "keep you[r] eye open on account 212," which Ms. Dedrick agreed to do and ultimately informed Mann when the wire arrived.  Neidl Decl. Ex. UUU.

36.     The ending balance in the MyPayroll 0212 Account on December 31, 2013 was $1,825,240.45, and during the month more than $5 million had been deposited in the account.  The two checks written from the account identified the payor as "Payroll Tax Management, Inc." and were made payable to "NYS Income Tax."  Neidl Decl. Ex. QQ.

37.     Pioneer charged MyPayroll a "SC Global Item" service charge of $.25 per transaction above 200 transactions/items in the MyPayroll 0212 Account.  Neidl Decl. Ex. QQ at 1; Neidl Decl. Ex. LLL at PB-SWP-00000376.

38.     David Blessing would receive a bonus in part based on fees charged to accounts held by his customers, including a "Global Item Charge."  Neidl Decl. Ex. NNNNNN.

7

39.    The GL Global Item Service Charge to the MyPayroll 0212 Account for December 2013 was $11.50.  Neidl Decl. Ex. QQ.

40.    In December of 2014, $14,751,382.32 was deposited in the MyPayroll 0212 Account, there were over 1,500 transactions in the account, and 199 checks had been written from the account.  Transaction descriptions include the term "PAYROLL TAX MANA/TAXDRAFT." Neidl Decl. Ex. OO.

41.    The GL Global Item Service Charge to the MyPayroll 0212 Account for December 2014 was $343.75.

42.    In December of 2015, $18,964,759.07 was deposited in the MyPayroll 0212 Account, there were over 5,800 transactions in the account, and 183 checks had been written from the account.   Transaction descriptions include the terms "[Entity Name]/PAYROLL" and "[ENTITY NAME]/TAXES." Neidl Decl. Ex. OO.

43.    The GL Global Item Service Charge to the MyPayroll 0212 Account for the month of December 2015 was $1,411.00.  Neidl Decl. Ex. OO at 2.

44.    In December of 2016, $60,198,426.60 was deposited in the MyPayroll 0212 Account, there were over 8,700 transactions in the account, and 66 checks had been written from the account.   Transaction descriptions include the terms "[Entity Name]/PAYROLL" and "[ENTITY NAME]/TAXES."  Neidl Decl. Ex. OO.

45.    The GL Global Item Service Charge to the MyPayroll 0212 Account for the month of December 2016 was $2,054.25.  Neidl Decl. Ex. OO at 3.

46.    On July 3, 2017, Mann sent an email to Christine Charbonneau (formerly Batchelder), a Customer Service Assistant at Pioneer, asking why the MyPayroll 0212 Account had a "transaction called SC Global Item 15717 at $.25 for $3,929.25."  He asked whether the

8

charge came from Pioneer, and stated that he thought "it was a charge from our ACH processor" but the ACH processor was being charged separately.  He indicated that since the MyPayroll 0212 Account had "over 15,000 transactions per month" he wanted "to know if we can change the account not to have this fee."  Mann said that he could "keep a high balance in the 212 account."  Neidl Decl. Ex. PPPPPP.

47.    Ms. Charbonneau responded, indicating that she was "working with Randy" and would "confirm with Dave" and she would get back to him.  Neidl Decl. Ex. PPPPPP.

48.    Thereafter, the GL Global Item Service Charge continued to be applied to the MyPayroll 0212 Account until February 2019.  Neidl Decl. Ex. OO at 4-5.

49.    In December of 2017, $187,365,306.66 was deposited in the MyPayroll 0212 Account, there were over 23,000 transactions in the account, and 192 checks had been written from the account.   Transaction descriptions include the terms "[Entity Name]/PAYROLL" and "[ENTITY NAME]/TAXES."   Neidl Decl. Ex. OO.

50.    The GL Global Item Service Charge to the MyPayroll 0212 Account for the month of December 2017 was $5,703.75.  Neidl Decl. Ex. OO at 4.

51.    In December of 2018, $216,463,751.35 was deposited in the MyPayroll 0212 Account, there were over 14,600 transactions in the account, and 419 checks had been written from the account.   Transaction descriptions include the terms "[Entity Name]/IMPOUND" and "CLOUDPAYROLL/TAX COL."   Neidl Decl. Ex. OO.

52.    The GL Global Item Service Charge to the MyPayroll 0212 Account for the month of December 2018 was $3,527.25.  Neidl Decl. Ex. OO at 5.

53.    The GL Global Item Service Charges to the MyPayroll 0212 Account from December 1, 2018 through November 30, 2018 totaled $68,486.25, which was reflected in a

9

document exchanged by Jerilee Beaudoin, SVP of Commercial Loan Administration and Joseph Fleming, who at the time served as Sr. Vice President – Chief Lending Officer. Neidl Decl. Ex. NNNNNN.

54.     Thomas Amell, CEO of Pioneer, and Patrick Hughes, CFO of Pioneer, also received copies of materials showing that the Global Item Charges to the MyPayroll 0212 Account from December 1, 2018 through November 30, 2018 totaled $68,486.25, and that Global Item Charges attributable to Blessing were many times higher than other loan officers at the bank. Neidl Decl. Ex. OOOOOO.

55.     In August of 2019, $169,857,909.40 was deposited in the MyPayroll 0212 Account and there were over 5,400 transactions in the account. Transaction descriptions include the term "[Entity Name]/PAYROLL." Neidl Decl. Ex. OO.

**Mann and Pioneer Discuss MyPayroll's ACH Needs**

56.     When Mann opened the MyPayroll 0212 Account, he was using PTM to process ACH payroll tax transactions. Mann vol. 1 Tr. 51:13-52:25.

57.     After opening Account 0212, Mann had discussions with David Blessing and others at Pioneer about having Pioneer serve as the Originating Depository Financial Institution ("ODFI") for MyPayroll's ACH transactions involving its customers' payroll and payroll tax funds. Mann vol. 1 Tr. 65:12-66:9.

58.     On March 26, 2014, Mann forwarded emails from representatives of PTM to Blessing, and stated "[w]e are ultimately taking over more and more control of processing for the payroll company. Please read down the email and let me know who from Pioneer that should be part of this meeting to go through the questions below." Neidl Decl. Ex. VVV.

10

59.     Blessing forwarded Mann's email to Alicia Riegert, who then served as Sr. Vice President – Chief Information Officer of Pioneer, and Graig Furlong, Operations/Electronic Banking Officer of Pioneer, asking for times to speak with PTM.  Neidl Decl. Ex. VVV.

60.     Joseph Fleming, who then served as Sr. Vice President – Chief Lending Officer of Pioneer, forwarded Blessing's email to Ms. Riegert, stating that he would "really appreciate you help [sic] with this.  It's an opportunity to generate some good deposits."  Neidl Decl. Ex. VVV.

61.     On April 1, 2014, Mann forwarded Dave Blessing a copy of MyPayroll's contract with PTM.  Blessing forwarded the document to Ms. Riegert.  Neidl Decl. Ex. WWW; Mann vol. 1 Tr. 84:3-85:2.

62.     On April 21, 2014, Blessing wrote the following in an email to Ms. Riegert, Fleming, and other Pioneer employees:

> I had lunch with Mike Mann today. Initially, we are only going to be handling the tax portion of the payroll, which is 100% prefunded with no obligation to forward on the taxes to the appropriate entities if it wasn't received. This will create $0 in credit risk. If we handle it well, his ultimate goal is to move over the actual payroll as well which isn't always pre funded. However we will cross that bridge when we come to it.

Neidl Decl. Ex. XXX.

63.     On September 16, 2014, Mann sent an email to Blessing and Mr. Scarchilli stating as follows:

> We are looking to bring both payroll tax and payroll deposit processing in house.  I am aware that we have the ability to upload ACH NACHA files and want to start those discussions.  Our system does create the files . . . However, I want to make sure we start talking so we create our processes that map to your processes to start moving forward on this.  Please forward to anyone that should be in the meeting and I am happy to set up some time for a conference call.  Didi is in NC . . . so we can start with a conference call.

Neidl Decl. Ex. YYY.

64.     Blessing then forwarded the email to Mr. Scarchilli, Ms. Dedrick, Graig Furlong,

11

Alicia Riegert, and Carol Beth Chase, asking them to "see below, and let me know what would work for everyone to get this ball rolling.  It means significant deposits for the bank."  Neidl Decl. Ex. YYY.

65.    Ms. Riegert responded, stating that the opportunity "first came up some time ago" and that at the time it was "agreed that we would hold off on going down this path, at least for the moment."  Ms. Riegert stated that she would "follow up with Tom to see if he would like us to pursue this."  Neidl Decl. Ex. ZZZ.

66.    Amell responded, suggesting "a brief meeting on this to make sure that we are all on the same page."  He stated that he did "not want to lose any business, but most importantly, if we elect not to pursue this business I want to make sure that I completely understand why we elect to pass.  Finally, if we do elect to pass, I need to make sure that we do not upset a good customer."  He requested that Ms. Riegert handle sending out a meeting notice.  Neidl Decl. Ex. ZZZ.

67.    On September 17, 2014, Mann forwarded MyPayroll sample ACH files to Blessing and Scarchilli "to see if someone can verify that these types of files can be uploaded."  Neidl Decl. Ex. AAAA.

68.    A meeting was held on September 18, 2014 in the Pioneer Board Room to "discuss the Michael Mann ACH Processing" and among those invited were Amell, Blessing, Scarchilli, Dedrick, Sarratori, Mazzara, Fleming, and Riegert.  Neidl Decl. Ex. BBBB.

69.    On September 18, 2014, Mann sent Blessing a detailed invoice from Cachet with monthly statistics and reflecting 47 batches for a total of more than 15,000 items.  Mann explained how often batches were sent and provided additional information.  Blessing forwarded the information to several officers of Pioneer, including Tom Amell, Joe Fleming, Laura Mazzara, and Ms. Dedrick.  Neidl Decl. Ex. CCCC.

70.     On September 23, 2014, Amell sent an email to the group, stating that "now it feel like [sic] we are I a place [sic] where we can put a quick business analysis around the cost so we can present a proposal to the customer to consider.  Not sure who would own this, but I am confident Dave Blessing can help guide the process and he can obviously deliver it to the customer to secure the business."  Neidl Decl. Ex. DDDD.

71.     Alicia Riegert responded to Amell, stating that she would work with Blessing, and that there were a couple of items that required follow up.  Mr. Amell responded, thanking Ms. Riegert and stating that they "need to explore all options to develop additional fee income and deposit."  Neidl Decl. Ex. DDDD.

72.     On September 24, 2014, Ms. Riegert sent an email to Sarratori, Blessing, Dedrick, Mazzara, Fleming, and others stating that they were "in the process of putting together an analysis of the current ACH pricing for MyPayrollHR.com."  Ms. Riegert identified a number of "action items," including understanding "per month ACH dollars flowing through the Master Account for MyPayrollHR."  Neidl Decl. Ex. EEEE.

73.     On October 7, 2014, Ms. Riegert sent an email to Sarratori, Fleming, Dedrick, Whalen, Blessing, and others, forwarding a "Pricing Comparison between Cachet and Pioneer on the spreadsheet."  Ms. Riegert identified some next steps, including finalizing an ACH agreement, finalizing a credit policy, and deciding on an ACH pricing schedule.  Neidl Decl. Ex. EEEE.

74.     After discussions with Pioneer, Mann concluded that it was not a viable option because Pioneer's cut-off time for submissions was too early, there would not be significant savings, and there would have been a lot of work needed for the transition.  Mann vol. 1 Tr. 70:18-71:8.

75.     On November 20, 2014, a lending officer at First Niagara Bank asked Blessing a series of questions about Valuewise and the payroll company that was acquired in December 2013. Blessing responded, and as to the payroll company stated that Mann was the "CEO/big picture" and that Frank Grant was "head of sales and operations/day to day."  Blessing further informed that "[c]urrent processor is out of California."  Neidl Decl. Ex. FFFF.

**<u>Blessing Acknowledges the Benefits of Housing Payroll</u>**

76.     In early March 2017, Michael Mann hosted a meeting attended by, among others, John Reinke and David Blessing to discuss his plans for payroll.  Neidl Decl. Ex. N, Deposition of John Reinke ("Reinke Tr.) 51:23-59:11.

77.     Reinke testified that Blessing toured the MyPayroll offices, which included a check printing, tax processing, customer service, and sales operations.  Frank Grant, who was introduced to Mann by Blessing, and who previously worked in payroll sales, was also there.  Reinke Tr. 55:3-56:6.

78.     According to Mr. Reinke, Mr. Blessing expressed that "the payroll business was a great business" and that "Pioneer really appreciated the payroll business" because it provided a "big deposit base" that Pioneer could use to lend, and the amount of money that Cloud Payroll was running through Pioneer "was extremely significant."  Reinke Tr. 56:7-58:9.

79.     The discussion among Mann, Blessing, and Reinke concerned the growth of the payroll business and the expectation that the business would continue to use Pioneer for the deposit account.  Reinke Tr. 58:14-64:12.

80.      Mann emailed Blessing on March 26, 2017, and stated, in part:

In our last conversation, I told you that I will probably try to move all the service bureaus that we have purchased and would like to buy a separate company that is separate from our relationship with Pioneer. Obviously, we would need to raise the money to pay back the 2M note and then have this other entity with their investors

responsible for the service bureaus. I would keep the technology company and tax/treasury company within the ValueWise umbrella and Pioneer would be able to take advantage of the deposits and have claim to these companies.

Neidl Decl. Ex. GGGG.

81.     In about April 2017, in an effort to raise capital for Cloud Payroll so that it could acquire additional payroll bureaus, David Blessing and Joseph Fleming, as a representative of Pioneer, and Michael Mann, John Reinke, and Matthew Schilling, as representatives of Cloud Payroll, met with two Albany businessmen. Neidl Decl. Ex. O, Deposition of Matthew Schilling ("Schilling Tr.") 88:25-91:20; Reinke Tr. 65:3-82:9; Neidl Decl. Ex. HHHH.

82.     The presentation included a powerpoint that described Cloud Payroll's business model. The powerpoint referred to MyPayrollHR and Pro Data as "regional service bureaus," and described the "CloudPayroll Approach" as offering "Software and Services, Tax and Treasury, and Payroll Service Bureaus." The presentation stated: "We take over tax processing so management can focus on growth." Neidl Decl. Ex. IIII.

83.     During the meeting, the fact that the tax funds were housed at Pioneer was specifically discussed. Schilling Tr. 91; *id*. 273:7-274:3. David Blessing expressed that Pioneer liked the fact that the tax dollars were being deposited at Pioneer. Mr. Blessing further indicated that the large tax deposit basis "would be an asset to the people that were in the payroll servicing business." Reinke Tr. 70:4-76:18.

84.     Blessing "made it clear that the reason that Pioneer wanted to support Cloud Payroll's further growth was because the payroll business was a great business from the perspective of Pioneer Bank. And the reason it was a great business is because these payroll tax dollars represented a good deposit base for the bank." Reinke Tr. 73:6-15.

85.     On April 21, 2017, a Pioneer customer sent an email to David Blessing with a subject line of "Check with Mike Mann on who would want to give us some pricing on payroll." Blessing forwarded the email to Mann, who forwarded the email to Frank Grant, who made plans to speak with the Pioneer customer.  Neidl Decl. Ex. JJJJ.

86.     On September 8, 2017, Blessing sent an email to a representative of another Pioneer customer, providing contact information for Frank Grant from MyPayroll, indicating that "[t]hey are a client and friend," and that Pioneer was "considering bringing them on as a vendor and branding our own Pioneer Payroll."  Neidl Decl. Ex. KKKK.

87.     On September 8, 2017, a representative of the same customer sent an email to Frank Grant, indicating that Blessing had provided his contact information "in regards to payroll services" and indicating that they were "looking to switch from ADP to another payroll company." Grant forwarded the email to Blessing on September 29, 2017, thanking him for the referral and stating that they were moving forward with MyPayroll and was a "great 80 employee group" for them.  Blessing forwarded the email to Tom Amell, who responded, noting that "Frank Grant was at GTM payroll for many years."  Neidl Decl. Ex. LLLL.

88.     In October 2017, Blessing introduced Mann to yet another Pioneer customer. Thereafter, Mann sent the customer an email, copying Blessing, stating he wanted to follow up regarding "your payroll" and offering to connect Frank Grant.  Neidl Decl. Ex. MMMM.

**Cloud Payroll Accounts**

89.     On January 15, 2019, Matthew Roberts, a Cloud Payroll employee, sent an email to Deborah Salsburg, "Sales Leader/Assistant Branch Manager," and Trudy Seeber indicating that he needed to set up a "wire-in account" for Cloud Payroll.  On January 16, 2019, Ms. Salsburg

sent Mann and Mr. Roberts an email with the paperwork that had been requested that was "marked everywhere that [Mann] need[ed] to sign."  Neidl Decl. Ex. NNNN.

90.    On January 29, 2019, Mann sent an email to Ms. Salsburg and Ms. Seeber stating that he needed to set up one more Cloud Payroll account and requested the paperwork to sign. Less than an hour later, Ms. Salsburg sent Mann the account opening paperwork fully prepared with no additional information needed other than Mann's signature in places marked by with a star.  Neidl Decl. Ex. OOOO.

91.    On February 25, 2019, Mann sent an email to Ms. Salsburg and Ms. Seeber, stating that he needed to open another account for Cloud Payroll because they were "collecting money from multiple locations and want to make sure we keep them separate."  Mann requested the "paperwork to sign."  Ms. Seeber responded, stating that they would send the paperwork in the morning.  On February 26, 2019, Ms. Salsburg sent Mann the account opening paperwork for a Cloud Payroll account ending in 2440 ("Cloud Payroll 2440 Account") fully prepared with no additional information needed other than Mann's signature in places marked by with a star, stating "You know the drill.  Once I get it back, I will get the account opened and shoot you an email." Neidl Decl. Ex. PPPP.

92.    Mann opened the Cloud Payroll 2440 Account for the purpose of housing customers' payroll tax funds.  Mann vol. 1 Tr. 106:22-107:20; *id.* 116:13-117:7; Reinke Tr. 84:8-17; Neidl Decl. Ex. L, Deposition of Darin Alred Vol. 1 ("Alred vol. 1 Tr.") 278:24-282:17; Neidl Decl. Ex. M, Deposition of Darin Alred Vol. 2 ("Alred vol. 2 Tr.") 383:5-384:17.

93.    Pioneer stopped charging the MyPayroll 0212 Account a GL Global Item Service Charge in February 2019, after Mann opened the Cloud Payroll 2440 Account.  Neidl Decl. Ex. QQQQQQ.

94.     The Cloud Payroll 2440 Account had a $0 balance on March 1, 2019. During the month, $22,893,678.62 was deposited in the account, and there were more than 1,600 transaction in the account that month. Transaction descriptions included the terms "CLOUDPAYROLL/TAX COL." Neidl Decl. Ex. PP.

95.     In April of 2019, $92,314,008.30 was deposited in the Cloud Payroll 2440 Account, there were over 9,600 transactions in the account, and there were 1,551 checks written from the account. The majority of the transactions bore the description "CLOUDPAYROLL/TAX COL." Neidl Decl. Ex. PP.

96.     In May of 2019, $107,260,596.40 was deposited in the Cloud Payroll 2440 Account, there were over 9,300 transactions in the account, and there were 840 checks written from the account. The majority of the transactions bore the description "CLOUDPAYROLL/TAX COL." Neidl Decl. Ex. PP.

97.     In June of 2019, $96,994,733.93 was deposited in the Cloud Payroll 2440 Account, there were over 8,000 transactions in the account, and there were 420 checks written from the account. The majority of the transactions bore the description "CLOUDPAYROLL/TAX COL." Neidl Decl. Ex. PP.

98.     In July of 2019, $102,765,717.30 was deposited in the Cloud Payroll 2440 Account, there were over 10,400 transactions in the account, and there were 1,842 checks written from the account. The majority of the transactions bore the description "CLOUDPAYROLL/TAX COL." Neidl Decl. Ex. PP.

99.     In August of 2019, $102,557,784.81 was deposited in the Cloud Payroll 2440 Account, there were over 8,200 transactions in the account, and there were 453 checks written

from the account.  The majority of the transaction bore the description "CLOUDPAYROLL/TAX COL."  Neidl Decl. Ex. PP.

**Pioneer's BSA Department**

100.    Ellen Fogarty was a Vice President and head of the Pioneer's Bank Secrecy Act ("BSA") Department from 1994 until her retirement in 2021. Neidl Decl. Ex. D, Deposition of Ellen Fogarty ("Fogarty Tr.") 18:6-22.  Darlene Julian and Kelli Rappleyea worked under Fogarty in Pioneer's BSA Department.  Fogarty Tr. 313:6-14; Neidl Decl. Ex. G, Deposition of Darlene Julian ("Julian Tr.") 48:2-51:17.

101.    It was the responsibility of the BSA Department at Pioneer to detect and investigate any suspicious activity and decide whether to file a Suspicious Activity Report ("SAR") with FinCEN.  Fogarty Tr. 141:9-142:2.

102.    The BSA policy at Pioneer references the concept of "know your customer". Fogarty Tr. 14:17-24.  Fogarty admitted that "know your customer" is a very important part of the BSA Department at Pioneer.  Fogarty Tr. 145:17-24.

103.    Pioneer used a software called BAM to generate monthly suspicious activity alerts in particular accounts.  BAM was the first level of investigation into potential bank fraud.  Fogarty Tr. 148:18-20; 153:3-13.

104.    The BAM software would generate a report of potentially suspicious activity in an account, and then members of the BSA Department at Pioneer would review the BAM reports and either (a) clear the alert or (b) complete a referral sheet to Pioneer's SAR Committee, who would determine whether to file a SAR with FinCen.  Fogarty Tr. 153:20-157:18.

19

105.    Additionally, Ellen Fogarty performed a quarterly review of accounts that were designated high risk by Pioneer, including the MyPayroll 0212 Account.  Fogarty Tr. 174:3-175:6; *id.* 191:2-194:19; Neidl Decl. Ex. II.

106.    To perform a review of a BAM report, a member of the BSA Department would have to review the activity in the bank account at Pioneer.  Julian Tr. 87:17-25.

107.    Julian testified that to determine whether account activity in a business account was suspicious, she had to know and understand the business of the customer.  Julian Tr. 90:19-91:10.

108.    Between September of 2017 and August 30, 2019, the BAM software at Pioneer generated at least 162 alerts or quarterly reviews relating to Mann's accounts at Pioneer.  Neidl Decl. Ex. II.

109.    Between September of 2017 and August 30, 2019, Pioneer's BSA Department reviewed the activity in the MyPayroll 0212 Account fourteen times, in connection with either a BAM alert or quarterly review.  Neidl Decl. Ex. JJ.

110.    After reviewing the account transactions in the MyPayroll 0212 Account, Pioneer's BSA Department consistently concluded that the activity was reasonable and that there was no suspicious activity in the account.  Neidl Decl. Ex. JJ.

111.    For example, Ellen Fogarty reviewed the MyPayroll 0212 Account on or about September 14, 2017 and noted that Valuewise is a "human resource consulting/payroll company" and that the account activity was "typical for this business and is multiplied by the number of companies they do business for."  Neidl Decl. Ex. JJ at 4.

112.    For further example, Kelli Rappleyea reviewed the MyPayroll 0212 Account on or about July 24, 2018, and documented that her review "revealed foreign wire activity" but the "[t]ransactions appear reasonable" and there was "[n]o suspicious activity detected."  Neidl Decl.

Ex. JJ at 3.

113.    For further example, Darlene Julian reviewed the MyPayroll 0212 Account on or about January 17, 2019, and documented that her review of December 2018 activity "revealed higher amounts for the month of December" that "appeared to be the pattern based on the totals from December 2017." She concluded that the "activity on [the MyPayroll 0212 Account] is high and the spike in amount is not believed to be suspicious. Neidl Decl. Ex. JJ at 2.

114.    December 2017, there were over 23,000 transactions in the MyPayroll 0212 Account, including deposits totaling $187,365,306.66, and in December 2018, there were over 14,000 transactions in the MyPayroll 0212 Account, including deposits totaling $216,463,751.35. Neidl Decl. Ex. OO.

115.    Between the opening of the Cloud Payroll 2440 in February 2019, and August 30, 2019, the BAM software at Pioneer generated two alerts. Neidl Decl. Ex. KK.

116.    Darlene Julian performed a review of the activity in the Cloud Payroll 2440 Account on about April 3, 2019, and document that "[t]his is a new business customer as of the end of February. Any business activity for March would create a spike in activity. There is wire and ACH activity for March. A pattern of business activity has not yet been determined." Neidl Decl. Ex. KK.

117.    In March 2019, there were more than 1,600 transactions in the Cloud Payroll 2440 Account, including the deposit of $22,893,678.62. Neidl Decl. Ex. PP.

118.    On about May 15, 2019, Darlene Julian again reviewed the activity in the Cloud Payroll 2440 Account and documented that "April review revealed the activity for this new business customer has increasing ACH totals. Due to the type of business, the activity is not

unusual."  Neidl Decl. Ex. KK.

119.   In April of 2019, there were over 9,600 transactions in the Cloud Payroll 2440 Account, including deposits of $92,314,008.30.  Neidl Decl. Ex. PP.

120.   Pioneer also had a SAR Committee, comprised of various officers and employees of the bank, who from at least 2013 through 2019 met monthly and were provided with various reports for their review.  Julian Tr. 81:14-82:24; Neidl Decl. Ex. LL.

121.   Among the reports transmitted or available to SAR Committee members was an ACH log that listed all ACH transactions over $5,000 in a given month.  Fogarty Tr. 157:6-158:4; Julian Tr. 131:5-16; *id.* 136:5-137:3.

122.   Beginning in 2014, the ACH logs provided to the SAR Committee members identified hundreds and eventually thousands of ACH transactions in the MyPayroll 0212 Account. The ACH transactions included descriptions such as "[Employer name]/PAYROLL"; "[Employer name]/TAXES"; "[Employer name]/Dir Dep"; and "PAYROLL  TAXMANA/TAXDRAFT". Neidl Decl. Exs. MM & NN.

123.   Ms. Julian testified that, prior to sending out the ACH log to SAR Committee members, she would review the document for any suspicious conduct.  Julian Tr. 134:6-137:3.

**Pioneer Employees Assisted in the Processing of Payroll**

124.   Christine Charbonneau (formerly Batchelder) is a Customer Service Assistant at Pioneer.  Neidl Decl. Ex. QQQQ, Deposition of Christine Charbonneau ("Charbonneau Tr.") 18:23-19:24.  Mann would routinely email Charbonneau requesting copies of cancelled checks that were payable to payroll taxing authorities from the MyPayroll 0212 Account, and Charbonneau would provide Mann with copies of the cancelled checks.  Neidl Decl. Ex. RRRR.

22

125.    Between 2014 and 2019, Charbonneau and others at Pioneer routinely wired same day payroll and/or payroll taxes for MyPayroll after receiving an email from Mann or his staff asking for assistance.  Neidl Decl. Ex. SSSS.  Two officers of Pioneer had to sign each wire request.  *Id.*

126.    On September 4, 2014, Amy Patentreger at MyPayroll emailed Dedrick and Charbonneau because one of MyPayrollHR's clients had bounced their payroll a couple of times the week before.  Ms. Patentreger needed to confirm that the client's funds for payroll had actually been deposited to Account 0212.  A few hours later, Charbonneau confirmed the payroll client funds were in Account 0212.  Neidl Decl. Ex. TTTT.

127.    On January 27, 2015, Mann forwarded an email to Ms. Charbonneau and Ms. Dedrick from Mr. McAuliffe, who stated that "[MyPayroll Customer] owes us payroll taxes for 2 pay periods" and stating that they might have sent wires.  Mann told Charbonneau and Dedrick that the wire might come in.  Neidl Decl. Ex. UUUU.

128.    On March 8, 2017, Mann emailed Charbonneau and stated, in part, "[o]ur tax person for our payroll company had to go into the hospital yesterday. We have been told that we need to make an IRS tax payment for [MyPayroll /Pioneer customer].  The money will come out of account ending in 0212."  Neidl Decl. Ex. VVVV.

129.    On October 26, 2018, Mann emailed Charbonneau a West Virginia State Tax Department Electronic Funds Transfer Application for Payroll Service Companies and asked her to sign the document.  Neidl Decl. Ex. WWWW.

130.    On May 13, 2019, Mann emailed commercialservicesdept@pioneerbanking.com. The subject line of the email is "Urgent Wire."  The text of the email states "I need to process this quickly because it is for same day payroll. I can verify at 518-312-XXXX." Attached to the email

23

is a completed Pioneer's Wire Transfer Authorization for money to be wired out of Account 0212.

Neidl Decl. Ex. XXXX.

131.    On July 9, 2019, Mann emailed Randall Benedict, inquiring whether certain fund

had been credited to Account 0212.  Benedict replied:

> We do not see that ACH coming into 2440. Other ACH transactions have been
> processed but they are normal tax collection ACH's. Perhaps the ACH had an
> effective date of 7/10/19? The trace number is not on our list of ACH coming in.
> Lets watch the account in the morning, I have a feeling it will hit then.

Neidl Decl. Ex. YYYY.

**The ValueWise Line of Credit**

132.    Pioneer has two forums in which a commercial loan is approved, a staff loan

committee and a board loan committee.  Neidl Decl. Ex. A, Deposition of Thomas Amell ("Amell

Tr.") 101:3-8; Neidl Decl. Ex. C, Deposition of Joseph Fleming ("Fleming Tr.") 57:14-21.  In

2019, Tom Amell was a member of both committees.  Amell Tr. 101:3-8.  Patrick Hughes was

also a member of both committees in 2019.  Neidl Decl. Ex. E, Deposition of Patrick Hughes

("Hughes Tr.) 26:24-27:14.  Mr. Fleming was on the staff loan committee in and prior to 2019.

Fleming Tr. 59:5-14.

133.    In 2014, Pioneer approved a renewal of a $6 million line of credit and a term loan

of $3 million to be used, in part, to pay down the line of credit.  The Commercial Loan Executive

Summary provides that:  "In December 2013, Valuewise Corporation acquired a payroll services

company called MyPayrollHR.com, LLC which is expected to generate $600M in revenue in 2014

and breakeven.  However, Mr. Mann noted that the business will grow dramatically after 2014 as

he is investing in a sales force."  Neidl Decl. Ex. W.

134.    The 2014 Credit Request & Approval provides that MyPayrollHR.com is a

"payroll services company" that provides "payroll services."  It further provided that the 2013

revenue attributable to "Payroll Services" was $77,000, with net losses of $48,000. It also identified two accounts held by MyPayroll and indicated that the average balance in the MyPayroll 0212 Account was $462,528.  Neidl Decl. Ex. W.

135.    In 2015, Pioneer approved an increase in the line of credit to $15 million.  The 2015 Credit Request & Approval provides that MyPayrollHR.com is a "payroll services company" that provides "payroll services."  Neidl Decl. Ex. X.

136.    The 2015 Credit Request & Approval identified three different accounts held by MyPayroll and indicated that the current balance in the MyPayroll 0212 Account was $613,978, which constituted about 87% of the combined current balances of all 10 accounts listed, and an average balance of $341,278, which far exceeded the combined average balances of the other nine accounts listed.  Neidl Decl. Ex. X.

137.    The 2015 Credit Request & Approval provided that the revenue for payroll services in 2014 was $671,000, just slightly more than the current balance in the MyPayroll 0212 Account. It further provided that payroll services lost nearly $1.7 million in 2014. Neidl Decl. Ex. X.

138.    The 2015 Credit Request & Approval provided as follows:  "Michael Mann really likes this division and has invested heavily in it to get it to grow more quickly.  He invested in a sales manager at approximately $250M per year and hired four back office people and over 10 sales people. The loss in 2014 is attributed to salaries and benefits as he is looking to rapidly grow the business."  Neidl Decl. Ex. X.

139.    In 2016, Pioneer approved the renewal of $15 million line of credit, a term loan of $5 million for the purpose of paying down the line of credit, and another term loan of up to $2 million to fund the acquisition of a payroll services company.  Neidl Decl. Ex. Y.

140.    The 2016 Credit Request & Approval provided that MyPayrollHR.com is a "payroll services company" that provides "payroll services."  It indicated that the payroll division had revenue of $3.283 million, and net losses of $2.813 million.  It stated that Mann began cutting sales resources midway through 2015, and would cut several sales and operational jobs in June 2016.  It further stated that "the payroll service company holds a value of approximately $6.6 million based on ADP Valuations" and that Mann was "seeking an acquisition target to get the company to breakeven by FYE '16."  Neidl Decl. Ex. Y.

141.    In 2017, Pioneer approved an increase in the line of credit to $22 million.  The 2017 Commercial Loan Executive Summary provides that "Valuewise has evolved into a conglomerate with four operating divisions including consulting, physical therapy, payroll services and finance and accounting consulting."  Neidl Decl. Ex. Z.

142.    The 2017 Credit Request & Approval identified three different accounts held by MyPayroll and indicated that the average balance in the MyPayroll 0212 Account was $935,324, which was more than double the average daily balance of the 18 other accounts combined. It also reflected that the payroll division's 2016 revenue was about $3.2 million, and had negative 2016 net income of about $1.3 million.  Neidl Decl. Ex. Z.

143.    The 2017 Credit Request & Approval described the payroll services provided by MyPayroll as follows:  "payroll processing, time and labor management, payroll tax processing, comprehensive resource information system and "pay as you go" workers compensation."  It further stated that, in December 2016 "management purchased ProData in Gurnee, Illinois which double [sic] the size of their service" and that "CloudPayroll, LLC was formed and [was] 100% owned by Michael Mann," was "51% owner of Prodata and [would] be added as a guarantor of

26

the proposed loans." It further stated that Valuewise purchased 51% of "Southwestern Payroll Service Inc., in Tulsa Oklahoma" in the first quarter of 2017. Neidl Decl. Ex. Z.

144. The 2017 Credit Request & Approval stated that Mann had invested approximately $4.5MM in the payroll services division in 2016. The payroll division reported a net of ($1,258M) in FY2016 mainly due to the expense of having a proprietary payroll technology platform. With the 51% acquisition of Pro/Data in Gurnee, Illinois this doubled the size of their service and upcoming purchase of Southwestern Payroll in Tulsa, Oklahoma, growth is anticipated." Neidl Decl. Ex. Z.

145. The 2017 Credit Request & Approval further stated that the "current revenue run rate of the payroll division was "between $8 million and $9 million and expected to continue to grow throughout the year. The EBITDA loss was higher than expected because of the work management is doing to migrate the business from Pro Data and SouthWestern payroll. Payroll division expects the development to be completed by late summer and plans on moving their business to the company's platform in the fourth quarter. Once this migration is completed, they can eliminate most of the costs to the other technology providers of Pro Data and SouthWestern Payroll. They expect to have another loss in the second quarter as we [sic] continue to develop the system to be able to take on the Pro Data and SouthWestern clients. This development work will enable the division to migrate other companies onto the system a lot faster in the future and management can start to sell the technology to other service bureaus (not owned by Valuewise)." Neidl Decl. Ex. Z.

146. In 2018, Pioneer increased the line of credit from $22 million to $32 million. The 2018 Commercial Loan Executive Summary provided the payroll division of Valuewise included

three "payroll bureaus," and noted that the division "sold a nation-wide contract to Gallagher Insurance for payroll in 2018."   Neidl Decl. Ex. AA.

147.    The 2018 Credit Request & Approval identified Cloud Payroll and MyPayroll as co-borrows on the line of credit.  It also described the payroll services provided by MyPayroll as follows:  "payroll processing, time and labor management, payroll tax processing, comprehensive resource information system and "pay as you go" workers compensation."  Neidl Decl. Ex. AA.

148.    The 2018 Commercial Loan Executive Summary identified four different accounts held by MyPayroll and indicated that the average balance in the MyPayroll 0212 Account was $1,848,764, which was more than double the average daily balance of the 19 other accounts listed combined.  Neidl Decl. Ex. AA.

149.    In 2019, Pioneer increased the line of credit from $32 million to $42 million.  Co-borrowers included Cloud Payroll and MyPayroll.  The 2019 Credit Request & Approval reflected that Cloud Payroll had three Pioneer deposit accounts and MyPayroll had four, and  the MyPayroll 0212 Account had an average balance of $661,439.  Neidl Decl. Ex. BB.

150.    The 2019 Credit Request & Approval described MyPayroll as "Cloud-based payroll and a HR software sold to clients throughout the US.  The company does not generate accounts receivable as cash is received when payroll services are provided.  The company has been developing payroll software over the past several years and is expected to roll out the software to 3rd parties in 2019."  The 2019 Credit Request & Approval described Cloud Payroll as "100% owned by Michael Mann and represents his 51% ownership share of ProData, a payroll service company located in Gurnee, Illinois."  Neidl Decl. Ex. BB.

151.    The 2019 Credit Request & Approval reflected total revenues of $175,389,000, payroll division revenues of $10,240 million, and payroll division net income of negative $5.887

28

million.  It indicated that "[t]he 23% increase in revenue in the payroll division was primarily due to organic growth of the company's three existing payroll service bureau, which are all profitable according to Mr. Mann. In 2018, MyPayrollHR.com sold their first technology license to a payroll service bureau in Oregon and feedback from the customer has been positive. Per Mr. Mann, MypayrollHR expects that technology licenses will provide a significant opportunity for revenue growth by the 2nd half of 2019."  Neidl Decl. Ex. BB.

152.    The 2019 Credit Request & Approval further provided that "[t]he payroll segment losses deepened in FY'18, declining to ($5,887M) due primarily to R&D and IT costs relating to the development of the company's new payroll technology. According to Mr. Mann, the payroll segment will begin seeing profitability from the investment by second half of 2019, when all the existing payroll service bureaus are migrated to the new technology and licenses to third parties are sold."  Neidl Decl. Ex. BB.

153.    The 2019 Credit Request & Approval also stated that "[a] notable change in assets between the last two periods was the addition of $414M in investment in subsidiaries, which included Cloud Payroll, LLC's 10% equity investment in HRNext, LLC (a payroll software company)."  It also reflected subordinated debt of Cloud Payroll as of December 31, 2018 totaling $1,257,000.  Neidl Decl. Ex. BB.

154.    The Independent Accountants' Report, dated July 3, 2019, the receipt of which was a condition of approval of the 2019 $42 million line of credit, stated as follows with respect to Valuewise federal and state withheld taxes:  "Payroll taxes are electronically paid to Cloud Payroll, which in turn remits them to the various government agencies."  Neidl Decl. Ex. CC.

29

**Collapse of the Check Kiting Scheme**

155.    Beginning no later than January 2019, Mann engaged in a check kiting scheme between Pioneer and Bank of America ("BOA").  Neidl Decl. Ex. GG at 15; Neidl Decl. Ex. R, Deposition of Michael Mann vol 2 ("Mann vol. 2 Tr.") 434:6-11; Neidl Decl. Ex. EE at 7-11.

156.    The kiting scheme collapsed on or about August 30, 2019, when BOA froze the accounts controlled by Mann at BOA.  Dkt. No. 157-2, at ¶ 6; Neidl Decl. Ex. EE at 7-11.

157.    On August 28, 2019, Mann deposited 39 checks totaling $18,043,000 into a BOA account held by ValueWise (x4559).  The checks were written from accounts at Pioneer held in the name of the following twelve entities: Valuewise dba Apogee (x4018), Ross Personnel (x3690), Valuewise dba Primacy Search Group (x3648), Trueconsulting Corp. (x1236), TrueHR LLC (x1244), Create Force LLC (x1699), Pro Data Payroll Services Inc. (x1988), SWP (x1996), Focalpointe Group LLC (x2192), Valuewise dba Optix Consulting (x2473), Valuewise dba Viverant (x2499), Create Force LLC dba Alwayslive (x4820).  Neidl Decl. Ex. CCC.

158.    The amount of each check was in the six figures and in round dollar amounts, such as $491,000, and $443,000, and $483,000, and every check was made payable to "ValueWise Corporation."  Neidl Decl. Ex. CCC.

159.    On August 29, 2019, Mann deposited 36 checks totaling $15,588,000 written from BOA accounts into Pioneer accounts held by the following twelve entities: Valuewise dba Apogee (x4018), Ross Personnel (x3690), Valuewise dba Primacy Search Group (x3648), Trueconsulting Corp. (x1236), TrueHR LLC (x1244), Create Force LLC (x1699), Pro Data Payroll Services Inc. (x1988), SWP (x1996), Focalpointe Group LLC (x2192), Valuewise dba Optix Consulting (x2473), Valuewise dba Viverant (x2499), Create Force LLC dba Alwayslive (x4820).  Neidl Decl. Ex. DDD.

160. The amount of each check was in the six figures and in round dollar amounts, such as $492,000, and $430,000, and $377,000. The 36 checks were drawn on BOA accounts in the name of Heutmaker Business Advisors, LLC, Primacy Search Group, and Optix Consulting, each a subsidiary or affiliate of ValueWise. Neidl Decl. Ex. DDD.

161. At about 4:30 pm on August 30, 2019, Pioneer received notification that BOA was calling back the 36 BOA checks totaling $15.588 million deposited by Mann on August 29, 2019 in various accounts at Pioneer. Neidl Decl. Ex. F, Declaration of David Hunn ("Hunn Tr.") 78:21-80:17; Neidl Decl. Ex. B, Declaration of Kimberly Catello ("Catello Tr.") 102:8-23; Neidl Decl. Ex. DD at 20-25.

162. Although Mann "wrote out of Pioneer an equivalent amount" in checks back to [BOA]" on August 29, 2019, Pioneer was able to call those back. Neidl Decl. Ex. J, Declaration of Frank Sarratori ("Sarratori Tr.") 136:15-19; Neidl Decl. Ex. EEE.

163. None of the accounts held in the name of MyPayroll were used by Mann to issue checks to or receive checks from the accounts he controlled at BOA on August 28, 2019. Neidl Decl. Exs. CCC & DDD.

164. None of the accounts held in the name of MyPayroll had a negative balance as of September 3, 2019 as a result of the collapse of the kiting scheme. Neidl Decl. Exs. RR, WW, XX, and YY.

165. The MyPayroll 0212 Account had a positive balance of $303,392.32 as of August 29, 2019. Neidl Decl. Ex. OO at 6.

166. Between August 29, 2019 and September 30, 2019, a total of $9,713,736.83 was deposited in the MyPayroll 0212 Account. Neidl Dec. Ex. RR.

167.     None of the accounts held in the name of Cloud Payroll were used by Mann to issue checks to or receive checks from the accounts he controlled at BOA on August 28, 2019.  Neidl Decl. Exs. CCC & DDD.

168.     None of the accounts held in the name of Cloud Payroll had a negative balance as of September 3, 2019 as a result of the collapse of the kiting scheme.  Neidl Decl. Exs. TT, ZZ, AAA, and BBB.

169.     The Cloud Payroll 2440 Account had a positive balance of $33,531.08 as of August 29, 2019.  Neidl Decl. Ex. TT.

170.     Between August 29, 2019 and September 30, 2019, a total of $10,628,738.17 was deposited in the Cloud Payroll 2440 Account.  Neidl Decl. Ex. TT.

**Events of August 30, 2019**

171.     At about 4:30 pm on August 30, 2019, Pioneer received notification that BOA was calling back and would not honor the 36 checks totaling $15.8 million deposited by Mann on August 29, 2019 in various accounts at Pioneer.  David Hunn, then Pioneer's Vice President, Deposit Operations, discussed the matter with Patrick Hughes and Joseph Fleming.  Sarratori Tr. 121:2-5; Hughes Tr. 88:6-12.

172.     Kim Catello, Pioneer Deposit Operations Analyst, received the directive to "freeze" or "restrict" all 32 commercial accounts opened by Mann as well as Mann's personal bank account, which she accomplished on August 30, 2019.   Hunn Tr. 84:16-86:18; Catello Tr. 103:13-104:24; *id*. 126:5-127:10; Neidl Decl. Ex. ZZZZ.

173.     As a result, Mann lost any ability to access any accounts at Pioneer.  Mann vol. 1 Tr. 194:5-22.

174.    When Pioneer freezes an account, all debit and credit transactions to the account are frozen and will unpost.  Hunn Tr. 18-25; *id.* 231:4-14; Catello Tr. 39:21-40:03.

175.    Pioneer can freeze an account so that all debit and credit transactions are automatically rejected during posting overnight.  Catello Tr. 40:25-41:12.  Alternatively, when the account is frozen, all debit and credit transactions are unposted and must be manually processed. Hunn Tr. 232:5-25.

176.    An alternative procedure to freezing an account is to restrict it to "Credits Only." In that scenario, credits/deposits will automatically post to the account, and debits/withdrawals will unpost and have to be manually processed.  Hunn Tr. 232:5-16; Catello Tr. 129:8-130:4.

177.    With respect to the Mann Entity accounts, Pioneer froze or restricted the accounts as to all transactions, whereby all debit and credit transactions "d[id] not post to the account, or they unpost[ed], and those transactions then need[ed] to be manually processed individually." Hunn Tr. 232:5-25; Hunn Tr. 88:18-24; *id.* 231:2-18; Catello 38:9-24.

178.    When both the credit and debit of an online banking transaction are unposted, Pioneer can either post both transactions or reject both transactions.  Catello Tr. 58:8-22.

179.    Joseph Fleming, who at the time was an Executive Vice President and Chief Credit Officer at Pioneer, was asked to contact Mann and let him know that BOA was calling back the checks and Pioneer would be "freezing his accounts."  Sarratori Tr. 124:2-6; Hughes Tr. 91:20-92:10; Mann vol. 1 Tr. 180:19-11.

180.    Fleming had a telephone conversation with Mann on August 30, 2019, and told him that BOA "had frozen his accounts and [Pioneer was] freezing his accounts."  Fleming Tr. 300:4-301:12; Neidl Decl. Ex. AAAAA.

181.    At 5:26 pm, Mann sent Fleming a text stating "I have left a message.  As soon as I hear back, I will let you know."  Fleming responded, "Okay.  Thanks."  Neidl Decl. Ex. BBBBB.

182.    At about 6:00 pm on August 30, 2019, Fleming sent a copy of the Valuewise "note, loan and security agreement, and credit write-up" to Thomas Amell, indicating that the "right of setoff language in the note addresses taking money from the deposit accounts to make payments on the loan" but that "[d]rawing down on the line to offset overdrafts is not addressed."  Neidl Decl. Ex. CCCCC.

183.    At 6:08 pm on August 30, 2019, Amell sent an email to Fleming, asking what Fleming's "gut" told him after speaking to Mann, and whether Mann responded "like he was caught or shocked that it happened."  Neidl Decl. Ex. CCCCC.

184.    At about 6:24 pm on August 30, 2019, Fleming responded to Amell's question, indicating  that Mann "was very short [and] he simply said that he was aware of it and would call them and call [Fleming] back."  Fleming stated that he was "concerned" because he "would have expected questions and more conversation."  Neidl Decl. Ex. CCCCC.

185.    At about 6:24 pm on August 30, 2019, Amell responded to Fleming's email, stating that he agreed that Mann "would have needed details."  Neidl Decl. Ex. CCCCC.

186.    At 7:37 pm, Fleming sent a text to Mann, asking "Have you heard anything?"  Neidl Decl. Ex. BBBBB.

187.    Mann responded to Fleming, stating that he had left several messages with BOA but had not heard back.  Mann further stated that he "could not access the accounts" that morning and BOA "said they were working on restoring the access" but said "[n]othing about freezing accounts or returning checks."  Neidl Decl. Ex. BBBBB.

188.    Fleming forwarded Mann's text to Amell, Hughes, Sarratori, and Mazzara.  PB-DDDDD.

**Events of August 31, 2019**

189.    At about 8:13 am on August 31, 2019, Fleming sent Mann a text asking that Mann call him because Fleming had a conference call scheduled and wanted to touch base.  Fleming Tr. 291:2-292:9; Neidl Decl. Ex. EEEEE.  Fleming also called Mann, but Mann did not pick up.  Neidl Decl. Ex. EEEEE.

190.    Mann responded to Fleming's text at 9:40 am, stating "Joe . . . do what's best for you (Pioneer).  I am going to jump on this first thing Tuesday to get this fixed.  My BofA contact did not call back."  Fleming forwarded the text to Amell, Sarratori, Hughes, and Mazzara. Neidl Decl. Ex. EEEEE.

191.    Amell responded to Fleming, "Not good[.]"  Neidl Decl. Ex. EEEEE.

192.    Fleming and others on the executive team participated in a conference call on the morning of August 31, 2019.  Fleming Tr. 294:13-296:19.

193.    At about 11:00 am on August 31, 2019, a representative from COOL Insuring Agency, Inc., sent an email to Mazzara with a subject line "FW: Check Kiting Fraud / Forgery or Alteration."  The email referenced Pioneer lines of insurance coverage relating to "Forgery" and "Kiting."  Ms. Mazzara forwarded the email to Amell, Sarratori, Fleming, and Hughes.  Neidl Decl. Ex. FFFFF.

194.    By this time, Pioneer executives were "doing their homework" regarding how Pioneer would recover if Mann was engaged in check kiting, forgery, or fraud.  Fleming Tr. 305:11-19.

35

195.    At about 11:02 am on August 31, 2019, Ellen Fogarty sent an email to "mitigation support.hhl@bankofamerica.com" inquiring about the status of three BOA accounts that had "items returned marked Frozen/Blocked account that exceed[ed] $15 million." Fogarty Tr. 293:11-294:9; Neidl Decl. Ex. GGGGG.

196.    While she was in the office on August 31, 2019, Fogarty made "copies of the checks that were bouncing" so that Pioneer executives would be aware of "the accounts that were going to have the negative balances." She made no other copies of anything after that. Fogarty Tr. 382:24-383:18.

197.    On August 31, 2019, at Amell's request, Fleming spoke with Mann's accountant, Patrick Scisci. After the call, Fleming sent Amell an email stating that Mann's accountants were aware that Mann was "understaffed in the financial area," and indicating that he had told Mann that. Amell responded, stating that he was "concerned it might not be him but his CFO." Fleming responded "He is the CFO. That's part of the problem." Amell responded, "That is a big problem." Fleming responded, "We have had multiple conversations about it." Neidl Decl. Ex. HHHHH; Fleming Tr. 306:2-311.25.

**Events of September 3, 2019**

198.    At about 7:45 am on Tuesday, September 3, 2019, Mann sent an email to Fleming and Blessing indicating that he was "stepping down as CEO of ValueWise (and all its affiliates) immediately." He further stated that "Tim [Burke] will be taking over running all entities." Neidl Decl. Ex. IIIII. Fleming forwarded the email from Mann to Amell, Mazzara, Sarratori, and Hughes. Neidl Decl. Ex. IIIII.

199.    Tim Burke is an investment banker who began working for Valuewise in 2017. Burke was introduced to Mann by Blessing in about April 2016. To explain Mann's businesses to

36

Burke, Blessing sent a link to Mann's "payroll website" which, at the time was www.mypayrollhr.com." Neidl Decl. Ex. JJJJJ; Mann vol. 1 Tr. 186:2-14. Joseph Fleming also knew Mr. Burke before he began working for Valuewise. Fleming Tr. 311:4-312:6.

200. At about 8:00 am on September 3, 2019, Mann sent an email to Burke with an attached document labeled "Instructions." The Instructions stated that the "[g]oal is to maximize asset value of current assets." As to the "Payroll Companies," the instructions stated as follows:

> There should be money in the line of credit as well as in Bank of America to cover all the tax dollars for the payroll companies. The Bank of America accounts are frozen (as well as Pioneer) currently. I highly recommend that they continue to make payments for our clients. This will keep the asset value of the payroll companies up and allow Pioneer to get a lot of their money back from this asset. If they don't allow Tim to put it back into the 2440 account, the asset value will go way down. The asset value will probably drop a lot more than the money they must keep the payroll tax payments going. Again, they should work with Tim. They will have a few days to figure this out with Tim if they keep it going. Tim/Pioneer should work with Bank of America to get these funds back. I don't have access to either bank so I am not sure where the money ended up with both banks freezing accounts.

Neidl Decl. Ex. KKKKK.

201. Mann was concerned about the payroll companies and tax payments because he believed if taxes were not paid, the value of the payroll companies would collapse. Mann vol. 1 Tr. 192:7-193:23.

202. On Tuesday, September 3, 2019, Pioneer executives, including Amell, Sarratori, Fleming, and Fogarty, participated in discussions in Sarratori's office. Fogarty Tr. 301:10-306:8; Fogarty Tr. 382:24-383:18; Sarratori Tr. 134:3-136:7. Sarratori had copies of the checks that BOA had returned. Sarratori Tr. 134:3-136:7; *id.* 137:22-138:15.

203. At about 8:10 am, Fleming and Sarratori spoke to Tim Burke by telephone. Burke offered to fly to Albany and to help in any way that he could. Neidl Decl. Ex. LLLLL.

204.    When David Hunn arrived at Pioneer on the morning of September 3, 2019, there was a "very large volume of unposted items that had to be processed."  Hunn Tr. 88:10-94:7.  Mr. Hunn went to Frank Sarratori, who was in his office with Tom Amell, Patrick Hughes, and possibly others to inform him of the unposted items that needed to be processed.  Hunn Tr. 97:14-98:23; Hughes Tr. 121:7-22.

205.    Pioneer executives were aware that the bulk of the credits, totaling millions of dollars, were going to accounts held by companies with "payroll" in their names.  Hughes Tr. 127:4-129:19; Pioneer Rule 30(b)(6) Tr. 345:3-18.

206.    Thereafter, Kim Catello began the manual process of reviewing each transaction in each of the frozen accounts, and either posting or rejecting the transaction.  Sarratori Tr. 151:20-152:10; Hunn Tr. 94:8-15; *id.* 99:3-11; Catello Tr. 110:22-112:8.  The information available as to each transaction included at least the account number, dollar amount, type of transaction, and transaction description.  Hunn Tr. 212:2-8.

207.    Ms. Catello accepted all credits to the accounts and rejected all debits except certain on-line banking transactions initiated by Mann on August 30, 2019, chargebacks representing the checks called back by BOA, and chargeback and other fees.  Hunn Tr. 102:8-104:12; Neidl Decl. Ex. MMMMM; Neidl Decl. Ex. ZZZZ.

208.    Ms. Catello completed processing all unposted August 30, 2019 items during the day on September 3, 2019.  Catello Tr. 112:12-19.

209.    At about 9:20 am, Tim Burke participated in a call with David Blessing and shared with him "what new information" he had after communications with Mann and others since 7:00 am that morning.  Neidl Decl. Ex. LLLLL.

38

210.    At about 12:30 pm, Mann forwards an email from Matt Schilling to Tim Burke. Matt requests access to Pioneer account and notes that they have $451,220.73 to be paid in taxes tomorrow out of the 2440." Burke states that he wanted to "ensure funds are getting moved back from the interest account to cover it." Mann asks Burke to "see what you can do when you talk to Pioneer." Neidl Decl. Ex. OOOOO.

211.    At about 12:55 pm on September 3, 2019, Mann sent an email to Sarratori and Burke, indicating that he had received Sarratori's message and that BOA was "not returning [his] calls (or text messages)," that Mann had sent "an email to authorize [Burke] to talk on [his] behalf," and that Burke was "in route to Albany and w[ould] work with [Fleming]." Neidl Decl. Ex. NNNNN; Mann vol. Tr. 186:27-188:10.

212.    At about 12:57 pm, Fleming forwarded Mann's email to Amell, Mazzara, Hughes, Fleming, and Fogarty. Neidl Decl. Ex. NNNNN.

213.    At 2:00 pm, Ms. Catello sent David Hunn and Randall Benedict, a Pioneer Commercial Portfolio Administrator, a spreadsheet reflecting all debits and credits to the Mann Entity accounts, as well as the transactions to be allowed and the transactions to be returned. The total number of debits and credits to the Mann Entity accounts was over 1,500, including about 737 separate deposits to the Cloud Payroll 2440 Account totaling over $8 million. Neidl Decl. Ex. MMMMM; Neidl Decl. Ex. UU.

214.    The spreadsheet reflected that Pioneer would allow $46,493,823.98 credits (deposits) to the accounts and $32,288,462.61 debits (withdrawals), for a net positive gain of $13,605,361.37. Neidl Decl. Ex. MMMMM.

215.    At about 2:25 pm, Dave Blessing picked up Tim Burke from Albany International Airport and brought him to Pioneer, where he met with Amell, Fleming, Sarratori, and Mazzara

39

for about two and a half hours.  During the meeting, Burke calls Mann and asks that he come to Pioneer the following day, with his attorney, for a meeting with Burke and Pioneer executives. Mann agrees.  Neidl Decl. Ex. LLLLL; Hughes Tr. 117:3-17; Amell Tr. 273:13-274:3.

216.    At about 5:00 pm, Mann sends an email to Tim Burke regarding the meeting at Pioneer the following day and the execution of a corporate resolution.  Burke responds that his attorney could be at Pioneer at 11:30 am on September 4, 2019.  Neidl Decl. Ex. PPPPP.

217.    Tim Burke and David Blessing had dinner together on September 3, 2019.  Neidl Decl. Ex. LLLLL; Amell Tr. 274:4-13.

218.    At about 8:40 pm on September 3, 2019, Burke and John Reinke, the CEO of the payroll business, spoke on the telephone.  Mr. Reinke stated, among other things that he was "very concerned about making tax payments and ability to manage transactions" because Pioneer had frozen the payroll company accounts.  Neidl Decl. Ex. LLLLL; Reinke Tr. 109:12-111:16; Reinke Tr. 112:19-113:23.

219.    At about 8:57 pm on September 3, 2019, Michael Mann sent an email to Tim Burke indicating, among other things, that "[t]here was probably close to 1.9M to cover tomorrow morning from the tax account," that Mann had moved "probably 3M to the line from the tax account on Friday [August 30, 2019]", and that there was "more money coming in tomorrow." Neidl Decl. Ex. QQQQQ; Mann vol. 1 Tr. 190:21-192:6.

220.    Burke responded to Mann's email, indicating that they could "talk about it at 11:30 with the bank."  Mann responded, indicating that 11:30 am might be "too late" because "they normally have to pay them before 11:30.  Again, I only say this because I don't want to hurt the payroll asset value.  If they look to sell without a blemish, the multiple will be a lot higher." Neidl Decl. Ex. RRRRR.

221.    At about 9:17 pm on September 3, 2019, Burke forwarded Mann's 8:57 pm email to Blessing and Fleming.  Neidl Decl. Ex. QQQQQ.

222.    At about 9:30 pm, Burke called Fleming to discuss what he had learned from Reinke.  Neidl Decl. Ex. LLLLL; Fleming Tr. 335:23-336:13.

223.    At about 9:38 pm on September 3, 2019, Fleming forwarded the emails from Burke and Mann to Amell, Sarratori, Hughes, and Mazzara.  Fleming stated that he "received the email from Tim" and that he was "not completely sure what [it] was about."  He further stated that he had "just hung up with Tim [Burke]," who had spoken "to the head of the payroll company" and was informed that Mann had gotten "kicked out of United Health four years ago" after getting "caught forging a signature on a United contract."  Neidl Decl. Ex. QQQQQ; Fleming Tr. 319:12-326:7.

224.    At about 10:08 pm on September 3, 2019, Amell responded to Fleming's email, copying Sarratori, Hughes, and Mazzara, and stating, among other things, that Mann was "a criminal" who had "completely fabricated millions in A/R's."  Neidl Decl. Ex. QQQQQ.

**Events of September 4, 2019**

225.    At 7:43 am on September 4, 2019, Mann sent an email to Tim Burke indicating that Michael Koenig would be representing him and requesting that all documents be emailed to him prior to the meeting.  Mr. Burke forwarded the email to Fleming and Blessing and proposed that he inform Mann that the documents would not be provided in advance.  Fleming forwarded the emails to Sarratori, Amell, Hughes, and Mazzara.  Neidl Decl. Ex. SSSSS.

226.    At 8:33 am, Mazzara responded to Amell's email sent the prior evening in which he called Mann a "criminal" who had "completely fabricated millions in A/R's," asking whether they had "talked to the attorney's [sic] about law enforcement?"  Neidl Decl. Ex. QQQQQ.  There

were further emails among Pioneer's executives, between 8:34 am and 8:43 am, all of which started with the September 3, 2019 email from Mann to Burke that referenced the "tax account" and indicating that more money would be deposited the next day. *Id.*

227. When David Hunn arrived at Pioneer on the morning of September 4, 2019, there was again "a high volume of unposted items that needed to be addressed." Hunn Tr. 207:19-23.

228. Ms. Catello was again tasked with manually processing the large number of unposted items. Hunn Tr. 209:6-25.

229. At 8:55 am, Ms. Catello sent David Hunn a spreadsheet reflecting "Items to be Returned" and "Items to be Paid," including $3,346,734.7 in credits, most primarily to the Cloud Payroll 2440 Account. Neidl Decl. Ex. TTTTT. Mr. Hunn forwarded the spreadsheet to Sula Landi, who served as Vice President Controller at Pioneer. Neidl Decl. Ex UUUUU.

230. John Reinke, the CEO of the payroll companies, directed Matthew Schilling, who served as Finance Manager for Cloud Payroll, to go to Pioneer's headquarters on Wolf Road in Albany, New York, to attempt to get the payroll funds unfrozen and keep the value in the payroll business. Mr. Schilling arrived at Pioneer's headquarters at about 9:47 am on September 4, 2019. Neidl Decl. Ex. U ¶ 4; Neidl Decl. Ex. O, Deposition of Matthew Schilling ("Schilling Tr.") 194:23-196:23; Schilling Tr. 199:19-202:8; Reinke Tr. 125:13-133:18.

231. Mr. Schilling met with Tim Burke in a coffee shop on the first floor and told Burke that payroll funds were frozen in the Pioneer accounts, and there was a concern that client payroll was going to bounce. Neidl Decl. Ex. U ¶ 5; Schilling Tr. 230:3-231:2; *id.* 231:25-232:14; Neidl Decl. Ex. LLLLL.

42

232.    Mr. Schilling also saw Mr. Blessing in the coffee shop, who appeared to be distraught and was crying or had been crying.  Neidl Decl. Ex. U ¶ 5; Schilling Tr. 201:10-203:17; *id*. 231:3-14.

233.    Shortly after Mr. Schilling arrived, Frank Sarratori and a female Pioneer employee came to the coffee shop and escorted Mr. Schilling to a conference room in the building.  Mr. Schilling explained that he worked for Cloud Payroll and that there were payroll funds frozen in the payroll company account.  Mr. Sarratori and the female employee told Mr. Schilling that since he was not the account holder, they could not speak to him about it.  Neidl Decl. Ex. U ¶¶ 6-7; Schilling Tr. 233:15-237:7.

234.    Sarratori did not ask any questions about the payroll funds that Mr. Schilling referenced. Schilling Tr. 251:15-253:4.  Mr. Schilling would have provided any information that he had and could have identified the payroll company accounts that held the frozen funds. Schilling Tr. 253:5-254-13.

235.    Mr. Schilling left Pioneer headquarters at about 10:34 am on September 4, 2019. Neidl Decl. Ex. U ¶ 9.

236.    At about 11:00 am, Mann and Koenig met with Amell, Sarratori, Hughes, Robert Alessi from DLA Piper, and Jeff Cardone from Luse Gorman, in a Pioneer conference room.  Neidl Decl. Ex. S, Deposition of Michael Koenig ("Koenig Tr.") 20:12-21:24; Pioneer Rule 30(b)(6) Tr. 360:.6-361:4.

237.    One goal of the meeting was for Mann to make contact with BOA, and Pioneer had four questions prepared for Mann to ask once he got through to someone.  Koenig 41:12-42:13; *id.* 43:22-44:2; Mann vol. 1 Tr. 198:13-199:3.

238.    Another goal of the meeting was for Mann to transfer authority over the various Mann Entities, including the payroll companies, to Tim Burke.  Sarratori Tr. 361:5-10; Mann vol. 1 Tr. 197:9-23.

239.    Mann's primary concern was the tax funds that were frozen in the accounts at Pioneer.  Koenig Tr. 69:14-23; *id.* 72:21-73:15.  Mann wanted to get answers from BOA so that Pioneer "could release the freeze on the payroll accounts."  Mann vol. 1 Tr. 229:8-21.

240.    Mr. Alessi opened the meeting by asking Mann why BOA was so unhappy.  Koenig 22:13-24.  Mr. Koenig did not allow Mann to answer questions or make any statements to the larger group.  Koenig 26:11-16.  The larger group asked neither Mann nor Mr. Koenig any substantive questions.  Koenig 50:23-51:8.

241.    Late in the morning, Mr. Koenig and Mann left the larger conference room and went to a smaller conference room where they were alone for between thirty minutes to an hour.  Koenig 28:3-10.  While in the smaller conference room, Mr. Alessi joined them from time-to-time, for a total of about 15 to 20 minutes.  Koenig 28:3-22; Mann vol. 1 Tr. 200:3-17.

242.    Mr. Alessi and Mann spoke directly to one another on substantive matters.  Koenig Tr. 29:20-30:2; *id.* 76:13-25.  Mann wanted to help Pioneer, and therefore Mr. Koenig allowed Mann to share whatever information Mann thought might help.  Koenig Tr. 75:3-17.

243.     Mr. Alessi asked Mann whether the payroll business "did taxes or payroll or both" and they engaged in some discussion about the payroll business.  Mann informed Mr. Alessi that payroll tax funds were housed at Pioneer and that it was in everyone's interest to let the funds move forward because "not letting the tax funds go through would ruin those companies" and there was "a lot of value in the payroll companies if [they could ] keep them going."  Mann vol. 1 Tr. 200:3-204:4; Sarratori Tr. 188:7-17.

44

244.    At about 4:00 pm, Mann and Koenig left Pioneer when it became clear that BOA was not going to get back to Mann.  Koenig Tr. 27:4-8; *id.* 42:14-21.

245.    At about 4:16 pm, Mr. Reinke called Pioneer to schedule a call with someone, and was told that Frank Sarratori would speak to him.  Shortly after that call, Mr. Reinke received a call back from someone who told him the specific time that he could call Sarratori.  Reinke Tr. 133:19-135:3.

246.    Mr. Reinke initiated a call with Sarratori at about 4:42 pm.  Mr. Sarratori was on the phone with Amell and a female employee of Pioneer for about seven minutes, during which he told them that the payroll company was in danger of shutting down because payroll and payroll tax had been frozen by Pioneer, and if the payroll company could not move the money out, then "it was going to wreak a lot of havoc[.]"  Reinke Tr. 135:4-137:16

247.    Mr. Reinke conferenced into the call Aberash Asfaw and Al Blowers from Cachet Financial Services, who were distraught because payroll funds were frozen in the Pioneer accounts.  Ms. Asfaw explained that at least $16 million of Cachet's funds had been lost as a result of the Pioneer accounts being frozen.  Reinke Tr. 135:4-139:14; Neidl Decl. Ex. P, Deposition of Aberash Asfaw ("Asfaw Tr.") 25:25-27:6.

248.    Sarratori, Amell, and the female officer from Pioneer listened patiently to everything said by Mr. Reinke and Ms. Asfaw, and said that, because they were not the account holders, they could not discuss the accounts with them.  Reinke Tr. 139:15-140:2.

249.    Had Pioneer asked any questions of Mr. Reinke, Mr. Reinke would have provided any information they requested.  He was desperate to provide information to Pioneer, but Pioneer did not provide him with that opportunity.  Reinke Tr. 143:3-16.

250.    On September 4, 2019, Sarratori received a call from a loan company stating that Mann owed $10 million and that the company had a security interest in account deposits at Pioneer. Sarratori Tr. 342:13-343:6.

251.    At about 7:20 pm on September 4, 2019, Tim Burke sent David Blessing a summary of his observations and a timeline of events beginning September 2, 2019 and ending the morning of September 4, 2019.  Neidl Decl. Ex. LLLLL.

**The Movement of Funds from the Mann Entity Accounts to a GL Account**

252.    Late in the afternoon on September 4, 2019, David Hunn was instructed by Hughes to move any funds in the Mann entity accounts to a Pioneer general ledger ("GL") account.  Hunn Tr. 133:8-134:12; *id*. 148:22-150:12; *id*. 208:2-209:5; *id*. 236:6-237:3; Sarratori Tr. 148:25-149:8.

253.    Hunn then directed Catello to move funds from the Mann Entity accounts to a GL account.  Catello Tr. 118:22-122:24; Hunn Tr. 237:4-10.

254.    Pioneer could have reversed the decision to move the funds at any time before the transfers were complete.  Neidl Decl. Ex. H, Deposition of Pioneer Rule 30(b)(6) ("Pioneer Rule 30(b)(6) Tr.") 212:18-213:2; Sarratori Tr. 149:9-12.

255.    Between about 6:19 pm and 6:31 pm on September 4, 2019, Ms. Catello effectuated transfers of funds in Mann Entity accounts to GL account ending in 2000, which was a Pioneer suspense account, *i.e.*, an account where funds are moved prior to decision on their disposition. Catello Tr. 118:22-120:19; *id*. 154:4-155:22; Hughes Tr. 160:19-161:10; Neidl Decl. Exs. VVVVV & WWWWW.

256.    The total amount withdrawn from the Mann Entity accounts and deposited to the GL 2000 account was $15,076,168.67, including $7,205,338.10 withdrawn from the MyPayroll

0212 Account, and $6,845,944.84 withdrawn from the Cloud Payroll 2440 Account. Neidl Decl. Ex. VVVVV; Neidl Decl. Ex. EE at 14-15.

257.    The withdrawal of funds from the MyPayroll 0212 Account and Cloud Payroll 2440 Account is reflected as a "Debit Memo" in Pioneer's records.  Catello Tr. 122:5-24; Hunn Tr. 133:8-25; Neidl Decl. Exs. RR & UU.

258.    At about 6:45 pm on September 4, 2019, Ms. Catello sent an email to Laura Mazzara with screenshots taken of the Pioneer's Horizon core banking system reflecting (1) the debit memos performed on that date to the Pioneer GL 2000 account; and (2) for each of the Mann Entity accounts, pending or posted transactions and current balances.  The screenshots included transactions described as "CLOUDPAYROLL/TAX" and a balance of $6,845,944.84 showing in the Cloud Payroll 2440 Account.  Neidl Decl. Ex. VVVVV; Catello Tr. 160:17-162:24.

259.    On September 4, 2019, Amell "had no idea what was going on, [and he] just wanted to possess our money."  Accordingly, he "made the decision to collect our money into a general ledger account."  Amell Tr. 153:8-22.

260.    Pioneer "acted swiftly" to move the funds from the accounts controlled by Mann to a Pioneer GL account because Pioneer executives "were concerned . . . because the bank was out $15.8 million and [they] weren't sure what other creditors were out there."  Pioneer wanted to prevent other creditors from attaching the accounts.  Pioneer Rule 30(b)(6)Tr. 342:7-344:8; Amell Tr. 142:14-143:11.

261.    The source of the funds, and the fact that the funds could belong to innocent third-parties, was not relevant to Pioneer's decision to move the funds to a GL account.  Amell Tr. 144:22-149:11.

262.    Pioneer made no contemporaneous writing concerning its decision to move funds from the accounts held by Mann Entities to Pioneer's GL account on September 4, 2019.  Sarratori Tr. 158:23-159:4; Amell Tr. 200:12-22; Hughes Tr. 179:2-182:3.  Pioneer did not mail notice of any set off to Cloud Payroll or MyPayroll in accordance with New York Banking Law § 9-g(2). *Id.*

263.    Before the debit memos were effectuated on September 4, 2019, Sarratori, Fleming, and/or Hughes reviewed the account opening documentation for the MyPayroll 0212 Account and Cloud Payroll 2440 Account, account balances, and the loan documents.  Pioneer Rule 30(b)(6) Tr. 194:20-197:5; Hughes Tr. 164:9-165:20.

264.    Before the debit memos were effectuated on September 4, 2019, Pioneer executives knew that there was about $15 million in the accounts, all of which had been deposited on August 30 and September 3, 2019, into the MyPayroll 0212 and Cloud Payroll 2440 Accounts.  Pioneer Rule 30(b)(6) Tr. 196:14-24.

265.    Before the debit memos were effectuated on September 4, 2019, Pioneer executives did no investigation concerning the source of the funds in the Cloud Payroll 2440 Account or the MyPayroll 0212 Account.  Pioneer Rule 30(b)(6) Tr. 206:14-20; Hughes Tr. 167:4-171:20.

266.    Before the debit memos were effectuated on September 4, 2019, neither Sarratori, nor Amell, nor Hughes had a direct discussion with David Blessing concerning the payroll companies or their accounts.  Pioneer Rule 30(b)(6) Tr. 355:11-17.

267.    Before the debit memos were effectuated on September 4, 2019, Pioneer had available to it information concerning the source of the funds in the MyPayroll 0212 and Cloud Payroll 2440 Accounts and each ACH credit and debit, including the description, and "ACH

48

Individual ID Name."  Pioneer Rule 30(b)(6) Tr. 346:24-350:17; *id.* 358:17-359:2; Neidl Decl. Exs. SS & VV.

**Material Events on and after September 5, 2019**

268.    At about 6:35 am on September 5, 2019, Kim Catello sent David Hunn a spreadsheet identifying "Items to be Returned" and "Items to be Allowed," which included credits totaling $1,778,740.71 to be deposited in the Cloud 2440 account.  Neidl Decl. Ex. XXXXX & YYYYY; Neidl Decl. Ex. UU.

269.    Kim Catello manually processed the unposted items in the Mann Entity accounts that morning.  Hunn Tr. 123:17-124:3; *id*. 127:9-130:21; Catello Tr. 177:13-20.

270.    At about 11:00 am on September 5, 2019, the funds that had been deposited to the GL 2000 account were transferred to a Pioneer GL "Deposit Clearance" account ending in 6000. Neidl Ex. ZZZZZ; Hughes Tr. 162:7-14.

271.    On September 5, 2019, a Pioneer customer sent an email to Randall Benedict, requesting that Pioneer "immediately suspend any activity that is requested from MyPayrollHR.com" and noting that the activity was reflected on the bank statements as: "CLOUDPAYROLL/TAX COL" and "2115-National Bu/Payroll."  The customer further stated that it did "not want them to take any money out of our account until further notice" because "[t]hey are having issues with their bank accounts[.]"  Mr. Benedict prepared and provided the customer with two "ACH Debit Stop-Payment Request" forms.  Neidl Decl. Ex. AAAAAA.

272.    On September 6, 2019, the *Albany Times Union* published an article entitled "Shuttering of Clifton Park payroll company sends businesses scrambling."  The article described in detail how the "abrupt closure' of MyPayroll HR left employers outraged and scrambling to pay their employees.  Neidl Decl. Ex. BBBBBB.

49

273.    Laura Mazzara circulated the article to Pioneer Executive Management, stating "FYI. . . . Our name NOT mentioned."  Amell responded, "Let's keep it that way."  Neidl Decl. Ex. BBBBBB.

274.    On September 6, 2019, NEWS10 (ABC, Albany) published an article on its website entitled "Local payroll company suddenly closes its doors."  The article indicated that a local business owner had reported that he had "no way of paying his employees," and that MyPayroll HR was "used by businesses across the country."  On September 6, 2019, Mazzara sent the article to Amell and Sarratori, indicating "Still no mention of any banks, but a matter of time."  Neidl Decl. Ex. CCCCCC.

275.    On September 6, 2019, Frank Sarratori, David Hunn, and others at Pioneer received an email that had been sent by MyPayroll on September 5, 2019, indicating that it was "no longer able to process any further payroll transactions" and advising that clients should find "an alternative method to pay employees," together with an email from a local accounting firm providing a "Payroll Processing update" and explaining that MyPayroll had over 200 employees and 4,000 clients nationwide, and that "all funds held in Trust by mypayrollhr are currently frozen at Pioneer Bank."  Neidl Decl. Ex. DDDDDD.

276.    On September 6, 2019, Robert Alessi received a letter from a law firm representing a human resources firm that contracted with MyPayroll "to provide payroll and direct deposit services" and suggesting that Pioneer "appears to have custody of Goodkind's funds that were wrongfully transferred to Pioneer."  Neidl Decl. Ex. EEEEEE.

277.    On September 9, 2019, Bonnie Pinzel, counsel to NatPay, emailed a letter addressed to Frank Sarratori demanding that Pioneer correct its erroneous return of ACH

transactions submitted by NatPay.  Pioneer did not respond to Ms. Pinzel's letter.  Neidl Decl. Ex. FFFFFF.

278.    On September 9, 2019, Pioneer customer Adirondack Oral & Maxillofacial Surgery, which had been referred to MyPayroll by Blessing, reached out to Blessing to request that its payroll account be closed because it had "been impacted by the closing of MyPayrollHR[.]" Blessing put the customer in touch with a someone in the branch of the bank located at Pioneer headquarters.  Neidl Decl. Ex. GGGGGG.

279.    On September 9, 2019, Pioneer representatives met with representatives of Berkshire Bank and Chemung Capital Bank.  Pioneer representatives explained that Pioneer was holding about $16 million in credits, and the funds "can be used to reduce the overdraft" but Berkshire and Capital felt the funds may be used to reduce line indebtedness.  Neidl Decl. Ex. HHHHHH.

280.    On September 12, 2019, David Hunn received a listing of all Pioneer Bank customers who had transferred or paid money to Cloud Payroll in August 2019.  The detailed spreadsheet listed all transactions with the Cloud Payroll account.  Neidl Decl. Ex. IIIIII.

281.    Pioneer's Board of Directors met on September 17, 2019, and neither Pioneer's Board of Directors Meeting minutes nor Pioneer's Executive Session minutes state that Pioneer had exercised its right of "setoff" from the Mann Entity accounts.  Neidl Decl. Ex. JJJJJJ.

282.    The CFO's Report to the Board of Trustees prepared on September 17, 2019 states that Pioneer had "segregated $15 million of deposit related credits into a separate general ledger account."  Neidl Decl. Ex. KKKKKK.

283.    Pioneer's balance sheet as of September 30, 2019 reflects that the funds transferred from the Mann Entity accounts remained in Pioneer's general ledger account ending in 6000. Hughes Tr. 187:15-189:21.

284.    On October 1, 2019, Pioneer filed a "Notification of Late Filing," indicating that it "recently became aware of potentially fraudulent activity" and was continuing to review the matter, which "caused a delay in filing the Form 10-K in a timely manner and without unreasonable effort or expense." Neidl Decl. Ex. KKKKKK.

285.    Slides prepared for presentation to the Board of Directors in October 2019 indicated that Pioneer had "segregated $16 million of deposit related credits into a separate general ledger account." Neidl Decl. Ex. MMMMMM.

286.    Pioneer's balance sheet as of October 31, 2019 reflects that the funds transferred from the Mann Entity accounts remained in Pioneer's general ledger account ending in 6000. Hughes Tr. 189:22-191:6.

287.    In about December, 2019, Pioneer contacted its long-time customer James Pfeiffer, who operated a payroll service bureau named Optimal Payroll Solutions and informed him that Pioneer would no longer allow Optimal Payroll Solutions to maintain accounts at Pioneer. Neidl Decl. Ex. V at ¶¶ 4-12; Neidl Decl. Ex. T, Deposition of James Pfeiffer 67:21-69:20.

288.    In or about March 2021, Pioneer changed its Customer Due Diligence Form to include a section that asked specifically whether the business opening the account "provides any type of payroll related service(s) to its customers?" The form states that if the answer was "yes" then Pioneer would be "unable to establish an account relationship." Neidl Decl. Ex. RRRRRR.

52

**NatPay's Relationship with Cloud Payroll**

289.    NatPay has been a third-party Automated Clearing House ("ACH") service provider since its inception in 1991. NatPay provides ACH transfer services to a nationwide clientele, including companies who calculate and prepare payroll and payroll-related taxes.  Pereira Decl. ¶¶ 1, 10; Dkt. No. 232 ¶ 76.

290.    NatPay has contracted with First Premier Bank ("First Premier"), located in Sioux Falls, South Dakota, to serve as its depository financial institution for the purpose of transmitting entries through the ACH system.  Pereira Decl. ¶ 11; Dkt. No. 232 ¶ 76.

291.    NatPay provided ACH data processing services for tax collection and tax payment to Cloud Payroll LLC ("Cloud Payroll") beginning in about November 2017.  Pereira Decl. ¶ 8; Dkt. No. 232 ¶ 84.

292.    Between August 30, 2019 and September 4, 2019, with no knowledge that Pioneer was blocking debits/withdrawals from Cloud Payroll's accounts, NatPay effectuated a series of credits to the 2440 Tax Account, resulting in the deposit of $9,968,692.32 in third-party tax funds from the accounts of about 1,340 employers.  Pereira Decl. ¶ 15.

293.    Specifically, NatPay effectuated the transfer of $6,152,367.91 in third-party tax funds from the accounts of approximately 740 employers to the 2440 Tax Account, effective August 30, 2019.  Pereira Decl. ¶ 16.

294.    NatPay effectuated the transfer of $2,037,583.70 in third-party tax funds from the accounts of approximately 200 employers to the 2440 Tax Account, effective September 3, 2019.  Pereira Decl. ¶ 17.

295.    NatPay effectuated the transfer of $1,778,740.71 in third-party tax funds from the accounts of approximately 400 employers to the 2440 Tax Account, effective September 4, 2019. Pereira Decl. ¶ 18.

296.    Each of the ACH credits/deposits was labeled "CLOUDPAYROLL/TAX COL." Pereira Decl. ¶ 19, Ex. A; Neidl Decl. Ex. UU.

297.    While it allowed third-party tax funds to be deposited to Cloud Payroll's account, Pioneer prevented the withdrawal of $4,329,563.94 in third-party tax funds from the 2440 Tax Account between August 30, 2019 and September 4, 2019.  Pereira Decl. ¶ 20, Ex. A.

298.    Specifically, on August 30, 2019, Pioneer blocked the withdrawal of $814,208.33 in third-party tax funds from the 2440 Tax Account that were to be paid to the IRS and other taxing authorities on behalf of third-party employers.  Pereira Decl. ¶ 21, Ex. A.

299.    On September 3, 2019, Pioneer blocked the withdrawal of $3,002,466.62 in third-party tax funds from the 2440 Tax Account that were to be paid to the IRS and other taxing authorities on behalf of third-party employers.  Pereira Decl. ¶ 22, Ex.

300.    On September 4, 2019, Pioneer blocked the withdrawal of $512,888.99 in third-party tax funds from the 2440 Tax Account that were to be paid to the IRS and other taxing authorities on behalf of third-party employers.  Pereira Decl. ¶ 23, Ex. A.

301.    By blocking withdrawals that were intended to make tax payments, Pioneer caused NatPay to fund such payments from its impound account at First Premier.  While NatPay attempted to call back these payments, in some instances it could not do so.  As a result, NatPay has incurred direct, out-of-pocket losses totaling at least $ 3,884,114.49.  Pereira Decl. ¶ 24, and Ex. A.

302.    On or about August 29, 2019, Cloud Payroll uploaded ACH instructions to effectuate the transfer of $2,721,815.77 from certain Mann Entity Accounts at Pioneer to the MyPayroll 0212 Account, effective August 30, 2019.  Pereira Decl. ¶ 25.

303.    Specifically, the instructions directed the transfer of $1,306,231.96 from a Mann-controlled account ending in 2382 to the MyPayroll 0212 Account.  Pereira Decl. ¶ 26, Ex. A.

304.    The instructions further directed the transfer of $1,309,196.51 from a Mann-controlled account ending in 1699 to the MyPayroll 0212 Account.  Pereira Decl. ¶ 27, Ex. A.

305.    Finally, the instructions directed the transfer of $106,387.30 from a Mann-controlled account ending in 1988 to the MyPayroll 0212 Account.  Pereira Decl. ¶ 28, Ex. A.

306.    The debits and credits that would have effectuated these transfers were not posted by Pioneer on August 30, 2019.  Pioneer did not return the debits/withdrawals until the last possible moment on September 3, 2019, so they were not received by NatPay until September 4, 2019. Pereira Decl. ¶ 29.

307.    As a result of Pioneer permitting the credits and returning the corresponding debits, Pioneer caused NatPay to fund the deposits to the MyPayroll 0212 Account.  Pereira Decl. ¶ 30; Neidl Decl. Ex. RR.

308.    This resulted in a direct loss to NatPay in the amount of $2,721,815.77, which was funded by NatPay's impound account at First Premier.  Pereira Decl. ¶ 31, Ex. A.

309.    NatPay attempted to reject the withdrawal from its account, but Pioneer refused to accept the rejection, contrary to industry practice.  Pereira Decl. ¶ 32

310.    Of the $7,205,338.10 that Pioneer transferred from the MyPayroll 0212 Account to Pioneer's general account, $2,721,815.77 was funded by NatPay.  Pereira Decl. ¶ 33.

55

311.    Of the $6,845,944.84 that Pioneer transferred from the Cloud Payroll 2440 Account to Pioneer's general account, $2,721,815.77 was funded by NatPay.  Pereira Decl. ¶ 34.

**NatPay Was Unaware of Mann's Criminal Activities**

312.    No one at NatPay spoke to Mann or had any knowledge of his consulting or other companies, his lending relationship with Pioneer, or any of his criminal conduct, including the diversion of tax funds from Cloud Payroll's tax settlement account.  Pereira Decl. ¶ 43.

313.    The only individuals at NatPay that negotiated the approval, pricing, and paperwork for new customers are Steven Pereira, General Manager, Jim Hagen, Vice President of Sales, and Dawn Cafaro, Manager of Operations.  Pereira Decl. ¶ 44.

314.    Jim Hagen never spoke to Michael Mann and was not aware of him until September 4 or 5, 2019.  Hagen Tr. 134:22-135:20.

315.    Jim Hagen is the Vice President of Sales at NatPay whose role at NatPay is as "a salesman."  Mr. Hagen has no direct reports, and reports to Steven Pereira.  Mr. Hagen is not involved in the operations of NatPay.  Hagen Tr. 72:22-73:7; *id.* 75:7-76:2; *id.* 94:17-95:5.

316.    Dawn Cafaro, NatPay's Operations Manager, never spoke to Mann and dealt mostly with Michael McAuliffe at Cloud Payroll.  Cafaro Tr. 44:7-19; Pereira Decl. Exs. E, F, G.

317.    Steven Pereira, the General Manager of NatPay, never spoke to Michael Mann. Pereira 178:17-23.

318.    Mann testified that he may have participated in a call with John Reinke and other Cloud Payroll executives early on with NatPay, but otherwise never spoke to anyone at NatPay, either directly or indirectly.  Mann vol. 1 Tr. 223:22-225:22; Mann vol. 2 Tr. 444:20-446:4; Mann vol. 2 Tr. 600:14-25.

319. In October and November 2017, NatPay's communications with Cloud Payroll were with John Reinke, CEO of Cloud Payroll, Frank Grant, CEO of MyPayroll, Michael McAuliffe, Cloud Payroll's Director of Bureau Services, and Matt Schilling, Cloud Payroll's Manager of Finance. Pereira Decl. ¶ 45, Exs. E, F, G.

320. The only involvement by Mann with respect to NatPay's and Cloud Payroll's communications in October and November 2017 was his execution of the contracts on behalf of Cloud Payroll and his confirmation of penny deposits to the accounts identified by Cloud Payroll. Pereira Decl. ¶ 45, Exs. E, F, G.

321. After November 2017, there were no further communications between NatPay and Cloud Payroll that involved Mann, other than a single email sent on July 9, 2019, by Mr. McAuliffe to Ms. Cafaro with copy to Mann, requesting a trace number of a payment to the IRS. Pereira Decl. ¶ 46, Ex. H.

322. NatPay is not the nation's largest processor of ACH transactions. Pereira Decl. ¶ 48.

323. If NatPay had contacted Pioneer to ask how Cloud Payroll had "set up" its account, Pioneer would not have provided NatPay with any information. Pereira Decl. ¶ 55.

324. In discussions in late October 2017, Mr. Reinke stated that Cloud Payroll wanted to stop using PTM due to performance issues. Pereira ¶ 56; Cafaro Decl. 89:22-90:18; Reinke Tr. 311:7-324:16.

325. In discussions in late October 2017, Cloud Payroll representatives indicated to NatPay that the payroll side of the business would be transferred to NatPay. Pereira ¶ 56, Ex. L; Neidl Decl. Ex. TTTTTT, Pereira Tr. 182:2-183:4, 229:3-236:9; Neidl Decl. Ex. WWWWWW, NatPay Rule 30(b)(6) Tr. 78:14-96:4, 216:4-217:3.

57

326.    ProData was switched over to NatPay for direct deposit services in November 2018. Pereira ¶ 57.

327.    Cloud Payroll was working on moving more payroll work to NatPay in the summer of 2019.  Pereira ¶ 57.

328.    NatPay's practice is to require payroll processors to house payroll tax funds in commercial accounts at their bank.  Pereira Decl. ¶ 59, Ex. N.

329.    For all of NatPay's payroll processor clients, payroll tax funds flow through NatPay's First Premier account before being credited to the payroll processor's or the taxing authority's bank account. Pereira Decl. ¶¶ 59 & 60.

330.    NatPay did not charge Cloud Payroll for the debits and credits to NatPay's First Premier account.  Pereira Decl. ¶ 62.

331.    NatPay does not charge any clients for the debits and credits to NatPay's First Premier account.  Pereira Decl. ¶ 62.

332.    NatPay requires only that its customers designate a commercial checking or savings account that will be used for tax payment transactions.  Pereira Decl. ¶ 63; NatPay Rule 30(b)(6) Decl. ¶¶ 13:15-16:10.

333.    NatPay imposes no obligations on its payroll processing customers in terms of "setting up" an account used for tax payment transactions.  Pereira Decl. ¶¶ 63-64; NatPay Rule 30(b)(6) Decl. ¶¶ 13:15-16:10.

334.    Cloud Payroll identified the Cloud Payroll 1640 account as the account to be debited for NatPay's fees.  Pereira Decl. ¶ 68.

335.    Each payroll service bureau was billed separately monthly for any fees attributable to its transactions.  Pereira Decl. ¶ 68.

336.    When a customer uploads a file to NatPay's systems without a debit account, the system automatically populates with the customer's main account.  Pereira Decl. Ex.¶ 69.

337.    No one at NatPay knew or had reason to know that the transactions labeled "ePay" forwarded by Cloud Payroll were in any way improper.  Pereira Decl. ¶ 70.

338.    None of the ePay transactions involved the movement of funds out of Cloud Payroll's designated tax settlement account.  Pereira Decl. ¶ 70.

339.    Mann was diverting funds initially from the MyPayroll 0212 Account and later from the Cloud Payroll 2440 Account via online banking, not ACH.  Neidl Decl. Exs. ¶¶ RR, TT, UU, & VV.

340.    NatPay does not manually review ACH data files received from its customers.  Pereira Decl. ¶ 72.

341.    NatPay will review transactions only if:  (1)  the transaction failed for some reason (e.g., wrong bank account number); (2) an item is returned; (3) the transaction involves a payroll credit of more than $100,000 to a single individual; (4) a batch contains too many items paid to a debit card; and (5) the customer requests information about a transaction.  Pereira Decl. ¶ 73; NatPay Rule 30(b)(6) Tr. 103:7-114:19.

342.    None of the ePay transactions failed to go through.  Pereira Decl. ¶ 73.

343.    Pioneer never returned an ePay transaction.  Pereira Decl. ¶ 73.

344.    NatPay does not run any analytics concerning the dollar amounts of its customers' transactions.  Pereira Decl. ¶ 77.

345.    NatPay does not and would not ever attempt to reconcile the tax funds that are deposited in its customers' accounts to the funds paid to taxing authorities.  Pereira Decl. ¶ 78.

346.    No one at NatPay "admitted" complicity or involvement in Mann's criminal activities as alleged by Pioneer.  Pereira ¶ 82.

Dated: June 3, 2024

Respectfully submitted,

GREENBERG TRAURIG, LLP

By:  */s/ Cynthia E. Neidl*
       Cynthia E. Neidl (513737)
       Julie A. Yedowitz (702823)
       54 State Street, 6th Floor
       Albany, New York  12207
       Tel:  (518) 689-1400
       Fax:  (518) 689-1499
       Email:   neidlc@gtlaw.com
               julie.yedowitz@gtlaw.com

       Roland Garcia (*admitted pro hac vice*)
       Jennifer Tomsen (*admitted pro hac vice*)
       1000 Louisiana Street, Suite 1700
       Houston, Texas 77002
       Tel:  (713) 374-3510
       Email:  garciar@gtlaw.com
               tomsenj@gtlaw.com

  *Attorneys for Intervenor-Plaintiff National Payment Corporation*