**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

---

SOUTHWESTERN PAYROLL SERVICE, INC. and
GRANITE SOLUTIONS GROUPE, INC.,

*Plaintiffs,*

*v.*

PIONEER BANCORP INC., et al.,

*Defendants.*

Case No. 1:19-cv-1349 (FJS/CFH)

---

NATIONAL PAYMENT CORPORATION,

*Intervenor-Plaintiff,*

*v.*

PIONEER BANCORP INC., et al.,

*Defendants.*

---

**DECLARATION OF STEVEN F. PEREIRA IN SUPPORT OF NATIONAL
PAYMENT CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

Steven F. Pereira, pursuant to 28 U.S.C. § 1746(2), declares under penalty of perjury the

following:

1.      I am Vice President and General Manager for Plaintiff-Intervenor National

Payment Corporation ("NatPay"), a Florida corporation with a principal place of business located

at 3415 W. Cypress Street, Tampa, Florida 33607-5007.  I have been employed by NatPay since

its inception in 1991.  As such, I am fully familiar with and have personal knowledge of the facts

herein.  I have been deposed twice in this matter, in my individual capacity and as NatPay's Rule

30(b)(6) corporate representative.  I understand that my deposition transcripts are submitted

herewith as attachments TTTTTT and WWWWWW to the Declaration of Cynthia Neidl.

## Background

2.      NatPay is a third-party Automated Clearing House ("ACH") service provider and has been since its inception in 1991.

3.      NatPay provides ACH transfer services to a nationwide clientele, including companies who calculate and prepare payroll and payroll-related taxes.

4.      Based on electronic instructions provided by its customers, NatPay manages the electronic data processing necessary to effectuate the transfer of payroll and payroll tax monies, through the ACH system in a series of debit and credit ACH entries.

5.      Under the ACH Operating Rules, each step in the ACH process must pass through a depository financial institution.  Accordingly, NatPay has contracted with First Premier Bank ("First Premier"), located in Sioux Falls, South Dakota, to serve as its depository financial institution for the purpose of transmitting entries through the ACH system.

6.      NatPay cannot direct the transfer of funds directly from, for example, an employer's account directly to an employee's bank account or the IRS.  Rather, each transaction must involve either a debit or credit of NatPay's account at First Premier.

7.      Tax payments are typically withdrawn from an employer's account and placed in a tax settlement account at the time that payroll is paid to employees, but tax funds are paid to taxing authorities on a differing and later schedule.  NatPay does not house the tax funds of its clients, but rather deposits them in a tax settlement account designated by its customer, where the funds are held until due to be paid to the appropriate taxing jurisdictions.

8.      NatPay provided ACH data processing services for tax collection and tax payment to Cloud Payroll LLC f/k/a MyPayrollHR.com, LLC beginning in about November 2017.  At that time, Cloud Payroll was operating a payroll service bureau known as MyPayroll and shared

common ownership with two other payroll service bureaus, ProData Payroll Services, Inc. ("ProData") and Southwestern Payroll Service, Inc. ("SWP").  Cloud Payroll managed tax processing for MyPayroll, ProData, and SWP, and maintained a tax settlement account at to house the tax funds.

9.     Cloud Payroll's tax settlement account was held at Pioneer Bank ("Pioneer"), in Albany, New York.  Until about March 2019, the tax settlement account was held in the name MyPayrollHR.com, LLC and ended in 0212 ("MyPayroll 0212 Account").  Beginning in about March 2019, the tax settlement account was held in the name Cloud Payroll LLC and ended in 2440 ("Cloud Payroll 2440 Account").

10.     The ACH transfer of tax funds from the accounts of the employer-clients' of MyPayroll, ProData, and SWP to the various taxing authorities' accounts was accomplished through a series of transactions involving the debiting and crediting of specific accounts.  The timing of outgoing tax payments was determined by Cloud Payroll, reflecting due dates for taxes to be paid to various taxing authorities.

11.     As an initial step in the process, Cloud Payroll would upload directly to NatPay's systems data files that identified the accounts to be debited and credited.  Such data files are not read by humans, but rather are automatically processed by NatPay's systems, which generate NACHA files that are then automatically transferred to First Premier.

12.      The flow of tax funds was generally no different for Cloud Payroll than NatPay's other customers.  First, tax funds were withdrawn from the employer-clients' accounts, the funds passed through NatPay's First Premier account, and then were deposited to Cloud Payroll's tax settlement account at Pioneer.  Once taxes were due, the tax funds were withdrawn from Cloud

Payroll's account at Pioneer, they passed through NatPay's First Premier account, and were then deposited to the appropriate taxing authorities' accounts.

13.     This process was slightly different with respect to SWP, which maintained a tax settlement account at Prosperity Bank in Tulsa, Oklahoma.  First, Prosperity Bank transferred SWP's employer-clients' tax funds to SWP's tax settlement account.  Then, upon instructions from Cloud Payroll, NatPay transferred the tax funds from SWP's tax settlement account through NatPay's account at First Premier, and deposited them to Cloud Payroll's tax settlement account at Pioneer.  Payment of SWP's employer-clients' tax funds to taxing authorities was accomplished by moving the funds from Cloud Payroll's account at Pioneer, through NatPay's First Premier account, and then to the accounts of the appropriate taxing authorities.  From NatPay's perspective, this process did not involve any extra steps for NatPay, and I understand that customers incurred no additional fees for the transfer of funds to SWP's tax settlement account.

14.     NatPay performed ACH tax transfer services for Cloud Payroll from about November 2017 through August 29, 2019, and also performed direct deposit payroll services for ProData from about November 2018 through September 2019.

### Events at Issue

15.     Between August 30, 2019, and September 4, 2019, with no knowledge that Pioneer was blocking debits/withdrawals from Cloud Payroll's accounts, NatPay effectuated a series of credits/deposits to the Cloud Payroll 2440 Account, resulting in the deposit of $9,968,692.32 in third-party tax funds from the accounts of about 1,340 employers.

16.     Specifically, NatPay effectuated the transfer of $6,152,367.91 in third-party tax funds from the accounts of approximately 740 employers to the Cloud Payroll 2440 Account, effective August 30, 2019.  I understand that Pioneer manually posted these items, and as of the morning of September 4, 2019, the Cloud Payroll 2440 Account had a balance of $6,845,944.84.

17.     NatPay effectuated the transfer of $2,037,583.70 in third-party tax funds from the accounts of approximately 200 employers to the Cloud Payroll 2440 Account, effective September 3, 2019.

18.     NatPay effectuated the transfer of $1,778,740.71 in third-party tax funds from the accounts of approximately 400 employers to the Cloud Payroll 2440 Account, effective September 4, 2019

19.     Each of the ACH credits/deposits was labeled "CLOUDPAYROLL/TAX COL."

20.     While it allowed third-party tax funds to be deposited to Cloud Payroll's account, Pioneer prevented the withdrawal of $4,329,563.94 in third-party tax funds from the Cloud Payroll 2440 Account between August 30, 2019, and September 4, 2019.

21.     Specifically, on August 30, 2019, Pioneer blocked the withdrawal of $814,208.33 in third-party tax funds from the Cloud Payroll 2440 Account that were to be paid to the IRS and other taxing authorities on behalf of third-party employers.  Pioneer did not return the debits to the Cloud Payroll 2440 Account until the last possible moment under applicable rules on September 3, 2019, so they were not received by NatPay until September 4, 2019.

22.     On September 3, 2019, Pioneer blocked the withdrawal of $3,002,466.62 in third-party tax funds from the Cloud Payroll 2440 Account that were to be paid to the IRS and other taxing authorities on behalf of third-party employers.  Again, Pioneer did not return the debits to the Cloud Payroll 2440 Account until the last possible moment.

23.     On September 4, 2019, Pioneer blocked the withdrawal of $512,888.99 in third-party tax funds from the Cloud Payroll 2440 Account that were to be paid to the IRS and other taxing authorities on behalf of third-party employers.  Again, Pioneer did not return the debits to the Cloud Payroll 2440 Account until the last possible moment.

24.     By blocking withdrawals that were intended to make tax payments, Pioneer caused NatPay to fund such payments from its impound account at First Premier.  While NatPay attempted to call back these payments, in some instances it was unable to do so.  As a result, NatPay has incurred direct, out-of-pocket losses totaling at least $ 3,884,114.49.  *See* **Exhibit A**, which lists the transaction details and reflects NatPay's calculation of its losses.

25.     On or about August 29, 2019, Cloud Payroll uploaded ACH instructions to effectuate the transfer of $2,721,815.77 from certain accounts at Pioneer to the MyPayroll 0212 Account, effective August 30, 2019.

26.     Specifically, the instructions directed the transfer of $1,306,231.96 from a Mann-controlled account ending in 2382 to the MyPayroll 0212 Account.

27.     The instructions further directed the transfer of $1,309,196.51 from a Mann-controlled account ending in 1699 to the MyPayroll 0212 Account.

28.     Finally, the instructions directed the transfer of $106,387.30 from a Mann-controlled account ending in 1988 to the MyPayroll 0212 Account.

29.     The debits and credits that would have effectuated these transfers were not posted by Pioneer on August 30, 2019.  Pioneer did not return the debits until the last possible moment on September 3, 2019, so they were not received by NatPay until September 4, 2019.

30.     As a result of Pioneer permitting the credits and returning the corresponding debits, Pioneer caused NatPay to fund the deposits to the MyPayroll 0212 account.

31.     This resulted in a direct loss to NatPay in the amount of $2,721,815.77, which was funded by NatPay's impound account at First Premier.  *See* Ex. A.

32.     NatPay attempted to reject the withdrawal from its account, but Pioneer refused to accept the rejection, contrary to industry practice.

33.     At about 6:30 pm on September 4, 2019, Pioneer posted a "debit memo" to the MyPayroll 0212 Account, reflecting its transfer of $7,205,338.10 from the MyPayroll 0212 Account to Pioneer general ledger suspense account.   Included in this amount was the $2,721,815.77 that was funded by NatPay and resulted in a direct loss to NatPay.

34.     Around that time, Pioneer also posted a "debit memo" to the Cloud Payroll 2440 Account, reflecting its transfer of $6,845,944.84 from the Cloud Payroll 2440 Account to a Pioneer general ledger suspense account.  Included in this amount was $1,162,298.72 that was funded by NatPay and resulted in a direct loss to NatPay.

35.     When Pioneer rejected NatPay's debit entries, it used the NACHA return code 16, indicating that the account was "frozen."  However, under Article Three, Subsection 3.8.1.1 of the 2019 NACHA Operating Rules, a receiving depository financial institution "may not return an Entry because it is a particular type of Entry," unless a specific exception applied.

36.     First Premier filed a Report of Possible ACH Rules Violation with NACHA with respect to Pioneer's returns on September 4 and 5, 2019.  First Premier explained that Pioneer violated the NACHA Operating Rules because it accepted ACH credits but selectively returned ACH debits.

37.     NACHA sent Pioneer a letter dated September 23, 2019, noting that "[t]he circumstances surrounding these alleged violations appear to indicate that your institution has committed a Class 2 rule violation," and invited Pioneer to submit a response.  *See* **Exhibit B**.

38.     Pioneer responded by letter, dated October 2, 2019, signed by Frank Sarratori, who then served as Pioneer's Chief Administrative Officer and General Counsel.  *See* **Exhibit C**.  Mr. Sarratori was not truthful to NACHA in his letter when he claimed that (1) as of September 4 and 5, 2019, "various debt obligations owed by [Cloud Payroll] to Pioneer Bank were in default or due

and payable," (2) "[a]ll attempted withdrawals from the Affected Accounts [sic] were dishonored

or returned because the [Cloud Payroll 2440 Account] had been frozen and there were no available

funds for such withdrawals"; (3) "the debit entries were not returned because of their 'type,' but

because there were no funds available cover [sic] the dollar value of the debit entry"; and (4) "while

Pioneer Bank used the return reason code R16 (indicating that the RDFI had taken action to freeze

the account), it could with equal justification have used return reason code R01 (the available

balance is not sufficient to cover the dollar value of the debit entry)[.]" *Id.*

39.     The first statement above was untrue because Cloud Payroll was not indebted to

Pioneer on September 4 and 5, 2019, as there were no overdrafts in any Cloud Payroll accounts

and there had not yet been any default on the Valuewise line of credit.  The second, third, and

fourth statements were untrue because there were sufficient funds in the Cloud Payroll 2440

Account to cover the debits.

40.     NACHA apparently accepted Mr. Sarratori's false assertions, as it "determined that

a violation of the *NACHA Operating Rules* does not appear to have occurred."  *See* **Exhibit D**.

**Pioneer's RICO Allegations Are Premised
on Demonstrably False Assumptions and Assertions**

41.      I understand that Pioneer has alleged that NatPay had knowledge of and

participated in Mann's wrongful conduct, including the diversion of tax funds from Cloud

Payroll's tax settlement account, bank fraud, money laundering, and kiting.

42.     Pioneer's allegations are either fabricated from whole cloth or are premised on a

fundamental misunderstanding of the operations of payroll companies and ACH service providers,

the distortion of witness testimony taken out of context, and summary reports of Cloud Payroll

ACH activity that were prepared after September 4, 2019.

**No One at NatPay Ever Spoke to Mann**
**or Had any Knowledge of His Activities**

43.     As a threshold matter, no one at NatPay spoke to Mann or had any knowledge of

his consulting or other companies, his lending relationship with Pioneer, or any of his criminal

conduct.  NatPay produced all communications with Cloud Payroll, and the witnesses who would

have communicated with Mann were deposed and denied having spoken to Mann.  Mann testified

that he spoke to no one at NatPay.

44.     The only individuals at NatPay that negotiate with, and onboard new customers are

myself, Jim Hagen, Vice President of Sales, and Dawn Cafaro, Manager of Operations.  Our

communications with Cloud Payroll were with John Reinke, CEO of Cloud Payroll, Frank Grant,

CEO of MyPayroll, Michael McAuliffe, Cloud Payroll's Director of Bureau Services, and Matt

Schilling, Cloud Payroll's Manager of Finance.  I understand that none of these individuals were

aware of or have been implicated in any of Mann's misconduct.

45.     Pioneer's allegation that unspecified persons at NatPay and Cloud Payroll had

discussions concerning a "business relationship" from September 2017 through late October 2017

is false.  Am Counterclaims ¶ 708.  Communications between the party show that Frank Grant

reached out to Jim Hagen on October 24, 2019, and Mr. Hagen reached out to Mr. Reinke later

that day.  *See* **Exhibit E**.  Cloud Payroll agreed to sign on with NatPay on October 26, 2019, and

submitted the requisite paperwork on October 30, 2019.  *See* **Exhibit F**.  The only involvement by

Mann in that process was his execution of the contracts on behalf of Cloud Payroll and his

confirmation of penny deposits to the bank accounts identified by Cloud Payroll.  True and correct

copies of the parties' communications from late October through early November 2017 are

attached hereto as **Exhibit G**.

46.     There were no further communications between NatPay and Cloud Payroll that involved Mann, other than a single email sent on July 9, 2019, by Mr. McAuliffe to Ms. Cafaro with copy to Mann, requesting a trace number of a payment to the IRS.  A true and correct copy of that email is attached hereto as **Exhibit H**.

47.     An internal communication among me, Ms. Cafaro, and Mr. Hagen on September 5, 2019, reflects that we had no prior knowledge of Mann's activities and were stunned and harmed by those actions.  A true and correct copy of that communication is attached hereto as **Exhibit I**.

**NatPay Is Not the Nation's Largest**
**Processor of ACH Transactions**

48.     Pioneer repeatedly and erroneously claims that NatPay is "the nation's largest processor of ACH transactions."  *See e.g.*, Pioneer's Amended Answer and Affirmative Defenses and Amended Counterclaims ("Am. CCs") ¶ 611.  NatPay is a relatively small processor of ACH transactions, eclipsed in size by, for example, the United States government, California, New York, and other states, national banks, ADP, Dwolla, and many, many others.

**Cloud Payroll's Structure Was Unique,**
**But Not Contrary to Industry Standards**

49.     Pioneer falsely claims that Cloud Payroll made, and NatPay agreed to, "unusual demands" that were "contrary to well-established industry standards" and that NatPay "admitted" that certain structural features proposed by Cloud Payroll were "highly unorthodox and virtually unprecedented" and served "no legitimate business purpose."  Am. CCs ¶ 706.

50.     As I testified in my deposition, Cloud Payroll presented a unique organizational structure, whereby Cloud Payroll owned or partially owned several payroll service bureaus.  However, just because the structure was unique does not mean that it was **contrary** to industry standards.  Nor is the structure in any way suspicious, as the three bureaus were engaged in the same business in different parts of the country.

51.     Contrary to Pioneer's allegations, the fact that Cloud Payroll concentrated the tax funds of employer-clients of MyPayroll, ProData, and SWP in a single account—rather than three accounts—was neither suspicious nor contrary to industry standards.  For example, NatPay contracts with a franchisor that manages the taxes for multiple franchisees and impounds taxes in a single account.  I am not aware of any laws, regulations, or other authorities that would prohibit affiliated payroll service bureaus from using a single account to impound tax payments, particularly if the account owner is the entity managing the tax payments.

52.     Cloud Payroll's structure made sense because the payroll service bureaus had common ownership and Cloud Payroll managed the tax portion of the business for its affiliated entities.  The fact that the tax funds were held in one account created no greater risk to NatPay and did not give rise to any suggestion of fraud or other improper behavior.

53.     Pioneer's claim that NatPay informed Cloud Payroll that "it could not open an account for Cloud Payroll that would process ACH payroll tax transactions for Cloud Payroll, Pro/Data, and Southwestern Payroll combined" is demonstrably false.  Am. CCs ¶ 709.  For this assertion Pioneer relies on an email wherein Mr. McAuliffe asked whether they would "need to complete the [starter] kit for every service bureau we bring on," and Mr. Hagen responded that, "[f]rom a full compliance standpoint" NatPay needed a starter kit from Cloud Payroll and each processor.  **Exhibit J**.  There is nothing in the email that suggests that separate accounts were necessary for ACH tax transaction, and in fact all tax processing was performed under Cloud Payroll's account.  Separate accounts were necessary, however, for payroll processing, and any payroll processing was or would have been performed under either the Cloud Payroll, SWP, or ProData accounts.

54.     Also completely without foundation is Pioneer's assertion that "NatPay understood it was required to verify Mann and his companies were not engaged in fraudulent activity."  Am. CCs ¶ 715.  Pioneer does not allege the source of any such requirement, nor does Pioneer explain how NatPay could be expected to uncover any fraudulent activity engaged in by Mann, all of which primarily occurred under Pioneer's roof and under its watch.  First Premier imposes certain obligations on NatPay in terms of onboarding new customers, and NatPay performed all the diligence it was required to perform with respect to Cloud Payroll, which included ensuring that Cloud Payroll, ProData, and SWP were legitimate businesses and that they provided the correct TIN, customer name, and address.  *See, e.g.,* **Exhibit K**.

55.     Similarly without any basis is Pioneer's allegation that NatPay should have performed "due diligence" as to how Cloud Payroll "handled" the tax funds or "the nature of any accounts" held by the payroll companies at Pioneer.  Am. CCs ¶ 716.  Pioneer does not explain how NatPay could have accomplished such due diligence, other than by contacting Pioneer. NatPay generally does not contact payroll processors' banks because, as Pioneer well knows, banks are prohibited by law from disclosing information concerning its customers' accounts to third parties in most instances.  For example, when NatPay and dozens of others contacted Pioneer about the tax funds frozen in the Cloud Payroll account, Pioneer refused to provide any information whatsoever.

**NatPay Reasonably Believed that the Payroll Portion of Cloud**
**Payroll's Business Would Also Be Transferred To NatPay**

56.     Pioneer's suggestion that there was anything nefarious about NatPay's agreement to provide Cloud Payroll with only tax process services is disingenuous at best.  Am. CCs 718-720.  Before switching to NatPay, Cloud Payroll contracted with Payroll Tax Management ("PTM") for ACH tax services, and Cachet Financial Services ("Cachet") for ACH payroll

services.  When Mr. Reinke reached out to NatPay in late October 2017, I understand that he stated that Cloud Payroll was desperate to stop using PTM due to performance issues.  Moreover, we were told that the payroll side of the business would relatively quickly be transferred to NatPay as well.  The parties' communications at the time show that NatPay was setting up the accounts to process both payroll and taxes, and that Mr. Hagen believed that "[b]y December the full conversion from Cachet w[ould] be completed."  **Exhibit L**.

57.     The transfer of payroll did not occur quickly, which was understandable because Cloud Payroll was in the midst of converting to a new tax software, and to move payroll from one ACH service provider to another can be a substantial undertaking and any errors can result in very unhappy employer-clients.  Ultimately, ProData began the process of moving to NatPay for direct deposit services in about November 2018, and Cloud Payroll was working on moving more work to NatPay in the summer of 2019.  NatPay's contemporaneous emails with Cloud Payroll demonstrate that the issue was discussed over the course of the parties' relationship.  *See, e.g.,* **Exhibit M**.

58.     Thus, while traditionally NatPay handles both payroll and payroll taxes for customers, there was no reason not to move forward with Cloud Payroll in late 2017 and there was nothing suspicious about Cloud Payroll's desire to switch immediately from PTM to NatPay.

**The Flow of Funds Involving Cloud Payroll's Settlement Account**
**Was Consistent with NatPay's Practices and Industry Standards**

59.     Pioneer's allegations that NatPay normally houses **tax funds** in its account prior to payment to taxing authorities and that it engaged in "roundtripping" funds are also untrue.  Am. CCs 722-723, 734-736, 738.  As Pioneer is well aware from discovery in this matter, NatPay's practice, which is consistent with industry standards, is to require payroll processors to house payroll tax funds in tax settlement accounts at their bank.  There are many reasons for this,

including that payroll processors often use other methods of paying taxes, such as by check, and some taxes are not due for weeks or months. NatPay's practice is reflected in NatPay's Processor Service Agreement, which requires processors to designate an "Authorized Account for Tax Payment Transactions." **Exhibit N**. To support its allegations, Pioneer deceptively quotes testimony concerning NatPay's practice of not allowing payroll processors to take possession of **payroll funds**, not tax funds. *Compare* Am. CCs ¶ 724 with **Exhibit O**.

60.     Thus, the chart depicted in Paragraph 734 of Pioneer's Counterclaims reflects a flow of payroll tax funds that is consistent with that of all of NatPay's ACH customers. That is, funds are withdrawn from the payroll processor's employer-clients' accounts, the funds pass through NatPay's First Premier account and are then deposited in the payroll processor's account until due to be paid, which could be days, weeks, or months. When the taxes are due, the funds are withdrawn from the payroll processor's settlement account, pass through NatPay's First Premier account, and then are deposited in the appropriate taxing authorities' accounts.

61.     The chart depicted in Paragraph 735 of the Counterclaims is deceptive in that NatPay is not involved in the first step, i.e., moving funds from SWP's employer-clients' accounts to SWP's Prosperity Bank account. My understanding is that Prosperity Bank moves the funds from SWP's employer-clients' accounts to SWP's account. Thus, the only difference for NatPay with respect to SWP was that the tax funds were already collected by SWP, and therefore NatPay moved the funds from SWP's account through its First Premier account to Cloud Payroll's settlement account. The number of steps for NatPay was exactly the same as for any other client.

62.     Compounding its erroneous narrative, Pioneer falsely alleges that, because NatPay did not house Cloud Payroll's tax funds and permitted them to be housed at Pioneer, NatPay was able to generate fees for double the number of transactions that it processed for Cloud Payroll.

Am. CCs ¶¶ 746-747.  This "roundtripping" allegation is wrong for at least two reasons.  First, as previously discussed, NatPay does not house any client's tax funds in its First Premier account. Second, NatPay did not charge Cloud Payroll and does not charge any clients for any debits and credits to NatPay's First Premier account.  Thus, for example, if Cloud Payroll initiated a debit from its tax settlement account and a credit to a taxing authority, that equaled two transactions for fee purposes, not four.  Similarly, if Cloud Payroll initiated a debit from one Pioneer bank account and a corresponding credit to different Pioneer bank account, that equaled two transactions, not four.  That pricing is the same for all of NatPay's customers, and the transaction fees generated as a result of its contract with Cloud Payroll were no greater than those generated from any other client.  Pioneer's "roundtripping" allegations are a work of fiction.

**NatPay Does Not Require Clients to Open "Trust" or "Custodial" Accounts**

63.     Pioneer falsely claims that NatPay requires payroll processor clients to set up "trust" accounts or "custodial" accounts like NatPay's First Premier account, but allowed Cloud Payroll to use a "general corporate operating account."  Am. CCs ¶¶ 725-730.  These allegations are wrong for several reasons.  First, NatPay requires only that its customers designate a commercial checking or savings account that will be used for tax transactions.  *See* Ex. N. NatPay's practice, which is consistent with payroll industry practices, is that demand deposit accounts (savings or checking) are used to house payroll taxes, and the bank and the payroll processor designate the account as an impound account or otherwise have an understanding regarding the use of the account for that purpose.  Accounts that are used to impound taxes are commonly referred to in the industry as "impound," "settlement," and "trust" accounts.

64.     Second, NatPay has no obligation or ability to require its clients to set up a true trust or escrow account or a "custodial" account like NatPay's First Premier account.  Banks

impose differing requirements, and there is no uniform way to establish and designate a tax impound account.  NatPay also would have no way of verifying how a customer's account was set up.  As I previously testified, since the events that have occurred in this case, NatPay has made efforts to educate its customers regarding the designation of accounts, but prior to September 4, 2019, it never occurred to us that a bank might setoff funds in a tax settlement account.

65.     Pioneer's allegations also ignore the fact that Cloud Payroll employees considered Cloud Payroll's tax settlement account to be a trust or impound account, and this was represented to NatPay.  *See, e.g.,* **Exhibit P**.  No one at NatPay had any way of knowing how Pioneer and Mann had "set up" the MyPayroll 0212 Account and the Cloud Payroll 2440 Account, that Pioneer and Mann agreed that Mann could "freely and easily" transfer funds between those accounts and any other accounts, or that they had agreed that those accounts would "serve as collateral" for the Valuewise line of credit.  Am. CCs ¶ 732.

66.     It was Pioneer's responsibility to ensure that Mann opened the right type of account and was using it properly. Pioneer's allegations in this regard ignore the fact that banks are required to know their commercial customers, understand their business operations, and know the source of funds that are flowing through their accounts.  This is particularly so when the amount of funds flowing through an account equals hundreds of millions of dollars a month.  A bank acting in regulatory compliance, reasonably, and in good faith would ensure that any payroll processor customers set up accounts that were appropriate under the circumstances.

**NatPay Processed Transactions According to
the ACH Files Provided by Cloud Payroll**

67.     In paragraph 754-760 of the Amended Counterclaims, Pioneer falsely claims that NatPay was doing something improper when it debited Cloud Payroll's account ending in 1640

for its fees.  Pioneer insinuates that these transactions were not authorized by Cloud Payroll, and that they were structured to avoid 18 U.S.C. § 1957.  This is nonsense.

68.     As we have explained to Pioneer, Cloud Payroll identified the 1640 account as the account to be debited for NatPay's fees.  Pioneer's reference to the occasions on which NatPay debited the 1640 account reflects either NatPay's receipt of fees consistent with Cloud Payroll's contract, or instances where Cloud Payroll sent ACH instructions to NatPay directing that the 1640 account be credited or debited for taxes.  *See* **Exhibit Q**.  Each payroll service bureau was billed separately monthly (*id.*), which explains why, for example, fees totaling $13,452.06 were "broken into two, same-day transactions" as alleged by Pioneer.  Am. CCs ¶ 760.

69.     Pioneer's reference to an instance where tax funds were deposited into the Cloud Payroll 1640 account does not support any of its theories and is further evidence of Pioneer's inappropriate use of selective quotes from the evidence.  Am. CCs ¶ 755.  As the contemporaneous emails make clear, and as explained by Ms. Cafaro during her deposition, when a customer uploads a file to NatPay's systems without a debit account, the system automatically populates the file with the customer's main account.  *See* **Exhibit R** & **Exhibit S**.  Mr. McAuliffe raised the fact that tax funds were moving through the 1640 account, he instructed NatPay to make the MyPayroll 0212 Account its main account, and NatPay did so.  Pioneer's claim that these events had anything to do with concealing Mann's money laundering scheme is unsupported and far-fetched at best.

**The ePay Transactions Reflected Deposits to Cloud Payroll's Account and Were Not Reviewed by NatPay**

70.     Pioneer alleges that, beginning in about July 2018, Mann began using ACH to move funds from Pioneer accounts that Mann controlled to the MyPayroll 0212 Account.  Am. CCs ¶¶ 761-773.  Pioneer further alleges, without any supporting facts, that NatPay "knew or willfully blinded itself" to the fact that these transactions were "illegitimate" and "unlawful."  Am. CCs ¶

765.  To the contrary, no one at NatPay knew or had reason to know that these transactions were part of the money laundering scheme engaged in by Mann or otherwise improper.

71.     Significantly, none of the transactions involved the movement of funds **out** of the Cloud Payroll's designated tax settlement account.  Rather, these transactions moved funds **into** the MyPayroll 0212 Account, an account Cloud Payroll had designated as its tax settlement account.  While **in hindsight**, the transactions "appear to be bogus" as Ms. Cafaro stated in her email on September 5, 2019 (*see* Ex. I), NatPay had no reason to analyze any of Cloud Payroll's transactions until after NatPay received returns from Pioneer beginning on September 4, 2019.

72.     Pioneer's allegations that NatPay knew or should have known about these transactions are premised on the clearly erroneous theory that someone at NatPay manually reviewed ACH instructions from Cloud Payroll or Cloud Payroll transaction details.  During the 2017 through 2019 timeframe, NatPay contracted with more than 1,100 processors and had more than 200,000 employer customers.  It processed more than 5,000,000 transactions a **month**.  Obviously, no one at NatPay was manually reviewing ACH transaction details as it would be impossible to perform such a review.

73.     ACH instructions are uploaded by customers into NatPay's systems, which create NACHA files for transmission to First Premier without manual intervention.  Transactions are reviewed under the following limited circumstances:  (1) if the transaction failed for some reason (e.g., wrong bank account number, wrong dates); (2) an item is returned; (3) the transaction involves a payroll credit of more than $100,000 to a single individual; (4) a batch contains too many items paid to a debit card; and (5) the customer requests information about a transaction.  None of the ePay transactions failed, and Pioneer never returned any of the transactions until September 4, 2019.

74.     Even if someone at NatPay had occasion to review Cloud Payroll's transactions in real time and in context, the ePay transactions would not have seemed unusual or suspicious. While the transactions often involved high six-figure dollar amounts, they were not round-dollar amounts. Cloud Payroll had thousands of employer-clients and was moving billions of tax dollars a year. The impound transactions ranged from under a dollar to six-figure dollar amounts, so the size of any particular transaction was immaterial. The description "ePay," while different from "TAX COL" and "TAX DEP," suggests a payment and is not on its face suspicious. In fact, Cloud Payroll also used the term "EPAY" in connection with the ACH payments of NatPay's fees. *See* Ex. Q.

75.     In addition to impounding tax funds, there are many reasons that a payroll processor might move funds from one account to another and could use ACH to do so for record-keeping purposes. Note that Pioneer's "roundtripping" allegations are false, the ePay transactions constituted two transactions, a nickel each. Some payroll processors use ACH to move tax funds from an impound account to an interest-bearing account or to a checking account for the purpose of remitting taxes by check. Wires, returns, and other deposits often need to be moved to the right account. Processors may impound fees in one account and need to move them to another account. NatPay has no ability or reason to monitor such movement, which as everyone knows is the responsibility of the bank where the payroll processor has its accounts.

76.     In addition, as Pioneer concedes, the ePay transactions were "bur[ied] among thousands of other transactions." Am. CCs ¶ 768. *See* Ex. A. From June 2018 through August 2019, there were "slightly more than 1,000 ePay transactions" and more than 44,000 other transactions. *Id.* ¶ 767. Pioneer fails to explain why NatPay should have been alerted to this small number of transactions that never failed to process nor were returned by Pioneer.

77.     Pioneer's discussion of the "volume and average amounts" of the transactions, Am. CCs ¶ 767, is entirely irrelevant due to NatPay's business model.  NatPay charges the same fee whether a debit or credit item is one dollar or a million dollars.  Accordingly, NatPay does not run analytics concerning the dollar amounts of its customers' transactions, and certainly does not average the amounts of different types of transactions for any of its more than 1,000 payroll processors.  While NatPay's systems flag <u>payroll</u> payments of more than $100,000 to a single <u>individual</u> to protect its customers from fraud, debits and credits involving payroll taxes routinely involve amounts in the hundreds of thousands to millions of dollars and are not flagged.

78.      Pioneer's allegation that it should have been "alarming[]" that the ePay transaction could not be tied to any later payments to taxing authorities" is also based on a faulty premise.  Am. CCs ¶ 769.  NatPay has no ability and does not attempt "to tie" the tax funds that are deposited in its customers' accounts to the funds paid to taxing authorities.  NatPay's customers may use ACH to pay taxes, but they also use checks, wires, direct transfers, and the Electronic Federal Tax Payment System.  NatPay's customers also often use a second ACH service provider or their bank to process a portion of their tax payments.  In addition, some tax payments are held for weeks or months before payment is due.  Accordingly, any attempt to reconcile a customer's tax debits and credits would be a fool's errand, and NatPay did not have any reason to attempt to do so.

79.     While Cloud Payroll changed its tax settlement account in about March 2019 to the Cloud Payroll 2440 Account Am. CCs ¶ 770, the fact that the ePay transactions involved deposits to the MyPayroll 0212 Account would not have caused those transactions to fail or otherwise trigger any sort of review.  Similarly, the fact that some of the ePay transactions involved debits to accounts that were not identified by Cloud Payroll as an employer client, Am. CCs ¶ 764, would not have caused those transactions to fail or otherwise trigger a review.

80.     There is no factual basis for Pioneer's allegations that someone at NatPay "knew" about the ePay transactions, that the transactions involved accounts maintained by other Mann controlled entities, or that Pioneer had extended Mann's businesses a loan.  Am. CCs ¶ 773-782. In a futile attempt to show NatPay's knowledge of the line of credit, Pioneer alleges that "Account 3614 was disclosed to NatPay on November 1, 2017."  Am. CCs ¶ 775.  Apparently, Pioneer is referencing a spreadsheet provided by Mr. McAuliffe to Ms. Cafaro on November 1, 2017, which listed its 925 customers, including Valuewise.  *See* **Exhibit T**.  However, there is nothing in the spreadsheet or the cover email that indicates that Mann owned Valuewise, that Valuewise had a loan from Pioneer, or that the 3614 account was used to draw down on the line of credit.  *See id.* Moreover, the spreadsheet identifies eighteen other entities with payroll accounts at Pioneer, none of which were affiliated with Mann.  *See id.*

81.     Notably, none of the ePay transactions involved the 3614 account.  Am. CCs ¶ 763. Pioneer alleges that Mann used the 3614 account to drawdown on the line of credit, and then "through a series of transactions" moved funds from that account to other accounts, and ultimately moved the funds to yet another account, and then transferred the funds to the MyPayroll 0212 Account.  Am. CCs ¶¶ 776-777.  NatPay would have no knowledge of the drawdown on the line of credit or the internal on-line banking transfers accomplished by Mann at Pioneer.

82.     Pioneer's assertions that NatPay admitted "complicity" and "involvement" in Mann's money laundering scheme, Am. CCs ¶¶ 779-781, is demonstrably false.  The email Pioneer misleading quotes from has no such admissions.  *See* Ex. I.  Rather, Ms. Cafaro and Mr. Hagen are reacting with shock upon learning that Mann was engaged in fraud.

83.     The occurrence of a payroll processor committing fraud or otherwise engaged in troublesome conduct, is rare.  Under usual circumstances, if a processor is having issues, NatPay

will receive returns from the processor's bank which would cause NatPay to react swiftly.  Here, NatPay never received returns from Pioneer until September 4, 2019, and until then, NatPay had no reason to know of any issues with Cloud Payroll or to investigate Cloud Payroll's transactions. We had also never heard of an instance where a bank setoff funds in a payroll processor's bank account, and until then considered it unthinkable.

84.     I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 3, 2024.

_____

**STEVEN F. PEREIRA**

698904409v3