UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOUTHWESTERN PAYROLL SERVICES, INC, PLAINTIFF, vs PIONEER BANCORP, et al, DEFENDANTS. | CASE NO: 1:19-CV-1349 (FJS/CFH) |

Videotaped Deposition

of

MICHAEL T. MANN

Albany, New York

Tuesday, August 3, 2021

Reported by:

Mary Agnes Drury, RPR, NYACR, CLR

August 3, 2021

10:02 a.m.

Videotaped Deposition of MICHAEL T. MANN, held at the offices of Greenberg Traurig, 54 State Street, Albany, New York, before Mary Agnes Drury, RPR, NYACR, CLR, a Notary Public of the States of New York and New Jersey.

A P P E A R A N C E S:

BAUM GLASS JAYNE CARWILE & PETERS, PLLC
Attorneys for Plaintiff
401 S. Boston Avenue, Suite 2000
Tulsa, Oklahoma 74103
(918) 938-7944
BY: ANDREW JAYNE, ESQ.
AJayne@bgjclaw.com

GREENBERG TRAURIG, LLP
Attorneys for Intervenor Plaintiff
54 State Street, 6th Floor
Albany, New York 12207
(518) 689-1435
BY: CYNTHIA E. NEIDL, ESQ.
Neidlc@gtlaw.com

A P P E A R A N C E S (CONTINUED):

DLA PIPER, LLP
Attorneys for Defendants
677 Broadway - Suite 1205
Albany, New York 12207
(518) 788-9705
BY: ROBERT J. ALESSI, ESQ.
Robert.Alessi@dlapiper.com

ALSO PRESENT:
Michael L. Koenig, Esq.
Frank Sarratori, IHC, Pioneer Bancorp
Michael Bennett, Legal Video Specialist

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be waived and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- oOo -

P R O C E E D I N G S

Albany, New York, Tuesday, August 3, 2021; the proceedings commenced as follows:

- o0o -

VIDEOGRAPHER: Here begins video number one, volume one in the deposition of Michael T. Mann taken in the matter of Southwestern Payroll Service Inc, Plaintiff versus Pioneer Bancorp Inc et al, Defendants and National Payment Corporation, Intervenor Plaintiff versus Pioneer Bancorp Inc et al, Defendants in the United States District Court for the Northern District of New York, Case Number 19-cv-1349.

Today's date is August 3, 2021, the time is approximately 10:02 a.m.

This deposition is being taken at the offices of Greenberg Traurig LLP located at 54 State Street in Albany, New York and was made at the request of National Payment Corporation.

My name is Michael Bennett, I am the videographer; the court reporter is Mary

PROCEEDINGS

Agnes Drury, and we are from Gregory Edwards LLC.

Will counsel please identify yourselves and state whom who you represent.

MR. JAYNE: Andrew Jayne for Southwest Payroll Service.

MS. NEIDL: Cynthia Neidl, Greenberg Traurig on behalf of National Payment Corporation.

MR. ALESSI: Robert Alessi, DLA Piper on behalf of Pioneer Bank and Pioneer Bancorp Inc.

MR. KOENIG: So, Michael Koenig; a little more complicated in terms of representation.

I represent Michael Mann in a criminal action called the United States of America versus Michael T. Mann and in a state court criminal prosecution, the People of the State of New York against Michael T. Mann.

Mr. Mann's federal and state court sentencings are tomorrow. I'm here as a

PROCEEDINGS

courtesy essentially to Mr. Mann to ensure that nothing infringes upon his criminal cases.

I've not entered an appearance in the civil case. I've not entered an appearance in any civil case on behalf of Mr. Mann. So I don't represent him for the purpose of this deposition; but rather, just to protect any of his rights that may bear upon the criminal sentencings, which are scheduled tomorrow.

So I'm here at Mr. Mann's request to ensure he's protected in that way. And I'm here at the courtesy of the respective parties who have agreed to allow me to sit in for the deposition as Mr. Mann's criminal defense attorney to ensure his rights in connection with his sentencings are protected; but again, not in the capacity of his attorney for the purposes of this civil litigation.

VIDEOGRAPHER: Thank you very much. Will the reporter please swear in the witness.

MICHAEL T. MANN

MICHAEL T. MANN,
called as a witness, having been duly sworn or affirmed by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. JAYNE:

Q. Please state your name for the record, sir.
A. Michael Mann.
MR. ALESSI: Excuse me, Mr. Jayne, can I put the stipulation on the record?
MR. JAYNE: Sure. Go ahead.
MR. ALESSI: The counsel for all parties have agreed for Mr. Mann's deposition, not unlike the other depositions, that all objections as except as to form are reserved unto trial. Thank you, Mr. Jayne.
MR. JAYNE: Agreed.

BY MR. JAYNE:
Q. Mr. Mann, do you understand that I represent Southwestern Payroll?
A. Yes, I do.
Q. Do you know that Southwestern

MICHAEL T. MANN

Payroll has filed a lawsuit against Pioneer Bank?

A. Yes, I do.

Q. Do you understand what that lawsuit is about?

A. Yes.

Q. What do you understand the lawsuit is about, sir?

A. It is my understanding it's about the potential tax funds in one of the accounts that was frozen.

Q. Was there only tax funds in one account?

A. There were payroll funds in another account, so there is two. I don't know the specifics of the case, but, yes.

Q. Do you understand, sir, that Southwestern has now had a receiver appointed for it?

A. Yes.

Q. You own 51 percent of Southwestern Payroll; is that correct?

A. That is correct.

Q. As your counsel in the criminal

MICHAEL T. MANN

action has pointed out, you are being sentenced in both the state and federal cases tomorrow; is that right?

A. That is correct.

Q. I'm going to ask you a lot of questions about the payroll, the payroll taxes, and Pioneer Bank.

But before we do that, I just want to do a few little housekeeping matters.

Did Darin Alred have anything to do with any of the crimes that you've pled guilty to?

A. He did not.

Q. Did any other employee or officer of Southwestern Payroll have anything to do with any of the crimes that you've pled guilty to?

A. No. No.

Q. Did John Reinke, or Matt Schilling, or Tim Burke have anything to do with any of the crimes that you pled guilty to?

A. They did not.

Q. When you were committing the crimes that you pled guilty to, were you acting outside of your capacity as any an officer of

MICHAEL T. MANN

Southwestern Payroll?

MR. ALESSI: Objection as to form.

Q. He's going to make objections as to form to reserve them for the judge, but you can go ahead and answer.

A. So ask that again, I want to make sure I understand the question.

Q. When you were committing the crimes that you pled guilty to, were you doing it on behalf of Southwestern or with the knowledge of anyone at Southwestern?

MR. ALESSI: Objection as to form.

And, Mr. Mann, if I could please; just as a matter of housekeeping also, if -- before you answer the question, if you can just pause a little bit in case I need to object; that way, we won't talk over each other and the reporter will be able to get it.

THE WITNESS: Okay.

MR. ALESSI: Thank you very much.

MR. JAYNE: Let me ask it again, so I can make a clean record.

And Mr. Alessi is right, if you'll

MICHAEL T. MANN

just give a little bit of a pause and time for him to make objections.

I probably should have told you that earlier. We've got a court reporter here who is taking down everything that you and I say, and we've also got a videographer video'ing this, but it's very important that we have a clean record, that you let me completely get my question out and give time for Mr. Alessi to make any objections, okay?

THE WITNESS: Um-huh.

Q. One other thing is --

A. Say "yes."

Q. -- um-huh and uh-huhs --

A. Say yes:

Q. Yes. So if you can say yeses or nos. And if I happen to correct you, I'm not trying to be rude, I'm just trying to make a clean record, okay?

A. Yes.

Q. When you were committing the crimes you pled guilty to, were acting on behalf of or with the knowledge of Southwestern Payroll?

MICHAEL T. MANN
MR. ALESSI: Objection as to form.
THE WITNESS: No.
Q. Was Southwestern Payroll at all times a legitimate payroll company operating in Tulsa, Oklahoma?
MR. ALESSI: Objection as to form.
THE WITNESS: Yes, it was.
Q. And you understood that they had clients, correct?
A. Yes.
Q. Over 1300 clients?
A. Yes.
Q. Let's jump right into your banking relationship with Pioneer Bank, okay?
A. Yes.
Q. When did that begin?
A. Not good with exact years, but it was 2009/2010.
Q. And did that begin -- did the banking relationship begin with Dave Blessing?
A. Yes.
Q. How did you know Dave Blessing?
A. I'm not exactly sure if my accounting firm introduced him to me or someone

MICHAEL T. MANN

else did, but I was looking for a bank, and someone got in touch with David, and he reached out to me and started a relationship.

Q. What type of business were you in, in 2009?

A. Mainly consulting at the time.

Q. What type of consulting?

A. I would call it management consulting. We did all sorts of things. We did work on IT projects, we did process re-engineering projects. There isn't a specific type, but it was general management consulting for the most part with a little bit of IT.

Q. What company did you do the consulting out of in 2009?

A. UnitedHealth Group was the main company.

Q. UnitedHealth Group was your client?

A. Yes.

Q. Okay. What entity did you do this consulting out of?

A. ValueWise Corporation.

Q. And when you went to Dave Blessing,

MICHAEL T. MANN

what type of banking relationship were you looking for?

A. I was looking for a line of credit.

We did have more than just UnitedHealth Group, but they were our largest client at the time, and so I was really just looking for a line of credit to support our consulting business.

Q. When you say United Healthcare was your largest client, what type of management -- what all different types of management consulting would you do for UnitedHealthcare back in the 2009/2010 timeframe?

A. I don't recall exactly what projects. I mean, we would do -- we would have several people working on 20, 30 different projects at any given point, so I don't recall what specific projects we were doing at that time.

Q. Were most of them IT related?

A. Some. It's not like we had a whole bunch of developers. We had a lot of business people. A lot of them are IT project related, but -- but, I mean, there were some IT. We

MICHAEL T. MANN

also did some business process, re-engineering business type projects. It was both, IT and I'll call it business consulting for them.

Q. And you were looking for a line of credit from Pioneer Bank when you met Dave Blessing, is that what you told us?

A. Yes.

Q. Is -- and the initial line of credit that was extended to you from Pioneer Bank did you say it was -- well, how much was it?

A. I don't recall exactly.

Q. If the records say $2 million, does that sounds about right?

A. Yes, that sounds about right.

Q. In order to get the line of credit with Pioneer Bank, did you have to explain to Dave Blessing what it was your consulting company did?

A. Yes.

Q. Did Mr. Blessing have an understanding, a firm understanding of what your consulting company did before Pioneer Bank would extend the $2 million line of credit?

MR. ALESSI: Objection as to form.

MICHAEL T. MANN

THE WITNESS: Yes.

Q. Did your -- from 2009 up until the point where you purchased MyPayrollHR, did your -- did the nature of your business change in any way?

A. Can you -- I'm not sure what you're asking.

Q. Did you start doing anything other than management consulting through ValueWise from 2009 up and to the point when you purchased MyPayrollHR?

A. Okay. Yes, we got into some other businesses. I believe that we started Viverant, which was a physical therapy company out in Minnesota.

I had another consulting company called Focalpointe Group; I don't know if it was that name at the time, but I was working on that.

There could have been a couple other smaller things that I don't recall, but those were probably the two main ones that I think happened before MyPayrollHR.

Q. What did Focalpointe do?

MICHAEL T. MANN

A. They also did management consulting and IT consulting; basically, the same thing.

Q. Would you have considered it separate from the management and consulting you told us about that ValueWise was doing it or different in some way?

A. It was different, because they ultimately had a partner with Focalpointe Group. ValueWise was a hundred percent mine, so that's really why they were different.

Q. Who was your partner in Focalpointe?

A. Jeff Steffens.

Q. What about Viverant, did you have a partner in Viverant?

A. Yes.

Q. Who?

A. Dennis Cernohaus.

Q. How much of Viverant did you own and how much did Dennis -- did you say Cerno --

A. Cernohaus.

Q. -- Cernohaus own?

A. I -- ValueWise owned 51 percent, and Dennis owned 49 percent.

Q. What about Focalpointe, who owned

MICHAEL T. MANN

what percentages?

A. I'm pretty sure, not a hundred percent sure ValueWise, I believe, owned 60 percent, and Jeff Steffens owned 40.

Q. The entire time you -- well, strike that.

Did you start Viverant or did you purchase an interest in it from Mr. Cernohaus?

A. We started it together, so it was a start-up.

Q. What about Focalpointe?

A. Also a start-up, we started it together.

Q. At all times up to the point when you sold Viverant, did ValueWise own 51 percent and Mr. Cernohaus owned 49 percent?

A. That is correct.

Q. What about Focalpointe, did it go out of business, was it sold?

A. I'm not really sure. I assume it went out of business. I saw some things, I don't know if he was trying -- I have no idea kind of what happened after it. But their website is not working, so I assume they went

MICHAEL T. MANN

out of business.

Q. How about this: Was Focalpointe still in business as of August 30th of 2019?

A. Yes.

Q. Was ValueWise still a 40 percent owner -- or 60 percent owner, excuse me?

A. Yes.

Q. Was Focalpointe a true going concern, was it making money?

A. It had actually just turned the corner. They started to get profitable at that time, so -- and they were actually starting to do a lot better.

Q. When you -- well, strike that.

And then I think you told us that after the events of August 30th, 2019, you don't really know what happened to Focalpointe; is that fair?

A. That's fair.

Q. Viverant, you said Viverant was a physical therapy company. Explain to me what they did. Did they provide physical therapists to facilities, is that...

A. No, it was actual physical therapy

MICHAEL T. MANN

clinics.

We had -- I'm not a hundred percent sure, but close to around 12 locations throughout Minnesota; we might have had one in another state, I'm not a hundred percent sure, but they were actually physical therapy clinics. We had employed physical therapists, we were a provider of services. So it wasn't consulting, it was actually physical therapy.

Q. Did -- tell me how you got into the payroll business?

A. The way we -- the way I kind of recall it, to the best, we had several entities; Viverant, you know, some of the ones we talked about.

We had used, I forget one company, it was a small payroll provider that ended up selling to one of the bigger players, one of our businesses used ADP, so we had used a lot of different companies.

And since -- we just thought boy, we then brought payroll in-house and we just said hey, let's just do it. We used, I forget the name of the system to do it in-house. At that

MICHAEL T. MANN

point as we were continuing to grow. We thought hey, it may make sense to just add a payroll company, not so much for us, but for, you know -- it would fit well with our portfolio, since we had been using a system to do our own, so we started to look for payroll companies.

Q. And how did you find MyPayrollHR -- and let me back up and let me do this better.

You ultimately started a company called MyPayrollHR; is that correct, or did you buy it?

A. I bought it.

Q. Okay. Was it called MyPayrollHR when you purchased it?

A. Yes, I believe. I'm trying to figure out if it was a d/b/a or, but it was called MyPayrollHR, because we purchased the rights for the name.

Q. Do you remember how you found MyPayrollHR to purchase?

A. I'm not a hundred percent sure how we got them.

Q. Who did you purchase MyPayrollHR

MICHAEL T. MANN

from?

A. The company at the time they changed their name but they were originally called FW Davidson.

Q. And was MyPayrollHR -- when it was owned by FW Davidson, was it both a service bureau and a software company?

MR. ALESSI: Objection as to form.

THE WITNESS: FW Davidson is really a software company. They provide the system. They built the platform that MyPayrollHR used. So when we first bought MyPayrollHR, we just bought the payroll, not the technology, but we put language in the contract where we would have the right to buy the technology, and we ultimately did.

BY MR. JAYNE:

Q. Let's back up and make sure that we're talking about the same things. When I think of a payroll company, I think of what I guess in the industry is called a service bureau. Do you know what that is?

A. Yes.

MICHAEL T. MANN

Q. Explain to the ladies and gentlemen of the jury what a payroll service bureau is?

A. So a payroll service bureau, they typically use another software vendor, and there are several vendors, there is ACH vendors, tax vendors, but they really were defined -- their clients, which are small businesses, midsize businesses. And they basically do their payroll, handle the tax payments, manage that part of the business. So a service bureau is sort of that, without the technology.

Q. And was Southwestern Payroll a service bureau?

A. Yes.

Q. Pro Data a service bureau?

A. Yes.

Q. And then I think you told me, and correct me if I'm wrong, but when you purchased MyPayrollHR, you only purchased the service bureau portion of that business; is that fair?

A. Yes, initially.

Q. Yes. And in the contract when you purchased the service bureau MyPayrollHR, there

MICHAEL T. MANN

was language that if FW Davidson stopped using the payroll platform, you would have the opportunity to purchase that.

Did I state that correctly?

A. I'm not exactly sure of the language. I knew they were looking at private equity. I had concerns, since they were only using that technology for MyPayrollHR, that it could be a risk at some point.

I don't know how we framed it in the contract, but we even identified sort of the price that would happen where if they at some point were going to shut the technology down, we would have the right to buy it. And we wanted to buy it, even at the time it was happening, so -- so, yeah, it was part of the contract, but I can't tell you exactly how it was worded, and we ultimately worked out a deal.

I don't even know if we followed the contract to the letter of the law, but we basically worked out a deal to acquire the rights of the technology.

Q. So when you first purchased the

MICHAEL T. MANN

service bureau portion of MyPayrollHR, was -- I think you said was that the only company that was using the FW Davidson software platform?

A. The one that was design for MyPayrollHR. They had another one they were selling to companies all over the country, but they built one specifically, which buying that service bureau I found attractive, because when we would sell to other clients, we had our own, it felt like proprietary technology, so we didn't look like a lot of other service bureaus that were using the same four or five vendors.

Q. When you purchased the service bureau portion of MyPayrollHR, how did you finance that purchase?

A. I don't recall exactly. I know the at time MyPayrollHR was a small bureau for FW Davidson, it really was just a pet project for them. It was probably several hundred thousand in revenue. I don't remember the numbers exactly.

I'm not sure if I reached out to Pioneer for help or if it was below price. They may have taken back a note, I just don't

MICHAEL T. MANN

remember all the specifics.

Q. When do you recall the purchase of MyPayroll service bureau occurring?

A. I could be wrong and you could point -- it was the end of 2013, I think.

Q. You're dead on.

And when you purchased the service bureau portion of MyPayrollHR, prior to the purchase where was MyPayrollHR housing tax dollars?

MR. ALESSI: Objection as to form.

THE WITNESS: Not a hundred percent sure, but I believe they were using a company called PTM, which is a -- I don't know if they were owned by Cachet Bank, but I think PTM was housing it, but I'm not a hundred percent sure what product they were using.

BY MR. JAYNE:

Q. And when we tell the ladies and gentlemen of the jury, explain to them what payroll tax is?

A. So payroll tax, there is a few different parts that are collected when a

MICHAEL T. MANN

company submits their payroll. You know, part of it is the money that the individual employees will get, that's included, but then there's also different taxes that go in there. Some taxes, you know, you turnaround, you collect on a, you know, really a couple of days later you submit the tax payment. And then there is different state SUI type taxes and things that come in that you collect and pay quarterly, so there is a couple of different versions of tax dollars you collect and hold, and then make the payments to the taxing authorities when they're due.

Q. And is it your recollection that 941s and typically the state taxes, those are due three days after payroll?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Let me ask it a different way.

When would the 941 federal taxes associated with payroll and the state taxes typically be due to the taxing authority?

MR. ALESSI: Objection as to form.

THE WITNESS: Those are, and I

MICHAEL T. MANN

believe, I wasn't as close as a lot of -- I wasn't the CEO of the payroll companies, but at the end of each quarter you collect stuff throughout the quarter, and they are due at the end of the following month on everything you collected throughout the quarter.

BY MR. JAYNE:

Q. But was it your understanding that the federal withholding the state withholding was due three days --

A. Three days later. There are some really small companies, it could be monthly. The majority of clients are three days.

Q. Okay. And then there's other what is referred to as quarterly taxes, the state unemployment, the medicare, FICA taxes, those are typically due on a quarterly basis; is that your recollection?

A. That's correct.

Q. When you purchased the service bureau portion of MyPayrollHR, what did you do in terms of handling the payroll taxes?

A. So we continued to use PTM initially

MICHAEL T. MANN

as the partner that helped us with our tax payments. They had several products. One of the products was -- I forget what they called it, but housed the tax payments in your bank, but they make the payments for you.

So we chose that product when basically they migrated from FW Davidson owning us to us, they moved to, I don't know what they called it, but some product where the tax dollars would house in our accounts instead of PTM.

Q. So, and correct me if I'm wrong, you recollection is when FW Davidson owned the MyPayrollHR service bureau, PTM was actually housing the tax dollars in their bank before those dollars were due to the taxing authorities?

A. Yeah, I'm not a hundred percent sure, but that's what I believe.

Q. And then when you purchased MyPayrollHR, you decided that you would house the tax dollars in your bank before they were due to the taxing authorities, is that what you explained to us?

MICHAEL T. MANN

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Let me hand you -- well, let's back up before I hand you this.

Did you have any conversations with Dave Blessing about purchasing the service bureau portion of MyPayrollHR?

A. Yes.

Q. Tell me about those conversations?

A. Again, I made him aware when he -- even before we made the decision that we were talking to him. I, you knew, kept him up to speed. And as we got closer, you know, he was involved, at least understanding everything that I was doing along the way.

Q. Did Dave Blessing understand that you had decided to house the payroll tax dollars at Pioneer Bank after you purchased MyPayrollHR?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Tell me about the conversations in that regard?

A. I don't recall the specific

MICHAEL T. MANN

conversations other than, you know, making him aware we're doing this and that we would move it over and do it after we purchased it at the end of 2013. So I don't recall specifically other than I know we talked about it.

Q. Is there any doubt in your mind that you told Dave Blessing that you were going to begin housing payroll tax dollars at Pioneer after you purchased MyPayrollHR?

MR. ALESSI: Objection as to form.

THE WITNESS: There is no doubt in my mind.

MR. JAYNE: Let me hand you what we'll mark as exhibit -- it's already been marked as Exhibit 252 to these depositions.

(Whereupon, Plaintiff Exhibit 252, Commercial Account Cover Sheet, MyPayrollHR Bates Stamped PB-SWP-00000372 to 379, 8-Pages was previously marked for identification.)

MR. ALESSI: Excuse me, Mr. Jayne, pardon the interruption. Mr. Mann has folders in front of him. And I'd like to know -- I'm sorry, they are now part of the

MICHAEL T. MANN

deposition. I'd like to know what are in those folders. We can do it on a break, I don't want to interrupt your questions.

THE WITNESS: It was just our stuff for tomorrow.

MR. KOENIG: Yeah. I believe, we'll confirm it during, but Mr. Mann and I were obviously were talking in advance of the deposition about his sentencing tomorrow. I believe they probably have -- I will review those, and if they're not, then we will certainly discuss further.

MR. ALESSI: Okay. Thank you.

BY MR. JAYNE:

Q. Mr. Mann, I've handed you what was previously marked 252 to the depositions. Can you take a look at it real quick?

A. Um-huh.

Q. I'm going to do the annoying thing, "yes," instead of "um-huh"?

A. Yes.

Q. Mr. Mann, does Exhibit 252 appear to be the account opening documentation for your MyPayrollHR account at Pioneer Bank?

MICHAEL T. MANN

A. Yes.

Q. What date did you sign the account opening documentation for the MyPayrollHR.com account at Pioneer Bank?

A. November 26, 2013.

Q. What was the account number assigned to the MyPayrollHR account at Pioneer Bank?

A. 178000212.

Q. I've referred to that account a lot as the "0212 account". Does that today even ring a bell to a particular account at Pioneer Bank?

A. Yes.

Q. I want to ask you a little bit about the account opening document. Did -- when you were opening this account, did you explain to anyone other than Dave Blessing that you were going to house payroll and payroll tax dollars in the account?

MR. ALESSI: Objection as to form.

THE WITNESS: I don't recall specifically. I know I talked to others or e-mailed with others about the account. Obviously, they wrote "client account" on

MICHAEL T. MANN

the document here, so it was -- I don't recall the specifics back in 2013. But I worked with others to open the account.

BY MR. JAYNE:

Q. And we'll give you some e-mails here in a second to see if we can refresh your recollection on that. But if you look at page -- the second page of Exhibit 252 it's the one with the Bates number ending in 373, there is the word "client account" under the account name.

Do you see that?

A. Yes.

Q. What was your understanding as to why -- and by the way, is that your handwriting?

A. No.

Q. Okay. What was your understanding as to why someone at Pioneer Bank wrote "client account" on the 0212 opening documents?

MR. ALESSI: Objection as to form.

THE WITNESS: This was the client tax accounts.

Q. When you initially opened account

MICHAEL T. MANN

0212, were you going to house anything in the account other than payroll tax dollars?

MR. ALESSI: Objection as to form.

THE WITNESS: No.

Q. You weren't initially going to run payroll through that account?

A. No.

Q. How was payroll dollars -- how were you going to handle payroll dollars when you first purchased MyPayrollHR?

A. I believe Cachet Bank always did the payroll dollars and ran it through there, so they were just handling the payroll dollars through their account.

Q. Let's turn to with the Bates number at the bottom 377. Do you see that page?

A. Um-huh.

Q. Is that a "yes"?

A. Yes.

Q. What type of business does it say in section two that MyPayrollHR LLC does?

A. It says, "Payroll Service Bureau."

Q. Is that your handwriting?

A. No.

MICHAEL T. MANN

Q. So would somebody at Pioneer Bank presumably have written that?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. And you would have told Dave Blessing and others that you were opening the MyPayrollHR LLC account on behalf of a payroll service bureau; is that right?

MR. ALESSI: Objection as to form.

Q. Look at section five. Do you know whether the "X" in the no box was written by you or not?

A. It wasn't checked by me.

Q. Oh, so that was not you checking the "no" box?

A. The reason why I'm almost a hundred percent sure, other than the signature, I didn't see anything on the form that I wrote.

Q. So you do not believe that the check in the "no" box was actually made physically by you; is that correct?

A. That is correct.

Q. When you read section five -- well, first of all, before we get to that, strike

MICHAEL T. MANN

that.

When you were having conversations with Dave Blessing about opening account 0212, did he ever tell you anything about Pioneer Bank having a policy of not doing or allowing third-party payroll processors to house money at Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: I don't recall him saying that to me.

Q. Did anyone at Pioneer Bank ever tell you that they had some policy of not allowing payroll companies that did third-party payroll to house payroll dollars and tax dollars at Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: I don't recall having that conversation with anyone.

Q. If that conversation happened, is that a conversation that you would remember?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah. I didn't have that conversation, I know that.

Q. And, you know, I am correcting

MICHAEL T. MANN

because sometimes there is a difference between I don't --

A. No, I don't recall.

Q. -- recall and it didn't happen?

MR. ALESSI: Objection as to form.

Give me a little bit of time.

THE WITNESS: Yes. Sorry.

Q. Let me correct this.

Did anyone at Pioneer Bank or associated with Pioneer Bank at any time tell you that the bank had a policy of not allowing third-party payment processors or payroll companies to house payroll or payroll tax dollars at the bank?

MR. ALESSI: Objection as to form.

THE WITNESS: No one told me that.

Q. In looking at section five of this Exhibit 252 Bates number 377, the customer due diligence form, would you consider MyPayrollHR to be a third-party payment processor based on the definition in section five?

MR. ALESSI: Objection as to form.

THE WITNESS: I would say it's kind of clear. There is parts when I look at it

MICHAEL T. MANN

and I say, boy, that could be it when they say typically debit or credit card transaction.

So it would be unclear without asking a follow-up on, you know, does this mean -- looking at third-party payment processor without reading the definition, I don't think of a service bureau, I think more of an ACH clearinghouse or something house is how I would look at that if I scanned the definition briefly when I see debit and credit, but I'm not exactly sure now that I'm reading it here in front of.

BY MR. JAYNE:

Q. You so did payroll service bureaus such as Southwestern or Pro Data or MyPayrollHR, did they actually physically move any money?

MR. ALESSI: Objection as to form.

THE WITNESS: No.

Q. All three of those companies: MyPayrollHR, Southwestern Payroll, and Pro Data, they would have third-party ACH processors who would actually move money,

MICHAEL T. MANN

correct?
MR. ALESSI: Objection as to form.
THE WITNESS: That is correct.
Q. Who, and I'm going to try to do this better, because he made an objection as to form.
For payroll service bureaus, such as MyPayrollHR, Southwestern Payroll, Pro Data, who actually moves money associated with payroll or payroll taxes?
MR. ALESSI: Objection as to form.
THE WITNESS: The actual company that moves it is the ACH processor actually moves it.
Q. Does my -- did MyPayrollHR ever settle debit and credit card transactions on behalf of merchant clients?
MR. ALESSI: Objection as to form.
THE WITNESS: Not that I recall. Probably not. I mean, I don't recall that.
Q. And did MyPayrollHR ever -- strike that.
Did anybody ever follow-up with you -- strike that.

MICHAEL T. MANN

Did anyone at Pioneer Bank ever ask you any questions about section five of this customer due diligence form for MyPayrollHR?

A. No.

Q. Did anyone at Pioneer Bank ever inquire and ask you whether or not MyPayrollHR was a third-party payment processor?

A. No one ever asked, and I had conversations with several people about what we were doing. So I -- no one's ever -- no one ever asked if we were a third-party payment processor.

Q. Turn the page to the Bates number 378 of Exhibit 252. This is another page of the customer due diligence form associated with the opening of the MyPayrollHR account.

Do you see that?

A. Um-huh, yes.

Q. That "no" box that's blackened, would you have filled in that "no" box?

A. I did not fill that "no" box.

Q. Did anybody at Pioneer Bank ever inquire to you have you as to whether MyPayrollHR was some type of service business?

MICHAEL T. MANN

A. I'm reading the definition. No one ever asked me if I was one of those.

Q. Okay. Do you know whether MyPayrollHR fit the definition of money services business in section nine of the customer due diligence form?

MR. ALESSI: Objection as to form.

THE WITNESS: I mean, number five, although, we didn't -- we weren't the ACH processor, so I don't think we were the money transmitter, so I don't think we're that.

But, again, I would ask questions to be sure.

Q. If anybody at Pioneer Bank would have come to you and asked you about section five or section nine of this form, would you have had a candid discussion with them and explain to them what Southwestern or what MyPayrollHR does and determine whether or not the "yes" boxes should be checked?

MR. ALESSI: Objection as to form.

THE WITNESS: Can you ask that again, I want to make sure I answer.

MICHAEL T. MANN

Q. If anyone at MyPayrollHR -- strike that.

If anyone at Pioneer Bank would have come to you with questions about section five or section nine of the commercial customer due diligence form, would you have been candid about what MyPayrollHR does and decided whether or not they met the definition of a third-party payment processor or a money services business?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes, I would be candid with them and talk about it.

Q. Were you completely transparent with Dave Blessing about what MyPayrollHR was going to do at the end of 2013 and why you wanted to open account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

MR. JAYNE: Let me hand you what we will mark as Exhibit 1.

(Whereupon, Plaintiff Exhibit 1, Mann E-mail Dated 12/16/13, Bates Stamped NP0093489 to '494, 6-Pages was marked for identification.)

MICHAEL T. MANN
BY MR. JAYNE:
Q. Go ahead and take a look at this e-mail chain.
A. It all starts on the first page, correct?
Q. They go in reverse chronological order from the back.
A. Oh, so this is all one e-mail chain?
Q. Yes.
A. (Witness peruses document.) Okay.
Q. Explain to us what was going on in December 2013 with the 0212 account as referenced in this e-mail?
MR. ALESSI: Objection as to form.
THE WITNESS: Yeah. So there was prep work. They needed a pre-note filed to make sure that the tax payments would work properly in the account. There were signature cards.
It was basically prepping to get this set up as a tax account.
BY MR. JAYNE:
Q. So was there mechanical issues at Pioneer Bank that had to be done in order for

MICHAEL T. MANN

payroll tax dollars to be transferred from the payroll tax management account into Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: I -- from what I recall and I in reading this, there wasn't a lot to be done. I mean, I know there was a sort of -- different signature cards. There were some discussions, but it didn't seem like a lot of work on the Pioneer front, but I know there was following up about the pre-note and, you know, obviously, you know, the check, you know, getting the right type of numbers here, but, you know...

BY MR. JAYNE:

Q. Did you -- when you were opening the 0212 account in December of 2013, was there some coordination between payroll tax management and Pioneer that had to be done in order to transfer the tax dollars into the Pioneer account?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

MICHAEL T. MANN

Q. And would you have had to have conversations with various people at Pioneer Bank about how you were going to go about transferring the payroll tax dollars from the PTM account into Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. During the conversations when you're first opening account 0212 and moving payroll tax dollars into Pioneer Bank, were you ever less than forthcoming about what type of money was being moved into Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: No. I was very forthcoming.

Q. Did you flat tell multiple people, Dave Blessing and others, that you were moving payroll tax dollars from an account at PTM into Pioneer Bank account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

MR. JAYNE: Let me hand you what we'll mark as Exhibit 464.

(Whereupon, Plaintiff Exhibit 464,

MICHAEL T. MANN

Blessing E-mail Dated 12/11/13, Bates Stamped PB-SWP-00335903 to '904, 2-Pages was marked for identification.)

BY MR. JAYNE:

Q. Exhibit 464, if you go to the first e-mail of the chain, it's from you to Dave Blessing dated December 11, 2013.

Do you see that?

A. Yes.

Q. And it says, "David, we will be using a third-party tax processor initially. They will need a pre-note to file and also to get approval processing checks from our system, probably me giving them signing authority. Who do I work with to get these done? I will probably be signing today and will want a quick turnaround."

Is that correct?

A. That is correct.

Q. When you say that you would initially be using a third-party tax processor, what did you mean?

A. We had some discussions and we were purchasing this that at some point we could

MICHAEL T. MANN

have conversations with Pioneer to see if it's something they could do or should do.

Q. So as of December 11, 2013, had you already had discussions with Dave Blessing about whether Pioneer would actually handle ACH'ing of payroll tax dollars?

MR. ALESSI: Objection as to form.

THE WITNESS: We talked about it, not in great detail, because we were focusing on purchasing, but it was just an item to look at, at that point.

Q. Okay. Just so the ladies and gentlemen of the jury aren't confused, there's multiple ways a payroll company can handle payroll taxes; is that fair?

A. Yes.

Q. One way is to completely outsource the entire payroll tax portion of payroll, correct?

A. Yes.

Q. And PTM did that back then, that was one of the services, correct?

A. Yes.

MR. ALESSI: Objection as to form.

MICHAEL T. MANN

Q. Was one of the services that PTM provided back in 2013 was a complete outsourcing of the entire tax portion of payroll?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. And in that instance, PTM would handle all of the tax payments and they would also house the funds in their bank?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Was another way you could handle payroll tax processing at a payroll company where a third-party would actually handle the ACH'ing of the payroll tax money, but the payroll company itself would handle the processing of the tax?

A. When you say "processing" is that holding, I want to make sure I understand what you mean by processing the tax.

Q. Well, let's talk about -- yeah, I do need to separate that out. So the first way we talked about where it's completely outsourced to a company like PTM, they are going to be

MICHAEL T. MANN

processing the tax payments and also housing the tax dollars in their bank; is that right?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Another way is where the payroll company houses the tax dollars in their bank and uses a third-party ACH company, such as Nat Pay to physically move the tax dollars; is that another way?

A. Yes.

Q. When you first bought MyPayrollHR which way were you doing it?

MR. ALESSI: Objection as to form.

THE WITNESS: We were housing the tax dollars, but using PTM/Cachet to move the tax dollars.

Q. So when you e-mail Dave Blessing in December 11, 2013, are you telling him that when you say "we're initially using a third-party tax processor," are you communicating that you're going to use the third-party tax processor to ACH the tax dollars?

A. Yes.

MICHAEL T. MANN

Q. You did not mean to communicate that the third-party tax processor was going to continue to house the actual dollars in their bank?

MR. ALESSI: Objection as to form.

Q. Is that fair?

MR. ALESSI: Objection as to form.

THE WITNESS: That's fair, because the next sentence talks about pre-noting, so if we weren't housing it, there wouldn't be any pre-noting to happen.

Q. And you also had conversations with Dave Blessing before December 11, 2013, about exactly what you were going to do with account number 0212 when you opened it; is that correct?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. If we go up the chain of e-mails on Exhibit 464, it looks like Dave Blessing put you in contact with Lucas Scarchilli and Sandra Dedrick regarding the mechanics of dealing with account 0212; is that correct?

MR. ALESSI: Objection as to form.

MICHAEL T. MANN

THE WITNESS: Actually, after I sent the e-mail to David, I actually realized he was out, so I then forwarded it to Lucas, and he got me connected. But I -- I worked with all three of them often, so...

Q. Who did you work with at Pioneer Bank to open account 0212?

A. I don't recall if it was the Malta branch or one of the ones in Clifton Park. I know originally I was using -- and I forget the name, someone in the Malta branch to open accounts and ultimately worked with people in one of the Clifton Park branches, but I don't know when they did the switchover.

Q. Who did you work with at Pioneer Bank to move the tax dollars from PTM's bank to Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: Like the last e-mail there were some pre-noting. A lot of that I wasn't heavily involved, other than I know work was done we were all set.

And then it was really PTM, once they knew all that work was done, which was

MICHAEL T. MANN

someone saying hey, we're set. PTM then moved the money into the Pioneer account.

Q. Did Lucas Scarchilli and Sandy Dedrick help at all in the process of PTM moving the payroll tax dollars from the PTM account into Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah, I don't know what Sandy -- that were all set other than setting up the pre-note. Again, I wasn't there with them, I was just forwarding requests from PTM. And so once it was all set, then the money was moved over, but...

BY MR. JAYNE:

Q. Did you have -- it appears from Exhibit 464, did you have a phone call with Sandy Dedrick about what needed to be done to move the tax dollars from PTM account into Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Did you tell Ms. Dedrick during that call that you were going to move payroll tax dollars from PTM's account into Pioneer account

MICHAEL T. MANN

0212?

MR. ALESSI: Objection as to form.

THE WITNESS: I don't know all the specifics. I mean, even when I said it specifically in that call, so I...

Q. Would Ms. Dedrick and Mr. Scarchilli had to have understood that you were moving payroll tax dollars into account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah, the best answer is I was very open about what we were doing to everyone, so I -- I assume. I can't recall specific conversations that happened back then, but it was no secret on what I was trying to do and to pre-note a file and to get my signature on things so checks could be sent into taxing authorities.

I just assumed yes, they did. But, I mean, the specifics of when Sandy said, I spoke to Mike, we're all set. I know I talked to her, but I don't remember the specifics of the call.

MR. ALESSI: I move to strike the answer as non-responsive.

MICHAEL T. MANN

MR. JAYNE: Okay.

BY MR. JAYNE:

Q. Did you have conversations with anyone other than Dave Blessing about the fact you were moving payroll tax dollars from PTM's account into Pioneer account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah, I mean -- yes, I can't remember -- you know. Yes.

MR. JAYNE: Let me hand you what was previously marked as Exhibit 253.

(Whereupon, Plaintiff Exhibit 253, MyPayrollHR Account 0212 Statement Dated 12/31/13, Bates Stamped PB-SWP-00002174 to '183, 10-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. 253 is the statement from account 0212 for December of '13. Do you see that?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. What is the activity description on all of the transactions that occurred in account 0212 on December 17th?

MICHAEL T. MANN

MR. ALESSI: Objection as to form.

THE WITNESS: I mean, all by one was payroll tax management tax draft.

Q. Who would have created that activity description?

A. I don't know the specifics of how it works, but it's probably PTM, that's how it shows up in the Pioneer account, how PTM had it structured.

Q. So what were all of these funds that were moving into account 0212 on December of 17th?

MR. ALESSI: Objection as to form.

THE WITNESS: Payroll tax funds.

Q. Were these the same payroll tax funds that you told Dave Blessing you were going to house at Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Were you in any way secretive or less than forthcoming about what you intended on doing in account 0212 when you opened the account?

MR. ALESSI: Objection as to form.

MICHAEL T. MANN

THE WITNESS: I was very forthcoming.

Q. Turn to page 2179 of Exhibit 253. Bates number 2179, Exhibit 253. Go down to the -- in the 12/20 date where you see strategic business/FEDEFTPPMT.

Do you see that?

A. Yes.

Q. What that was?

MR. ALESSI: Objection as to form.

THE WITNESS: So that's actually payment to the federal government.

Q. So on the 17th it appears from this account, and you correct me if I'm wrong, that payroll tax dollars are going into the account; is that right?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. And then three days later, what's happening in the account?

MR. ALESSI: Objection as to form.

THE WITNESS: Payments are being made to the Federal government and a couple of states.

MICHAEL T. MANN

Q. After looking at Exhibit 253, is what's going on in this account exactly what you intended to do when you opened the account?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. And is what's going on in account 0212 in December of '13 exactly what you told Dave Blessing you were going to do with the account?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. And let's look at the back page of Exhibit 253, and it's Bates numbered 2182, and it is two checks that appear, am I right?

A. Yes.

Q. Who does it show are the payees on the checks?

A. Both look like New York State Income Tax.

Q. So income tax?

A. New York State Tax Department.

Q. And is this typical of a payroll tax account, what you would see in it?

MR. ALESSI: Objection as to form.

MICHAEL T. MANN

THE WITNESS: Yes.

Q. And again, when you opened the MyPayrollHR account 0212, you intended to not only house tax dollars in the account, but also make payments to taxing authorities when those taxes were due; is that right?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. And that's what you told Dave Blessing you were going to do?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

MR. JAYNE: Let me hand you what we've previously marked as about 358.

(Whereupon, Plaintiff Exhibit 358, Blessing E-mail Dated 12/18/13, Bates Stamped PB-SWP-00335930, 1-Page was previously marked for identification.)

BY MR. JAYNE:

Q. 358 is an e-mail from David DeLuca to David Blessing dated December 18, 2013. Do you see that?

A. Yes.

Q. Could you read it for us, please?

MICHAEL T. MANN

A. "I saw where Mike Mann opened a new business checking account in Clifton Park East in November and deposited over 500,000 today, awesome."

Q. Did David Blessing ever express any interest in having large deposits at Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes, deposits are good so he -- yes. Yes, he likes them.

Q. Did Dave Blessing like the large deposits that you had in account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: Although he never specifically would say an account, I know -- I know he has said that, you know, deposits are -- you know, we've had those conversations. We never talked specifically about the exact account, but yes.

BY MR. JAYNE:

Q. Did you have a -- not being an account specific, did you have conversations with Dave Blessing where he indicated he liked

MICHAEL T. MANN

the fact that your companies had large deposits at Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Did he ever explain to you why?

MR. ALESSI: Objection as to form.

THE WITNESS: I don't recall specific conversations. I'm familiar with how the banking system works and when we first purchased MyPayrollHR getting the tax dollars into Pioneer would be a good thing for them. So we had those type of conversations, but I don't recall specific, you know, words at a certain time, but, yes.

BY MR. JAYNE"

Q. But you had conversations with Dave Blessing when you purchased MyPayrollHR about the fact that getting the payroll tax dollars into Pioneer Bank would be a good thing for the bank?

MR. ALESSI: Objection as to form.

THE WITNESS: And we talked about it before the purchase.

MICHAEL T. MANN

Q. Before and after?

A. Correct.

MR. ALESSI: Objection as to form.

Q. So when you first opened account 0212, PTM was going to handle the ACH'ing of the tax dollars, both in and out of the account; is that correct?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes. Although, I think they leveraged Cachet's systems, but they're the same thing, but -- so, yes.

Q. Was PTM a division of Cachet?

A. That is my understanding, yes.

Q. So -- and let me, just so we have it corrected: Who -- when you opened account 0212, who was to handle the ACH'ing of payroll tax dollars?

MR. ALESSI: Objection as to form.

THE WITNESS: I mean, that would be PTM or/Cachet, but PTM was our contact in the tax dollars.

Q. And my understanding of ACH'ing is you are moving money into accounts and out of accounts. Is that similar to your

MICHAEL T. MANN

understanding?

A. Yes.

Q. Did you do any more about it than that?

A. I mean, that is probably the best way to describe it.

Q. Yeah. The movement of money electronically into and out of bank accounts; is that a fair definition of ACH'ing?

A. Yes.

Q. Did you ever have any discussions with anyone at Pioneer Bank about Pioneer Bank actually handling the ACH'ing of payroll tax dollars in and out of account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Did you have those discussions before and after the opening of account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: Discussions with people outside of Dave Blessing all happened after. Before -- and I didn't over -- it was just a high-level conversation saying, we should look at what

MICHAEL T. MANN

we could do for you to save you money on ACH.

But after -- it was after the opening of the account that I spoke to other people other than David.

MR. JAYNE: Let me hand you what we previously marked as Exhibit 3 to these depositions.

(Whereupon, Plaintiff Exhibit 3, Blessing E-mail Dated 4/21/14, Bates Stamped SWP000564, 1-Page was previously marked for identification.)

BY MR. JAYNE:

Q. Tell us, if you will, about Exhibit 3, this e-mail?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah. What it looks like to me, again, was more discussions about the future of, you know, possibly even taking on the payroll side and -- but and that -- he says they're going to be handling, but we were handling.

But, yeah, and it looks like, you know, there were just plans to talk about

MICHAEL T. MANN

payroll at some point. And credit risk meaning the tax funds come in there for a few days, so they don't have to be worry about being pulled.

BY MR. JAYNE:

Q. Does this e-mail have to do with the physical ACH'ing of payroll tax funds?

A. Yes.

Q. Because Pioneer was already housing the dollars in account 0212; is that right?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

MR. JAYNE: And then it looks like, let me hand you what we will mark Exhibit 5.

(Whereupon, Plaintiff Exhibit 5, Blessing E-mail Dated 5/29/14, Bates Stamped NP0093510 to 512, 3-Pages was marked for identification.)

BY MR. JAYNE:

Q. Looking at Exhibit 5, was there some issue with payroll tax management in May '14 that would necessitate you using Pioneer for ACH'ing --

MICHAEL T. MANN
MR. ALESSI: Objection as to form.
Q. -- in tax account?
MR. ALESSI: Same Objection as to form.
THE WITNESS: Yeah. I mean, I see the e-mails, I was involved. I don't recall the specific issues other than PTM was making some changes and needed to work with Pioneer based on these changes.
I mean, because I don't recall -- I mean, I read this. I know it happened. But I don't think it was much of an issue other than, you know, when PTM contacted me, I reached out to the bank and I said hey, can you help with this.
BY MR. JAYNE:
Q. And would PTM have then dealt with the bank on some issues they were having on the ACH'ing into and out of account 0212?
MR. ALESSI: Objection as to form.
THE WITNESS: Sorry, can you ask that again? I want to make sure I answer.
Q. Would then PTM have had to reach out to Pioneer Bank or you put them in contact with

MICHAEL T. MANN

Pioneer Bank to fix these issues with the ACH'ing of payroll tax dollars in and out of 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah. In looking at this, I still can't recall if PTM actually worked with the bank or if it was all through me and it worked.

I don't remember how this ultimately was resolved, other than it was resolved and it wasn't an issue after May of 2014.

BY MR. JAYNE:

Q. Who else did you deal with at Pioneer Bank other than Dave Blessing regarding potentially using Pioneer Bank to ACH payroll tax dollars?

MR. ALESSI: Objection as to form.

THE WITNESS: I don't remember the specific people.

Q. Do you remember dealing with Alicia Riegert?

A. The name is familiar, but I didn't work with Alicia often. So, I mean, it's a familiar name.

MICHAEL T. MANN

Q. Was there ultimately a meeting where there was discussions about Pioneer Bank using or Pioneer Bank handling the ACH'ing of payroll tax dollars into and out of account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Who do you recall being at the meeting other than Dave Blessing?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah, I don't -- I don't remember, I'd be guessing.

Q. Do you recall actually the meeting occurring though, you can't name the names of the people who were there?

A. I remember part of the discussion. I remember the ultimate outcome, so...

Q. What was the ultimate outcome of your discussions with Pioneer Bank about them handling the ACH'ing of the payroll tax dollars into and out of account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: There were several issues, one being their cut-off time. We had clients in all 50 states and needed

MICHAEL T. MANN
later cut-off times when they stopped processing.
It didn't appear it was going to be as cheap as we thought. And I think our systems, there would have been a lot of work needed, so it was not a viable option after we spoke about it.
BY MR. JAYNE:
Q. Did you ever speak about it with Tom Amell, the CEO of Pioneer Bank?
MR. ALESSI: Objection as to form.
THE WITNESS: Question about them doing the tax processing?
Q. About Pioneer Bank handling the ACH'ing of payroll tax dollars?
MR. ALESSI: Objection as to form.
THE WITNESS: I never had a conversation with Tom about that.
Q. What about, do you remember having a conversation with the subject of Joe Fleming?
MR. ALESSI: Objection as to form.
THE WITNESS: I don't recall Joe. Joe wasn't in the meeting, and I don't recall talking to him about it either.

MICHAEL T. MANN

Q. When the meeting took place, Pioneer Bank had already been housing the payroll tax dollars in account 0212 for quite some time; is that true?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Was there any confusion at the meeting about whether Pioneer Bank was still or was already housing the payroll tax dollars?

MR. ALESSI: Objection as to form.

THE WITNESS: No, there was no confusion.

Q. Was the -- would the fact that Pioneer was already housing the payroll tax dollars had been discussed during the meeting?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah. It's a part of it. Our main focus in discussion about the meeting was potentially to save money or improve things. So, yes, that would have to be part of conversation.

Q. Because one of the issues would be the volume of transactions in and out of the account and the expenses associated with that,

MICHAEL T. MANN

I assume. Would that have been something that had to have come up during the meeting?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah, whether they brought up the price at the meeting or followed up with me afterwards on pricing, that's when it became apparent it wasn't going to be the cheaper option.

Q. In order for them to come up with the pricing, would somebody have had to look at the account 0212 to figure out what the volume of the transactions were?

MR. ALESSI: Objection as to form.

THE WITNESS: I don't know how they officially came up with pricing, but...

Q. Could you think of a way to come up with it other than to understand and know the volume of transactions going in and out of 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: What I don't recall is whether they gave me tier pricing, which then -- or if they sat there and said, it would be -- I'm not exactly sure how that

MICHAEL T. MANN

works on pricing.

Q. Do you have any doubt in your mind that the people who you were dealing with in 2014 concerning whether Pioneer Bank would start handling the ACH'ing of payroll tax dollars knew that Pioneer Bank had already been housing those dollars?

MR. ALESSI: Objection as to form.

THE WITNESS: It most likely is. I can't -- I can't picture the conversations we had. There were several people that I dealt with that may or may not. If I knew who was in the meeting, I could say hey, here are people I could talk to.

The meeting itself, I can't say a hundred percent, you know, we -- if we had some preamble saying hey, there some tax dollars in here or not. I could only, you know, assume it's part of the discussion. And again, I don't know what Pioneer did to take a look at it. It happened in that meeting, I might be splitting hairs, but...

BY MR. JAYNE:

Q. But you could say a hundred percent

MICHAEL T. MANN

that Dave Blessing knew that Pioneer had been housing payroll tax dollars from the inception of the account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

MR. JAYNE: Let's talk about -- let's talk a little bit about what we will mark as exhibit -- I think it was previously marked as Exhibit 40.

(Whereupon, Plaintiff Exhibit 40, Riegert E-mail Dated 9/18/14, Bates Stamped PW-SWP-00321576, 1-Page was previously marked for identification.)

BY MR. JAYNE:

Q. Exhibit 40 is an -- it looks like a calendar invite for a meeting at Pioneer Bank on September 18, 2014.

Do you see that?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Does it look like a calendar invite to you?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

MICHAEL T. MANN

Q. And it looks like the attendees at this meeting were Tom Amell, Dave Blessing, Lucas Scarchilli, Sandy Dedrick, Graig Furlong, Carol Beth Chase, David DeLuca, Frank Sarratori, Laura Mazzara, Annmarie Perchinsky, and Joe Fleming.

Does that look right?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. After seeing this, do any of those names appear familiar such that you can identify somebody that would have been in the meeting with you when you discussed with Pioneer, potentially them handling the ACH'ing of payroll tax dollars?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah, I don't recall who was in the meeting. All I know is, you know, I worked with Lucas, and Sandy, and David more. I know there were some specific people, probably Alicia, but I don't know if it was her specifically that was representing the ACH group, but I don't recall. I know, you know... I don't

MICHAEL T. MANN

recall.

MR. ALESSI: Objection as to form. I'm sorry, I don't see the last statement on the record.

(Whereupon, there was a brief discussion held off the record.)

BY MR. JAYNE:

Q. And I want to back up and make sure we're clear on something. When we're talking about when I talk about payroll taxes here, I want to make sure that you and I are in agreement. I'm talking about payroll taxes done for clients of a payroll company.

Do you understand that?

A. Yes.

Q. As opposed to payroll being done for employees of ValueWise?

A. Yes.

Q. And just so we're clear, there was no confusion about and you Dave Blessing about what you were going to do in account 0212, it was clear that you were going to do -- house payroll tax dollars for the clients of MyPayrollHR; is that fair?

MICHAEL T. MANN

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

VIDEOGRAPHER: This will conclude video number one in the deposition of Michael T. Mann. We are off the record at 11:32 a.m., August 3rd, 2021.

(Whereupon, proceedings recessed for a short break and once again resumed.)

VIDEOGRAPHER: This is the beginning of video number two in the deposition of Michael T. Mann. We are on the record at 11:51 a.m., August 3rd, 2021.

MR. KOENIG: So this is Mike Koenig, I wanted to put on the record the issue regarding the material Mr. Mann had in front of him at the beginning of the deposition that Mr. Alessi questioned about the content, whether it was relevant to this deposition.

There were three manila folders; one of them is empty, and two of them have papers in them. I have looked through these documents and I can represent that these documents contain two categories of

MICHAEL T. MANN

information.

One category of information relates to Mr. Mann's sentencings that are scheduled in federal and state court tomorrow, including drafts of sentencing memorandums that he and I were exchanging over the last several weeks that he has handwritten notes on, but those handwritten notes only pertain to the sentencing.

The other category of documents pertain to his current employment situation. He has a position where he currently resides, and the documents are nothing more than that. There are no notes whatsoever that relate to the subject matter of today's deposition.

MR. ALESSI: Thank you, Mr. Koenig, for providing that explanation for the record.

In almost every instance I would ask to, notwithstanding counsel's representations, given they were present and under Mr. Mann's hands at a deposition, I would ask to see those documents and to

MICHAEL T. MANN

make my own conclusions.

For two reasons I'm not going to make that request. The first reason is I've known Mr. Koenig for over 20 years, and his word is the gold standard in this area.

Number two, given the nature of the documents Mr. Koenig has represented, given they're related to a criminal matter, given that sensitivity in and of itself, I am not going to pursue the matter further.

And that is the conclusion of my comment and, my view, conclusion of the issue that I raised.

MR. KOENIG: Just bear in mind the criminal documents and also the current employment situation.

MR. ALESSI: Correct.

MR. KOENIG: But there were no notes related no handwritten notes or documents related to this deposition.

BY MR. JAYNE:

Q. Sir, we're back on the record and I just want to clean up a couple of things and

MICHAEL T. MANN

make sure we're a hundred percent clear.

Did you ever tell anyone at Pioneer Bank that you were going to house third-party client payroll tax dollars in account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Who?

A. I spoke to David Blessing before and after. It's not that I would go to people and say hey, I'm doing this, but I had conversations with several other people in the bank that -- and it would be apparent that there were tax dollars there. So there were multiple people. Some, if you gave me names I could say yes and no, but that's it, I don't know if I'm answering your question.

Q. You are, and we'll get to that later.

When you say "before and after" what did you mean?

A. Clarifying what I said earlier, which was before I acquired MyPayrollHR, I made David aware we would be moving the tax dollars over and after I purchased it, it was there,

MICHAEL T. MANN

but he knew.
Q. Real quick, can we jump back to Exhibit 252?
A. Yep.
Q. If you could turn to Bates 377, the customer due diligence form that we previously looked at.
Do you see that?
A. Um-huh, yes.
Q. Did anyone at the bank, at Pioneer Bank ever walk you through this form?
MR. ALESSI: Objection as to form.
THE WITNESS: I doubt it.
Q. Do you have any recollection of that happening?
MR. ALESSI: Objection as to form.
THE WITNESS: I don't remember going through the form.
Q. Did anyone at Pioneer Bank ever ask you any questions about your answers on this customer due diligence form?
A. No.
Q. Did anyone at Pioneer Bank ever tell you that there was a policy against allowing a

MICHAEL T. MANN

payroll company to house third-party payroll tax dollars at the bank?

MR. ALESSI: Objection as to form.

THE WITNESS: No.

Q. Did anyone at Pioneer Bank ever tell you that there was a policy against letting a payroll company open a deposit account?

A. No.

Q. Did -- well, strike that.

If there were discussions at Pioneer Bank about the bank beginning to do the ACH processing of payroll tax dollars, the payroll tax dollars would have had to have been in the bank for Pioneer to do the ACH processing; is that true?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes. They would have to be in the bank to do ACH processing.

MR. JAYNE: Real quick, I'm going to hand you what we'll mark as Exhibit 2.

(Whereupon, Plaintiff Exhibit 2, Mann E-mail Dated 4/1/14, Bates Stamped NP0093496 to '504, 9-Pages was marked for identification.)

MICHAEL T. MANN

BY MR. JAYNE:

Q. Will you tell us what Exhibit 2 is?

A. So this is an e-mail I sent to Dave Blessing and it included our PTM contract.

Q. And why were you sending him the PTM contract?

A. It's really one of two reasons. One, you know, I was in, you know, I was working closely with David on everything we did, so it wasn't unusual for me to do something like that.

The only other reason, because I did include pricing in here, was to possibly give them an idea for pricing, but I'm not sure if it was one or the other.

It was one of those two things, but I'm not sure which one.

Q. So would one of the things potentially that you were sending this Dave Blessing for was so that Pioneer Bank could see the pricing that PTM used for ACH'ing in order to determine whether the bank wanted to start doing the ACH'ing of tax dollars?

MR. ALESSI: Objection as to form.

MICHAEL T. MANN

THE WITNESS: Most likely.

Q. Were there any discussions at Pioneer Bank or between you and Pioneer Bank about there being a company opened called Pioneer Payroll?

MR. ALESSI: Objection as to form.

THE WITNESS: I -- I'm not sure. I don't recall the name. I do recall having conversations about them getting into payroll, but Pioneer Payroll, I don't recall that.

MR. JAYNE: Let me hand you what we previously marked as Exhibit 398 to those depositions.

(Whereupon, Plaintiff Exhibit 398, Mann E-mail Dated 3/26/17, Bates Stamped PB-SWP-00073106, 1-Page was previously marked for identification.)

BY MR. JAYNE:

Q. Is 398 an e-mail that you sent to Dave Blessing on March 26th of '17?

A. Um-huh.

Q. Yes?

A. Yes.

MICHAEL T. MANN

Q. And if you go down to paragraph two, it says, "In our last conversation I told you that I probably tried to move all the service bureaus that we had purchased and would like to buy a separate company that is separate from our relationship with Pioneer. Obviously, we would need to raise the money to pay back the $2 million note and then have this other entity with inventors responsible for the service bureaus."

Is that right?

A. Yes.

Q. And it goes on to say, "I would keep the technology company and tax/treasury company within the ValueWise umbrella, and Pioneer would be able to take advantage of the deposits and have claim to these companies."

A. Yes.

Q. Explain to me what you're meaning in this e-mail?

A. So we were talking about, I think, our overall financials and the amount of subordinated debt we had in our balance sheet and coming up with potential creative ways to

MICHAEL T. MANN

address that.

Q. And it says I would keep the technology company and tax/treasury company within the ValueWise umbrella and Pioneer would be able to take advantage of the deposits and have claim to these companies.

Why would that have been important to Dave Blessing?

MR. ALESSI: Objection as to form.

THE WITNESS: I mean, I had conversations throughout the years about the deposits. That was just, you know, something Dave and I talked about.

Q. And you understood that the deposits from the tax -- payroll tax dollars going into 0212 were something that Dave Blessing liked?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

MR. JAYNE: Let me hand you what we will mark as Exhibit 46.

(Whereupon, Plaintiff Exhibit 46, Mann E-mail Dated 8/10/17, Bates Stamped PB-SWP-00069704 to '705, 2-Pages was marked for identification.)

MICHAEL T. MANN

BY MR. JAYNE:

Q. Before we talk about 46, MyPayrollHR did that company always operate as a payroll software -- or excuse me, payroll service bureau?

A. Yes.

Q. And then did you -- you ultimately purchased the -- or strike that.

Did you ever purchase payroll software from FW Davidson?

A. Yes.

Q. When would that have been?

A. I forget exact date, because again, we used the same one from the start even when we purchased it, it could have been 2017. It was a few years into the relationship.

Q. Was it -- well, did you purchase the payroll software from FW Davidson before you purchased Southwestern Payroll and Pro Data?

A. Most likely, yes.

Q. And then did you use Cloud Payroll to purchase the payroll software?

A. Most likely, yes.

Q. Did you ever tell anyone at Pioneer

MICHAEL T. MANN

Bank that you were in payroll consulting?

MR. ALESSI: Objection as to form.

THE WITNESS: I don't recall if I told anyone in Pioneer. I possibly could have, because we did have one group in Texas doing some of that as well. They were doing more of what they call it ASL but more, you know, beyond payroll and looking at helping them with benefits and stuff.

So we were doing a little bit of that. We did some of it. I could have told someone at Pioneer that we were, I just don't recall.

BY MR. JAYNE:

Q. Was there any confusion -- or strike that.

Did -- what company did you operate this outfit out of Texas under?

A. We had a d/b/a called -- and I'm trying it think if it just ended at d/b/a called True HR they did some payroll consulting.

Q. Did True HR generate significant

MICHAEL T. MANN

revenues ever?
A. No.
Q. Did -- let's jump back to Exhibit 46.
If you look at the bottom, there is an e-mail from you to Dave Blessing in August of 2017?
A. Yes.
Q. Had you already by August of '17 purchased Southwestern Payroll and Pro Data?
A. I don't think I did. I don't recall the exact --
Q. Take a look at paragraph two.
A. Oh, right here. Yeah. I have them on here, yes.
Q. So by August of 2017, had you purchased Pro Data and Southwestern Payroll?
A. Yes.
Q. And then if you look above that e-mail, there is an e-mail from Dave Blessing to Mike Mann dated August 10, 2017.
Do you see that?
A. Yes.
Q. What is Dave Blessing asking you to

MICHAEL T. MANN

do in August of '17?

MR. ALESSI: Objection as to form.

THE WITNESS: Basically create, if Pioneer wanted to create their own service bureau, what would the P&L look like.

Q. By August of '17, do you own three or at least the majority interest in three separate service bureaus at this point?

A. Yes.

Q. And then also by August of '17, Cloud Payroll owns its own proprietary software; is that true?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Tell me about your discussions with Dave Blessing about this Pioneer Payroll project?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah, I -- I recall in taking to David that Pioneer was looking at a lot of services they could offer to their customers, and he wanted to explore offering their own payroll solution.

So as you can see in the e-mail, it

MICHAEL T. MANN

started out as, you know, creating a P&L, what would it look like.

BY MR. JAYNE:

Q. Did you actually put together a presentation on this subject?

A. I know I put together probably spreadsheets. Whether I had a separate presentation with it, I may or may not have. I usually do that type of it, but I don't recall the presentation currently.

MR. JAYNE: Let me hand what we previously mark as Exhibit 381.

(Whereupon, Plaintiff Exhibit 381, Mann E-mail Dated 4/18/17, Bates Stamped PB-SWP-00073670 to '685, 16-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. Does that help refresh your recollection that you actually did put together a little PowerPoint presentation on Pioneer Payroll?

MR. ALESSI: Objection as to form.

THE WITNESS: I'm going to look at this briefly.

MICHAEL T. MANN

Q. Sure. Take your time.

A. So this actually was not part of the Pioneer Payroll. This was our vision of our payroll portfolio and companies and what we wanted to do. Pioneer Payroll was probably something that happened a couple of months afterwards as a discussion.

But this presentation was not related to Pioneer Payroll. It was actually our vision of what we wanted to do with our combined payroll companies and technology.

Q. Why were you giving that presentation?

MR. ALESSI: Objection as to form.

THE WITNESS: We were really excited about what we had created and where it was going and felt we could really do something special in the industry. So it was getting them excited. You know, one, providing an update saying hey, this is what our vision is, this is what we were trying to do, and just trying to stay connected.

BY MR. JAYNE:

Q. It seems like you were heavily

MICHAEL T. MANN

involved with Dave Blessing as to what was going on with your companies is that a fair statement?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Did you kind of view Dave Blessing as somebody who could provide you feedback on what you were doing with your companies?

A. I -- David was a very intelligent person. I always welcomed his feedback, so it was a good relationship. I didn't even have to ask, he would give it to me, so -- but I mean, we had that type of relationship on feedback.

But part of this was also presenting to him, getting his thought on, you know, does this make sense, are we doing the right thing, should we move forward? Because we borrowed money for Southwestern Payroll and other things, it's just keeping him updated.

Q. How did you pay for Southwestern Payroll?

A. Part of it, I forget the details of it, I did borrow money from Pioneer to pay for some of it. Some of it was cash we had, and

MICHAEL T. MANN

then Darin and Ray took back second notes that we paid off over time.

Q. And then how did you come up with the cash to pay them back over time?

A. Most of that was -- I didn't borrow more money, it was -- they were -- our goal was to use the profits from the business to pay that over time.

MR. JAYNE: Let me hand you what we'll mark as 465.

(Whereupon, Plaintiff Exhibit 465, Blessing E-mail Dated 9/29/17, Bates Stamped PB-SWP-00069341, 1-Page was marked for identification.)

BY MR. JAYNE:

Q. Tell us what Exhibit 465 appears to be?

MR. ALESSI: Objection as to form.

THE WITNESS: So this was a meeting that we were looking to set up.

Q. Did you -- was it a meeting regarding the potential of a Pioneer Payroll product?

MR. ALESSI: Objection as to form.

MICHAEL T. MANN
THE WITNESS: Yes.
Q. Did the meeting ever occur?
MR. ALESSI: Objection as to form.
THE WITNESS: We did have a meeting at Pioneer.
Q. Who was present at that meeting when you discussed the potential for a Pioneer Payroll product?
MR. ALESSI: Objection as to form.
THE WITNESS: David was definitely in it. I don't know if it was this specific meeting where Tom Amell was in it. He was in a meeting that I gave an update to. Joe Fleming was at a meeting I gave an update to.
What throws me off a little is I don't know if Tim Burke -- I'm confusing a couple of different meetings. I met with a couple of different people there a few times, but I did meet with several people at Pioneer.
BY MR. JAYNE:
Q. Tell me about the meeting where you recall Joe Fleming and Tom Amell being present

MICHAEL T. MANN

where you said you gave an update?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah, I mean, part of it we went over Pioneer Payroll, what the P&L would look like. We also talked about the accounting firms we owned, which is another company we had. So it was more than just Pioneer Payroll, but I know that was part of it.

BY MR. JAYNE:

Q. What accounting firm did you own?

A. We had a company, it was called Hutmacher Business Advisors, that was the first company we acquired. We also acquired Feldman and Associates, I might be off the name a little bit, they were out of Iowa, and at the end, I forget the last company, but we had basically three small accounting firms out in the Midwest and we were looking to create a business where we would go out and find small accounting firms and roll it up into something bigger.

Q. When you had the meeting with Tom Amell and Joe Fleming, would Dave Blessing have

MICHAEL T. MANN

been present in that meeting, too?

A. Yes.

MR. ALESSI: Objection as to form.

THE WITNESS: Sorry. Yes.

Q. Do you only recall having one meeting with Tom Amell and Joe Fleming?

MR. ALESSI: Objection as to form.

THE WITNESS: I only recall one meeting with Tom Amell. I don't -- I met with Joe Fleming not so much in a meeting format several times, but I only recall the one specifically.

That does not mean, you know, there were probably other meetings without Tom, but only one with Tom that I remember.

BY MR. JAYNE:

Q. During the Tom Amell meeting, do you recall Pioneer Payroll being brought up?

A. Yeah, we talked about it a little bit.

Q. Do you recall that the tax account was brought up during that meeting?

MR. ALESSI: Objection as to form.

THE WITNESS: I don't recall if it

MICHAEL T. MANN

was brought up.

Q. Anything else that you recall with your meeting of Tom Amell and Joe Fleming regarding the payroll Pioneer Payroll product?

A. It was really just talking through how it would work, what would the numbers look like, what would Pioneer do, what we would do. That is kind of how we had it set up.

Q. Did you ever -- did Dave Blessing ever talk about one of the advantages of having a payroll company of the float on the tax account?

MR. ALESSI: Objection as to form.

THE WITNESS: I -- not necessarily in those words, but just like the deposits and having float on it allows deposits to sit in the account longer, so I don't know if he used it in those type of terms, but I was -- felt, you know, I -- the interest in those tax deposits were -- I believe that's, you know -- sorry, I'm kind of all over.

We didn't talk about float specifically I that I can remember. I just

MICHAEL T. MANN

know tax deposits sitting there for a few days, you know, is a good thing so -- but I don't remember talking about float specifically.

BY MR. JAYNE:

Q. Do you recall ever meeting with a gentleman named Vikram Agrawal regarding potentially investing in your payroll companies?

A. Yes.

MR. JAYNE: Let me hand you what we'll mark as Exhibit 380.

(Whereupon, Plaintiff Exhibit 380, Calendar Invite Dated 3/14/17, Bates Stamped PB-SWP-00073249, 1-Page was previously marked for identification.)

BY MR. JAYNE:

Q. Exhibit 380 indicates there was a meeting that might have involved Dave Blessing, Tim Burke, Mike Mann and Joe Fleming. Does that look correct?

MR. ALESSI: Objection as to form.

THE WITNESS: That does look correct. I don't think -- I'm not a

MICHAEL T. MANN

hundred percent sure, I don't think Joe ended up at that meeting.

Q. Did John Reinke end up at that meeting?

MR. ALESSI: Objection as to form.

THE WITNESS: I kind of recall John being there, yes.

Q. Where was this meeting with Mr. Agrawal?

MR. ALESSI: Objection as to form.

THE WITNESS: At Pioneer Bank.

Q. What was the purpose of the meeting with Mr. Agrawal?

MR. ALESSI: Objection as to form.

THE WITNESS: So we went over our vision of what we were trying to do. We probably gave them an overall view of ValueWise and a lot of our subsidiaries. But I know we talked about payroll and we just knew he could be a potential investor if there was interest.

Q. Did Dave Blessing say anything at this meeting about the payroll tax account?

MR. ALESSI: Objection as to form.

MICHAEL T. MANN

THE WITNESS: I don't know if he said it at this meeting. I mean, David would acknowledge it at times, but I can't recall what meetings or who.

Q. If John Reinke recalls Dave Blessing talking about the payroll tax account during this meeting, would you disagree agree with Mr. Reinke?

MR. ALESSI: Objection as to form.

THE WITNESS: I would not disagree.

MR. JAYNE: Let me hand you what we'll mark as Exhibit 32 or I think it's already been marked as Exhibit 32.

(Whereupon, Plaintiff Exhibit 32, MyPayrollHR Account 0212 Statement Dated 8/30/19, Bates Stamped PS-SWP-00030576 to '667, 92-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. Mr. Mann, would you tell us what Exhibit 32 is?

A. So this is account 0212. And at that point a lot of these transactions are payroll dollars coming in and out of the

MICHAEL T. MANN

account.

Q. How many transactions were going through account 0212 in August of 2019?

A. Is there a number on here I can find?

Q. Yeah. Look under "beginning balances as of 8/1/19"?

MR. ALESSI: Objection as to form.

Q. It will be up --

A. Oh, there were --

Q. Let me ask a better question.

Looking at Exhibit 32, can you tell how many transactions were going into and out of account 0212 in August of '19?

A. Yes.

Q. How many?

A. There were 3,001 deposits and credits and there are 2,401 withdrawals and debits.

Q. And how much money, dollars in terms of -- or how many dollars were going into account 0212 in August of 2019?

A. $169,857,909.40.

Q. And what are almost all of these

MICHAEL T. MANN

funds going into the account?
A. Payroll.
Q. And does the description -- how does it indicate which funds are payroll funds?
A. It says "payroll" on the individual transaction line.
Q. And would the account activity in account 0212 during this period of time between roughly consistent each month?
MR. ALESSI: Objection as to form.
THE WITNESS: It would most likely.
Q. So looking at 169 million going through account in August of '19, that would be over $2 billion a year going through account 0212; is that approximately correct?
MR. ALESSI: Objection as to form.
THE WITNESS: Yes.
Q. And what are almost all of those $2 billion in funds?
MR. ALESSI: Objection as to form.
THE WITNESS: Payroll dollars.
Q. And did you ever -- did you ever think that Pioneer Bank did not know that more than $2 billion in payroll dollars and payroll

MICHAEL T. MANN

funds were going through account 0212?
MR. ALESSI: Objection as to form.
THE WITNESS: You know, I don't know from their end. I didn't talk about the payroll dollars, but I don't know what they see on there from their perspective.
Q. You could control the description of the transactions, correct?
MR. ALESSI: Objection as to form.
THE WITNESS: Let me -- asking if I can control the description?
Q. If you wanted to put something in the description of the ACH other than payroll, you could have made that happen?
A. The way I'll answer that, because maybe I'm not understanding your question. These terms -- the way these individual lines are displayed or based on our payroll system, so if it was a client, it gives the client name and then it says payroll.
So I didn't control how this is, it's our technology system is set up that would display the name of the company and payroll.
Q. But it was your payroll system that

MICHAEL T. MANN

controlled how they were described?

A. That is correct.

Q. And somebody, if you wanted to, you could have had somebody in your system give them a different description?

A. Yeah. The one thing I'm not 100 percent sure on is how much is our system versus how much Cachet, since they're an ACH processor dictated this format. I believe, since we had our own payroll technology it was housed in our system, but I'm not sure if it was Cachet or our system.

MR. JAYNE: Let's move to what's been previously marked as Exhibit 36.

(Whereupon, Plaintiff Exhibit 36, Salsburg E-mail Dated 2/26/19, Bates Stamped NP0093514 to '526, 13-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. Tell us what Exhibit 36 is.

A. So this is the account agreement for account ending in 2440, as well as my e-mails back and forth with Trudy and Deborah to get the account set up.

MICHAEL T. MANN

Q. Why did you open account 2440?

A. So there are multiple things that were going through in account ending in 0212. We were running payroll through it most of the time. We had tax going through it. We also had some other payroll-related activities, you know, if someone was using us to write their checks, it was a service we offered, we would need to house the money the in an account and it wasn't tax-related.

So the reason why I requested this is I wanted to separate tax out from all the other payroll services and make 2440 the tax account, and then 0212 all other-related client payroll activity.

So the two accounts were specifically for clients, it's just I didn't want tax blended in with the other payroll activities that happened for our clients.

Q. And let's back up now to when you purchased Pro Data. Do you recall that you purchased the majority interest in Pro Data in approximately late 2016, does that sound correct?

MICHAEL T. MANN

A. That sounds correct.

Q. And how did you purchase the majority interest in Pro Data through what company?

A. So the one thing and this will be helpful, it was most likely Cloud Payroll, but there were two Cloud payrolls, so that could get confusing at times.

If we had -- we had a MyPayrollHR that we changed the name to Cloud Payroll, that was one entity. And then we had another Cloud Payroll, so I get them confused, so I would think the company was Cloud Payroll that purchased Pro Data.

Q. What was Pro Data?

A. Pro Data was a service bureau based north of Chicago.

Q. Who owned Pro Data?

A. Horatio Lopez.

Q. When you purchased Pro Data, what did you do with the tax account, the payroll tax account?

A. We ultimately moved it over into our tax account.

MICHAEL T. MANN

Q. Which at the time would have been account 0212; is that right?

A. That is correct.

Q. Was that one of the conditions of the purchase of Pro Data?

A. Yes. Not that it was a formal -- I remember when we were acquiring those, it was very clear that I was going to move the tax dollars over.

Q. And you would be the majority owner, so you could do that?

A. Correct.

Q. At Pro Data, did you also start processing payroll tax dollars out of account 0212 after you purchased it?

MR. ALESSI: Objection as to form.

THE WITNESS: The payroll dollars or payroll tax dollars?

Q. We've already talked about payroll tax dollars.

A. So payroll?

Q. Yes, let's talk about payroll dollars?

MR. ALESSI: Objection as to form.

MICHAEL T. MANN

THE WITNESS: I don't recall running their payroll through our account.

Q. When you purchased Pro Data in '16, 2016, who was doing ACHs for you?

A. We were using Cachet Bank.

Q. So do both ACH'ing payroll dollars and payroll tax dollars?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes. I forget when PTM sort of stepped away, but -- because they're the same, I would say Cachet was doing the ACH for both, payroll and payroll taxes.

Q. And then you purchased Southwestern in April of 2017, does that sound correct?

A. Yes.

Q. Who did you purchase Southwestern payroll from?

A. Darin Alred and Ray Fowler.

Q. And what percentage of ownership in Southwestern did you purchase in April of '17?

A. 51 percent.

Q. Was the 51 percent purchased through a Cloud Payroll entity?

MICHAEL T. MANN

A. Yes.
Q. As one of the conditions of the purchase, 51 percent of Southwestern Payroll, was it clear that you were going to run tax through Pioneer Bank?
MR. ALESSI: Objection as to form.
THE WITNESS: And again, we didn't have an official condition, but it was discussing hey, if we buy this, we're going to move the tax over.
Q. And so let me try to get a little clearer on the record. Were there any discussions -- strike that.
When you were in the process of purchasing Southwestern Payroll, did you have any discussions about what was going to be done with the payroll tax dollars after the purchase?
MR. ALESSI: Objection as to form.
THE WITNESS: I mean, we just -- we told them we would ultimately use our tax account to house them.
Q. And when you said "we" told them, would you be referring to Darin Alred and Ray

MICHAEL T. MANN

Fowler?

A. Correct.

Q. And after you purchased Southwestern Payroll in April of 2017, did you begin running payroll tax dollars from the clients of Southwestern Payroll through Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: I recall it wasn't immediate, it took awhile, but we worked towards it.

Q. And ultimately, well before August of '19, all of the client payroll tax dollars of Southwestern client was running through Pioneer; is that right?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. When you -- after you purchased the majority interest in Southwestern Payroll, who provided ACH services for payroll tax dollars of Southwestern payroll's clients?

A. I think he was using Prosperity Bank. I don't remember. I know he -- when I say "he" Darin was not a big fan of Cachet Bank, so I'm pretty sure it was Prosperity

MICHAEL T. MANN

Bank.

Q. Prosperity Bank was who Southwestern was using for ACH'ing -- for ACHs of both payroll dollars and payroll tax dollars prior to purchase, is that your recollection?

A. Yes, that's my recollection.

Q. And do you have a recollection of Darin not wanting to use Cachet Bank for any ACH services?

A. Yes, and that's one of the reasons we were moving to Nat Pay for the tax side, so we could get away from Cachet Bank.

Q. Is the reason you used -- ultimately ended up using Nat Pay for ACH services, because Darin didn't want to use Cachet Bank?

A. Yes. We started to look into it and liked what Nat Pay offered. It was a good decision from a business perspective but, yes, Darin was the one that got us going down that path.

Q. Was the ultimate plan with respect to Southwestern Payroll to move to -- well, strike that.

Was there any plans to change what

MICHAEL T. MANN

Southwestern Payroll was doing with respect to payroll dollars and ACH'ing of payroll dollars?

A. Darin and I would have discussions at times about finding someone to house it, you know, even if we got away from Prosperity Bank.

We weren't -- I know Pioneer, running it through them as the ACH processor wasn't an option, so we, at times, would talk about other banks.

But there wasn't anything -- I don't recall ever trying to strong-arm Darin into, you know, letting it run through Cachet, I was fine keeping it at Prosperity unless we found a better corporate plan that would be good for all the entities, so...

Q. But ultimately, after you purchased Southwestern Payroll in April of '17, where were the client payroll tax dollars housed?

MR. ALESSI: Objection as to form.

THE WITNESS: Initially in Prosperity Bank, but ultimately -- I don't recall how long it took us before we -- and maybe it was 2018, I don't recall when we ultimately moved the tax dollars over I

MICHAEL T. MANN

just -- I don't recall.

Q. Was it well before the opening of account 2440?

MR. ALESSI: Objection as to form.

THE WITNESS: There is a chance that 2440 was the start of having that. I'm not a hundred percent sure. I just don't recall Southwestern ever going through 0212, but I could be wrong.

BY MR. JAYNE:

Q. Do you recall Darin complaining about the fact that payroll and payroll tax wasn't segregated in account 0212 and there being difficulties in reconciliations?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes. I recall, as we were going through and we had systems pulling stuff, there were too many -- and that's, again, back to the e-mail we talked about a little while ago, I wanted to separate tax into its own account and then keep the other payroll-related items in another account, so it was easier to reconcile.

MICHAEL T. MANN

BY MR. JAYNE:

Q. And are you comfortable that by the time that account -- strike that.

By the time account 2440 was opened, are all of Southwestern's payroll client payroll tax dollars being run through Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: I believe so, yes.

Q. Did I hand you Exhibit 36?

A. Yes.

Q. Tell us again what Exhibit 36 is?

A. So this is our request to open account 2440, which not only housed Southwestern Payroll tax dollars, but the other two service bureaus as well.

Q. So what was the then the sole reason for opening account 2440 at Pioneer Bank?

A. To be a tax account.

Q. For --

MR. ALESSI: Objection.

Q. For which bureaus?

MR. ALESSI: Objection as to form.

THE WITNESS: For Southwestern

MICHAEL T. MANN
Payroll, Pro Data Payroll, and MyPayrollHR, and we had a few other smaller payroll companies that were -- we were -- they were using our technology as well as we were doing their tax; I forget their names, but there were a few smaller ones as well.
BY MR. JAYNE:
Q. By February of 2019, where is your tax department located?
A. I would say it would be Clifton Park, New York. We had several people on the first floor. Although, we had a representative from each of the payroll service bureaus working with them. Hold that. We also hired someone out of Miami, and we were thinking we were in the process of wanting to move tax operations to Miami, so...
Q. Was that Marisa Maso?
A. Yes.
Q. So by February 2019, was Southwestern Payroll processing tax in-house at -- in Tulsa?
A. You said February 2019?
Q. Yes.

MICHAEL T. MANN

A. No, they were not.

Q. Was that being done by Ms. Maso in Miami?

A. Yes.

Q. When you opened account 2440, how did that process work?

MR. ALESSI: Objection as to form.

THE WITNESS: Sorry to ask, I need a little more clarification of what you mean by "that process."

Q. Good clarification. Did you talk with anybody at Pioneer Bank when you opened account 2440?

A. Yes. I don't recall the specifics, but it was no secret again we needed to have signatures and items like that. And as I worked with the people on a daily basis, I -- because to me it was very apparent, I don't recall specific conversations of who I was speaking to.

MR. ALESSI: Objection. Move to strike the answer as non-responsive.

Q. Would you have spoken with Dave Blessing about the fact that you were opening

MICHAEL T. MANN

an account solely for housing payroll tax dollars for all of your service bureaus?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes. I was sharing a lot on the payroll side with Dave Blessing and yes, I would bring it up and separate it out.

Q. And did you tell Dave Blessing that you were opening account 2440 for the sole purpose of housing payroll tax dollars for the clients of your payroll service bureaus?

MR. ALESSI: Objection as to form.

THE WITNESS: The one part -- and again, I'm not trying to answer this, I talked a lot with David, there was a time when he was not around and working, and I forget when that was, but because I was always open about the tax accounts, if he was working at the time, we definitely talked about it.

I also needed to work with several other people that we worked with on a daily basis and getting this set up and going. So I don't recall a specific conversation

MICHAEL T. MANN

about 2440.

I do recall being clear to the people we worked with at Pioneer that this is what we're doing with 2440.

BY MR. JAYNE:

Q. Would one of the people looking at Exhibit 36 been Deborah Salsburg?

A. Yes. And I can see earlier -- even though my e-mail is a little cryptic, we were collecting money from multiple locations, we wanted to make sure we keep them separate. It was not cryptic, it was poorly worded, but I was describing that I wanted to separate tax from the rest of the other payroll things.

Q. And would you have had telephone conversations with Ms. Salsburg where you were specific as to you why your opening account 2440?

MR. ALESSI: Objection as to form.

THE WITNESS: I did talk to her. I don't recall the specifics of the conversation I had with her.

Q. Are you comfortable saying that you told Pioneer Bank that you were opening 2440 to

MICHAEL T. MANN

house payroll tax dollars?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

MR. JAYNE: In looking at -- let me hand you now what we'll mark as 466.

(Whereupon, Plaintiff Exhibit 466, Mann E-mail Dated 2/26/19, Bates Stamped PB-SWP-00123022 to '035, 14-Pages was marked for identification.)

BY MR. JAYNE:

Q. Subject to you correcting me, Exhibit 466 is an e-mail where you returned the signed documentation to open account 2440.

Does that appear correct?

A. Yes.

Q. And go to Exhibit 466, to the Bates number 123026. The for profit commercial customer due diligence information sheet.

A. Yes.

Q. Do you see that?

All of these "no" boxes on section three, four, five, six, seven, eight, nine have -- are filled in with a black box. Do you see that?

MICHAEL T. MANN

A. Yes.

Q. Would you -- did you fill that in or would that have been filled in by Pioneer when it was e-mailed to you in Exhibit 36?

MR. ALESSI: Objection as to form.

THE WITNESS: It was filled in when I got it.

Q. Did anyone at Pioneer Bank go through the customer -- commercial customer due diligence form associated with the opening of account 2440 with you?

A. We didn't go through the form, but there was a conversation before what we were going to do, so I could just get the form filled out, that's my guess.

Q. And in the conversation you would have communicated the fact that 2440 was being opened to house payroll tax dollars?

MR. ALESSI: Objection as to form.

Q. Is that correct?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. And you see section three on the customer -- commercial customer due diligence

MICHAEL T. MANN

form?

A. Yes.

Q. And again, that has to do with the third-party -- whether Cloud Payroll is a third-party payroll or a third-party payment processor?

A. I see it.

Q. And you indicate in section one that Cloud Payroll is a payroll company; is that true?

A. Yes.

Q. Who is doing the ACHs for Cloud Payroll at this time?

A. For this account it would be Nat Pay.

Q. And Nat Pay was the entity that was actually moving payroll dollars; is that right?

MR. ALESSI: Objection as to form.

THE WITNESS: Payroll tax dollars.

Q. Good point. Who was the entity that was actually moving payroll tax dollars when you filled out the customer due diligence form associated with the account 2440?

MR. ALESSI: Objection as to form.

MICHAEL T. MANN

THE WITNESS: I don't recall if we started cleanly at 2440 with Nat Pay or if we got them involved with 0212 before we even -- I don't recall the exact break. However, I do know that it was very similar on the timing, and we needed to create some specific reports from Pioneer so we could run it through Nat Pay's -- through a system to help do reconciling and pulling bank statements -- I mean, reconciling the tax dollars.

But I don't know specifically when -- if Nat Pay started at 2440 or if they were before it, I can't recall.

BY MR. JAYNE:

Q. Well, let's see if we can do it this way: Was Southwestern Payroll actually moving any payroll tax dollars when you filled out the commercial customer due diligence form associated with account 2440?

A. Most likely no, because I remember them starting with 2440, and that would be Nat Pay.

Q. Well, Southwestern Payroll never

MICHAEL T. MANN

moved any of its own tax dollars, correct?

MR. ALESSI: Objection as to form.

THE WITNESS: Correct.

Q. Yeah. So before Nat Pay, Prosperity Bank was actually the ACH provider for Southwestern, is that your recollection?

A. Yes.

Q. So when you filled out the commercial customer due diligence form associated with account 2440, was Southwestern Payroll physically moving any payroll tax dollars?

A. No.

Q. We already talked about section three on the commercial customer due diligence form about the third-party payment processor. Do you think Southwestern Payroll or Pro Data or MyPayrollHR service bureau are third-party payment processors?

MR. ALESSI: Objection as to form.

THE WITNESS: No.

Q. As defined on this form?

MR. ALESSI: Objection as to form.

THE WITNESS: No.

MICHAEL T. MANN

Q. Same question as to money service business on section eight; do you think that MyPayrollHR, Cloud Payroll, Southwestern Payroll, or Pro Data are money service businesses as defined on the form?

MR. ALESSI: Objection as to form.

THE WITNESS: No.

Q. I left one entity out. Since the account was opened in the name of Cloud Payroll, do you think Cloud Payroll was a third-party payment processor as defined on the customer due diligence form?

MR. ALESSI: Objection as to form.

THE WITNESS: No.

Q. Did anybody at Pioneer Bank ever talk to you about whether or not you correctly filled out the customer -- commercial customer due diligence form associated with any account that you opened?

MR. ALESSI: Objection as to form.

THE WITNESS: I don't recall anyone bringing up the form.

MR. JAYNE: Let me hand you what we'll mark as Exhibit 29.

MICHAEL T. MANN

(Whereupon, Plaintiff Exhibit 29, Cloud Payroll Account 2440 Statement Dated 5/31/19, Bates Stamped PB-SWP-00032897 to '051, 155-Pages was marked for identification.)

BY MR. JAYNE:

Q. Tell us if you would what Exhibit 29 is?

A. It is our -- statement date from May 31st to June 2nd, but it's a statement for account ending 2440.

Q. For what month?

A. May.

Q. Of 2019?

A. Yes, May of 2019.

Q. What was the sole source of funds being deposited into account 2440 in May of '19?

A. Should have been predominantly tax funds.

Q. And how were the funds described?

MR. ALESSI: Objection as to form.

Q. In the statement?

MR. ALESSI: Objection as to form.

MICHAEL T. MANN

THE WITNESS: It says, CLOUDPAYROLL/TAX COL.

Q. And what is "COL" stand for?

A. Collection.

MR. ALESSI: Objection as to form. Just give me a little time, Mr. Mann. Thank you.

THE WITNESS: Sorry.

Q. And then what did the transactions say when the payroll tax funds -- go to page 32906, at the bottom.

A. I am there.

Q. Okay. Go down to where you see there are transactions that say "Nat Pay tax DEP"?

A. I see them.

Q. What are those?

MR. ALESSI: Objection as to form.

THE WITNESS: Those are payments that go to Nat Pay to make tax payments.

Q. So that's the money going out of the account?

A. Yes.

Q. And where does that money go when it

MICHAEL T. MANN

says not pay tax DEP, where does the money ultimately end up?

MR. ALESSI: Objection as to form.

THE WITNESS: To the different taxing authorities that are owed the money.

Q. Did you in any way try to be confusing, or mysterious, or misleading what was going on -- why 2440 was opened and what was going on in that account?

MR. ALESSI: Objection as to form.

THE WITNESS: No.

Q. Did Dave Blessing absolutely know that account 2440 was holding payroll tax dollars of the clients of Southwestern Payroll, Pro Data, and MyPayrollHR?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes, he knew.

Q. Is that because you told him?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

MR. JAYNE: Let's jump real quick to what we'll mark as Exhibit 35.

(Whereupon, Plaintiff Exhibit 35, Salsburg E-mail Dated 1/16/19, Bates

MICHAEL T. MANN

Stamped NP0093542 to '555, 14-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. I'm sorry, it was previously marked as Exhibit 35.

If you jump to the e-mail chain on page two of the exhibit, which is NP 0093543 Bates stamp?

A. I'm there.

Q. Okay. What's going on or what is Exhibit 35?

A. So it's the beginning of a request where Matt Schilling wanted to set up another account for a special circumstance that we could track.

Q. What was the special circumstance?

A. It was set up an account where people could wire us in money, especially, if they have poor credit or we're getting a lot of NSFs or non-sufficient funds from them, so it would just be a special account to pre-fund it with wires from clients.

Q. Did it have anything to do with payroll?

MICHAEL T. MANN

A. Yes. Because in this case if there was a payroll NSF, it would come back on us even if we ran the payroll through Cachet as they're not reliable, they'll come back to us asking us to pay the payroll.

So we were encouraged to, you know, track clients that would have an NSF or two, and give them an option of either leaving or you're going to have to pre-fund it with a wire.

Q. So would it be fair to characterize the account that you were asking Pioneer to open as an account for wiring funds associated with pre funded payrolls?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. And just so the record is clear, what was the purpose of the account that you were asking be opened as referenced on Exhibit 35, what was the purpose for that account?

A. For this account 2336?

Q. Correct.

A. It was to pre-fund payrolls to

MICHAEL T. MANN

reduce potential non-sufficient fund activities from clients.

Q. So account 0212 historically held payroll tax dollars and also payroll dollars; is that true?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. And then why was account 2440 opened?

A. To move all tax funds to go through 2440.

Q. And what type of tax funds?

MR. ALESSI: Objection as to form.

THE WITNESS: Payroll tax funds.

Q. And then account 2366, why was it opened?

A. To pre-fund payroll for certain clients to avoid non-sufficient fund issues.

Q. So how many accounts at Pioneer Bank have we now talked about that were opened to deal with payroll and payroll taxes?

MR. ALESSI: Objection as to form.

THE WITNESS: Three.

Q. And did Dave Blessing know what you

MICHAEL T. MANN

were doing when you opened account 2336?

MR. ALESSI: Objection as to form.

THE WITNESS: This is one that I may not have talked about. It was a small account. It was addressing an issue, so I may or may not have talked to David about this one.

Q. Your e-mail that you forwarded to Deborah Salsburg in order to open the account, if she would have read it, the full thing, it clearly indicates that the reason the account is being opened is for wires associated with pre-funded payrolls?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes, and that's the reason why I sent it that way, intentionally done that way.

Q. So when you opened account 2366, did you communicate to Pioneer Bank why that account was being opened?

MR. ALESSI: Objection as to form.

THE WITNESS: Again, it might have been because 2366 relative to the other two accounts were very small I -- I -- you

MICHAEL T. MANN

know, I don't recall my conversations about that account.

BY MR. JAYNE:

Q. By forwarding the e-mail that Matt Schilling sent you to Ms. Salsburg, with the request to open the account were you doing that for the reason to indicate why the account being opened?

A. Yes. My goal was to provide context without writing it, so I forwarded the e-mail by saying we need to open an account to do this.

MR. JAYNE: Let me hand you what we'll mark as 467.

(Whereupon, Plaintiff Exhibit 467, MyPayrollHR Account 0428 Statement Dated 9/28/18, Bates Stamped PB-SWP-00231578 to '782, 205-Pages was marked for identification.)

BY MR. JAYNE:

Q. What is Exhibit 467, sir?

MR. ALESSI: I'm going to object to the form of the question.

Q. Do you recognize Exhibit 467?

MICHAEL T. MANN

A. I have -- I think I know what it is.
Q. What -- what is it?
A. I believe, I'm not a hundred percent sure, but we had, for some clients, we had the ability to basically write their checks to their employees for them.
It was services other payroll service bureaus offered, so people that wanted to just draft their money and have us actually send the checks to the people, my belief is that -- I know we offered that service. I didn't, you know, I wasn't familiar with the account, but that is what I believe this account is for.
Q. Let's back it up and make it even more simple for you. Looking at Exhibit 467 without a complete explanation of the purpose for the account, what is the document?
A. The document is a bank statement.
Q. For what month?
A. September 2018.
Q. What account?
A. 178000428.
Q. And if you look at the back, you see

MICHAEL T. MANN

-- do you see all of these different checks written off this account?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. What do you believe -- oh, and who is the account in the name of?

A. Well, on the checks it says -- and on the statement too, MyPayrollHR.com.

Q. And what do you believe MyPayrollHR was doing with account ending in 0428?

A. Looking at the checks, this is the account where we were letting companies let us pay with our checks, and we would pull the payroll funds to make the payments.

Q. And now, how much different accounts have we talked about at Pioneer Bank where payroll or payroll tax was being run through an account?

MR. ALESSI: Objection as to form.

THE WITNESS: Four.

Q. And did Dave Blessing understand what was going on in account 0428?

MR. ALESSI: Objection as to form.

THE WITNESS: Like the last account,

MICHAEL T. MANN

because this is so small relative to the other two, I'm not sure if we talked much about this.

Q. Based on your discussions with Dave Blessing and everyone else at Pioneer Bank, did you think you were doing anything wrong with regard to the account activity in 0428?

MR. ALESSI: Objection as to form.

THE WITNESS: No.

Q. Were you ever told anything by Dave Blessing or anyone at Pioneer Bank that they had a policy against doing what you were doing in account ending in 0428?

MR. ALESSI: Objection as to form.

THE WITNESS: No.

MR. JAYNE: Why don't we take a little break?

(Whereupon, a discussion was held off the record.)

VIDEOGRAPHER: This will conclude video number two in the deposition of Michael T. Mann. We are off the record at 1:11 p.m., August 3rd, 2021.

(Whereupon, proceedings recessed for

MICHAEL T. MANN

a lunch break and once again resumed.)

VIDEOGRAPHER: This is the beginning of video number three in the deposition of Michael T. Mann. We are on the record at 2:18 p.m., August 3rd, 2021.

BY MR. JAYNE:

Q. Sir, we're back on the record. Did anyone at Pioneer Bank ever tell you that you needed to check a box on the customer due diligence form to denote that account or that the funds in account 0212 or 2440 were trust funds?

MR. ALESSI: Objection as to form.

THE WITNESS: No one mentioned that.

Q. Did anyone at Pioneer Bank ever tell you that you needed to do anything on the customer due diligence form to indicate that the payroll tax funds were some type of special funds?

MR. ALESSI: Objection as to form.

THE WITNESS: No, no one told me that.

Q. Do you recall interacting with Christina Batchelder at Pioneer Bank?

MICHAEL T. MANN

A. Yes.

Q. We've looked at lots of e-mails or we've seen e-mails in this case between you and Ms. Batchelder. Would you also call her on the phone with questions?

MR. ALESSI: Objection as to form of the question.

THE WITNESS: Yes.

Q. Would you call Ms. Batchelder with questions about your accounts at Pioneer Bank on a regular basis?

A. Yes.

Q. If we saw -- if we see a lot of e-mails between you and Ms. Batchelder, would you have had more telephone conversations with her as opposed to e-mail communications?

A. It was probably similar to each.

Q. Darin Alred had said you're a big phone guy, that you talk on the phone a lot?

MR. ALESSI: Objection as to form.

Q. As opposed to being an e-mailer. Is he fairly characterizing you?

MR. ALESSI: Objection as to form.

THE WITNESS: I think it's -- I was

MICHAEL T. MANN

probably doing both, I'm on the phone and doing e-mails. But I -- I was on the phone all the time, but I was doing e-mails all the time, so I think I did them both a lot.

Q. Would it be fair to say you had a lot of calls with Christina Batchelder regarding your accounts at Pioneer?

A. Yeah, I had a lot of calls with her on the accounts; calls and e-mails, yep.

MR. JAYNE: Okay. Let's talk about a few of the e-mails. I'm going to hand you what's been previously marked as Exhibit 280.

(Whereupon, Plaintiff Exhibit 280, Batchelder E-mail Dated 9/4/14, Bates Stamped PB-SWP-00097119 to '120, 6-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. If you look at 280, the first e-mail on the string is from Amy Patentreger to Sandra Dedrick and Christine Batchelder on September 4th of; 14; is that right?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

MICHAEL T. MANN

Q. And then at the top of the e-mail it looks like Christine Batchelder is sending on e-mail to you on September 4th of '14; is that right?

A. That is right.

Q. Explain to us what's going on in this e-mail chain?

MR. ALESSI: Objection as to form.

THE WITNESS: So we had a client that basically had non-sufficient -- you know, they bounced their payroll. We a lot of times when they are new, we will run it again and try to get it to go through.

Amy was concerned she wanted to verify that we did have a deposit and it was good on the previous day I think.

BY MR. JAYNE:

Q. And then Ms. Batchelder responded to you; is that right?

A. That's correct.

Q. And the MyPayrollHR.com account that would have been account 0212?

A. Most likely, yes.

Q. And Ms. Patentreger, how do you

MICHAEL T. MANN

pronounce that name?
A. Patentreger. We used to call her "Amy P. "
Q. Amy P. You recall her being an employee of MyPayrollHR?
A. Yes.
Q. She's e-mailing Ms. Dedrick and Ms. Batchelder about issues with payroll account?
MR. ALESSI: Objection as to form.
THE WITNESS: She is.
Q. Did you have frequent conversations with Ms. Batchelder about account 0212?
A. Yes.
Q. Did you also have frequent conversations with Ms. Batchelder regarding account 2440?
A. Yes.
Q. Did you also tell Ms. Batchelder on numerous occasions that account 0212 housed payroll taxes?
MR. ALESSI: Objection as to form.
THE WITNESS: I would be less on saying it. I think as you can see in this

MICHAEL T. MANN

e-mail here, I wouldn't have to say that, most of the questions would be hey, did this taxing authority get paid or hey, you know, what's this? I didn't frame it up in that way, but I had a lot of tax discussions, payroll tax discussions with Ms. Batchelder.

BY MR. JAYNE:

Q. And the payroll tax account, are there a lot of issues with that account in terms of things that have to be corrected or fixed in terms of payroll?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes. And I mean that from a -- I think it's common from all service bureaus to have those issues. But, yeah, it takes a lot of work and a lot of coordination to keep everything reconciled and accurate.

Q. I didn't maybe it to be pejorative in any way, but in your experience all service bureaus have issues with the payroll tax account that have to be addressed with their bank; is that fair?

MICHAEL T. MANN

MR. ALESSI: Objection as to form.

THE WITNESS: That's correct.

Q. It happens on almost a daily basis, doesn't it?

MR. ALESSI: Objection as to form.

THE WITNESS: Pretty close.

MR. JAYNE: Let's look at some more of these e-mails. Exhibit 283 we previously marked as 283.

(Whereupon, Plaintiff Exhibit 283, Mann E-mail Dated 1/27/15, Bates Stamped PB-SWP-00100901, 1-Page was previously marked for identification.

BY MR. JAYNE:

Q. 283 is an e-mail from Mike McAuliffe to you, Amy P, and Katrina Thompson dated January 27, 2015; is that right?

A. That is correct.

Q. Who is Mike McAuliffe?

A. Mike McAuliffe was an operations manager for us that helped manage several people and oversee payroll.

Q. And what -- what's going on, on January 27th at 2015?

MICHAEL T. MANN

MR. ALESSI: Objection as to form.

THE WITNESS: So we had a client that owed us two pay periods of payroll taxes. He was just checking, most likely, to see if we got it before he followed up with them.

Q. What account would you need to check to see if you got it?

A. 0212.

Q. What did you do when you got the e-mail?

A. I forwarded it to Christine, and I copied Sandra to see, you know, if they have seen anything.

Q. What would Ms. Batchelder have had to do in order to determine whether these payroll tax funds had come into account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: I guess if I could not see it on the account sometimes it goes to the wire department first. I was probably checking to see if there were wires, you know, that hadn't been processed yet. So I was checking on this as it relates to this

MICHAEL T. MANN

account.

Q. Okay. So you were looking to see whether the money had come from some wire account, into some wire account?

A. No. I think they only had our 0212 account. It's just the way it would work -- when a wire is sent, it doesn't always -- it didn't necessarily hit your account immediately. Sometimes it goes through a wire department, they process it and there is a delay on showing up in your account.

So I was -- I would call and say hey, could you check with the wire. You know, where I was going, could you check with the wire department if this is in, so I could let Michael know to reach back out to the client and say hey, when are you going to send it?

Q. And you forward the e-mail from Mike McAuliffe that specifically says that the issue has to do with payroll taxes; is that right?

A. Yes.

Q. And this e-mail 283, you would have e-mailed with Ms. Batchelder on issues like this, but sometimes you would call her on the

MICHAEL T. MANN

phone with questions similar; is that correct?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes. Or if there is no response from her, she may have picked up the phone and called me and said, I just checked we don't have it, right. So it could be mix and matches of e-mails and phone calls.

Q. But do you specifically recall numerous phone calls with Ms. Batchelder where there were issues with the payroll tax account?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah, I would talk to her almost every day, sometimes multiple times a day. I would talk to her about the tax account.

Q. Did you consider Ms. Batchelder kind of your go-to contact for issues with the payroll tax account?

MR. ALESSI: Objection as to form.

THE WITNESS: She was my go-to contact for pretty much all the accounts. It's just payroll would take more care and need, you know -- there is a lot more

MICHAEL T. MANN

involved with the payroll than the other accounts, but she was kind of my go-to person on most questions.

Q. How did that happen? Was she assigned to you or did that just happen over a period of time because she was the most responsive, how did that happen?

A. I can't recall. She wasn't assigned to me. I had spoken to several people at different times; she was part of a department that handled things, so I think it happened over time. But I talked to several of the people in the department, I would call Christine first, you know, and if she wasn't available, I would call one of the other, someone else I knew, so...

MR. JAYNE: Let me hand you what we previously marked as Exhibit 9.

(Whereupon, Plaintiff Exhibit 9, Batchelder E-mail Dated 4/4/16, 3-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. Tell us about Exhibit 9?

A. So one of our common challenges with

MICHAEL T. MANN

the tax account is we would send a payment, sometimes a check like this e-mail, sometimes an electronic payment. And if our client receives something saying pay it or there is an issue, they would come to us.

And then I think I had access for two or three months back. But if it was for a longer period of time, I would have to reach out to get a copy of the cleared check. And whenever that would happen, I would reach out and ask for a copy of a cleared check.

Q. Is the reason you are asking for a copy of the cleared check is the taxing authority would say they don't have it, but you wanted to show them that it's already been paid?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. When you would call Christine Batchelder, did you refer to the tax account as the tax account, or did you refer to it as account 0212 or 2440? How would you have referred to the account?

MR. ALESSI: Objection as to form.

MICHAEL T. MANN

THE WITNESS: I'm not really sure. I there were certain requests that were tax related so if I -- as you can even see in this e-mail I called it 212, so I probably used the numbers if I needed her to look at a specific account, just to make it easy. But I don't recall specifically if I had an exact name other than I would see in the e-mail I mentioned 212.

BY MR. JAYNE:

Q. You talked to Ms. Batchelder so frequently would you ever, you know, introduce the conversation by hey, I've got another issue with the tax account, could you help me out, something like that?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah. And I -- again, because it's part of the business, I didn't view it as an issue, so I would, you know, I'm not sure how I addressed it, but...

MR. JAYNE: Let's look at Exhibit 11, which we previously admitted.

(Whereupon, Plaintiff Exhibit 11, Mann E-mail Dated 3/8/17, Bates Stamped

MICHAEL T. MANN

PB-SWP-00106850 to '853, 4-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. Exhibit 11 is an e-mail from you to Ms. Batchelder Dated March 8, 2017 at 10:59 a.m.; is that right? At the top of it.

A. I have March 8th at 4 p.m. Do I have the right --

Q. Oh, I have the wrong version of it. You're correct.

Exhibit 11 is an e-mail from -- string, and it ends with an e-mail from you to Ms. Batchelder on March 8th of '17; is that right?

MR. ALESSI: Excuse me, Mr. Jayne, given the confusion here, I just want to make sure I have the right one you have. Can you tell me what Bates is the first number?

MR. JAYNE: I'm using his; I've got a different version, but I will refer to his. His Bates is 106850 through 106853.

MR. ALESSI: Thank you.

BY MR. JAYNE:

MICHAEL T. MANN

Q. So Exhibit 11 ends with an e-mail from you to Ms. Batchelder dated March 8th of '17. Does that appear correct?

A. That's correct.

Q. And in the e-mail you say to Ms. Batchelder, "Christine, our tax person for our payroll company had to go into the hospital yesterday. We have been told that we need to make an IRS tax payment for National Business Equipment. The money will come out of account ending 0212. I was told the info you need to make the payment is as follows."

Did I read that correctly?

A. Yes.

Q. Would Ms. Batchelder actually make payments out of the 0212 account for MyPayrollHR?

MR. ALESSI: Objection as to form.

THE WITNESS: This is -- this is a rare situation. Normally, no. But in this case I don't know why, but I needed her assistance on this one. But typically she wouldn't make payments for us, but in this case she did or attempted to.

MICHAEL T. MANN

Q. In this case you were actually asking Ms. Batchelder to make a payroll tax payment to the IRS out of account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Is that right?

A. Yes.

Q. And just to put it another way, what were you asking Ms. Batchelder, if anything, in this e-mail dated March 8th of 17?

A. Basically asking her to -- there is a certain way to make wires to the IRS, and so I was putting it in a form that was not typical of our typical wire form. So I was just asking her to help facilitate this payment to the IRS for National Business Equipment, one of our clients for a tax payment.

Q. Why were you asking Ms. Batchelder to do this?

A. There was some issue, I don't know what the issue was specifically for this account, but obviously we needed to get payment into the IRS, so it wouldn't be late.

Q. What does the e-mail say is the

MICHAEL T. MANN

reason why you are asking her to do it?

A. Oh, read down below.

Q. Look at the first sentence of the e-mail?

MR. ALESSI: Objection as to form.

THE WITNESS: Our --

Q. Let me rephrase it.

Based on the e-mail, why are you asking Ms. Batchelder or why were you asking Ms. Batchelder to make an IRS tax payment out of account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: Because our tax person was in the hospital.

MR. JAYNE: Let's move on to exhibit -- what we marked as 301.

(Whereupon, Plaintiff Exhibit 301, Mann E-mail Dated 8/25/17, PB-SWP-00103667 to '668, 2-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. What is going on in the e-mail chain dated August 25, 2017, which is marked as Exhibit 301?

MICHAEL T. MANN

A. So I asked Christine to stop a payment coming out of the 0212 account it looks like going to North Dakota Unemployment Insurance Tax Payment. So I asked her if I could do a stop payment, basically.

Q. And is North Dakota uninsurance tax payment, would that qualify as payroll tax?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. And again, that payment was coming out of account 0212?

A. That's correct.

Q. And you are asking Ms. Batchelder with assistance of stopping payment of the payroll tax coming out of 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: That is correct.

Q. And these type of issues relating to the payroll tax department in the e-mails that we looked at so far, would you ever had circumstances where you had similar issues, but instead of sending an e-mail, you would call Ms. Batchelder to try to resolve those issues?

MR. ALESSI: Objection as to form.

MICHAEL T. MANN

THE WITNESS: Yeah, I could call.

Q. And that happened on a frequent basis?

A. Yes.

MR. JAYNE: Let's look at Exhibit 303.

(Whereupon, Plaintiff Exhibit 303, Batchelder E-mail Dated 9/27/17, Bates Stamped PB-SWP-00103278 to '279, 2-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. Exhibit 303 at the bottom starts with an e-mail from you to Ms. Batchelder September 27, 2017. What's going on in this e-mail?

A. Yeah, I, again similar to another item we needed to do same-day wire payments that could be something go out of the account for some issue, I wanted to get it to the IRS. So I asked for her assistance on, is there a way to do the same-day wire payments to the IRS and she sent me back, it looks like a link, to do it.

Q. When I was with the payroll

MICHAEL T. MANN

industry, the same-day wire payments usually occurred when there had been a mistake on the payroll and you are running into your three-day deadline and you've got to get the money right then, or there will ultimately be penalties and interest assessed for late payment.

Does that sound familiar from your experience in the payroll industry?

MR. ALESSI: Objection as to form.

THE WITNESS: That is correct.

Q. And when you are -- typically when you are asking -- when you ask Ms. Batchelder to make same-day IRS wire payments, is something like that going on where you need to have that payment made that day?

MR. ALESSI: Objection as to form.

THE WITNESS: That is correct.

Q. And do you recall frequent calls and e-mails to Ms. Batchelder where you would ask her to make same-day wire payroll tax payments?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah, that would happen periodically. I don't think compared to looking for cleared checks and

MICHAEL T. MANN

others I think were much more significant than same-day wire payments. But from time-to-time I would do that and there is a good chance we figured out how to do it later on without needing her help at some point, but I don't recall. We had a tax person and other people that were able to do a lot of the work.

MR. JAYNE: Let me hand you what's marked as 308.

(Whereupon, Plaintiff Exhibit 308, Mann E-mail Dated 9/27/17, Bates Stamped PB-SWP-00103259 to '271, 13-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. What is Exhibit 308?

A. So this is a wire to -- it's a wire of a tax payment coming out of our 212 account.

Q. And in Exhibit 308, are you asking Ms. Batchelder to make a wire payment to the IRS?

MR. ALESSI: Objection as to form.

THE WITNESS: Whether -- I mean, I'm asking her to wire it. Our process of

MICHAEL T. MANN

doing wires were basically to fill out this form. I sign it, I send it to Christine, or if she's not there, someone else in her department, and then they would process the wire and send me, you know, wire confirmation number or whatever. So that was the process typically for wires.

Q. And while -- when you were running the payroll companies, did you aspire not have to be doing a whole lot of same-day wires to the taxing authorities?

A. Yes, we try to avoid those.

Q. But mistakes in payroll happen all the time; is that fair?

A. That is fair.

Q. And typically, the same-day wires are result in something that's gone wrong in the payroll process and you have to make sure that the money gets to the IRS on time to avoid penalties and interest; is that fair?

MR. ALESSI: Objection as to form.

THE WITNESS: That is fair.

Q. And when you are at -- when you ask Ms. Batchelder to process these wires -- oh,

MICHAEL T. MANN

first of all, what account would the wire to the IRS have come out of?
A. Account ending in 212.
Q. And it says the title of the account receiving the funds is what?
A. MyPayrollHR.
Q. Oh, look down at the title of the account receiving the funds?
A. Oh, US Treasury single tax assist.
Q. Is it taxes or tax?
A. Tax.
MR. ALESSI: I'm going to object to the question and object to the answer and move to strike; that's not what the document says.
Q. Okay. Let's go back to the document. Where is -- what's the title of the account receiving the funds on this wire?
A. US TREAS single TX.
Q. Who is that?
A. It appears to be the US Treasury.
Q. Would that be the same as the IRS?
MR. ALESSI: Objection as to form.
THE WITNESS: Most likely.

MICHAEL T. MANN

Q. And then other pertinent information not included, what is that information?

A. That information is someone from our tax department put that on it. It highlights probably our client, their tax year, the month for the payment, just so there is information that can identify what this payment is for so they can properly allocate it when they receive the wire.

Q. When you say "they," who are you talking about?

A. The US Treasury, the IRS.

Q. So when you are sending these requests to Ms. Batchelder for same-day wiring of IRS payments and Pioneer Bank is doing that out of account 0212, they're essentially making tax payments, Pioneer Bank is making the payments, correct?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes. They're processing the wire for me, yes.

Q. So when you're asking -- when you asked Pioneer Bank to handle same-day wiring of IRS or to IRS to the IRS, whose processing the

MICHAEL T. MANN

tax payments out of account 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: Pioneer Bank.

MR. JAYNE: Let's go to Exhibit 320 previously marked.

(Whereupon, Plaintiff Exhibit 320, Batchelder E-mail Dated 10/19/18, Bates Stamped PB-SWP-00316512 to '513, 2-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. Tell us what's going on in the e-mail chain marked as Exhibit 320?

A. So Marisa is our tax lead and Matt Schilling worked in our payroll finance department wanted to make sure that we didn't have a debit block for Colorado basic payment.

So I was reaching out to Christine just to make sure there wasn't a block on it, because we had a planned transaction.

Q. What type of funds would Colorado try to pull from the account?

MR. ALESSI: Objection as to form.

THE WITNESS: This is probably a local tax, since it identifies as Denver,

MICHAEL T. MANN

Colorado payroll tax, payroll tax.

Q. So the payroll tax you've got the IRS payments and then you've got your statement and some local taxing authorities require local tax, is that your recollection?

MR. ALESSI: Objection as to form.

THE WITNESS: That is correct.

MR. JAYNE: Let me hand you what's been previously marked as Exhibit 321.

(Whereupon, Plaintiff Exhibit 321, Batchelder E-mail Dated 12/3/18, Bates Stamped PB-SWP-00318903 to '905, 3-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. Tell us about the e-mail chain at Exhibit 321?

A. So PTM showed us paying a check, paying a payment twice, so our tax department asked me to check with the bank to see, you know, did the check go out, there were two. And so I asked Christine if she would give me a copy of it and look into it, and she only saw the one.

Q. What account are you -- did you ask

MICHAEL T. MANN

Ms. Batchelder to look into?
A. Account ending in 212.
Q. And the check that -- did Ms. Batchelder ever give you a copy of the check?
A. Yes.
Q. Who is the check made out to?
A. To Mississippi State Tax Commissioner.
Q. And then explain to us, if you would, what is the information in the memo line of that check?
MR. ALESSI: Objection as to form.
THE WITNESS: The information in the memo gives the client ID and their EIN number again so they can properly allocate this payment to the right client.
BY MR. JAYNE:
Q. Is the check attached to Exhibit 321 a payroll tax payment to the Mississippi State Tax Commissioner?
MR. ALESSI: Objection as to form.
THE WITNESS: Yes.
Q. What is, and I'm going to rephrase

MICHAEL T. MANN

it differently, what is the check that's attached to Exhibit 321?

MR. ALESSI: Objection as to form.

THE WITNESS: It is a payroll tax account to Mississippi.

MR. JAYNE: Real quick, Exhibit 322.

(Whereupon, Plaintiff Exhibit 322, Batchelder E-mail Dated 12/19/18, Bates Stamped PB-SWP-00319825 to '832, 8-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. Explain to the ladies and gentlemen of the jury what's going on in the e-mail chain at Exhibit 322, please?

A. So I was requesting several cancelled checks from Christine to get front-and-back copies to prove that we made the payroll tax payment.

Q. Tell us about what is attached to the e-mail Exhibit 322?

MR. ALESSI: Objection as to form.

THE WITNESS: To Christine responded back with the front and back of all the -- I assume all of them are in here of all the

MICHAEL T. MANN

checks I requested so we could contact the payroll tax agencies and make sure we get credit for making the payment.

Q. Who were the checks made payable to?

A. So all of these look to be Salem City, so it looks like a local payroll tax for Salem, Ohio. Ohio has a lot of local taxes in their payroll.

Q. Look at the last check attached to the e-mail of Exhibit 322?

A. Here is the last one is a check to the Oklahoma Employment Security Commission. So this appears to be an Oklahoma State Unemployment payment, which is part of the things you collect with the payroll taxes and pay to the proper authorities.

Q. Are all the checks attached to Exhibit 322 payroll tax payments?

MR. ALESSI: Objection as to form of the question.

THE WITNESS: That is correct, yes, they are.

Q. Do you recall literally hundreds of occasions where you were communicating with

MICHAEL T. MANN

Pioneer Bank to get copies of cancelled payroll tax checks?

MR. ALESSI: Objection to form.

THE WITNESS: Yes.

Q. Did you ever contact anybody other than Christine Batchelder with issues regarding account 0212 or 2440?

A. Yes. I mean, Christine one, wasn't always there, sometimes she was in meetings. They had -- I don't know what her department was called, but they had several people that could help.

So if she -- sometimes I'd e-mail with her and someone else would monitor the e-mail and respond back. I would call other people. So it wasn't just Christine, it was just Christine was the person I communicated with the most.

Q. Do you remember talking to a woman named Marcia Leggett?

A. Yes.

(Whereupon, Plaintiff Exhibit 25, Leggett E-mail Dated 2/25/19, Bates Stamped NP0093414 to '420, 7-Pages was previously

MICHAEL T. MANN

marked for identification.)

BY MR. JAYNE:

Q. Let me hand you what we previously marked as Exhibit 25. Tell us what Exhibit 25 is, please?

A. Again, very similar to the last couple of e-mails, front-and-back copies of payroll checks that we've sent.

Q. And look at the checks attached to the e-mail at Exhibit 25, who are they made payable to?

A. All of them were made payable to the regional income tax agency in -- I think it's Brecksville, Ohio, which looks like, again, another local payroll tax.

MR. ALESSI: Objection as to form. I'm going to object to the last part of the answer, move to strike it as non-responsive and the parts specifically beginning "which looks like again."

Q. What do the checks look like to you that are attached to the e-mail Exhibit 25?

MR. ALESSI: Objection to the form of the question.

MICHAEL T. MANN

THE WITNESS: Local payroll tax.

Q. Do you specifically recall other occasions other than the e-mail at Exhibit 25 when you would reach out to Marcia Leggett or someone other than Christina Batchelder for assistance with the payroll tax accounts at Pioneer Bank?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yes. And you see here my original e-mail went to a general commercial services department, and Marcia responded, so that was an e-mail I could send to anyone that was available.

So sometimes I would e-mail it to the group, especially if I knew Christine wasn't around.

MR. JAYNE: Let me show you what previously marked as Exhibit 26.

(Whereupon, Plaintiff Exhibit 26, Mann E-mail Dated 7/9/19, Bates Stamped PB-SWP-00117971 to '974, 4-Pages was previously marked for identification.)

BY MR. JAYNE:

MICHAEL T. MANN

Q. Would you also occasionally deal with Randy Benedict at Pioneer Bank regarding the 0212 payroll tax account?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yes.

Q. Tell us what's going on in Exhibit 26 in that e-mail chain?

A. So it appears we were trying to find an incoming ACH payment, and I asked Randy if he saw it there, because we couldn't find it.

Q. What account are you asking him to look in?

A. Account ending in 2440.

Q. What was going on in account 2440, what was it used for?

A. That was used for payroll tax funds for our clients.

Q. If you will, read to the ladies and gentlemen of the jury how Randy Benedict responds to your request on July 9, 2019, at 3:57 p.m.?

A. He says, "We do not see that ACH coming into the 2440. Other ACH transactions

MICHAEL T. MANN

have been processed, but they are normal tax collection ACHs. Perhaps the ACH had an effective date of 7/10/2019. The trace number is not on our list of ACH coming in. Let's watch the account in the morning, I have a feeling it will hit then."

Q. Would you agree with Mr. Benedict that the normal activity in account 2440 was payroll tax transactions?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yes.

Q. During -- so you were processing payroll taxes at Pioneer Bank beginning in December of 2013 all the way to August 30th of '19; is that right?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: That is correct.

Q. Okay. Let's back it up, just to have a clear record --

(Whereupon, there was a brief discussion held off the record.)

BY MR. JAYNE:

MICHAEL T. MANN

Q. Did you -- did MyPayrollHR ever process payroll taxes through accounts at Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. What account numbers?

MR. ALESSI: Same objection.

THE WITNESS: Account ending in 0212 and account ending in 2440.

Q. When did you -- when did MyPayrollHR start processing payroll tax through account number 0212?

MR. ALESSI: Objection as to form.

THE WITNESS: December 2013.

Q. And did it occur in that account all the way up until the point you opened account 2440?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. And after you opened account 2440, were payroll taxes for Southwestern Payroll, Pro Data, and MyPayrollHR, were payroll taxes processed through account 2440?

MR. ALESSI: Objection as to form.

MICHAEL T. MANN

THE WITNESS: Yes.

Q. All the way up to August 30th of 2019?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. So from December 30th to August -- or excuse me, from December of 2019 all the way to August 30th of 2019, you were processing payroll taxes in accounts at Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: From December 2013 to August of 2019 I was processing tax payments at Pioneer Bank.

MR. ALESSI: Move to strike the answer as not responsive to the question.

Q. For what period of time were you processing payroll taxes through accounts at Pioneer Bank?

MR. ALESSI: Objection as to form.

THE WITNESS: From December 2013 through August 2019.

Q. During that entire -- how many years is that?

A. Almost six.

MICHAEL T. MANN

Q. In the almost six years where -- when you were processing payroll taxes through accounts at Pioneer Bank would there be nearly daily issues with those accounts which would require you to deal with personnel at Pioneer?

MR. ALESSI: Objection as to form.

THE WITNESS: A good chance it's almost daily, yes.

(Whereupon, Plaintiff Exhibit 468, Commercial Account Cover Sheet, Bates Stamped PB-SWP-00000505 to '546, 42-Pages was marked for identification.)

BY MR. JAYNE:

Q. 468 looks like an account opening for an account -- strike that.

Let's start over. Exhibit 468 appears to be the account opening information for account in the name of Southwestern Payroll Services Inc, does that look correct?

MR. ALESSI: Objection as to the form of the question.

THE WITNESS: Yes.

Q. What is -- and let me ask it a different way. What are the documents at

MICHAEL T. MANN

Exhibit 468?

A. It is a -- it's a -- basically a cover sheet, but it's basically documents to open an account at Southwestern Payroll.

Q. Did anyone at Southwestern Payroll know that you were opening this account at Pioneer?

A. No.

Q. Were you ever the president of Southwestern Payroll?

A. No.

Q. Does -- Darin Alred recalls -- well, strike that.

Do you have any documentation making you the treasurer or secretary of Southwestern Payroll?

A. I do recall there was some -- in conversation with Darin, he said hey, you should be the treasurer, secretary, and I don't know when that first came up it was something he needed for his bank, but it made a lot of sense, because I wanted Darin to be the day-to-day guy, and that's why he was the president and -- but I do recall filing that

MICHAEL T. MANN

way as the secretary treasurer.

Q. Let me back it up. And you correct me if I'm wrong, Darin recalls discussions about you -- making you secretary and treasurer of Southwestern Payroll, but does not actually recall formalizing it in writing. Do you recall formalizing it in writing?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: I don't recall specifically other than I don't know, I thought I saw my name as that somewhere it could have been an e-mail, but we may not have -- if Darin is a hundred percent sure, he's probably right. I'm not a hundred percent sure if we formalized it or not. I do recall the discussions and -- but -- yeah.

MR. ALESSI: Object to the answer, move to strike.

Q. Let me ask it this way: Do you know of any documents appointing you as secretary or treasurer of Southwestern Payroll?

A. I don't know of any documents.

MICHAEL T. MANN

Q. And do you recall actually signing any documents making you secretary or treasurer of Southwestern Payroll?

A. I don't recall.

Q. Okay. And you brought up a good point, did Darin Alred or anyone else at Southwestern Payroll have anything to do with accounts 0212 or 2440 at Pioneer Bank?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: No.

Q. Other than handling the bank accounts at Pioneer Bank, did you have any other involvement whatsoever in the day-to-day operations of Southwestern Payroll?

A. No.

Q. Let's look at quickly -- turn to Bates number 510 on Exhibit 468. Once again this is the commercial customer due diligence form associated this time with Southwestern Payroll Services Inc.

MR. ALESSI: Objection as to the form of the question.

Q. Is that correct?

MICHAEL T. MANN

MR. ALESSI: Objection to the form of the question.

THE WITNESS: That is correct.

Q. What is the document at Bates number 510 of Exhibit 468?

A. It is the customer due diligence information sheet for this account that I opened.

Q. Did you actually fill in the information on pages 510 and 511 of the customer -- commercial customer due diligence form?

A. No.

Q. Who would have done that?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: I mean, I probably got it -- it was usually Trudy or Deborah, but I don't know who filled it in they just sent it to me.

Q. It would have been someone at Pioneer Bank?

MR. ALESSI: Objection to the form of the question.

MICHAEL T. MANN
THE WITNESS: Yes.
Q. And again, on section five of the customer due diligence form for Southwestern Payroll Services Inc opening of account 1996, did you check the box "no" or would that have been done by somebody at Pioneer Bank?
MR. ALESSI: Objection to the form of the question.
THE WITNESS: I didn't check it, so it came to me from Pioneer that way.
Q. Did anyone at Pioneer Bank ever talk to you or counsel you about how the commercial customer due diligence form for the Southwestern Payroll Services Inc account 1996 should be filled out?
A. No.
Q. And I think we've already touched on this, but do you believe that Southwestern Payroll Services is a third-party payment processor as defined in section five of the customer due diligence form at Exhibit 468?
MR. ALESSI: Objection to the form of the question.
THE WITNESS: No.

MICHAEL T. MANN

Q. And moving to the next page section nine of the customer -- commercial customer due diligence form for Southwestern Payroll Services Inc account 1996, do you believe that Southwestern Payroll is a money services business as defined in section nine?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: No.

Q. And nobody at Pioneer ever told you any different?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: No.

Q. Okay. We're getting there. Let's jump to August 30th of 2019.

A. Okay.

Q. Tell me how you first learned there was an issue at Pioneer Bank on August 30, 2019?

A. I received a phone call from Joseph Fleming.

Q. Tell me about that phone call?

A. He called. He basically alerted to

MICHAEL T. MANN

me that there was an issue with Bank of America. I don't recall all the exact words at this point, but basically told me that they would be freezing the accounts and, you know, it was short, but he also said, you know, asking me what I could do but -- but it was a short call from Joe.

We talked. He just made me aware of what happened with Bank of America, and they were taking actions.

Q. What did you tell him in response?

A. I didn't -- I mean, I don't recall at that point.

Q. After the phone call from Joe Fleming on August 30th -- well, strike that.

August 30th, what day of the week was that?

A. I believe it was a Friday.

Q. Did you have any other conversations with anybody at Pioneer Bank on Friday, August 30th, 2019, after your call with Joe Fleming?

A. No.

Q. What was your next communication

MICHAEL T. MANN

with anybody at Pioneer Bank?

A. And it's kind of -- I -- I think Joe tried calling me on Saturday. He may have left a message saying I've got to talk to you soon or something. But other than that, I didn't -- I didn't take the call so I -- I didn't talk to him on Saturday.

MR. JAYNE: Let me hand you what we'll mark as Exhibit 85.

(Whereupon, Plaintiff Exhibit 85, Text Messages, Bates Stamped PB-SWP-00049164 to '166, 3-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. Tell us about Exhibit 85?

A. So he tried calling my first and sent me a text, give me a call when you have a minute.

So my response is, do what's best for you Pioneer, I'm going to jump on this first thing Tuesday to get it fixed, my BOA contact did not call back.

And I did try calling -- so I did try calling Bank of America after I had my

MICHAEL T. MANN

conversation with Joe, yes.

Q. So after your conversation with Joe Fleming on August 30th, 2019, what did you do?

A. I tried calling Bank of America.

Q. Were you able to get in touch with anybody at Bank of America that could assist you?

A. No. My contact was not taking my phone calls.

Q. Who was your contact?

A. Scott Card.

Q. Is he still at Bank of America do you know?

A. I heard he left. I can't confirm either way, but I heard he's no longer with Bank of America.

Q. Was he here in an Albany branch?

A. Yeah. He was based locally, I don't know his official branch, but, yes.

Q. Did you have any loans with Bank of America?

A. I didn't have a loan, I had a -- I had a $2 million credit card line, because we had a lot of employees use credit cards, but --

MICHAEL T. MANN

so that was my only facility with him.

Q. The credit card line didn't have anything to do with payroll, did it?

A. No.

Q. Did you talk to anyone at Pioneer Bank over the weekend -- when I say "the weekend," Saturday, August 31st or Sunday, September 1st?

A. No. My only communication was this text.

Q. And then what was the next action that you took after you couldn't get ahold of your contact at Bank of America on Friday, August 30th, 2019?

MR. ALESSI: Object to the form of the question.

THE WITNESS: Yeah, that whole -- I mean, there are certain things I did over the weekend in terms of trying to reach out to someone that could potentially take over for me, but that might have been Monday. I don't know the events on the actual days.

There was no one at Pioneer I was trying to get in touch with other than

MICHAEL T. MANN

reaching out to the Bank of America contact. I don't recall talking to anyone else Friday evening or Saturday again, other than this text, I was just preparing for Tuesday what I was going to do.

BY MR. JAYNE:

Q. And Monday, September 2nd was a holiday?

A. That is correct.

Q. So did you understand that your action was going to have to wait until Tuesday, September 3rd?

A. That is correct, and why I mentioned Tuesday on the text response.

Q. Did you communicate anything with anybody at Southwestern Payroll or at Cloud Payroll about there being an issue over the weekend?

A. No. I think -- and I don't know what day it was, the only first person I reached out to, but I don't know what day it was, it was probably over the holiday weekend was Tim Burke to, you know, see if he was willing to fill in for me.

MICHAEL T. MANN

Q. Who was Tim Burke?

A. Tim Burke was senior guy that worked for me. He helped improve Viverant, we were having -- not issues, but he was looking to try to, you know, see what he could do to potentially sell it or make it more salable. He had a lot of private equity background, he was helping me and other businesses just to get a good handle on it, so I view him as a very senior person that had a general knowledge of a lot of the businesses and could step in and that's why I reached out. He was the one person that I recall reaching out to first.

MR. JAYNE: And let me hand you what was already marked Exhibit 93.

(Whereupon, Plaintiff Exhibit 93, Amell E-mail Dated 9/3/19, Bates Stamped PB-SWP-00058072 to '074, 2-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. Exhibit 93 look at the bottom where there is an e-mail from you to Frank Sarratori dated Tuesday, September 3rd, 2019. Tell us what's going on there?

MICHAEL T. MANN

A. Okay. So I continue to try to get in touch with Bank of America on Tuesday. My contact would not take my calls. I would call Bank of America corporate number and they would tell me to talk to my contact, and I would get nowhere with them.

I did send an e-mail back to what I was saying just before this to authorize Tim Burke to be able to speak for me and represent the company. So I was hoping that would help move this along, so...

Q. Why are you sending this e-mail to Frank Sarratori?

A. I don't recall the specific conversation, but I, you know -- because there were some checks with Bank of America that they pulled back there was a question of how much money was in the Bank of America account. So I was trying to get in touch with Bank of America to help answer those questions.

Q. And Mike, here is my question, why were you communicating with Frank Sarratori as opposed to somebody else at Pioneer Bank; Joe Fleming or Dave Blessing?

MICHAEL T. MANN

A. I actually don't remember how -- I didn't talk to David at all after I got the call from Joe. My guess is I was already in touch with Tim Burke and Tim was reaching out to Pioneer. I don't recall all the order of the events.

But I don't know if someone told me to send Frank or if there was some message, I don't recall why I was doing this at this time.

Q. Did you know -- did you have any dealings with Mr. Frank Sarratori before September 3rd of 2019?

A. No, not really.

Q. Any that you can recall at all?

A. None that I can recall.

Q. Did --

MR. JAYNE: Let me hand you what we'll mark as or yeah we need to mark this as Exhibit 94.

(Whereupon, Plaintiff Exhibit 94, Fleming E-mail Dated 9/3/19, Bates Stamped PB-SWP-00058077 to '078, 2-Pages was marked for identification.)

BY MR. JAYNE:

MICHAEL T. MANN

Q. Actually, before we talk about 94, do you know when Dave Blessing went on leave at Pioneer Bank?

A. I don't know what month in 2019 it started. It went through June, July, but I'm not exactly sure when did, you know, March, April. So it was late spring or beginning spring actually. It was March, April through June, July-ish. I don't know the exact range, but it's the rough time.

Q. But Dave Blessing was back at Pioneer Bank by August 30th of '19?

A. Yes.

Q. Did you call Dave Blessing about what was going on?

A. On August 30th or after?

Q. Yes.

A. No.

Q. How come?

A. I knew what was about to happen and I just felt I would keep my contacts limited until I retained an attorney, and so I just -- other than contacting Tim Burke to take over for me, just because I view that as the best

MICHAEL T. MANN

path of doing the most good to help all the companies, I stayed away from communications with other employees.

Q. Do you know why Dave Blessing went on leave at Pioneer Bank?

A. I was never told specifically. And I didn't talk to Dave a lot when he came back and he was, you know, was going to talk to me at some point about it, but we never got to that point.

Q. Did you ever hear any rumors?

A. I heard he was sick, but I -- beyond that I didn't hear a lot. He obviously wasn't ready to share it with me when he did get back, so I didn't push it.

Q. Going over to Exhibit 94, down at the bottom tell us what's going on at September 3rd, 2019, e-mail at 7:46 a.m.?

A. Okay. So I did send Dave and Joe and e-mail. This is the one action I told you that, you know, stepping down as the CEO. I said Tim would be taking over, running all the entities, and it's in everyone's best interest to work with Tim.

MICHAEL T. MANN

Q. And is this separate from what you told us you gave authorization for Bank of America to communicate with Tim?

A. That happened a few hours later, so we were moving -- we were trying to move forward on getting Tim in place. So after I sent Joe Tim's information, at some point I was probably asked to, you know, give authorization for Bank of America to Tim. That's most likely I'm not exactly sure the order of events, but...

MR. JAYNE: Let's now look at Exhibit 97, previously marked for identification as 97.

(Whereupon, Plaintiff Exhibit 97, Amell E-mail Dated 9/4/19, Bates Stamped PB-SWP-00058057 to '059, 3-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. If you thumb to the back of it there is an e-mail from you to Tim Burke dated September 3rd, 2019. Do you see that?

A. Yep. Yes.

Q. Tell us about that e-mail?

MICHAEL T. MANN

A. I was giving Tim instructions on the tax account. Talked about what I did on Friday. Basically giving him instructions hey, if we want to keep forward with this, this is the information that you need.

Q. Did you have any telephone conversations with Tim Burke from August 30th of '19 all the way up to this e-mail on September 3rd, 2019, at military time 2057?

A. Yeah, I don't know if there was another e-mail. I did talk to Tim briefly. He asked if everything was okay; I said I'll explain more later. I just need you to take over type voice conversation. And I was more communicating by e-mail other than a quick discussion.

Shortly, I don't know what time, we did probably talk a second time where Tim was still opened to stepping in and doing all of this but thought, you know, we should probably communicate through lawyers, so those were sort of the conversations. I did not have a lengthy conversation or conversations on the phone the first time when he asked, I didn't share much

MICHAEL T. MANN

other than I was going to send them e-mails. And then the next time we talked he was more nervous in talking to me, so the conversations were light, you know. I was just giving him specific instructions on the tax, because that was the one thing I wanted to -- one of the big things I wanted to address.

Q. Over the weekend from August 30th to September 3rd, were you concerned about the payroll tax account?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes.

Q. Why?

A. I -- if those taxes don't get paid, you know, all these clients are going to get hit with and only not making their payments, but penalties and not -- penalties and interest. I knew in the payroll industry, if we don't make those payments, the value of all the payroll companies would just collapse, so it was very important because the companies combined were worth quite a bit of money.

Q. Did you have any conversations between August 30th September 3rd of '19 with

MICHAEL T. MANN

Tim Burke where you talked about the payroll taxes getting paid?

A. No, just the e-mail that I sent.

Q. Tell us this e-mail it says there was probably close to 1.9 million to cover tomorrow morning from the tax account; is that right?

A. That is correct.

Q. And then your e-mail September 3rd, 2019, says I did move probably three mill -- 3M to the line from the tax account on Friday?

A. That is correct.

Q. Did -- and did you do that?

A. I did.

Q. Did it go through or had Pioneer froze your account?

A. Well, I did this the Friday before I got the call from Joe. So when -- so by the time he called me, my systems were shut down immediately, so there was no going back to move the money back or anything.

Q. Do you know whether that $3 million movement of payroll tax money to your line at Pioneer actually went through on August 30th of

MICHAEL T. MANN

'19?

MR. ALESSI: Objection as to form.

THE WITNESS: I mean, I don't know, because you can -- I mean, I -- you pay the line pretty quickly and it looks like you see it on your balance, but I know there is also time, you know, afterwards where Pioneer can pull things back and stuff, so I just had no visibility starting Friday evening. I didn't know what it would look like, so...

Q. On this e-mail September 3rd of '19 did you mean to communicate to Tim Burke that you were concerned as to the payroll tax account?

MR. ALESSI: Objection as to form.

THE WITNESS: Can you ask the question again, I want to make sure I answer it properly?

Q. Let me do better. In this e-mail -- or strike that.

What are you mean -- what, if anything, were you meaning to communicate to Tim Burke regarding the payroll tax account at

MICHAEL T. MANN

Pioneer in this e-mail dated September 3rd of '19?

MR. ALESSI: Objection as to form.

THE WITNESS: Yeah, I just wanted him to make sure he kept the taxes going. Make sure it continued.

So that was really the point of having a specific e-mail that just -- I mean, I also talk about Bank of America in here too, but I was really -- yeah, I was making a point.

Q. On September 3rd of '19, if the payroll tax payments weren't made from the Pioneer Bank account, it was going to be a disaster for the payroll companies?

MR. ALESSI: Objection as to form.

THE WITNESS: Yes, I was aware it would be a disaster to the payroll companies.

MR. JAYNE: Now, let me hand you what we will mark as Exhibit 95.

(Whereupon, Plaintiff Exhibit 95, Amell E-mail Dated 9/4/19, Bates Stamped PB-SWP-00052936 to '937, 2-Pages was marked

MICHAEL T. MANN

for identification.)

BY MR. JAYNE:

Q. The beginning of the e-mail chain Exhibit 95 is an e-mail from you to Tim Burke, cc to Mike Koenig on September 4th of 2019; is that right?

A. That is correct.

Q. Was there a meeting at Pioneer Bank on September 4th of 2019?

A. Yes.

Q. What was the meeting about?

A. We were trying to put Tim Burke in as the person stepping in for me. He had a lawyer. I brought Mr. Koenig, just because I knew there would be some criminal fall out from this, and I wanted him to represent me from that angle more than getting a deal done.

But the intent going into the day is -- was for Tim to step in, run all the companies, including the payroll companies and the payroll tax, and I step aside while we sort through this.

Q. Where did this meeting occur?

A. At Pioneer Bank.

MICHAEL T. MANN

Q. At their home office?

A. Yes.

Q. What time did you, approximately, did you arrive at Pioneer Bank?

A. I don't know, it was mid-morning, mid-to-late morning. I'm speculating.

Q. Was the meeting over by the end of business by 5:00?

A. It ended around four or five, yes.

Q. Who did you talk to at Pioneer Bank during this meeting on September 4th of 2019?

A. I -- there weren't specific conversations. I had Michael with me so we -- you know, we weren't in a lot of direct conversations. It's even hard to say specifically. I stayed away from probably talking to Pioneer employees, you know, with Michael, we talked through to -- kind of communicated through lawyers and -- but it was clear, you know, we were trying to get Bank of America on the phone to release the funds in the account, and we tried everything we could to get them on the phone, you know, really trying to see how much money they had in their

MICHAEL T. MANN

accounts to hopefully, you know, keep the tax payments going.

Q. Did you ever have conversations with directly with anyone any Pioneer Bank employee during this September 4th, 2019, meeting at Pioneer?

A. I don't think I talked to any Pioneer employee. I mean, there might have been some discussion, casually, but I don't -- not about -- not about this. I mean, other than at the end of the day to stop the freeze it became too late, that's when we left, you know, Bank of America didn't call. And at that point it's like probably too late to let funds go through, right.

And it's like, yeah, so then we left hoping Bank of America would still call and get it resolved, but...

Q. Did you talk to Tim Burke during the meeting at Pioneer Bank on September 4, 2019?

A. He -- I didn't have communication. He left midday at some point. He didn't stick around to the end. I mean, his lawyer was there trying to work things, but I think he

MICHAEL T. MANN

left at some point after a couple hours.

Q. Did you talk with Mr. Alessi, Robert Alessi on September 4, 2019?

A. We did have a conversation with Mr. Alessi.

Q. When you said "we," who is the we in that conversation?

A. Mr. Koenig and myself.

Q. Where that was conversation?

A. We grabbed a small conference room.

Q. And what part of the day would this have been on September 4, 2019?

A. Midday, early afternoon. It's a guess.

Q. Okay.

A. It wasn't the end of the day.

Q. Okay. What did you tell Mr. Alessi?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: In what way, just general?

Q. No. Specifically, what did you tell Mr. Alessi during this conversation?

MR. ALESSI: Objection to the form

MICHAEL T. MANN

of the question.

THE WITNESS: We talked about some of the businesses. We did talk about payroll a little bit. He asked me if we did taxes or payroll or both, and so we engaged in some discussion about the payroll, you know, about the payroll business. You know, I stressed many times that, you know, we really need to, you know, let the funds move forward.

And, you know, again a big part of the day was trying to get Bank of America on the phone so we could get the funds moving forward.

Q. Did you tell Mr. Alessi that there were payroll tax funds being housed at Pioneer Bank?

A. Yes.

Q. Did you tell Mr. Alessi that it was important that those payroll tax funds get released?

A. Yes. I do recall the words, it's in -- I think it's in both of our best interest to let this move forward.

MICHAEL T. MANN

And there is two points to that. One is not letting the tax funds go through would ruin those companies. And again, based on what I did, you know, Pioneer doesn't have to, you know, believe me but, you know, there is also a lot of value in the payroll companies if we can keep them going.

Q. What did Mr. Alessi respond you telling him that there was payroll tax funds being held at Pioneer Bank?

A. It wasn't any response, it was more of a question-and-answer. There wasn't a response, like, that I can recall, other than it was just kind of question-and-answer back and forth.

Q. And was it clear that when you said there were payroll tax funds, they were the tax funds that the clients of your payroll companies?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: I mean, in my mind it was clear, but I don't know.

Q. And you --

MICHAEL T. MANN

MR. ALESSI: Objection as to form. I'm sorry. He didn't finish the answer to your question. You can finish the answer to your question.

THE WITNESS: In my mind I thought I was clear. I -- I...

Q. Did you explain to Mr. Alessi that you owned payroll companies that had clients?

A. I don't -- yeah, I thought it was kind of giving payroll service bureaus as clients, it's not just our company payroll, but...

MR. ALESSI: I'm going to object to the answer and move to strike as non-responsive.

Q. Did you mention to Mr. Alessi that the companies that you owned, some of them were payroll service bureaus?

A. I mean, yes.

Q. How long did this conversation with Mr. Alessi last?

A. I don't think it was long, it might have been 20 minutes, 20, 30 minutes.

Q. And this conversation you had with

MICHAEL T. MANN

Mr. Alessi was on September 4, 2019, and it was before 5:00 p.m. that day; is that true?

A. Yes.

Q. How did the conversations with Pioneer Bank end on September 4th of 2019?

A. I mean, we were sitting in the big conference room waiting for Bank of America to call us back. We tried many avenues and again, once we -- it was getting close to five, we passed the time where you could let the funds move forward, so we decided to pack up and if we heard from Bank of America or anything, you know, we would get on the phone, but...

Q. Was Mr. Koenig present with -- for all of your conversations with Mr. Alessi regarding the payroll tax funds that were housed at Pioneer Bank?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yes.

MR. JAYNE: Let's take a break.

VIDEOGRAPHER: This will conclude video number three in the deposition of Michael T. Mann. We are off the record.

MICHAEL T. MANN

The time is 3:45 p.m., August 3rd, 2021.

(Whereupon, proceedings recessed for a short break and once again resumed.)

VIDEOGRAPHER: This the beginning of video number four in the deposition of Michael T. Mann. We are on the record at 4:02 p.m., August 3rd, 2021.

BY MR. JAYNE:

Q. Sir, we're back on the record and I was going to ask you, are you aware that Pioneer Bank took money, payroll tax money out of accounts 2440 to cover your either your overdrafts or -- excuse me, either the bounced checks, the Bank of America checks or the default on your loans as the Pioneer Bank?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yeah, I haven't received any specific of what happened to what funds, so I didn't know if it was still sitting there or no, so I haven't been.

Q. Did you ever tell Pioneer Bank to take the payroll tax dollars in account 2440 to

MICHAEL T. MANN

cover your bounced checks from Bank of America or your default on the loan with Pioneer Bank?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: No.

Q. Do you -- what you want Pioneer Bank to take the payroll tax dollars from thousands of employers who are clients of your payroll companies to satisfy your default on the loan with Pioneer Bank or your bounced checks the bounced Bank of America checks?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: I mean, no, I don't want -- I want all the companies to get their tax dollars back. I also want Pioneer to get their money back. So -- I mean -- I mean, I don't, you know -- I guess the short answer is no, but I also don't want them, you know -- you know, I don't want anyone to lose money on this.

Q. You don't think it's fair -- well, strike that.

Do you think it's fair that Pioneer

MICHAEL T. MANN

Bank took payroll tax funds out of accounts 2440 to offset your bounced checks with Bank of America or your default on the loan with Pioneer?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yeah, I don't think it's fair. I didn't think they could do it. I mean, I know they froze the account, they told me they froze the account, I didn't think they could do it, you know.

I'm not answering the fair question, but there is a lot of people that there were things that weren't fair in this, so...

Q. You know, as you sit here today, would you want Pioneer Bank to take those payroll tax dollars to satisfy your bounced checks from Bank of America or your loan default, or would you like that money to go back to those employers?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: You know, one

MICHAEL T. MANN

question: Can I talk to Michael just briefly?

MR. JAYNE: Absolutely. Sure.

VIDEOGRAPHER: We are off the record, 4:06 p.m.

(Whereupon, there was a brief pause in the proceedings and they once again resumed.)

VIDEOGRAPHER: Stand by. We are back on the record, 4:07 p.m.

MR. KOENIG: Mr. Mann had a question triggered by what you asked that related directly to something pertaining to the criminal sentencing, perhaps. So he just wanted to clarify with me that he could give the answer that he wanted to, in view the sentencing. He's free to do so.

(Whereupon, the last question was read back.)

MR. ALESSI: Same objection to the form of the question.

THE WITNESS: Yeah, I want all victims to be made right. I, you know, I -- a few parts, I don't feel comfortable

MICHAEL T. MANN

weighing in on this victim and that.

So my main point is I feel horrible for all of them and I want everyone made right, so...

BY MR. JAYNE:

Q. Did you sell your private residence and pay whatever you had above equity to Pioneer Bank?

A. We did sell our residence. We gave them a payment which, you know, my wife and I split funds, but I made a payment to them to release the lien, and to help pay down, you know, some of the stuff. I mean, small compared to total damages, but, yes, we sold the house and there was -- in addition to the mortgage, there was another lien release payment.

Q. And then did you also sell Viverant?

A. Yes.

Q. Did all of the proceeds from the sale of Viverant go to Pioneer Bank?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yeah, I believe so.

MICHAEL T. MANN
Q. And they probably paid the other proportion of that or a portion of that to the other two banks on -- that had a piece of your loan, did you know that?
MR. ALESSI: Objection to the form of the question.
THE WITNESS: Yeah, I'm not familiar with how it -- I wouldn't be surprised.
Q. What did Viverant sell for?
A. We sold our end, I think it was around $3 million, my 51 percent.
Q. If the settlement agreement and release reflects $3,875,000 does that sound right?
A. That could be, yeah.
Q. And that was for the sell of your interest or -- yeah, your interest in Viverant?
A. Yes.
Q. And all of that money it looks like it was all wired to Pioneer Bank?
MR. ALESSI: Objection to the form of the question.
THE WITNESS: Yeah, I'm not the one that made the payment. I just signed my

MICHAEL T. MANN

rights over to Pioneer to get it, I'm not familiar with how they were paid.

Q. Was there any discussion with Pioneer Bank about giving that money to all of the payroll or the -- all the clients of payroll companies who had lost their payroll tax dollars?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: No.

MR. JAYNE: Let me hand you what we'll mark as Exhibit 12.

(Whereupon, Plaintiff Exhibit 12, Mann E-mail Dated 7/3/17, Bates Stamped PB-SWP-00105894 to '895, 2-Pages was previously marked for identification.)

BY MR. JAYNE:

Q. Okay. We have in front of you what was previously marked as Exhibit 12. Tell us what this e-mail is about, the e-mail chain, excuse me?

A. Yeah, I was asking for a fee that I was being charged for, it would appear to be the ACH transactions in our account ending in

MICHAEL T. MANN

212.

Q. Do you know whether anyone -- strike that.

You were being charged $0.25 in ACH transactions in account 212?

A. Yes, it appears that way.

Q. And you were inquiring as to whether you could get those fees reduced in some way?

A. Yes.

Q. Did Pioneer Bank ever respond to your recollection?

A. I don't think we ever resolved this.

Q. Were you aware that Dave Blessing received a bonus that was tied to the amount of fees collected for accounts he was responsible for at Pioneer Bank?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: I never spoke to Dave about his compensation, so I'm unaware.

Q. You mentioned in your e-mail to Ms. Batchelder on July 3rd of '17 that there were 15,000 transactions per month in account 212; is that right?

MICHAEL T. MANN

A. Um-huh, yes.

Q. That's a lot of transactions, isn't it?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yes.

Q. Did any of the companies that weren't payroll companies have any -- have transactions that even approached 15,000 a month?

A. No.

Q. Can you think of any company other than a payroll company that would run 15,000 transactions a month through a bank account?

A. I mean, I can recall some. Like, a credit card, you know, but, you know, there's very few -- transactional type businesses, but no, not off the top of my head.

Q. Other than the sale of your home and the sale of Viverant, have you made any other types of payments to Pioneer Bank in relationship to your -- the bounced checks from Bank of America or your default on the loan?

A. The only other thing I could think

MICHAEL T. MANN

of was half of our joint account. My wife got her half, but my half stayed in. Other than that, I really haven't had any other sources of income or anything, so...

Q. Was that account checking account?

A. Yes.

Q. How much are we talking about that Pioneer took from your checking account?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Estimate is probably $38,000 or so. It's a guess, somewhere around there.

MR. JAYNE: Let me hand you what we'll mark as Exhibit 390.

(Whereupon, Plaintiff Exhibit 390, Blessing E-mail Dated 1/17/19, Bates Stamped PB-SWP-00054313, 1-Page was marked for identification.)

BY MR. JAYNE:

Q. Exhibit 390, you correct me if I'm wrong, but it appears to be a meeting invite between you and Dave Blessing dealing with overdrafts?

MICHAEL T. MANN

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yes.

Q. Did you have meetings with Dave Blessing regarding frequent overdrafts in accounts at Pioneer Bank?

A. I didn't have frequent meetings. This specific meeting request, I know he was going to set up a time to meet to address and fix it. Prior to that meeting we were able to stop it, you know, stop having overdrafts. So I told Dave it's fixed, we're not having overdrafts, so we cancelled it.

We did have overdrafts after the date of that, later. But the meeting didn't happen, because prior to it we stopped the overdraft issue for a period of time.

Q. What did you tell Dave Blessing was the reason for the overdrafts, the frequent overdrafts?

A. I don't think I -- I mean, on some I would call -- when they would happen, I would tell him there was a timing issue. And when I would reach out to him, even though the

MICHAEL T. MANN

overdrafts were there, there were cash in the accounts to cover the overdrafts. And usually when I reached out, I said the money is already in the accounts to cover the overdrafts.

Q. Did you ever explain to Dave Blessing what was the timing issue?

A. No, and he never asked.

Q. Did anybody at Pioneer Bank ever ask you what the timing issues was that was causing the frequent overdrafts?

A. No.

MR. JAYNE: Last two exhibits from me. Let me hand you what we'll mark as Exhibit 60 and 61.

(Whereupon, Plaintiff Exhibit 60, Affidavit of Michael Mann Dated 9/5/20, Bates Stamped PB-SWP-00038127 to '129, 3-Pages was marked for identification.)

(Whereupon, Plaintiff Exhibit 61, Declaration of Michael Mann Dated 9/1/20, Bates Stamped PB-SWP-00038123 to '126, 4-Pages was marked for identification.)

BY MR. JAYNE:

Q. Exhibit 60 is an Affidavit of

MICHAEL T. MANN

Michael Mann and Exhibit 61 is a Declaration of Michael Mann, right?

A. Yes.

Q. Did you write these?

A. They were most likely -- I didn't author the initial Declaration. I received these, reviewed it, you know, made sure they were accurate, but I didn't do the initial authorship.

Q. Who did?

A. My guess is either Mr. Alessi or someone in the -- I'm not exactly sure who officially started it, but...

Q. It was one of Pioneer's lawyers?

A. That is my understanding.

Q. Were there drafts of it?

MR. ALESSI: Objection. And we -- well, I can't direct the witness not to answer, because it's not my witness, I'm prepared immediately to get on the phone with Magistrate Hummel. And I will also say that this issue has been the subject of meet-and-confers. We provided to the plaintiffs' counsel weeks ago our basis for

MICHAEL T. MANN

why this is attorney/work product doctrine drafts, and we posted them on the privilege log at least two weeks ago.

We have not heard a response from you on that, but we're prepared to get on the phone with the magistrate immediately to move for a protective order to stop any questions about drafts.

BY MR. JAYNE:

Q. Were there drafts?

MR. ALESSI: I'm suspending the deposition and asking that we get on the phone with Magistrate Hummel or you can wait until the end of the questioning?

MR. JAYNE: What privilege is this, common interest privilege?

MR. ALESSI: No, it's been put in writing to you, Mr. Jayne, it's in writing.

MR. JAYNE: No. We have the witness here. So what privilege is it?

MR. ALESSI: It's work product doctrine. And we've given you the cases, the Madoff case and other cases for it. You've got the cases.

MICHAEL T. MANN

I'm not going to debate the law here. I'll debate it with you in front of the magistrate.

MR. JAYNE: Let's go ahead and get the magistrate on the phone on this one.

MR. KOENIG: Should we step out or should Michael step out or? I don't care, I'll do whatever you want me to do.

VIDEOGRAPHER: We are off the record, 4:22 p.m.

(Whereupon, proceedings recessed for a short break and once again resumed.)

VIDEOGRAPHER: We are back on the record, 4:31 p.m.

MR. ALESSI: Counsel have just discussed the continuation of the deposition of Michael Mann for the purposes of Pioneer Bank deposing Mr. Mann.

Mr. Mann has agreed, subject to his travel compensation, to return to the Albany area for that continued deposition.

Counsel have spoken about the dates for that continued deposition. Counsel have agreed that they are striving to have

MICHAEL T. MANN

the continued deposition be September 9th or September 13th.

That is going to be subject to what happens at Mr. Mann's sentencing tomorrow so we're looking to have closure with regard to the dates, assuming Mr. Mann still remains out of custody by those two dates, then one of those two dates will be the date for the continued deposition.

To the extent it unexpectedly occurs that we find tomorrow that Mr. Mann will not be out of custody on September 9th or September 13th, Pioneer Bank intends to issue a formal subpoena for Mr. Mann for the date September 1st.

MR. JAYNE: The only thing I would put is I am -- this is Andrew Jayne, and I am absolutely unavailable the entire week surrounding September 1st of this year, and that if that gets interfered with, I will be getting a divorce, and it won't be initiated by me.

Are we ready?

BY MR. JAYNE:

MICHAEL T. MANN

Q. Mr. Mann, just a couple more questions. Are you still receiving mail at PO Box 505 Broadalbin, New York 12025?

A. Yes.

Q. And do you continue to -- are you going to continue receiving mail at that PO Box into the future?

A. At least up until I report, as planned.

Q. Okay. And I've been told that if I want to send you something, that's where I should send it. Is that where I should continue to send anything that I need to send you up until you're sentenced or up until you report?

A. Yes.

Q. You and I never met before today, did we?

A. No.

Q. We've talked on the phone twice, correct?

A. Correct.

Q. My recollection is both of those phone calls lasted about an hour?

MICHAEL T. MANN

MR. ALESSI: Objection to the form of the question.

THE WITNESS: It could -- I don't recall, but they...

Q. Did we talk about anything different than what we talked about today?

A. No.

Q. Do you have any incentive in the outcome of this case of this, this case against Pioneer, Southwestern's case against Pioneer?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: No.

Q. Has everything that you've told the ladies and gentlemen of the jury today been truthful?

A. Yes.

MR. JAYNE: Pass the witness.

MS. NEIDL: Okay.

EXAMINATION BY

MS. NEIDL:

Q. Good afternoon. I'm Cyndi Neidl, I'm the attorney for National Payment Corporation.

MICHAEL T. MANN

You've heard of National Payment Corporation?
A. Yes.
Q. Do you know what, if any, relationship National Payment Corporation had with Cloud Payroll?
A. I was aware that we were using National Payment Corporation as our tax processor in 2019.
Q. Did you have any involvement in the agreement between Cloud Payroll and National Payment Corporation?
A. I was -- I was made familiar with it. I approved it. I had John Reinke ran everything, and he's a very seasoned senior individual, so.
And then we had Darin and other people that I trusted, the CEOs of the different payroll bureaus.
So they did most of it. They just presented to me, hey, we want to do this and asked for my okay, and I agreed.
Q. Do you know -- did you or anybody from Cloud Payroll disclose to Nat Pay that tax

MICHAEL T. MANN

funds would be moved from the 2440 account or the 0212 account to other accounts at Pioneer Bank?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Can you ask that again Cyndi, sorry?

Q. I'll do better. Did you disclose to National Payment Corporation that tax funds would be transferred out of the 2440 account or the 0212 account at Pioneer Bank?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: I didn't really talk to National Payment Corporation much. John or Marisa -- or I'm not sure who took the lead on that, or what they told National Payment Corporation, so I'm not exactly sure what was told to them.

Q. Did any of those individuals, did they know that the tax funds would be transferred out of the account, the 2440 and the 0212 account?

MR. ALESSI: Objection to the form

MICHAEL T. MANN

of the question.

THE WITNESS: Yeah, they were aware because the entire team supported moving tax funds from the 0212 account and putting into its own 2440 account when we were looking at the tools to help reconcile the taxes and make sure that it matches, we really needed its own specific account.

So the team was well-aware, and I don't know if it made National Payment Corporation aware, but the team was aware.

BY MS. NEIDL:

Q. Were they aware that you would transfer funds from the 0212 account to other accounts held by ValueWise or other companies that you owned and partially owned?

A. They were not aware of that.

Q. Were they aware that you would move money from the 2440 or the other ValueWise -- or accounts owned by ValueWise?

A. They were not aware.

Q. Do you know whether National Payment Corporation had any conversations with anybody at Pioneer?

MICHAEL T. MANN

A. I am not aware.

Q. Did you give authorization for Nat Pay to have conversations with Pioneer?

A. I don't recall.

Q. Do you know if anyone at Cloud Payroll or MyPayroll had direct conversations with people at Pioneer?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Most of the time they would come through me. I mean, we saw in a couple of the e-mails where people would reach out once in a while. So, yes, it did happen, but the majority of it came through me.

Q. We talked about Christina Batchelder earlier. Did you find her to be responsive to your requests?

A. Yes.

Q. Did you find her to be of normal intelligence?

A. Yes.

MR. ALESSI: Objection to the form of the question.

MICHAEL T. MANN

THE WITNESS: I mean, normal meaning she was intelligent and very easy to work with.

Q. Okay. Did she -- if you asked her to do things was she generally accommodating?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: She was very accommodating.

Q. Did she ever raise any questions about things that you would ask her to do in connection with your accounts at Pioneer?

A. No. I don't know if I'm answering that correctly but, yeah, no.

Q. And you dealt with Randall Benedict at Pioneer, correct?

A. Yes, at times.

Q. And was he the person that you would generally go to with NSFs?

A. Yes. I knew he would handle the payment of the overdrafts. A lot of times I would send it to him. And Dave Blessing, just figuring Dave would get approval, and once Dave gets approval, Randy would pay them.

MICHAEL T. MANN

Q. Was there ever a time that Pioneer did not approve is the payment of NSF?

A. Not that I can think.

Q. Did you ever have a conversation with Randall Benedict about the reason for any NSFs or overdrafts?

A. The only thing I said earlier at times I threw something on there that said, due to timing issue, you know, these accounts need to be paid, the money is already in the account, can you make sure they get paid.

MR. ALESSI: Object to the answer and move to strike as non-responsive to the question.

Q. Did you find Randall Benedict to be of normal intelligence?

MR. ALESSI: Object to the Form of the question.

THE WITNESS: Yeah, I found Randy to be intelligent.

Q. And was he responsive to your requests?

A. Yes.

Q. Did anyone at Pioneer ever tell you

MICHAEL T. MANN

not to move tax funds from the 212 account or the 2440 account to the other accounts that you held at Pioneer Bank?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: No.

Q. The meeting that you talked about on September 4th, 2019, at Pioneer Bank, do you recall who was in that meeting?

A. I mean, it wasn't one big meeting, they were there for most the day. People were in and out of the conference room. I mean, Tom Amell was in there at some point. Again, we didn't talk much in that scenario. Frank was in the meeting. You know, there were several other lawyers, I could be missing some people. But, again, a big part of the day was get Bank of America on the phone to get an answer to the questions about the checks so we could release the freeze on the payroll accounts.

Q. Was Dave Blessing ever in the room?

A. I did not see Dave come in.

Q. Was Joe Fleming ever in the room?

A. I don't think Joe was in there

MICHAEL T. MANN

either. I'm not a hundred percent sure. I don't recall. He could have been, but I don't think so.

Q. When you were in that meeting, did anybody show you any documents related to the accounts?

A. My Pioneer accounts or?

Q. Correct.

A. No, not that I recall.

Q. Did anybody ask you what was the source of the funds in your accounts at that time?

A. I mean, no one asked that question that way in terms of what's the source of the funds. I mean, I was under the -- you know, I knew we had payroll accounts and I was fighting to get the payroll dollars released, but -- so there was, you know, as I said earlier, a discussion on that. But with Pioneer there, there was no discussion about -- other than I -- you know, we asked the question we're in the room at the end is it too late to stop the freeze and we passed our window, and that's why we went home. So I was -- I was under the

MICHAEL T. MANN

impression everyone was aware of that.

Q. Do you recall any questions that you were asked that day?

A. I mean, there wasn't a lot with Michael there, you know. Well, no, take it back. They showed us some of the checks that were on the Bank of America. I know most the questions, you know, at least the accounts we're looking for, the accounts we're trying to look into and see if the money was in Bank of America.

So, you know, there some was direct communication with Pioneer on that; again, trying to get them on the phone. Once we did that, then we could, you know -- I was hoping, you know, that, you know, potentially release the funds.

Q. Was there any discussion of the e-mail that you had sent earlier to Tim Burke about the money in the tax account?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: No. We didn't talk about the e-mail that I sent to Tim, and

MICHAEL T. MANN

Tim wasn't even there in the second half of the day.

Q. What's your understanding about the -- this window that, you know, once that window closed there was no turning back; can you explain that?

A. I, from my perspective, I knew there was a freeze going into Tuesday. I think the 4th was a Wednesday. We would have had some probably late fees on the Monday. But Wednesday was the big -- we talked three days later, it actually might have been Thursday, but still, there was a lot of pressure to get the freeze released just so we could avoid penalties, tax penalties, those types of items. So that was to the big item.

Q. Okay. Was this window was it in your view it was that was your window or did Pioneer articulate that it was like close of business that day or...

A. I think it was -- I was trying to get them released as quick as possible. We were already in my mind a day behind. So if they were to release the next day, I would have

MICHAEL T. MANN

been fine. I know when we left if Bank of America did call me we were going to get Pioneer on the phone with them, you know. It would have been more pain and damage if it was released the following day, but I was still mentally, you know -- I didn't know all the banking rules on, you know, something, you know, added clock. What I learned after the fact even when I was in the meeting, the payroll dollars that were in account ending 212 when I was at the meeting, I didn't even think they were frozen, because I saw my accounts Friday, that money leave my accounts.

So when I was in there, I was specifically talking about the tax accounts to keep them flowing and I learned later that evening, because I got a call from Cachet Bank where, you know, it sounded like money from the previous Friday, I don't know, it's pulled back or stopped, but I was made aware later that it also had 26 million in payroll dollars.

Q. Was there any discussion that day that Pioneer intended to take the money in the accounts by the end of the day if there was no

MICHAEL T. MANN

word by the Bank of America?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: No. I was under the assumption that if I could get Bank of America on the phone, I couldn't answer the question. They did ask me, did I have 13, 15 million in the Bank of America accounts. I learned much later I believe I did, but they were trying to get to the answer to that. So I was fighting to get them Bank of America on the phone. I was hoping that the 15 million was in that account and we could resolve whatever they were looking to do and again, get those the payroll tax stuff just moving and paid.

BY MS. NEIDL:

Q. When you opened the MyPayrollHR 212 account, did you intend that those funds would be client funds, you know, held in trust until paid to the appropriate taxing authorities?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yes. I didn't --

MICHAEL T. MANN

because when I acquired MyPayrollHR, I was always told tax funds are, you know, an account people can't touch. What I wasn't aware is it's a trust account or to ask the right thing.

So when I opened it, I would say we're going to do taxes, I'm going to house taxes here, and that's how I presented it. I never presented hey, I want to open a trust account for taxes. I just said I want to open an account for our taxes. And similar to the other e-mails when we had the other accounts, I would describe the need I had for this type of payroll account and go from there.

So I, again, didn't know the term trust account until after the fact, but I was always told, you know, these accounts are, you know, protected accounts.

MR. ALESSI: Objection to the end of the question of what he was told and move to strike as not responsive to the question.

BY MS. NEIDL:

MICHAEL T. MANN

Q. Who did you have conversations with at Pioneer about the account opening account?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Each one was different. I know we walked through it in the previous testimony first 0212. There were communications before and after about getting the tax dollars. 2440, you know, I don't even recall now who were on the e-mails, but I think a lot of them are documented in the e-mails and, you know, what I was requesting was the one that -- and there were some e-mails, the 0212 there were a lot more conversation, because that was the first one when we were putting it in place.

MR. ALESSI: Objection to the answer and move to strike anything that doesn't have to do with the question, which were conversations.

Q. Did anybody at Pioneer tell you that they were what you were setting up was a trust fund or essentially a trust fund?

MICHAEL T. MANN

MR. ALESSI: Objection to the form of the question.

THE WITNESS: No.

Q. Did anyone at Pioneer -- when you indicated that you were going to open up on account for payroll, did anybody indicate from Pioneer that it should be a certain type of account?

A. No.

Q. But it was your intention that it would be a client account for tax funds third-party tax funds, correct?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Say it again, I lost my train of thought.

Q. Was it your intention when you opened the 0212 account, that it would be a client account housing third-party tax funds?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yes. And when it said client account, I thought it was set up that way, just by how the account was

MICHAEL T. MANN

titled.

Q. When you opened the 2440 account, was it your intention that the account would be a client account housing third-party tax funds?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yes.

Q. Were you friends with Dave Blessing?

A. Yeah, I became friends with him over the years.

Q. Did you socialize with him?

A. We would go to a couple Sienna basketball games once or twice a year. We played golf once or twice a year.

You know, I -- I will say this: I think he had other clients that he met with just as much, even though, you know, he was good to me and talked a lot of business, but he was a -- I would have called him a friend, as well as, you know, my bank contact.

Q. Okay. Based on your conversations with him, did he understand your payroll companies?

MR. ALESSI: Objection to the form

MICHAEL T. MANN

of the question.

THE WITNESS: Yes.

Q. Do you know how he died?

A. I didn't get specifics. I heard from Mr. Koenig, I don't know -- well, it was a while ago now, that he passed away, and that was the only time I ever heard it, and Michael didn't give me any specifics.

Q. So you didn't talk to him after August 30th, 2019?

A. No.

Q. Did you talk to Joe Fleming after August 30th, 2019?

A. There was a text on September 1st, but other than that, I don't recall any conversations with Mr. Fleming. I might have and I got a call from Cachet Bank about the 26 million they were trying to get in touch with Pioneer.

I may have been looking for Frank's number to try to get in touch. I may have texted Joe then to say hey, do you have Frank's number. I don't remember when it was, but there were, again, no verbal communication and

MICHAEL T. MANN

I was just looking for Frank's number. That I kind of vaguely recall something like to, but no communication.

Q. Do you recall ever talking to Ellen Fogarty from Pioneer Bank?

A. That name sounds familiar. I mean, I can't recall her right now.

Q. She worked in the BSA department. Does that refresh your recollection?

MR. ALESSI: Object to the form of the question.

THE WITNESS: Do you know what the BSA department is?

Q. Bank Security Secrecy Act?

MR. ALESSI: Object to the form of the question.

THE WITNESS: I don't recall any conversation. It doesn't mean it didn't happen, but...

Q. Did you ever speak to Darlene Julian from Pioneer Bank?

A. I don't recall.

Q. Did you ever speak to Kelli Rappleyea from Pioneer Bank?

MICHAEL T. MANN

A. I don't recall.

Q. Do you recall anyone other than David Blessing talking to you about activity in your account?

A. Usually David would be the one that would call me if there was ever an issue or a positive; most things went through -- through him.

Q. Do you recall if in 2019 you had a conversation with David Blessing about your plan to segregate tax and payroll in two separate account at Pioneer?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yeah. I think I addressed this before, because I know he was out a piece a part of the time in 2019. I was always very opened about our different payroll accounts.

I was also very open to him about housing the tax dollars. When I set up the account, I don't recall specifically, you know, having a conversation with him, but I wasn't hiding the fact that I was opening

MICHAEL T. MANN

2440 to move the taxes there.

And we did talk about business a lot, so but I don't recall any specific -- I mean not I just don't recall.

MR. ALESSI: Move to strike every aspect of the answer as non-responsive, except the answer to the question that was posed.

BY MS. NEIDL:

Q. Do you recall being sued by Pioneer in state court in connection with the ValueWise loan?

A. In state -- I remember -- yeah, I -- I believe so. I -- I -- I -- believe I know what you're talking about, yes.

Q. Do you recall signing a consent judgment with respect to the line of credit?

A. Yes.

Q. Were you represented by counsel in that?

A. I didn't -- the only counsel I had was criminal. So, I mean, I couldn't afford counsel to fight everything off, so I, you know, kind of just did it without counsel.

MICHAEL T. MANN

Q. Okay. Did Pioneer offer you separate counsel in connection with that lawsuit?

A. No.

Q. And did you agree to the amount of the judgment that was entered against you and ValueWise and the other companies?

A. I did. It seemed like it could be accurate again, when you lose -- you don't have access to accounts and stuff it's hard to, you know, check, but I had nothing to verify it, but it seemed like it could be accurate, so I -- I agreed with it based on it seemed -- and that wasn't just Pioneer. I received a lot of -- obviously, there is a lot of lawsuits and things going, and I've been less worried about is someone suing me for too much anymore, you know, trying to figure out if there is anything I can do to help them in any way.

So I didn't feel a great need to ask for all the numbers backing up the number.

Q. In connection with your Declaration, which is still in front of you, I believe. What was your understanding of the purpose of

MICHAEL T. MANN

that?

A. I have to refresh. So I'm not exactly -- a couple of ways to answer this. I'm not exactly sure how it works. The one thing I will state that any party if, you know, we would use many means of communication, whether it's an Affidavit Or Declaration, we would do it, you know, as long as it's the truth and we're saying what's in there. I would move forward with saying or stating so.

So, you know, I didn't have restrictions on how I communicate with people, I just wanted to make sure I was speaking the truth in those.

But I don't -- I never inquired directly with the exact purpose of this was. I might have been told, I just don't recall.

Q. Do you recall whether that was prepared in connection with the sale of your house?

A. No, not at all. Even at the end of the day on the sale of my house, my wife was able to keep her half. The little money that would have come to me, we ran up $60,000 in

MICHAEL T. MANN

debt, so the money I had left basically paid my wife the last half.

So personally -- and Mr. Alessi will tell you, I wasn't happy with our arrangement at the time with paying for the lien, so I definitely would say these things have nothing to do with the house, because I was going in there hoping they wouldn't charge me anything for the lien.

Q. Pioneer's position in this litigation is that no one at Pioneer knew on September 4th that tax and payroll monies were being housed in the accounts that you controlled at Pioneer.

What do you think of that?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: I disagree. I believe they -- I believe they knew or people knew. I don't know to the extent, but everyone I communicated with, I didn't hide the fact of what we were doing. It was never a secret you can tell in my e-mails.

MS. NEIDL: Okay. Thank you.

MICHAEL T. MANN

MR. JAYNE: Just a couple of follow-ups.

EXAMINATION BY
MR. JAYNE:

Q. As you might expect, Southwestern has gotten a couple of calls from its clients about the unpaid taxes.

You know, we've looked at -- there's been a lot of e-mails produced in this case and there's been a lot of bank statements produced in this case. Do you have any objection to me providing customers of Southwestern with copies of your e-mails between Pioneer and your bank statements?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yeah, I -- I don't see any issue.

Q. Same question as to regulatory authorities: Do you have any objection to me discussing and providing regulatory authorities the NYDFS, the FDIC, the SEC with copies of your e-mails and your bank statements?

A. Yeah, I don't see an issue with

MICHAEL T. MANN

that.

Q. Did anyone at Pioneer ever ask you to sign any document that would indicate that you never told Pioneer Bank or anyone at Pioneer Bank that they were housing payroll tax dollars?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Can you ask that again, Mr. Jayne?

Q. Were you ever presented with any document from anybody at Pioneer Bank or their lawyers and were asked to sign it -- strike that. Let me do better. Butchering it.

Did Pioneer or its lawyers ever present you with a document and ask you to sign it such that the document indicated you never told anyone at Pioneer Bank about the fact you were housing payroll tax dollars there?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: They didn't present that to me and I wouldn't have signed it if they did.

MICHAEL T. MANN

MR. JAYNE: What's our run time?

VIDEOGRAPHER: I'm sorry?

MR. JAYNE: Never mind. We'll go off the record. We're good. I'm finished.

Mr. Mann, we appreciate your time today. Thank you very much. You can read your deposition and sign it or you can waive your signature. You just need to tell the court reporter what you want to do.

THE WITNESS: I'll waive my signature.

MR. JAYNE: Thank you. We're off the record.

THE WITNESS: Thank you.

VIDEOGRAPHER: I believe our run time for today is five hours and 11 minutes.

MR. KOENIG: Hold on.

MR. ALESSI: I'm sorry.

MR. KOENIG: Too many noises going on. What just happened?

MR. JAYNE: He said he's going to waive signature.

MICHAEL T. MANN

THE WITNESS: Am I doing something really --

MR. KOENIG: Well, I can't give you advice. Let me talk to him --

MR. JAYNE: I'll help him out on the record.

First of all, our run time is five hours and 11 minutes?

VIDEOGRAPHER: I believe so.

MR. JAYNE: Second of all, I just wanted to -- I'm not giving you legal advice, okay.

And let me just explain the process of reading and signing or waiving.

If you elect to read and sign, the court reporter will get you a copy of the transcript in any way that you tell her, and then you have the opportunity to read it and make any changes you see fit like, for instance, if there is a misspelling or anything like that.

Then if you get it and you don't do anything for 30 days, it's just deemed as waived.

MICHAEL T. MANN

So I personally always think it's a good thing.

THE WITNESS: No, no, I'll do that.

MR. KOENIG: Hypothetically, you meant to say the word "not" and she may have mistakenly not put the word "not" in for whatever any reason, so in a global generic sense that is why anybody I would advise to read, unless you --

THE WITNESS: Yes, I'll read it, unless there is --

MR. JAYNE: And you need to tell her where she needs to send it. Okay. You'll handle that off the record.

VIDEOGRAPHER: This concludes video number four, and we'll end today's recording of the deposition of Michael T. Mann. We are off the record at 5:07 p.m., August 3rd, 2021.

(Time Noted: 5:07 p.m.)

- oOo -

---------------------------------------

MICHAEL T. MANN

Subscribed and sworn to before me

this_________day of ______________2021.

---------------------------------------

C E R T I F I C A T E

STATE OF NEW YORK )
) ss.:
COUNTY OF ONONDAGA )

I, Mary Agnes Drury, a Notary Public within and for the State of New York, do hereby certify:

That MICHAEL T. MANN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of August, 2021.

________________________

Mary Agnes Drury

## I N D E X


| WITNESS/EXAMINATIONS | PAGE |
|---|---|
| MICHAEL T. MANN | |
| EXAMINATION BY MR. JAYNE | 9 |
| EXAMINATION BY MS. NEIDL | 222 |
| EXAMINATION BY MR. JAYNE | 246 |


*********

## PLAINTIFF EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Mann E-mail Dated 12/16/13, Bates Stamped NP0093489 to '494, 6-Pages | 45 |
| Exhibit 464 | Blessing E-mail Dated 12/11/13, Bates Stamped PB-SWP-00335903 to '904, 2-Pages | 48 |
| Exhibit 5 | Blessing E-mail Dated 5/29/14, Bates Stamped NP0093510 to 512, 3-Pages | 67 |
| Exhibit 2 | Mann E-mail Dated 4/1/14, Bates Stamped NP0093496 to '504, 9-Pages | 83 |

PLAINTIFF EXHIBITS (CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 46 | Mann E-mail Dated 8/10/17, Bates Stamped PB-SWP-00069704 to '705, 2-Pages | 87 |
| Exhibit 465 | Blessing E-mail Dated 9/29/17, Bates Stamped PB-SWP-00069341, 1-Page | 95 |
| Exhibit 466 | Mann E-mail Dated 2/26/19, Bates Stamped PB-SWP-00123022 to '035, 14-Pages | 121 |
| Exhibit 29 | Cloud Payroll Account 2440 Statement Dated 5/31/19, Bates Stamped PB-SWP-00032897 to '051, 155-Pages | 127 |
| Exhibit 467 | MyPayrollHR Account 0428 Statement Dated 9/28/18, Bates Stamped PB-SWP-00231578 to '782, 205-Pages | 134 |
| Exhibit 468 | Commercial Account Cover Sheet, Bates Stamped PB-SWP-00000505 to '546, 42-Pages | 174 |

PLAINTIFF EXHIBITS (CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 94 | Fleming E-mail 9/3/19, Bates Stamped PB-SWP-00058077 to '078, 2-Pages | 188 |
| Exhibit 95 | Amell E-mail Dated 9/4/19, Bates Stamped PB-SWP-00052936 to '937, 2-Pages | 196 |
| Exhibit 390 | Blessing E-mail Dated 1/17/19, Bates Stamped PB-SWP-00054313, 1-Page | 214 |
| Exhibit 60 | Affidavit of Michael Mann Dated 9/5/20, Bates Stamped PB-SWP-00038127 to '129, 3-Pages | 216 |
| Exhibit 61 | Declaration of Michael Mann Dated 9/1/20, Bates Stamped PB-SWP-00038123 to '126, 4-Pages | 216 |

PLAINTIFF EXHIBITS PREVIOUSLY MARKED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 252 | Commercial Account Cover Sheet, MyPayrollHR Bates Stamped PB-SWP-00000372 to 379, 8-Pages | 33 |
| Exhibit 253 | MyPayrollHR Account 0212 Statement Dated 12/31/13, Bates Stamped PB-SWP-00002174 to '183, 10-Pages | 57 |
| Exhibit 358 | Blessing E-mail Dated 12/18/13, Bates Stamped PB-SWP-00335930, 1-Page | 61 |
| Exhibit 3 | Blessing E-mail Dated 4/21/14, Bates Stamped SWP000564, 1-Page | 66 |
| Exhibit 40 | Riegert E-mail Dated 9/18/14, Bates Stamped PW-SWP-00321576, 1-Page | 75 |
| Exhibit 398 | Mann E-mail Dated 3/26/17, Bates Stamped PB-SWP-00073106, 1-Page | 85 |
| Exhibit 381 | Mann E-mail Dated 4/18/17, Bates Stamped PB-SWP-00073670 to '685, 16-Pages | 92 |

PLAINTIFF EXHIBITS PREVIOUSLY MARKED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 380 | Calendar Invite Dated 3/14/17, Bates Stamped PB-SWP-00073249, 1-Page | 100 |
| Exhibit 32 | MyPayrollHR Account 0212 Statement Dated 8/30/19, Bates Stamped PB-SWP-00030576 to '667, 92-Pages | 102 |
| Exhibit 36 | Salsburg E-mail Dated 2/26/19, Bates Stamped NP0093514 to '526, 13-Pages | 106 |
| Exhibit 35 | Salsburg E-mail Dated 1/16/19, Bates Stamped NP0093542 to '555, 14-Pages | 129 |
| Exhibit 280 | Batchelder E-mail Dated 9/4/14, Bates Stamped PB-SWP-00097119 to '120, 6-Pages | 140 |
| Exhibit 283 | Mann E-mail Dated 1/27/15, Bates Stamped PB-SWP-00100901, 1-Page | 144 |
| Exhibit 9 | Batchelder E-mail Dated 4/4/16, 3-Pages | 148 |

PLAINTIFF EXHIBITS PREVIOUSLY MARKED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 11 | Mann E-mail Dated 3/8/17, Bates Stamped PB-SWP-00106850 to '853, 4-Pages | 150 |
| Exhibit 301 | Mann E-mail Dated 8/25/17, PB-SWP-00103667 to '668, 2-Pages | 154 |
| Exhibit 303 | Batchelder E-mail Dated 9/27/17, Bates Stamped PB-SWP-00103278 to '279, 2-Pages | 156 |
| Exhibit 308 | Mann E-mail Dated 9/27/17, Bates Stamped PB-SWP-00103259 to '271, 13-Pages | 158 |
| Exhibit 320 | Batchelder E-mail Dated 10/19/18, Bates Stamped PB-SWP-00316512 to '513, 2-Pages | 162 |
| Exhibit 321 | Batchelder E-mail Dated 12/3/18, Bates Stamped PB-SWP-00318903 to '905, 3-Pages | 163 |

PLAINTIFF EXHIBITS PREVIOUSLY MARKED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 322 | Batchelder E-mail Dated 12/19/18, Bates Stamped PB-SWP-00319825 to '832, 8-Pages | 165 |
| Exhibit 25 | Leggett E-mail Dated 2/25/19, Bates Stamped NP0093414 to '420, 7-Pages | 167 |
| Exhibit 26 | Mann E-mail Dated 7/9/19, Bates Stamped PB-SWP-00117971 to '974, 4-Pages | 169 |
| Exhibit 85 | Text Messages, Bates Stamped PB-SWP-00049164 to '166, 3-Pages | 182 |
| Exhibit 93 | Amell E-mail Dated 9/3/19, Bates Stamped PB-SWP-00058072 to '073, 2-Pages | 186 |
| Exhibit 97 | Amell E-mail Dated 9/4/19, Bates Stamped PB-SWP-00058057 to '059, 3-Pages | 191 |
| Exhibit 12 | Mann E-mail Dated 7/3/17, Bates Stamped PB-SWP-00105894 to '895, 2-Pages | 211 |

*********

LAWYER'S NOTES

PAGE LINE

CERTIFICATE OF DEPONENT

I hereby certify that I have read the foregoing pages of my deposition testimony in this proceeding, and with the exception of changes and/or corrections, if any, find them to be a true and correct transcription thereof.

____________________________________

Deponent

____________________________________

Date

NOTARY PUBLIC

Subscribed and sworn to before me this ________ day of ___________________, 20___.

________________________________________________

Notary Republic

My Commission Expires:____________

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

ERRATA SHEET

PAGE -- LINE -- CORRECTION/REASON

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

ERRATA SHEET

PAGE -- LINE -- CORRECTION/REASON

| PAGE | LINE | CORRECTION/REASON |
|---|---|---|
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |