UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOUTHWESTERN PAYROLL SERVICES, INC, PLAINTIFF, vs PIONEER BANCORP, et al, DEFENDANTS. | INDEX NO: 19-CV-1349 |

Videotaped Deposition

of

MICHAEL T. MANN

Volume II

Albany, New York

Tuesday, September 14, 2021

Reported by:

Mary Agnes Drury, RPR, NYACR, CLR

September 14, 2021

9:35 a.m.

Videotaped Deposition of MICHAEL T. MANN, held at the offices of DLA Piper, 667 Broadway, Albany, New York, before Mary Agnes Drury, RPR, NYACR, CLR, a Notary Public of the States of New York and New Jersey.

A P P E A R A N C E S:

BAUM GLASS JAYNE CARWILE & PETERS, PLLC
Attorneys for Plaintiff
401 S. Boston Avenue, Suite 2000
Tulsa, Oklahoma 74103
(918) 938-7944
BY: ANDREW JAYNE, ESQ.
AJayne@bgjclaw.com

GREENBERG TRAURIG, LLP
Attorneys for Intervenor Plaintiff
54 State Street, 6th Floor
Albany, New York 12207
(518) 689-1435
BY: CYNTHIA E. NEIDL, ESQ.
Neidlc@gtlaw.com

A P P E A R A N C E S (Continued):

DLA PIPER, LLP
Attorneys for Defendants
677 Broadway - Suite 1205
Albany, New York 12207
(518) 788-9705
BY: JEFFREY D. KUHN, ESQ.
ROBERT J. ALESSI, ESQ.
MATTHEW M. GRAVES, ESQ.
Jeffrey.Kuhn@dlapiper.com
Robert.Alessi@dlapiper.com
Matthew.Graves@dlapiper.com

ALSO PRESENT:

Carol Clark, DLA Piper
Frank Sarratori, Pioneer Bancorp
Janelle Murnane, Esq, Hinckley Allen
Michael Bennett, Legal Video Specialist

**********

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be waived and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

**********

PROCEEDINGS

Albany, New York, Tuesday, September 14, 2021; the proceedings commenced as follows:

- o0o -

VIDEOGRAPHER: Here begins video number one, Volume I in the deposition of Michael T. Mann, taken in the matter of Southwestern Payroll Services Inc, Plaintiff versus Pioneer Bancorp Inc, et al, Defendant, and National Payment Corporation, Intervenor Plaintiff, versus Pioneer Bancorp Inc, et al, Defendants in the United States District Court of the Northern District of New York, Case Number 1:19-cv-1349.

Today's date is September 14th, 2021; the time is approximately 9:35 a.m.

This deposition is being taken at the offices of DLA Piper, LLP located at 667 Broadway in Albany, New York and was made at the request of Defendant Pioneer Bancorp Inc.

My name is Michael Bennett; I am the videographer. The court reporter is Mary

PROCEEDINGS

Agnes Drury from Gregory Edwards, LLC.

Will counsel please identify themselves at this time.

MR. KUHN: Sure. My name is Jeffrey Kuhn, representing Pioneer Bank and Pioneer Bancorp. From DLA Piper.

MR. ALESSI: Robert Alessi, DLA Piper representing the Pioneer parties.

MR. JAYNE: Andrew Jayne, Southwestern Payroll.

MS. NEIDL: Cynthia Neidl with Greenberg Traurig for National Payment Corp.

MR. GRAVES: Matthew Graves from DLA Piper, representing the same entities as my colleagues.

MR. SARRATORI: Frank Sarratori from Pioneer Bank and Pioneer Bancorp.

MS. MURNANE: My name is Janelle Murnane.

I do not represent Mr. Mann in this action. I, along with my former colleague. Mr. Koenig represented Mr. Mann in a criminal action called, "The United States

PROCEEDINGS

of America versus Michael T. Mann," and in a state court criminal prosecution, "The People of the State of New York against Michael T. Mann."

Mr. Mann was sentenced in federal and state court on August 4th.

I'm here as a courtesy to Mr. Mann to ensure that nothing infringes upon his criminal cases and ensures that he preserves his attorney/client privilege should that issue arise.

I have not entered an appearance in this civil case or any civil case for Mr. Mann, so I don't represent him for purposes of this deposition; rather, I'm here at Mr. Mann's request to protect any of his rights that may bare upon the criminal cases.

And I'm here at the courtesy of the respective parties who have agreed to allow me to sit in the deposition as Mr. Mann's criminal defense attorney, to ensure that his rights in connection with his criminal case are protected; but again, not in the

MICHAEL T. MANN

capacity of his attorney for the purposes of this civil litigation.

VIDEOGRAPHER: Thank you all very much.

Will the reporter please swear in the witness.

M I C H A E L T. M A N N,

called as a witness, having been duly sworn or affirmed by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. KUHN:

Q. Mr. Mann, my name is Jeffrey Kuhn. I'm an attorney with the law firm of DLA Piper; and as I've just said, I represent Pioneer Bank and Pioneer Bancorp in this matter.

Can you hear me okay? I just want to make sure.

A. Yes, I do.

Q. Okay. Can you please state and spell your full name for the record?

A. Yes. Michael Thomas Mann. Michael is M-i-c-h-a-e-l; Thomas, T-h-o-m-a-s; Mann, M-a-n-n.

MICHAEL T. MANN

Q. Great. Thank you. I'd like to briefly review the rules of the road so we can get through the deposition as smoothly as possible.

Do you understand that you are under oath and obligated to truthfully answer the questions I ask you, unless your attorney instructs you otherwise?

A. Yes.

Q. Do you understand that the testimony you provide today is the same as if you are testifying in court?

A. Yes.

Q. The court reporter is preparing a transcript of your testimony here today. Accordingly, please wait to speak until my question is finished, so the court reporter can transcribe the testimony accurately.

I will also do my best to wait to ask a question until you've finished answering the last question.

Is that clear?

A. Yes.

Q. Also, please articulate your answers

MICHAEL T. MANN

audibly in words, instead of nodding, shaking your head, or saying "uh-huh" or "um-huh."
Okay?
A. Okay.
Q. All right. If there is any part of my question that you do not understand, please ask me to repeat the question or tell me the portion of the question that you do not understand, and I will do my best to rephrase it.
Do you understand that?
A. Yes.
Q. If you do not hear any question clearly, please tell me and I will repeat the question.
Do you understand that?
A. Yes.
Q. If you answer, I'm going to assume that you heard and understood my question.
Do you understand that?
A. Yes.
Q. If you need to take a break during the day, please let me know, and we will take a break at the next convenient stopping point,

MICHAEL T. MANN

okay?
A. Okay.
Q. The only exception is if I asked you a question and you have not yet given an answer, you will need to answer the question before we take a break.
Do you understand that?
A. Yes.
Q. Is there anything that might interfere with your ability to testify truthfully and accurately here today; such as illnesses, drugs, or medications?
A. No.
Q. Many of my questions will ask you for a yes-or-no answer, and I would appreciate if you would provide a yes-or-no response when appropriate?
A. Okay.
Q. In terms of definitions: If I use the term "ValueWise affiliates" or "ValueWise entities" today, I mean any company that you or ValueWise directly or indirectly held an ownership interest in. Okay?
A. Okay.

MICHAEL T. MANN

Q. So ValueWise affiliates or ValueWise entities would include ValueWise itself, and all of ValueWise's various d/b/as and MyPayrollHR, Cloud Payroll, Pro Data Payroll, Southwestern Payroll, Ross Personnel Consultants, Always Live Holdings, Kaningo, HireFlux, Viverant, Heutmaker Business Advisors, Weitz & Associates, FocalPointe Group, Create Force, Lincoln Academy, True Consulting, and True HR.
Okay?
A. Okay.
Q. Your relationship with Pioneer Bank began in 2009, correct?
A. Yes.
Q. And an attorney representing ValueWise Inc, Vincent Valenza referred you to David Blessing at Pioneer Bank, correct?
A. That's what I recall.
Q. Prior to being referred to Mr. Blessing by Mr. Valenza, did you know Mr. Blessing?
A. No.
Q. Did you even know who he was?

MICHAEL T. MANN

A. I heard of him, because I was -- I did know his younger brother; he was in my graduate class.

So I -- before I met him, they said he was a class ahead of me, but I didn't know him personally, other than I knew who he was when I first met him; meaning, he was related to the brother in my class, but I didn't know him, so...

Q. Okay. Were you good friends with the -- with his younger brother when you were in high school?

A. I wouldn't call it good friends. We knew each other and were always friendly, but he wasn't someone I socialized with outside of graduate school activities.

Q. Okay. I'm sorry, you said graduate. I said high school, but you said graduate school?

A. It was in graduate school, yes.

Q. Okay. Now, ValueWise acquired MyPayrollHR.com LLC in January 2017; is that correct?

A. Yes, that's correct.

MICHAEL T. MANN

Q. For the sake of the deposition today, I'm not going to say "MyPayrollHR.com LLC," I'll just say "MyPayroll," is that okay?

A. That's fine.

Q. Now, part of the reason ValueWise acquired MyPayroll was to be able to use the funds collected from employer clients for the payment of taxes, before those taxes were due to be paid to taxing authorities, correct?

MR. JAYNE: Object to form.

THE WITNESS: Just ask it again; I think -- I want to make sure I got it.

Q. Sure. Part of the reason that ValueWise acquired MyPayroll was to be able to use the funds collected for employer clients for the payment of taxes, before those funds were due to be paid to the taxing authorities, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Objection.

THE WITNESS: Yeah. When -- I want to make sure I answer the right question.

If you are saying I was buying a company to -- in 2013, to use the funds for

MICHAEL T. MANN

something other -- as part of owning a payroll company, I'm not sure, I'm going to answer it this way; and if I'm not answering the right question, ask it differently.

Part of the responsibility of a payroll company is to collect taxes; at least a service bureau is to collect taxes from the companies and pay them on their behalf to the taxing authorities.

So I was aware of that, but I'm not sure if that's your question.

BY MR. KUHN:

Q. Well, there is a period of time after funds are collected from MyPayroll's employer clients, but before those funds are due to be paid to taxing authorities, correct?

A. There is a time, yes.

Q. Okay. And does -- was your intention in acquiring MyPayroll, was part of your intention of acquiring MyPayroll, to be able to use those funds during that interim period?

MR. JAYNE: Object to form.

MICHAEL T. MANN

THE WITNESS: To the best of my recollection, not for buying the payroll company, it was not the intention to use it then for myself or outside of that, no.

Q. Okay. Are you familiar with the term "float" with respect to payroll companies?

A. Yes.

Q. How would you define the float with respect to the payroll processing industry?

A. Right. The float is what you're referring to, the time between you get the money from the clients, until the time you pay it to the taxing authority; that's what I would call the float.

Q. Okay. And -- all right. ValueWise acquired 100 percent of MyPayroll in December 2013, correct?

A. Correct.

Q. Now, after ValueWise acquired MyPayroll in December 2013, what was your title at MyPayroll?

A. Before we acquired it?

Q. After ValueWise acquired it.

A. After we acquired it I would

MICHAEL T. MANN

probably have called myself president of MyPayroll, or something like that.

Q. Okay. Now, you testified earlier that when ValueWise acquired MyPayroll, ValueWise "just bought the payroll, not the technology. But we put language in the contract where we would have the right to buy the technology; and we ultimately did."

Correct?

A. That is correct.

Q. By "the technology" you were referring to a software program, correct?

A. Correct.

Q. Okay. And what did that software program do?

A. It is the tool or application a payroll service bureau uses to manage the whole payroll process for your clients.

Q. Okay. Now, earlier you also testified that MyPayroll was a payroll bureau, correct?

A. Correct.

Q. But MyPayroll also developed and marketed this software; is that correct?

MICHAEL T. MANN

A. My -- the company MyPayroll that I purchased in 2013, I just purchased the payroll service bureau, which did not include the technology, the software application.

The company I acquired it from was a software company, and their expertise was in the software realm. They created MyPayrollHR as an experiment, but they weren't experienced at running service bureaus.

So when they were first selling it, because that is just not the business they were in, they were really technologists, I heard them say they were talking to investment partners, that they were looking for money to grow their bigger application, which was separate from the technology we use for the service bureau. So we just negotiated up front to say, I was just concerned that big investor comes in and why are you keeping that software available for that small service bureau. I just wanted the ability, if that ever happened, to purchase the software from them.

Which, as my previous testimony a few years later, that's actually what happened.

MICHAEL T. MANN

Q. Okay. Can you describe what you told Pioneer Bank employees about MyPayroll's software development activities?

A. Can you be more specific -- I mean, can you be more specific?

Q. Well, so there did come a time when MyPayroll got into the software development and marketing business, correct?

A. Correct. We created a company called Cloud Payroll, and we did it under that entity, it's still one of the entities.

But, yes, we as a collective organization did get into it once we acquired the technology.

Q. So was MyPayroll specifically involved in that software development or marketing business?

MR. JAYNE: Object to form.

THE WITNESS: Not really sure of the question, because we would call MyPayrollHR at one point when we -- after we acquired it we created -- we had several entities: We had the service bureaus; MyPayrollHR, Southwestern Payroll, which we acquired,

MICHAEL T. MANN

Pro Data Payroll, they were service bureaus, so I always referred to MyPayrollHR as the service bureau.

And then we had Cloud Payroll, which there were two Cloud Payroll entities, not to make this confusing, but one of them owned, you know, half -- you know, 51 percent of Southwestern and 51 percent of Pro Data. The other Cloud Payroll was what we were calling our technology.

So we were trying to build a company that managed the technology. The employees that ran the service bureau were not the same employees that did the technology, they were different skill sets and different employees.

But I don't -- one last note, just to add, from a corporate structure on -- I don't recall, you know, if -- you know, if technically, if someone was under MyPayrollHR that was working on it, you know, but I was the majority owner of both, we just created different employees and different management.

MICHAEL T. MANN

I don't know if that's answering the question you are asking.

BY MR. KUHN:

Q. Now, earlier you testified that when ValueWise first acquired MyPayroll, MyPayroll was "using a company called PTM" to house MyPayroll tax dollars, correct?

MS. NEIDL: Objection to form.

THE WITNESS: No. PTM never has housed ValueWise's tax dollars or MyPayroll's tax dollars.

Q. Okay. But you testified that after ValueWise acquired MyPayroll, "We continued to use PTM initially as the partner that helped us with our tax payments," and that PTM had several products," and that one of those products involved PTM housing "the tax payments in your bank, but they make the payments for you."

So when ValueWise first acquired MyPayroll in December 2013, can you describe to me step-by-step how funds collected from MyPayroll's employer clients were eventually paid to the taxing authorities, including every

MICHAEL T. MANN

bank account and entity involved?

MR. JAYNE: Object to form.

THE WITNESS: There are several -- your first question I thought was how you described -- my testimony you played back is all accurate.

PTM, when we first set this up, it's very similar to Nat Pay, when we moved to Nat Pay. We use a tax software that actually moves the money, that actually pulls the money from all the client accounts. They then put it in our bank account at Pioneer.

And then when the taxes are due, that technology is the same technology then that will, you know, manage the process of paying all the taxing authorities.

Q. So are you saying that PTM was an ACH processor?

A. It's more complicated than that. PTM was owned by Cachet Bank, which is an ACH processor, so they had an ACH component. But there is also several other tax tools on managing taxes and managing the tax process

MICHAEL T. MANN

that that software provides.

Q. Okay. So back to my question: Can you please describe when ValueWise first acquired MyPayroll, describe step-by-step how the funds collected from MyPayroll's employer clients were eventually be paid to taxing authorities.

And in that description, please include every bank and every entity that is involved in the process.

MR. JAYNE: Object to form.

THE WITNESS: This is the best, because, again, even though I was the executive, if we get into specific details, they were 50, 60 employees under me, but I think I know what you are asking and I think I know best how to describe it.

All of our clients, each client has bank accounts, and there is money sitting in that bank account. People would go in and process their payroll through our front-end, of the system which originally we didn't own, but ultimately we acquired, they would go in and they would process

MICHAEL T. MANN

payroll.

It would then basically take the money from their accounts and probably, I don't know if it goes through, whether it was PTM at the time on the tax side, it would go through some account. PTM had it, but then they put it into our Pioneer account.

The tax software that we're talking about that's PTM and ultimately Nat Pay -- there were some work, I didn't do it, so I can't describe the work, but at some point it manages -- okay. All of these payments, all of these tax dollars that we collected, here is what is due to what place on what date.

And it then, I assume, pulls -- I don't know the pulling, I wasn't involved in that; it takes the money out of our account at Pioneer and then sends it to each of the proper tax authorities; whether it's the federal government on their's or whether it is a state taxing authority or a local taxing authority, and basically

MICHAEL T. MANN

deposits it in the appropriate account.

So that's the flow of money on how the process is supposed to work.

BY MR. KUHN:

Q. So earlier in the deposition you talked about opening an account for MyPayroll at Pioneer in November 2013, correct?

A. Yes, I believe so.

Q. And that payroll account at Pioneer Bank had an account number of 178000212, correct?

A. That's correct.

Q. And I'm going to refer to that today as "account 0212," okay?

A. Okay.

Q. Now, you were responsible for opening MyPayroll's account 0212 at Pioneer Bank, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Correct.

Q. And no one else affiliated with MyPayroll or ValueWise dealt with Pioneer Bank in opening account 0212, correct?

A. Correct.

MICHAEL T. MANN

Q. After you opened account 0212 at Pioneer Bank in November 2013, did the flow of funds from MyPayroll's employer clients to taxing authorities, was it identical to what you just described a few moments ago?

A. To the best of my recollection, yes.

(Whereupon, Plaintiff Exhibit 252, Commercial Account Coversheet, MyPayrollHRCom LLC, Bates Stamped PB-SWP-00000372 to '379, 8-Pages was previously marked for identification.)

BY MR. KUHN:

Q. Now, I've just given you a document that was previously marked as Exhibit 252 for your deposition.

Do you recognize the document that has been marked as Exhibit 252?

A. I mean, it looks very familiar. Yeah, it looks familiar.

Q. What do you identify it as?

A. It looks like a, you know, an account sheet that you use to open accounts.

Q. Now, Exhibit 252 is the November 2013 Account Opening Agreement for

MICHAEL T. MANN

account 0212, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Yep, it appears to be.

Q. Okay. And you signed this Account Opening Agreement twice on Bates page ending 373, right?

A. Yes.

Q. And throughout the course of the deposition today, I will refer to the Bates numbers and refer to the last three digits; I'm not going to give you the whole, you know, I'll just use the last three digits.

And you signed this Account Opening Agreement on Bates pages 374, 375, 376 and 379, correct?

A. That is correct.

Q. And you signed this Account Opening Agreement for account 0212 in your capacity as president of MyPayroll, correct?

A. That is correct.

Q. And you were the president of MyPayroll at the time you signed this account agreement for account 0212, correct?

MICHAEL T. MANN

A. That is correct.
Q. Now, besides Exhibit 252, did you enter into any other agreements with Pioneer Bank regarding account 0212?
MS. NEIDL: Objection to form.
MR. JAYNE: Same objection.
THE WITNESS: One problem: This was opening two accounts, 0212 and 0204, right? I just want to make sure, it wasn't just 0212.
Q. Okay.
A. So it's opening our operating account and the client account.
Q. Well, if you refer to page 373, this document --
A. Yeah, 373 is only 0212.
Q. Okay. And --
A. I talked over you.
Q. Yeah. So 373 only refers to account 0212, correct?
A. That is correct.
Q. And then 375 is a Pioneer Bank Application Form for the linking of account 0212 with an account numbered 178000204,

MICHAEL T. MANN

correct?

A. Yes. Yeah. I just thought I opened at the same time, but I may not have.

Q. So besides Exhibit 252, you did not enter any other agreements with Pioneer Bank regarding account 0212, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: I'm going to ask you to say the question one more time.

Q. Besides Exhibit 252, you did not enter into other agreements with Pioneer Bank regarding 0212, correct?

MS. NEIDL: Objection to form.

THE WITNESS: I don't know if I understand the question. This is the only thing I think I signed, if that's the question. I don't think I had agreement. I'm not sure if I understand the question.

Q. Okay. Well then so this is the only signed agreement you have, you entered into with Pioneer Bank -- strike that.

This is the only signed agreement that MyPayroll entered into with Pioneer Bank

MICHAEL T. MANN

concerning account 0212, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

Q. If you turn to page -- Bates page 373, this is an agreement between MyPayroll and Pioneer Bank concerning account 0212, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. And you signed this page 373 on behalf of MyPayroll, correct?

A. Correct.

Q. You were in charge of managing account 0212 for MyPayroll, correct?

A. Correct.

Q. And there were no other authorized signatories to account 0212 beside yourself, correct?

A. Correct.

Q. Turn to Bates page 375, which is titled the "Pioneer Link Application Form." First, the chart in the middle of the page states that account 0212 is a "checking"

MICHAEL T. MANN

account, correct?

A. Correct.

Q. Now, if you turn back to Bates page 373, it states there that account 0212 will be permanently designated as a checking account, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

Q. So on Bates page 373?

A. Yes.

Q. Do you see on the right side towards the top there is a box that says "Type of Account"?

A. Yes.

Q. And you see that the box for "checking" is checked?

A. Correct.

Q. And do you see that the box for "permanent" is checked?

A. Correct.

Q. Okay. So to get back to my question; Bates page 373 states that account 0212 will be permanently designated as a checking account, correct?

MICHAEL T. MANN

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. So back to Bates page 375, this is an application to link account 0212 with another account held by MyPayroll; account 178000204, correct?

A. Correct.

Q. Now, by linking account 0212 with account 0204, MyPayroll could move funds between those two accounts, correct?

A. It was my understanding that linking accounts -- and there were a lot more than just these two, I signed multiple linking agreements that linked all our accounts; it's less about moving money, it gives you online account access to see all of your accounts, which you can move money when you see all of them.

But all of our accounts were linked on one sign-in, so ultimately, all accounts were linked together.

Q. Okay. So by linking the accounts were you able to move money between the linked accounts?

MICHAEL T. MANN

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Yes.

Q. Okay. So MyPayroll could move funds between account 0212 and account 0204 for any reason?

MR. JAYNE: Objection to form.

MS. NEIDL: Form.

THE WITNESS: Any reason and all the other accounts which aren't showing up; I don't know if there is another sheet, but I could have moved it to other accounts at the time, not just these two.

Q. So you could move money between account -- ultimately, you could move money between account 0212 and other accounts that ValueWise held at Pioneer Bank or ValueWise entities held at Pioneer Bank?

MR. JAYNE: Object to form.

THE WITNESS: At that time, yes, they would ultimately merge.

Again, the purpose when -- my understanding of the purpose was so you don't have to login four different times,

MICHAEL T. MANN

you can just log into one and manage any one of your accounts. And that's how I was told that the Pioneer, you know, linking the accounts was meant for.

But I only see that -- I don't recall the different -- I never remember logging on to multiple things: Just for payroll for this one, ValueWise, I always used one login to be able to access all of the accounts.

BY MR. KUHN:

Q. Well, did MyPayroll move funds between account 0212 and account 0204?

A. Yeah, and I can't speak to different times, I moved and pled guilty to money laundering with the state, I moved money from 0212 to other accounts.

I don't know if I -- I may have moved it to 204, because I usually tried to keep the operating accounts -- because other people would have access, again, I'm not saying I never did, but I'm -- you know, I could have, and I did move money inappropriate from account 0212 to other accounts.

MICHAEL T. MANN

Q. Okay. So you were able to move funds between account 0212 and account 0204, correct?
A. I would have that ability, yes.
Q. Okay. And I guess I'll just ask you, if you could to try and limit your answers to the questions that I'm asking to the extent possible, okay?
A. (Witness nods.)
MR. JAYNE: I will say though, you don't have to take direction from him on that; you may answer the questions the way you feel most appropriate.
MR. ALESSI: I'm sorry, you are not representing this witness. You cannot coach a witness --
MR. JAYNE: I'm not coaching.
MR. ALESSI: Yes, you are. You told him how to answer a question.
MR. JAYNE: He told him how to answer a question, and I told him he's doesn't have to listen to him, he's not his lawyer.
MR. ALESSI: You're not his

MICHAEL T. MANN

attorney.

MR. JAYNE: You are not asking the questions, why are you making objections?

MR. ALESSI: I am in appearance here, I have the right to participate in the deposition.

MR. JAYNE: You absolutely do not. You've got Mr. Kuhn asking questions, he makes the objections.

MR. ALESSI: It doesn't matter.

MR. JAYNE: Yes, it does and you know it does.

MR. ALESSI: He's not going to make objections.

MR. JAYNE: If he's going to say something to the witness, telling the witness how to answer; I can tell him, the witness, that the witness doesn't have to listen to Mr. Kuhn.

MR. ALESSI: He has an attorney here.

MR. JAYNE: She's not representing him.

MS. MURNANE: I'm not representing

MICHAEL T. MANN

him.

MR. ALESSI: I understand; nor can you.

MR. JAYNE: I'm not representing him any more than Mr. Kuhn is. All I said was, he doesn't have to listen to Mr. Kuhn's instructing the witness.

MR. ALESSI: Are you done coaching the witness?

MR. JAYNE: I'm not coaching anyone, and you know it. And it's inappropriate that you're making objections, you're not asking the questions.

MR. ALESSI: I'm not making an objection.

If you have an objection to form, state your objection to form; those are the only objections permitted.

MR. JAYNE: Again, if you wanted to talk in this deposition, ask the questions; if not, be quiet and listen.

MR. ALESSI: It's not the rules of the road in federal court.

MR. JAYNE: Absolutely, it is

MICHAEL T. MANN

absolutely the rules.

MR. ALESSI: There's three attorneys from DLA Piper that will be asking questions today.

MR. JAYNE: Absolutely that will not happen; that's not the rules. You designate one lawyer to ask the questions. I've never once been in a deposition where multiple lawyers ask questions.

MR. ALESSI: You're going to learn today. And we can go to the magistrate, if we have to.

(Whereupon, Plaintiff Exhibit 253, Account 0212 Statement Dated 12/31/13, Bates Stamped PB-SWP-00002174 to '183, 10-Pages was previously marked for identification.)

BY MR. KUHN:

Q. I've given you a document that was previously marked in this deposition as Exhibit 253.

Do you recognize the document that's been marked Exhibit 253?

A. Yes.

MICHAEL T. MANN
Q. Exhibit 253 is the December 2013 statement for account 0212, correct?
A. Correct.
Q. So if account 0212 was opened in late November 2013, this would be one of the first account statements ever generated for account 0212, correct?
A. Correct.
Q. And Exhibit 253 shows the activity in account 0212 starting on December 17, 2013, correct?
A. Correct.
Q. Now, the first five pages of Exhibit 253 show many deposits into account 0212 on December 17, 2013, correct?
A. Correct.
Q. And then Bates page 2179 shows that the deposit on December 17, 2013, totalled about $737,000; correct?
A. Where?
Q. So if you go to page Bates 2179 --
A. Yeah.
Q. -- where all the deposits on December 17th, 2013, finish, right, so you see

MICHAEL T. MANN

at the top of the page?
A. Oh, okay, yep.
Q. You'll see that the total deposits into account 0212 on December 17th, 2013, total $737,355.09; correct?
A. Correct.
Q. And then the only withdrawal on December 17, 2013, was an internet transfer to 3614 of $180,000; correct?
A. Correct.
Q. Now, account 3614 is a general corporate checking account at Pioneer Bank held by ValueWise with an account number 8603614, correct?
A. That is correct.
Q. In December 2013, ValueWise used account 3614 as a general deposit checking account, correct?
A. Correct.
Q. Now, an internet transfer to 3614 means that on December 17, 2013, $180,000 was transferred from MyPayroll's account 0212 to ValueWise's account 3614, correct?
A. Correct.

MICHAEL T. MANN

Q. And you personally initiated that internet transfer of $180,000 from account 0212 to account 3614, correct?

A. Correct.

Q. And then on the next day, December 18, 2013, there are two more transactions transferring a total of $350,000 from account 0212 to account 3614, correct?

A. Correct.

Q. And then another $330,000 was transferred on December 23rd, 2013, from account 0212 to account 3614, correct?

A. Correct.

Q. And then on the next page, which is page2180, on December 27, 2013, another $400,000 was transferred from account 0212 to account 3614; correct?

A. Correct.

Q. Now, you personally initiated all of those transfer of funds from account 0212 to account 3614, correct?

A. Correct.

Q. Can you describe the purpose of the transfer of the funds from account 0212 to

MICHAEL T. MANN

account 3614 in December of 2013?

A. I don't know the exact reason, but I know it's not appropriate and I shouldn't have done it. But I don't know why, and I pled in state court that that's what I did, yes.

Q. Well, can you -- you said you don't know the exact reason. Can you give me -- what can you tell me about why, the purpose of those transfers?

A. I could have been using it to cover another charge for a short period of time. It could have been -- I don't know a specific, I can only give you examples on why.

Q. Okay. Now, when account 0212 was opened at Pioneer Bank, MyPayroll was able to transfer money between account 0212 and other accounts at Pioneer Bank held by ValueWise affiliates, correct?

A. Correct.

Q. And when account 0212 was opened at Pioneer Bank, MyPayroll was able to comingle the funds in account 0212 with funds in other accounts at Pioneer Bank held by MyPayroll or other ValueWise affiliates, correct?

MICHAEL T. MANN
MS. NEIDL: Objection to form.
MR. JAYNE: Same objection.
THE WITNESS: I could. I didn't put them in all, but yes, I had the ability to put funds anywhere.
Q. Okay. Now, when account 0212 was opened, there was no agreement between MyPayroll and Pioneer Bank that the funds in account 0212 were to be kept separate and isolated from other accounts at Pioneer Bank, correct?
MS. NEIDL: Objection to form.
MR. JAYNE: Objection to form.
THE WITNESS: Yes, there was no agreement between us. Correct.
Q. Now, if you turn back to Exhibit 252, which is the first one I asked you to look at, 252?
A. Um-huh.
Q. Which is the -- if you specifically turn to page Bates page 373?
A. Um-huh.
Q. In the top right-hand corner of that page, there are the handwritten words "client

MICHAEL T. MANN

account," correct?

A. Correct.

Q. Do you know who wrote the words client account on Bates page 373?

A. I don't recall.

Q. Okay. So you do not know who wrote the words client account on Bates page 373, correct?

A. I don't know.

Q. Okay. Now, the fact that the words client account were written on Bates page 373 did not restrict MyPayroll from transferring funds from account 0212 to other accounts at Pioneer Bank held by other ValueWise affiliates, correct?

MR. JAYNE: Object to form.

THE WITNESS: Correct.

Q. Now, if you turn back to Exhibit 252 at the same page we've been looking at, do you see your signature on the right-hand side of 373, you signed this document and certified the accuracy of the information provided in the Account Opening Agreement for account 0212, correct?

MICHAEL T. MANN

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. And under "Type of Account," account 0212 was opened as a "checking" account, right?

MS. NEIDL: Objection to form.

THE WITNESS: Correct.

Q. And this -- and page 373 does not state anywhere that account 0212 will be a trust account, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: Yeah, I don't see it anywhere. Correct.

Q. Now, with respect to bank accounts, you understand the difference between a general demand deposit checking account on one hand and a special purpose or trust account on the other?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: I -- when I -- I wasn't a payroll person when we first acquired MyPayroll, so I called it a tax

MICHAEL T. MANN

account. I didn't know the exact words.

So obviously after everything happened, I always referred to it as a tax account. But when I first got into this I wasn't -- I didn't know the exact account name to ask for when I opened this.

BY MR. KUHN:

Q. So my question though was: Do you understand that a general demand deposit checking account, that funds in a general demand checking account are unrestricted and can be withdrawn by the accountholder at any time for any reason?

MS. NEIDL: Objection to form.

THE WITNESS: Correct.

Q. All right. And in contrast, the funds in a special purpose or trust account are restricted, and they can only be withdrawn from the account for a specific purpose agreed to by the bank and, must be kept separate and isolated from other accounts, correct?

MS. NEIDL: Objection.

THE WITNESS: Correct.

Q. Now, you never told anyone at

MICHAEL T. MANN

Pioneer Bank that you wanted account 0212 to be a special purpose or trust account, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: I never used those words, correct.

Q. And no one at Pioneer Bank ever told you that account 0212 was a special purpose or trust account, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: Yeah, no one ever used those words before, we always referred to it as a tax account.

Q. Who is the "we" in that sentence?

A. I have used that with -- there were e-mails in the last deposition that we talked about it. When I was working with Pioneer I, at times, would say -- I would either say "0212" or I would say the "tax account," so I would use those words often.

Q. Now, the fact that MyPayroll could transfer money between account 0212 and other accounts at Pioneer Bank, that confirms that

MICHAEL T. MANN

account 0212 was not a trust account, correct?

A. Correct.

MR. JAYNE: Objection to form.

MS. NEIDL: Same objection.

THE WITNESS: Correct.

(Whereupon, Plaintiff Exhibit 32, 32, Account 0212 Statement Dated 8/30/19, Bates Stamped PB-SWP-00030576 to '667, 92-Pages was previously marked for identification.)

BY MR. KUHN:

Q. Now, I've just given you a document that has been previously marked as Exhibit 32 in your deposition. Exhibit 32 is an August 2019 statement for account 0212, correct?

A. Correct.

Q. And Exhibit 32 shows the activity in account 0212 in August 2019, correct?

A. Correct.

Q. Now, if you'll turn to Bates page 30581?

A. (Witness complies.)

Q. That's page five at the top.

MICHAEL T. MANN

Do you see about halfway down the page there is a list of 25 withdrawals on August 1st, 2019?

A. Yes.

Q. Okay. Each of those 25 withdrawals says "internet transfer to checking," and then a four digit account number, correct?

A. Correct.

Q. And each of those accounts are other general deposit checking accounts held by ValueWise affiliates at Pioneer Bank, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. Now, you personally initiated the 25 internet transfers of funds from account 0212 on August 1st, 2019, shown on page 30581, correct?

A. Correct.

Q. For example, in the middle of that list there is a transfer of $141,000 from account 0212 to account 1996 on August 1st, 2019, correct?

A. Correct.

MICHAEL T. MANN

Q. Account 1996 is account 178001996, which was held by Southwestern Payroll Services, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: I can -- to answer this the best, I opened a Southwestern Payroll account that I used to transfer to that.

But -- so if -- it was a Southwestern Payroll account that I opened at Pioneer Bank.

Q. Account 1996?

A. It could be. I don't recall the numbers. If you have a document and I see it, I'll believe it.

Q. I'll represent to you that account 1996 is the Southwestern Payroll account that you opened at Pioneer Bank.

A. Correct.

MR. JAYNE: Object to form.

THE WITNESS: Okay.

Q. Now, in August of 2019, Southwest Payroll Services used account 1996 as a general

MICHAEL T. MANN

deposit corporate checking account, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: It was a general deposit checking account, correct.

Q. In the name held by Southwestern Payroll?

A. Yeah, I opened it as Southwestern Payroll.

Q. Now, at the bottom of the page; back to page 30581, there were transfers of $450,000; $985,000; $986,000; $987,000, $988,000 and $989,000 from account 0212 to account 3648 on August 1, 2019, correct?

A. Correct.

Q. Now, account 3648 is account 8603648, which was held by ValueWise d/b/a Primacy Search Group, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Correct.

Q. In August 2019, ValueWise used account 3648 as a general deposit corporate checking account, correct?

MS. NEIDL: Objection to form.

MICHAEL T. MANN

THE WITNESS: Correct.

Q. Prior to the 25 internet transfers from account 0212 on August 1st, 2019, account 0212 had a balance of $16,353,176.69, correct?

A. Correct.

Q. Now, after those 25 internet transfers from account 0212, account 0212 had a balance of $4,622,176.69, correct?

A. Correct.

Q. On August 1st, 2019, MyPayroll transferred $11,730,999.90 from account 0212 to several general deposit corporate checking accounts at Pioneer Bank held by multiple ValueWise affiliates, correct?

A. Correct.

Q. Now, if you turn to Bates page 30584, also page eight. On August 2nd, 2019, MyPayrollHR made a similar series of internet transfers of approximately $2.7 million from account 0212 to several general deposit corporate checking accounts at Pioneer Bank held by multiple ValueWise affiliates, correct?

MS. NEIDL: Objection to form.

MICHAEL T. MANN

THE WITNESS: Correct.

Q. And if you go through Exhibit 32, the entire thing, on every business day during August 2019, MyPayroll made similar series of internet transfers of millions of dollars from account 0212 to several general deposit corporate checking accounts at Pioneer Bank held by multiple ValueWise affiliates, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. Now, you personally initiated all the transfer of funds from account 0212 to checking accounts at Pioneer Bank held by other ValueWise affiliates shown in Exhibit 32, correct?

A. Correct.

Q. Describe the purpose of these round dollar transfer of funds from account 0212 to checking accounts held by other ValueWise affiliates in August of 2019?

A. I, in most cases, was probably covering money I owed to put into those accounts.

MICHAEL T. MANN

Q. Money you owed to who?

A. It could have been anywhere. I had, you know -- again, one of the things that I pled to was kiting. It is a form of kiting going on here.

Q. What else?

A. I mean, I'm not sure what else I'm doing it. I could have used it for other things. But I was miss -- you know, I was moving money out of an account that I shouldn't have been doing for covering again -- again short in other accounts. I was using this float to cover other financial money shortages at that time.

Q. Were some of those using the funds for general business purposes for some of these other entities?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: I mean --

Q. Let me restate that.

Were you using the funds from 0212 to cover business expenses for other ValueWise entities?

MICHAEL T. MANN

A. I wouldn't be able, without looking at things and getting an accurate view of each business. The majority of the accounts that I see here were really accounts that weren't used as real operating accounts in our majority of our functioning businesses.

Because I would have other people associated with a lot of our operating accounts. I really kept moving money to accounts where I would be the only one to see it.

And again, if you look at some of the entities that had a lot of employees and had a finance person, I wouldn't be typically moving it to that. Most of these accounts were really -- I opened, not even using some of the business names, to use the account so I could kite stuff.

I'm saying that's the majority -- I'm not saying all, but that's the majority of the activity here.

Q. So when you say "it's not all," is it correct that you would use funds from 0212 for business expenses for other ValueWise

MICHAEL T. MANN

affiliates?

MS. NEIDL: Objection to form.

THE WITNESS: The reason why I'm -- I mean, I don't know for sure.

Again, I can pick a company as an example and I could walk through each entity from ValueWise.

But Viverant had their own finance person; I wouldn't move an 0212 account movement in there.

Again, I'm not saying -- I can't sit here and say I never did, because I could have, but that wasn't the general purpose and -- but, you know, I just don't recall, I think is the best way to answer, but I could have easily done it.

What I remember at this period of time is just moving money to cover just float issues I had on other accounts just to pay it.

I mean, part of it could be doing this because of losses, but I didn't really use it as an account that a lot of our operating companies said, hey, do you need

MICHAEL T. MANN

money from the 0212 account, so...

BY MR. KUHN:

Q. When you say you "could have been doing because of losses," what do you mean by that?

A. I mean, there are several losses that contributed to my -- the activity that I had here. Some of it was inappropriate factoring companies I set up and they had very high interest rates over time, and that built up and, you know, after four or five years of that activity was, you know, probably several million a day.

You know, it's hard for me right now to say. I really kept -- that's why I opened several demand accounts, just me, I didn't talk to the finance people in a lot of these companies to say hey, I'm opening another Pro Data account. Just like I didn't call up Darin and say, hey, I opened this.

I was creating these accounts to kite money to just cover this extreme negative balance I was in at the time.

Q. And my question isn't just limited

MICHAEL T. MANN

to August 2019.

Through the history of account 0212, did you transfer funds from account 0212 to cover business expenses from other ValueWise entities?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: Yeah. And I could say in that first one we -- you showed me early on at 3614, that was a business account entity I was probably covering -- I don't know what I was covering, I can't testify to, but I had -- I had moved that into real operating accounts at times that I wasn't using just for this.

BY MR. KUHN:

Q. So just to make sure I understand your testimony: You, throughout the history of account 0212, would transfer funds from account 0212 to cover business expenses of other ValueWise entities, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: Correct.

MICHAEL T. MANN

Q. So there was never any agreement between MyPayroll and Pioneer Bank that the funds in account 0212 were to be kept separate and isolated from other accounts at Pioneer Bank, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: Correct.

Q. And neither you nor anyone else representing MyPayroll ever asked Pioneer Bank to restrict account 0212 so that the funds could not be transferred out of account 0212 to other accounts at Pioneer Bank, correct?

MR. JAYNE: Object to form.

THE WITNESS: Correct.

Q. So there was never any agreement between MyPayroll and Pioneer Bank to restrict or limit in any way, MyPayroll's use of the funds in account 0212, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: Correct.

Q. From the time account 0212 was opened in November 2013 through September 2019,

MICHAEL T. MANN

MyPayroll could withdrawal and transfer funds from account 0212 for any reason?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. From the time that account 0212 was opened in November 2013 through September 2019, MyPayroll regularly transferred funds from account 0212 to entities that were not taxing authorities, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: Correct.

Q. I'm going to read you a passage from your earlier deposition testimony regarding account 0212.

So there were multiple things going on that -- excuse me, I'll start over.

"So there are multiple things that were going through in account ending in 0212. We were running payroll through it most of the time. We had tax going through it. We also had some other payroll-related activities, you know, if someone was using us to write their

MICHAEL T. MANN

checks, it was a service we offered; we would need to house the money in an account and it wasn't tax related."

So MyPayroll used account 0212 for purposes that were not tax related, correct?

MR. JAYNE: Object to form.

THE WITNESS: Correct.

Q. So MyPayroll did not use account 0212 only to deposit funds eventually to be paid to taxing authorities, correct?

A. Correct.

Q. And MyPayroll used funds in 02 -- in account 0212 for reasons besides paying taxes or payroll, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

MR. KUHN: Do you want to take a break?

THE WITNESS: I'm still good.

MR. KUHN: Okay. We'll keep going.

BY MR. KUHN:

Q. Now, ValueWise acquired Pro Data Payroll Services Inc in December 2016, correct?

MICHAEL T. MANN

A. Correct.

Q. What was your role in ValueWise's acquisition of Pro Data Payroll Services?

A. Can you be more specific? I mean, I was the major shareholder owner, ValueWise wanted to acquire them, but I think you're asking me a different question.

Q. Well, I mean, did you negotiate the terms of ValueWise's acquisition of Pro Data Payroll?

A. With working with John Reinke. John Reinke was with us at the time, and so I worked with him as well. There were -- kind of, I got feedback from other people in our company, but I was the decisionmaker and the person that was ultimately responsible for what we agreed.

Q. Were you involved in the negotiations of the acquisition of Pro Data Payroll Services?

A. Absolutely. Absolutely.

Q. And you have -- after the acquisition transactions, after the transaction whereby ValueWise acquired Pro Data Payroll Services in December 2016, describe the

MICHAEL T. MANN

ownership of Pro Data Payroll Services?
A. Cloud Payroll, which, I don't recall if it was my entity separate or ValueWise entity, but they were all part of the ValueWise entities you described owned 51 percent of it, and I forget if it was just Horatio or if he had one other gentleman had 49, but Horatio Lopez was the main minority guy. He may be the only one. But, yeah, I had 51 percent.
Q. Who is Horatio Lopez?
A. He was the previous 100 percent owner of Pro Data Payroll, and he sold 51 percent of his business to us and he -- or he and another gentleman, I just don't recall, owned 49 percent.
Q. Okay. So Cloud Payroll purchased 51 percent of Pro Data Payroll Services, correct?
A. Correct.
Q. And that's -- who owned Cloud Payroll?
A. That's where I'm trying to recall if ValueWise owned it or if I owned Cloud Payroll. I don't recall.

MICHAEL T. MANN

There was a reason why we were doing it, and I know even -- I was working with Dave Blessing at Pioneer at the time. There was a way we were trying to figure out -- there was a reason why -- I just don't know if ValueWise owned Cloud Payroll or if I owned it; I just don't recall, but one of the two owned Cloud Payroll.

Q. Did the need to form Cloud Payroll have something to do with the fact that Pro Data Payroll Services was an S Corp?

A. That sounds familiar. So probably, that sounds familiar.

Q. But other than that, does that refresh your recollection at all about --

A. There is two --

Q. Hold on a second.

A. Sorry.

Q. Does that refresh your recollection at all about the way that Pro Data Payroll Services was acquired?

A. Yes, that was a driving factor, but that was also part of our plan to put all the payroll companies under one umbrella, so the

MICHAEL T. MANN

two worked well together.

But, yes, that was a driving factor to do it then.

Q. Describe what services Pro Data Payroll provided to its customers?

A. I mean, it was a payroll service bureau, so it provided payroll and tax services; lump them together where they would help companies basically run their payroll and make sure they stayed tax compliant and do it appropriately.

Q. Describe the operating relationship between Pro Data Payroll Services, MyPayroll, and Cloud Payroll?

A. So to the best of my recollection Cloud Payroll, at least the entity that acquired it was really a holding company that just owned it.

MyPayroll and Pro Data Payroll, I viewed them as two service bureaus.

Pro Data was based in north of Chicago and had a lot of clients in that area. I mean, everyone had clients all over the country, but they brought clients -- MyPayroll

MICHAEL T. MANN

was based in Clifton Park, New York, it had clients all over.

So MyPayroll and Pro Data were, you know, just basically two separate bureaus; they had different managers that managed them day-to-day. Although, all the bureaus rolled up to John Reinke, who managed all of our payroll business who reported to me.

Q. Now, you said a couple of seconds ago that Cloud Payroll was a holding company, correct?

A. There were two Cloud payrolls, one of them was a holding company, correct.

Q. Let's get back to the Cloud Payroll in a few minutes.

But Pro Data Payroll Solutions had an account at Pioneer Bank, correct?

A. I opened an account in Pro Data's name at Pioneer.

Q. And that account was number 178001988, correct?

A. Sounds familiar.

Q. Can you describe for me step-by-step how the money collected from Pro Data Services

MICHAEL T. MANN

employer clients eventually flowed to taxing authorities; including each bank involved and each entity involved in that flow of funds?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: It is the same as the process I described with MyPayroll.

They would have clients that would have bank accounts, they would process their payroll.

Before Nat Pay, we used PTM. I don't know the exact mechanics, but basically they would move the money from the client accounts into originally 212, and we changed tax accounts towards the end, but 212.

And then when it was time to make the tax payments, they would take the money out of 212 and pay the taxing authorities; federal, state, and local.

BY MR. KUHN:

Q. Who is the "they" in that sentence?

A. Whether it's PTM or Nat Pay, I use the they, their software, but they're the

MICHAEL T. MANN

ones that moved the money for the tax dollars.

Q. And they moved -- either PTM or Nat Pay. Who instructs PTM or Nat Pay in that scenario where to move the money to?

MS. NEIDL: Objection to form.

THE WITNESS: So the payroll systems, when people use the payroll system, collect all the information on the employer, where they are based, based on where the employee lives, where are they working; there is all of these payroll rules that generate the map to the regulations, to laws to say, here is how you pay taxes.

So this payroll software -- and I don't know, I was not in the detail on, you know, what all lies in the payroll software versus the PTM or Nat Pay software, I don't know exactly how they work; I know they work together to basically make all of this work and make sure you pay people appropriately, but...

BY MR. KUHN:

Q. So I do want to walk through it

MICHAEL T. MANN

step-by-step. I want to make sure we understand it.

Let's use Pro Data Payroll Services right now.

A. Um-huh.

Q. Money is in an account held by an employer client of Pro Data Payroll Services at some bank, correct?

A. Correct.

Q. Then that money is -- where is the next bank? So when the money is collected from that account, right, where is the next bank account that that money goes to?

A. I don't know all the mechanics on how it ends up in the 0212 account. I'm not exactly sure how PTM or Nat Pay orchestrate their technology to move the money. But it is just understood; PTM does it, Nat Pay, all the tax companies that -- most payroll service bureaus have an account at their bank where they hold it until the money comes out.

Q. Between the money being -- when the money is collected from Pro Data Payroll Services' employer clients from their accounts

MICHAEL T. MANN

at their banks, does the money first go to a bank account held by either PTM or to Nat Pay?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: On the tax side, I'm not exactly sure. It probably goes through one, but I don't know. I don't know the answer to that.

Q. So you testified just a few minutes ago that there were two Cloud payrolls. And then earlier in your -- correct, there were two Cloud Payrolls?

A. There were two. We had Cloud Payroll Delaware and Cloud Payroll Massachusetts I think was an old MyPayroll that we changed the name to Cloud Payroll; it's complicated, and I don't know if I'll get it right today.

Q. Okay. So you testified in your earlier deposition and I'll quote, "We had a MyPayrollHR that we changed the name to Cloud Payroll; that was one entity, and then we had another Cloud Payroll, so I get them confused."

Correct?

MICHAEL T. MANN

A. Yes. And I just re-said that, yes.

Q. So did you eventually change the name of the company known as MyPayroll that ValueWise acquired in December 2013 to Cloud Payroll?

A. Correct. What I don't recall is we either created another MyPayroll. I don't recall all the moves, because we were trying to make it all fit together and it was a mess, and we were still in the process of trying to get the companies right on how we wanted the companies to be.

Q. Okay. I'm just trying to hammer down what we can be certain of today.

The company that ValueWise acquired in December 2013, its name was -- its name was eventually changed from MyPayroll to Cloud Payroll; is that correct?

MS. NEIDL: Objection to form.

THE WITNESS: I believe so.

Q. Okay. But then there is another entity called Cloud Payroll that was formed with respect to the acquisition of Pro Data Payroll Services, correct?

MICHAEL T. MANN

A. Correct.

Q. And those are two different entities?

A. Correct.

Q. Okay. Do you know when you changed the name of MyPayroll to Cloud Payroll?

MS. NEIDL: Objection to form.

THE WITNESS: I don't know exactly when.

Q. Okay. Can you describe why you changed the name of MyPayroll to Cloud Payroll?

MS. NEIDL: Objection to form.

THE WITNESS: Ultimately -- and we were in discussions with Pro Data and Southwestern, that we ultimately wanted to have one brand called Cloud Payroll.

So we started working on our logos and our cites to start making it look together.

We didn't want to shock all the clients; Southwestern has a loyal following, so if we just showed a new logo and new name and called it Cloud Payroll, people may have a problem.

MICHAEL T. MANN

So we were, at the end, redesigning their website and make it look more like Cloud Payroll.

So we were going to take baby steps to ultimately get all the three service bureaus under one name, one company.

So that was the ultimate goal and why there were these name changes and moving things around.

BY MR. KUHN:

Q. So account 0212 that we discussed a few minutes ago, that was opened by you as president of MyPayroll in November 2013, correct?

MR. JAYNE: Object to form.

THE WITNESS: Correct.

Q. And account 0212 was still being used as of September 2019, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Correct.

Q. And the name on account 0212 was never changed from MyPayroll to Cloud Payroll, correct?

A. Correct.

MICHAEL T. MANN

Q. Can you describe your communications with Pioneer Bank concerning changing the name of MyPayroll to Cloud Payroll?

A. We may never have communicated that.

Q. Okay. And the other Cloud Payroll, the Cloud Payroll that was formed for purposes of the Pro Data Services acquisition, do you know when that company was formed?

A. Most likely shortly before the acquisition of Pro Data Payroll.

Q. Okay. Are there any other Cloud Payrolls besides these two that we're talking about?

A. I don't think so.

Q. Okay. As of September 2019, there were four checking accounts at Pioneer Bank held by Cloud Payroll. One account ending in 1640, one account ending in 2066, one account ending in 2832, and one account ending in 2440, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. Which Cloud Payroll held those

MICHAEL T. MANN

checking accounts at Pioneer Bank?

A. The best way to answer my -- my guess is the Cloud Payroll from Pioneer Bank's perspective, because I didn't change the name of 0212 or 0204 would be the Cloud Payroll that I had started in -- right before the acquisition of Pro Data.

Q. Okay. So just for clarity sake, for the rest of this deposition, when I refer to "Cloud Payroll," okay, I'm referring to that entity that you testified was formed related to the acquisition of Pro Data Payroll Services, okay?

A. Okay.

MR. JAYNE: Hey, Jeff, whenever you get to a stopping point, Mr. Mann is tough, but my bladder will not let us go much longer.

MR. KUHN: Okay. Three minutes?

MR. JAYNE: Fine.

BY MR. KUHN:

Q. And if I refer to "MyPayroll," I'm referring to the entity that ValueWise acquired in December 2013; notwithstanding that you're

MICHAEL T. MANN

telling me that its name was at some point changed to Cloud Payroll, okay?

A. Correct. Correct.

Q. Now, you owned 100 percent of Cloud Payroll individually, correct?

A. Either I owned it 100 percent or ValueWise owned it 100 percent, but I owned ValueWise 100 percent, so I ultimately owned it 100 percent. But I don't always understand what was direct without seeing the latest org chart, because we moved things, but it was a Mann entity and I owned it 100 percent.

Q. At any time from the formation of Cloud Payroll until September of 2019, were you employed by Cloud Payroll?

A. I'll tell you why it's a tough question. A lot of our employees -- we had a couple of companies that were separate, but most companies were technically employed by ValueWise Corporation, and then they would work for Cloud Payroll or someone else.

I never viewed myself as -- I was very hands-on in the payroll businesses; at the same time John Reinke ran all the businesses,

MICHAEL T. MANN

and I was more of an owner org member role than day-to-day running the business.

Q. Okay. Well, did you have a title at Cloud Payroll?

A. I might have, but a lot of times -- and I worked with different companies, and I couldn't recall all of them, someone would say -- if I had someone that was the CEO of it, someone would say, okay, you're the CFO here, or can you be my secretary, or whatever.

So I played a lot of roles. So I may have -- I may have had a title; John Reinke may have called me CFO. I didn't view it that way. I ran ValueWise and did it, but I -- I was involved, but I'm not sure what your question is. I want to answer it accurately.

Q. Yeah. My question was whether you had a title at Cloud Payroll?

A. I don't recall or never used it, but people may have called me something. I may have. It sounds like -- I'm not avoiding the question, it just -- I didn't view it as that.

MR. KUHN: Okay. We can stop here.

VIDEOGRAPHER: This will be conclude

MICHAEL T. MANN

video number one in the deposition of Michael T. Mann. We are off the record at 10:58 a.m., September 14, 2021.

(Whereupon, proceedings recessed for a short break and once again resumed.)

VIDEOGRAPHER: This is the beginning of video number two in the deposition of Michael T. Mann. We are on the record at 11:18 a.m., September 14th, 2021.

BY MR. KUHN:

Q. Okay. Mr. Mann, can you turn back to Exhibit 252. If you can turn to page, Bates page 373 in that document?

A. (Witness complies.)

Q. Do you see the bold text on the right-hand side that begins with "The undersigned"?

A. Yes.

Q. Can you read that paragraph out loud for me, please?

A. "The undersigned certifies the accuracy of the information he/she has provided and acknowledges receipt of a completed copy of this form. The undersigned authorizes the

MICHAEL T. MANN

financial institution to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge receipt of a copy and agree to the terms of the following agreement and/or disclosures."

Q. Okay. And then you signed immediately below that, correct?

A. Correct.

Q. Are there any other written agreements for this account between MyPayroll and Pioneer Bank?

MS. NEIDL: Objection to form.

THE WITNESS: Not that I'm aware of.

Q. Okay. We were talking about Cloud Payroll before. Can you describe the details of how Cloud Payroll operated?

A. Repeat the question, again, please.

Q. Sure. Can you describe how Cloud Payroll operated?

MS. NEIDL: Objection to form.

THE WITNESS: Where it gets blurry is where we're all -- as I said before, we

MICHAEL T. MANN

were all trying to move everything to Cloud Payroll.

We, toward the end, would view Cloud -- we would use terms where there was Cloud Payroll that owned the service bureaus, which is how we had it set up.

We also called our technology group that managed the technology part Cloud Payroll, and I think that's simplified.

BY MR. KUHN:

Q. Well, Cloud Payroll -- did Cloud Payroll have its own customers?

A. No, I don't -- not to the best of my recollection, it didn't.

Q. Okay. Was Cloud Payroll an independent payroll bureau?

MS. NEIDL: Objection to form.

THE WITNESS: No.

Q. Was Cloud Payroll a payroll bureau at all?

MS. NEIDL: Objection to form.

THE WITNESS: Not really. I mean, no.

Q. Was Cloud Payroll a holding company

MICHAEL T. MANN

that owned interests in payroll bureaus?

A. Yes.

MR. JAYNE: Object to form.

THE WITNESS: Yes.

Q. So did Cloud Payroll have any employer clients?

MS. NEIDL: Object to form.

MR. JAYNE: Object to form.

THE WITNESS: Not that I'm aware of.

Q. You testified earlier that in April 2017, Cloud Payroll purchased 51 percent of Southwestern Payroll Services from Darin Alred and Ray Fowler, correct?

A. Correct.

Q. Describe how you first became aware of Southwestern Payroll Services?

A. I am not sure how our team found them, but John Reinke was on the search of finding companies to acquire, and somehow -- I don't know how he found them, but I know John brought them to my attention.

Q. Were you involved in the negotiation of Cloud Payroll's acquisition of an ownership interest in Southwestern Payroll?

MICHAEL T. MANN

A. Yes.

Q. Pioneer Bank never conditioned providing financing to Cloud Payroll on funds collected from Southwestern Payroll's employer clients being deposited at Pioneer Bank, correct?

A. There was no contract saying we had to do that, correct. There was no condition that said I had to do that, correct.

Q. Now, one of the reasons you wanted Cloud Payroll to acquire an ownership interest in Southwestern Payroll was to allow Cloud Payroll to use funds collected from Southwestern Payroll's employer clients between the time those funds were collected and the time those funds were due to taxing authorities, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: I did misuse their funds, yes.

Q. Well, that doesn't -- my question: One of the reason why you wanted Cloud Payroll to acquire an interest in Southwestern Payroll

MICHAEL T. MANN

was so that Cloud Payroll could use the funds collected from Southwestern Payroll's employer clients before those funds were due to pay the taxing authorities, correct?

MR. JAYNE: Object to form.

THE WITNESS: Yes. That's true. There is a lot more to that, but yes, that's true.

(Whereupon, Defendant Exhibit A, Alred E-mail Dated 6/21/17, 2-Pages was marked for identification.)

BY MR. KUHN:

Q. Mr. Mann, what has been marked as Exhibit A is a chain of e-mails from June 21st, 2017, between you, Darin Alred, and Michael McAuliffe, correct?

A. Correct.

Q. Have you seen this e-mail before?

A. I mean, I sort of recall it, correct.

Q. Who is Mr. McAuliffe?

A. He was a manager in our payroll business. I -- again, I was not day-to-day on this. Michael McAuliffe started out as a --

MICHAEL T. MANN

working in MyPayroll in the service bureau. He was one of our better employees.

And as we were adding -- as we acquired Pro Data and Southwestern, he played a more active role in how we would use, as I mentioned before, Cloud Payroll, we had the technology and the support, so Michael was kind of working with all of the bureaus.

So we called him a Cloud Payroll employee, but he worked with all the service bureaus, you know, technology, that type of stuff.

Q. Mr. McAuliffe asks in the first e-mail in this chain, the June 21stm 2017 e-mail at 3:40 p.m., Mr. McAuliffe asks Mr. Alred to provide a list of Southwestern Payroll's corporate officers, correct?

A. Correct.

Q. Oh, excuse me, I referenced the wrong e-mail. It's actually Mr. McAuliffe's 3:19 p.m. e-mail where he asks Mr. Alred for the list of corporate officers, correct?

A. Correct.

Q. And then at 4:28 p.m., Mr. Alred

MICHAEL T. MANN

responds, "That is only me and Mike Mann at the moment. I am president, he is secretary treasurer."

Correct?

A. Correct.

Q. And then you send an e-mail and reply at 8:28 p.m. that same day where you say, "Correct."

Right?

A. Right.

Q. So as of June 2017, you were one of only two officers of Southwestern Payroll, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. You were the secretary treasurer of Southwestern Payroll, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. And you remained the secretary treasurer until September 2019, correct?

MS. NEIDL: Objection to form.

MICHAEL T. MANN

THE WITNESS: I believe so, yes.

Q. And you remained the secretary treasurer of Southwestern Payroll until September 2019, correct?

A. I believe so, yes.

Q. And you owned 51 percent of Southwestern Payroll through Cloud Payroll, through at least September 2019, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. When Cloud Payroll first acquired majority ownership in Southwestern Payroll in April 2017, Southwestern Payroll was processing payroll taxes for employer clients, correct?

A. Correct.

Q. When Cloud Payroll first acquired majority ownership interest in Southwestern Payroll in 2017, describe for me step-by-step how the funds collected from Southwestern Payroll's employer clients flowed from taxing authorities, including every bank account and entity involved?

A. So what date was this?

MICHAEL T. MANN

Q. I said when Cloud Payroll first acquired its majority ownership in Southwestern Payroll.

A. So when it first happened, I'm not sure, because Southwestern continued in the beginning with their own tax. It took -- I don't know how long, but it took a while before we moved Southwestern over.

Q. So before you moved Southwestern over, can you describe how the money moved prior to that?

A. I mean, I assume it's the way we all did, but I had no personal knowledge of how they were doing it, necessarily. I think it's the same for every company.

So, you know, the employer has a bank account, they run payroll. The money gets pulled and probably put into an account at Southwestern's bank, that was my understanding, but I didn't have access to that account, I didn't know anything about it, I believe it was just held there.

And then money out of that account would go to the taxing authorities.

MICHAEL T. MANN

Q. You previously testified that when you were in the process of purchasing Southwestern Payroll you told Southwestern Payroll that you would ultimately use "our tax account to house them," correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. And you also previously testified that at one point Darin Alred complained to you about the fact that payroll and payroll taxes were not segregated in account 0212, correct?

MR. JAYNE: Object to form.

THE WITNESS: Yeah. And it may not have been just payroll, it could have been some other writing checks off of. But, yes, he didn't like that it was tax only, so.

Staying away from the exact words payroll, he didn't like the fact that we were doing a couple more than just tax out of the account 212; all payroll related. So it sounds like I'm answering yes, but it...

MICHAEL T. MANN

BY MR. KUHN:

Q. Well, explain to me what you were using account 0212 for that Mr. Alred objected to?

A. So some of the things he had a problem is one, a lot of times if we -- I'll just give one example; and again, I wasn't as close, I can't drive into all of them, I just dealt with the issue that we were doing a couple of different things.

From Darin's perspective, like, one thing we were doing in that account was some clients would pick an offering where they want us to write checks off of their account. So we would collect the money in the account 0212, and people would write, basically, payroll checks off of our account 0212, which Southwestern Payroll had that -- most payroll service bureaus had that product, but he was uncomfortable that we were using the same account for taxes, as we were using some of those other accounts, which led to creating the new tax account.

Q. When you say "he was uncomfortable

MICHAEL T. MANN

that we were using the same account for taxes as we were using some of those other accounts," I don't -- explain to me what you mean by that?

A. He was uncomfortable that we were using 0212 for other things -- for not just tax; we had some other payroll services being done out of the same account.

Q. You mentioned the payment of checks being written directly out of 0212. What other services being done out of account 0212 did Mr. Alred object to?

A. I would be thinking hard and, again, I wasn't that close to all of that, other than the fact that we were using 0212 for more than tax, which was a problem.

I don't know all the other -- there were other payroll things, but I wasn't that close to it.

Q. Do you know when Mr. Alred objected to you that account 0212 was being used for things other than taxes?

MS. NEIDL: Object to form.

MR. JAYNE: Object.

THE WITNESS: Most likely, I'm not a

MICHAEL T. MANN

hundred percent sure, but when we were -- well, it first started, he didn't like the fact that we were using Cachet Bank and PTM, so we decided to go with Nat Pay.

And when we were getting Nat Pay installed and we were trying to reconcile through their systems, that's when Darin said hey, why don't we have these two accounts separated, why don't we have a separate tax account and we'll use 0212 for these ancillary payroll services.

So that I think -- I'm not a hundred percent sure, because I was not involved as others, where he first realized that 212 was doing things other than just tax.

BY MR. KUHN:

Q. All right. Can you tell me approximately what year that was?

A. I mean, I don't recall if we opened 2440, the other tax account, if we opened that in the beginning of 2019.

So he probably would have realized three or four months before that. I don't know the exact timing, because I wasn't day-to-day

MICHAEL T. MANN

in there. It was probably still 2018, but I'm still guessing.

Q. How did you address Mr. Alred's complaints about the use of account 0212?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: I thought it was great. I thought that's why I said let's open a tax account that's just for tax and then we'll use 212. I agreed with him and then we proceeded on a path to -- from his perspective, to handle the situation and address it by opening another tax account.

BY MR. KUHN:

Q. Other than you, did anyone else address Mr. Alred's objections regarding the use of account 0212?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: My understanding, the whole team agreed, so a lot of people were -- thought that that was a great idea.

Q. Did Mr. Alred know that funds collected from customers of multiple payroll

MICHAEL T. MANN

bureaus were being deposited into account 0212?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: He knew we were doing tax account -- money from other employer's tax dollars going into 0212, is that your question?

Q. My question is: Did Mr. Alred know that funds collected from employer clients of multiple payroll bureaus were all being deposited into account 0212?

MS. NEIDL: Same objection.

MR. JAYNE: Objection.

THE WITNESS: Yes.

Q. Did Mr. Alred know that funds collected from employer clients of multiple payroll bureaus were being deposited together into account 2440?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Yes.

Q. Did Mr. Alred ever complain that funds collected from and employer clients of multiple payroll bureaus were being deposited

MICHAEL T. MANN

into account 0212?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: I'm not sure -- I mean, his complaint was we were using it for more than just tax. I don't think he had a problem pulling it into one account for tax.

I think his problem was that it wasn't just a tax account; that's how I recall it.

BY MR. KUHN:

Q. All right. And then the same question with respect to account 2440, did Mr. Alred ever complain that funds collected from the employer clients of multiple payroll bureaus were being co-mingled together in account 2440?

MS. NEIDL: Objection to form.

MR. JAYNE: Objection to form.

THE WITNESS: Not that I recall.

Q. At the time Cloud Payroll acquired a majority of interest in Southwestern Payroll in April 2017 -- well, strike that.

MICHAEL T. MANN

Did there come a time when after Cloud Payroll acquired majority ownership interest in Southwestern Payroll, that the flow of funds from Southwestern Payroll's employer clients to taxing authorities changed?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Ask that again. I'm not sure.

Q. Sure. There was a way when -- when Cloud Payroll acquired Southwestern Payroll in April 2017, there was a way, status quo, of how the money flowed from Southwestern Payroll's employer's clients ultimately to taxing authorities, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct. Right.

Q. After the acquisition, how did that flow of money change, if it did?

MR. JAYNE: Same objection.

THE WITNESS: Right after the acquisition? Because right after it, it didn't change initially.

MICHAEL T. MANN

I don't recall the timing or all the steps, but we were -- we had worked through several issues; one being Cachet Bank, not liking them as a partner. Two, there might have been other issues, again, I wasn't day-to-day in this, but there was a period of time when it first was acquired we continued to run it there.

There might have been some transition period before we opened account 2440 where he was still running it through his or collecting it in his or sending it to ours -- I don't recall, because I wasn't on it day-to-day.

And then ultimately we went to Nat Pay and we opened account 2440. His Southwestern Payroll was just like Pro Data and MyPayroll, and everything was coming into, at that time, account 2440 and going out to pay taxing authorities.

BY MR. KUHN:

Q. There was a time when the funds collected from Southwestern's employer clients were deposited into account 0212, correct?

MICHAEL T. MANN

A. There might have been a transition period possibly, yes, when he was collecting in his account. And I don't know how long this was, I thought a very short term, he would then either wire or send it all to 0212. I don't recall exactly, you know, did he ever use 0212 or did he just start at 2440? My guess is there might have been a period of time where he did run some through 0212, but I'm not a hundred percent sure, I don't know all the time.

Q. Okay. Well, ultimately, once account 2440 was opened, explain to me how the funds flowed from Southwestern Payroll's employer clients ultimately to taxing authorities; every step, please?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: So Southwestern will have an employer client. They would have a bank account. When they run payroll -- again, I don't know if it goes through Nat Pay -- I don't know exactly, but it is -- it goes from their account, and ends up

MICHAEL T. MANN

sitting in account 2440. And then it would sit there until we paid the taxing authority, whether it's federal, state, or a local agency.

Q. The funds in question would initially be on deposit in a bank account held by one of Southwestern Payroll's employer clients, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Correct.

Q. And those funds would initially be transferred to an account held by Southwestern Payroll at Prosperity Bank, correct?

MS. NEIDL: Object to the form.

MR. JAYNE: Same objection.

THE WITNESS: I thought they changed that when we opened 2440, but I'm not a hundred percent sure, I wasn't that close. I thought that was some transition period, but that could still be true. I don't know, I wasn't close enough.

BY MR. KUHN:

Q. Who would know how south -- how the funds from Southwestern Payroll's employer

MICHAEL T. MANN

clients -- strike that.

Who would know how funds collected from Southwestern Payroll's employer clients would flow from those employer clients ultimately to taxing authorities from the time Cloud Payroll first acquired an interest in Southwestern Payroll until September 2019?

A. So over the course of the whole time Darin Alred would know how they flew -- how things flowed through, throughout all the periods of time. Darin would know.

Q. When the funds collected from Southwestern Payroll's employer clients were deposited into account 2440, would those funds be transferred directly out of account 2440 to taxing authorities or would they be transferred to another bank account before flowing to taxing authorities?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: The only thing I don't know with Nat Pay or -- if they ran through one of their banks or not. All I know is they leave our account, they end up

MICHAEL T. MANN

in the tax authority. And if we have an issue with a tax authority, I would have to go to Pioneer to say, hey, look up this Detroit local tax, do you have a record that it was sent. And we would talk, yes, it was. And then I would work with the Detroit local tax to say hey, here is our proof that we sent it.

So if there is another bank, I'm unaware; I'm not exactly sure how these tax companies operate. But I know we were the account of record and we worked with the taxing authorities, based on what happened in our accounts.

Q. Were tax funds collected from Southwestern Payroll's employer clients deposited into account 0212 or later into account 2440 so that MyPayroll or Cloud Payroll could take advantage of the float?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: There are several -- one, I don't think it's MyPayroll or Cloud Payroll taking advantage, but I used that

MICHAEL T. MANN

float inappropriately for a lot of different reasons, but it -- so I don't know if I'm answering your question. I'm trying to.

Q. Were the tax funds collected from Southwestern Payroll's employer clients deposited into account 0212 so that you could take advantage of the float?

A. That was a reason, yes.

Q. And were the tax funds collected from Southwestern Payroll's employer clients deposited into account 2440 so that you could take advantage of the float?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Yes, but I would have done it if I wasn't taking advantage of the float. So that is why I struggling answering that question.

I would have -- they should have been put in one account, managed in one account with one tax manager based on our vision. And our ultimate goal was the bigger you get, the higher the multiple the

MICHAEL T. MANN

company is worth, and that was why we all merged the companies. Because as a small bureau, we might be able to get two times revenue. But at our size with the technology, we were up to three-and-a-half times revenue. And if we could acquire four or five more, it gets us closer to five times revenue, six times revenue.

That was the real reason we were doing this. I was mis-appropriately -- I was incorrectly using the funds. It helps me out that way. That was the not the reason why I got into it. There was a much bigger play that we were doing.

So if I wasn't using them inappropriately, we still would have merged them together, that is where I just wanted to be clear on that answer.

BY MR. KUHN:

Q. When you say "but our size with the technology, we were up to three-and-a-half times more revenue, and if we could acquired four or five more, it gets us closer to five times revenue, six times revenue," explain that

MICHAEL T. MANN

to me?

A. So the payroll industry -- all industries have ways they're valued, you know. And the way the payroll industry is valued is a multiple of a revenue and a series of factors that go with that.

And people that own service bureaus are very aware of these factors and what they're trying to do.

So the day I bought MyPayroll, the day after I bought MyPayroll -- and I shared this with Pioneer, I got a call from ADP saying I know you are not going to sell to me right now, but when you do, give me a call, I'll buy it from you. They're very easy to sell.

So what we were trying to do was basically go out and acquire other service bureaus, which increases -- the bigger you get, the higher the multiple, that's one of the things; bigger companies just get a higher multiple, it's just how the industry works.

The second part is you need to own your own technology; that also increases the multiple. So Darin Alred, Horatio, were all

MICHAEL T. MANN

aligned on that to say hey, let's grow this to some, you know, big entity and now, you'd look at Gusto and others, we had it all charted, what's our goal, so we could sell it at a much higher multiple than it was worth individually. So that was our goal as a collective group.

Q. Multiple of what?

A. Of revenue. The reason why the industry is like that: If ADP goes out and buys it, they fire your whole staff, it's really about the client.

So it's not about your costs, they are not buying your business. The big players buy clients, so it's really all about revenue, and that's why the multiples in that industry are structured that way.

Q. How is revenue measured?

A. It's what you bill your clients. So revenue, like, you run a payroll, I don't know, I'll give -- just be guessing, but let's say you charge someone $4 an employee, they have ten employees, that's $40 a month, and so that's the revenue.

It has nothing to do with tax

MICHAEL T. MANN

dollars, payroll dollars, it's what you actually bill the clients, that's revenue.

Q. You testified that account 0212 and account 2440, one of the reasons that the tax funds or the funds collected from Southwestern Payroll's employer clients were deposited into those accounts, one of the reasons was so that you could take advantage of the float, correct?

A. Yes, and that's why I wanted to clarify. Absolutely. But that's the main driver -- if I wasn't taking advantage of the float, we would still do the same thing; I just want to be very clear on that.

Q. Were account 0212 and account 2440 set up as unrestricted checking accounts so that you could take advantage of the float?

MS. NEIDL: Objection to form.

MR. JAYNE: Objection to form.

THE WITNESS: Absolutely not. That was not -- I didn't know payroll or anything when I was first setting them up. I didn't know how the accounts worked.

So I did not -- I did a lot of things wrong, but I wasn't calculating,

MICHAEL T. MANN

boy, this is how you -- I'm trying to set this up wrong. I didn't -- no.

I was very clear that I was setting up a tax account and we were putting tax dollars in it.

BY MR. KUHN:

Q. Funds collected from Southwestern Payroll's employer clients for payment of taxes were deposited in account 0212 starting in or around October 2017, correct?

A. That could be accurate. That could have been when he was running it through Prosperity and -- again, I wasn't that close to this. There are other people that -- that sounds about right when it was coming in. But, yeah, I...

Q. Mr. Alred was aware that funds collected from Southwestern Payroll's employer clients were being deposited into account 0212, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: I believe so.

Q. And then starting approximately

MICHAEL T. MANN

March 2019, funds collected from Southwestern Payroll's employer clients for payment of taxes were deposited into account 2440, correct?

MR. JAYNE: Objection.

THE WITNESS: That's sound right.

Q. Mr. Alred was aware that the funds collected from Southwestern Payroll's employer clients payment of taxes were being deposited into account 2440 starting in March of 2019, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

(Whereupon, Defendant Exhibit B, Alred E-mail Dated 5/9/17, 3-Pages was marked for identification.)

BY MR. KUHN:

Q. Document marked Exhibit B is a chain of e-mails from May 8, 2017 to May 9, 2017, between you, Mr. Alred, Mr. McAuliffe, John Reinke, and Matt Schilling, correct?

A. Correct.

Q. You've seen this e-mail before, correct?

MICHAEL T. MANN

A. I have to read this to refresh, just to make sure that I can talk about this.

(Witness peruses document.)

Okay.

Q. Now, on the second and third pages, do you see that Mr. Alred writes an e-mail to Mr. Reinke and you on May 8, 2017, at 2:42 p.m. asking several questions about formalizing the relationship between Cloud Payroll and Southwestern Payroll?

A. Yes, I see that.

Q. Now -- and then Mr. Reinke responded at 3:14 by answering Mr. Alred's questions.

Now, on this copy it might be -- it might take a little thought to figure out where the answer is, stop and start.

You can see the shade of the text is different for the questions versus Mr. Reinke's answer.

Can you perceive the shade difference between those?

A. Yeah. If I look, I think I can.

Q. So just to make it clear, in the first -- in the first paragraph, it ends with

MICHAEL T. MANN

"I think you will need this with each service bureau," and then the answer starts, "you are correct." Do you see how the shade is slightly different?

A. Yep.

Q. And then on the next paragraph the answer starts with "We are trying to build one that covers both"?

A. Correct.

Q. And then the next paragraph, the answer begins with, "I agree"?

A. Yep.

Q. And in the next paragraph the answer begins with, "Mike Mann"?

A. Yes.

Q. And in the next paragraph the answer begins, "Send me a copy of"?

A. Yep.

Q. And then in the final paragraph, the answer begins with, "It may"?

A. Yes.

Q. Okay. Do you see the first question and answer Mr. Alred states, "With Cloud preparing to take over tax filing, it occurs to

MICHAEL T. MANN

me that we need some kind of agreement between Southwestern and Cloud for the shared services you will performed. I think you will need this with each service bureau."

And then Mr. Alred states below, "There are a host of liability issues here."

That's in the third paragraph.

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

MR. KUHN: I'll re-ask that question again.

Q. Mr. Alred's question in the first paragraph is, "With Cloud preparing to take over tax filing, it occurs to me that we need some kind of agreement between Southwestern and Cloud for the shared services that you will perform. I think you will need this with each service bureau."

Do you see that?

A. Um-huh, yes.

Q. And then you -- and then Mr. Reinke responds, "You are correct. We have been working with our legal folks to hammer out a service agreement. We should have a final

MICHAEL T. MANN

version this week."

Correct?

A. Correct.

Q. Was the service agreement between Cloud Payroll and Southwestern Payroll ever finalized and executed?

A. I don't recall.

Q. And further down in the e-mail Mr. Alred states, "Also, I think we probably want someone to look at our service agreement with our clients to ensure it does not need any updates or 'outsourcing' tax and ACH. I believe the current agreement includes agents that we hire to perform the services. Maybe Matt's folks could review it."

Do you see that?

A. Um-huh, yes.

Q. Was Southwestern Payroll's service agreements ever updated to allow this outsourcing that Mr. Alred was asking about?

A. I don't know.

Q. Did each of Southwestern Payroll's employer clients execute an updated service agreement to accounting for outsourcing to

MICHAEL T. MANN

Cloud Payroll or depositing of their funds in account 0212 or account 2440?

MS. NEIDL: Objection to form.

THE WITNESS: I don't know.

Q. Mr. Alred's e-mail also states, "Also, with respect to ACH, as a third-party sender, we undergo an ACH audit each year. We use Encore. Have you made arrangements for that with anyone for Cloud? I am not sure when we will be looking at ACH, but want to think ahead."

Do you see that?

A. Um-huh, yes.

Q. And then Mr. Reinke responds by stating, "Mike Mann/Mike McAuliffe, can you answer this?"

Correct?

A. Correct.

Q. And then you respond by 3:34 p.m. by stating, "We haven't done the audit, because we have not been a third-party sender. We have outsourced to Cachet. If we go down the third-party sender path, we would need the audit."

MICHAEL T. MANN

Correct?

A. Correct.

Q. When you stated "we have not been a third-party sender," who is the "we" you are referring to in that sentence?

A. Meaning MyPayroll, Cloud Payroll; any of our organizations. I mean, MyPayroll or Cloud Payroll. I was referring to our payroll company.

Q. When you said "third-party sender," did you mean a third-party money transmitter?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: Yes. And if you see Darin originally says in the e-mail here, "I know we're not doing ACH payments yet, I'm looking ahead." I basically reiterated what he said. But then he does ask some other questions.

But I was thinking an ACH transmitter, which we were not an ACH transmitter.

Q. Describe the basis of your statement that we have not been a third-party sender?

MICHAEL T. MANN

A. So I was referring to, I believe, that we were not an ACH transmitter, is what I think I was saying.

Q. What did you mean by "third-party sender path"?

A. That could be, work out a deal with Pioneer, or we go out and buy an ACH company. Our ultimate goal -- we already added technology, we had service bureaus. Our goal was to be a competitor with ADP, Paychex, whatever. Our ultimate vision was we're going to have all these pieces, so we're basically -- again, back to valuations, that's even a higher valuation.

So our -- you know, at some point we would like to be an all-in-one like the four or five biggest payroll providers.

Q. Okay. And then you see that Mr. Alred responds, "okay, I think we need to discuss this, when you are not driving. I am pretty sure you are still technically considered a third-party sender. You create files that instruct Cachet to move the money as a result of processing a payroll, same as us.

MICHAEL T. MANN

I doubt Cachet would take on that liability for you or that they even can."

Correct?

A. Correct.

Q. And then you respond, "Absolutely. It is important to work through all this now."

Right?

A. Correct.

Q. Describe your communications with Mr. Alred on the issue of Cloud Payroll's or Southwestern Payroll's status as a third-party sender?

A. I don't -- my guess is one, I knew we were nowhere close to being an ACH transmitter. So when we had the discussions, you know, I was thinking that's probably fix, six years down the road; we need to add several more service bureaus, we need to get a lot bigger.

I'm guessing how that conversation would go. I think what Darin -- and I don't know for sure, so there is a little speculation here, is there are lighter audits that service bureaus can go through. And actually, in 2019

MICHAEL T. MANN

we were scheduling to get one for MyPayroll and all the others, so we took him up on his concern here ultimately, because we were preparing for it.

And we -- even further on the technology side there is a bigger audit, we were preparing for a bigger technology audit. Actually, we took his advance and decided to go down a path too shore up.

But what we were originally talking about in my mind was an ACH transmitter, that's a whole different audit, and we were years away from that ever happening.

Q. Who was involved in your conversations with Mr. Alred on the issue of the third-party sender?

A. I mean, other than my conversation here, John Reinke probably -- John Reinke talked to Darin a lot more than I did, so -- those two were always talking. So he would be -- he would be a much better source than I am on discussions they were having; although, I did have this discussion with Darin.

Q. So what was the basis of your

MICHAEL T. MANN

position that neither Southwestern Payroll or Cloud Payroll were money transmitters as of May 2017?

MR. JAYNE: Object to form.

MS. NEIDL: Objection.

THE WITNESS: I was taking that as an ACH transmitter. We have used Cachet to transmit our ACHs. So we talked to Pioneer early on and it just wasn't feasible to leverage them as one for many reasons.

And so we had used Cachet Bank. I know I'm not answering your question, but we just weren't anywhere close to figuring out how we could become an ACH transmitter.

BY MR. KUHN:

Q. What were the reasons Pioneer Bank could not serve that role?

MR. JAYNE: Object to form.

THE WITNESS: One, I think it would have even cost more money, when we looked at pricing.

Two, their windows of turning off ACH payments was relatively early; we had clients even in Hawaii, so we had clients

MICHAEL T. MANN

all over all the time zones.

I also think the systems weren't robust enough to be able to handle some of our stuff, so there were many reasons that -- there was also another piece, as that as we, and even maybe at the time, if we got larger on the payroll side, there would be a liability issue with Pioneer too on the payroll dollars just to -- we have to be a very large bank. If we grew really large, would they have the ability to even offer that. At some point, you know, we wouldn't be able to do it with them. That was another reason.

BY MR. KUHN:

Q. Describe how the third-party sender issue was resolved?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: I think it was pretty simple. It's like, Darin, it's not on our short-term radar, we're not ready to do this.

We continued to use Cachet Bank as

MICHAEL T. MANN

ours.

And Darin I think used Prosperity -- I don't even know; I wasn't that close, so I'm not -- I don't think Darin used Cachet, I think he continued to use someone else, if it was Prosperity Bank or -- he just refused to use Cachet, but he used his own ACH provider. And maybe there is someone else I'm just forgetting right now.

BY MR. KUHN:

Q. Right. But Mr. Alred's position is that technically -- he states in this e-mail, "Pretty sure you are still technically considered a third-party sender." So his point isn't hey, we have to find a third-party sender, his point is we are a third-party sender. That's the issue I'm asking how that was resolved?

MR. JAYNE: Object to form.

THE WITNESS: Right. There are two things. Originally, he called a third-party sender an ACH transmitter in the first paragraph. I respond to that by saying, we're not there yet.

MICHAEL T. MANN

He then said, I still think we're technically.

That's when I talked -- and I'll say this again, there are audits, not for an ACH transmitter, but there are lower-level audits for service bureaus that you can get as -- that you can get.

And once we became aware of them and it's like oh, that's a great idea, we started scheduling one for MyPayroll.

Pro Data I think was getting some already, but we started scheduling them for MyPayroll. As well as we learned there is a bigger auditor for a software company, and we were getting prepared to pass the software company audit.

I don't know the details. John Reinke was very close. I know we were working to pass certain audits in all the bureaus, as well as the software company.

But none of those audits were audits meant for an ACH transmitter, because we were years away from that happening.

So let me make one mention: He got

MICHAEL T. MANN

away from me using the term third-party senders and ACH transmitters, he started referring it as, we are moving money and there are audits, and we looked into it and started to go down that path.

(Whereupon, Defendant Exhibit C, Alred E-mail Dated 1/9/18, 1-Page was marked for identification.)

BY MR. KUHN:

Q. So Mr. Alred said -- you stated "Mr. Alred started referring to it as we are moving money, and there are audits, and we looked into it and started to go down that path."

What path?

A. I was not at all involved in -- that's why I can't describe them very accurately. They have some series of audits. Again, I wasn't even close to this, Darin was working with John Reinke.

I remember John telling me they have these payroll service bureaus and there are certain levels of audits, you know, that they can basically stamp something. And they also

MICHAEL T. MANN

have an audit for software companies.

I don't know the scope of the audits. I don't know. I just know that we started -- we were planning on doing exactly what Darin was recommending in preparing for it.

But I wasn't close to that. I wasn't part of that on a day-to-day basis. They're not financial audits, necessarily. I mean, I'm sure they look at processes and controls, but I wasn't close to this, John was working it out with Darin and the team.

Q. The document marked as Exhibit C is a chain of e-mails. It's a chain of e-mails between you, Darin Alred, and John Reinke, correct?

A. Yeah.

Q. You've seen this e-mail before, correct?

A. I mean, I'm pretty sure I know what it's about, yes.

Q. Mr. Alred states, "I am writing you confidentially to share that I am growing increasingly alarmed by the tsunami of notices

MICHAEL T. MANN

we have been receiving from companies that are supposed to be handled by Cloud. We are getting inundated by notices on some of our largest clients by non-filing of returns, non-payment of taxes, et cetera. Plus the responses are sporadic and provide little or no explanation of why the tax was not filed or paid."

Correct?

A. Correct.

Q. Mr. Alred then addresses receiving a subpoena from the State of Washington regarding unpaid taxes and states, "I hope you can appreciate how alarming this is to clients."

Correct?

A. Correct.

Q. You respond to Mr. Alred by stating that you and Mr. Reinke are "getting involved and will reach out to you later."

Correct?

A. Correct.

Q. What was the cause of the unpaid taxes described in Mr. Alred's e-mail?

MS. NEIDL: Objection to form.

MICHAEL T. MANN

MR. JAYNE: Same objection.

THE WITNESS: The main cause we didn't have a good tax manager running it.

Q. How did you and Mr. Reinke get involved?

A. We dug into -- looked at the issues. We saw what the notices were. We worked with our tax manager, the new tax guy that we put in, because the previous tax person wasn't doing well either.

So we just basically looked at all of it, figured out what's going on. I wasn't as involved as John, because John did most of the work, I had all the other companies I was running.

We came to the conclusion that this guy wasn't right. We ultimately hired someone named Marissa and she actually did really well and she fixed all the problems, so it was really an employee issue.

Q. What was the name of the first person you said wasn't doing a good job?

A. I don't even remember. He wasn't around long, and I don't recall his name.

MICHAEL T. MANN

Q. Okay. And then what is Marissa's full name?

A. I don't remember Marissa's last name.

Q. Based on the foregoing e-mails; and I mean Exhibits A, B, and C; in your capacity as secretary treasurer of Southwestern Payroll, you were involved in decisionmaking and management of funds collected from Southwestern Payroll's employer clients, including management of those funds prior to payment to taxing authorities, correct?

MR. JAYNE: Object to form.

THE WITNESS: Correct.

Q. Mr. Alred and other employees of Southwestern Payroll knew you were in charge of managing accounts at Pioneer Bank that Southwestern Payroll was using to house funds collected from its employer clients, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. So your duty as secretary treasurer at Southwestern Payroll included managing

MICHAEL T. MANN

accounts, holding funds collected from Southwestern Payroll's employer clients, correct?

MS. NEIDL: Object to form.

MR. JAYNE: Objection to form.

THE WITNESS: I don't if that's because of my secretary treasurer, but yes. I think the answer is yes.

Q. So your duties at Southwestern Payroll included managing the accounts, holding funds collected from Southwestern Payroll's employer clients, correct?

MR. JAYNE: Object to form.

THE WITNESS: Correct. And to be fair, I wasn't a secretary or treasurer of Pro Data, I did the same thing at Pro Data.

It was mainly because they were using Cloud Payroll to manage the taxes.

(Whereupon, Defendant Exhibit D, Southwestern Payroll Services Agreement Dated 10/26/18, 9-Pages was marked for identification.)

BY MR. KUHN:

Q. Exhibit D is a Service Agreement

MICHAEL T. MANN

dated October 26, 2018, between Southwestern Payroll and DLV Enterprises Inc, correct?

A. Correct.

Q. Now, on October 26, 2018, you were the secretary treasurer of Southwestern Payroll, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. As the secretary treasurer of Southwestern Payroll, you were aware that Southwestern Payroll had service agreements with its employer clients, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: I knew that as not a secretary treasurer of Pro Data as well. I don't think it had anything to do with my role, but I was aware they had contracts with their clients.

Q. Had you seen this service agreement that had been marked as Exhibit D before?

A. I probably didn't. I don't recall.

I viewed John Reinke as CEO of Cloud

MICHAEL T. MANN

Payroll and 51 percent owner of them, as I used him to work with Darin and the other service bureaus on a lot of this stuff, but I was heavily involved.

Q. You have seen however substantially identical service agreements between Southwestern Payroll and one of its employer clients before, correct?

A. When we did our due diligence to even acquire them, we looked to make sure they had contracts, sent them over, looked at them, so we did review it.

Again, John was more familiar and any changes or representing ValueWise on the agreement stuff, John Reinke would have handled discussions on any changes.

Q. Do you know if this service agreement, Exhibit D, is substantially identical to the service agreements between Southwestern Payroll and its employer clients?

MR. JAYNE: Object to form.

THE WITNESS: I would not know.

Q. Now, by October 2018, all funds collected from Southwestern Payroll's employer

MICHAEL T. MANN

clients were being deposited into account 0212, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: I believe so.

Q. Now, if you look at Section 3.2 of this agreement, which is titled, "Payroll Tax Processing Service," do you see that?

A. Yes.

Q. Okay. And then you see under Section 3.29(a) it states, "Client hereby contracts and authorizes SPSI, which is Southwestern Payroll --

A. Um-huh.

Q. -- to collect on client's check date EFT transactions for such amounts as necessary to pay proper taxing authorities the payroll taxes which are specifically identified on payroll reports.

Such amounts are to be held in an account established by SPSI until such time as these amounts are due to the appropriate taxing authorities."

Do you see that?

MICHAEL T. MANN

A. Yes.

Q. At the time of this service agreement between Southwestern Payroll and DLV Enterprises was on signed on October 26, 2018, funds collected from the accounts of Southwestern Payroll's employer clients for taxes were not being held in an account established by Southwestern Payroll until those funds were paid to the appropriate taxing authorities, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: I believe so, yes. Yeah. Yep.

Q. I'm going to ask you for a more clearer answer to my question.

A. Yes, we were. I believe -- and it goes back to that, I believe we had October 26th on -- I mean, October 26, 2018, I believe they were going through it.

So I'm just saying the same thing; just looking at this contract, I'm pretty -- yes, to the best of my knowledge, yes, we were -- they were going through our account. I am

MICHAEL T. MANN

pretty sure they were going through in 2018.
Q. And you know that by early 2019, the funds collected from Southwestern Payroll's employer clients were being deposited into account 2440 before those funds were paid to taxing authorities, correct?
MR. JAYNE: Object to form.
THE WITNESS: Oh, sorry. Correct.
Q. So the funds collected from Southwestern Payroll's employer clients were not being held in an account established by Southwestern Payroll until such time as those amounts were due to the appropriate taxing authorities, correct?
MS. NEIDL: Object to the form.
MR. JAYNE: Object to form.
THE WITNESS: Correct.
Q. So Southwestern Payroll was not complying with Section 3.2(a) of this service agreement, correct?
MS. NEIDL: Objection to form.
MR. JAYNE: Same objection.
THE WITNESS: Yeah. Yes.
Q. They were not complying, that's

MICHAEL T. MANN

correct?

A. Yes, that's correct.

Q. You can finish your response.

A. Yeah. I agree, they weren't complying, they were sitting in our account.

Q. When you say "our account" you mean account 2440, which was held by Cloud Payroll, correct?

A. Correct.

Q. Or account 0212, which was held by MyPayroll, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. Was there an agreement between Southwestern Payroll and MyPayroll addressing the depositing of funds collected from Southwestern Payroll's employer clients into account 0212?

A. I'm not sure if they ever did it, if John had one with them or not, I'm not sure.

Q. Was there an agreement between Southwestern Payroll and Cloud Payroll addressing the depositing of funds collected

MICHAEL T. MANN

from Southwestern Payroll's employer clients into account 2440?

A. I am not sure.

Q. Were there any agreements between Southwestern Payroll's employer clients and MyPayroll regarding the depositing of funds collected from them into account 0212?

A. I am not sure.

Q. Was there an agreement between Southwestern Payroll employer's clients and Cloud Payroll regarding the depositing of funds collected from them into account 2440?

MR. JAYNE: Object to form.

THE WITNESS: I am not sure.

Q. Who would know that?

A. John Reinke and Darin would have most of the leadership discussions, as it relates to this.

Q. Did you inform Southwestern Payroll's employer clients that the funds collected from them to pay taxes were being deposited into account 0212 or account 2440 before being transferred to the taxing authorities?

MICHAEL T. MANN

A. I did not.

Q. Did anyone else affiliated with Southwestern Payroll inform Southwestern Payroll's employer clients that the funds collected from them to pay taxes were being deposited into account 0212 --

MR. JAYNE: Objection to form.

MR. KUHN: Can I finish my question?

MR. JAYNE: It wasn't on purpose.

Q. Did anyone else affiliated with Southwestern Payroll, inform Southwestern Payroll's employer clients that funds collected from them to pay taxes were being deposited into account 0212 or account 2440 before being transferred to the taxing authorities?

MR. JAYNE: Object to form.

THE WITNESS: I would -- I do not know.

Q. Southwestern Payroll's service agreement with DLV Enterprises did not require funds collected from DLV Enterprises to be deposited into segregated funds or trust accounts, correct?

A. Ask that again, please.

MICHAEL T. MANN

Q. Sure. The service agreement --
A. Yeah.
Q. -- Exhibit D between Southwestern Payroll and DLV Enterprises did not require the funds collected from DLV Enterprises to be deposited into a segregated account or a trust account, correct?
MS. NEIDL: Objection.
MR. JAYNE: Same objection.
THE WITNESS: I haven't read all of it, but I know looking at 3.2(a) where they talk about it, they do not say an escrow account in that paragraph, it just says an account.
Q. Or a trust account?
A. Correct, or a trust account.
Q. Why not?
A. I have no idea.
Q. But you were the secretary treasurer of the company, correct?
MS. NEIDL: Objection to form.
MR. JAYNE: Same objection.
THE WITNESS: I -- that's why I've said several times, I was secretary

MICHAEL T. MANN

treasurer probably Darin did it, because I was an owner and he wanted me on the board.

But I made it very clear to Darin that John was my guy. He was a former executive Stamford MBA. He was much more qualified than I was to run something.

And over time, Darin and John became very close and established that.

So, yes, I was the secretary and treasurer, I'll stand up to all the responsibilities, but that doesn't always mean the day-to-day manager of this stuff.

And as Cloud Payroll being 51 percent owner and John Reinke as CEO, he -- I really delegated a lot of this to him to manage.

BY MR. KUHN:

Q. Did you ever discuss with Mr. Alred or anybody else at Southwestern Payroll whether Southwestern Payroll was required to deposit funds collected from its employer clients into segregated or trust accounts?

A. No, because I still never referred to them until much later, so I would call it

MICHAEL T. MANN

the tax account, that is how I always referred to it, but I never said escrow or trust account.

Q. Did you ever discuss with anyone whether any of the payroll bureaus affiliated with ValueWise were required to deposit funds collected from employer clients into segregated or trust accounts?

MS. NEIDL: Object to form.

MR. JAYNE: Same objection.

THE WITNESS: I want you to ask it again, please.

Q. Sure. Did you ever discuss with anyone whether any of the payroll bureaus affiliated with ValueWise were required to deposit funds collected from employer clients into segregated or trust accounts?

A. I never use those terms, but I -- the way I would say it, just like with the other questions is: We need to put this into our tax account.

I knew the tax account, I shouldn't be moving money, and I did that incorrectly. I did know the tax account should be just for

MICHAEL T. MANN

taxes, even though I didn't use it that way.

I didn't know it was called an escrow or trust account at the time; I used "tax" as a third synonym always.

Q. Well, did you ever discuss with anyone whether any customer of Southwestern Payroll, MyPayroll, or Pro Data Payroll Services requested that funds collected from them be deposited into a segregated or trust account?

MS. NEIDL: Object to form.

MR. JAYNE: Same objection.

THE WITNESS: I don't remember anyone using those words, but we would call it the "tax account" saying, hey, we need to put this into our collective tax account.

Q. Did you ever discuss with Mr. Alred or anyone else at Southwestern Payroll that the use of funds collected from employer clients for purposes other than paying taxes in the interim before the taxes were due to be paid to taxing authorities?

MR. JAYNE: Object to form.

MICHAEL T. MANN

THE WITNESS: Ask that one more time, please.

Q. Sure. Did you ever discuss with Mr. Alred or anyone else at Southwestern Payroll the use of funds collected from employer clients for purposes other than paying taxes?

A. No.

Q. And what I'm referring to there is the float?

A. Correct. Definitely not. I never told them I used those -- that money.

Q. Have you ever discussed the concept of using the float from any of the payroll bureaus with anyone?

MS. NEIDL: Objection to form.

THE WITNESS: No.

Can I pause for a second and add to that?

We, in a perfect world; and ultimately, and I'd have discussions with Darin, at some point we would want to get a bank account that has a good interest rate on it. I know Prosperity had one that was

MICHAEL T. MANN

really low; everyone is aware that I was not getting an interest rate on it.

So there were some discussions that in the future we need to find an account where we can actually, you know, get a return.

So I did have discussions like that with people, but -- so there were some discussions about the tax account, but we didn't necessarily -- I just remember using the words "tax account" is how we would refer to it.

BY MR. KUHN:

Q. Did Mr. Alred have any objection to using an interest bearing account for a tax account?

A. I am not sure the makeup of the account he had at Prosperity Bank when he was using them. What I do know -- and what I do know is he was getting a very small interest -- it didn't amount to much, I know he was complaining, you know, he wasn't happy with it.

But whatever account he had for his taxes, he may have had it on payroll, I think

MICHAEL T. MANN

they did his payroll as well.

He was getting -- or they were giving him points off a loan he had. I don't know the deal; I just know he was being financially compensated somehow that way, you know, through the bank. I didn't know if there was an interest, I thought he had an interest, but I'm not a hundred percent sure.

Q. Is it your testimony that you think Southwestern Payroll's account at Prosperity Bank was an interest bearing account?

A. I thought there was. But it could have been where he was getting a point off of his other loan; I'm not a hundred percent sure, so I wouldn't call that a strong testimony.

I do recall in the discussions, and Darin knows this business a lot better than I do, I was -- even with this, I had a lot of companies, so I would never call myself a payroll expert. But I do know there was discussion in the industry where there are probably, you know, I didn't use the word at the time, but there might be bank type accounts that are approved for taxes.

MICHAEL T. MANN

I don't know that for sure. I just know there was -- I heard discussions from a lot of service bureaus, even ones we didn't own that, you know, is there a way to get interest on the tax, which I don't know how that's accounted for. Again, I'm getting into an area I don't know well.

Q. Earlier in your deposition you talked about opening an account for Cloud Payroll at Pioneer Bank in February of 2019; is that correct?

A. Is that the 2440 account?

Q. Yes.

A. Yes.

Q. That Cloud Payroll account had an account number of 178002440, correct?

A. Correct.

Q. And you were responsible for opening Cloud Payroll account 2440 at Pioneer Bank?

A. Yes.

Q. What was your title at Cloud Payroll when you opened account 2440 at Pioneer Bank in February of 2019?

A. I may have signed it as president.

MICHAEL T. MANN

A lot of times when I opened accounts, I viewed -- I was president of ValueWise, so I would put, president, and sign it ValueWise.

I mean, I viewed John Reinke as my CEO, but he reported to me as the owner or the board of directors, or however you want to look at it, but I'm the one who was responsible for opening the account, yes.

Q. So no one else affiliated with Cloud Payroll dealt with Pioneer Bank with respect to opening account 2440, correct?

A. I'm not sure if people pulled papers together for me to send over. I don't recall how it happened. I know I'm the signer, but in terms of -- I'm not sure I understand your question.

Q. Well, no one else from Cloud Payroll communicated with Pioneer Bank concerning the opening of account 2440, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: I'm not a hundred percent sure, because I was talking to Pioneer Bank, you know, I was -- when I

MICHAEL T. MANN

worked with Dave and other things it's like, I'm opening another tax account, we need to segregate.

I tried to keep him updated on a lot of the stuff we were doing. So -- but I don't know if anyone sent anything over.

Sometimes I would do it all myself. Other times, someone might send some paperwork and then they would prepare it and send it back to me. I don't know the answer to that, is the best way to answer that. I don't know if anyone else communicated.

Q. You previously testified that account 2440 "not only housed Southwestern's payroll tax dollars, but the other two service bureaus as well."

Correct?

A. Right.

Q. Which bureaus had tax dollars deposited into account 2440?

A. MyPayroll, Southwestern, and Pro Data.

Q. So the funds collected from the

MICHAEL T. MANN

employer clients of Southwestern Payroll, MyPayroll, and Pro Data and intended for payment of taxes were all co-mingled in account 2440?

MS. NEIDL: Object to form.

MR. JAYNE: Object to form.

THE WITNESS: Yes.

Q. So the funds collected from employer clients of Southwestern Payroll, MyPayroll, and Pro Data Payroll Services and intended for payment of taxes were all deposited into account 2440, correct?

MR. JAYNE: Same objection.

THE WITNESS: Yes.

Q. Mr. Alred was aware, starting in March 2019. That the funds collected from Southwestern Payroll employer's clients for payment of taxes were being deposited into account 2440 with the funds from customers of MyPayroll and Pro Data Payroll Services, correct?

MS. NEIDL: Object to form.

MR. JAYNE: Object to form.

THE WITNESS: Yes.

MICHAEL T. MANN

Q. Were the employer clients of Southwestern Payroll aware that funds collected from them and intended for payment of taxes were being deposited into account 2440?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: I don't know the communication when we took over the tax on what was made to Southwestern's clients.

(Whereupon, Defendant Exhibit E, Commercial Cover Sheet, Cloud Payroll, Bates Stamped PB-SWP-00000072 to '84, 13-Pages was marked for identification.)

BY MR. KUHN:

Q. Do you recognize the document that has been identified as Exhibit E?

A. Yes.

Q. Turn to page three -- excuse me, turn to page 73, the second page.

A. (Witness complies.)

Q. Do you see the bold text on the right-hand side that says, "The undersigned certifies the accuracy of the information he/she has provided and acknowledges receipt of

MICHAEL T. MANN

a completed copy of this form. The undersigned authorizes the financial institution to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following agreements and/or disclosures."

Do you see that?

A. Yes.

Q. Do you see there's, amongst the agreements and disclosures referenced, there is something called "Terms & Conditions," do you see that?

A. Yes.

Q. And then you signed this form, this account agreement below that bold text?

A. Yes.

Q. And at the top of the document it is titled, "Account Agreement," correct?

A. Yes.

Q. Now, you signed this account agreement at -- you signed this account agreement for account 2440 in your capacity as

MICHAEL T. MANN

a member of Cloud Payroll, correct?
And if you turn to Bates page 78.
A. Yes.
Q. So on page Bates page 78, you signed the account agreement as a member of Cloud Payroll, correct?
A. Correct.
Q. Besides this Exhibit E, Cloud Payroll did not enter into any other agreements with Pioneer Bank regarding account 2440, correct?
MS. NEIDL: Object to form.
THE WITNESS: Correct.
Q. Besides Exhibit E, no one affiliated with -- no one else affiliated with Cloud Payroll or ValueWise entered into any agreements with Pioneer Bank regarding account 2440, correct?
MS. NEIDL: Objection to form.
THE WITNESS: Correct.
Q. You were solely in charge of managing account 2440 for Cloud Payroll, correct?
MS. NEIDL: Objection to form.

MICHAEL T. MANN

THE WITNESS: There were -- I mean, I was the owner. I was heavily involved in it. I mean, other people would work with the tax systems that generated money being pulled from clients and then also making payments to the taxing authorities, so I didn't do all of that work, other people would do that, but I had access to it.

They didn't do it in the work, they did it through the systems which were tied to this account.

Q. There were no other authorized signatories to account 2440 aside from yourself, correct?

A. Correct.

Q. Turn back to page 73. On the left-hand side of that page, Bates page 73, it states that account 2440 is a "Business Premier Checking" account, correct?

A. Yes.

Q. Now, turn to pages -- Bates pages 81 through 83 of this document.

A. (Witness complies.)

Q. That is a three-page, Bates page 81

MICHAEL T. MANN

to 83 is a three-page request to combine accounts for cash management, correct?

A. Correct.

Q. Now, in this three-page request to combine accounts for cash management, you were requesting combine account 2440 with 23 other accounts held by 12 other ValueWise affiliates, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct. And what I recall is every time I added a new account, this list would just get bigger, so I could have single access to all the accounts.

Q. Do you know what account -- I'm going to run through them one at a time.

Do you know what ValueWise account 0960 was used for?

A. I don't, unless I was using it -- that number doesn't ring a bell, so that could have been an account that I opened that I only used to kite dollars but, yeah, I'm not sure.

And to be honest, some of these I will not know by doing that. I mean, we can go

MICHAEL T. MANN

through it; there will be a few that I can recognize. But I can say, you know, I used that inappropriately as an account and you find out no, we used it.

But I don't think we can be accurate if we go through the exercise of saying oh, hey, what is this one for and that; I don't remember all of these numbers.

Q. Can you tell me what, if any, of these accounts were set up and used for legitimate business purposes?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: So there were several that come out -- and some of these were set up for legitimate, and I may have misused them and stopped using them later, and I turned them into something it shouldn't have been. So it's not a clear cut or an account was just opened for inappropriate activity.

Some of these started out as -- like, 3648, Primacy Search Group. We acquired a company called Primacy Search

MICHAEL T. MANN

Group. Early on, a good chance we used it properly. At some point, we didn't need it anymore; I turned off access to other people and just used it for mine.

Q. Well, as of February 26, 2019, which of these accounts were being used for legitimate business purposes?

A. So the first two that start with 911, I don't know if they're loan accounts, I'm just looking at the digits, I don't recognize those, those could be certain type of borrowing accounts, which I would call legitimate -- I mean -- I mean, I inappropriately used them. So it get tough on -- I don't know how to answer that.

I mean, I pled to, you know, fake receivables and stuff like that. But I would consider it a legitimate account, meaning, it's not used for kiting or something like that.

3614 was -- I would call it legitimate. Not that I didn't run stuff through it early on, but that was the ValueWise main account. By that date 3622 I don't think was legitimate anymore. 3648 wasn't. 4000, if

MICHAEL T. MANN

that was Viverant, I'm not sure, it might have been. 4018, I'm not sure what 4018, if it was legitimate or not. 3945 was Weitz, that was not. FocalPointe Group, yes, that was a legitimate account. 204 in MyPayroll, yes, that was a legitimate account. 212 was a legitimate account, even though I did some, you know, I did some things wrong with it. I think 0428 was a legitimate account; I forget what we used that for, I'm not a hundred percent sure. 1640 was a legitimate account. We had -- I don't know if this is right, we had a HireFlux account that was legitimate, it's probably that one; 1632. I think Kaningo was a legitimate account; again, I'm not a hundred percent sure. I don't know what Create Force account we were using as our -- because I see there is a Create Force here on page 82, but then there is a Create Force -- there is a Create Force LLC d/b/a Always Live on page 83. My guess is the one on 83 was the legitimate account, I'm not sure. 1962, Lincoln Academy, my guess is that was a legitimate account. The Pro Data, 1988, that was not. Southwestern Payroll, 1996, that

MICHAEL T. MANN

was not. I don't think this FocalPointe was legitimate; I think the first one we went over was legitimate, I'm not a hundred percent sure, but I think that's it. I already talked about 2267. And then 2440 was a legitimate account.

Q. Well, this is 2440.

A. No, it was the last one. I was looking; 2382 and 2366, I don't think were, but I'm not a hundred percent sure. I don't think they were, because I think I had a couple of Cloud Payroll accounts that weren't.

MR. KUHN: Why don't we stop here for lunch.

THE WITNESS: Okay.

VIDEOGRAPHER: This concludes video number two in the deposition of Michael T. Mann. We are off the record. The time is 12:54 p.m., September 14, 2021.

(Whereupon, proceedings recessed for a lunch break and once again resumed.)

VIDEOGRAPHER: This is the beginning of video number three in the deposition of Michael T. Mann. We are on the record at 2:17 p.m., September 14, 2021.

MICHAEL T. MANN

MR. ALESSI: I'm going to state what I understand to be an agreement among the parties to this deposition.

There was, earlier, a discussion about three attorneys from DLA Piper asking questions for this deposition. It has been resolved in the following fashion:

DLA Piper; and specifically, Jeffrey Kuhn, Robert Alessi, and Matthew Graves; it's agreed upon, are able to ask questions of Mr. Mann at this deposition.

And Mr. Jayne, on behalf of Southwestern Payroll, after the conclusion of the questioning by the DLA Piper attorneys, will be asking questions of Mr. Mann.

And you've estimated how much time?

MR. JAYNE: Well, he's just graciously agreed to give me 30 minutes at the conclusion of your questioning.

MR. ALESSI: Very good.

MR. JAYNE: "He" being Michael Mann, Mr. Mann.

MR. ALESSI: And if Ms. Neidl and

MICHAEL T. MANN

Mr. Jayne can state their agreement or disagreement with what I just put on the record.

MR. JAYNE: Yes, I agree. And for purposes of this deposition; both at trial and here today at deposition, we have resolved the issue as to multiple lawyers asking questions of witnesses under the agreement you just stated.

MR. ALESSI: And there will be no objections here or at trial or any other time as to the three attorneys I mentioned from DLA Piper asking questions at this deposition?

MR. JAYNE: On this witness and this deposition, correct.

MR. ALESSI: Ms. Neidl?

MS. NEIDL: Agreed.

MR. ALESSI: Thank you.

BY MR. KUHN:

Q. Okay. Mr. Mann, before we broke for lunch we were discussing Exhibit E, which -- and specifically, we were talking about Bates pages 81, 82, and 83, which are requests to

MICHAEL T. MANN
combine accounts for cash management.
From the time account 2440 was opened in February of 2019 through September of 2019, Cloud Payroll was able to move funds between account 2440 and the 23 other accounts listed on Bates pages 83 through 85, correct?
A. Yes. And if I added any accounts afterwards, I would have been able to do that as well. But, yes.
Q. And Cloud Payroll could move funds between account 2440 and those 23 other accounts for any reason, correct?
A. Correct.
Q. Cloud Payroll could move funds between account 2440 and these 23 other accounts at any time, correct?
A. I think on transfers, yeah, you can do that any time.
Q. Now, nothing in Exhibit E for account 2440, nowhere in Exhibit E does it state that account 2440 will be a trust account, correct?
MS. NEIDL: Objection to form.
THE WITNESS: Correct.

MICHAEL T. MANN

Q. And you never told anyone at Pioneer Bank that you wanted account 2440 to be a trust or special account, correct?

MR. JAYNE: Objection to form.

MS. NEIDL: Object to the form.

THE WITNESS: I did not ask for a trust or escrow account, I just said I'm opening a tax account.

Q. So you never told anyone at Pioneer Bank that you wanted account 2440 to be a special purpose account, correct?

MR. JAYNE: Object as to form.

MS. NEIDL: Object to form.

THE WITNESS: Yeah, and that's why I used the exact words I used. In conversations I had I said, hey, I need to open up a new tax account, here's what I'm doing, and we're going to be moving it from 212 to 2440.

So I used the word tax account. I didn't use trust, I didn't use special account, I didn't use escrow in any of my messages to Pioneer.

BY MR. KUHN:

MICHAEL T. MANN

Q. And no one at Pioneer Bank ever told you account 2440 would be treated as a trust account or a special account or an escrow account, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Correct.

(Whereupon, Defendant Exhibit F, Pioneer Bank Statement, Bates Stamped PB-SWP-00034626 to '880, 255-Pages was marked for identification.)

BY MR. KUHN:

Q. Do you recognize the document that has been marked as Exhibit F?

A. It looks like copies of cleared checks to taxing authorities.

Q. If you flip through Exhibit F, you'll see it's the August 2019 statement for account 2440.

Can you confirm that?

A. Oh, okay. Yes.

Q. If you turn to page 118 of this document, which is Bates page 34280.

A. 34280?

Q. 34 -- oh, that's a typo on my end.

MICHAEL T. MANN

It's 34820. That's the page which is page 118 also.

A. (Witness complies.) I'm there.

Q. Do you see that on August 28th, 2019, four out of the five largest deposits into account 2440 are direct deposits from ValueWise and Ross Personnel Consultants?

A. Yes.

Q. Those four deposits total approximately $1.9 million, correct?

A. Yes.

Q. You personally initiated those four deposits from ValueWise and Ross Personnel Consultants, correct?

A. One, they're closer to 1.6; you said 1.9, but still -- anyway, that being said, yes, I'm the one that initiated those.

Q. Neither ValueWise nor Ross Personnel Consultant are payroll bureaus, correct?

A. Correct.

Q. The four deposits from ValueWise and Ross Personnel Consultants on August 28, 2019, totalling approximately $1.6 million are not funds collected from customers of Southwestern

MICHAEL T. MANN

Payroll, MyPayroll, or Pro Data Payroll Services for payment of taxes, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Correct.

Q. Describe the source of the funds deposited by ValueWise and Ross Personnel Consultants on August 28, 2019, into account 2440?

A. Not exactly sure what account, maybe -- I think it was one of the other demand checking accounts, most likely. Or it came from Bank of America.

I'm not exactly sure where it came from, but it was money I had somewhere else.

Q. Now, turn to page 127, which is Bates page 34829.

A. (Witness complies.)

Q. At the end of the day on August 28th, 2019, there was $38,490.12 in account 2440, correct?

A. Correct.

Q. Now turn to page 137, which is Bates 34839.

A. (Witness complies.)

MICHAEL T. MANN

Q. On August 29th, there were approximately $5.5 million in deposits into account 2440, correct?

A. It looks like withdrawals. Are you talking about the transfers?

Q. I'm talking about -- do you see the total deposits into this account on August 29th totaled approximately $5.5 million?

A. Oh, yes.

Q. Correct?

A. Yes, that's correct. I see what you're saying.

Q. And then via six internet transfers on August 29th, almost all of the approximately $5.5 million deposited into account 2440 is transferred to account 0212, correct?

A. Correct.

Q. After those six internet transfers to account 0212, only $52,540.79 was left in account 2440 at the end of the day on August 29th, correct?

A. What was your amount?

Q. I said $52,540.79.

A. There were some more charges on

MICHAEL T. MANN

August 29th afterwards, so it was $33,531.

Q. You're right. Okay. So at the end of the day.

But after the six internet transfers, that was my question, there was $52,540.79 left in account 2440 after those six internet transfers, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Correct.

Q. Now, you personally transferred the six internet transfers for approximately $5.5 million from account 2440 to account 0212 on August 29th, correct?

A. Correct.

Q. Now, if you turn back to Exhibit 32, which is another exhibit you have in front of you.

A. (Witness complies.)

Q. Now, Exhibit 32 is the August 2019 statement for account 0212, correct?

A. Correct.

Q. And now turn specifically to page 89 of Exhibit 32 which is Bates page 30665?

A. Yes.

MICHAEL T. MANN

Q. Do you see that the six internet transfers from account 2440 totaling approximately $5.5 million, do you see those that we just looked at?

A. Yes.

Q. Now, those six internet transfers from account 2440 bring the total funds on deposits in account 0212 to approximately $12.8 million, correct?

A. Correct.

Q. And then approximately $12 million is withdrawn via 22 internet transfers from account 0212 to various other checking accounts held by ValueWise affiliates at Pioneer Bank, correct?

A. Correct.

Q. Including $529,000 transferred to account 1996 held by Southwestern Payroll, correct?

A. It was a Southwestern Payroll account, correct.

Q. You personally initiated the 22 internet transfers totaling approximately $12 million from account 0212 to these various

MICHAEL T. MANN

other checking accounts held by ValueWise affiliates at Pioneer Bank, correct?

A. Correct.

Q. And among the $12 million transferred from account 0212 via these 22 internet transfers was the $5.5 million that was transferred from account 2440, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Correct.

Q. Now, in August 2020, you pled guilty to several federal crimes, correct?

A. Correct.

Q. And one of the crimes you pled guilty to was check kiting, correct?

A. Correct.

Q. Now, these internet transfers of $12 million from account 0212 to the checking accounts held by ValueWise affiliates on August 29, 2019, were made as part of your check kiting scheme, correct?

A. Most likely, yes. I mean, I am pretty sure. There was a transaction in there that wasn't, but, yes.

Q. So, at minimum, the vast majority of

MICHAEL T. MANN

the internet transfers of $12 million from account 0212 to the checking accounts of the other ValueWise affiliates on August 29th, 2019, were made as part of your check kiting scheme, correct?

MR. JAYNE: Object to form.

THE WITNESS: Correct.

Q. You thus used the funds transferred from account 2440 as part of your check kiting scheme, correct?

A. Yes, because funds came in 212 from 2440, so...

Q. Throughout 2019, you repeatedly transferred funds from account 2440 to account 0212, and then to other checking accounts held by ValueWise affiliates at Pioneer Bank as part of your check kiting scheme, correct?

MS. NEIDL: Object to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. Can you estimate how many times in 2019 you transferred funds from account 2440 to account 212, and then to other checking accounts held by ValueWise entities at Pioneer

MICHAEL T. MANN

Bank as part of your check kiting scheme?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: I mean, I can't estimate.

Q. Well, can you estimate how many times a day you did that?

A. There were certain times during the -- you know, throughout 2019 there were different periods where it would be done more. There were certain days where it was worse.

Without looking at it, you know, I would just be throwing out guesses that wouldn't be good testimony.

Q. Do you think you transferred funds from account 2440 to account 0212 as part of your check kiting scheme more than 100 times in 2019?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Does this count as six? I don't know how you are counting the times.

Q. If we count every transaction as

MICHAEL T. MANN

one.

A. Yeah, there is already six on this one, so there easily can be.

Q. Could easily be more than a hundred?

A. There could be, yeah.

Q. How long were you kiting checks and ACHs at Pioneer Bank?

A. I mean, without looking at it, it was on and off for the last several years. I don't know without going back. I didn't go back and say, this is the exact first day, but it was years.

Q. You started -- did you start in 2018 or earlier?

A. Most likely yes. And there were periods where I was doing it for a period of time and then I catch myself a little bit and things aren't as bad and I would go for a period of time without doing it, and then resume.

So prior to 2019, I mean, it was always kind of up and down. I wasn't always doing it, I don't think. But whenever it would pop up and there was an issue, I would do it.

MICHAEL T. MANN

Q. But you were always doing it continually through 2019; is that correct?

MS. NEIDL: Objection to form.

Q. I'll rephrase that.

You were continually throughout all of 2019, January through August, kiting checks and ACHs at Pioneer Bank on a nearly daily basis, correct?

A. Yes, that is correct. To the best of my recollection, yes.

Q. There was never any agreement between Cloud Payroll and Pioneer Bank that the funds in account 2440 were to be kept separate and isolated from other accounts at Pioneer Bank, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. Neither you nor anyone else representing Cloud Payroll ever asked Pioneer Bank to restrict account 2440, so that the funds could not be transferred between account 2440 and other accounts at Pioneer Bank held by Cloud Payroll or other ValueWise affiliates,

MICHAEL T. MANN

correct?

MR. JAYNE: Object to form.

THE WITNESS: Correct.

Q. There was never any agreement between Cloud Payroll or Pioneer Bank to restrict or limit in any way, Cloud Payroll's use of the funds in account 2440, correct?

MS. NEIDL: Object to form.

THE WITNESS: Correct.

Q. From the time account 2440 was opened in February of 2019 through September of 2019, Cloud Payroll had the right to withdrawal or transfer funds from account 2440 for any reason, correct?

MR. JAYNE: Object to form.

THE WITNESS: We had the ability, not the -- I'm getting caught in semantics, but we had the ability to -- we shouldn't have the right.

Q. I'll rephrase the question.

From the time account 2440 was opened in 2019 through September 2019, Cloud Payroll had the ability to withdrawal or transfer funds from account 2440 for any

MICHAEL T. MANN

reason, correct?

MR. JAYNE: Object to forth.

THE WITNESS: Correct.

Q. From the time account 2440 was opened in February of 2019 through September 2019, Cloud Payroll regularly transferred funds from account 2440 to entities that are not taxing authorities, correct?

A. Correct.

Q. Cloud Payroll did not use the funds in account 2440 exclusively for payment of taxing, correct?

MS. NEIDL: Objection. Form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. During your time as secretary treasurer as Southwestern Payroll Services what were the restrictions, if any, on the types of bank accounts that Southwestern Payroll Services could use to deposit funds collected from its employer clients to pay taxes?

A. Can you ask the question again.

MS. NEIDL: Objection to form.

Q. Sure. During your time as secretary

MICHAEL T. MANN

treasurer of Southwestern Payroll Services, what were the restrictions, if any, on the types of bank accounts Southwestern Payroll Service could use to deposit funds collected from its employer clients to pay taxes?

MS. NEIDL: Objection to form.

THE WITNESS: The easiest way, because part of my time there, I didn't always have control of their funds, so however Darin was originally doing it, that was fine, I didn't place restrictions on him, if that was the question.

And then obviously when we started to bring his funds into our accounts, again, I obviously had the ability to move those funds.

Does that answer your question?

BY MR. KUHN:

Q. Well, were there -- during the time that you were in charge of Southwestern Payroll's funds, were there any restrictions on the type of bank accounts that those funds could be deposited into?

MS. NEIDL: Objection to form.

MICHAEL T. MANN

THE WITNESS: You see, I'm not sure if I understand the question. I'm sorry.

Q. Sure. Let me rephrase it.

During the time that you were secretary treasurer of Southwestern Payroll --

A. So again --

Q. Well, why don't you let me ask it, all right.

A. Go ahead.

Q. During the time that you were the secretary treasurer of Southwestern Payroll, were there any restrictions -- let me strike that.

During the time that you were secretary of Southwestern Payroll Services and were responsible for the management of funds collected from Southwestern Payroll Services employer clients for the payment of taxes, were there any restrictions on the type of bank accounts those funds could be deposited into?

MR. JAYNE: Object to form.

THE WITNESS: The problem with the question on the premise is I was listed as secretary or treasurer, my guess, looking

MICHAEL T. MANN

at the documents, before I even had control of his funds. I think he did that early on. So that's why I'm struggling answering this question.

At that point in time, Darin handled it how he always had and did.

So I don't think us taking over -- when we started taking the tax deposits into the Pioneer accounts for Southwestern, that wasn't the same event as being secretary treasurer, so that's why it's tough to answer.

When I took over control of the tax funds from Southwestern Payroll; meaning, it's in the Pioneer accounts, I had the ability to move those funds, not the right, I had the ability and did move those funds to other accounts.

BY MR. KUHN:

Q. So during the time that you were in control of tax funds from Southwestern Payroll, were there any restrictions on the type of bank account that those funds could be deposited into?

MICHAEL T. MANN

MR. JAYNE: Object to form.

THE WITNESS: And again, I think obviously those funds deposited into our checking account, so again, I may not be understanding the question, but they seem to come into our checking account fine. I am still not following.

Q. Well, during your time at Southwestern Payroll, during the time when you had any authority over funds collected from Southwestern Payroll's employer clients, were there any internal policies of Southwestern Payroll governing the types of bank accounts those funds could be deposited into?

MR. JAYNE: Object to form.

THE WITNESS: You see, the challenge, and this is the issue I had right from the start is the escrow or trust account, I always used the word "tax account."

I was well aware of what a tax account should be and that this activity that we've been going, should not have happened, and I knew this activity could

MICHAEL T. MANN

get me in a lot of trouble.

So I was treating this account, even though I was using it improperly, and that's why I pled to this, is I felt at any point, even though this wasn't an escrow or trust account, I felt it was a tax account; and if people knew I was doing this, I would be in big trouble.

So I always believed what I was doing every step of the way was absolutely wrong. And that this account, I shouldn't be able to do that, even though all the documents I signed and everything else, it clearly gave me the ability -- and that's why I did it, which is just wrong.

But I knew if people looked at this, I'd be in trouble.

Q. Did Darin Alred or any other employee of Southwestern Payroll ever inquire if account 0212 or account 2440 were unrestricted checking accounts versus trust accounts?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

MICHAEL T. MANN

THE WITNESS: The way we talked about being a tax account, I think he assumed it was, because I used the word -- again, a lot of people in the industry use that word.

So I think he -- he could have; I don't know, you'd have to ask him specifically, but I think he assumed it was in some way. But I don't know, he would have to answer that.

BY MR. KUHN:

Q. Well, Darin Alred knew that there was no agreement between MyPayroll and Pioneer Bank that restricted how MyPayroll used the funds in account 0212, correct?

MS. NEIDL: Object to the form.

MR. JAYNE: Object.

THE WITNESS: He never saw the agreement; I don't think he was on the signatures. I don't think he knew my agreement.

Q. Was Mr. Alred ever provided copies of account statements for account 0212 or account 2440?

MICHAEL T. MANN

A. No.

Q. Did he ever ask for them?

A. No. But with the tax system, I think he assumed he was getting it. Because these tax systems pull in transactions from the account.

That's why I had to work with Pioneer to set up a specific report so I could pull into the tax accounts.

So we had to set it up so it could pull into Nat Pay. And then Darin would be able to see basically what it looked like was his account statement from the tax software.

However, the reason why he didn't see all these other things is these internet transfers, which aren't typically part of a tax account, error out, because they shouldn't be in a tax account. Those are transactions that shouldn't happen.

So he didn't see these. So I don't think he felt the desire to see it, because he could run the reports from the tax software to see what's my account detail for the month.

Q. Did Mr. Alred ever -- was Mr. Alred

MICHAEL T. MANN

ever provided with copies of the account opening agreements for account 0212 or account 2440?

A. Not to my recollection.

Q. Did he ever ask for them?

A. Not to my recollection, no.

Q. Now, National Payment Corporation knew that account 0212 and account 2440 were not special or trust accounts, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: I have no idea, and I had none of the conversations with Nat Pay on employment; that was all John and Darin and the team. So I don't know what they told Nat Pay, and I don't know what Nat Pay said back.

BY MR. KUHN:

Q. Did you ever have any communications with a representative of Nat Pay?

A. I recall early on when I called them when they were selling to us and they were talking about the features; and a few of the executives, John Reinke asked me to come down

MICHAEL T. MANN

and said hey, take a look at this, what did you do think. And then he was selling me on it too, how it would be better.

So I was part of a bigger sales pitch, but most of it I left it with John to work with the bigger bureaus to say, this is the right decision, let's move forward with it.

Q. Do you know if any employee of National Payment Corporation ever asked for the account statements for account 0212 or account 2440?

A. I have no idea.

Q. Do you know if any employee of National Payment Corporation ever asked for the account opening agreements for account 0212 or account 2440?

A. I don't recall anyone asking for that. Can I rephrase? Actually, I don't know. Those agreements we probably had stored. So if someone asked a junior finance person, they could have pulled it, but no one came to me asking for it, so...

Q. Did any employee of National Payment Corporation ever inquire if account 0212 or

MICHAEL T. MANN

account 2440 were unrestricted checking accounts versus trust accounts?

A. I don't know.

(Whereupon, Defendant Exhibit G, Commercial Account Cover Sheet, Southwestern Payroll Services, Bates Stamped PB-SWP-00000505 to '546, 42-Pages was marked for identification.)

BY MR. KUHN:

Q. Do you recognize the document marked as Exhibit G?

A. Yes.

Q. Exhibit G is an October 23rd, 2017 Account Opening Agreement for Southwestern Payroll's account 1996 at Pioneer Bank, correct?

A. Correct.

Q. You signed this Account Opening Agreement for account 1996 at Bates pages 508, 509, 512, 513, 516, and 517, correct?

A. Correct.

Q. At the time you opened account 1996, you were the secretary treasurer of Southwestern Payroll, correct?

MICHAEL T. MANN

A. Correct.

Q. And you had the authority to open account 1996 in your capacity as secretary treasurer of Southwestern Payroll, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to the form.

THE WITNESS: Yeah, and that's -- I didn't open accounts as part of that job. That wasn't a typical role.

Again, he appointed me that because we were the two owners. He knew I had control of a lot of the financials, so it probably made sense, but this was opened without his knowledge. And it wasn't as a function of my Southwestern Payroll duties.

BY MR. KUHN:

Q. All right. Putting aside your capacity as the secretary treasurer of Southwestern Payroll, you had the authority to open account 1996, correct?

MR. JAYNE: Object to form.

THE WITNESS: I assume. I don't know the bank -- you know, if I'm 51 percent owner and a 51 percent owner can

MICHAEL T. MANN

open a bank account, then yeah.
I mean, I thought I could open the bank account, that's why I did.
Q. Besides Exhibit G, Southwestern Payroll did not enter into any other agreements with Pioneer Bank regarding account 1996, correct?
MS. NEIDL: Objection to form.
MR. JAYNE: Same objection.
THE WITNESS: Correct.
Q. You were solely in charge of managing account 1996 for Southwestern Payroll, correct?
MR. JAYNE: Object to form.
THE WITNESS: Correct.
(Whereupon, Defendant Exhibit H, Pioneer Bank Statement, Bates Stamped PB-SWP-00233535 to '588, 54-Pages was marked for identification.)
BY MR. KUHN:
Q. Do you recognize the document that's been marked as Exhibit H?
A. Yes. It looks like bank account statement for account ending in 3614.

MICHAEL T. MANN

Q. Exhibit H is an account -- is an August 2019 statement that includes account 1996.

A. Oh, sorry about that; I was just looking at a couple of pages. It looks like it has a few of them. Yes, I see that now.

Q. Specifically, I'll direct your attention to the Bates -- page nine of the actual account statement, which is Bates 233571.

MS. NEIDL: Objection to the form of the statement.

THE WITNESS: What's the Bates number again?

Q. 233571.

A. Okay. I'm there.

Q. Do you see that account 1996 is included in the account statement that is Exhibit H?

A. Yes.

Q. Now, look at the first 15 pages of this document, Exhibit H, which is Bates pages 535 to 549?

A. Um-huh.

MICHAEL T. MANN

Q. They show dozens of checks deposited into account 1996 in August 2019, all written out of accounts held by ValueWise entities at Bank of America, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. And all of those checks are depositing round dollar figures into account 1996, correct?

A. Correct.

Q. And you personally wrote and deposited all of those checks into account 1996, correct?

A. Correct.

Q. Let me correct something.

The first 15 pages of the document, they show checks and ACH remote deposit tickets into -- well, let me correct that.

The first 15 pages of this document, Exhibit H, show dozens of checks and electronic deposits into account 1996 in August of 2019 all written out of accounts held by ValueWise entities at Bank of America, correct?

MICHAEL T. MANN

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Yeah. I think the deposits tickets match to some of the checks, but I think the answer is yes to your question.

Q. And all of these -- all the checks are depositing round dollar figures into account 1996, correct?

A. Correct.

Q. Okay. And you testified that you personally wrote, deposited all of those checks into account 1996, correct?

A. Correct.

Q. Now, look at the 12 pages of the document -- the next 12 pages of the document, which are Bates pages 550 to 561.

They show dozens of checks written out of account 1996 in August 2019, all written to ValueWise entities in round dollar figures, correct?

A. Correct.

Q. Now, you personally wrote all of those checks out of account 1996, correct?

MICHAEL T. MANN

A. Correct.

Q. Now, turn to Bates page 571.

A. (Witness complies.)

Q. It states there, there was a -- $42.57 in account 1996 on both August 1st and August 31st of 2019, correct?

A. Correct.

Q. But during the month of August, there were 42 deposits into account 1996 totally $29.6 million, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. And there were 66 withdrawals from account 1996 in August of 2019, also totaling $29.6 million, correct?

MS. NEIDL: Objection.

MR. KUHN: Well, okay, let me restate that.

Q. During the month of August, there were 42 deposits into account 1996 totaling $29,619,000; correct?

A. Correct.

Q. And there were 65 withdrawals from

MICHAEL T. MANN

account 1996 in August of 2019, also totaling $29,619,000; correct?

A. Correct.

Q. And if you look through the list of those 107 deposits and withdrawal transactions in account 1996 in August 2019, all of them are round dollar checks or electronic transfers back and forth to other accounts held by other ValueWise affiliates to either Pioneer Bank or Bank of America, correct?

A. Correct.

Q. You personally initiated all 107 of those transactions, correct?

A. Correct.

Q. None of those 107 transactions served any legitimate purpose, correct?

A. Correct.

Q. You knew at the time you initiated each of those 107 transactions, that the transactions were fraudulent kiting transactions, correct?

A. Correct.

Q. Throughout 2019, you used account 1996 exclusively for kiting checks and ACHs to

MICHAEL T. MANN

defraud Pioneer Bank and Bank of America, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: That's -- I pled to that.

Q. Well, I'm going to repeat the question.

A. Yeah, okay.

Q. Throughout 2019, you used account 1996 exclusively for kiting checks and ACHs to defraud Pioneer Bank and Bank of America, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Yes. Yeah.

Q. Throughout 2019 you used account 1996 exclusively for kiting to defraud Pioneer Bank and Bank of America, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Yeah. I used 19 -- this account exclusively to kite between Bank of America and Pioneer, which is

MICHAEL T. MANN

illegal activity, so I think I agree with you.

Q. No one at Pioneer Bank was aware of your kiting scheme?

MS. NEIDL: Object to form.

MR. JAYNE: Object to form.

THE WITNESS: Not that I'm aware. They would have called me, I'm sure.

Q. Was anyone at Pioneer Bank aware of the fact that you were engaged in kiting?

MS. NEIDL: Object to form.

MR. JAYNE: Objection to form. Same objection.

THE WITNESS: Yeah, I would think they would call me immediately if they did, so my answer would be no.

Q. Could you just answer this question, please. Like, was anyone at Pioneer Bank aware of your kiting scheme?

MS. NEIDL: Objection to form.

MR. JAYNE: Objection to form.

THE WITNESS: So the one part -- here's the part where that is a tough question. My short answer is no, I think

MICHAEL T. MANN

people would call me. But I can't answer for someone at Pioneer if someone saw something and they didn't raise it up the management chain, so that's why I don't answer that directly. I would think someone would have called me immediately and it would have been an issue. So the answer is probably, I don't think anyone is aware of it.

But again, I don't know what everyone at Pioneer did or looked at.

BY MR. KUHN:

Q. Did anyone at Pioneer Bank ever say anything to you to lead you to believe that Pioneer Bank was aware of the fact that you were engaged in kiting?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: No.

Q. In addition to account 1996, your kiting scheme also involved accounts held by numerous other ValueWise entities, correct?

A. Correct.

Q. Including account 0212, correct?

MICHAEL T. MANN

MS. NEIDL: Objection to form.
MR. JAYNE: Same objection.
THE WITNESS: I did move -- yeah, I did kite funds or move funds out to contribute to this.
Q. Your kiting scheme also involved account 2440, correct?
MS. NEIDL: Objection to form.
MR. JAYNE: Same objection.
THE WITNESS: What I noticed on the other, I moved money from 2440 to put into an account that funded the account.
So I think the flow of money, yes, it was used to cover these and some of the kiting through 212, so, yes.
Q. I'll restate my question.
A. Okay. Go ahead.
Q. Your kiting scheme also involved funds in account 2440, correct?
MS. NEIDL: Objection to form.
MR. JAYNE: Same objection.
THE WITNESS: My hesitation is I don't -- I know what kiting is. I don't know all the definition of the other

MICHAEL T. MANN

pieces.

I view kiting as going between two bank accounts, you know, trying to -- you know, I wrote a check here to cover and this one is fine.

I'm not giving a straight answer because 2440, I didn't do that back and forth to Bank of America. Now, there might have been funds in 2440 that I moved to account 212 to move to one of these others to cover something. So if that by the legal definition is part of the kiting scheme, the answer is yes. I just don't know the exact part of the kiting.

There were funds inappropriately moved out of 2440 to cover money that I needed in the accounts to either cover, you know, something that was -- I forget the term but, you know -- you know if I over -- if I bounce, you know, a bunch of checks and I needed them covered, I would use those funds for that or other things.

So, yes; the only reason why I'm not answering the one is I don't know if kiting

MICHAEL T. MANN

is just this piece, but I used funds from there to cover money that I needed for my scheme.

Q. You used funds from account 2440 --

A. Right.

Q. As -- hold on. Let me finish the question.

You used funds withdrawn from account 2440 as part of your kiting scheme, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: I don't know the definition of the full thing on kiting, so that's where I'm sitting here.

I know kiting -- we can keep going back and forth. All I can be as specific to the examples you showed me. I moved money out of 2440 into another account that did feed some of these accounts that were kiting checks back and forth between Bank of America and Pioneer.

And if that is -- used part of the kiting, then that's what I did. I just

MICHAEL T. MANN

don't know if that's part of the kiting, if you're using funds from that account to cover losses in others. I just don't know the legal definition, so...

BY MR. KUHN:

Q. The 107 transactions in account 1996 in August 2019, they were part of your kiting scheme, correct?

A. They definitely were, because they were checks to Bank of America and then back to Pioneer and then, you know, basically covering a -- something that is going to be a loss here with writing a check. Yes, absolutely.

Q. Starting in 2009 Pioneer Bank extended a line of credit to ValueWise -- to the ValueWise entities, correct?

A. Correct.

Q. That line of credit was started at $2 million dollars in 2009; is that correct?

A. That sounds about right.

Q. And that line of credit was increased to $3 million in 2010, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Yeah. I don't know

MICHAEL T. MANN

all the exact increases and years, yes, if you have that data, it sounds accurate.

Q. And that line of credit increased year over year until it reached $42 million in 2019, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. And starting with the $3 million line of credit in 2010 and running through the $42 million line of credit in 2019, Pioneer Bank conditioned all lines of credit issued to the ValueWise affiliates on receipt of audited financial statements for ValueWise, correct?

A. Correct.

Q. From 2009 to 2019, ValueWise's auditor was Teal Becker & Chiaramonte, correct?

A. Correct.

Q. I'm going to refer to Teal, Becker & Chiaramonte as "TBC" for the rest of the deposition, okay?

A. Okay.

Q. In 2010, you informed TBC that Pioneer Bank required audited financial

MICHAEL T. MANN

statements for ValueWise as a condition to a $3 million line of credit, and as part of Pioneer Bank's credit underwriting process?

MR. JAYNE: Object to form.

THE WITNESS: Correct.

Q. From 2009 to 2010, TBC agreed with ValueWise personnel each year to prepare audited financial statements for the ValueWise entities that would be submitted to Pioneer Bank to satisfy Pioneer Bank's credit underwriting requirements, correct?

A. Correct.

Q. You are familiar with the term "Asset-Based Loan" or ABL, correct?

A. Correct.

Q. The line of credit issued by Pioneer Bank to the ValueWise entities from 2010 to 2019, those were asset-based loans, correct?

A. Correct.

Q. The ValueWise entities accounts receivables set forth in the ValueWise entities' audited financial statements, were the primary borrowing base and collateral issued by Pioneer Bank, correct?

MICHAEL T. MANN

MS. NEIDL: Objection.

MR. JAYNE: Same objection.

THE WITNESS: Right.

Q. From 2010 to 2019, when TBC was performing annual audits of the ValueWise entities and preparing the audited financial statements for the ValueWise entities, what did TBC do to confirm the ValueWise entities' account receivable?

A. Most years, maybe all, they would send e-mails to potential clients. It changed, depending on how much of a percentage as it got bigger and stuff, but they basically sent e-mails to the larger clients that we had in there and got verification going directly back to them.

Q. From 2010 to 2019, when TBC was performing its annual audits of the ValueWise entities and preparing the audited financial statements for the ValueWise entities, did you or any other representative of any ValueWise entity do anything to deceive TBC regarding the ValueWise entities' accounts receivable?

A. Yes, I did. No one else, just me.

MICHAEL T. MANN

Q. What did you do?

A. I would create -- I would basically be the other person on the other line for any e-mails for them to send them to, and then I would then reply back to Teal Becker.

Q. What do you mean you would be the other person on the other line, what does that mean?

A. So when they asked for what's the name of the company, what's the e-mail address, just some of the details; the e-mail address would go to me.

Q. Did you create e-mail domains to deceive TBC in that regard?

A. I'm trying to think of the e-mails we used. In some cases, yes. I mean, it varied. In different cases there were others that -- I think the short answer is, yes, there would be domains that looked like stuff for the clients that people would send, they would send it to, correct.

(Whereupon, Defendant Exhibit I, Mann E-mail Dated 6/7/16, Bates Stamped PB-SWP-00067997 to '998, 2-Pages was marked

MICHAEL T. MANN

for identification.)

BY MR. KUHN:

Q. Exhibit I is a chain of e-mails between you, Dave Blessing, and Pat Scisci, correct?

A. Yeah. Two e-mails, correct.

Q. You've seen this e-mail before, correct?

A. This looks familiar.

Q. Who is Mr. Scisci?

A. Mr. Scisci is one of the partners at TBC.

Q. On June 2nd, 2016, Mr. Scisci sent you an e-mail with the subject "ValueWise Receivable Confirmation," correct?

A. Correct.

Q. In that e-mail Mr. Scisci states that TBC "tested 100 percent of all receivables for ValueWise and subsidiaries as of 12/31/15," excluding Viverant and Heutmaker, correct?

A. Correct.

Q. And Mr. Scisci states the amount of the receivables tested totaled $26,432,114, correct?

MICHAEL T. MANN

A. Correct.

Q. And Mr. Scisci also states that TBC sent out confirmation letters to the ValueWise and subsidiaries' clients and received back on 100 percent of these receivables for ValueWise, Weitz, and Ross, and 97.26 percent receivables for FocalPointe Group, correct?

A. Correct.

Q. Mr. Scisci finally states, "All communication with clients were between Teal Becker & Chiaramonte and the clients." Additionally -- and that "TBC verified ValueWise and subsidiaries collected $26,423,487 in payments from their clients per bank statements as of March 24, 2016."

Correct?

A. Correct.

Q. After Mr. Scisci sent you the e-mail on June 2nd, 2016, you forwarded the e-mail to Dave Blessing at Pioneer Bank on June 7, 2016, correct?

A. Correct.

Q. Did Mr. Scisci send this e-mail to you on June 2nd, 2016?

MICHAEL T. MANN

A. I believe so. That's what it says.

Q. Did you alter the text of Mr. Scisci's e-mail in any way before you forwarded it to Mr. Blessing on June 7th, 2016?

A. I mean, I don't know for sure, but I don't think so. I think these are the type of numbers he would get in the audit. I don't think I doctored his e-mail here. I mean, I'm not a hundred percent sure, because -- but I don't think so.

Q. Describe the conversation you had with Mr. Scisci or any other employee of TBC about this e-mail and its intended purpose?

A. I don't recall, because I thought these things were written in the actual audit statement as one of the notes or whatever, so I'm not quite sure why he sent an e-mail like this at this time.

So I don't know the background that led to this specific e-mail.

Q. Did you doctor any e-mails from Mr. Scisci or anybody else at TBC before forwarding those e-mails on to Pioneer Bank?

A. I do not -- I do not know.

MICHAEL T. MANN

All I can say is the audit reports, which he's referring to, would be in the audit report, would have to reflect this. Pat, and Dave and I would get together and open and look at the same audit report.

So an e-mail like, this information is right in the audit. So this isn't anything new that wouldn't be in the audit, so that's why I don't think this would be doctored.

I could be wrong. They maybe not had that not -- maybe he didn't put it in that year. So Dave might have been asking, what was your percentage.

I don't know the context of why this happened on this date, but I don't think I doctored this e-mail, I don't know. Because I created domains for fake clients to have them send stuff, I could have doctored this e-mail, but I don't see why.

BY MR. KUHN:

Q. Well, my question though was: Did you ever doctor e-mails from Mr. Scisci or anyone else at TBC before forwarding those e-mails to Pioneer Bank?

MICHAEL T. MANN

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Right. I could have. Without the context or seeing something, I -- I mean...

Q. Well, do you recall doctoring any e-mails?

MS. NEIDL: Objection to form.

MR. JAYNE: Objection.

Q. Let me rephrase that.

Do you recall doctoring e-mails from Mr. Scisci or anyone else at TBC?

A. I don't recall doctoring an e-mail from Mr. Scisci. That doesn't mean I -- I mean, the amount of doctoring that went into the actual audit was quite large, so it's kind of hard to focus on just an e-mail, when a lot of the stuff in the audit was fabricated.

Q. What do you mean besides -- you mentioned before the accounts receivable and the bogus e-mails; what else are you talking about?

A. It's mainly that. That's the whole purpose here.

MICHAEL T. MANN

And there were also doctored bank statements, so when they did their checking to make sure 99.97 percent come in, it was a doctored statement that was provided to Teal Becker, TBC.

I mean, some of these receivables did go to direct clients. In 2016, we still had United Healthcare and there was a contact there. FocalPointe's receivables were all accurate, all of their clients were real.

You know, ValueWise probably had a few other real ones in there; but Weitz were all fabricated, there were some fabricated in ValueWise.

I didn't use the companies that were in the borrowing base that Pioneer had, I only had like seven or eight clients that were fabricated to make up the numbers and tie it together.

So this e-mail could be completely accurate as written by Mr. Scisci as he sent it, because there was a lot of fabricated stuff in the actual audit.

Q. Did Mr. Scisci know that you

MICHAEL T. MANN

intended to forward this e-mail to Pioneer Bank?

MS. NEIDL: Objection to form.

Q. Let me ask it a different way.

Did you tell Mr. Scisci before he wrote this e-mail that you wanted him to send you an e-mail on ValueWise's receivable confirmation so that you could forward it to Pioneer Bank?

A. I don't recall, but I easily could have said Mr. Blessing is wondering what percent of the receivables you did, and he said I'll type something.

I don't recall that conversation back in 2016 on why he sent this, but it very well could have been.

Q. Describe all the conversations or communications you have had with anyone from TBC since September 4th, 2019?

MS. NEIDL: Objection to form.

Can I just say there's another litigation pending, and this is not the place to be asking questions about that.

I mean, if you want to talk about

MICHAEL T. MANN

why this is relevant to this proceeding.

MR. ALESSI: I'm sorry, is there an objection to the form of the question?

MS. NEIDL: There is an objection this line of questioning.

MR. ALESSI: And the basis of your objection is?

MS. NEIDL: Well, I don't want to waste the witness' time, he's pressed for time.

And you have another litigation pending against Teal Becker. These questions -- if you want to say they're relevant to this proceeding, you know, we can go forward, but I'm putting my objection on the record.

MR. KUHN: That's fine.

MR. ALESSI: I understand your objection. I won't take much time. Relevancy is never a basis for an objection in a deposition, never.

And I can explain the relevancy of this, which I think is pretty straightforward, but I am not going to take

MICHAEL T. MANN

up the time.

We're allotted the hours and we'll keep going, and we'll note your objection.

THE WITNESS: What was the question?

BY MR. KUHN:

Q. So the question was: Describe all the conversations or communications you have had with anyone from TBC since September 4th, 2019?

MS. NEIDL: Objection to the form of the question.

MR. JAYNE: Object to the form.

THE WITNESS: I did not have any conversations with anyone at TBC since September 4th.

I think I got some cease and desist or some type of letter basically sometime in September or -- saying they're not -- I got something, but there was no communication that I had with anyone at TBC after all this happened.

(Whereupon, Defendant Exhibit J, Mann E-mail Dated 6/9/16, Bates Stamped PB-SWP-0067976 to '978, 3-Pages was marked

MICHAEL T. MANN

for identification.)

BY MR. KUHN:

Q. Exhibit J is a chain of e-mails two days later from Exhibit I. So this is June 9th, 2016, between you, Mr. Blessing, and Denise Lurenz, correct?

A. Yes.

Q. Ms. Lurenz is another employee of TBC, correct?

A. Correct.

Q. Now, on June 9, 2016, Ms. Lurenz sent you an e-mail that attached a letter from TBC, correct?

A. Correct.

Q. The letter to you is signed by Mr. Scisci, correct?

A. Correct.

Q. The first paragraph of Mr. Scisci's letter states, "Per your request, the following information details the accounts receivable confirmation and testing process we performed related to the December 31st, 2015, year end audit for ValueWise Corporation and Subsidiaries."

MICHAEL T. MANN

Correct?

A. Correct.

Q. And then the second paragraph of Mr. Scisci's letter repeats the same information about TBC's receivable testing process and methods that were set forth in Mr. Scisci's June 2nd, 2016, e-mail that is Exhibit I, correct?

A. Correct.

Q. With respect to Mr. Scisci's letter to you dated June 9th, 2016, and Bates numbers 67978, did you alter the text of Mr. Scisci's letter in any way before you forwarded it to Mr. Blessing on June 9th, 2016?

MS. NEIDL: Objection to the form.

MR. JAYNE: Same objection.

THE WITNESS: Can I ask -- clarifying, are you asking going back, did I change this or this letter? I mean, you asked earlier, did I change this document in any way?

Q. My question to you is with respect to the June 9th, 2016, letter on TBC letterhead, that is Bates numbered 67978, okay,

MICHAEL T. MANN

did you alter the text of that letter in any way before you forwarded it to Mr. Blessing?

A. I don't think so. I don't know why I would. I mean, I'm not saying I didn't, but this is -- it looks like something I wouldn't have.

Q. Can you describe the conversations you had with Mr. Scisci or any other employee of TBC about the June 9th, 2016, letter and its intended purpose?

A. I mean, I'll say this is speculation on why this happened. In looking at this e-mail, now that I have these, this was probably a request from Mr. Blessing, something had to do with, you know, what percentage of the receivables.

Pat Scisci probably first tried sending me an e-mail saying this is it, and I probably forwarded it to David, and David probably came back to me and said, I actually need it on their letterhead.

That's a guess. I don't know if that happened. This is, to me, is not a -- isn't a big thing that I would register in my

MICHAEL T. MANN

mind.

But when I look at the numbers, they look the same. I -- my guess is this was authored by TBC.

And again, where a lot of my fraudulent activity would have been on the work within the audit that created these results, is my guess.

But that does not mean that, you know, I have altered things before as part of this whole process, so I'm not saying that's it.

But, for me, looking at this, Mr. Blessing wanted this information, this wasn't good enough, and then they wanted a signed document.

That's my best guess, but I'm not pulling that from memory, I'm pulling that from what's in front of me.

Q. Did you provide names and addresses of ValueWise customers to TBC to use in the receivables testing and confirmation process?

A. Yes.

Q. And Mr. Scisci knew you were going

MICHAEL T. MANN

to forward this June 9th, 2016, letter to Pioneer Bank, correct?

A. The letter?

Q. Yes.

A. Most likely, yes.

Q. Are you aware of any controls testing conducted by TBC?

A. They would do -- I mean, they had some control testing done. They would always have a new test that you didn't know what it would be each year.

You know, every certain number of years they had to re-test this.

So there were -- I mean, the audit took five months, almost, so it was a very long and intense process.

Q. Can you describe your understanding of how TBC tested the receivables for the ValueWise Corporation and subsidiaries?

A. So, yeah. I would provide company name, AP contact, AP contact e-mail.

They would then pull all the receivables at the end of the year, based on each client, and send it to the e-mail I

MICHAEL T. MANN

provided to TBC.

As I said, 2016, some would go to legitimate customers and they would receive it and fax it back. But a lot of those numbers were probably five to eight clients that I made up with e-mail addresses that they would send, so the e-mail would actually come to me, and then I would fax them back into Teal Becker, you know, basically pretending to be the client.

Q. Did David Blessing's wife work at TBC?

A. At one point she joined later on, correct.

Q. Do you know what Mrs. Blessing's job was at TBC?

A. David told me. It was sort of a management leadership. I mean, I didn't work with her on any of this. But I don't remember what her title was, but I know -- I always got the impression from Mr. Blessing that she was pretty senior and was helping out in a senior way, but she wasn't on my audit team.

Q. Can you -- did you have -- so did

MICHAEL T. MANN
you have any communications with Mrs. Blessing concerning TBC's auditing of ValueWise and its subsidiaries?
A. Absolutely not.
Q. Are you good?
A. I'm good.
(Whereupon, Defendant Exhibit K, ValueWise Consolidated Financial Statement, 12/31/18 and 2017, Bates Stamped PB-SWP-00334220 to '245, 26-Pages was marked for identification.)
BY MR. KUHN:
Q. Can you identify the document marked Exhibit K?
A. Yes, this is one of our audit reports from the Teal Becker audit.
Q. And you've seen this document before, correct?
A. Correct.
Q. Now, Exhibit K is the consolidated financial statements for ValueWise and subsidiaries prepared by TBC for fiscal years 2018 and 2017 that you provided to Pioneer Bank in May 2019, to satisfy Pioneer Bank's

MICHAEL T. MANN

underwriting requirements for Pioneer Bank's line of credit issued to the ValueWise entities, correct?

MR. JAYNE: Objection to form.

MS. NEIDL: Object to the form.

THE WITNESS: Correct.

(Whereupon, Defendant Exhibit L, ValueWise Consolidated Financial Statements, Dated 12/31/18 and 17, Bates Stamped TBC-PB-035989 to '017, 29-Pages was marked for identification.)

BY MR. KUHN:

Q. Now, can you identify the document marked Exhibit L?

A. This appears to be the statement that Teal Becker provided me, as opposed to the one I provided. It looks like the same audit report title page.

Q. I'll represent to you that Exhibit L is the version of consolidated financial statements for ValueWise and subsidiaries for fiscal years 2018 and 2017 prepared by TBC that was produced by TBC in litigation with Pioneer Bank.

MICHAEL T. MANN

Now, can you please flip -- keep both of them in front of you.

Can you please flip to page nine of both documents, which would be Bates numbers 999 and 230?

A. (Witness complies.)

Q. Do you see in the version of the consolidated financial statements produced by TBC within note one under the heading "Income Taxes," there is a second paragraph that starts with the words, "Weitz and Associates Incorporated is a C corporation for which income taxes are provided."

Do you see that paragraph?

A. Yes, I do.

Q. Do you see on the same page of the version of the consolidated financial statements you provided to Pioneer Bank, that paragraph in note one is missing? Do you see that?

A. Yes.

Q. Can you describe how the paragraph -- how that paragraph was removed from the version of the consolidated financial

MICHAEL T. MANN

statements that you provided to Pioneer Bank?
A. Right. I took it out before I sent it to Pioneer.
Q. Why did you do that?
A. I'd have to look into this to figure it out. It obviously would have created a red flag in some way.
Weitz and Associates -- I mean, I was most likely -- I had a lot of accounts receivable with Weitz and Associates in the audit that Teal Becker did, and I was trying to hide that from Pioneer.
Q. Did you have any communications with TBC regarding the removal of that paragraph?
A. No.
Q. Now, please flip to page 17 of both documents.
A. (Witness complies.)
Q. Which is 007 and 238.
Turn your attention to the last paragraph in "Note 9: Income Taxes."
Do you see that in the version of the consolidated financial statements produced by TBC, the first sentence in the final

MICHAEL T. MANN

paragraph of Note 9 reads, "The company's consolidated effective income tax rate is lower than what would be expected if the federal statutory rate were applied to income from continuing operations primarily due to all companies, with the exception of Weitz and Associates Inc having elected to be taxed as either small business corporations or limited liability companies."

Correct?

A. Correct.

Q. But now when you turn to the first sentence in the last paragraph of Note 9 in the version of the consolidated financial statements that you provided to Pioneer Bank, the text is different.

The words, "With the exception of Weitz and Associates Inc" have been removed, correct?

A. Correct.

Q. Now, turn back to the version of the consolidated financial statements produced by TBC.

Do you see that in the final

MICHAEL T. MANN

paragraph in Note 9 ends with the sentence stating, "Weitz and Associates Inc has a $1,003,886 in net operating losses to carry forward to future years." Correct?

A. Correct.

Q. But in Note 9 of the version of the consolidated financial statements you provided to Pioneer Bank, that final sentence has been removed, correct?

A. Correct.

Q. Can you describe how the text referring to Weitz and Associates was removed from Note 9 in the version of the consolidated financial statements you provided to Pioneer Bank?

A. Like, how I did it? Like, how I removed it?

Q. Yes.

A. Just using a PDF -- I don't remember exactly how, either a PDF editor or something where you retract.

I know they had security on there's, but it was probably printing it to a new PDF. I don't remember exactly how, but I went

MICHAEL T. MANN

through some steps to modify that by removing the Weitz and Associates language.

Q. Can you describe why you did that?

A. Again, Pioneer Bank were in a lot of discussions about Weitz having a lot of receivables.

So I basically -- the numbers -- that's why Dave and Pat Scisci talked, most of the conversations would be fine, because the numbers all sort of flow, it's just I just rolled Weitz's stuff into the general public is my guess, without going through and verifying it.

But I was eliminating talking about Weitz on what I was sending to Pioneer.

Q. Did you have any communications with TBC regarding the removal of that text referring to Weitz and Associates?

A. No.

MR. KUHN: Why don't we take a break?

VIDEOGRAPHER: This concludes video number three in the deposition of Michael T. Mann. We are going off the record at

MICHAEL T. MANN
3:36 p.m., September 14, 2021.
(Whereupon, proceedings recessed for a short break and once again resumed.)
VIDEOGRAPHER: This is the beginning of video number four in the deposition of Michael T. Mann. We are on the record at 3:48 p.m., September 14, 2021.
BY MR. KUHN:
Q. On or about June 29, 2017, Pioneer Bank extended a $22 million revolving line of credit to the ValueWise entities, correct?
A. It could be. I don't know if you have the years right, but that's probably accurate.
Q. I'm going to refer to that line of credit of 2017 as the "$22 million LOC," if that's okay.
A. Okay.
(Whereupon, Defendant Exhibit M, Mann E-mail Dated 6/30/17, Bates Stamped PB-SWP-00250674 to '677, 4-Pages was marked for identification.)
BY MR. KUHN:
Q. Exhibit M is a chain of e-mails from

MICHAEL T. MANN

June 28th to 30th of 2017, between you, Mr. Blessing, and Stephen Malinowski, correct?

A. Correct.

Q. You have seen this e-mail before, correct?

A. I mean, it makes sense. I don't remember -- you know, it makes sense, yeah.

Q. Mr. Malinowski was a vice president of Berkshire Bank, correct?

A. Correct.

Q. Berkshire Bank was a participating bank in the $22 million LOC, correct?

A. Correct.

Q. Mr. Malinowski was your main contact at Berkshire Bank with respect to all matters involving Berkshire Bank's participation in lines of credit or loans to the ValueWise entities, correct?

A. Correct. I -- a lot of times I want to work through Dave, as opposed to talking to Steve, because they were a partner there, but we included Steve in things, and I did have conversations with Steve at times.

Q. So Mr. Malinowski was your main

MICHAEL T. MANN

contact at Berkshire Bank with respect to Berkshire Bank's participation in loans or lines of credit to the ValueWise entities, correct?

MS. NEIDL: Objection.

MR. JAYNE: Same objection.

THE WITNESS: If I want to talk to anyone at Berkshire Bank, Steve Malinowski, yeah, he was my point of contact at Berkshire Bank, correct.

Q. Who else did you deal with at Berkshire Bank regarding Berkshire Bank's participation in loans to the ValueWise entities?

A. Loans, I can't think of anyone else, I think it was always Stephen.

Q. And if I say "loans" I'm including in that term, lines of credit?

A. Correct.

Q. Prior to Berkshire Bank purchasing a 50 percent participating interest in the $22 million LOC, Berkshire Bank conducted a credit underwriting investigation into the ValueWise entities, correct?

MICHAEL T. MANN

A. Correct.

Q. The first e-mail in the chain is from Mr. Malinowski to Mr. Blessing stating that the loan participation agreement was under review, correct?

A. Correct.

Q. And Mr. Malinowski also sent Mr. Blessing an invoice for a field examination, which Mr. Blessing then forwards to you for payment, correct?

A. Correct.

Q. Berkshire Bank initiated and controlled a field audit of the ValueWise entities, as part of Berkshire Bank's credit underwriting investigation for the $22 million LOC, correct?

MS. NEIDL: Objection.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

Q. That field audit included auditors visiting ValueWise entities' offices, correct?

A. There was one guy doing it, but yes.

Q. Did that field audit involve testing of the ValueWise entities' receivables?

MICHAEL T. MANN

A. I mean, we had some restrictions. I'm trying to remember all the pieces he did. He looked at accounts.

I don't think it was the same since we had done the TBC one right before, and there was a 100 percent receivable verification on that. They probably carved that piece out, just because they were so close together.

But he did look at all of the contracts with all the vendors. And, I mean, he still did some testing, but I don't think he reached out to the clients; that was taken off I think as the scope.

Q. Can you describing for me what that field auditor did?

A. I mean, they have a lot of -- they look at several things. They look at sales outstanding. He basically takes our books, runs a bunch of reports, looks at numbers, and comes up with a conclusion.

They do have some testing. He looked at all the contracts. He looked at payables. He would ask me to pull some stuff random that he would see in our accounting

MICHAEL T. MANN

file. It was a -- although it was only four or five days, it's significantly more intense than the four or five-month audit.

Q. Were any employees or representatives of Pioneer Bank present for that field audit?

A. No.

Q. Did any employees of representatives of Pioneer Bank control what ValueWise entity information the field auditor had access to?

A. Ask the question again.

Q. Sure. Did any employees or representatives of Pioneer Bank control what ValueWise entity information the field auditor had access to?

A. No.

(Whereupon, Defendant Exhibit N, Mann E-mail Dated 5/4/18, Bates Stamped PB-SWP-00051955, 1-Page was marked for identification.)

BY MR. KUHN:

Q. Exhibit N is a chain of e-mails -- actually, I take that back. Exhibit N is just an e-mail from you to Mr. Blessing on May 4th,

MICHAEL T. MANN

2018, correct?
A. Correct.
Q. You wrote and sent this e-mail, correct?
A. Yes.
Q. Now, on or about June 27, 2018, Pioneer Bank extended a $32 million revolving line of credit to the ValueWise entities, correct?
A. That's probably accurate, yes.
Q. Well, do you remember something else?
A. I don't remember the numbers and the years. I mean, you could say it. If you have a document that says it, I believe you a hundred percent.
I'm not good with these are the years that I had this amount. So, I mean, if I start answering yes to everything, it sounds right, I don't remember.
I know it was $42 million at the end, it probably went up to -- I just don't remember all the exact numbers and years.
Q. I'll represent to you that it was

MICHAEL T. MANN

$32 million in 2018.

A. Yes, and I believe you that that's accurate.

Q. So Berkshire Bank was once again a participating bank in the $32 million LOC, correct?

A. Correct.

Q. That's what I refer to as the $32 million line of credit that Pioneer Bank issued in June 2018, I'll refer to that as the "$32 million LOC," okay?

A. Okay.

Q. If you turn to the fifth paragraph in that e-mail that begins with the word "finally." There, you are describing the field audit of the ValueWise entities the prior year with respect to the $22 million LOC that was initiated and controlled by Berkshire Bank, correct?

MS. NEIDL: Objection to the form.

MR. JAYNE: Same objection.

THE WITNESS: Say it one more time.

Q. Sure. The fifth paragraph, okay. In that paragraph you are describing the field

MICHAEL T. MANN

audit of the ValueWise entities in the prior year with respect to the $22 million LOC that was initiated and controlled by Berkshire Bank, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Correct.

Q. And you state, "The guy that was recommended by Berkshire Bank spent four days on site, and three of the days were looking at things that were all covered by the audit."

Correct?

A. Correct.

Q. And at the end of paragraph you state, "I did not like the fact that the examiner felt like he was working for Berkshire."

Correct?

A. Correct.

Q. Do you remember who conducted the 2017 field audit?

A. I can't remember the gentleman's name, but I found out in 2019 he was an employee. At least they hired him afterwards, he was a contractor originally, but he was an

MICHAEL T. MANN

employee of Berkshire.

But he did -- what I didn't like and I stated it here, instead of calling Mr. Blessing saying hey, what do you want me to look at or do, he pretty much got all direction from Stephen Malinowski.

Q. When you said in the sentence that I just read that "in 2017, the field auditor spent days looking at things that were all covered by the audit."

The audit that you're referring to is TBC's annual audit of the ValueWise entities; is that correct?

A. That's correct.

Q. And then further down you state, "I know we do well on those tests. And Pat" -- let me start it over.

Further down you state, "I know we do well on those tests, and Pat does do 100 percent verification of invoices and does look at concentration; just doesn't do concentration at a level that an examiner would look to at it."

A. For example.

MICHAEL T. MANN

Q. Correct?

A. Correct.

Q. The "Pat" that you're referring to in that sentence is that sentence is Mr. Scisci from TBC, correct?

A. Correct.

Q. TBC was required to verify 100 percent the ValueWise entities' invoices as part of TBC's annual audit of the ValueWise entities, correct?

A. Correct.

Q. And Mr. Scisci agreed that TBC would verify 100 percent of the ValueWise entities' invoices as part of TBC's annual audit of the ValueWise entities, correct?

A. Correct.

Q. And Mr. Scisci knew you were providing the ValueWise entities' annual consolidated financial statements audited and prepared by TBC to Pioneer Bank as part of Pioneer Bank's credit underwriting investigation into the ValueWise entities, correct?

MR. JAYNE: Object to the form.

MICHAEL T. MANN

THE WITNESS: Correct.

Q. How did TBC verify 100 percent of the ValueWise entities' invoices as part of TBC's annual audit of the ValueWise entities?

A. Like I was -- I mean, the same answer I just gave a while ago: I would provide name, AP contact, e-mail address. He would send it out.

There were some that were real invoices out there that they would reach and people would respond.

But a lot of the dollar value would go to me to get the numbers up to make the audit look properly.

(Whereupon, Defendant Exhibit O, Mann E-mail Dated 6/15/18, 1-Page was marked for identification.)

BY MR. KUHN:

Q. Now, Exhibit O is a chain of e-mails between you and Mr. Malinowski on June 15, 2018, correct?

A. Correct.

Q. And you sent and received these e-mails, correct?

MICHAEL T. MANN

A. Correct.

Q. In your e-mail to Mr. Malinowski, you state that you just spoke with TBC and TBC indicated that Mr. Malinowski needed some enclosed documents to finalize a presentation, correct?

A. Yes.

Q. So Mr. Malinowski communicated directly with TBC regarding the ValueWise entities, correct?

A. It appears that way, yes.

Q. What is the presentation you are referring to?

Well, strike that.

Did Mr. Malinowski communicate directly with TBC regarding the ValueWise entities?

A. It appears looking at this that he did. And I can't recall what it was for, what this presentation was.

My guess is June 15th, looking at the time, he may have needed more information to present for their approval on the loan facility. That would be a guess, it's

MICHAEL T. MANN

hypothetical guesses.

But just looking at the dates of the e-mails, the audit was probably circulated and reviewed, and Stephen Malinowski, it appears, went to TBC directly.

And now I'm reading this, I don't recall why or -- I can only make assumptions based on this.

Q. Now, in this e-mail you were providing documents directly to Mr. Malinowski related to Berkshire Bank's credit underwriting investigation into the ValueWise entities, correct?

A. Correct.

Q. From 2017 to 2019, Mr. Malinowski regularly communicated directly with you when Berkshire Bank needed documents or information related to Berkshire Bank's credit underwriting investigation into the ValueWise entities, correct?

A. I mean, my recollection is it would happen from time-to-time. I mean, I -- it was very clear with David that I prefer to deal with him, my relationships with Pioneer.

MICHAEL T. MANN

But there would be times -- that's why when I responded to Steve -- I don't know the beginning, that Steve asked me directly, and then I copied Dave just to let him know what was going on.

I copied Dave on this as I responding so he was aware, and it looks like Steve responded back without copying David, so.

I tried to keep Pioneer in the bank, but Steve did come to me from time-to-time. I don't know, it didn't feel like a lot, but he would come to me time to time.

Q. So you would deal with Mr. Malinowski directly --

A. From time-to-time.

Q. -- when Berkshire Bank needed documents or information related to Berkshire Bank's credit underwriting investigation into the ValueWise entities, correct?

A. Yes, at times. I wouldn't say all the time, but at times, yes.

Q. When Mr. Malinowski or anyone else at Berkshire Bank requested documents or information from you relating to Berkshire

MICHAEL T. MANN

Bank's credit underwriting investigation into the ValueWise entities, you would provide those documents or information, correct?

A. Correct. I don't know if I had a conversation with David before I did it. But, yes, I tried to comply and work with him, yes.

Q. And Berkshire Bank was not required to send all requests for documents or information relating to the ValueWise entities through Mr. Blessing or Pioneer Bank, correct?

MS. NEIDL: Objection to the form of the question.

MR. JAYNE: Same objection.

THE WITNESS: Yeah, I don't think he would. From my perspective, I don't know -- I've never seen a participation agreement or what the rules say; but from my perspective is, I would try to let Dave -- you know, if Steve ever called me, I would let Dave know Steve called me, so I tried to let him know.

But there was never stopping Stephen from reaching out and asking for things.

Q. From you?

MICHAEL T. MANN

A. From me.
Q. On or about August 12, 2019, Pioneer Bank extended a $42 million line of credit to the ValueWise entities, correct?
A. Correct.
Q. And I'm going to refer to that as the "$42 million LOC," okay?
A. Okay.
Q. Berkshire Bank and Chemung Canal Trust Company were participating bank in the $42 million LOC, correct?
A. Correct.
Q. And prior to Berkshire Bank and Chemung Canal Trust Company purchasing participating interest in the $42 million LOC, Berkshire Bank and Chemung Canal Trust Company conducted credit underwriting investigations into the ValueWise entities, correct?
A. As part of the approval process for the loan? Ask the question again.
Q. Sure. Prior to Berkshire Bank and Chemung Canal Trust Company purchasing participating interest in the $42 million LOC, Berkshire Bank and Chemung Canal Trust Company

MICHAEL T. MANN

conducted credit underwriting investigations into the ValueWise entities, correct?

A. I -- I'm not sure. I can tell you the facts on what I think happened. It's a hard question for me to answer.

They looked at the audit that TBC did. We also had a field exam right before the 2019 $42 million.

There was a couple of calls where Chemung and Berkshire would jump on the phone and ask me questions.

And I do know in just talking, they would have to go to their credit departments to get approval to participate in that.

So I do -- I am confident the answer is yes, but I'm just laying out all the facts, because we would wait to say, hey, did Berkshire approve this yet, we're still waiting on Berkshire, you know, Chemung is good to go. I think Berkshire took a while to get it approved is what I recall.

So, yes, I think they did, but I'm not familiar with their process and what they looked at other than -- I don't even recall all

MICHAEL T. MANN

the questions they asked me in the meetings, but they would have the audit, as well as the field exam, and I know there were some other meetings and questions leading up, but they had a credit department group and they had to approve it.

(Whereupon, Defendant Exhibit P, Mann E-mail Dated 6/18/19, 4-Pages was marked for identification.)

BY MR. KUHN:

Q. Now, Exhibit P is a chain of e-mails between you and Kevin P. Harrigan on June 14th to June 18th of 2019, correct?

A. Correct.

Q. You sent these e-mails, correct?

A. Correct.

Q. Mr. Harrigan was the vice president/commercial loan officer at Capital Bank, which is a division of Chemung Canal Trust Company, correct?

A. Correct.

Q. For the purposes of my remaining questions, I'll refer to Chemung Canal Trust Company and Capital Bank just collectively as

MICHAEL T. MANN

"Chemung," okay?

A. Okay.

Q. Mr. Harrigan was your main contact at Chemung with respect to all matters involving Chemung's participation in the $42 million LOC, correct?

A. Correct.

Q. Who else did you deal with at Chemung, regarding Chemung's participation in the $42 million LOC?

A. I can't recall dealing with anyone else.

Q. Prior to Chemung purchasing a participating interest in the $42 million LOC, Chemung conducted a credit underwriting investigation into the ValueWise entities, correct?

A. Correct.

Q. The first e-mail in Exhibit P is from Mr. Harrigan to you on June 14, 2019, correct?

A. Correct.

Q. And in that e-mail Mr. Harrigan is asking you for information about the ValueWise

MICHAEL T. MANN

entities' finances related to Chemung's credit underwriting investigation, correct?

A. Correct.

Q. And then you and Mr. Harrigan e-mail back and forth on June 14th and June 17th. And eventually, you set up a call for June 18th for you to provide the requested information to Mr. Harrigan, correct?

A. Correct.

Q. And except for the first e-mail from Mr. Harrigan, no one from Pioneer Bank is copied on the e-mails between you and Mr. Harrigan, correct?

A. Correct.

Q. Now, during 2019 you repeatedly provided documents and information directly to Mr. Harrigan related to Chemung's credit underwriting investigation into the ValueWise entities, correct?

A. Correct.

Q. And during 2019, Mr. Harrigan regularly communicated directly with you when Chemung needed documents or information relating to Chemung's credit underwriting

MICHAEL T. MANN

investigation into the ValueWise entities, correct?

A. Correct.

Q. And when Mr. Harrigan or anyone else at Chemung requested documents or information from you relating to Chemung's credit underwriting investigation into the ValueWise entities, you provided those documents or information, correct?

A. Correct. And I think a lot -- I don't know if Mr. Blessing was out at this time, because I used to always copy him on a lot of this stuff.

But the point is, I would work directly with him, or at least I did on this -- for the $42 million line of credit, I was working directly with them.

Q. And Chemung was not required to send all requests for documents or information relating to the ValueWise entities through Pioneer Bank personnel, correct?

MS. NEIDL: Objection to form of the question.

MR. JAYNE: Same objection.

MICHAEL T. MANN

THE WITNESS: Yeah, no, I was obviously sharing things back and forth with him. And also had set up a call to talk through the questions that he needed answered to talk to his credit people.

Q. Well, to your knowledge, did anyone at Pioneer Bank ever communicate to you that Berkshire or Chemung representatives must go through Pioneer Bank with regard to any questions about any line of credits extended to -- extended by Pioneer Bank?

A. Ask that one more time.

Q. Sure. To your knowledge, did anyone at Pioneer Bank ever communicate to you that Berkshire or Chemung representatives must go through Pioneer Bank with regard to any questions about lines of credit issued by Pioneer Bank?

MS. NEIDL: Objection to the form of the question.

MR. JAYNE: Same objection.

THE WITNESS: I don't recall. And from my part, no. I know I went to David a lot of times saying I would rather deal

MICHAEL T. MANN

with you than them.

But I was unaware of any conversation where -- from anyone at Pioneer telling Berkshire or Chemung that they had to go through Pioneer; I'm not aware of it.

Q. Can you describe the information or the documents Berkshire Bank or Chemung requested you to provide to them during their credit underwriting investigation into the ValueWise entities?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Yeah, I mean, I may have provided some documents. I know when I looked at Kevin's e-mail here, it was really answering questions on documents. Again, a lot of these either came up as part of the TBC audit or the field exam. And I think Kevin was just trying to get more familiar on things that he had seen and wanting to understand our business that he was presenting to the Capital group.

Stephen was around longer and --

MICHAEL T. MANN

again, if he -- they had their own internal reports. I think I remember Stephen once showing me some way that they look at their loans and different things.

So they had some of their own tools that they put my numbers in, that I didn't always have access to. So I didn't know how they looked at it, I just cooperated with them if asked.

BY MR. KUHN:

Q. When you communicated with representatives of Berkshire Bank or Chemung as part of their credit underwriting investigation into the ValueWise entities, you always provided them with the documents or information they requested of you, correct?

MS. NEIDL: Objection to the form.

THE WITNESS: Yeah. I always thought I was cooperating, yes.

Q. And when you communicated with representatives of Berkshire Bank or Chemung as part of the credit underwriting process or credit underwriting investigation into the ValueWise entities, you always provided

MICHAEL T. MANN

Berkshire Bank or Chemung with truthful information; is that correct?

MS. NEIDL: Objection to the form of the question.

MR. JAYNE: Same objection.

THE WITNESS: I mean, the audit and the field exam had a lot of faulty information.

So they were -- I didn't -- the majority of the documents I think they relied on or pulled or asked questions; I didn't go through a lot of exercises to create spreadsheets for them.

I'm not saying I never did.

But it was -- most of their stuff also came from the same documents I provided Pioneer, and they would ask me questions.

BY MR. KUHN:

Q. During your credit underwriting investigation of the ValueWise entities, did representatives of Berkshire or Chemung ever ask you to provide account statements for the ValueWise entities' accounts at Pioneer Bank?

MICHAEL T. MANN

A. Not that I recall.

Q. If representatives of Berkshire or Chemung had asked you to provide account statements for the ValueWise entities' accounts at Pioneer Bank, would you have done so?

A. Probably not. I probably would have called Dave right away and said, why are they asking for this.

Q. Did Berkshire Bank or Chemung ever ask you questions about non-sufficient fund incidents at Pioneer Bank?

A. They never asked me about that, no.

MR. KUHN: Okay. I think I'm all set.

MS. NEIDL: Can I just make a note on the record that that entire line of questioning was clearly directed to Pioneer's litigation against the bank; I'm noting it for the record.

MR. ALESSI: And I'm going to note for the record, that it is not at all the case. And at the appropriate time, if necessary, we will make a very clear showing of relevancy of all the lines of

MICHAEL T. MANN

questioning today with regard to this litigation.

VIDEOGRAPHER: We're off the record, the time is 4:16 p.m.

(Whereupon, proceedings recessed for a very quick break and once again resumed.)

VIDEOGRAPHER: We are back on the record, the time is 4:19 p.m.

EXAMINATION BY
MR. GRAVES:

Q. Good afternoon, Mr. Mann.
A. Good afternoon.
Q. I know it's been several hours since the introductions. Again, my name is Matt Graves, I'm an attorney with DLA Piper representing the bank.

Now, you know someone named Luke Steiner, correct?
A. Correct.
Q. And you're aware that Mr. Steiner pled guilty to participating in a criminal conspiracy with you, correct?
A. Correct.
Q. As part of this conspiracy, you

MICHAEL T. MANN

created fraudulent invoices, correct?

A. Correct.

Q. These fraudulent invoices falsely reflected that UnitedHealthcare Group/Optum, were various companies affiliated with you for consulting services that were supposedly rendered, correct?

A. Correct.

Q. And those services were, in fact, not rendered, correct?

A. Correct.

Q. And you, in turn, submitted these invoices to financing companies, correct?

A. Correct.

Q. And you have knowledge that the financing companies, in turn, contacted Mr. Steiner to confirm the accuracy of the invoices, correct?

A. Correct.

Q. And you have knowledge that Mr. Steiner would then lie to the financing companies and tell them the fraudulent invoices were accurate, correct?

A. Correct.

MICHAEL T. MANN

Q. How did you meet Mr. Steiner?

THE WITNESS: Can I just ask you one -- I think I know the answer. It doesn't effect me, but there is other criminal cases going on. So can I just take --

MR. ALESSI: Let's go off the record.

VIDEOGRAPHER: We are off the record, 4:21 p.m.

(Whereupon, proceedings recessed for a short break and once again resumed.)

VIDEOGRAPHER: We're back on the record, the time is 4:29 p.m.

BY MR. GRAVES:

Q. Mr. Mann, how did you meet Mr. Steiner?

A. Derek Schwartz introduced him to me.

Q. Who raised the idea of Mr. Steiner participating in your fraud scheme?

MS. NEIDL: Objection to the form of the question.

MR. JAYNE: Same objection.

THE WITNESS: Years ago, actually before I engaged with Pioneer Bank, I

MICHAEL T. MANN

actually used to use factoring companies legitimately; that is how I was financing and it was too expensive.

As I was starting to get into some financial trouble, that's -- I basically approached Derek Schwartz, because we did have UnitedHealth Group as a client.

So I think the way Derek would go out and -- who was working for ValueWise at the time, they way he would present it to someone at UnitedHealth Group and say, hey, you guys know ValueWise is doing work here, can you guys verify these receivables, because there's -- you know, AP is a nightmare anyway, and he recruited Luke.

I'm not -- I wasn't part of any of those discussions of him getting Luke, I just know Derek found Luke to verify the receivables.

BY MR. GRAVES:

Q. Okay. So when Mr. Schwartz approached Mr. Steiner about verifying the receivables, do you know whether Mr. Schwarz said at the time that the receivables were

MICHAEL T. MANN

going to be false?

MR. JAYNE: Pardon me, you trailed off. I didn't hear what you said.

Q. Sure. When Mr. Schwartz approached Mr. Steiner about verifying receivables, did he describe that the receivables were going to be false, the invoices were going to be false?

A. My best recollection at the time -- I never went to Derek Schwartz or Luke and said, these aren't real. I would just say, hey, I need to finance these.

I don't -- I'm not going to get into -- they're both smart guys, I have a big line of credit, why are you doing this.

But I didn't go out and say hey, here is a big scheme, Derek, you know, go recruit someone to do these fake.

I never used the word, even though it would be hard to say, why are we doing these and should we check them.

So I don't know what Derek -- what conversations Derek had with Luke, that probably would be much richer to what they thought what was going on.

MICHAEL T. MANN

You know, mine was just, you know, plausible deniability type of approach with them to say, hey, can you get someone to verify these receivables.

Q. But you knew that your companies were not performing the work that was represented in the receivables, correct?

A. Yeah. There could be -- to clarify, there were several. Since we were doing work, sometimes it might have been real work from their stuff, but I was using it as -- on my Pioneer line of credit.

So if I use the same stuff when I first started out on a factoring company, I still called them fake, because I'm already borrowing over here. Over time, they just became fake in general.

So there could have been. I don't know this for sure, but if Luke would have looked the first time he received a report, he would have saw this from our system. He would have noticed that it looked like their hours, and he would have said, yeah, this looks right; but over time, I would doctor those or I was

MICHAEL T. MANN

putting stuff in that didn't exist.

Q. And to the extent the invoices reflected work that you supposedly performed but didn't, can you think of any reason that anyone at UnitedHealthcare Group would think that you actually performed that work or your company actually performed that work?

A. Well, that's why I want to verify. Like, early on, when you look at the reports I was sending, that work was performed. They didn't know I was going to multiple factoring companies using the same exact work.

That's early.

Over time, I even lost my contract, I forget what year, 2017 to '18, I forget the time, I continued that. I used the same form that looks like the UnitedHealth Group system, the way they track vendor hours, so it looked like it was all doctored at the end.

Q. And that's what I am talking about, the doctored portion.

You don't have any reason to believe that someone at UnitedHealthcare Group would think that the doctored invoices; that work was

MICHAEL T. MANN

actually performed, do you?

MR. JAYNE: Object to form.

THE WITNESS: I -- this gets into the same. And, I mean, this is part of everything; I shared this with the government over and over again.

I -- they're both very bright guys. You know, even though I didn't say hey, this is fake. Those are real reports. You go pull a report from the UnitedHealth Group, that's what you would get. It would look like -- if you looked at that, it does not look like a doctored report.

But anyone truly -- if you're asked to verify something, you go out and you check, okay, did this person do these hours and such and such, it would have a project name, they would call up.

There is a way to verify. They weren't verifying.

So if he was truly verifying; he wasn't.

So, you know, I -- you know, I -- they're very smart. I can't speak for what

MICHAEL T. MANN

they were doing, but from my perspective, as most people would -- you know, they had to know something was wrong.

Q. Yeah. And to be clear, if you listened to my question, I'm not asking you what they knew, I'm asking you whether you have any reason to believe that with the doctored invoices, when they looked at them, they would have some reason to believe that it was work actually performed?

MS. NEIDL: Objection to the form of the question.

THE WITNESS: Yeah. I would think they knew something was wrong. They would have to know something was off.

Even to the point where at one point I'm using multiple factoring companies to have Luke verify, so why are you using multiple factoring companies.

So that's why; logically speaking, I would find it hard for them to believe that they weren't doing something wrong.

But, you know, I tried to stay out of, you know -- that's me, just my

MICHAEL T. MANN

perspective.

BY MR. GRAVES:

Q. To your knowledge, did Mr. Schwartz try to recruit anyone else at the UnitedHealthcare Group to try to participate in your scheme?

A. There were -- like, if Luke wasn't around and he needed something quick, there might have been one or two people where they would do it as a one-off.

There wasn't anyone that did it on a regular basis.

And I can't recall the name. I know it happened at least once. It wasn't often. Luke was usually around. If he was out for two weeks, I would just delay getting them approved, mostly.

Q. And I think you said this in your answer, but I want to confirm: You can't recall the name of anyone else at UnitedHealthcare Group who might have verified one of these receivables?

A. Right, I can't recall any other names.

MICHAEL T. MANN

Q. All right. And the one instance that you're recalling sitting here today that you just testified about, do you recall whether that was a doctored invoice or not?

A. So the -- let me clarify doctored, because I even viewed the ones that I didn't call doctored as fraudulent invoices, right. I might have been doubling up.

I don't know what timing, if I was using, you know, data I was using. I don't recall if that was at a time where I was really doubling up on borrowing on invoices or if I made up the hours; the report looks exactly the same.

Q. All right. So let me ask the question this way: Do you recall whether that incident involved a fraudulent invoice?

MS. NEIDL: Objection to the form.

MR. JAYNE: Same objection.

THE WITNESS: So what is a -- I view even the first ones when you double up invoices, what's a fraudulent invoice, I guess I don't recall.

Q. What's your definition of a

MICHAEL T. MANN

fraudulent --

A. I think all of them were. I think anything that was factored was wrong.

If I'm going to Pioneer on real receivables and I'm borrowing on it, I might turnaround and go to one of these factoring companies and use that same receivable, I view that as a doctored invoice; even if it's real data.

The challenge would be to what you're asking is if you used real data, there is a chance that Luke or whoever filled in would go out to the system and say, no, that's real, and they could verify it.

The issue, and I can tell you, is over time, and he did it plenty of time that if he would have went and checked reports for the past couple of years, he would have realized either -- like, I would re-use old data, use old names, change the hours. You know, he would go out and say I can't find this in the report.

So he would have -- if he did any verification in the past couple of years, it

MICHAEL T. MANN

wouldn't have matched.

Q. So let me use your language: The one incident where you can recall where someone other than Mr. Steiner verified the invoice, can you recall whether that invoice involved real data or not?

A. I can't recall. And it was longer, so there is a chance that it did, but I don't know.

Q. Did Mr. Steiner ever indicate to you that others at his company were aware that he was verifying these receivables?

A. He never mentioned to me that others were aware that they were verified. I don't recall him telling me.

Q. Did Mr. Steiner ever describe any steps that he had to take to ensure his colleagues did not learn that he was verifying your invoices?

A. Yeah, I do not recall him telling me about any steps he took to his activity and control of it.

Q. Did Mr. Steiner ever describe being disciplined by UnitedHealthcare Group in

MICHAEL T. MANN

connection with verifying the invoices?
A. Other than when -- after September 4th, 2019, I thought he lost his job.
Prior to that, I never heard of -- and I didn't hear -- I mean, I wasn't in communication with him, so I -- I just heard, you know, I don't know where I heard it, that he lost his job when this first happened; after September 4th, 2019 at some point, so...
Q. Did you speak to him at any point after September 4th, 2019?
A. No.
Q. Did he ever attempt to contact you after September 4th, 2019?
A. I think he reached out early on saying, what's going on. I didn't answer the phone. I was not -- I wasn't talking to anyone after September 4th, 2019, so I didn't talk to anyone at that point.
Q. To your knowledge, did Mr. Steiner have any employment problems while he was at UnitedHealthcare Group?
MS. NEIDL: Objection to the form of the question.

MICHAEL T. MANN
MR. JAYNE: Same objection.
THE WITNESS: I was not aware of any.
Q. Are you aware of any employment problems that Mr. Steiner had prior to joining the UnitedHealthcare Group?
A. I was unaware of any.
Q. Are you aware of where he worked prior to joining UnitedHealthcare Group?
A. I don't know even know where he worked before.
(Whereupon, Defendant Exhibit Q, Mann Federal Plea Agreement Dated 8/11/20, 34-Pages was marked for identification.
BY MR. GRAVES:
Q. We marked for you what we marked as Deposition Exhibit Q. Do you recognize Deposition Exhibit Q as the plea agreement you signed on August 11th, 2020?
A. It looks like it.
Q. I want to direct your attention to Section 5 of Exhibit Q, which starts on page six and it is entitled, "Factual Basis For Guilty Plea."

MICHAEL T. MANN

Do you see that?

A. You said it starts on page six?

Q. Yep. Section 5, "Factual Basis For Guilty Plea."

A. Yep.

Q. And if you flip through, you'll see that this section, Section 5, continues through to page 18.

A. Um-huh.

Q. Do you see that it continues through, this section, to page 18?

A. Yes.

Q. Do you see that this section, "Factual Basis For Guilty Plea" contains a description of certain acts you committed?

A. Yes.

Q. You'd agree that the section entitled, "Factual Basis For Guilty Plea" fairly and accurately describes conduct in which you engaged?

A. Yes.

Q. You admitted to the conduct described in the Factual Basis For Guilty Plea, correct?

MICHAEL T. MANN

A. Correct.
Q. In other words, these are your admissions, correct?
A. Correct.
Q. And you admitted to the conduct because you, in fact, committed all the acts described in the Factual Basis For Guilty Plea, correct?
A. Correct.
Q. Your signature appears on page 34 of the document, correct?
A. Correct.
Q. And you signed the document because you wanted to plead guilty for your criminal acts, right?
A. Correct.
Q. Now, I want to review some of your admissions. Let's go to page seven, Paragraph B. Can you please read aloud the first sentence of that paragraph?
A. "From at least 2013 until September 2019, the defendant engaged in a fraudulent scheme to deceive banks and financing companies into loaning his companies

MICHAEL T. MANN

tens of millions of dollars under false pretenses. To obtain the loans, the defendant overstated the companies' revenue and receivables, as well as their business relationships and prospects, and created companies whose sole purpose was to further the fraud by generating fake invoices and disguising sources of funds."

Q. So your fraud scheme went roughly six years, correct?

A. Around, yes.

Q. Do you see the reference to "deceiving banks" on the second line?

A. Correct.

Q. One of the banks you deceived was Pioneer Bank, correct?

A. Correct.

Q. And in that second sentence there is a portion that reads, "defendant overstated his companies' revenue and receivables."

Do you see that portion of the second sentence?

A. Correct.

Q. And that means that you lied about

MICHAEL T. MANN

how much your company has made and how much they were due, correct?

A. Correct.

Q. And your admission that the defendant overstated his companies' business relationships and prospects, that means you lied about your companies' success and prospects for success in the future, correct?

A. Correct.

Q. And your admission related to generating fake invoices means that you were involved in creating fraudulent documents, correct?

A. Correct.

Q. All right. Let's go to Paragraph C. Please read the last sentence, "he also."

A. "He also diverted millions of dollars in escrowed payroll funds, entrusted to payroll companies he owned, and used certain of the funds for his own ends."

Q. Okay. And diverted millions of dollars means you took millions of dollars belonging to other people, correct?

MS. NEIDL: Objection.

MICHAEL T. MANN

MR. JAYNE: Object to form.

THE WITNESS: Yeah. I used employers' or employees' monies for my own -- yes. It's pretty clear. Yep.

Q. And you used these millions of dollars in a different way than you told people you would, correct?

A. Correct.

Q. And when you took other people's money, one of the things that you did is you used some of the money for your own personal benefit, correct?

MR. JAYNE: Object to form.

THE WITNESS: What do you mean own personal benefit?

Q. You used some of the money yourself that you diverted?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: I --

Q. Mr. Mann --

A. Ask the question differently.

Q. All right. Let's look at your admissions.

MICHAEL T. MANN

Read the last part of the sentence you just read aloud in Paragraph C, "Used certain" --

A. -- "funds for his own ends."

That did not mean it went to me or went to buy other things. I think -- and I don't know, we'd have to get Mike on the phone to clarify this.

Because even in a lot of the discussions -- I mean, even at sentencing, you know, personal gain is a tough thing; they'll say, by taking a salary, you were doing this, you're getting personal gain.

There is a bigger meaning to that.

I will say this is: What I recall when we were going over this is using it to my own ends, even at other businesses or to improve stuff, but I would have to talk to Mike on, you know, on what that exactly -- as we went through that.

But that was a big thing. Because one of your big discussion points were a lot of people, you know, take the money it's being put into a bunch of accounts, they have, you know,

MICHAEL T. MANN

offshore this, a lot of boats and stuff; it wasn't that way.

The only argument that people were making is, if your companies weren't doing well, your salary itself is to your own end.

So that's why I'm trying to add -- you know, I see that right there, "to his own ends." I just want to clarify, and the government looked at all the stuff, I was not moving those dollars to a personal account. They were all going to the business accounts. I wasn't taking the dollars and moving them to personal things.

Q. You were using them for the benefit of your fraud scheme, right?

MS. NEIDL: Objection to the form of the question.

MR. JAYNE: Same objection.

THE WITNESS: I was using them -- yeah. I mean, those funds were used for the fraud scheme, correct; and that's how I read that, too.

Q. All right. Let's go to page eight, Paragraph F. And this time, I'll read, and I'm

MICHAEL T. MANN

going to start with the seventh line of the paragraph, with the sentence that begins, "The defendant used."

"The defendant used fraudulently obtained loans from other lenders, including a pre-existing line of credit from Pioneer and other banks that grew to $42 million to pay the fake invoices. To make the fake invoices appear legitimate to the financing companies, the defendant paid them through automated clearinghouse ACH transfers, which the defendant manipulated to make it appear as if the payments came from Optimum UHG when the payments, in fact, came from the defendant."

Do you see the portion of Paragraph F that I just read?

A. Yes.

Q. Did I read it accurately?

A. You did.

Q. And the reason they were fraudulently obtained loans is because you told lies to get these loans, correct?

A. Correct.

Q. You also submitted documents that

MICHAEL T. MANN

you knew were falsified to get these loans, correct?

A. Correct.

Q. And one of the banks you lied to get these loans -- you lied to, to get these loans was Pioneer Bank, correct?

A. Correct.

Q. One of the banks to which you submitted falsified documents to get these loans was Pioneer Bank, correct?

A. Correct.

Q. Prior to September 4th, 2019, you never told anyone at Pioneer Bank that you lied to the bank, correct?

A. Correct.

Q. Prior to September 4th, 2019, you never told anyone at Pioneer Bank that you submitted falsified documents to the bank, correct?

A. Correct.

Q. Let's go the heading on page ten, between Paragraphs M and N.

Do you see the heading that reads, "Fraud against Pioneer, Berkshire Bank, and

MICHAEL T. MANN

Chemung Canal Trust Company"?
A. Yes.
Q. And you're aware that Pioneer lost money as a result of your fraud scheme, correct?
MS. NEIDL: Objection to the form of the question.
MR. JAYNE: Object to the form.
THE WITNESS: Correct.
Q. Pioneer Bank was a victim of your fraud scheme, right?
MS. NEIDL: Objection to the form.
MR. JAYNE: Object to the form.
THE WITNESS: Yes.
Q. To your knowledge, prior to September 4th, 2019, no one at Pioneer Bank knew anything about the fraud scheme described in this section entitled "Factual Basis For Guilty Plea," correct?
MS. NEIDL: Objection to form.
MR. JAYNE: Same objection.
THE WITNESS: Correct.
Q. Let's go to page 11, Paragraph R.
If you could read that paragraph

MICHAEL T. MANN

aloud, please.

A. "Under the terms of the LOC, the defendant was required to submit to the banks, a monthly borrowing base certificate, BBC, attesting to his companies' receivables. The BBCs were prerequisites to the defendant obtaining funds under the LOC.

As part of his fraudulent scheme, the defendant submitted dozens of materially false BBCs, in which he lied about his companies' receivables, and used those misrepresentations to maintain the LOC and obtain funds under the LOC."

Q. Do you understand LOC in this context to refer to the Letter of Credit from Pioneer, and ultimately Berkshire and Chemung maintained for your companies?

A. Yeah, I call it the Line of Credit, which might be the same as a Letter of Credit.

Q. Okay. Line of credit.

And the reason why you had to submit dozens of false certifications in connection with the LOC was because Pioneer Bank and the other financial institutions were unaware that

MICHAEL T. MANN

you had lied to get the LOC?

MS. NEIDL: Objection to the form of the question.

Q. Correct?

A. Correct.

Q. And you needed to continue to submit false documents so that they would not uncover these lies, right?

A. Correct.

Q. And you needed to continue to submit these false documents in order to continue your fraud scheme, correct?

MS. NEIDL: Objection to the form of the question.

THE WITNESS: Correct.

Q. Let's go to page 15, Paragraph FF.

And if you could read that paragraph aloud, please.

A. "By 2019, the defendant could no longer obtain loans sufficient to sustain the fraud. To maintain cash flow, cover expenses, and continue the fraud scheme without detection, the defendant temporarily inflated his account balances, and fraudulently gained

MICHAEL T. MANN

access to the float, by rapidly transferring, a/k/k kiting, millions of dollars among various accounts using checks, wire transfers, and the ACH system. This continued from at least January 2019 through on or about August 30th, 2019."

Q. And I know you've previously testified about check kiting. But I don't think we've heard from you in your own words what you view check kiting to be. Would you please explain in your own words what you understand check kiting to be?

A. Yeah. First, I'll say I'm not a lawyer, and I'll do that.

You know, it is basically, you know -- it's easiest way to describe on the checks, when you write a check to one bank, before it then cashes it, you then cover it with another check that doesn't have funds, so you basically create money that doesn't exist to keep paying different people.

And in addition to just checks, you know, at times, the wire transfers that they talk about in my guilty plea, is at times I had

MICHAEL T. MANN

to send wires, maybe to the Bank of America, so I had some cash over in Pioneer, so I would wire funds to cover that, so that didn't become a non-sufficient funds item.

And the same with the ACH. So I used all three of those to basically cover negative balances I would have in different accounts.

Q. And you understood that at the time you were engaging in this scheme, check kiting was illegal, right?

A. Yes.

Q. And in order for the kiting scheme to work, you had to hide from the banks involved that you were kiting, correct?

MS. NEIDL: Objection to the form of the question.

Q. All right. Strike that.

You believed that in order for your kiting scheme to work, that you had to hide from the banks that you were engaged in check kiting, right?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

MICHAEL T. MANN
THE WITNESS: Yes. If a bank feels you're kiting checks, my assumption is they would reach out to me immediately and say, what are you doing.
So, yes, I was not -- I didn't think anyone sat there and thought I was kiting checks and let me get away with it.
Q. While you were a customer at Pioneer Bank, you had a number of incidents when accounts you maintained were in not sufficient fund status, correct?
A. Correct.
Q. In some instances, the reason that there were not sufficient funds was because you were operating the kiting scheme, correct?
A. Correct.
Q. You never told anyone at Pioneer Bank that the reason accounts had insufficient funds at times was because you were operating this kiting scheme, correct?
MS. NEIDL: Objection to the form of the question.
MR. JAYNE: Same objection.
THE WITNESS: Correct.

MICHAEL T. MANN

Q. You never told anyone at Pioneer Bank that you were using funds in the accounts you maintained at Pioneer Bank for different purposes than you represented you would, correct?

A. May you ask that one more time.

Q. Sure. You never told anyone at Pioneer Bank that you were using funds in accounts you maintained at Pioneer Bank for different purposes than you represented you would to others, correct?

A. Correct.

Q. In fact, on those occasions when individuals at Pioneer Bank would ask you about the not sufficient fund issues, you did not disclose any of the fraudulent activity, correct?

MS. NEIDL: Objection to the form of the question.

MR. JAYNE: Object to the form.

THE WITNESS: Correct.

Q. Instead, you would offer false justifications, correct?

MS. NEIDL: Objection.

MICHAEL T. MANN

MR. JAYNE: Objection to the form.

THE WITNESS: Correct. I think I used -- the main thing I used over was timing issue, which -- it's one of those things where kiting is a timing issue anyway.

So I wasn't saying that like saying, hey, I'm kiting; I was hiding the fact that I was kiting, but I would use something like, hey, timing issue.

When I would usually reach out to Pioneer, I already had -- because I moved the money from somewhere else, I already had the funds in the accounts that were -- that had an NSF in there, so they weren't paying it without knowing there is cash there.

So that was my approach. Whenever that happened with Pioneer, I made sure the money was in the accounts that had a non-sufficient funds.

BY MR. GRAVES:

Q. And to the extent that Pioneer Bank asked you about any not sufficient funds, as

MICHAEL T. MANN

you just said, one of those justifications that you routinely gave was it's just an operational issue, correct?

MS. NEIDL: Objection to the form of question.

THE WITNESS: Yeah, and I would use timing issue, over, and over, and over again in the e-mails.

Q. Timing issue.

(Whereupon, Defendant Exhibit R, Blessing E-mail Dated 6/1/16, 2-Pages was marked for identification.)

BY MR. GRAVES:

Q. Now, I just handed you what's been marked for purposes of the deposition as Exhibit R, which is a June 1st, 2016 e-mail chain, correct?

A. Correct.

Q. And you see a reference there to Mr. Scisci. And as we discussed earlier, Mr. Scisci was the lead outside auditor for your companies, correct?

A. Correct.

Q. Do you see the subject line of the

MICHAEL T. MANN

e-mail says, "Management Letter"?

A. Yes.

Q. And you're aware that the manager letter is a letter from the auditor that discusses internal controls that need to be approved, correct?

MR. JAYNE: Hold on a second. This doesn't have Bates numbers. Has this been produced?

MR. KUHN: Well, I mean, without encyclopedic knowledge of everything, this is from Mann's production, which we produced.

MR. JAYNE: Okay. Okay.

MR. GRAVES: Are you good, Mr. Jayne?

MR. JAYNE: Yeah.

MR. KUHN: Hold on a second. Yours weren't Bates numbered, were they?

MR. JAYNE: Yes. There were two ways to print them out with Bates and without.

MR. KUHN: I think that might have been done with that.

MICHAEL T. MANN

MR. GRAVES: And then, since realtime is down, I am going to impose the court reporter to please read back the last question.

(Whereupon, the last question was read back.)

THE WITNESS: Correct.

BY MR. GRAVES:

Q. And in this particular instance, the e-mail chain reflected in Deposition Exhibit R, you understood that the reason Mr. Blessing was interested in the management letter was because it was part of his due diligence efforts with respect to your companies, correct?

MS. NEIDL: Objection to the form of question.

THE WITNESS: Correct.

Q. All right. And you write in the second sentence of your e-mail, "I have been working with him closely over the past couple of years as we scale."

Do you see that sentence?

A. Yes.

Q. The "him" to whom you are referring

MICHAEL T. MANN

to is Mr. Scisci, right?

A. That is correct.

Q. And your reference to "scale" is a reference to your business growth, correct?

A. Yes.

Q. And not just growing, but growing rapidly, correct?

A. Correct.

Q. You write in reference to Mr. Scisci and his colleagues, "We have taken their advice from last year and significantly improved our operations."

Do you see that?

A. Correct. Yes.

Q. All right. And you meant "improving operations" to be a reference, at least in part, to improving internal controls of your companies, correct?

MS. NEIDL: Objection to form of the question.

MR. JAYNE: Same objection.

THE WITNESS: Correct. I don't see the details of this specific management report, but, yes, they're usually talking

MICHAEL T. MANN

about internal controls and -- I always thought it was -- it could be even more general than just controls, it's just what are things you can do to improve your business, but a lot of it is control based, yes.

BY MR. GRAVES:

Q. And would you be surprised to hear that the perception at Pioneer Bank was that the not sufficient fund problems your accounts were experiencing was a function of your businesses growing so rapidly, and the businesses effectively outgrowing their internal controls?

MS. NEIDL: Objection to the form of question.

MR. JAYNE: Same objection.

THE WITNESS: Yeah. I mean, it could -- I don't know, but that could be --

Q. Is that surprising to you?

MS. NEIDL: Objection to the form of the question.

THE WITNESS: Right. I -- without seeing how Pioneer looks at it, I don't

MICHAEL T. MANN

understand that business, but that wouldn't -- that's not surprising to me as a general person. I mean, I'm the one that told them I have timing issues and they said fine. And I felt that they, you know -- I explained it well enough, and they did know I was growing rapidly, so it could be.

That seems logical; I'm just not answering for them.

BY MR. GRAVES:

Q. Sure. And I'm not asking you to.

But you're the one who represented to them that these not sufficient fund issues were the result of timing issues?

A. Correct.

Q. And the timing issues existed, as you represented to Pioneer Bank, because of a lack of operational controls, correct?

MS. NEIDL: Objection to the form of the question.

MR. JAYNE: Object to the form.

THE WITNESS: Yeah, I don't recall the specific -- and there could be something, I just kept using timing. I

MICHAEL T. MANN

would probably try to give that impression.
But I don't want you to think I'm disagreeing, it could be accurate, but I don't recall the exact details on timing and we're getting it fixed.
I think I definitely implied timing and control issues, so, yes.
Q. In the next paragraph you write that you are about to name a corporate controller.
Do you see that?
A. Yes.
Q. And the corporate controller typically has responsibilities related to internal controls, correct?
A. Correct.
Q. And the person you identified as Derek Schwartz, correct?
A. Correct.
Q. You're aware that Mr. Schwartz has been indicted by the Department of Justice for participating in this fraud scheme with you, correct?
MS. NEIDL: Objection to the form.
THE WITNESS: Correct.

MICHAEL T. MANN

Q. And you're aware that, according to the Department of Justice, he participated in this fraud scheme with you from in and around 2013 through in or around September 2019, correct?

A. I actually stayed away from reading any of that, but that makes sense to me -- I haven't seen any of the reports, but it makes sense to me, if that's what it says.

Q. And the reason it makes sense to you is because you know that Mr. Schwartz was participating in your fraud scheme during that period, correct?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Correct. I don't know if -- and he probably was there right at 2013. I'd have to think back, you know, when this really first started. I got involved very early, yes.

I don't know if it was at the very, very beginning, but he was involved very early on.

I'm just questioning -- that's why

MICHAEL T. MANN

we're always in my plea agreement and other things, that is a lot of general in, or about, or before, because it's in the range, but -- he was involved early on.

I used him to recruit Luke early on and I used his name often when I needed a name.

BY MR. GRAVES:

Q. Putting aside his exact start date, by the time you sent this e-mail on June 1st, 2016, Mr. Schwartz had already been participating in a fraud scheme with you for multiple years, correct?

MS. NEIDL: Objection to the form.

THE WITNESS: Pretty sure looking at it we were factoring. If we were factoring, he recruited Luke, which means yes, he did. Yes.

Q. And you never told anyone at Pioneer Bank that the controller you were about to bring on was engaged in a multi-year fraud scheme with you, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Correct.

MICHAEL T. MANN

Q. Let's go back to Exhibit Q very quickly, which is your plea agreement.

If we could go to page 17.

A. Um-huh. (Witness complies.)

Q. And there's a Paragraph NN, do you see that?

A. Yes.

Q. All right. If you could read Paragraph NN aloud?

A. "As part of his scheme to fraudulently obtain loans based on falsified revenues and receivables, the defendant filed and caused to be filed materially false tax returns for several of his corporate entities, including Weitz."

Q. All right. In sum, you lied to the IRS?

A. Yes.

Q. And the basic thing you lied about was that Weitz made millions of dollars; when, in fact, its revenues were essentially non-existent?

A. Correct.

Q. And the reason you were willing to

MICHAEL T. MANN

pay taxes on revenue that Weitz didn't actually make was that lies about Weitz were key to hiding the fact that you were diverting millions of dollars, right?

MS. NEIDL: Object to the form.

THE WITNESS: The interesting part -- and I never really -- and you saw them in your earlier documents, there was a $1,003,000-some odd dollar loss carried forward.

The receivables, all the tax returns were done on a cash basis. So even though we had all those receivables and there were payables; at some point I would owe taxes, but I hadn't reached that far on a cash basis.

So there was a potential issue coming down the road where, boy, I might have to pay taxes on this. They even had in the audit reports where are the future tax liabilities; Pioneer wanted to look at that, too saying, boy, some day your growth will slow, your things will catch up and you'll have to pay taxes on this and how

MICHAEL T. MANN

are we going to handle it.
So, to be short, I wasn't paying -- happy to pay to keep the fraud scheme going. I was -- I mean, I don't owe the IRS money, because I was losing many anyway, but at the same time, I was falsifying the revenues to give the appearance to Pioneer and other banks that I was doing better than I was.

BY MR. GRAVES:

Q. So now, I just want to ask you in general, and this isn't necessarily related to your plea agreement: You lied to your business partners at Southwestern Payroll in connection with the fraud scheme, correct?
A. Correct.
Q. You lied to your business partners at MyPayroll in connection with your fraud scheme, correct?
A. Correct.
Q. You lied to individuals at Cachet in connection with your fraud scheme, correct?
A. Correct.
Q. In connection with your guilty plea,

MICHAEL T. MANN

you had to turn over to the government, half the money in the joint checking account that you maintain with your wife, correct?

A. Correct.

Q. But your wife was able to keep her half of the money in that account, right?

A. Correct.

Q. And the reason she was able to keep half of her money in the account is because she didn't participate in your scheme, correct?

A. Correct.

Q. She didn't know anything about your scheme, correct?

A. Correct.

Q. And the reason she didn't know anything about your fraud scheme is because you hid it from her, correct?

A. Correct.

Q. And to keep the fraud scheme hidden from her over the course of the roughly six years of its existence, you had to, at times, lie to her about what you were doing, right?

A. Yes.

Q. None of your other family members

MICHAEL T. MANN

knew about your fraud scheme, correct?
A. No.
Q. You hid that from them, you hid the scheme from them as well, correct?
A. Yes. I hid the scheme to most of the world.
Q. As calculated in your plea agreement, the losses in connection with your fraud scheme were in excess of $100 million, correct?
A. Correct.
Q. During the course of your roughly six-year scheme that resulted in over $100 million in losses, how many lies did you tell?
A. I mean, there were countless lies. I mean, I could play numbers; it's horrible. You have -- you can just see, you know, you're falsifying audits, you're falsifying this. People ask, you know, there's -- it's -- you're living a lie.
Q. Do you think there was a business day that went by that you weren't lying to someone about something connected to the

MICHAEL T. MANN

scheme?

MS. NEIDL: Objection to the form of the question.

THE WITNESS: I mean, it's hard to say. It's -- I mean, the easiest way to say it; I was living a lie.

I mean, I frame it up to anyone I talk to. Whether I go a day and we don't talk about anything that has to do -- you know, you are not always talking about the financials, there is a lot of things being done that you talk.

There were businesses that were, you know, done the right way. Now, I may have gone out and opened an account in their name and used that to do that, but there were a lot of -- there were quite a few businesses that were real and we spent a lot of time on those businesses.

But I view, personally, I was living a lie and it was -- and my plea agreement kind of issues that too -- or reflects that.

BY MR. GRAVES:

MICHAEL T. MANN

Q. And I don't want to belabor the point, Mr. Mann, but to try to close it: I understand there might have been some days you didn't lie, there might have been some days you did lie. But given six years, I mean, it has to be over a thousand lies, right?

MS. NEIDL: Objection to the form of question.

MR. JAYNE: Same objection.

THE WITNESS: Right. I think giving a number downplays the severity of the life I was living. You get a number, that's actually saying, boy, you could cut a thousand out.

When you live a lie, that's worse than if I said 10,000. So I don't know what your point is, you are going here. What this was, was disgusting behavior on a daily basis.

Even if I had two weeks where I wasn't talking about financials and let's say it was a great thing coming in; with that in the backdrop, it's horrible.

So I'm actually not trying to

MICHAEL T. MANN

diminish what I'm saying. What I'm saying is what I did was horrible. And even if I guess on a number, I actually don't think that does it justice.

BY MR. GRAVES:

Q. That's a fair point. So to sum up what you just said: For six years, you were living a lie?

A. Correct. Correct. And it was -- the only other part I will say is it got progressively worse.

So if you sit there and say six years ago maybe it was a lie once a month, right, or whatever; I'm not trying to do that.

At 2019, I mean, I was spending seven hours a day just trying to make sure all the checks were written to the right accounts. You had to get up at three in the morning to do that.

These are the same things I shared with the government, you know, it was just impossible to keep something like that going.

So 2019 felt like, you know, even though 2013 might have been, you know, a few

MICHAEL T. MANN

here and there, it wasn't as bad; it was still horrible, it started the whole thing, and that's where you eliminate it. But 2019, you know, was significantly worse.

I don't know if that makes sense.

BY MR. GRAVES:

Q. And at the time you were telling these lies, because you believed it was in your interest to tell these lies?

MS. NEIDL: Objection to form.

MR. JAYNE: Object to form.

THE WITNESS: Yeah, I have said this several times. I mean, one of the things -- and Janelle and Mr. Koenig can talk; he's never had a client ask him -- even the day that I was at Pioneer, wanting to turn myself in as fast as anyone he's ever seen.

I was very quick.

And that's not because I was doing it -- it was something that I wanted to do.

When I was going through this, and I used to think about this all the time: If I ever felt I couldn't get myself out -- and I'll explain that here in a minute, but

MICHAEL T. MANN

if I couldn't get myself out of this, you know, I might put an end, and that's how I thought I'll get it, you know, actually talk to people, figure out how I can resolve this; even if I have to take something, if I ever got to that.

The part where I sat there -- and I might have been living a pipe dream, I'm not saying I was being realistic in my thoughts, but Viverant, which was one of our companies I had Tim Burke in. And, you know, when I first had it, we were struggling with it.

Unfortunately, three or four weeks, even before all of this happened, and then I know we only sold it for a few million, I was trying to do a deal with Anytime Fitness.

Tim Burke had an investment banker call him and say, don't do it, I could sell it for $30 million tomorrow, and Tim was saying this.

So I had that company.

The payroll companies -- and you

MICHAEL T. MANN

don't take my word, we had, I don't know, between the three of them, 13, $14 million in yearly revenues. They were at three-and-a-half times on the open market. So I mentally had a picture.

And actually, when I showed up with the government before I realized all the -- when I was first putting it together, you know, I would sit there and say, gosh, here are the asset values I have.

I was in the hole. That was my plan to get out. So my goal I was fighting, as long as I have a path. And if Viverant goes from 30 to 60 million; could we bring on two or three more payrolls.

Not saying to cover. Yes, I was using the float illegally. But if we could get that to a point where we get -- we double the size and now it's worth 40.

So I was trying to come up and fix it myself, which you never do, and you are just digging a bigger hole.

So that's -- that was my approach. As I was living this hell, that was my plan

MICHAEL T. MANN

on trying to get out.

So I don't know if I'm explaining it. And I was probably living a pipe dream, you know, when I reflect back saying, that was crazy, you should have just done something out there.

MR. GRAVES: So move to strike the entire answer as non-responsive.

THE WITNESS: Sorry.

MR. GRAVES: I know this is difficult, Mr. Mann. I promise you, I am almost done. If you just focus on my questions --

THE WITNESS: I'll focus in.

MS. NEIDL: It was perfectly responsive to your question.

MR. JAYNE: It was responsive.

BY MR. GRAVES:

Q. My question was: You believed at the time you were telling these lies that it was in your interest to do so --

MS. NEIDL: Objection to the form of the question.

MR. JAYNE: Objection to the form.

MICHAEL T. MANN

Q. -- yes or no?

A. I think my long explanation does make that a yes.

I'm just trying to -- sometimes I need all the facts to make sure, boy, that's what my yes means.

Q. Now, you were aware that the Court had the probation office prepare a presentence -- something called a presentence report in connection with your sentencing?

A. Yes.

Q. All right. And you were aware that the probation office calculated that under the United States Sentencing Guidelines, your sentence should be between 235 and 293 months, correct?

A. That's what the guidelines came up with, yes. I don't remember exactly, but it sounds --

Q. Just roughly, 25 years sound correct?

A. Correct.

Q. All right. A sentence of that length would have meant that you would be in

MICHAEL T. MANN

your 70s when you were released from incarceration, correct?

A. Correct.

(Whereupon, Defendant Exhibit S, Mann Federal Sentencing Memorandum, 15-Pages was marked for identification.

BY MR. GRAVES:

Q. Do you recognize Deposition Exhibit S?

A. I'm looking at it. It looks like a sentencing memorandum.

Q. This is the memorandum that your counsel submitted on behalf in anticipation of your sentence, correct?

A. Correct.

Q. And you read this document before it was submitted, correct?

A. Correct.

Q. You understood that this was your lawyer's chance in writing to advocate for you to receive the least amount of jail time possible?

A. Correct.

MR. JAYNE: Object to form.

MICHAEL T. MANN

THE WITNESS: Sorry. Correct.

Q. As such, you carefully reviewed the document prior to it being filed with the court, correct?

A. Correct.

Q. I take it there is nothing that you disagree with in the filing, correct?

A. Correct.

Q. I'd like to direct your attention to footnote four on page 11, and ask you to read it to yourself. You don't have to read it out loud.

A. (Witness complies.) I read it.

Q. Did you finish reading footnote four?

A. Yes.

Q. And you understand that the reference in this footnote to frozen funds is a reference to Pioneer Bank exercising its account overdraft recovery rights on accounts your companies maintained at Pioneer Bank, correct?

MS. NEIDL: Object to form.

MR. JAYNE: Object to form.

MICHAEL T. MANN

THE WITNESS: What we're talking -- because he mentions the nationwide publicity, and the number of victims. That's specifically referring to the payroll accounts, in terms of the nationwide publicity.

But we also go on here to say, we are not --

Q. Huh?

A. Go ahead. Ask the question.

Q. So just to make sure we're talking about the same thing: The reference in footnote four to frozen funds is the reference to what happened to the accounts at Pioneer Bank after September 4th, 2019, correct?

A. I have to answer a little bit more.

The nationwide publicity, and out of the 298 victim complaint letters, 279 of them were payroll people not getting their money. So I think the -- you know, the case we were making here is this, you know, this had a lot of nationwide publicity because of the payroll impact on this.

I mean, it's -- and we say, we're

MICHAEL T. MANN

not talking a legal -- we're not saying I didn't cause it. We were very clear. And when Mike spoke about it, you know, he was very clear in saying, hey, we're not taking a stand on this, it's it just that it wouldn't have been as nationally publicized if 300,000 employees and, you know, "X" thousand businesses didn't have money pulled back.

Q. Right. So I'll ask you to focus on my question.

A. Okay.

Q. All right. You believe that the "freezing" of funds at Pioneer Bank increased the amount of loss your victims suffered, correct?

A. The only two are the payroll ones.

If you froze all of my operating accounts, it wouldn't have had the nationwide impact. It was really the payroll accounts that created the impact.

Q. You believe that freezing the payroll accounts increased the amount of the loss your victims suffered, correct?

MS. NEIDL: Objection to the form of

MICHAEL T. MANN

the question.

MR. JAYNE: Objection.

THE WITNESS: I don't think that's what I said.

He's talking about publicity in that, no? I don't see the dollar value. I could have read it wrong, but I thought he was just talking about nationwide publicity.

Q. All right. The number of victims was increased as a result of --

A. Correct, the number. We're not talking about the dollar amount, just the number of victims.

Q. And the publicity was increased because of the freezing of the funds in the payroll accounts, correct?

A. Correct. That's, I think, what we're saying here, yes.

Q. In short, you believe the actions that the bank took hurt you, right?

MS. NEIDL: Objection to the form of the question.

THE WITNESS: We say very clearly in

MICHAEL T. MANN

here we're not making a -- the issue is subject to a litigation between the government and the bank and other civil entities, and I do not take a merit on the position -- I don't take a position on the merits of those. I don't.

I'm not -- I'm not a lawyer. I don't know the law on it. I can't make a legal place.

I think -- you said it well: We went in with the best case we can to lower the thing.

One of the challenges beyond just this crime was just the nationwide publicity; and all the people speaking were payroll clients.

Q. Mr. Mann, I'm not asking you for a legal opinion.

A. Okay.

Q. It is a really simple question.

From your perspective, it would have been best if the bank, Pioneer Bank had not frozen the funds in the payroll accounts, correct?

MICHAEL T. MANN

MR. JAYNE: Object to form.

THE WITNESS: Yes. I think we could have -- we both could have been in better position, not just me, but Pioneer and me personally, if we wouldn't have frozen those accounts. Yes, I do believe that.

BY MR. GRAVES:

Q. So after your scheme collapsed, you'd agree with me that you didn't really have a factual basis for denying the existence of the fraud scheme, right?

MR. JAYNE: Object to form.

THE WITNESS: Yeah. And I didn't even think that way. I wanted to unwind this and prevent as much damage as possible, as fast as possible. That was my intent right from the start.

Q. And you obviously didn't have $100 million to pay your victims back, correct?

MS. NEIDL: Objection to the form of the question.

THE WITNESS: Correct.

MR. JAYNE: Same objection.

THE WITNESS: Correct.

MICHAEL T. MANN

Q. So the one thing that you could do to help yourself with the pending criminal investigation was to be helpful to the government, right?

MR. JAYNE: Helpful to who?

MR. GRAVES: The government.

MS. NEIDL: Objection to the form of the question.

MR. JAYNE: You're trailing off at the last -- I'm having trouble hearing you.

MR. GRAVES: I'm sorry. I'm facing this way, the mask.

THE WITNESS: Ask the question one more time.

BY MR. GRAVES:

Q. All Right. So one thing you could do to help yourself with the upcoming and predictable criminal investigation was to be helpful to the government in that investigation?

MS. NEIDL: Objection to form.

MR. JAYNE: Objection.

THE WITNESS: I mean, I wanted to call -- like I said, I can repeat the

MICHAEL T. MANN

conversation.

When I first brought it up to Mr. Koenig, I don't think --

MR. GRAVES: Don't say what you said to your counsel.

MS. MURNANE: Don't say anything to what you said to Mike.

THE WITNESS: No. No. No. But the whole point is what I did was rare on the timing.

That being said, when I was meeting with the government, you know, there was, you know, money had been pulled back on the payroll dollars, you know.

One of my intentions, not just for me, but was to talk to them and say hey, what can we do to save the pain that was currently going on at that time.

I mean, when we called the government, there were no media stories. We called them before they knew what was going on.

So I was hoping to really just reduce the pain as much as possible.

MICHAEL T. MANN

I knew I was facing a lot, regardless. I did not want all these -- you know, I wanted to minimize the impact on the people.

But, yeah, go ahead.

BY MR. GRAVES:

Q. You believed your cooperation with government authorities would ultimately help you at sentencing?

MS. NEIDL: Objection to form.

MR. JAYNE: Objection.

THE WITNESS: I went in, and it was very clear, and they stated when I sat down: This does not mean we're giving you any special cooperation.

And actually, you talk about the presentence report. They -- the way the government operated is they just do it as a fact basis. There were no special deals with the government. The government didn't give me, you know, it's just these are all the facts, and we went through it.

I would hope, as a side, yes.

But they made it very clear if I

MICHAEL T. MANN

come in, they're not giving me anything. They're not promising anything. And I went in under those engagements.

And so I'm not sure of the question, you know.

Q. Mr. Mann, the second paragraph of your sentencing memo, go to page one. It's all about accepting full responsibility, going in early, proactively contacting the United States Attorneys Office.

A. Right.

MS. NEIDL: Objection to the form.

Q. This is what you ultimately led with at your sentencing, right?

MR. JAYNE: Object to the form.

MS. NEIDL: Objection to the form of the question.

THE WITNESS: I mean, it was a part of it. I don't think we prioritized the order based on importance.

It was something we put here, but --

I'm not sure of your question. Go ahead.

Q. You wanted a sentence below 20 to

MICHAEL T. MANN

25 years, didn't you?
A. Yeah, of course I'd want a sentence less than 20 to 25 years.
Q. And in September of 2019, outside of cooperating with the government, there was nothing else you were going to be able to do at that point in time to try to minimize the amount of time that you were going to be in jail, right, from your perspective?
MS. NEIDL: Objection to the form of the question.
MR. JAYNE: Objection.
THE WITNESS: I'm not even sure how to answer that question.
Q. Let's go to page five of your sentencing memo.
A. (Witness complies.)
Q. Do you see that that paragraph at top of page five of the sentencing memo describes three multi-hour meetings attended by multiple government agencies that you had in the second half of 2019?
A. Yes.
Q. And one of the agencies that

MICHAEL T. MANN

attended the meeting was the New York State Department of Financial Services, correct?

A. Correct.

Q. The paragraph goes on to note that you also testified before the New York State Department of Financial Services for multiple hours, correct?

A. Correct.

Q. During the course of your meetings and testimony with the New York State Department of Financial Services asked you questions related to the issue of whether Pioneer Bank or its agents knew that you kept monies that were supposed to be used for payroll or tax purposes in accounts you maintained at Pioneer Bank, correct?

A. They may have. That wasn't the focus of our three-hour thing. That may have come up, but it was not the focus of the three-hour meeting.

Q. Could you tell from the questions asked that the New York State Department of Financial Services hoped to be able to develop evidence that Pioneer Bank was aware that you

MICHAEL T. MANN

placed funds designated for tax and payroll into Pioneer Bank accounts?

MS. NEIDL: Objection to the form of the question.

MR. JAYNE: Objection to the form.

THE WITNESS: Yeah. And again, as I recall that meeting, there was not that much.

I actually thought it was going to be more payroll related, but it wasn't.

And if there was a question they -- they didn't ask much about that.

I mean if they asked me and I don't recall, I would tell them we had tax funds there.

But again, that three-hour meeting we're referring to here, there was actually not much on the tax stuff, which surprised me.

Q. Rather than being sentenced to 235 months, the minimum amount of time under the guidelines, you were sentenced to 144 months, correct?

A. Correct.

MICHAEL T. MANN

Q. And that sentence is more than seven years below your guideline range, correct?

A. Correct.

MR. GRAVES: All right. That's a good time for a break.

VIDEOGRAPHER: This concludes video number four in the deposition of Michael T. Mann. We are off the record at 5:33 p.m., September 14, 2021.

(Whereupon, proceedings recessed for a short break and once again resumed.)

VIDEOGRAPHER: This is the beginning of video number five in the deposition of Michael T. Mann. We are on the record at 5:46 p.m., September 14, 2021.

EXAMINATION BY
MR. ALESSI:

Q. Good afternoon, Mr. Mann. My name is Robert Alessi. I'm with DLA Piper Law Firm; the attorneys representing the Pioneer Bank parties.

In preparation for this deposition today, how many times did you talk to attorney Andrew Jayne representing Southwestern Payroll?

MICHAEL T. MANN

A. I haven't talked to Mr. Jayne since prior, and we talked about it the last testimony, we had just a couple of phone calls, but I have not talked to Mr. Jayne.

Are you talking since September 4th, 2019?

Q. Correct.

A. I may have had a couple of calls, short. Just like the same things we've done -- and I don't know if there was one call or two calls.

Q. My question is about Mr. Jayne; conversations with Mr. Jayne since September 4th, 2019?

A. We would have -- we had one or two conversations like we did with any other parties wanting to know the -- you know, wanting to hear us talk.

MR. JAYNE: I think he's confused.

MR. ALESSI: I'm sorry, you cannot make those statements on the record, Mr. Jayne.

MR. JAYNE: Well, I'm an officer of the court and I --

MICHAEL T. MANN

MR. ALESSI: You cannot talk anymore, Mr. Jayne, or I'm going to call the magistrate. You cannot talk.

If you have an objection as to the form, please make the objection.

MR. JAYNE: I was trying to help you out. The magistrate is gone, I'm sure, it's after five, but I was just trying to help you out, Mr. Alessi.

MR. ALESSI: I don't need your help, Mr. Jayne.

BY MR. ALESSI:

Q. Mr. Mann, can you --

A. I can recall two times that we set up a call; Mr. Koenig was on the call with us, that we had a short conversation about stuff.

Q. With Mr. Jayne?

A. Mr. Jayne was on the call. Yes, with Mr. Jayne.

Q. Who else was on the call with Mr. Koenig and Mr. Jayne?

A. Mr. Alred might have been the first one, I'm not a hundred percent sure.

Q. Was Mr. Alred ever on a call among

MICHAEL T. MANN

yourself and Mr. Jayne?
A. I'm not a hundred percent sure, I think he was on the first call.
Q. How many times did you have a call with Mr. Jayne?
MS. NEIDL: Objection to the form of the question.
Q. How many times did you participate in a telephone call with Mr. Jayne?
MS. NEIDL: Objection to the form.
THE WITNESS: Twice.
Q. When were those telephone calls that you refer to in number of twice?
A. One was about a year ago.
I just had moved down here, that's how I can -- I just moved to North Carolina, that was the first time I was on a conversation.
And then the other one, my best guess was a few months, but it's a guess, a few months ago.
Q. What were the topics of discussion in the conversation -- telephone call in which you participated in with Mr. Jayne one year

MICHAEL T. MANN

ago?
A. I don't recall all the topics. We -- they asked questions, we answered them honestly, just like we do with everyone.
I don't even recall specific questions. It wasn't -- it was more of a fact base.
And I've had so many conversations with so many people, you know, I -- you know, I just try to answer them honestly.
I can't recall specific --
Q. So you cannot recall one topic of a conversation you had with Mr. Jayne on the telephone one year ago?
MR. JAYNE: Objection.
THE WITNESS: We talked about, you know, the tax funds, that account.
But I actually can't recall specific questions, I can't.
Q. Did Mr. Jayne provide to you any information on the call one year ago as opposed to just asking questions?
A. I don't recall him providing any information. What I remember in that call is

MICHAEL T. MANN

he was basically just asking questions.

Q. Did Mr. Alred participate in the call you just described being on the phone with Mr. Jayne one year ago?

MR. JAYNE: Object to form.

THE WITNESS: I am 90 percent sure he was on that call. I thought he was.

Q. Did Mr. Alred speak on that call?

A. If he did, it was -- no, I don't even remember. Mr. Jayne was asking all the questions.

Q. Was it your impression that Mr. Jayne was directing the call one year ago with you?

MR. JAYNE: Object to form.

THE WITNESS: He was directing the call with the question/answer, yes; and Mr. Koenig was also on the call with us.

Q. Other than the topic of tax funds using your term, tax funds --

A. Um-huh.

Q. -- any other topics discussed on that call one year ago?

A. Not that I recall. It was really

MICHAEL T. MANN

specific to the tax account. That's the line of questioning. I don't remember the exact questions.

Q. When you say "the tax account," what are you referring to?

A. In the end it was account ending in 2440, because I know that's where taxes were last.

What I recall, the most questions that we had were probably more around the end than, you know, years ago, but it's really just the tax account and the tax funds.

Q. How long, approximately, did that call with Mr. Jayne and Mr. Alred and Mr. Koenig and yourself take approximately one year ago?

A. So Mr. Koenig wanted it to be a 15-minute call. It probably ended up going 30-some minutes, because I remember Mr. Koenig needing to got off for another meeting. But it went long. It was supposed to be a quick 15-minute call, but probably 30-some minutes. I'm speculating.

I remember sitting in my car. It

MICHAEL T. MANN

wasn't a big two-hour or lengthy thing, it was less than an hour, but my guess would be 30, 35-minutes.

Q. So I want to try to tie down how long the call was.

You said approximately 30 minutes.

Would it have been between 30 minutes and one hour?

A. I would say between 30 minutes and an hour.

Q. Would it have been greater than an hour?

A. I doubt it. I'm not a hundred percent sure, but I doubt it. It didn't feel like that. I was out in the car. I would still even guess it's closer to 30 than an hour, but I'm not sure, I wasn't timing it.

Q. So is it your testimony you did not recall whether Mr. Alred spoke during that one-hour or 30 to 60-minute call?

A. If he did, it was short. The basis of the call was Mr. Jayne really asking his questions. Mr. Alred didn't ask any questions. He didn't start taking over to ask questions.

MICHAEL T. MANN

If he spoke, it was hello. It was very --

Mr. Alred's participation was very minimal; that, I know.

Q. Did you take any notes from that conversation one year ago?

A. No.

Q. In any form; electronic or handwritten?

A. No. And I actually -- I have not taken notes on almost every call I've had when I've talked to people --

Q. My question, Mr. Mann, is just with regard to that call one year ago.

A. I didn't.

Q. Did you agree to produce and send to Mr. Jayne, any documents after that call one year ago?

A. I don't recall sending any documents.

Q. Do you at any time recall ever sending any documents to Mr. Jayne or to his law firm?

A. I mean, other than handing over

MICHAEL T. MANN

e-mails and all the other stuff, I don't think
we did a document -- I don't recall.

Q. When did you get the request from
Mr. Jayne to "hand over those other e-mails"?

MR. JAYNE: Object to form.

THE WITNESS: I don't know. I
handed over my e-mail so many times, I
don't even know the order in which I handed
them over.

There is probably an e-mail that
went to Mr. Koenig that said, hey, you need
to do this.

Because all the communication was
not from Mr. Jayne.

Q. So to clear, let me interrupt you,
this is to protect: I'm not asking for
anything you turned over to Mr. Koenig, just
turned over to Mr. Jayne.

A. Correct. And I'm not -- I didn't
turn over anything to him anyway; it sounded
like I was saying the wrong thing.

I'm just saying, you know --

MS. MURNANE: Nothing about
conversations with Mr. Koenig, either.

MICHAEL T. MANN

THE WITNESS: Correct. I don't recall when I turned it over, just because I've reproduced my e-mails for so many parties over the past nine months, I'm not sure where this case fit in.

BY MR. ALESSI:

Q. Now, let's turn to your testimony that you had another interaction with Mr. Jayne; your words, a few months ago.

Do you recall that conversation as you sit here today?

A. The way I would summarize --

Q. My question is, yes or no, do you recall it?

MR. JAYNE: Mr. Alessi, I get what you are doing, but you've got to let him finish, you're cutting him off.

THE WITNESS: Yeah. I don't recall the specifics. It felt like more of the same type of questions, just specific -- there wasn't any -- I don't recall the specific question and answers.

BY MR. ALESSI:

Q. Do you recall any topic in a

MICHAEL T. MANN

conversation with Mr. Jayne you had just a few months ago?

A. No -- it was just questions and -- I -- again, I have been questioned by so many people; I don't recall in these get on the phone, discuss what's going on, they all seem like the same questions.

I think I -- I'm confident I'm very consistent with my answers to everyone with those questions and they'll hear the same thing, but I have just answered the same questions over and over again.

I don't recall anything Mr. Jayne asked me that many other people didn't ask me as well, so that's why nothing sticks out.

Q. After that call you had with Mr. Jayne a few months ago, did you produce to Mr. Jayne any document in written or electronic form?

A. Not that I recall.

Q. Who was on the call with Mr. Jayne a few months ago that you have been describing?

A. I think that one was just Mr. Jayne and Mr. Koenig. I'm not sure. I know

MICHAEL T. MANN

Mr. Alred was not on the one a few months ago.

Q. How long did the call with Mr. Jayne and Mr. Koenig last a few months ago?

A. That one I think was significantly shorter. I think that one was closer to -- that one didn't feel as long. I think it was a relatively short call.

Q. So you remember clearly it was a shorter call than the first one, correct?

A. I think so. Because I know Mr. Koenig -- I was getting hit -- no, I won't share that.

But I know we set it up that way, too. It's -- I think -- again, this gets into what Mike -- because I never talked directly with Mr. Jayne, everything was through Mr. Koenig. And, you know, as he approached me setting up a call with Mr. Jayne, I know we were setting it up as another short call.

Q. Other than Mr. Jayne, Mr. Alred, have you talked to anybody else since September 10th regarding Pioneer Bank?

MR. JAYNE: Object to form.

THE WITNESS: We had -- we had a

MICHAEL T. MANN

meeting with DFS; that was a three-hour question/answer ordeal.

I had the three meetings with the government, which included the IRS. I had the State Attorney General. I had FBI.

Those were all, I don't know, half-day meetings, each one of them.

I had a short call with Mr. Corsi, again, probably ten minutes. That's Lee Corsi, ten minutes.

I could be missing others, but I think that covers multiple -- without looking at it, that's...

BY MR. ALESSI:

Q. Did you have any conversations with any representatives of Berkshire or Chemung?

A. I have not, other than coordinating my deposition with them, which was originally scheduled as a Zoom call this Friday, and Pioneer would be involved, but I was notified that they're going to do it after I report in -- report to Fort Dix and they'll set it up later, so...

Q. So it's your understanding that the

MICHAEL T. MANN

Zoom deposition that was to occur this Friday is not --

A. Is going to be postponed.

Q. When did you learn of that?

A. I got a message this week about that from Brendan, I don't know his name.

Q. Carosi?

A. Yeah, I think so, saying it was going to be postponed. I think he asked in the e-mail about signing something, just because it's hard once I get in, I'm going to consent to agreeing that it happens before I go in, but it's just going to happen after I report.

Q. Where are you reporting to for prison?

A. Fort Dix, New Jersey.

Q. You recall the deposition, the beginning of this deposition at the Greenberg Traurig Law Offices, correct?

A. Correct.

Q. In preparation for that deposition, did you have any conversations with Ms. Neidl, who is appearing here today on behalf of Nat Pay?

MICHAEL T. MANN

A. No.

Q. During any break at any part of this deposition, either at Greenberg Traurig or here, did you talk with either Mr. Jayne or Ms. Neidl?

A. No.

Q. Were there any indirect conversations with Mr. Jayne or Ms. Neidl?

A. The only thing we had a conversation, I want to make sure I get this, was at one of the first breaks, Mr. Jayne approached Janelle about proposing to you having 30 minutes.

So that was the one exchange that happened after, I think it was the -- I don't know what break it was, but it was earlier today.

Q. Mr. Mann, do you have, in your mind, any concerns about liability to Southwestern Payroll?

MS. NEIDL: Objection to the form of the question.

MR. JAYNE: Objection.

THE WITNESS: When you say "concerns

MICHAEL T. MANN

about liability" can you change it or clarify?

Q. Sure. Do you have any concerns that Southwestern Payroll will bring any type of legal action against you?

A. I have been sued by so many, I thought Southwestern did have action against me, so I am being sued by Southwestern Payroll.

Q. Do you believe it's in your interest to assist Southwestern Payroll in this litigation?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: My approach is not to assist. I just -- I just want to tell the truth on what's going on. I'm not trying to assist anyone. And I'm open to, you know, we've always been open to anyone to have a conversation. And Mr. Koenig -- he says this all the time, he's always just advised me to just tell the truth and...

BY MR. ALESSI:

Q. Yeah. Do you owe my money, including restitution, to Southwestern Payroll?

MICHAEL T. MANN

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: Yeah, I didn't see -- there's still $49 million that the government needs to decide who I owe.

I mean, they had -- I think Pioneer was, you know, already on a list. They had -- I don't recall the exact numbers, but I don't recall a specific line item for Southwestern, but they do have almost half of that hundred million as -- I think the government asked for 90 days at sentencing to try to sort through that and determine who gets what of that.

So I don't see anything -- I haven't followed a lot of my lawsuits that come in, there's just so many on defaults and other things just because of what I've gone through. So I -- I don't even view it as what do I owe Southwestern; I know I have a lawsuit, and I don't know a specific number I think I owe them.

You know, I'm not saying I don't owe them, I'm just not sure.

MICHAEL T. MANN

Q. Do you know Southwestern Payroll any money?

MS. NEIDL: Objection to form.

MR. JAYNE: Same objection.

THE WITNESS: I don't think I owe them any -- without getting into the lawsuit and I'm not familiar with it right now, I'm not aware that I owe money.

That doesn't mean that we pass some default thing where I actually did. I'm not aware of owing them any money.

BY MR. ALESSI:

Q. Have you had any conversations at all with any representative of Nat Pay?

A. No.

Q. Have you had any indirect conversations with anyone from Nat Pay --

MS. NEIDL: Objection.

Q. -- in other words, through another person?

A. No.

Q. Has Nat Pay sent you any communications in any form?

A. No.

MICHAEL T. MANN

Q. In preparation for your deposition at the Greenberg Traurig Law Firm, did you review any documents?

A. Not really. Not -- I mean, I had a meeting with my lawyer to talk about it, but there wasn't really -- we were so focused on the sentencing, this was really just coming in and telling the truth is all it was.

There was no real review or prep for that meeting; nor this one.

Q. I'm not asking about conversations with your lawyer. I'm not asking you about documents your lawyer may or may not have shown you.

I'm asking you whether you, in preparation for the deposition phase at Greenberg Traurig, reviewed any documents?

A. I probably looked through the affidavit just to make sure that it made sense. I looked at things quickly, but I probably spent less than 15 minutes preparing.

Q. Other than the affidavit, did you look at any other documents in preparation for the deposition at Greenberg Traurig?

MICHAEL T. MANN

A. No.

Q. In preparation for the part of the deposition here today, did you look at any documents?

A. No.

Q. At the deposition that occurred at Greenberg Traurig, did Mr. Jayne indicate to you any questions he was going to ask you at that deposition?

A. No.

Q. And at any break at Greenberg Traurig did Mr. Jayne indicate to you any questions he was going to ask you at that deposition?

A. No.

Q. At the deposition at Greenberg Traurig, did Mr. Jayne have any discussions with you, other than social, pertaining to the litigation?

A. No.

Q. Same questions I'm going to ask with regard to any representative with Mr. Jayne. You remember -- I believe the pronunciation of her name is /Zig-a-fuse/?

MICHAEL T. MANN

A. I know who you are talking about, yes.

Q. If I asked you the same questions I just asked you about Mr. Jayne about Ms. Zickefoose, would your answers be the same?

A. They would be the same.

Q. Now I'm going to switch to Ms. Neidl.

A. The answers would be the same.

Q. And would the answers be the same regarding any potential conversation -- well, let me strike that.

Did you have any conversations with Ms. Neidl today with regard to this deposition?

A. No.

Q. Do you have any obligations to speak to any government agencies from today forward?

A. I can't think of any planned discussions that are -- I don't have any obligations that I'm aware of.

However, if they contacted me, I'm still open to helping them.

Q. Are you still cooperating with any governmental agency?

MICHAEL T. MANN

MS. NEIDL: Objection to the form of the question.

THE WITNESS: Yeah, I think I wrapped up. There's nothing that I am aware of that is planned in the future to assist anyone any further, that I'm aware of.

Q. Do you have any outstanding document production obligations to any governmental agency?

A. No.

Q. Do you have any documents in your possession pertaining to accounts you had or have at Pioneer Bank that you have not produced to at least one person?

A. No. I've turned -- everything that I've turned over is all I have.

Q. Other than attorney/client privilege --

A. Correct. Correct. And one is I'm going through, I think you're aware of the case, as --

Q. Understood. My questions are about this case.

MICHAEL T. MANN

A. Yeah, this case; no.

MR. ALESSI: Okay. Let's take one moment; we don't need to go off the record.

(Whereupon, a brief pause was held in the proceedings.)

MR. ALESSI: That's all the question I have at this moment. I understand I have more time.

MR. JAYNE: Today? Robert, do you mean today? Pardon? Do you mean today or some other time?

MR. ALESSI: I'm sorry, today.

MR. JAYNE: Okay. Yeah.

MR. ALESSI: Oh, yeah. And of course, if someone else for some reasons calls him back, I'm going to reserve my right.

But as for today, this is all I have for now.

I'm going to hear what your questions are. I may have more questions after your questions.

(Whereupon, there was a discussion held off the record.)

MICHAEL T. MANN

(Whereupon, Plaintiff Exhibit 469, Seeber E-mail Dated 11/3/17, Bates Stamped PB-SWP-00351386 to '389, 4-Pages was marked for identification.)

EXAMINATION BY

MR. JAYNE:

Q. Mr. Mann, do you remember when Mr. Kuhn asked you questions about whether you informed Pioneer Bank about opening Cloud Payroll LLC and it taking over control of a previous Cloud entity?

A. Yes.

Q. Take a look at what we'll mark as Exhibit 469 to your deposition, please.

A. Okay.

Q. Does this Exhibit 469 refresh your recollection as to whether you informed Pioneer Bank that you were creating Cloud Payroll LLC, and it was to take over a previous Cloud entity?

A. Correct, yes.

Q. Tell us what you're communicating to Pioneer Bank in Exhibit 469, that e-mail chain?

A. Right. So I -- on October 30th of

MICHAEL T. MANN

2017, I sent Deborah and Trudy, they're the ones that usually open accounts, I said we start the process to officially change the name of MyPayrollHR to Cloud Payroll LLC.

We just received the e-mail from the IRS and would like to make sure that we change the name on the following account number.

Q. So after you opened Cloud Payroll LLC, would it be accurate to say that Cloud Payroll LLC owned both; the service bureau, the payroll service bureau along with -- that was previously MyPayrollHR, along with 51 percent of Pro Data and Southwestern Payroll, is that the structure?

A. Those were -- that's sort of where it gets confusing, two different companies.

We changed the name of MyPayrollHR to Cloud Payroll. That was one of the Cloud Payrolls.

The other one that we referred to in the testimony earlier as Cloud Payroll was the entity that held Southwestern and Pro Data. That was a new company that we formed that we didn't change the name, and we formed that

MICHAEL T. MANN

right before acquiring Pro Data.

MR. JAYNE: And let me hand you what we'll mark as Exhibit 470.

(Whereupon, Plaintiff Exhibit 470, Mann E-mail Dated 1/11/18, 9-Pages was marked for identification.)

BY MR. JAYNE:

Q. Tell us what Exhibit 470 is?

A. So it's an e-mail to me from Deborah Salsburg. Again, she opens accounts.

And she's basically giving me the four signature cards for the four checking accounts that they are changing, and they needed a resolution and due diligence form.

So, yeah, she's basically sending me documents I need to sign.

Q. Did -- in Exhibit 470, did Ms. Salsburg fill out all the information contained in that exhibit?

A. Yes. She just needed my signatures.

Q. And flipping over to Section 5 about, "Is your business a non-bank or third-party payment processor," the "no" box is checked.

MICHAEL T. MANN

Did you fill that out or was it Ms. Salsburg who filled that out?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yeah. This -- I'm pretty sure she filled it out; she's just looking for signatures.

Q. The same thing for Section 9, the "no" box is marked. Did you fill that out or did Ms. Salsburg fill that out?

MR. ALESSI: Objection as to the form of the question.

THE WITNESS: Ms. Salsburg filled that out.

Q. Did anybody at Pioneer Bank tell you that you needed to put the payroll tax money in an escrow or special account or a trust account?

MR. ALESSI: Objection as to the form of the question.

THE WITNESS: No.

Q. Were there any conversations with anyone at Pioneer Bank about putting the payroll tax money in a trust account or a

MICHAEL T. MANN

special purposes account?

MR. KUHN: Objection to the form of the question.

THE WITNESS: No.

Q. If someone at Pioneer would have told you that in order to keep Pioneer from seizing the money in a situation like this, you needed to check the "trust" box or identify that the payroll tax accounts were special funds, would you have done that?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: When I was knee-deep in the problems, I enjoyed the advantages of not being an escrow account.

So before, yes. It should be, if I was asked at the start before this happens, I would done it.

But when I was -- two years ago when I was in the middle of this, I was -- from a legal perspective, probably glad I could move money around.

BY MR. JAYNE:

Q. Did you ever explain to Dave

MICHAEL T. MANN

Blessing the structure of the payroll service bureaus Cloud Payroll LLC, MyPayrollHR?
A. Yes.
Q. Did you specifically tell Dave Blessing on more than one occasion that you owned payroll service bureaus?
MR. ALESSI: Objection to the form of the question.
THE WITNESS: Absolutely.
Q. And in December of 2013, when you first opened the 0212 account, did you tell Dave Blessing that payroll tax funds were going to be deposited into that account?
MR. ALESSI: Objection to the form of the question.
THE WITNESS: Yes.
Q. Did the subject of you having payroll tax funds in both account 0212 and account 2440 come up on numerous occasions with numerous people at Pioneer Bank before August 30th of 2019?
MR. ALESSI: Objection to the form of the question.
THE WITNESS: Yes. Just because of

MICHAEL T. MANN

the work to follow-up on tax payments to agencies, yes.

BY MR. JAYNE:

Q. Did Southwestern Payroll, Cloud Payroll, MyPayrollHR, and Pro Data have a legitimate business purpose?

A. Yes.

Q. Were any of the check kiting or the bank fraud or the money laundering to which you pled guilty, did any of that have to do with furthering a legitimate purpose for Southwestern Payroll, Pro Data, MyPayrollHR, or Cloud Payroll?

A. No, not -- actually, ask that again.

Q. Let me ask it this way: Were you acting in furtherance of legitimate business pursuits for Southwestern Payroll when you were doing any of the check kiting or the money laundering or the fraudulent activity to which you pled guilty?

A. I was not.

Q. Were you outside the scope of any officer-ship that you had with Southwestern Payroll when you were doing the money

MICHAEL T. MANN

laundering, check kiting, or any of the fraudulent activities to which you pled guilty?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: The way I've answered it, I wasn't doing it as an officer of Southwestern, I was -- it really wasn't -- it had nothing to do with Southwestern.

Q. Do you remember when Mr. Kuhn asked you about -- some questions about co-mingling money in account 2440; do you remember that?

A. Yes.

Q. Would the MasterTax data tell us exactly how much money for each Pro Data, MyPayrollHR, and Southwestern Payroll clients went in and came out of the Pioneer Bank account 2440?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yes. We had -- I'll just make sure I'm answering this right.

We -- each service bureau could pull the report that was specifically tied to their customers and their customer tax

MICHAEL T. MANN

dollars.

So we were able to divide. It wasn't unclear on who owned what.

Q. And, in fact, all the way up to August 30th of 2019, if you ever moved any payroll tax money out of account 0212 or 2440 before it was due to taxing authorities, you would always put enough money back in the account, such that the taxes were timely paid; is that right?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: That's correct. There was always enough money in the day that stuff was going out in the accounts, correct.

Q. Up to August 30th of 2019, was there ever a point in time where you did not have enough money in the payroll tax accounts at Pioneer Bank to make timely tax payments for the clients of Southwestern, Pro Data, and MyPayrollHR?

MR. ALESSI: Objection to the form of the question.

MICHAEL T. MANN

THE WITNESS: No. I always had enough money to make timely tax payments in the accounts the day they were due.

Q. And, in fact, the first time that timely tax payments weren't made out of account 0212 or account 2440 was after Pioneer took the money, correct?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Yeah, I didn't know, I didn't have visibility whether they took it; I just know it wasn't going out to the taxing authority, so...

Q. Let me do it better.

After August 30th, 2019, do you have any knowledge as to whether tax payments after that time were not timely made out of account 2440 at Pioneer Bank?

A. Yes. I'm aware things weren't timely made. I've -- after August 30th, I know they weren't being made timely, correct.

Q. Why were they not made timely?

A. I mean, all accounts were frozen; I assume.

MICHAEL T. MANN

Q. Do you know what Pioneer ultimately did with the money?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: I don't know what they did.

Q. Did you ever ask Pioneer not to take the payroll tax funds after August 30th, 2019?

MR. ALESSI: Objection to the form of the question.

THE WITNESS: Right. I didn't ask not -- I never asked anything, don't take the funds.

I know I was -- I wanted the funds to continue to be paid; but I didn't say don't take them, I just said. Keep these accounts going.

BY MR. JAYNE:

Q. Did you ask that the funds be unfrozen?

A. Yes, I wanted the accounts unfrozen.

Q. You mentioned earlier that Darin Alred would get some type of report that would show what was going on in the Pioneer accounts,

MICHAEL T. MANN

but it would error out the inner account transfers that you made.

What were you talking about there?

A. Yeah. I think -- and I'm not exact -- I'm not exactly sure of the mechanics. I know in a general -- I can describe it generally; I wasn't close enough specifically.

But I think the way -- whether it was Nat Pay or PTM, they have -- I forget the name of some of the files; we had to get a certain report format.

Well, the problem with the internet transfers, that's just not part of the tax process.

So I think what happened, when we ran transactions through Nat Pay, what would happen is it would error out the transfers as they just delete that out, but all the tax incoming and tax outgoing come through, so Darin would have a good view of his stuff.

It just basically eliminates the activity that I did that was illegal activity.

Q. Did you have to work with somebody at Pioneer to generate these reports?

MICHAEL T. MANN

A. Yeah, they had to -- they set up a special report. We did it for 212 earlier, and then I think we used it for 2440.

But there was some -- I think it's called a BAF file. So I had to work with Pioneer and they had to create some report where I could pull -- I think it was a BAF, I could be butchering that, but I think it was a BAF file. So I worked with them to creat that, because we needed to create a spreadsheet that fed into the Nat Pay system.

Q. Who did you work with at Pioneer to create the BAF file?

A. Christine Batchelder coordinated the work. I don't know who did it, whether it was the development team or someone in the reporting group, but I coordinated through Christine Batchelder.

Q. During the course of creating this report, would you have told that this is payroll tax money; and you're needing to reconcile that?

A. Possibly. I don't recall the specific conversation I had with her.

MICHAEL T. MANN

I mean, she knew it was for tax; I only needed it on the tax account, and it's a tax form. But I don't know how much detail I went into Christine with on why. I could have, I'm not saying I didn't, but I don't recall the specific conversation.

Q. Do you remember anyone else at the bank you dealt with other than Ms. Batchelder regarding creation of this BAF report for accounts -- for the payroll tax accounts?

A. I don't recall. I could have talked to someone else, I just remember going here. I'm not sure.

Q. Approximately when would you have worked with Ms. Batchelder to create these BAF reports?

A. This is very similar; I am not good with time. It was probably 2018. I mean, it wasn't early in the years, it was -- my guess is -- my best guess would be sometime in 2018 before 2440.

And what I'm not sure is if I was doing it for 2445 or if I had to do it when we were working with Horatio and Pro Data; I think

MICHAEL T. MANN

he wanted it too to reconcile, so we might have been doing it in the 212 account before then.

Q. Was the purpose of this BAF report, was the sole purpose of it so that Pro Data and Southwestern Payroll could reconcile the payroll tax data that they were generating with the payroll software and the MasterTax software with the bank statements at Pioneer Bank?

A. Yeah. I think it was something that MasterTax needed to basically run the reports. It's a -- it's my understanding that it's not that uncommon, a lot of banks can generate it. It wasn't available as a general report at Pioneer, and I had to request it. And it was probably, from a timing, is when we added MasterTax is probably shortly after we got it; I was working on getting a BAF report.

Q. Do you remember when Mr. Kuhn asked you questions about the payroll service agreement at Southwestern Payroll?

A. Yes.

Q. Have you ever seen one of those before?

A. Other than -- and I told Mr. Kuhn

MICHAEL T. MANN

this as well, I know we went through some due diligence. We checked their contract. I think it was making sure they had contacts with the client. But we had reviewed -- you know, just to try to make sure the business they say they had, they had. Did they have a general, you know.

So we looked at some, but that was back before we bought. Since we acquired the company I had -- I didn't look at any contracts; it was either Darin or John Reinke or the team that handled it.

Q. Would you defer to Darin Alred on the Southwestern Payroll client contracts and the notice that was provided to Southwestern Payroll clients regarding Cloud stepping in to handle payroll taxes?

MR. KUHN: Objection to the form of the question.

THE WITNESS: Yeah. What I recall -- and again, he would worked closer with John; those two would talk.

Darin wanted -- Darin wanted to make sure that it was done appropriately. If

MICHAEL T. MANN

anything, he brought more questions to the table.

But I don't know the result of that. I don't know what they issued. I don't know if they issued a special letter or they changed the contracts, I'm not sure which steps were taken.

BY MR. JAYNE:

Q. And as of August 30th, 2019, at that point Cloud Payroll -- and correct me if I'm wrong. Strike that.

As of August 30th, 2019, who was handling tax processing for the clients of MyPayrollHR, Southwestern Payroll, and Pro Data?

A. Cloud Payroll was handling those.

Q. Would that have been the Miami office?

A. Yes.

Q. When, if you recall, did Cloud Payroll's Miami office start handling the tax portion of payroll processing for the clients of MyPayrollHR, Pro Data, and Southwestern Payroll?

MICHAEL T. MANN

A. I don't remember exactly when we hired Marissa. And she lived in Miami. She had an employee she could bring over that were talented. I don't remember exactly when that happened. It was probably in 2018 is my guess.

I know there was a -- when I was talking to Mr. Kuhn earlier, he talked about the tax guy that was doing horrible; we hired her right after him, but that probably took a couple of months. So it's probably been two to three months after that one e-mail that I was referring to earlier regarding all the issues that they were having with tax notices.

Q. There were some hiccups at the beginning of trying to have Cloud Payroll handle the tax -- payroll tax portion of payroll for the clients of MyPayrollHR, Southwestern Payroll, and Pro Data?

A. Yeah. And partly it was mainly because of lack of leadership and talent. We had someone who was good at the size of a MyPayroll; she was probably doing okay. But when we added Pro Data, I think it was too much for her. So that's when we looked to bring on

MICHAEL T. MANN

someone. The gentleman made it worse. That was an e-mail Mr. Kuhn shared with me. He made it worse; we got rid of him.

And then we found Marissa, because she ran tax for a company that was significantly larger than ours. She came in and actually -- everyone was really impressed on how she pulled it together; Southwestern, Pro Data, and from a tax perspective, everyone was feeling much more comfortable when she took over.

Q. Mr. Alessi asked you questions about our two phone calls. Did I ever reach out to you directly or call you directly at any time?

A. Never.

Q. How were the meetings set up where you and I had discussions?

A. Coordinated through my attorney.

Q. If Mr. Alessi or anyone at Pioneer Bank would have asked Mr. Koenig for a meeting with you prior to your deposition today, would you have done it?

MR. KUHN: Objection to the form of the question.

MICHAEL T. MANN

THE WITNESS: Between the two depositions or before the depositions?

Q. Either one.

MR. KUHN: Same objection.

THE WITNESS: Right. And I could be wrong, but I thought between them, I wouldn't talk to anyone, I just don't think that's right until you were together.

Prior to the first deposition and August 4th, we would have been open to have a conversation with anyone if they called.

We've always had an open door.

BY MR. JAYNE:

Q. And just to be clear, you and I never spoke at all after your first deposition in this case on August 3rd, 2021, up until today?

A. Correct.

MR. JAYNE: Let's take, like, a minute-and-a-half break, and I think I'm finished.

VIDEOGRAPHER: We are off the record, 6:37 p.m.

(Whereupon, proceedings recessed for

MICHAEL T. MANN

a short break and once again resumed.)

VIDEOGRAPHER: We are back on the record, the time is 6:40 p.m.)

BY MR. JAYNE:

Q. Mr. Mann, we're back on the record. Just, really quickly, are you still getting mail at the same PO Box?

A. I am actually shutting it down today, just because a week from today I'll be getting mail at Fort Dix, New Jersey.

They will hold it up to ten days, so they're going to have it for the next seven, but I'm coordinating here shortly, because once I figure out my address at Fort Dix, that will be the new one.

But I'm getting it right now, but I'm in the process of shutting it down. I will not have access to it after ten days from today is what I think it said on the USPS site.

Q. If we need to mail you something, where should we mail it?

A. Boy, I -- once I report next Tuesday, there's probably an inmate number, you can get mail at that stuff.

MICHAEL T. MANN

I just -- I'm still learning that process, and I'm sure I'll learn, but it's Fort Dix, New Jersey; that would be the place I would get it. So that's where I'll be taking mail. I mean, I don't know how else to answer it, but that's the plan.

Q. Oh, what were the phone numbers that you would have used to talk to Pioneer when you were calling Pioneer from '13, 2013 up all the way to August 30th of 2019?

A. I mean, there's my cell.

Q. What's your cell?

A. (518) 312-6191.

Q. Are you going to keep that number after this week?

A. I don't think -- I don't know if my wife will keep it active for a few days. I just -- I can't take it into prison with me, so I don't know what value it will have after next Tuesday. So that will maybe shut down. We're just not sure keep it opened in case she gets messages where she can call me and say so and so. We've talked about keeping it open for a little bit, that's the plan, but we're trying

MICHAEL T. MANN

to figure that out.

Other numbers, I don't -- again, my memory is not good on this. I probably had a couple of different office numbers over the years. They're probably somewhere in the e-mails that I handed over, if you look through it where if I didn't give a cell, there might have been a number. Those would have been numbers that I -- because I do know a lot of times I wouldn't -- just call my cell, when I would call Christine Aliotta would be from my desk at work, a lot of time.

Q. Do you remember who -- who is your cell phone provider?

A. It's Time Warner, I believe, Business, Time Warner business.

Q. Is your cell provider? I've never heard of that one.

A. Oh, cell. I thought you were talking about the business. Cell; AT&T I've had for the last few. I might have had my number on Verizon for a while, but AT&T has been the last several years.

Q. And who is the provider for your

MICHAEL T. MANN

office?

A. That was -- I'm pretty sure Time Warner Business.

Q. Do you plan on giving your criminal lawyer your mailing address at some point?

A. Yes. I'm staying in touch with him. He's always going to know where I am. He's going to stay in touch with my wife, too, because if anything happens, she's supposed to call him. So we'll keep him notified. And I'm supposed to let him know if I have any issues.

He is someone who can get in touch with me if someone needs -- and probably Janelle can too now with Mike's thing, but someone can get in touch with me, and at some point I'll have an address that we would share with people, but...

Q. Do you mind if I contact your criminal attorneys and ask for your mailing address?

A. After I report?

Q. Correct.

A. Yeah, I don't have a problem with that.

MICHAEL T. MANN

MR. JAYNE: I'll pass the witness.

MR. KUHN: To us or to Ms. Neidl?

MS. NEIDL: No, I'm good.

MR. KUHN: Yeah, probably 120 seconds.

MR. JAYNE: Mr. Alessi already told us those are lies.

MR. ALESSI: What I said is that's on lawyer's time, on the lawyers's clock.

THE WITNESS: So you had me excited.

EXAMINATION BY

MR. KUHN:

Q. Okay. Mr. Mann, before -- when Mr. Jayne was just questioning you, you referred to Exhibit C from earlier in your deposition, which is the January 9th, 2018, e-mail from Mr. Alred to you and Mr. Reinke.

Do you remember that?

A. Oh, the one where we were talking about the third-party or...

Q. No, this was -- you can find it.

A. I don't have to -- go ahead and describe it, it may hit.

Q. All right. This is the e-mail where

MICHAEL T. MANN

you referred to -- Mr. Alred wrote, I am writing you confidentially to share that he was growing increasingly alarmed about the tsunami of notices that they had been receiving from companies that was supposed to be handled by Cloud. We are getting inundated by notices on some of our largest clients about non-filing of returns, non-payment of taxes, et cetera.

Do you remember that?

A. Yes, I'm familiar with the e-mail.

Q. Okay. So there were instances of Southwest Payroll not paying its -- the taxes on behalf of its employer clients well prior to August 2019, correct?

MS. NEIDL: Objection to the form of the question.

MR. JAYNE: Same objection.

THE WITNESS: Right, but that had nothing to do with not having money in the account.

Those were -- we were uploading files from Southwestern, and there were issues with our tax people doing it right.

So missing a tax payment could be we

MICHAEL T. MANN

didn't pull the file over properly and we may get it the next day. But if we upload the file the next day and we pay it that day, we're a day late; and from that perspective, they're going to get a notice.

So if the -- and I'm not -- that's why by hiring a new tax person when actually things got worse in my situation, the payroll tax stuff was going actually very smooth throughout 2019.

So those payments were not because we couldn't afford it and I didn't have money, those were -- and you can ask, you can call in John Reinke, Darin Alred, the tax person that we hired, I don't know the details, they could probably get into the details of what actual issues were going on.

BY MR. KUHN:

Q. Okay. You had testified earlier though that your misuse of funds in account 0212 went back to 2013 and 2014, correct?

A. Misuse of 0212, yes. There were trans -- there were -- I saw it on one of the

MICHAEL T. MANN

exhibits you sent me, movement of money to account ending in 3614 in December of 20 -- I don't know if it was 2012 or 2013; but, yes, that was -- I saw that on that report.

Q. Okay. Is it possible that the tsunami of notices and the inundation of Southwestern Payroll with notices of non-payment of taxes, was any of that in any way the result of misuse of funds in account 0212?

A. Absolutely not. That one is an easy one.

MR. KUHN: No further questions. That's it.

MR. JAYNE: We're finished.

VIDEOGRAPHER: This will conclude video number five and end today's recording of the deposition of Michael T. Mann. We are off the record at 6:49 p.m., September 14, 2021.

(Time Noted: 6:49 p.m.)

- oOo -

_______________________________________

MICHAEL T. MANN

Subscribed and sworn to before me

this_________day of ______________2021.

_______________________________________

C E R T I F I C A T E

STATE OF NEW YORK )

) ss.:

COUNTY OF ONONDAGA )

I, Mary Agnes Drury, a Notary Public within and for the State of New York, do hereby certify:

That MICHAEL T. MANN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of September, 2021.

Mary Agnes Drury

# I N D E X


| WITNESS/EXAMINATIONS | PAGE |
|---|---|
| MICHAEL T. MANN | |
| EXAMINATION BY MR. KUHN | 273 |
| EXAMINATION BY MR. GRAVES | 514 |
| EXAMINATION BY MR. ALESSI | 582 |
| EXAMINATION BY MR. JAYNE | 606 |
| EXAMINATION BY MR. KUHN | 630 |


**********

## DEFENDANT EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Alred E-mail Dated 6/21/17, 2-Pages | 348 |
| Exhibit B | Alred E-mail Dated 5/9/17, 3-Pages | 372 |
| Exhibit C | Alred E-mail Dated 1/9/18, 1-Page | 386 |
| Exhibit D | Southwestern Payroll Services Agreement Dated 10/26/18, 9-Pages | 391 |
| Exhibit E | Commercial Cover Sheet, Cloud Payroll, 13-Pages | 411 |

DEFENDANT EXHIBITS
(CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit F | Pioneer Bank Statement, Bates Stamped PB-SWP-00034626 to '880, 255-Pages | 424 |
| Exhibit G | Commercial Account Cover Sheet, Southwestern Payroll Services, Bates Stamped PB-SWP-00000505 to '546, 42-Pages | 446 |
| Exhibit H | Pioneer Bank Statement, Bates Stamped PB-SWP-00233535 to '588, 54-Pages | 448 |
| Exhibit I | Mann E-mail Dated 6/7/16, Bates Stamped PB-SWP-00067997 to '998, 2-Pages | 466 |
| Exhibit J | Mann E-mail Dated 6/9/16, Bates Stamped PB-SWP-0067976 to '978, 3-Pages | 473 |
| Exhibit K | ValueWise Consolidated Financial Statement, 12/31/18 and 2017, Bates Stamped PB-SWP-00334220 to '245, 26-Pages | 480 |

DEFENDANT EXHIBITS
(CONTINUED)


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit L | ValueWise Consolidated Financial Statements, Dated 12/31/18 and 17, Bates Stamped TBC-PB-035989 to '017, 29-Pages | 481 |
| Exhibit M | Mann E-mail Dated 6/30/17, Bates Stamped PB-SWP-00250674 to '677, 4-Pages | 487 |
| Exhibit N | Mann E-mail Dated 5/4/18, Bates Stamped PB-SWP-00051955, 1-Page | 492 |
| Exhibit O | Mann E-mail Dated 6/15/18, 1-Page | 498 |
| Exhibit P | Mann E-mail Dated 6/18/19, 4-Pages | 505 |
| Exhibit Q | Mann Federal Plea Agreement Dated 8/11/20, 34-Pages | 528 |
| Exhibit R | Blessing E-mail Dated 6/1/16, 2-Pages | 546 |
| Exhibit S | Mann Federal Sentencing Memorandum, 15-Pages | 568 |

PLAINTIFF EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 469 | Seeber E-mail Dated 11/3/17, Bates Stamped PB-SWP-00351386 to '389, 4-Pages | 606 |
| Exhibit 470 | Mann E-mail Dated 1/11/18, 9-Pages | 608 |

PLAINTIFF EXHIBITS PREVIOUSLY MARKED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 252 | Commercial Account Coversheet, MyPayrollHRCom LLC, Bates Stamped PB-SWP-00000372 to '379, 8-Pages | 291 |
| Exhibit 253 | Account 0212 Statement Dated 12/31/13, 10-Pages | 303 |
| Exhibit 32 | Account 0212 Statement Dated 8/30/19, 92-Pages | 313 |

**********

LAWYER'S NOTES

PAGE LINE

CERTIFICATE OF DEPONENT

I hereby certify that I have read the foregoing pages of my deposition testimony in this proceeding, and with the exception of changes and/or corrections, if any, find them to be a true and correct transcription thereof.

_________________________________

Deponent

_________________________________

Date

NOTARY PUBLIC

Subscribed and sworn to before me this ________ day of ___________________, 20___.

________________________________________________

Notary Republic

My Commission Expires:____________

# INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

ERRATA SHEET

PAGE -- LINE -- CORRECTION/REASON

| | | |
|---|---|---|
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |

ERRATA SHEET

PAGE -- LINE -- CORRECTION/REASON