IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW YORK

---

SOUTHWESTERN PAYROLL SERVICE, INC.,
Plaintiff,

-against-

Case No.:
1:19-cv-1349 (FJS/CFH)

PIONEER BANCORP INC., et al.,
Defendants.

---

NATIONAL PAYMENT CORPORATION,
Intervenor-Plaintiff

-against-

PIONEER BANCORP INC., et al.,
Defendants.

---

Videotaped Deposition

of

STEVEN PEREIRA

Albany, New York

Wednesday, October 19, 2022

Reported by:

Mary Agnes Drury, RPR, NYACR, CLR

October 19, 2022

10:12 a.m.

Videotaped Deposition of STEVEN PEREIRA, held at the offices of Greenberg Traurig, 54 State Street, Albany, New York, before Mary Agnes Drury, RPR, NYACR, CLR, a Notary Public of the States of New York and New Jersey.

A P P E A R A N C E S:

BAUM GLASS JAYNE CARWILE & PETERS, PLLC
Attorneys for Plaintiff
401 S. Boston Avenue, Suite 2000
Tulsa, Oklahoma 74103
(918) 938-7944
BY: ANDREW JAYNE, ESQ. (Via Zoom)
AJayne@bgjclaw.com

GREENBERG TRAURIG, LLP
Attorneys for Intervenor Plaintiff
54 State Street, 6th Floor
Albany, New York 12207
(518) 689-1435
BY: CYNTHIA E. NEIDL, ESQ.
Neidlc@gtlaw.com
- and -
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
(713) 374-3500
BY: ROLAND GARCIA, ESQ. (Via Zoom)
Garciar@gtlaw.com

A P P E A R A N C E S :
(Continued)

DLA PIPER, LLP
Attorneys for Defendants
1251 Avenue of the Americas
New York, New York 10020-1104
(212) 335-4500
BY: STEVEN M. ROSATO, ESQ.
Steven.Rosato@dlapiper.com

ALSO PRESENT:

George Hamilton, National Payment Corp
(Appearing via Zoom)

Michael Bennett, Legal Video Specialist

* * * * *

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be waived and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

* * * * *

PROCEEDINGS

Albany, New York, Wednesday, October 19, 2022; the proceedings commenced as follows:

- o0o -

VIDEOGRAPHER: Here begins Video Number 1, Volume I in the Deposition of Steven Pereira, taken in the matter of Southwestern Payroll Services Inc, Plaintiff versus Pioneer Bancorp, Inc, et al, Defendants, and National Payment Corporation, Intervenor Plaintiff versus Pioneer Bancorp Inc, et al, Defendants in the United States District Court, Northern District of New York. Case Number 1:19-CV-1349.

Today's date is Wednesday, October 19, 2022, the time is 10:12 a.m.

This deposition is being taken at the offices of Greenberg Traurig located at 54 State Street, Albany, New York made at the request of the Defendants Pioneer Bancorp Inc, et al.

My name is Michael Bennett, I am the videographer. The court reporter is Mary

STEVEN PEREIRA

Agnes Drury, and we are from Gregory Edwards, LLC.

Will counsel please identify themselves.

MR. ROSATO: Steven Rosato, DLA Piper LLP on behalf of Pioneer Bank and Pioneer Bancorp Inc.

MS. NEIDL: Cynthia Neidl with Greenberg Traurig for National Payment Corporation.

MR. JAYNE: Andrew Jayne on behalf of Southwestern Payroll appearing via Zoom.

VIDEOGRAPHER: Thank you very much.

Would the reader please swear in the witness.

S T E V E N P E R E I R A,

called as a witness, having been duly sworn or affirmed by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. ROSATO:

Q. Good morning, Mr. Pereira.

A. Good morning.

Q. I've seen you before, obviously

STEVEN PEREIRA

we've met. My name is Steven Rosato, I'm here on behalf of Pioneer Bank and Pioneer Bancorp Inc, who I will refer to as "Pioneer" together; is that okay?

A. Absolutely.

Q. Have you ever been deposed before?

A. I have not.

Q. Okay. So I'm sure you've heard these ground rules, but I'll just put them out there, just so we all know, kind of how this needs to proceed to help the court reporter get a clean record for us.

If you need any clarification on any question that I ask, please let me know and I'll try to rephrase it as best as I can.

Let's try not to talk over each other; let me finish my questions, I'll try to let you finish your answers. We won't always succeed, but we'll try to do that.

Verbalize your answers, you know, no shaking of the head or nodding.

And your attorney, I'm sure you know, will object throughout the day; she may not like the way that I phrased a question.

STEVEN PEREIRA

And also, Mr. Jayne may lodge objections via Zoom. That doesn't mean you don't answer the question or you can't answer the question; you can answer the question, unless you're instructed not to answer on the basis of attorney/client privilege.

Does that all make sense?

A. Yes, I understand.

Q. Am I correct that you have been working at NatPay -- and I'll refer to National Payment Corporation as "NatPay" --

A. Understood.

Q. -- since its founding in 1991?

A. Yes.

Q. And were you involved in founding the company?

A. I was the first hire on June 1st, 1991, and I was hired so I could write the core systems; I was a programmer.

Q. Okay. So, yeah, why don't we -- before we get to the founding, let's step back and get a little bit of your background.

Where did you go to school?

A. Well, I went to school at Tampa

STEVEN PEREIRA

University, but I dropped out a year-and-a-half in to get a job; I needed to work, and my first job was at a bank called Exchange Bank.

Q. When was that?

A. 1980.

Q. Okay. Were you doing programming work then?

A. I was not. I started at a very, very low-level position; I was responsible for putting the numbers on the bottom of checks.

Q. Like, the actual account numbers?

A. The amounts.

Q. Oh, the amounts?

A. Right.

Q. Okay. I see.

When did you get into computer programming and that sort of stuff?

A. Well, it's a long tale.

I worked there for a while, and I was promoted to what we call third-shift operation supervisor. And we received our first IBM computer, maybe 1982, and I was interested; third shift was a little boring, so I just self-taught.

STEVEN PEREIRA

Q. Interesting. So just during the course of your job you just learned --

A. I just saw a lot of inefficiencies and everything was done manually, and the new tool was capable of doing really interesting things, and so I thought it would make everything more efficient, and it did.

Q. So what types of programs would you write?

A. All business-related, I wasn't a fancy programmer, just all business-related.

Do you want to know specifically some of the functions that I accomplished with my computer programs?

Q. So what languages did you write in?

A. Initially, it was COBOL.

Q. Back in the day, that was what everyone used?

A. You don't have to put it that way, but, yes.

Q. Well, I mean, it does pre-date my birth, so I feel like I have to.

A. Oh, another blow.

Q. I just remember my father, he was,

STEVEN PEREIRA

like, the same way; oh, yeah, I learned how to do COBOL back in the day, so...

So, yeah, what kind of programs would you write?

A. Well, some of the functions we had to perform were very technical, but it was done very manually.

One the first things that I programmed for was something called "Cash Slips," which is banks send out a lot of checks to a lot of different banks, and there has to be some form of reconcile and tracking, and it was all done manually with computer reports.

I developed a way for us to enter that into a computer and have all the math and all the numbers crunch out for us, and that was a particularly time-saving program.

Q. How long did you self-teach on these kind of computer programming?

A. Frankly, you don't ever stop self-teaching; I'm programming to this day, you just don't stop. So I don't think the answer to that is I ever stopped self-teaching.

Q. Do you have any certifications?

STEVEN PEREIRA

A. I have none.
Q. And so how long were you at -- Exchange Bank I think you said?
A. It was Exchange Bank. It was -- I mean, if you want an accurate history, it was Exchange Bank for a number of years, and then the merger craze began with a North Carolina Bank, so we were acquired by NC&B, North Carolina National Bank, which became Nations Bank, which is now Bank of America.
After some time on the third shift, which is a great training ground, because you see everything, I was promoted to a manager of one of the operational shifts, which was the second shift.
Q. So when you say the third shift, was that sort of a graveyard shift on a 24-hour scale?
A. Midnight to eight, yes.
Q. So I just want to understand, so would it be fair to say that you learned sort of how banks operate in that position?
A. It was certainly the beginning of a very long education, but...

STEVEN PEREIRA

Yes, I mean, it was a very good beginning. Unfortunately, third shift, there is only a few departments that work that shift, so there wasn't a lot of commingling or listening in or visiting other departments to see how it went, that pretty intense education began when I was promoted to an earlier shift.

Q. So then you moved to the second shift?

A. I did.

Q. What did your responsibilities become then?

A. That was an item processing department. There is not a lot of equivalence to that now, but these were the people that received all the checks from all the deposits all over the bank, and we were responsible for putting them through high-speed reading equipment and then packaging that work for distribution to the Federal Reserve.

Q. Was the automated clearinghouse functioning at that time or...

A. ACH?

Q. Yes.

STEVEN PEREIRA

A. Oh, absolutely.

Q. Did you become familiar with the ACH system at that time?

A. You know, sort of, not directly; that came later on when I started to have a lot more interaction with all the other departments, I became familiar with the general ebb and flow with how the ACH departments work.

Q. So essentially in the second shift you're taking checks and making sure they get processed and routed to the Federal Reserve?

A. And they have to be balanced. You know, there is a lot of technical details. Just for example, we send checks to -- there is probably 146 endpoints, and the sorting equipment had 36 pockets, so it's very complicated to make sure that you have to re-run groups of work to get it broken down furtherer and further.

And then you have to balance all that work as it goes to the Federal Reserve, so it's very technical.

Q. So a couple of things: Endpoints, what do you mean by that?

STEVEN PEREIRA

A. An endpoint is whoever receives that bundle of checks.

Q. And you also talked about 36 pockets, what do you mean by that?

A. Well, the checks are all in huge stacks, like deposits, et cetera. Well, they have to go to be presented to the correct banks, and those are what we call endpoints.

So we run checks through this big computer or big machine at that time and it would say, okay, this pocket, it would sort them into the appropriate pocket; think of it as a mail-sorting machine.

Q. So you run the checks through and then they are sorted out into the 36 --

A. Right. And at the same time, reading the account number data, because some of the checks were actually drawn on the bank that I worked at, and then the amount numbers, et cetera, that has to be captured at extremely high speed.

And it's because of that speed, I had probably 20 or 30 people that balanced that work as it went through the system.

STEVEN PEREIRA

Q. Were you managing those people?
A. I was.
Q. And this was around what time?
A. Specific dates elude me, but it was probably '83 to '85, maybe '86.
Q. And so you're on the second shift for that period of time; what did you move to next?
A. Well, then I was promoted again to another department which was what we considered -- it was called reconcilements.
And that department was responsible for reconciling and balancing all the banks' internal accounts and doing the monitoring and that's it.
It was just a -- we reconciled all the accounts and made sure the bank was in balance.
Q. So when you talk about internal accounts at the bank what do you mean?
A. General ledger. You know, we have to make sure that if we sent a million dollars in checks to a Federal Reserve, we had to have that million dollar entry booked into the

STEVEN PEREIRA

system, and it has to balance to all the incoming work. It's banking; everything has to equal zero.

Q. Do you have any understanding of what goes on to the general ledger account?

A. Absolutely. That was one of my functions was actually booking all the entries to the bank.

Q. Okay. So what does -- what amounts I guess go on the general ledger?

A. Well, it's endless. There are so many categories of general ledger. I think I've seen one of the Pioneer reports; for such a small bank, it has page, after page, after page of general entry accounts.

And they each signify some entry on the bank's actual balance sheet. So, for example, if we process $10 million worth of entries to a customer's account, we had to book that entry to general ledger, so it would match the account balances bank-wide.

Q. So a bigger picture question: Would funds on deposit at the bank in checking accounts, would those go in the general ledger?

STEVEN PEREIRA

A. They would be represented by a number that should be in balance on that, on the liability side of the bank's balance sheet.

Q. And what about if there are funds that are on deposit at the bank that can't be used by the bank, would they go on a separate general ledger?

A. No.

Q. And, sorry, let me just -- I know that you know what I'm about to say, just for her sake, just let me finish the question.

I get it, I mean, it's a kind of like a conversation, but I just -- let's make sure, and I'm going to really try not to --

A. Am I rushing? Am I going too quick?

Q. No, not at all.

MS. NEIDL: Just make sure you give me time to object, too.

MR. ROSATO: That's another one.

MS. NEIDL: That's fine. It's fine.

MR. ROSATO: Do you want to read that question back?

(Whereupon, the last question was read back.)

STEVEN PEREIRA

THE WITNESS: I suppose if there is money that the bank isn't supposed to lend. But, I mean, that's just such a simplistic view of how a bank operates.

You know, what the bank lends is probably a general ledger that reflects the loan. I mean, banks are given a legal lending limit of what they can loan, and it's always a reserve ratio.

So if a bank takes a dollar, they get to lump $10. It's just how they make money.

So it's simplistic to say that what money can't a bank use to loan out; because essentially, the bank has one huge deposit or balance at the Federal Reserve, which is what they use.

BY MR. ROSATO:

Q. So would you agree though, if money was placed in -- do you know what a special deposit account is?

A. I do.

Q. If money is -- if funds are placed in a special deposit account, would they go on

STEVEN PEREIRA

the bank's general ledger?
A. Absolutely, it has to.
Q. For the balancing you're saying, the assets and liabilities?
A. Every balance that the bank holds has to be reflected in the general ledger.
Q. What is your understanding of what a special deposit account is?
A. Well, again, it's one of those generic jargony terms. Special could mean that it's a Christmas Club, because that's a special deposit.
It doesn't have any -- in my -- with my understanding, it has no specific meaning whatsoever. It's what people call various things. Some people call it custodial, they call it trust, everyone has jargon.
Q. Well, why don't we go with those two; custodial account?
A. A custodial account in my understanding is money that is put in a bank account that is clearly recognized as funds that do not belong to the accountholder.
Q. And in your experience would there

STEVEN PEREIRA

be an agreement reflecting that?

A. Again, it's a very simplistic view, because there is no setting on an account number at a bank, there is no button you push in a machine when you are setting up an account that says "I am custodial."

Custodial is an understanding. Some people accomplish it simply by putting the title, they put client account, or they put XYZ, so that there is an understanding, when you see people look at the account, that that money doesn't belong to them.

Q. And in your view then, just having a label on the account is sufficient to get at that status?

MS. NEIDL: Objection to form.

THE WITNESS: Well, I am not, by any stretch of the means, a legal expert. This is just based on my general understanding and being in the business that there are types of accounts that require very specific designation because of one reason or another.

But, generally speaking, when you

STEVEN PEREIRA

open an account at a bank, it's commercial or retail; that's -- the computer systems know nothing else.

BY MR. ROSATO:

Q. Right. The default is it's just a regular checking account?

A. It's not the default, there is no other account designation; it's DDA or savings. And if it's DDA, it's commercial or retail.

And the rules how the accounts are handled are very significant between commercial and retail, but there isn't a button you push, it's almost always a designation in the account name.

Q. You're not aware of any instance when an accountholder would have an agreement, a specific agreement stating that the --

A. I mean, there are those agreements that --

Q. Sorry.

A. Sorry.

Q. I understand. I get it.

MS. NEIDL: Just let him finish.

THE WITNESS: Sorry.

STEVEN PEREIRA

Q. It's okay. Wait for me.

So you're not aware of any instance where an accountholder would have a specific agreement stating that the bank cannot use the funds that are going into that account because they belong to a third-party?

MS. NEIDL: Objection to form.

THE WITNESS: Absolutely, you can have all kinds of -- really smart people know to get things in writing so that it's locked in and clear.

Generally speaking, those designations are because customers that are putting the money in that account need some sort of comfort that the person that they're doing business with has clearly acknowledged that there is -- that money belongs to someone else.

BY MR. ROSATO:

Q. So you want it to be made clear to the bank that those funds belong to someone else, right?

A. In most cases it's actually just sort of pacification for the client, because

STEVEN PEREIRA

regardless of what you designate an account, the activity in the account is what defines it.

I could -- you know, I could -- you can't put one thing in an account and pretend it's another. What is in an account is what is factual; you can call it whatever you want, the activity defines the account.

Q. When you're talking about the client in that last answer, which client are you referring to?

A. It can go all over. But in my case, we designated ours in the name; I believe it's custodial, because my clients want to know that I understand that that money is their's. It's pacification.

Q. You're referring to NatPay's clients?

A. Absolutely.

Q. You also said the activity defines the account. So if -- what do you mean by the activity?

A. Well, if the account looks like it's all credit card deposits, then it's a merchant clearing account. If it looks like it's

STEVEN PEREIRA

household activity, then the bank knows that that's what the account is used for.

My general belief is that as a bank, you are responsible for understanding everything. As a matter of fact, it's a regulatory requirement. There is no disguise or hiding behind, I didn't know what it was and, you know, we all understand what I'm referencing.

But you just can't -- there is no excuse that you didn't know, it doesn't exist.

Q. What I'm trying to understand is -- I'm not asking about any specific to this case.

A. Absolutely.

Q. I want to know: So if there is no agreement up front that we just talked about, right, and you said that NatPay has an agreement like that, correct?

MS. NEIDL: Objection to form.

THE WITNESS: We have an addendum.

Q. You do have an addendum, correct?

A. Um-huh.

Q. So if there is no agreement of that kind, how does it become the bank's

STEVEN PEREIRA

responsibility to understand that everything that is happening in that account that was set up as a regular checking account is the funds of a third-party?

MS. NEIDL: Objection to form.

THE WITNESS: Again, especially since 2001, the Patriot Act, a bank is required to know what's in that account, because criminals don't self-identify.

In other words, if someone is laundering money, they are not going to tell you in the account title that they are laundering money. The bank is required to know what the activity is and what it is for; there is no alternative.

BY MR. ROSATO:

Q. What I want to understand though, how does that lead to -- let's assume you are right, the bank needs to know what's in the account; how does that then turn the account into a trust account?

MS. NEIDL: Objection to form.

THE WITNESS: Well, a trust account is a whole nother matter; I don't find an

STEVEN PEREIRA

equivalence between trust and custodial.

Q. And we'll get to that in a second.

But let's just use your parlance of the custodial account, right. How then, if there is nothing placed in front of the bank, that says you need to set these funds aside, they can't be used for any other purpose by the bank; there is no agreement in that, and the account is set up as a regular checking account, how then is the bank, in your view, required to treat the account as a custodial account?

MS. NEIDL: Objection to form.

THE WITNESS: That's a lot of question.

First off, in my understanding there is no designation that tells a bank that money has to be carved out and can't be overnight invested; banks make money in a lot of different ways.

If the bank uses half of your account balance to make a mortgage loan, which technically they are using a little bit of this and a little bit of that, you

STEVEN PEREIRA

don't see a withdrawal from your account. And if the loan goes bad, the amount of money that's in your account is still there.

The bank gets this amorphus total, because the bank is basically a checking account with the Federal Reserve. The Federal Reserve says your balance is $10 million, this is your loan rate; they don't break it down to what makes up that $10 million.

BY MR. ROSATO:

Q. Right. The account balance is essentially a promise to pay by the bank, correct?

MS. NEIDL: Objection to form.

THE WITNESS: It's a liability, yes.

Q. So when the money is -- when funds are deposited into the checking account, those funds become the property of the bank to then go and lend to other customers, other clients, correct?

MS. NEIDL: Objection to form.

THE WITNESS: The money is never the

STEVEN PEREIRA

property of the bank.

Q. It's never the property in any checking account?

A. I think it's a liability, it's money due to the customers; I don't think they own it, I think they're allowed to utilize it.

Q. So your testimony is -- what's the difference between being allowed to use the money, right, versus having a possessory interest in the money?

MS. NEIDL: Objection to form.

THE WITNESS: I don't -- I think we're getting into really specific legal details that I just can't relate to.

I think -- let's just say that the money goes in the bank and they own it now, they still owe it back to you; that's why everything is FDIC insured.

BY MR. ROSATO:

Q. Right. So you put the money in; the bank then can use it, correct, and they have a promise to pay you?

MS. NEIDL: Objection to form.

THE WITNESS: We're way -- I was

STEVEN PEREIRA

always on the operational side, not a lending side, so we're kind of moving outside of my realm.

Q. I'm just trying to ask for your general understanding of how bank accounts work, that's all.

MS. NEIDL: Objection to form.

Q. I'm not asking you -- you know, I'm not asking you in some, based on your own experience. Well, I am. I'm just trying to understand, you know, what you know about how bank accounts generally function.

MS. NEIDL: Is there a question?

MR. ROSATO: So that's all. Let's just move forward.

Q. So we're in the mid-80s now; what do you do next?

A. Mid-80s, I started running a --

Q. Second shift and then --

A. -- reconcilement.

Q. What do you do after that?

A. It was almost like an audit department. So we were responsible for balancing the Federal Reserve. We balanced

STEVEN PEREIRA

official checks; all internal CDs, all of those accounts, and I did that for probably two years.

I was moved to that department because of my programming skill, because it was an incredibly manual effort, and the bank was growing so rapidly, I was able to modernize all the reconcilements.

Q. And this was still at the bank; it had been acquired I guess at this time and became Bank of America, eventually?

A. That's way after me. It was Nations Bank, we just controverted to Nations Bank from NC&B.

Q. How long were you in that position?

A. A year, year-and-a-half, maybe two.

Q. And what do you do after that?

A. I was promoted to a department as a department manager of something we call Center Support.

And what that was was a small PC programming unit and sort of project management, and that was probably the most rewarding part of my banking career, because I

STEVEN PEREIRA

was involved with every single operational department in trying to modernize and make it more efficient.

So that's when I learned ACH. That's when I learned quite a lot about the mechanics of how the bank operates. And that was my last job there.

Q. So what did you learn about ACH during the --

MS. NEIDL: Object to form.

THE WITNESS: Repeat the question, please.

Q. You just testified that in that position that's where I learned ACH; what did you mean by that?

A. I learned what it was. I learned what the bank rules in general were about it. Having coming from -- having come from a processing and reconcilement background, it wasn't a big leap. I mean, I learned that there is a lot of things in ACH that people don't know about; reclamation is a thing that people don't know a lot about.

But at that time all the ACH

STEVEN PEREIRA

processing was done on mainframe computers, so my knowledge was basically the general workflow of how ACH works.

Q. Can you describe the general workflow?

A. That again is really broad: Workflow from where to where, ACH is moving in a lot of different directions?

Q. Well, do you know the terms like ODFI and RDFI?

A. I do, yes.

Q. Describe the flow from one transaction?

A. Well, it depends on who originates the transaction. I don't know a good example that would simplify it.

Let's say you're paying your one employee and you send a direct deposit file to the bank. The general workflow is that the bank takes that -- every transaction has to have a debit and a credit; the debit is a funding entry to make sure that there is money for the credit.

Generally speaking, outside of

STEVEN PEREIRA

third-party behavior, the debit is always drawn on the customer doing the transmitting, the funds are verified that they are existing, and then the debit or the deposit to the employee is sent from the bank to the Federal Reserve for distribution; just like checks, only electronic.

Q. Basically an electronic form of a check, right?

MS. NEIDL: Objection to form.

THE WITNESS: I would say that that's a decent analogy.

Q. Okay. So your next job is you started at NatPay?

A. Yeah. We were going through a period of time in banking in the late-80s where it was becoming very impersonal, and so I was dissatisfied, and then I an ad popped up from my two current bosses looking to start a new company that would facilitate ACH transfers between small businesses.

And they looked at my resume; I had a complete background in bank operations, and that's where we started.

STEVEN PEREIRA

Q. When you talk about your two bosses, is that Jefferson Harkins and George Hamilton?

A. Those are the people that I consider my bosses, yes.

Q. Are they the founders of NatPay?

A. They are two of the founders, yes.

Q. Are there any other founders?

A. There is a founder that's a very minor participant. There were three founders and one of them was a Timothy Tracey, and he is a very minor piece now, and we don't really talk to him.

Q. Do you have an ownership interest in NatPay?

A. I have a very small one, yes.

Q. So in terms of Mr. Harkins and Mr. Hamilton, what are their roles --

MS. NEIDL: Objection to form.

Q. -- at NatPay?

A. On paper, George is chairman and Jefferson is president and secretary.

Functionally, is that what you want to know, what they do functionally as well.

Q. Sure. Why don't we start with

STEVEN PEREIRA

Mr. Hamilton.

A. George is -- we're a very small company and everyone wears a lot of hats, there is no real specific duties, that's one of the keys to our success.

George is in the office to provide advice, brainstorm, to come up with new product, to just basically move the company in the correct direction. You know, he's there, if you need to spend money, you run it by him, he approves it; just general boss kind of things.

Q. And what about Mr. Harkins?

A. Mr. Harkins has a much more definitive role. He is -- he handles all the operational -- not operations; the business operating side, you know, the payrolls, the money, the balance sheet, all the books; that's Jefferson's primary responsibility.

Q. And you are the general manager; is that correct?

A. The operational general manager, yes.

Q. Can you describe what your

STEVEN PEREIRA

responsibilities are in that role?

MS. NEIDL: Objection to form.

THE WITNESS: Like, as of today?

Q. Well, when did you come into that position?

A. The timeframe of course is it's 31 years; I started out programming, that was it.

The product that eventually developed wasn't exactly what they thought it would be going into it; I had a grander scheme. So I stayed the programmer, probably the only employee for two or three years.

And then I was -- as the company grew -- I mean, there is no upward mobility when you are the only guy, but as the company grew, I was given more and more responsibility over the operations piece.

I'm technically in charge of marketing and sales, but it's just not my thing; I don't get it and it's just not my area.

I was probably made general manager, I'd say, ten years ago.

STEVEN PEREIRA

Q. Okay. So let's start with the programming piece when you first got there.

What type of programming were you doing?

A. Language?

Q. No, what kind of computer programs were you writing?

A. Well, everything. I mean, literally I didn't even have a computer. I mean, Jefferson my boss comes from a very technical background, so he was, you know, he said here is where you order the parts, build yourself a computer and network and let's see what happens.

So I had to -- I had to start programming the core systems which would handle incoming files.

At the same time, we had to get the files. So we wrote software -- or I wrote software that was distributed in a lot of retail software so a customer could do their payroll and hit a button, and it would transmit.

So I had to learn how to program

STEVEN PEREIRA

modems. We were one of the -- we were really the only truly paperless company; all of our correspondence with the customer -- keep in mind we're in '91, it was via fax, so I had to learn how to program faxes, so fax distribution was all of my programming.

And then as we developed the core systems, we had customers. I had to program all the customer service and customer data record systems so that when a customer signs up with us, they get put into a system, that system is mine.

And then we had to develop what happens when a customer calls, what do you see, what do you do.

It's literally every function to some extent that you see at a bank we did on a much more smaller, tailored scale to our business.

Q. So would it be fair to say that you were responsible initially for setting up all of those systems?

A. Absolutely, yeah.

Q. So how long were you sort of in this

STEVEN PEREIRA

developer/programming role?

A. To this day.

Q. Right. You said you still do it to this day, right?

A. Um-huh.

Q. Okay. But that's just a part of what you do now; is that fair?

A. It is fair.

Q. Okay. Before you became the general manager, you said about ten years ago, what was your role before, right before that?

A. Programming. Programming, you know, supporting the customer.

Q. When were you granted an equity interest in the company?

A. It was more than that; 20 years ago.

And at the time, because there wasn't a lot of employees and I programmed everything, it was sort of golden handcuff.

Q. They wanted to keep you there, right?

A. Make sure I stayed, yeah.

Q. You had a lot of -- built a lot of knowledge up by that time I would think, right?

STEVEN PEREIRA

A. I would say so, yes.

Q. So as the general manager how many direct reports do you have?

A. Direct reports are four.

Q. And who are they?

A. They're the person in charge of marketing, compliance, computer programming, operations and the operation staff, which is customer service and actual processing and there are four of them, four people.

Q. What are their names?

A. Dawn Cafaro.

Q. What does she do?

A. Dawn is the operations manager, which is -- she handles all the work for direct deposit and customer service on-boarding, everything that is basically in the core ACH system.

Q. And marketing, who is in charge of marketing?

A. Tyler Roberson.

Q. And what does he do?

MS. NEIDL: Objection to form.

THE WITNESS: He --

STEVEN PEREIRA

Q. Do you have an understanding of what his responsibilities are?
A. Well, I established them, so yes, but he's in charge of marketing and graphic design. He has a couple of salespeople that roll up to him; just that kind of stuff.
Q. You also mentioned compliance?
A. Right. It's something -- I created a department that would sort of be the catchall, that is where everything else that doesn't have a good fit would go to.
We have several very, very important company certifications, and there is a lot of paperwork associated with those; this group handles that.
Q. Who is in charge of that group?
A. Mark Williams.
Q. What are the -- the certifications that you just talked about, what are those?
A. Well, we are HIPAA certified, and everyone should be moderately familiar with that term. We're SSA-16 certified.
Q. What does that mean?
A. I have trouble explaining.

STEVEN PEREIRA

SSA-16 is a sort of data processing security protocol. I'll give you an example: Our passwords have to automatically be requested to be changed in our core system every 30-days; that's an SSA-16 requirement.

You have to fill all these requirements in order to get the certification; and in our business it's crucial to have that certification.

Q. Any other certifications?

A. Not per se, but Mark makes sure that we're ready for the financial audits. We have an outside audit yearly.

Our bank is constantly -- auditing is a really strong term, but the bank is always verifying that we are doing what we are supposed to do, and he deals and fields those issues.

Q. Is the bank that you're referring to First Premier Bank?

A. It is, um-huh.

Q. What about licenses and registrations?

MS. NEIDL: Objection to form.

STEVEN PEREIRA

THE WITNESS: You know, registrations, again, that's one of those really fuzzy terms, it could mean anything.

Licensing, of now we're licensed with the State of Texas.

Q. As a money transmitter?

A. Yes.

Q. We'll talk about that a little later, but is Mark Williams responsible for that as well?

MS. NEIDL: Objection to form.

THE WITNESS: Responsibility to the extent --

Q. Well, let me rephrase it.

Does that fall under the responsibility of the compliance group at NatPay?

A. Well, the responsibility -- because there is a voluminous number of reports and paperwork that has to be gathered quarterly for this, Mark handles and manages that.

Q. There was a fourth person we haven't discussed, what was that fourth group?

A. That was our systems and programming

STEVEN PEREIRA

department, and that is Michael Russo.

Q. And so those are your four direct reports, right?

A. Absolutely.

Q. How many people are under them?

A. Generally, I think 25 all tolled.

Q. So about 30 people indirectly and directly reporting up to you?

A. Maybe a little lower than that, but that's the number, it's more than 20 but less than 30, and it fluctuates, of course.

Q. How many employees does NatPay have in total?

A. I'd have to really give you a moment to concentrate, because we're growing, but I would say, off the top of my head, 28.

Q. Okay. So you're at the top of the organization, right?

MS. NEIDL: Objection to form.

THE WITNESS: No. I have two bosses that I report to which I assume are at the top.

Q. You're at the top -- at least from an operational standpoint, you're -- the buck

STEVEN PEREIRA

stops with you; is that fair?

MS. NEIDL: Objection to form.

THE WITNESS: Again, I have to -- I mean, I have two bosses, but I get your point; yes, I'm the guy.

Q. Right. You report to, you know, the majority owners of the company and I understand that, but you're responsible for the operations of the company?

MS. NEIDL: Objection to form.

THE WITNESS: But they're very involved, so it's not like I'm reporting to a board and giving them once a quarter, it's, like, daily.

Q. Understood.

A. Okay.

Q. So you do report to them daily?

MS. NEIDL: Objection to form.

THE WITNESS: Jefferson, not as much as George, but I'm probably daily in contact with George; sometimes not, but -- yes, if anything occurs that I deem has to be told to them, I don't hesitate, I have to tell them, no matter where they are.

STEVEN PEREIRA

BY MR. ROSATO:

Q. Okay. What about -- does NatPay have policies and procedures related to its business that it maintains?

MS. NEIDL: Objection to form.

THE WITNESS: That's really broad. Are you talking about operational procedures?

Q. Yeah, so let's break it down then.

Sure, operational procedures, there are written policies and procedures?

MS. NEIDL: Objection to form.

THE WITNESS: Operationally, like, the daily job functions that people have to do, no, no procedure.

Q. What about generally, like, you know, how to handle ACH transactions?

A. Well, the system is pretty thorough so that there is not a lot of guesswork on what to do, but we don't have anything specifically written.

Q. What about on-boarding new customers?

A. We certainly have -- in our system,

STEVEN PEREIRA

policies and procedures aren't required, because you have to -- the steps are pretty -- the steps are pretty apparent.

So if you are on-boarding a client, it's not a form that you sign and send and it's done, everything is done in our system. So our system says, okay, get the Secretary of State, and you do that, and then that step is done.

So they don't have flip, what do you do next? The system is -- if they don't do it, the system will let them know they didn't do it.

Q. So there is control around what is done through the system; is that correct?

A. I would say so, yeah.

Q. What about, you know, form contractual agreements with potential clients, have you been involved in developing those?

MS. NEIDL: Objection to form.

THE WITNESS: You're talking about just our -- the clients, what they fill to sign up with us, that contract?

Q. Yes. Yes.

A. I mean, there are tons and tons of

STEVEN PEREIRA

legalese, so I didn't do that.

But, yeah. I mean, our attorney that would draw up the contracts, you know, I probably would interface with them, but I didn't write them.

Q. Those documents have been referred to as a "starter kit," have you heard that term before?

A. Many times, yes.

Q. So when I say that today, you're not going to have any confusion about what I'm talking about?

A. No.

Q. Okay. What about -- still asking about policies and procedures, are you familiar with any Know Your Customer procedures that NatPay has put in place?

MS. NEIDL: Objection to form.

THE WITNESS: Intimately, yes.

Q. And why don't you just describe that for me?

A. Okay. The Know Your Customer rules are sort of -- they're imposed upon us by our primary bank, First Premier.

STEVEN PEREIRA

These rules are generated by the federal government, but the banks are charged with -- anybody who is required to do Know Your Customer, the bank is charged by the government; I never interact with the FDIC or the federal government, it's all done as a pass-through.

So we have very, very specific requirements of what our bank says is necessary to successfully on-board a client with KYC, Know Your Customer.

Q. So what are those requirements?

A. Well, when you're on-boarding a business, much different than on-boarding a bank, like, if you went and opened up a checking account, you have a driver's license and a passport, that's me.

Businesses are trickier. And the requirements for Know Your Customer all center around verifying that you absolutely know who your customer is and what they do; there is no grey area as far as that's concerned.

So we have steps, first of all, to verify that all the information that the

STEVEN PEREIRA

customer gives us can resolve to a -- sort of a tertiary search, if that business exists.

A perfect example is if you say you're a restaurant, we would look at Yelp. And if there is 150 reviews about sandwiches, we're pretty certain that you're a sandwich shop.

Q. What about any other sort of more formal checks beyond, like, looking at a Yelp page?

MS. NEIDL: Objection to form.

THE WITNESS: A Yelp page is an example I gave you to make it easier to understand.

We are required to verify with the Secretary of State that business is in, that the business license -- number one, they have to be there, and it has to be an active license. If it's suspended or extra, we have to get additional documentation as to why it's potentially suspended.

States make mistakes. We have to -- sometimes people will sign up as a d/b/a

STEVEN PEREIRA

and the d/b/a is not what's registered with the state.

The absolute requirement is that the name of the business and the TIN number match according to the IRS databases.

We use several services; Lexus Nexus which is -- they actually provide service to everyone, but ours is very tailored.

We put in our system all the business information we receive. That's through an API. That information is shot to Lexus who scores it and says, through all of the means that we use, which is scouring multitudes of public database systems, we say that that address does belong to that dry cleaner.

BY MR. ROSATO:

Q. So that's all very helpful.

Do you get documentation directly from the potential client as well?

A. Yes. I actually forgot a step.

We have to have proof of ten. So we are -- there are certain -- depending on how the customer is on-boarded depends a lot on how

STEVEN PEREIRA

we receive the documentation.

But let's say the average customer that comes over, they are required to give us a blank check; voided, of course.

And then they are required to give us some form of governmental form that indicates that name and that TIN number, so that it can't be spoofed. We have to -- so we need official documentation.

We can use a lot of different things for that. We can use a screenshot from EFTPS, which is the IRS' tax payment system; that, we have to get.

We don't -- because of what we do, we aren't required to get things like Articles of Incorporation, et cetera, but we can get them in order to help support additional information.

One of the things that we're absolutely required to, because there are very specific companies that are prescribed from having bank accounts or transmitting on the ACH network, we're required to verify -- or a we don't say -- our bank doesn't accept if we say

STEVEN PEREIRA

we don't know what they do.

So what we do is we have various means, as simple as going to their corporate website and say, okay, they say they're an attorney and it's a law firm, that resolves to a law firm, the address, that's good.

But if someone -- like I said, criminals don't self-identify. So if someone could come in and say they're a dry cleaner, we'll go look at the address and it's a marijuana sales shop; well, we can't do it, marijuana is not federally legal.

Q. You mentioned that you don't generally review Articles of Incorporation?

A. No. No, they're not really that valuable.

Q. What about any other organizational documents?

A. Not necessarily, uh-huh.

We are endorsing a business or we're trying to underwrite a business that actually exists and it isn't on a prescribed list; they're not gambling and selling cigarettes.

So our -- when you're underwriting a

STEVEN PEREIRA

business, you just have to verify, according to the Patriot Act and Know Your Customer that that is a true business.

MR. ROSATO: The court reporter will hand to you what will be marked as Pereira 1.

(Whereupon, Pereira Exhibit 1, Cafaro E-mail Dated 9/18/19, Bates Stamped NP0099854 to '865, 12-Pages was marked for identification.)

BY MR. ROSATO:

Q. I'm most interested in the document that's attached to it; the first attachment.

A. Are you referring to the document entitled "Why NatPay Drives You Crazy"?

Q. Yes.

A. Okay.

Q. Do you recognize that document?

A. I do.

Q. Did you prepare it?

A. I wrote it, yes.

Q. It has a lot of the information that we were just discussing, right?

MS. NEIDL: Objection to form.

STEVEN PEREIRA

THE WITNESS: Yes, sure.

Q. Would you say that this letter is a fair summary of NatPay's Know Your Customer requirements?

MS. NEIDL: Objection to form.

THE WITNESS: No, not necessarily. You have to take this e-mail or this letter that I distributed -- and I do a lot of white papers, this letter was directly addressing a constant issue we have, which a lot of our competitors and banks, sadly, are very sloppy in what they require for paperwork; we are not.

So people will always complain to us, why do you make me do this, why do you make me do that. So I thought it was a good idea to let them know, this is why we do it; it is very important to us and to you for safety, et cetera.

You don't want to be, like, oh, I didn't know what they did and all of a sudden you are actually facilitating marijuana sales.

The potential downfall to doing a

STEVEN PEREIRA

mistake like that is enormous, like, you're blocked from the ACH network.

So I wanted customers to understand that we do this for them, that this is an effort that we make, and we're not going to circumvent them because it's easier.

BY MR. ROSATO:

Q. I want to turn your attention to the page that has a number at the bottom, it ends in 58; just the top of that page.

Do you see that's referring to you require the name of the owner be provided when a potential client is signing up.

MS. NEIDL: Objection to form.

THE WITNESS: What's your question?

Q. Would you agree with me that what you're stating in that part of the letter at the top is that you need the owner's name of the business?

A. Again, context. There is thunder clouds in the regulatory environment that state that at some point you are going to have to actually underwrite a principal at the business; that is not a deed a fact.

STEVEN PEREIRA

But we work with a very conservative bank that -- for example, we were underwriting businesses through this means years before it was required. Our bank is extraordinarily conservative, as are we, with the regulatory issues.

Our customers literally -- they just went insane when we started asking for additional information. They felt it was an intrusion. They felt we were violating their privacy, et cetera.

So I don't bend, you have to put a name there or something. I was trying to explain to them that this is for the good of everyone. But the bank requires a name, the bank may or may not background check the person, I don't know.

It is not a requirement. As far as our Know Your Customer rules or concerns, we just put a name in there.

What we prefer, of course, is absolute accuracy; we have no way of checking it.

And we also -- that name is very

STEVEN PEREIRA

beneficial, because a lot of people operate their business out of cell phones, not everybody has a storefront or not everybody has a legitimate brick-and-mortar.

So we need a -- we have to -- but the rules are, you have to resolve the phone number that they gave you to something to do with the business.

That name is very beneficial, because the phone, the cell phone will not resolve to the dry cleaner, but it resolves to the dry cleaner owner.

And if it resolves to the name that they put there, then we're satisfied that we can get in touch with the client, if necessary.

Q. What if the owner of the company is another entity?

MS. NEIDL: Objection to form.

THE WITNESS: I don't understand the question.

Q. So let's say it's not a physical person that owns the company, right?

A. Interestingly enough, it's never come up.

STEVEN PEREIRA

Q. You've never seen that happen before?

MS. NEIDL: Objection to form.

THE WITNESS: That someone put in a corporate name and the principal? No, I don't think I've ever seen it.

But again, I don't do all the paperwork every day, but I don't think I've ever seen it.

I'm not going to say it doesn't happen; we have a lot -- we make exceptions all the time, it's one of our strong points.

BY MR. ROSATO:

Q. Exceptions, when you say you make exceptions all the time, what do you mean?

MS. NEIDL: Object to the form.

THE WITNESS: Sometimes they'll put the general manager. Like, I'm authorized to sign various documents, et cetera, for our company. And if -- and I'm assuming they know that I'm not the owner but, you know, a little one.

BY MR. ROSATO:

STEVEN PEREIRA

Q. Do you know whether the starter kit, there is a document in it that has a line for owner and it requires a percent ownership interest to be placed there?

A. I'm familiar with that line, yes.

Q. So does NatPay do anything to verify that information?

A. No.

Q. You testified that you are authorized to sign documents on behalf of NatPay?

A. Depending on the document.

Q. What type of documents are you not authorized to sign?

MS. NEIDL: Objection to form.

THE WITNESS: Stumped there.

Opening bank accounts, there you go.

Q. Do you have access to NatPay bank accounts?

MS. NEIDL: Objection to form.

THE WITNESS: I have access, but I do not have signing authority.

Q. When you say you don't have signing authority, do you mean you can't write checks?

STEVEN PEREIRA

A. I can make no -- I can do no -- I can't call my bank and ask them to wire money out. I can't generate activity in-person like that. And that's by design, I have an audit background, I like dual control.

Q. Who has that authority?

A. That authority is absolutely only Jefferson and George.

Q. Okay. So I want to talk a little bit about NatPay's operations.

So how many clients does NatPay have, do you know?

A. I can give you a rough estimate and I would probably say individual employers are definitely north of 200,000.

Q. When you say individual employers, what do you mean?

A. That's who we open the accounts transactionally, those are employers, businesses.

Q. Does NatPay do -- serve customers other than for the purposes of processing payroll and payroll taxes?

MS. NEIDL: Objection to form.

STEVEN PEREIRA

THE WITNESS: On our ACH core business --

Q. Um-huh.

A. -- we have one customer that we process furniture payments for; very legacy customer, they use our Doc Delivery platform, but typically speaking, we do not do any business that results in a consumer debit.

Q. Okay. So just to clarify then: Is the core of the ACH business strictly processing payroll, ACHs for payroll and payroll taxes?

A. And payroll-related businesses. Some companies ask us to collect -- like a payroll service bureau will utilize our service to collect their monthly fee from the client.

Q. But in terms of consumer transactions, NatPay doesn't do ACH services for those?

MS. NEIDL: Objection to form.

THE WITNESS: Well, we do an enormous number of consumer transactions; we pay two million people a month, but we do not withdrawal funds from them, we only

STEVEN PEREIRA

deposit.

BY MR. ROSATO:

Q. Are you talking about the employees --

A. I am talking about the employees.

Q. -- of employer clients?

A. Um-huh.

Q. Do you contract directly with these employers?

MS. NEIDL: Objection to form.

THE WITNESS: Again, I hate to speak in broad generalities, but generally speaking, the rules require that any company that transacts or wants us to transact under their company ID, we have to have a one-to-one contract.

BY MR. ROSATO:

Q. So I guess what I want to understand is do you -- so you don't just contract with a payroll service company like Cloud Payroll, for example, right?

MS. NEIDL: Objection to form.

THE WITNESS: Of course we do.

Q. What I want to understand is, that's

STEVEN PEREIRA

not the only clients base that you have is, like, payroll service companies?

MS. NEIDL: Objection to form.

THE WITNESS: I would say 96 or 97 percent of our business is payroll service bureaus. It's economies of scale, they give us their customers, I don't have to have them one-to-one.

Q. That number doesn't total 200,000 though, am I correct about that?

MS. NEIDL: Objection to form.

THE WITNESS: I don't get the question.

Q. So you said you have 200,000 individual employers?

A. Yes, approximately.

Q. Are those NatPay's clients?

A. Yes.

Q. Are they also the payroll service company's clients?

A. Yes.

Q. You have contracts with both?

A. Well...

MS. NEIDL: Objection to form.

STEVEN PEREIRA

THE WITNESS: We contract with the payroll service provider, because they are going to send us their customers and we have to make them understand that there are rules and requirements that they have to fulfill; just all that legalese stuff that you need.

That they are going to bring their clients. In some cases we negotiate prices; we'll charge the clients $0.08 and they only pay $0.06 and they get the uptick.

But they are bringing us the base of their customers, so they're in the top of the pyramid. They have to be in the system, so we have an ability to always associate those employers to who we call, who we report problems to.

It's just a hierarchy of responsibility. They're the only people authorized to look at the activity. They are the only people authorized to upload or download files into our system.

BY MR. ROSATO:

STEVEN PEREIRA

Q. So how many payroll service companies has NatPay contracted with?

MS. NEIDL: Objection to form.

THE WITNESS: My best guess is between 1300 and 1600, but I haven't looked at the number recently.

Q. So between 1300 and 1600?

A. 1600 payroll service providers, yes.

Q. Would you say they are interspersed throughout the country?

A. Absolutely everywhere, but only United States territories or states, we don't operate out of the country.

Q. Only in the United States?

A. Yes, and territories.

MR. ROSATO: I want to put in front of you what will be marked as Pereira 2.

(Whereupon, Pereira Exhibit 2, Pereira Declaration Dated 12/6/19, 14-Pages was marked for identification.)

BY MR. ROSATO:

Q. Do you recognize this document?

THE WITNESS: Can I take a break?

MR. ROSATO: Sure. That was one I

STEVEN PEREIRA

didn't mention.

MS. NEIDL: Yeah, it's been a while.

THE WITNESS: I just need a moment.

MR. ROSATO: There is no question pending, so that's fine.

That was another one I should be clear about though: If there is a question pending, I'll ask you to answer it before we go on a break, okay?

THE WITNESS: All right. Okay.

MR. ROSATO: All right?

MS. NEIDL: We're good.

VIDEOGRAPHER: This will conclude video number one in the deposition of Steven Pereira. We are off the record at 11:13 a.m., October 19, 2022.

(Whereupon, proceedings recessed for a short break and once again resumed.)

VIDEOGRAPHER: This is the beginning of video number two in the deposition of Steven Pereira. We are on the record at 11:23 a.m., October 19, 2022.

BY MR. ROSATO:

Q. Before we broke I had put in front

STEVEN PEREIRA

of you what was marked as Pereira 2.
Do you recognize this document?
A. Yes.
Q. What is it?
A. The title says, "Declaration of Steven F. Pereira In Support of National Payment Corporation's Motion to Intervene."
Q. Did you prepare this document?
A. I think I consulted on it, but I don't think I wrote it.
Q. You didn't write this document?
A. No. No.
Q. You signed it though?
A. I did. I'll double check. Yep.
Q. And you understand as a declaration this is signed under penalty of perjury, right?
A. Okay, um-huh.
Q. You do understand that, right?
A. Yes, um-huh.
Q. I just wanted to go through some of the introductory paragraphs you have here. And I think we talked about a fair amount of this already, but there are a few things I wanted to ask you about.

STEVEN PEREIRA

If you could turn to Paragraph 3. So it starts on the first page and goes on to the second. You see it has a defined term called "Operating Rules" at the end of the paragraph?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. So just reading through that, is that referring to the rules of the NACHA Rules?

A. There are -- well, there are a voluminous number of rules, but there is a basic set of behavior rules in order to participate in the ACH network.

Q. Are those rules promulgated by NACHA?

A. They're enforced by NACHA; the bank is the one who teaches us how to deal with it.

Q. By "the bank" what do you mean?

A. First Premier; if there is a new rule, they give us guidance.

Q. So I'd like to understand. The relationship between NatPay as the ACH processor and First Premier as the bank, can you explain to me in the context of processing

STEVEN PEREIRA

ACH transactions, what is NatPay's role versus First Premier's role?

MS. NEIDL: Objection to form.

THE WITNESS: That's a big question. I would say that we are an originator of ACH transactions, but we're not -- we're not members of the ACH or NACHA network; banks do that. Banks are the only avenue to getting this into the banking system. I can't send -- the banks have to do everything; that's a simplistic answer.

First Premier is responsible that everything is done in accordance with the rules. There are special rules. Transactions can't be dated this far in advance. The routing and transit numbers, there is a very specific -- it's called a modular check, they have to get resolved or they don't get transmitted.

First Premier is sort of the gatekeepers to make sure that all the people that send them ACH files, so that can be processed through the Federal Reserve system. First Premier has been

STEVEN PEREIRA

charged and that's their duty and responsibility to make sure that we're adhering to those rules.

BY MR. ROSATO:

Q. That's all fair. So then, what is NatPay's role in the transaction?

MS. NEIDL: Objection to form.

Q. In an example ACH transaction, what is NatPay's role vis-a-vis the bank?

MS. NEIDL: Objection to form.

MR. ROSATO: What is objectionable about the question; I'm just trying to understand.

MS. NEIDL: I'm preserving my right. I can read it. It was in two parts and it was a little unclear.

So read your question, and if you want to correct it, you can or I'll stand on my objection.

MR. ROSATO: Okay. I'm going to ask the court reporter to read the question back.

(Whereupon, the last question was read back.)

STEVEN PEREIRA

BY MR. ROSATO:

Q. Vis-a-vis First Premier Bank?

MS. NEIDL: Objection to form.

THE WITNESS: I don't want to be difficult, but I just don't know how to answer that. I'm very pragmatic. Do you mean technically what do we do? Like, we format -- we put the entry into an acceptable format, in an acceptable batching and file system.

We're responsible for verifying, you know, that the entry is valid to some extent. That it's dated appropriately. To the best of our ability that it's going to the right endpoint, and that we have to batch that work and do it correctly according to the NACHA Rules, and then we hand it to First Premier.

We don't -- we are not involved in delivery technically, we're an originator, First Premier takes care of delivery.

BY MR. ROSATO:

Q. When you say delivery are you talking about the funds?

STEVEN PEREIRA

A. I'm talking about all the transmission of this, transactions through the system, it is all -- it all begins at the ODFI, which is what First Premier technically is.

We create the work, we give it to First Premier, and then they make the magic happen; we don't do that.

Q. So let's just use a more concrete example relevant to this case.

NatPay hands an ACH file to First Premier; that's the first step?

MS. NEIDL: Objection to form.

THE WITNESS: The first step of what?

Q. Let's say we're debiting -- they're ACH debits, okay, so it's a file of debits from accounts.

A. Okay.

Q. Is the first thing that NatPay does is hand that file to First Premier?

A. Well, it depends on where you want to begin the story.

We don't create anything out of thin air. We have people that send us their NACHA

STEVEN PEREIRA

files or in some cases other formats with instructions of what to do.

Q. That's the payroll service companies, correct?

A. There are any number of people that can do this to us, but they're the ones that begin the journey.

So they send the work to us and we do several things to make sure that the date is correct and we verify that the routing and transit numbers are valid, et cetera, et cetera, and then we accumulate this work on a daily basis.

Banks do everything in batch, so there is very little realtime. So twice a day, we have accumulated all this work, and then we send it in bulk to First Premier.

And then, that's when they take it and then they start distribution.

Q. And those ACH files, they have instructions on which bank and which bank account to pull money from?

A. Absolutely, yes.

Q. Okay. Just going down your -- back

STEVEN PEREIRA

to Pereira 2 here, Paragraph 5 you say "only depositary financial institutions may transmit entries through the ACH system."

Is that what you're taking about is that the banks are ultimately the ones sending the money through the ACH system?

MS. NEIDL: Objection to form.

THE WITNESS: They're the only people that are allowed, yes.

Q. But on one of these example transactions that we're talking about, money does pass through an account that's held in the name of NatPay, correct?

MS. NEIDL: Objection to form.

THE WITNESS: It's a -- again, there is a lot of ways to describe pass-through. There is a huge -- it does -- okay, it does pass through a NatPay account.

BY MR. ROSATO:

Q. Right. So that's what I'm trying to understand. The money does come -- it's either debited from another account and then comes to the NatPay account, or it leaves the NatPay account and goes to another account somewhere

STEVEN PEREIRA

else, right?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. So what I'm trying to understand is how does that then mean that only the bank is allowed to transmit funds through ACH transactions?

A. I -- again, I just don't know how to answer that. I mean, I can give you an analogy, which is: You manufacture Pepsi Cola, but you give it to Walmart and they distribute it. You don't buy your Coke from Pepsi, you buy it from a vending machine or Walmart.

So we're PepsiCo, we create these transactions, send them to the bank, but they're the only ones that can make anything happen. No one accepts a file from me except First Premier.

Q. So NatPay doesn't send files to Pioneer Bank, for example?

A. No, that's not how it's done. I mean, we probably could make an arrangement; very unlikely, but we could, but no, you have to send your files to the bank.

STEVEN PEREIRA

Q. First Premier would send the file to Pioneer Bank?

A. No. They send it to the Federal Reserve for distribution. They don't really -- First Premier just makes sure it's a valid endpoint, they don't know what's going to whom, they don't care.

Q. Would that be the same on the other side? Let's say there are ACH debits scheduled to be pulled from a Pioneer Bank account, would Pioneer, based on what you just said, have knowledge of where the funds are going out of that account?

MS. NEIDL: Objection to form.

THE WITNESS: Well, keeping in mind the bank is aware of the activity that is occurring on their bank accounts.

So First Premier is very aware of the money going in and out of my account. They send the work to Pioneer.

It's an enormous ecosystem and a huge chain of trust. They don't worry that there is something -- a fraudulent account they are sending it to. They know that

STEVEN PEREIRA

bank is responsible for it.

So they send the work to Pioneer and their part is done. The banks exist in a -- it's a chain of trust.

BY MR. ROSATO:

Q. This is what I'm trying to understand: You said First Premier sends the files to the Federal Reserve and make sure it's a valid endpoint; they don't necessarily care where the money is going?

A. It's an impossible task.

Q. Why?

A. There are a lot of banks.

Q. Thousands and thousands of banks, right?

A. I suppose, yes.

Q. How many transactions does NatPay process every day, ACH transactions?

A. What we process everyday, of course we're a payroll processing facilitator, so our volume is based on the time of week and month, et cetera. We peak at a million-and-a-half and we have a low of maybe four or 500,000.

Q. Okay. So on average then, would you

STEVEN PEREIRA

say a million transactions a day is fair?

MS. NEIDL: Objection to form.

THE WITNESS: I would say we probably do eight million a month, and you can average it out however you like; we're a monthly cycle.

BY MR. ROSATO:

Q. So eight million transactions a month?

A. Yes.

Q. One of the mechanics I'm trying to understand is this: You have an agreement -- you send your files to First Premier, right?

A. Um-huh, yes.

Q. Based on instructions that you're given by the payroll service company, by your clients, right?

MS. NEIDL: Objection to form.

THE WITNESS: That's sort of a simplistic view, but, yes, someone tells us what to do.

Q. Understood. What is it that then allows First Premier Bank to debit funds from -- what causes that transition. Strike that.

STEVEN PEREIRA

What I'm trying to understand is what sends the file to a Pioneer Bank, for example, who is on the opposite end of the transition to pull money out of their account?

A. Could you, like, maybe restate that question?

Q. We just discussed, you don't have a contractual relationship with Pioneer bank, right?

MS. NEIDL: Objection to form.

THE WITNESS: No, we do not.

Q. You don't have bank accounts at Pioneer Bank, right?

A. No, we do not.

Q. So in an ACH transaction, we're talking just the typical transaction, one where there is money in one bank account and it's being pulled out of that account and being sent to another account.

How is that effectuated by your sending instructions to First Premier?

A. It is such a complicated flowchart to understand. For me to make you understand, you would have to understand how settlement

STEVEN PEREIRA

occurs at banks, how they book transactions, why they book the transactions.

I really don't know how to answer that. A bank is a post office, and they just pass the letters along. But every letter -- someone has to be responsible for that letter, and that's us.

I just don't know how to answer that.

Q. Well, what I'm really getting at of what is in Paragraph 8 of Pereira 2, and I think that's what you are referring to is this process of settlement, you know, it's not an instantaneous transaction, right?

A. Correct.

Q. So can you break that down for me a little bit?

A. Let's simplify it by saying we're sending one item to First Premier, and it's a deposit to someone else's account.

Now, keep in mind, every single transaction, it's banking related, there is an equal debit and credit, so it's a zero.

We transmit it to First Premier, and

STEVEN PEREIRA

First Premier says this deposit has to go to Pioneer Bank. They just know it goes out. They could determine who it goes to if they had to, but it's unattainable, why would you want to know that.

So they know items are going out and it will result from a withdrawal from the First Premier Federal Reserve account.

Well, someone has to be responsible for that.

In a nutshell, that explains why we have a pass-through account. If a deposit goes to Pioneer from First Premier, the Federal Reserve Bank is saying First Premier, you lose a hundred; Pioneer, you gain a hundred, if that makes sense to you.

Well, First Premier isn't a charity, they want someone to have that money there for them, which is why they book to us.

These transactions are all moving around, and what you don't see is this floating above cloud where the Federal Reserve is saying you gain 100 and you lose 100; it's a whole nother can of worms about how clearing works.

STEVEN PEREIRA

But First Premier gets a hundred taken out of their account; like I said it's not a charity, they want someone to pay that 100, I have to pay it, if that makes sense.

Q. That does make sense. It's very helpful.

But one thing I want to zero in on is you said First Premier, they don't look at where the money is going; and frankly, don't care; is that fair?

MS. NEIDL: Objection to form.

THE WITNESS: The work that is typically -- when a bank processes works, checks or ACH or otherwise, it is in two classifications: On us or transit.

On us is the stuff that they don't have to send to the Fed, because I'm debiting my own account. And that happens a lot; especially in the big banks. The ACH transaction never goes anywhere, it's right there and they get to save all that money, because the Fed charges you per transaction.

BY MR. ROSATO:

STEVEN PEREIRA

Q. Are you talking internal transfers?
A. It's not really an internal transfer, that's a whole nother mechanism in a bank.
It stays an ACH, but the bank says -- remember, banks receive ACH files; Pioneer receives incoming data. Some of that data could actually be their own, if they actually originated transactions.
So there are two types of work for a bank; transit and on us. Transit goes out the door and they don't -- the Fed takes care of everything.
So you send this bulk of data to the Federal Reserve. The Federal Reserve says this many debits, this many credits, you owe us this much money or we're going to give you this much money, because of the net.
You typically send out more withdrawals than deposits, so First Premier gains a little.
But they don't care. If they had to settle individually with each endpoint bank, it would be impossible.

STEVEN PEREIRA

The Fed takes care of everything, because at the end of night they look at all the bank positions and they say, Pioneer, you owe First Premier $200 for that deposit, and the Fed takes care of everything.

Q. Okay. It may just be too much data for First Premier to go through by itself?

A. Well, it's pointless, it's just pointless, when you can do a clearinghouse situation, which is everyone settles at the end of the night.

And that's why banking to this day is still done by batch, which means the banks close at 5 or 6. At midnight, magically, all the magic happens.

Then they re-open and you have seen it before, you go into the bank account in the morning, it's not updated, then bing, bang, boom, there is your balance.

Banks are batched so that all this magic can happen over the layers on top.

Q. You say here that banks can reject ACH transactions. And when I say here, Pereira 2, Paragraph 8.

STEVEN PEREIRA

And then in Paragraph 9 you say they usually have "up to two days to reject an ACH entry."

Do you see that?

A. I do.

Q. Do you know why a bank might reject an ACH transaction?

A. Yes.

Q. Why?

A. Well, there are 96 current reasons.

They go all the way from insufficient funds to invalid account number. Not every transaction is initiated by the client. If the bank can't figure out who the money belongs to or who it should be withdrawn from, they return it; they are not responsible for it.

So there are a lot of different reasons. If they suspect fraud. Everything can happen.

Q. If the account that the money is trying to be debited from is frozen, is that a reason that a bank can reject an ACH transaction?

STEVEN PEREIRA

MS. NEIDL: Objection to form.

THE WITNESS: Well, I know exactly what the question really means. But, yes, a bank can freeze an account and return a transactions. Now, I don't want to add my opinion to that.

BY MR. ROSATO:

Q. I'm sure you'll have the opportunity to do so at some point today.

A. I'm going to so take advantage of it.

Q. I have no doubt.

So Paragraph 10 you say, "NatPay provides ACH transfer services to a nationwide clientele, including companies who calculate payroll and prepare payroll-related taxes."

Do you see that?

A. Um-huh.

Q. So when I read that, I understand that to mean NatPay provides these ACH transfer services to more than just companies who calculate and prepare payroll and payroll-related taxes.

Is that a correct reading of that

STEVEN PEREIRA

paragraph?

A. Yes, you're correct, we provide to a mix.

Q. Can you just explain that to me, what is that mix comprised of?

A. Again, the way the system is structured; we're a very small company, if we had to go out and sign up every dry cleaner through a marketing plan, our margins aren't that large. So we determined many years ago that the best way to do it is to find people that had all these ready clients all at once, and that's a payroll service provider.

It's just economies of scale, it's the only thing that makes dynamic sense.

So the bulk of our business comes via payroll processors, which is what we call them, payroll processors. But they're a customer in the extent that they're going to be responsible for a lot of real customers.

Which is why when we do payroll for any business we have a one-to-one contractual agreement. And there are a lot of the reasons for that. One of the greatest reasons is it's

STEVEN PEREIRA

the rule; that if you want to avoid getting in trouble with NACHA, you have a one-to-one agreement with every individual company you're processing payroll for.

Q. So you do have separate agreements with each of the customers of the payroll processing companies?

A. I -- well, it all depends, of course, if we're processing payroll.

I'm not going to lead the witness, I know where this is going.

But we have 285,000 customers, I probably have 285,000 applications on the system, contracts.

Q. What I'm trying to understand is, like -- let me just put an example out there.

A business has bills, right, that is beyond paying their employees and paying payroll taxes, right?

A. Um-huh.

Q. Do you provide ACH services for, you know, if they need to pay the, I don't know, the janitor at the building or they have to pay the rent?

STEVEN PEREIRA

A. Well, the janitor of the building could be an employee, so we would do it.

But the rent, no. We don't pay bills, we're not a payment service.

Q. So NatPay doesn't do any processing of any ACH transactions more broadly?

MS. NEIDL: Objection to form.

THE WITNESS: Again, we do a lot of work. I do know of a circumstance where customers go to our Doc Delivery platform and they can pay their furniture loan payment, Royal Furniture. They go in, they click, they go through various authorization terms and they hit enter and we will debit their account and credit Royal Furniture; I think that's the only one.

BY MR. ROSATO:

Q. That's the only circumstance of which you're aware?

MS. NEIDL: Objection to form.

THE WITNESS: That I'm aware of.

Now, we do our own invoices. Our customers can sign onto our platform and we

STEVEN PEREIRA

will debit them for their fees instead of them writing a check, so technically, there's two.

BY MR. ROSATO:

Q. Okay. So we've already talked a little bit about First Premier.

Are you aware of any other banks that NatPay has a banking relationship with?

MS. NEIDL: Objection to form.

THE WITNESS: Related to the operational functions of the company or the operations of the company as an entity?

Q. Both.

A. I -- we do not have a relationship with any other bank outside of First Premier for origination of ACH entries. That's it; First Premier is it.

If it's an ACH, it's going to them. We have arrangements. I mean, we have an operating account at the company, I don't know where it's at, I know it exists; probably some investments, some savings.

I know they exist. I've seen ghostly rumors, but I don't spend time worrying

STEVEN PEREIRA

about things that aren't my issue. I know they exist, but I don't know where they are.

Q. You don't know if they are at First Premier Bank or some other bank?

A. I know they are not at First Premier; we have one account at First Premier, simply this.

Q. There is just a single account at First Premier?

A. There is only a single account.

Q. But there are separate accounts related to, you know, funding the operations of the company?

A. I know our paycheck comes out of an account somewhere that isn't First Premier; so, yeah, the money.

Q. That is a completely separate financial institution?

A. Absolutely, yeah, First Premier does no operating stuff for us.

Q. Okay. And obviously, you don't have access to those accounts, right?

MS. NEIDL: Objection to form.

THE WITNESS: You mean the accounts

STEVEN PEREIRA

that the boss uses?

Q. Yeah. And just to be clear, the ones where you receive payroll from or operations are funded?

A. No, none; I have no interest in it.

Q. You did testify you have access to this First Premier account, right?

A. Tangentially, yeah. I mean, I can look at the account. We look at it all the time to make sure everything is looking great.

We can download -- we reconcile daily, or not daily, but we reconcile.

But actual interactions with the account, we have no authority.

Q. Do you know whether -- you talked about how your clients -- they can pay their fees via ACH, you know, through NatPay, right?

A. Our clients?

Q. Let me back up. Strike the question.

We talked about the payment -- NatPay receives a fee for each transaction; is that fair? Each ACH transaction that it's given?

STEVEN PEREIRA

A. Our income is transactionally based so, yes, we charge something for every transaction.

Q. Am I also correct that you testified that the clients can sign up, your customers can sign up to have the fees that are due paid via ACH; is that correct?

A. We have three methodologies for the clients to pay their invoicing and that is, indeed, one of them.

Q. And for clients who select that option, do those fees come into the account at First Premier?

A. Every ACH transaction that we generate passes through the account at First Premier, that's the law, but it passes immediately on to where it belongs.

Q. When you say to where it belongs, you mean -- are those fees -- so they pass through the First Premier account, but then I guess they'll go to some other account that is controlled by NatPay?

A. If I'm collecting fees, because it's an ACH transaction, even though I'm debiting a

STEVEN PEREIRA

client and crediting the NatPay income account or operating account; by definition, it has to pass through First Premier, because there has to be a home at the bank for it to go through.

So does it go through? You wouldn't be able to recognize the fact that these entries are going through our account because of the complexity in the way that we settle; but on a very technical basis, yeah, they zip right through.

Q. So they do pass through the First Premier account?

A. Absolutely, everything does.

Q. Would it also be included -- let's say you have a batch of ACH transactions, would those fees be included in one of those batches along with, you know, debits from the payroll service companies?

A. Absolutely. I mean, the demarcation in ACH work is not at the file level, it's at the batch level; that's the entity. And it's like a bunch of these things that make up the file.

But as far as anybody in the world

STEVEN PEREIRA

is concerned, the entity is the batch. So one batch doesn't relate to the other. There are all single items upon themselves.

So, yes, we send a batch of work, it has a lot of different stuff in it; commingling isn't the right word to use.

Q. I didn't use the word; apparently you have it on your mind though.

But that's just what I want to be clear on. So funds come into the First Premier account in big batches; is that fair?

A. What do you mean?

Q. There is not, like, individual items, you know, for Joe Schmo's Restaurant and 6,000 dry cleaners or whatever. There is just a batch; it's got one entry and it's, you know, that's the batch?

A. No, not necessarily.

Because of the complexity and the requirements, banks do something called unbalanced batches.

So when I send First Premier a deposit, a payroll, they don't want me to tell -- they automatically take the money from my

STEVEN PEREIRA

account. They don't let me -- again, it's incredibly complex to explain, but they don't -- they just say, you know what, I'm not giving you a choice; if you send me deposits, you're paying for it.

But they don't book that one-to-one. I send 60,000 batches a day, that's probably low, I don't get 60,000 entries on my bank account, that would be just insane. So they do -- I send a file of work that they settle. You know what, you had 500,000 in debits, 500,000 in credits, I see two entries on my bank statement that represent everything that's in that file in total.

Q. So the account statement just reflects a debit and a credit for an amount and they should match up, presumably?

A. Per file and settlement date, but then we're getting into the weeds, but yes, that's why the bank statements are incomprehensible.

Q. I want to go back quickly to Pereira 2, Paragraph 9. This two days to reject an ACH entry, is the bank that intends

STEVEN PEREIRA

to reject the entry, like, do you know if they are required to notify anybody before the two days is up that they're going to do that?

A. No, they're not required.

Q. Okay.

(Whereupon, Pereira Exhibit 3, First Premier Bank Letter Dated 2/3/98, Bates Stamped NP0013523 to '551, 29-Pages was marked for identification.)

BY MR. ROSATO:

Q. So there are quite a few documents kind of bundled together there. Let me know when you've had an opportunity to leaf through them.

I'm going to put in front you, because it's related, I'm going to mark it as Pereira 4.

(Whereupon, Pereira Exhibit 4, FDIC Letter Dated 5/19/98, Bates Stamped NP0013585 to '596, 12-Pages was marked for identification.)

BY MR. ROSATO:

Q. I just have a few specific questions. You don't have to read every word

STEVEN PEREIRA

of these.

A. Well, I've never seen a couple of these, so that's why I'm interested.

Q. Well, that's one of the my questions. If you're not familiar with them, then let me save it for tomorrow.

So do you recognize these documents?

A. I have seen this document, but...

Q. Pereira 3 you are referring to?

A. Yes. I've never seen or I cannot remember seeing Number 4.

I've looked at this document, it's from 1998, so it's not fresh in my memory, but I've seen it.

Q. Okay. You have no reason to doubt that this is an authentic copy of the document?

A. I have no reason to doubt that whatsoever.

Q. The first question, on the first page of Pereira 3 it references -- well, a couple of things.

Do you see the sentence that starts "As discussed" in the second paragraph?

A. On the first page?

STEVEN PEREIRA

Q. Yeah.

A. Yeah, I see it.

Q. And it references "ACH activity now being originated through First Bank."

Do you see that?

A. Um-huh, yes.

Q. Is that -- what is First Bank, to your knowledge?

A. In the Wayback Machine I think that that was a bank that we were converting from, but I can't speak to that of any -- I just can't.

Q. It's 24 years ago now, yeah, so I understand.

Do you know what the reference is to when First Premier says in that sentence that they "have committed $7 million in US Treasuries," do you know what that means?

A. No.

Q. What about this part here about -- at the start of that paragraph, it's discussing the "POSSIBILITY of having the FDIC's approval on allowing up to $100,000 coverage per company for funds being on deposit in NPC's ACH

STEVEN PEREIRA

settlement account"?

A. I know what this is in reference to; I don't remember any of this.

Q. Okay. I'm going to ask you more closer-in-time questions?

A. Okay. Well, I understand. I understand.

Q. So what is that in reference to?

A. My take on this is that there was some question about FDIC insurance and how it applied to these types of accounts.

My memory tells me that they made a determination, but I thought it was in 2007 crash, not this time, that every single individual contributor to that account is full FDIC coverage; not just a hundred thousand, but it's a hundred thousand for the dry cleaner, for the, et cetera. That's what I would say this is about.

Q. Were you involved in setting up this account?

A. In 1998, I was really a programer and not very savvy, and so my guess is that George or Jefferson did all of this heavy

STEVEN PEREIRA

lifting.

Q. I want to turn you to the page on Pereira 3 ending in 539.

A. Got it.

Q. Do you see there is a list -- it says "Attachment Four" at the top there, and it says, "Authorized representatives and/or company contact signatures and phone numbers, including non-banking hours."

Do you see that?

A. 539?

Q. Yes. It says that at the top, right?

A. Oh.

Q. Would you agree with me this is a listing of authorized representatives?

A. Signers, yes.

Q. Do you see your name is actually filled in there but then crossed out?

A. I do.

Q. Do you know, do you recall why that was?

A. I almost certainly do, because I came from an audit control background at the

STEVEN PEREIRA

bank, and I understand dual control; I convinced the principals it was a very bad idea for me to have any signing authority over the account. I insisted that it be removed.

Q. When you talk about dual control, what do you mean?

A. That's a -- again, that's a whole accounting principle and incentives.

Dual control means like, let's say the bank statement you received from the bank is dual control, so -- maybe that's a poor analogy.

If a customer is transacting with us, we always tell them that we send activity reports, that that go to someone else, not the person who is doing the transacting, that's dual control. You don't want the fox watching the henhouse.

And is the basic principle that banks are built upon. If someone is sending me a payroll, I want that report that documents that payroll to go to another person, potentially in another department, so they can say wait, Sally shouldn't have got $80,000.

STEVEN PEREIRA

If you are looking at your own work you can say, it's no big deal. Dual control.

Q. If you turn to the next page, I think consistent with what you just said, you were VP of systems and programming at this time?

A. Oh, okay.

Q. Is that consistent with your recollection?

A. I have no reason to believe that this is false.

Q. But that was what you said; I mean, you were doing programming mostly at the time this document was generated?

A. I thought it took a lot longer for me to be promoted to VP frankly, but apparently it was seven years.

Q. Good for you.

I want to turn back a few pages, it's the one ending in 5431.

A. Got it.

Q. Have you seen this document before?

A. I perused this document. It seems a little boiler plate, so, yeah.

STEVEN PEREIRA

Q. What is it?

A. It's an ACH agreement, which is not the agreement -- it's not -- there is a lot of agreements; this is one of them.

Q. Okay. So what is your understanding of what this ACH agreement -- let me back up.

Do you have an understanding of what this ACH agreement involves?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. What is it?

THE WITNESS: What is?

Q. What is the nature of the agreement?

MS. NEIDL: Objection to form.

THE WITNESS: It is simply outlying everybody's responsibilities. I think outlining the rules. You notice they state you have to obey you NACHA. They talk about just the rules of the road, making sure everything is clear.

BY MR. ROSATO:

Q. Meaning, First Premier is agreeing to those things?

A. They are as well. I mean, I'd have

STEVEN PEREIRA

to really peruse the document, but typically they'll say they'll make sure it happens and we make sure happens; I don't believe these agreements are completely one-sided.

Q. So by this agreement, is this First Premier saying we'll be your depository financial institution for these transactions?

MS. NEIDL: Objection to form.

THE WITNESS: I think it's implied, but I don't think this is an account opening documentation. This is how we are going to utilize the ACH facilities.

Q. Do you know if an account opening agreement exists for this account 5690?

A. Not a lawyer, but this looks to me that it just covers basically how we're going to follow the rules of the ACH product and what they'll do and what we have to do.

Q. You don't see an account opening agreement in here, do you?

A. No. I have seen it, but I don't see it here.

Q. So you're aware that one exists?

A. It would have to; I would assume it

STEVEN PEREIRA

would have to, yeah.
Q. If you turn to page ending in 526 in Pereira 3, is this the addendum you were referring to earlier?
A. I don't think this is the exact one. I know I have seen an addenda that deals with this.
Q. And actually you put Pereira 4 in front of you. This one is not signed, obviously, you see?
A. Um-huh.
Q. The signed one is actually on the last page of Pereira 4.
A. This one looks properly executed, yes.
Q. Whose signature is that, do you recognize it?
A. Which side?
Q. On the left side, the NatPay signature?
A. Jefferson Harkins.
Q. And he was the president, at least at this time?
A. He was and he still is.

STEVEN PEREIRA

Q. And this is just focusing on Pereira 4, we can look at the signed version. You see it says -- this relates to this account ending in 5690, right?

A. Um-huh, yes.

Q. It says "This account has been established for exclusive use of customers of National Payment Corporation as being kept separate from other accounts maintained by National Payment Corporation with the bank. The funds shall at no time be used directly or indirectly as security for a loan to National Payment Corporation by the bank, and shall be subject to no writ, charge, security interest, lien of any kind in favor of the bank."

Do you see that?

A. I do.

Q. A couple of questions.

One, this seems to suggest that there are other accounts maintained by NatPay with the bank. Do you see that in the first sentence that I read?

A. Could you read that again?

Q. Do you see where it says that the

STEVEN PEREIRA

funds are being "kept separate by other accounts maintained by National Payment Corporation with the bank"?

A. I'm just being really stupid, can you tell me approximately where in the page that is.

Q. It's in the second big paragraph.

A. The second big paragraph.

Q. It's the second sentence.

A. All right. What was the question?

Q. Are there other accounts maintained by NatPay at First Premier Bank?

A. No.

Q. There are not?

A. No, there are not.

Q. So what is this referring to then when it says --

MS. NEIDL: Objection to form.

THE WITNESS: I can't speculate. I mean, I wold think that what they're saying is if we opened up an operating account there, we promise not to use this money to put into an account.

I don't think it implies there is

STEVEN PEREIRA

another account; I think it says if there is another account. They only wrote one account number there.

BY MR. ROSATO:

Q. No, I understand that that's the account that they're talking about here where the funds are going to be kept separate, right?

A. I mean, if you want to speculate, it's very possible that a lot of people that do what we do have two accounts; we just don't, so this is what it is.

Q. So you know for certain there is not any other account at First Premier in NatPay's name?

A. To my recollection there is no other account at First Premier.

Q. Okay. And the second sentence -- I mean, there is an explicit agreement that the bank isn't going to use the funds in the account, you know, as security for a loan to NatPay or for any other purpose.

Do you see that?

MS. NEIDL: Objection to form.

THE WITNESS: I see that.

STEVEN PEREIRA

Q. Do you have any recollection of how this addendum came to be?

A. No.

Q. You don't know if it was requested by NatPay?

A. No, I don't remember.

Q. Do you recall if you reviewed it at the time?

A. I don't recall that.

Q. Sticking with Pereira 4, you said -- you see there is two letters before the -- or actually, three, excuse me, four. Sorry, there is four letters, it's a series of correspondence about the FDIC issue?

A. Yes.

Q. Have you ever seen those letters before?

A. You know, never say never, but I don't recall them.

Q. I want to point your attention to -- it's the letter that starts on the page with ending Bates 591.

A. Okay. Got it.

Q. And I'm focused on the big paragraph

STEVEN PEREIRA

in the middle there. You see it says, kind of in the middle of paragraph "You also indicate that both the bank and NPC will have detailed records maintained on a daily basis showing the ownership of the funds in the custodial account"?

A. Yes.

Q. Do you know if that's something that NatPay and First Premier do today?

MS. NEIDL: Objection to form.

THE WITNESS: I can't answer for the bank. And I think that it's taking it out of context. This is, like, 20-something years ago when we were, like, cutting edge. Everyone was sort of, like, making the rules up as they go.

I do know that the FDIC Insurance is dependent upon us being able to indicate to the FDIC who the proportionment or how the money is apportioned; I do know that's a requirement and it's of course something we can do. I can't speak to this. I was a programmer at the time. George had the finance backing and so did Jefferson, they

STEVEN PEREIRA

did the heavy lifting.

BY MR. ROSATO:

Q. I'm asking about now, right. I understand this is from 1998, but this is the same account. It is the one that -- this 5690 is the same account that NatPay uses today, correct?

A. It is, um-huh.

Q. So does NatPay have detailed records maintained on a daily basis maintaining ownership of the funds in the custodian account?

A. It's attainable, yes.

Q. It's attainable, but are there daily records created?

A. Well, they are created, we just don't do it. If we had to, we can, we reconcile this and know what's going on once a week; the payroll cycle is weekly, it's illogical to do it on a daily basis.

Q. And you said you don't know what records First Premier maintains?

A. I absolutely do not. As a matter of fact, they're very secretive.

STEVEN PEREIRA

Q. Why is that, to your understanding?

MS. NEIDL: Objection to form.

THE WITNESS: My best guess would be you don't want people to know exactly what you are looking at, because then they can't fake you out.

BY MR. ROSATO:

Q. And then you see at the bottom of that paragraph it says, "It is our understanding that NPC has an agreement with the bank that the funds in the account are not to be used or otherwise pledged by NPC except for the express purpose of settling payroll transactions after transmission of ACH file."

Do you see that?

A. Yes.

Q. Fair to say that's a reference to this addendum that we were just looking at?

MS. NEIDL: Objection to form.

THE WITNESS: I know what it says. I don't know if -- I mean, they're sort of different documents, right. I mean, I'm guessing. Someone just stapled this together, I don't know if they all belong

STEVEN PEREIRA

together; they could be different times.

BY MR. ROSATO:

Q. I can represent to you that they were produced this way by NatPay.

A. I don't -- what's the question?

Q. Well, let me just ask it a different way.

To your knowledge, does NatPay have a written agreement in force today with First Premier that First Premier is not to use or otherwise pledge the funds in account 5690?

A. I suspect we do. I think that I've seen the addendum on the latest contracts that we have, because you re-up all the time, depending on service changes. I have seen the addendum, so I'm saying yes, it's clearly understood.

I mean, we interact with the bank quite regularly. There is no way they can say, oh, no, we didn't know.

Q. Which contracts are you talking about, are those the client contracts?

A. No, the bank contract is what we're referencing, isn't it?

STEVEN PEREIRA

Q. Yes. Well, I just want to be clear about which ones you are referencing. You are talking about contracts at the bank?

A. I am.

Q. That was going to be my next question. Do you know if the account agreement was ever been updated since 1998 for 5690?

A. I think that there is a large number of addendums. Because every time there is a price change, any -- and the rules change, we have to re-execute. When NACHA changes a significant rule, you re-execute. Because they bank wants you to get it on paper that, yeah, you're going to follow the rule.

Q. And you've seen those documents?

A. I've certainly seen the addendums, yes.

Q. In terms of an addendum, you said there is an addendum that -- your understanding is that -- you've recently seen an addendum that looks like the one in Pereira 4?

A. Yes.

Q. Are you aware of whether NatPay shares the fact that the funds in 5690 can't be

STEVEN PEREIRA

used by First Premier in any way with its -- with NatPay's clients?

MS. NEIDL: Objection to form.

THE WITNESS: Can you put that again? Can you try that again?

Q. Does NatPay share that information with its clients regarding the restrictions on the use of the funds that go into account 5690?

A. I mean, it depends on what you consider share. I mean I have customers sophisticated enough to ask. We're trying to set an example so we tell people, if they ask. But this is -- it's sort of implied, everyone is comfortable that we know what we're doing.

So do I submit documents to our customers in a bulletin that say, custodial account; no, I don't, it's implied. They just know that we're really good at what we do and we don't miss things like this.

Q. But if people ask for that information, if customers ask for that information, you give them the information, right?

MS. NEIDL: Objection to form.

STEVEN PEREIRA

THE WITNESS: I mean, the only way I could give it to them is tell them. I'm not going to send them a copy of our contract.

Q. But you Dell them?

A. If someone asks me, yeah, of course I tell them, but it's a given.

Q. Sure. Do you know whether you are now listed as an authorized representative on this account 5690?

A. Am I a signer, absolutely not. I do not have any signing authority on this account.

Q. Yeah, I think we've been over the ground, but I just want to make sure there is not another document out there that would list you as an authorized representative?

A. No.

MS. NEIDL: Do you need a break?

MR. ROSATO: Do you want to break for lunch?

THE WITNESS: It's up to you.

MS. NEIDL: Whatever you want.

THE WITNESS: I know I'm going to need a short break in the near future.

STEVEN PEREIRA

MR. ROSATO: I have, like, one more set of questions to go through. Why don't we get through it and then we can break.

MS. NEIDL: Okay. Does that work for you?

MR. ROSATO: You can put those documents to the side.

THE WITNESS: Thank you.

MR. ROSATO: The court reporter is going to hand you what will be marked as Pereira 5.

(Whereupon, Pereira Exhibit 5, Account 5690 Statement Dated 8/30/19, Bates Stamped NP0094201 to '250, 50-Pages was marked for identification.)

BY MR. ROSATO:

Q. Do you recognize this document?

A. I know what it is, I've never seen it.

Q. You haven't seen this specific --

A. Uh-huh.

Q. What is the document?

A. It looks like a bank statement.

Q. You have access to the bank

STEVEN PEREIRA

statements I think you testified to earlier, right?

A. Yes, um-huh.

Q. I want to walk through a few things with you on this document.

If you turn to -- well, why don't we start with this. The first page, first entry it says, "Wire in - National Payment Corp" in the amount of $29.72. What is that?

MS. NEIDL: Objection to form.

Q. Do you understand what that line item is referring to?

A. Yeah, it's a wire. We're getting a deposit; someone sent us a wire.

Q. Just a single wire transaction for --

A. Um-huh.

Q. Do you know what that -- you know, that's a small dollar figure, you would agree, right?

A. Um-huh, yes.

Q. Would that be one that's related to NatPay's fees?

A. I can't speculate. There are a

STEVEN PEREIRA

million things that it could be for.

Q. But I think you testified earlier that NatPay's fees would pass through there account; is that right?

MS. NEIDL: Objection to form.

THE WITNESS: Nobody pays their fees with a wire.

Q. They pay them through ACH?

A. Yeah. Why would they pay $20.

Q. Okay. So why don't we move to -- let's move to the page ending in 203.

A. Yes.

Q. Do you see there is a wire in for approximately $4.3 million?

A. I see that, yes.

Q. That's a big dollar figure for a wire, right?

A. No, not really.

Q. Not really?

A. Uh-huh.

Q. Is there any way for me to tell on this, like, I see an ID number; ID 134904. What is this?

A. You know, I really can't tell you.

STEVEN PEREIRA

I don't know. That's not a number that we use. It probably references something in the internal wire system; those are not the numbers that we use.

Q. So that's internal to the bank you're saying?

A. Potentially, yes, um-huh.

Q. But you don't know for sure?

A. Uh-huh, no.

Q. What about on the same page, if you go down to, like, the middle of the page, there is one that says "Cross NPC," do you see that, and it's for $8,433.56. There is a couple of them. There is another one for $249,000 and change.

A. Yes.

Q. Do you know what those are referring to?

A. I know what they're -- at this time we had an account at Bancorp, and we actually did most of our wire receipt there. A cross is a transaction to move the money from that bank to the bank that it belonged to.

Q. So First Premier had a bank account

STEVEN PEREIRA

at Bancorp?
A. No, we did.
Q. Excuse me, NatPay had a bank account there?
A. Yeah, we cleared our wire customers through that account.
Q. What do you mean by that, you cleared your wire customers through that account?
A. We directed anybody that funded their payroll via wire through Bancorp. Our system was capable of doing that. We had an account with them; not a big one, but we transacted with them.
Q. But NatPay didn't do --
Did NatPay not do any ACH transactions through that Bancorp bank account?
A. No, we did ACH through them.
Q. You did?
A. Yes.
Q. And a bank account in --
A. Bancorp.
Q. -- NatPay's name?
A. Yes.

STEVEN PEREIRA

Q. So I'm trying to understand what you mean by cross. Like, well, not what you mean, but can you explain what that means? It says cross and it's for $249,000; it's a credit?

A. Our customers were told, if you want to fund your payroll with wire, you send it to Bancorp. Well, our customers who would use the wrong instructions and send the wire to First Premier, we would cross it over.

Q. Okay.

A. From one bank to the bank that required the funding, so it was a cross. It's an accounting term.

Q. And then if we look at -- there is a bunch of -- well, let me start with reversals. There is small amounts, but reversals of consolidated ACHs.

Do you know what those line items refer to?

A. Yes. They are a reversal of a transaction.

Q. Is that a reversal -- this is a credit to NatPay's account at First Premier, right?

STEVEN PEREIRA

A. Um-huh.
Q. So that's NatPay reversing the transaction?
A. Yes. Well, at the direction of a client.
Q. Well, that was going to be my next question: Like, under what circumstances would NatPay reverse a transaction?
A. An error in payroll, they gave the wrong amount to a client. They terminated the client; and in some states you have to cut a check immediately, but they already sent the direct deposit, so we perform a reversal.
Q. What about non-sufficient funds?
A. Those aren't reversals, those are just returned.
Q. So when you say return, what do you mean?
A. Oh, no, reversals don't -- that's not a NatPay-generated return. A reversal, we generate. It's a return by definition, but we generated that return; the other ones are all generally incoming.
Q. So if it's a non-sufficient fund,

STEVEN PEREIRA

it's just returned because there is not enough money in the account?

A. Right. We get hit with it, it's a debit.

Q. For the amount of whatever that ACH item is?

A. Well, it accumulates. They don't -- these hit individually, because it's easier to reconcile; the other ones come in one huge clump.

Q. How does that get resolved ultimately, to your knowledge?

MS. NEIDL: Objection to form.

Q. When you have an NSF, right?

A. Well, we get a lot of them, and we contact the client and say they have to make it good.

Q. And so put money in the bank account to make it --

A. Well, they tell us -- they give us direction on how to collect the money or they'll send us a wire.

Q. So they'll wire money in order to --

A. Yes, to cover.

STEVEN PEREIRA

Q. -- in order to cover?

So that happened let me think of it this way: You set up a file for payment of taxes to various taxing jurisdictions and you go to -- well, let me back up.

You want to debit it from the employer's account, right, and then on the other side of that you're setting up a credit that is going to go to the taxing jurisdiction.

Do I have that generally correct?

A. Yes.

Q. What is the sequence in which those transactions are set up, to your knowledge?

A. Can you tell me that again, you lost me.

Q. So there is a transaction, right. There is a debit from the client's account, from the employer's account, and there is a credit to the taxing jurisdiction's account.

What is the sequence of those two ACH items being set up?

A. The sequence; you mean the timing?

Q. Yes.

A. Well, we send out the debit, First

STEVEN PEREIRA

Premier credits my account. And then we send the tax payment, First Premier debits my account.

Q. And what if when the debit is sent out eventually you get an NSF, what is the next step?

A. It comes back and then we have to resolve it.

Q. So you go to the client and say hey, you know, we just paid this taxing jurisdiction, you've got to give us the money?

A. Typically, yes, um-huh.

Q. Okay. But your understanding is that, you know, NatPay is not responsible for paying the tax, like it's always the client, the employer, right?

A. Well, what we think and what in reality are two different things. I mean, if we made the payment, I paid it, there is no alternative. If something NSFs, we have to collect, you know, but in a lot of cases paying to the taxing jurisdiction is once the money goes in, it ain't coming out, so we have to collect on it.

STEVEN PEREIRA

Q. And you go to the employer, you know, with the client to collect the money?

A. We go to whomever we can to resolve it.

Q. It might be the payroll service company?

A. It could be.

Q. But it also could be the employer directly, the employer client?

A. Very rarely; they don't like us to do that.

Q. It's more often you go to the payroll service company?

A. Yes.

Q. And why don't we turn on this Pereira 5 to, I guess just the next page.

Do you see these settlement consolidated ACH?

A. I do.

Q. Is that what you were talking about earlier that that's how it's a big batch that will be reflected here and kind of in a big amount?

A. Right. Most of these entries except

STEVEN PEREIRA

wires are just vast accumulations.

Q. So would those accumulations include payroll?

A. You mean the settlement entry?

Q. Yes.

A. It's whatever is in the file; it could be anything.

Q. So in the file would that include payroll?

A. Yeah.

Q. Or it could include?

A. It certainly could.

Q. It doesn't always have to include, but these are things that it could include?

A. Most likely, yes.

Q. The payroll taxes?

A. Potentially.

Q. NatPay's fees?

A. It could be, um-huh.

Q. Anything else?

A. Correction entries. There is any number of things it could be.

Q. What do you mean by correction entry?

STEVEN PEREIRA

A. Well, you've seen a reversal, in some cases a correction entry could do down in a different way, it doesn't --

Q. It would come in batches?

A. Um-huh.

Q. Okay. So just moving forward a little bit, if you could go to the page ending in 214?

A. Got it.

Q. You see these -- the volume, the dollar amounts are significantly higher than the ones we just looked at, right?

A. Um-huh.

Q. Would that be potentially because maybe it's a pay day?

A. Yes.

Q. I don't know when this was, but it was August 28th of 2019. We can go look at a calendar, but I'm assuming on Fridays you would see your highest volume?

A. Well, all the numbers are inflated in this week because it looks like end of the month. 8/30 is the end of period Friday, so everybody pays end of month, I mean, end of

STEVEN PEREIRA

week, so the numbers could be inflated.
Q. Do you see there are two deposits on 8/28, small amounts?
A. Okay.
Q. I mean, there is no way of being able to tell what those are, but any idea why, you know, there would be these sort of -- it looks like a manual deposit of some kind?
A. It could be a bank error. It could be anything. I don't know.
Q. And then why don't you turn to the page ending in 236.
A. Okay.
Q. Also 237. So this is showing all the debits out of the account; is that fair?
A. Yes.
Q. Why don't you return to 243?
A. Got it.
Q. Do you see the fourth line item there; return, return settle, retire, $3.4 million?
A. Yes.
Q. Can you explain to me what your understanding is?

STEVEN PEREIRA

A. That's the settlement entry for our returns. So we received $24 million of returns for that day.

Q. Returns meaning what we were just talking about?

A. All kinds of reasons.

Q. It could be non-sufficient funds or something else?

A. Ban account numbers, debit blocks. We were in a high growth period, so we had a lot of debit blocks at this time.

Q. Yeah, what's a debit block?

A. Because fraud has become so prevalent, customers will say I don't allow debits to my account unless I specifically ask for the bank to raise them.

Q. Got it. Understood.

I just want to ask you about mechanics. If you go to the end, right?

A. Yes, sir.

Q. You see the balance goes 21 million on August 26th. And I'm on the page that the Bates number ends in 248.

And then it goes all the way up to a

STEVEN PEREIRA

billion dollars, and then back down the next day to 15.6 million.

A. I see that.

Q. So wide swings, right?

A. Yes.

Q. So just trying to understand that a little bit.

So do you think -- let me see if I understand this correctly: There are on -- up through August 29th, there is a bunch of debits I think probably being made to make payroll for that week; would that be fair?

A. Yes. We pre-fund, yes.

Q. And then the credits go out?

A. Right.

Q. So are the credits scheduled, like, before the money -- before the funds come in, like, officially clear, are the credits that are scheduled to go out, do those get scheduled before the money is actually cleared through the account?

MS. NEIDL: Objection to form.

THE WITNESS: Yes. Oh, sorry, Cyndi.

STEVEN PEREIRA

Our system is very sophisticated, so we don't -- the customer doesn't send us, here is the money I want you to take and then here is your payroll. Our system is sophisticated enough that they send the whole thing to us and then we determine the timing; every customer is a contractually different timing.

So yes, debits don't go out unless the credits are scheduled already.

BY MR. ROSATO:

Q. Let me see if I have that. I may have it reversed. When you say debits don't go out, you are talking about debits out of the First Premier account or debits from the --

A. We're debiting a client for funding.

Q. Yes.

A. If we've done that, we know when the credits -- the credits are already scheduled and they're ready to go.

Q. Before those funds are cleared?

A. Well, they come together, they have to be scheduled. They could be five days in, they could be two days, it's not relevant.

STEVEN PEREIRA

But if the debit goes out, the matching deposits are in our system, it has to be.

Q. What about the payroll taxes; I mean, are those -- do those follow the same type of schedule as, like, the payroll payments to the employees?

A. No.

Q. Okay. What's the schedule there?

MS. NEIDL: Objection to form.

THE WITNESS: Well, it is dependant upon the client in the agreement. Up until around this time, we were very -- we weren't very strict with our tax payments because, for various reasons, we never suspected that a bank would freeze all the money and take it.

So we were -- now the scheduling is much different. Back then, we understood that when someone is moving tax money, we were putting it in someone's account, we knew the money was there.

And so all of our systematic and risk mitigation did not ever assume that

STEVEN PEREIRA

would be the weak point, which is the money would be frozen and absconded.

BY MR. ROSATO:

Q. So what do you mean by absconded?

A. The money was in that account and the bank took it. I guess maybe it's a bad word or a wrong term, but the bank took that money. We never had that issue. In my 40 years I've never seen that happen where this kind of money was taken.

So our risk mitigation for taxes at the time was we were -- they had a compressed time schedule, we were very -- you fund it today, pay tomorrow. Because we always knew we paid that, we saw the money go into that account, we felt it very secure.

Q. I'm asking I think a little bit different. Do you understand whether payroll taxes, when you collect them, when NatPay collects payroll -- schedules ACHs for the purpose of collecting funds that are going to be paid to the various taxing jurisdictions, is the collection -- can the collection of the -- can the scheduling of the ACH that debits those

STEVEN PEREIRA

payroll tax monies, could there be a significant gap in time between the debiting and the paying out to the taxing jurisdictions?

MS. NEIDL: Objection to form.

THE WITNESS: Taxes don't follow the traditional payroll methodology; because remember, the first step is to collect taxes from a customer and concentrate them to the processor. Simply because all taxes aren't paid out at the same time, your business may own $20,000, but Thursday they have to pay IRS and Thursday they pay New York State or Friday, and so it's all different.

And the customer -- the endpoint employer does not want 14 tax withdrawals on their account; they want to see one amount. People collect in advance for quarterlies. So there is like a middle man, we collect the money, give it to the processor, they're the people that are responsible for collecting the money to distribute to tax payments. But that occurs in all kinds of whack-a-do

STEVEN PEREIRA

schedules.

So there is an extra guy. So they're not necessarily tied together like a payroll would be. We collect the money and give it to the processor. And then the processors send us and then we withdraw it from the processor and pay the taxing authority.

We very rarely take money -- well, never take money from an employer directly to the taxing agency. Number one, we don't know what their taxes are. They don't know what to do, it's a complex calculation.

BY MR. ROSATO:

Q. So you get the instruction for the taxes from the payroll company?

A. We get the instructions for what transactions to do from the payroll company. We, of course, don't do math, so we don't know if the taxing amounts are correct or incorrect.

But that's why they actually are in business, because that's an extremely complicated calculation.

Q. So you just mentioned something

STEVEN PEREIRA

else. You said you'll first schedule an ACH that pulls the money earmarked for the payment of payroll taxes to go to the payroll service company first; is that correct?

A. Yes.

Q. So it doesn't pass through NatPay's First Premier account?

A. It absolutely does pass through.

Q. It does. Okay. So let's just break that down a little bit.

So you schedule the ACH. NatPay pulls from the employer client's bank account. And does it pass through First Premier first and then to the payroll service company?

A. Again, if I send a transaction to anyone, it passes through First Premier without fail, it has to, that's the rules.

Q. Okay.

A. How the -- the number of steps between getting it from point A and point B for, like, the payroll processor from the employer, that can vary; but what doesn't vary is the money must come through my account.

Q. Understood. But then you may not

STEVEN PEREIRA

get an instruction for whatever those payroll taxes were collected for, you may not get an instruction from Southwestern Payroll, for example, to send the money off to a taxing jurisdiction until sometime later; is that fair?

A. Well, that's a poor example, because we never got instructions from Southwestern. But if you are talking about a processor that we do taxes for in general --

Q. Cloud Payroll, is that fair? Actually, I cut you off. I'm sorry, you can continue.

A. I'm old. You destroyed my train of thought.

Q. You said it was a poor example because you didn't do taxes for Southwestern Payroll?

A. Right. So you said specifically if Southwestern sent me instructions, they never did.

But in the general, if a payroll processor -- you know, I completely lost the original question.

STEVEN PEREIRA

(Whereupon, the last question was read back.)

THE WITNESS: That is absolutely correct.

BY MR. ROSATO:

Q. So during that time period you don't know what's going on in the payroll processor's account, right?

A. No. No.

Q. You don't know how the account is set up?

A. No, we don't care.

Q. Why don't you care?

A. Well, it's not really specific to us. Now, do we recommend, especially now that you make sure that, you know, you do your Ps and Qs, but, no, we don't care.

If the account is accepting transactions, that's it, that's fine.

Q. That's all you care about?

A. It would be impossible. I deposit two million transactions, I pay two million employees, I could never --

Q. You'd be buried in paperwork?

STEVEN PEREIRA

A. No, that's why I always refer to the chain of trust. It's an ecosystem, it only functions if all the parts are in sync.

MR. ROSATO: Why don't we break for lunch.

MS. NEIDL: Yeah.

VIDEOGRAPHER: This will conclude video number two in the deposition of Steven Pereira. We are off the record at 12:51 p.m., October 19, 2022.

(Whereupon, proceedings recessed for a lunch break and once again resumed.)

VIDEOGRAPHER: This is the beginning of video number three in the deposition of Steven Pereira. We are on the record at 1:38 p.m., October 19, 2022.

BY MR. ROSATO:

Q. Welcome back, Mr. Pereira.

A. Thank you.

Q. So I wanted to shift gears now to the specifics of this case. We talked about a lot of general stuff, but do you have an understanding of the circumstances under which Cloud Payroll and its subsidiaries became a

STEVEN PEREIRA

client of NatPay?
A. Yes.
Q. And what are they?
MS. NEIDL: Objection to form.
Q. Or what's your understanding, excuse me?
A. Wow, that's a good one. They didn't appear -- generally, they just came up as a new processor like everybody does. The only difference is with them, they were in transition. Their work was at another company, and so the early part of the transition is we just did the tax processing for Cloud Payroll, none of the payroll services, direct deposit of employees, we didn't do that.
Q. So, okay, let me ask you a little bit about that; you only did tax processing. Is that normal or is that typical for NatPay to have only tax processing done?
A. It was not. It is not typical. And we -- because of this, we don't do anymore. So, no, it wasn't typical.
Q. When you say it wasn't typical, I mean, how often at that time are you aware of

STEVEN PEREIRA

that ever having been done?

A. Just the taxes?

Q. Yes.

A. I think it was a first, actually.

Now, to preface that, when we get a conversion customer from another business, generally speaking they always move payroll first by definition and then the taxes, because it's a lot more complicated.

Because of where they were it didn't seem unreasonable, because we were promised the payroll, and we actually did do payroll for a couple of their, I don't know what the term is, subsidiaries.

Q. Okay. So -- but typically, it goes the other way, if you're going to onboard a new customer that has an existing provider, ACH services provider, they'll bring the payroll over first and then the payroll taxes?

A. Yes. And it used to be that it was always the case, because there is more scare with taxes because of various responsibilities and penalties, now they just come together, boom.

STEVEN PEREIRA

Q. So you said at the time. This is the only time that NatPay just permitted just taxes to come over?

MS. NEIDL: Objection to form.

THE WITNESS: As far as I know. There may be smaller ones and this one -- there could have been more and I haven't heard of them, this one obviously moved to the forefront of our collective consciousness.

Q. And since then, to your knowledge, NatPay hasn't allowed payroll tax processing to come over first?

A. No, because our paradigm shifted. It used to be the safest form of business, and now we don't look at it that way anymore.

Q. Why don't you explain to me why it's helpful to have the payroll tax and payroll processing come together?

A. It all depends on how you manage risk mitigation. So if you have a processor with 500 clients, we take a different approach than a bank does to risk. Banks look at risk as very isolated events. We look that this

STEVEN PEREIRA

client has 500 customers and their business is dependent upon me processing. So they're not going to risk their entire line of business, their whole company because one customer goes awry. And so we take a very holistic approach to risk mitigation for these clients. And virtually, they never mess with payroll, because when employees don't get paid, it's really ugly. So that is like -- we cherry-pick the best of the ACH business, which is payroll processing.

But we've always considered taxes extraordinarily safe because we put the money there and we put it there and so there is no question about it not being good, until this time.

Q. I guess I'm trying to understand the risk that you're talking about and why that's relevant to having the payroll tax processing and payroll processing all housed under one umbrella?

MS. NEIDL: Objection to form.

THE WITNESS: Because we're doing all of this very vital work for someone,

STEVEN PEREIRA

all the payroll, very essential they would go out of business in two days if the payrolls weren't made. The risk is such that it's diverse across a number of companies.

So if we do 500 payrolls, that's 500 funding items that we send to 500 different businesses. The odds of any single group of them going bad at one time are not existent, it just doesn't measure up, so we leverage the whole thing; the odds are we're not going to get 500 returns.

Then, you have to look at the fact that if we do get a return, the processor that is responsible for all of these accounts is going to be very cognizant of the fact that we say we can't process anymore work until you give us the money, that it could be, you know, a significant impact.

They're just not going to take that risk and let one person, one apple screw the whole barrel.

BY MR. ROSATO:

STEVEN PEREIRA

Q. I know you are trying to answer my question, but I'm not seeing the connection, so I need you to help me.

What about having the payroll -- what makes it riskier, let's put it this way: What makes it riskier from your perspective to have only payroll taxes be processed through NatPay and not also the payroll?

MS. NEIDL: Objection to form.

THE WITNESS: It used to be almost no risk. But now, because of this issue, we realize that nobody in the country's risk mitigation had any factoring in that there would be a bank intervening and taking the money. So we always thought that it would be the money is going to a taxing authority; if the debits were bad, generally speaking, you could potentially withdraw, take the money back, it's taxes, some places will allow that.

But now we look at it as a single point of failure. Before with payroll I have leverage across 500 different entities paying me $10 million. With taxes, I have

STEVEN PEREIRA

$10 million to one entity that obviously in the event of something untoward, all of it is gone, there is no leveraging. So what used to seem very safe is now very dangerous.

BY MR. ROSATO:

Q. The one entity that you're talking about, you are talking about, like, for example, the IRS?

A. No. The one entity is -- when I was paying all the taxes for Cloud Payroll, only one account was funding all of those transactions, not 500 accounts.

Q. That's what I'm trying to get at, okay. So is it the practice now that you don't allow one bank account to fund all of the taxing transactions?

A. No, that's impossible to not let that happen. What I mean is that we're just not going to do that.

Q. Not going to do what?

A. Just taxes.

Q. Again, I'm just trying to understand, how does that mitigate risk by not

STEVEN PEREIRA

just doing -- by doing more than just taxes?

MS. NEIDL: Objection to form.

THE WITNESS: I can't explain it any better than I have. It's part -- some part is psychological, it's some part is just averaging and leveraging.

By definition, in my 31 years at NatPay, this has never happened before. It's, like I said, it's caused everyone to re-evaluate.

We didn't think that it was going to be a risk or that it was very risky, which is why we allowed it to happen.

BY MR. ROSATO:

Q. Allowed what to happen?

A. Allowed a company to just do taxes and we believed the promise that the payroll would come.

MR. ROSATO: I'm going to put in front of you what are going to be marked as Pereira 6 and Pereira 7.

(Whereupon, Pereira Exhibit 6, McAuliffe E-mail Dated 10/30/17, Bates Stamped NP0002917 to '944, 28-Pages was

STEVEN PEREIRA

marked for identification.)

(Whereupon, Pereira Exhibit 7, McAuliffe E-mail Dated 10/31/17, Bates Stamped NP0002504 to '543, 40-Pages was marked for identification.)

BY MR. ROSATO:

Q. These will be very familiar to everybody here, I think. Give them a leaf through.

MS. NEIDL: Is 6 '917?

MR. ROSATO: Yes.

Q. So I know you're not on the e-mails, but do you recognize the attachments to them?

A. Yes, um-huh.

Q. You've seen them before?

A. Yes.

Q. And what are they, start with Pereira 6?

A. Well, this one, you know, although over here and there we're e-mailing back-and-forth, we're doing this, we're doing that; if we skip through to the actual guts of this thing, which I assume would be the actual attachments.

STEVEN PEREIRA

Q. Yes.

A. The first page is the authorization for payroll taxes, payroll service fees, et cetera.

Q. Okay. Let's start there then. You're looking at Bates ending in 2923?

A. I am.

Q. So you said this is federal/state tax liabilities or payroll service fees authorization agreement; is that right?

A. Yes.

Q. If you turn to the next page, this I guess Section 3, do you see it says "By signing this agreement initial on each page," quote it's the first sentence of this, "authorization is hereby granted by NatPay to process automatic credit and debit entries and correct inadvertent duplicate and or erroneous credits/debits information to the account specified in Section 2 of this agreement for the purpose of transferring funds for federal and/or state tax liabilities and/or payroll service fees."

Do you see that?

STEVEN PEREIRA

A. I do.

Q. So this agreement authorizes NatPay to withdraw funds from the bank account listed on Section 2, am I correct about that?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. It's not just any federal and state tax liabilities, it's also authorizing payment of the service fees, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Frankly, the rules require that if we're going to debit someone, we have to get authorization.

And we have -- taxes were a late entry into our capabilities, we didn't do them for many years, so we just did an addenda so we could specifically -- sometimes the accounts that fund tax payments are not -- they are never the account that fund the payroll.

So we require a separate authorization just to protect us so that if the client says, I didn't want that debit, who are you, so we show it to the bank and

STEVEN PEREIRA

everyone is happy.

BY MR. ROSATO:

Q. Just so to be clear then, all I want to know is -- and I just read you that sentence, is my understanding correct that it authorizes withdrawal of fees, service fees, or the federal and state tax liabilities from the account listed on Section 2?

A. Okay, yes.

Q. Yes, correct?

A. (Witness nods.)

Q. Okay. Do you see on Section 2, if you turn back to 2923, it lists a Pioneer Bank account ending in 0212?

A. I do.

Q. Do you also see there is a person named -- let me back up.

You have account type there, it just says checking or savings, right?

A. Yes.

Q. Am I correct that NatPay doesn't require any more specificity around this type of bank form?

MS. NEIDL: Objection to form.

STEVEN PEREIRA

THE WITNESS: The NACHA ACH network doesn't recognize different transactions, it's DDA or savings.

Q. Checking or savings, that's it?

A. Um-huh.

Q. Okay. Do you see a person named Deb Salsburg listed there?

A. Yes.

Q. Have you ever been in contact with that person?

A. I have not.

Q. Do you know of anyone at NatPay that may have been in contact with that person?

MS. NEIDL: Object to form.

THE WITNESS: I would hesitate to say that someone has actually contacted her. I've heard testimony from my people which would have and they said no, and so I have to trust them.

BY MR. ROSATO:

Q. And so this one says it's for Cloud Payroll LLC, do you see that?

MS. NEIDL: Object to form.

THE WITNESS: Yes.

STEVEN PEREIRA

Q. This agreement that we're looking at, do you see the company information, it's Cloud Payroll LLC is listed there?

A. Yes.

Q. There is also a tax identification number listed, do you see that?

A. Yes, um-huh.

Q. And you see, if we turn to 2925, there is I guess the IRS letter that confirms the tax identification number?

A. Yes, um-huh.

Q. That's part of the Know Your Customer?

A. Yes.

Q. Okay. And similarly, if we turn to 2926 and 27 we have voided checks. What's the purpose of having the voided checks?

A. We have to actually data input these numbers into our system. And if this -- these were -- this was a very tidy person who did this; normally, they're just chicken scratch, so this helps us make sure that we get the right account.

Q. Right. The account number and the

STEVEN PEREIRA

routing number at the bottom there --

A. It's clear here.

In the old days we would use this to verify that they had a checking account, but now anybody could print their own so it doesn't matter.

Q. Print their own what?

A. You can buy blank check stock and print whatever you want on it. When we first started the company this told us that they had a check for this account, which would be difficult if it wasn't their account.

Q. Okay. So I want to turn to -- do you see that there is a total number of clients listed as 1200 there?

A. I do.

Q. In the Section 1, the Processor Business Information?

A. I do.

Q. Does NatPay do anything to verify the information?

A. Well, inadvertently we do. If there is 1200 clients, we actually get 1200 applications; for payroll taxes, it's a

STEVEN PEREIRA

different animal, but they always overestimate because they think it gets them better prices.

Q. You don't have the client send in, you know, here is all 1200 contracts I have with these 1200 employers?

A. If someone is coming on board initially with 1200 clients, no, that would never happen.

Q. It's just -- that would, again, be a lot of paperwork and --

A. Yeah, it would be ridiculous.

Q. -- you wouldn't be able to get any business going, it would take quite a while, right?

A. Yes.

Q. Let's go to the second section there.

Do you know who Mike McAuliffe is?

A. I know of him of course by now.

Q. You don't remember ever speaking with him?

A. I hate to speak in definites; I really rarely speak to customers unless there is a huge ordeal. So I can't remember ever

STEVEN PEREIRA

having a conversation with anybody from Cloud Payroll.

Q. Like, a phone call?

A. I can't remember anything like that, uh-huh.

Q. What about e-mails?

A. Possibly, but if it was, it was about a problem.

Q. Okay. And similarly, Matt Schilling, did you ever speak with him?

A. Not that I can -- I can't remember ever speaking to Matt, but the first time I ever met him was Monday.

Q. Monday. You rarely, you said -- am I correct that you rarely intervened or speak with customer directly?

A. Many years ago that's all I did, so I've made sure that I have staff that does it, because it's kind of trying and I'm just, like, I've been there, done that, so -- and I have people that are really good at it, they come to me with a problem that they need help with or a resolution, but typically, no.

Q. So who usually deals with customers,

STEVEN PEREIRA

if you know?

A. Exclusively, Dawn Cafaro. If it's at that level, every customer service rep actually deals with customers on a daily basis; if they go to Dawn, they're big.

Q. If you turn to the next page 2932, do you remember we looked at that letter, the Know Your Customer letter, it was the first exhibit that we looked at today that you prepared?

A. What Drives NatPay Crazy?

Q. Yes. Yes.

A. I remember that like I wrote it.

Q. And we talked about how NatPay will ask for information about the principal of the company?

A. Yes.

Q. Is that what's intended here on this page 2932 of Pereira 6?

A. Yes.

Q. I think you testified in terms of ownership percentage that's listed here, that's not something that NatPay goes back and tries to verify, right?

STEVEN PEREIRA

A. No, it doesn't.
Q. What about the title of the person listed?
A. We don't verify that at all.
Q. You just take it at the person's word that they're giving you accurate information?
MS. NEIDL: Objection to form.
THE WITNESS: Our online system doesn't have a place to put the title.
Q. So I guess I want to understand, why do you ask for the information in the first place?
A. Well, our bank has said we need to start collecting it, but we're doing it as a presumptive strike when the rule ultimately comes down that the principal will have to have -- we'll have to get a driver's license or passport.
The rules get stricter every year, but they have been talking about this rule for five or ten years now and they keep pushing it back, because it's just impractical.
But we do it now just so -- we're

STEVEN PEREIRA

making a diligent effort to do this for our bank.

Q. And so in your view, this is information that you're gathering for the bank?

A. The bank wants to know someone associated with the company. We don't -- aren't required to provide a percentage or their title; we give them a name. What the bank does with it, I don't know, our bank is extraordinarily conservative they, may do a background check on every single name we gave them, but I don't know.

Q. You don't know what they do with the information?

A. I don't know. And it's a new requirement, I think three or four years old, but I could be wrong.

Q. Do you know whether NatPay has any requirements around the ownership structure of a payroll service company?

A. No.

Q. So it can be owned by another entity, for example?

A. Sure.

STEVEN PEREIRA

Q. What about processing payroll or payroll taxes or funds that are earmarked for those purposes by the payroll companies, like, through a single bank account on behalf of, like, multiple payroll companies?

MS. NEIDL: Objection to form.

THE WITNESS: What's your question?

Q. Is that something that NatPay allows?

MS. NEIDL: Objection to form.

THE WITNESS: Are you talking about the concentration of employer tax funds into a single account and then paying out of that account to the taxing agencies?

Q. No, for multiple payroll service bureaus. So not just -- so the employer clients of multiple payroll service bureaus all going into a single bank account?

A. It all depends on who's doing the taxes. You see, everyone refers to the other bureaus in this framework like Southwestern and Pro Data, et cetera. As far as the taxes are concerned, the service bureau is Southwestern itself -- we were -- our customer was Cloud

STEVEN PEREIRA

Payroll, and Cloud Payroll gave us all of these clients. The service bureau was sort of in the hierarchy, but it wasn't -- if it were there, it doesn't matter to us, because we're processing for Cloud Payroll.

Q. So let's get to that though. So Pereira 7, I'm sure you looked at that, right?

A. Yes.

Q. Aren't these separate contracts with Southwestern Payroll and Pro Data?

A. Yes.

Q. Wouldn't it be fair to say that you're processing transactions on behalf of those two entities as well, not just Cloud Payroll?

MS. NEIDL: Objection to form.

THE WITNESS: In the context of this situation, this was -- this account was opened up, if indeed it was, because they were going to do the payroll, and then they do become important. The payroll wouldn't have been Cloud Payroll, the payroll would have come to us under the auspices of Southwestern Payroll. But they told us

STEVEN PEREIRA

we're getting the payroll, so we probably have one of these for each of those subsidiaries of Cloud Payroll. I think Pro Data, we have one Southwestern, and Pay Medic or something like that, and there is another one that hangs out there.

BY MR. ROSATO:

Q. Checkmate or something like that?

A. Yeah. And again, sometimes we get the application because we weren't quite sure what the structure was going to be, so we would go ahead.

Southwestern was a little strange because we didn't actually concentrate the tax money from Southwestern's clients; Southwestern took care of that themselves, along with the payroll. The only people we debited to fund tax liabilities was Southwestern's tax escrow account. We didn't debit their individual employees. That's what memory serves. They did it themselves and we had nothing to do with the concentration of tax funds.

Q. So Southwestern Payroll --

A. Did it themselves.

STEVEN PEREIRA

Q. --debited from the employer clients themselves?

A. They put it in their account, and that's where it was withdrawn in order to move to Pioneer Bank.

Q. Is that, in your experience, in your over 30 years of experience is that typical, that process?

A. No, because Cloud Payroll wasn't typical, they were really quite a unique business model. But I can't specific definitively. We have an enormous pallet of different types. We have some payroll processors that are franchisees that do everything and then transmit everything to the home office, and the home office actually sends us the NACHA files.

We have people that are web-based.

I mean, there is no single model, we just make sure that it's all going to work.

Q. I want to understand. But this model, you said it was unique, right?

MS. NEIDL: Objection to form.

Q. That's what literally the word that

STEVEN PEREIRA

you used, it was a unique business model?

MS. NEIDL: Objection to form.

THE WITNESS: My recollection was Cloud Payroll was sort of a new sort of thing, he got a very unique and quite interesting business model.

Q. Can you explain your understanding of what that model was?

A. That he was doing the tax services but not the payrolls for these people, and he sort of owned a bit of them and they were sort of under his umbrella. To us, they were just the customer.

He just got Southwestern to say, okay, do our taxes for us. And that occurs a lot, because there is a lot of documentation that prior to us, Cloud Payroll used PTM software or it's a little confusing; MyPayrollHR, Cloud Payroll, they used PTM, which is basically Cloud Payroll themselves. That's a version of Cloud Payroll that does everything that Cloud Payroll does, they are a tax processor, period.

Q. PTM is?

STEVEN PEREIRA

A. PTM, Payroll Tax Management.
Q. Is that a piece of software?
A. No, that's an entity.
Q. So they actually provide payroll tax management services?
A. Right. Yes. And in many ways I've read multiple e-mails where they indicate that they're transitioning in some of the early documentation, because we've had people transition away from Cashet and the PTM model, they would have a different -- they might have been NACHA files, so we were familiar and had to educate ourselves on what they had to change system-wide.
But Cloud Payroll, as they migrated to MasterTax, that is an enormous undertaking, which is why every time they said we're going to get you the payroll, we're dealing with this, that was understandable, because we've seen the migrations take years.
Q. What is your understanding of what MasterTax is?
A. My understanding of MasterTax is it's quite an industry-dominant software

STEVEN PEREIRA

package that accepts payroll data feeds from a plethora of payroll software packages. It imports and calculates taxes. That's an extremely complicated because of all the taxing jurisdictions. We have a processor that just does Hollywood movie stars, because it's so complicated.

If you import it and it does everything and spits back out what's going to happen. And like I said, they're the 800-pound gorilla in the industry.

Q. Turning back to Pereira 6, if you could turn to 2933.

A. Got it.

Q. Do you see Section 8?

A. Yes.

Q. It says, "Authorized Account for ACH Transactions"?

A. Yes.

Q. What is that for? Strike that.

If you could explain to me, what does it mean authorize account for ACH transactions?

A. Well, I know what it means on first

STEVEN PEREIRA

blush. There is a lot of these kind of authorization forms; the names have changed, I'd have do see the dates, the nomenclature changes. But what it generally means is we're going to use some account for some reason that they need us to use and we want to have authorization.

But I'm not going to pin down exactly what kind of transactions it indicates, because it's a very broad ACH.

Q. It just says for ACH transactions, right?

A. Right.

Q. Do you see account number 1640, do you see it ends in 1640, from Pioneer Bank is listed there?

A. Yes.

Q. Have you ever spoken to Christine Batchelder?

A. No, I have not; not that I can recollect.

Q. Not via e-mail?

A. I don't remember ever talking to her or corresponding.

STEVEN PEREIRA

Q. If you turn to the next page, 2934, you see Section 9, "Authorized Account For ACH Fees"?
A. Yes.
Q. And so they selected Option 1. And then that's -- that allows withdrawal of fees from the account listed on Section 8, am I reading that right? Is that correct?
A. Was that a question, I didn't catch that?
Q. Would that be right, the account in Section 8, which is the one we just looked at is the one that the ACH fees would be taken from?
A. Yeah, I guess; I mean, sure.
Q. So down to Option 3 -- or, excuse me, Section 10 on 2934, you see the account number ending in 0212 is listed?
A. Yes.
Q. And again, just ask whether it's a checking or savings account, right?
A. Yes, um-huh.
Q. So you're not aware of any special requirements or conditions that NatPay puts on

STEVEN PEREIRA

payroll service companies with respect to how their bank accounts have to be set up?

MS. NEIDL: Objection to form.

THE WITNESS: We certainly recommend what they do, but there are banks that don't even understand what we're asking.

So we do recommend to clients and we've made them aware of the dangers of not being specific, but we don't have any requirements.

We require it to be a commercial account, that's all.

BY MR. ROSATO:

Q. Do you recommend, make that recommendation in writing?

A. No.

Q. It's just --

A. Discussed possibly. I mean, I'm not in on the discussions.

Q. Okay. And then I'll just turn quickly to Pereira 7.

I just want to turn to 2512 to start. You see this one, this process service agreement is for Southwestern Payroll Services

STEVEN PEREIRA

Inc?

A. Yes.

Q. You see that the tradename is listed as Cloud Payroll?

A. Yes.

Q. Is that something to your recollection that -- well, let me back up.

One other thing I just wanted to confirm with you: If you'd just go to -- give me one second, go to 2522, so you're listed as the NatPay manager who is signing on behalf of NatPay?

A. Yes.

Q. Do you see there is no signature here?

A. Yes.

Q. Do you know if a signed copy of this with your signature exists?

A. I would love to say we're truly diligent, I'm not sure that we fully execute all the agreements, we get their signature and we're happy.

Q. Okay. That's understandable.

So you would have reviewed this

STEVEN PEREIRA

package, right, like, your name is here; would you have reviewed this package before they signed?

MS. NEIDL: Objection to form.

THE WITNESS: No.

Q. You wouldn't have looked at this?

A. No.

Q. Okay. So you can put that to the side.

A. Both of these, 6 and 7?

Q. Yeah. Just so we're clear, you wouldn't have reviewed either of these documents?

A. No, I would not have.

Q. Do you know -- do you know if you did review these documents at the time that they were generated?

A. I can't say for certain. The likelihood is that I would have never looked at them. Keeping in mind that these customers don't drop out of the sky, there is probably a year's worth of discussion and negotiations, so my people know them and everybody knows them, so when they come, they underwrite them.

STEVEN PEREIRA

And most of these accounts come and go, I've never even heard of them.

Q. But your name is just on the starter kits as, like, the NatPay manager?

A. It makes the customers feel better.

Q. To have you know -- yeah.

A. Because we're agreeing to what we're saying we are agreeing to as well.

Q. I understand that. Okay.

All I wanted -- you just confirmed, if you haven't looked at them, then, you know, there is really not much point asking you too many questions about it today at least?

A. The legalese and contracts is mind-bending, so I do as little as possible.

Q. So let me just ask you about a couple of other names.

Have you ever spoken to Michael Mann?

A. I cannot remember having any interaction with him via e-mail or any form whatsoever.

Q. What about Darin Alred?

A. No, I can't remember any

STEVEN PEREIRA

conversation. But I don't -- during the whole lawsuit, I don't think I even interacted with him at all; he's the Southwestern owner or something.

Q. You haven't spoken with him?

A. Not that I can remember.

Q. And John Reinke?

A. I don't believe I've ever spoken with him or interacted with him via e-mail, but it's possible.

Q. So the Cloud Payroll and the other two entities of Southwestern and Pro Data, right, they're all now on-boarded to NatPay after these are signed, right?

MS. NEIDL: Objection to form.

Q. After the Pereira 6 and Pereira 7 that we just reviewed was signed?

A. What you showed me is the processor account was on-boarded. To me, the meat is the ones below it. And I don't know at that that they were on-boarded; I would probably say no, it takes a bit of time.

Q. Oh, and one other thing, actually. Back to Pereira 7 for one second. It's not

STEVEN PEREIRA

really an issue about, you know, whether you reviewed this or that, but I just wanted to ask you, if you could turn to 2515. Do you see in Section 10, the authorized account for tax payment transactions is in the account ending 0212?

A. Yes.

Q. And then, similarly, if you turn to 2534, and if you leaf through that one, it's the start of it, so on 2531, you'll see that this one is for Pro Data?

A. Okay.

Q. And then 2534 also lists the 0212?

A. Yes.

Q. So, you know, I think I've asked this question, but I just want to be clear, all three of these, you agree they all list as the bank account for tax payment transactions as the account ending in 0212?

A. You know, the numbers begin to blur, but I'll say okay, I don't disagree.

Q. Well, we can go back and look, but I'm representing to you. But in all three of those it's listed as Pioneer Bank account is

STEVEN PEREIRA

checking account ending in 0212?

A. Yes.

Q. So what I want to understand is, you have Cloud Payroll and Southwestern Payroll, and Pro Data; all of the tax payment transactions are authorized to go into a single account.

And my question is: Is that a typical setup from your experience?

MS. NEIDL: Objection to form.

THE WITNESS: The setup is very typical, because Cloud Payroll did the taxes. They did the taxes, they're the ones that have to facilitate and have the account.

It could be four different bureaus reported, but they did the taxes; we did not get taxing instructions from any of the other members of the Cloud Payroll umbrella.

Cloud Payroll, as far as taxes were concerned, they were our customer and they were the ones that sent us the instructions to do the taxes.

STEVEN PEREIRA

Q. But what I'm trying to understand, if that's the case, then why were three separate agreements required?

A. Because we were promised that they would do payroll, and the payroll would not be coming from Cloud Payroll, Cloud Payroll did taxes.

The payroll would have been coming from Southwestern, so they needed authorizations above those accounts, and those accounts would roll up to them.

So if a payroll bounced, I wouldn't call Cloud Payroll, they would have no idea, I would call Southwestern.

That's why we -- and he promised us those accounts.

Q. He being?

A. Apparently, from the e-mails I've read, every time we said, are we getting the payroll? Michael Mann would responded, it's coming, it's coming.

And actually, we did get a few. We did ProData's payroll, so that agreement was actually being functional. We received all the

STEVEN PEREIRA

client authorizations and account set-ups from all the Southwestern people, we just never received their payroll.

Q. Okay. So I'll move past the contracts here. Do you recall having any involvement in the sort of initial sort of setting up of Cloud Payroll and the subsidiaries in the NatPay system?

A. You know, everyone -- especially if we get an account that we think has potential, they kind of brag to me about it, look what we've done, but as far as operationally, I don't remember that at all; they just weren't that significant.

(Whereupon, Pereira Exhibit 8, Pereira E-mail Dated 11/3/17, Bates Stamped NP0096487, 1-Page was marked for identification.)

BY MR. ROSATO:

Q. I'm going to put in front of you what will be marked as Pereira Exhibit 8.

Do you recognize this e-mail?

A. No.

Q. Do you have any reason to doubt that

STEVEN PEREIRA

you sent it?
A. Oh no.
Q. And you see the date on it is November 3rd, 2017?
A. Yes.
Q. If you looked back at the Pereira 6 and 7, that was October 30th, 2017?
A. Okay.
Q. And so I just want to walk through what you're trying to convey here.
So you first say they transmitted today, just tax files.
Is that sort of confirming that there was an initial transmission of ACH files on that day?
MS. NEIDL: Objection to form.
THE WITNESS: I mean, if I had to guess, I'd say this is when they sent their initial files. This could have even been a test, because if they joined us at the end of October, yeah, they were pretty quick off the mark, a couple of days to actually get us a test files. There is nothing here to indicate that it really was a file.

STEVEN PEREIRA

BY MR. ROSATO:

Q. It was just a test file you think?

A. It could be. I'm not going to say that this was an actual file.

Q. And you -- I mean, according to this, you personally had a look at the files that they sent over?

A. Oh, I see the perspective. Yes, I probably was told that somebody sent us some test files and could I look at them. And I did, they had some bugs, I fixed them.

Q. So, yeah, these were -- I mean, was there related to sort of the programming issues that you talked about earlier?

A. Everybody has weird things in their file that we have to compensate for; it's one of the things that makes us a sort of good place to do this, we have a lot of flexibility and a lot of preferences. So they send us a file, we prefer that the effort to fix it be ours and not their's because we're a little better at it.

So if they send us a file and if it's something Dawn can't get to right away,

STEVEN PEREIRA

she sends me a file and asks, can you get this to work. Dawn has gotten much better at it. At this time, she wasn't that good at it, so I helped her out.

Q. Okay. So this is normal course type of work that you'll do on what a client is on?

A. Not anymore. I used to be quite -- we have a lot of experience now taking conversions on MasterTax. If she asked me to do it now, but she wouldn't ask me.

Q. But I just want to be clear, you say you did note here it was just tax files, right?

A. Right. She said this company -- and again, I know that it says Cloud Payroll, I probably paid as little attention to that as possible. I looked at a file. I knew their account number in the system, that's all I care about.

So she said, here is some test files. And so I'm telling her they're just tax, obviously, I didn't know they were going to be just a tax account, because I get all kinds. She said, this is what is wrong, I need this.

STEVEN PEREIRA

Q. So you were expecting to get more than tax files; is that fair?

A. I had no expectations. Dawn said here is some customer test files, would you look at them. I looked at them and I'm telling her, it's just tax. Because if they were supposed to be a payroll file and I didn't get it, then the customer would be upset when they tried to transmit and it didn't work.

So I'm acknowledging to her that it's only tax and not anything else.

But again, I'm looking at a set of files for a customer in a vacuum; I know nothing except this needs to work.

Q. I guess I'm just -- I just want to understand.

Do you think you're noting that they're just tax files, because that's not typically what you see?

A. Oh, I get all kinds of things, but I'm wanting Dawn to be made aware: If she's expecting me to fix payroll files, I didn't get them.

MR. ROSATO: Understood. Okay. You

STEVEN PEREIRA

can put that one to the side.

(Whereupon, Pereira Exhibit 9, Pereira E-mail Dated 11/6/17, Bates Stamped NP0105883 to '887, 5-Pages was marked for identification.)

BY MR. ROSATO:

Q. I'm handing you what will be marked as Pereira 9.

So I think you testified -- first of all, I mean, do you recognize these e-mails?

A. I do not.

Q. No reason to doubt that you received them?

A. No. I made typical Steve-type responses; but, yeah, no, I don't remember it.

Q. So a couple of questions.

First, I think you testified that you didn't recall interacting with Mike McAuliffe?

A. No, this is a big surprise to me.

Q. So I guess you did have some e-mail communications. According to this, at least, there was e-mail communication with him?

A. Well, there is no doubt.

STEVEN PEREIRA

Q. And who is Josh Newman?

A. He was the -- he was actually the guy that set these clients up. He was a supervisor. He doesn't work for us anymore.

Q. When did he leave?

A. I don't know, sometime after November 6, 2017.

Q. Okay. I want to point you to your e-mail, the Bates ends 884, it's on the second page.

Well, first Mike McAuliffe sends this e-mail. He says, I just uploaded a tax payment file for Cloud Payroll and I'm getting these warnings.

Do you see that?

A. I do.

Q. What are those warnings that he's referring to, that image there?

A. That is a very, very complicated technical issue; I can go into it if you'd like.

Q. I'm going to do so at my peril.

A. All right. The traditional file that we receive has multiple deposits and a

STEVEN PEREIRA

single withdrawal.

As you've seen through this voluminous number of on-boarding documents, they indicate to us the account, they give us a blank check of who will do the funding. We put that in our system.

One of the check and balances is if the customer sends us a payroll and the funding account doesn't match the funding account in the system, which was authorized, the system provides an alert just like this one that a debit doesn't have -- there isn't a debit in our master system for this particular account that matches the debit in that file.

Keeping in mind that payroll, multiple deposits, a single funding debit. Very simple, when we open the account we say, this is the account that they have authorized to debit, and our system automatically verifies that. If they don't match, it's flagged, because it's a potential issue.

Q. Okay.

A. This is a MasterTax file, which means it's a plethora of deposits and

STEVEN PEREIRA

withdrawals. Traditionally -- or we have to systematically, we cannot put in our system all the debit funding accounts that have been authorized for various means.

In tax case in particular, the taxes come under -- let's say we were doing payroll for Pro Data. We have all the taxes are being processed under the account for Cloud Payroll; they're not necessarily associated with Data Pro or Pro Data.

So we have all the authorizations on Pro Data, but they aren't in the system also flagged for Cloud Payroll.

When we get a MasterTax file, what they're supposed to do in advance is to tell the system this is a tax file, stop doing this, because it's not relevant anymore.

So I think I may have said, let's just stop doing this.

Q. So you said we have all the authorizations on Pro Data, but they aren't in the system also flagged for Cloud Payroll.

What do you mean by authorizations?

A. Even if we have -- this thing, I

STEVEN PEREIRA

authorize NatPay to debit and credit this account. So that's typically the funding account for payroll and taxes.

MasterTax doesn't process the tax payments under the account number of the recipient or the payor of the taxes. I literally have no idea how to explain this.

Q. Yeah, it's -- yeah, what I really want to get to is this -- maybe this is how we get there.

In your response you talk about unmatched funding accounts. You say you are not set up for ignoring unmatched funding accounts?

A. Right.

Q. I think that's what you're trying to explain, but what are the funding accounts that are unmatched?

A. Okay. When we receive a Cloud Payroll tax payment file --

Q. Yes.

A. -- or an impound file; ordinarily, the system is a company's worth of deposits, which are credits, and a single debit to fund.

STEVEN PEREIRA

That single debit, because they are signing an authorization, is put in our system because it's an extra safety check.

If the funding entry comes in and it doesn't match what's on file, then the system says we have a problem.

We have spaces for eight funding accounts. When we are concentrating cash for tax impounds, I'm assuming is the direction, we get a file, that's credit/debit, credit/debit, credit/debit ad nauseam, there could be two or 300 of them.

Those funding accounts, because of the nature, are not -- do not fall under this feature, because it's too many, I can't do it.

Q. It's too many accounts?

A. Too many accounts that -- Cloud Payroll doesn't have room for two or 300 accounts that are showing as pre-authorized, so the system can't do a match.

It's not anything saying oh, my God, it's just saying these debits are not in the master file for Cloud Payroll, and so they get this warning. I mean, it's a huge explanation

STEVEN PEREIRA

and the solution is, click, they just turn it off.

Q. Okay. They just -- meaning, Cloud Payroll can turn it off?

A. No, they have to ask us. And then we look to see that's indeed what the issue is, we don't just trust people.

So we look at them and it's like okay, this has happened to every Master client that we ever had, so we take this one account that's transacting -- this one account that transacts all the tax payments under Cloud Payroll, they don't do it under all the individuals, we do it under one; and we say for this one, ignore this warning.

Q. Do you know if Cloud Payroll was on MasterTax at this point?

A. I wasn't -- I couldn't say the files and everything were indicative of what I know to be MasterTax. Dawn, who is intimately familiar said it's MasterTax. And in most cases in a file of that format, there is no other guy, I mean, MasterTax is the guy.

But do I -- I don't know. Yeah,

STEVEN PEREIRA

sure I know.

Q. So it's your testimony that Cloud Payroll was on MasterTax as of November 6, 2017?

A. Everything that I've read says that was the case. This error is indicative of a customer that processes in the manner of MasterTax.

Q. Okay. So basically NatPay went on and turned off -- you turned off that security feature for Cloud Payroll?

A. Right. It was irrelevant for a MasterTax file. Someone should have already done it and they didn't think to do it in advance.

Q. And it's all because it's going through this account 0212, right?

MS. NEIDL: Objection to form.

THE WITNESS: Right. There are several methods for processing payroll software -- payroll service providers have two methods. What always tells us it's a MasterTax file, it's one account that does the taxes, which is in Cloud Payroll. They

STEVEN PEREIRA

had a processor account and a transaction account, two accounts.

If all the taxes come into one account, it's undoubtedly MasterTax. The other people that do the taxes through their own payroll software, they do it under each client ID. So if you are XYZ Dry Cleaner, I would get a batch for XYZ Dry Cleaner with the taxes individually.

BY MR. ROSATO:

Q. The other people, you mean like the other kind of payroll processing companies?

A. Right. There are two methods. A lot of people do MasterTax, and a lot of people do it themselves through their own software.

All the software can do it, it's just not pretty.

Q. In that latter example that you're talking about where it's individually --

A. Um-huh.

Q. -- so the funds are pulled from each individual employer client's bank accounts?

A. It's pulled for the initial funding of the processor. And then every debit to pay

STEVEN PEREIRA

those taxes is drawn from the same processor account; there is no alternative.

And because it's one additional account, for every one of this processor's clients, it's paying taxes by -- under their own batch, our system automatically adds that pre-approved account to their Master matrix. So you'll see, if you look under this account, they all have the same account number that's pre-approved, so the match works.

Q. If you could -- why don't you, for one second here, turn to -- it ends in 886?

A. I'm looking at page 886?

Q. Yeah, it ends in 886.

A. Okay.

Q. It's an e-mail from Mike; it's a continuation of an e-mail from Mike McAuliffe, and he's talking about some proprietary platform here.

Do you know what he might be -- might have been referring to there?

A. In retrospect, I do now. At this point, I have no idea, but I believe MyPayrollHR had a proprietary system that they

STEVEN PEREIRA

purchased and were utilizing for their clients.
Q. Okay. And that would be the MasterTax?
A. No, this would be payroll.
Q. That would be payroll only?
A. Right.
Q. I see. Do you recognize Millennium?
A. I do.
Q. What is that?
A. It's another -- it's quite a large software platform for people processing as payroll service providers.
Q. And SaaS, that's an acronym for software as a service as I understand it; is that also --
A. SaaS HR is really what he should have said, it's an actual platform.
Q. Got it. And Evolution, is that similar?
A. Yeah, I don't think they exist anymore, I think they have been bought, but those are three very popular platforms for pay processing payroll. Just as a payroll processor, I mean, a dry cleaner, this stuff is

STEVEN PEREIRA
tens of thousands of dollars, you don't do it by yourself.
MR. ROSATO: Okay. You can put that one to the side.
(Whereupon, Pereira Exhibit 10, McAuliffe E-mail Dated 11/7/17, Bates Stamped NP0008211 to '213, 3-Pages was marked for identification.)
BY MR. ROSATO:
Q. The court reporter will put in front of you what will be marked Pereira Exhibit 10.
Do you recognize this e-mail?
A. I do not.
Q. No reason to doubt that you received it?
A. None whatsoever.
Q. I'm just going to ask a straightforward question. Can you explain to me what is being conveyed in this e-mail, to your understanding?
A. Apparently, this e-mail was precipitated by this notice which is saying one of your customers bounced, okay.
Q. Yeah.

STEVEN PEREIRA

A. So we reach out to them and we say, okay, we need to resolve this.

He's responding and saying, you know what, in all the cases of NSFs for our clients, I'm telling you just charge me back for them. They're taking full responsibility for the NSFs.

Q. Okay. And is this a payroll tax ACH?

A. I don't see a batch description, so I can't tell you.

Q. But at this time you wouldn't have been receiving anything other than tax files from Cloud Payroll, correct?

A. No, we received impound files as well. We concentrated the cash as the first step and then we paid the taxes as a second step.

Q. What do you mean by impound files, sorry?

A. We collected the money and put it into their account waiting for them to pay the taxes; so it's a two-step process.

So the first step -- this is

STEVEN PEREIRA

undoubtedly us withdrawing money from one of the clients and giving it to Cloud and it bounced. And so we reach out and tell Cloud we're going to take our money back if you don't fix it, and so he's responding and saying, you know what, let's go ahead and take this process -- because this is saying I want a wire. And so he said just take it from our account and we're like, okay, we'll do that.

Q. So is that from the account 0212?

A. I don't know if he indicated.

He's saying -- it sounds like they got this notice and he thought he had already taken care of the fact that every return would be drafted and resolved in a particular manner, and it looks like it wasn't.

And he wrote me probably because Dawn is out and she puts herself on that, like, I'm not here, bother Steve thing.

And it was sort of forwarded from return -- I mean, this is not very complicated. He just is affirming, please make sure that you guys understand that every return from one of my clients, I am going to pay for it; that made

STEVEN PEREIRA

them a very good customer.

Q. And I'm just -- all I'm trying to understand is -- yeah, just keep that in front of you, I've got a couple of other questions.

You don't know what account he's referring to here?

A. No.

Q. It says draft R account?

A. Nope.

Q. I mean, but we just looked at the agreements. I mean, they just agreed to do taxes, correct, at this time?

MS. NEIDL: Objection to form.

THE WITNESS: I don't understand -- are you telling me that because he doesn't say specifically what account?

Q. Is it fair to say that the account that he's referring to is 0212?

MS. NEIDL: Objection to form.

Q. At Pioneer Bank?

MS. NEIDL: Objection to form.

THE WITNESS: I mean, I don't if I can -- I don't know if they had another account in the system, I hadn't looked at

STEVEN PEREIRA

that. They authorized that account, but they could have thrown in a funding account.

My recollection is whatever account is in their system under our bank one, we have eight of them, would be the account that he indicates.

Because I really have so little -- he's asking me to find out why we didn't do what he wanted. I would have forwarded this to someone and said do what Mike wanted.

BY MR. ROSATO:

Q. Understood. Can you return to the return wire form?

A. I can.

Q. You see it says make wire out to beneficiary in parenthesis there and it says, National Payment Corporation?

A. Yes.

Q. What is American Momentum Bank?

A. That was a small bank for a little while we tried to allow to do the wires, they were a local bank and they really, really

STEVEN PEREIRA

wanted our business; and they were horrible, so it didn't last.

Q. Okay. So NatPay had bank accounts at American Momentum Bank?

A. You know, now I remember. We did. It was American Momentum, they were begging us for our business. And we said, okay, let's try wires, so all the wires would go to that bank, and we crossed them to where they needed to be.

Q. Do you know if NatPay still has any bank accounts there?

A. Oh, absolutely not.

Q. So this American Momentum Bank, is that -- you talk about Bancorp Bank, is that in the same -- similar role, this crossing?

A. Yes, exactly the same.

And we didn't transact -- again, memory, you know, I believe we only used them for incoming wires. Because we're very cautious. If someone wants my business, they have to prove themselves.

So my recollection is we said we'll give you wires. So every customer that was funding a problem, the wire would go here, and

STEVEN PEREIRA

then once a night we would cross it back to the bank that needed the money.

And if this was -- if this was paying a tax payment that went through First Premier, then the money would be crossed to First Premier.

Q. Okay. I understand.

A. But we didn't wire it back-and-forth, because we don't need it, we don't want to pay the expense.

MR. ROSATO: You can put that one to the side.

THE WITNESS: Okay.

MR. ROSATO: We're going to do one more from this.

(Whereupon, Pereira Exhibit 11, McAuliffe E-mail Dated 11/7/17, Bates Stamped NP0105843 to '846, 4-Pages was marked for identification.)

BY MR. ROSATO:

Q. I'm going to hand you what will be marked as Pereira 11.

Do you recognize these e-mails?

A. I do not. But boy, do I have egg on

STEVEN PEREIRA

my face. I recognize what I'm doing, but -- you know, my clients, they know I love each and every one of them, I just don't know who they are.

Q. So this kind of gets to what I was just asking you about. What account were they asking to have drafted? This is a continuation of the e-mail chain we just looked at, right?

A. Okay.

Q. Do you see on the first page here Michael McAuliffe says, "Thanks, Steve. For Cloud Payroll, please draft the account ending in 0212"?

A. Okay.

Q. So does that refresh your recollection that maybe that was the 0212 was the account that they asked to be drafted for wires or for NSFs?

MS. NEIDL: Objection to form.

THE WITNESS: It doesn't refresh my recollection, but I can see that's obviously the point.

Q. So my question is: We're talking about tax -- that's the account that they

STEVEN PEREIRA

authorized -- that Cloud Payroll said put the tax funds -- or strike that.

You recall that we looked at the three starter kits?

A. I recall.

Q. They all had the 0212 as the account for payments of payroll taxes to be routed to; is that correct?

A. Yes.

Q. Is it typical for a payroll processor to authorize drafting of that account to cover NSFs?

MS. NEIDL: Objection to form.

THE WITNESS: Okay. Well, the NSF was a customer that was supposed to be funding the tax account.

Q. Right.

A. So I gave him the money and his customer bounced. He's saying, take the money back, we won't pay the taxes unless he sends us a wire.

So he is telling me take your money back, the customer isn't good for it.

Q. But aren't you drafting against --

STEVEN PEREIRA

wouldn't you be drafting against 0212 to get the money back?

A. Which is where I put the money. The money went in there it first; the money wasn't funded, so this is saying, take it back.

Q. Right. But there is still the non-sufficient funds from the employer's account, correct?

A. Probably, yes.

Q. And NatPay credited the account that amount of money, right?

A. Yes.

Q. NatPay then, when there was non-sufficient funds, Cloud Payroll then says debit the 0212 account?

A. Right.

Q. And we'll deal with the consequences?

A. In most cases the payroll processor doesn't want us to call the client and say, give us the money; a lot of them don't know I'm here.

So what Cloud Payroll undoubtedly did is they contacted this customer. And I saw

STEVEN PEREIRA

countless e-mails that said, we're waiting for a wire. He called customer service and let us know. He contacted the client and said you've got to wire us the money, you bounced.

Q. That's fair. What I'm trying to understand is -- if you look back at the wire on Pereira 10?

A. Yes.

Q. This is a request for a wire, right?

A. It's a notice, yes.

Q. And it's for $5,800 around?

A. It is, um-huh.

Q. My question to you is: Where did that $5,800 coming from in account 0212 to credit back to your account?

MS. NEIDL: Objection to form.

THE WITNESS: I don't understand that at all.

Q. Whose money is that, that's what I'm trying to understand.

There was non-sufficient funds in the employer's client account, correct?

A. Yes.

Q. And Cloud Payroll says, just draft

STEVEN PEREIRA

off of 0212 the amount. What is that $5,800; whose funds are those?

A. They are mine.

Q. They are yours?

A. They are now. I gave Cloud Payroll $5,800 and the funding entered was no good, I want my money back.

Q. So the funds before that though, they were in account 5690 at First Premier, right? The $5,800 came from the First Premier account?

A. It was debited from my bank account to pay Cloud Payroll.

Q. Correct, yes.

A. Everything flows through me.

Q. So what is that -- who -- when that money went from the First Premier Bank account to account 0212, whose money was it?

A. Mine.

Q. But it wasn't the -- wait a minute.

I thought we had been discussing that that was all a custodial account, none of the money in it is yours.

A. I'm using a euphemism; it's money

STEVEN PEREIRA

that I'm steward of.

Q. Okay. But whose money is it though, whose money is it?

A. At what point?

Q. I mean, it's supposed to be tied to -- it's obviously not the employer client's right, because they didn't have the money in their account, so whose money is it?

A. Well, I mean...

MS. NEIDL: Objection to form.

THE WITNESS: The whole basis of the loss and why we're suing is because I -- the system is an ecosystem of trust. So I trusted that the money was good, and I sent it to Cloud Payroll.

Just like if you order a chair; then the chair is broken, you send it back. So I asked for the money and credited myself; and almost probably the same day, I debited myself. Because, remember, every transaction has to -- the offset to every entry is me.

And again, so we don't get crossed swords, it's a euphemism. I call "me"

STEVEN PEREIRA

NatPay/First Premier. It went into my account, and I said okay, I collected it and now I'm giving it to you. Well, the chain broke, so everything goes backwards.

I took my money back from Cloud Payroll, because their customer bounced. Undoubtedly, they collected a wire, which is why they said, give it back.

The client could have wired me directly to reimburse me, but Cloud Payroll wanted all the control. They didn't want the customers wiring me. I would almost guarantee that this five-thousand-some-odd dollars, there is a wire at Cloud Payroll's 212 account for this bounce.

BY MR. ROSATO:

Q. Right. But all I want to just be clear about is when NatPay initially credited account 0212 with the $5,800; that was not the employer client's money, correct?

A. I just don't know how to answer that.

Q. It was not funds that came from the employer's bank account; is that correct?

STEVEN PEREIRA

A. It was, until it wasn't.

Q. All right. Now, it either was or it wasn't.

So you credited -- there was money sitting in the First Premier Bank account, right? Before you tried to debit the employer client's bank account --

A. Let me give you a simple analogy.

You deposit -- someone writes you a check and you put it in your bank account, it appears as a deposit.

But if it bounces, and Pioneer should know quite well what that does to you, then the money comes back and it's deducted from your account.

It's yours until it isn't.

It's yours until the final -- the endpoint says it's no good, take it back.

Q. Right. But what I'm trying to understand is so -- I'll give you a second.

We're not talking about a check here necessarily, okay. I mean, we're talking about two separate items, ACH items, okay.

There is one that's crediting the

STEVEN PEREIRA

bank account at Pioneer Bank, 0212, right. What were the funds used to credit that account?

MS. NEIDL: Objection to form.

THE WITNESS: They were National Payment funds.

Q. Okay. They weren't the employer client funds that had the non-sufficient funds in their account?

A. Well, again, they're tied together. It's obvious that I was funded by this account and the money was no good, so that's why we reconcile the account.

I -- they -- I literally cannot explain this to you.

Q. All I want to just confirm is that those aren't the employer client funds, the ones that were first credited into account 0212?

A. They were given credit for it because when they went to Cloud Payroll, they said oh, XYZ Dry Cleaner just give me money.

In an esoteric fashion, they are assigned to that client. But as soon as --

STEVEN PEREIRA

they are assigned to the client.

Q. But there are specific dollars in a bank account at First Premier; I'm talking about the ACH items, right. There is dollars in the bank account.

The $5,800 that was first credited to account 0212 you just said is NatPay funds, right?

A. Yes.

MR. ROSATO: Okay. Thank you. You want to take a little break?

MS. NEIDL: Okay.

VIDEOGRAPHER: This will conclude video number three in the deposition of Steven Pereira. We are off the record at 2:57 p.m., October 19, 2022.

(Whereupon, proceedings recessed for a short break and once again resumed.)

VIDEOGRAPHER: This is the beginning of video number four in the deposition of Steven Pereira. We are on the record at 3:08 p.m., October 19, 2022.

BY MR. ROSATO:

Q. Okay. All right. So I want to fast

STEVEN PEREIRA

forward a little bit.

Do you recall any issues that might have arisen during the course of the relationship between NatPay and Cloud Payroll?

A. I know of them, because I've heard about them, you know, in retrospect. But at the time, nothing that I can recall was brought to my attention, nothing was significant.

Q. What about anything with respect to, like, the size of the tax files that Cloud Payroll was sending?

A. No, I don't think I -- I can't remember that being brought to my attention; it may have, it happens occasionally.

Q. And the other thing I think we talked about a little bit is this representation that had been made that payroll processing would migrate over to NatPay, but it never did.

Do you recall that?

A. It did for some; it didn't do it for others.

Q. For Southwestern Payroll, for example?

STEVEN PEREIRA

A. It did not happen. We opened all of their accounts, which gave us hope, but it didn't happen.

(Whereupon, Pereira Exhibit 12, Cafaro E-mail Dated 4/4/18, Bates Stamped NP009880 to '881, 2-Pages was marked for identification.)

BY MR. ROSATO:

Q. I'll put in front you have what we have marked as Pereira 12.

Do you recognize this e-mail?

A. I recall it, but I don't.

Q. No reason to doubt that you received this e-mail at the time?

A. No, of course not.

Q. What is the debit dispute that's being referred to in this e-mail, if you know?

A. This happens when a client goes to their bank and says, I don't agree to this debit. That's if they do it within 48 hours, they're allowed to return it.

Q. Okay. So this Hibrid Solutions client I guess disputed a debit from its account is that -- accurate?

STEVEN PEREIRA

A. That's what it appears, um-huh.

Q. Dawn asked you, can I send this to First Premier, is that opening up a can of worms?

Why would that -- I mean, if you know, why do you think that would open up a can of worms?

A. I don't know what she was referring to, but I know Dawn, and I know that you're very careful the way you approach banks, they're just skittish. And so I don't know why she would have thought it was a problem, we had the authorization, we sent it to them. I'm sure we were able to deny the dispute, but I have no idea why she would say that, but Dawn is kind of neurotic.

Q. Fair enough. If you can -- this authorization to debit that's attached, am I correct that's a Cloud Payroll contract?

A. I don't think it's a contract, I think it's authorization.

Q. Okay. Yeah. So it's authorization, but it's a Cloud Payroll that they get from their client?

STEVEN PEREIRA

A. Right. When you process taxes the way they did, they collect the authorizations, because they also undoubtedly had affidavits that allowed them to pay the taxes; you can't just log into the IRS unless you have an affidavit, and they were very good about getting them to us.

Q. Is that something NatPay requires these debit authorizations?

A. We collect them ourselves, except in situations like when it's doing taxes.

Q. And why is that?

A. It's -- again, it's a really hard concept to explain. I'm at a loss on how to explain that. And I had an analogy, I did.

Q. You've had a couple of good ones today.

A. Thank you. I'm blank.

But, no, we weren't required to, because these people were not accountholders.

(Whereupon, Pereira Exhibit 13, Hagen E-mail Dated 9/6/18, Bates Stamped NP0102771 to '774, 4-Pages was marked for identification.)

STEVEN PEREIRA

BY MR. ROSATO:

Q. I'm going to hand you what will be marked as Pereira 13.

So you're not on the original e-mails, but you're copied at the top of this chain.

Do you see that?

A. I do.

Q. No reason to doubt that you received these e-mails?

A. Um-huh. Oh, no, not at all.

Q. If you go to the first one with the Bates ending in 773, Dawn Cafaro sends an e-mail to Mike McAuliffe to inform him that NatPay received extremely large files for next day, including one for over $5 million.

Do you see that?

A. Um-huh, yeah.

Q. And you see she says the NatPay limit is $1 million for the next day.

Is that still NatPay's policy?

A. It depends. Because the process is -- the $1 million limit is someone doing their own payroll, single point of failure; one debit

STEVEN PEREIRA

for a million dollars.

For these files, let's say we were collecting from 800 of Southwestern's or Cloud Payroll's customers, that could easily exceed $5 million, because they paid a lot of people and paid a lot of taxes.

So you can't make it an arbitrary number. It was a large file $5 million, but it could have been 500,000 entries, and that's all factored in.

We care about the global risk. If it's 5,000 clients that contribute to this $5 million, the risk is minor, because what are the chances that they're all in a club and they are going to return everything altogether; it might be one or two.

Q. But in this case, and just let me note this is September 6, 2018, this e-mail, so this is like almost a year after Cloud Payroll had been brought on --

A. Um-huh.

Q. -- wouldn't all of these funds be coming from or be debiting from a single account at Pioneer Bank?

STEVEN PEREIRA

A. No.
Q. So explain that to me; this is not referring to the tax processing?
A. It is referring to the tax processing, but she doesn't clearly indicate which direction the money is going, because remember, we collected money for them.
Q. So I understand that, but we're talking about specifically about next day processing --
A. Right.
Q. -- why would that relate to debiting 5,000 different employer client accounts rather than, you know, sending out credits or payments that were instructed the next day?
A. Because the money was collected before it was distributed. So they would send us instructions -- especially, if it's a heavy -- I have got to look at the timing period.
They would send us instructions that all of these people owe payroll taxes and we have to collect the money now. So we would get a file that saying these 800,000 or 2,000 employers have to put tax money in our account

STEVEN PEREIRA

so we could calculate the taxes; so this could very well be a concentration of that.

Q. So let's just -- maybe we can figure this out if we turn to the next page, 772. And Michael McAuliffe responds, "This is an issue for us as we continue to grow. Also, we begin to process all service bureaus through the single tax instance of NatPay, these batches will be even larger. We cannot submit payments two days prior for taxes, because that exposes us to too much risk, as the client drafts will not have cleared the account in many cases."

So sitting here today and reading that, does that infer or do you agree that we're talking about payments of taxes that Dawn was referring to in the first e-mail?

A. No. It doesn't tell me anything. I mean, it may. The timing of entries is somewhat complicated, and this indicates a problem that's very real that people experience all the time.

They'll say, look, we'll let you keep the money for a day pre-funding in this direction, but in that direction we just can't

STEVEN PEREIRA

do it.

Q. Let's just go down a little bit further then. It says, "All of this money is coming from our account as well"?

A. Oh, okay, you got me.

Q. Okay. Right. So they're talking about presumably account 0212?

A. Presumably, yes.

Q. Okay. So we're talking about next-day ACHs for, you know, over $5 million out of the Pioneer Bank account?

A. Correct.

Q. And let's turn to the next page, 771. I guess this is Dawn forwarding the chain to you and says, "See below or please read Mike's e-mail below, any thoughts?"

MS. NEIDL: Objection to form.

Q. And you say -- sorry, I haven't actually gotten the question out. Sorry.

And you say, "He's right, but we can say that we generally are able to leverage our risk because of the payroll files, they don't send them to us, right?"

What is he right about in his

STEVEN PEREIRA

e-mail?

A. I have a lot of trouble following these e-mail chains. I want to get the sequence right. So this one is before this one.

What's the question, please?

Q. So we just read Mike McAuliffe's e-mail on 772, right?

A. Yes.

Q. Now we're up on 773, and you say "he's right."

MS. NEIDL: 771.

MR. ROSATO: I'm sorry, 771, yes. Thank you.

THE WITNESS: Okay. I got it.

Q. So my question is: Sitting here today -- I mean, what is he right about in his e-mail?

A. What he's explaining to us is that in some cases, banks aren't -- if the deposits and the withdrawals hit on the same day, the bank will overdraw you.

So he's saying that we can't do that. So if I'm drafting and putting the money

STEVEN PEREIRA

in his account on Thursday, he's saying please don't withdraw it until Friday until we're certain that the funds are there.

Q. Okay. When you refer here to "leveraging our risk because of the payroll files," what do you mean?

A. What we've discussed many, many, many times in the past; we consider that -- it moves the risk into a bigger pool.

But also, keep in mind that we're pressuring this man to give us a very lucrative slice of business. And so he's asking us for a favor, and we want a favor back. And so if you want me to continue doing these nice things for you, you have to give me what I want; meaning, what I wanted was all the business.

Q. Meaning, the payroll in addition to the payroll tax?

A. Correct.

Q. Okay. But the leveraging of the risk, I want to specifically understand that. Is that because if you have the payroll coming in, that's presumably a much greater amount of money than the payroll taxes; is that fair?

STEVEN PEREIRA

A. Yes.

Q. And that's all going into the NatPay account at First Premier, right?

A. Yes.

Q. So that if there is a problem, there's more money to potentially deal with the issue, right, if one should arise?

MS. NEIDL: Objection to form.

THE WITNESS: Well, our -- I don't really care how much money is in my account, the risk is there.

We always just had this idea or this feeling that if we did a lot of their business, there is less potential for them to do something bad to us, because the harm is so great to their business.

If they -- you know, if they go sideways, I have a lot of leverage over their heads; hundreds of people to be paid.

So I don't think I can write you a formula calculating risk based upon payroll or not payroll, but I can tell you psychologically, it's extremely effective.

BY MR. ROSATO:

STEVEN PEREIRA

Q. The fact that employees might not get paid?

A. Well, there is a lot of potential; all kinds of things can happen, but they're just not going to take that risk. They're going to do everything they can to make sure that I am happy and that I am made whole, because they just aren't going to take that risk.

Q. So why don't we move up to the next e-mail. Do you see Dawn says, "Looking at their billing it doesn't look like we're getting their payroll items." And it says for Cloud Payroll, we're only billing 13,000-and-change, for Pro Data we billed 33,175 and for Southwestern Payroll we billed 16,000-and-change.

Do you see that?

A. I do.

Q. So as of September 2018, still no payroll at all from any of the three, right?

A. I have to -- I do know at some point we did Pro Data. We had on-boarded all the clients for Southwestern, but I don't know if

STEVEN PEREIRA

that was happening by this time or not.

Q. You have no reason to doubt what Dawn is saying in this e-mail, right?

A. No, of course not.

Q. Okay. And then she asked Jim, "How hard can we push on the payroll files, the files are huge, they are moving millions of dollars for us through taxes with debits and credits happening on the same day."

Do you see that?

A. I do.

Q. So this -- reading these e-mails, I mean, this seems to be sort of atypical, is that a fair representation?

MS. NEIDL: Objection to form.

THE WITNESS: This was a very unique case.

Q. No payroll coming in, massive files, you know, same-day debits and credits of millions of dollars, right?

MS. NEIDL: Objection to form.

Q. And these are not typical for NatPay, correct?

MS. NEIDL: Objection to form.

STEVEN PEREIRA

THE WITNESS: Well, they were a very small client. So in the grand scheme of things, the dollars weren't huge at all. I mean, you saw a ginormous wire when we were going through that for one payroll.

They were not a big client, but they were annoying us. And they promised us the payroll, they kept stringing us along. And this is Dawn pressuring the sales person to do something, to push them.

We didn't know at the time that it was never going to happen for other various reasons. But they were a Cashet customer, and we've seen these migrations take forever. It was a big deal. So they were migrating taxes, but we were a little bit.

But Dawn is obviously losing patience. And frankly, when something like this happens, it's an opportunity. Because we like to go to a client and pressure them into doing the right thing. And so this is an opportunity that says Dawn says, okay, you want me to waive this rule, give me what I want.

STEVEN PEREIRA

BY MR. ROSATO:

Q. Okay. Do you know if that -- well, I mean, do you know if after this set of e-mails there was another demand made along the lines that Jim Hagen says in the e-mail at the top?

A. I think Jim was losing patience. I do recollect that looking back at this stuff, Jim of getting annoyed. He felt they made a lot of promises. It's not the first time this happened, that's why they all write 12,000 clients when they have ten on their application.

Jim was getting annoyed and we were tired of the runaround. So were there other e-mails about people complaining to Jim or to me about this company not doing it; there may be more.

Q. What then -- I mean, in your view what was the reason why NatPay didn't just drop them immediately?

A. Because they were a really good client.

Q. Except for this, right? I mean,

STEVEN PEREIRA

this is --

MS. NEIDL: Objection to form.

Q. -- that isn't what's stated in Paragraph 13?

A. That's what's bad about that. They were breaking -- they were hitting a couple of dollar limits and some annoying thing; but they never really had a year's history.

According to Dawn, they were one of the most responsive processors we had. They really cared that they were doing a good job. They were not a problem account. We wanted to pressure them to give us business; and to do that, every single issue that cropped up like this, we blew out of proportion.

Q. NatPay blew it out of proportion?

A. Right. Yes. I think we used every bit of this as leverage in hopes to -- I think at some point they gave us a thousand Southwestern clients and we thought, finally, we're breaking through. They never transmitted and we went through all the trouble of doing that, but they would just give us a little bit of a taste.

STEVEN PEREIRA

But there was never any concern. Anytime that there was an NSF, you saw yourself, right away, they dealt with it. They never -- they were responsive, they always answered the phone. Those were the things that we look for. If we can't get through to someone and it goes to voicemail, we get worried.

Q. Okay. So they were responsive, but you said they never transferred the payroll, right?

A. Right, um-huh.

Q. And you also said there were various reasons for that; I think that's what you said. Can you break those down a little bit?

A. Well, they were currently using a competitor, and the competitor had a whole different way of doing things than us.

Their NACHA files, because of their system limitations had a lot of turns in the plumbing, so it was a big deal to convert to us.

And it's not a conversion that some people were able to do in pieces. So you

STEVEN PEREIRA

couldn't migrate ten and give it a test, you had to migrate the whole shabang. It was a big deal, and we understand that.

Q. So can you walk through a little bit the system limitations that you just referred to in your last answer?

A. With our competitors?

Q. Yes, please.

A. This is a big one.

National Payment does not allow a customer to push money to us. That is a -- to us, that's not a good thing.

I'll back up.

When you submit work via a NACHA file, which is the way we took files, you're allowed one date for the batch of work. So a customer would send us their deposits and a withdrawal.

But the system limitation with NACHA is you get one day to make that entry effective; so the debits and credits have to be the same day, which is not a good idea. We like to get the debit funded a day or two early; it's an optimal way to do business, it

STEVEN PEREIRA

gives us a little bit of additional protection. You can't do that in a NACHA file.

Cashet was incapable of dealing with that situation. So they said, if you send us your direct deposit, fake a debit to a fake account, which is an account they had in their bank, a pseudo account. And the debit that's funding the account, you send it in another offset to the fake batch; so you would get a batch for the funding and a batch for the payroll, not necessarily on the same day.

So they were not -- so the funding and the payment were detached systematically. It was an honor system; a funding batch here, and a payroll batch there, they hoped they got it. They had no real -- obviously, considering what happened to them, they had no way of verifying that the money wasn't received.

We allow a single batch of debits and credits to have separate dates. We contractually tell the customer, your debit has to be this much early. The funding entry must be Wednesday, not Friday.

So when we receive the file, our

STEVEN PEREIRA
system breaks apart the file between deposits and withdrawals, and then we change -- we say the debits are now this date, because now they're detached, I can say debits this day and deposits this day, but in our system they're still the same batch; so we don't have to rely on the honor system of the customer. That is the systematic flaw in Cashet's system.
Q. I understand. So just to break down a little bit of that. The reason that you'd want the debits to be a few days earlier or a couple of days earlier is because of this rule that allows the bank from which the money is being withdrawn to reject the debit two days, right?
A. Yes, 48 hours.
Q. So that allows the money to actually clear before money is then -- the funds are then credited, the credit is then sent out?
A. The absolute safest way is that the debits, the deposits do not leave my business until the 48 hours is expired; that's the safest way to do business outside of a wire.
Q. Right. And that's because the NACHA

STEVEN PEREIRA

Rules themselves allow rejection of debits for that 48-hour period?

A. Typically.

Q. Okay. I want to turn back to declaration it was Pereira 2.

A. Are we done with 13?

Q. Yeah, you can put it aside.

So you know I think we've gone through a lot of what's in Paragraphs 12 through 26, but I want to drill down on a few things in here.

First, I want to go to Paragraph 16. And you say there, "Based on the instructions provided by Cloud, NatPay was required to pass any tax funds collected from Cloud's clients' accounts through Cloud's account at Pioneer before being deposited with the IRS or other taxing authority."

Do you see that?

A. Yes.

Q. Is that a typical arrangement for NatPay with payroll service companies?

A. Yes.

Q. And so let's -- and I want to get to

STEVEN PEREIRA

actually Paragraph 18 in a second, but -- so the typical arrangement, right, is that the funds come out of the client's accounts and then they go to the payroll service company's account, right?

A. Yes.

Q. And then they sit there until there is a tax payment due?

A. Yes.

Q. And that's when you debit out of that account, the money goes into NatPay's account at First Premier, and then it gets credited to all the different taxing jurisdictions; is that correct?

A. Yes. Yes.

Q. But that's not what happened here, right?

MS. NEIDL: Objection to form.

Q. That's not the process that occurred here, is it?

MS. NEIDL: Objection to form.

THE WITNESS: That's exactly the process that occurred here.

Q. Well, let's turn to Paragraph 18.

STEVEN PEREIRA

So reading this, is there anything in it that you'd like to amend?

A. None that I can see.

Q. Didn't you testify earlier that in this instance, Southwestern Payroll would collect the money first and it would go into Southwestern Payroll's bank account?

A. Yes.

Q. Where is that reflected in here?

A. I don't really now how to answer that. This is indicating to us that we collect the money from the people that are going to pay the taxes from the people that owe the taxes, and we're giving it to the people that pay the taxes.

I mean, we can split hairs all day about who really has the money. I wanted to debit someone to give Cloud Payroll the tax money.

Did I study every two million entries that come in to make sure that it's that exact client, no.

Everybody in the banking system is an auditor. If someone was getting a debit

STEVEN PEREIRA

that they didn't want, they would have reported it. Everyone audits their own bank account.

Do I want to amend 18; absolutely not, I'm not splitting hairs.

Q. I understand that, but NatPay didn't move the funds from employer client accounts to its account at First Premier, isn't that correct?

A. Well, unless you say that the money moved to Southwestern, it was done in benefit for those clients then, yes, I was moving the employer's account money to Cloud Payroll.

When they collected the money, it still belonged to those employers. So where does it matter where it sat; I was collecting those people's money.

Q. I understand that. All I'm trying to do is clarify the mechanics here.

The money didn't move from the employer clients' accounts directly to the NatPay account at First Premier, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Again, all their money was moved to another location, but it was

STEVEN PEREIRA

still their money, so it was still their account.

Again, I mean, I -- I don't really know -- I just don't know how to explain it any further.

BY MR. ROSATO:

Q. I just want to -- all I'm trying to do is there was another intermediate step here, right. There was first from the employer clients' accounts, the first place that the funds went was Southwestern's payroll account at Prosperity Bank, isn't that correct?

A. I mean, there is a million extra steps for the clients. I mean, they had to earn the money to put in their operating account to pay their taxes.

Q. Sure.

A. So do we step further and further back? That's where the money sat. That's where I collected it.

Q. From Prosperity Bank?

A. From whomever said that's where the money is at.

Q. But not from the employer's clients'

STEVEN PEREIRA

accounts?

MS. NEIDL: Objection to form.

THE WITNESS: I literally have nothing that I can expand upon.

Q. I'm asking a very, very specific question.

Did NatPay collect money directly from the bank accounts of Cloud's employer clients?

MS. NEIDL: Objection to form.

THE WITNESS: I just don't know how to answer that. To us, it was their money, it was their account. But did we debit those particular employers directly, no.

Q. That's all I was asking.

And so let's continue down the line here. All right. So we've established it went from the employers clients' accounts to Southwestern's payroll account at Prosperity first, right?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. And then the next step is it went from that account at Prosperity Bank to

STEVEN PEREIRA

NatPay's account at First Premier, right?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. And then the funds went to the account in Cloud's name at Pioneer, right, according to your Paragraph 18 here?

A. Okay. I'm lost. The money came to us, it went to Pioneer. Is that where we are?

Q. Yes.

A. Okay. Good. We're together now.

Q. And then money went back to NatPay's First Premier account, right?

A. When we debited for the taxes it washes through our account, yes.

Q. How long, if you know -- well, it can vary from -- it can vary based on the circumstances, right, the amount of time that the money might have sat in this account at Pioneer?

A. There is no telling, yes.

Q. And you didn't have any view into I think you testified earlier, you didn't have any view into how that account was set up?

MS. NEIDL: Objection to form.

STEVEN PEREIRA

THE WITNESS: You mean set up technically at Pioneer Bank, what buttons they push?

Q. Yes.

A. No, I don't.

Q. And you didn't have view into the activity into that account?

A. Well, it was all ours so, you know, by definition I could probably figure it out. Everything in that account originates from NatPay or the bulk, so yeah, I kind of knew what was going in, which is why we felt it wasn't risky, I knew what kind of money I was putting in there.

Q. But you didn't actually have a window into that monthly account activity in that account, right?

A. I could not get official Pioneer data on exactly what's occurring on that account, yes.

Q. Right. Cloud Payroll didn't give that to you?

A. They did not give that to us.

Q. And the money -- I mean, it could

STEVEN PEREIRA

have been deposited in there and sat there for months --

MS. NEIDL: Objection.

Q. -- or been, who knows, it could have been transferred out of the account for other reasons?

MS. NEIDL: Objection to form.

THE WITNESS: I don't know how to answer that.

Q. All you care about is just that the money is there, right, when you do a debit out of it?

MS. NEIDL: Objection to form.

THE WITNESS: Absolutely. When I debit an account, I want to know the money is there.

Q. And then the last step of course is it goes out of the First Premier account, and the money goes out to the accounts at the taxing authorities; is that right?

A. It sounds right, yes.

Q. So in Paragraph 19 you refer to Cloud's tax settlement account.

I think we discussed earlier the

STEVEN PEREIRA

starter kits indicated the accounts were a checking account, right?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. On what basis were you able to claim that the account was a tax settlement account?

A. A tax settlement account was the behavior. We put taxes in there. We funded it and withdrew; by definition that makes it a tax settlement account.

Q. From your perspective you thought it was?

A. I think from the world's perspective that is what occurred in that account; I don't understand the dispute.

There is no argument that we deposited tax funds or impound account, and paid taxes from that account. There is no argument of what it was, it was a tax settlement account.

Q. But again, you're not aware of -- or at least you weren't at any relevant time, you know, prior to September of 2019, or that time period, that there were other uses of the

STEVEN PEREIRA
accounts at Pioneer?
MS. NEIDL: Objection to form.
THE WITNESS: Other uses of other accounts?
Q. Of this account, of 0212?
A. I mean, I'm assuming. Take, for example, fees. It's traditional banks only book fees to the account that the transaction of the fees were incurred.
So like my account, that's our wash settlement account; my fees book directly to their account and then we have to clear it off.
They're not going to charge an account at Regents for activity that occurred in this account. So, yeah, there is always additional activity. Customers make mistakes. There is a million kinds of things that could occur.
But from our purposes, we put the money in, and then we paid it out; it's a tax settlement account.
Q. It's just the account where you're depositing money that you believe is being collected for the purpose of paying taxes,

STEVEN PEREIRA

right?

MS. NEIDL: Objection to form.

THE WITNESS: That I believe is being collected for taxes?

Q. Right. I mean, that's --

A. I see the transactions and they hit all of these customers and say, tax impound. I could assume that someone would fuss if it were for, I don't know, a pair of shoes.

Q. But again, you're not aware of whether funds were moved into and out of account 0212 for other purposes beyond just paying taxes?

MS. NEIDL: Objection to form.

THE WITNESS: I mean, I can't speak to that.

Q. Right. So just a related question; if you turn to 26 in Pereira 2 you say "NatPay's account and Cloud's account for us was intended to be pass-through accounts for tax funds; and thus, served as tax settlement accounts."

On what basis do you have to claim that the account at Pioneer that Cloud was

STEVEN PEREIRA

using was intended as a tax settlement account?

MS. NEIDL: Objection to form.

THE WITNESS: Because we put -- collected tax liabilities into that account, and then we paid out of that account; therefore, taxes were settled in that account.

Q. Well, you paid out of First Premier's -- NatPay's account at First Premier, did you not?

A. You see, now you are just being difficult.

Q. No, I'm not. Isn't that technically correct?

A. No, it is not correct.

Q. That taxes were paid out of First Premier's account to the taxing jurisdictions; that's not correct? That's not accurate?

A. I don't know how to answer that.

Q. Is it true or not that the actual payments to taxing jurisdictions went out of NatPay's account 5690 at First Premier, yes or no?

A. That's the mechanism that the entire

STEVEN PEREIRA

system operates on. Just like you can say Cloud Payroll paid the taxes, but were they really paid with the funds that this employer contributed? I mean, you can twist this into as many knots as you want.

Q. But just to answer my question: The funds were actually paid out of NatPay's account ending in 5690 at First Premier to the taxing jurisdictions, correct?

MS. NEIDL: Objection to form.

THE WITNESS: After we received the funding entry then, yes, the mechanism is that we had to -- we were then responsible for the payment.

Q. Right. Paragraph 27 you say "NatPay provided tax payment services to Cloud for nearly two years without any issue until September of 2019"?

A. Yes.

Q. Do you agree that -- wouldn't you agree that, you know, a client representing to you many, many times that they were going to transfer business over and still didn't do it, the payroll is an issue?

STEVEN PEREIRA
A. Not as far as we were concerned. We never had problems collecting our money; that's an issue.
Q. So that's the only issue, that's your definition of issue is collecting money?
A. Did we have trouble -- well, that's what we do.
If this client was responsive and never gave us any flack on any kind of issue that occurred with the transactions, they were a good client.
Did we want the other business, oh, absolutely. But there were no issues; they never misbehaved.
Q. What do you mean? We were just looking at -- they are sending $5 million next-day ACHs debits out of the 0212 account, right?
MS. NEIDL: Objection to form.
THE WITNESS: It was not an issue as far as we did not lose money.
Q. But that was against NatPay's policy, right?
A. I don't know what you want me to

STEVEN PEREIRA

say.

Q. Just it was against NatPay's policy, right?

MS. NEIDL: Objection to form.

THE WITNESS: We have no written policy that does that. We have guidelines. We have a field for risk.

Q. Okay. It seems pretty well-understood by Ms. Cafaro that it was a requirement that $1 million is the maximum for next day?

A. We waive it on a regular basis depending on circumstances.

Q. Okay. How often is that waived?

MS. NEIDL: Objection to form.

THE WITNESS: I couldn't tell you. I personally have written a program that waves that requirement a hundred times a day.

Q. But you have, as I think you testified, there is like 200,000 different employers that you service?

A. Approximately.

Q. And how many transactions on a daily

STEVEN PEREIRA

basis?

MS. NEIDL: Objection to form.

Q. You know, thousands of thousands of transactions on a daily basis, right?

A. Well, it's more than one; it's a hundred or more.

Q. But as a percentage of the number of transactions, it's quite small, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Sure, percentage-wise, it's a very, very tiny percentage.

Q. Do you recall if there -- when there came a time or if there came a time, excuse me, when Cloud Payroll asked that the bank account designated for the depositing of funds to be paid for taxes, right, was changed?

A. I don't recall that.

Q. You don't have any recollection of that?

A. No.

Q. To your knowledge it was always account 0212?

A. I know now it wasn't, but I don't recall it happening.

STEVEN PEREIRA

Q. Let's move to the events of late August, early September of 2019, and I want to get your summary of your understanding of what occurred during that time period with respect to funds that were to have been paid to taxing jurisdictions.

A. Do you want me to explain the event or do you want me to explain the timeline or what do you want?

Q. I just want, you know, what's your -- what is your narrative understanding of what happened?

MS. NEIDL: Objection to form.

THE WITNESS: Well, what happened is we started to receive debits back from Pioneer for account frozen.

We called Cloud Payroll. They said they're looking into it. That is not uncommon, it's happened before where the banks have an issue, they'll freeze the account temporarily and everything resumes; that's what we assumed was going to occur.

Unfortunately, the deposits that offset the deposits had already gone out

STEVEN PEREIRA

the door, so I had funded those entries without being funded myself.

BY MR. ROSATO:

Q. So there was some handful of -- some handful of entries that NatPay had funded and sent out to the taxing jurisdictions without having received the money?

A. We had received the money, it was recalled.

Q. Okay. But it was within that two-day window, right?

A. Yes.

Q. The money was rejected --

A. Keeping in mind that --

Q. -- or the debits were rejected?

A. -- 2.4 million of it was an internal transfer in Pioneer Bank itself. So they, you know, delightfully froze the debit, but let the deposit sit. That's why we consider this theft.

Q. I mean, I understand what NatPay considers it to be, but I'm asking --

A. Well, how else would you explain 2.4 million between two accounts in the same

STEVEN PEREIRA

bank and they only froze half and didn't at least return our funding item as well.

They're both clearly marked, but they've decided -- it isn't a case of where did the money come from; it clearly came from us and they clearly returned the deposit -- the withdrawal entry.

An internal transfer that they have claimed many times that one of those few rare delightful transactions that have to be approved. This was an internal transaction that we facilitated for Michael Mann and they only returned half.

Q. Okay. That's -- I'm going to move to strike the answer as not responsive to the question.

A. You wanted to know what I thought about this event.

Q. Yeah, I appreciate that.

I asked a specific question about how NatPay had credit entries to go out of its account at First Premier --

A. Yes.

Q. -- before that two-day before where

STEVEN PEREIRA

the debit could be rejected had lapsed?
A. Yes.
Q. So what funds were used to credit the various taxing jurisdictions?
A. That was NatPay funds or funds in this account.
Q. But not funds from, you know, a Pioneer Bank account, right?
A. Well, we were funded by them, so it is until it isn't. It was there until it wasn't.
So when we sent that money out we had been funded by Pioneer Bank or the Pioneer Bank accounts, so everything was copacetic.
Then all of a sudden the returns come back, and now we're holding the bag.
Q. But that can happen though, right? I mean, debits are rejected from time-to-time, right?
MS. NEIDL: Objection to form.
THE WITNESS: They happen a lot of times, but it's never been the bank that does it and steals the money, it's usually a client that goes back. There is an

STEVEN PEREIRA

insane distinction.

Q. Okay. Again, I'm going to move to strike the answer as non-responsive.

All I'm asking you is whatever funds were used to credit those transactions were not funds from a Pioneer Bank account, yes or no?

MS. NEIDL: Objection to form.

THE WITNESS: I mean, you can say yes, you can say no. Because I'm the one on the hook, so apparently, I had to pay it.

But we were funded. We received a deposit to cover those -- we received a deposit to cover those transactions, and then the deposit was reversed.

Q. Within the two-day period?

A. Within the two-day period.

Q. So the funds hadn't cleared?

A. No, the funds clear instantly; they can unclear.

Q. And they did in this case, right?

A. They uncleared.

Q. So whatever money -- whatever funds went out to the taxing jurisdiction were funds that came out of a Pioneer Bank account, right?

STEVEN PEREIRA

MS. NEIDL: Objection to form. It's been asked and answered about six times; you have to move on.

MR. ROSATO: I don't think so. I just want a very clear answer --

MS. NEIDL: You don't like the answer, but you need to move on.

MR. ROSATO: Because the answer is, yes, but that's not what I'm getting. But that's the answer that I'm looking for, because that's the answer.

BY MR. ROSATO:

Q. So please just answer the question; that's all I'm asking.

Whatever funds were credited to the taxing jurisdictions, right, they came out of First Premier's bank account -- or out of NatPay's bank account at First Premier, correct?

A. Yes.

Q. Just keep this declaration in front of you; we're going to be referring to it.

So Paragraph 28 you note that "Mann has admitted that he fraudulently obtained

STEVEN PEREIRA

$70 million in loans from Pioneer and Bank of America and kited checks between those two banks"?

A. Yes.

Q. So you would agree that Pioneer was defrauded, right?

MS. NEIDL: Objection to form.

THE WITNESS: Was Pioneer frauded? Again, I don't know how to answer that question. I think they knew about it. So were they defrauded? Yeah, they lost money, but they supported that transaction, those kinds of transactions for years.

BY MR. ROSATO:

Q. Supported the transactions, what do you mean?

A. They looked the other way. He had millions, upon millions, upon millions of dollars of NSFs in those accounts. It is inconceivable that that bank just allowed that to go on, and then Bank of America is the one that stopped that little merry-go-round and now they're out money.

I mean, they were out that money

STEVEN PEREIRA

again and again. If they had just let something NSF, they would have given us a heads-up that there was a problem. But by covering him for years, they put us in harms way, we had no idea.

Q. So you agree though that Pioneer's lost millions of dollars as a result of this fraud?

MS. NEIDL: Objection to form.

THE WITNESS: I don't know the exact numbers but, yeah, they claim -- I mean, I've read their newspaper articles, they say they have lost all of this money.

Q. Have you ever read Michael Mann's plea?

A. No.

Q. Guilty plea?

A. Uh-huh, I did not.

Q. So how did you then -- on what basis -- on what basis did you make this statement that Mann has admitted that he fraudulently obtained $70 million in loans in Paragraph 28?

A. I don't know. I don't know how to answer that now.

STEVEN PEREIRA

Q. Okay. And similarly, in Paragraph 29 it says, "Mr. Mann also contends that in early September 2019, he diverted about $35 million of his clients' payroll payments to a bank account that he controlled at Pioneer, in order to temporarily reduce the amount of money owed to Pioneer."

Do you see that?

A. Yes.

Q. What was the basis for your making that statement?

A. Well, that was in the news everywhere.

Q. You got that from a news article?

A. I probably did.

Q. But you don't have personal knowledge of that?

A. No.

Q. On or about -- I'm on paragraph 30 now. "On or about September 3rd of 2019, Pioneer partially froze all accounts connected to Michael Mann including Cloud's account."

Do you see that?

A. Yes.

STEVEN PEREIRA

Q. What do you mean by partially froze?

A. They allowed deposits and denied withdrawals.

Q. Is it your view that that's improper in some way?

A. I think it is, yes.

Q. You think that's not permitted?

A. I don't know exactly if you would call it permitted; it's certainly not done typically where someone just harvesting money and then freezes the debits.

We have seen it happen when there is fraud on the account where incoming debits are fraudulent, they'll freeze the account and then reactivate another account number.

But I've never seen it never unfreeze, just deposits being harvested, I think that's unusual.

Q. So isn't it more technically correct to say that they were rejecting debits out of the account?

MS. NEIDL: Objection to form.

THE WITNESS: I can only go by the return code reasons they sent us, which was

STEVEN PEREIRA

account frozen; that's the designation they put in the ACH network.

Q. They could have chosen another number of reasons to freeze the account, right?

A. They could have chosen anything, they picked the one I suppose that they did.

Q. And what was the outcome of that?

MS. NEIDL: Objection to form.

THE WITNESS: I believe that we filed a NACHA complaint and it was -- Pioneer was able to get it denied.

Q. So then in paragraph 32 you say, "It was impermissible under the circumstances."

NACHA didn't agree, right?

MS. NEIDL: Objection to form.

THE WITNESS: NACHA's problems go back and forth between banks; I was told that NACHA accepted their reason.

Q. Right. So obviously, they didn't think what was done, NACHA didn't think what was done was impermissible?

MS. NEIDL: Objection to form.

THE WITNESS: I think whatever explanation Pioneer gave to them, they

STEVEN PEREIRA

accepted.

Q. And also in paragraph 32 you again used the phrase, tax settlement account?

A. Yes.

Q. You, again, don't have any personal knowledge as to how the account was set up?

MS. NEIDL: Objection to form.

THE WITNESS: I think we're describing what the account acted as. I mean, I don't know if there is a button at Pioneer that says, tax settlement.

Q. You also don't know sitting here today that the account being referred to in paragraph 32 is account 0212?

MS. NEIDL: Objection to form.

THE WITNESS: I don't understand the question.

Q. Do you know whether the account that you're referring to in this paragraph 32 was account 0212?

MS. NEIDL: Object to form.

THE WITNESS: I think we knew it, because we were depositing and withdrawing from it. I don't know at this time we've

STEVEN PEREIRA

actually seen the documentation.

Q. Well, it's your testimony -- well, it's your belief that it's 0212 that's being referred to here?

A. I suspect it's whatever account that when we did our research to document the transactions, it was all going and in and out of this certain account, and I'm sure that's what we're referring to.

MR. ROSATO: Why don't we take five or ten minutes. I'm going into a module with a lot of documents, so just give me a little.

MS. NEIDL: Okay.

VIDEOGRAPHER: This will conclude video number four of Steven Pereira. We're off the record at 4:06 p.m., October 19, 2022.

(Whereupon, proceedings recessed for a short break and once again resumed.)

VIDEOGRAPHER: This is the beginning of video number five in the deposition of Steven Pereira. We are on the record at 4:27 p.m. October 19, 2022.

STEVEN PEREIRA

BY MR. ROSATO:

Q. Welcome back.

A. Thank you.

Q. We were talking before about this debit rejection that happened in early September of 2019.

You recall that?

A. I do.

Q. Do you know when you became aware that this was going on?

A. If memory serves me, I was actually off of work and Dawn called me and said that we've had all of these rejections occur, and she told me that they were returned under account frozen, which is not at first glance a terrible thing, it's not actually a bad thing; NSF is a bad thing.

So when she told me that, I knew what I had to do was talk to the boss, which is one of the least pleasurable experiences in my life, I've never had to do that before. And I tried to exert calm. I told Dawn, talk to Cloud Payroll, find out what's going on; I'm sure it's just a quirk or a glitch, you know,

STEVEN PEREIRA

don't set your hair on fire.

Q. Do you know what date that was, do you recall?

A. I think we got the first debit returns on the 4th.

Q. September 4th?

A. I believe so.

Q. Do you recall what actions, if any, you or NatPay -- well, let's start with you: What actions did you take immediately after finding out?

MS. NEIDL: Objection to form.

THE WITNESS: I told Dawn to get in touch -- I don't believe that it's very helpful for a lot of people to start making these crazed the-sky-is-falling phone calls. Everyone in the office was aware, everyone was starting to get very upset.

And my goal was to make sure that they don't all have a meltdown, so I frankly was very calm about it, at least externally. I told Dawn call them and found out this information.

I think the first day or two we

STEVEN PEREIRA

spoke to the gentleman that you just -- I can never remember his name, you just interviewed him on Monday.

Q. Mr. Schilling?

A. Mr. Schilling. He was always very cooperative. He said it doesn't look -- the bank won't talk to us, but we think it's going to be fine and there was no problem with the account, so we were okay for an additional day.

We didn't start to really, really panicking until probably Wednesday.

Q. Would that be September 5th?

A. It should be the 5th.

Q. You said you spoke to your boss?

A. Jefferson.

Q. Jefferson, okay. When would that conversation have taken place?

A. Probably sometime Tuesday, because I -- it's not something I would have waited on. So when we got the returns and we found the account was frozen -- and I could be off a day or two, I don't remember.

As it was happening, you know, I'm always -- my boss is always telling me, you

STEVEN PEREIRA

should write notes and I never do, and I knew at this point I should alert him to there is a potential issue and it was big; and I do remember that it was probably mid-afternoon.

Q. What was his reaction?

A. He was very calm. He said, don't panic, we'll do whatever you can do to get it fixed.

Q. Did you speak to George Hamilton at all?

A. I don't think so, I think George was out of the country.

Q. So as a result of all of these discussions, did you make any decision on how to move forward?

A. Once we found out that it was really not -- once we found out that there was another burst of returns that came back and that we -- that this was a real deal, that it wasn't like a one-time problem that the bank was going to resolve; at that point, I turned it over to -- I think by that time George was aware, our attorney.

And there's literally no benefit in

STEVEN PEREIRA

every single person running around screaming and calling people. I just -- you tell us what to do and I -- at that point I think Bonnie and our attorney at the time and George, they came up with a plan of action of what to do.

Q. Is that Bonnie Pinzel you're referring to?

A. It is.

Q. And so do you know what the plan of action was?

A. Well, again, in context, the customers have now realized, I think it already broke in the news, all of the customers started to call, and all of them started to, like, panic and scream.

We started to receive calls from Cashet customers realizing that they were also -- at the same time Cashet made the dreadful choice to withdraw the money back from the employees, which is a real no-no; and they accidentally did it twice; so that made national news.

So every single person, all of my customers, we're trying to tell them we're

STEVEN PEREIRA

fine, we're cool, we can absorb this if we have to. We'll deal with it, but we're fine, we're in business.

But that was the worst time. All of those employers, everybody was on the phone crying and panicking; that was my day.

MR. ROSATO: I'm going to put in front of you what will be marked Pereira 14.

(Whereupon, Pereira Exhibit 14, Hagen E-mail Dated 9/5/19, Bates Stamped NP0097967 to '968, 2-Pages was marked for identification.)

BY MR. ROSATO:

Q. You see you're copied on the top e-mail there?

A. Yes.

Q. Do you recognize these e-mails?

A. I do not remember this e-mail, but I do not doubt that I received it.

Q. Okay. Thank you. Dawn writes in her 10:28 a.m. e-mail on September 5th that -- I guess she's referring to Cloud Payroll, that's in the subject line, their CEO Mike Mann

STEVEN PEREIRA

was doing fraudulent things, which caused all of their accounts to be frozen.

So by the morning of September 5th people were aware that this was related to some fraud with Michael Mann?

MS. NEIDL: Objection to form.

THE WITNESS: I'm sorry, I was looking, what was the question?

Q. I see reading that here, I mean, when you received this at 2:37 at the latest, 2:37 p.m., I guess did you understand that this had something to do with Michael Mann being engaged in some kind of a fraud?

A. At this time that's exactly what -- that's the only news that was available. I think it was in the paper, I think it was everywhere. So, yes, at that point this is exactly what we thought had happened.

Q. You see she says at this point the bank isn't being very forthcoming with John, because he is not listed on the account. Do you know if that's referring to John Reinke?

MS. NEIDL: Objection to form.

THE WITNESS: I do know that you now

STEVEN PEREIRA

because Dawn has told me that she had talked to John Reinke.

Q. And so he couldn't get information because he wasn't listed on the account?

MS. NEIDL: Objection to form.

THE WITNESS: That's what we were told.

Q. She says, "We currently have returns of $7 million."

Do you see that?

A. Yes.

Q. So returns, is that referring to the debit rejections?

A. Yes.

Q. And you see it says $2 million seems to be bogus transfers from one bogus account to another Cloud Payroll account?

A. Yes.

Q. Is that what you were talking about earlier --

A. Yes.

Q. -- there were transfers between accounts?

A. Right.

STEVEN PEREIRA

Q. But that was, like, a different account under Cloud Payroll's name?

MS. NEIDL: Objection to form.

THE WITNESS: I don't recall which accounts were involved.

Q. You don't know which they were?

A. No.

Q. But this is indicating here there was some transfer out of that account, whichever one it was, which is what you've referred to as a tax settlement account, into some other account, right?

A. I don't know where the -- there was a lot of accounts. I don't recall, I'm sure it's somewhere in the documentation which account the withdrawal was from and which account the deposit was from; I don't recall that data.

Q. Do you see at the end Dawn says at the end of her e-mail she asks "Should we be looking for a way to pull back our tax deposits for the states or the IRS"?

A. Yes.

Q. Is that something that was

STEVEN PEREIRA

considered?
A. That was something that was done.
Q. So NatPay did reject -- it pulled back credits to taxing jurisdictions?
A. There are some taxing jurisdictions that are very compliant when there is a problem like this or something that allows you to pull the money back, which is why our -- that's why the $7 million isn't -- it's $3.8 million direct loss, not $7 million; we were able to recover.
Q. So according to what you just said there was $3.2 million at least that was pulled back from the taxing jurisdiction?
A. If that's how the math works out, yes.
Q. Okay.
A. But it became much more than $7 million in the next couple of days, but we at that point had not started to -- we didn't release the deposits, we knew better.
Q. Would you say that's partially freezing the First Premier account?
MS. NEIDL: Objection to form.

STEVEN PEREIRA

THE WITNESS: I don't understand the question.

Q. Well, you rejected a bunch of credits out of the account, right?

A. No, we didn't send them. They were sitting in my system to be sent; I held them.

Q. The ACH files for those credits?

A. Right. I didn't send them. I knew the debits would be coming back, so they won't be funded, so we disabled those ACH files.

Q. But they were in the system to be sent?

A. Yes.

Q. Do you see Jim Hagen responds, "We have to do whatever it takes to be whole, no question"?

A. Yes.

Q. Do you know what he was referring to by being made whole there?

A. Yes.

Q. So what is your understanding?

A. Our business, the entire industry is based on simply trust. And we needed to guarantee to our customers that we were still

STEVEN PEREIRA

viable and that we could still operate, and that's -- like I said, for an entire year. I fielded questions having to prove that we weren't out of business. But that's what he means. The people panicked nationwide. And even people not related to this issue were all in a panic.

So because Cashet was hit so hard, significantly harder than we were, everyone panicked. We wanted to put out calm, just calm.

Q. Going back though to this, you pulled back the credit files. Did you personally make that decision?

MS. NEIDL: Objection to form.

THE WITNESS: We didn't pull back the credit files, we didn't initiate them, we never sent them.

Q. When you say you never sent them, you never sent them to Federal Reserve?

A. Never sent them to First Premier.

Q. Never sent them to First Premier?

A. No.

Q. They were in your system and going

STEVEN PEREIRA

to go out on some day?

A. Yes.

Q. And you said, pull them out of the system?

A. And it happens. It's a regular thing, the customer will send a payroll and we'll get an NSF before we send the credits, I'm not paying to keep them.

Q. When were the -- if you know, so the credits that -- so there were already then -- I guess files had been sent to First Premier?

A. Which ones?

Q. I guess related to this $3.8 million figure that you mentioned?

A. Yes, that had already transacted.

Q. Do you know when those credit files were sent to First Premier?

A. Off the top of my head I can't tell you, but we have spreadsheets ad nauseam that tell you all the timing.

Q. But of course as I think we discussed, these were funds that were in NatPay's bank account at First Premier, right?

A. Which funds?

STEVEN PEREIRA

Q. The $3.8 million that was sent out?

MS. NEIDL: Objection to form.

THE WITNESS: Right. They were sent out and then the deposits were reversed, so we had to eat that money, yeah.

Q. Well, did NatPay have to eat that money?

A. Yeah, of course we did.

Q. That money was NatPay's money?

A. It was money held for -- in trust. I mean, we have to make that account whole. We can't let that not happen.

So, yeah, I mean, that's the law. Someone's got to pay it back and it's not going to be the bank.

Q. But my question is: Is it your testimony that that -- that those funds are the property of NatPay pay?

A. They're not the property of us, they're the responsibility of us.

Q. But they're not NatPay's property?

A. No, they're not, but we're responsible for them; we step up and take care of our responsibility.

STEVEN PEREIRA
Q. And I think as we discussed those funds -- I'm going to draw an objection here, I know, but those funds did not come from a Pioneer Bank account?
MS. NEIDL: Objection to form.
THE WITNESS: Which funds?
Q. The $3.8 million in funds that were sent to taxing jurisdictions?
MS. NEIDL: Objection to form.
THE WITNESS: They were. The account was funded by those transactions when we sent those deposits out. The reversal meant that it was now a loss.
Q. But I'm talking about the actual dollars themselves that funded the transactions, the $3.8 million, these came from -- we don't know where they came from; not from Pioneer Bank though, right?
A. Yes, they were until they weren't.
Q. But they weren't, right?
A. They eventually weren't, but when we sent them out, they were.
Q. Okay. But the end result is they were not?

STEVEN PEREIRA

A. They were not.
Q. Yes.
A. So we're responsible for making up that difference.
Q. You recall, you testified you had Bonnie -- is it Pinzel or Kinzel?
A. Let's go with Pinzel.
Q. Do you recall coordinating with her on how you were going to address this issue?
A. There were a lot of moving parts. The first thing that I was charged with was getting information to the clients to kind of quell the panic, because it was spreading like wildfire. The processors were panicking and all of their clients were panicking, and we were getting hammered by the processors.
One of the moving parts was we had to formulate some sort of communique to send it our customers to let them know that we got it, we're covered, so don't panic.
MR. ROSATO: So I'm going to put in front of you what will be marked Pereira 15.
THE WITNESS: Is this one done?

STEVEN PEREIRA

MR. ROSATO: Yeah, you can put that to the side.

(Whereupon, Pereira Exhibit 15, Pereira E-mail Dated 9/9/19, Bates Stamped NP0098667 to '670, 42-Pages was marked for identification.)

BY MR. ROSATO:

Q. It's a little wonky, because we have a big spreadsheet here. Do you recognize this e-mail?

A. I recognize it. I don't remember it, but I recognize it.

Q. But no reason to doubt that you sent it?

A. None whatsoever.

Q. Who is Katie Kennett?

A. She is sort of the bank's compliance guru, and she was a vice president; she's pretty high up.

Q. Who is Leslie Higgins?

A. She runs the ACH department at First Premier.

Q. How frequently do you communicate with Katie Kennett?

STEVEN PEREIRA

A. Well, she doesn't work there anymore, but until then, very rarely.

Q. Rarely?

A. We consider that good, yes.

Q. What about Leslie Higgins do you communicate with her often?

A. She's operational, so my people probably talk to her daily or frequently; I almost never speak to her.

Q. Okay. You see your e-mail says attorney letter, debits returned, credits not returned, this account was not legally frozen.

Do you see that?

A. Yes.

Q. Was this e-mail proceeded by a phone call or any other communication?

MS. NEIDL: Object to the form.

THE WITNESS: I don't remember. I remember calls, I don't know the sequence of events, but I almost certainly guarantee that I called them and gave them a heads-up so they knew it was coming.

BY MR. ROSATO:

Q. So this was on September 9th of

STEVEN PEREIRA

2019. Do you recall whether you had by that time, you know, removed those credit transactions from NatPay's system for the $3.2 million or so?

A. That we did not send out?

Q. Yes, that did not get sent.

A. Well, they weren't removed, they were just suspended.

Q. Would that, to your knowledge, have occurred by this point?

MS. NEIDL: Objection to form.

THE WITNESS: Oh, absolutely, um-huh.

Q. So I want to go to the spreadsheet and it's quite long, and this is going to be hard to look through. This is one that I wish was single-sided, but here we are.

So do you see at the top there is, I guess, a number of Cloud Payroll, a Cloud Payroll -- it says in the first name column, do you see that?

A. Yes.

Q. And it looks like it's account ending 0212?

STEVEN PEREIRA

A. It is.
Q. And those are credits of varying amounts, but totals a couple of million dollars I think. What are -- reading this document, do you know what those transactions were for?
A. I didn't then, I do now.
Q. Okay. So sitting here today, what do you understand?
A. Well, if you notice the batch description is odd; he pays 001. He was moving money into the Cloud Payroll account. And we determined since then that he was moving it from another one of his Pioneer Bank accounts. Those are deposits into Cloud Payroll. Are they? Yes.
Q. Deposits into Cloud Payroll you said?
A. That's what it looks like, um-huh, they're credits.
Q. How did you get this information on the spreadsheet?
A. Our system.
Q. This came out of your system?
A. Absolutely.

STEVEN PEREIRA

Q. So that's actually -- I'd like to understand that.

Why would those transactions be reflected in NatPay's system?

A. Because they were ACH entries that we received.

Q. For an internal transfer between two --

A. Yes.

Q. -- accounts at Pioneer Bank?

A. Right, um-huh.

Q. That would be done via ACH?

A. It could be done via ACH is one of the mechanisms. I mean, it's a debit to one account and a credit to another; I don't really know which accounts it's going to. In this case, he was funding the Cloud Payroll account.

Q. And it says the transmit date was August 29, 2019. Do you see that?

A. That's when we received the file.

Q. The deposit date is reflected here as August 30th of 2019?

A. Yeah. That's just a layman's term; the settlement date was the 30th.

STEVEN PEREIRA

Q. Do you know when -- what the date was on which debits out of accounts at Pioneer Bank were rejected?

MS. NEIDL: Objection to form.

THE WITNESS: Ask that again.

Q. When was the first date to your knowledge on which debits were rejected out of the Pioneer Bank accounts?

A. Well, there are several phases of the rejection. I believe we started receiving returns, my guess would be Wednesday, and I could probably -- it's probably there somewhere, but because -- from what I've learned now, they actually suspended all transaction activity on the 30th, which put it a day late.

So that was -- then they started to process the returns on Tuesday, which means we got them on Wednesday.

Q. Understood. So but this reflects that presumably Michael Mann was doing transfers between his accounts via ACH transactions at NatPay, right?

A. In retrospect, yes.

STEVEN PEREIRA

Q. No one at NatPay noticed that?

A. We do now.

Q. No, but at the time?

A. We weren't looking for it.

Q. Why?

A. They're harder to detect.

Q. Why is that?

A. Because there's -- I mean, when you look at them it's obvious, but that's a human brain working on it. Computer-wise we're receiving all the files, how do we know that they're internal bank transactions and the items are related to each other; there are a lot of variables involved. We have developed a methodology to detect it on now.

Q. Right. So human eyeballs would have to get on this, right?

A. At the time it was just not -- we never thought it was an issue, we were taken -- we had our pants down.

Q. But if a human had looked at this, it would be like, wow, that's weird?

A. Well, look at it now. You can see five or six deposits into Cloud Payroll, what

STEVEN PEREIRA

makes that any different than any of the other deposits into Cloud Payroll? I mean, the description is a little different, but it looks like a deposit into Cloud Payroll.

Q. Right. I mean, you know, the computer program I guess at the time wouldn't have had reason to flag this, is that what you're saying?

A. At that time there was no logic that would detect this.

Q. But now there is?

A. But there is now.

Q. Why don't we flip to the next spreadsheet, it's a one-page spreadsheet you'll see produced in native format, and the ending Bates number is 69.

So you have to flip a little bit. Flip past those. All the way past those. There will be another short sheet after the long sheets. Yeah, there you go.

A. Okay. Well, there you go. There are the return dates.

Q. So 9/4 is the first return date?

A. That's when we received them, yes.

STEVEN PEREIRA

Q. So can you walk me through this a little bit. Let's look at the first, these first five or so, or six.

These are those -- they look like e-pay 0001 that we were just looking at on the last spreadsheet.

Do you see that?

A. Yes.

Q. So sitting here and looking at this today, does this mean that those transactions also were rejected?

A. Yes.

Q. Okay. So the transfers between what appear to be bank accounts at Pioneer Bank, right --

A. Yes.

Q. -- between the two accounts, those were also rejected, right?

A. Yes.

Q. And then looking at the rest of these you see most of them have an account number ending in 2440?

A. Yes.

Q. There is one for $3 million on

STEVEN PEREIRA

September 3rd, 2019, that was the effective date?

MS. NEIDL: Objection to form.

Q. Do you see that?

A. Which one again?

Q. There is a $3 million or so transfer. There was a debit that was supposed to come out of that 2440 account?

A. Yes.

Q. And then that was returned on September 5th.

Do you see that?

A. Yes.

Q. So does this spreadsheet reflect the debit returns, reflect the debit returns that you were talking about earlier?

MS. NEIDL: Objection to form.

THE WITNESS: I mean, I don't know them by heart, but, yes. It actually looks like it's a short list, but these are all returns that were generated to us in this event.

And there is a couple of not so orthodox ones, but that's another issue.

STEVEN PEREIRA

BY MR. ROSATO:

Q. Which ones would those be?

A. Well, there is one that says, corporate advice not authorized.

We had some Pioneer or Cloud Payroll customers that panicked very quickly and were able to return to us the funding entry within the 48-hour window; not many, thank God, but...

Q. So a customer figured out there was something going on?

A. Yeah.

Q. Did you speak directly to any of those customers?

A. I don't -- it was not -- well, if they were within the 48-hour window there is nothing to say to them. I asked them not to do it. But, no, I don't believe so. They may have called us and asked what was going on and we probably gave them an honest answer, which is what precipitated the return.

Q. So I want to zero in on these transfers between bank accounts at Pioneer Bank at the top.

A. Okay.

STEVEN PEREIRA

Q. Those transfers. Let me just understand this correctly. They would have taken a stop off in First Premier's -- in NatPay's bank account at First Premier before they went to the other bank account, right?

A. Absolutely, that's why it's a loss.

Q. So is that in your view -- whose property is that money?

MS. NEIDL: Objection to form.

THE WITNESS: Whose -- you mean the money or the lack of?

Q. The funds, these funds, right; they were in another Cloud Payroll -- it says it's in the name of Cloud Payroll here.

Do you see that?

A. Um-huh.

Q. And they were going to be -- they were going to go through First Premier, and then back to Pioneer Bank into another account there, right?

A. Yes.

Q. So I guess what I'm -- what I want to understand is: Whose property are those funds?

STEVEN PEREIRA
MS. NEIDL: Objection to form.
THE WITNESS: The property of the funds; at what point?
Q. When they got to First Premier?
A. Well, they weren't -- it was a lack of funds, not funds, and so we had to make good on the lack of funds.
Q. But this was not money that was going to a taxing jurisdiction, correct?
A. It's a debit, so it was funding an entry.
Q. Right. But back to another account at Pioneer Bank, right?
A. Yes, um-huh.
Q. So it wasn't intended to go to a taxing jurisdiction, correct?
A. Correct.
Q. Let's see, turning to the letter, the last page it's Bates number ending in 70?
A. Yes.
Q. Do you know who prepared this letter?
A. Bonnie, it looks like.
Q. Did you have any input on it?

STEVEN PEREIRA

A. Maybe, you know, some to help, you know, define terms or she needed data exactly what terms they used, et cetera, but this is prototypical Bonnie.

Q. And this is a letter to Mr. Sarratori at Pioneer Bank.

Do you see that?

A. Yes.

Q. Do you know who Mr. Sarratori is?

A. I do now.

Q. Have you ever spoken to him before?

A. Again, I hate absolutes, but from my recollection I never knew who he was.

Q. And this letter is claiming a violation of ACH operating rules?

A. Yes.

Q. Do you know if there is a response to this letter?

A. I have heard anecdotally that Pioneer Bank never responded to anything that we requested, so I would say, no response.

MR. ROSATO: You can put that one to the side and we're going to hand you what will be marked as Pereira 16.

STEVEN PEREIRA

(Whereupon, Pereira Exhibit 16, Higgins E-mail Dated 9/9/19, Bates Stamped NP0109244 to '246, 3-Pages was marked for identification.)

BY MR. ROSATO:

Q. So I think you'll see this is a continuation of the last e-mail chain. You see the first e-mail is on the Bates ending in 45?

A. Oh.

Q. That's the e-mail that we just reviewed where you're forwarding that information, right?

A. Got it.

Q. And Leslie Higgins responds, "Steve I am in the process of dishonoring the debit returns; however, there is one that I've in the been able to locate."

Well, first of all, your initial e-mail doesn't request that First Premier begin does honoring debit returns, right?

A. Right.

Q. So was there a phone call after that or some other?

A. There is undoubtedly some

STEVEN PEREIRA

communication that happened and she's responding to my last e-mailing telling me what she is doing.

Q. What did you do understand her to mean when she says I'm in the process of I'm dishonoring the debit --

A. Well, the second phase of this is that the customers of Cloud Payroll said they aren't going to pay my taxes, I want my money back.

These are people that missed the 48-hour window; so we dishonored it. They tried to return the money, and we dishonored the return, they violated the rules.

Q. Who are these people?

MS. NEIDL: Objection to form.

THE WITNESS: Just a lot of people; she's saying 33 employers.

Q. So they tried to claw their money back from NatPay?

A. Yeah. And a lot of -- as you can tell, it's a complicated issue.

So a lot of people didn't realize they were clawing it back from me; in some

STEVEN PEREIRA

cases, we explained it, and in some cases it was like, oh, that's unfair. They didn't understand all the mechanics in between. These people thought they were clawing their money back from Pioneer.

Q. Okay. Fair. But what I want to understand of these, of the mechanics here; these were people trying to reject debits out of their accounts?

A. Yes.

Q. So similar to what Pioneer did, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Well, a return is a return. So what they were doing is they were dishonoring them for unauthorized. They're claiming it was an unauthorized entry. That's the -- that was the code available to them.

Q. Okay. But so you rejected those dishonored those returns?

A. They missed the 48-hour window.

Q. Let's go to the next page ending in 44. And you see Leslie Higgins said,

STEVEN PEREIRA

dishonored 33 items totaling a little over $7 million?

A. Yes.

Q. So NatPay dishonored to attempt to reject debits of over $7 million; is that correct?

A. Yes.

Q. So then NatPay then had credited into its account at First Premier $7 million; is that right?

A. You mean when the original debit funding entry went?

Q. Yes.

A. Yes, we credited our account and then passed the money to Pioneer.

Q. But the money wasn't refunded back to the accounts that it was originally debited from, right?

A. No, uh-huh.

Q. Is it then -- is what you're saying this $7 million, where did that money then go?

A. To Pioneer.

Q. Okay. And then what happened to that money?

STEVEN PEREIRA

A. You guys took it.

Q. Well, there were debits that were rejected, correct?

MS. NEIDL: Objection to form.

THE WITNESS: No. We made deposits to you of $7 million that the customers were never able to get their taxes paid for that $7 million. You had the funding and you would not honor the debits.

Q. The debits were rejected, correct?

A. Potentially. Or with the way timing is, these people -- Cloud Payroll never even initiated the tax deposit entries at that point.

Q. Okay. But what I want to understand is, this reflects that NatPay rejected attempts of presumably employers, right --

A. Um-huh.

Q. -- to have funds credited back to their bank accounts?

A. Yes.

Q. And the reason why is because they didn't follow the rules; is that right?

A. They missed the deadline, yes.

STEVEN PEREIRA
Q. Put that to the side.
And again as we discussed, any payments to be made by taxing jurisdictions, their last stop before the payment was First Premier's bank account?
A. Yes.
Q. Or, excuse me, NatPay's bank account at First Premier?
A. Yes.
MR. ROSATO: I'm going to hand you what will be marked as Pereira 17.
(Whereupon, Pereira Exhibit 17, Cafaro E-mail Dated 9/23/19, Bates Stamped NP0100294 to '296, 7-Pages was marked for identification.)
BY MR. ROSATO:
Q. Do you recognize this e-mail?
A. I don't, but I understand it and I definitely received it.
Q. So I'd like you to help me understand it a little bit. There is now some debits from Wells Fargo referenced in the e-mail?
A. Yes.

STEVEN PEREIRA

Q. Do you know what that's referring to?

A. Yes.

Q. What is it?

A. It's the tax payments that we made to, I believe, the State of Wisconsin.

Q. And is that the first spreadsheet that's attached to the e-mail?

A. Yes.

Q. Looking at the batch totals you see is there is a batch total of 2,993,986.80 at the bottom of that first page?

A. No, I don't see it.

Q. The right-most column, there is no --

A. No, those numbers don't add up to $2 million.

Q. I'm just looking at batch total, there is a batch total and also an amount.

A. Oh, okay.

Q. And so these were -- this was a set of credits to this Wells Fargo account that were reversed, right?

MS. NEIDL: Objection.

STEVEN PEREIRA

THE WITNESS: Yes.
Q. You rejected the debits; is that fair?
A. No. We attempted to recover our money, so we debited what the State of Wisconsin for all of these taxes.
Q. You tried pull back?
A. We did try to pull back.
Q. Were you successful?
A. We were not successful, this is why you got a spreadsheet of them.
Q. So this was a handful that you were not successful in pulling back?
A. Initially we were, but they arm-twisted and we accepted the money.
Q. So you said they arm-twisted, what did they do?
A. This was in the issue of Cashet and the disaster of double crediting the clients and they were very polite in reminding me that I didn't want my name in the paper.
Q. All right. So you just --
A. We just took it.
Q. -- you let these ones go?

STEVEN PEREIRA

A. It was recommended to us to just eat it.

Q. So let me ask you a question though: Whose responsibility is it, to your knowledge, to ultimately make these payments to the taxing jurisdiction?

A. Whose the responsibility?

Q. Right.

A. It's the payroll processor.

Q. Okay. But whose ultimately liable for the taxes?

A. The employer.

Q. Right. Do you know if NatPay retains any liability to pay taxes for an employer?

MS. NEIDL: Objection to form.

THE WITNESS: I don't -- it's a legal term. I do know that we take responsibility if something we did do causes a delay for a legitimately funded tax payment we step up.

BY MR. ROSATO:

Q. Like if, I don't know, if NatPay is negligent in some way?

STEVEN PEREIRA

A. Yes.

Q. So turning to the next spreadsheet is this another set. Okay. So going back to the -- well the e-mail sort of explains it, but I want to ask you. The e-mail says second is the spreadsheet from Pioneer Bank, these were all reversal attempts for funds deposited but weren't collected.

Do you know what Ms. Cafaro is saying there?

MS. NEIDL: Objection to form.

THE WITNESS: Which e-mail is that?

Q. It's the e-mail started 9/4, the first page, and then we can flip back to the spreadsheet, but I just wanted to get your understanding of what she means by these were all reversal attempts for funds deposited but weren't collected?

A. It could mean two things, but what it did mean is we attempted to, like, dispute the return, so we generated another debit back to Pioneer Bank. Or we in many cases, if a client has a frozen, when it unfreezes, they say debit me again; so this is a second attempt

STEVEN PEREIRA

to collect the funds at Pioneer.

Q. What was the outcome of that?

A. It was -- we all know that it was denied.

Q. Was that because the -- I mean, there were still no debits being allowed out of that account at that time?

A. Correct.

Q. I want to turn back to your declaration, which is marked as Pereira 2.

A. I literally can't find it. Can I have another copy?

Q. So I wanted to just ask you about paragraphs 37 to 40.

Do you see paragraph 37 says, "NatPay did not begin to receive notice of return debit transactions until September 6, 2019"?

A. Yes.

Q. Isn't it true that NatPay started to receive notice on September 4th of 2019?

A. Yes. If I could correct that, this is not -- they started returns. I think we're referencing that we sent out a series of debits

STEVEN PEREIRA

naively on September 3rd and we started receiving those returns on September 6th. We received returns, but they were from entries dated August 30th.

Q. By September 4th, right?

A. I believe they started the fourth or the 5th again the dates blur the at that point we thought there was just a little snag so the next set of debits went so we sent those on the third so yes the timing is correct.

Q. So why don't we just turn back to 33 though, paragraph 33. You see 33A it discusses on August 30, 2019, NatPay received instructions from Cloud to debit approximately $3.2 million?

A. Yes.

Q. So your declaration does go through some transactions prior to September 3rd, right?

A. Can you repeat that?

Q. I mean, this is referring to transactions prior to September 3rd --

A. Yes.

Q. -- the one referenced in paragraph

STEVEN PEREIRA

40, right?
A. Yes. Those were the first sets of troubles, yeah.
Q. And I think we just established that -- at least as of the morning of September 4th, people were aware of debits being rejected, right?
A. Yes.
Q. And refresh me, when did, to your recollection, NatPay begin I guess the word that you used suspend ACH files, credit files and not send them to First Premier?
A. My guess would be that it was the entries that we started -- if we sent out entries on September 4th, which was a Wednesday, we were going to wait to send out deposits until we received word we were going to determine that things had unhinged.
Q. Okay. So probably as of September 4th you started that process?
A. We finally said this is not going to go away. We thought up until that time after speaking to Matt Schilling, that it was just a little snag that everything -- and like I said,

STEVEN PEREIRA

we've encountered this before; someone has their identity stolen, they freeze the account and it re-opens and everyone is good.

Q. Okay.

A. So we hoped for the best.

Q. So just moving down to 41, paragraph 41, you say "As a result of these transactions, Pioneer prevented the payment of approximately $7.7 million in tax funds."

A. You said which number again, please?

Q. Paragraph 41.

A. Yes. Okay.

Q. I think we talked about, isn't it also true that NatPay prevented the payment of millions of dollars in tax funds?

A. I don't know if we prevented it, we didn't send them, because they weren't fund.

Q. But they weren't paid, right?

A. Right.

Q. And at least as to those to whomever those employers those funds applied to, I mean, their tax liability with respect to those payments is extinguished, right?

MS. NEIDL: Objection to the form.

STEVEN PEREIRA

THE WITNESS: I don't understand the question.

Q. Well, the taxes were paid, right?

MS. NEIDL: Objection to form.

THE WITNESS: Which taxes?

Q. The $3.2 million you say at least --

A. I thought we were saying seven --

Q. That you say the credit files were pulled back -- or excuse me. Hang on a minute.

No. As to the $3.8 million, right, that you're claiming did get paid out, right?

A. Including $2.5 million that was an internal transfer at Pioneer, yes.

Q. That's included in the 3.8?

A. It is.

Q. So money not intended to go to a taxing jurisdiction?

MS. NEIDL: Objection to the form.

Q. Or at least wasn't scheduled to go to a taxing jurisdiction, right?

A. Yes.

Q. It was --

A. We were funding an account that, you know, we would -- you would think was going to

STEVEN PEREIRA

be -- then the funds were in that in order to pay taxes, but it's just perspective.

Q. So then that would leave $1.3 million that actually went to taxing jurisdictions; is that correct?

A. If that's the math, yes.

Q. So, you know, these are just rough numbers: The 3.8 minus is 2.5 is 1.3 million, right?

A. That's money we paid out that we weren't able to collect.

Q. Okay. But those taxes were paid, right?

A. Yes.

Q. And the funds are not -- I think as you've testified, are not NatPay's property, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Correct.

Q. I want to go to paragraph 45. You say NatPay has also received multiple demand letters sent by or on behalf of the employer clients of Cloud demanding "return" of their tax funds; notwithstanding that Pioneer

STEVEN PEREIRA

admittedly has possession of their tax funds.
What was Nate's response to these alleged demand letters?"
A. I don't know.
MS. NEIDL: Objection to form.
THE WITNESS: I don't know. We sent out letters to everyone trying to pacify them. Sometimes we just explained that we didn't have the money, it was sent to Pioneer Bank; and a lot of people were satisfied, a lot of people were not satisfied.
I think the threat of these lawsuits -- maybe people are waiting to see how this resolves, I don't know, but I think the threat of lawsuits is definitely something that we deal with daily.
BY MR. ROSATO:
Q. But NatPay hasn't been sued in connection --
A. Yes, we have.
Q. By whom?
A. I can't remember the names. I know there's -- I'm sorry, I don't remember the

STEVEN PEREIRA

names, but I think there was some group of people that sued us in Nevada.

Q. Well, that's in paragraph 46.

A. There Simmons.

Q. Do you know whether NatPay remains a defendant in that lawsuit?

A. I think that we are not.

Q. Do you know whether they were still a defendant in that lawsuit as of the time -- as of the date this document was filed?

A. I hate to be appended to dates, but I believe, yes, we were still a defendant. I think it took well into 2020 to get dropped off, but I don't know for a fact.

Q. Do you know why NatPay was dropped as a defendant in the case?

A. I don't know, sorry.

Q. So was that the only -- to your knowledge, was that the only lawsuit that was pending against NatPay?

A. Yes.

Q. All right. I want to turn to the communications with employer clients of Cloud Payroll -- NatPay's communications.

STEVEN PEREIRA

Do you recall that there was a form letter that was drafted to go out to anyone who was making inquiries about this issue?

A. Yes.

Q. Were you involved in preparing that?

A. I'd have to see it; probably.

Q. Well, lucky for you I have a copy.

A. I have no doubt.

MR. ROSATO: I think I went a little bit out of order here. Yeah, I did.

(Whereupon, Pereira Exhibit 18, Hagen E-mail Dated 9/8/19, Bates Stamped NP0098649 to '650, 2-Pages was marked for identification.)

BY MR. ROSATO:

Q. So we're going to hand you what's is going to be marked as Pereira 18.

Do you recognize these e-mails?

A. I don't remember them, but I have no doubt.

Q. Do you see in the middle of the page -- well, actually, let's go to the bottom.

Did you say, "George wanted me to ask you to see if you could do a rough draft of

STEVEN PEREIRA

our communication to the customers."

Do you see that?

A. I'm so bad with these threads. Am I writing Jim Hagen?

Q. Yes. It's close to the bottom there?

A. I seem to think that we asked Jim for his input, because he knew the kind of hysterical mess was being caused for us by the clients, he was closer-to-the-road.

Q. It was phone calls and that sort of thing?

A. Yeah. He was on a cruise to Italy.

Q. Great timing, right?

So you say, "This is good, I send it on for approval."

Does that mean you sent it to Mr. Hamilton?

MS. NEIDL: Objection to form.

THE WITNESS: It doesn't say so here, but that is the logical thing I would have done is ask George for approval.

Q. Okay. Anyone else?

A. In this kind of thing, George is the

STEVEN PEREIRA

guy.

Q. So Jim sends back a draft here.

You see it says in the middle of it that sentence in, like, the third paragraph, "NatPay immediately put in place steps to manage the orderly process of recovering funds"?

A. Yes.

Q. Do you know what steps those were?

A. No.

Q. Were you involved in putting them in place? Or let me back up, do you know if any steps were put in place?

A. Well, in context it is 9/8. The first steps we were doing is NACHA violation, so we were taking steps at all the things that were at our disposal in order to get the bank to disgorge.

As of now maybe the wording would be a little different, but back then we still had hopes that we would get Pioneer to disgorge.

Q. And the next sentence says, "NatPay, as part of its total fraud and best practices, has more than sufficient insurance to cover the

STEVEN PEREIRA
actions of attempted fraud."
Do see that?
A. Yes.
Q. Do you know what insurance Jim is referring to in that insurance?
A. Yes, our E&O, and at the time we thought we were covered.
Q. So a claim was made under that policy?
A. You'd have to ask. I know we made claims for various things, but I don't know.
Q. Do you know if there has been any insurance coverage provided in connection with the events?
A. I know as of this point nothing is being covered by insurance. There may have been a few at the beginning but I believe that was withdrawn the coverage was withdrawn from us from very early on.
Q. Okay. So to your knowledge there hasn't been any payment made on any insurance policy?
A. There might have been disbursements for legal fees but that ended rather quickly.

STEVEN PEREIRA

Q. Okay. Do you have any knowledge of the reasons why that ended?

A. No.

Q. You can put that to the side.

So one the steps that was referred to in the process would you agree that that might be dishonoring debits out of NatPay's account at First Premier?

MS. NEIDL: Objection.

THE WITNESS: We're back on this?

Q. Yeah. I'm sorry, I made you put away -- I'm sorry, I just had another question on it.

A. Can you repeat the question, I don't get it?

Q. So you remember we just talked about the orderly process of recovering funds?

A. Yes.

Q. And we also just previously discussed steps that NatPay took to reject debits out of its account to, you know, various taxing jurisdictions, right?

A. Yes.

Q. Was that one of the steps to recover

STEVEN PEREIRA

funds?

A. No. No, that would be odd.

Q. Because NatPay would just keep the funds in its account, right?

A. Well, we wanted to make ourselves whole; that was my priority.

(Whereupon, Pereira Exhibit 19, Williams E-mail Dated 10/15/19, Bates Stamped NP0109468 to '470, 3-Pages was marked for identification.)

BY MR. ROSATO:

Q. I'm going to hand you another document here that we'll mark as Pereira 19.

Do you recognize this e-mail?

A. No.

Q. No reason to doubt that you received it though?

A. No.

Q. Remind me again, who is Mark Williams?

A. He's sort of our, like, our all-around-guy-compliance, he does paperwork and stuff like that.

Q. Okay. You see a number of other

STEVEN PEREIRA

individuals are copied here. Who is Allen vanFleet?

A. He's an attorney.

Q. He represents NatPay?

A. I don't know if he represents, I think he consults.

Q. What about Richard Savage?

A. I know that he -- now he was our adjuster, an insurance adjuster.

Q. And what about Andrea Janetti?

A. I don't know the name, but at Travelers.com leads me to suspect that she worked at the insurance company.

Q. So what was the response to this demand letter that's attached? Are you -- well, let me back up.

You see there is a demand letter attached in the Bates number ending in 69?

A. Yes.

Q. Do you know if NatPay ever responded to this demand letter?

A. No.

Q. Do you know if NatPay paid the amount demanded?

STEVEN PEREIRA

A. No, I don't.

MR. ROSATO: You can put that one to the side.

(Whereupon, Pereira Exhibit 20, Williams E-mail Dated 9/20/19, Bates Stamped NP0098384 to '385, 2-Pages was marked for identification.)

BY MR. ROSATO:

Q. I'm going to hand you what will be marked Pereira 20.

Do you recognize this e-mail?

A. No, but I have no doubt, it sounds like me.

Q. You see this letter this is like a -- I guess some new draft letter here?

MS. NEIDL: Objection.

Q. Do you see this attached? The attachments looks like Mark Williams says letters attached with the phone numbers attached?

MS. NEIDL: Objection to form.

THE WITNESS: Okay. I got it now.

Q. Were you involved in drafting this letter that's attached here?

STEVEN PEREIRA

A. I can't say. It doesn't necessarily sound like me, so this might have been an attorney or George or somebody else.

Q. Do you see in the third paragraph there it says, "NatPay only handled the movement of tax payments for a very limited number for Cloud Payroll companies"?

A. Um-huh.

Q. Didn't you handle the movement of tax payments for all of the Cloud Payroll companies?

A. I think this is in reference to the people that their direct deposits via Cashet; they were conflating.

So we were getting a flood of calls from people complaining about their payroll. So what we're saying is we didn't do payroll, we did the tax. I don't -- I can't argue about the nomenclature we used; a very limited number for Cloud Payroll, but we did taxes and we tried to get people to make that distinction, because we were being peppered by everybody at Cachet Banq, because we were there; Cashet closed.

STEVEN PEREIRA

Q. Moving to the third sentence it says, you will understand NatPay cannot move money for tax payments if, as in this case, the funds went missing at Cloud Payroll.

Do you know what's being conveyed there?

MS. NEIDL: Objection to form.

THE WITNESS: What's being conveyed is the truth, which is the money that we -- that they deposited into Cloud Payroll's account isn't there anymore, so we can't make the tax payments.

Q. Well some payments were made, right?

MS. NEIDL: Objection.

THE WITNESS: Sadly, yes.

MS. NEIDL: Objection to form.

Q. It says -- the next sentence says, "There is no way for us to know at this time what payments have been paid, due to the unfortunate way Cloud Payroll files were processed through the system."

Do you know what's being referred to there as the unfortunate way Cloud Payroll files were processed through the system?

STEVEN PEREIRA

A. I don't know about the choice of words, but I know what point was the point was that we don't really know what's taxes -- people deposited their money at Cloud Payroll, but their taxes hadn't been transmitted yet or -- I mean, there are various phases, so we can't tell people if their taxes were paid or not, because we would get transactions to pay taxing authorities, and the information on the ACH transaction doesn't specify exactly what company it is; it's a tax ID number, et cetera. So you can't just pluck out an entry and say oh, that belongs to this dry cleaner.

Q. You would agree though that NatPay originally processed the transaction where the money actually came into the Pioneer Bank account in the first place, right?

MS. NEIDL: Objection to form.

THE WITNESS: The deposits made in the Cloud Payroll account were facilitated by NatPay, yes.

Q. Do you think that's why NatPay was being contacted by people, by employers about this issue?

STEVEN PEREIRA

MS. NEIDL: Objection to the form.

THE WITNESS: My memory serves me Pioneer wouldn't handle or return any phone calls, so they had to call somebody, and they called us; and we pick up the phone.

Q. Do you think that might be because none of those employers had bank accounts at Pioneer Bank?

MS. NEIDL: Objection to form.

THE WITNESS: Oh, I don't know. I can't guess that. I'm sure they didn't; it's such a small little bank.

Q. Do you know whether NatPay permits its own clients to contact First Premier Bank?

A. They do, um-huh, all the time.

Q. They can?

A. They can call and say, I have a problem with this transaction at First Premier, and we say, call this number.

Q. So they don't really give any information?

MS. NEIDL: Objection to form.

THE WITNESS: They do give information.

STEVEN PEREIRA

Q. They gave them a phone number?
A. And a name and a contact, yes.
Q. Where?
A. It depends; our reconcile letter gets the questions or Dawn.
Q. You said they direct them to NatPay?
A. Yes.
Q. But think don't otherwise -- First Premier doesn't otherwise give out information about the bank account that NatPay has at First Premier?
MS. NEIDL: Objection to form.
Q. Correct?
MS. NEIDL: Objection to form.
THE WITNESS: First Premier gives out no banking information.
MR. ROSATO: You can put that to the side.
Q. Do you recall about how many inquiries NatPay received from employers, you know, trying to figure out where their funds were?
A. No.
Q. Were you involved in responding to

STEVEN PEREIRA

those in any way?

A. The system -- we evolved where the questions to our returns desk and we were told to tell the clients that we will send them something that should give them information.

(Whereupon, Pereira Exhibit 21, Plaza E-mail Dated 9/30/19, Bates Stamped NP0099523 to '524, 2-Pages was marked for identification.)

BY MR. ROSATO:

Q. Let me hand you what will be marked as Pereira 21.

Do you recognize this e-mail?

A. Faintly. I mean, I don't doubt that this is ours, but...

Q. Do you know who Authority Brands or what Authority Brands is?

A. No.

Q. What is the CSR department at NatPay?

A. Customer service.

Q. Okay. And so you'd agree that the attachment in the second page of Bates number ending 24, is the same draft letter that we

STEVEN PEREIRA

just reviewed?

A. It certainly looks like it.

Q. And to your recollection or to your knowledge, were employers satisfied with the response here with this response letter?

MS. NEIDL: Objection to form.

THE WITNESS: Well, this was not a NatPay customer, this was a MyPayrollHR customer, so they were talking to us when they should have been talking to Cashet.

Q. You see the letter directs parties just to contact Pioneer Bank for more information?

A. Yes.

Q. But as you just said, even your bank doesn't give out information to people to even your own clients, right?

MS. NEIDL: Objection to form.

THE WITNESS: Okay. Yes.

Q. So, I mean, what was the purpose of just sending people to Pioneer Bank?

A. Well, our feeling was that they -- it was their money in that bank account that they should call the bank and find out why it's

STEVEN PEREIRA

frozen.

Q. But NatPay was responsible for the money making it there in the first place, right?

MS. NEIDL: Objection to form.

THE WITNESS: No. In this case, this was a MyPayrollHR customer through Cashet.

Q. Well we can look at another one. Let's see if I can find one.

Okay. So this was about payroll processing, is that what you're saying?

A. Yes.

Q. Okay. So this was just solely to deal with employers who had issues with their payroll not being made, not the payroll taxes?

MS. NEIDL: Objection to form.

THE WITNESS: Right. Customers were spraying complaints to anyone who would listen.

Q. All right. You can put that to the side. Let me get to this -- I wanted to get to the NACHA complaint.

So do you recall whether you

STEVEN PEREIRA

approached First Premier to make that complaint?

A. Oh, absolutely.

Q. And what prompted that?

A. The returns and -- yeah, the returns of the account was supposedly frozen, they took our credits.

Q. Why is it that First Premier had to prepare the complaint?

A. That's the way it works; NACHA doesn't even recognize us in that instant.

Q. The financial institution --

A. It's bank-to-bank.

Q. -- has to make a complaint?

A. Yes.

Q. Do you know who drafted the complaint?

A. I have to see it again, but I know I didn't; I think the bank has to do it.

Q. I'll hand you what will be marked as Pereira 22.

(Whereupon, Pereira Exhibit 22, Kennett E-mail Dated 9/12/19, Bates Stamped NP0109209 to '210, 2-Pages was marked for

STEVEN PEREIRA

identification.

BY MR. ROSATO:

Q. Do you see at the bottom of this page you have an e-mail it says our attorney wants me -- first of all let me ask you, do you recognize the e-mails?

A. I don't remember them.

Q. But no reason to doubt that you received them?

A. Yes.

Q. Do you see at the bottom you say, "Our attorney wants me to get a paperwork to file a NACHA violation against Pioneer, can you send me the appropriate forms?"

Do you see that?

A. Yes.

Q. And then you see Katie Kennett's response that says, "Like I mentioned on our call this morning."

So I guess you had a call on September 12th, that morning, is that fair to say?

MS. NEIDL: Objection to form.

THE WITNESS: I have no reason to

STEVEN PEREIRA

doubt it.
Q. She goes on to say, "I would be happy to file the NACHA Rules violation on NBC's behalf. I obviously want your input as well, so if you want to send me any information that you and your attorney would like included in the violation, I'll be happy to include it."
Do you see that?
A. Yes.
Q. So did NatPay provide the information to First Premier to be included in this NACHA complaint?
A. What information? Dialogue of the Complaint or the transaction details, what part?
Q. Well let's start with that, dialogue of the Complaint?
A. I think this is Katie's polite way of telling me she has to do it, not us, that's the way it works; we thought we have to do the complaint.
So her first thing is I'll be happy to do it on your behalf.
And then they -- we discussed the

STEVEN PEREIRA

scenario, we discussed what happened. Our attorney undoubtedly discussed it with them and then they decided which was the best -- what they determined was the true violation.

Q. But she says here in the parentheses at the end of that sentence that she would obviously share with you prior to submitting so that you can approve it.

Do you see that?

A. Yes.

Q. So the submission of it, at least according to her in that e-mail is subject to NatPay's approval?

A. Yes. Sorry.

MR. ROSATO: You can put that to the side. I'll hand you what will be marked as Pereira 23.

(Whereupon, Pereira Exhibit 23, Kennett E-mail Dated 9/12/19, Bates Stamped NP0109220, 1-Page was marked for identification.)

BY MR. ROSATO:

Q. Do you recognize this e-mail?

A. No.

STEVEN PEREIRA

Q. No reason to doubt that you sent the first e-mail or received the other one?
A. No.
Q. You see you say to Katie Kennett, that your attorney or I guess "our" meaning NatPay's attorney?
A. Yes.
Q. Would that be Bonnie Pinzel?
A. Yes.
Q. "Has asked me if First Premier filed an injunction or lawsuit against another bank on behalf of their customer."
So do you know whether you ever got a response to that inquiry?
A. Obviously we got a no, because they didn't file suit.
Q. And it looks like based on your e-mail the thought was maybe freeze the money in those accounts; are those referring to accounts at Pioneer Bank?
A. That's what I would assume, yes.
Q. So First Premier likely said, as you just said, said no, this didn't happen, right?
A. Yes. This was entirely new ground,

STEVEN PEREIRA

we didn't know what to do.

Q. Do you recall having a discussion with First Premier about why an injunction of the kind that you are talking about here was possible?

A. Well, it obviously was impossible and I believe --

Q. It was impossible, that's what I'm saying?

A. Yeah. They made it quite clear that banks don't do that. If we wanted an injunction, my recollection is that we would have to take our own action.

Q. Did they tell you why banks don't do that?

A. Not really.

MR. ROSATO: You can put that to the side.

MS. NEIDL: Can we take a quick break?

MR. ROSATO: I've got like literally like -- we're getting close here. And I just have like a two more documents to go through in this module can we do that and

STEVEN PEREIRA

unless it's if it's urgent and you want to check in, that's fine.

THE WITNESS: No. Tomorrow it will be -- I don't have an option to not do it, but today we can go.

MR. ROSATO: I'm happy to accommodate you, if you would like to.

THE WITNESS: I know you are. You are generally a lovely man.

MR. ROSATO: Well, thank you very much for saying so and on the record, too.

All right. Let's get these last two done and then you can step out. Let me hand you what will be marked Pereira 24.

(Whereupon, Pereira Exhibit 24, Pioneer Letter Dated 10/2/19, Dates Stamped PB-SWP-00385498 to '509, 12-Pages was marked for identification.)

MR. ROSATO: Oh, and you know what, we need to get we can mark this one as Pereira 25.

(Whereupon, Pereira Exhibit 25, NACHA Letter Dated 9/23/19, Bates Stamped PB-SWP-00397920 to '970, 51-Pages was

STEVEN PEREIRA
marked for identification.)
BY MR. ROSATO:
Q. It's too late now, but I would have referred to put Pereira 25 in front of you first.
A. Okay.
Q. Have you seen Pereira 25 before?
A. No.
Q. So why don't you turn to the third page. And have you seen that particular document before?
A. No.
Q. It's the Bates number ending in 23?
A. What was the question?
Q. Have you seen this document before?
A. I can't -- this stuff is usually not -- we're not privy too, but I have seen something that looks like this. I mean, I know what this is.
Q. What is it?
A. It looks like the kind of information the bank will print out or use for a report in a violation.
Q. This is the NACHA complaint, right?

STEVEN PEREIRA

A. That would be my guess.

Q. So if you go down to the bottom, that bottom box, that second box there?

A. Yes.

Q. What is transaction code 26, if you know?

A. I don't. I kind of do, but I don't.

Q. All right. Don't guess. If you don't know, that's fine.

Do you see that there is a dollar amount listed of about $800,000?

A. Yes.

Q. So whatever this complaint -- this complaint was dealing specifically with one transaction?

MS. NEIDL: Objection to form.

THE WITNESS: It doesn't have a volume here so I can't really tell you.

Q. Well let's look. It says additional violation details please see the attached spreadsheet for the additional 22 violations?

A. So it's 22 items.

Q. 22 violations. Okay.

When you look at the description of

STEVEN PEREIRA

rule violation it says, "An RDFI may not return an entry, because it is a particular type of entry."

An RDFI means Receiving Depository Financial Institution?

A. Yes.

Q. Who is the RDFI in this circumstance, your understanding?

A. Pioneer.

Q. Why are they the RDFI?

A. They receive the data.

Q. The ACH items, right?

A. Yes.

Q. Okay. And so that would make First Premier the originating?

A. The ODFI, yes.

Q. Okay. Do you understand what that means an RDFI may not return an entry because it is a particular type of entry?

A. Yes.

Q. What does that mean?

A. That means you can't return items just because they're debits. We believe that if you're freezing an account, you should have

STEVEN PEREIRA

returned everything going into that account, debits and credits, but they chose only debits, which is a type of entry.

Q. Okay. And you point to this rule subsection 3.8.1.1 as the basis for that?

MS. NEIDL: Objection.

Q. Well, actually, let me back up.

Do you recall whether you assisted in preparing the text of this complaint?

A. No, absolutely not. This is not a random way to write it. I think there is a very specific methodology.

Q. Okay. But the point of the Complaint, I think the last sentence says, the RDFI was selectively accepting certain entries and returning others?

A. Yes.

Q. That's the thrust of the Complaint, right?

A. Yes.

Q. And if you turn to the detail provided, you have a list here, I guess this is of the 22 transactions that were referred to in the complaint?

STEVEN PEREIRA

A. Yes.

Q. And do you see there is the one big one and we've seen it before of about $3 million?

A. Yes.

Q. And then there is another fairly sizable of $451,000?

A. Um-huh, yes.

Q. The rest of them are kind of small, right? Do you know why this complaint didn't include later transactions?

A. Ask that again, I don't get it.

Q. Do you understand why this complaint didn't include transaction that's occurred after this last one on September 5th, 2019?

A. No.

Q. If you go back to your declaration Pereira 2, I told you you've got to keep that one handy, paragraph 40, and keep the other one in front of you, too; the other one being Pereira 25.

Do you see it refers to a transaction in the amount of a debit in the amount of 451,058.89?

STEVEN PEREIRA

A. Yes.

Q. It says on this declaration that the date is September 6th?

A. Yes.

Q. Do you see that?

A. Um-huh.

Q. If you turn back to Pereira 25, the same page that we were looking at with the Bates ending in 24?

A. Which number, 25?

Q. Yeah, that table that we were just looking at, do you see that entry transaction number 16 matches up with that?

A. Yes.

Q. And you see the date is reflected as September 4th, 2019?

A. Yes.

Q. Can you explain why there is a discrepancy between what's stated in the declaration and what's reflected on this complaint?

A. Yes.

Q. What's the discrepancy?

A. We tried again, we did a second

STEVEN PEREIRA

attempt.

Q. You tried to debit the funds?

A. We thought typically you can do that, the freeze is released, so you try again.

Q. Okay. So you sent another ACH item to --

A. That's what it -- yes, that's probably the major reason why there is a date discrepancy. If I remember correctly, we waited a few days and we tried again; we were very hopeful.

Q. Okay. So back to my original question. We have -- well, in your declaration you have -- so paragraph 39, for example, it refers to a withdrawal a debit of 3,800,000 and change?

A. Yes.

Q. That's not reflected on Pereira 25 in that table that we're looking at, right?

A. We didn't lose any money.

Q. So that's what I want to understand. Why?

A. Because we didn't send out the payments.

STEVEN PEREIRA

Q. That why they're not reflected on the Pereira 25 table?

A. That would be my guess.

Q. So it relates to --

A. And this is one particular complaint is this the only one. Is there more? I don't know. Is this the entire list of items that we filed complaints on?

Q. I don't know, can you tell me? You don't know the answer to that?

A. I'd have to do the math.

Q. I mean, just looking and doing rough math, I don't know, it looks like somewhere around three-and-a-half million dollars; is that fair?

A. Um-huh.

Q. Okay. So you can put that to the side. And you can move to Pereira 24, which have you ever seen this document before?

A. No.

Q. I'll represent you to that this is Pioneer Bank's response to the NACHA complaint?

A. Yes, that's obvious. But we are not made privy to any of this data, it's private.

STEVEN PEREIRA

Q. Okay. So just between the depository financial institutions; is that right, and NACHA, of course?

A. I don't even know if First Premier is privy, they're told yes or no.

Q. Do you see it's close to the bottom of the first page of Pereira 24 it says "The operating rules clearly contemplate the return of debit entries so long as also a valid reason for the return."

Do you see that?

A. Yes.

Q. Do you generally agree with that statement?

A. I'm trying to find it again.

Q. It's close to the second to -- the third-to-last sentence of that big paragraph there.

A. Yeah, I see it.

Q. Do you agree with that statement?

A. Yes. If there is a valid return reason, that's what they're for, yes.

Q. And so turning to the next page ending in the Bates number ending 99, it says,

STEVEN PEREIRA

"While Pioneer Bank used the return reason code R16, that's to indicate that action was taken to freeze the account, it could equal justification of return reason code R01, insufficient funds." And then it says at the end, "a code that only applies to debit entries."

Do you see that?

A. Yes.

Q. Do you agree that that code applies only to debit entries?

A. Yes.

Q. So do you also agree that there could be more than one reason under NACHA rules to return a debit?

MS. NEIDL: Objection to form.

THE WITNESS: There is always an exception, yes.

MR. ROSATO: All right. I think -- strike that.

Q. Do you see also if you turn back to the first page, the third bullet point in the -- it says, "Pioneer is also granted a right of setoff against the affected account for all the

STEVEN PEREIRA

account owner's debt obligations due and payable to Pioneer Bank."

Do you see that?

A. I do.

Q. If you turn to the terms and conditions that are attached, if you go to paragraph 15, the Bates number ending 06, and you say you see it says you each agree that we may, in parenthesis when permitted by law, end parenthesis, set off any funds in the account against any payable date that you owe us through now and the future. Do you see that?

A. Can you help me zero in on this.

Q. Do you see Section 15?

A. Yes.

Q. Entitled setoff?

A. Yes.

Q. It's the first sentence. Do you see it?

A. Um-huh.

Q. Have you ever heard the term, setoff?

A. I heard it before, I'm intimately familiar with it now.

STEVEN PEREIRA

Q. What was your understanding of it prior to this lawsuit?

A. I've heard the term, I never imagined that it never applied, it seemed odd, but...

Q. Well, have you ever heard of, for example, account overdraft protection?

A. Yes.

Q. You know, where a bank either let's say you overdraw one of your accounts, they'll use funds from another account to protect against the overdraft.

Have you ever heard of that?

A. Yes.

Q. That's a form of setoff, wouldn't you say?

A. No.

Q. That's different?

A. Yes.

Q. How is it different?

A. The overdraft protection is directed by the client, and I think that it has to be related and, you know, the accounts have to be tied together, et cetera.

STEVEN PEREIRA

Or what I understand is setoff from my layman's point of view is let's say you have a car loan at a bank and you default on the loan, the bank can take your money.

Q. But what about if you overdraw on your account, isn't that also now a debt that you owe to the bank because you are overdrawn on the account?

A. Yes.

Q. So why wouldn't the right of setoff apply equally to that?

MS. NEIDL: Objection to form.

THE WITNESS: Well, if you want to be specific: From all the documentation of the accounts that I've seen, that account wasn't overdrawn. So all of this about returning it as an R1 would have been a bigger -- it would have been a bigger mystery, because on the day that we debited those funds, the funds were in that account they were not overdrawn.

Q. But other accounts were, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Irrelevant to me.

STEVEN PEREIRA

Q. Are you aware there are other accounts controlled by Michael Mann at Pioneer Bank that were withdrawn by?

MS. NEIDL: Objection to form.

THE WITNESS: I believe there were all kinds of craziness in all the accounts.

Q. Are you aware whether accounts were overdrawn --

A. I don't remember I know there were overdrawn accounts after all the returns.

MR. ROSATO: You can put that to the side and we've got one more and then we can break.

(Whereupon, Pereira Exhibit 26, Cafaro E-mail Dated 10/3/19, Bates Stamped NP0098889 to '948, 60-Pages was marked for identification.)

BY MR. ROSATO:

Q. And just to be clear, NACHA ultimately denied the complaint, right?

A. Yes.

Q. I'll hand you what will be marked Pereira 26. Have you seen this document before?

STEVEN PEREIRA

A. No.

Q. The e-mail at the top is addressed to you, right?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. No reason to doubt that you received this e-mail?

A. No.

Q. So the underwriting application that's referred to here, that's all the documents that are attached?

MS. NEIDL: Objection to form.

THE WITNESS: This appears to be the information that we also used for the underwriting.

Q. Okay. And that would include -- so this looks like the starter kit for Cloud Payroll is included in that?

A. Yes.

Q. And then beyond that -- so the information that was provided in the starter kit that was part of the underwriting file?

A. We utilize that, yes.

Q. Okay. And then it looks like you

STEVEN PEREIRA

have a continue check that's checking the tax identification number?

A. It has to match the name in the IRS database.

Q. There was a match found. Beyond that, it looks like there is a Google search starting on NP0098920?

A. Yes.

Q. And then I think you testified to this earlier, but after that it looks like there is just the printout of the Cloud Payroll website?

A. We go to the website we try to, yeah, verify they are what they say they are.

Q. And then finally it looks like on the Bates the number ending in Bates 42, a zoom info search that was done?

A. I'm not familiar with this, but our different underwriters have different things that they tap into.

Q. So my question is: Do you know what prompted this review of the underwriting information?

A. To the best of my memory, we didn't

STEVEN PEREIRA

really know that there was a MyPayrollHR and we were starting to get a little confused about all the interaction because people would call us complaining about MyPayrollHR and they would conflate it with the name Cloud Payroll. So I think at this point we're trying to figure out exactly who is who and what business we were actually transacting with because, as I said, we were being flooded with calls.

Q. Did you ever figure out what the connection was to MyPayrollHR?

A. I'm still a little fuzzy on it, it seems a little convoluted so, no, I don't fully understand exactly how that whole arrangement worked. I know Cloud Payroll did taxes.

Q. MyPayrollHR wasn't disclosed to you?

A. They weren't a customer and that's what they were dying to ascertain were they really a customer somehow and they weren't.

Q. And of course you look on the underwriting file here and there is no mention of MyPayrollHR, right?

A. No, we thought that was peculiar, too.

STEVEN PEREIRA

Q. And so this was about -- this was October 3rd of 2019, so about a month after. Do you know if anything further came out of this review?

A. No, I don't.

MR. ROSATO: Okay. You can put that to the side and take a break.

VIDEOGRAPHER: This will conclude video number five in the deposition of Steven Pereira. We are off the record at 6:18 p.m., October 19, 2022.

(Whereupon, proceedings recessed for a short break and once again resumed.)

VIDEOGRAPHER: This is the beginning of video number six in the deposition of Steven Pereira. We are on the record at 6:36 p.m., October 19, 2022.

BY MR. ROSATO:

Q. Mr. Pereira, do you recall NatPay being contacted by law enforcement after the events of early September 2019?

A. Yes.

Q. Do you recall receiving a federal grand jury subpoena?

STEVEN PEREIRA

A. No.

Q. You don't have a recollection of that?

A. I don't, no.

MR. ROSATO: I'll put in front of you what will be marked as Pereira 27.

(Whereupon, Pereira Exhibit 27, Wabby E-mail Dated 9/12/19, Bates Stamped NP0109111 to '116, 6-Pages was marked for identification.)

(Whereupon, Pereira Exhibit 28, NatPay Letter, Bates Stamped NP0093965 to '030, 69-Pages was marked for identification.)

BY MR. ROSATO:

Q. Do you recognize Pereira 27?

A. I recognize what it is, I don't remember it.

Q. You don't have any reason to doubt that you received the e-mail?

A. No. Traditionally, when we do get subpoenas and we do get them, I forward to them Mark Williams.

Q. And Mark Williams deals with them?

STEVEN PEREIRA

A. Right. They're simply addressed to me, because I'm simply the recordkeeper.
Q. Okay. So quickly let's just look at the subpoena itself.
So were the documents requested relating to -- and do you see the five topics there?
A. Um-huh.
Q. For a period of January 1st, 2010, to the present. And then, categories of documents in paragraph six there it's contracts and agreements, ACH transactions, account records, electronic/internet records, correspondence, communications, and recorded telephone calls.
Do you see all of that?
A. Yes.
Q. Do you recall preparing a response to this subpoena?
A. No.
Q. You don't. So why don't you turn to 28, Pereira 28. Do you see the first three pages it's a letter it says re, grand jury subpoena duces tecum?

STEVEN PEREIRA

A. Yes, I see it.

Q. Signed by you?

A. Um-huh.

Q. Did you prepare this letter?

A. I did not.

Q. You didn't prepare it?

A. No.

Q. Who did? Well, let me back up:

Do you know who did?

A. Without certainty, no, but my best guess would be Mark Williams.

Q. Do you know if you had any phone calls with Special Agent Wabby who sent the --

A. That's the only one that I remember.

Q. There was one phone call with him?

A. Pretty quickly after the event.

Q. Was it before you received this e-mail with the subpoena?

A. Typically what occurs is they call on a sort of factfinding to see who they should direct it to, and then they ask a few questions.

I don't remember the context of the phone call. He may have asked me specifics,

STEVEN PEREIRA

but he wanted to know who to send the subpoena to.

Q. Do you recall anything else about the conversation anything he might have said?

A. No. Again, it wasn't like being questioned by the FBI, I think it was factfinding trying to figure out where we fit in, in the picture.

Q. And that was the only time you spoke to him?

A. I won't speak again in absolutes, but as far as I remember I do remember his name because it popped up, but I do remember a phone call. And I get, I won't say a lot because that's all subjective, but I get calls from FBI agents, they want to know what to do and what to ask.

And so it wasn't out of the ordinary, except in this case it was something very critical to us.

Q. Okay. And so after this response was provided it looks like on -- well, I don't see a date on here. But after this response was provided, did the government -- did the

STEVEN PEREIRA

federal government follow-up at all?

A. I can honestly say that there was literally nothing that occurred after we submitted the subpoena. My recollection was we were not contacted again by law enforcement whatsoever. I could be wrong, because I'm not the only one that would get the call, but I don't remember speaking to them again.

MR. ROSATO: Okay. You can put that to the side.

I'll put two documents in front of you that will be marked Pereira 29 and Pereira 30.

(Whereupon, Pereira Exhibit 29, Williams E-mail Dated 10/2/19, Bates Stamped NP0109588 to '596, 9-Pages was marked for identification.)

(Whereupon, Pereira Exhibit 30, Pereira E-mail Dated 10/22/19, Bates Stamped NP0109447 to '452, 6-Pages was marked for identification.)

BY MR. ROSATO:

Q. Do you recognize Pereira 29?

A. I don't remember it, but it's

STEVEN PEREIRA

obviously a real deal.

Q. No reason to doubt that you received --

A. None whatsoever.

Q. Okay. And this is an e-mail attaching a subpoena from the New York Department of Financial Services, right?

A. Yeah.

Q. Do you see on the page ending on 95, Bates ending in 95, the second-to-last page and did you have any involvement in preparing any response to this subpoena?

A. This one, I would almost guarantee, was completely dealt with by our attorney. If anything, I was asked could I get this data or get that data.

Q. So turning to Pereira 30, again, this is an e-mail from you back to representative of the New York Department of Financial Services.

Do you have any reason to doubt that you sent this e-mail?

A. Just this first page saying...

Q. The e-mail including the

STEVEN PEREIRA

attachments, do you have any reason to doubt that you sent it?

A. I don't, but let me look at the attachments.

Q. Sure.

A. All right.

Q. Do you recognize the attachments?

A. I don't, but I don't doubt that it's the real thing.

Q. There is two verifications. One on the page Bates ending 49. You represent there that the information or the documents provided were provided under your supervision; is that correct?

A. Yes.

Q. And you did supervise the response?

A. I'm pretty certain I did, yes.

Q. If you move to the next page 50, ending in 50, it's another verification. And it states in paragraph 3 National Payment Corporation does not purchase insurance or bonds related to payroll business.

Is that still true today?

A. No.

STEVEN PEREIRA

Q. What kind of insurance products does NatPay produce -- purchase now?

A. Well, I think any insurance we have is related to just E&O on the company, I don't think it's directly related to payroll; we have a bond with the State of Texas.

Q. And is that in the amount of $2 million?

A. It is.

Q. And that's related to NatPay's licensing as a money transmitter in the state, right?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. That's like a regulatory requirement of the State of Texas, correct?

A. Yes.

Q. You state in Paragraph 4, "NatPay does not do business in New York and is not governed by the provisions of New York banking Law Section 641"?

A. Okay.

Q. Is it true that NatPay does not do business in the State of New York?

STEVEN PEREIRA

A. This was done by an attorney with my reading it over it. I don't know what she uses as an interpretation; I think she meant we don't reside in New York.

Q. So NatPay doesn't have offices in New York?

A. No, none.

Q. Do you have clients in New York?

A. We have clients in New York.

Q. About how many would you think?

A. It's hard to say. We have a few large ones in Manhattan; we had one in Albany.

Q. Oh, I almost forgot about that. And then if you turn to the next page, it's just I guess two pages. It provides, I guess, some background in response. Some background on NatPay in response to the subpoena?

A. Okay. Yes.

Q. You see this first Section 1, it states an additional requirement placed on ACH third-party processors is to ensure funds do not change form.

Do you see that?

A. Yes.

STEVEN PEREIRA

Q. What does that mean?

A. Whatever we do never changes form away from an electronic deposit. That's why we think the basis of Texas is incorrect, because money transfer licenses were designed to prevent money-laundering. And money-laundering could occurs when you take cash and turn it into a wire or take cash and turn it into a check; that's where the money-laundering, from our point of view, can occur.

For us, the money never leaves the ACH banking network and it was monitored by everybody and every institution along the way, including OFAC checking, et cetera, that's why we believe Texas is incorrect.

Q. Would you agree with me though that NatPay takes money from one place and moves it to another place?

A. Yes.

Q. Just as a general matter, that's kind of --

A. Not for the sake of movement, it's for goods and services. We're not moving from account-to-account just because, at least we

STEVEN PEREIRA

don't try to, we try to prevent that.

Q. Okay. But NatPay's general -- just at a high level, I mean, your role is to move money from one place to another, right?

A. Yes.

Q. I mean, regardless of what the underlying purpose is, that's kind of what NatPay does, right?

A. Yes.

Q. This is talking about a lot of the Know Your Customer regulations that we talked about earlier?

A. Um-huh, yes.

Q. So there are six bullet points here. Those are the main items that NatPay checks when its doing its KYC procedure?

A. There are a couple of missing that we verify that we understand what the nature of the business is, and that's not in here, and to me, that's a big one. I don't know why it was excluded.

Q. So is it says here, bank statement verifying account ownership.

Do you see that?

STEVEN PEREIRA

A. Yes.

Q. Do you recall if in any of the underwriting files we looked at there was a bank statement included?

A. That's not accurate.

Q. What's not accurate?

A. We don't require a bank statement in all cases; sometimes we do. Sometimes what we do is we do a pennies challenge, sort of an industry standard, and that, to us, indicates if they can verify the amount they have of access and ownership.

Q. So pennies challenge meaning you mean, like, a small transaction?

A. Yeah. I stole the whole idea from PayPal so we send the two types, debit and credit before we activate the account, they have to tell us the amounts; very standard.

Q. So these are things I see here it says, information requested for a company might include, and it's these six items, so...

A. The bank statement is a new rule, we do it a lot more now or something similar, we want to verify that the account that they're

STEVEN PEREIRA

funding account that they are opening is a business account, not retail. A business account is a 48-hour return window; a retail account is, for various reasons, can stretch for two years.

Q. Is there another reason that you might want a bank statement?

A. It's a customer that we don't know, so it wouldn't be necessarily underwriting, but we would request information, like, after the first payroll before we send the credits out, we would want them to verify funds.

Q. Any other requirements that, to your knowledge, NatPay has adopted since this verification was prepared?

A. No. And there is a lot of nuances if the customer is very, very new, their TIN registration, they don't have an official letter, we will allow them to print the screen from the IRS.

Q. Have you had a discussion with any representative from the New York Department of Financial Services since this report?

A. I know I've had discussion with

STEVEN PEREIRA

them, I'm not sure of the timeframe that it falls in within this time response is referred. I know we met with them, I don't know if it was before or after this letter.

Q. Were you present at a meeting in March of this year with the New York Department of Financial Services?

A. Of this year?

Q. Yes.

A. I don't remember that at all, no.

Q. Did you -- have you had any other e-mail communications with any representative of DFS?

A. I would say that I don't recall any communication after the meeting.

Q. No phone communications either?

A. Not that I can remember, no.

VIDEOGRAPHER: You've got five minutes.

MR. ROSATO: All right. Pretty close.

Q. Do you remember getting a Department of Labor subpoena?

A. You know, it just came up, yes.

STEVEN PEREIRA

Q. What was the purpose of that, if you recall?

A. Somehow they get involved when all of these people hadn't been paid or there was confusion that we didn't pay anybody and/or may have been complaining that they didn't get the FUTA or SUTA taxes, that was all handled by the attorney.

MR. ROSATO: Okay. I'll put in front of you what will be marked Pereira 31.

(Whereupon, Pereira Exhibit 31, Geyer E-mail Dated 4/14/21, Bates Stamped NP0109700, 1-Page was marked for identification.)

BY MR. ROSATO:

Q. Do you recognize this e-mail?

A. No.

Q. You don't have any reason to doubt that you received it?

A. No, and I understand what it's about yes.

Q. This is a request for a temporary license as a money transmitter in Texas, right?

STEVEN PEREIRA

A. This is -- we had to start getting the ball rolling, yes.

Q. What prompted that, if you recall?

A. There is a lot of events. There was confusion first because the State of Texas had a long-standing carveout for anybody in the payroll business, and all a sudden they decided the carveout didn't exist.

And then Alice is -- I don't know what the proper name would be, she was an attorney for the Department of Banking in Texas, she called us and said, don't worry about it, you're not a money transfer. There is an exception.

To the extent that she actually sent letters to clients saying if you want to, you need to use National Payment to avoid the licensor requirement.

And then she was removed, and then the full force of this regulation came down.

Q. Okay. And ultimately, it resulted in NatPay's being required to be a money transmitter?

A. It is.

STEVEN PEREIRA

Q. A licensed money transmitter?

A. We disagree with the decision, but, yes, we follow the rules.

Q. Do you know if NatPay has mounted any legal challenge to that determination?

A. I know that we've retained attorneys that have fussed about it; I don't know if it was termed a legal -- I think we had lobbyists, we talked to people, the governor, et cetera. Sadly, it was in COVID, but I don't know if we actually filed a lawsuit. Is that what you mean by legal challenge?

Q. Yes.

A. I don't think we filed a lawsuit.

MR. ROSATO: All right. I'm going to reserve these for tomorrow and I think that does it for me for today.

VIDEOGRAPHER: This will conclude video number six and end today's recording of the deposition of Steven Pereira. We are off the record at 6:59 p.m., October 19, 2022.

- o0o -

(Time Noted: 6:59 p.m.)

____________________________________

STEVEN PEREIRA

Subscribed and sworn to before me

this_________day of ______________2022.

____________________________________

C E R T I F I C A T E

STATE OF NEW YORK )
) ss.:
COUNTY OF ONONDAGA )

I, Mary Agnes Drury, a Notary Public within and for the State of New York, do hereby certify:

That STEVEN PEREIRA, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of November, 2022.

MADrury

Mary Agnes Drury

# I N D E X

| WITNESS/EXAMINATIONS | PAGE |
|---|---|
| STEVEN PEREIRA | |
| EXAMINATION BY MR. ROSATO | 7 |

* * * * *

## PEREIRA EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Cafaro E-mail Dated 9/18/19, Bates Stamped NP0099854 to '865, 12-Pages | 56 |
| Exhibit 2 | Pereira Declaration Dated 12/6/19, 14-Pages | 68 |
| Exhibit 3 | First Premier Bank Letter Dated 2/3/98, Bates Stamped NP0013523 to '551, 29-Pages | 100 |
| Exhibit 4 | FDIC Letter Dated 5/19/98, Bates Stamped NP0013585 to '596, 12-Pages | 100 |
| Exhibit 5 | Account 5690 Statement Dated 8/30/19, Bates Stamped NP0094201 to '250, 50-Pages | 121 |
| Exhibit 6 | McAuliffe E-mail Dated 10/30/17, 28-Pages | 153 |

PEREIRA EXHIBITS
(CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 7 | McAuliffe E-mail Dated 10/31/17, Bates Stamped NP0002504 to '543, 40-Pages | 154 |
| Exhibit 8 | Pereira E-mail Dated 11/3/17, Bates Stamped NP0096487, 1-Page | 183 |
| Exhibit 9 | Pereira E-mail Dated 11/6/17, Bates Stamped NP0105883 to '887, 5-Pages | 188 |
| Exhibit 10 | McAuliffe E-mail Dated 11/7/17, Bates Stamped NP0008211 to '213, 3-Pages | 199 |
| Exhibit 11 | McAuliffe E-mail Dated 11/7/17, Bates Stamped NP0105843 to '846, 4-Pages | 205 |
| Exhibit 12 | Cafaro E-mail Dated 4/4/18, Bates Stamped NP009880 to '881, 2-Pages | 217 |
| Exhibit 13 | Hagen E-mail Dated 9/6/18, Bates Stamped NP0102771 to '774, 4-Pages | 219 |
| Exhibit 14 | Hagen E-mail Dated 9/5/19, 2-Pages | 272 |

PEREIRA EXHIBITS (CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 15 | Pereira E-mail Dated 9/9/19, Bates Stamped NP0098667 to '670, 42-Pages | 283 |
| Exhibit 16 | Higgins E-mail Dated 9/9/19, Bates Stamped NP0109244 to '246, 3-Pages | 297 |
| Exhibit 17 | Cafaro E-mail Dated 9/23/19, Bates Stamped NP0100294 to '296, 7-Pages | 302 |
| Exhibit 18 | Hagen E-mail Dated 9/8/19, Bates Stamped NP0098649 to '650, 2-Pages | 315 |
| Exhibit 19 | Williams E-mail Dated 10/15/19, Bates Stamped NP0109468 to '470, 3-Pages | 320 |
| Exhibit 20 | Williams E-mail Dated 9/20/19, Bates Stamped NP0098384 to '385, 2-Pages | 322 |
| Exhibit 21 | Plaza E-mail Dated 9/30/19, Bates Stamped NP0099523 to '524, 2-Pages | 328 |
| Exhibit 22 | Kennett E-mail Dated 9/12/19, 2-Pages | 331 |

PEREIRA EXHIBITS
(CONTINUED)


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 23 | Kennett E-mail Dated 9/12/19, Bates Stamped NP0109220, 1-Page | 334 |
| Exhibit 24 | Pioneer Letter Dated 10/2/19, Dates Stamped PB-SWP-00385498 to '509, 12-Pages | 337 |
| Exhibit 25 | NACHA Letter Dated 9/23/19, Bates Stamped PB-SWP-00397920 to '970, 51-Pages | 338 |
| Exhibit 26 | Cafaro E-mail Dated 10/3/19, Bates Stamped NP0098889 to '948, 60-Pages | 351 |
| Exhibit 27 | Wabby E-mail Dated 9/12/19, Bates Stamped NP0109111 to '116, 6-Pages | 356 |
| Exhibit 28 | NatPay Letter, Bates Stamped NP0093965 to '030, 69-Pages | 356 |
| Exhibit 29 | Williams E-mail Dated 10/2/19, Bates Stamped NP0109588 to '596, 9-Pages | 360 |
| Exhibit 30 | Pereira E-mail 6-Pages | 360 |
| Exhibit 31 | Geyer E-mail 1-Page | 370 |


* * * * *

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Southwestern vs Pioneer
Dep. Date: October 19, 2022
Deponent: STEVEN PEREIRA

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 13 | 9 | NC&B | NCNB | Sp |
| 20 | 12 | lump | loan | Sp |
| 32 | 15 | NC&B | NCNB | Sp |
| 35 | 19 | I | (delete) | extra word |
| 46 | 7 | tolled | told | Sp |
| 53 | 23 | ten | TIN | Sp |
| 58 | 25 | a deed | indeed | Sp |
| 61 | 6 | and the | is the | wrong word |
| 64 | 7 | Doc delivery | Doculivery | Sp |
| 64 | 25 | withdrawal | withdraw | Sp |
| 86 | 4 | nother | other | Sp |

(Continued)

[signature]

STEVEN PEREIRA

SUBSCRIBED AND SWORN BEFORE ME

THIS 3RD DAY OF JANUARY, 2023.

Notary Public State of Florida
Mark R. Williams
My Commission HH 028972
Expires 11/15/2024

[signature]

(Notary Public) MY COMMISSION EXPIRES: 11/15/2024

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Southwestern vs Pioneer
Dep. Date: October 19, 2022
Deponent: STEVEN PEREIRA

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 92 | 11 | Doc delivery | Doculivery | Sp |
| 135 | 10 | Ban | Bad | Sp |
| 140 | 12 | own | owe | Sp |
| 140 | 14 | or | on | Sp |
| 147 | 22 | scare | care | Sp |
| 150 | 10-11 | not existent | non existent | Sp |
| 169 | 12 | specific | specify | Sp |
| 171 | 11 | Cashet | Cachet | Sp |
| 191 | 6 | case | cases | Sp |
| 230 | 14 | Cashet | Cachet | Sp |
| 231 | 10 | Jim of | of Jim | wrong order |

(Continued)

STEVEN PEREIRA

SUBSCRIBED AND SWORN BEFORE ME

THIS 3RD DAY OF JANUARY, 2023.

Notary Public State of Florida
Mark R. Williams
My Commission HH 028972
Expires 11/15/2024

(Notary Public) MY COMMISSION EXPIRES: 11/15/2024

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Southwestern vs Pioneer
Dep. Date: October 19, 2022
Deponent: STEVEN PEREIRA

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 235 | 4 | Cashet | Cachet | Sp |
| 236 | 9 | Cashet | Cachet | Sp |
| 271 | 18 | Cashet | Cachet | Sp |
| 271 | 19 | Cashet | Cachet | Sp |
| 278 | 9 | Cashet | Cachet | Sp |
| 304 | 19 | Cashet | Cachet | Sp |
| 310 | 18 | fund | funded | Sp |
| 323 | 14 | Cashet | Cachet | Sp |
| 323 | 24 | Cashet | Cachet | Sp |
| 329 | 11 | Cashet | Cachet | Sp |
| 330 | 9 | Cashet | Cachet | Sp |

(Continued)

STEVEN PEREIRA

SUBSCRIBED AND SWORN BEFORE ME

THIS 3RD DAY OF JANUARY, 2023.

Notary Public State of Florida
Mark R. Williams
My Commission HH 028972
Expires 11/15/2024

(Notary Public) MY COMMISSION EXPIRES: 11/15/2024

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Southwestern vs Pioneer
Dep. Date: October 19, 2022
Deponent: STEVEN PEREIRA

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 331 | 12 | instant | instance | Sp |
| 333 | 5 | NBC | NPC | Sp |
| 365 | 8 | occurs | occur | Sp |
| 371 | 14 | transfer | transferor | Sp |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

(Final)

STEVEN PEREIRA

SUBSCRIBED AND SWORN BEFORE ME

THIS 3RD DAY OF JANUARY, 2023.

Notary Public State of Florida
Mark R. Williams
My Commission HH 028972
Expires 11/15/2024

(Notary Public) MY COMMISSION EXPIRES: 11/15/2024