IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

SOUTHWESTERN PAYROLL SERVICE, INC.,
Plaintiff,

-against-

Case No.:
1:19-cv-1349 (FJS/CFH)

PIONEER BANCORP INC., et al.,
Defendants.

---

NATIONAL PAYMENT CORPORATION,
Intervenor-Plaintiff
-against-

PIONEER BANCORP INC., et al.,
Defendants.

---

Videotaped Deposition
of
STEVEN PEREIRA - 30(b)(6)
Thursday, October 20, 2022
Albany, New York

Reported by:
Mary Agnes Drury, RPR, NYACR, CLR

October 20, 2022

9:36 a.m.

Videotaped Deposition of STEVEN PEREIRA - 30(b)(6) held at the offices of Greenberg Traurig, 54 State Street, Albany, New York, before Mary Agnes Drury, RPR, NYACR, CLR, a Notary Public of the States of New York and New Jersey.

A P P E A R A N C E S:

BAUM GLASS JAYNE CARWILE & PETERS, PLLC
Attorneys for Plaintiff
401 S. Boston Avenue, Suite 2000
Tulsa, Oklahoma 74103
(918) 938-7944
BY: ANDREW JAYNE, ESQ. (Via Zoom)
AJayne@bgjclaw.com

GREENBERG TRAURIG, LLP
Attorneys for Intervenor Plaintiff
54 State Street, 6th Floor
Albany, New York 12207
(518) 689-1435
BY: CYNTHIA E. NEIDL, ESQ.
Neidlc@gtlaw.com
- and -
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
(713) 374-3500
BY: ROLAND GARCIA, ESQ. (Via Zoom)
Garciar@gtlaw.com

A P P E A R A N C E S :
(Continued)

DLA PIPER, LLP
Attorneys for Defendants
1251 Avenue of the Americas
New York, New York 10020-1104
(212) 335-4500
BY: STEVEN M. ROSATO, ESQ.
Steven.Rosato@dlapiper.com

ALSO PRESENT:

George Hamilton,
National Payment Corp (via Zoom)
Carol Clark, DLA Piper Paralegal
Debbie O'Toole, Legal Video Specialist

* * * * *

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be waived and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- o0o -

PROCEEDINGS

Albany, New York, Thursday, October 20, 2022; the proceedings commenced as follows:

- o0o -

VIDEOGRAPHER: Here begins video number one, volume one in the deposition of Steven Pereira 30(b)(6)taken in the matter of Southwestern Payroll Service Inc, Plaintiff versus Pioneer Bancorp Inc, et al, Defendants and National Payment Corporation, Intervenor Plaintiff versus Pioneer Bancorp Inc, et al, Defendants, in the United States District Court for the Northern District of New York, Case Number, 1:19-cv-1349.

Today's date is October 20, 2022, the time is approximately 9:36 a.m.

This deposition is being taken at the offices of Greenberg Traurig LLP, Located at 54 State Street, Albany, New York and was made at the request of Pioneer Bancorp, Defendants.

My name is Debbie O'Toole, I am the videographer; the court reporter is Mary

STEVEN PEREIRA - 30(b)(6)

Agnes Drury, and we are from Gregory Edwards LLC.

Will counsel please introduce themselves?

MR. ROSATO: Steven Rosato DLA Piper LLP on behalf of the Pioneer Bank and Pioneer Bank Corp Inc.

MS. NEIDL: Cynthia Neidl.

VIDEOGRAPHER: Will the court reporter please swear in the witness.

S T E V E N P E R E I R A - 30(b)(6),

called as a witness, having been duly sworn or affirmed by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. ROSATO:

Q. Good morning.

A. Good morning.

Q. Good to see you again.

So yesterday we spent quite some time in a deposition that was, do you understand, that was kind of in your individual capacity?

A. I understand that. I don't really

STEVEN PEREIRA - 30(b)(6)

comprehend it, but...

Q. So the purpose of yesterday's deposition was to get your own personal knowledge of matters relevant to this case okay. Do you understand that?

A. The distinction does allude me, but I get it.

Q. So today there is a rule in the Federal Rules of Civil Procedure everyone calls it 30(b)(6), and you're here today as the corporate designee of National Payment Corporation, so you're testifying on behalf of the company itself.

Do you understand that?

A. Okay, yeah.

Q. And so in connection with that we issued a Notice of Deposition that included a number of topics on it?

A. Okay, yes.

MR. ROSATO: And so I'm going to put that in front of you.

(Whereupon, NatPay Exhibit 1, Amended Notice of 30(b)(6) Deposition, 8-Pages was marked for identification.)

STEVEN PEREIRA - 30(b)(6)

BY MR. ROSATO:

Q. Have you seen this document before?

A. Yes.

Q. You have. I'd like you to turn to the topics -- the subject matter areas as they're called in here that start at the bottom of the fourth page?

A. Okay.

Q. Have you reviewed these topics before?

A. I've read them, yes.

Q. You have?

A. Yes.

Q. What did you do to prepare for today's deposition?

A. I had two Zoom meetings on consecutive Tuesdays with my attorney, and we spent Monday going over documents.

Q. Did you review -- so, okay, so you did go over documents?

A. A lot of them, yeah.

Q. Do you believe that you prepared yourself to testify on each of the topics set forth in this notice?

STEVEN PEREIRA - 30(b)(6)

A. Yes, I believe so.

Q. Did you speak to anyone other than your attorney in preparation for the deposition?

A. I mean, I spoke to my boss all the time, but I don't think it's in preparation.

Q. So I'm asking specifically about, you know, if you spoke to anybody other than your counsel about this deposition?

A. I speak to my boss about it, I mean, he gives me encouragement and tells me, you know, I'll do fine, but other than that, we don't get into the details.

Q. You didn't discuss any specifics?

A. Oh, no. No.

Q. When you refer to your boss...

A. George Hamilton.

Q. Okay. So you had the two Zoom meetings you said and then an in-person meeting?

A. Yes.

Q. Was that this week?

A. They were consecutive Tuesdays, so I don't remember the exact dates, but last

STEVEN PEREIRA - 30(b)(6)
Tuesday was the last Zoom meeting.
Q. And an in-person was this week?
A. It was, it was Tuesday.
Q. Okay. And of course I'll be asking you questions that you may have personal knowledge about today, so the deposition is not necessarily limited to these topics, but to the extent that I -- your attorney may object on the grounds that, you know, this isn't corporate designee testimony because it's not listed as a topic here; but just so you are clear, you can still answer the question.
A. Um-huh.
Q. Do you understand that?
A. Yes.
Q. I don't believe I need to go over the ground rules again, I think we covered that yesterday; is that fair?
A. (Witness nods.)
Q. I guess we should both remind ourselves not to talk over each other; we did pretty good with that, but we had a couple of hiccups, so let's just try to remember that.
So why don't we start with -- do you

STEVEN PEREIRA - 30(b)(6)

recall yesterday we talked for quite a while about how NatPay came to have a relationship a business relationship with Cloud Payroll and Southwestern Payroll?

A. Yes.

MR. ROSATO: So I wanted to go back through a couple of the documents we looked at yesterday. They were marked as Pereira 6 and Pereira 7. You can mark them today as NatPay 2 and NatPay 3.

(Whereupon, NatPay Exhibit 2, McAuliffe E-mail Dated 10/30/17, Bates Stamped NP0002917 to '944, 28-Pages was marked for identification.)

(Whereupon, NatPay Exhibit 3, McAuliffe Letter dated 10/31/17 to page NP0002543 to '543, 40-Pages was marked for identification.)

BY MR. ROSATO:

Q. Do you recall looking at NatPay 2 and NatPay 3 yesterday?

A. Yes to 2, and yes to 3.

Q. So what is NatPay 2?

A. This looks like the application for

STEVEN PEREIRA - 30(b)(6)

services and the underwriting information that we gave to Cloud Payroll.

Q. So why don't you turn to 2923?

A. Okay.

Q. I just have a few questions.

One, I think you testified yesterday you see in Section 2, bank account information?

A. Yes.

Q. No one at NatPay ever contacted Deb Salsburg at Pioneer Bank, correct?

MS. NEIDL: Objection to form.

THE WITNESS: No, they did not, that I know of.

Q. And you see also that account number ending in 0212 there?

A. Yes.

Q. You would agree there is just the account type, it just asks for checking or savings, right?

A. Yes.

Q. And I think you testified that NatPay doesn't care beyond weather -- beyond the description between a checking and savings account what the nature of the bank account is,

STEVEN PEREIRA - 30(b)(6)

right?

MS. NEIDL: Objection to form.

THE WITNESS: We kind of do now, we emphasize it, because what -- events that occurred with Pioneer Bank has never really been done before, so we never really thought about it, so now we're asking customers to try to take care of those little details. But as of this form, checking or savings.

BY MR. ROSATO:

Q. So at the time the only information that NatPay requested was whether the account was a checking account or a savings account?

A. Correct, yes.

Q. And now you say NatPay has changed their practices around that?

A. We are informing the customers that they might want to take a look to get a designating or a re-designation on their account. As I said, it wasn't necessary until -- this probably won't happen again, but we want to try to cover all of our bases.

Q. So does NatPay have any written

STEVEN PEREIRA - 30(b)(6)

policy around that?

A. I think I wrote a white paper sort of explaining to people about why they might want to do that, but we don't have any written policies.

Q. What basis do you have to state that this will probably never happen again?

A. I mean, I've been in this business for 40 years, I've never heard of anything like this; and I've been in the ACH business for 31 years, we've never had a bank setoff a commercial account, as far as what we do is concerned.

And I think it was an anomaly, we certainly don't think it will happen again.

Q. Relatedly, in your experience, have you ever seen a massive check kiting fraud scheme by someone who was running payroll companies?

A. No. Not a -- no, nothing like that.

Q. So a lot of unprecedented things happening here, you would agree?

MS. NEIDL: Objection to form.

THE WITNESS: As far as we're

STEVEN PEREIRA - 30(b)(6)

concerned, yes.

Q. But again, nothing in this particular document, we're looking at NatPay 2, indicates anything about whether this account 0212 is -- has any special designation, correct?

MS. NEIDL: Objection to form.

THE WITNESS: I agree with that, we simply ask for checking and savings.

Q. I just want to turn to NatPay 3.

MS. NEIDL: Can we go off for one second?

VIDEOGRAPHER: We're going off the record, the time is 9:48.

(Whereupon, the deposition was recessed for a quick few moments and once again resumed.)

VIDEOGRAPHER: Back on the record, the time is 9:49.

BY MR. ROSATO:

Q. Turning to NatPay 3, if you can turn to the page that has the Bates ending in 2523?

A. Got it.

Q. Do you see this is for -- this is

STEVEN PEREIRA - 30(b)(6)

the federal -- the same form that we just looked at for Southwestern Payroll Service Inc.

Do you see that?

A. Yes.

Q. Again, like the Cloud Payroll in one attached to NatPay 2, this agreement just asks for a checking or savings, right?

MS. NEIDL: Objection.

THE WITNESS: Yes. I'm sorry.

MS. NEIDL: Give me time.

Q. So if you turn to 2542, same question, Section 2, there is only boxes there for the account type of checking or savings, right?

MS. NEIDL: Objection to form. Asked and answered a hundred times. You can go ahead.

THE WITNESS: Yes. There is only a box for checking and a box for savings.

Q. If you go back to NatPay 2 -- or we'll stay on NatPay 3, please, if you go to page 2512.

You see in Section 1 it lists Southwestern Payroll Services tradename is

STEVEN PEREIRA - 30(b)(6)

Cloud Payroll?

A. Yes.

Q. Did you -- did NatPay ever do anything to confirm the accuracy of that?

MS. NEIDL: Objection to form.

THE WITNESS: I mean, do we -- I mean, we have no reason to believe that this was a misrepresentation. Obviously, the salesperson spoke to them and met the people. So, no, we did not do any specific documented verification.

BY MR. ROSATO:

Q. I think you testified yesterday that NatPay does look for d/b/as of businesses when it's doing its underwriting work; is that correct?

MS. NEIDL: Objection to form.

THE WITNESS: It's not correct. We look for d/b/as if we're having trouble finding the actual business name, because then we'll look and search Lexis Nexis for the different d/b/as name, because the names differ, depending on what you are looking at, we'll get a d/b/a and we look

STEVEN PEREIRA - 30(b)(6)
at the Secretary of State, and it doesn't find the match, and so then we look at the actual IRS registered business name. But it's not cut-and-dry at all, we have to do a little bit of, you know, like, if it's spelled Inc with a period, it won't show up.
So we do -- I mean, there is a lot of holistic searching to make sure that we're getting the correct data.
BY MR. ROSATO:
Q. If you turn back to 2523, do you see the tradename listed there as Southwestern Payroll?
A. Yes.
Q. So there is obviously a discrepancy between these two pages, right?
MS. NEIDL: Objection to form.
THE WITNESS: I'd have to see. I mean, is it all the same contract, there is so much paper here?
Q. It's all part of the same as we talked about yesterday, a starter kit, right?
MS. NEIDL: Objection to form.

STEVEN PEREIRA - 30(b)(6)
THE WITNESS: Which was the page with --
Q. 2512?
A. 2512. I mean, one is the authorization agreement to authorize the account for tax and payment services; the other one is a Processor Service Agreement. So, I mean, they're not the same document.
Q. You'd agree that they're both for Southwestern Payroll Service Inc though, right?
A. I'd agree that that's the name that we put in the legal business name.
Q. Is there a reason why the tradename listed to your understanding would be different on the two documents?
A. No, I can't understand why it's different.
Q. Nobody at NatPay looked into that at the time back in October of 2017, right?
MS. NEIDL: Objection to form.
THE WITNESS: They may have, I'm not aware of that.
Q. If you go to 2512, did you anyone inquire with Mike McAuliffe to determine if he

STEVEN PEREIRA - 30(b)(6)

was the bureau services manager with Southwestern Payroll?

A. Specifically, this is so we can call and contact people, this isn't to develop a hierarchy of who is what.

This indicates to us that Mike McAuliffe is sort of the big cheese, so if it's a big issue, you call the guy at the top. He could have put his title as anything, but he's in the hierarchy of events. As you see, it moves from management, to supervisor, to software operator.

Did we verify that who is it, Darin actually is the software operator? No, that would be ridiculous.

What we do is, this tells us if it's a software issue, call the person here. If it is an upper management issue, contact, call Michael McAuliffe.

Q. Did NatPay do anything -- going to Darin Alred, did NatPay do anything to verify that his title at Southwestern Payroll was managing partner?

MS. NEIDL: Objection to form.

STEVEN PEREIRA - 30(b)(6)
THE WITNESS: Again, the title is not really relevant to us; it's the assignment of responsibility.
So if it was an issue that was a management issue that we could not get a hold of Mike McAuliffe, then we would keep going down the list trying to get a hold of someone.
The point of the contact information in my estimation isn't a legal designation, it's who they assign that responsibility to.
BY MR. ROSATO:
Q. I understand, but I just want to confirm, I think the answer is no, but you can correct me if I'm wrong: NatPay did not follow-up with Darin Alred or anyone else to confirm whether he was the managing partner of Southwestern Payroll?
MS. NEIDL: Objection to form.
Q. Is that correct?
A. As far as I know we never verify these roles. Someone may have talked to him, but verification would have been rather tricky

STEVEN PEREIRA - 30(b)(6)

anyway.

Q. Do you see that each of the people listed has different e-mail address extensions?

A. Yes.

Q. So there is one for CloudPayroll.com, and then MyPayrollHR.com, and then SWPayroll.com?

A. Yes.

Q. In your experience, is that typical to have people with three different e-mail extensions being listed as representatives of the payroll processing company?

MS. NEIDL: Objection to form.

THE WITNESS: It's actually quite common. We get people with gmail, we get rather flavorful e-mail addresses, everyone just gives the one they know they check.

BY MR. ROSATO:

Q. I'm not talking about a gmail, I'm talking about three different, it appears to be, you know, Cloud Payroll, MyPayrollHR, SW --

A. Well, it could be. I'm nationalpayment.com; that's a gmail account. They give us the best e-mail address if we need

to reach out to them. There are some businesses that don't even have their own domain, so it would be yahoo.com, we just want to be able to reach them.

Q. What about the number of clients listed there, 1,200, do you see that?

A. I do, yes.

Q. What does NatPay do to verify the number of clients that a payroll processor lists?

MS. NEIDL: Objection to form.

THE WITNESS: Prior to the agreement being signed, there is absolutely nothing we can do.

If -- this number is put in there to give us a sort of approximation of how much work we have to do to on-board them. And sometimes they will say they are this big, and the salesperson will set the pricing appropriately.

If it is -- we get a processor once a week, at best, so there is usually someone that says, you know, they only have 60, but the number is not really relevant.

STEVEN PEREIRA - 30(b)(6)

BY MR. ROSATO:

Q. Why isn't it relevant?

A. Because it is what it is. I mean, if they get a pricing break because of size, then the salesperson gets a report and he says, you know, they're not -- he's concerned that they oversold, but other than that, it's not relevant to us.

Q. So if you turn to the next page, 2513, and I'm looking at the top there.

Did NatPay do anything to verify the information provided regarding Michael Mann's title and his percentage ownership of Southwestern Payroll?

MS. NEIDL: Objection to form. I believe all of these questions were asked yesterday, I don't know why you're doing it again.

MR. ROSATO: Because he's now here in his representative capacity, he's speaking on behalf of --

MS. NEIDL: Why didn't you just ask him today instead of yesterday. Are we going to duplicate everything that you did

STEVEN PEREIRA - 30(b)(6)

yesterday?

MR. ROSATO: No.

MS. NEIDL: Okay. You can answer.

THE WITNESS: No. We did not verify that he was a hundred percent president. We don't verify title, percentage; we just like getting a name of someone so we can submit that to the bank, it is not a regulatory requirement.

BY MR. ROSATO:

Q. Are you aware that that information is false?

MS. NEIDL: Objection to form.

THE WITNESS: This is Southwestern's -- if you think about Southwestern now, I know he was 51 percent, I suppose. But if he was signing as Cloud Payroll doing Southwestern work, then it is accurate, because he owned a hundred percent of Cloud Payroll.

BY MR. ROSATO:

Q. You believe that he -- he personally owned a hundred percent of Cloud Payroll?

MS. NEIDL: Objection to form.

STEVEN PEREIRA - 30(b)(6)
THE WITNESS: Yeah, I did. I thought he was the sole owner of Cloud Payroll.
Q. That's your understanding?
A. It is.
Q. I'll represent to that you ValueWise Corporation was the parent Cloud Payroll?
A. What was his ownership percentage of ValueWise.
Q. Well, I believe that might have been a hundred percent?
A. So then you're just like -- then he obviously owned a hundred percent of Cloud Payroll.
Q. Not directly though, right?
MS. NEIDL: Objection to form.
THE WITNESS: That just gets into legal, and I'm just -- I'm a layman.
Q. Going back to the point that you just raised; he signed than on behalf of Cloud Payroll but on 2512, Southwestern Payroll Service is listed at the processor, right?
MS. NEIDL: Objection to form. The document speaks for itself. You can

STEVEN PEREIRA - 30(b)(6)

answer.

THE WITNESS: I mean, you put the tradename as Cloud Payroll, but now we're finding that, you know -- so, no, we did not verify what his percentage was at Southwestern Payroll.

BY MR. ROSATO:

Q. Okay. Similarly, if you turn to -- back to NatPay 2 and 2931 is the page, I just want to confirm.

Your answers would be the same as we just discussed about what NatPay might have done to verify the information here as -- the same as the answers you just gave for the Southwestern Payroll agreement; is that fair?

MS. NEIDL: Objection to form.

THE WITNESS: We're on 2931?

Q. Yes.

A. Right. Our research would have indicated if the tax ID number matched the d/b/a or the actual legal business name, then we're just pretty comfortable that that's the right name.

Q. With respect to the number of

STEVEN PEREIRA - 30(b)(6)

clients listed, those -- your answer would be the same as it was for the Southwestern Payroll agreement?

MS. NEIDL: Objection to form.

THE WITNESS: It is just a guideline for us, the number means nothing.

Q. And if you turn to 2932, the statements here about Michael Mann's title and his ownership percentage, NatPay wouldn't have done anything to verify that independently, correct?

MS. NEIDL: Objection to form.

THE WITNESS: We review no documentation that actually has to prove legally that he is what he says he is.

Q. Okay. Turning to 2934, do you see a person named Christine Batchelder is listed as a contact name for Pioneer Savings Bank?

A. Yes.

Q. Are you -- I think you testified to this yesterday but no one at NatPay contacted Ms. Batchelder to verify this information, correct?

MS. NEIDL: Objection to form.

STEVEN PEREIRA - 30(b)(6)

THE WITNESS: This particular issue appears again and again, and I think there is a misconception that in most cases the -- a person who works at the bank isn't the name that they put there.

We want to know someone to call if there is a problem with the account. Like, if it doesn't accept a penny's debit entry or something like that.

This is a little unusual that -- in my experience, it's very unusual for someone to put a person at the bank's name here, because banks traditionally won't discuss issues with someone who isn't the accountholder.

This is a sort of anomaly, and I don't know what would have motivated Michael Mann to put a bank person's name. When we had an issue with the bank account during this disaster, the first person we called was Matt Schilling. We don't talk to banks directly, they're sort of not very cooperative.

BY MR. ROSATO:

STEVEN PEREIRA - 30(b)(6)

Q. Okay. So as a general matter, NatPay will not contact the banks of the payroll processing companies?

MS. NEIDL: Objection to form.

THE WITNESS: It's a matter of normal business, it isn't necessary. If there is something that occurs; like, if there is suspected issues with the account, we'll try to get a hold of a bank person.

But like this is very unusual that he listed the actual person at the bank's name.

BY MR. ROSATO:

Q. What is your understanding of why banks typically won't give information if NatPay calls?

MS. NEIDL: Objection to form.

THE WITNESS: Well, there's -- you have to put caveats with that. There are certain privacy issues they won't give us information, but they will in some cases give us something.

Like, if someone said I want to know why that debit is in my account, we'll call

STEVEN PEREIRA - 30(b)(6)

the bank and they'll confirm or deny the debit, but they don't give, like, real -- they won't give us a balance, they won't give us that sort of things.

They will assist if we think it's fraud, they'll look at the problem and they'll see, okay, we see the entry and we'll return it or what.

BY MR. ROSATO:

Q. So in that specific instance you might be able to -- NatPay would perhaps talk to a bank?

MS. NEIDL: Objection to form.

THE WITNESS: We talk to banks all the time, but it's very narrow in scope the kinds of things that they will discuss.

If we call and ask is the account a commercial or retail account, they won't answer. If we ask who is the signer on the account, they won't answer.

But if we say this customer said they didn't get the deposit, could you double check for us; they'll look.

BY MR. ROSATO:

STEVEN PEREIRA - 30(b)(6)

Q. As I understand your answer just now, the bank won't give specific information out about the nature of the account; is that fair?

MS. NEIDL: Objection to form. His answer is his answer, you do not need to summarize it for him.

If you do understand it, you can answer.

THE WITNESS: Can you repeat that, please?

MR. ROSATO: Can you just limit your objections to form and kind of curtail the speaking objections, I'd appreciate it, but...

MS. NEIDL: I'll try.

(Whereupon, the last question was read back.)

MS. NEIDL: Objection to form.

THE WITNESS: There is -- I won't say where the line is drawn, but there is specific information they will not tell us.

And then there is a lot of information. From our point of view, we

STEVEN PEREIRA - 30(b)(6)

would have probably never called -- if we have an ACH question, we would call the ACH department; they're forthcoming, because we're discussing entries, not accounts.

BY MR. ROSATO:

Q. Okay. And then I just wanted to go back to NatPay 3, and if you could go to 2531.

A. Pardon me, you said 2531?

Q. Yeah. Actually, no, 2532.

A. Got it.

Q. Same question on the information at the top of the page there that I've asked with respect to Southwestern Payroll and Cloud Payroll: NatPay did not do any independent verification of the information set forth here regarding Michael Mann's title or his percentage ownership of Pro Data?

MS. NEIDL: Objection to form.

Q. Is that correct?

A. Yes.

Q. I'd like to turn to -- you can go back to NatPay 2. And I just want to focus on specific provisions of the Processor Service Agreement.

STEVEN PEREIRA - 30(b)(6)
So if you turn to 2935, are you personally familiar with these provisions of this agreement?
MS. NEIDL: Objection to form. He's here in a representative capacity, what difference does that make?
MR. ROSATO: I just want to level set.
Q. Have you reviewed these provisions?
A. I've read them before, but I don't really, like, I didn't memorize them or study them; our attorney wrote this.
Q. So I want to focus on 12(c).
Well, first of all, do you see this refers to PPP clients, this refers to PPP client contract at the top there, Section 12?
A. Yes.
Q. Do you know what a PPP client is?
A. A PPP is an acronym for Professional Payroll Processor. So you want to know what that means or what their client means?
Q. So is it fair to say that that's referring to a client of the payroll processor?
A. Yes.

STEVEN PEREIRA - 30(b)(6)

Q. And do you see at the bottom of that prefatory paragraph in Section 12 it says, "For each PPP client you will," and then a colon.

Do you see that?

A. That's 12(c)?

Q. This paragraph at the top.

(Indicating.)

That's how it ends, do you see that?

A. Oh, I see it, yes.

Q. And then if you go down to (c) it says, "Enter into and maintain, in effect a, written, signed, and enforceable contract including all provisions necessary to ensure the PPP clients compliance with the obligation as an originator, and for you to comply with the provision of the service agreement and specifically containing provisions in which the PPP client," colon.

Do you see that?

A. Yes.

Q. And I want to direct your attention to the next page 2936 at iv in particular. It starts, "To agree to indemnify and agree to hold harmless you, and National Payment

STEVEN PEREIRA - 30(b)(6)
Corporation from and against any and all claims, et cetera," and just go to the capital F. You see it says, "Any incorrect distribution of or failure to distribute funds to or from a payee, except to the extent caused by the negligence of the processor or National Payment Corporation."

Do you see that?

A. I do.

Q. Can you explain why NatPay requires payroll processors to have agreements like that in place?

MS. NEIDL: Objection to form.

THE WITNESS: I'm trying to put that into perspective.

I think that our goal here is to tell the processors that -- not to hold us responsible if they screw up and don't, like, pay the wrong person. That's not my problem. We take whatever instructions we receive and we execute them, that's my interpretation.

BY MR. ROSATO:

Q. So NatPay just takes instructions by

STEVEN PEREIRA - 30(b)(6)

the payroll processor and carries them out, right?

MS. NEIDL: Objection to form.

THE WITNESS: That's our normal course of business, yes.

Q. NatPay doesn't have any discretion in that regard, does it?

MS. NEIDL: Objection to form.

THE WITNESS: I mean, that's a really broad subjective term; what do you mean, discretion into what?

Q. I mean, if you get the instructions, can NatPay unilaterally change them, if you want?

MS. NEIDL: Objection to form.

THE WITNESS: We don't change instructions which, in my opinion, is the data that's included in the actual transaction line.

But we -- we do things like they want to date it and they dated it wrong, they'll ask us to change a date, so we'll change a date on a file.

BY MR. ROSATO:

STEVEN PEREIRA - 30(b)(6)

Q. But NatPay would do that themselves, is that fair to say?

A. We have customers that give us special instructions if we date the file on a Saturday, you can change to Monday.

We have customers that say if it doesn't come in on time, you can convert us to wire funding.

So, yeah, we make changes. That's why I have, like, five people in operations, we're constantly adjusting things according to customer's instructions, what we know is right, we can't pay on a holiday. And if we can't reach a customer -- I mean, we have 31 years of experience, if they date something on a holiday and they disappear on vacation, it happens at Christmas all the time, we will do the best we can to ensure that the employees get paid in a timely manner.

But, yes, we will change instructions, but we typically do it, you know, for the right reasons.

Q. Would NatPay ever change the bank account listed on the NACHA file?

STEVEN PEREIRA - 30(b)(6)

MS. NEIDL: Objection to form?

THE WITNESS: We do not change the bank account on a NACHA file.

Q. So going down to vii on 2936 NatPay 2, do you see it says acknowledges -- and we're talking about the PPP client has to sign an agreement that says this, "Acknowledges that it is responsible for verifying the tax payments are deposited to the proper account with the IRS and credited to it and agrees to hold harmless and defend NatPay from and against any and all claims, et cetera, resulting directly or indirectly from or in any way related to your failure to deposit tax payments with the IRS on its behalf."

Do you see that?

A. Yes.

Q. So is it a fair reading of this to say that NatPay requires that it be indemnified from any claims or damages, anything in connection with a failure of the IRS to receive tax payments that might be due from the client?

MS. NEIDL: Objection to form.

THE WITNESS: I don't want to seem

STEVEN PEREIRA - 30(b)(6)

ignorant, but can you describe indemnify; I mean, what does it mean to you?

Q. So it also says, hold harmless there, do you see that? So indemnify means protect or insure NatPay against any damages as a result if tax payments aren't made.

A. If it's their fault, yes, I get it. The IRS in particular, I think it addresses tax payments specifically, because with the IRS, if they're late to us or they didn't fund us and we don't send out the payments, penalty accrue the first day, they are late. And we do this because it happens. We send the file and we don't get the money to pay for the taxes, we will delay the taxes, and we don't want them coming at us for the one percent.

Q. NatPay is not responsible for the taxes though, correct?

MS. NEIDL: Objection to form.

THE WITNESS: What do you mean responsible for the taxes?

Q. NatPay is not liable for the taxes due from the employer clients of these payroll processors, correct?

STEVEN PEREIRA - 30(b)(6)
MS. NEIDL: Objection to form.
THE WITNESS: I'm sorry, I don't really understand.
We don't calculate the taxes, we don't verify that the taxes are a correct amount, but we are -- we step up. If we screw up and the tax file doesn't go out because our system doesn't do it correctly and there is a penalty, we'll pay it, that's because we're held to a higher standard.
If they send us the file late, not my problem, we will do anything we can. We've actually contacted the IRS asking for, I don't know the proper term, they'll say okay, we'll waive that response or that problem.
We've had customers with system problems that the taxes don't get paid on time; Dawn has contacted many a state government asking for a waiver of the penalties, and we just do that because we care about our customer. But I'm not going to pay a penalty, if it's not my fault.

STEVEN PEREIRA - 30(b)(6)

BY MR. ROSATO:

Q. In the event that NatPay pays a penalty because it, you know, made a mistake, do you pay it to the employer client?

A. In a roundabout way the dunning notices and the penalties that are going to the taxpayer of record, which is in some cases is a processor, they have an 8655 document which gives them that power.

What we do is we pay that money to the processor for distribution.

Q. Not directly to the taxing jurisdiction, right?

A. No, they won't accept it. And that's a weird way. They calculate -- you can't just send an ACH deposit to the IRS, there is a bunch of NACHA-related data goes with it because, the IRS gets a bajillion credits to their account, there is something in NACHA that's called an addendum record, which is what tells the IRS what it's for.

So you can't just send money to the IRS, it has to be accompanied with data that we have access to.

STEVEN PEREIRA - 30(b)(6)

Q. The taxpayer has access to the data; is that fair?

MS. NEIDL: Objection to the form.

THE WITNESS: That's why they use the payroll processors; it's extremely obtuse. The payroll process system like MasterTax, they take all the data that's associated with that taxpayer and they crunch it into a -- like a -- it's not a very easy read, but that system accumulates and attaches that data to the ACH credit.

BY MR. ROSATO:

Q. Has the IRS ever demanded payment from NatPay for a tax obligation of an employer client?

A. The IRS, they know our role, so they never contact us about this stuff at all; they care about the taxpayer.

Q. Right. They care about getting their money from the taxpayer, right?

A. Yes, they do.

Q. Is the same true of other taxing jurisdictions?

MS. NEIDL: Objection to form.

STEVEN PEREIRA - 30(b)(6)

THE WITNESS: That is -- there are so many -- there is 1,200 in Pennsylvania alone. There are so many jurisdictions, and they all behave differently.

Some, if the tax payment is ten days late, they don't care; the IRS, ten minutes late, they don't care.

The original question was?

Q. Let me back up.

For other taxing jurisdictions, has any other taxing jurisdiction come after NatPay and demanded payment of an employer's tax obligation directly?

A. They don't contact us in regards to the payment, they contact us in regards if they have to about the ACH transaction.

Because I believe that we went over a thing yesterday where the State of Wisconsin said no, you're not taking this money back; this was not -- really had anything to do with the taxpayer, that was about the ACH transactions alone.

Q. Okay. It was a dispute over the ACH transaction itself, right?

STEVEN PEREIRA - 30(b)(6)

A. Right. Yeah, it wasn't about oh, XYZ didn't get paid and we need to know.

When they talk to us, it's about this is our money now and you're not going to get it back.

Q. Okay. Back to NatPay 2, if you could turn to the next page 2937. Actually, not 2937, can you turn to 2939?

You see this is another indemnification provision?

MS. NEIDL: Objection to form.

Q. It's titled "Indemnification," you see that?

A. Um-huh.

Q. And it starts with the word "processor." Is it your understanding that's referring to the payroll processor?

A. Yes.

Q. So it starts, "Processor will indemnify and hold harmless and defend NatPay and NatPay's employees, agents, and processing financial institutions from any and against all claims, lawsuits, demands, liabilities, damages, costs, or other expenses, including

STEVEN PEREIRA - 30(b)(6)

attorneys' fees, resulting directly or indirectly from, or in any way related to" and then it has a list of five items. I just wanted to focus on the last one, v there, it says, "Processor or PPP client's failure to comply with the NACHA rules or any applicable law or regulation."

And the next one, iv, "Or any incorrect distribution of or failure to distribute funds to or from a payee or to the IRS except to the extent caused by NatPay's negligence."

Do you see that?

A. Yes, I do.

Q. So again, I mean, this is NatPay requesting from the processor indemnification from against basically any losses relating to an incorrect distribution of or failure to distribute funds to or from a payee or to the IRS unless NatPay was negligent.

Do you see that?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. Why does NatPay require that type of

STEVEN PEREIRA - 30(b)(6)

indemnification?

A. Again, I'm -- these contracts -- I mean, I can describe it in general, but these contracts -- I mean, we just don't -- if an issue comes up, the lawyer says -- they deal with it; I'm not well-versed in this.

Now, I do know that -- I'll give you an example of why we like to be indemnified. There is a rule in NACHA if they send you something called Notice of Change, which is you have the wrong account number, it goes to the bank and they have to fix it, the third time, they violate you.

And we tell our clients we're required from the bank to notify them that they have to make the change, and if you don't make the change, it's a $5,000 fine.

So we don't want to absorb that change, we want them to take responsibility that they're the ones not modifying their system with the new account data.

So we don't want to ever get in trouble for things that they do wrong or when they break the rules. Like, we tell them we're

STEVEN PEREIRA - 30(b)(6)

doing payroll; if they are slipping in something not payroll and there is trouble, we want to be able to -- our attorney tells me that this allows you to give, you know, pass the buck.

Q. So has NatPay enforced this provision against Southwestern Payroll in connection with this matter?

MS. NEIDL: Objection to form.

THE WITNESS: In what context? What would we enforce? What did they do wrong?

Q. Well, what I'm saying is the money, the funds didn't get to the IRS or other payees, correct?

A. I don't understand how that would be -- that's not is Southwestern's fault, that's the fault of the bank that took the money.

Q. That's not stated here.

What I'm saying is the funds didn't reach -- for whatever the reason is, the funds did not reach the IRS. There were funds that didn't reach the IRS, right?

A. But it's not their fault; they're not to blame.

STEVEN PEREIRA - 30(b)(6)

Q. Where does it say it has to be --
A. Their fault?
Q. Right.
A. Probably all over the place.
Q. Well, why don't you read it?
A. Or, you know, it wasn't their fault. I just don't know how else to tell you. Why are we going to kick a puppy when it's down? They didn't cause the problem, and we're certainly not going to blame them.
What specifically would I -- as far as any IRS personalities that came to us, nothing came to us. They have probably been inundated with penalties for the taxes not being paid; they weren't passed through me.
So, in a way, I didn't take the responsibility, they're the ones paying the enormous IRS penalties.
Q. That's what I'm getting at. The IRS hasn't demanded payment from NatPay in connection with the events, is that fair to say?
A. It is, the IRS takes a very logical approach and they understand our role in this

STEVEN PEREIRA - 30(b)(6)

entire process.

Just like they didn't go after the bank, First Premier, for not making those payments, that would be just ridiculous, so they go offer the taxpayer.

Q. As we discussed yesterday though, NatPay did pull back over $3 million in payments that had been scheduled out of its files, right?

A. Yes. Sorry.

MS. NEIDL: Objection to form.

THE WITNESS: Yes, we pulled back money.

Q. So just so I understand it, the reason that NatPay isn't seeking indemnification from Southwestern Payroll is nobody's come after NatPay for the payment of any taxes or any other penalty, anything else, isn't that fair?

MS. NEIDL: Objection to form.

THE WITNESS: Again, you're making me walk on very unsteady ground; I'm not an attorney and what hairs you splint.

We have not pursued any action

STEVEN PEREIRA - 30(b)(6)
against Southwestern, as far as I'm aware.
Q. And just to follow-up on that, so -- but no taxing jurisdiction has come after NatPay and demanded that NatPay make payments of taxes on behalf of any of Southwestern Payroll employer clients, correct?
MS. NEIDL: Objection to form.
THE WITNESS: We have not been notified by any taxing agency that we have to make those payments.
Q. So I just want to turn you -- so NatPay 2, this is the Cloud Payroll starter kit, would you agree?
MS. NEIDL: Objection to form.
Q. I just want to confirm that.
MS. NEIDL: Objection to form.
THE WITNESS: You know, they all look alike; I lose track. We're talking about number 2?
Q. Yes.
A. Let me once again flip that page. This is for Cloud Payroll.
Q. We're not going to go through the same exercise that we did. I want to go to

STEVEN PEREIRA - 30(b)(6)

NatPay 3 and confirm that this same form of Processor Service Agreement appears at pages 2511 through 2522?

MS. NEIDL: Objection to form.

THE WITNESS: What's the question?

Q. You'd agree that this same form processor service agreement that was in NatPay 2, is also at pages 2511 to 2522 of NatPay 3?

MS. NEIDL: Objection to form.

THE WITNESS: I'm going to sound really stupid, but can you, like, give me another jumping off point? I'm looking at 3, and you asked me to look at what pages?

Q. Pages 2511.

A. 2511.

Q. You see it starts, "Processor Service Agreement" at the top?

A. Okay. We're on the page there.

Q. And if you flip to the next page, 2512, you see this is for Southwestern Payroll, correct?

A. Yes.

Q. And then if you turn to page 2516

STEVEN PEREIRA - 30(b)(6)

through 2517, it has the same Section 12 that we just reviewed for Cloud Payroll?

A. I'm going to say that they're probably -- I mean, we do have several revisions, but I'm sure they got the same one.

Q. And similarly, for Section 13, that's 2518 through 2521?

A. Yes. I don't -- it's probably not appropriate to add anything, but this Southwestern contract was never really activated, because we never got their payroll.

Q. So it wasn't -- you got the funds that they collected for the payment of taxes from the employer clients, right?

A. Right. Their customers were customers of Cloud Payroll. Cloud Payroll was our customer. Southwestern was going to be a customer when we started to do their payroll.

But Cloud Payroll -- all the activity that National Payment performed was for Cloud Payroll; we did do ProData's payrolls, so that was an actual contract that was doing something.

Southwestern was, okay, they send us

STEVEN PEREIRA - 30(b)(6)

all their accounts and they told us, okay, we are going to give you the business. As far as I know, we never got anything.

This has nothing to do with the taxes coming back-and-forth between Cloud Payroll and their clients. Southwestern wasn't necessarily in this process for taxes.

They happen to have clients that we used, and they had the money that we debited, but they weren't a customer.

Q. But why were they required to sign this then?

A. They signed this in anticipation because we kept nagging them, we want -- we kept nagging Cloud Payroll, we want the payroll. And so they said well, here, let's fill out all the paperwork, because you're going to get it.

Q. Let me just clarify something. If you go to 2515 of NatPay 3, I mean, this agreement, it covers tax payment transactions?

A. It always does.

Q. So is it your understanding that Southwestern Payroll's clients were Cloud

STEVEN PEREIRA - 30(b)(6)

Payroll's clients?

A. Yes. They did the taxes for them; of course they were. They had to have all the paperwork, all the associated affidavits. They had to have all the employer's taxing data.

Southwestern didn't give them that stuff every -- they fed them the data and then Cloud Payroll calculated the taxes, that's my understanding.

But Southwestern was sort of the manager of those accounts, but they were not a customer; we wanted them to be, but they were not a customer.

Q. Are you aware of whether Southwestern Payroll's clients were notified in any way that they were now Cloud Payroll's clients?

A. Oh, I couldn't speak to that. But they started get -- no, because we debited directly from Southwestern; I don't know if they were notified. I don't know what sort of agreement they may have had.

My guess would be that they were notified that they're changing the way taxes

STEVEN PEREIRA - 30(b)(6)

are being processed, but I can't speak to that.

Q. So NatPay did debit directly from Southwestern Payroll, correct?

A. We debited directly from Southwestern Payroll, yes.

Q. I'm having a hard time understanding how they weren't a customer of NatPay then.

MS. NEIDL: Objection to form.

THE WITNESS: I don't know how else to explain it.

They sent their customers, their clients to Cloud Payroll. Cloud Payroll was our customer. They're the ones that transacted. A customer is someone who transacts.

We received no transactions from Southwestern Payroll.

BY MR. ROSATO:

Q. But you debited their account at Prosperity Bank, right?

MS. NEIDL: Objection to form.

THE WITNESS: We debited an account that was designated as the tax funding account for a group of customers.

STEVEN PEREIRA - 30(b)(6)
BY MR. ROSATO:
Q. If you just turn to 2509 of NatPay 3?
A. NatPay 3.
Q. You see that it says "Funding Guaranty" at the top?
A. Yes.
Q. Can you explain to me what the purpose of this document is?
MS. NEIDL: Objection to form.
THE WITNESS: Yes.
Q. What is it?
A. My understanding, I'm not a lawyer, okay, when we -- we want payroll processors to give us their book of business. It's a very economic way to gain customers. It's is an establish business model.
But we want to pressure the payroll processors to only sign up good clients, not to just -- we don't accept clients that a payroll processor doesn't meet or sets up over the web; the chance of risk is greater when people get to hide beyond a computer.
So we did, because we're trying to,

STEVEN PEREIRA - 30(b)(6)

in a lot of ways, enforce the psychological rule that you are responsible for your customers.

So this -- we've never actually executed this against a client, but this tells them -- this is almost like them saying, yeah, I get it, you want us to be responsible.

Because a lot of -- we get clients -- we get processors that say, I'm sending you a client, I have nothing to do with it.

Well then, guess what, they don't get special timing. They don't get any of those perks you get when you take responsibility for your client.

So if Southwestern had decided to give us their payroll, this tells them that those payrolls are their responsibility if there is an NSF, et cetera.

Q. Okay. But the payrolls are Southwestern's responsibility, not NatPay's?

MS. NEIDL: Objection to form.

THE WITNESS: Well, again, wow. I mean, they're not entirely their responsibility; we're responsible for

STEVEN PEREIRA - 30(b)(6)

making sure they get paid or that the funding account is debited correctly. And that there is any issues that are brought up, we will deal with.

But financially responsible, yes.

If they send us a client that's a bad guy or doesn't have any money, we want them to know that that's their problem.

Q. Okay. So -- right. So -- but if -- if the financial -- that's what I'm talking about, financial responsibility to ensure that payrolls get paid, that's on the payroll processor, not NatPay?

MS. NEIDL: Objection to form.

THE WITNESS: The financial responsibility. They are responsible for signing up good clients, that their payrolls will be good. This tells them you've got to make sure of that. So if that answers your question, yes.

Now if the client has a problem or they give the wrong bank account numbers to Southwestern if we did their payroll, let me add that, then it's -- then it just --

STEVEN PEREIRA - 30(b)(6)

Southwestern isn't responsible for that. Like, if the client gives them all bogus account numbers, you know, Mr. Smith or Mrs. Smith doesn't get paid, Southwestern is not responsible.

So financial in a narrow aspect of, is the funding item going to be true, and are we paying legitimate, non-terrorist.

Q. Okay. That's fair.

You can put that to the side.

A. Both of them?

Q. Yes.

(Whereupon, NatPay Exhibit 4, Complaint in Intervention, 22-Pages was marked for identification.)

BY MR. ROSATO:

Q. The court reporter will give you what will be marked as NatPay 4.

Have you seen this document before?

A. I have, yes.

Q. Did you have any role in preparing it?

A. Quite a broad term. Role, yeah. I would probably -- I would say that someone said

STEVEN PEREIRA - 30(b)(6)
so how much did you lose? I would be the one probably coming up with the numbers seeing the number of spreadsheets produced.
Did I -- I didn't do anything with the language, the verbiage, but any factual data in here is probably mine.
Q. Okay. If you turn to paragraph 63?
A. That's number 63?
Q. Yes, paragraph 63 of NatPay 4.
And I think we looked at your Declaration yesterday, do you recall that?
A. I do.
Q. There was a similar statement in your Declaration to what's here in paragraph 63. Do you recall that?
A. Yes.
Q. So I want to focus on the statement here that NatPay's account was intended as a pass-through account.
Do you see that?
A. Yes.
Q. And the account there is the account ending in 5690 at First Premier Bank?
A. At First Premier, yes.

STEVEN PEREIRA - 30(b)(6)

Q. When you say pass through, what does the phrase pass through account mean?

MS. NEIDL: Objection. Form.

THE WITNESS: I'm not delaying, I'm trying to come up with good words.

A pass-through is sort of an old school banking term, which means that if the money is not -- like, it's not like income that you put in there and it just sits and then -- it's money that is eventually -- that is only intended to be put in there to be taken out; that's passing through.

BY MR. ROSATO:

Q. So we discussed this a lot yesterday, but I want to confirm it because you're here in a different capacity today.

Funds that pass through the accounts, am I correct that it's NatPay's position that those funds are not the property of NatPay?

MS. NEIDL: Objection to form.

THE WITNESS: None of the funds are my property, necessarily. I have a

STEVEN PEREIRA - 30(b)(6)

fiduciary responsibility and we take care of them and we're responsible for them, but I can't lay a claim to, you know, to someone's money.

Banks don't own the money in the checking accounts, that's why I believe it's a liability.

No financial business owns the funds that are deposited with them.

BY MR. ROSATO:

Q. So you're -- well, your understanding is that when funds are deposited into a checking account, they don't become the property of the bank?

A. No. They become -- the bank guards them. The bank holds them, but the bank doesn't own that money.

Q. But I think we've --

A. That's why it's called --

Q. You're not a lawyer, so...

A. Right. I mean, a lot of experience, that's why I call a demand deposit account, it's your money. But again, it's just semantics and subjective.

STEVEN PEREIRA - 30(b)(6)

Q. The bank can take the funds that are deposited at the bank and use them to invest in securities or lend to, you know, people seeking mortgages, right?

MS. NEIDL: Objection to form.

THE WITNESS: I think that's probably part of the contract. But if the bank invests your money in a loan that goes bad, they don't penalize a customer's DDA account.

They don't the portion to -- let's say your money is being used to make a home loan. If that home loan goes bad, your account balance doesn't change.

So they can utilize it, but they don't get it. They just -- they use it as leverage with the Federal Reserve as their capital lending limits, but...

BY MR. ROSATO:

Q. The money on deposit on the account, that dollar figure, isn't it fair to say it's a promise to pay by the bank if you ask to withdraw the money?

MS. NEIDL: Objection to form.

STEVEN PEREIRA - 30(b)(6)

THE WITNESS: I do not believe that the bank owns the money you deposit.

Q. Do you know what the purpose of FDIC insurance is?

A. From a layman's point of view, yes.

Q. What is your understanding?

A. That if the bank fails and the money does disappear, it's insured.

Q. By the federal government, right?

A. I suppose so, yes.

Q. So that means the bank -- the money would be gone, right, from the account, because there was a run on the bank or it failed in some way, right?

A. Well, if you're in possession of some person's property and it's stolen, it wasn't your property but it's still gone, someone's got to give it back, and the bank is no capitalized position to return that money.

So if I borrow someone's car and it's taken from me, I have a responsibility to return the car, but I never owned the car; that's just ridiculous.

Q. I think we're getting a little bit

STEVEN PEREIRA - 30(b)(6)

beyond -- all I want -- you as a -- you don't know as a legal matter when money goes into a checking account whose property it becomes?

MS. NEIDL: Objection to form. You're specifying that it's a legal question, and it's not a question to the company, you're just battering him, so please move on.

MR. ROSATO: Okay. Can you please answer my question?

THE WITNESS: Can you ask it again?

BY MR. ROSATO:

Q. You don't have any knowledge as a legal matter whether when money is deposited into a checking account, just a regular checking account, whose property it becomes?

MS. NEIDL: Objection to form. You don't need to answer that.

MR. ROSATO: Yes, he does.

THE WITNESS: Can I answer, I don't know how to answer it.

MS. NEIDL: Yes.

MR. ROSATO: You can say I don't know, sure.

STEVEN PEREIRA - 30(b)(6)
THE WITNESS: I don't know how to answer that, okay, that's my answer, I don't know.
MR. ROSATO: Thank you. Why don't we take a little break.
VIDEOGRAPHER: Going off the record, the time is 10:48.
(Whereupon, proceedings recessed for a short break and once again resumed.)
VIDEOGRAPHER: We're back on the record the time is 11:07.
BY MR. ROSATO:
Q. Welcome back.
A. Thank you.
Q. Do you recall testifying that Southwestern Payroll was a client of NatPay?
MS. NEIDL: Objection to form.
THE WITNESS: They were a client, but we never actually did any work for them.
MR. ROSATO: I'm going to hand you what we'll mark as NatPay Exhibit 5 the front is a little I'm more interested in the client ACH authorization form on the

STEVEN PEREIRA - 30(b)(6)

back.

(Whereupon, NatPay Exhibit 5, IRS Letter Dated 3/9/18, Bates Number NP0107544 to '545, 2-Pages was marked for identification.)

BY MR. ROSATO:

Q. Is that a NatPay form?

A. Yes.

Q. Do you see that there's an area there for PPP information?

A. Yes.

Q. And it has Southwestern Payroll Service Inc listed?

A. Yes.

Q. There is also a PPP account number; what is that?

A. That would be Southwestern account number with National Payment.

Q. And that's something that NatPay issues to its clients?

A. Yes.

Q. You see Darin Alred signed this as the president of Southwestern Payroll, it appears?

STEVEN PEREIRA - 30(b)(6)

A. Yes.

Q. So if Southwestern Payroll wasn't ever a client, I mean, why would it be necessary, you know, for him to provide this ACH authorization form?

MS. NEIDL: Objection to form.

THE WITNESS: Well, they weren't a client in relationship to anything that had to do with Cloud Payroll.

I probably said this 20 times that they promised us all of their direct deposit data, so -- or their direct deposit clients. So they gave us all the paperwork I would assume to try to get us to back off a little. We put in all the clients in there and had it set up, but we never transacted anything on behalf of Southwestern Payroll.

BY MR. ROSATO:

Q. But obviously you did debit their account; you see Prosperity Bank is listed there?

MS. NEIDL: Objection to form.

THE WITNESS: That is a account that

STEVEN PEREIRA - 30(b)(6)

they designated for us if we wanted to, like, debit for fees, et cetera.

Q. Did Southwestern Payroll pay fees to NatPay?

MS. NEIDL: Objection to form.

THE WITNESS: I would say no but, I mean, I can't promise you that, I haven't looked at the record.

But in relationship to the fact that we never processed for Southwestern -- I mean, they may have -- Cloud Payroll, I don't know the distinction, they may have said for this group of people charge this company, which may have been this account as well.

We may have charged Southwestern on behalf of Cloud Payroll for the tax services they performed.

BY MR. ROSATO:

Q. Okay. But -- so NatPay may have charged Southwestern Payroll for fees?

A. It's a distinct possibility, yes.

(Whereupon, NatPay Exhibit 6, Schilling E-mail Dated 7/24/18, Bates

STEVEN PEREIRA - 30(b)(6)

Stamped NP0003762 to '764, 3-Pages was marked for identification.)

BY MR. ROSATO:

Q. I want to put what will be marked as NatPay six in front of you. And I know you're not on the e-mails obviously, but you're here today as the corporate designee of NatPay.

So just so you know, I'll be sharing with you -- I'll be putting in front of you several e-mails that you may not be on, but I may ask you some questions about this, because they were produced by NatPay in this litigation, okay.

Do you understand this?

A. Yes.

MS. NEIDL: Just so the record is clear, I don't think there is anything in your notice that indicated that the witness should be prepared to answer any questions about specific documents or the documents produced by NatPay generally. Go ahead.

MR. ROSATO: The deposition notice covers topics. There have been documents produced by NatPay in this litigation.

STEVEN PEREIRA - 30(b)(6)

This e-mail that is in front of him is relevant to several of the topics that are set forth on the notice, so it's in my view fair game, but you can put whatever you want on the record.

MS. NEIDL: I have.

BY MR. ROSATO:

Q. So I just want to start with the first e-mail from Matt Schilling to Dawn Cafaro on the -- it's the page ending in 3763.

And he's asking her if he says, "As we add more bureaus to our tax processing business, we want the ability to upload one ACH file that contains the tax collections/deposits rather than processing a separate for each and uploading them into a different instance."

Do you see that?

A. I'm looking for the record endpoint.

Q. End quote.

A. And that's the first page?

Q. 3763.

A. Oh, I see. Got it.

Q. So what do you understand that request to be?

STEVEN PEREIRA - 30(b)(6)

MS. NEIDL: Objection to form.

THE WITNESS: They wanted -- they were uploading a single file, that's what I gather for all of their customers, and this indicates they wanted to start to be able, as they added more bureaus, probably to keep things a little bit more logically organized, they wanted to upload their customers based upon the bureau that they got them from.

BY MR. ROSATO:

Q. This is saying though, right, it's talking about adding more bureaus, and they want to do for all of the bureaus just one ACH file, right?

A. Oh, I got it backwards then.

Q. That's what they're asking to do, correct?

MS. NEIDL: Objection to form.

THE WITNESS: You're right. I had it backwards, yes.

Q. Is that something that NatPay permits its clients to do?

A. What?

STEVEN PEREIRA - 30(b)(6)

Q. Let's say there is four different payroll processing bureaus, does it permit them all to just put all of their collective tax files, ACH files together in one instance and give that over to NatPay?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. NatPay does permit that?

A. In this particular circumstance, because these bureaus were all customers of Cloud Payroll, so they took all their -- let's just say it's -- to simplify it, that Cloud Payroll had franchisees; four different businesses, four different TINs, four different everything; potentially because it's all the same company, they would all process them under one tax -- one file.

It's just they wanted to be able to get all the data from all their bureaus and process it as one entity under Cloud Payroll instead of having to separate it by bureau.

Q. But if you turn to the first page that ends in 3762, you see Dawn Cafaro's -- she has an e-mail on July 24, 2018, at 2:11 p.m.

STEVEN PEREIRA - 30(b)(6)

She responds, "Currently, each bureau works independently of each other. We would need to have something in the file that would let us know which bureau the batch was for, and then we would need to work out something on our end."

Do you see that?

A. Yes.

Q. According to Ms. Cafaro, the bureaus were working independently of each other at this time?

MS. NEIDL: Objection to form.

Q. Do you disagree with her statement in this e-mail?

MS. NEIDL: Objection to form.

THE WITNESS: I would have to see how the work was gathered. I would suspect that they processed in Cloud Payroll every one of their bureaus, they processed under a separate, like, just a separate batch run, because it's this bureau, that bureau, and they're getting all the data from the bureaus, not directly from the client, potentially. And that's about -- that's

STEVEN PEREIRA - 30(b)(6)

the best that I can describe this.

BY MR. ROSATO:

Q. Just so we're clear, for the record when we're talking about bureaus, we're talking about the payroll processing companies?

A. We are, yes.

Q. So that would be Southwestern Payroll and Pro Data and -- is that fair?

A. Yes.

Q. Okay. But you don't know sitting here as NatPay's corporate representative whether the bureaus were working independently with each other at the time?

MS. NEIDL: Objection to form.

THE WITNESS: I wasn't aware of it if they were actual bureaus. It was a strange arrangement, granted, probably before they were going to subsume all of their work, but we transacted only for Cloud Payroll.

Q. Why do you say it was a strange arrangement?

A. Because the bureaus -- there's never been a situation where four bureaus are all

STEVEN PEREIRA - 30(b)(6)

owned by one company, another bureau. At least I've never -- I don't know it from my recollection.

Q. Do you know why that might be?

MS. NEIDL: Objection to form.

THE WITNESS: No, I do not.

Q. So you've never seen that sort of organizational structure before?

A. That would be the question to ask Dawn, because she's real close to where the rubber meets the road; I've never had that situation brought up to my attention.

Q. I want to go back to another arrangement that we discussed at length yesterday, but wanted to confirm it here today.

So NatPay, before this arrangement where they were only taking payroll tax funds, funds earmarked for the payment of payroll taxes and not payroll, that was the first time that NatPay had ever done that, right?

MS. NEIDL: Objection to form.

THE WITNESS: You mean only do taxes instead of payroll and taxes?

Q. Yes.

STEVEN PEREIRA - 30(b)(6)

A. I would say yes, because it's always payroll first and then taxes.

Q. And NatPay hasn't done that since either, right?

A. No. Now, we're -- now because the risk has moved around a little. Never say never, I never will, but I would definitely scrutinize that situation a lot more. I would be more determined to understand why. Cloud Payroll had a very good reason. They were desperate to get off PTM, and PTM is a known poor performer, so they were rushed to get taxes, that is sort of what we felt.

They were going to convert the payroll; it's happened a lot of times, normally the payroll first, but Cashet -- we were taking their customers on a regular basis. Generally speaking, they were fine with PTM, and then they wanted to convert the payroll first.

This was just the opposite. Nothing set off a flag.

Q. But it was the only time that NatPay has ever done that, right, had that arrangement with a payroll processing company?

STEVEN PEREIRA - 30(b)(6)

MS. NEIDL: Objection to form.

THE WITNESS: As far as I know, we don't do this signing up with a company that doesn't give us payroll.

Q. Can you explain why that is NatPay's practice?

A. Well, I mean, we talked a lot about that we believed that it sort of spreads the risk around that people are less willing to damage their payroll business and damage all of those payrolls, which are -- if you make a tax payment late sometimes -- I mean, you don't even know about it from the IRS for six months the legs are really long. If you screw up a payroll, it's instant, so the threat of that is significant.

But we are an aggressive company that if you want us to do that, we're going to do this. But I will say that we have clients that we have 40 percent of their payroll and we do all of their taxes. We have clients that we do probably 25 percent of their payrolls and we still pay their taxes. So there is no way of knowing here is our payroll, that that's every

STEVEN PEREIRA - 30(b)(6)

bit.

I actually recommend to my clients to don't put their eggs in one nest, it's just foolish. We could get hit by a meteor and then how many people would be devastated.

Q. But why -- I want to be clear about the risk that you're talking about. Why does that sort of de-risk NatPay to have payroll in addition to payroll tax funds, funds earmarked for that purpose flowing through NatPay's ACH services?

MS. NEIDL: Objection to form.

THE WITNESS: I really think that I've answered that question a hundred times; I don't know how to phrase it to make you understand it. It's two parts psychological, it's one part just -- well, there is a lot of psychological involvement; it just makes us feel better.

BY MR. ROSATO:

Q. Okay. What about the ability to reconcile the taxes that are being paid and the payrolls that are being paid on behalf of an employer client, is that a reason why you'd

STEVEN PEREIRA - 30(b)(6)

want to have payroll and payroll tax?

MS. NEIDL: Objection to form.

THE WITNESS: Are you saying we could determine that if we're paying X Company or we're paying these taxes, we'll be able to identify that we're not doing their payroll?

Like we have some way of determining that I did XYZ Dry Cleaners taxes, but I didn't do their payroll, is that what you mean?

BY MR. ROSATO:

Q. Well, I mean, if we're talking about XYZ Dry Cleaner to make sure that the payroll that is being paid ties out with payroll tax monies that are being paid?

A. It's virtually impossible, simply because we have processes that will do the taxes for them. But remember, we do ACH only. So we have companies that are, like, lawn care services, we have construction and trucking companies, they don't use ACH, so the payroll doesn't come to us, it's all checks.

Plus, in Cloud Payroll, the way that

STEVEN PEREIRA - 30(b)(6)

we would identify all of the transactions of all kinds by a certain company is all tied to their particular NPC account number.

When you process taxes under MasterTax, we just see payments, and the information that we could use to see who that is for, it's so unreliable. You know, all we can look at is the first and last name that is initiated in the ACH entry.

We have situations where it's Dunkin Donuts 245A, but there is only room for Dunkin Donuts 124, so we don't know if it's A, B, C or D, or so it's unreliable. And I'm in the business of data and I don't depend on unreliable data.

Q. We also talked a little bit about the large ACH tax-related tax payment files that Cloud Payroll was sending.

Do you remember that?

MS. NEIDL: Objection to form.

THE WITNESS: Yes, I remember that conversation.

(Whereupon, NatPay Exhibit 7, McAuliffe E-mail Dated 9/13/18, Bates

STEVEN PEREIRA - 30(b)(6)

Stamped NP0003032 to '037, 6-Pages was marked for identification.)

BY MR. ROSATO:

Q. I'm going to hand you what will be marked as NatPay 7.

A. Is number six done?

Q. Yeah, you can put that to the side.

A. Am I done with this one?

Q. Yes. You may recall, if you turn to Bates ending in 35 on NatPay 7, that e-mail, it was part of a chain that we looked at yesterday.

Do you recall that?

A. We're discussing their dollar items; is that correct?

Q. Well, yeah. Actually, yeah, go to 36, the first e-mail from Dawn.

Do you recall looking at that it says, we noticed very extremely large files for next day, for example, we had a file over $5 million uploaded on Tuesday to pay on Wednesday.

Do you see that?

A. Yes.

STEVEN PEREIRA - 30(b)(6)

Q. Do you recall looking at that e-mail yesterday?

A. Yes.

Q. I want to focus you on Bates ending in 34. Do you see Dawn writes there, "I discussed this with our GM."

Is that you?

A. Yes.

Q. And he said while we have other companies that do the same tax deposits in the same amount as yours, they don't do same-day tax deposits. Everything you upload to us for Cloud Payroll is you pull and pay the next day, and that is where he sees the issue.

When she says that other customers don't just do same-day tax deposits, does she mean they also would do payroll-related deposits?

MS. NEIDL: Objection to form.

THE WITNESS: No. No.

Q. What is she referring to there?

A. We have some clients that will -- they debit for the tax payments the day before the payments are made.

STEVEN PEREIRA - 30(b)(6)

Q. Okay. But they don't do that for a hundred percent of the payments that they want to make, is that --

A. There is always emergencies. I mean, we have exceptions. And -- I run -- the reason that I'm in business is because banks are very rigid and very bad at this; we are very flexible and we discuss options with customers, so we have all sorts of situations.

Q. Do you see she says there, we ask that our customers only do 20 percent of their business as next day due to daylight overdraft?

A. Yes.

Q. So is that a policy of NatPay generally only 20 percent of the business should be done as next day?

A. We -- the earlier you debit, the safer the transaction, because of the 48-hour limit.

We talk about all of these things, because we -- we're not going to tell a customer go away because they're over 20 percent, but we like to put pressure on them.

STEVEN PEREIRA - 30(b)(6)

And in particular, if we want more from them, it's like I just scratched your back, I'm doing you a huge favor, now give me more business.

It's a -- you keep hitting 1 million, 5 million. I have clients that do 200 million next-day transactions in taxes; they were a minor account.

That is not -- Dawn is bringing it to our attention, because number one, she's irritated that she they didn't send payroll and it's rude, and we wanted that business, Southwestern had a good bank of business.

But as far as the amounts, you know, to a layman it looks like a lot, but it's not.

Q. No, I appreciate that detail, but I just want asking a simple question.

Is it NatPay's policy -- regardless of the amounts that we're talking about, that only 20 percent of the business should be done as next-day processing?

A. I would not classify that as a policy, I would classify that as a guideline.

Q. It is something that you -- that

STEVEN PEREIRA - 30(b)(6)
NatPay will tell clients to try to follow, right?
MS. NEIDL: Objection to form.
THE WITNESS: We do, but it's -- we're very unsuccessful at it.
Q. How often is it the case that a hundred percent of the business -- of a client's business is done next day?
A. I have a client based in Manhattan that probably processes -- they're my largest client, they probably do a billion dollars a month; all of it is next day, every dollar.
Q. And that's done through ACH?
A. Yes.
Q. And why does NatPay allow that particular client to do next-day processing?
A. Well, we have to take a walk down memory lane.
When NatPay in 2011 had a completely different business model. We consider ourselves the Lexus. So let's say a bank charges $0.02 for an item; we charged a $1.15.
Well, as people became more comfortable doing ACH themselves, we started to

STEVEN PEREIRA - 30(b)(6)

shrink. We're incredibly low cost. We have a low cost of business, fully automated, so we decided to have a half-a-loaf rather than no loaf, so we dropped our prices radically.

But everyone we would say come join NatPay team, they would say who is NatPay, it's a common business problem, our name isn't known, no one wanted to trust us.

So we took and targeted two companies and we gave them enormous latitude, so I had a story to tell. If they do it, everything is going to be fine, and it obviously worked.

These companies, we knew of them, they're incredibly well run. So was it a risk, potentially, but it's been since 2011 and it hasn't happened, so...

We granted some serious accommodations to those early adopters that gave us the ability to tell us the story that NatPay is where you want to go.

Q. And those are clients that NatPay is comfortable with their financial position such that there shouldn't be an issue funding

STEVEN PEREIRA - 30(b)(6)

next-day transactions?

A. Well, ironically we don't request transactions, the customer will not provide that. So we just had a lot of discussion. It's a lot of face time. My salesperson probably spent months, months, just going to the office, kicking the tires, meeting them. We, you know, as a company well-funded, if they're in a really nice office and they have a hundred employees, wow, they are doing pretty well. Every one of my clients and salesperson told me they reached out, they all love him, so we, you know, we did it.

Q. I want to turn back to the e-mail on 3034 of NatPay 7. If you move down Dawn says, "Essentially, we need the employee's direct deposits to help balance out all the same day-transactions. I know you guys are working on moving that over to us, but right now we're not seeing it and it's causing concerns on our end."

Do you see that?

A. Yes.

Q. So I just asked you before if the

STEVEN PEREIRA - 30(b)(6)

concern being expressed here one of the issues with the same-day transactions is you -- NatPay wasn't receiving the payroll processing from Cloud Payroll and the other bureaus, right?

MS. NEIDL: Objection to form.

THE WITNESS: Yes. We're saying most companies never want same day payroll. It's -- they do, but they don't; they don't get it.

And you can -- you ask what the industry accepts. The industry when I first started this business accepted five-day, four-day. But now it's a little different world so you have to accommodate the fact that the timing windows have shrunk.

So payrolls always exceed taxes monetarily, by definition. So if someone -- it's like if you're processing a hundred million dollars and it's two-day, it's 5 million in taxes next day, they're under the 20 percent. It sort of leverages all of that out, the averages. So we get a big chunk of work that we get a day in advance.

STEVEN PEREIRA - 30(b)(6)
It doesn't glare that some of it is the next day.
Q. Because you'll have funds coming the next day that would cover any issue?
A. Well, that's not really it, because that's not really the issue. But if we're talking strictly that we like -- we want our customers to give us money as early as possible. So we -- we pressure them to not do this. And that's one of the -- that's just one of the ways that companies understand that they can keep it under 20 percent. And the 20 percent is sort of like a little gift. Because I know taxes, some clients will not accept tax money being withdrawn the same day as the payroll.
So if the taxes are due Friday, we may take your payroll money Wednesday, but the customers are like you're not getting it before Thursday; that's just not how it works.
Q. She uses the phrase "balance out" in this -- in that first sentence that we just looked at?
A. Yes.

STEVEN PEREIRA - 30(b)(6)

Q. Can you just -- what's your understanding of what's being referred to there, balancing out all the same-day transactions?

MS. NEIDL: Objection to form.

THE WITNESS: Balancing out means that your 20 percent of the tax overnights isn't -- if it's 60 percent and you add in all the payrolls, the percentages drop, so it balances out. So if you add 20 percent, even if it's the same dollar amount, it's less than 20 percent, because we get an enormous amount the day early.

Q. That's not being done by next day?

A. Um-huh.

Q. Okay. Understood. And if you go to the bottom -- well, first of all, she says in that next little paragraph's one sentence she says, "By only sending us the tax portion of your ACH transactions, you're not getting us what agreed upon initially."

So again, there is still as of -- this is September of 2018, despite these requests, there is still no payroll being moved

STEVEN PEREIRA - 30(b)(6)

over, right?

MS. NEIDL: Objection to form.

THE WITNESS: The straight answer is yes. They only moved over Pro Data, maybe Payroll Medic, Pay Medic, the names blur.

Keeping in mind that we have had customers try to transition from Cashet, and a year is not an abnormal amount of time, especially since they have cycles.

And Cashet is -- PTM doing the tax processing was a complete disaster, Cashet was functional.

So it wasn't like they were sending it to their own -- the difference is we have seen the situation where the migration is incredibly difficult. So we weren't, like, necessarily thinking that they were trying to pull a fast one, we were, like, trying to get them to prioritize it. Like, okay, come on, get it done. If we put enough pressure on us, they might allocate the resources to do the conversion.

But we have customers, I believe it's taken two years for them to migrate;

STEVEN PEREIRA - 30(b)(6)

it's a big deal.

BY MR. ROSATO:

Q. You did see at the bottom of that e-mail, you keep using the word pressure. It seems that Dawn is trying to put some more pressure to get Cloud Payroll to move the payroll funds over as well those payroll transactions, right?

A. Right. We want more money.

(Whereupon, NatPay Exhibit 8, McAuliffe E-mail Dated 12/12/18, Bates Stamped NP0002842 to '845, 4-Pages was marked for identification.)

BY MR. ROSATO:

Q. Let met put in front of you what will be marked as NatPay 8.

So it looks like based on these e-mails, consistent to what you said before, Pro Data had moved some payroll processing over to NatPay?

A. They did. I don't think they were very big, but they did.

Q. Yeah. I think if you look in the last -- in NatPay 7 on the front it says, there

STEVEN PEREIRA - 30(b)(6)

are around 150 clients; it's talking about Pro Data?

A. That puts them in the bottom five percent of our client size.

Q. So not a lot of business, but it's at least something, right?

I want to focus on in NatPay 8 on 2843, Dawn writes, "The problem isn't total payroll of 100K, it's single deposits over 100K and we are pretty firm on that rule."

What rule is Dawn referring to there?

A. We -- if it's a direct deposit, taxes don't count, because they're quite commonly over a hundred thousand.

If we get a file that there is one ACH transaction and over $100,000, the system will halt that and then we have to figure out what to do.

Q. I see. And this is, as indicated by the subject line, this is bonus season?

A. Yes.

Q. So this is referring to a credit being given to some employee somewhere for over

STEVEN PEREIRA - 30(b)(6)

a $100,000.

Am I reading that right?

A. That would be my guess, yes.

Q. And what is the reason for that rule?

A. If you're going to steal money from an employer, you're not going to do it in $5 increments, we're very cautious.

So if it's over a $100,000 and we flag the transaction -- and a lot of times we do cause them or we make them adhere to this, that if they send us a wire, the employer is fully recognizes that's a valid entry, they can't come back and say, oh, we didn't know they paid us a hundred grand, yeah, you just wired us for it, and the money is secure and it's not our problem.

So $100,000 is a pretty rock solid rule. We have exceptions; we pay every single star in Hollywood, commonly, it's over a $100,000.

Q. Yeah. So is the reason that fraud could be more easily committed, you know, the ACH transaction goes through and then the two

STEVEN PEREIRA - 30(b)(6)

days have passed, and nobody figured out that the money has gone from the bank account and can't be pulled back?

MS. NEIDL: Objection to form.

THE WITNESS: It's -- if a payroll -- this is how we accept risk. If you send me a payroll and you had three employees and it's $3 million, that's a wire; no way, no how, you could easily be trying to defraud me. If you had 10,000 employees, really unlikely.

Because we look, are all the account numbers matching? If they are all different accounts, it's impossible for any type of conspiracy to be quite that large, so we feel safe.

They're not going to take a risk and essentially have 8,000 employees storm the gate.

So risk is -- the problem that we're more popular at this than a bank is, a bank is not capable of realizing real world circumstances. To them, it is an $8 million payroll; it's equally dangerous

STEVEN PEREIRA - 30(b)(6)

as a $10 payroll. We are able to look at it and say, the odds are this is not fraud, they're not going to open up 8,000 accounts to take $800,000.

Q. Okay. You can put that one to the side. I wanted to turn back to the Complaint, which is marked as NatPay 4.

So I just wanted to go to paragraph 64 of the Complaint. You see we looked at a similar statement in your Declaration yesterday?

Is it NatPay's position that there was never any issue with the services provided to Cloud over that two-year period?

MS. NEIDL: Objection.

THE WITNESS: From the perspective of NatPay to make an issue, they didn't give me or they did not make good on a debit. That's an issue.

The other things -- I mean, we all call it issues, it's such a subjective term. To me it's an issue if a client e-mails and uses a dirty word. I mean, that's an issue.

STEVEN PEREIRA - 30(b)(6)

But it's not something -- did I lose money two years from Cloud Payroll? The answer is no. So in my eyes, they were ideal, they never, ever left us hanging.

BY MR. ROSATO:

Q. So if you go back to NatPay 7, you are talking about the failure to migrate any of the payroll. Dawn Cafaro's e-mail says it's causing concerns on our end. I mean, that wasn't an issue?

MS. NEIDL: Objection to form.

THE WITNESS: That was an annoyance.

Q. You can go to the first paragraph it says, "Everything you upload for us for Cloud Payroll is to pull and pay the next day, and that is where he sees the issue."

So is it NatPay's position that there was no issue?

MS. NEIDL: Objection to form.

THE WITNESS: I just don't know what to say anymore. If we had a bad e-mail address, that's an issue. If they didn't pick up a phone, that's an issue. But in the grand scheme of things, in my business,

STEVEN PEREIRA - 30(b)(6)
did I have trouble collecting money? That's an issue. Potentially I could have changed the language: We lost no money from Cloud Payroll over two years, they were the perfect client in regards to the stability of their funds.
Maybe that's how we should have phrased it, but it wasn't what we did. We used an apparently very loose term that applies to the fact that Dawn had an argument with someone.
BY MR. ROSATO:
Q. But is it also not an issue that by your own testimony a very unique setup, right, NatPay had never done this before, correct?
MS. NEIDL: Objection to form.
THE WITNESS: We viewed it as an opportunity, but they didn't completely fulfill their side. So was it an issue? Yeah, I wanted more money.
Q. Okay. So let's turn to Paragraph 4 of NatPay 4, we're on the Complaint still.
A. What page did you say?
Q. It's Paragraph 4, so it's on the

STEVEN PEREIRA - 30(b)(6)

second page?

A. Not to be ignorant, every number signifies a paragraph?

Q. Yes. Yes. Often times people don't understand why lawyers number documents like this, but it's actually quite helpful to locate a specific statement, which is why we do it.

So on Paragraph 4 here, you talk about -- well, NatPay says, "In this capacity, NatPay managed the electronic data processing necessary to effectuate the transfer of tax funds through the ACH system, et cetera."

Do you see that?

What is the phrase "electronic data processing" mean to you in that sentence?

A. You know, it's a bit of an old school, which means that we did it.

So, I mean, it's just legalese fancy, fancy words. We did -- I don't know how else you would summarize it. We did all the computational transmission work in order to make this happen; pick any word you want, it will work.

Q. So just turn to paragraph 58. And

STEVEN PEREIRA - 30(b)(6)

that says "Based on electronic instructions provided by Cloud, NatPay," and then it uses "It managed this electronic data" phraseology.

Do you see that?

A. Yes, um-huh.

Q. So my question is: When we're talking about electronic data processing, I want to just focus on the electronic piece of it. What I want to understand is how much of NatPay's system is automated versus, you know, what requires human intervention?

MS. NEIDL: Objection to form.

THE WITNESS: In regards to?

Q. So when I -- when a client uploads an ACH file how much of what then happens when it's uploaded to NatPay is automated?

A. Well, I'm proud to say that in a perfect world, a perfect file, we never even knew it came in, we never even knew it went out; that's the perfect world.

Q. It just goes right through?

A. Japanese factory, that was my goal.

Q. I like that. That's efficient.

How often would you say NatPay

STEVEN PEREIRA - 30(b)(6)

succeeds in having that, you know, no human intervention on the file?

A. Sadly, much less than optimal. There's a lot of intervention. Anytime an item is over a hundred thousand, BAM, human intervention. Every time a client questions a needs or research entry, that's an intervention. That's why I would love to have one person work for me, but I have, like, 25.

Q. You could just work out of your basement or something?

A. You know, that's how it worked for three years.

Q. You recall we talked yesterday about sort of the transaction volume that NatPay does on a monthly basis?

A. Yes, I do.

Q. Am I correct that it was around you said around 8 million transactions or so per month?

A. Yes.

Q. When I say "transactions" I mean, like, a single ACH item?

A. Yes.

STEVEN PEREIRA - 30(b)(6)

Q. So it's not like, you know, the credit and the debit it's just a credit or a debit, is that what you mean?

A. Yes. And when we're dealing with taxes paid to the government, because there is tertiary data that's transmitted with it. It's an ACH transaction and an addenda, so we make a little more money with taxes.

Q. So that has some additional -- what is it, like, information that the taxing jurisdiction requires?

A. You have to really be specialized to read it. But, yeah, it follows the ACH transaction in NACHA file, and the government insists on a certain format so they know who to pay.

Q. NatPay charges a fee for that addendum?

A. One more transaction, yes, I'm happy to say.

Q. All right. So would you count that as another transaction then?

A. In the case of the 8 million per month number, no.

STEVEN PEREIRA - 30(b)(6)

Q. So that's just part of the 8 million per month?

A. I'd have to think about the stats. I actually believe that I don't count addenda when we do our volume statistics at the end of the month.

Q. Okay.

A. So I've just wasted your time. No, we don't count them.

Q. You don't count them, but NatPay gets I fee for those?

A. We certainly do.

Q. All right. How many of the 8 million transactions per month are related to the payment of taxes?

A. Oh, it's growing, because so is the government, but I don't -- I couldn't say. A rough guess would be 20 percent.

Q. Okay. So that would be, like, 1.6 million?

A. That sounds awfully high, but it's certainly more than ten and less than 50 percent.

Q. All right. What I want to get to is

STEVEN PEREIRA - 30(b)(6)

okay you have the 8 million transactions or so -- so then that would add -- well, let me back up. Let me say it's ten percent, so it's 800,000.

Let's say there is a million transactions, so there would be a million addenda?

A. Yes.

Q. So out of those millions of transactions a month, I mean, how many are flagged by NatPay's system and require human intervention?

MS. NEIDL: Objection to form.

THE WITNESS: It depends on -- we have customers that we know our system is very flexible if it comes in with a particular batch -- they do reject, but I designed a system that might process if it says an item over a hundred thousand, the system quickly brings it up and it says, IRS payable, they just pass it, it's just --

Q. "They" meaning the system passes it?

A. No, an actual human being. They

STEVEN PEREIRA - 30(b)(6)

have to look at the items; I don't do that automatic, that's machine learning and I'm not that good. They do items one at a time rapidly. It used to be very time-consuming. If it says Mr. Smith, then we've got a problem.

Q. So again, my question was, do you have a ballpark of, you know, how many out of the 8 million or so transactions a month get flagged before --

A. I only now when they used a system that was a little time-consuming to do it, it was almost a full-time job of a person.

Now, I've rewritten that code, so it's maybe -- an individual probably takes two hours a day to process high dollar items. I can't really tell you if I knew, I could probably count them, I have a way.

Q. I'm just trying to understand.

Is it a million transactions a month that get flagged and need review?

MS. NEIDL: Objection to form.

THE WITNESS: That seems a little excessive, a million. Because at some point our system does learn a little and it

STEVEN PEREIRA - 30(b)(6)

knows that this customer is going to have these taxing things. I suspect there is a little bit of that, but a million would be really -- I think that's a lot.

Q. Would that be really high?

MS. NEIDL: Objection to form.

THE WITNESS: Out of 8 million transactions, a million rejected for high dollar, yeah, it would be a problem.

Q. What other reasons would a transaction be rejected, as you just said?

A. The dates are bad. The customer is trying to pay it too soon or on a weekend or a holiday.

They reject -- some customer we like to look at the file before we process it so we have a police fail. We have customers that say, I'm going to send you a file, but I want it rejected, but I'm going to send you a wire, so I want you to not debit me.

Hundreds and hundreds and hundreds of rejects a day. Like I said, it's percentage-wise, thankfully, it isn't high enough to make me not profitable. But there is

STEVEN PEREIRA - 30(b)(6)

a few for all kinds of reasons.

Q. You said percentage-wise, would you say it's less than five percent?

A. That reject?

Q. Yeah.

A. For any reason whatsoever?

Q. For any reason.

A. I would say more, but we have really clever ways of determining which ones are really not a problem. So they reject, but the repair of all of those files is not time-consuming, so it's probably 5 to 10 percent for one reason or another.

Q. Beyond this dollar threshold for, like, single payments to Mr. Smith, as you said, are there any other -- are there any other safeguards built into NatPay's system that would detect fraud or designed to detect fraud?

MS. NEIDL: Objection to form.

THE WITNESS: That fraud detection occurs on our website. That's our what we call our edge system. I do not -- I did not do that programming, but I know we look

STEVEN PEREIRA - 30(b)(6)

for things like -- if an account number changes for an employee, it's -- it comes out as an exception for the customer, because that's an area of fraud.

People will spoof the system and take your checking account and change it to mine, and I get your money. It's a huge -- banks are five now just noticing it. We've noticed it for three years. The system will do that. The system looks for debit cards. A huge source of fraud is people steal money and deposit it into a green dot card, which is a Walmart card. And the magic of a payday card is that you can't debit, you can only deposit.

So if that money is stolen and put in there, we have to -- we can't take it back, we have to request it back. So our system looks for very -- various algorithm questions to determine that it is a payroll of a thousand people and there is one pay card, not a problem. There is 20 employees and ten are pay cards, that will be flagged. We look for an outlier on the

STEVEN PEREIRA - 30(b)(6)

number of pay cards.

I believe that if someone's pay -- well, we're just starting to implement that. If the pay goes out of the historical norm, that will reject.

There's new waves of fraud coming every day. We're being hit now with something similar to that, I'm a Somalian princess or prince, people are doing that with the elderly and putting money in their account and then getting the elderly to give it to them. So we see everything and try to stay ahead of it.

We have significant safeguards on the website that flag for the -- when they upload the file, an exception report comes out and say-- you saw them, that they complained about in that one yesterday, why are these -- these are exceptions that he got saying, come on, that's a flag in our system. That's what they see. That's the example. They see things come up and say do you know this. And typically we say I see it. So that if they were not paying

STEVEN PEREIRA - 30(b)(6)

attention and allowing money to go to someone they don't know, it's sort of their bad.

BY MR. ROSATO:

Q. So just picking up on that, do your clients -- do NatPay's clients fix things on their end when they get a flag in your system, does that occur as well?

A. They're allowed to. If they send a file that's clearly like they want to pay tomorrow and the system knows when they should transmit. It will come up and say you've dated this incorrectly, would you like to put the correct date.

We try to does intermediate all of our problems so we have a lot of people fixing instead of just my five.

Q. So, yeah, the clients can do some of the works to fix things?

A. Within reason; they can change an ACH file to a wire file and vice versa.

Q. How many employees at NatPay are assigned to resolving, you know, when an ACH file is flagged?

STEVEN PEREIRA - 30(b)(6)

MS. NEIDL: Objection to form.

THE WITNESS: Well, another thing that we're proud of is the fact that for repair, at night when we're busiest, we have one or two people at most; the system is that efficient.

Q. So one, maybe two people doing with that?

A. If it's really bad, the second person comes in. But, yeah, like as we speak today, the files are coming in, I have one person doing it.

Q. Okay. So just so -- to be clear then, you know, the vast majority of the files, the ACH files that come to NatPay are not looked at with human eyes, is that fair to say?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. I want to turn to Paragraph 6 of NatPay 4.

A. That's the -- this?

Q. Yes. Do you see this references, it says, all ACH -- it says -- let me just read the whole thing.

STEVEN PEREIRA - 30(b)(6)

For 23 months millions of dollars passed through Cloud settlement account at Pioneer and all ACH transactions carried a description clearly identifying the type of tax payment represented.

My question is: These descriptions that are -- the description that's referenced here, do you know who prepares that description?

MS. NEIDL: Objection to form.

THE WITNESS: In this particular case, MasterTax.

Q. That comes from MasterTax?

A. MasterTax understands what the entry is doing and it places that data in the batch description field of an ACH file.

Q. Okay. And so -- and MasterTax, that's the software used by the service bureau, the payroll service companies, right?

A. This one in particular, yes.

Q. Yeah. The ones that we're talking about, Cloud Payroll, correct?

A. Yes.

Q. And as you just testified, you know,

STEVEN PEREIRA - 30(b)(6)

NatPay doesn't look at every ACH transaction -- well, let me strike that.

NatPay doesn't look at the vast -- there's not a human being looking at the vast majority of the ACH transactions that come through NatPay's system, correct?

MS. NEIDL: Object to form.

THE WITNESS: Our computing system does what we -- is our eyes, but we don't inspect it. I trust my programs a lot more than my people's eyes anyway.

Q. So unless -- yeah, unless there is one of these flags, no one's going to be looking at the specific ACH item, right?

A. Yes.

Q. And are you aware of when a transaction comes into the bank, whether they have automated systems that wouldn't flag the transactions unless there is some issue?

MS. NEIDL: Objection to form.

THE WITNESS: I'm not really aware of what any particular bank -- what their control procedures are for incoming ACH. They may have things that I never heard of.

STEVEN PEREIRA - 30(b)(6)

I suspect that they don't do -- well, I really don't.

Q. Well, if you don't know, you don't know.

A. I do not know.

MR. ROSATO: This is kind of a longer next module. What do you think about a break now?

THE WITNESS: I would adore a break now.

VIDEOGRAPHER: Off the record at 12:03 p.m.

(Whereupon, proceedings recessed for a lunch break and once again resumed.)

VIDEOGRAPHER: We're back on the record the time is 1:04.

BY MR. ROSATO:

Q. Welcome back.

A. Thank you.

Q. If you could put NatPay 4 in front of you, and I wanted to turn specifically to paragraph 62.

Well, first, paragraph 61, which is on page ten.

STEVEN PEREIRA - 30(b)(6)
We talked about this yesterday, but I just want to confirm. So NatPay agrees that the transactions at issue here, the processing of the funds that came from Southwestern's payroll clients, for example, it passed through a number of bank accounts before they would ultimately get to a taxing jurisdiction, right?
MS. NEIDL: Objection to form.
THE WITNESS: In some cases it only passed through us.
Q. When would that be?
A. When we debited a client directly and sent the money to Pioneer, the only stop was us.
Q. When would NatPay debit a client directly?
A. If we're debiting the client's account directly for tax payments for the impound.
Q. So there were times when the taxes would be debited from the client accounts directly?
A. Yeah. In this case the Southwestern deducted the money themselves and concentrated

STEVEN PEREIRA - 30(b)(6)

it into their account. But I think all of Pro Data, I believe we debited their clients directly. I would have to double check, but...

Q. Okay. So my first question was: Isn't it true that the funds at issue were at different accounts at various points in time before they went to the taxing jurisdiction?

MS. NEIDL: Objection to form.

THE WITNESS: You mean the trail of tears, like it went from the client, to us to Pioneer, and then from Pioneer to us to the taxing agency?

Q. Yes. There were different debit and credit transactions that related to all of those steps that you just talked about?

A. That is correct.

Q. And turning to paragraph 62, as we just discussed, I mean, one of the -- I think the first step here was that they moved from the Cloud employer client accounts -- you just said that employer clients would put their money with Southwestern Payroll first?

MS. NEIDL: Objection to form.

THE WITNESS: We did not aggregate

STEVEN PEREIRA - 30(b)(6)

the Southwestern employees' money, Southwestern did that.

Q. Okay. So the first stop was after the employer client accounts themselves was the Southwestern Payroll account, right?

A. Right. From our point of view the employer accounts were the Southwestern account, but...

Q. And then as you said, NatPay's account at First Premier. And then after that to an account at Pioneer Bank, and then back to NatPay's account.

Let me be clear about something, when I say back to, I'm actually talking -- I want to be clear about something.

So is it NatPay's position that the funds -- it's the same specific funds that are traveling all this way through on this journey from the employer client accounts to the taxing just additions?

MS. NEIDL: Objection to form.

THE WITNESS: I mean, on an esoteric level we're paying the person's taxes for the amount that we collected for them, but

STEVEN PEREIRA - 30(b)(6)

it's impossible to say. Was it the exact dollars deposited into Pioneer, I can't say, it's all concentrated.

But in a practical sense the funds that we deducted from Pioneer to pay the taxes were from the portion of the money that we deposited into Pioneer.

BY MR. ROSATO:

Q. You're paying from -- from First Premier's account when payments are made out to the taxing jurisdictions, we're talking about amounts that were paid and not necessarily specific dollars that could be tied back somewhere to a specific employer client, right?

MS. NEIDL: Objection to form.

THE WITNESS: I'm lost. I'm sorry.

Q. You just said, you know, we're talking about amounts and not specific dollars, correct?

MS. NEIDL: Objection to form.

Q. You have instructions to pay an amount out of the First Premier account. As long as the money is in the First Premier account, those funds are going to be paid out,

STEVEN PEREIRA - 30(b)(6)

right?

MS. NEIDL: Objection to form.

Q. The amounts are going to be paid?

MS. NEIDL: Objection to form.

THE WITNESS: If we've been properly funded, yes, we continue the transaction.

Q. But I think as we discussed yesterday, you schedule the credits that are going to go out to the taxing jurisdictions before necessarily the debits from the other account have cleared, correct?

MS. NEIDL: Objection to form.

THE WITNESS: In most -- yes, generally speaking.

Q. Right. So in this paragraph 62 it says the tax funds were moved from all of these different places. I mean, we also discussed -- I mean, you say in the last paragraph here or in the last sentence of the various, yeah, the timing of outgoing tax payments was determined by Cloud Payroll reflecting due dates for taxes to be paid to the appropriate taxing authorities.

Do you see that?

STEVEN PEREIRA - 30(b)(6)

A. I do.

Q. As we talked yesterday, the timing of tax payment could be days in the future or months in the future, depending on the type of tax, right?

MS. NEIDL: Objection to form.

THE WITNESS: We only get them -- we're not -- we don't hold back. In other words, you can only send a credits two days in advance, according to the rules.

So if there is a tax due in a month, we don't get that -- we always get the transaction a day or two early, never more in advance of that.

So if there is money to be paid, if we haven't received instructions, it's probably just sitting in Pioneer.

BY MR. ROSATO:

Q. Yeah. It's sitting somewhere else, right?

MS. NEIDL: Objection to form.

THE WITNESS: Yes. Sorry.

Q. And then NatPay receives instructions to debit the amount to go to

STEVEN PEREIRA - 30(b)(6)
NatPay's First Premier account?
MS. NEIDL: Objection to form.
MR. ROSATO: What's objectionable about the question; I am trying to understand?
MS. NEIDL: Let me read it back to you. And then NatPay debits the account to go to NatPay's First Premier account.
What are you talking about? I don't know. That's objectionable. Read your question and tell me -- if you want to fix it, go ahead, but that's -- to me, a lot of these are unintelligible.
BY MR. ROSATO:
Q. As we just discussed, there can be a time lag between when an amount is collected from an employer client for the payment of a certain tax and the time that that tax is ultimately paid, correct?
A. If you mean at the time we withdrawal the money and the taxes aren't paid immediately upon withdrawal of the money, yes, that does occur.
Q. And in that intervening time there

STEVEN PEREIRA - 30(b)(6)

can be hundreds and hundreds of transactions?

MS. NEIDL: Object to form.

THE WITNESS: Related to what?

Q. Related to additional tax transactions or additional debits from the employer clients' accounts for the payment of, I don't know, other taxes, right?

MS. NEIDL: Objection to form.

THE WITNESS: Relative to what? I mean, are we talking about a specific debit to a client moving to Pioneer or now we're talking about an overall flow of the funds?

Q. Paragraph 62 is describing generally the flow of funds, am I describing that fairly? It's not talking about a specific transaction, right?

A. Right. That's a general workflow, yes.

Q. Just trying to nail down the timing here. And the point that -- what I want to understand is this says the tax funds were moved. And what I want to know is when they get to the final endpoint before payment to the taxing jurisdiction, what are the funds that

STEVEN PEREIRA - 30(b)(6)
NatPay is paying out of its First Premier account to the taxing jurisdictions?
MS. NEIDL: Objection to form.
THE WITNESS: Well, the final endpoint is the taxing authority. I don't understand your question; it doesn't make sense.
Q. Would you agree with me that whatever those funds, they can't be specifically tied to, you know, any amount sitting in some other bank account; is that fair?
MS. NEIDL: Objection to form.
THE WITNESS: I don't understand that either. What do you mean -- if I'm debiting a client to pay their taxes, I don't understand the distinction. There is a specific amount that I'm debiting, a specific amount that the client owes, I don't -- I don't understand the question.
BY MR. ROSATO:
Q. These transactions are done in bulk ACH files; is that fair?
A. There's a large number of

STEVEN PEREIRA - 30(b)(6)

transactions, individualized transactions in a single transmittal from Cloud Payroll, yes.

Q. And there are -- at various points in time there is funds from other sources in NatPay's account at First Premier, sources from other than a Pioneer Bank account, correct?

A. Yes, there are.

Q. So when you receive -- when NatPay receives the instructions to credit various taxing jurisdictions, they're not pulling specific funds tied to, you know, XYZ Dry Cleaner, as you've talked about, there is just funds in the account. And then you take the instructions and you make the payment, isn't that fair?

MS. NEIDL: Objection to form. Go ahead.

THE WITNESS: No, it isn't fair, because we have to be able to determine exactly who is in that account at any given time.

So it may look like a large pool of money, but we know exactly that if we're pulling $2 million to pay someone's taxes,

STEVEN PEREIRA - 30(b)(6)

we know exactly what -- that there is a $2 million little tiny pot for that client.

It's -- I mean, we reconcile all the time to verify that for every client that we paid, we got the money and it was funded.

It's all put into one account to make it manageable, but we know, we reconcile by customer.

BY MR. ROSATO:

Q. You reconcile that you received an amount of funds that can be tied to a customer with a payment that goes out of the account?

A. It's allocated, yes.

Q. We're talking about amounts, it's just comparing one amount that comes in to another amount that goes out, right?

MS. NEIDL: Objection to form.

THE WITNESS: When we are debiting someone to pay taxes, that money that is moved into First Premier is allocated to that taxing agency for that particular payment, because it's all done in one movement.

STEVEN PEREIRA - 30(b)(6)

So the money is -- it has to be allocated, or we would never be able to get a grip on the settlement account. That's how we know when an account -- when an item isn't funded, we know who didn't fund it.

If we get a return for funding, we know exactly who caused the return and we know exactly the implications of that return.

The returns come in very specific and we assign them very specifically.

You have to think of our bank account is like -- most people don't realize it if you have a debit card and you have your own account number, you don't really have your own account, it is one account at a bank with sub-general ledgers. Just like a bank, they have general ledgers, but the money is in one pot at the Federal Reserve. The Federal Reserve doesn't know it's DDA and that's savings, but there is a sub-ledger that reflects every single dollar in that account; that's how the business work.

STEVEN PEREIRA - 30(b)(6)
Even with a debit card, there is one bank account for all those debit cards, but everyone is assigned to a little tiny sub-ledger number. In our case, that sub-ledger number is the account number, so we do everything based upon that number.
BY MR. ROSATO:
Q. So I want to understand something. There's two times in this process that's described in paragraph 62 of NatPay 4 that funds pass through NatPay's account at First Premier, correct?
A. You're talking about in this paper?
Q. Paragraph 62.
A. Where money has passed through First Premier, yeah, we say that a couple of places.
Q. They touch First Premier's account. There is amounts that touch First Premier's accounts at two different points in time, right?
MS. NEIDL: Objection to form.
THE WITNESS: In a general sense it's two times, yes.
Q. And my question is: Does NatPay

STEVEN PEREIRA - 30(b)(6)

reconcile against amounts that are transferred that first time from its account to Pioneer Bank?

In other words, when the tax payment is ultimately made, let's say it's one that's due three months from now, it's a quarterly tax payment, does NatPay do a reconciliation at that time back to a payment or back to a transfer that was made three months prior?

A. The funding -- in the case of taxes, the funding transactions are an island unto themselves. That's a different animal. We're collecting the taxes due for any entity.

That is a unit to us.

We verify that we got the money and that we gave away the money so that we balance to zero, but we know exactly what portion of our bank, when it's funded, who that belongs to, and then we pass it along and we say, okay, we have now -- their balance is now zero again.

The tax, because of the taxing -- the way taxes work, we can withdrawal a thousand dollars, but it ultimately can be five different transactions to five different taxing

STEVEN PEREIRA - 30(b)(6)

authorities. That's why the who process of tax settlement works this way, because the customer is due to pay the thousand dollars on a certain day; and sometimes that's mandated, but how it's paid out is not directly related to the thousand, because some of it is accumulated quarterly, for weekly taxes.

That's what MasterTax does and that's what Cloud Payroll did to verify that they collected the appropriate amounts at the appropriate time, and then they pay out the distributions at the appropriate time.

That's why people use something as sophisticated as MasterTax; it's very complicated accounting.

Q. But all I want to know is does NatPay -- let's say it's a quarterly tax, right. You collect it on day one, and it's not due until three months from now.

When the due date comes and you get instructions for the ACH, is the reconciliation that you're doing just against the debit and the credit at that time?

A. Well, when we collect the money,

STEVEN PEREIRA - 30(b)(6)

that is reconciled that we debited the money and we sent the money off; that is a unit of measurement.

We can't compare that to the tax payments, because some people pay with -- some municipalities require checks. Some municipalities debit themselves. Some municipalities require you to ACH money to a particular manner; like the federal government has a platform called EFTPS, where they going in and -- I don't know anything about that, so I can't reconcile both sides of the entries. That is what the payroll processor does and they use a mechanism like MasterTax.

But I can't guarantee that I will see all the transactions that are the results of that funding, it's not possible, they could write a check.

Q. All I'm talking about is that day three months in the future, right, when there is going to be a tax payment made, right, I just want to understand the reconciliation process that NatPay is performing at that time is comparing if there is a debit matching up

STEVEN PEREIRA - 30(b)(6)

with a credit at that time?

A. When we receive a tax payment, we debit somebody; in this case, it would have been Cloud Payroll. And if the tax payment was a thousand, we debit a thousand. We verify that that nets to zero; that we were funded and that we sent the entry on.

Q. Okay. You are just matching up the amounts, right?

A. In the sub units, they don't compare to each other, it's impossible.

Q. Okay. Again, we may have talked about this a little bit yesterday, but for the funds to pass through, let's count them, the employer client's account to Southwestern Payroll's account to First Premier's account to the account at Pioneer -- or, excuse me, NatPay's account at First Premier, and then the account at Pioneer, and then back to the account at First Premier, NatPay's account.

Is that a typical way that NatPay sets up these types of transactions?

MS. NEIDL: Objection to form.

THE WITNESS: For tax payments, it's

STEVEN PEREIRA - 30(b)(6)

absolutely the only way to do it, yes.

Q. Going through five different bank accounts?

MS. NEIDL: Objection to form.

THE WITNESS: Well, it doesn't go to the employer's account, it's already there, it's not a pass-through. We're just debiting them.

And it doesn't go to the taxing authority, we're just depositing it there.

But the mechanism for the entire banking industry is to transact through a bank, you have to have a bank account, which is the whole reason we have one.

Now, Cloud Payroll has one for different purposes, because they can't collect the taxes as they're being paid, because then they would -- some people like to be debited weekly for their quarterly taxes, that's just the industry standard. So it flows through two accounts.

BY MR. ROSATO:

Q. Let me just ask you though: Does NatPay ever hold funds on behalf of clients,

STEVEN PEREIRA - 30(b)(6)

you know, for, like, an extended period of time until the tax is due?

A. As of this time, no.

Q. Has it ever?

A. We are developing a product in order to facilitate that because of the money transfer rules.

Q. What rules are those that you're talking about?

MS. NEIDL: Objection to form.

THE WITNESS: The rules are only a license holder is able to escrow.

Q. A license holder?

A. Yes.

Q. What type of license?

A. For Texas, it's the money transmitter license.

Q. The money transmitter license?

A. Yes, that is what I refer to.

Q. So why does that rule prompt NatPay to develop a product that would allow it to hold funds for a more extended period of time?

A. Because, for example, a company like Cloud Payroll would never be able to -- most

STEVEN PEREIRA - 30(b)(6)

payroll processors don't have the resources in order to meet the regulatory requirements for paperwork, and we have a full-time staff member now that does nothing but paperwork, it's just not feasible.

So we're going to provide them, for all practical purposes it's the exact same setup, only now I oversee the account. And we're the responsible third-party monitoring the account.

It didn't exist at this time, we didn't know it would be necessary. But it is another way for us to give our clients a little peace of mind that they don't have to worry about it. And the State of Texas has said if you do this your clients don't need a license.

Q. Okay. So it's a product that you're developing so NatPay wouldn't have to be licensed as a money transmitter, is that what you're saying?

MS. NEIDL: Objection to form.

THE WITNESS: No, it isn't.

Q. So I'm just reading through your last answer, and you said the State of Texas

STEVEN PEREIRA - 30(b)(6)

said if you do this, your clients don't need a license.

You're talking about the payroll processing companies?

A. Any company that is going to escrow taxes for someone would -- as far as Texas is concerned -- and again, let me say, I believe they're incorrect, but they say we can save our customers the burden if we monitor the process.

Q. What do you mean by, monitor the process?

A. We look at the account and we make sure that we balance to them.

Q. Which account?

A. The escrow account.

Q. Whose escrow account?

A. Goodness. We are now in the process of developing a product that we open a bank account that we assign to that client their own bank account, and they behave with that account like Cloud Payroll did with that Pioneer Bank account. The only difference is, we're a responsible third-party that's going to monitor that account. So technically and fundamentally

STEVEN PEREIRA - 30(b)(6)
nothing changes, but it assigns the responsibility for the money transfer license to us.
Q. Would you be an escrow agent in that scenario?
A. No, we're not an escrow agent.
Q. But you monitor this escrow account?
A. We monitor the escrow account.
Q. You said -- and they behave with that account like Cloud Payroll did with the Pioneer Bank account, what do you mean?
A. They access it the same way with MasterTax. They reconcile it the same way with MasterTax. It's just a change of -- it's just as if Cloud Payroll said okay, NatPay, now you can log in and you look at our account every day.
Q. Would these clients of NatPay be able to transfer funds out of that account to one of their other accounts?
MS. NEIDL: Objection to form.
THE WITNESS: There are several -- there are restrictions in place. We would probably question that transaction.

STEVEN PEREIRA - 30(b)(6)

Q. Why would you question that transaction?

A. Because typically, all the deposits in that account, all of the deposits in that account are generated by us via our -- by our impounding system, so the system won't accept deposits from elsewhere, it would probably reject.

Checks, by definition, the checks have to be pre-approved. Now, could they spoof us and say we are writing a check to the IRS and it isn't? Probably, but we see the checks and we mail the checks for them.

Q. So there would be restrictions on the types of transfers that could go in and out of that account, right?

A. Right. Now, there are circumstances that of course all of this is so new, I don't know where it's going.

But it is not uncommon because banks does like paying interest on escrow accounts that a customer would take their excess balance and move it into a money market account and then move it back. You know, I don't literally

STEVEN PEREIRA - 30(b)(6)

can't tell you what we would do about that yet.

Q. I wanted to step back.

Is it your understanding that Texas has taken the position that your clients would be money transmitters absent this arrangement that you're now talking about?

MS. NEIDL: Objection to form.

THE WITNESS: According to Texas rules, that's apparently their sticking point.

I believe if they want to regulate the industry, they put a round peg in a square hole. Because everything changed after this Pioneer incident.

They are mistaken in understanding exactly where the system broke down, so they are shoving us into the wrong place.

For example, Indiana tells the payroll processors, give us your financials, give us $500 to look it over, now you have a license.

Texas is taking a different approach. There are a lot of states that carve off ACH providers and carve off ACH

STEVEN PEREIRA - 30(b)(6)

payment transactions so payroll processors are exempt. Theoretically, they're going to do a federal license, that's what they're gunning for, so we have to register one place instead of 50.

VIDEOGRAPHER: Going off the record, the time is 1:33.

(Whereupon, proceedings recessed for technical audio difficulties and once again resumed.)

VIDEOGRAPHER: Back on the record, the time is 1:34.

BY MR. ROSATO:

Q. Are you aware of any of NatPay's clients who have been licensed in Texas as money transmitters?

A. I do not know of any of our customers that have licensed. We had a customer that was so intimidated by the process, they sold to another -- to ADP.

But, no, it's too onerous, they would never be able to qualify.

Q. There are, what, financial requirements?

STEVEN PEREIRA - 30(b)(6)

A. It's not just necessarily financial. I mean, if you want my legitimate opinion, this rule is established to actually penalize small businesses and to not penalize large; simply because the dollar transmission fee, there is a fee for how much you transmit caps out at a ridiculously low amount for me or for ADP, but it's a ridiculously high amount for the average payroll processors it's $200 million a year and the fees stop at that. For a large business that's not a lot, but I have payroll processors that they would be paying the maximum fee, even though they're a little tiny company, so it's just onerous.

And there is something in the system called the NACHA audit, which is you're required by NACHA Rules to have certain capabilities if you don't underwrite your accounts.

So we developed a way that we shield our clients that by doing all of that work for them and that's just another thing that makes National Payment a very attractive option.

If you go directly to your bank to

STEVEN PEREIRA - 30(b)(6)

do the ACH, you are subject to the NACHA audit, which is various onerous.

So I do one, and I save 1300 or 1500 businesses from having to do there's. It as a marketing approach. And the licensing thing, I'm certainly going to figure out a way to make money from it.

Q. You also said that Indiana has -- has Indiana required NatPay to be licensed?

A. Indiana does not consider a third-party ACH processor, at least my recollection, they do not consider a third-party ACH processor a payroll processor.

They're specifically targeting regulations for money transfer if that's what you call it for people that do payroll. They're not interested in escrow what they're interested is in the financial health. That is, to my, is the measured approach.

There are states that I believe Indiana doesn't think -- if we don't exist in Indiana, they have no right to regulate us. They are only regulating payment processors that exist in Indiana. If you are across the

STEVEN PEREIRA - 30(b)(6)

border and you have a customer in Indiana, they don't consider that.

Q. You have to have a headquarter and have an office in Indiana?

A. There are a lot of states like that; we just think Texas got a little crazy. Texas has other issues, which is why they are getting caught in the border and they have the money-laundering if that's the proper term, they have a lot of people that get paid in the money order that's pain able to someone in Mexico that's a huge source of money movement and that is what the rules were originally intended to.

I don't disagree with the need to be licensed, I disagree with what they're calling and making the license about.

Q. Okay. So it's more about the requirements that are being placed on money transmitters than the licensing itself is that fair?

MS. NEIDL: Objection to form.

THE WITNESS: What is?

Q. So you don't disagree with the need

STEVEN PEREIRA - 30(b)(6)

to be licensed, that's what you just said, right?

A. I don't disagree with the need to be regulated. If it's smart regulation and it actually serves a purpose, it's great.

Q. But it's the nature of the regulation in the instance?

A. And it's extraordinarily onerous and very dangerous for small business. And like I said, our customers -- for instance, it can't be that vital that there are probably 900 or a thousand payroll processors in Texas that fall into the Texas rules; and there's probably been four that have been approached for the license, all the rest are being ignored.

Q. Do you know -- you say they are being ignored, do you have any idea why that might be?

A. They're only going after people for licensing if they're being reported. And we inadvertently got reported by one of our customers that did get approached. And they said well, we use NatPay, they do this for us. And they said oh, okay, so gotchya.

STEVEN PEREIRA - 30(b)(6)

Q. What about other states beyond Texas and Indiana, is NatPay licensed anywhere else?

A. We are not licensed in any other state as a money transmitter. Our position is we are not a money transmitter.

We don't qualify federally. There are some states that look to the federal guidelines to implement that restriction.

Are there more that will look at it? I mean, there are fees associated, and what government doesn't want to collect more money?

Q. Has NatPay been approached by any other states?

A. We have been approached just recently by a state, Illinois. And with Illinois -- we're in a factfinding mission now to find out -- you always want to know what they really think we are.

They wrote us a letter and said, you're licensed in Texas, why are you not licensed in Illinois. And so they sent us, I don't know what the legal term is, but it's like a page of, we want to know this. And so I think that our attorneys are in the process of

STEVEN PEREIRA - 30(b)(6)

dealing with that issue.

Q. How recently was this letter sent?

A. It's probably not even a week or two old.

Q. Any other jurisdictions?

A. Not a single peep, thankfully.

Q. Can you turn to Paragraph 6 of NatPay 4, please. We looked at it earlier.

A. That's this, number six, right?

Q. Yes. And to repeat it starts, "For 23 months, million of dollars passed through Cloud's settlement account at Pioneer."

Do you see that?

A. I do.

Q. Is it NatPay's position that the same account at Pioneer was involved in -- for that entire 23-month period?

A. I don't know if this is specific to a certain account. I can't -- I don't know. But whatever transactions we process through Pioneer, whatever they use as a tax settlement account, all of those items were appropriately identified.

Q. I asked you this yesterday but, you

STEVEN PEREIRA - 30(b)(6)

know, you are here in a different capacity today: Are you aware of a time when Cloud Payroll asked that the account through which transactions would be processed was changed, that it asked that it be changed?

A. Right. I believe that they were -- MyPayrollHR had a -- they had an odd way that they settled payroll. They didn't do it the normal way, so they were using that account and then they decided as they were going to grow, it became unattainable to try to use that account; it's much easier to separate the account, then MasterTax doesn't choke over every non-tax entry.

So, yes, they changed accounts.

Q. You said that MyPayrollHR had an odd way that they settled payroll, what do you mean?

A. They actually escrowed their payroll as well instead of -- we don't allow -- well, it's not that we disallow it, we actually do allow it.

But typically, the money for payroll doesn't go to the payroll processor, that's

STEVEN PEREIRA - 30(b)(6)

directly us and them only.

Q. Okay. So there were payroll funds that were being processed into a bank account under the name of MyPayrollHR?

A. I surmised those transactions were not ours. I have looked at bank statements that show literally millions of items that are marked payroll; I'm assuming they were concentrating escrow for payroll there.

Q. And typically, it's -- well, let me back up.

Is the issue that there was also funds that had been earmarked for the payment of payroll taxes were also being processed through the same bank account?

A. I think the way that I would present it is that they had one settlement account that they were using for all their settlement, and then decided that the business would be better served if they separated out the product lines, so that's how we approached it.

They're not the only client that impounds payroll taxes, or payroll themselves. A lot of people don't like to fuss, so they

STEVEN PEREIRA - 30(b)(6)

don't deal with it.

(Whereupon, NatPay Exhibit 9, Cafaro E-mail Dated 3/27/19, Bates Stamped NP0096947 to '949, 3-Pages was marked for identification.)

BY MR. ROSATO:

Q. The court reporter will hand you what will be marked as NatPay 9.

Do you see on the page that ends in 48?

A. Yes.

Q. It's asking that this -- that the account where funds earmarked for taxes were to go -- was switched from the account ending in 0212 that we discussed earlier, to an account ending in 2440?

A. Yeah, I see that.

Q. Would you agree with me that Paragraph 6 of the Complaint is not accurate?

MS. NEIDL: Objection to form.

Q. That's on NatPay 4?

A. I don't understand what you think is inaccurate. We didn't refer to a specific account number, it was a Cloud settlement

STEVEN PEREIRA - 30(b)(6)
account, that's how we referred to it.
Q. Wasn't there more than one account involved in this process over that 23-month period?
A. Well, we have customers that change banks, for instance, so they get a new account number. We have customers that say you know what, we have to split this line of business they open a new account.
I don't understand the -- I don't understand the specific account number changing, making this incorrect.
Q. What is settlement account referring to then?
A. Whatever account they were settling in.
Q. Okay. So it doesn't matter if the bank account itself changes, it's just whatever account they're -- meaning, the payroll processor is settling in?
A. Whatever account they're using to facilitate the settlement of these entries is the settlement account.
We have customers that change bank

STEVEN PEREIRA - 30(b)(6)

accounts all the time, to the point of annoyance, but they do. I mean, people change banks.

Q. Did NatPay acquire as to what type of account this new account 2440 was?

A. What do you mean? We wanted to know it was a checking account.

Q. Did NatPay ask if was it a checking account?

A. Yes, probably we asked if it was a commercial account.

Q. Just a commercial account?

A. Right.

Q. NatPay didn't contact anyone at Pioneer Bank at that time?

MS. NEIDL: Objection to form.

THE WITNESS: Like I said, we have so many accounts that we deal with, it's just not practical.

You know, when a bank such as Pioneer initiates a transaction to process somewhere else, did they say, hey, it's coming? No, it's just not how the system works.

STEVEN PEREIRA - 30(b)(6)
BY MR. ROSATO:
Q. That's makes sense. You can put that to the side.
A. Nine is done?
Q. Yes.
A. Okay. Thank you.
(Whereupon, NatPay Exhibit 10, First Premier Bank Letter Dated 2/3/98, Bates Stamped N00013523 to '551, 29-Pages was marked for identification.)
(Whereupon, NatPay Exhibit 11, FDIC Letter Dated 5/19/98, Bates Stamped NP0013585 to '596, 12-Pages was marked for identification.)
BY MR. ROSATO:
Q. I'm going to put in front of you what was marked yesterday as Pereira 3 and Pereira 4.
I'll mark these as NatPay 10 and NatPay 11.
Do you recall reviewing these yesterday?
A. Yes, I do.
Q. And I think as we discussed,

STEVEN PEREIRA - 30(b)(6)

Pereira 3 is not an account agreement, right?

A. Which is bear proof, there is new numbers on them?

Q. Oh, NatPay 10 is not an account agreement?

A. I'm with you now.

MS. NEIDL: Objection to form.

Q. Do you see an account agreement anywhere in here?

A. This looks like it's simply -- or not simply, there is nothing simple about it. There is an ACH agreement. I mean, it touches on certain account implications with the authorized signer, but...

Q. I think you said NatPay does have a separate account agreement for this 9650 right?

A. Well one existed for us to open the account where they did the background checks for George and Jefferson et cetera. It was 1998. I would assume it was produced, but it was old.

Q. Do you believe that NatPay maintains a copy of it in its records somewhere?

A. I would hope so; if not, I could

STEVEN PEREIRA - 30(b)(6)

probably get a copy.

Q. And I think you testified also that there have been updates to the agreement over the years; is that right?

A. There is a number of addenda, yes.

Q. Do you know what the content of those addenda is?

A. I think in 2004 the rules changed or something changed and I think there was a whole new RE up with the ACH agreement. It could have been re-evaluated because we went from a knob to a somebody.

The addendas are always executed when there was a significant NACHA rule change. Like there was a rule change when a particular class code of returns was changed from a $0.50 fee, that the banks could now penalize the next bank $6.50; they passed that charge to me, that was an addenda. Because I was quoted at $0.50, and now it's 6.50 for this particular type of return.

That, I negotiated a new price decrease and a negotiated a new price for wires; every one of those was an executed

STEVEN PEREIRA - 30(b)(6)

addenda.

Q. Now, if you turn to NatPay 11, the last page -- oh, and let me ask you: Aside from the addenda that you just referenced, have there been any other changes to the account agreement itself?

A. Not that I'm aware of, no.

And I'm more aware now. This was 1998, I was like a real nobody. So I wasn't -- I know what these are, I can read them, I don't even know if I ever saw them.

Q. Understood. So this addendum, we talked about it yesterday, would you agree with me that NatPay has a written agreement with First Premier Bank that First Premier Bank is not to -- has no -- it can't use any funds in 5690 as security for a loan? It's not subject to any -- and you can read the words here, writ, charge, security interest lien or claim of any kind in favor of the bank?

MS. NEIDL: Objection to form.

THE WITNESS: There is an addendum.

I think what's really interesting is that people thought I was smart enough to figure

STEVEN PEREIRA - 30(b)(6)

that out. I believe First Premier is the one that insisted about the addenda. They are just a really good bank.

They knew what the activity was. They knew what the Federal Reserve was going to do about the activity. They were way ahead. And they said, see, that's why this crazy activity is in this account.

BY MR. ROSATO:

Q. First Premier is in the ACH business though, isn't it?

A. Oddly enough they are in the secured debit card business; we've made them an ACH big boy.

Q. In these agreements, you go back to NatPay 10, the page ending in 37.

A. My eyes are starting to cross, got it.

Q. So this is First Premier Bank laying out a schedule of fees that they would charge NatPay for the services listed here, right?

A. Yes, sir.

Q. Okay. And so that's -- it says, "Automated Clearinghouse Fee Schedule," right?

STEVEN PEREIRA - 30(b)(6)

A. Yes.

Q. So, I mean, would you agree with me that they were in the business of doing automated clearinghouse transactions at this time?

A. Well, in context in 1998, they were really new and this, was a desire. They had a very good technical core staff, they thought they could grow it.

They weren't anywhere near as they are now as we weren't either. We probably did 30,000 transactions a month at this point, maybe a little more.

But yes, they were determined to become a clearing bank for ACH.

Q. Do you know whether Pioneer Bank is in the ACH business?

A. Of course they are, they take ACH payrolls from customers.

Q. So -- but -- that's different in kind from having an agreement with a NatPay, right, and charging them fees for each of these transactions, right?

A. I mean, I know now because I saw

STEVEN PEREIRA - 30(b)(6)

that they were in discussions with Michael Mann in order to do their custodial accounts through that bank that they are not equipped to do it. But they do ACH, they're in the business.

Q. So, yeah, I'm trying to make the distinction. I mean, every bank sense ACH transactions, right?

MS. NEIDL: Objection to form.

THE WITNESS: I'm also certain they originate. But to the extent that they are just some little, tiny, tiny bank, there is no way they can do this.

Q. Turning back to NatPay 11, this ACH agreement addendum.

A. What number again?

Q. NatPay 11.

A. Okay. I think I have it.

Q. What was your -- the basis for your statement that you thought that this was something that First Premier Bank approached NatPay with?

A. Well, they wrote George and said, enclosed, is a copy of the FDIC ruling concerning our request that the NPC custodial

STEVEN PEREIRA - 30(b)(6)

settlement account be considered as a custodial account.

Q. Where does it -- okay. You are looking at the March 17, 1998, letter?

A. Maybe the wrong page, I have lost track, but it says 13588 at the bottom.

Q. Yes. But do you know if it was a request that was discussed among NatPay and First Premier at the time?

A. First Premier -- we weren't really that -- we weren't -- well, I certainly wasn't that smart back then about all of these details.

My guess is when you sit down with the bank and you open the account and you tell them what they want to use it for, a good bank like First Premier is going to say -- they did this for the own benefit, because the FDIC and the regulators, if they see a high-volume account and it says tax collection one million times in a month, they are going to nail that bank and figure out what's going on.

First Premier is a really good bank, they guided us and protected us the whole time.

STEVEN PEREIRA - 30(b)(6)

Q. What I'm trying to understand though is this is not the account agreement, right? Neither of these documents is the account agreement?

MS. NEIDL: Objection to form.

THE WITNESS: You mean the checking account agreement when you first sign up?

Q. Yes.

A. I mean, ours with First Premier is probably no different -- the account opening agreement is no different than a person who owns a bakery, it's very boilerplate.

Q. That's what I'm getting at.

This ACH agreement is dealing with an entirely separate arrangement. It relates to the bank account, but it addressing a different issue, right?

A. How we're going to utilize the account, right.

Q. So you needed a specific agreement with First Premier that -- under which they would be your ODFI, correct?

A. In part, but you have it backwards. First Premier wanted us to agree that we would

STEVEN PEREIRA - 30(b)(6)

follow those rules.

We didn't say give us an ACH agreement. First Premier said that we want to be able to determine what this account is being used for.

They're the ones -- we were so green that we would have probably signed anything. First Premier said we understand our fiduciary responsibilities and the FDIC regulation; therefore, we're going to get this all firmed up so the regulators don't knock on our door every three months.

Q. Did NatPay explain to First Premier the nature of its business the first time?

MS. NEIDL: Objection.

THE WITNESS: Undoubtedly. I'm sorry, Cyndi. I wasn't there.

Q. You said they were made aware that NatPay would be processing large amounts of ACH transactions through the account, right?

A. Again, this negotiation was way above my pay grade. But looking at these documentations, they obviously had some discussions.

STEVEN PEREIRA - 30(b)(6)

And again, you don't slip under the radar when you open up a settlement account, the bank really, really wants to know what you're going to transact.

First Premier is such a good bank, they're so conservative. There were some discussions, but I bet you they led us by the hand the whole time, because I wouldn't have known what to classify this account. But it got classified that way, so I'm assuming that First Premier followed the rules.

Q. You're talking classify this account...

A. Apparently, the classification via the addendum is custodial, but it's called high risk/high volume.

MR. ROSATO: Okay. I'll put in front of you what was previously marked as Pereira 5, but this is going to be NatPay Exhibit 12.

(Whereupon, NatPay Exhibit 12, Account 5690 Bank Statement, Dated 8/30/19, Bates Stamped NP0094201 to '250, 50-Pages was marked for identification.)

STEVEN PEREIRA - 30(b)(6)

BY MR. ROSATO:

Q. You recall looking at this bank statement yesterday?

A. Yeah.

Q. So I just wanted to confirm; obviously there are a lot of transactions in here, right, hundreds and hundreds. And am I correct that NatPay, at various times, will have in this account 5690, more than just funds that are earmarked for the payment of payroll taxes, there are other types of payments that NatPay makes out of the account; is that fair?

MS. NEIDL: Objection to form.

THE WITNESS: That is fair.

Q. What other types of payments are made out of this account?

A. We're strictly in the payroll vertical, so it's either payroll direct deposits and process, taxes and process.

Or we will -- because we consider it payroll-related, we will allow people to use us to debit their client for invoices, but that's very tiny, tiny money.

Q. And also, NatPay's fees, do those

STEVEN PEREIRA - 30(b)(6)

get paid out that account as well?

MS. NEIDL: Objection to form.

THE WITNESS: You mean when First Premier books a debit to us for the fee?

Q. No, like, NatPay's fees that it earns from its clients?

A. Well, we generate the transactions, but it's next day. It zips right through here to our operating account.

Q. But it does hit this account?

A. Everything hits this account.

Q. Okay. And are those fees -- is that NatPay's principle source of revenue?

A. Yes.

Q. Does NatPay have revenue from any other source?

A. Yes.

Q. What else?

A. We have a product line that's probably 20, 25 percent of our business that's called Doc Delivery, where we have a very, very advanced platform of document storage and delivery; we do stubs, we do W-2 presentment. So, yeah, it's big, but not like ACH.

STEVEN PEREIRA - 30(b)(6)

Q. Okay. Do you see that there is some redactions, there is, like, blacked-out entries here?

A. Yes.

Q. Do you know what those are?

A. Yes.

Q. What are they?

A. They are specific customer name or their TIN number.

Q. And on the first page ending in 02?

A. Right. When a customer wires in, the bank sometimes puts privacy data in there, so we redact that.

Q. Yeah, because these are wires into the First Premier account?

A. Yes, sir.

Q. And I think we talked yesterday, if you turn to 07, about this. Do you see the entries that say "Cross NPC"?

A. Yes.

Q. I just want to clarify again, so those relate to transactions that were going through Bancorp Bank?

A. At this time we're processing a very

STEVEN PEREIRA - 30(b)(6)

minor amount of work with Bancorp, we were testing them out, but they never really did a good job. So a wire would come here that belonged to Bancorp, so we crossed it over.

Q. Why would the wire end up in this account? By this account, I mean, this First Premier account?

A. Well, when we started using Bancorp, that was the new bank and we had customers that had been wiring ad nauseam, they had old forms and so they would just use the old instructions and wire them to the wrong bank.

We tried diligently to get it corrected and it did get better, did to the very end it was the wrong bank.

Q. Were there times when, you know, you missed transactions that should have gone to Bancorp that ended up in the First Premier account?

MS. NEIDL: Objection to form.

THE WITNESS: What do you mean?

Q. Like, First Premier didn't do the cross procedure?

A. Who didn't?

STEVEN PEREIRA - 30(b)(6)
Q. There were times that NatPay didn't do the cross procedure to send the money over to Bancorp Bank account?
A. And what is the question?
Q. Did that ever happen?
A. That we didn't do it?
Q. Yes.
A. I suppose human error is possible, but we reconcile this.
Q. If you just turn to the page ending in 32, just as an example, there is these high dollar volume settlement consolidated ACHs at the top?
A. Yes.
Q. Would those be batches of ACH items that would include payroll tax -- payments out to the taxing jurisdictions, payroll payments, anything else?
MS. NEIDL: Objection to form.
THE WITNESS: Everything. Because we batch it together -- and we consider the batch -- the unit, as far as settlement is concerned, it's the file, we don't want a lot of debit to credits.

STEVEN PEREIRA - 30(b)(6)
Q. With respect to NatPay's fees, would those be included in one of those consolidated batches?
A. Which fee?
Q. The fees that NatPay earns from its clients?
A. We auto debit -- we don't do them all like that, we auto debit clients every Friday for their fees from the previous week.
We have an account that we opened up at our own company called NatPay Fees that we debit the client and then credit our operating account.
But we process the ACH, so they are buried in one of these numbers as well.
Q. They would be in the consolidated ACH?
MS. NEIDL: Objection to form.
Q. In one of them?
A. Absolutely.
Q. Just as an example, that would be included in a batch of ACH items?
A. Yes.
Q. Okay. What was the -- you just

STEVEN PEREIRA - 30(b)(6)

mentioned an account that you opened up at our own company, what do you mean by that?

A. Well, every -- if you want items to go to a person which is the distinction between why you open an account or like in Cloud Payroll there is one account, it's really dependent on how you want the item to appear on the bank statement.

So if we want those items to appear with a unique company ID, you have to open an account with us, and that's information on the master files that we pass through the ACH network.

So we wanted customers to not just see a blank entry, we wanted them to see NatPay fees. So we opened up our own account, and we process it through that particular NPC account number and therefore, the items are appropriately notated.

Q. So it would be like one of those customer account numbers that is assigned -- that NatPay assigns?

A. Right. We opened an account. We've indicated the name that we wanted to appear on

STEVEN PEREIRA - 30(b)(6)

the bank statement. And -- yeah, and then we can transact. You have to have an account number to transact.

Q. Where is NatPay's operating account?

A. I don't know. There is a rumor that it's at Regents Bank, but I can't tell you for sure. I do nothing on that side of the bank -- I mean, the company.

Q. Okay. You can put that to the side.

A. Number 12 the...

Q. Yes. We just talked about this account 2440 that Cloud Payroll requested NatPay switch to?

A. Okay.

Q. Do you recall that?

A. I'm with you, yes.

Q. Other than what NatPay has learned during the litigation, does NatPay have any knowledge about, you know, when account 2440 was opened?

A. When it was opened?

Q. Yes.

A. No, of course we don't know that.

Q. What about how the account was

STEVEN PEREIRA - 30(b)(6)

opened?

MS. NEIDL: Objection to form.

THE WITNESS: You mean, like, who physically went to the bank and filled out the paperwork?

Q. Yes?

A. How?

Q. Yes.

A. Oh, absolutely not.

Q. What about the account agreement, any account agreement that was signed?

A. No. Typically. We don't worry about it too much because the way this account was going to be used, it will set off flags at the bank anyway.

Normally, we worry that it's a commercial account, there is no way that the bank would let this be a retail account. So that is the primary thing that we are concerned about is how soon we can expect the returns.

Q. So NatPay -- again, outside of this what has been learned in this litigation, has no knowledge about the terms of any account agreement that was signed for account 2440?

STEVEN PEREIRA - 30(b)(6)

A. Like in this moment in time when all of this was done, no, we have no clue.

(Whereupon, NatPay Exhibit 13, Account 2449 Cover Sheet, Dated 2/26/19, Bates Stamped PB-SWP-00000072 to '084, 13-Pages was marked for identification.)

BY MR. ROSATO:

Q. The court reporter will hand you what will be marked as NatPay 13.

Have you ever seen this before?

A. I have recently seen this, because I only remember it because the boxes were checked so perfectly, I thought, if this man did it, he should have gotten a prize.

Q. Yeah. They look like they were entered on a computer; you're talking about on the pages, you know, 74, 75, 76?

A. All I can tell you is I was just envious at his penmanship.

Q. And I'll get there in a second.

But if you just turn to the second page?

A. That's 73, according to this, correct, at the bottom?

STEVEN PEREIRA - 30(b)(6)
Q. Yes.
A. The second page means all kinds of things.
Q. Yes. Do you see that the account description is business premier in the left-hand column there?
A. Yes, I do.
Q. And it's marked off as a checking account.
Do you see that?
A. Yes.
Q. And you see there is also a box with a blank line next to it, do you see that as well?
A. Next to now?
Q. Yeah, that next box?
A. Oh, the one that just --
Q. Would you agree with me that that's like an area where someone might be able to specify some other type of account?
MS. NEIDL: Objection to form.
THE WITNESS: I suppose.
Q. Does that appear to you that way?
MS. NEIDL: Objection to form.

STEVEN PEREIRA - 30(b)(6)

THE WITNESS: What's unusual is that like business premier is a particular product at Pioneer. So I mean you couldn't you know just say the happy Tuesday product, they would have no way to put it in the system.

So I can't imagine a freeform column when you are trying to classify an account, but I get your point.

BY MR. ROSATO:

Q. And do you also see -- so there is nothing on here -- I don't see the word escrow, do you?

MS. NEIDL: Objection to form.

THE WITNESS: I do not.

Q. Do you see tax trust fund account anywhere?

A. I do not.

Q. Do you see the word tax anywhere?

A. That's a lot of writing, but...

Q. There is taxpayer identification number, so I see that down there.

But other than that, do you see any reference to hey this is going to have, you

STEVEN PEREIRA - 30(b)(6)
know, tax payments in it?
A. Right. But I think one of the points of contention is that he may not have known what the words were, I think the bank should have known.
Q. How would the bank know if he just marks this as a checking account?
A. Because you open an account, you do transactions, the bank is supposed to look at it and they say oh, we want to protect you, the bank, we want to make the FDIC happy, so let's write notes and do addendas to make sure we're covered.
When I told customers to look into if they are custodial. These are seasoned professionals that had no idea what I was talking about, none whatsoever.
The bank is the banking expert, not the customer.
Q. Those other customers though, are you aware of whether their banks, you know, insisted on them preparing some special agreement?
A. Well, the ones that went to the bank

STEVEN PEREIRA - 30(b)(6)

-- and, I mean, I can't speak for the quality of all of these banks, but a lot of the banks so oh, we get it, a lot of the banks said we have no idea what you're talking about, a lot of times it's words.

Some banks call it custodial, some banks have different words for it. We've been called high volume/high risk. And typically, those tags are because the regulators want to see accounts that look peculiar, and they want to have a reason. They have to explain it to the Federal Reserve why there is this activity in the account.

Q. Do you remember we looked yesterday at a set of terms and conditions that were attached to Pioneer Bank's response to the NACHA Complaint?

A. I remember looking at it.

Q. And again, we talked about Section 15 of that document included language about a right of the bank to set off funds in the account?

MS. NEIDL: Objection to form. You want him to get the document out?

STEVEN PEREIRA - 30(b)(6)
MR. ROSATO: Sure, we can get it.
THE WITNESS: I don't have it, to the best of my knowledge.
(Whereupon, NatPay Exhibit 14, Pioneer [Sarratori] Letter Dated 10/2/19, Bates Stamped PB-SWP-00385498 to '509, 12-Pages was marked for identification.)
THE WITNESS: Can I tell you that I think at some point in the very near future I'm going to need to have a moment break.
MR. ROSATO: Yeah.
THE WITNESS: I know you don't like it if we're in the middle of something huge; is this going to be huge?
MR. ROSATO: Let me just get through this line of questioning, and then we can break. I don't think we're going to be that long on this, I really don't.
BY MR. ROSATO:
Q. If you turn to the page ending in NatPay 14, page06 and you see 15 entitled, "setoff" is there?
A. Could you give me a page number.
Q. It ends in 06.

STEVEN PEREIRA - 30(b)(6)

A. Oh, good.

Q. Do you recall looking at that yesterday?

A. I know I looked at it. I recall nothing.

Q. So just generally would you agree with me that it sets forth in a lot of words a right of the bank to set off funds in the account due to any payable debt due to us now and in the future.

Do you see that?

A. Yes.

Q. And there are a lot of provisos in that?

A. I'm not an attorney, but I'm going to say he attached an account agreement that I don't even think that it says Pioneer Bank on it.

I mean, as a matter of fact it has New York banking system not that I'm a suspicious individual, but there is no -- I mean, he could have just grabbed this off the internet; there is no signature, there is no header.

STEVEN PEREIRA - 30(b)(6)

Q. Those are fair observations.

I'll represent to you that Pioneer Bank does maintain terms and conditions?

A. But how do you know that's are the ones that they gave Michael Mann?

Q. Yeah. So if you turn back to NatPay 13. There is a box that's checked terms and conditions on page 73 indicating that those were provided to the -- to Mr. Mann the person opening the account?

A. What was provided?

Q. Terms and conditions.

MS. NEIDL: Objection to form.

THE WITNESS: But which ones?

Q. So assume for the purposes of this line of questioning it's this set of terms and conditions that --

A. Right, but the whole basis of them saying we didn't make a mistake is based upon terms and conditions that we can't tie to anything.

Q. So you can let me worry about weather we can tie it directly to the bank account.

STEVEN PEREIRA - 30(b)(6)

I'm representing to you for the purpose of this line of questioning that these are the terms and conditions that apply to this bank account?

A. All right.

MS. NEIDL: I'll have a standing objection to all the questions, along this line based on that.

MR. ROSATO: Okay. That's fine.

BY MR. ROSATO:

Q. You see that that that's X'd off by Michael Mann. It says, "The undersigned also acknowledges receipt of a copy and agreed to the terms of the following agreements and/or exposures"?

A. Is that 13 or 14?

Q. 13.

A. Thank you. With the perfect boxes.

Q. NatPay 13, page 73.

A. Okay. Tiny print. What am I looking at again?

Q. On the right-hand column of page 73 do you see underneath the signature, it says signature and there is some sentences there?

STEVEN PEREIRA - 30(b)(6)

A. Right and he's just checking off all the things that he said he got.

Q. Yes, and one of them is terms and conditions?

A. Okay. Yes.

Q. And do you see that there is also a box with a blank -- with just a line next to it?

A. Next to common features?

Q. Yes.

A. Yes, I see that.

Q. And that's not filled out?

A. It is not.

Q. If you just flip through this, do you see any type of addendum similar to the one in the addendum to the ACH agreement between First Premier and NatPay?

A. Do I see an addendum attached to this, like, the addendum that we have with First Premier about the account, is that the question?

Q. Yes.

A. I do not.

Q. And if you turn to page 83 of

STEVEN PEREIRA - 30(b)(6)

NatPay 13?

A. Okay.

Q. And there is a request to combine accounts for cash management.

Do you see that?

A. Yes.

Q. Do you know what that -- do you have, you know, in your own personal experience any knowledge of what that would entail?

A. Intimately.

Q. Okay. What does that mean?

A. It's a strange way, but the treasury department of every bank is the one that controls access.

I have -- like this new product we're doing, we're potentially going to have an account for every customer.

Cash management, I had to list all the accounts that I want to be able to see, so I don't have to log into 15 accounts at the time.

And to be fair. I've obviously read literally everything about this account. He wanted to be able to log into one place and see

STEVEN PEREIRA - 30(b)(6)

all the activity.

I think we can't infer, that he meant that cash had something to do with it. It's control.

Q. Okay. Do you know what Lincoln academy LLC is?

A. I have heard the name. I know it was a Michael Mann entity, but I don't know what they did.

Q. What about FocalPointe Group LLC do you know what that is?

A. Frankly that name isn't even familiar to me.

Q. And what about Create Force d/b/a always live?

A. I think I only heard about that when Matt Schilling mentioned it, I think.

Q. But there would allow there be a single sign on single sign-on to everything at once, right?

MS. NEIDL: Objection to form.

Q. Is that what your understanding is?

MS. NEIDL: Objection to form.

THE WITNESS: That would be my

STEVEN PEREIRA - 30(b)(6)
understanding of why they would list all the accounts.
Q. And if you turn to the next page, 84, you see at the top it says "This form is intended to combine like products. All business premier checking or all business basic checking together avoid service charges and to document exceptions.
Do you see that at the top of the page there?
A. Yes.
Q. Do you see that ValueWise -- an account in the name of ValueWise Corporation is listed as the primary account there?
A. Yes and that's usually because you still have to log into an account. So everybody has the hierarchy top account.
Like, we log into an account, we will be able to see all of our customers' accounts.
So other than that, this form is moderately infantile; I've not seen anything like this.
Q. The secondary account there is the

STEVEN PEREIRA - 30(b)(6)
account ending in 2440, right?
A. Yes.
Q. And if you turn back to 81 and 82 and 83, I mean, there are a lot of different accounts listed on those pages, right?
MS. NEIDL: Objection to form.
THE WITNESS: Yes.
Q. Yet the only one that was selected as the selected as the secondary account for purposes of this is account 2440, right?
A. What does secondary account imply?
Q. Well, if we looked at the top there, it says, "This form is intended to combine like products together to avoid service charges and/or to document exceptions." Do you see that?
MS. NEIDL: Objection to form.
THE WITNESS: Right. But secondary means that it's sort of below something. I guess I'm just stupid I don't get what this form does.
Q. Do you agree that this form says it is intended to combine like products, do you see that?

STEVEN PEREIRA - 30(b)(6)

A. Yeah, right, they're both business premiers or something.

Q. Checking accounts, right?

A. Well, everything is a checking account.

Q. Right.

A. And there is nothing else on this document to reflect that it's anything other than a checking account, right?

MS. NEIDL: Objection to form.

THE WITNESS: No, but I've just never encountered a form this -- in this manner.

Q. But just to answer my question, there is nothing on this document on this document in this document that indicates that account 2440 is anything other than a business checking account?

MS. NEIDL: Objection to form.

THE WITNESS: There is not. But if you just looked at our account opening document the addendum is not there, the addendum is a separate piece of paper.

Not that I'm saying that there is

STEVEN PEREIRA - 30(b)(6)
one, but how do I know this is complete?
Q. Well, I guess you don't, but...
A. I just trust you.
Q. I don't know if I asked this yesterday, but I want to ask it to make sure it's clear: Is there a reason why NatPay maintains only one account at First Premier for the specific purpose of processing ACH transactions?
MS. NEIDL: Objection to form.
THE WITNESS: Traditionally, banks are -- banks are more comfortable with fewer accounts.
Like, most processors in my position will get a second bank. It's the regulators frown on a processor having a third bank, it begins to look fishy.
So First Premier says, let's put it all in there, it keeps things neat. Things happen, you don't want things going into this account and that account. You've seen this week we've had three crosses between different banks.
I just think it's bad form to

STEVEN PEREIRA - 30(b)(6)

reconcile accounts and have so many entries that could or could not easily be changed.

It adds complexity. To me, less is better.

But First Premier has guided us and really doesn't -- has never recommended another account. We would do it, if they said.

BY MR. ROSATO:

Q. Well, let me ask you another question: Why does NatPay maintain what you call its operating account at Regents Bank or wherever it is as opposed to First Premier Bank?

A. Probably just because they're all the way in God forsaken South Dakota. I'm sure that our boss goes to the bank and says, I want to make a deposit, we have to literally physically deposit our checks. They do that, yes. We get invoice checks.

I mean, it's just silly to go to a bank out in South Dakota.

Q. That raises another question for me. First Premier is out in South Dakota, so how

STEVEN PEREIRA - 30(b)(6)
did NatPay find First Premier Bank in the first place?
MS. NEIDL: Objection to form.
THE WITNESS: It's a long story.
When we started in 1991, the person -- one of the people that was a principal who is Tim Tracy who is only a minor partner now, a minor principal, he was coming with a business that -- well, they did something very similar to what we hope to do.
I don't understand all of that, which was going on, but he had already come with a bank that would be billing to do this called Western Bank. Western Bank was then sold -- we did them for a few years. Western Bank was sold to First Premier in Minnesota, they were just horrible, we fired them.
But the guy that ran Western Bank ran First Premier Bank, and he called me.
BY MR. ROSATO:
Q. So you said he found a bank that would be willing to do this.
What do you mean?

STEVEN PEREIRA - 30(b)(6)

A. Well, it was very early in the ACH world, very early, and we were very new to this. We were, like, one of the first in the country to do what we do.

And he had, through his mechanism -- his software he sold to Western Bank, the software that he would produce used to -- you had the client, the dry cleaner would buy it, the bank had it, and it would allow the dry cleaner to transmit to the bank; back then it was virtually impossible. This facilitated them typing in the payroll and then hitting enter, so the bank was familiar with them.

And then they had an ACH department and they were willing to develop this product with us, and they were very good at it.

When they got bought, everybody quit and went to First Premier. The Minnesota bank was dreadful and they said, come on back, we want to see you again, that was in 1998.

Q. Is NatPay aware of, you know, whether there are banks out that just won't do this kind of business?

MS. NEIDL: Objection to form.

STEVEN PEREIRA - 30(b)(6)

THE WITNESS: I would say that the number of banks that will do it is extraordinarily rare.

Q. Okay.

A. They have to be very special.

Q. It's a specialized area, right?

A. Well, any kind of high volume account like ours with fluctuating balances -- actually Cloud Payroll is the same way, those accounts, you just have to be very careful with them, so a lot of companies just won't do it.

We're very lucky. They're also a private bank very well-capitalized, which is the balances -- which is why I was always confused about Cloud Payroll and Pioneer is a bank has to be extraordinarily capitalized to take the fluctuating balances. Everyone thinks more money, but 10 to 20 percent has to be put in a pot for the government, you cannot invest it. There are so many restrictions in monitoring that we've been fired from three banks simply because their balance sheet couldn't handle our fluctuating balances.

Q. What banks were those?

STEVEN PEREIRA - 30(b)(6)

A. You know, I knew you'd ask. We tried a local bank, because that's a nice thing to do and they just -- Florida National.

They were good, they did it, but they said that our balances were causing issues with the balance sheet, so they asked us to leave.

Q. Okay. Any others?

A. Yes, but I don't remember.

Q. Was it a similar reason?

A. They're always a similar reason.

Banks capitalize below $10 billion. They struggle to meet capital requirements with high fluctuating balances.

Q. So it's -- just to close the loop on that, there really aren't very many banks that are in this particular business, right?

MS. NEIDL: Objection to form.

THE WITNESS: Banks that will do a third-party ACH processor are not common.

Q. As far as the hierarchy among third-party ACH processors goes, where does NatPay sit in terms of the volume of transactions that it handles?

STEVEN PEREIRA - 30(b)(6)

A. Number one.

Q. Number one. Who is second, if you know?

A. I think it's a little company called Kotapay.

Q. So you would probably say you are far ahead of Kotapay?

A. I would say, yes.

Q. Do you know if any of the larger banks like Bank of America, for example, does business with third-party ACH processors?

A. Yes, but different. They would -- like, if Cloud Payroll or Southwestern -- Southwestern was essentially a third-party ACH processor, because they sent their payrolls directly to their bank.

When you're sending anything -- when you're sending anything for someone else, you're now an originator.

So everybody -- every payroll company that transmits to their bank, they're a third-party processor. We're a little unique that we don't send any of our -- like, I won't say our customers, they're all our customers,

STEVEN PEREIRA - 30(b)(6)

but there is a distinction.

Q. So Southwestern was acting in sort of the same role as NatPay in --

A. Theoretically.

Q. -- in doing it?

A. I don't know this for a fact, but I can ascertain that anybody who sends files as a payroll processor to their bank is now a third-party processor.

MR. ROSATO: Okay. We can break there.

VIDEOGRAPHER: We are going off the record, the time is 2:35.

(Whereupon, proceedings recessed for a short break and once again resumed.)

VIDEOGRAPHER: We're back on the record, the time is 2:57.

BY MR. ROSATO:

Q. Welcome back, Mr. Pereira.

A. Thank you.

Q. I wanted to turn back to the Complaint; and in particular -- and that's NatPay 4, and in particular, the allegation in paragraph 127.

STEVEN PEREIRA - 30(b)(6)

Do you see that paragraph?

A. 127?

Q. Yes.

A. Yes, um-huh.

Q. Can you explain to me NatPay's understanding of the duty that's referenced in this paragraph?

MS. NEIDL: Objection to form.

THE WITNESS: I believe that what we're implying is that tax funds and those sorts of impounds are held to a higher standard by everyone.

And that what we're saying is that everyone in this whole process has a duty to watch guard them and keep them safe.

BY MR. ROSATO:

Q. But NatPay's position is that Pioneer owes a duty to NatPay?

MS. NEIDL: Objection to form.

THE WITNESS: I think that it's probably pertaining to the fact that we paid taxes that we didn't get our money for.

So they did owe a duty to pay us.

STEVEN PEREIRA - 30(b)(6)

The money was in the account, which they should have at least paid what we paid out.

Q. Do you understand the legal significance of the phrase to owe a duty?

A. I have no idea.

Q. Okay. NatPay doesn't have any business relationship with Pioneer; is that correct?

MS. NEIDL: Objection to form.

THE WITNESS: Outside the fact that all the banks and all the financial institutions work in an ecosystem of trust, we all are related.

But specifically, like, a contractual relationship, we have none.

Q. Right. There is no -- that's what I'm asking. There is no direct relationship between NatPay and Pioneer, right?

MS. NEIDL: Objection to form.

THE WITNESS: Like I said, outside of all the ACH operators and only ACH -- everyone who participates in the ACH network, according to NACHA has rules to do no harm. There are very specific rules

STEVEN PEREIRA - 30(b)(6)
that we're all one big happy ACH family.
But as far as a direct banking relationship or anything along those lines, no, we had no idea who they were until this event.

BY MR. ROSATO:

Q. And NatPay -- during that relevant period that we're talking about now, never had any communications with anybody at Pioneer Bank; is that correct?

MS. NEIDL: Objection to form.

THE WITNESS: I would say that there is a slight possibility that in the course of normal events -- we do have customers at Pioneer, I believe, just a mom and pop shop, it's very possible, we may have talked to an ACH operator.
I hate to talk in absolutes, but there is a possibility that we spoke to them; not in relationship to this event.

BY MR. ROSATO:

Q. So sitting here today, but you're not aware of any communications?

A. No, it's so commonplace, it wouldn't

STEVEN PEREIRA - 30(b)(6)

even be noted.

Q. Okay. I think we've gone over this ground, but the funds at issue, is it NatPay's position that those funds belong to NatPay?

MS. NEIDL: Objection.

THE WITNESS: Are we talking about a specific number here?

Q. Well, I mean, if we want to put a number to it, paragraph 135. This says that NatPay lost over $3.8 million that were paid to various taxing entities.

Do you see that?

A. Yes. I will say that in the traditional sense when everything flows properly, we are guardians of the money, we don't own it.

But in the event -- as soon as the returns came and the transactions that we sent out were not funded, that transferred to me; that's my problem now.

That's just -- we just -- we always step up and we take responsibility. So as soon as those returns came in and we realized -- we sent out items without funding, that full

STEVEN PEREIRA - 30(b)(6)
ownership transferred to me, in my opinion. Yeah, my customers aren't -- they're safe.
Q. These funds that were supposed to be paid to various taxing entities as alleged in paragraph 135, those aren't taxes that NatPay owes, right?
A. No. No.
Q. And I think we've talked about, isn't it NatPay's position that the funds in account 5690 at First Premier are not NatPay's -- NatPay doesn't own those funds, right?
A. That is correct, we are guardians.
Q. Except for, of course, there are some fees that come through, and then those fees that are owed from NatPay's customers, NatPay owns those funds, right?
A. They are never in through a posting cycle, no. I mean, they are never there. If everything happens on the same day, money washes out instantly, money isn't there.
Q. Those funds go quickly in and out of the account, is that what you're saying?
A. It goes quickly, simultaneously. It passes through us for the sake of a debit and

STEVEN PEREIRA - 30(b)(6)

credit, they go the same day, but it washes itself out, the money is not ever there.

Q. Which money are you referring to?

A. Any, like, in particular, we were discussing our fees. They hit -- go through First Premier who gives us the money from our clients, because we've debited all of these people for their fees. But at the same simultaneous time, I'm sending the money to the operating account.

So the money isn't -- you can see a bookkeeping entry, but it's an instant. In a bank, if it happens on the same day, it essentially doesn't happen.

Q. But back to my original question: The funds that are transferred into account 5690, it's NatPay's position that those are not -- NatPay does not own those funds?

MS. NEIDL: Objection to form.

THE WITNESS: I agree that when a customer funds it and it goes into the National Payment account, I don't own that money.

Q. So if NatPay were to recover

STEVEN PEREIRA - 30(b)(6)
$3.8 million, is NatPay entitled to keep that money?
A. As soon as those items unfunded, we took ownership, because who else is -- I mean, if there is a loss into that account, we take ownership immediately.
It's sort of like we're the FDIC insurance; we have no choice. We can't -- that's not our money to play with. So when a loss hits, we have to absorb it.
Q. So NatPay would pocket that money for itself is what you're saying?
A. If --
MS. NEIDL: Objection to form.
THE WITNESS: Well, it would be filling a pocket that was already emptied, because that money came out of our pocket.
Q. I need to understand that, because if the funds never belonged to NatPay to begin with, how did it come out of NatPay's pocket?
MS. NEIDL: Objection to form.
THE WITNESS: I don't know how to explain that. We are charged in keeping that account whole and intact.

STEVEN PEREIRA - 30(b)(6)
When that money -- when it was unfunded by the returns, somebody has to take the responsibility to make that account whole again; if not us, who?
BY MR. ROSATO:
Q. The employer clients perhaps?
MS. NEIDL: Objection to the form.
THE WITNESS: That's all legal. I just know that that was -- we -- that became our money the minutes those returns came in; that loss became ours.
And it's not the money that became ours, the lack of money became ours.
Q. There is no -- for NatPay, there is no liability to any taxing jurisdiction, correct?
MS. NEIDL: Objection to form.
Q. That's at issue here?
MS. NEIDL: Objection to form.
THE WITNESS: As a taxing agency. Well, three years, maybe the IRS, who knows, they're slow, are you saying has a taxing authority contacted us and said, give us your money?

STEVEN PEREIRA - 30(b)(6)

Q. Yes.

A. No. Well, Wisconsin did, kind of.

Q. NatPay also, as we discussed yesterday, did prevent the payment of over $3.2 million in taxes to various taxing jurisdictions, right?

MS. NEIDL: Objection to form.

THE WITNESS: We did not make those payments because they were not funded, yes, that's how it works.

Q. How does NatPay account for the funds that move through account 5690 in its financial statements?

A. Because --

MS. NEIDL: I'll object to form.

THE WITNESS: Because they are not our funds, they're off balance sheet.

We can't include it as an asset, that would be a mis-statement of your assets.

Q. So going with that then, I mean, we're talking about funds that were in that account, that's all off balance sheet, right?

A. Yes.

STEVEN PEREIRA - 30(b)(6)
Q. So what am I missing then? I'm just a little confused.
If it's not -- they're not NatPay's funds, they're off balance sheet, they're not an asset, so how is it something that NatPay ever lost?
MS. NEIDL: Objection to form.
THE WITNESS: I just can't answer that. It's sort of like if someone has your car and they lose it, they owe you the money. I don't know how to explain it any more.
MR. ROSATO: That's fine.
THE WITNESS: We are responsible for the good care of those funds.
This was a huge withdrawal from this account, so we decided -- we made them whole. That was -- we stepped up and made them whole.
BY MR. ROSATO:
Q. Made who whole?
A. Our customer base.
Q. How did NatPay make its customer base whole?

STEVEN PEREIRA - 30(b)(6)
MS. NEIDL: Object to the form.
THE WITNESS: We -- well, we had to absorb the loss.
Q. In what way?
A. We have to pay that.
Q. To whom?
A. Into that account.
Q. NatPay took $3.8 million of its own money and put it into the account?
A. I'm not sure if they have done that, but it certainly is going to happen, if it hasn't.
Q. But that hasn't happened?
A. I'm not aware of that or aware if it didn't happen.
Q. There would be documentation of that if it did, correct?
A. You would suspect so, yes.
Q. Are you aware of whether NatPay has any contractual obligation to do something like that?
A. I'm not aware of. Again, our contracts are, like, 30-pages long. I would almost say our customers made us sign in a

STEVEN PEREIRA - 30(b)(6)

contract that we are going to have their money safe for the period that it's with us.

Q. You think a contract like that exists?

A. It's got to be buried. I mean, my customers are so picky when they sign their contracts, they would really want to make sure that it's cool and safe.

Q. You're talking about customers, you're talking about the payroll processing companies?

A. Any customers that transacts through us.

Q. We looked at the starter kits for the three payroll companies issued here, right?

A. We did, yes.

Q. We didn't see any provision of that kind in those contracts, right?

MS. NEIDL: Objection to form.

THE WITNESS: I'd have to look again; that's a really narrow promise, you know.

Q. At least the provisions that we looked at, right?

STEVEN PEREIRA - 30(b)(6)

A. Right. But we have this attitude that you don't need regulation to be a good person. I mean, we don't need a regulation to do the right thing.

Q. That's fair.

I want to talk about any changes -- I know we sort of touched on this at a few points, but I wanted to do it in a little more of an organized fashion; changes in NatPay's business since the events of, you know, September 2019.

A. Okay.

MR. ROSATO: So first of all, I want to put in front of you what will be marked NatPay 15.

(Whereupon, NatPay Exhibit 15, Texas Consent Order Dated 1/1/21, Bates Stamped NP0094195 to '200, 6-Pages was marked for identification.)

BY MR. ROSATO:

Q. Do you recognize this document?

A. No. I've heard of it, but I don't think I've read it.

Q. It appears to be a consent order

STEVEN PEREIRA - 30(b)(6)

between NatPay and the Texas Department of Banking?

A. I know it's called a consent order, I don't know what that means.

Q. Well, if you look at the last two pages it's signed by both the Commissioner of the Department of Banking and NatPay?

A. I see that, yes.

Q. If you look, you know, there is a lot of legal jargon in here, right. But this consent order basically states that NatPay will agree to be licensed as a money transmitter in the State of Texas; is that fair?

MS. NEIDL: Objection to form.

THE WITNESS: It just looks to me that we decided that we bent and we're going to do everything that they tell us to do.

Q. And you see on the page ending in 97, paragraph 12, NatPay agreed to pay a fine of -- an administrative penalty of $89,400?

A. Yes.

Q. Do you know if that payment was made?

STEVEN PEREIRA - 30(b)(6)

A. Oh, no doubt.

Q. And since this time, has NatPay been licensed as a money transmitter in Texas?

A. Yes.

Q. Do you know if the events of September 2019 had anything to do with this result, this consent order being entered into?

A. I don't think I could make that association. I mean, I don't know how one could lead to the other, but -- oh, I get what you're saying.

Yes. They read about this disaster and they interpreted it, in my opinion, incorrectly what actually happened, and they decided they wanted to show their constituents and they're on the program in saving the people in Texas.

I think they reacted to the wrong thing, but it is what it is and you can't fight the government.

Q. Right. I mean, so in this document, in this NatPay 15, the department makes a bunch of findings, makes a number of findings and NatPay agreed not to contest those findings,

STEVEN PEREIRA - 30(b)(6)

correct?

A. We agreed to stop contesting those findings.

Q. To cease contesting?

A. Yes.

Q. Okay. We also talked about, I think, this new product, right, I think we discussed that a little bit?

A. We did.

Q. And so on this new product that NatPay is developing, you would essentially have oversight of accounts opened in the name of each payroll processing company?

A. Every participant, yes. I mean, whoever choses to participate.

Q. And in that oversight role -- so what would NatPay's responsibilities be in that oversight role?

MS. NEIDL: Objection to form.

THE WITNESS: It gets -- we are -- because most of the transactions, at the least the funding transactions come from us.

This is -- I've been writing

STEVEN PEREIRA - 30(b)(6)

programming, and this is my goal. That I will -- everybody -- like, if the MasterTax Cloud Payroll people were here, they could get MasterTax to print a report of what's in that account and who it's apportioned to, they have to know that.

So they get all these sub-ledger totals that equal the total at the bottom of the bank statement.

People have shown interest that have figured out a way to be able to do that from my end approaching the sub-ledger total problem from a completely different angle, so that their totals will match our totals, but it's not garbage in and garbage out.

I'm going to regulating them another way; they do it through the accounting system, and the comparison is it gives the regulators happy in making sure that that account is good.

Q. Okay. I think we also discussed that NatPay recommends verbally to its customers that it arranges its bank accounts in

STEVEN PEREIRA - 30(b)(6)

a way to ensure that the funds going in them from the employer clients is protected; is that correct?

MS. NEIDL: Objection to form.

THE WITNESS: I don't think it's a part of our sales process, but I did publish a white paper, and I indicated the dangers and that they might want to look into it.

I will say the paper was not very flattering to Pioneer Bank, but I indicated see what somebody can do to you, you might want to protect yourself like this.

BY MR. ROSATO:

Q. Is that white paper on NatPay's website?

A. I don't think so.

Q. Do you know if it's been produced?

A. I don't know.

Q. What about NatPay's relationship with First Premier, has that changed in any way?

MS. NEIDL: Objection to form.

THE WITNESS: As a result of this?

STEVEN PEREIRA - 30(b)(6)
Q. Yes.
A. No.
Q. By the way, you remember we looked at the ACH agreement and it had a schedule of fees. Do you know how much revenue First Premier gets on a yearly basis from its relationship with NatPay?
A. I've actually -- I've seen a one-month fee; $250,000.
Q. Okay. So that would be, like, $3 million a year?
A. Yeah.
Q. It depends on the month, I guess?
A. It does and cycles are tricky, but that's probably very high. They do okay.
Q. And, you know, I would guess that's sort of, as you said, they offer what is a relatively unique service, right?
A. What makes them most unique is they're very good at it. They grew with us and there is no bank that would be as good as they are in keeping us in compliance. They are just really, really top notch.
Q. And what about vetting and Know Your

STEVEN PEREIRA - 30(b)(6)

Customer policies and procedures at NatPay has in place, have those changed at all?

MS. NEIDL: Objection to form.

THE WITNESS: The underwriting policies and procedures have not changed, not related to this. But they do alter, now we ask the clients to provide us some document -- depending on the class of client, some document that states that it is a commercial account, not a retail account.

BY MR. ROSATO:

Q. And also, NatPay does not allow any exceptions to the rule that you cannot just migrate over taxes and not payroll, correct?

MS. NEIDL: Objection to form.

THE WITNESS: I would say that we would definitely scrutinize it very, very closely.

But would I allow that if, say, some huge wonderfully big company said we're going to go with taxes first and then we'll follow with payroll, I would probably succumb, just because of the potential

STEVEN PEREIRA - 30(b)(6)

business increase. There would be a different approach, potentially.

MR. ROSATO: I'm going to hand you what were marked Pereira 15 and 16 yesterday. This is NatPay 16 and 17.

(Whereupon, NatPay Exhibit 16, Pereira E-mail Dated 9/9/19, Bates Stamped NP0098667 to '670, 42-Pages was marked for identification.)

(Whereupon, NatPay Exhibit 17, Higgins E-mail Dated 9/9/19, Bates Stamped NP0109244 to '246, 3-Pages was marked for identification.)

BY MR. ROSATO:

Q. Do you recall reviewing these documents yesterday?

A. Yes, I do.

Q. So on NatPay 16, if you could turn to the spreadsheet, there is a slip sheet that says, produced in native format, and the page number ends in 68, the first page?

A. This big spreadsheet?

Q. Yeah.

A. Okay.

STEVEN PEREIRA - 30(b)(6)

Q. Do you recall we talked about these first five entries that have a batch description of e-pay?

A. Yes, I remember that.

Q. And, let's see, they total about, I don't know, $2.6 million, somewhere around there, right?

A. Yes.

Q. Those were the transactions that went from one Pioneer account at Pioneer Bank to another account at Pioneer Bank, correct?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. Are those funds -- those funds are part of the $3.8 million that NatPay is claiming, correct?

A. Yes.

Q. So they weren't funds that were scheduled to go to a taxing jurisdiction, right?

A. They were not.

Q. You can turn to the next, NatPay 17.

You recall looking at this document yesterday?

STEVEN PEREIRA - 30(b)(6)

A. Yeah.

Q. And this document reflects that First Premier dishonored 33 items totalling $7 million on NatPay's behalf?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. So again, can you just explain what that means, that First Premier -- Leslie Higgins says, "I have dishonored 33 items totaling $7 million and change"?

MS. NEIDL: Objection to form.

THE WITNESS: The short answer is they missed the 48-hour window, and so we don't have to take them.

Q. This was people trying to get their money back out of NatPay's account?

A. Right. By the time that this -- that the news came out about this day, everybody tried to do this; even customers that weren't involved tried to do this.

Q. Did taxing jurisdictions try to do this as well?

A. They don't -- no.

Q. So this is just customers trying to

STEVEN PEREIRA - 30(b)(6)

pull money back from the account 5690 at First Premier?

A. Yes.

Q. And you said well, the 48-hour window is gone, dishonored, right?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. So as a result, NatPay was able to keep more than $7 million in that First Premier account, correct?

A. We didn't lose $7 million, the money is already gone because, those were returns from Pioneer Bank.

Q. But this prevented $7 million from leaving NatPay's account, correct?

A. It prevented $7 million being deducted from NatPay's account.

Q. Right.

(Whereupon, NatPay Exhibit 18, Welch E-mail Dated 9/25/19, Bates Stamped NP0095634 to '635, 2-Pages was marked for identification.)

BY MR. ROSATO:

Q. You can put that to the side, and

STEVEN PEREIRA - 30(b)(6)

the court reporter will hand you what will be marked as NatPay 18.

I know you're not on this e-mail, but you see this is an e-mail thread between Dawn Cafaro and a man named Kevin Welch at Journey Payroll?

A. Yep.

Q. Do you know who Kevin Welch is?

A. No, not really, but I know he's a customer, obviously.

Q. Do you see the first -- so you see that the Bates number ends in 35, he says, "From what I understand, the payroll company manipulated the file before it was sent to a fraud account. Is that what you heard, too? Wouldn't that file fail with NatPay?"

Do you see that?

A. Yes.

Q. Are you aware of whether any file was manipulated by any person at Cloud Payroll, including Michael Mann, before it was sent to a "fraud account?"

MS. NEIDL: Objection to form.

THE WITNESS: Before September '19,

STEVEN PEREIRA - 30(b)(6)

I mean, our industry is like a lot of gossip. Before the 19th, that's what everybody said happened. It says the money was diverted from Cashet to a bank; we didn't know what bank, I think we now know it was Bank of America, at least the majority of it, but that is what everybody thought at the time.

Q. So you think there was a large amount of funds that ended up at the Bank of America?

A. I think I was told that there was money, but I don't think they kept it.

Q. Do you know if it's been -- I don't know, do you know what's happened to that money?

A. I won't speculate, but I do -- no, I won't speculate.

Q. If you turn to the next page that ends in 34, it ends in 34, Dawn sends a response and she says at the end of the second paragraph, "At this point we have our" -- we are just about -- I think there is a have that should be there, but she says, "At this point

STEVEN PEREIRA - 30(b)(6)
we are just about whole."
Do you see that?
A. I do not, I'm sorry.
Q. It's the last sentence of that second paragraph, you see, (indicating.)
A. Yes.
Q. Do you agree with that statement?
A. I think this was more public relations.
Q. So she wasn't telling the truth?
MS. NEIDL: Objection to form.
THE WITNESS: I think that's a terrible way to put it. We saved ourselves a lot of money through various things, and I think she was just telling him that we were whole, because she knew we would just put the money in the account if it was an issue.
But was she lying, no, it was subjective.
Q. This was subjective whether NatPay was whole or not?
MS. NEIDL: Objection to form.
THE WITNESS: Yes, I believe so, the

STEVEN PEREIRA - 30(b)(6)

customers were freaking out.

Q. What I want to know, and I'm not saying she's lying or not, but in your view, is that a true statement or an untrue statement of what's written here on the page?

MS. NEIDL: Objection to form.

THE WITNESS: In retrospect, we are not whole, except we were not insolvent.

Q. NatPay hasn't made any payments to any of its clients in connection with these events, has it?

MS. NEIDL: Objection to form.

THE WITNESS: What do you mean "payments"?

Q. Have you -- you know, a client has made a demand for money, and NatPay has exceeded to the demand and NatPay --

A. You mean they want money back?

Q. Yes.

A. Well, some did get returns. We do it through the return system. As you see, we are very successful to bat a bunch of them off. But has someone said I want my money and we wrote them a check? No, we have not.

STEVEN PEREIRA - 30(b)(6)

Q. I want to see if we can turn to -- well, let's see actually if we can do it through this.

Let's go back to the Complaint, it's NatPay 4, paragraph 66, on page 11.

And it says, "Between September 3rd and September 5th, 2019, with no knowledge that the account had been partially frozen, NatPay made a series of deposits to the Cloud account."

Do you see that?

A. Yes.

Q. So I think as we discussed earlier, that's not true, is it?

MS. NEIDL: Objection to form.

THE WITNESS: In what context is it not true.

Q. Didn't NatPay learn on the morning of September the 4th that there were debits being rejected from that account?

A. Yeah, but I think these entries were already re-initiated. I mean, I can't quote it from -- I produced ad nauseam reports showing when, and what happened, and where. I would

STEVEN PEREIRA - 30(b)(6)

bet that this data is extracted from my reports.

(Whereupon, NatPay Exhibit 19, Hagen E-mail Dated 9/5/19, Bates Stamped NP0097967 to '968, 2-Pages was marked for identification.)

BY MR. ROSATO:

Q. I'm going to hand you what was previously marked as Pereira 14. I'm sorry, I misspoke, I meant the morning of September 5th.

Doesn't Dawn Cafaro's e-mail state -- it says their CEO Mike Mann was doing fraudulent things which caused all of their accounts to be frozen, right?

A. Yes.

Q. So Dawn was aware on the morning of September 5th that there had been a freeze on the accounts, right?

A. Yes.

Q. Do you know if she had become aware the day prior?

MS. NEIDL: Objection to form.

THE WITNESS: I mean, we knew there were returns. She told me she was talking

STEVEN PEREIRA - 30(b)(6)

quite regularly with Matt Schilling and they sort of indicated that it was a snafu everything would be fine. And we have encountered a situation where banks had frozen and then they unfreeze and then we go on. I think maybe we were hoping but that's what we wanted. That's what we were hoping for.

Q. I mean, she says they understand -- the understanding I guess then was Mike Mann was doing fraudulent things.

That's what she says, right?

MS. NEIDL: Objection to form.

THE WITNESS: That's what she said.

Q. What was the likelihood that the accounts would be unfrozen, if that were the case?

MS. NEIDL: Objection to the form.

THE WITNESS: If the money is -- was there, like, let's say -- I mean, if the money was there, the bank would traditionally re-open the accounts and disgorge it. This is a -- that is not a situation that was anticipated; everything

STEVEN PEREIRA - 30(b)(6)

that we've seen is the bank would say something is going on, they would freeze it and then they let the dust settles and they unfreeze it and give the people back the money.

You know I was cc'd on this and it was a very chaotic time. Did every word that we used in communication with our clients in hindsight perfect? No. We were talking about what we knew. We probably already worked three days straight.

Q. Do you see she also said we have returns of $7 million. Is she referring there to the returns that NatPay ultimately dishonored?

MS. NEIDL: Objection to form.

Q. Well, what do you understand that to be the return of $7 million there?

MS. NEIDL: Objection to forth.

THE WITNESS: I think by this point Pioneer had returned $7 million. She's saying they returned $7 million.

Q. Okay. So this is --

A. These are returns from Pioneer, I'm

STEVEN PEREIRA - 30(b)(6)

certain.

Q. This is different from the returns that NatPay ultimately had First Premier dishonor?

A. September 5th, yeah, it's probably what was returned from Pioneer, because she also says 2 million was the bogus transfers; she kind of lumped them together.

Q. Would you agree with me that the bogus transfers that she's referring to are the e-pay entries that we looked at on NatPay 16?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. I think you testified yesterday that those were peculiar transactions I don't know if you used that word but they seemed odd, right?

MS. NEIDL: Objection to form.

THE WITNESS: Well obviously at the time, no. But when we went and started scrutinizing back, we thought, you know, geez, if we caught this.

Q. I'm sorry, yeah, so with hindsight looking back at them now, those are peculiar

STEVEN PEREIRA - 30(b)(6)

transactions, right?

A. I don't think I'd classify peculiar, he's doing something that most people used -- I mean, if you saw his accounts, he did billions of that all the time with internal transfers.

We were wondering why he would do it with us when he was doing so many internal transfers directly with the bank, and those were deposits.

So in hindsight it was looking back, why did he do it with us when he had free range for him to do it -- I mean, Pioneer was perfectly fine for him doing the transfer.

I don't think any of them exceeded his transfer amounts. So looking back I think it's odd, why did he do it with us. Only he can answer that. I don't know if that's in the paperwork that he did.

I mean, looking back now it is odd. We do now look for it. It's very difficult to detect, unless the amounts are exactly the same, the debits and credits that are going out essentially to the same bank and the names are the same.

STEVEN PEREIRA - 30(b)(6)
Q. So NatPay's system at the time did not detect those as, you know, potentially problematic transactions?
A. No. Programmatically, they're very difficult to determine. We tried our best. Could I say with 100 percent certain; we stopped it, no, because a transfer from one bank to another, how do we determine that it's not just somebody being paid.
Q. And if NatPay's system program doesn't flag it, no one's going to look at it, right?
A. Unless it rejects for another reason and we get a little lucky. But in most cases -- and it was even called e-pay. So looking at first glance, the first thing we do is wonder why he's just paying somebody.
Q. Would you like to step out now or...
A. No, not yet.
Q. I want to put in front of you your Declaration, which was marked as Pereira 2 yesterday.
(Whereupon, NatPay Exhibit 20, Pereira Declaration Dated 12/6/19, 14-Pages

STEVEN PEREIRA - 30(b)(6)
was marked for identification.)
THE WITNESS: Can we take a break, my staff needs me now.
MR. ROSATO: Sure. There is no question pending, so that's fine.
VIDEOGRAPHER: We're going off the record, the time is 3:44.
(Whereupon, proceedings recessed for a short break and once again resumed.)
VIDEOGRAPHER: Back on the record, the time is 4:00.
BY MR. ROSATO:
Q. Welcome back. Hopefully, our last break of the day.
A. Thank you.
Q. So before we broke, we put in front of you, your Declaration that we looked at in some detail yesterday.
And I want to -- it's been marked NatPay 20 today, and I wanted to turn your attention to paragraphs 42 to 44.
Oh, actually, can we first -- hold on, let me find it; paragraph 37 first, I think this is similar, we just looked at the

STEVEN PEREIRA - 30(b)(6)

Complaint as we marked in NatPay 4, this states that NatPay did not begin to receive notice of returned debit transactions until September 6th, 2019?

A. Can you do that again?

Q. In paragraph 37, the last sentence of that first part before you get to A?

A. Okay. Got it.

Q. I'm not trying to go back over the point, but as you recall, we have the e-mails that indicate that at least Dawn Cafaro had learned and forwarded you an e-mail on September 5th, 2019, about a freeze on the accounts?

MS. NEIDL: Objection to form.

THE WITNESS: Yes.

Q. Just to confirm, did NatPay receive notice of those returned debit transactions within that 48-hour time period that we've been discussing?

A. All of the returns that we accepted from Pioneer were within the 48 hours.

Q. Okay. And Pioneer didn't have an obligation to reach out before it did and

STEVEN PEREIRA - 30(b)(6)

contact you and say, hey, you know, we've put a freeze on this account?

MS. NEIDL: Objection to form.

THE WITNESS: There are no hard-and-fast rule that they are required to reach out; some banks do it out of a courtesy, but there is no rule.

Q. And then turning to paragraphs 42 to 44, and in particular, why don't we just go to 44. Which says, in relevant part, as a result of Pioneer's partial freezing of the Cloud account -- and then there is approximately $3.8 million there, you see?

A. Um-huh.

Q. Was debited from NatPay's accounts and credited to the accounts of various taxing authorities.

How did those debits and credits result from anything that Pioneer did?

MS. NEIDL: Objection to form.

THE WITNESS: Oh, they didn't release the money, so we paid things in the anticipation that the funds would be good and when we got the returns, they weren't

STEVEN PEREIRA - 30(b)(6)

good.

Q. Any action Pioneer took didn't cause these debits and credits to occur that are referenced in paragraph 44, right?

MS. NEIDL: Objection to form.

THE WITNESS: You know, I don't know how lawyers write, that's not how I would have phrased it, but -- I don't know how to answer that.

Q. You signed this though; I mean, this is your Declaration, right?

A. Yes.

Q. I mean, there were funds that were in -- actually, let me clarify something else.

Why does it say NatPay's accounts, pleural?

A. I don't know.

Q. But these -- this $3.8 million, those were funds that were present in account 5690 at First Premier, and they were credited to various taxing jurisdictions, right?

MS. NEIDL: Objection to form.

THE WITNESS: I believe some portion of that was the internal transfer at

STEVEN PEREIRA - 30(b)(6)
Pioneer Bank.
Q. So the $2.6 million was, right?
A. Yes.
Q. So it's not correct that $3.8 million went out to various taxing authorities, right?
A. No. We were still -- it was three years ago, this was very early on.
Q. Okay. But if you go back to NatPay 16, you had the spreadsheet, and this was developed on September 9, 2019, right?
A. Where am I going back.
Q. NatPay 16?
A. Oh, another page.
Q. This was the spreadsheet with the e-pay transactions on it, so you recall that?
A. Yes.
Q. And we looked at September 9th and we also looked at Dawn Cafaro's e-mail on 10:19 and she says that $2 million seems to be bogus transfers from one account to another Cloud Payroll account. That's on September 5th, right?
A. Um-huh.

STEVEN PEREIRA - 30(b)(6)

Q. So what was the basis of stating in this Declaration that $3.8 million had gone to various taxing authorities?

A. I don't know how to answer that.

Q. It's not correct, right?

MS. NEIDL: Objection to form.

THE WITNESS: I mean, the semantics make it incorrect, yes.

Q. Well, it's literally incorrect, right?

MS. NEIDL: Objection to form.

THE WITNESS: I think that the -- the endpoint of who we were paying isn't relevant; it's still money we paid out. I don't know if adding taxing authorities makes it any more, I don't know, it gives it anymore Cashet, the money was paid out; we could have used any number of language there.

The issue is the money went out and we didn't get paid for it. I mean, is it truly relevant where we said the money went.

BY MR. ROSATO:

STEVEN PEREIRA - 30(b)(6)
Q. You don't think it was relevant?
A. It was a loss to us.
Q. I just want to be clear though. So let's even talk about the other -- so the $1.2 million or so that may have actually gone to various taxing authorities, let's focus on that piece.
A. Okay.
Q. Can NatPay actually identify specific funds that were Pioneer Bank -- that that amount is even tied to?
MS. NEIDL: Objection to form.
THE WITNESS: I don't get the question.
Q. Let me phrase it another way.
NatPay, in order to make these debits out of its accounts and credits, right, NatPay used existing funds that were in account 5690, correct?
A. They were existing as soon as the transactions occurred. So that payment to the taxing authority at the same simultaneous time, the withdrawal was being initiated to Pioneer Bank.

STEVEN PEREIRA - 30(b)(6)

Q. Those funds hadn't cleared yet, right?

A. Right.

MS. NEIDL: Objection to form.

Q. So, you know, I understand your point that there is a debit being made, but it doesn't clear for another two days, right?

A. It clears instantly.

Q. But there is an opportunity for the money to be returned?

A. There is an opportunity for it to be uncleared. But it -- the -- I count when the settlement occurs at the Federal Reserve and First Premier says that money is now in your account. As soon as that is, it's clear.

Q. Okay. I wanted to just turn back to the Complaint quickly, that's NatPay 4, paragraph 95.

Do you see this references, this lawsuit in the United States District Court for the District of Nevada?

A. 95?

Q. Yes.

A. Yeah, we talked about that

STEVEN PEREIRA - 30(b)(6)

yesterday.

Q. And it says -- this document is dated August 18, 2020, right?

A. Yes.

Q. So your Declaration, this was December of 2019?

A. Okay.

Q. Do you know if NatPay was still a defendant in the action referenced in paragraph 95 as of August 18th, 2020?

A. I do not. I know that we're no longer, but I don't know when it happened.

Q. And then just turning back to your Declaration, NatPay 20, can you explain why there's no statement in here about the $7.1 million in dishonored returns that NatPay effectuated?

MS. NEIDL: Objection to form.

THE WITNESS: You want me to explain why something isn't in here?

Q. Um-huh.

A. I don't know what -- I just can't answer that question. I mean, I don't know what is considered proper to put in this

STEVEN PEREIRA - 30(b)(6)

document or not.

Q. Do you think it's relevant that NatPay was able to do that?

MS. NEIDL: Objection to form.

THE WITNESS: Isn't this document -- it's surrounding losses, and we didn't lose that money.

Q. Right, it was kept in the account. And there was $3.8 million that's being claimed to have been debited out of the account, so that nets out to me as $3.3 million?

A. No. When the returns came, the money was removed from my account. And so when they wanted -- they wanted to double dip, the client. I already paid that money back to Pioneer Bank.

Q. So those were related to returns that were -- or debits that were also returned by Pioneer?

A. What?

Q. The 7.1, the $7.1 million?

A. Are you referencing the letter where we said we were able to dishonor the $7 million in returns?

STEVEN PEREIRA - 30(b)(6)

Q. Yes.

A. Okay. Those were Cloud Payroll customers that got the news and said oh, geez, I want my money back. They missed the 48-hour window.

But that money was long gone, because it was already taken away from us by Pioneer Bank.

Q. Pioneer Bank had, within the 48-hour time period, rejected the debits, correct?

A. Right. But that has no relevance of what actually happened outside of the -- in the timeframe, the money was removed from the NatPay accounts.

Q. Within the 48-hour timeframe, right?

A. Right, but that means that the people wanted it back, we didn't have it anymore, it was gone.

If we had not received those debit returns, we would have honored those returns.

Q. I understand. Are you aware that NatPay has prepared -- has filed a proposed Amended Complaint?

A. I have heard news of that.

STEVEN PEREIRA - 30(b)(6)

Q. Did you have any involvement in preparing it?

A. No, not that I'm aware of.

Q. No?

A. I'm sure there is data in there that I provided.

Q. Are you aware that one of the central allegations in it is that Pioneer was a knowing participant in Michael Mann's fraud?

A. That has been discussed, yes.

Q. And what is the basis for that allegation?

A. Well, with my experience in banking, the activity that occurred on those accounts, especially the endless number of NSFs, it's inconceivable that the bank didn't take very corrective action in that.

I've seen so many e-mails, so many bank statements where it's so obvious that this man was kiting. And so at some point the bank had to just turn the other cheek.

I saw David Blessing saying just pay it, no fees; just pay it, no fees. That's not how it was supposed to work.

STEVEN PEREIRA - 30(b)(6)

If they let one of those NSFs hit me, we would have had a heads up that there was a problem at Cloud Payroll.

So I can't look at this in any other way that the people in that bank were aware of what he was doing; they had to be.

Q. What document -- so you're saying that because there were NSFs, they were assisting Michael Mann in committing a fraud that ultimately caused them millions of dollars in damage?

MS. NEIDL: Objection.

THE WITNESS: I don't know -- I mean, I've been told there is all of these legal words that fraud means this and fraud means that.

What I'm saying is that any bank that allows that amount of consistent overdraws in an account and then gives someone instant magic ferry credit from a remote deposit into that account, not even considering the effect that they're having on their balance sheet seems to me that they were complicit, you can't let that

STEVEN PEREIRA - 30(b)(6)

happen.

Q. Do you know whether these NSFs were cleared, if there were valid reasons to clear them?

MS. NEIDL: Objection to form.

THE WITNESS: I saw many, many e-mails with him saying, timing, this thing, that thing; there is all kinds of reasons.

But once you bounce the first hundred million dollars, you possibly want to say, hmmm, not a good idea.

Q. Are you aware that Michael Mann admitted that he would give excuses and then get money back into the account so there wasn't any issue; that's what he admitted in this case?

A. Right, but he --

MS. NEIDL: Objection to the form of the question.

THE WITNESS: Right. But the money that he was able to put in there was, again, this magic money that they gave him immediate credit on.

STEVEN PEREIRA - 30(b)(6)
That's why you don't get immediate credit on a check or a deposit, it doesn't happen; the bank allowed this to occur.
Q. Is it your position -- is it NatPay's position that it's not proper for a bank to provide remote deposit capture privileges to clients?
MS. NEIDL: Objection.
THE WITNESS: I think our position is that you provide that responsibly.
But someone that bounces that much and your response is going to be, let's up his daily limit to $1.3 million. Insanity.
Our position is that Pioneer was fully aware of the activity that was occurring in that account, there was no option. The banks doesn't get to say oh, I didn't know it was tax deposits. A bank doesn't get to say oh, he's kiting all of this money, and we didn't know about it, they can't say that.
Not like -- I've watched all this testimony of everybody at Pioneer, not a single credible testimony. They could not

STEVEN PEREIRA - 30(b)(6)

even remember where they sat in the office.

There is no way that these people did not -- were not made aware that this man was bouncing and kiting.

The seven FBI steps for the detection of kiting, he is so classic, he literally checks every box.

Q. You're aware, you testified earlier there are also accounts at Bank of America that were involved in this kiting scheme, correct?

A. Yeah, and they caught it.

Q. On September 5th, 2019. But isn't the allegation that it was going on for many years?

MS. NEIDL: Objection to form.

THE WITNESS: You know, I have seen no evidence on what he did at Bank of America.

If you want to produce every single one of his bank statements there, I could help you figure out what he did.

But what I know is he is a classic check kiter. A bank detects this, but all they see is they are in. When a person is

STEVEN PEREIRA - 30(b)(6)

withdrawing money in and then money out consistently, he is classic.

The bank has a built-in DDA systems. Their DDA system undoubtedly kept saying, this is a kiter, this is a kiter, a red flag; it can't help but do that.

Q. Is there any evidence that you can point to, any proof that shows a DDA system that you're talking about that says, this man is a check kiter, you should report him to the authorities immediately?

MS. NEIDL: Objection to form.

THE WITNESS: Well, we only got to see what was produced, but I guarantee you, having worked in that department that some computer system was flagging this account for kiting.

Q. Nothing in NatPay's computer system flagged anything about the activity that Mann was doing. And it all related to these payroll service companies, didn't it?

MS. NEIDL: Objection to form.

THE WITNESS: Are you talking about the five e-pay entries?

STEVEN PEREIRA - 30(b)(6)

Q. No, I'm talking about the two years that NatPay was handling ACH transactions for Cloud Payroll?

A. What was I supposed to detect?

Q. Don't you have systems in place to detect fraud and those sorts of things?

A. Yes.

Q. Well, you obviously didn't detect those first five particular transactions. You said, I think we agree those were odd transactions --

MS. NEIDL: Objection to form.

THE WITNESS: But they weren't fraudulent, the bank made them fraudulent, by taking half of my money and returning half.

Literally side-by-side, NatPay makes a deposit, NatPay makes a withdrawal. They harvested the deposit, and they returned the withdrawal.

Where is that fraud that I could have possibly detected? I did not like or appreciate his activity, but it wasn't fraudulent.

STEVEN PEREIRA - 30(b)(6)
Q. And NatPay's position is that those transactions were not fraudulent?
MS. NEIDL: Objection to form.
THE WITNESS: From our point of view, I don't think that I would -- well, like I said, I think we said we'll look harder if someone is moving between their own bank. But at that time we didn't look at it, but it wasn't fraud. He could legitimately be transferring money from this account to that account, it could have been legitimate.
Q. Do you know if you've ever seen any other records throughout that 23-month period where similar transactions occurred?
A. I have not seen anything in addition to that. Would I say that it hasn't occurred, no, I bet it did.
Q. So that information might be in NatPay's system somewhere, right?
A. That he was making withdrawals and deposits, which is sort of like what we do.
Q. So people also just every day banks allow people to transfer money between checking

STEVEN PEREIRA - 30(b)(6)
accounts, I do it all the time, I'm sure you do too. What's suspicious about that?
MS. NEIDL: Objection to form.
THE WITNESS: Well, from what I saw he had what, 15, 16 accounts that the only activity was writing a check to cover a balance in another -- I mean, there is no income revenue. There was no -- all of those accounts consisted of is I write a check for this. If I was overdrawn, I can count on the bank giving me immediate credit.
If you see an account with nothing but ins and outs in the same amount as checks, it's kiting. It's kiting.
You know, I know that we would like to think that they weren't involved; they absolutely knew.
Q. Ins and outs of -- you say ins and outs of which accounts, the accounts at the same bank?
A. I don't have the list in front of me, but he had 14 or more checking accounts at Pioneer Bank that the only activity was to

STEVEN PEREIRA - 30(b)(6)

write checks and deposits into his other accounts. There was no revenue source, there was no income.

And the only thing going into those accounts was other checks from other accounts that were only created in order to write checks.

Q. Your testimony is that all of the activity occurred internally at accounts at Pioneer Bank only?

A. What I'm saying is that there were accounts that the only activity was to write checks to cover overdrafts in other accounts.

Q. What I'm asking you is -- what is your understanding of what check kiting is?

MS. NEIDL: Objection to form.

THE WITNESS: Well, it's a lot harder to do, unless you have a bank that gives you instant credit.

But what you do is you -- since checks especially back in the day used to take three days to clear, you could write a check, the bank would give you some provisional credit, and then that check

STEVEN PEREIRA - 30(b)(6)

would work its way to the bank, and then it would bounce.

So you take a check that you just deposited into from that account, and then you take a check to cover the incoming check on the other account.

Q. At two different financial institutions, correct?

A. Traditionally between two and three.

Q. So that's what I want to understand.

They're internal transfers at the bank, but there was also other financial institutions that he used in this scheme, correct?

A. Yes, but you are able to detect check kiting by only seeing one side of the activity, because it follows a pattern.

The amounts are even. They come in and out typically the same amount. There is a incredibly high ins and outs, but the beginning balancing of any account is very, very, very small.

Q. Are you aware of the activity in the accounts that he held at Bank of America?

STEVEN PEREIRA - 30(b)(6)

MS. NEIDL: Objection to form.

THE WITNESS: No.

Q. Was Bank of America, according to NatPay, also involved in this fraudulent scheme?

MS. NEIDL: Objection to form.

THE WITNESS: I don't think so.

Q. Why not? Aren't they in the same position as Pioneer Bank?

MS. NEIDL: Objection to form.

THE WITNESS: Because we deposited our customer's money that we were responsible for at Pioneer, not at Bank of America.

If this money was at Bank of America and they made the same insane ridiculous decision that Pioneer did, we'd probably be suing Bank of America as well.

Q. You're aware that Bank of America did dishonor almost $16 million in checks that were written to come into Pioneer Bank accounts; are you aware of that?

A. Yes.

Q. So they did do exactly that, did

STEVEN PEREIRA - 30(b)(6)

they not?

MS. NEIDL: Objection to form.

THE WITNESS: I would have to see which accounts those checks were originally deposited into. Was it 2440? Was he using checks to -- I mean, he had a lot of accounts, a lot of them are bogus.

I mean, even for that argument to even have the slightest credibility, he would have had to be funding the 2440 account with these checks at the Bank of America.

Q. How do you know he wasn't?

A. I looked at the bank statements; I didn't see his incoming deposits. I could be wrong, I'd be happy to look at them again. It looks like he did not use other accounts to fund these accounts. He was using these accounts to fund other accounts.

Q. What if Pioneer had between the bank and not Bank of America that detected this check kiting on whenever it was, August 29th, August 30th of 2019, and immediately rejected all debits out of the accounts; would you be

STEVEN PEREIRA - 30(b)(6)

sitting here today saying Pioneer Bank was in on the fraud with Michael Mann?

MS. NEIDL: Objection.

THE WITNESS: I don't even -- can't even wrap my brain around. If you're saying if it were flip flopped?

Q. Pioneer Bank was the one that detected the check kiting and immediately put a stop to it?

A. Well, in a perfect world they should have caught it first, but they didn't. They would have not been overdrawn. The accounts, because these were checks that were drawing on Pioneer, so the account balances would have been reduced. You would have returned the checks -- your account balances would have elevated back, and then you would literally have no legitimate reason to steal the money, because you have no overdrafts.

Q. Are you aware that the -- that there is a large sum of funds that the government has seized from the Bank of America bank accounts, Pioneer is making a claim on those as well?

MS. NEIDL: Objection to form.

STEVEN PEREIRA - 30(b)(6)

THE WITNESS: I don't think it was ceased. I think they did what typically banks would do in this situation, Bancorp did it and I believe Bank of America did it. I don't the legal terms but they say, oh-oh, they give the money to a judge and they stand in line and argue their position in line like everybody else.

BY MR. ROSATO:

Q. You also said in a perfect world they should have caught it first, but they didn't.

Why would Pioneer Bank, which you described multiple times is a tiny bank, discovered this first before Bank of America, one of the biggest banks in the world?

MS. NEIDL: Objection to form.

THE WITNESS: Okay. This bank, it was their largest account.

You want to know how many $15 million checks Bank of America gets a day, a lot.

I guarantee you if there was a $15 million check written at Pioneer, it

STEVEN PEREIRA - 30(b)(6)

was Michael Mann. I would bet money that he cleared the most amount in checks. He had the highest overdraws. He had the highest ACH activity. Everything was extreme.

So, yeah, a little bank isn't monitoring too much, and I guarantee you that that biggest account at Bank of America is monitored by someone who isn't looking the other way, because they are bouncing millions of dollars.

And at Bank of America, a $10 million bounce is like a rounding area. To a small bank, they have to be more nimble, they have to be more critical; because frankly, I would love to see their balance sheet statement with the Federal Reserve, because it is probably completely whack-ado, because he was completely overdrawing at least a significant portion of their loan reserves or their loan lending limit.

And every time they paid an entry instantly, they were giving this man a

STEVEN PEREIRA - 30(b)(6)

loan.

Q. You're aware that Pioneer Bank is a public company, correct?

A. I am aware that they went public sometime before this event, maybe a few months.

Q. They disclosed their financials, are you aware of that?

A. They what?

Q. They disclosed their financials, are you aware of that?

A. Sure.

Q. It's public knowledge?

A. Um-huh.

Q. So are you sure that -- your guess is that their balance sheet at the Federal Reserve is whack-ado?

A. I would suspect that they did have balance and capitalization problems.

Are Michael Mann's hundreds of millions of dollars of NSF checks in their balance sheet or their proposal that they sent out to the potential stockholders for the IPO; I would bet not.

Q. All I'm saying is the financial

STEVEN PEREIRA - 30(b)(6)
statements and all of their financials are disclosed publicly and they are vetted by the SEC and investors, okay, are you aware of that?
MS. NEIDL: Objection to form.
THE WITNESS: I'm aware that public financials are scrutinized, yes.
Q. But it's your position that because he was a big client of Pioneer, they should have -- I don't know, been able to detect check kiting more easily than Bank of America?
MS. NEIDL: Objection to form.
THE WITNESS: I think any competent bank would catch check kiting relatively quickly.
I think a small bank where the largest customer is consistently bouncing and covering those with immediate credit checks, I think it's not out of the question that someone should be paying attention to the largest customer.
Q. But according to NatPay, this kiting went on for years, did it not?
A. It did.
Q. And there were no other banks that

STEVEN PEREIRA - 30(b)(6)

discovered there was some kiting scheme going on until late August of 2019, correct?

MS. NEIDL: Objection to form.

THE WITNESS: I have not seen how he framed the activity at Bank of America.

I can't tell you if, because they have a different system, he figured he did something different; I can't tell you that, I haven't seen the statements.

Q. So let me make this a little bit clear. You're talking about -- you're saying they had to be participating in the fraud solely based on the account activity.

That's your testimony, am I correct about that?

MS. NEIDL: Objection.

THE WITNESS: I really think I've made my case very clear. I can restate it to you a hundred times.

There is no way that those employees did not know exactly what was occurring in those bank accounts.

Q. Are you aware of a single e-mail to support -- any communication involving anybody

STEVEN PEREIRA - 30(b)(6)

at Pioneer Bank to support that anybody had knowledge of what Michael Mann was doing was check kiting?

MS. NEIDL: Objection to form.

Q. Is there a single document?

A. What, that someone wrote, our biggest customer is check kiting, oh my goodness, what do we do, look the other way? You know, those weren't presented.

Q. They don't exist as far as you know?

MS. NEIDL: Objection to form.

THE WITNESS: Like I said, fraudsters don't self-identify.

Would I love to see a bank account or e-mails from the people that obviously were charged with monitoring this account that apparently were either too stupid or being told to look the other way. Is everyone at Pioneer a criminal, maybe not. But there were people high up enough to tell them to look the other way.

Or the testimony that all of these employees gave wouldn't have been consistent: I don't remember a single

STEVEN PEREIRA - 30(b)(6)

thing, I don't remember where I worked.

There was a lady that worked at ADP, the largest payroll company in the world who had no idea what the term payroll meant.

So are they complicit or just criminally stupid?

Q. Are you aware that the United States Department of Justice investigated these events?

MS. NEIDL: Objection to form.

THE WITNESS: I am not.

Q. You're not aware of that?

A. That there is a DOJ investigation that's closed?

Q. There is now a -- it's now closed, yes. You're aware that there was a DOJ --

A. Not aware.

Q. There was an active investigation, are you aware of that?

A. Nope, not at all.

Q. You're aware that Michael Mann pled guilty to a whole host of federal crimes, are you aware of that?

STEVEN PEREIRA - 30(b)(6)

A. I am aware of that there.

Q. Are you also aware that in his guilty plea he admitted that Pioneer was the largest victim of his fraud?

MS. NEIDL: Objection to form.

THE WITNESS: He magically became credible? Like, overnight this man went from demon to saint? And he also pledged knowing tax funds, he wrote that consent order, yeah, just take it. He's a criminal and you guys did what he said. I don't know. But did he transform from Satan to Jesus and all of a sudden the word of God, no.

Q. What interest would Michael Mann facing many years in prisons from your perspective not to give up a bank like Pioneer to say, they were the ones directing all of this?

MS. NEIDL: Objection to form.

THE WITNESS: I can't speak for Michael Mann, maybe he was hoping for a softer plea, I don't know. Or maybe, just maybe there were people in the bank in on

STEVEN PEREIRA - 30(b)(6)

it with him.

Q. Wouldn't a softer plea result if he actually provided information that would lead to prosecutions?

MS. NEIDL: Objection.

THE WITNESS: I don't know how the law works. But if my theory is correct, that there was a bunch of people at the bank, maybe he didn't want to get suicided or something, he thought, you know what, I'm taking the fall; I don't want my best friend Dave Blessing perhaps to die unexpectedly. Oh, oops, he did.

Q. So you're now suggesting that Pioneer Bank killed Dave Blessing, is that what you're suggesting?

A. I'm just saying he's dead now.

Q. Okay. Give me a second to collect my thoughts after that one.

Are you aware of any person employed by Pioneer who has been indicted by any law enforcement authority in connection with these events?

MS. NEIDL: Objection. We're far

STEVEN PEREIRA - 30(b)(6)

afield of a 30(b)(6); and while I'm enjoying it, is there any point to you sparring on the merits?

This doesn't make a lot of sense. You're asking him if he's aware of criminal pleas, et cetera. Why is that --

MR. ROSATO: There are topics listed.

MS. NEIDL: Okay. You show me what topic you are covering when you are talking about what Michael Mann pled to.

MR. ROSATO: I'll tell you right now, it's covering Topics 21 and 22.

MS. NEIDL: Give me a second.

MR. ROSATO: On NatPay 1.

MS. NEIDL: Give me a second. All right, 21 is about RICO allegations, you haven't mentioned that at all.

And the other one was aiding and abetting Mann's fraud; okay, that's fair game. But you're asking him if he's aware of what Michael Mann has pled to. It's just -- you're going far afield. You're just fighting with him at this point.

STEVEN PEREIRA - 30(b)(6)

MR. ROSATO: This is my deposition. And I -- you're welcome to make your comments, but, I mean, frankly, you're supposed to be limited to objecting to form, and that's it. I'm asking the questions here. We're nearly finished and so why don't we just continue and we can get this to a conclusion. How does that sound?

MS. NEIDL: It's your funeral.

MR. ROSATO: My funeral?

MS. NEIDL: Go ahead. I said I'm enjoying it, so go ahead.

BY MR. ROSATO:

Q. I had a pending question. I said, are you aware of anybody who is employed by Pioneer who has been indicted by any law enforcement authority in connection with these events?

MS. NEIDL: Objection to the form of the question.

THE WITNESS: I have no information about any criminal indictments of any employee at Pioneer Bank.

STEVEN PEREIRA - 30(b)(6)
Q. Has NatPay had any communications about the results of the DOJ investigation about the DOJ?
A. If NatPay has, I'm not aware of them.
Q. You're not aware of any communications in that regard?
A. Between us and the DOJ?
Q. Yes.
A. No, I'm not aware of that.
(Whereupon, NatPay Exhibit 21, Hamilton E-mail Dated 12/9/19, Bates Stamped NP0109378 to '381, 4-Pages was marked for identification.)
BY MR. ROSATO:
Q. This should be the last of the day; NatPay 21.
A. So I'm done with those two?
Q. Yes, I believe so, unless I come up with any other ideas.
Do you see that you're copied on these e-mail communications?
A. Are we talking about 21 to -- that George sent to the FBI guy?

STEVEN PEREIRA - 30(b)(6)

Q. Yeah. Yes. So it's on the Bates numbers ending in 79 and 80.

A. I have a lot of trouble with sequencing. The first one I am not, but depending on where it falls, I may have been, and I really wasn't and so --

Q. If you go to the page ending in 79 it says, Dear Mr. Wabby?

A. Okay.

Q. Do you see you're copied on this e-mail?

A. Yes.

Q. And no reason to doubt that you received it?

A. None.

Q. You can read quickly through this e-mail and let me know when you're ready.

A. (Witness complies.) I'm done.

Q. Okay. You see this is dated December 5th, 2019, right?

A. Yes.

Q. So this is just a few days before NatPay seeks to intervene in this case, right? If you look -- we do need your Declaration, if

STEVEN PEREIRA - 30(b)(6)

you look back at your Declaration, NatPay 20, this was filed with the application to intervene in this case.

Do you see it's dated -- well, the Declaration was signed on December 6th, so the day after this.

A. And this talks about the intervention, the intervening?

Q. Yes. Yes.

A. I didn't know that. Oh, it's -- okay. I'm with you now, I'm sorry.

Q. So did you -- did you have any involvement in preparing this communication to Special Agent Wabby from Mr. Hamilton?

A. If George wrote it, no.

Q. George probably wrote it you think?

A. It's from him, right?

Q. Yes.

A. Yes. I don't think I had -- I think that Bonnie and George probably -- if it was any kind of collaboration, it would have been them, because it was technically -- not technical, they only tap me when they need math.

STEVEN PEREIRA - 30(b)(6)

Q. Okay. So I just want to turn to the end of it on page ending in 80.

Do you see the sentence that starts, given the national scope?

A. Yes.

Q. It says, "Given the national scope of the fraud committed by Michael Mann, Cloud Payroll and Pioneer Bank, it seems to us that the investigation cries out to be run seriously. We expect and hope the FBI's management has placed at your disposition, the budget necessary to pursue this investigation on a more timely basis and we'd be utterly delighted to help."

Do you see that?

A. That's typical George, yes.

Q. So he's telling an FBI agent that Pioneer Bank was involved in a fraud with Michael Mann on December 5th, 2019, correct?

MS. NEIDL: Objection to form.

THE WITNESS: It does appear that's what George said.

Q. And as you said, there is no more active investigation by the FBI into this

STEVEN PEREIRA - 30(b)(6)

matter. Are you aware of that?

MS. NEIDL: Objection to form.

THE WITNESS: I mean, I don't know that; we are still hoping.

Q. Still hoping that?

A. That they're looking into it at least -- yeah. I don't know -- we didn't get a letter saying case closed.

Q. Do you know if that would be something that the FBI would do?

A. You know what, I don't even know -- you said DOJ, is that the FBI? I'm a --

Q. The Department of Justice, the FBI is part of the Department of Justice, yes.

A. So the DOJ investigation with the FBI is conflated, is that how it works?

Q. Yes, the prosecutor's office works together with the FBI, yes.

A. By golly, I'm learning something every day.

Okay. So what is the question again?

Q. So my question is: It was NatPay's belief -- or at least George Hamilton's belief

STEVEN PEREIRA - 30(b)(6)
as of December 5th, 2019, that Pioneer was involved in Michael Mann's fraud, right?
A. Yes.
Q. And he urged the FBI agent to conduct an investigation into that?
A. Yes. I think the opening was because they subpoenaed data from us. I'm not -- I remember George saying he talked to the FBI, but that was not -- if I interacted with the FBI, it's on a data collection; I don't talk about -- and a lot of times they don't tell us anything, I collected data and explain to them, the company. I don't interact with them on a high level, management level.
Q. I understand.
A. Okay. Thank you.
Q. So it's October 20th, 2022, now and I think as we discussed, you're not aware of any person at Pioneer affiliated with Pioneer being indicted by the United States government, correct?
MS. NEIDL: Objection to form.
THE WITNESS: I'm not aware of that, but there could be secret indictments.

STEVEN PEREIRA - 30(b)(6)

Q. Do you know if NatPay had any further communications with Special Agent Wabby after these communications here?

A. Well, you know, every time I say no, you pull out an e-mail, so I'm going to say I don't recall.

Q. I actually don't think I'll have the rabbit to pull out of my hat, at least right now.

A. I like to not -- I would say that I spoke to Wabby once. And I stopped thinking about him as a person, like, an FBI agent; I responded to the subpoena with data. This -- I remember that there was some communication with him, not involved. They did cc me, I typically don't read it.

Q. So do you know if NatPay shared any information beyond the documentation that it provided in response to the subpoena that we looked at yesterday?

A. All I can speak to is the data provided to the FBI of what they asked, I think it was really a lot of data. And other than that, anything happens sidebar with our

attorney, I'm not privy to that.

MR. ROSATO: Okay. I think I'm done with my examination; you are free to leave.

VIDEOGRAPHER: This concludes today's deposition, the time is 4:48 p.m.

- oOo -

(Time Noted: 4:48 p.m.)

---------------------------------------

STEVEN PEREIRA - 30(b)(6)

Subscribed and sworn to before me

this_________day of ______________2022.

---------------------------------------

C E R T I F I C A T E

STATE OF NEW YORK )
) ss.:
COUNTY OF ONONDAGA )

I, Mary Agnes Drury, a Notary Public within and for the State of New York, do hereby certify:

That STEVEN PEREIRA - 30(b)(6), the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of November, 2022.

MADrury

Mary Agnes Drury

# I N D E X


| WITNESS/EXAMINATIONS | PAGE |
|---|---|
| STEVEN PEREIRA - 30(b)(6) | |
| EXAMINATION BY MR. ROSATO | 7 |


* * * * *

## PEREIRA EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Amended Notice of 30(b)(6) Deposition, 8-Pages | 8 |
| Exhibit 2 | McAuliffe E-mail Dated 10/30/17, Bates Stamped NP0002917 to '944, 28-Pages | 12 |
| Exhibit 3 | McAuliffe Letter dated 10/31/17 to page NP0002543 to '543, 40-Pages | 12 |
| Exhibit 4 | Complaint in Intervention, 22-Pages | 61 |
| Exhibit 5 | IRS Letter Dated 3/9/18, Bates Number NP0107544 to '545, 2-Pages | 69 |
| Exhibit 6 | Schilling E-mail Dated 7/24/18, Bates Stamped NP0003762 to '764, 3-Pages | 72 |

PEREIRA EXHIBITS
(CONTINUED)


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 7 | McAuliffe E-mail Dated 9/13/18, Bates Stamped NP0003032 to '037, 6-Pages | 83 |
| Exhibit 8 | McAuliffe E-mail Dated 12/12/18, Bates Stamped NP0002842 to '845, 4-Pages | 95 |
| Exhibit 9 | Cafaro E-mail Dated 3/27/19, Bates Stamped NP0096947 to '949, 3-Pages | 151 |
| Exhibit 10 | First Premier Bank Letter Dated 2/3/98, Bates Stamped N00013523 to '551, 29-Pages | 154 |
| Exhibit 11 | FDIC Letter Dated 5/19/98, Bates Stamped NP0013585 to '596, 12-Pages | 154 |
| Exhibit 12 | Account 5690 Bank Statement, Dated 8/30/19, Bates Stamped NP0094201 to '250, 50-Pages | 164 |
| Exhibit 13 | Account 2449 Cover Sheet, Dated 2/26/19, Bates Stamped PB-SWP-00000072 to '084, 13-Pages | 174 |

PEREIRA EXHIBITS
(CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 14 | Pioneer [Sarratori] Letter Dated 10/2/19, Bates Stamped PB-SWP-00385498 to '509, 12-Pages | 179 |
| Exhibit 15 | Texas Consent Order Dated 1/1/21, Bates Stamped NP0094195 to '200, 6-Pages | 209 |
| Exhibit 16 | Pereira E-mail Dated 9/9/19, Bates Stamped NP0098667 to '670, 42-Pages | 217 |
| Exhibit 17 | Higgins E-mail Dated 9/9/19, Bates Stamped NP0109244 to '246, 3-Pages | 217 |
| Exhibit 18 | Welch E-mail Dated 9/25/19, Bates Stamped NP0095634 to '635, 2-Pages | 220 |
| Exhibit 19 | Hagen E-mail Dated 9/5/19, Bates Stamped NP0097967 to '968, 2-Pages | 226 |
| Exhibit 20 | Pereira Declaration Dated 12/6/19, 14-Pages | 231 |
| Exhibit 21 | Hamilton E-mail 4-Pages | 268 |

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Southwestern vs Pioneer
Dep. Date: October 20, 2022
Deponent: STEVEN PEREIRA - 30(b)(6)

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 14 | 21 | designating | designation | Sp |
| 48 | 20 | change | charge | Sp |
| 51 | 54 | splint | split | Sp |
| 58 | 17 | It's is an | It is an | extra word |
| 66 | 19 | is | is in | missing word |
| 79 | 17 | Cashet | Cachet | Sp |
| 94 | 8 | Cashet | Cachet | Sp |
| 94 | 11 | Cashet | Cachet | Sp |
| 94 | 12 | Cashet | Cachet | Sp |
| 108 | 11 | now | know | Sp |
| 109 | 18 | police fail | please fail | wrong word |

(Continued)

[signature]

STEVEN PEREIRA - 30(b)(6)

SUBSCRIBED AND SWORN BEFORE ME

THIS 3rd DAY OF JANUARY, 2023.

Notary Public State of Florida
Mark R. Williams
My Commission HH 028972
Expires 11/15/2024

[signature]

(Notary Public) MY COMMISSION EXPIRES: 11/15/2024

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Southwestern vs Pioneer
Dep. Date: October 20, 2022
Deponent: STEVEN PEREIRA - 30(b)(6)

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 110 | 23 | That's our what | That's what | extra word |
| 111 | 9 | five | finally | wrong word |
| 111 | 23 | There is | There are | wrong word |
| 113 | 16 | does intermediate | disintermediate | wrong word |
| 132 | 2 | who | whole | Sp |
| 144 | 5 | there's | theirs | Sp |
| 144 | 20 | to my | to me | wrong word |
| 145 | 12 | pain able | payable | Sp |
| 156 | 13 | knob | nobody | Sp |
| 166 | 22 | Doc Delivery | Doculivery | Sp |
| 191 | 14 | billing | willing | Sp |

(Continued)

[signature]

STEVEN PEREIRA - 30(b)(6)

SUBSCRIBED AND SWORN BEFORE ME

THIS 3RD DAY OF JANUARY, 2023.

Notary Public State of Florida
Mark R. Williams
My Commission HH 028972
Expires 11/15/2024

[signature]

(Notary Public) MY COMMISSION EXPIRES: 11/15/2024

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Southwestern vs Pioneer
Dep. Date: October 20, 2022
Deponent: STEVEN PEREIRA - 30(b)(6)

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 222 | 5 | Cashet | Cachet | Sp |
| 237 | 18 | Cashet | cachet | Sp |
| 244 | 21 | ferry | fairy | Sp |
| 257 | 3 | ceased | seized | Sp |

(Final)

[signature]

STEVEN PEREIRA - 30(b)(6)

SUBSCRIBED AND SWORN BEFORE ME

THIS 3RD DAY OF JANUARY, 2023.

Notary Public State of Florida
Mark R. Williams
My Commission HH 028972
Expires 11/15/2024

[signature]

(Notary Public) MY COMMISSION EXPIRES: 11/15/2024