**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

SOUTHWESTERN PAYROLL SERVICE, INC. and GRANITE SOLUTIONS GROUPE, INC.,

*Plaintiffs,*

*v.*

PIONEER BANCORP INC., et al.,

*Defendants.*

NATIONAL PAYMENT CORPORATION,

*Intervenor-Plaintiff,*

*v.*

PIONEER BANCORP INC., et al.,

*Defendants.*

Case No. 1:19-cv-1349 (MAD/PJE)

# PLAINTIFFS' TRIAL BRIEF

JAYNE PETERS MCVICKER BURKE
ASKEW & PARKER
401 S. Boston Ave., Suite 2000
Tulsa, Oklahoma 74103
Tel: (918) 938-7944

COOPER ERVING & SAVAGE LLP
39 North Pearl Street, 4th Floor
Albany, NY 12207
Tel:: (518) 449-3900

*Attorneys for Plaintiff Southwestern Payroll Services, Inc. and Granite Solutions Groupe, Inc.*

GREENBERG TRAURIG, LLP
54 State Street, 6th Floor
Albany, New York 12207
Tel: (518) 689-1400

GREENBERG TRAURIG, LLP
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Tel: (713) 374-3510

*Attorneys for Intervenor-Plaintiff National Payment Corporation*

**TABLE OF CONTENTS**


INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

Mann's Payroll Businesses ........ 3

Mann's Kiting and Money Laundering ........ 6

The House of Cards Fall ........ 7

ARGUMENT ........ 9

I. Pioneer Is Liable to Plaintiffs for Conversion ........ 9

II. Pioneer Is Liable to Plaintiffs for Unjust Enrichment/Money Had and Received ........ 13

III. Pioneer Is Liable to Plaintiffs for Negligence/Gross Negligenc ........ 14

IV. Pioneer Is Liable to Plaintiffs for Fraud ........ 15

V. Pioneer Is Liable to Plaintiffs for RICO Violations ........ 16

A. Plaintiffs Will Establish a RICO Enterprise. ........ 16

B. Plaintiffs Will Establish Pioneer's Participation in the Conduct of the Enterprise. ........ 17

C. Plaintiffs Will Demonstrate a Pattern of Racketeering Activity ........ 18

D. Plaintiffs Will Demonstrate RICO Injury and Proximate Cause. ........ 18

VI. Plaintiffs Will Establish Their RICO Conspiracy Claims ........ 19

VII. Pioneer Is Liable to Plaintiffs for Aiding and Abetting Mann's Fraud and Conversion ........ 19

A. Pioneer Aided and Abetted Mann's Fraud ........ 19

B. Pioneer Aided and Abetted Mann's Conversion. ........ 20

VIII. Pioneer Cannot Establish Its Counterclaims Against NatPay and SWP, or Its *In Pari Delicto* and Unclean Hands Affirmative Defenses ........ 21

EVIDENTIARY ISSUES LIKELY TO ARISE AT TRIAL ........ 22

CONCLUSION ........ 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alchar Hardware Co.*,
759 F.2d 867 (11th Cir. 1985) ....................12

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006)....................18

*In re Applied Logic Corp.*,
576 F.2d 952 (2d Cir. 1978)....................12

*AXH Air-Coolers, LLC v. Pioneer Bancorp, Inc.*,
No. 1:20-cv-1022, 2022 WL 16790328 (N.D.N.Y. Aug. 2, 2022)....................14, 15

*Bamberger Polymers International Corp. v. Citibank, N.A.*,
124 Misc. 2d 653 (N.Y. Cnty. Sup. Ct. 1983) ....................10, 11

*Beecher v. Vogt Manufacturing Co.*,
227 N.Y. 468 (1920) ....................11

*Blackwell Livestock Auction, Inc. v. Community Bank of Shidler, Oklahoma*,
864 P.2d 1297 (Okl. Ct. App. 1993) ....................12

*Bridgeport Co. v. United States Postal Service*,
39 B.R. 118 (Bankr. E.D. Ark. 1984) ....................11

*Burns v. Lopez*,
256 N.Y. 123 (1931) ....................11

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
187 F.3d 229 (2d Cir. 1999)....................18

*Colavito v. New York Organ Donor Network, Inc.*,
8 N.Y.3d 43 (2006) ....................9

*Core Development Group LLC v. Spaho*,
199 A.D.3d 447 (1st Dept. 2021)....................10

*Daly v. Atlantic Bank of New York*,
201 A.D.2d 128 (1st Dep't 1994) ....................11, 14

*De Sole v. Knoedler Gallery, LLC*,
974 F. Supp. 2d 274 (S.D.N.Y. 2013)....................15

*DeFalco v. Bernas*,
244 F.3d 286 (2d Cir. 2001)....................16

*Matter of Witbeck*,
245 A.D.2d 848 (3d Dep't 1997) ....................13

*Family Health Management, LLC v. Rohan Developments, LLC*,
207 A.D.3d 136 (1st Dep't 2022) ....................10

*Georgia Malone & Co. v. Rieder*,
19 N.Y.3d 511 (2012) ....................13

*H.J. Inc. v. Northwestern Bell*,
492 U.S. 229 (1989) ....................18

*Kaufman v. First National Bank of Opp, Alabama*,
493 F.2d 1070 (5th Cir. 1974) ....................11, 12

*Kaye v. Grossman*,
202 F.3d 611 (2d Cir. 2000) ....................15

*Kirschner v. Bennett*,
648 F. Supp. 2d 525 (S.D.N.Y. 2009) ....................20

*Kirschner v. KPMG LLP*,
15 N.Y.3d 446 (2010) ....................21

*Marine Midland Bank v. Graybar Electric Co.*,
51 A.D.2d 903 (1st Dep't 1976) ....................11

*Modern Settings, Inc. v. Prudential-Bache Securities, Inc.*,
936 F.2d 640 (2d Cir. 1991) ....................10

*Myun-Uk Choi v. Tower Research Capital LLC*,
890 F.3d 60 (2d Cir. 2018) ....................13

*Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC*,
652 F. Supp. 2d 495 (S.D.N.Y. 2009) ....................19

*Petrone v. Davidoff Hutcher & Citron, LLP*,
150 A.D.3d 776 (2d Dept. 2017) ....................10

*S. Kane & Son Profit Sharing Trust v. Marine Midland Bank*,
1996 WL 325894 (E.D. Pa. June 13, 1996) ....................11

*Salinas v. United States*,
522 U.S. 52 (1997) ....................19

*In re Saugus General Hospital, Inc.*,
698 F.2d 42 (1st Cir. 1983) ....................12

*Schreibman v. Chase Manhattan Bank*,
15 A.D.2d 769 (1st Dep't 1962) ....................11

*Silvercreek Management, Inc. v. Citigroup, Inc.*,
346 F. Supp. 3d 473 (S.D.N.Y. 2018) ....................19

*Southwestern Payroll Services, Inc. v. Pioneer Bancorp, Inc.*,
No. 119-cv-1349, 2020 WL 4353219 (N.D.N.Y. July 7, 2020) ....................15

*In re Tonyan Construction Co.*,
28 B.R. 714 (Bankr. N.D. Ill. 1983) ....................12

*Union Stock-Yards National Bank v. Gillespie*,
137 U.S. 411 (1890) ....................13

*United States Fire Insurance Co. v. United Limousine Service*,
303 F. Supp. 2d 432 (S.D.N.Y. 2004)....18

*United States v. Morales*,
185 F.3d 74 (2d Cir. 1999)....16

*United States v. Turkette*,
452 U.S. 576 (1981)....16

*United States v. Yannotti*,
541 F.3d 112 (2d Cir. 2008)....18

*Vic Gerard Golf Cars, Inc. v. Citizen's National Bank of Fairfield*,
528 F. Supp. 237 (D. Conn. 1981)....12

*Westinghouse Credit Corp. v. D'Urso*,
278 F.3d 138 (2d Cir. 2002)....11

**Statutes and Rules**

18 U.S.C. § 1961(4)....16

18 U.S.C. § 1962(c)....17

Federal Rule of Evidence 401....22

Federal Rule of Evidence 402....22

Federal Rule of Evidence 403....22

Federal Rule of Evidence 408....22

Pursuant to Rule 16 of the Federal Rules of Civil Procedure, N.D.N.Y. Local Rules 16.1 and 39.2, and the Court's July 8, 2026 Scheduling Order, Plaintiffs National Payment Corporation ("NatPay"), Southwestern Payroll Service, Inc. ("SWP"), and Granite Solutions Groupe ("Granite") respectfully submit this Trial Brief in anticipation of the trial in this case scheduled to begin on September 28, 2026. Plaintiffs reserve the right to supplement or amend this Trial Brief to address issues and arguments raised by Defendants Pioneer Bancorp, Inc. and Pioneer Bank (collectively, "Pioneer") and any questions or requests by the Court.

## INTRODUCTION

This action arises from the actions taken by Pioneer upon the collapse of the massive kiting and money laundering schemes orchestrated by Michael Mann in late August, 2019. Much of the fallout from that collapse was suffered by the legitimate payroll companies owned by Mann, their employer-clients, and their clients' employees. And that suffering was the direct result of Pioneer's decision to partially freeze the payroll companies' accounts, allow millions of third-party payroll and payroll tax funds to accumulate in the accounts, and then use the third-party funds to cover Pioneer's losses and Mann's debts to Pioneer. Pioneer seized about $10 million in third-party tax funds paid by thousands of employers across the country, including Granite and customers of SWP. Because their tax liabilities were not paid, the employers incurred penalties, interest, and were out-of-pocket for a second tax payment, if they could afford it.

What is perhaps most egregious, is that Pioneer was told by multiple individuals, including Mann himself, that the frozen payroll company accounts held third-party funds and it should release the funds so that employees would receive their wages and payroll taxes could be paid timely. In the ensuing days, when the source of the funds deposited to the payroll companies' accounts was crystal clear, Pioneer could have released the third-party funds or turned the funds

over to authorities for payment to the IRS and other taxing authorities. But Pioneer senior executives cared only about protecting the bank's shareholders and their own paychecks and bonuses. They made false statements to victims who begged for information, and colluded with Mann to obtain additional funds from the sale of Mann's surviving business and his home. They remain indignant that they did nothing wrong, because money deposited at Pioneer Bank is theirs, end of story.

Plaintiffs brought this case to recover the third-party tax funds seized by Pioneer and their damages incurred by Pioneer's malevolent conduct. They assert claims for conversion, unjust enrichment/money had and received, negligence/gross negligence, fraud, violations of RICO and RICO conspiracy, aiding and abetting fraud, and aiding and abetting conversion. As discussed in more detail below, Plaintiffs will prevail on their claims at trial and, due to the egregious nature of Pioneer's conduct, Plaintiffs anticipate the jury will award punitive damages in an amount that should send a strong message to Pioneer's senior executives, its Board of Directors, and shareholders, as well as other banks in the community.

## FACTUAL BACKGROUND

Michael Mann started a consulting company called ValueWise Corp. ("ValueWise") in the 1990s. In about 2008, he established a banking relationship with Pioneer. At the time, Mann opened two accounts and obtained a line of credit in the amount of $2 million. Mann's relationship partner throughout the relevant period was David Blessing, an Executive Vice President and commercial lending officer who joined Pioneer in 2009.

Over time, Mann formed or acquired additional companies and opened thirty-two bank accounts in the names of those companies. From 2008 to 2019, Pioneer increased incrementally Mann's line of credit. The primary collateral for the line of credit was ValueWise's accounts

receivable, and several of Mann's companies were guarantors. By 2018, the line of credit was $32 million, and, in August 2019, Pioneer increased the line to $42 million. Michael Mann was unquestionably Pioneer's largest and most valuable customer.

**<u>Mann's Payroll Businesses</u>**

In late 2013, Mann purchased MyPayrollHR.com, LLC ("MyPayroll"), a payroll service bureau. Mann and Blessing discussed this new business, and Blessing assisted Mann in opening accounts in MyPayroll's name. One of those accounts, ending in 0212, was opened for the purpose of housing the payroll taxes of MyPayroll's clients until they were due to be paid ("MyPayroll 0212 Account"). Mann fully informed Blessing and others at Pioneer the purpose that the account would serve. On the account opening documents, Pioneer representatives identified MyPayroll's type of business as a "Payroll Svce Bureau" and in the "Account Owner" box, under the typed name of MyPayroll and its address, handwrote "Client Account." The term "Client Account" appears on both the account opening documentation and the monthly account statements.

The MyPayroll 0212 Account was used immediately to receive, house, and ultimately pay payroll taxes, mostly by ACH but also by check and wire. The ACH deposit transactions were labeled "PAYROLL TAX MANA/TAXDRAFT" and Pioneer collected a monthly service charge of .$25 per ACH transaction in the account. Pioneer designated the account "high risk," which required Pioneer's Bank Secrecy Act ("BA") Department to perform a quarterly reviews of the account for suspicious activity.

Blessing and others at Pioneer assisted Mann, as well as his then-current payroll tax ACH processor, Payroll Tax Management, in setting up checks to issue from the MyPayroll 0212 Account. The checks issued from the account listed "Payroll Tax Management, Inc." as the payor, and were addressed to state and local taxing authorities. The "memo" line of the check listed the

employer-customer on whose behalf taxes were being paid, their Employer Identification Number, and the applicable tax year and quarter.

Over the next several years, MyPayroll grew, and the amount of funds flowing through the MyPayroll 0212 Account increased significantly. In the month of December 2014, over $14 million passed through the account, and there were about 1,500 transactions in the account. In December 2015, nearly $19 million passed through the account, and there were over 5,858 transactions in the account. At this point, ACH credit transactions were labeled "[employer name]/TAXES" and "[employer name]/PAYROLL." ACH debit transactions were labeled "IRS/USATAXPYMT," "[employer name]/DIR DEP," and "[employer name]/CHILD SUPP." The monthly service fee earned by Pioneer was over $1,500, in addition to any wiring fees.

In 2016 and 2017, Mann purchased the majority interest in two more payroll service bureaus, a company called ProData Payroll Services ("ProData") located in Chicago, Illinois, and SWP, located in Tulsa, Oklahoma. Also in 2017, Mann formed Cloud Payroll, LLC ("Cloud Payroll") to serve as a holding company and perform back office operations (including tax processing) for the three payroll bureaus. John Reinke served as Cloud Payroll's Chief Executive Officer, and the company had employees in Clifton Park, New York, and its tax operations were located in Miami, Florida.

By the end of 2017, all three service bureaus were using the MyPayroll 0212 Account to house third-party payroll taxes. In 2018, more than $2.5 billion in payroll, payroll tax, and other payroll related dollars flowed through the account. The December 2018 account statement is 280 pages long, lists nearly 15,000 transactions, and reflects credits/deposits of over $216 million, and debits/withdraws of over $216 million. Pioneer collected a service charge of $3,527.25 based on the transactions in the account during the month.

In October 2017, Cloud Payroll severed its relationship with Payroll Tax Management, Inc., and contracted with NatPay to perform ACH tax payment services. Cloud Payroll representatives informed NatPay that they would eventually move the payroll ACH services, including direct deposits, from Cachet Financial Services to NatPay. NatPay began serving Cloud Payroll in about October 2017.

In 2019, Mann opened several accounts for Cloud Payroll, one of which was to be used to house third-party tax funds exclusively, rather than the MyPayroll 0212. The Cloud Payroll 2440 Account was opened in February, 2019. In the month of March 2019, over $22 million moved through the account. A BSA Department employee reviewed the April 2019, activity in the Cloud Payroll 2440 Account and noted "increasing ACH totals" but that "[d]ue to the type of business, the activity is not unusual."

From the outset, Mann communicated with Pioneer Bank employees on a near-daily basis regarding his payroll businesses, and often needed assistance with transactions. For example, Mann frequently requested copies of checks made payable to state and local taxing authorities. Mann also requested that funds from the payroll companies' accounts be wired to the IRS, employees, Cachet's account, and NatPay's account, all of which required the approval of two senior executives. Mann also routinely had questions regarding whether certain transactions had occurred, which required Pioneer employees to review the activity in MyPayroll 0212 Account or the Cloud Payroll 2440 Account. For example, on July 9, 2019, a Pioneer employee reviewed the Cloud Payroll 2440 Account for a certain transaction, reporting to Mann that all ACH transactions in the account were "normal tax collection ACH's." Mann not only did not keep his payroll activities secret from Pioneer, but Pioneer was also actively assisting Mann in payroll operations.

**Mann's Kiting and Money Laundering**

Pioneer gave Mann "remote deposit capture privileges," which allowed him to deposit checks online, which is not unusual. However, Pioneer also gave Mann instant access to the deposited funds. This allowed Mann to kite checks between Pioneer and Bank of America. Pioneer's records show that, by July of 2019, Mann was using about 18 of his companies' accounts solely for kiting. Because each account had a remote deposit limit of $650,000 per check and $1.3 million per day, Mann was able to kite over $20 million a day. The account statements for the accounts used to kite reflect that, each day, Mann would remotely deposit about $1,299,000 to each of the accounts, then write three or four checks from each of the accounts in six-figure, round-dollar amounts, leaving a small balance in each account. For example, the July 2019, beginning balance in an account held by Ross Personnel Consultant Inc. was $491.73. In that account in July, there were deposits totaling $29,399,000.00, withdrawals totaling $29,399,020.00, and an ending balance of $471.73, which was $20 less than at the start of the month because Pioneer charged a $20 balance requirement fee.

Mann frequently had insufficient funds in his companies' accounts to cover checks or other items. Pioneer's records show that, often in these circumstances, Pioneer employee Randall Benedict would receive a report listing accounts with insufficient funds. He would send an email to Mann, who would usually apologize and indicate that he would move money to the overdrawn accounts. Benedict would then forward the emails to David Blessing and Joseph Fleming, who would approve payment of the checks, nearly always instructing that Mann not be charged, using the terms "pay and waive." At times, Blessing instructed Mann to "move the money" to the overdrawn accounts. From 2014 through 2019, there are hundreds of emails between Mann and Pioneer employees addressed to the overdrafts. By 2019, the overdrafts occurred almost daily,

and involved multiple checks totaling millions of dollars. According to Pioneer witnesses, the overdrafts were the result of "timing issues."

Beginning in about 2014, Mann began to take advantage of the "float" on the third-party tax funds (the time between when the funds were withdrawn from an employer's account and the time that the tax funds were required to be paid), by using the third-party tax funds for other purposes, including to cover any overdrawn accounts. Typically, he would move the tax funds out of the payroll company's account to other accounts held by his various companies, and then transfer them back to the payroll company's account before the taxes were due to be paid to the IRS or other taxing authorities. Mann had no timing issues in this regard, as there was never a time, prior to September 4, 2019, that Pioneer returned any debit/withdrawal transactions from the payroll company accounts for insufficient funds.

**<u>The House of Cards Fall</u>**

On August 30, 2019, Bank of American froze Mann's accounts and informed Pioneer that it was not going to honor more than $15 million in checks Mann had written from various accounts at Bank of America to accounts at Pioneer. Pioneer did not freeze the accounts of Mann and his companies, which would have caused all transactions, both debits and credits, to be returned. That also would have alerted other parties that there was an issue with the accounts.

Rather, Pioneer restricted all of Mann's accounts, which caused all transactions in the account to be unposted, and would require Pioneer to manually post or reject each item. Rather than rejecting all items, Pioneer elected, beginning on September 3, 2019, to post all credits/deposits to the accounts and reject all debits/withdrawals. An exception to this were a series of plainly suspicious on-line banking transfers initiated by Mann on August 30, 2019, including (1) five transfers that moved $6,845,000 from the Cloud Payroll 2440 Account to the

MyPayroll 0212 Account, (2) one transfer that moved $2.8 million to an account held by Weitz and Associates, (3) 17 transfers that moved $3,140,000 from the Weitz and Associates account to various other accounts, including $3 million to a ValueWise account, and (4) one transfer of $3.2 million from the ValueWise account to the ValueWise line of credit account, thereby reducing the amount outstanding on the line of credit.

Between August 30, 2019 and September 4, 2019, having no knowledge of any issue with Cloud Payroll or its account, NatPay facilitated the ACH transfer of nearly $10 million in third-party tax funds from NatPay's Custodial ACH Settlement Account at First Premier Bank to the Cloud Payroll 2440 Account, including approximately $416,866.62 paid by Granite and about $9.8 million paid by employer-clients of SWP. Pioneer's records reflect that the transactions were labeled "CLOUDPAYROLL/TAX COL," and there were thousands of them. In addition, NatPay initiated the transfer of $2,721,815.77 from accounts at Pioneer to the MyPayroll 0212 Account, but due to the one-way freeze, NatPay funded the deposit from its Custodial ACH Settlement Account at First Premier Bank.

On September 4, 2019, Michael Schilling, an employee of Cloud Payroll, went to Pioneer to see if he could get the accounts unfrozen. He met with Pioneer General Counsel Frank Sarratori and another senior executive and explained that payroll funds were in the frozen accounts and needed to be released and paid. Later that day, Cloud Payroll Chief Executive Officer John Reinke spoke on the telephone with Frank Sarratori and Pioneer Chief Executive Officer Tom Amell, and similarly informed them that payroll and payroll tax funds were in the frozen payroll company accounts and needed to be released.

Also on September 4, 2019, Pioneer senior officers and other representatives, including Pioneer's counsel Robert Alessi, met with Mann and Mann's criminal defense attorney, Michael

Koenig, at Pioneer's headquarters. According to Mann, his goal was to get Bank of America to pay the checks so that Pioneer would unfreeze his accounts. Mann knew that the payroll companies would not survive if the accounts were not unfrozen. Mann testified that, in the presence of Koenig, he told Alessi that there were payroll and payroll tax dollars in the accounts that needed to be released.

Concerned about other creditors, Pioneer senior executives directed employees to move any funds remaining in the accounts held by Mann or his companies to a suspense account. That evening, Pioneer removed $6,845,000 from the Cloud Payroll 2440 Account, and $7,205,338.10 from the MyPayroll 0212 Account. The next day, Pioneer moved all the funds to a general ledger account, where they remained through the end of the year. In early December 2019, Pioneer announced for the first time that Pioneer had set off about $15 million to cover the overdrafts.

At trial, the jury will be tasked with determining Pioneer's liability with respect to following causes of action: (1) conversion; (2) unjust enrichment/money had and received; (3) negligence/gross negligence; (4) fraud; (5) violation of RICO; (6) RICO conspiracy; (7) aiding and abetting conversion; and (8) aiding and abetting fraud.

## <u>ARGUMENT</u>

### I. PIONEER IS LIABLE TO PLAINTIFFS FOR CONVERSION

Under New York law, "conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50 (2006). "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Id.* "[C]onversion is concerned with [plaintiff's] superior right of possession of such property, not title ownership" *Core Dev. Grp. LLC v. Spaho*, 199 A.D.3d

447, 449 (1st Dept. 2021). "Money, if specifically identifiable, may be the subject of a conversion action." *Petrone v. Davidoff Hutcher & Citron, LLP*, 150 A.D.3d 776, 777 (2d Dept. 2017).

At trial, Plaintiffs will establish that they had a possessory right in $9,968,692.32 deposited into the Cloud Payroll 2440 Account between August 30, 2019, and September 4, 2019. NatPay will also establish that it funded the deposit of an additional $2,721,815.77 to the MyPayroll 0212 Account. Plaintiffs will identify the source of all funds deposited, and all deposits are specifically identifiable. *See Fam. Health Mgmt., LLC v. Rohan Devs., LLC*, 207 A.D.3d 136, 145 (1st Dep't 2022) (holding that "when the funds at issue in an action for the conversion of money constitute a specific sum, one that is determinate, and reflects an ascertained amount, the money is specifically identifiable" (internal quotation marks omitted)).

There is no dispute that Pioneer exercised dominion over the funds deposited to the Cloud Payroll 2440 Account and the MyPayroll 0212 Account when it moved the funds to a suspense account, then to a general ledger account, and ultimately to set off the negative balances in the accounts held by other Mann entities. Plaintiffs will establish that Pioneer had no possessory right or interest in the deposited funds for at least three reasons. First, there were no overdrafts in the Cloud Payroll or MyPayroll accounts and neither Cloud Payroll nor MyPayroll was indebted to Pioneer. A bank's right to set off against a debtor's account is permissible only where, among other things, the debts sought to be set off are mutual. *See Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*, 936 F.2d 640, 648 (2d Cir. 1991) (applying New York law and observing that "[t]he equitable remedy of set-off is unavailable where the claims do not involve mutual debts and credit"); *Bamberger Polymers Int'l Corp. v. Citibank, N.A.*, 124 Misc. 2d 653, 655 (N.Y. Cnty. Sup. Ct. 1983) ("The right of setoff may be asserted only when the debtor-creditor relationship is shown to exist between the bank and customer.") (citing *Marine Midland Bank v. Graybar Elec.*

*Co*., 51 A.D.2d 903 (1st Dep't 1976)). Mutuality means that the debts are "due to and from the same persons in the same capacity." *Id.* (quoting *Beecher v. Vogt Mfg. Co*., 227 N.Y. 468, 473 (1920)); *see also Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138 (2d Cir. 2002); *Burns v. Lopez*, 256 N.Y. 123, 128-129 (1931) (holding "the debts which are to be set off against each other shall be due from and to the parties in the same right"). The evidence will establish that mutuality was lacking, and therefore Pioneer had no right to help itself to third-party funds.

Second, while a bank is generally entitled to apply a deposit to the payment of a debt due it by the depositor, when "the bank is on notice that funds in a depositor's account are owned by a third party, the bank cannot appropriate those funds in order to set them off against a debt of the depositor." *Daly v. Atlantic Bank of N.Y.*, 201 A.D.2d 128, 129 (1st Dep't 1994); *accord S. Kane & Son Profit Sharing Tr. v. Marine Midland Bank*, 1996 WL 325894, at *3 (E.D. Pa. June 13, 1996); *see Schreibman v. Chase Manhattan Bank*, 15 A.D.2d 769, 770 (1st Dep't 1962) ("It is universally conceded that knowledge upon the part of a bank that deposits made by a debtor of the bank in his own name belonging to a third person absolutely precludes the bank from applying such funds to the individual indebtedness of the depositor to it."); *Bamberger Polymers Int'l Corp. v. Citibank, N.A.*, 124 Misc. 2d 653, 657 (Sup. Ct. N.Y. Cnty. 1983) ("[A] bank can make no setoff when it knows that the funds it holds belong to a third party."); *see also Kaufman v. First Nat. Bank of Opp, Ala*., 493 F.2d 1070, 1071 (5th Cir. 1974) ("The right to make a setoff requires determining the character of the deposit and the bank's knowledge or notice of its character."); *Bridgeport Co. v. U.S. Postal Serv*., 39 B.R. 118, 128 (Bankr. E.D. Ark. 1984) ("Where the bank has knowledge of a third person's interest in deposited funds, or notice of facts sufficient to put it upon inquiry as to the true character of the deposit, the debtor-creditor relationship is altered and the bank's right of set off is subject to the rights of such third party"); *In re Tonyan Const. Co.*, 28

B.R. 714, 725 (Bankr. N.D. Ill. 1983) ("Where, however, a bank has knowledge of a third person's interest in deposited funds, or notice of facts sufficient to put it upon inquiry as to the true character of the deposit, the debtor-creditor relationship is altered and the bank's right of setoff is subject to the rights of such third party."); *Blackwell Livestock Auction, Inc. v. Cmty. Bank of Shidler, Okl.*, 864 P.2d 1297, 1299 (Okl. Ct. App. 1993) (holding bank's setoff was improper where bank was aware that customer used his checking account for "order buying" and was therefore required to inquire as to the nature of the deposit from an out-of-state depositor). The evidence at trial will establish that Pioneer was specifically informed by several individuals that payroll accounts consisted of funds owned by third parties, and that any reasonable inquiry would have revealed the nature of the deposits.

Third, it is "settled law that a bank cannot exercise a setoff against a deposit which is known by it to be dedicated to a special use, *e.g.*, for the sole purpose of meeting payrolls or paying taxes." *In re Applied Logic Corp.*, 576 F.2d 952, 958 (2d Cir. 1978); *see also In re Saugus Gen. Hosp., Inc.*, 698 F.2d 42, 47 (1st Cir. 1983) (holding "that a payroll account whose funds are known by a bank to be dedicated solely to the satisfaction of employee paychecks qualifies as a deposit dedicated to a special use and may not be set off by the bank"); *In re Alchar Hardware Co.,* 759 F.2d 867, 868 (11th Cir. 1985) ("The 'special fund' doctrine precludes a bank from exercising a setoff against a deposit which is known by it to be dedicated to a special use such as meeting payrolls or paying taxes."); *Kaufman*, 493 F.2d at 1072 (explaining that "funds deposited for a special purpose known to the bank, or under special agreement, cannot be set off by the bank"); *Vic Gerard Golf Cars, Inc. v. Citizen's Nat. Bank of Fairfield*, 528 F. Supp. 237, 241 (D. Conn. 1981) (holding that it is "settled law . . . that funds deposited in a bank for a special purpose, known to the bank, or under a special agreement, cannot be set off by the bank against a debt due it from

the depositor. Such funds constitute a special deposit, the distinctive feature of which is that the funds must be used for the specific purpose for which the money was deposited.") *Union Stock-Yards Nat'l Bank v. Gillespie*, 137 U.S. 411, 419-20 (1890) (holding "[j]ustice forbids the upholding" of a transaction whereby a bank set off funds which it knew or had reason to know were owned by a third party).

## II. PIONEER IS LIABLE TO PLAINTIFFS FOR UNJUST ENRICHMENT/MONEY HAD AND RECEIVED

Unjust enrichment "contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012). To establish an unjust enrichment claim under New York law, the plaintiff must "establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (internal quotations omitted).

Similarly, to establish a claim for money had and received, the plaintiff must establish that "(1) the defendant received money belonging to the plaintiff, (2) the defendant benefited from receipt of the money, and (3) under principles of equity and good conscience, the defendant should not be permitted to keep the money." *Matter of Witbeck*, 245 A.D.2d 848, 850 (3d Dep't 1997) (internal quotation marks and alteration omitted).

The evidence to be presented at trial will overwhelmingly demonstrate that Pioneer was enriched at Plaintiffs' expense when Pioneer implemented a one-way freeze of the MyPayroll and Cloud Payroll accounts, allowed third-party funds to accumulate, and then seized those funds to cover the debts of Mann.

The evidence will further establish that equity and good conscience require restitution of all deposited funds: (1) Pioneer had no right to setoff funds in the accounts of MyPayroll and

Cloud Payroll and knew the funds deposited in the accounts were third-party payroll tax funds to be paid to the IRS and other taxing jurisdictions; (2) Pioneer's actions with respect to the payroll accounts resulted in substantial harm to hundreds of employers and their employees throughout the country; (3) Pioneer facilitated and participated in Mann's money laundering scheme, when it allowed Mann to use the third-party tax funds to cover overdrafts and then did so itself after taking control of the accounts; and (4) Pioneer's systemic failure to abide its BSA/AML obligations facilitated Mann's kiting, money laundering, and other schemes.

## III. PIONEER IS LIABLE TO PLAINTIFFS FOR NEGLIGENCE/GROSS NEGLIGENCE

While a bank has no duty to third parties to monitor fiduciary accounts to safe guard the funds from fiduciary misappropriation, "a bank may be liable for participation in such a diversion, either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being executed." *AXH Air-Coolers, LLC v. Pioneer Bancorp, Inc.*, No. 1:20-cv-1022, 2022 WL 16790328, at *6 (N.D.N.Y. Aug. 2, 2022) (cleaned up). Under those circumstances, "the bank is under the duty to make reasonable inquiry and endeavor to prevent a diversion." *Id.* (internal quotation marks omitted). Similarly, when a "bank is on notice that funds in a depositor's account are owned by a third party, the bank cannot appropriate those funds in order to set them off against a debt of the depositor." *Daly*, 201 A.D.2d at 129.

Plaintiffs will establish that Pioneer and Mann agreed that the MyPayroll and Cloud Payroll accounts would be used to house and process third-party payroll and tax funds. The evidence will show that Pioneer knew the accounts held third-party tax funds entrusted to MyPayroll and Cloud Payroll solely for the purpose of making payroll and payroll tax payments. While Pioneer and Mann knew it was wrongful to use the third-party funds for other purposes, Mann did so with Pioneer's assistance and encouragement. Once Pioneer took control of the MyPayroll and Cloud

Payroll accounts on August 30, 2019, Pioneer implemented a one-way freeze for the purpose of causing third-party payroll and payroll tax funds to accumulate in the accounts. With actual knowledge that the funds in the accounts belonged to third-parties, Pioneer seized the funds to cover its liabilities and the debts of Mann.

Accordingly, Plaintiffs will establish that "the MyPayroll and Cloud Payroll accounts constituted special purpose tax accounts, thus triggering Defendant Pioneer's duty to Plaintiff[s]." *AXH Air-Coolers, LLC*, 2022 WL 16790328, at *6. Plaintiffs will also establish that Pioneer breached its duty when "it diverted those special tax funds to its own account instead of remitting them to the appropriate taxing authorities as it knew it was required to do." *Id.* Plaintiffs will further establish that Pioneer knew that its wrongful acts would ruin the payroll companies and would cause devastating harm to employers and employees across the country, but intentionally and willfully converted the tax funds anyway, and that its wrongful conduct was so careless as to show a complete disregard for the rights and safety of others, and so reckless as to indicate a disregard of the consequence of the bank's wrongful conduct.

## IV. PIONEER IS LIABLE TO PLAINTIFFS FOR FRAUD

To recover for fraud by misrepresentation, a party must prove that "1) the defendant made a material misrepresentation; 2) the defendant knew of its falsity; 3) the defendant possessed an intent to defraud; 4) the plaintiff reasonably relied on the misrepresentation; and 5) the plaintiff suffered damage as a result of the misrepresentation." *Kaye v. Grossman*, 202 F.3d 611, 614 (2d Cir. 2000). To prove fraudulent concealment or omission by the defendant, a plaintiff must establish: (1) a duty to disclose material facts; (2) knowledge of material facts by a party bound to make such disclosures; (3) failure to discharge a duty to disclose; (4) scienter; (5) reliance; and (6) damages." *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 314 (S.D.N.Y. 2013). A duty to disclose may arise under the special facts doctrine, which "applies when one party has superior

knowledge that is not readily available/accessible to the other party and that party knows the other party is acting on the basis of mistaken knowledge." *Sw. Payroll Serv., Inc. v. Pioneer Bancorp, Inc.*, No. 119-cv-1349, 2020 WL 4353219, at *4 (N.D.N.Y. July 7, 2020).

The facts at trial will establish that, at the time of the one-way freeze, "Pioneer certainly knew that Plaintiffs, and those similarly situated, were continuing to deposit debits, and attempting to pull credits, out of the payroll company accounts." Dkt. No 393, at 16. Accordingly, "[a] jury could easily conclude that, therefore, Defendant Pioneer knew Plaintiffs were relying on the fact that the credits and debits would both be finalized on the account." *Id.* Moreover, it will be undisputed at trial that "Pioneer's lawyers, at the time of the partial freeze, stated to Plaintiffs that Defendant Pioneer was not exercising a setoff." *Id.*, at 15. Accordingly, Plaintiffs will establish at trial that Pioneer had superior knowledge and a duty to disclose the one-way freeze and Pioneer's intention to seize the third-party payroll tax funds, but failed to so disclose and as a result Plaintiffs suffered damages.

## V. PIONEER IS LIABLE FOR RICO VIOLATIONS

"To establish a violation of 18 U.S.C. § 1962(c), a plaintiff must establish that a defendant, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in an enterprise, the activities of which affected interstate or foreign commerce." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).

### A. Plaintiffs Will Establish a RICO Enterprise.

A RICO enterprise is defined broadly to include any "individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A RICO enterprise may consist of a formal or informal group of persons, "associated together for a common purpose of engaging in a course of conduct"

which functions as a "continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *see also United States v. Morales*, 185 F.3d 74, 80 (2d Cir. 1999).

At trial, Plaintiffs will present evidence that, from about 2014 through September 4, 2019, Mann, certain of the companies controlled by Mann, and Pioneer were associated with and comprised an "enterprise" within the meaning of 18 U.S.C. § 1961(4) that engaged in acts and activities that affected interstate commerce, including money laundering (the "Enterprise"). The purpose of the Enterprise was to obtain third-party tax and payroll payments from employers throughout the country and to use those third-party tax and payroll funds to cover overdrafts, pay down the ValueWise line of credit, and otherwise to benefit themselves. Documentary evidence demonstrates that Pioneer executives were not only aware that Mann was moving funds from the payroll company accounts to cover overdrafts, but they also encouraged him to do so.

### B. Plaintiffs Will Establish Pioneer's Participation in the Conduct of the Enterprise.

Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c). Initially, Mann conducted the Enterprise's affairs, and from about 2014 until August 30, 2019, Pioneer participated in the Enterprise's affairs by approving Mann's overdrafts and encouraging him to divert the third-party tax funds from the MyPayroll and Cloud Payroll accounts. After August 30, 2019, Pioneer conducted the Enterprise's affairs when it took control of the payroll company accounts and seized the third-party tax funds, and made a number of false and misleading statements to Plaintiffs and others to conceal the Enterprise's actions.

**C. Plaintiffs Will Demonstrate a Pattern of Racketeering Activity.**

"Racketeering activity" is defined in 18 U.S.C. § 1961 with a list of the predicate "acts" and "offenses" that must underlie a RICO claim, including money laundering. A plaintiff seeking to demonstrate a pattern of racketeering activity under 18 U.S.C. § 1962 "must allege (1) at least two predicate acts of racketeering occurring within a ten-year period; (2) that the predicate acts are related to each other; and (3) that the predicate acts amount to or pose a threat of continued criminal activity." *United States Fire Insurance Co. v. United Limousine Service*, 303 F. Supp. 2d 432, 448 (S.D.N.Y. 2004) (citing *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) and *H.J. Inc. v. Nw. Bell*, 492 U.S. 229, 239 (1989)).

The evidence at trial will establish that Mann pled guilty to money laundering based on his diversion of third-party tax funds to cover overdrafts in other business accounts. Beginning in about 2014, Pioneer Vice President David Blessing was not only aware of this activity, but encouraged Mann to "move the money." Over time, other senior officers were also aware of this conduct and condoned it. This activity continued until August 30, 2019, when Pioneer took control of the payroll accounts and knowingly diverted the third-party tax funds and embarked on a series of frauds to hide its illegal activities. Accordingly, the jury will find that Plaintiffs have met the continuity requirement of both a close-ended pattern – that is, criminal conduct extending over a substantial period – and an open-ended pattern, *i.e.*, past criminal conduct coupled with a threat of future criminal activity.

**D. Plaintiffs Will Demonstrate RICO Injury and Proximate Cause.**

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). Plaintiffs will establish at trial that their damages flow directly from Enterprise's decision to implement a one-way freeze of the accounts, thereby

allowing deposits to accumulate in the accounts, and then seize the funds to cover Pioneer's losses and Mann's debts.

## VI. PLAINTIFFS WILL ESTABLISH THEIR RICO CONSPIRACY CLAIM

A claim under 18 U.S.C. § 1962(d) builds on a properly pleaded § 1962(c) claim. To establish a claim for RICO conspiracy, a plaintiff must demonstrate that a defendant agreed to participate in the affairs of a RICO enterprise through a pattern of racketeering activity. *United States v. Yannotti*, 541 F.3d 112, 121–22 (2d Cir. 2008). A plaintiff need not establish that the defendant personally agreed to participate in the management of the enterprise or to commit the predicate acts, or that the conspirator agreed to commit or facilitate each part of the substantive offense. *See Salinas v. United States*, 522 U.S. 52, 63-64 (1997).

The evidence at trial will demonstrate that Pioneer agreed to assist and facilitate Mann's improper diversion of third-party employer tax funds to cover shortfalls in other business accounts controlled by Mann. Mann admitted and pled guilty to money laundering based upon his diversion of third-party tax funds, and the evidence will show that Pioneer was not only aware of Mann's money laundering activities, but actively participated in those activities by approving Mann's frequent overdrafts and encouraging him to move the money from his accounts. These allegations are further supported by the fact that, once Pioneer controlled the Mann entity accounts, it diverted the tax funds to itself and to third parties.

## VII. PIONEER IS LIABLE FOR AIDING AND ABETTING MANN'S CONVERSION AND FRAUD

### A. Pioneer Aided and Abetted Mann's Fraud.

To establish aiding and abetting fraud under New York law, a plaintiff must show "(1) an underlying fraud; (2) the defendant's actual knowledge of the fraud; and (3) the defendant's substantial assistance to the fraud." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d

473, 482 (S.D.N.Y. 2018). Aiding and abetting fraud requires only "a reasonable inference of actual knowledge." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 652 F. Supp. 2d 495, 503 (S.D.N.Y. 2009). The evidence establishes each of these elements.

Plaintiffs will establish at trial, and there can be serious dispute, that Mann committed fraud by inducing employers and NatPay to contract with his payroll companies without disclosing that he intended to misuse the tax funds. Mann testified that he understood that the funds were "entrusted" to his payroll companies for the payment of taxes and should have remained in the payroll accounts until paid. Mann also pled guilty to money laundering under New York State law based on this conduct.

Plaintiffs will further establish that Pioneer had "actual knowledge" of, and "substantially assisted," Mann's fraud. As the Court previously found, evidence in "the form of excerpts from emails, bank statements, and other communications" establishes a "strong inference" that Pioneer had actual knowledge that Mann was improperly using the tax funds to cover overdrafts. Dkt. No. 230 at 30.

**B. Pioneer Aided and Abetted Mann's Conversion.**

The elements of aiding and abetting a conversion are "substantially similar" to the elements of aiding and abetting a fraud, requiring "the existence of a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance." *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009).

Here, Plaintiffs will establish that Mann agreed to and facilitated the one-way freeze of the MyPayroll and Cloud Payroll accounts, which caused third-party funds to accumulate in the accounts, and then the use of the funds for the benefit of Pioneer and Mann, including $3.2 million in third-party tax funds used to pay down the ValueWise line of credit. Plaintiffs will demonstrate

that Pioneer knew about the conversion and provided Mann with substantial assistance in converting the funds.

## VIII. PIONEER CANNOT ESTABLISH ITS COUNTERCLAIMS AGAINST NATPAY AND SWP, OR ITS *IN PARI DELICTO* AND UNCLEAN HANDS DEFENSES

Pioneer's RICO counterclaims and *in pari delicto* and unclean hands affirmative defenses all rest on the same, unsupported allegations. As to NatPay, Pioneer alleges that NatPay ignored certain of its purported policies when contracting with Cloud Payroll in 2017, and ignored certain "red flags" that should have alerted NatPay to Mann's money laundering and bank fraud schemes. However, Pioneer's allegations are predicated on cherry-picked testimony and implausible inferences. Pioneer will not establish a single element of its RICO claims against NatPay, and its *in pari delicto* and unclean hands affirmative defenses will be found similarly deficient.

In support of its RICO and fraud counterclaims and *in pari delicto* and unclean hands defenses, Pioneer alleges that Mann's conduct and knowledge are imputed to SWP. However, under New York law, there is an adverse interest exception to imputation, applicable when a corporate agent totally abandoned the principal's interests and acted entirely for personal or third-party gain. *See Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 468 (2010). The facts at trial will establish that the adverse interest exception to imputation applies because, in using SWP's customers' payroll tax funds to engage in money laundering and other crimes, Mann totally abandoned SWP's interests and acted entirely for his own personal interests. This is particularly true of Mann's actions on and after August 30, 2019, when Mann and Pioneer conspired to use the third-party tax funds belonging to SWP's customers to cover Pioneer's losses and Mann's debts.

SWP will also establish at trial that no one at SWP had any knowledge that Mann was engaged in money laundering, bank fraud, or any other misconduct. The evidence at trial will also establish that SWP made no misrepresentations to Pioneer nor any statements on which Pioneer

could reasonably rely. Accordingly, Pioneer will not establish at trial either its RICO and fraud counterclaims against SWP, or its affirmative defenses of *in pari delicto* and unclean hands.

## EVIDENTIARY ISSUES LIKELY TO ARISE AT TRIAL

The parties are filing motions in limine addressed to multiple evidentiary issues. Plaintiffs seek to preclude the following:

1. Evidence, testimony, and argument in support of Pioneer's Setoff Defense, on the grounds Pioneer knowingly and strategically withdrew it, and pursuant to Federal Rule of Evidence 402, because evidence concerning a withdrawn defense is not relevant;

2. Evidence, testimony, and argument in support of the bank accounts' classification as being determinative of Pioneer's right of setoff on the grounds it is inconsistent with the law, including decisions previously made in this case, and pursuant to Federal Rule of Evidence 401 because it is irrelevant, Rule 403 because such argument would confuse and mislead the jury, and because the argument is contrary to public policy;

3. Evidence, testimony, and argument in support of Pioneer's alter-ego theory of mutuality on the grounds Pioneer did not plead it and did not raise it until summary judgment, and it should be excluded pursuant to Federal Rules of Evidence 401 and 403 because it is legally baseless, irrelevant, and would confuse the jury;

4. Testimony and argument that SWP and NatPay are illegal money transmitters pursuant to Federal Rules of Evidence 401, 402, and 403, because any such testimony and argument would be inadmissible legal conclusions, speculative, irrelevant, and would cause unfair prejudice to Plaintiffs, confuse the jury, and result in mini-trials that would waste time and cause undue delay;

5. Evidence, testimony, and argument regarding the Texas or Illinois Consent Orders pursuant to Federal Rules of Evidence 401, 402, 403, and 408;

6. Testimony or argument that SWP and NatPay owed Pioneer a duty to inform it that third-party payroll tax funds were being deposited into the payroll companies' accounts at Pioneer Bank pursuant to Federal Rules of Evidence 401, 402, and 403, because the existence of a legal duty is a question of law for the Court, the proffered duty is legally nonexistent, and such testimony and argument would confuse and mislead the jury; and

7. Argument that NACHA's decision is conclusive on propriety of Pioneer's one-way freeze on the grounds the decision has no preclusive or binding effect, and pursuant to Rule 403.

## CONCLUSION

For the foregoing reasons and based on the evidence to be presented at trial, Plaintiffs respectfully submit that the jury in this matter will find in favor of Plaintiffs on their claims, and the Court will enter judgment in favor of Plaintiffs and against Defendants.

Dated: September 8, 2026

Respectfully submitted,

JAYNE PETERS MCVICKER BURKE ASKEW & PARKER

*/s/ Andrew C. Jayne*
Andrew C. Jayne (*admitted pro hac vice*)
401 S. Boston Ave., Suite 2000
Tulsa, Oklahoma 74103
Tel: (918) 938-7944
Email: ajayne@jpmlawgroup.com

Michael A. Kornstein, Esq. (103178)
Cooper Erving & Savage LLP
39 North Pearl Street, 4th Floor
Albany, New York 12207
Tel: (518) 449-3900
Email: mkornstein@coopererving.com

*Attorneys for Plaintiff Southwestern Payroll Services, Inc. and Granite Solutions Groupe, Inc.*

GREENBERG TRAURIG, LLP

*/s/ Cynthia Neidl*
Cynthia Neidl (NDNY Bar No. 513737)
54 State Street, 6th Floor
Albany, New York 12207
Tel: (518) 689-1400
Email: neidlc@gtlaw.com;

Roland Garcia (*admitted pro hac vice*)
Jennifer Tomsen (*admitted pro hac vice*)
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Tel: (713) 374-3510
Email: garciar@gtlaw.com
tomsenj@gtlaw.com

*Attorneys for Intervenor-Plaintiff National Payment Corporation*

728313720v3