**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**SOUTHWESTERN PAYROLL SERVICE, INC., and GRANITE SOLUTIONS GROUPE, INC.,**

**Plaintiffs/**
**Counter Defendants,**

**and**

**1:19-CV-1349**
**(MAD/PJE)**

**NATIONAL PAYMENT CORPORATION,**

**Intervenor Plaintiff/**
**Counter Defendant,**

**vs.**

**PIONEER BANCORP, INC., and PIONEER BANK,**

**Defendants/**
**Counterclaimants.**

---

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **COOPER ERVING & SAVAGE LLP**<br>20 Corporate Woods Blvd., Suite 501<br>Albany, New York 12211<br>Attorney for Plaintiffs/Counter Defendants | **MICHAEL A. KORNSTEIN, ESQ.** |
| **JAYNE PETERS MCVICKER**<br>**BURKE ASKEW & PARKER**<br>401 S. Boston Avenue - Suite 2000<br>Tulsa, Oklahoma 74103<br>Attorney for Plaintiffs/Counter Defendants | **ANDREW JAYNE. ESQ.** |
| **GREENBERG TRAURIG, LLP**<br>54 State Street<br>6th Floor<br>Albany, New York 12207<br>Attorneys for Intervenor Plaintiff/ | **CYNTHIA E. NEIDL, ESQ.**<br>**JENNIFER TOMSEN, ESQ.**<br>**KENDYL T. HANKS, ESQ.**<br>**ROLAND GARCIA, ESQ.** |

Counter Defendant
**YOUNG/SOMMER LLC**
500 Federal Street
5th Floor
Troy, New York 12180
Attorney for Intervenor Plaintiff/
Counter Defendant

**JULIE A. YEDOWITZ, ESQ.**

**DLA PIPER LLP (US)**
1251 Avenue of the Americas
Ste 27th Floor
New York, New York 10020
Attorneys for Defendants/
Counterclaimants

**ROBERT J. ALESSI, ESQ.**
**BEN FABENS-LASSEN, ESQ.**
**COURTNEY SALESKI, ESQ.**
**JON MICHAEL REID, ESQ.**
**M. DAVID JOSEFOVITS, ESQ.**
**STEVE M. ROSATO, ESQ.**

**HODGSON, RUSS LAW FIRM**
677 Broadway - Suite 401
Albany, New York 12207
Attorneys for Defendants/
Counterclaimants

**MICHAEL D. ZAHLER, ESQ.**

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

This case is scheduled to proceed to trial on September 28, 2026. Plaintiffs Southwestern Payroll Service, Inc. ("SWP") and Granite Solutions and Intervenor Plaintiff National Payment Corporation ("NatPay") (collectively, "Plaintiffs") have sued Defendants Pioneer Bancorp, Inc. and Pioneer Bank (collectively, "Defendants") for civil fraud and conspiracy related to Defendants' seizure of over approximately $15 million, which allegedly belonged to Plaintiffs' third-party clients for payroll tax purposes. *See* Dkt. No. 245. Defendants deny Plaintiffs' claims and bring numerous counterclaims against Plaintiffs for fraud and conspiracy. *See* Dkt. No. 259. The Court assumes the parties' familiarity with the factual allegations underlying the case and refers the parties to Plaintiffs' third amended complaint, Defendants' answer and cross claims, and

the decision dated August 25, 2025, denying their motions for summary judgment. *See* Dkt. Nos. 245, 259, 393.[1]

Presently before the Court are nine separate motions to exclude expert opinions, also known as *Daubert* motions. *See* Dkt. Nos. 423–32, 442–450. For the reasons that follow, the parties' motions are granted in part and denied in part.

## II. DISCUSSION[2]

### A. Legal Standard

"The admissibility of expert [] testimony is governed by the Federal Rules of Evidence." *Rutledge v. Walgreen Co.*, 182 F.4th 168, 183 (2d Cir. 2026). Rule 702 sets forth the basic tenets for an expert opinion, requiring as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

[1] Plaintiffs also brought claims against Michael T. Mann and companies he partially or fully owned or controlled. Defendants brought cross claims against those same parties. Neither Mann nor his companies have appeared in the action, and they are not parties to the pending motions.

[2] Citations to the parties' filings are to the page numbers generated by CM/ECF in the header of each page.

FED. R. EVID. 702. "This standard requires district courts to look carefully at the qualifications and methodology of each expert." *Rutledge*, 182 F.4th at 184; *see also Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 598 (1993).

"Under Federal Rule of Evidence 703, an expert's opinion may be based on facts or data that are not themselves admissible, so long as 'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.'" *United States v. Ray*, 583 F. Supp. 3d 518, 533 (S.D.N.Y. 2022) (quoting FED. R. EVID. 703). "The expert is not permitted to simply transmit otherwise inadmissible facts to the jury but 'must form his own opinions by "applying his extensive experience and a reliable methodology" to the inadmissible materials.'" *Id.* (quoting *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008)) (additional citation omitted). "'[I]f the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.'" *Id.* (quoting FED. R. EVID. 703).

Further, "experts in civil cases may, while providing otherwise appropriate expert opinions, speak to mental states, [and] provide ultimate-issue opinions . . . ." *Waldman v. Palestine Liberation Org.*, 171 F.4th 575, 597 (2d Cir. 2026). "Federal Rule of Evidence 704(a) provides that '[a]n opinion is not objectionable just because it embraces an ultimate issue.'" *Id.* "Rule 704(b) adds a caveat for opinions about mental states in criminal cases, but that 'exception does not apply in civil cases.'" *Id.* (quoting *Diaz v. United States*, 602 U.S. 526, 534 (2024)).

"'The law assigns district courts a "gatekeeping" role in ensuring that expert testimony satisfies the requirements of Rule 702.'" *Id.* (quoting *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011)). "'To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject

matter of the proffered testimony.'" *Rutledge*, 182 F.4th at 184 (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)). "'Experts need not conduct studies of their own in order to opine on a topic; a review of other studies and scientific literature can be enough to qualify experts to testify and to make that proposed testimony reliable.'" *Id.* (quoting *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016)).

"To determine reliability, the district court may consider whether the expert's theory or technique can and has been tested; whether it has been subjected to peer review and publication; whether it has a known error rate or standards to control its operation; and its general acceptance in the relevant scientific community." *Id.* (citation omitted). "The objective of this gatekeeping requirement is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "'In deciding whether a[n] . . . expert's analysis is []reliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'" *Id.* (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)) (alteration in original).

"While the focus of [a] court's *Daubert* inquiry should be 'on principles and methodology, not on the conclusions that they generate,' . . . 'conclusions and methodology are not entirely distinct from one another . . . .'" *Id.* (citations omitted). "Accordingly, 'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is

connected to existing data only by the *ipse dixit* of the expert.'" *Id.* (citation omitted).[3] "Consequently, 'when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.'" *Id.* (quoting *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005)).

"As the Rules Committee has explained, '[i]t will often occur that experts come to different conclusions based on contested sets of facts. Where that is so[, Rule 702] does not necessarily require exclusion of either side's experts.'" *Id.* at 184-85 (quoting FED. R. CIV. P. 702 committee note to 2023 amendment) (alterations in original). "That is because a party 'do[es] not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable.'" *Id.* (citation omitted). "The evidentiary standard of reliability is lower than the merits standard of correctness." *Id.* (citation and quotation marks omitted).

"In deciding whether expert testimony will be helpful to the fact-finder, the Court must determine whether the testimony 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) (quoting *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)). "While an expert 'may opine on an issue of fact within the jury's province,' an expert 'may not give testimony stating ultimate legal conclusions

[3] "*Ipse dixit* is a Latin term that translates to 'he himself said it.' In legal contexts, it refers to an assertion or statement made by an individual based solely on their own authority, without any supporting evidence or proof. It is often used to criticize arguments or claims that rely solely on the speaker's authority, rather than objective evidence or reasoning." *Ipse Dixit*, Legal Information Institution, Cornell Law School, https://www.law.cornell.edu/wex/ipse_dixit, (last visited Sept. 2, 2026).

based on those facts.'" *Id.* (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)). "Relatedly, no expert may 'supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence.'" *Id.* (quoting *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001)). In other words, "'[a]n expert should not be permitted to express an opinion that is merely an interpretation of federal statutes or regulations, as that is the sole province of the Court.'" *Jones v. Midland Funding, LLC*, 616 F. Supp. 2d 224, 227 (D. Conn. 2009) (citation omitted); *see United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000). Additionally, "'[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony.'" *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2022 WL 15044626, *16 (E.D.N.Y. Oct. 26, 2022) (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)). "'Experts may, however, offer testimony discussing "ordinary practices and usages" in a particular industry.'" *Id.* (quoting *Scott*, 315 F.R.D. at 46).

Finally, "'[t]he scope of a rebuttal is limited to the same subject matter encompassed in the opposing party's expert report, but district courts have been reluctant to narrowly construe the phrase same subject matter beyond its plain language.'" *Liberty Mut. Ins. Co. v. Day to Day Imports Inc.*, No. 22-CV-2181, 2025 WL 2117897, *7 (S.D.N.Y. July 29, 2025), *on reconsideration in part*, 2025 WL 2531478 (S.D.N.Y. Sept. 3, 2025) (quoting *Scott*, 315 F.R.D. at 44). "[R]ebuttal reports 'must meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology and relevance of the testimony.'" *Id.* (citation omitted). "Like any expert report, rebuttal reports may not usurp the court's role in instructing the jury on the law." *Id.* (citing *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, No. 17-CV-1789, 2019 WL 1304452, *3-4 (S.D.N.Y. Mar. 21, 2019)). "'Nor may the rebuttal expert witness

usurp the role of the trial court to act as gatekeepers to ensure the relevance and reliability of all expert testimony.'" *Id.* (quoting *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 139 (S.D.N.Y. 2022)).

"A rebuttal report could be excluded while the initial report is admitted, . . . or a rebuttal report may be admitted while the initial report is excluded[.]" *Id.* (citing *City of New York v. FedEx Ground Package Sys., Inc.*, No. 13-CV-9173, 2018 WL 4961455, *5 (S.D.N.Y. Oct. 15, 2018); *Allen v. Koenigsmann*, No. 19-CV-8173, 2023 WL 11803060, *6 (S.D.N.Y. Mar. 30, 2023)). "However, because rebuttal reports often involve similar opinions from the same experts and face very similar requirements, they often meet the same or nearly the same fate as the initial report from the corresponding expert." *Id.* (citation omitted).

"[W]hile '[a] rebuttal expert report is not the proper place for presenting new legal arguments, unless presenting those arguments is substantially justified and causes no prejudice,' . . . '[r]ebuttal evidence is properly admissible when it will explain, repel, counteract or disprove the evidence of the adverse party[.]'" *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 354 (S.D.N.Y. 2023) (quoting *Ebbert v. Nassau Cnty.*, No. 05-CV-5445, 2008 WL 4443238, *13 (E.D.N.Y. Sept. 26, 2008); *Scott*, 315 F.R.D. at 44). "'[A] rebuttal expert need not use the same methodology as the affirmative expert to stay within the "same subject matter."'" *Id.* (citation omitted).

**B. Analysis**

***1. Individual Experts***

***a. David Payne***

David Payne was retained by Plaintiffs "to evaluate and consider the financial results subsequent to April 30, 2021[.]" Dkt. No. 423-4 at 4. He engaged in an "[a]ssessment of the

revenues, operating costs and net profits . . . available to [SWP] both prior and subsequent to the alleged wrongful acts of" Defendants. *Id.* at 3. He identified "customer tax funds . . . affected by the alleged wrongful acts" and assessed "customer composition and retention . . . both prior to and subsequrnt to the alleged wrongful acts." *Id.* Payne opines on "the actual and projected economic results and profits" of SWP as well as SWP's damages as a result of Defendants' alleged wrongdoing. *Id.* He concludes that SWP lost approximately $1.5 million in profits as a result of Defendants' conduct. *See id.* at 9. Payne states that SWP's business loss value is approximately $1,770,000. *See id.* at 10-11.

Defendants seek to exclude Payne's opinion, arguing that his accounting background is insufficient to permit him to testify about payroll accounts, he inappropriately relies on hearsay and evaluates the credibility of witnesses to support his opinions, and he failed to consider alternative explanations for why SWP lost clients. *See* Dkt. No. 423-1 at 6-7.

Plaintiffs argue that Payne is well-qualified to testify about the value of businesses because of this thirty-five years of experience in the accounting industry, and that "[c]onsistent with well-established valuation methodology employed in cases where there has been financial harm to a company, Mr. Payne calculated damages Southwestern Payroll may be entitled to through the 'but for' method, looking at the resulting diminution in value of Southwestern Payroll that could be contributed to Pioneer's wrongful actions." Dkt. No. 446 at 5.

The Court agrees that Payne is qualified to testify about a company's valuation and damages. The Court also agrees that his opinion rests on questionable proper methodology. The Court will not permit him to present his opinions to the jury unless he can lay a proper foundation.

It is appropriate for an expert to assume certain facts and conclusions in calculating damages, such as who is at fault. *See AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d

273, 331 (N.D.N.Y. 2021) ("[A]s an expert on causation and damages rather than liability, it was appropriate for [the expert] to do what he did here, *i.e.* assume a finding that [the defendants] adopted a coercive tying policy, and then perform an analysis of the separate question of whether that coercive policy actually caused [the plaintiff] to lose any [] sales that it otherwise would have made"). However, Payne does not discuss only the amount of SWP's damages as a result of Defendant's alleged wrongdoing. He opines that because of Defendant's presumed wrongdoing, SWP clients stopped working with SWP, and then calculates SWP's losses as a result. Payne has not provided any support for his conclusions that the loss of SWP's clientele was because of Defendants' conduct. *See AngioDynamics*, 537 F. Supp. 3d at 331 (excluding the expert's damages opinion "because it does little more than summarize record evidence (including sales and market share data and documents produced in this litigation) and lend [] expert credentials to [the plaintiff's] interpretation of that evidence. Dr. Frankel offers no specialized economic analysis that would assist a fact-finder in interpreting the record evidence he relies on").

For example, Payne explains in his report that "[t]he 'but for' analysis consisted of estimating the Company's income generating capacity assuming that the alleged wrongful acts had not occurred." Dkt. No. 423-4 at 8. However, as Defendants point out, that calculation assumes that SWP lost clients only because of Defendants' conduct, and that had Defendants' conduct not occurred, SWP would never have lost a single client. *See* Dkt. No. 423-1 at 24-25.

Plaintiffs argue in their response that "Payne considered a plethora of records and documents that go beyond just conversations with Southwestern Payroll's president and receiver. Overall, Mr. Payne's report lists eighty-seven categories of documents and data considered in forming his opinions . . . ." Dkt. No. 446 at 9. It is true that Payne reviewed a plethora of information, including third-party client engagement records, financial agreements, escrow

account statements, tax returns, income statements, and transaction reports. *See* Dkt. No. 423-4 at 14-15. However, none of that information provides Payne with evidence supporting his assumption that SWP lost some of its clients because of Defendants' conduct.

During his deposition, Defendants' counsel stated that it appeared Payne did not "look at whether clients may have left because they felt that [SWP] had done something wrong." Dkt. No. 423-3 at 48. Payne responded that he relied on "what the plaintiff asserts." Dkt. No. 423-3 at 48-49 (emphasis added). Defendants' attorney asked, "Am I correct that you are relying on the assertions of Southwestern Payroll in stating in this report this causal link between actions of Pioneer and loss of business for Southwestern Payroll?" *Id.* at 49. Payne stated in response that in many of his fiduciary duties, if he "had funds on deposit" that were frozen, he "would seriously consider and probable move [his] account" but that he is "relying on the plaintiff." *Id.* at 49-50. He then testified that Plaintiffs "listed" the account that "they claim were lost because of" Defendants' actions. *Id.* at 50.

Plaintiffs argue that "[i]t does not convert the expert into an impermissible hearsay conduit so long as the expert applies independent expertise to the material relied upon, rather than simply repeating an unverified conclusion." Dkt. No. 446 at 12-13. However, the latter appears to be what Payne has done; he has repeated an unverified conclusion. SWP concluded that specific clients stopped working with SWP because of Defendants' conduct. They listed those clients in a report, gave that report to Payne, and asked Payne to provide an opinion about the amount of money SWP lost from those clients leaving. That is not, by itself, permissible expert testimony. *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002) (excluding expert testimony because "[t]o permit Fashion Boutique to present evidence of the

value of the entire business in the absence of evidence of widespread dissemination would invite the jury to award damages based on speculation").

Plaintiffs compare Pioneer's arguments about Payne to their own objections to one of Defendants' damages experts, Scott Carnahan. First, SWP did not make a motion to exclude Carnahan as an expert witness. Second, Carnaharn's assumptions appear to be based on the amount of money Defendants issued to Michael Mann and the entities he owned as lines of credit. *See* Dkt. No. 446-3. Those assumptions do not require Carnahan to rely on Pioneer's statements regarding third parties' reasons for taking certain actions. Rather, Carnahan's report assumes only that SWP and NatPay knew about Mann's fraud, making them liable to Pioneer for the amount of money Mann drew down as lines of credit from Pioneer and never repaid. Plaintiffs are, of course, permitted to cross-examine Carnahan about his conclusions at trial, but Plaintiffs' arguments do not save the errors identified in Payne's opinion. Rather, the Court will not permit Payne to testify unless Plaintiffs present appropriate foundation for the conclusions that certain third-party clients stopped working with SWP because of Defendants' actions.

***b. Joseph Sova and Daniel Wood***

Joseph Sova has been offered by Plaintiffs as a rebuttal expert to Defendants' experts, Nicholas Pirrung and Daniel Wood. Because Sova is proffered as a rebuttal expert, the Court will address Pirrung and Wood, first. Plaintiffs have not moved to preclude Pirrung from testifying or sought exclusion of any portion of his report. They do, however, move to exclude Wood's opinions. *See* Dkt. No. 429-4.

Wood is a licensed attorney who worked as an assistant attorney general at the Texas Department of Banking on matters concerning money services businesses, including money transmitters. *See* Dkt. No. 429-2 at 3. Subsequently, and to today, he has been practicing at a law

firm where he advises "businesses with respect to the regulation of [money services businesses], including money transmitters under both state and federal law." *Id.* Wood was retained by Defendants "to develop an opinion and prepare this report with respect to the question of whether [SWP, NatPay, Cloud Payroll, and/or MyPayroll] were required to be licensed as a money transmitter by any state regulatory authorities pursuant to relevant state laws." *Id.* at 4. After reviewing and discussing the laws of Arkansas, Connecticut, Idaho, Oklahoma, and Texas, Wood opines that "each of the Mann Payroll Companies was required to obtain and maintain at least one state money transmission license during the relevant time period based on the payroll activities described herein." *Id.* at 27.

Plaintiffs move to exclude Wood's testimony, arguing that his opinion is an improper legal conclusion which "rests on an unreliable foundation that would not be helpful to the jury . . . ." Dkt. No. 429-4 at 6-7. Specifically, Plaintiffs contend Wood cannot explain to the jury what the law requires regarding money transmitters nor can he conclude that Plaintiffs meet those legal definitions. Plaintiffs also argue that Wood's opinion is irrelevant because he "ignored the one relevant state—New York." *Id.* at 15 (emphasis omitted). Plaintiffs state that "Wood's opinion about Plaintiffs' licensure status in random states is not relevant because it is neither sufficiently tied or the facts of the case nor consequence in determining the action." *Id.* Plaintiffs emphasize that "Wood has regulatory experience in exactly one state—Texas . . . ." *Id.* at 16 (emphasis omitted). They assert that this means "Wood is in no way qualified to speak generally about 'state money transmission laws' or specifically about the laws of states where he has neither practiced as a lawyer, is not licensed as a lawyer, nor has ever been employed." *Id.* at 17.

Defendants argue in response that (1) Wood is qualified to testify about money transmitters because of his years of experience in the banking industry dealing directly with

money transmission; (2) he is allowed to testify about a complex issue that is not common knowledge; and (3) New York is not the only relevant state. *See* Dkt. No. 442.

Defendants have a counterclaim against Plaintiffs for a civil RICO claim. *See* Dkt. Nos. 259, 332. Defendants allege that "[t]he numerous acts of financial institution/bank fraud, wire fraud, and operating as illegal money transmitting businesses set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5)." *Id.* at ¶ 230.

In their summary judgment motion, Defendants argued that "[e]ven were the Court to find a factual dispute as to whether the exception applies to Mann's conduct, SWP's felonious operation as an unlicensed money transmitter and Alred's intentional concealment of information about its handling of employer-client funds alone warrant application of the *in pari delicto* doctrine[4] []." Dkt. No. 341-1 at 19 n.2. Therefore, pursuant to Defendants' theory of the case, they cannot be held liable for the harm alleged by Plaintiffs because Plaintiffs are "money transmitters" but failed to have a "money transmitter" license, which is illegal.

In Judge Scullin's summary judgment decision from August of 2025, he explained that "Defendant Pioneer [] asserts that separate, unconnected, alleged misconduct by Plaintiff Southwestern Payroll alone warrants the application of the *in pari delicto* doctrine []." Dkt. No. 393 at 9 n.8 (citation omitted). Judge Scullin noted that "Defendant Pioneer argues that Plaintiff Southwestern Payroll conducted business feloniously by operating as an unlicensed money

---

[4] "The doctrine of *in pari delicto*, a term meaning 'of equal fault,' reflects the principle that a plaintiff who has participated in wrongdoing equally with another person may not recover from that other person damages resulting from the wrongdoing." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 160 (2d Cir. 2014). "Not only must the plaintiff 'be an active, voluntary participant in the unlawful activity that is the subject of the suit,' but it is necessary that 'the degrees of fault [be] essentially indistinguishable or the plaintiff's responsibility [be] clearly greater.'" *Id.* (citation omitted).

transmitter and, through its representative [Jeffery Darin] Alred,[5] intentionally concealed information." *Id.* Additionally, "Defendant Pioneer argues that Intervenor Plaintiff NatPay conducted business feloniously by operating as an unlicensed money transmitter and, through its business relationship with Defendant Mann, assisted in Defendant Mann's fraud." *Id.* at 23. And "Intervenor-Plaintiff NatPay argues that these assertions of wrongful conduct in operating business with Defendant Mann are disputed, and Defendant Pioneer's claim that NatPay operated as an unlicensed money transmitter is irrelevant." *Id.* Judge Scullin found "that there remains an issue of fact as to whether Intervenor-Plaintiff NatPay's conduct triggers the doctrine of *in pari delicto* and bars Intervenor-Plaintiff NatPay's claims." *Id.*

To permit an expert to tell the jury that Plaintiffs meet the legal definition of "money transmitter" would usurp the jury's role. *See In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126, 2020 WL 5849142, *13 (S.D.N.Y. Sept. 30, 2020) ("Mr. Marshall is not testifying that Defendants' conduct was not a 'bona fide hedging transaction' within the definition of CFTC regulations; but instead he is commenting on whether Defendants' market actions resemble those of a hedger or speculator. Such expert commentary is admissible").

That does not mean that Wood must be entirely precluded from testifying. The concept of a "money transmitter" and the existence of licensing requirements is not a subject matter that is commonly known. It will aid the jury to hear testimony explaining the concept of money transmission, but the Court will not permit Wood to go so far as to conclude that SWP meets the legal definition of a "money transmitter." Wood may testify to, and be questioned about, whether the federal government and certain states require a money transmitter to be licensed. He may also

---

[5] Alred was the sole owner of SWP prior to Mann's purchase of 51% of SWP's outstanding stock in 2017. *See* Dkt. No. 245 at ¶¶ 82-83.

testify as to whether SWP or NatPay were licensed as such. The Court will not permit Wood to testify about what the laws in various states require and whether NatPay or SWP meet those various states' legal requirements. The Court is the sole instructor on the law, and the jury must decide whether the evidence meets the law given by the Court.

Because the Court is excluding Wood's testimony insofar as he opines that Plaintiffs are is "money transmitters," SWP's rebuttal witness, Sova, will not be permitted to testify to the contrary.

As to Sova, the Court recognizes Defendants many other challenges to his testimony and finds that most of them are better suited for cross examination. Defendants move to exclude Sova's opinion because it is outside the scope of proper rebuttal testimony and he is not otherwise qualified to give opinions about industry practices/standards. *See* Dkt. No. 424-1. Plaintiffs disagree, arguing that Sova's personal experience owning and operating a payroll company makes him qualified to testify about industry standards and practices. *See* Dkt. No. 445. Plaintiffs also contend Sova's opinions are directly responsive to Pirrung and Wood's opinions. *See id.*[6]

Sova's report lacks proper foundation in some respects. It is true that:

> [n]othing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."

*Beede v. Stiefel Lab'ys, Inc.*, No. 1:13-CV-120, 2016 WL 916418, *21 (N.D.N.Y. Mar. 7, 2016) (quoting Advisory Committee Notes to Rule 702).

---

[6] Defendants also seek to preclude Sova's opinion to the extent Sova addresses Pioneer's state of mind. Because this argument is raised in multiple motions currently before the Court, the Court addresses it at the end of this Memorandum-Decision and Order.

Sova explains his experience and background as being involved "in the payroll industry since 2003 . . . ." Dkt. No. 424-4 at 3. Between 2003 and 2005, Sova "worked in an operational role gathering tax data and managing accounts for a Professional Employer Organization []." *Id.* "From 2005-2011, [he] worked for Paychex, one of the largest payroll processing companies in the world. [He] worked at Paychex in a sales capacity, earning multiple national, regional, and district awards for performance." *Id.*

Sova then owned and operated his own payroll service company between 2011 and 2023 called ANLU LLC d/b/a Ideal Payroll Service. *See id.* Sova explained as follows:

> I started my company with zero clients, zero employees, and zero revenue. I grew this company to a team that serviced hundreds of clients and tens of thousands of client employees annually. I was deeply involved in every aspect from operations, tax, sales, vendor choice, daily ACH processing, and more. I merged our company with a larger provider in mid 2023. I have experienced the entire lifecycle of a payroll service bureau from starting at zero to a successful exit.

*Id.* Sova utilized Intervenor-Plaintiff NatPay as one of his ACH vendors. His "company had almost daily interaction with the NatPay team." *Id.*

Sova noted that he has "been a part of a number of payroll industry peer groups, attended payroll educational events, and attended payroll conferences. As a payroll service bureau owner, [he] kept up to date on current topics and important changes in the payroll and payroll tax landscape." *Id.* at 3-4. Sova states that he is "an expert covering topics in payroll, payroll tax, human resources, [professional employer organizations], small business, management, leadership, communication, and entrepreneurship," has "consulted and trained small business owners on topics including sales, operations, [and] leadership" and is "an award-winning Entrepreneur and Board Certified Business Success Coach." *Id.* at 4.

As the Court has already concluded that Wood, and in turn Sova, cannot testify as to whether SWP and NatPay were money transmitters who required licensure in specific states, the Court will focus this portion of its review of Sova's rebuttal to Pirrung's report.

Sova provided five opinions to rebut Pirrung. Again, SWP did not move to exclude Pirrung as an expert. Sova opines: (1) "[t]here were multiple legitimate business reasons for SWP and NatPay to process payroll tax funds in the manner they did and in doing so reduced risks for both companies"; (2) "[i]t was a normal business practice for SWP to use its parent company, Cloud Payroll, to process payroll tax, and the existence or non-existence of a shared services agreement has nothing to do with what transpired between Mann and Pioneer"; (3) "SWP and NatPay did not 'enable' Mann’s fraud"; (4) "SWP exercised appropriate due diligence before selling controlling interest to Cloud Payroll"; and (5) "[t]here were multiple legitimate reasons for SWP and Natpay to handle ACH transactions the way they did. Doing so in this case actually reduced their risk." Dkt. No. 424-4.

Some of these opinions are subject to cross examination, while others will not be permitted to go before the jury. As to the first opinion, Sova discusses whether it was appropriate for SWP to use two different ACH processes for payroll and payroll tax funds. *See id.* at 6. Sova states, *inter alia*, that "[u]sing two vendors is common in business and especially in payroll," "fraud is a very real concern in any business"; "[h]aving one ACH provider responsible for both payroll funds and tax funds is a larger risk than having a provider for each function"; and "SWP is only here today because it did not use Cachet as its sole vendor to move payroll funds and payroll tax funds." *Id.* at 8.

Sova does not appear to provide support for these assertions. He does not explain whether he knows these things based on the time he ran his own company or whether he knew of other

companies that did similar things, nor does he explain how he opines that the "only" reason SWP did not go out of business is because it used more than one ACH processor. Although Sova worked for a payroll company other than his own for six years, he worked there in a sales capacity. *See* Dkt. No. 424-4 at 3. He does not explain what that experience taught him that would apply to his opinions for this case.

As Defendants point out in their motion, Sova testified during his deposition that he did *not* use separate vendors for processing payroll and payroll tax for his own company, like SWP did. *See* Dkt. No. 424-1 at 18 (citing 205:3-25). In his opinion, Sova discusses how "[t]he use of Prosperity Bank to ACH money from employer clients before NatPay moved the money to its home bank (First Premier) and ultimately to Pioneer made business sense given the dynamics of Mann purchasing SWP." Dkt. No. 424-4 at 8. In doing so, he explains that Alred, SWP's partial owner, "believed" "it was important to utilize a local bank to maintain a local feel with his clients," "that by initializing the ACH transactions from the same local bank he had utilized in the past, [Alred] could maintain the local connection with many of his clients" and "that having Prosperity Bank initiate the payroll and payroll tax transactions actually gave [Alred] some oversight and the ability to deal with payroll tax issues that arise directly with the client by having immediate access to Prosperity Bank accounts." *Id.*

"Although the Rules permit experts some leeway with respect to hearsay evidence, . . . 'a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.'" *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (quoting *Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 666 (S.D.N.Y. 2007)); *see* FED. R. CIV. P. 703. "The appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those

events." *Id.* "And the jobs of judging these witnesses' credibility and drawing inferences from their testimony belong to the factfinder." *Id.* (citing *Nimely v. City of New York*, 414 F.3d 381, 397-98 (2d Cir. 2005)). The Court finds that Sova's opinions related to Alred's statements and beliefs about SWP is a step too far. Plaintiffs do not explain why Alred cannot himself testify before the jury about why he took certain steps or made specific choices with respect to running SWP.

Sova also opines that "[p]ayroll and payroll tax processing for payroll companies the size of the ones owned or controlled by Mann in this case require near daily communication with the bank to check balances, make wires, or correct problems." Dkt. No. 424-4 at 9. He stated, "[i]n fact, it requires so much interaction with the bank that it would be virtually impossible for the bank not to know that payroll and payroll tax was being housed at the bank." *Id.* at 9.

Sova does not provide an explanation for how he knows about "payroll companies the size of the ones owned or controlled by Mann in this case." He does not cite or reference any outside information. He never mentions working with companies of that size, or whether his own company was of a similar size.

Sova then states, among many other things, that "Pioneer not only froze and took SWP's employer client payroll tax funds, it froze and took the payroll funds of employer clients of MyPayrollHR and ProData." *Id.* Sova has not presented a sufficient foundation for his opinion that the funds in the accounts belonged solely to SWP's third-party clients.

These same issues persist throughout Sova's second through fifth opinions. For example, he states that "I do not see how a shared services agreement would have prevented the movement of payroll tax funds to cover overdrafts in other accounts or Pioneer's decision

to take the payroll tax funds to cover Mann's bounced checks in other accounts," *id.* at 11; and "based on my experience in the payroll industry, I do not know of any industry practice that requires separate payroll tax accounts for SWP, ProData, and MyPayrollHR, when each of those companies are majority owned by Cloud Payroll," *id.* at 13. Sova asserts that "[i]t makes perfect since that when one company owns controlling interest in multiple payroll service bureaus and has a centralized tax office, the payroll tax funds flow into one tax account for all of three of the payroll tax bureaus." *Id.*

Sova does not explain what experiences give him such knowledge. He provides no examples, references no personal experiences, and relies on no outside sources of information. Sova does explain that he has "gone through the process of selling a payroll company," which SWP did when Mann bought a controlling share. *Id.* However, Defendants accurately note that during Sova's deposition testimony, he stated that his selling experience was different than SWP's experience because Sova's "sale was to a large organization as an asset sale. So it was very different than selling to an individual a percent of my business in a stock sale. So different scenario." Dkt. No. 424-1 at 23 (quoting Dkt. No. 424-5 at 267).

Nevertheless, Sova did own and run his own payroll company for twelve years. Where Defendants believe there are gaps in his knowledge and opinions based on his experience, or lack thereof, they may cross-examine him about that.

Insofar as Sova's opinion about SWP's sale to Mann states what Alred did or believed at the time of the sale, *see* Dkt. No. 424-4 at 13 ("Alred did not see any red flags when he was dealing with Mann about the sale of 51% of SWP"), Plaintiffs do not explain why Alred cannot testify to that himself or why it must be stated through an expert witness.

In Sova's fifth opinion, he explains that he "used NatPay for 12 years with my own company and can say they performed more due diligence on new clients we brought on than any other vendor I experienced." *Id.* at 15. Sova states NatPay "regularly had questions asking for new client details or provided information on potential fraud alerts. It was quite impressive given the volume of transactions that run through their system daily." *Id.* Sova opined, "[b]ased on my experience, training, and expertise, the due diligence I experienced from NatPay was the best in the industry." *Id.* at 15. Sova does not explain if he ever worked with other vendors besides NatPay. Sova states only that he "used NatPay as one of [his] ACH vendors of choice for the entire length of [the] business." Dkt. No. 424-4 at 3. He does not explain how he knows NatPay is the "best." *Id.* at 15. Therefore, this opinion will not be permitted.

In sum, Defendants' motion to exclude Sova is granted to the extent outlined herein, and Plaintiffs' motion to exclude Wood is granted in part and denied in part.

***c. James Kreig and Bryant Moravek***

Defendants have proffered James Kreig as an expert "to help the jury understand the technical banking mechanics at the center of this case and to explain why Pioneer's conduct was consistent with standard industry practice." Dkt. No. 443 at 5.

Plaintiffs move to exclude Kreig's testimony. *See* Dkt. No. 428. Plaintiffs concede that Kreig is qualified to provide testimony about banking industry practices and procedures, but they argue that his opinions are inappropriate legal conclusions which invade the Court and the jury's roles. *See id.* at 6.

Plaintiffs argue that the following opinions from Kreig are legal conclusions that should be precluded:

> The Pioneer Bank deposit accounts at issue were unrestricted demand deposit or checking accounts, not special deposit accounts or fiduciary accounts. . . .
>
> [A]ll deposits into the accounts of the Mann Entities at Pioneer Bank became the property of Pioneer Bank, regardless of whether certain deposits were intended by some for payment of tax obligations . . . .
>
> [T]he third parties that caused funds to be deposited into the Cloud Payroll account at Pioneer Bank did not retain any possessory interest in those funds after they were transferred. Pioneer Bank had no obligation or business reason to review the details of the transactions in the accounts of Mann's payroll companies. . . .
>
> Pioneer Bank's provision of Remote Deposit Capture privileges to Mann's companies was appropriate. . . .
>
> Pioneer Bank's exercise of the contractual and statutory right of setoff or overdraft recovery was consistent with commonly accepted practices in the banking industry.
>
> Pioneer Bank properly treated the accounts of the Mann Entities as belonging to a single entity for purposes of setoff because the Mann Entities operated as a common enterprise. . . .
>
> Pioneer Bank's decision to accept deposits into the Cloud Payroll account while blocking withdrawals was consistent with the standard practice in the banking industry for freezing or restricting use of an account, and it had no obligation to investigate the source of the funds that were being deposited before performing setoff or chargeback.

Dkt. No. 428 at 10-17. To support their argument to exclude Kreig, Plaintiffs cite a case from the Middle District of Florida wherein a district court judge "rebuffed Kreig's testimony." Dkt. No. 428 at 17. In *W. Wyvern Cap. Invs. LLC v. Bank of America, N.A.*, No. 8:22-CV-191 (M.D. Fl.), the district judge denied as moot a motion to exclude Kreig as an expert witness because the judge granted summary judgment. *See* Dkt. Nos. 163, 164. However, in granting summary judgment, the court noted that Kreig's opinion included "numerous inappropriate legal conclusions," was

"unreliable," and included a "baseless" opinion that no reasonable fraud investigation should take more than 60 days. Dkt. No. 163 at 25-26.

Plaintiffs proffer Bryant Moravek as a rebuttal witness to Kreig. Moravek rebutted each of Kreig's eight opinions regarding general and special accounts, remote deposit, and the setoff. *See* Dkt. No. 425-3. Defendants move to preclude Moravek from testifying because his opinion exceeds the scope of his expertise and he does not review or consider the New York banking framework. *See* Dkt. No. 425-1 at 6-7.[7]

Judge Scullin explained in his decision denying the parties' motions for summary judgment, that a key "issue of material fact, that a jury and not this Court must answer, is whether, at the time that the subject accounts were created, and the subject funds were deposited in them, Defendant Pioneer knew, or should have known, that the funds were not general deposits." Dkt. No. 393 at 13. Because there were disputes of fact, Judge Scullin concluded he could not "hold as a matter of law that the subject accounts were general accounts and that, therefore, the funds deposited into those accounts became the property of Defendant Pioneer as soon as they were deposited into those accounts." *Id.* at 14. Judge Scullin noted that "[t]here remain numerous issues of fact, mainly regarding the parties' intent in creating and depositing the funds, that a jury must resolve in order to determine whether the accounts were general accounts." *Id.*

"'[T]he distinction between fact and legal conclusions . . . is extremely fine and courts faced with determining whether an expert's opinion goes too far are often forced to recite a slew of case law in an attempt to determine where the line should be drawn.'" *Town of Halfmoon v. Gen. Elec. Co.*, No. 1:09-CV-228, 2016 WL 866343, *16 (N.D.N.Y. Mar. 3, 2016) (quoting *TC*

[7] Defendants also argue that Moravek should not be permitted to testify about what Pioneer was aware of or should have known. That argument is addressed in tandem with other motions later in this decision.

*Sys. Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 181 (N.D.N.Y. 2022)). "But the mere fact that an expert's opinion is based on criteria delineated by the applicable law does not transmogrify it into a legal conclusion." *Id.*

The Second Circuit has provided an example of this balancing test, noting that "telling the jury that a defendant acted as a 'steerer' or participated in a narcotics transaction differs from opining that the defendant 'possessed narcotics, to wit, heroin, with the intent to sell,' or 'aided and abetted the possession of heroin with intent to sell[.]'" *United States v. Scop*, 846 F.2d 135, 142 (2d Cir.), *on reh'g*, 856 F.2d 5 (2d Cir. 1988). Courts have permitted testimony as to whether "investor were 'misled,'" and "that 'retail customers who buy securities from broker dealers have a reasonable expectation that the prices they pay for securities are determined by the economic forces of supply and demand'" because "these factual conclusions [do not use] language from the regulations that the defendants are alleged to have violated." *S.E.C. v. U.S. Env't, Inc.*, No. 94-CV-6608, 2002 WL 31323832, *5 (S.D.N.Y. Oct. 16, 2002); *see also In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126, 2020 WL 5849142, *13 (S.D.N.Y. Sept. 30, 2020) ("Mr. Marshall is not testifying that Defendants' conduct was not a 'bona fide hedging transaction' within the definition of CFTC regulations; but instead he is commenting on whether Defendants' market actions resemble those of a hedger or speculator")

Testimony concerning whether the Mann accounts were general or special deposit accounts and the propriety of Defendants' setoff rests on the fine line between an impermissible legal conclusion and a permissible expert opinion. It is up to the jury to decide if Defendants knew or should have known that the bank accounts were intended as special use accounts. However, it is appropriate for an expert to explain to a jury what general and special deposit accounts are, how the banking industry treats those accounts, and whether, in their expert

opinions, the accounts at issue were being treated as general or special. However, who maintained property rights over the money in those accounts is a legal conclusion reserved for the jury. See *In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126, 2020 WL 5849142, *13 (S.D.N.Y. Sept. 30, 2020) (concluding that an expert could present his "market observations" to the jury and "testif[y] to the effect of Defendants' conduct on the market and whether that effect was, in his view, normal" but could not "testify to [the d]efendants' state of mind when they made certain business decisions"). It is up to the lawyers to present their arguments to the jury that the parties knew the accounts were either general or special and that money in those accounts did or did not belong to Defendants.

In his rebuttal report, Moravek opines that "Mr. Kreig's suggestion that deposit accounts are categorized as "general and special" is erroneous." Dkt. No. 425-3 at 20. Moravek states that "Pioneer Bank's exercise of setoff or chargeback was incompatible with generally accepted banking practices." *Id.* at 21. In defining what constitutes a "special deposit account," Moravek cites Keyes v. Paducah & I. R. Co., 61 F.2d 611 (6th Cir. Ky. 1932) and 25 C F R § 115.002). *See id.* As with Kreig, it is not appropriate for Moravek to opine that specific conduct by the parties meets the legal definition of a special deposit account.

It is within Kreig and Moravek's roles as experts to explain what, if anything, that occurred is outside ordinary industry practices. For the stated reasons, the Court will permit opinions on these issues, and Moravek's related rebuttals, to be presented to the jury with these limitations in place. Likewise, Kreig's opinions about Defendants' obligation to review bank account transactions and decision to grant Mann remote deposit privileges address industry standards and practices around those two issues. The Court finds that these opinions do not take

over the jury's role such that they can be presented to the jury. In turn, Moravek may rebut those opinions.

Kreig's opinions about whether Defendants' setoff of the funds in Mann's accounts was appropriate will not be permitted in their entirety. Kreig states in his report that "Pioneer Bank had statutory and contractual rights to take back or recover from the Mann Entities the $15.6 million in provisional credits given to the Mann Entities on August 29, 2019, when the checks drawn on Bank of America were deposited." Dkt. No. 427-2 at 54. He opines that "[b]ased on the documents provided to me, Michael Mann used and operated the accounts of the Mann Entities as if the Mann Entities was a single entity. For this reason, it was appropriate for Pioneer Bank to look to balances in each of the available accounts in performing the setoff." *Id.* at 56. In coming to that conclusion, Kreig cites what Mann "instructed" Defendants to do, what Mann "provided" to Defendants, and what Mann "testified" about during a deposition. *Id.* at 57. Kreig then concludes that "Pioneer Bank's decision to accept deposits into the Cloud Payroll account while blocking withdrawals was consistent with the standard practice in the banking industry for 'freezing' or restricting use of an account, and it had no obligation to "investigate" the source of the funds that were being deposited before performing setoff or chargeback." *Id.* at 59. In coming to that opinion, Kreig states that "Pioneer acted to protect a federally insured financial institution from greater losses resulting from the criminal conduct of SWP and Intervenor (the agent of SWP) in a substantial criminal check kiting and theft operation." *Id.* at 61. Kreig applies this conduct to a definition of "[t]he right of setoff" from case law. *Id.* at 55.

This issue also straddles the line between permissible statements made by applying facts to industry standards and impermissible legal conclusions. The Court notes that in their motion to exclude DelPonti's opinion, Defendants concede that "[a] qualified banking expert may opine on

whether a bank's exercise of setoff was consistent with sound banking practice . . . ." Dkt. No. 432-1 at 15-16. In opposing Defendants' motion to exclude Crowell's setoff opinion, Plaintiffs assert that "[n]o opinion Crowell offers is an impermissible legal conclusion. . . . Crowell explains how his experience led him to his conclusions, applied to the facts." Dkt. No. 447 a 16-17. Albeit in relation to different experts, both parties appear to concede that an expert's opinion on whether Pioneer's setoff complied with banking standards is permissible.

Therefore, the Court finds that a balance can be struck by permitting the experts to testify about their understanding of setoffs in the banking industry and whether Defendants' conduct complied with that. They may not, however, testify to whether the setoff meets a specific regulatory requirement or complies with a statutory or legal right. Likewise, no expert may testify as to whether any party's conduct was illegal or fraudulent and Kreig's statement labeling SWP's actions as "criminal conduct" is excluded.

Plaintiffs also argue that Kreig's opinions that Defendants had no duty or obligation to investigate or look further into Mann's accounts should be excluded because they are improper legal opinions which do not apply the Bank Secrecy Act ("BSA"). *See* Dkt. No. 428 at 18. Kreig testified during his deposition that he "was asked as part of [his] engagement not to address any obligations Pioneer Bank might owe to the federal government under the Bank Secrecy Act." *Id.* at 19 (quoting Dkt. No. 427-3 at 19). Plaintiffs argue Kreig's refusal to consider the BSA created an "analytical gap" in his opinions. *Id.* at 21.

Defendants argue in their opposition that "Kreig did not need to consider the BSA for his opinions to be reliable and helpful." Dkt. No. 443 at 24. They assert that another expert has been designated as the expert to opine on BSA compliance. *See id.* Kreig is opining only on aspects of banking that do not concern the BSA, or only minimally relate. *See id.* at 25-26. Defendants also

move to exclude Moravek as an expert, in part, because he relied on "a Bureau of Indian Affairs regulation governing trust funds held for Indian tribes, . . while conceding at his deposition that he did not review New York law at all . . . ." Dkt. No. 425-1 at 7 (citations omitted). Defendants argue that because Moravek "never engages the general versus-special framework under New York law that the Second Circuit and this Court have identified as governing—under which classification turns on the mutual intent of Pioneer and Mr. Mann—his opinions rest on no reliable principles under Rule 702(c) and cannot assist the jury." *Id.*

Plaintiffs are correct that Kreig did not address the BSA. Although Kreig stated that "[b]anking is the most highly regulated business in the United" and "one cannot understand general banking practice and the actions of a bank without reference to the laws and regulations that govern the activities of banks," Dkt. No. 427-2 at 6, he did not discuss the Bank Secrecy Act. According to Moravek, the BSA "is the common name for a series of laws and regulations enacted in the United States to combat money laundering[] and the financing of terrorism []." Dkt. No. 425-3 at 6. On the other hand, Defendants are correct that Moravek quoted and seemingly relied on the definition of "special deposit account" that is derived from the Code of Federal Regulations governing "Trust Funds for Tribes and Individual Indians." 25 C.F.R. § 115.001. There is nothing about this case which concerns tribes.

Both sides take issue with the regulations or rules that the opposing party's expert did or did not consider. That is an issue for cross examination. These arguments do not support complete exclusion of the experts' testimony.

However, as to the issue of an opinion about a party's duty, the answer is less straight forward. This Court has previously looked to the Third Circuit's decision in *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217[, 218] (3d Cir. 2006), wherein the court "acknowledged that 'the

line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties.'" *Beede*, 2016 WL 916418, at *25. "Nevertheless, the Court of Appeals concluded that an opinion on the issue of whether a party complied with and/or violated 'legal duties' constitutes an impermissible legal opinion, even if offered by a well-qualified expert." *Id.* (quoting *Berckeley Inc. Grp.*, 455 F.3d at 217-18).

This Court then explained that "any qualified expert . . . may provide an opinion on whether a party's conduct or actions meet underlying bases for an ultimate issue in a case (by, for example, testifying whether certain acts would in the abstract be improper and/or inconsistent with a party's legal duties)[.]" *Id.* But they "may not merely instruct the jury on the result to reach based upon a party's specific conduct or actions (by, for example, stating that a party did indeed violate an applicable duty through certain actions)." *Id.* (footnote omitted). This Court acknowledged that the "distinction [is] a fine one" and "exclude[d] [the] report and testimony to the extent that he reaches the specific conclusion that any Defendant or person acted in compliance with and/or in violation of applicable legal duties or industry standards." *Id.*

Here, too, Kreig and Moravek may testify about the parties' conduct and whether, in their respective opinions, that conduct is consistent with a bank or payroll company's duties. *See Brown v. Nat'l Football League*, 219 F. Supp. 2d 372, 384 (S.D.N.Y. 2002) ("A plaintiff arguing that a member of a particular trade or profession behaved negligently in carrying out his duties may appropriately use as evidence of negligence manuals, regulations, or other materials defining the reasonable and expected standards of professional practice within that occupation") (collecting cases). They may not, however, testify that either party did indeed violate a legal duty.

Next, Defendants argue that Moravek's discussion of the BSA is irrelevant because he is a rebuttal witness to Kreig and Kreig did not address the BSA. *See* Dkt. No. 425-1 at 25. However, it is appropriate for a rebuttal witness to identify what the opposing expert purportedly failed to consider, review, or discuss that the rebuttal expert believes is material to the issues. *See Roberts v. Los Alamos Nat'l Sec., LLC*, No. 11-CV-6206, 2016 WL 4442833, *2 (W.D.N.Y. Aug. 19, 2016) (explaining that a "[c]ourt has 'wide discretion over what evidence may be presented on rebuttal,' but, at base, '[t]he function of rebuttal evidence is to explain or rebut evidence offered by the other party'") (quoting United States v. Casamento, 887 F.2d 1141, 1172 (2d Cir. 1989)). Therefore, the Court disagrees that Moravek's opinion is flawed because it addresses the BSA.

Defendants also challenge Moravek's opinion that "[r]egulations allow for a broad category of exception holds, which can be made when an account has been overdrawn for a certain number of days during the previous six (6) months when the depository bank has good reason to think the check won't clear. This was certainly the case in many of the accounts." Dkt. No. 425-3 at 32; *see* Dkt. No. 425-1 at 24-25. Defendants argue that "Moravek's opinion supplies neither facts nor method. He does not identify in his report which Mann accounts he believes would qualify for an exception hold. . . . Nor could he identify them at his deposition." Dkt. No. 425-1 at 25. During his deposition, Moravek stated, "What I identified was, is that many – in many of -- of Mann's accounts, there -- there were -- there -- that these accounts had been overdrawn." Dkt. No. 425-4 at 312. When asked which accounts those were, Moravek testified "I can't specify exactly which accounts that was present in." *Id.* at 313.

The issue Defendants take with this portion of Moravek's opinion can be addressed on cross examination. As Plaintiffs note in their response to Defendants' motion, Moravek includes a list of the documents he reviewed as part of his report, *see* Dkt. No. 448 at 19, which includes

approximately 1,500 documents, *see* Dkt. No. 425-3 at 70. To the extent Defendants do not believe Moravek sufficiently relied on those documents to support his opinions or failed to explain his reliance, they can cross-examine Moravek on that issue at trial.

Defendants also seek to exclude Moravek's opinion because he did not "address[] whether the accounts were general or special deposits . . . ." Dkt. No. 425-1 at 13. In his opinion, Moravek concludes that "Mr. Kreig's suggestion that deposit accounts are categorized as 'general and special' is erroneous." Dkt. No. 425-3 at 20. Moravek opines, "In practice[,] there are two types of deposit accounts based on the availability of funds: (1) demand deposits and (2) time deposits." *Id.* Moravek then defines "special deposit" and "special deposit account," so reference to "demand" and "time deposits "is untenable" because allowing the jury to the testimony would "[i]nundat[e] the jury with irrelevant legal or banking jargon . . . ." Dkt. No. 425-1 at 12-14, 15.

The Court agrees that this case involves terms, practices, and issues that are not generally known to laymen. It is the Court's role to ensure they are not presented with irrelevant, cumulative, or confusing information, but the Court does not find that the portion of Moravek's opinion identified by Defendants will create such confusion. It is true that Judge Scullin noted that "'[a]s a common rule, bank deposits can be classified as either general or special.'" Dkt. No. 393 at 13 (quoting *Peoples Westchester Sav. Bank v. Fed. Deposit Ins. Corp.*, 961 F.2d 327, 330 (2d Cir. 1992)). Judge Scullin quotes *Peoples Westchester* for the proposition that "[w]hether a deposit in a bank is general or special depends upon the mutual understanding and intention of the parties at the time such deposit is made . . . ." *Id.*

The parties disagree as to what Mann's accounts were—special or general. The fact that this is a primary issue that must go to the jury does not mean an expert is unable to use other terms or discuss other concepts. Indeed, Defendants do not dispute the underlying facts Moravek

relies on in forming his opinions, such as "[t]he MyPayroll 0212 account was also designated a 'Client Account' by Pioneer . . . ." Dkt. No. 425-3 at 21 n.64. Moravek also cites specific documents to support his opinion that certain Mann accounts were "demand deposit accounts." *Id.* at 27. Defendants may disagree that accounts should be categorized as Moravek proposes, but they can cross-examine him about those opinions at trial. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MD-2542, 2025 WL 354671, *52 (S.D.N.Y. Jan. 30, 2025) ("[O]nce an expert has sufficient sources, 'the method to contest the factual underpinning of expert opinion is vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof'") (citation omitted).

Defendants also take issue with Moravek's opinion that Kreig is incorrect in concluding that the Mann accounts are general accounts. *See* Dkt. No. 425-1 at 16-18. Defendants argue that Moravek's opinion is flawed because he does not consider that the classification of an account as general or special is determined by the parties' intent. *See id.* In his opinion, Moravek contends "[t]he mutual agreement between" the parties "does not negate the fact that the accounts were acting in" a certain way. Dkt. No. 425-3 at 30.

In Plaintiffs opposition, they note that Judge Scullin concluded Plaintiffs "presented facts from which a jury could conclude that Defendant Pioneer engaged in its own fraud and knew or should have known of Mann's fraud, that the subject accounts were intended as special use accounts, and that Defendant Pioneer knew the funds were owned by third parties[.]" Dkt. No. 393 at 14. Therefore, how the parties were utilizing the accounts is relevant.

Defendants also seek to exclude Moravek's opinions about "the Operation and Expectations of Payroll Companies." Dkt. No. 425-1 at 20. Defendants argue that Moravek expressly disavowed he is "not an expert on payroll companies." *Id.*; *see* Dkt. No. 425-4 at 167.

Therefore, Defendants contend the following opinions about payroll companies must be precluded: "[p]ayroll companies exist and maintain profitability through their ability to charge their third-party customer's fees for the provision of [their] services" and "[n]othing else"; his descriptions of the "business model" about "payroll companies"; and "this is industry practice in the payroll industry, that is, funds are held in the depository account of a payroll company until tax payments are due." Dkt. No. 425-1 at 20-22.

In their opposition, Plaintiffs assert "Moravek's occasional references to payroll companies are not central to his rebuttal opinions, and nothing about his actual opinions requires expertise in payroll companies or processing. " Dkt. No. 448 at 15. Plaintiffs argue that Moravek was responding to Kreig's opinions, which was his role as a rebuttal expert. *See id.*

Moravek explains in his opinion that he worked for twenty years with the United States Secret Service investigating financial crimes including bank fraud. *See* Dkt. No. 425-3 at 4. Moravek has served "as a Senior Bank Examiner with the Office of the Comptroller of the Currency" and a Senior Special Agent within the Office of Enforcement/Investigations for the Financial Crimes Enforcement Network." *Id.* at 5.

Defendants appear to be correct that Moravek has not worked for a payroll company. However, neither has Kreig. As Plaintiffs note in their response, "Kreig does not purport to have any experience whatsoever with payroll or ACH service providers, yet Pioneer offers him to opine on these issues." Dkt. No. 448 at 15.

In his report, Kreig explains his background as a bank examiner, internal auditor, and in-house attorney for banks. *See* Dkt. No. 427-2 at 4-5. Kreig states that he has "appeared as an expert witness testifying both for and against banks in litigation involving various aspects of banking . . . ." *Id.* at 5. It does not appear that Kreig has worked for a payroll company, *see id.* at

71-73, yet he provides opinions about Plaintiffs and the Mann entities. For example, Kreig opines that "[t]here was no legitimate business reason for NatPay to move funds to Pioneer Bank." Dkt. No. 427-2 at 48.

To the extent both Kreig and Moravek discuss what is expected of payroll companies in their relationships with banks, the Court will permit them to testify consistently with their respective opinions. They each have decades of experience working with various banks and banking operations. Counsel can cross-examine the opposing expert about any purported lack of payroll experience to support a specific opinion. *See Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 732 (E.D.N.Y. 2016) ("[S]ome courts have found an expert unqualified to render an opinion where that expert did not have direct experience with the particular product, machine or specific field at issue in the litigation. . . . [O]ther courts have found that a lack of specific familiarity with a product, machine or specific field does not, in itself, render an expert unqualified to proffer their opinion") (collecting cases).

Finally, Plaintiffs seek to preclude Kreig's opinion regarding the appropriateness of Pioneer's setoff as irrelevant. *See* Dkt. No. 428 at 23-24. Plaintiffs explain that Defendants raised an affirmative defense in their answer that their "overdraft recovery was also completely within Pioneer Bank's rights," but that they withdrew the defense on summary judgment such that any testimony or arguments related thereto are irrelevant. *Id.* at 23 (quoting Dkt. No. 332 at ¶ 574).

Defendants do not contest that they withdrew their affirmative defense but argue that their "withdrawal did not take setoff out of the case." Dkt. No. 443 at 27. Rather, Defendants contend that by withdrawing their affirmative defense on the issue, Plaintiffs carry the burden at trial to prove that Defendants' setoff was unlawful rather than Defendants carrying the burden to prove that it was appropriate. *See id.* at 27-28.

Defendants are correct. In Judge Scullin's summary judgment decision, he explained that "there remains an issue of fact regarding whether Defendant Pioneer's setoff of the subject account was a 'wrongful seizure' and resolution of the legality of Defendant Pioneer's setoff will 'finalize the controversy and offer relief from uncertainty.'" Dkt. No. 393 at 16 n.11 (quoting *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005)). As such, opinions and testimony concerning Pioneer's setoff remains relevant at trial.

In sum, the Court will not exclude Kreig nor Moravek's opinions or testimony, in full, but they are limited to the extent outlined in this decision.

***d. C. Wayne Crowell***

Crowell is a banking consultant who worked as a National Bank Examiner and Assistant Deputy Comptroller for Bank Supervision with the Office of the Comptroller of the Currency. He was retained "by Plaintiffs to review this case based on my experience as a bank regulator and provide testimony relating to banking industry custom and practices and BSA and other regulatory guidelines applicable to banks." Dkt. No. 426-3 at 6. He also provided a rebuttal opinion to Richard Hollowell and Kreig. *See* Dkt. No. 426-4. As explained earlier, Plaintiffs have sought to exclude Kreig, but they have not moved to preclude Hollowell nor any portion of his expert opinion.

Defendants move to exclude Crowell's opinions because he "opines on banking functions he has never performed, he substitutes his personal 'experience' and notions of 'prudence' for identified standards, he reasons backward from the collapse of Mr. Mann's fraud, and he resolves questions of law and fact reserved for the Court and the jury." Dkt. No. 426-1 at 6. The Court agrees with Plaintiffs that "[m]ost of [Defendants'] criticisms of Crowell's opinions concern matters more appropriately addressed through cross-examination." Dkt. No. 447 at 6.

First, Defendants seek to exclude Crowell's opinion regarding Pioneer's setoff. *See* Dkt. No. 426-1 at 11. Defendants contend "[t]he relevant 'experience' to offer such an opinion would be experience actually exercising, approving, supervising, or examining a bank's setoff rights . . . . Mr. Crowell has none of that experience, despite repeatedly invoking his 'experience' to criticize Pioneer's setoff." *Id.* at 12. Defendants state that Crowell "admitted" during his deposition "that he has never personally participated in a decision to take a setoff, even while serving as a bank director, . . . has never examined setoffs as a discrete banking function during his regulatory career, . . . and has observed only a handful—approximately one to five—setoffs during his career . . . ." *Id.* (citations omitted).

Plaintiffs argue in response that "Crowell is not unfamiliar with setoffs, having seen banks engaging in setoff more than once. . . . Any alleged gap in Crowell's expertise may be addressed through cross-examination and does not justify excluding his opinions on this subject matter clearly within the ambit of his field." Dkt. No. 447 at 15 (citation omitted).

The Court agrees with Plaintiffs. Although Crowell testified that he has never been "personally involved in th[e] decision" of a bank to take a setoff, that does not negate his testimony that he does have experience with setoffs. The extent of that experience can be addressed on cross examination.[8]

Defendants' next argument concerning Crowell relates to his "lending and underwriting opinions" set forth in his rebuttal opinion. Dkt. No. 426-1 at 15. Crowell provided his "opinions on Pioneer's loan policy, underwriting, administration and supervision of the ValueWise loan

---

[8] The Court also notes that Kreig, Defendants' expert who opines that Pioneer's setoff was appropriate, testified in a very similar fashion to Crowell. Both experts testified that they knew about setoffs from companies defaulting on loans. *See* Dkt. No. 427-3 at 6; Dkt. No. 426-5 at 50, 262. It is unclear why this sort of experience is sufficient for Defendants' expert, Kreig, but is insufficient for Plaintiffs' expert, Crowell.

relationship" in response to Hollowell's opinion. Dkt. No. 426-4 at 6. Again, Hollowell is not the subject of a *Daubert* motion. Hollowell opined that Pioneer's conduct was appropriate, and Crowell contends that opinion is "flawed." *Id.*

Defendants argue "Crowell cannot identify the standard against which he measures Pioneer's conduct." Dkt. No. 426-1 at 16. They argue that Crowell inappropriately relies on just his "experience," without reference to industry standards or other secondary sources. *Id.* Defendants contend Crowell inappropriately opines that Defendants' conduct permitted fraud to occur, which an issue for the jury to decide. *See id.* at 16-17. Defendants also contend Crowell's opinion is circular and built on hindsight because he looks at all of the information presently available and concludes that Defendants should have done more but "[e]ach of these opinions measures Pioneer's conduct against information unknowable until after the fraud collapsed." *Id.* at 17.

Setting aside for a moment Crowell's opinion about whether Defendants turned a blind eye to Mann's fraud, the other opinions are permissible and subject to cross examination. Crowell's underwriting and lending opinions are rebuttals to Hollowell's opinions. Crowell testified that he has "over the years, I've reviewed hundreds, if not thousands, of underwritings. I've got lots of experience doing that. But I've not been the actual underwriter." Dkt. No. 426-5 at 18. If Defendants want to challenge that experience, they are free to do so on cross examination. Likewise, if Defendants believe any of Crowell's opinions are based on information that was neither known nor available to Defendants at the time of Mann's conduct, they can inquire about that on cross examination. Any opinions that Defendants permitted Mann's fraud, however, must be precluded. One of Plaintiffs' theories of liability concerns aiding and abetting. *See* Dkt. No. 245. It is not appropriate for an expert to present a conclusion on that to the jury. *See*

*GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 342 (N.D.N.Y. 2013) ("[A]n expert may not offer an opinion as to whether a parties' actions amount to gross negligence") (collecting cases).

Next, Defendants argue Crowell's opinions regarding the remote deposit limits should be excluded because they lack an "objective basis," and do not stem from any proper methodology or applicable standard. Dkt. No. 426-1 at 19-20. Plaintiffs retort that Defendants' arguments do not support exclusion but concern issues for cross examination. *See* Dkt. No. 447 at 21-22. The Court, again, agrees.

The Court has already concluded that Kreig and Moravek will be permitted to testify as to whether the remote deposit privileges granted to Mann by Defendants is standard industry practice. Crowell may do the same. Crowell has experience in the banking industry and may testify as to how that experience compares to the parties' conduct. Crowell may not testify that Defendants' grant of remote deposit privileges to Mann was "the primary vehicle for his kiting scheme that was not monitored and went undetected and escalated over several years." Dkt. No. 426-3 at 21. That is a question for the jury to decide and shall not be opined by an expert.

Defendants also attack Crowell's "third-party processing opinions." Dkt. No. 426-1 at 20. Crowell opines as follows:

> In my experience as a bank regulator, bank director and banking consultant, the dollar volume and the number of transactions flowing through the MyPayroll and CloudPayroll accounts would have alerted Pioneer management of the need to investigate the nature and volume of activity both in the credit analysis and in the BSA monitoring of the deposit accounts. In my experience proper monitoring of the account would have clearly identified the accounts truncations related to third party payroll funds. . . . .
>
> [T]he descriptions for the thousands and thousands of transactions flowing through Account No. 0212 were the payroll client name or

> partial name followed by "payroll" when the transaction involved third-party payroll and "tax" or some other designation with the word "tax" in it when the transaction involved payroll taxes. There are literally thousands of transactions with these descriptions every month from the inception of the Account No. 0212.

Dkt. No. 426-3 at 14-15.

Contrary to Defendants' argument, the Court does not find that Crowell must have extensive experience "involving a payroll company," to opine on what transactions were occurring in the Mann accounts and what, in his experience, knowing that information would have caused a bank to do. However, the Court agrees with Defendants that Crowell should not be permitted to testify that "Pioneer's failure to conduct proper due diligence and ensure the accounts were properly titled would not entitle Pioneer to be enriched." Dkt. No. 426-4 at 20. First, as Defendants assert, Crowell does not explain what those "proper titles" would have been. *See* Dkt. No. 426-1. Second, the opinion comes too close to one of the questions that will be presented to the jury: whether Defendants were unjustly enriched. *See* Dkt. No. 245 (listing Plaintiffs' sixth claim for unjust enrichment).

Defendants also take issue with Crowell's opinions regarding whether Defendants had specific "duties" to investigate the Mann accounts. Dkt. No. 426-1 at 21. Defendants contend "[w]hether such a duty exists is a question of law for the Court to resolve and, to the extent any duty is submitted to the jury, for the Court to define through its instructions and for the jury to apply to the facts." *Id.*

First, as Plaintiffs explain, Crowell's opinion that Defendants had a duty to investigate the Mann accounts is directly responsive to Kreig's opinion that Defendants had no obligation or responsibility to investigate the Mann accounts. *See* Dkt. No. 426-3 at 23; Dkt. No. 447 at 22-23. Second, as earlier explained, "the mere fact that an expert's opinion is based on criteria delineated

by the applicable law does not transmogrify it into a legal conclusion." *Town of Halfmoon*, 2016 WL 866343, at *16. Therefore, the Court will not preclude Crowell from testifying about whether Defendants had specific duties to investigate the Mann accounts. He cannot, however, testify that a legal duty was indeed violated.

Similarly, Defendants take aim at Crowell's opinion regarding ACH "batch headers." Dkt. No. 426-1 at 22. However, Plaintiffs correctly note that Crowell never used that term in his opinion. *See* Dkt. No. 447 at 23. Rather, Crowell opined that "Pioneer was required by Bank Secrecy Act and regulatory guidance on ACH processing to understand and monitor the nature of the activity in its accounts. Bank regulatory guidance for ACH activity also required Pioneer to conduct a risk assessment for a customer using an account to conduct ACH activity." Dkt. No. 426-4 at 18. This opinion does not require precise expertise in ACH processing and will be allowed to go before the jury.

Next, for the same reasons discussed regarding Moravek's opinion, Defendants' argument that Crowell cannot discuss the BSA as a rebuttal to Kreig because Kreig did not consider the BSA, is meritless. *See* Dkt. No. 426-1 at 27-28. As a rebuttal witness, Crowell is entitled to identify what information he believes Kreig failed to consider and explain why it matters. *See Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 386 (S.D.N.Y. 2014) ("[T]he expert's testimony should be to 'explain, repel, counteract or disprove evidence' presented by the expert to whom he or she is responding") (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006)).

Defendants also seek to exclude Crowell's opinion that Kreig "contradict[ed] himself" in his report. Dkt. No. 426-1 at 25-26. Defendants contend that this is an argument for an attorney to make. *See id.* Defendants are correct; expert rebuttal witnesses should be used to attack the

substance of another expert's opinion and, if a contradiction is a mere typographical error, it is not the basis for an expert rebuttal. As Plaintiff states in their response, it does not appear that the purported "contradiction" is the basis for any of Crowell's opinions.

In sum, Crowell will not be precluded from testifying and presenting his opinions to the jury, but he is limited in doing so to the extent set forth herein.

***e. David Williams and Craig Vaream***

Williams is Senior Managing Director in the Forensic & Litigation Consulting practice of FTI Consulting, Inc. *See* Dkt. No. 430-2 at 4. He is a licensed attorney in New York and previously worked as a tax attorney and special agent with the Internal Revenue Service. *See id.* Williams was retained by Defendants to evaluate the "[f]low of funds through accounts held by Mann and Mann Entities at Pioneer Bank"; "[i]dentify instances of fraudulent funds flowing through Mann and Mann Entity Accounts as well as instances where these funds were ultimately used in transactions processed by NatPay and/or SWP"; and "[i]dentify red flags for money laundering known or apparent to NatPay and/or SWP." *Id.* at 7. Williams affirmed during his deposition testimony that he intends to offer opinions with respect to SWP and NatPay's actual knowledge. Dkt. No. 430-3 at 13.

Plaintiffs move to exclude his testimony, arguing that (1) he has "no familiarity with payroll and ACH industry standards"; (2) he is unqualified to testify about NatPay's own policies and compliance with them; and (3) his calculations and conclusions are not based on a proper methodology. Dkt. No. 430-4 at 20-23[9].

[9] Plaintiffs also move to Williams' exclusion because his opinions touch on Plaintiffs' state of mind. This is addressed later in the Memorandum-Decision and Order.

Defendants argue in response that Williams "is not offering opinions about how payroll companies should run their businesses. He is identifying whether the data exhibit patterns associated with fraud and money laundering." Dkt. No. 444 at 11. They also contend "Williams's testimony will assist the jury because the transaction evidence is extraordinarily complex. Mr. Williams analyzed over 593,000 transactions in Account 0212 alone and tens of thousands more across additional accounts, spanning November 2017 through September 2019." *Id.* at 12.

The Court agrees with Defendants. Plaintiffs have not presented grounds which require the Court to exclude Williams' testimony altogether. The Court has thoroughly reviewed Williams' report and finds him to be qualified to testify about account information including the types of transactions in the Mann accounts, their frequency, and any patterns that he identified. Much like a law enforcement agent will testify during a criminal trial about a collection of evidence, the Court will permit Williams to summarize the hundreds of thousands of financial transactions that occurred in this case and present an opinion as to whether those transactions were indicative of anything.

The Court comes to the contrary conclusion on Williams' opinion insofar as he opines on NatPay's compliance with its own internal policies. Williams concluded that "[d]eviations from normal operating procedures and policies for NatPay were a warning sign to NatPay of the risk involved with conducting transfers for the Mann Entities." Dkt. No. 430-2 at 30. He opines as follows:

> NatPay disregarded its own policies and ignored criteria that it considered important as it continued to process larger transaction amounts for the Mann Entities and SWP. There were numerous warning signs in the NatPay data that Mann was laundering money by means of ePay transfers that NatPay processed for the Mann Entities and SWP.

> NatPay departed from their normal practices designed to mitigate risks of fraud or loss. These included separation of tax and payroll processing, commingling of processor activity in one account, large and repeated ACH returns, and continuous next day processing far in excess of its $1 million dollar limit. In some cases, NatPay had never before (or since) departed from its own policies NatPay has since added policies relating to mitigating the specific activities engaged in by Mann. In doing so, NatPay consciously knew that there was a greater risk of fraud in processing ACH transactions for Mann.

*Id.* at 58.

Williams has provided no explanation or information to support his opinions about NatPay's departures from its own policies. He discusses the NatPay and Pioneer accounts that he reviewed in connection with this case, but he does not explain that he reviewed any other NatPay information. Williams does not discuss how he reviewed or considered NatPay's "normal practices" before concluding that their conduct in relation to this case was a departure. Rather, Williams states that he reviewed the deposition testimony of NatPay's Vice President of Sales, Jim Hagen, who "testified that it was 'not very common' for a payroll processor to split payroll and tax processing between two ACH companies, noting that having the data from processing both payroll and taxes can serve as a fraud control." Dkt. No. 430-2 at 21 (citation omitted). Williams also reiterated the Hagen's testimony that "when prospective clients sought to split their payroll and tax processing between ACH companies this was not NatPay's normal practice and, in fact, Cloud Payroll and other related Mann Entities were the only clients that NatPay allowed to split payroll and tax processing as an exception to NatPay's 'hard and fast rule' against decoupling." *Id.* (citation omitted).

Although experts can rely on hearsay when forming their opinions, expert opinions are not meant to serve as a mouthpiece for otherwise inadmissible hearsay. *See Marvel Characters*, 726

F.3d at 136. Williams' opinions that NatPay deviated from its own policies appears to rely almost entirely on Hagen's deposition testimony. Unless Defendants can lay an appropriate foundation and methodology for Williams' opinions, such as relying on information other than one deposition employee's testimony, the conclusions will be precluded.

During his own deposition, Williams was asked how he determined some actions were "atypical." Dkt. No. 430-3 at 17. He stated his conclusion was based on Hagen's testimony and he thought "also [Steven Pereira, NatPay's Vice President] may have testified about that as well." *Id.* Williams does not reference Pereira's deposition testimony when discussing NatPay's "normal" practices and procedures in his report.

The Court finds that testimony regarding NatPay's policies and compliance therewith is not permissible to be presented through Williams. He may, however, testify to his understanding of banking standards, any patterns he identified in NatPay's records, and whether NatPay's conduct complied with his understanding of industry-wide banking standards.

Plaintiffs proffer Craig Vaream as a rebuttal expert to Williams. Defendants move to exclude Vaream's opinions not because of his experience; indeed, Defendants admit "Vaream has some experience in ACH processing mechanics, and Pioneer does not seek to exclude testimony limited to that narrow subject." Dkt. No. 431-1 at 5. Rather, Defendants argue that Vaream's opinions delve into subjects he is not qualified to discuss including "payroll-industry standards and practices," "the regulatory obligations of banks," and "causation and fault-allocation." *Id.* Defendants contend "Vaream weaves regulatory opinions throughout his report." *Id.* at 9. They argue that "[d]espite his lack of regulatory expertise, Mr. Vaream repeatedly offered opinions allocating responsibilities rooted in regulatory obligations." *Id.* at 10 (collecting quotations from

Vaream's report wherein he opined that Pioneer Bank was required to monitor the Mann accounts).

Defendants also focus on Vaream's deposition testimony where he admitted that he has worked with payroll clients as "less than 5 percent" of his clientele. *Id.* at 12 (quoting Dkt. No. 431-3 at 45). Therefore, Defendants argue he cannot give opinions about payroll service bureau operations and payroll-tax administration, such as what is "standard practice." *Id.* at 13. Defendants also challenge Vaream's opinion as being improper rebuttal to Williams' opinion. *See id.* at 15.[10]

Defendants also seek exclusion of Vaream's opinion regarding the commingling of funds from multiple payroll processors. *See id.* at 18. Defendants argue Vaream's opinions "rest[] on a claim about what is 'standard within the industry,' what is 'very typical' for payroll processing, or what constitutes a 'typical occurrence'—that is, on expertise in payroll-industry practice that Mr. Vaream does not have." *Id.*

Plaintiffs argue in their opposition that Defendants are attempting to narrow Vaream's expertise and opinions too much. Plaintiffs assert that the amount of experience Vaream has with payroll companies compared to other businesses as well as his conclusions about industry standards are issues for cross examination. *See* Dkt. No. 449 at 10-15.

Vaream worked at JPMorgan Chase for eighteen years managing the ACH business. *See* Dkt. No. 431-4 at 6. He testified that during his time with JPMorgan, "less than 5 percent" of his clients were payroll processing companies. Dkt. No. 431-3 at 45. Whether this lessens the weight of Vaream's opinion as to what is "standard" in the "industry" regarding "payroll

---

[10] Defendants argue that Vaream does not properly rebut Williams' opinion about NatPay's compliance with its own policies. However, because the Court has excluded Williams from testifying as such, this argument is moot.

processing" and "processors" does not require exclusion of the entire rebuttal opinion. Dkt. No. 431-4 at 13-14. Vaream has worked in the banking industry for many years and has experience with multiple payroll-company-clients. Although that does not appear to be the majority of his work experience, Defendants may cross-examine him as to that fact and the jury can determine how much weight to afford his opinion. *See United States v. M/Y Amadea*, 770 F. Supp. 3d 558, 580 (S.D.N.Y. 2025), *aff'd sub nom. United States v. Khudainatov*, 177 F.4th 224 (2d Cir. 2026) ("Claimants' argument that the bulk of Captain Meagher's experience was on comparatively smaller vessels goes more to the weight that should be afforded his testimony, rather than suggesting that he is altogether unqualified").

The Court reaches the same conclusion with Vaream's discussion of applicable regulations. In his report, Vaream opines that Williams' opinion regarding "red flags" likely pertains to "Bank Secrecy Act and Anti-Money Laundering regulations regarding the processes financial institutions must follow." Dkt. No. 431-4 at 10. Vaream states, "They have no applicability to payroll tax processors or NatPay in this situation. They do have relevance for Pioneer Bank, which is a financial institution and therefore is obligated to adhere to the processes and requirements specified by federal and state banking regulations." *Id.* Vaream affirmed the same during his deposition. *See* Dkt. No. 431-3 at 56-57. Defendants' attorney asked if Vaream was aware of what a "money transmitter" is and whether such an entity is subject to federal regulations. *See id.* at 57-58. Vaream stated that he knows of the term but "know[s] very little." *Id.* at 57.

In essence, Defendants seek to preclude Vaream's rebuttal opinion because he did not apply banking regulations to NatPay's conduct despite concluding that NatPay was not subject to those regulations. That is not a basis to exclude Vaream's opinion, but a challenge to be lodged

during cross examination. Therefore, Varеam's opinion will not be entirely excluded, but is limited as explained in this decision.

***f. John DelPonti, Jr.***

DelPonti is a certified public accountant and certified anti-money laundering specialist who was retained by Plaintiffs to give "opinions on banking industry practices and standards, including Bank Secrecy Act [] and anti-money-laundering [], and Pioneer's compliance with those standards." Dkt. No. 450 at 6. DelPonti also provides a rebuttal opinion to Kreig, Hollowell, Robert Flores, and Michael C. Spitler. *See id.*

Defendants move to exclude DelPonti's expert opinion because he has never engaged with a bank's setoff rights; he fails to consider applicable legal standards and/or regulations; he gives legal conclusions; and he relies on insufficient facts or data to support his opinions. *See* Dkt. No. 432-1. Plaintiffs disagree on all points. *See* Dkt. No. 450.

First, Defendants argue DelPonti is not qualified to give an opinion about the propriety of Defendants' set off because he has only ever worked "on the lending side of the bank: he has worked with setoff provisions in the negotiation and restructuring of commercial credit facilities—contractual clauses bargained between lender and borrower" and "[t]he setoff at issue in this case arises on the deposit operations side: a bank holding customer funds on deposit, facing an unpaid debt from that customer, applies the deposited funds against the debt." Dkt. No. 432-1 at 13. Defendants contend the deposit operations side of setoffs "is governed by the deposit agreement, by U.C.C. § 4-212, and by the common law of setoff. . . . It requires the banker to determine whether the debt is due and payable and which accounts and balances the agreement reaches." *Id.* (citing Kreig expert report). Defendants liken the issue to engineering, stating, "[j]ust as a 'general background in safety engineering' does not qualify a person 'to offer

expert testimony on the design of a particular product,' Mr. DelPonti's general background in financial services does not qualify him to opine on a depository setoff—*i.e.*, a banking function he has never performed, supervised, or examined." *Id.*

Defendants assert that the terms and conditions listed on Pioneer's account opening form mentions the right to set off funds, that Defendants had a statutory right under U.C.C. § 4-212(a), and that Mann asked Pioneer to link his accounts together, which impacts Defendants' recovery. *See id.* at 14. Defendants argue that DelPonti did not address any of those facts or laws in his report. *See id.* They assert that "[a] witness who has not examined the instruments and authorities that define the transaction he criticizes has no basis on which to opine that the transaction was improper." *Id.* at 14-15. Defendants acknowledge that DelPonti considered other authorities such as "New York Banking Law's broad public-interest purpose, FDIC director-governance guidance, and [Unfair or Deceptive Acts of Practices] principles," but argue that "none addresses when or how a bank may exercise contractual, statutory, or common law setoff right[.]" *Id.* at 15.

Defendants concede that "[a] qualified banking expert may opine on whether a bank's exercise of setoff was consistent with sound banking practice—but to do so reliably, the expert must engage with the deposit agreement, the U.C.C., and the common law that define the bank's rights, and explain how the practice he describes operates within that framework." *Id.* at 15-16.

Plaintiffs argue "DelPonti's more than thirty-four years of financial-services experience in bank operations, risk management, and regulatory compliance qualify him as an expert under Rule 702 to opine on industry banking standards, including setoffs as it applies to deposit operations." Dkt. No. 450 at 10. As Plaintiffs note in their response, and contrary to Defendants'

assertions, "DelPonti testified that defaults and setoffs were part of his work as Chief Risk Officer." *Id.* at 11. Plaintiffs also cite a recent case from the Southern District of New York for the proposition that an otherwise qualified expert who "does not have experience with non-lender/non-bank administrative agents can be 'properly explored on cross-examination and [goes] to his testimony's weight and credibility — not its admissibility.'" *Id.* (quoting P*atriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.*, No. 16-CV-4488, 2025 WL 2592224, *8 (S.D.N.Y. Sept. 8, 2025)); *see also McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995).

During his deposition, Defendants' counsel asked DelPonti, "What is a setoff?" Dkt. No. 432-3 at 58. After seeking some clarification as to the context the question was being asked, DelPonti stated, "It depends on the situation." *Id.* When asked to define the term as it "is used in this case," DelPonti responded, "Generally, you're taking funds from one account to cover losses in another account or in situations set off. If there was a default on a lending arrangement, you would use also that, set it off." *Id.* at 59. Counsel asked DelPonti if he had "any professional experience with setoffs." *Id.* DelPonti responded, "I don't recall off the top of my head, but it has to be, given the breadth of my experience and everything. I just don't recall off the top of my head." *Id.* at 59-60. He then explained that as "chief risk officer at a bank, we're dealing with lending. There's defaults. There's setoffs. We're dealing with a CEO at a mortgage company. You've got loans, right? You're paying different things. You've got setoffs. I mean, there's just a lot of different experiences. There's deposit agreements. Like you said, they have -- there could be setoff provisions in them. There could be -- I just don't remember off the top of my head." *Id.* at 60. DelPonti noted that "when we're doing restructuring for the warehouse lines, I believe they

were doing setoffs for purposes of that. I think that's another specific situation." *Id.* He explained his role as follows:

> I served as the -- one of the restructuring officers. So we would negotiate with the -- this was during the mortgage crisis. We would negotiate with the lenders and ensure -- I think there were, like, setoff provisions, the bank accounts and things like that. That's another - what we actually were doing, working with the company and serving as their restructuring officers, to actually ensure setoffs were occurring. Because they were similar type of situation where there was significant losses. That's another one.

*Id.* at 61. DelPonti stated that he was "negotiating new terms. So what was occurring during that time was the warehouse lender -- the warehouse lender, where you're backing their loans. We had correspondent relationships, and as part of that, we were negotiating revised terms to determine whether we were going to keep a lot of that." *Id.* at 61. He said, "And I do distinctly recall there being -- ensuring the revised negotiations in the default that we were adding setoff provisions, working with the legal teams to make sure those were in there." *Id.* at 61-62.

Contrary to Defendants' arguments, the Court does not find this experience so deficient as to warrant exclusion of DelPonti's setoff opinions. DelPonti clearly has an understanding of, and experience with, setoffs in a variety of contexts, even if that experience is not identical to what occurred in this case. Counsel is free to cross-examine DelPonit about the differences between his experiences and the setoff at issue, here.

Likewise, to the extent Defendants argue DelPonti's opinion is deficient because he did not analyze certain written agreements or legal provisions, that is additional fodder for cross examination. As Defendants concede and Plaintiffs reiterate, DelPonti expressly relied on "New York banking law, FDIC requirements, and [Unfair or Deceptive Acts of Practices] principles." Dkt. No. 450 at 12; *see also* Dkt. No. 432-1 at 15. The fact that Defendants believe DelPonti

should have relied on different or additional sources in forming his opinions does not mean his opinions are baseless. Defendants can question DelPonti about that during trial.

Next, Defendants contest DelPonti's comparison between Defendants' decision to exercise their purported right to offset the Mann accounts and Bank of America's decision to freeze the money in accounts held by Mann "until the funds were forfeited to the government as part of Mr. Mann's court case." Dkt. No. 432-4 at 90; *see* Dkt. No. 432-1 at 16. Defendants argue the comparison is inappropriate because DelPonti "never established the predicate facts that would make the comparison meaningful. . . . He cites no evidence that Bank of America faced a comparable loss." Dkt. No. 432-1 at 17. Defendants argue that the "distinction is dispositive: a bank with no unpaid debt has no occasion to exercise a setoff at all, so its decision to freeze funds instead says nothing about whether Pioneer's setoff was proper." *Id.*

Plaintiffs retort that "[t]he point of the comparison is not that the two banks faced identical balance sheets; it is that both institutions confronted funds and circumstances suggestive of fraud, and one chose to freeze and investigate while the other did not." Dkt. No. 450 at 14.

The Court agrees with Defendants. Defendants cite *Edmondson v. RCI Hosp. Holdings, Inc.*, 2020 WL 1503452, at *5 (S.D.N.Y. Mar. 30, 2020) as an example whereby a court excluded an expert opinion because of a lack of an appropriate comparator. *See* Dkt. No. 432-1 at 16. In *Edmonson*, the expert witness opined that "[b]ecause stock photos can be licensed from Getty for between $50 and $499, depending on file size" then the photos that were misappropriated in the case were worth that same value. *Edmondson*, 2020 WL 1503452, at *5. The district court concluded that "[b]ecause [the p]laintiffs' images are not available on Getty for royalty-free licenses, they are not comparable to the stock photos referenced by" the expert. *Id.*; *see also Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 675-76 (S.D.N.Y. 2007) (omitting

comparison between U.S. and European markets where the expert said "the European countries have demographics and other characteristics similar to the U.S., and have mature markets for Louis Vuitton products, whereas parts of Asia do not" but the expert "cite[d] no support for these assumptions; he relie[d] on no articles or studies to justify either the empirical assumptions or the premise that a statistical analysis is more reliable (or reliable at all) when the comparison base is substantially narrowed").

During his deposition, DelPonti testified that he compared Bank of America to Pioneer because Bank of America "went on to owe money. That was the comparison to them." Dkt. No. 432-3 at 249. DelPonti does not expand on the comparison any further in his report or his deposition. Without any explanation as to how the two companies are similar or what similar circumstances they faced, it would not be appropriate to tell a jury what one bank did, in order to say that Pioneer should have done the same. Therefore, the Court will not allow the comparison to be made.

Defendants also assert that "DelPonti's account classification and deposit-agreement opinions apply a test New York law does not recognize." Dkt. No. 432-1 at 18. Defendants quote portions of DelPonti's deposition testimony wherein he stated that the parties' demand deposit agreement does not negate that the accounts contained third-party funds. *See id.* at 19. Plaintiffs argue that DelPonti did not give an opinion in either his initial or rebuttal reports about how the Mann accounts were or should be classified. Plaintiffs contend Defendants are using "*Daubert* motions as a vehicle for arguing the merits of its defenses [which] is improper, a burden on Plaintiffs, and a waste of judicial resources." Dkt. No. 450 at 15.

During his deposition, defense counsel asked DelPonti about page 31 of his report where, for the first time, he called "the 2440 account[,] the Cloud Payroll tax account." Dkt. No. 432-3 at

113. DelPonti agreed that "no Pioneer Bank account calls the account 2440[,] Cloud Payroll tax account." *Id.* at 114. Defense counsel asked why DelPonti chose that name and he responded, "Just to name it and describe it." *Id.* at 115. DelPonti said, "I came up with the naming. It's how I refer to it." *Id.* Counsel asked if DelPonti was "opining on the type of account that 2440 is in this case." *Id.* DelPonti responded, "I'm opining on the information that's - the accounts that the -- I do have in my rebuttal report information related to the accounts, and the fact that the bank called it a deposit account is irrelevant as to the fact that third-party funds are going through." *Id.* at 115-16.

DelPonti noted that he "knew it was set up with a deposit agreement. I knew that Pioneer Bank had set off against the account. Let me see in the rebuttal if I talk about it." *Id.* at 116. After reviewing his own rebuttal report, DelPonti pointed defense counsel to page 13, paragraphs 20 and 21. In paragraph 20 of his rebuttal report, DelPonti states as follows:

> Mr. Kreig opines that the "Pioneer Bank deposit accounts at issue were unrestricted demand deposit or 'checking' accounts, not special deposit accounts or fiduciary-type accounts." Although it is true that Pioneer treated these accounts as regular deposit accounts, Mr. Kreig does not properly consider how Pioneer should have treated the accounts in accordance with banking industry standards. Based on my experience in the banking industry, to the extent that Pioneer knew that the funds were third-party funds, the Bank should not have appropriated the funds to set them off against other liabilities.

Dkt. No. 432-5 at 13 (footnote omitted). In paragraph 21, he states as follows:

> Further, Mr. Kreig's opinion suggests that the accounts at issue must be either a special deposit account or a demand deposit account, but it is important to note that the banking landscape encompasses various types of accounts beyond this binary classification. Banking institutions often offer a spectrum of account types, each with distinct features and characteristics. The assertion that the absence of a specific label automatically grants the bank the right to treat the account as a demand deposit account, ignoring the source of the funds, is incorrect. The nature and terms of an account,

> including the customer and source of funds, should be analyzed comprehensively, rather than solely relying on this categorization.
>
> The absence of a special deposit account label does not inherently confer the right to treat the funds as a demand deposit account, and a nuanced evaluation is necessary to determine the rightful treatment of the account in question. This is consistent with an opinion involving Atlantic Bank of New York (discussed in further detail below) where a court found that "when a bank is on notice that funds in a depositor's account are owned by a third party, the bank cannot appropriate those funds in order to set them off against a debt of the depositor."

*Id.* at 13-14 (footnote omitted).

As Judge Scullin explained in his summary judgment decision and this Court has already reiterated, there is an issue of fact as to whether "Defendant Pioneer engaged in its own fraud and knew or should have known of Mann's fraud, that the subject accounts were intended as special use accounts, and that Defendant Pioneer knew the funds were owned by third parties, . . . and that Defendant Pioneer knew the funds were third-party tax funds entrusted for the purpose of paying taxes." Dkt. No. 393 at 14.

Defendants know this is an issue that must go before the jury. DelPonti did not purport to present an opinion on the naming or categorizing of the accounts in his initial report. He only responded to Kreig's report as a rebuttal expert and answered defense counsel's questions. Defendants do not cite or quote a single part of DelPonti's rebuttal opinion in this part of their motion to exclude. *See* Dkt. No. 432-1 at 19-20. Whether Defendants agree or disagree, the fact is that the jury must be presented with evidence about whether Defendants knew how the Mann accounts were being used. That is a key theme of Plaintiffs' case, and they have the right to present that to the jury and a *Daubert* motion is not the place to argue against the opposing party's theory of the case. Therefore, this aspect of Defendants' motion is denied.

Defendants next argue that DelPonti inappropriately relies on the FDIC's preliminary findings to opine about BSA compliance. *See* Dkt. No. 432-1 at 21. Defendants cite two pages of DelPonti's report. First, DelPonti states that "[t]he FDIC found that Pioneer's Bank Secrecy Act Program was 'fundamentally and materially deficient' and Pioneer disclosed in its financial statements for the year ending June 30, 2020[,] that it failed to comply with applicable laws and regulations." Dkt. No. 432-4 at 101. DelPonti then explains "[i]n December 2019, the FDIC conducted a 'Safety & Soundness Exam' at Pioneer. Based on this exam, the FDIC found that Pioneer's BSA program 'is fundamentally and materially deficient.'" *Id.* at 103.

Defendants explain that DelPonti conceded during his deposition that the FDIC's findings were preliminary. *See* Dkt. No. 432-1 at 21. That is precisely the type of cross examination that Defendants can present during trial. Defendants do not contest the accuracy of the statements made by DelPonti in his report but argue that DelPonti fails to qualify his statements. *See id.* To the extent Defendants believe there is additional information the jury should know, they can ask DelPonti from the witness stand, just as they did during his deposition.

Defendants also seek exclusion of DelPonti's report because "his report does not distinguish between the regulatory requirements in force before and after May 18, 2018[.]" Dkt. No. 432-1 at 22. Defendants state that "[b]ecause the account openings he criticizes predate the rule, an analysis that applies the post-2018 framework to pre-2018 conduct does not reflect 'a reliable application of the principles and methods to the facts of the case.'" *Id.* (quoting FED. R. EVID. 702(d)). Defendants do not cite or quote any part of DelPonti's report that it believes is inappropriate because of this; rather, they cite only his deposition testimony.

The Court does not find this to be an appropriate basis for a *Daubert* motion. Indeed, Defendants fail to identify what "customer due diligence opinions" they seek to exclude. Dkt. No. 432-1 at 22.

In his deposition, DelPonti was asked by defense counsel, "Can you tell us why your expert report does not make a distinction between prior to May 18, 2018, and after May 18, 2018, when discussing allegations about Pioneer's customer due diligence, transaction monitoring, and customer risk profiles?" Dkt. No. 432-2 at 110. DelPonti said, "I mean, the customer due diligence still applied. The May 2018, like, the basic framework didn't change. I believe they were -- the focus on this was related to beneficial owners. And in this case, there was only one owner. So a lot of this relates to the fact that when you're doing customer due diligence, that part of the process, in order to enhance it, was to ensure that you had an understanding of the ownership structure of the companies you're dealing with. And then for people that had higher percentage of ownership, they -- you would do more analysis on them." *Id.* at 110-11.

Plaintiffs correctly state in their response that Defendants do not identify what portion of Defendants report is misleading or incorrect based on the purported distinction between the pre- and post-2018 regulations. *See* Dkt. No. 450 at 16. Defendants' motion is denied on this ground.

Defendants continue to attack DelPonti's opinion insofar they argue that DelPonti's deposition testimony about Cloud Payroll's website "cannot be used to tell the jury "was the law require[s]." Dkt. No. 432-1. Defense counsel asked DelPonti during his deposition whether he was "opining that when Pioneer opened the account ending in 2440, that it was required to review the Cloud Payroll website." Dkt. No. 423-3 at 150. DelPonti responded, "I'm opining that they need to follow the BSA/AML regulation and know the customers, and this would be -- a typical practice would be to go to the website." *Id.*

DelPonti has over thirty years of experience in the banking industry. Defendants are free to question him during trial about whether reviewing a client's website is necessary or best practice before opening a new account, but this is not an issue for a *Daubert* motion.

Defendants also argue that DelPonti "reason[s] backward from Pioneer's 2020 CDD form update, which post-dated the discovery of Mann's fraud. He points to the update as evidence that Pioneer's earlier practices were deficient." Dkt. No. 432-1 at 22. Defendants contend that "reasoning from a subsequent improvement to conclude that earlier practices were inadequate—without independent evidence that the prior form failed to meet contemporaneous standards—is hindsight, not methodology." *Id.* at 22-23. Likewise, they assert that DelPonti's opinions that Defendants should have monitored transactions in the accounts should be excluded because he does not cite any regulations which require such monitoring. *See id.* at 23. Defendants contend that DelPonti "opines that Pioneer had *a duty* to scrutinize the description fields of individual Automated Clearing House [] transactions—the data fields that accompany electronic payment entries and identify their originator." *Id.* (emphasis added).

Plaintiffs state in their response that as an expert, DelPonti was permitted to rely on past events to form his opinion and that "Pioneer identifies no facts that DelPonti relies on that were only available after the credit decisions had been made." Dkt. No. 450 at 19. Plaintiffs also argue that DelPonti does not give an opinion about transaction monitoring, but instead he "catalogues the vast quantities of information readily available to Pioneer from its own records and communications with Mann that support his opinion that Pioneer had sufficient information to know that the accounts held by Cloud Payroll and MyPayroll were used for tax purposes." Dkt. No. 450 at 16.

When the Court searches for the word "duty" across the reports and exhibits attached to Defendants' motion to exclude DelPonti's opinion, the Court is taken to Kreig's opinion, not DelPonti's opinion. *See* Dkt. No. 432-6. The Court is also directed to DelPonti's deposition, during which the following exchange occurred:

> Q. Can you tell me, is it your opinion that Pioneer had a duty to scrutinize ACH transactions of the Mann accounts?
>
> A. They had a responsibility to do transaction monitoring of the information that goes through it, and it includes the ACH. So, yes.
>
> Q. Okay. And was that duty in existence prior to 2018?
>
> A. Yes.
>
> Q. Is it your opinion that Pioneer had a duty to scrutinize ACH descriptions?
>
> A. They had a duty to meet the BSA/AML rules at that time, of which they were supposed to do transaction monitoring. They had the BAM system. They had alerts that came out. And it's my opinion, though it's in the report, that the investigation related to those alerts was not consistent with expected practices.
>
> Q. Is it your opinion that Pioneer had a duty to scrutinize ACH descriptions?
>
> A. They had a duty to understand what was going through their accounts. If that duty involves going into the details of company descriptions to accomplish that goal, then they should be doing that.
>
> Q. Is it your opinion that they should have been doing that?
>
> A. It's my opinion that they should have been evaluating the information going through. They had the ACH information, so when they're doing their investigations, if you were doing it properly, you would evaluate that.
>
> Q. Is it your opinion that Pioneer had a duty to scrutinize ACH descriptions?
>
> A. In the context of doing appropriate investigations and transaction monitoring analysis, my answer, yes.

> Q. Is it your opinion that Pioneer had a duty to scrutinize ACH account detail?
>
> A. Again, in the context of doing an appropriate investigation and analysis and understanding the transactions that are going through, they had a duty.
>
> Q. Is that true before 2018?
>
> A. Yes.

Dkt. No. 432-3 at 215-16. Defense counsel asked questions related to duty and the witness answered, directly. The Court finds no grounds on which to preclude those answers.

Defendants note that "DelPonti opines that the [remote deposit] limits Pioneer set for the Mann entities were 'inappropriately high.'" Dkt. No. 432-1 at 23. They move to exclude that opinion on the ground that "he identifies no standard against which to measure what an 'appropriate' [remote deposit] limit would have been for a customer with Mr. Mann's transaction profile." *Id.* Defendants acknowledge that DelPonti discusses Federal Financial Institutions Examination Council [] and FDIC guidance recommending that banks conduct 'a risk assessment' before implementing [remote deposit] services," but argue that the guidance does not address remote deposit limits. *Id.* at 23-24.

As Plaintiffs assert in their response, this opinion of DelPonti's comes from his rebuttal to Kreig. *See* Dkt. No. 450 at 17 (citing *Henkel v. Wagner*, No. 12-CV-4098, 2016 WL 1271062, *12 (S.D.N.Y. Mar. 29, 2016) (concluding that a rebuttal expert "does not need a 'model or theory' to identify purported flaws in Mr. Hall's testimony. Rather, she needs only her expertise and the 'method' identified at the beginning of her report—namely, reviewing the documents in this case, along with Mr. Hall's report, and arriving at an opinion as to Mr. Hall's analysis of the alleged economic damages to Henkel)). Moreover, as Plaintiffs state, DelPonti, as a risk officer

of many years, is qualified to give an opinion on risk and whether he believed it was appropriate for Defendants to take certain actions based on his experience in the industry. *See* Dkt. No. 450 at 18.

The same conclusion is reached regarding Defendants' challenges to DelPonti's underwriting and lending opinions. Defendants argue DelPonti's opinion that Pioneer should have engaged in different or better analyses or considered certain information in reviewing the Mann accounts relies on inappropriate hindsight. *See* Dkt. No. 432-1 at 25. However, as Plaintiffs argue in opposition, Defendants do not explain what information was unavailable to Pioneer at the time it made its choices. *See* Dkt. No. 450 at 20.

Defendants state, "Hindsight is not itself per se disqualifying—experts may evaluate past events after the fact. What Rule 702(d) forbids is something narrower and more specific: evaluating a decision against information the decision-maker did not and could not have had, and then faulting the decision maker for not reaching the conclusion that later information compels." Dkt. No. 432-1 at 25. Defendants fault DelPonti for not looking over Pioneer's data from the perspective of "a voting member of the loan committee." *Id.*

Defendants may cross-examine DelPonti on the precise angle at which he viewed all of the known or knowable information that was or could have been available to employees at the time of their decision making. The fact that DelPonti did not place himself in the shoes of a very specific employee or set of employees does not mandate exclusion of his opinion. The Court agrees with Plaintiffs that "Pioneer's argument that DelPonti should have given more weight to the 'clean audit reports' that Mann supplied to Pioneer and less or no weight to the daily NSF activity [] is an argument for the jury[.]" Dkt. No. 450 at 20. Indeed, in DelPonti's opinion, he

noted the "limit[ed] scope of audits" performed by Pioneer as one way in which third-parties were harmed. Dkt. No. 432-4 at 102. Defendants are free to attack that opinion on cross examination.

In sum, DelPonti is not precluded from testifying about his opinions to the jury, but his testimony must be restricted in the ways set forth in this Memorandum-Decision and Order.

***2. Knowledge and State of Mind Opinions***

Both parties make similar arguments in nearly all of their motions: that the opposing party's experts cannot testify about the other party's state of mind, knowledge, or beliefs. *See* Dkt. No. 423-1 at 14 (arguing that Payne cannot testify about "why" payroll clients SWP); Dkt. No. 424-1 at 8 (seeking to exclude Sova's opinion that "it would be virtually impossible for a bank not to know" about the involvement of payroll funds); Dkt. No. 425-1 at 23 (arguing that Moravek should not be permitted to testify that Pioneer "knew or should have known" specific details about the third-party payroll funds); Dkt. No. 426-1 at 23 (moving to exclude Crowell's opinion that Pioneer knew what sort of funds Mann was putting into his accounts); Dkt. No. 428 at 11-12 (seeking to preclude Kreig from testifying that SWP and NatPay knew about Mann's wrongdoing); Dkt. No. 430-4 at 10-11 (arguing that Wiliams impermissibly opines about what Plaintiffs knew about Mann's wrongful conduct); Dkt. No. 423-1 at 26-27 (moving to preclude DelPonti from testifying about what Pioneer knew or should have known regarding Mann's accounts).

"Determining what motivated a particular person or entity is generally not an appropriate subject matter for expert testimony." *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 268 (S.D.N.Y. 2010); *see also United States v. Phillips*, No. 22-CR-138, 2023 WL 6620146, *14 (S.D.N.Y. Oct. 10, 2023) ("Both parties agree that "[o]pinions concerning state of mind are an inappropriate topic for expert opinion'") (quoting *SEC v. Am. Growth Funding II, LLC*, 2019 WL 1772509, at *1

(S.D.N.Y. Apr. 23, 2019)). Courts have permitted expert testimony "as to the content of banking industry standards and practices—and the Bank's compliance with such standards and practices" because "[t]he report and testimony . . . is probative, but not dispositive, of the Bank's state of mind." *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 537 (E.D.N.Y. 2012). But, "[e]xperts are not permitted to testify to an actor's state of mind, but an expert can testify to whether a given practice is consistent with a given state of mind." *United States Commodity Futures Trading Comm'n v. Wilson*, No. 13-CV-7884, 2016 WL 7229056, *7 (S.D.N.Y. Sept. 30, 2016) (collecting cases).

Accordingly, both sides' motions are granted to the extent that no expert will be permitted to testify to what a party or their employee(s) knew, thought, ignored, disregarded, or otherwise had in their mind at a given time.

### ***3. Cumulative Opinions and Testimony***

Defendants argue that Moravek, Crowell, and DelPonti's opinions are cumulative. *See* Dkt. No. 425-1 at 28; Dkt. No. 426-1 at 29; Dkt. No. 432-1 at 30.

Plaintiffs assert that "these experts address distinct aspects of the same subject matter, evaluated from different perspectives and backgrounds." Dkt. No. 447 at 28. Plaintiffs describe the differences as follows:

> Crowell evaluates the conduct of Pioneer's compliance and BSA functions, while DelPonti evaluates the conduct of Pioneer's lending, underwriting, and risk-management functions. Although both experts analyze the same banking relationship, they apply different professional expertise to different decisions made by different bank personnel. Also, Bryant Moravek is solely a rebuttal expert whose opinions directly rebut opinions offered by Pioneer's expert James Kreig.

*Id.* Plaintiffs argue that "[i]t would be premature to exclude Crowell's opinions as cumulative when no testimony has yet been offered." *Id.* at 29. Plaintiffs make the same arguments in their responses to Defendants' motions regarding Moravek and DelPonti. *See* Dkt. No. 448 at 21-22; Dkt. No. 450 at 25-27.

"Admissible expert testimony may still be excluded under Federal Rule of Evidence 403 if 'its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Country Mut. Ins. Co. v. Broan Nutone, LLC*, No. 8:20-CV-1356, 2023 WL 7324516, at *4 (N.D.N.Y. Nov. 7, 2023) (quoting FED. R. EVID. 403). "'The Rule 403 inquiry is particularly important in the context of expert testimony, "given the unique weight such evidence may have in a jury's deliberations."'" Id. (quoting *Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, 571 F. Supp. 3d 106, 114 (S.D.N.Y. 2021)); *see also Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005). "In weighing the probative value of evidence against possible prejudice, district courts have broad discretion." *Country Mut. Ins.*, 2023 WL 7324516, at *4 (citing *United States v. Bermudez*, 529 F.3d 158, 161 (2d Cir. 2008)).

"[S]ome overlap in testimony does not necessarily render that testimony needlessly cumulative under" Rule 403. *Quinton v. Am. Express Co.*, No. 19-CV-566, 2025 WL 1384896, *4 (E.D.N.Y. May 13, 2025), *on reconsideration in part*, 2025 WL 1994848 (E.D.N.Y. July 17, 2025) (citing *Guardino v. Alutiiq Diversified Servs., LLC*, 457 F. Supp. 3d 158, 164 (N.D.N.Y. 2020)). Nevertheless, "[t]he [C]ourt takes seriously the risk that jurors 'will resolve competing expert testimony by "counting heads" rather than evaluating the quality and credibility of the testimony.'" *Id.* (quoting *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 414 (S.D.N.Y. 2015)).

The Court appreciates Defendants' arguments in recognizing the importance of preventing cumulative evidence from being presented to the jury. However, the Court will not make any determinations about whether the purported testimony or opinions are cumulative. The Court will address the issue should it arise during trial.

## III. CONCLUSION

After carefully reviewing the record in this matter, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that the parties' motions to exclude expert opinions and testimonies (Dkt. Nos. 423, 424, 425, 426, 427, 429, 430, 431, 432) are **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 9, 2026
Albany, New York

Mae A. D'Agostino
U.S. District Judge