**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**SOUTHWESTERN PAYROLL SERVICE, INC., and GRANITE SOLUTIONS GROUPE, INC.,**

**Plaintiffs/ Counter Defendants,**

**and**

**NATIONAL PAYMENT CORPORATION,**

**Intervenor Plaintiff/ Counter Defendant,**

**vs.**

**PIONEER BANCORP, INC., and PIONEER BANK,**

**Defendants/ Counterclaimants.**

---

**1:19-CV-1349 (MAD/PJE)**

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **COOPER ERVING & SAVAGE LLP**<br>20 Corporate Woods Blvd., Suite 501<br>Albany, New York 12211<br>Attorney for Plaintiffs/Counter Defendants | **MICHAEL A. KORNSTEIN, ESQ.** |
| **JAYNE PETERS MCVICKER**<br>**BURKE ASKEW & PARKER**<br>401 S. Boston Avenue - Suite 2000<br>Tulsa, Oklahoma 74103<br>Attorney for Plaintiffs/Counter Defendants | **ANDREW JAYNE. ESQ.** |
| **GREENBERG TRAURIG, LLP**<br>54 State Street, 6th Floor<br>Albany, New York 12207<br>Attorneys for Intervenor Plaintiff<br>Counter Defendant | **CYNTHIA E. NEIDL, ESQ.**<br>**JENNIFER TOMSEN, ESQ.**<br>**KENDYL T. HANKS, ESQ.**<br>**ROLAND GARCIA, ESQ.** |

**DLA PIPER LLP (US)**
1251 Avenue of the Americas
Ste 27th Floor
New York, New York 10020
Attorneys for Defendants/
Counterclaimants

**ROBERT J. ALESSI, ESQ.**
**BEN FABENS-LASSEN, ESQ.**
**COURTNEY SALESKI, ESQ.**
**JON MICHAEL REID, ESQ.**
**M. DAVID JOSEFOVITS, ESQ.**
**STEVE M. ROSATO, ESQ.**

**HODGSON, RUSS LAW FIRM**
677 Broadway - Suite 401
Albany, New York 12207
Attorneys for Defendants/
Counterclaimants

**MICHAEL D. ZAHLER, ESQ.**

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

This case is scheduled to proceed to trial on September 28, 2026. On September 9, 2026, the Court issued a Memorandum-Decision and Order ruling on the parties' motions to exclude various experts. *See* Dkt. No. 484. As explained in that decision, this case concerns alleged fraud and civil conspiracy claims brought initially by Plaintiffs Southwestern Payroll Service, Inc. ("SWP") and Granite Solutions, and Intervenor Plaintiff National Payment Corporation ("NatPay") (collectively, "Plaintiffs" or "SWP") against Defendants Pioneer Bancorp, Inc. and Pioneer Bank (collectively, "Defendants" or "Pioneer"). Defendants have filed similar counter-claims against Plaintiffs. The Court assumes the parties' familiarity with the facts and procedures underlying this case and will not separately set such information forth in this decision. The Court will, however, discuss the facts of the case where necessary to decide the issues.

Presently before the Court are the parties' motions *in limine*. *See* Dkt. Nos. 468, 475. Plaintiffs ask the Court to exclude specific evidence, testimony, and arguments concerning the following: (1) Pioneer's setoff to support an affirmative defense; (2) a bank account's

classification as a general deposit account being controlling of Pioneer's right to setoff; (3) Pioneer's "Alter-Ego" theory; (4) Plaintiffs being illegal money transmitters; (5) Texas and Illinois consent orders; (6) discussion of whether Plaintiffs owed Pioneer a legal duty to inform it that third-party payroll tax funds were being deposited into the Pioneer accounts; and (7) a decision by the National Automated Clearing House Association ("NACHA"). *See* Dkt. No. 475.

Defendants move for relief on twelve issues: (1) preclude Plaintiffs from presenting argument that Pioneer initiated or fabricated a $3.2 million payment to pay down Mann's credit line; (2) prohibit any witness or counsel from asserting that a party's intent or expectation is relevant to how funds are used in a deposit account; (3) preclude the use of misleading or argumentative terminology; (4) exclude evidence of updated SWP service agreements; (5) exclude evidence of spreadsheets created by SWP; (6) preclude Aberash Asfaw's testimony; (7) preclude testimony about David Blessings' knowledge; (8) exclude evidence of subsequent changes to Pioneer's account opening documents; (9) preclude reference to other lawsuits or settlements; (10) prevent SWP from presenting evidence of SWP's liability to others; (11) preclude reference to specific banking laws and regulations; and (12) preclude a 2019 report from the Federal Deposit Insurance Corporation ("FDIC"). *See* Dkt. No. 468.

Both parties filed an opposition to the other, *see* Dkt. Nos. 490, 491, and Pioneer filed a two-page letter in reply, *see* Dkt. No. 495. The Court held a final pretrial conference on September 18, 2026.

For the reasons that follow, the parties' motions are granted in part, denied in part, and otherwise reserved upon until trial.

## II. DISCUSSION

### A. Legal Standard

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility of certain forecasted evidence. *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *see also Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). A court should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds. *See Baxter Diagnostics, Inc. v. Novatek Med., Inc.*, No. 94 Civ. 5220, 1998 WL 665138, *3 (S.D.N.Y. Sept. 25, 1998). Courts considering motions *in limine* may reserve decision until trial so that the motion is placed in the appropriate factual context. *See Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Group*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996). Alternatively, the court is "free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling" at trial as "the case unfolds, particularly if the actual testimony differs from what was contained in the [movant's] proffer." *Luce*, 469 U.S. at 41-42.

### B. Analysis

As an initial matter, both parties' motions *in limine* seek to preclude, exclude, and/or limit the opposing party's theory of the case or issues that the Court has already addressed on summary judgment or when ruling on the parties' *Daubert* motions. As both sides state in their responses, motions *in limine* are not the appropriate place to relitigate issues that have already been decided or raise issues that should have been addressed through dispositive motion practice. *See, e.g.*, Dkt. No. 491 at 24, 41-42; Dkt. No. 490 at 34-35, 40.[1]

---

[1] Citations to the parties' filings are to the page numbers generated by CM/ECF in the header of each page.

### *1. Evidence Regarding Propriety of Setoff and Pioneer's "Alter-Ego" Theory*

Plaintiffs argue "Pioneer must be precluded from presenting evidence or arguments in support of [its] affirmative defense at trial" that "its setoff was proper and consistent with applicable law." Dkt. No. 475-1 at 15-16. Pioneer asserts that Plaintiffs' "motion rests on the flawed premise that Pioneer's withdrawal of its good faith affirmative defense somehow removed the propriety of Pioneer's setoff from the case." Dkt. No. 490 at 12. Pioneer contends "SWP and NatPay have made many allegations about how (in their view) Pioneer wrongfully restricted the linked Mann accounts and set off the funds in those linked accounts" and "Plaintiffs bear the burden of proving those allegations . . . ." *Id.* at 13 (citations omitted).

In Plaintiffs' motion, they appear to argue only that Pioneer should not be permitted to argue that its setoff was lawful as an affirmative defense, and they do not seek to "remove[] the propriety of Pioneer's setoff from the case[,]" entirely. Dkt. No. 490 at 12. To the extent Plaintiffs are arguing that Pioneer cannot raise an affirmative defense at trial that Pioneer has formally withdrawn, it is axiomatic that Pioneer cannot try to raise it again at trial. However, it is likewise axiomatic that the lawfulness of Pioneer's setoff remains an issue that must be addressed at trial. Indeed, it is the primary issue at trial and this Court already concluded that "opinions and testimony concerning Pioneer's setoff remains relevant at trial." Dkt. No. 484 at 36. Neither party has asked the Court to reconsider that decision and Plaintiffs' motion does not seem to directly challenge that conclusion. Plaintiffs ask the Court to exclude argument that "Pioneer's Setoff Was Valid Because Pioneer Withdrew its Setoff Defense," but Plaintiffs must still prove that the setoff was unlawful. Dkt. No. 475-1 at 13. Pioneer has the right to rebut Plaintiffs' arguments, by presenting evidence and argument that the setoff was lawful. Such argument does not improperly reassert a withdrawn defense. Plaintiffs' motion on this specific ground is denied.

However, this issue is complicated by Plaintiffs assertion that, in Pioneer's response to Plaintiffs' motion for summary judgment, "Pioneer argued for the first time that it was entitled to treat all of Mann's companies as a single entity for purposes of setoff." Dkt. No. 475-1 at 25. In their response to the summary judgment motion, Defendants asserted, "Setoff under an alter-ego theory of mutuality is valid." Dkt. No. 359 at 14. Plaintiffs now contend that "Pioneer pled no theory that the various companies owned by Mann may be treated as one" and the "contrived 'alter-ego theory of mutuality' is legally baseless"; therefore, Defendants should not be allowed to present the theory to the jury. Dkt. No. 475-1 at 25. To support its position, Plaintiffs discuss New York's laws concerning corporate veil piercing and argue that Pioneer did not plead such a claim in its counter-claims. *See id.* at 25-28. Plaintiffs also aver that "[t]here is no authority for the notion that the 'alter ego' doctrine permits a bank to set off against a non-debtor's account if the bank independently concludes that the non-debtor was the alter-ego of a debtor." *Id.* at 29.

Pioneer argues (1) it did not need to plead its alter-ego theory; and (2) that its theory is permissible under the law. *See* Dkt. No. 490 at 28-33. Pioneer contends its "alter-ego" theory is not the same as a claim asking a court to pierce the corporate veil. *See id.* at 28-30. It also argues that parties can agree through contracts and a course of dealing to certain rights, which is what Pioneer and Mann did in terms of treating the Mann entities as one. *See id.* at 31-33. Therefore, the theory is plausible under the law and should be permitted to be presented to the jury. *See id.*

Pioneer cites two cases to contend it did not need to plead or otherwise give greater notice to Plaintiffs of its alter-ego defense. *See id.* at 29 (citing *In re Top Flight Stairs & Rails*, 398 B.R. 321, 325 (Bankr. N.D. Ill. 2008); *Consol. Risk Servs., Inc. v. Auto. Dealers WC Self Ins. Tr.*, 2007 WL 951565, at *5 (N.D.N.Y. Mar. 27, 2007)). Those cases are inapposite.

First, *Top Flight* is an out-of-circuit bankruptcy case wherein a trustee was seeking to recover funds that the debtor made to a defendant company. *See Top Flight*, 398 B.R. at 323. The defendant company filed an answer and "assert[ed] three affirmative defenses: equitable estoppel, joint venture, and alter ego." *Id.* The bankruptcy court explained that "the gist of each defense is the same: that [the defendant company] received the transfers[ of funds] from [the debtor] in exchange for merchandise [] shipped to [a third party, and the third party] was either a related entity or the same entity as [debtor], . . . therefore [the defendant company] did in fact give reasonably equivalent value for the transfers[]" to the debtor. *Id.* The bankruptcy court struck the "alter ego" defense, finding that it was not an affirmative defense but "simply [an allegation used to elaborate] on [the company's] reasons for denying [the trustee's] allegation of less than reasonably equivalent value." *Id.* at 325. The bankruptcy court defined an affirmative defense as "'requir[ing] a responding party to admit a complaint's allegations but then . . . assert that for some legal reason [the responding party] is nonetheless excused from liability.'" *Id.* (quoting *Reis Robotics USA, Inc. v. Concept Indus., Inc.*, 462 F. Supp. 2d 897, 904 (N.D. Ill.2006)).

Pioneer argues that it "is not seeking to pierce the corporate veil in this action, and it is not litigating as a plaintiff. Rather, Pioneer has responded to Plaintiffs' contention that it had no right to setoff the funds by explaining why its contractual right of overdraft recovery permitted it to treat Mann's linked accounts as one for setoff purposes." Dkt. No. 490 at 28. First, the Court disagrees that Pioneer "is not litigating as a plaintiff." *Id.* Pioneer has affirmative defenses and counterclaims against Plaintiffs for which Pioneer will bear the burden at trial. Pioneer argued, vehemently, during the final pretrial conference that because it has counterclaims against Plaintiffs, it should be permitted to present its case-in-chief to the jury, in the manner and order that best suits its theories of the case. To argue that it is not litigating as a plaintiff is insincere.

Second, Pioneer's "alter-ego" theory fits within the definition of an affirmative defense. The Second Circuit has defined an affirmative defense as follows: "'[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all allegations in the complaint are true.'" *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) (quoting Black's Law Dictionary 430 (7th ed. 1999)); *see also Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 7 F.4th 50, 63 (2d Cir. 2021) ("An affirmative defense is a defense that 'will defeat the plaintiff's . . . claim, even if all allegations in the complaint are true,' rather than an attack on the truth of the allegations, or a rebuttal of a necessary element of the claim").

Here, Pioneer treating the Mann entities as a single entity is not a necessary element of any of Plaintiffs' claims. Rather, it is Pioneer's defense of Plaintiffs' claim that the setoff was unlawful. Pioneer does not dispute or attack the fact that they exercised a setoff with the funds in the Mann accounts. Rather, they argue that the setoff was lawful because they contractually agreed with Mann to treat all of the Mann accounts as one. Pioneer argues that it "has responded to Plaintiffs' contention that it had no right to setoff the funds by explaining why its contractual right of overdraft recovery permitted it to treat Mann's linked accounts as one for setoff purposes." Dkt. No. 490 at 28. That is the definition of an affirmative defense.

Plaintiffs rely on, and Defendants distinguish, *Consol. Risk Servs., Inc. v. Auto. Dealers WC Self Ins. Tr.*, No. 1:06-CV-871, 2007 WL 951565, *5 (N.D.N.Y. Mar. 27, 2007). *See* Dkt. No. 475-1 at 26; Dkt. No. 490 at 29. In that case, the plaintiff moved to dismiss the defendant's breach of contract counterclaim, and the defendant argued its claim should survive because it was not clear whether one company was "a subsidiary, affiliate, or alter-ego of" another. *Consol. Risk Servs.*, 2007 WL 951565, at *4. The district court granted the motion to dismiss because the defendant "did not make even conclusory allegations of alter-ego liability

until it submitted its Memorandum of Law in opposition to the motion to dismiss" and, therefore, had "not provided fair notice of an alter-ego claim[.]" *Id.* at *5.

Pioneer argues *Consolidated Risk Services* is different because that case "involved a plaintiff or a counterclaim plaintiff seeking to have the court pierce the corporate veil and impose liability" and "[n]othing in those cases supports requiring a defendant to 'plead' a defense." Dkt. No. 490 at 29.

The Court has already concluded that Defendants' alter-ego theory is an affirmative defense; therefore, the issue becomes whether Defendants adequately pled the theory such that they can present it to a jury. "[A] defendant pleading affirmative defenses 'need[s] to support th[o]se defenses with some factual allegations to make them plausible.'" *Cengage Learning, Inc. v. Google LLC*, No. 1:24-CV-4274, 2025 WL 3022375, *2 (S.D.N.Y. Oct. 29, 2025) (quoting *GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 99 (2d Cir. 2019)). "Courts applying this relaxed standard permit defendants to plead affirmative defenses 'in a "conclusory" manner' given that they rely on 'the sort of facts that would typically be revealed during discovery.'" *Id.* (quoting *Tal Dagan MD v. Resolutions Billing & Consulting, Inc.*, No. 24-CV-632, 2024 WL 5089276, *5 (S.D.N.Y. Dec. 12, 2024)) (collecting cases).

Plaintiffs contend they "cannot be forced to meet at trial a fact-intensive theory it had no reason to anticipate." Dkt. No. 475-1 at 27. However, the Court finds that Pioneer did provide fair notice of the alter-ego claim. In its answer, Pioneer asserted that "[a]nswering Defendants have at all times acted reasonably, in good faith, and have discharged all of their responsibilities and duties in accordance with applicable law." Dkt. No. 259 at ¶ 511. Throughout the counterclaims, Pioneer asserts that "the Mann Payroll Companies intended to commingle the funds collected from their respective employer-clients in a *single* 'checking' account." *Id.* at ¶¶

665, 685 (emphasis added). Pioneer also correctly notes that one of its expert witnesses opined that treating the Mann accounts as one was appropriate, and one of its lay witnesses explained during his deposition that Pioneer made the decision to treat the accounts as one after reviewing the accounts. *See* Dkt. No. 490 at 29 (citations omitted). Plaintiffs had sufficient notice that Pioneer would argue throughout this case that the setoff was lawful because Pioneer and Mann intended the accounts to be linked.

The Court finds it prudent to reiterate that, as explained, Pioneer moved, and was granted permission to, withdraw its fourth affirmative defense of good faith, which affirmatively asserted that the setoff was lawful. *See* Dkt. Nos. 382, 393. Pioneer has argued that it chose to forego this affirmative defense to ensure that the burden remains with Plaintiffs—that Plaintiffs must prove the setoff was unlawful rather than Pioneer having to prove its legality. *See* Dkt. No. 490 at 14 (quoting Dkt. No. 484 at 35); *see also* Dkt. No. 382. Pioneer has not tried to argue that it is merely "explaining" why it treated the Mann accounts as a single account for purposes of exercising the set off which is a "defense" it was not required to "plead." Dkt. No. 490 at 28-29. However, in actuality, Defendants are presenting an affirmative defense.

Pioneer's argument in its response to Plaintiffs' motion *in limine* demonstrates this. Pioneer asserts that "Mann's Treatment of His Linked Accounts as One Account Supports Pioneer's Exercise of Its Setoff Rights." Dkt. No. 490 at 30. Pioneer explains that "Mann [] asked Pioneer to link all his accounts," "he operated the linked accounts as a single business account and routinely moved funds among them to cover ordinary operating expenses," and "even if mutuality were required—as it would be in bankruptcy—the record would support treating Mann's entities as alter egos of one another, and evidence of that record is admissible for the same reason." *Id.* at 30-31. Pioneer states that it "read the setoff rights in those agreements, against

that course of dealing, to permit it to treat the linked accounts as one and setoff the total negative overdraft balances." *Id.* at 30. That appears to meet the definition of an affirmative defense which accepts facts as true but adds new allegations to explain why those allegations are insufficient to hold a defendant liable.

All of the back-and-forth regarding the affirmative defense, Pioneer's decision to withdraw that offense at the final hour before summary judgment motions were decided, and the present arguments concerning what can be presented at trial appear to be a bit of gamesmanship on both sides. Regardless, the Court will not reconsider a prior decision of the Court which permitted Pioneer to withdraw its fourth affirmative defense. *See* Dkt. No. 393. The burden remains on Plaintiffs to prove that Pioneer's setoff was unlawful, and Plaintiffs have had enough notice throughout this litigation that Pioneer would contest that claim, in part, on the ground that Mann asked the accounts to be linked and because the accounts were general accounts, Pioneer could link them. Plaintiffs' motion *in limine* on this issue is denied.

***2. Pioneer's $3.2 Million Transfer***

Pioneer moves to prevent Plaintiffs from arguing that Pioneer "initiated or fabricated" a $3.2 million payment to pay down Mann's credit line on the ValueWise loan. *See* Dkt. No. 468-1 at 10. Pioneer argues that Plaintiffs have already admitted that it was Mann who initiated the transfer of $3.2 million between his accounts and that Plaintiffs' admissions are binding. *See id.* at 11 (citing Plaintiffs' statements of material facts filed in support of their summary judgment motions). Pioneer alternatively seeks to preclude the argument under Rule 403. *See id.* at 12.

Plaintiffs state in their response that they do "intend to offer evidence of the facts surrounding the $3.2 million payment[.]" Dkt. No. 491 at 9. Plaintiffs explain the movement of funds between Mann's accounts by Mann and Pioneer. *See id.* at 9-12. Plaintiffs then state that

they "intend to acknowledge that Mann himself initiated the online banking transfers on August 30, 2019, prior to the time that Pioneer suspended all transactions in any accounts affiliated with Mann," and they "do not intend to argue that Pioneer 'fabricated' the $3.2 million payment." *Id.* at 13.

Pioneer is correct that in Plaintiffs' statements of material facts filed in support of their motion for summary judgment, they attested that Mann "initiated" multiple transfers between his Pioneer accounts, including "a payment of $3,200,000 to the ValueWise line of credit[.]" Dkt. No. 362-1 at ¶¶ 255-57; Dkt. No. 367-1 at ¶ 257. Plaintiffs state that they do not intend to argue that Pioneer "initiated" or "fabricated" that transaction, *see* Dkt. No. 491 at 13; therefore, Pioneer's motion is denied as moot.

***3. David Blessing***

Pioneer moves to preclude any witness from testifying about what David Blessing, a Pioneer employee who managed ValueWise's business accounts, knew or understood. See Dkt. No. 468-1 at 32. Pioneer states that Blessing died in July of 2020, and numerous witnesses, lay and expert, improperly testified during their depositions about Blessing's thoughts. *See id.* Plaintiffs contend Pioneer's motion "rests on an uncontroversial premise—that no witness may read another person's private thoughts (which Plaintiffs do not contest)—but stretches that premise to bar testimony" such as a witnesses' "own conversations with Blessing, the understanding they formed from those firsthand dealings, and reasonable inferences from what Blessing said and did." Dkt. No. 491 at 30.

The Court agrees that it well settled that no witness may testify about what was in the mind of another. "Rules 602 and 701, [] require, respectively, that a lay witness testify only to matters within his or her 'personal knowledge,' . . . and offer opinion testimony based only on the

'the witness's perception[.]'" *United States v. McPartland*, 81 F.4th 101, 116 (2d Cir. 2023) (quoting FED. R. EVID. 602, 701(a)). "However, personal knowledge of a fact 'is not an absolute' to Rule 602's foundational requirement, which 'may consist of what the witness thinks he knows from personal perception.'" *United States v. Cuti*, 720 F.3d 453, 458–59 (2d Cir. 2013) (citation omitted). "[A] witness may testify to the fact of what he did not know and how, if he had known that independently established fact, it would have affected his conduct or behavior." *Id.* (citation omitted).

With these principles in mind, the Court reserves ruling on this issue. It is impermissible for any witness to testify that Blessing held a specific thought in his head at a specific moment in time. But witnesses may testify to conversations that were had with Blessing and the impressions left by those conversations. The Court will address any specific objections about Blessing or any other witness' state of mind in the context of trial.

***4. Plaintiffs' Liability to Third-Party Clients***

Pioneer argues SWP should be precluded from presenting evidence concerning SWP's liability to third-party clients. *See* Dkt. No. 468-1 at 37. Specifically, Pioneer asserts, "the Court should not permit SWP to suggest at trial that it faces liability to its employer-clients approaching anything even close to $10 million, nor should SWP be permitted to present evidence concerning its employer-clients' alleged aggregate outstanding tax liabilities." *Id.* at 38. Pioneer argues that such evidence is irrelevant and unduly prejudicial, and SWP cannot otherwise establish the full amount of damages alleged in Plaintiffs' complaint. *See id.* at 38-39.

Pioneer's own motion *in limine* recognizes why the Court will not grant this relief: "In its Memorandum-Decision and Order, Judge Scullin agreed that 'Pioneer has pointed to numerous shortcomings in [SWP's] evidence regarding [its] damages," *but permitted SWP to*

*proceed to trial* . . . ." *Id.* at 38 (quoting Dkt. 393 at 20). Judge Scullin concluded that "Plaintiffs have presented the Court with a record of damages that is sufficient to permit them to present further evidence of damages at trial." Dkt. No. 393 at 20. Pioneer has not presented any valid grounds on which to second guess that decision. Pioneer's motion *in limine* is denied.

***5. Factors Relevant to Account Classification***

Both parties raise an issue in their motions *in limine* concerning what the other side should be allowed to present to the jury related to Pioneer's setoff: SWP argues that the classification of an account as a general deposit account is not dispositive of the type of funds in such an account and Pioneer should not be permitted to argue that the classification is dispositive, *see* Dkt. No. 475-1 at 16-17; and Pioneer argues that "any argument, evidence, or testimony regarding employer Clients' intent or expectations as to how funds deposited into the [MyPayrollHR] and Cloud Accounts would be used" should be precluded, Dkt. No. 468-1 at 12.

SWP notes in their motion that, as part of Judge Scullin's decision denying the parties' motions for summary judgment, he held that "Plaintiff has presented facts from which a jury could conclude that Defendant Pioneer engaged in its own fraud and knew or should have known of Mann's fraud, that the subject accounts were intended as special use accounts, and that Defendant Pioneer knew the funds were owned by third parties . . . ." Dkt. No. 393 at 14; *see* Dkt. No. 475-1 at 16. Pioneer notes that in Judge Scullin's decision denying Pioneer's motion for reconsideration, he stated that "it is the intent of Defendant Pioneer Bank and Defendant Mann at the time that the accounts were created and funds deposited in those accounts that ultimately determines whether the accounts in question are general or special accounts." Dkt. No. 399 at 9; *see also* Dkt. No. 468-1 at 13.

Pioneer seeks not to exclude testimony about anyone's intent, but only "employer-clients' subjective expectations . . . . " Dkt. No. 468-1 at 13. Pioneer asserts that the "question turns solely on the mutual understanding between Pioneer and Mann" and "[n]o one else's intent matters." *Id.* at 12-13.

Plaintiffs' motion is denied as moot insofar as they seek to preclude Pioneer from arguing that an account's classification controls because it appears Pioneer does not intend to argue as such. Pioneer concedes that its and Mann's intentions do matter. *See* Dkt. No. 468-1 at 12-13.

Defendants' motion is reserved upon. "Typically, ownership of a bank account is governed by the contract between the bank and the customer." *United States v. Bank of Am.*, No. 06-CV-711, 2009 WL 2009022, *6 (W.D.N.Y. Feb. 20, 2009) (citing *Hartford Accident & Indemnity Co. v. American Express Co.*, 74 N.Y.2d 153, 164 (1989)). "'However, when a bank is on notice that funds in a depositor's account are owned by a third party, the bank cannot appropriate those funds in order to set them off against a debt of the depositor.'" *Id.* (quoting *Daly v. Atlantic Bank of New York*, 201 A.D.2d 128, 130 (1st. Dept. 1994)). "A bank will be considered to have such notice when it is aware of facts which would fairly provoke it to inquire as to the true ownership of the funds and such inquiry, if made with ordinary diligence, would reveal the true ownership." *Id.* (citation omitted). "Thus, New York law contemplates situations in which the ownership of funds in an account is not solely a function of the name of the account holder." *Id.*

The Second Circuit has explained that "[w]hether a deposit in a bank is general or special depends upon the mutual understanding and intention of the parties at the time such deposit is made . . . ." *Peoples Westchester Sav. Bank v. F.D.I.C.*, 961 F.2d 327, 330 (2d Cir. 1992) (quoting *Keyes v. Paducah & I.R. Co.*, 61 F.2d 611, 613 (6th Cir.1932)). "[T]he burden of proof

is on the depositor to overcome such presumption by proving that the deposit was made upon such terms and conditions as constituted a special deposit, or a deposit for a specific purpose, as distinguished from a general deposit." *Id.* (citation omitted) (emphasis added).

Therefore, it is not about only Mann's beliefs as to how the accounts would be used, but the parties, *i.e.*, SWP, Granite, and NatPay. Therefore, the Court agrees with Defendants that the beliefs or expectations of the non-party employee-clients is irrelevant to the issue of whether the accounts were special or general. However, the parties' intentions do matter. Therefore, the Court will not entirely limit argument about account classification to only what Pioneer and Mann intended for the accounts. The Court will more specifically rule on this issue as it arises during trial, but the parties should be mindful of this general ruling in making any objections.

***6. Use of Specific Phrases, Names of Parties, Account Titles, and Ownership***

Pioneer moves the Court to preclude Plaintiffs and their witnesses from (1) referring to the bank accounts as "tax accounts," "third-party funds," or any other name which would support Plaintiffs' argument that the accounts held third-party funds; and (2) using phrases such as "stealing," "looting," or "theft" to describe Pioneer's act of exercising the setoff. Dkt. No. 468-1 at 14-19. Pioneer also asks that NatPay be prevented from describing any of the funds as its "own." *Id.* at 19. Pioneer cites Federal Rules of Evidence 403, 602, 611(a), 701, and 702 to support its arguments. *See id.* at 14-19.

Plaintiffs argue in their response that "it is impossible to practically police word choice in the manner Pioneer requests, because Pioneer's own internal documents refer to the funds at issue as tax funds." Dkt. No. 491 at 15. They contend that "Pioneer's request that the Court preclude Plaintiffs from describing Pioneer's conduct as stealing, looting, and theft, is [] without merit" because attorneys should be permitted to refer to claims for what they are, Plaintiffs have alleged

conversion, and "[t]he essence of conversion is theft." *Id.* at 18. Plaintiffs argue that the Court should deny Pioneer's motion concerning how NatPay may refer to the funds because, although NatPay did not own the funds, it had superior possessory rights in them. *See id.* at 19-21.

Under Rule 611, "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to[.]" FED. R. EVID. 611(a). "Under Rule 403 of the Federal Rules of Evidence, the trial court has 'broad discretion to exclude even relevant evidence if its probative value is substantially outweighed by the danger of confusion of the issues or if it would be needlessly cumulative.'" *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1193 (2d Cir. 1989)); *see also* FED. R. EVID. 403; *United States v. Carter*, 801 F.2d 78, 83 (2d Cir. 1986); *United States v. Martinez*, 775 F.2d 31, 37 (2d Cir. 1985). "Rule 403 also provides for the exclusion of relevant evidence if 'its probative value is substantially outweighed by the danger of unfair prejudice.'" *Highland Cap.*, 551 F. Supp. 2d at 176 (quoting FED. R. EVID. 403).

"Evidence is prejudicial under Rule 403 if it 'involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *Id.* at 176-77 (quoting *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995)). "The Court will exclude such evidence if it has 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Id.* (quoting FED. R. EVID. 403, advisory committee's notes). "Because Rule 403 excludes relevant evidence, 'it is an extraordinary remedy that must be used sparingly.'" *Id.* (quoting *George v. Celotex Corp.*, 914 F.2d 26, 31 (2d Cir. 1990)). "The 'district court retains broad discretion to balance the evidence's potential prejudice . . . against its probative value.'" *Id.* (quoting *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002)).

Next, "Rule 701 requires lay opinion testimony to be based on the witness's personal perceptions." *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005) (citing FED. R. EVID. 701(a)). "The 'traditional objective' of the rule is, after all, to afford the trier of fact 'an accurate reproduction of the event' at issue." *Id.* (citations omitted). "Recognizing that eyewitnesses sometimes find it difficult to describe the appearance or relationship of persons, the atmosphere of a place, or the value of an object by reference only to objective facts, the law permits such witnesses to testify to their personal perceptions in the form of inferences or conclusory opinions." *Id.* "In short, Rule 701 represents no departure from [Rule] 602: 'A witness may not testify to a matter until evidence is introduced sufficient to support a finding that the witness had personal knowledge of the matter.'" *Id.* (quoting FED. R. EVID. 602). "Rather, Rule 701 simply recognizes lay opinion as an acceptable 'shorthand' for the 'rendition of facts that the witness personally perceived.'" *Id.* (quoting 4 Weinstein's Federal Evidence § 701.03(1)); *see also* FED. R. EVID. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion").

The Court disagrees that any and all references to the bank accounts as "tax accounts" or "third-party fund" accounts is unduly prejudicial or speculative. The attorneys and lay witnesses may refer to the bank account in the manner that they were discussed in the evidence, such as on bank records, in e-mails, etc. In support of the Court's ruling, above, about the parties' intentions regarding use of the accounts, witnesses may testify to what they believed the accounts to be and why. Additionally, in compliance with the Court's decision on the *Daubert* motions, the parties'

expert witnesses may testify about the accounts, how they were used, and how the accounts and their usage compare to industry standards. *See* Dkt. No. 484 at 25-26.

The Court also concluded in its decision on the expert motions that experts will be not be permitted to testify that specific conduct of either party constitutes fraud, negligence, aiding and abetting, or any other conclusion which rests solely in the province of the jury after applying the evidence to the law that the Court provides. *See id.* at 38-39. The same stands true of lay witnesses. However, the attorneys may argue in their opening and closing statements about their positions regarding the conduct of the other party. The Court will instruct the jury that attorney's arguments are not evidence, but attorneys are permitted to present their theory of the case to the jury, which includes, for example, whether conduct constitutes fraud or negligence.

Finally, Pioneer argues that NatPay should not be permitted to refer to any of the funds in the bank accounts as NatPay's "own" funds. Dkt. No. 468-1 at 19-20. Pioneer contends that permitting NatPay to argue or present testimony as such "would hand the jury the disputed possessory-interest premise rather than letting it decide the issue from the evidence and the Court's instructions." *Id.* at 19. The Court agrees. As noted in the Court's *Daubert* decision, "[i]t is up to the lawyers to present their arguments to the jury . . . that money in those accounts did or did not belong to Defendants." Dkt. No. 484 at 26. Witnesses are not permitted to testify that the funds ultimately belonged to a specific party or entity as that is one of the primary issues in the trial that must be decided by the jury.

In sum, this aspect of Pioneer's motion in limine is granted in part and denied in part.

***7. Money Transmitters***

Plaintiffs argue that Pioneer should be precluded from arguing that SWP or NatPay are illegal money transmitters. *See* Dkt. No. 475-1 at 30. Plaintiffs acknowledge that Pioneer has

asserted numerous affirmative defenses to Plaintiffs' claims, including the contention that Plaintiffs cannot recover against Defendants because Plaintiffs operated illegally as unlicensed money transmitters. *See id.* (citing Dkt. Nos. 259, 332). Plaintiffs argue that (1) "there is no evidence that supports allegations that either SWP or NatPay were required prior to 2019 to register with FinCEN or obtain a state money transmitter license"; (2) any argument or testimony that Plaintiffs were operating as money transmitters or were required to obtain a license as such is speculative; and (3) Defendants' arguments are irrelevant to their "unclean hands" and *in pari delicto* defenses. *Id.* at 30-36.

Pioneer responds that evidence concerning whether Plaintiffs were operating as money transmitters "goes to an element of Pioneer's counterclaim" and is, therefore, relevant. See Dkt. No. 490 at 34. Specifically, Pioneer points to its RICO counterclaims whereby it alleges that SWP and NatPay "conducted and participated in the conduct of the affairs of the Enterprise by intentionally operating as an unlicensed and otherwise illegal money transmitting businesses in violation of 18 U.S.C. § 1960." *Id.* (quoting Dkt. No. 259 at 125-19; Dkt. No. 332 at 141-43). Pioneer stated those claims in its Civil RICO statements. *See id.* at 35 (citing Dkt. Nos. 270, 338). Pioneer also notes that at the summary judgment stage, Judge Scullin denied SWP's motion on Pioneer's fraud and RICO counterclaims. *See id.*; *see also* Dkt. No. 393 at 21-22.

Pioneer is correct that 18 U.S.C. § 1961(1) defines "racketeering activity," in part as "any act which is indictable under . . . section 1960 (relating to illegal money transmitters)[.]" *See* Dkt. No. 490 at 35. Plaintiffs do not dispute this. Rather, they argue that Pioneer's allegations are irrelevant and speculative legal conclusions. *See* Dkt. No. 475-1 at 30. Plaintiffs' arguments as to relevance are meritless as this issue pertains to at least one of Pioneer's counterclaims. As to speculation, the Court cannot determine at this juncture whether any specific piece of testimony

or evidence is speculative. The Court will decide such during trial based on whether proper foundation has been laid for specific evidence or testimony. However, the Court already set some evidentiary parameters concerning money transmitters in its *Daubert* decision, *see* Dkt. No. 484 at 12-16, and the parties should review that ruling prior to trial.

Plaintiffs also argue that Pioneer's allegations and arguments are irrelevant to Pioneer's unclear hands theory. *See* Dkt. No. 475-1 at 32. "The doctrine of *in pari delicto*, a term meaning 'of equal fault,' reflects the principle that a plaintiff who has participated in wrongdoing equally with another person may not recover from that other person damages resulting from the wrongdoing." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 160 (2d Cir. 2014). The Second Circuit has explained that "the plaintiff [must be] 'be an active, voluntary participant in the unlawful activity that is the subject of the suit[.]'" *Id.* (quoting *Pinter v. Dahl*, 486 U.S. 622, 636 (1988)); *see also In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 424 n.5 (Bankr. S.D.N.Y. 2005) ("*In pari delicto* is an equitable defense analogous to unclean hands 'rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct'") (citation omitted).

First, the Court notes that Plaintiffs did not raise this issue at the summary judgment stage. *See* Dkt. Nos. 346-1, 347-1. The Court agrees that "[w]hether Plaintiffs are illegal money transmitters was a dispositive motion-to-dismiss and summary-judgment issue; it is not a motion-in-limine issue." Dkt. No. 490 at 35. Second, the Court will instruct the jury on the law regarding Pioneer's defenses. Pioneer has submitted to the Court proposed jury instructions which include discussions about money transmission. *See* Dkt. No. 479. The Court will determine later what instructions shall be given to the jury and will hear the parties' arguments on the same. The Court will not entirely preclude any arguments or evidence concerning money transmission at this stage.

***8. State Consent Orders, NACHA Decision, FDIC Report, Settlements, and Lawsuits***

Both parties argue that certain evidence should not be permitted because it is highly prejudicial, including consent orders from the states of Texas and Illinois, a NACHA decision, an FDIC report, and any settlements or lawsuits involving the parties. *See* Dkt. No. 475-1 at 36-43, 47-50; Dkt. No. 468-1 at 35-37, 42-51.

The FDIC report was prepared "only after Mann's fraud surfaced, and it found issues with Pioneer's [regulatory] compliance," Dkt. No. 468-1 at 42; NACHA found that Pioneer had not violated NACHA regulations, *see* Dkt. No. 475-1 at 47; and the consent orders required Plaintiffs to register and obtain money transmitter licenses in Texas and Illinois, *see id.* at 37. Pioneer argues that throughout discovery and motion practice, "Plaintiffs have invoked other lawsuits, investigations, and settlements involving Pioneer to create an atmosphere of suspicion and suggest that those lawsuits, investigations, or settlements show that Pioneer must have done something wrong and that Pioneer is liable to Plaintiffs in this case." Dkt. No. 468-1 at 36. Both parties argue that the evidence cannot be used to prove the other parties' fault, the FDIC report constitutes inadmissible hearsay, and the evidence is unduly prejudicial under Rule 403.

Rule 408 concerns "Compromise and Offers to Compromise" and provides as follows:

> (a) Prohibited uses. Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:
>
> > (1) furnishing or offering or promising to furnish or accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise the claim; and
> >
> > (2) conduct or statements made in compromise negotiations regarding the claim. . . .

> Permitted uses. This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a).

FED. R. EVID. 408. "The Rule 'essentially forbids a court from basing adverse findings on a party's concessions in settlement negotiations.'" *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, 739 F. Supp. 2d 125, 129 (D. Conn. 2010) (quoting *Rein v. Socialist People's Libyan Arab Jamahiriya*, 568 F.3d 345, 351 (2d Cir. 2009)). "'[T]he Rule is based on the policy of promoting the compromise and settlement of disputes,' by taking into account 'the reality that permitting the consideration of settlement offers as reflecting an admission of liability would discourage parties from discussing settlement or making settlement offers.'" *Id.* (quoting 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 408.02(1)).

The Second Circuit has stated that "[a] civil consent decree, as the settlement of a civil suit, is governed by [Rule] 408." *United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981). Also, "'[c]ourts generally exclude evidence of other lawsuits, even if the other lawsuits are related to the case before the court.'" *Sohnen v. Charter Commc'ns, Inc.*, 761 F. Supp. 3d 556, 571 (E.D.N.Y. 2025) (quoting *Moore v. Rubin*, No. 17-CV-6404, 2020 WL 13573582, *3 (E.D.N.Y. Jan. 31, 2020)). "'Such evidence is excluded because the probative value of the existence of other lawsuits typically is substantially outweighed by the danger of unfair prejudice.'" *Id.* (citation omitted); *see also Puglisi v. Town of Hempstead Sanitary District No. 2*, No. 11-CV-445, 2014 WL 12843521, *3 (E.D.N.Y. Jan. 27, 2014).

The Court finds that the same principles apply across all of the challenged evidence. The Court will not permit any of the evidence to be presented to the jury as an admission of fault or to prove liability. However, the Court will not exclude the possibility of the evidence coming in for

impeachment purposes. The Court also recognizes that there are different evidentiary concerns regarding the consent orders, which are public filings, and the FDIC report which is a non-public and non-final report. *See Coleman v. City of Niagara Falls*, No. 09CV157S, 2013 WL 12114564, at *9 (W.D.N.Y. Feb. 26, 2013) ("[T]he Consent Order is a publicly filed document from a state court proceeding, executed by various state and local government officials in their official capacity, relating to an official investigation by one public agency of another public agency. The Court finds that the Consent Order, . . . would be admissible under Rule 803(8)(iii)"). Should either be offered into evidence during trial for a limited and appropriate purpose, the Court will address additional concerns at that time. Therefore, this aspect of the parties' motions are reserved for trial.[2]

***9. A Legal Duty from Plaintiffs to Pioneer***

Plaintiffs move to preclude any argument "that SWP and NatPay had a legal duty to inform Pioneer that third-party payroll tax funds were being deposited into the payroll companies' accounts at Pioneer Bank." Dkt. No. 475-1 at 43. Plaintiffs argue that "[t]he threshold question in any negligence analysis, including a contributory-negligence defense, is whether a legal duty exists." *Id.* at 44. Plaintiffs contend the legal duty asserted by Pioneer "does not exist under New

[2] In Plaintiffs' response to Pioneer's motion, they argue that "Pioneer's damages claims opens the door" to evidence concerning other lawsuits, investigations, and settlements. Dkt. No. 491 at 38. Plaintiffs contend Pioneer's damages expert referenced "Professional Fees" as part of the damages calculation which includes investigation, white collar, and litigation fees. *Id.* Pioneer filed a letter in reply, stating that "Pioneer does not intend to present any evidence at trial—through its damages expert or otherwise—concerning professional fees it has incurred in addressing the fallout from Michael Mann's fraud and hereby withdraws any claim for damages with respect to such professional fees." Dkt. No. 495 at 1. The Court, therefore, agrees with Pioneer that this aspect of Plaintiffs' argument is moot. *See id.* Pioneer also "does not object to Plaintiffs' intended presentation of" a 2020 consent judgment that Pioneer obtained against Mann. *Id.* at 2; *see* Dkt. No. 491 at 39. As such, the Court will permit the same into evidence. That parties are encouraged to stipulate to as much as evidence as possible to effectuate a smoother and more easily understandable trial for the jury.

York Law." *Id.* at 45. They also seek exclusion of any such argument under Rules 401 and 403 because "[j]urors told that NatPay should have disclosed the nature of the funds are likely to treat that alleged omission as legally culpable, discounting NatPay's recovery on the basis of a duty that does not exist." *Id.* at 47.

Pioneer asserts it "does not intend to" "tell[] the jury that they owed a duty to Pioneer to inform Pioneer that funds moving through the Mann Entity Accounts were destined for taxing jurisdictions." Dkt. No. 490 at 47-48. However, "Pioneer does intend to tell the jury that SWP and NatPay owed a duty to themselves to act reasonably and that they breached that duty by engaging in 'culpable conduct' by not disclosing to Pioneer that they were sending millions of dollars destined for taxing jurisdictions without adequate safeguards." *Id.* at 48 (quoting N.Y. C.P.L.R. § 1411(a)).

Insofar as Pioneer does not intend to argue that Plaintiffs had a specific legal duty to inform Pioneer of the third-party funds being placed in the bank accounts, Plaintiffs' motion is denied as moot.

Pioneer's fifth affirmative defense alleges that Plaintiffs' own negligence contributed to Plaintiffs' alleged damages. *See* Dkt. No. 259 at ¶ 519; Dkt. No. 258 at ¶ 535. "[T]he doctrine of comparative negligence is a doctrine in which the amount that a *plaintiff* can recover is reduced if the *plaintiff* is found to have been negligent and his or her own negligence contributed to the injury—it is not a claim that is applicable against co-defendants." *Am. Med. Distributors v. Macdonald Tuskey*, No. 16-CV-6016, 2018 WL 1478301, *6 (S.D.N.Y. Mar. 23, 2018) (emphasis in original). At this stage, Plaintiffs have not provided sufficient justification for precluding any argument about Plaintiffs acting reasonably toward themselves. Therefore, that aspect of Plaintiffs' motion is denied.

***10. Updated SWP Agreements and Pioneer's Account Opening Documents***

Pioneer moves to (1) "preclude SWP and its witnesses from suggesting that SWP updated, revised, replaced, or otherwise modified employer-client agreements beyond the 44 updated agreements it produced in discovery" and (2) exclude any evidence that Pioneer enhanced its account opening procedures and documentation after Mann's fraud was discovered. Dkt. No. 468-1 at 20, 34-35. Pioneer argues it "had no opportunity to depose witnesses about the scope or timing of additional [SWP] agreements." *Id.* at 21.

First, Plaintiffs argue that Pioneer deposed Darin Alred about SWP's updated agreements. *See* Dkt. No. 491 at 22-23. Second, Plaintiffs contend Pioneer has not identified any evidence that was withheld from Pioneer in discovery. *See id.* at 23. The Court agrees on both fronts and will permit testimony and evidence related to the updated SWP agreements to the extent they were produced pre-trial. As stated during the final pretrial conference in reference to the use of demonstratives, the Court will not permit either party to introduce evidence at trial which has not previously been disclosed to the other side. This aspect of Defendants' motion is denied as moot.

As to Pioneer's updated account opening documents, "'[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction.'" *Kozak v. Liberty Mar. Corp.*, 729 F. Supp. 3d 277, 297 (E.D.N.Y. 2024) (quoting FED. R. EVID. 407). "'The prohibition against using evidence of subsequent remedial measures is based on the policy of not wanting to discourage people from taking steps to improve safety.'" *Id.* (quoting *D'Nelson v. Costco Wholesale Corp.*, No. 03-CV-219, 2007 WL 914311, *4 (E.D.N.Y. Mar. 23, 2007)); *see also Dusenbery v. United States*, 534 U.S. 161, 172 (2002). Rule 407 does permit evidence of subsequent remedial measures "for

another purpose, such as impeachment or—if disputed—proving ownership, control, or the feasibility of precautionary measures." FED. R. EVID. 407.

Plaintiffs contend they do not seek to introduce Pioneer's updates to prove "wrongdoing" but argue they should be permitted to seek to introduce the updates "if Pioneer affirmatively argues that the earlier forms already clearly conveyed the payroll prohibition later added expressly." Dkt. No. 491 at 35. The Court agrees. Plaintiffs will not be permitted to present evidence that Pioneer changed its procedures and documents after Mann's fraud was discovered to prove that Pioneer committed alleged wrongs. However, the Court will consider their admission during trial should Plaintiffs proffer the evidence for a permissible purpose.

***11. SWP's Client Spreadsheets***

Defendants argue that Plaintiffs should be prohibited from introducing into evidence three spreadsheets created by SWP which "identify 175 employer-clients SWP claims it lost because of Pioneer's account restrictions and the reason each supposedly gave for leaving." Dkt. No. 468-1 at 22. Defendants argue that the spreadsheets are inadmissible hearsay, improper summaries, and are more prejudicial than probative. *See id.* at 22-26.

Plaintiffs explain that the spreadsheets were created by Darin Alread. *See* Dkt. No. 491 at 25. They state that "[a]t trial, Darin Alred will testify exactly how these spreadsheets were prepared, who prepared them, when they were prepared, and why they were prepared." *Id.* Plaintiffs also note that one of their experts, David Payne, relied on the spreadsheets in coming to his damages' opinion. *See id.*

The Court addressed this issue in its Memorandum-Decision and Order concerning the *Daubert* motions. In addressing Pioneer's motion to exclude Payne's opinion and testimony, the Court noted that "SWP concluded that specific clients stopped working with SWP because of

Defendants' conduct. They listed those clients in a report, gave that report to Payne, and asked Payne to provide an opinion about the amount of money SWP lost from those clients leaving." Dkt. No. 484 at 11. The Court noted that Plaintiffs will be required to lay a proper foundation before permitting Payne to testify about the lists. *See id.* at 12. The Court holds the same, today.

"Hearsay is an out-of-court statement that is offered to prove the truth of the matter asserted in the statement." *United States v. Singh*, 726 Fed. Appx. 845, 848 (2d Cir. 2018) (summary order) (citing FED. R. EVID. 801(c)). "Hearsay and hearsay-within-hearsay are inadmissible unless the statement fits within a hearsay exception." *Id.* (citing FED. R. EVID. 802, 805). "An out-of-court statement is not hearsay and is therefore admissible 'if it is offered to prove relevant facts other than the truth of what was asserted in the statement.'" Id. (quoting *United States v. Johnson*, 529 F.3d 493, 500 (2d Cir. 2008)). "Out-of-court statements not offered for their truth must satisfy Federal Rules of Evidence 401 and 403." *Id.* (citing *United States v. Paulino*, 445 F.3d 211, 217 (2d Cir. 2006)); *see also United States v. Cummings*, 858 F.3d 763, 773 (2d Cir. 2017).

"[T]here are a long list of exceptions to the so-called 'rule against hearsay.'" *United States, v. Watts*, No. 1:25-CR-411, 2026 WL 2665706, *3 (N.D.N.Y. Sept. 10, 2026) (quoting FED. R. EVID. 803). "[T]he Federal Rules of Evidence contain a 'business records exception.'" Id. (quoting FED. R. EVID. 803(6)). The exception permits the admission into evidence of a "record of an act, event, condition, opinion, or diagnosis" if:

> (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge;
>
> (B) the record was kept in the course of regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rules 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness.

FED. R. EVID. 803(6).

"The purpose of the rule is to ensure that documents were not created for personal purpose[s] . . . or in anticipation of any litigation so that the creator of the document 'had no motive to falsify the record in question." *Watts*, 2026 WL 2665706, at *3 (quoting *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010)); *see also United States v. Freidin*, 849 F.2d 716, 719 (2d Cir. 1988); *United States v. Ary*, 518 F.3d 775, 786 (10th Cir. 2008).

At this time, the Court has not been presented with any explanation as to how Alred learned why a client left SWP and how those conversations are admissible. Plaintiffs will be required to proffer hearsay exceptions before the spreadsheets can be admitted into evidence.

As to Pioneer's argument that the spreadsheets are not appropriate summary charts, "[s]ummary charts are [] to be admitted 'as evidence.'" *United States v. Guan*, No. 24-CR-0322, 2026 WL 1948543, *2 (S.D.N.Y. July 6, 2026) (quoting FED. R. EVID. 1006(a). The Advisory Committee Notes state as follows:

> Rule 1006 has been amended to correct misperceptions about the operation of the rule by some courts. Some courts have mistakenly held that a Rule 1006 summary is "not evidence" and that it must be accompanied by limiting instructions cautioning against its substantive use. But the purpose of Rule 1006 is to permit alternative proof of the content of writings, recordings, or photographs too voluminous to be conveniently examined in court.
>
> To serve their intended purpose, therefore, Rule 1006 summaries must be admitted as substantive evidence and the rule has been

> amended to clarify that a party may offer a Rule 1006 summary "as evidence." The court may not instruct the jury that a summary admitted under this rule is not to be considered as evidence.

FED. R. EVID. 1006 Advisory Committee Notes on 2024 Amendment.

"Because summary charts governed by Rule 1006 must [] be admitted as evidence without a limiting instruction, a trial court's responsibility to ensure that summary charts 'fairly represent and summarize the evidence upon which they are based' is of even greater importance." *Guan*, 2026 WL 1948543, at *2 (quoting *United States v. Citron*, 783 F.2d 307, 316 (2d Cir. 1986)). "'Unless this requirement is met, the chart is more likely to confuse or mislead the jury than it is to assist it.'" *Id.* (citations omitted). "This requirement is additionally critical as summary charts may now be admitted under Rule 1006 even when the underlying material has not been introduced as evidence." *Id.* (citing FED. R. EVID. 1006(a)).

The Court recognizes Pioneer's evidentiary concerns about the spreadsheets. At this time, the Court lacks sufficient information about them to make a ruling; therefore, the Court will determine the admissibility of the spreadsheets based on the foundation or lack thereof presented by Plaintiffs during trial.

***12. Aberash Asfaw***

Pioneer moves to exclude the testimony of Aberash Asfaw, altogether. *See* Dkt. No. 468-1 at 26-32. Asfaw is the president of Cachet Financial Services ("Cachet") and, at the time of her deposition on April 21, 2023, Cachet was in litigation with Pioneer. Pioneer argues that her deposition testimony should not be presented to the jury because it violated Federal Rule of Civil Procedure 30(c)(2) and Federal Rule of Evidence 804(b)(1).

Plaintiffs explain in their response that Asfaw is not represented by Plaintiffs' counsel, who "did not instruct her not to answer, and did not participate in the challenged conduct. Ms.

Asfaw was represented by separate counsel, Franklin J. Contreras, Jr., who gave the challenged instructions." Dkt. No. 491 at 26. Plaintiffs also note that Magistrate Judge Christian F. Hummel expressly authorized Asfaw's deposition because "[P]laintiffs [] demonstrated that Ms. Asfaw's testimony is relevant and is neither duplicative or cumulative." Dkt. No. 214 at 11. Plaintiffs assert that to the extent Pioneer took issue with how Asfaw's deposition was proceedings, Federal Rule of Civil Procedure "30(d)(3) permitted Pioneer to suspend the deposition and seek immediate judicial relief, and [Rule] 37(a)(3)(B)(i) authorized a motion to compel." Dkt. No. 491 at 27. Plaintiffs explain that "Pioneer never moved to compel, sought sanctions, requested a continuation, or asked the Court to obtain the allegedly withheld answers." *Id.* "The deposition occurred on April 21, 2023; discovery remained open for approximately another year; Plaintiffs later submitted the deposition with summary-judgment materials . . .; and Pioneer never argued that the deposition was unusable or inadmissible." *Id.* Finally, Plaintiffs argue that Pioneer's Rule 804(b)(1) argument fails because Pioneer had a full and fair opportunity to cross-examine Asfaw during her deposition. *See id.* at 28-29.

Having reviewed Asfaw's deposition testimony, the Court agrees that she was represented by independent counsel and Pioneer did not contact the Court or file a motion seeking to challenge the deposition during discovery.

As to whether Pioneer had a full and fair opportunity to depose Asfaw, Pioneer cites *United States v. Carneglia*, 256 F.R.D. 366, 372 (E.D.N.Y. 2009) and *United States v. Amato*, 306 Fed. Appx. 630, 632 (2d Cir. 2009) (summary order). Neither case concerns the issue presented but instead stand for the general proposition that a party must have a full and fair opportunity to depose an individual under Rule 804(b)(1). *See* Dkt. No. 468-1 at 31. Pioneer has not presented any cases wherein a court has concluded that a witness' deposition testimony should be excluded

where they were instructed not to answer certain questions, but the opposing party never made a motion to compel or otherwise challenged the deposition testimony prior to trial. Having found no legal authority requiring such a conclusion, the Court will not entirely preclude Asfaw's testimony.

***13. Reference to Various Banking Laws and Regulations***

Pioneer asserts that "[t]his case involves private tort and other causes of action asserted against Pioneer; none of these claims allege violations of banking laws or regulations." Dkt. No. 468-1 at 40. Pioneer argues that compliance with federal banks laws and regulations "are immaterial to the jury's consideration of the state-law and federal RICO claims at issue here." *Id.* Therefore, Defendants seek exclusion of this evidence as irrelevant and unduly prejudicial. *See id.* at 40-42.

Plaintiffs contend "Pioneer attacks a theory Plaintiffs do not advance. Plaintiffs do not contend that the [Bank Secrecy Act] creates a private right of action, imposes an independent tort duty, or establishes liability merely because a bank allegedly failed to comply with a regulation." Dkt. No. 491 at 43. "Rather, Plaintiffs offer [the Bank Secrecy Act], [anti-money laundering regulations], and [know your customer regulations] as relevant evidence of banking-industry standards, account-monitoring practices, notice, inquiry, and the reasonableness of Pioneer's conduct." *Id.*

"Relevance under the [Federal Rules of Evidnece is a low threshold, easily satisfied. 'Evidence is relevant if: (a) it has *any* tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.'" *United States v. Gramins*, 939 F.3d 429, 450 (2d Cir. 2019) (quoting FED. R. EVID. 401). "'To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it

beyond a reasonable doubt.'" *Id.* (quoting *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010)); *see also United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (explaining that Rule 401 prescribes a "very low standard"). As explained, Rule 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice, confusing the issues, [or] misleading the jury." FED. R. EVID. 403; *see United States v. Garnes*, 102 F.4th 628, 635 (2d Cir. 2024).

Defendants discuss cases which support the proposition that the Bank Secrecy Act does not create an independent private right of action. *See* Dkt. No. 468-1 at 41 (citing *In re Agape Litig.*, 681 F. Supp. 2d 352, 360-61 (E.D.N.Y. 2010); *Targoff v. Wells Fargo Bank, N.A.*, 67 Misc. 3d 504, 510 (N.Y. Sup. Ct. 2020)). Plaintiffs expressly "do not dispute this proposition." Dkt. No. 491 at 44.

Rather, Plaintiffs contend that any violations of the Bank Secrecy Act and other specific regulations demonstrate Pioneer's lack of reasonable care in overseeing Mann's accounts. *See id.* (citing *Marchak v. JPMorgan Chase & Co.*, No. 15-CV-4297, 2016 WL 3911926, *3 (E.D.N.Y. July 15, 2016)). Judge Scullin has already noted in his decision permitting Plaintiffs leave to add negligence claims to their complaint, that "at least one court in this Circuit has concluded that, under New York law, a violation of the Bank Secrecy Act or other banking regulations or statutes could constitute evidence of simple negligence . . . ." Dkt. No. 230 at 17 (citing *Marchak*, 2016 WL 3911926, at *3). This Court also concluded in ruling on the *Daubert* motions that certain expert witnesses will be permitted to testify about regulatory compliance and industry standards. *See* Dkt. No. 484 at 28-29.

Plaintiffs will not be permitted to argue or present evidence of independent regulatory violations and assert that such violations equate to fault on a specific legal claim. However,

certain expert witnesses will be permitted to testify about regulatory compliance, and lay witnesses may testify about their understanding of the applicable regulations and how, if at all, that knowledge affected their decision making. This aspect of Pioneer's motion is denied to the extent outlined herein.

**C. Trial Decorum**

As counsel know, at the final pretrial conference, the Court indicated that it intends to give appropriate time to both sides to present their respective case to the jury. This should not be construed to mean that the Court will allow relentless cumulative testimony. Having reviewed multiple deposition transcripts, counsel are also forewarned that objections during trial must be sound and based on a specific rule of evidence. The jury should not be subjected to continuous interruptions because of unnecessary or baseless objections.

This case has been pending since October 31, 2019. The time has come for a full and fair presentation of the case to be made to the jury; not the Court. The Court will, of course, not abrogate its duty to decide issues of law. However, this is not a bench trial, and the Court will not entertain daily issues of law being raised which have already been decided or which should have been raised during dispositive motion practice.

Finally, counsel are reminded that civility in the courtroom, and in communications with opposing counsel and the Court, is expected at all times. The legal profession's very existence is dependent on civility. All attorneys shall set and maintain a very high bar for civility.

## III. CONCLUSION

After carefully reviewing the record in this matter, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that the parties' motions *in limine* (Dkt. Nos. 468, 475) are **GRANTED in part, DENIED in part, and RESERVED in part**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 22, 2026
Albany, New York

Mae A. D'Agostino
U.S. District Judge